# EXHIBIT 5

Ⓐ Neutral

As of: November 1, 2024 9:13 PM Z

# *Lateral Recovery LLC v. Funderz.net, LLC*

United States District Court for the Southern District of New York

September 27, 2024, Decided; September 27, 2024, Filed

22-cv-2170 (LJL)

**Reporter**

2024 U.S. Dist. LEXIS 176985 *

LATERAL RECOVERY LLC, BENCHMARK BUILDERS, INC., FTE NETWORKS, INC., JUS-COM LLC, and FOCUS WIRELESS, LLC, Plaintiffs, -v- FUNDERZ.NET, LLC d/b/a HOP CAPITAL and d/b/a BUSINESS MERCHANT FUNDING, JOSEPH YITZCHAKOV a/k/a JOSEPH ISAACOV, GAVRIEL YITZCHAKOV a/k/a GABE ISAACOV, and JOHN AND JANE DOE INVESTORS, Defendants.

## Core Terms

Merchant, receivables, debits, reconciliation, enterprise, collection, lender, summary judgment, Funding, entities, credit agreement, Remittance, loans, champerty, default, parties, purchase price, bank account, Foreclosure, double, material fact, Receipts, records, pattern of racketeering activity, champertous, conspiracy, repayment, transactions, undisputed, borrower

**Counsel:** **[*1]** For Lateral Recovery LLC, Benchmark Builders, Inc., FTE Networks, Inc., Jus-Com LLC, Focus Wireless, LLC, Plaintiffs: Alex David Corey, White and Williams LLP, Philadelphia, PA; Shane R. Heskin, White & Williams, LLP(Philadelphia), Philadelphia, PA.

For Joseph Yitzchakov, also known as, Joseph Isaacov, Defendant: Mark W Stout, LEAD ATTORNEY, Padfield & Stout, LLP, Fort Worth, TX.

For Funderz.net, LLC d/b/a Hop Capital and d/b/a Business Merchant Funding, Joseph Yitzchakov a.k.a. Joseph Isaacov, Defendants: Hilda Piloto, LEAD ATTORNEY, Saul Ewing Arnstein & Lehr LLP (Miami), Miami, FL; Jennifer L. Beidel, LEAD ATTORNEY, New York, NY; Steven M. Dickstein, LEAD ATTORNEY, Saul Ewing LLP, Miami, FL; Steven William Wells, LEAD ATTORNEY, Lancaster, NY; Howard Foster, Foster PC, Chicago, IL; Ryan Michael Jerome, Stephanie L Denker, Saul Ewing LLP, New York, NY.

**Judges:** LEWIS J. LIMAN, United States District Judge.

**Opinion by:** LEWIS J. LIMAN

## Opinion

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

This matter comes before the Court on opposing motions for summary judgment. Plaintiffs Lateral Recovery, LLC ("Lateral," or when distinguished from other Lateral entities, "Lateral Recovery"), Benchmark Builders, Inc. **[*2]** ("Benchmark"), FTE Networks, Inc. ("FTE"), Jus-Com LLC ("Jus-Com"), and Focus Wireless, LLC ("Focus Wireless," and collectively with Lateral, Benchmark, FTE and Jus-Com, "Plaintiffs"), move for partial summary judgment pursuant to *Federal Rule of Civil Procedure 56(a)* on their first cause of action against Defendant Joseph

Yitzchakov a/k/a/ Joseph Isaacov or Joseph Isaacoff ("Isaacoff,"[1] or "Defendant"), for collection of unlawful debt in violation of the _Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962_. Dkt. No. 145. Defendants Funderz.net, LLC d/b/a HOP Capital and d/b/a/ Business Merchant Funding ("Funderz," and with Isaacoff, "Defendants") and Isaacoff move for summary judgment on all claims against them and dismissal of the lawsuit. Dkt. No. 150.

For the following reasons, Plaintiffs' motion for summary judgment is granted in part and denied in part, and Defendants' cross-motion for summary judgment is also granted in part and denied in part.

## BACKGROUND

Facts are taken from the parties' joint statement of material facts under _Local Rule 56.1_. Dkt. No. 146 ("JSMF"), Plaintiffs' _Rule 56.1_ statement of material facts, Dkt. No. 145 ("PSMF"), Defendants' _Rule 56.1_ statement of material facts, Dkt. No. 153 ("DSMF"), and Defendants' counterstatement to Plaintiff's _Rule 56.1_ statement, Dkt. No. 160. The facts are **[*3]** undisputed except where otherwise indicated.

### I. Funderz

Funderz is a New York limited liability company organized in March 2015. JSMF ¶ 1. The articles of organization are signed by "Joseph Isaacoff, Organizer." Dkt. No. 147-32 at 1. Isaacoff is the sole owner and member of Funderz and has full decision-making authority. JSMF ¶ 15; "DSMF" ¶ 11. Bank account applications for Funderz for the years 2016 and 2018 list Isaacoff's ownership percentage as "99%" and "100%." JSMF ¶¶ 4, 10. The applications list Isaacoff as the only member/manager of Funderz.[2] Dkt. No. 147-25 at 14-15, 39-40. They state that Funderz had 15 employees. JSMF ¶¶ 8, 13. However, Isaacoff states in his declaration that Funderz had no employees, only independent contracts who acted as agents or brokers. Dkt. No. 151 ("Isaacoff Decl.") ¶ 13. Between 2016 and 2019 and possibly at other times, Isaacoff's brother Gabriel Isaacoff ("Gabe") was one of these agents. Dkt. No. 157 ¶ 16.

Funderz has 18 registered d/b/a names on file with the New York State Division of Corporations, including Empire Funding, HOP Capital, and Panthers Capital. JSMF ¶ 2. The parties also agree that Funderz has done business as Business Merchant Funding **[*4]** or BMF. _See id._ ¶¶ 2, 51.[3] Several of Funderz's d/b/a names are the same or similar to independent LLC's incorporated in New York between 2017 and 2019. DSMF at 88 ¶¶ 1-5. Isaacoff's brother Ben Isaacoff a/k/a Benjamin Yitzchakov ("Ben") has submitted affidavits stating he is a representative of Panthers Capital, and his LinkedIn Profile listed him as CEO of Panthers Capital. Dkt. No. 147-68; Dkt. No. 44-7. Plaintiffs state that Ben therefore worked for Funderz d/b/a Panthers Capital, PSMF ¶¶ 54-57, but Defendants state that Ben in fact worked for the separately incorporated entity Panthers Capital LLC. Dkt. No. 160 ¶ 47; _see id._ at 88 ¶ 3.

---

[1] The Court uses "Isaacoff" rather than other versions of Defendant's name because Defendant uses the name "Isaacoff" on his sworn declaration in this litigation. Dkt. No. 151 ("Isaacoff Decl."). Isaacoff's brothers are referred to by their first names to distinguish them from Defendant.

[2] Defendants do not concede that Isaacoff was listed as the "only" member, stating that he was identified as "a member." Dkt. No. 160 ¶¶ 95, 99. However, the documents emphasize that "ALL OF THE MEMBERS/MANAGERS" of the LLC must sign. Dkt. No. 147-25 at 15, 40. Therefore, the fact that only Isaacoff signed the documents amounts to a statement that he was the only member of the LLC. In addition, Isaacoff stated in his declaration that he "was the sole member and owner of Funderz." Dkt. No. 151 ¶ 7.

[3] The Division of Corporations list only establishes that Funderz registered a d/b/a of "Merchant Funding." Dkt. No. 44-5. However, the parties' joint statement lists this entry as "[Business] Merchant Funding," and states that "Funderz d/b/a BMF" entered into the relevant agreements. JSMF ¶¶ 2, 51, 74, 92; _see_ Dkt. No. 157 ¶ 13. Therefore, although "Business Merchant Funding" or "BMF" is not one of Funderz's official registered aliases, it is undisputed that Funderz did business under this name.

The parties refer to Funderz as being generally in the Merchant Cash Advance ("MCA") business. DSMF ¶ 7; PSMF ¶¶ 19, 30, 38. The precise nature of Funderz's business is a hotly contested issue in this litigation. Defendants state, based on Isaacoff's declaration, that Funderz "was in the business of advancing capital to small and mid-sized businesses." DSMF ¶ 7. As described by Isaacoff, Funderz would purchase "all or a portion of a merchant's future accounts receivables," and then "withdraw funds from the merchant's bank account until the purchase **[\*5]** amount was repaid." Isaacoff Decl. ¶¶ 17-19. He states moreover that such a transaction "was not a loan nor was it intended to be construed as a loan." *Id.* ¶ 20.

Plaintiffs, by contrast, state that the nature of Funderz's business was to provide loans. PSMF ¶¶ 1-29. Plaintiffs refer to websites for "Empire Funding," "Hop Capital," "Panthers Capital," and other apparent aliases of Funderz. PSMF ¶¶ 4-5, 16-18, 23-26. These websites state that the companies provide "loans," or "lending." *Id.* Defendants note that at least some of these websites may be for similarly-named but separate LLCs, and that some of the websites also state that the companies provide "cash advance" or "merchant cash advance" products. Dkt. No. 160 ¶¶ 4-5, 16-18, 23-26. Bank account applications state that Funderz's business was to "provide small business loans" and "provide small business advance[s]." JSMF ¶¶ 5, 11. Isaacoff referred to Funderz as a "lender" or offering "loans" at certain places in his testimony. PSMF ¶¶ 27, 29. Isaacoff has also signed court affidavits stating that Funderz purchased receivables.[4] PSMF ¶¶ 8, 31. In one of the cases where Isaacoff signed an affidavit, in 2017, the creditor claimed that **[\*6]** its agreement with Funderz was a usurious loan. Dkt. No. 147-78.

## II. FTE

FTE Networks, Inc. ("FTE") was a technology and telecommunications infrastructure company headquartered in Florida. JSMF ¶¶ 31-33. From December 2017 to December 2019, its stock was traded on the New York Stock Exchange. *Id.* ¶ 34. At all relevant times, FTE was affiliated with plaintiffs Benchmark, Jus-Com, and FocusWireless. *Id.* ¶ 25. FTE acquired Benchmark in April 2017. DSMF ¶ 1.

During the time of FTE's transactions with Funderz, David Scott Letham ("Letham") was FTE's CFO and Michael Palleschi ("Palleschi") was FTE's CEO and Chairman of the Board of Directors. JSMF ¶¶ 26-27. Both Lethem and Palleschi were indicted on criminal charges in 2021 related to defrauding investors, misappropriating company funds, and concealing an issuance of convertible notes. JSMF ¶ 37. Lethem and Palleschi pled guilty to these charges. *Id.* ¶ 38. Palleschi admitted as part of his guilty plea that while CEO of FTE from 2016 to 2019, he worked with others to misrepresent FTE's financial condition. *Id.* ¶ 39. At the time of FTE's transactions with Funderz, Lethem knew that FTE was not authorized to enter into merchant cash advance **[\*7]** agreements. *Id.* ¶ 35.

## III. The Relevant Agreements

Funderz and FTE entered into six contracts between October 12 and November 8, 2018, labeled "Secured Merchant Agreements" ("SMAs"). Dkt. Nos. 147-1 ("First BMF Agreement"), 147-2 ("First HOP Agreement"), 147-3 ("Second BMF Agreement"), 147-4, 147-5, 147-6 ("Second HOP Agreement"), 147-7, 147-8, 147-9 ("Third BMF Agreement"), 147-10, 147-11 ("Third HOP Agreement"), 147-12.

Gabe brokered the contracts for Funderz. JSMF ¶ 48. Funderz's agreements were underwritten based on the merchant's creditworthiness, not the creditworthiness of any account debtor. *Id.* ¶ 42. Underwriting for the agreements included reviewing FTE's bank statements, voided checks, driver's licenses, application, some tax returns, and credit reports. *Id.* ¶ 43. During the period of October 1-15, 2018—immediately before the agreements—FTE's Bank of America account statement reflects payments to entities including Queen Funding, Green Capital, Capital Merchant Services, Argus Capital, and Franklin Funding. *Id.* ¶ 44; Dkt. No. 146-16.

---

[4] Defendants assert that Isaacoff signed one of the affidavits for Empire Funding, which is "not a party to this action." Dkt. No. 160 ¶ 6-8. However, Defendants concede that Funderz "used Empire Funding as an assumed name." *Id.* ¶ 4. Empire Funding is a party to this action, because Empire Funding is Funderz.

Payments to these entities are listed as "Preauthorized ACH Debit" and often recur in the same or similar amounts. Dkt. No. 146-16.[5] Isaacoff testified **[\*8]** that Funderz reviewed this bank account statement as part of its underwriting. Isaacoff Decl. ¶ 33(c); *see* Dkt. No. 151-3. Isaacoff also stated that Funderz reviewed five other financial documents, Isaacoff Decl. ¶ 33, and provided as evidence an FTE bank account summary from August 2018, Dkt. No. 151-1, an FTE bank account summary from September 2018, Dkt. No. 151-2, a Benchmark transaction record from September 2018, Dkt. No. 151-4, an FTE bank account summary from September 2018, Dkt. No. 151-5, and a Jus-Com account summary from September 2018, Dkt. No. 151-6. Palleschi asserted his *Fifth Amendment* rights when asked whether he knew "if FTE accurately represented its receivables" to Funderz. JSMF ¶ 41. On October 15, 2018, an FTE employee sent Gabe a list of FTE's "Daily Note Payments," and Gabe responded by asking about the balances. JSMF ¶ 146; Dkt. No. 146-17. The employee responded that there was a balance of $185,000 on the Capital Merchant Services note, $117,500 on the Influx Capital note, and $117,500 on the Franklin Funding note. JSMF ¶ 146; Dkt. No. 146-17.

Each agreement was signed by Letham and Palleschi as "owners" of FTE and as guarantors. JSMF ¶¶ 52, 63, 75, 85, 92, 110.[6] FTE's **[\*9]** assistant controller became aware of the first two agreements on or about October 16, 2018, shortly after they were signed. *Id.* ¶ 73. He stated that he when he saw a deposit into the FTE account, he would "most likely" ask the controller of FTE for documentation to support it. *Id.* ¶ 72. At the time of the agreements, FTE believed the agreements were legal. *Id.* ¶ 50; Dkt. No. 146-10 at 160:4-13.

The first agreement was signed on October 12, 2018, between FTE and Funderz under its assumed name Business Merchant Funding or BMF. JSMF ¶ 51. The agreement, like all subsequent agreements, provided generally that Funderz would purchase 10% of FTE's future receivables for a specified "Purchase Price," and that over time FTE would pay a specified "Receipts Purchased Amount." *Id.* ¶¶ 51, 62, 74, 84, 92, 109. For the First BMF Agreement, the Purchase Price was $500,000 and the Receipts Purchased Amount to be repaid was $728,500. First BMF Agreement at 3. The contract states that:

> Merchant hereby sells, assigns, and transfers to BMF[7] (making BMF the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights, and other **[\*10]** obligations arising from or relating to the payment of monies from Merchant's customers and/or other third party payors (the "Receipts" defined as all payments made by cash, check, credit or debit card, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business) for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by Merchant to BMF.

First BMF Agreement at 3.

The agreement contains an explicit provision stating that the parties "agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan." *Id.* at 4. Further, it is explicitly agreed that the Purchase Price is in exchange for the Receipts and "equals the fair market value of the Receipts." *Id.* The same provision states that payments are "conditioned upon Merchant's sale of products . . . and the payment therefore by Merchant's customers" and shall not be "deemed as interest." *Id.* at 4.[8] Only FTE is listed as "the Merchant," *id.* at 3, but the agreement **[\*11]** lists

---

[5] For example, there is a debit of $8,999 to Capital Merchant Services on each day that transactions are listed (there are no transactions listed on October 6-8 or 13-14). Dkt. No. 146-16. There is a debit of $8,999 to Green Capital on each day that transactions are listed. *Id.*

[6] Palleschi states that certain of the signatures were not his. JSMF ¶ 76, 111. The parties do not suggest that the accuracy of the signatures is material to any issue discussed here.

[7] The original agreements use "BMF" or "HC," abbreviations for Business Merchant Funding and Hop Capital. The agreements do not mention Funderz or state that the names on the agreement are aliases, although they provide that "Merchant hereby acknowledges and agrees that BMF [or HC] may be using 'doing business as' or 'd/b/a' names." *E.g.* Second HOP Agreement § 1.14.

Benchmark Builders, Inc., FTE Holdings LLC, Jus-Com, Inc. and Focus Venture Partner Inc. as "additional parties in whose assets seller has granted buyer a blanket security interest," *id.* at 13.

The agreement states that the Purchased Amount will be paid "by Merchant's irrevocably authorizing only one depositing account acceptable to BMF . . . to remit the percentage specified below . . . of the Merchant's settlement amounts due from each transaction, until such time as BMF receives payment in full of the Purchased Amount." First BMF Agreement at 3. FTE is required under the agreement to authorize BMF to ACH debit these remittances directly from FTE's account on a daily basis. *Id.* The daily remittance for this agreement is stated to be $14,999 per day, and payment records reflect that that amount was actually debited on a daily basis. JSMF ¶ 55; Dkt. No. 146-22.[9] Funderz characterizes this amount as a "good faith estimate" of 10% of FTE's receivables. DSMF ¶ 40; JSMF ¶¶ 94, 96. Plaintiffs contest this characterization. Dkt. No. 157 at ¶ 40. The agreement states that FTE "is responsible for ensuring that the specified percentage to be debited by BMF remains in the account and **[\*12]** will be held responsible for any fees incurred by BMF resulting from a rejected ACH attempt." First BMF Agreement at 3.

The First BMF Agreement contains a reconciliation provision stating that:
> [U]pon the Merchant's request and receipt of the Merchant's monthly bank statements, BMF shall on or about the eighteenth day of each month reconcile the Merchant's account by either crediting or debiting the difference between the amount debited and the Specified Percentage, from or back to the Merchant's bank account so that the amount debited each month equals the Specified Percentage.

*Id.* However, an addendum to the agreement provides that:

> At the Merchant's option, within five (5) business following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby Business Merchant Funding may ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage. However, in order to effectuate this reconciliation, upon submitting the request for reconciliation to Business Merchant Funding . . . the Merchant must produce any and all evidence and documentation requested by Business Merchant Funding **[\*13]** in its sole and absolute discretion, necessary to identify the appropriate amount of the Specified Percentage. . . .
> The Merchant specifically acknowledges that: (i) the Daily Payment and the potential reconciliation discussed above are being provided to the Merchant as a courtesy, and that Business Merchant Funding is under no obligation to provide the same.

*Id.* at 10. The addendum states that in case of any conflict between the addendum and the main agreement, "the terms of this Addendum shall govern and be controlling." *Id.* The addendum is signed by Lethem and Palleschi. *Id.*

The agreement states that it would have a term of one year, but be automatically renewed for successive one year terms. *Id.* at 4. FTE could terminate the agreement only by satisfying its obligations to BMF. *Id.*

---

[8] The provision further states that: "In the event that a court nonetheless determines that HC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and HC shall promptly refund to Merchant any interest received by HC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that HC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding." First BMF Agreement at 4. Under New York law, however, a clause "purporting to reduce the rate of interest to a non-usurious rate if the rate originally imposed was found to be usurious" cannot save a loan from being usurious. *Fred Schutzman Co. v. Park Slope Advanced Med., PLLC, 128 A.D.3d 1007, 9 N.Y.S.3d 682, 682 (2d Dep't 2015)*; *see Simsbury Fund, Inc. v. New St. Louis Assocs., 204 A.D.2d 182, 611 N.Y.S.2d 557, 558 (1st Dep't 1994)*.

[9] This number is not visible on the face of the agreement, but is listed on a separate printout from Funderz's internal database, which the parties agree "memorialize[s]" "various terms of the agreements." JSMF ¶ 54; Dkt. No. 146-21.

As part of the agreement, FTE warranted that the bank statements it provided fairly represented its financial condition, that it was in compliance with all laws, that it did not contemplate bankruptcy, and that the Receipts were not encumbered. *Id.* Violation of any of the terms of the agreement, including breach of warranty, constitutes an "Event of Default" under the agreement. *Id.* at 5. Appendix A to the **[\*14]** agreement, which lists applicable fees, states that a non-sufficient funds fee will be charged "[u]p to TWO TIMES ONLY before a default is declared." *Id.* at 9. Isaacoff testified that missing a payment or lowering payment would be a default, though he also testified that Funderz would work with the client "to make sure they're satisfied." JSMF ¶¶ 129-130. Other Events of Default include FTE admitting an inability to pay its debts, filing for bankruptcy, dissolution of the business, use of multiple depository accounts or change of depository account without consent, and default under the terms and conditions of any other agreement with BMF. First BMF Agreement § 3.1. If an Event of Default occurred, the entire Receipts Purchased Amount would immediately become due. *Id.* at 3.

In addition, the Guaranty agreement provided that upon any breach of the contract by FTE, admission of inability to pay debts, or bankruptcy proceeding, BMF would be able to collect from the Guarantors. *Id.* at 6. Lethem and Palleschi signed as guarantors. *Id.* at 7.

After the agreement was signed, Funderz deducted a $150,000 "Bank Fee" and transferred $350,000 to FTE. JSMF ¶ 61. The contract, and all subsequent contracts **[\*15]** in this action, lists an "ACH program fee" of $395 or 12% of the funded amount, as well as other assorted lesser fees. First BMF Agreement at 9. Plaintiffs assert that an additional fee not referenced in the contract was collected and paid to Gabe. PSMF ¶ 161. Defendants do not deny this, characterizing the fee as a broker's commission fee. Dkt. No. 160 ¶ 135.

The second agreement was entered into on October 15, 2018, between FTE and Funderz under its assumed name HOP Capital (the "First HOP Agreement"). *Id.* ¶ 62. This agreement stated that HOP purchased 10% of FTE's future receivables, listing a Purchase Price of $1,000,000 and a Receipts Purchased Amount of $1,459,000. *Id.* The daily payment under this agreement was $29,999 per day, and payment records reflect that that amount was actually debited on a daily basis. *Id.* ¶ 65; Dkt. No. 146-24. The terms of this agreement were otherwise identical or materially identical to the terms of the First BMF Agreement, including the addendum. *Compare* First BMF Agreement *with* First HOP Agreement.

On October 25, 2018, FTE entered into another agreement with Funderz under the name BMF (the "Second BMF Agreement"). JSMF ¶ 74. This agreement stated **[\*16]** that BMF purchased 10% of FTE's future receivables, listing a Purchase Price of $1,000,000 and a Receipts Purchased Amount of $1,499,000. *Id.* The daily payment under this agreement was $24,999 per day. *Id.* ¶ 78. Other than debits of $21,500 on October 31 and November 1, payment records show that $24,999 was actually debited on a daily basis. Dkt. No. 146-28. Of the amount paid to FTE under this agreement, $620,000 went to paying off the outstanding balance on the First BMF Agreement. JSMF ¶ 80. The Second BMF agreement was subject to the same terms and conditions as the First BMF Agreement. *Id.* ¶ 79.

Also on October 25, 2018, the same day as the Second BMF Agreement, FTE entered into another agreement with Funderz under the name HOP (the "Second HOP Agreement"). *Id.* ¶ 84. This agreement stated that HOP purchased 10% of FTE's future receivables, listing a Purchase Price of $1,750,000 and a Receipts Purchased Amount of $2,623,250. *Id.* The daily payment under this agreement was $39,999 per day. *Id.* ¶ 87. Other than a debit of $36,999 on October 31, payment records show that $39,999 was actually debited on a daily basis. Dkt. No. 146-32. Of the amount paid to FTE under this agreement, $1,249,000 **[\*17]** went to paying off the outstanding balance on the First Hop Agreement. *Id.* ¶ 89. The Second HOP Agreement was subject to the same terms and conditions as the First HOP Agreement. *Id.* ¶ 88.

On November 8, 2018, FTE entered into a third agreement with Funderz under the name BMF (the "Third BMF Agreement"). *Id.* ¶ 92. This agreement stated that BMF purchased 10% of FTE's future receivables, listing a purchase price of $1,550,000 and a Receipts Purchased Amount of $2,323,450. *Id.* The daily payment under this agreement was $38,724 per day, and payment records reflect that this amount was actually debited on a daily basis. *Id.* ¶ 95; Dkt. No. 146-35. Of the amount paid to FTE under this agreement, $1,281,900 went to paying off the outstanding balance on the Second BMF Agreement. JSMF ¶ 103.

The Third BMF Agreement had some different provisions than the previous agreements. Rather than stating that FTE transferred "all" of its future accounts, it stated that FTE transferred "the Purchased Percentage" of all of its future accounts. Third BMF Agreement at 3. It stated in the initial description of the transaction that:

> Merchant is selling a portion of a future revenue stream to BMF at a discount, **[\*18]** not borrowing money from BMF, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by BMF. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. BMF is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and BMF assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give BMF a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4.

*Id.* The **[\*19]** aforementioned Paragraph 1.4 further detailed that:

> If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to BMF to request a decrease in the Remittance. The amount shall be decreased if the amount received by BMF was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide BMF with viewing access to their bank account as well as all information reasonably requested by BMF to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page l of this Agreement.

*Id.* at 4. The addendum to this agreement did not add any superseding language regarding adjustment of the remittance amount. *See* Dkt. No. **[\*20]** 147-10.

The Third BMF Agreement made the term of the agreement indefinite until the entire Purchased Amount was received, rather than being one year with successive yearly renewals. *See* Third BMF Agreement at 4. It also explicitly set out the daily payment as $38,724, debited Monday through Friday. Dkt. No. 147-10 at 2. It stated that "[i]f any payment date falls on a weekend of holiday . . . the payment may be executed on the next business day." *Id.*

In addition, bankruptcy was not included in this agreement as an Event of Default. JSMF ¶ 100. Similarly, bankruptcy was not made a condition for Funderz to recover from the Guarantors. *See* Third BMF Agreement at 7.[10] Although the Third BMF agreement retains the provision stating that FTE "is responsible for ensuring that the Agreed Remittance to be debited by BMF remains in the Account and will be held responsible for any fees incurred" as a result of insufficient funds, the Appendix listing those fees no longer states that the fee will only be charged two times before a default is declared. *Id.* at 4, 9. The terms and conditions of the Third BMF Agreement were otherwise similar or identical to the earlier agreements. *Compare* Third BMF Agreement **[\*21]** *with* First BMF Agreement.

---

[10] The agreement retained a provision in the guaranty that if BMF needed to return any amount paid by FTE because it entered bankruptcy, the guarantor would be obligated for that amount. *See* Third BMF Agreement at 7.

On November 8 or 9, 2018,[11] FTE entered into a third agreement with HOP (the "Third HOP Agreement"). JSMF ¶ 109. This agreement stated that HOP purchased 10% of FTE's future receivables, listing a purchase price of $2,750,000 and a Receipts Purchased Amount of $4,122,250. *Id.* The daily payment under this agreement was listed as $69,999 per day. JSMF ¶ 113; Dkt. No. 146-37. The Third HOP Agreement had materially the same terms as the Third BMF Agreement. *Compare* Third BMF Agreement *with* Third HOP Agreement.

## IV. Payment and Payment Disputes

Funderz tracked payment of amounts due under the agreement in an internal database, FunderzLink. Dkt. No. 160 ¶ 181. A printout from that database shows columns for "Advance," equal to the Purchase Price, "Payback," equal to the Receipts Purchased Amount, and "Daily," equal to the daily payment. Dkt. No. 146-21. The printout also has a column with the heading "TERM," and the values in that column equal the number of days it would take to reach the Purchased Amount based on the daily payment. Dkt. No. 146-21.

The payment records for each deal are undisputed. Records for the First BMF Agreement show that FTE paid $14,999 each **[*22]** business day between October 17 and October 29, 2018, at which time the remaining balance was eliminated by a payment credit of $650,000 presumably resulting from the Second BMF Agreement. Dkt. No. 146-22.[12] The payment record shows that FTE overpaid on this contract by $70,490. *Id.*; PSMF ¶ 79.

Records for the First HOP Agreement show that FTE paid $29,999 each business day between October 17 and October 29, 2018, at which point the remaining balance was largely eliminated by a payment credit of $1,200,000 presumably resulting from the Second HOP Agreement. Dkt. No. 146-24.[13] Records for the Second BMF Agreement show that FTE paid $21,500 on October 31 and November 1, and $24,999 each business day from November 1 to November 9, the day after the Third BMF Agreement. Dkt. No. 146-28. There are no further daily payments after that date, and two large payments, presumably resulting from the Third BMF Agreement, essentially wipe out the remaining balance. *Id.*[14] Records for the Second HOP Agreement show daily payments of $36,999 from October 31 to November 9, 2018, at which point there are no further daily payments and two large payments essentially wipe out the remaining balance. Dkt. No. **[*23]** 146-32.[15]

The daily payments for the Third HOP Agreement were more varied and span a longer period of time. Dkt. No. 146-37. In November, there were daily debits of $49,999,[16] followed by an increase in December to $69,999, no payment between January 22 and February 2, 2019, and daily payments of $20,000 or $30,000 after February 2, with a final payment of $2,306 on March 15, 2019. JSMF ¶ 126; *see* Dkt. No. 146-37. Some days within this period show multiple debits in the relevant amount. Dkt. No. 146-37. Plaintiffs state that there were 13 such double debits, which they refer to as "unauthorized." PSMF ¶ 76. Defendants do not dispute the number of double debits, but state that some were to make up for a holiday or lost weekday as permitted under the contract and others could have been authorized by FTE to speed up repayments. DSMF ¶¶ 76-83. The parties agree that FTE fully repaid the agreement. JSMF ¶ 123.

---

[11] The Joint Statement of Material Facts states that this agreement occurred on November 8. JSMF ¶ 109. Some of the signatures on the agreement are dated November 9. *See* Third HOP Agreement at 10.

[12] The Second BMF Agreement itself states that the balance transfer would be $626,000, and the reason for the apparent discrepancy is not explained. *See* Second BMF Agreement at 4.

[13] The balance was fully wiped out by one additional daily payment and a $40,990 payment marked "Transfer Deal Fund," which may also have been connected to the Second HOP Agreement. Dkt. No. 146-24.

[14] The record submitted shows a remaining balance of $65,100. Dkt. No. 146-28.

[15] The record submitted shows a remaining balance of $15,268. Dkt. No. 146-32.

[16] Isaacoff testified that this initial amount, which varied from the contractual amount of $69,999, may have been because "the back office made a mistake in the payments," or because "the client asked for . . . a deduction." Dkt. No. 146-6 at 94:5-14.

The payment records for the Third BMF Agreement show daily debits of $38,724 between November 13, 2018, and January 14, 2019. Dkt. No. 146-35. Some days in this period show multiple debits in that amount, including two days with four debits. *Id.* Plaintiffs state that there were 30 multiple **[*24]** debits, and Defendants do not dispute this number. Dkt. No. 160 at ¶ 75. Defendants again dispute whether the debits could have been authorized pursuant to the contract or by request of FTE. *Id.* ¶¶ 74-90.

On December 3, 2018, Lethem emailed Gabe stating that BMF had been taking double payments. Dkt. No. 147-45. Gabe responded: "[O]ur deal got stacked by other lenders when u said u won't do that. If you like us to stop the double pulls we need a refi done here." *Id.* Lethem responded that "I have a text from u saying you wouldn't do that if I took the last refi." *Id.* Gabe replied that "I am a very fair person. I will stop the double pulls lets do the refi net 1M." *Id.* Lethem stated that "being fair and honest would mean no double pulls," and Gabe agreed that "[a]s of Wednesday double pulls won't come out." *Id.* According to the undisputed payment records, there are still double debits after that date, for example four debits on January 2, 2019. Dkt. No. 146-35. Gabe suggested in his deposition that the merchant may have requested the double debits, but stated he was not aware of any communication that would show this. Dkt. No. 146-5 at 59. Isaacoff stated the multiple debits might be a **[*25]** "bank glitch," that the money might be properly collected if the merchant's receivables were higher than expected, or that the merchant agreed to the multiple debits. Dkt. No. 146-6 ("Isaacoff Dep.") at 113-118. He stated he had no supporting email or specific recollection of the client asking for four debits in one day. Isaacoff Dep. at 118:15-24.

On January 14, 2019, FTE employee Mike Hess raised concerns with Gabe via email regarding alleged overdraws by BMF. JSMF ¶ 131; Dkt. No. 147-22. Hess initially identified the overdrawn amount as $409,614 but followed up the same day revising the number to $89,688. Dkt. No. 147-22. Gabe said that the refund "will be in UR account tomorrow," but no refund occurred at that time. *Id.*; *see* JSMF ¶ 134. FTE counsel followed up on July 17, 2019. Dkt. No. 147-22. After some further discussion, the requested amount was refunded to FTE on or about July 31, 2019. *Id.*; JSMF ¶ 134.

There is no evidence that FTE ever requested reconciliation or a decreased remittance below the estimated daily amount based on the actual amount of its receivables. DSMF ¶ 61.[17] Funderz's corporate representative stated that she did not know if Funderz had a reconciliation department **[*26]** or had policies on how to perform reconciliations. PSFM ¶¶ 163-167. When asked how Funderz would know if a merchant was entitled to a reconciliation, she stated that the broker "would look over the bank statements to see if they had . . . issues with their revenue" or "any type of hardship." Dkt. No. 146-5 at 18:21-19:5. Gabe stated he could not recall ever refunding money pursuant to a reconciliation provision. Dkt. No. 146-4 at 199:5-21. Isaacoff stated that "requests for modification were routinely and normally approved if the merchant's documents support the modification." Isaacoff Decl. ¶ 24.

The total amount withdrawn by Funderz from FTE's bank account pursuant to the SMAs minus the amount deposited is between $5.8 and $5.9 million. JSMF ¶ 127.

In September 2019, FTE sent a document preservation notice to BMF at Gabe's email address, concerning only the BMF agreements. JSMF ¶ 135; Dkt. No. 146-39. Funderz's corporate representative testified that she had not seen the letter before preparing for the deposition. Dkt. No. 146-5 at 48:22-49:3. Funderz's representative additionally testified that responsive emails were lost because Funderz used a different server at the time of the **[*27]** transactions, and that server was "deleted" in early 2019. *Id.* at 42:1-44:13. She testified that she did not know why the server was changed at that time. *Id.* at 48:22-49:13. Isaacoff testified that the server was switched "after a long time of no use" because "we were out of business for a long time." Isaacoff Dep. at 237:7-21.

**V. Lateral Recovery**

---

[17] FTE requested that Funderz cease double debits or overdrawing above the estimated daily amount—in other words, that FTE only collect the estimated daily amount. Dkt. No. 157 ¶ 61. However, these requests did not reference contractual provisions regarding reconciliation or remittance, and do not request that the daily value be altered below the estimated amount based on FTE's actual receipts. *See* Dkt. Nos. 147-22; 147-45.

In 2015, FTE affiliate Jus-Com, Inc. entered into a credit agreement with Lateral Juscom Feeder LLC ("Lateral Juscom"). JSMF ¶ 141; Dkt. No. 146-40 ("Credit Agreement"). FTE was also a party to the agreement, denominated a "Credit Party" and identified as the "holder (indirectly) of all of the Stock and Stock Equivalents of the Borrower [Jus-Com, Inc.]." Credit Agreement at 5. Lateral FTE Feeder LLC and Lateral U.S. Credit Opportunities Fund were additional Lenders. Dkt. No. 146-44 at 20-24.[18] Lateral Juscom was named administrative agent for the Lenders. Credit Agreement at 5. Under the Credit Agreement, the Lenders agreed to extend loans and other financial accommodations up to a maximum amount, which in July 2019 was approximately $50 million. JSMF ¶ 142.

Pursuant to this agreement, FTE granted a security interest to Lateral Juscom in "substantially **[*28]** all of its Property." Credit Agreement at 5. In or around July 2019, several months after making its last payments to Funderz, FTE defaulted on the Credit Agreement. JSMF ¶ 143; PSMF ¶ 273, see Dkt. No. 160 ¶ 246. On October 10, 2019, the parties to the Credit Agreement executed an agreement titled "Surrender of Collateral and Strict Foreclosure" (the "Foreclosure Agreement"). Dkt. No. 146-46 ("Foreclosure Agreement").

The Foreclosure Agreement recited that the lenders had perfected their security interest in substantially all of FTE's assets as well as in the assets of Benchmark, which had joined the agreement upon its purchase by FTE in 2017. Foreclosure Agreement 1-2. It then noted that FTE had failed to satisfy judgments issued against it in July 2019 and was in default under the Credit Agreement. Id. The total obligations to the lenders were acknowledged to be over $50 million. Id. § 2.1. In satisfaction of these obligations, the lenders agreed to accept transfer of certain assets to two entities: Benchmark Holdings LLC and Lateral Recovery LLC. Id. at 2. FTE's cash on hand and equity interests in Benchmark were transferred to Benchmark Holdings LLC. Id. Lateral Recovery LLC received **[*29]** the Credit Parties' interest in the "Litigation Claims," defined as:

> [C]ertain commercial tort litigation claims, fraud claims, and insurance claims against (a) various lenders under various merchant cash advance or other agreements for Indebtedness that was incurred but not permitted under the Credit Agreement . . . and (b) FTE's former management arising from the actions of certain officers and directors (i) in breach of their respective employment agreements, (ii) taken in violation of their fiduciary duties, and/or (iii) taken in contravention of the Credit Agreement resulting in a default thereunder.

Id. at 2. However, the agreement provided that after Lateral Recovery LLC received payments on the litigation claims of $25 million, any additional payments would be turned over to FTE. Id. § 6.2.

The Foreclosure Agreement was signed by Fred Sacramone, CEO of FTE, for FTE and for the Credit Parties, which included Plaintiffs Benchmark and Focus Wireless. Id. at 15.[19] It was signed by Richard de Silva as Manager of Lateral Juscom, Lateral Recovery LLC, and Benchmark Holdings LLC. Id. at 14. Lateral Juscom was listed as "Agent," Lateral Recovery LLC as "Lender" and "Foreclosing Lender" and **[*30]** Benchmark Holdings as "Lender" and "Foreclosing Lender." Id.

De Silva's deposition in this case describes the relationships between the entities involved in this agreement, as does the deposition of Lateral Recovery's corporate representative Anthony Cassano. Dkt. Nos. 146-7, 146-11. Lateral Investment Management, not a party to any agreement in this case, is a registered investment advisor and manager of funds which invest in a portfolio of companies, including FTE. Dkt. No. 146-7 at 9-12; Dkt. No. 146-11 at 12:13-18, 13:1, 14. Lateral U.S. Credit Opportunities Fund, one of the lenders on the Credit Agreement, is a fund managed by Lateral Investment Management. Dkt. No. 146-11 at 29:14-18. Lateral Juscom, the administrative agent on the Credit Agreement, was a "subset entity" within one of the other Lateral entities. Dkt. No. 146-11 at 17:12-13.

Lateral Recovery LLC is a company organized to hold assets as part of the FTE foreclosure. Dkt. No. 146-11 at 26-29. According to de Silva, it is owned by Lateral U.S. Credit Opportunities Fund. Dkt. No. 146-11 at 26-29. It was incorporated two days before the Foreclosure Agreement. JSMF ¶ 146. In an affidavit submitted in a separate case,

---

[18] ECF pagination is used for this document.

[19] ECF pagination.

de **[*31]** Silva stated that "Lateral Recovery is a Delaware limited liability company that was organized, among other reasons, for the specific purpose of taking possession of and pursing certain commercial claims belonging to Benchmark, FTE Networks, Inc., Jus-Com LLC, Focus Wireless, LLC and/or their subsidiaries or affiliates." Dkt. No. 146-48. Lateral Recovery LLC has no employees. Dkt. No. 146-11 at 29:21.[20] Benchmark Holdings, LLC, which de Silva refers to as "[t]he entity that took over Benchmark," is also a Lateral company. *Id.* at 28:19-29:6. All the Lateral companies are located in the same office. *Id.* at 30:2-3.

In 2021, FTE and Lateral Juscom, Lateral U.S. Credit Opportunities Fund, and other Lateral affiliates (the "Lateral Parties") entered into a Modification and Settlement Agreement. Dkt. No. 146-49. This agreement stated that the Lateral Parties would pay FTE "50% of any amounts received from [claims related to the merchant cash advance agreements] in excess of an annualized preferred return of 100% on any amounts invested or expended" by the Lateral Parties in pursuing the claims. *Id.* at 3 ¶ 3. Lateral Recovery LLC was not a party to this agreement. *See id.*

## PROCEDURAL HISTORY

Plaintiffs **[*32]** filed a complaint in this action on March 16, 2022, alleging civil RICO violations pursuant to *18 U.S.C. §§ 1961-68*. Dkt. No. 1. The complaint named as defendants BMF Advance, LLC, HOP Capital, LLC, Isaacov Investment, Inc, Joseph Yitzchakov aka Joseph Isaacov (here, "Isaacoff"), and Gavriel Yitzchakov aka Gabe Isaacov (here "Gabe"). *Id.* It also listed Ben Isaacov and Simon Isaacov as "culpable persons," and Panthers Capital as part of the RICO enterprise. *Id.* ¶¶ 123, 130.

HOP Capital, LLC and Isaacoff (the "HOP Defendants"), represented by the same counsel, sought permission to file a motion to dismiss on May 27, 2022. Dkt. No. 28. On the same day, BMF Advance, LLC, Isaacov Investment, Inc., and Gabe (the "BMF Defendants") sought permission to file their own motion to dismiss. Dkt. No. 29. The Court granted leave to file the motions. Dkt. No. 31.

Both sets of defendants moved to dismiss on July 21, 2022. Dkt. Nos. 35, 38. The motion by Isaacoff and HOP Capital, LLC stated that HOP Capital, LLC was properly named as Funderz.net, LLC, d/b/a HOP Capital, and this set of defendants was subsequently referred to as the "Funderz Defendants." Dkt. No. 36, 37.

These motions to dismiss were subsequently terminated **[*33]** due to the parties' agreement that Plaintiffs would file an amended complaint, which Plaintiffs did on August 8, 2022. Dkt. No. 42-44.[21] The Amended Complaint named Funderz.net LLC and John and Jane Doe Investors as additional defendants. Dkt. No. 44 ("Amended Compl."). It omitted Isaacov Investments, LLC, and recognized that Hop Capital, LLC and Business Merchant Funding (or BMF) were trade names of Funderz.net, LLC rather than independent defendants. *Id.* ¶ 16.

Gabe filed a motion to dismiss the amended complaint on September 22, 2022, and the Funderz Defendants filed a motion to dismiss on the same date. Dkt. Nos. 47, 49, 58. Plaintiffs responded opposing the motions, Dkt. No. 55, but Defendants then withdrew the motions before they were ruled on the court. Dkt. No. 58. On December 29, 2022, Defendants filed answers to the amended complaint. Dkt. Nos. 60-61. Defendants then sought leave to file a motion for judgment on the pleadings under *Federal Rule of Civil Procedure 12(c)*. Dkt. No. 62.

On January 26, 2023, while that motion remained pending, the case was reassigned to the Hon. Jennifer L. Rochon.[22] Dkt. No. 66. Leave was granted for Defendants to file motions for judgment on the pleadings, Dkt. No. 74, and Gabe and the **[*34]** Funderz Defendants filed such motions separately on March 23 or 24, 2023. Dkt. Nos. 87, 89. The Funderz Defendants argued that Plaintiffs incurably failed to allege several elements of the RICO claim and could not show that Defendants knew their conduct was illegal. Dkt. No. 91. Gabe argued that Plaintiffs could

---

[20] Lateral Investment Management's corporate representative testified that to his knowledge, Lateral Recovery LLC has no assets. Dkt. No. 146-7 at 20:6-8.

[21] Among other changes, the amended complaint added defendant Funderz.net, LLC. Dkt. No. 44 ¶ 17.

[22] The case was originally assigned to the Hon. Andrew L. Carter, Jr.

not show he knew that his conduct was illegal and did not plead he engaged in a pattern of racketeering under *18 U.S.C. § 1962(c)*. Dkt. No. 90. Plaintiffs opposed these motions, Dkt. No. 94, and Defendants replied, Dkt. Nos. 98-99.

Discovery proceeded during the pendency of the motions for judgment on the pleadings. Dkt. Nos. 102-123. On November 27, 2023, Plaintiffs expressed an intent to move for summary judgment. Dkt. No. 130. On December 22, 2023, the Funderz Defendants and Gabe separately sought leave to file summary judgment motions. Dkt. Nos. 132, 133.

On January 19, 2024, the court issued an order denying the motions for judgment on the pleadings. Dkt. No. 140. The court held the substance of the agreements adequately supported the plausibility of Plaintiff's allegations that the transactions were loans rather than purchases of receivables. *Id.* at 17-24. Plaintiffs also adequately pleaded **[*35]** that Defendants acted with the requisite scienter, *id.* at 25-26, and "sufficiently alleged the existence of a RICO enterprise consisting of the company Funderz, the Isaacovs, and the John and Jane Doe Investors," *id.* at

30. These allegations were sufficient to state a RICO claim based on collection of unlawful debt. *Id.* The court therefore did not examine whether Plaintiffs sufficiently pleaded a RICO violation based on wire fraud. *Id.* at 33-34.

On February 21, 2024, the parties stipulated to the voluntary dismissal of Gabe from the suit. Dkt. No. 144. Plaintiffs then submitted a motion for partial summary judgment on February 22, 2024, limited to Plaintiff's claims against Isaacoff based on collection of unlawful debt. Dkt. No. 145. The parties submitted a joint *Rule 56.1* statement with 41 attached exhibits. Dkt. No. 146. Plaintiffs also submitted their own *Rule 56.1* statement, a declaration of counsel with 74 attached exhibits, and a memorandum of law in support of their motion. Dkt. Nos. 147-149.

On the same day, Defendants submitted a motion for summary judgment on all claims. Dkt. No. 150. This motion was accompanied by Defendants' *Rule 56.1* statement, a declaration of Isaacoff with six attached exhibits, **[*36]** a declaration of counsel with five attached exhibits, and a memorandum of law in support. Dkt. Nos. 151-153.

On March 1, 2023, the case was reassigned to the Hon. Margaret M. Garnett. Dkt. No. 155. Plaintiffs filed a response to Defendants' *Rule 56.1* statement, a memorandum of law in opposition to Defendants' motion, and an associated declaration. Dkt. Nos. 157-160. Defendants filed a response to Plaintiffs' *Rule 56.1* statement and counterstatement of material facts, a memorandum of law in opposition to Plaintiff's motion, and an associated declaration of counsel with nine exhibits. Dkt. Nos. 157-162. Plaintiffs then filed a response to Defendants' counterstatement of material facts. Dkt. No. 164. Each side also filed a reply memorandum of law. Dkt. Nos. 163, 165.

The case was then reassigned to the undersigned on April 11, 2024. Dkt. No. 166. On August 2, 2024, the Court received Plaintiff's submission of supplemental authority, specifically the decision in *Oakshire Properties, LLC v. Argus Cap. Funding, LLC, 229 A.D.3d 1199 (4th Dep't 2024)*.

## LEGAL STANDARD

### I. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact **[*37]** and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.*

*2d 202 (1986)*). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008)*, and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002)* (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)*. "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)* (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." *Fed. R. Civ. P. 56(c)(1)(A)*; *see also* *Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)*. To defeat a motion for summary judgment, the **[*38]** non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996)* (internal citation omitted). "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate." *Am. Home Assurance Co. v. Jamaica, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006)*. *Local Rule 56.1 of the Local Rules* for the Southern District prescribes the manner and method in which a party is to present undisputed issues of fact to the Court. The moving party must annex to its notice of motion "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." *Local Rule 56.1(a)*. The party opposing the motion for summary judgment is required to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." *Local Rule 56.1(b)*.[23] The statements "must be followed by citation to evidence which would be admissible, set forth as required by *Fed. R. Civ. P. 56(c)*." *Local Rule 56.1(d)*. The consequences of failure to follow these rules can be severe. "Each numbered paragraph in the statement of material **[*39]** facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." *Local Rule 56.1(c)*.

Thus, a *Rule 56.1* statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz, 258 F.3d at 74*. If portions of a *Rule 56.1* counterstatement cite to no admissible evidence in support of its denials, the Court is instructed to disregard those portions and deem the factual statements in the original *Rule 56.1* statements admitted. *See, e.g.,* *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev., 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013)* (holding that denials that are not supported by citations to admissible record evidence are to be disregarded). When the non-moving party in certain instances fails to cite to any record evidence for its denials, the Court accepts the moving party's characterization of those facts in its 56.1 statement as undisputed. *See* *Colton v. N.Y. Div. of State Pol., 2017 U.S. Dist. LEXIS 220766, 2017 WL 5508911, at *2 (N.D.N.Y. Feb. 8, 2017)* ("The failure to properly controvert a supported statement of fact by pointing to admissible evidence contravening the movant's evidence results in the movant's statement being deemed admitted."); *Knight v. N.Y.C. Hous. Auth., 2007 U.S. Dist. LEXIS 9148, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)* ("Pursuant to *Local Civil Rule 56.1* Defendant's statements are deemed to be admitted **[*40]** where Plaintiff has failed to specifically controvert them with citations to the record.").

## II. RICO

Plaintiffs' Amended Complaint brings civil RICO claims under *18 U.S.C. § 1962(c)* and *(d)*. Amended Compl. ¶¶ 115-189.

---

[23] **Local Rule 56.1** was amended effective July 1, 2024, after all **Rule 56.1** statements were submitted in this action. The wording of **Local Rule 56.1** set forth here is the wording at the time the statements were submitted, which differs slightly from the wording of the current rule.

The RICO statute was passed in 1970 as "an aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 498, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)*. Although "[o]rganized crime was without a doubt Congress' major target," Congress "chose to enact a more general statute . . . broad[] enough to encompass a wide range of criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 246-48, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)*. Thus, the Supreme Court has held that the statute's purposes more generally encompass "protect[ing] a legitimate enterprise from those who would use unlawful acts to victimize it" and "protect[ing] the public from those would unlawfully use an enterprise (whether legitimate or illegitimate) as a vehicle through which unlawful activity is committed." *Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 164, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001)* (internal citations and quotations omitted). A RICO violation may be criminally prosecuted. *18 U.S.C. § 1963*. Alternatively, "[a]ny person injured in his business or property by reason of a violation" of the statute may sue in federal court and recover treble damages. *18 U.S.C. § 1964(c)*.

"To establish a RICO claim, a plaintiff must show: (1) a violation of **[*41]** the RICO statute, *18 U.S.C. § 1962*; (2) an injury to business or property; and (3) that the injury was caused by the violation of *Section 1962*." *DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001)* (citations and quotations omitted). Here, plaintiffs allege violations of *18 U.S.C. § 1962 (c)* and *(d)*. *Section 1962 (c)* provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*18 U.S.C. 1962(c)*.

To establish liability under this provision, a plaintiff must "prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner, 533 U.S. at 161*. A "person" is defined in the statute as "any individual or entity capable of holding a legal or beneficial interest in property." *18 U.S.C. § 1961(3)*. An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4)*.

"A corporate entity can be sued as a RICO 'person' or named as a RICO 'enterprise,' *see 18 U.S.C. § 1961(3)*, *(4)*, but the same **[*42]** entity cannot be both the RICO person and the enterprise." *U1it4less, Inc. v. Fedex Corp., 871 F.3d 199, 205 (2d Cir. 2017)*; *see Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 120-21 (2d Cir. 2013)* ("[A] corporate person cannot violate the statute by corrupting itself."). However, the distinctness requirement is satisfied "when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner." *Cedric Kushner, 533 U.S. at 164-65*. This accords with the statutory purpose of protecting the public from those who "run organization[s] in a manner detrimental to the public interest." *Id. at 165* (quoting S. Rep. No. 91-617, at 82 (1969)). The plaintiff must also establish that the enterprise was "engaged in . . . foreign or interstate commerce. *18 U.S.C. 1962(c)*. This element is rarely disputed, as "[t]he law in this Circuit does not require RICO plaintiffs to show more than a minimal effect on interstate commerce." *DeFalco, 244 F.3d at 309*.

*Section 1962(c)* then requires that the RICO person must "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." *18 U.S.C. 1962(c)*. To fulfill this requirement, the RICO person "must have some part in directing those affairs," although she need not have "primary responsibility." *Reves v. Ernst & Young, 507 U.S. 170, 179, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)*. Finally and importantly, the plaintiff must prove "a pattern of racketeering activity or collection of unlawful debt." *18 U.S.C. 1962(c)*. This language provides two **[*43]** paths to liability: either "a pattern of racketeering activity" or "a single instance of collection of unlawful debt." *United States v. Grote, 961 F.3d 105, 119 (2d Cir. 2020)*. "Racketeering activity" is defined in the statute to encompass a large number of state and federal offenses. *18 U.S.C. § 1961(1)*. A "pattern of racketeering activity" must include at least two such acts. *18 U.S.C. § 1961(5)*. For a claim to succeed under this prong, the "[p]redicate crimes must be related both to each other (termed 'horizontal relatedness') and to the enterprise as a whole ('vertical relatedness')." *Reich v. Lopez, 858 F.3d 55, 60 (2d Cir. 2017)* (quoting *United States v. Cain, 671 F.3d 271, 284 (2d Cir. 2012)*).

"Unlawful debt" is defined in the statute as:

[A] debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6). To satisfy this definition, **[*44]** a plaintiff must show that "[1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with 'the business of lending money . . . at a [usurious] rate,' and [3] the usurious rate was at least twice the enforceable rate." Durante Bros. & Sons v. Flushing Nat. Bank, 755 F.2d 239, 248 (2d Cir. 1985). Under New York law, a loan is criminally usurious if the rate of interest is greater than 25% per annum. N.Y. Penal Law § 190.40. The usury law applies "only to loans or forbearances, not investments." Seidel v. 18 E. 17th St. Owners, Inc., 79 N.Y.2d 735, 598 N.E.2d 7, 11, 586 N.Y.S.2d 240 (1992).

Plaintiffs also allege violations of 18 U.S.C. § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." This claim requires a showing that the defendant "agreed with at least one other entity to commit a substantive RICO offense." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 487 (2d Cir. 2014). The claim will fail if the agreed-upon acts, even if carried out, would not satisfy all the elements of a RICO offense. See id. at 489; Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244-45 (2d Cir. 1999). Assuming that Section 1962 was violated, Plaintiffs must show that this violation injured them in their business or property. DeFalco, 244 F.3d at 305.

**DISCUSSION**

**I. Assignment of Claims to Lateral**

A threshold issue is whether Lateral may properly bring RICO claims based on transactions between Funderz and FTE. Plaintiffs state **[*45]** that Lateral can properly bring FTE's claims against Funderz as an assignee of those claims pursuant to the Foreclosure Agreement. Dkt. No. 149 at 25. Defendants argue that this assignment is void as a violation of New York's champerty statute, Judiciary Law § 489, and that Lateral lacks standing under the RICO statute. Dkt. No. 154 at 13-15.

**A. Champerty**

New York Judiciary Law § 489(1) provides that:

No person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon; provided however, that bills receivable, notes receivable, bills of exchange, judgments or other things in action may be solicited, bought, or assignment thereof taken, from any executor, administrator, assignee for the benefit of creditors, trustee or receiver in bankruptcy, or any other person or persons in charge **[*46]** of the administration, settlement or compromise of any estate, through court actions, proceedings or otherwise. Nothing herein contained shall affect any assignment heretofore or hereafter taken by any moneyed corporation authorized to do business in the state of New York or its nominee pursuant to a subrogation agreement or a salvage operation, or by any corporation organized for religious, benevolent or charitable purposes.

*Section 489(2)* creates a safe harbor for any assignment, purchase or transfer "if such assignment, purchase, or transfer included bonds, promissory notes, bills of exchange and/or book debts, issued by or enforceable against the same obligor . . . having an aggregate purchase price of at least five hundred thousand dollars." *Judiciary Law § 489(2)*. New York's champerty statute is derived from the common-law doctrine of champerty, which prohibited "rendering aid in the prosecution of a suit under an agreement to share in the avails." *Sedgwick v. Stanton, 14 N.Y. 289, 299 (1856)*. One historical concern addressed by the doctrine is that lawyers would purchase and file claims as a vehicle for obtaining costs and fees. *See Bluebird Partners, L.P. v. First Fid. Bank, N.A., 94 N.Y.2d 726, 731 N.E.2d 581, 586, 709 N.Y.S.2d 865 (N.Y. 2000)*; *Wightman v. Catlin, 113 A.D. 24, 98 N.Y.S. 1071, 37 N.Y. Civ. Proc. R. 105 (2d Dep't 1906)*. However, the modern statute also seeks to "prevent or curtail the commercialization of or trading in litigation," preserving **[*47]** the idea of a lawsuit as a way of settling a dispute between parties rather than a marketable commodity. *Bluebird Partners, 731 N.E.2d at 582*; *see* Max Radin, *Maintenance By Champerty*, 24 Calif. L. Rev. 48, 48 (1935). In accordance with this aim, the statutory prohibition notably does not apply to isolated assignments of claims to individuals.[24] Rather, it prohibits the purchase of claims only by persons "engaged directly or indirectly in the business of collection or adjustment of claims," corporations, and associations. *N.Y. Judiciary Law § 489(1)*. An assignment which violates the statute is void, and a corporate officer who participates in a violation is guilty of a misdemeanor. *Id.*; *see Semi-Tech Litig., LLC v. Bankers Tr. Co., 272 F. Supp. 2d 319, 331 (S.D.N.Y. 2003)*.

A purchase is only champertous if the purchase is "with the intent *and* for the purpose" of bringing a lawsuit. *N.Y. Judiciary Law § 489(1)* (emphasis added). As interpreted by New York courts, this means that "a mere intent to bring a suit on a claim purchased does not constitute the offense." *Moses v. McDivitt, 88 N.Y. 62, 65 (1882)*. Rather, the crucial test for whether the statute has been violated is whether the party receiving the assignment had the "primary purpose" of bringing a lawsuit. *Justinian Cap. SPC v. WestLB AG, 28 N.Y.3d 160, 43 N.Y.S.3d 218, 65 N.E.3d 1253, 1256 (N.Y. 2016)* (quoting *Moses, 88 N.Y. at 65*). By contrast, if a potential lawsuit is "contingent" or "incidental" to some other purpose, there is no champerty. *Id.* (quoting *Moses, 88 N.Y. at 65*). Although **[*48]** application of this test is necessarily fact-specific, the cases where courts have addressed claims of champerty fall into several different categories.

First, courts have consistently found champerty where a corporation that is otherwise a stranger to the parties solicits or takes an assignment of a claim in exchange for the agreement it will share the proceeds of the litigation that ensues with the assignor. This is the prototypical picture of champerty. It is presumed in such circumstances that the assignment will sow "the 'strife, discord and harassment'" that the doctrine of champerty was designed to avoid. *Tr. For the Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding Corp., 13 N.Y.3d 190, 918 N.E.2d 889, 893, 890 N.Y.S.2d 377 (2009)* (quoting *Fairchild Hiller Corp. v. McDonnell Douglas Corp., 28 N.Y.2d 325, 270 N.E.2d 691, 693, 321 N.Y.S.2d 857 (1971)*). The law is indifferent to whether the consideration paid to the assignee is in the form of a cash sum certain paid at the moment of assignment or a percentage of the recovery to be paid after the litigation is concluded. *See, e.g., Sprung v. Jaffe, 3 N.Y.2d 539, 544, 147 N.E.2d 6, 169 N.Y.S.2d 456 (1957)* (cash payment); *Justinian Cap., 65 N.E.3d at 1254-56* (contingency). The assignment agreement in such cases often explicitly states that the assignee will sue and describes its consideration for doing so. *See Justinian Cap., 65 N.E.3d at 1254-56* (bank which wanted to avoid lawsuit for political reasons assigned claim to a shell company which would keep 20% of proceeds); *PDVSA US Litig. Tr. v. Lukoil Pan Americas, LLC, 991 F.3d 1187, 1193-95 (11th Cir. 2021)* (state-owned oil company assigned **[*49]** claims to a trust, which returned 34% of proceeds and paid 66% to attorneys and financers); *Refac Int'l, Ltd. v. Lotus Dev. Corp., 131 F.R.D. 56, 58-59*

---

[24] There is some authority suggesting that the statute applies indiscriminately to all persons. *See Aretakis v. Caesars Ent., 2018 U.S. Dist. LEXIS 29552, 2018 WL 1069450, at *9-10 (S.D.N.Y. Feb. 23, 2018)*; *see also Justinian Cap. SPC v. WestLB AG, 28 N.Y.3d 160, 43 N.Y.S.3d 218, 65 N.E.3d 1253, 1258 (2016)* ("*Section 489(1)* restricts individuals and companies from purchasing or taking an assignment of notes or other securities."). However, the text appears to prohibit only persons "engaged directly or indirectly in the business of collection and adjustment of claims" from taking an assignment with the purpose of bringing an action. *N.Y. Judiciary Law § 489(1)*. New York authority supports this interpretation. *See Traktman v. City of N.Y., 182 A.D.2d 814, 582 N.Y.S.2d 808, 814-15 (2d Dep't 1992)* (denying champerty defense because "the evidence presented fails to establish that the plaintiff is engaged in the business of collecting claims"); *Edrich v. Festinger, 2017 U.S. Dist. LEXIS 131576, 2017 WL 3575238, at *5-6 (E.D.N.Y. Aug. 17, 2017)* (same, and collecting cases).

*(S.D.N.Y. 1990)* (patent holder granted a 5% interest in patent to second company in exchange for explicit agreement that the second company would sue infringers); *Am. Optical Co. v. Curtiss, 56 F.R.D. 26, 28-29 (S.D.N.Y. 1971)* (university assigned patent claim to corporation on the condition that it would bring suit to vindicate the university's rights). There is no purpose to such assignments except bringing legal action. *See Elliott Assocs., L.P. v. Banco de la Nacion, 194 F.3d 363, 375-76 (2d Cir. 1999)*.

The same result generally has followed when multiple plaintiffs assign or sell their claims to an entity so that the entity can bring suit on the aggregated claims. *See Syracuse Mountains Corp. v. Petróleos de Venezuela S.A., 2024 U.S. Dist. LEXIS 136302, 2024 WL 3637997, at *1-4 (S.D.N.Y. Aug. 1, 2024); Sharbat v. Iovance Biotherapeutics, Inc., 2023 U.S. Dist. LEXIS 1428, 2023 WL 34377, at *7 (S.D.N.Y. Jan. 4, 2023); Richbell Info. Servs., Inc. v. Jupiter Partners, 280 A.D.2d 208, 723 N.Y.S.2d 134, 136-37 (1st Dep't 2001)*. The courts have concluded that, in such circumstances, preparing and bringing a lawsuit is "the 'very essence,' of [the transaction]," not merely an incidental consequence," *Syracuse Mountains Corp., 2024 U.S. Dist. LEXIS 13630, 2024 WL 3637997, at *4* (quoting *Justinian Cap. 65 N.E.3d at 1257*), and thus have held the assignment or sale to be champertous.[25]

By contrast, courts have been far less skeptical when instead of purchasing a claim directly and nakedly, the plaintiff has acquired an asset whose value may be realized through a lawsuit. It is not champertous for a party "to acquire a debt instrument with the intent of obtaining payment, even should litigation become necessary." **[*50]** *Bluebird Partners, 731 N.E.2d at 587*; *see Love Funding Corp., 918 N.E.2d at 894* ("[I]f a party acquires a debt instrument for the purpose of enforcing it, that is not champerty simply because the party intends to do so by litigation."); *Elliott Assocs., 194 F.3d at 377* ("[T]he mischief *Section 489* was intended to remedy did not include the acquisition of debt with the motive of collecting it."). Were the rule otherwise, the distressed debt market would be frozen and "holders of debt instruments would have substantial difficulty selling those instruments if payment were not voluntarily forthcoming." *Elliott Assocs., 194 F.3d at 380*. The result would inure to the detriment not just of high-risk borrowers but of all borrowers, who would see their costs to borrow capital increase for fear that a high-risk loan once made could not be sold or assigned. *Id.*[26]

A debt purchase may still be champertous if made "for the very purpose of bringing . . . suit." *Justinian Cap., 65 N.E.3d at 1256* (quoting *Moses, 88 N.Y. at 65*). For example, an inference of champerty may be supportable if the purchase involves explicit statements of intent to sue at the time of the assignment, specific language in the assignment agreement related to litigation rights, and immediate suit on the claim after assignment. *Bluebird Partners, 731 N.E.2d at 588*. But even in such a case, the question of whether the transaction is "made with the intent and **[*51]** for *the* purpose (as contrasted to *a* purpose) of bringing an action or proceeding" generally presents an issue of fact. *Bluebird Partners, 731 N.E.2d at 587-588*; *see Love Funding, 918 N.E.2d at 894* ("The inquiry into purpose is a factual one"); *Fairchild Hiller, 270 N.E.2d at 693* ("[T]he question of intent and purpose of the purchaser or assignee of a claim is usually a factual one to be decided by the trier of facts.").

It follows from the primary purpose doctrine that the receipt of an assignment or a transfer by a party who has a "preexisting proprietary interest" in the claim is not champertous. *Love Funding, 918 N.E.2d at 895*. Where the party

---

[25] If managers or non-claimant shareholders of the new entity share in proceeds of the litigation, the aggregation scenario is hardly different from the prototypical picture of champerty. Outsiders are aiding in the prosecution of the claims in return for a share of proceeds. If the claimants themselves fully own and manage the new entity, the transaction becomes reciprocal. Each claimant partially aids in the prosecution of the claims of the others in return for a share of the proceeds. *See Syracuse Mountains Corp., 2024 U.S. Dist. LEXIS 13630, 2024 WL 3637997, at *2-6* ("Syracuse provided each Shareholder shares in Syracuse in proportion to its contribution to the total face value of all Notes and other debt instruments transferred. After all the Transfers had been made, the Shareholders collectively owned 100% of Syracuse's shares; each Shareholder held a pro rata share of Syracuse equal to its pro rata contribution of Notes.").

[26] In addition to a purpose of enforcement or collection, a party may also take an assignment of debt to cover risk or gain leverage in related transactions. *See Moses, 88 N.Y. at 67-68*; *Bluebird Partners, 731 N.E.2d at 588*. It may do so without risk of being found liable for champerty.

receiving the claim is acting "to protect its own interest" and has a "substantial, legitimate interest in the transactions involved in the suit," *id.*, its primary purpose in acquiring the claim cannot be said to bring litigation, even if the preexisting interest is beneficial and not legal and even if the means to protect its pre-existing interest is litigation, *see Promenade v. Schindler Elevator Corp., 39 A.D.3d 221, 834 N.Y.S.2d 97, 98-99 (1st Dep't 2007)* (claim or indemnification assigned as part of settlement of the main action); *Am. Bag & Metal Co. v. Alcan Aluminum Corp. (Alcan Sheet & Plate Div.), 115 A.D.2d 958, 497 N.Y.S.2d 787, 789 (1st Dep't 1985)* (assignment of breach of contract claims to the party that held the contract); *Bellarno Int'l Ltd. V. Irving Tr. Co., 165 A.D.2d 809, 560 N.Y.S.2d 287, 288 (1st Dep't 1990)* (assignment of wrongful payment claim from bank to account party).

Still another category of cases exists where a claim is conveyed as part of a larger business **[*52]** transaction in which other assets are exchanged. *See Fairchild Hiller, 270 N.E.2d at 692-93*. Two corporations can agree to a merger and can convey assets, including choses in action, into the resulting entity without fear that the transaction will be unwound as champertous. In *Fairchild Hiller*, for example, the assignment of a claim was "simply an incidental part of a substantial commercial transaction," namely an agreement by Fairchild and non-party Farmingdale to acquire and divide the assets of a third company, Republic. *Id. at 692*. As part of this transaction Fairchild agreed to take a certain claim held by Republic and turn over part 75% of the proceeds to Farmingdale. *Id.* The Court of Appeals held that in this context such an arrangement "can by no means be said to be champertous," because the clear purpose was "to induce Farmingdale to take part in the acquisition." *Id. at 693*. The case stands for a broader proposition. When the transfer of a claim is an incidental part of a non-litigation business strategy, it is not plausible that the primary purpose is litigation and the champerty statute is inapplicable as a matter of law. *See also Limpar Realty Corp. v. Uswiss Realty Holding, Inc., 112 A.D.2d 834, 492 N.Y.S.2d 754, 755 (1st Dep't 1985)* (champerty could not be inferred from the purchase of a mortgage in default when plaintiff had a clear business **[*53]** strategy of acquiring properties on the same block); *Prudential Oil Corp. v. Phillips Petroleum Co., 69 A.D.2d 763, 415 N.Y.S.2d 217, 218 (1st Dep't 1979)* (champerty not inferred from assignment of claim to subsidiary as "one small detail of corporate parent restructure"). Interpreting the statute to cover such transactions would "cast the potentiality of a champerty cloud too easily over modern business practices." *Bluebird Partners, 731 N.E.2d at 587*.

Applying these principles here, neither side has established a right to summary judgment. Genuine issues of fact exist as to whether the transaction pursuant to which Lateral Recovery LLC obtained its claims is champertous. Lateral Recovery LLC was assigned FTE's litigation claims in connection with the Foreclosure Agreement, a significant commercial transaction. In that agreement, Lateral U.S. Credit Opportunities Fund and other affiliated entities foreclosed on all of FTE's assets pursuant to the security interest in those assets (including these claims) which they had received in a prior loan deal with FTE (the Credit Agreement). *See* Foreclosure Agreement. FTE defaulted on the Credit Agreement while it had an outstanding debt of approximately $50 million to Lateral which it did not appear able to satisfy. *Id.* Lateral therefore attempted to enforce its "independent **[*54]** right[s]" under the Credit Agreement to foreclose on FTE's collateral and recover a portion of the lost value. *Love Funding, 918 N.E.2d at 894*. It did so in part by seeking a transfer of Benchmark's assets and cash on hand, and in part by seeking a transfer of the litigation claims. Credit Agreement at 2. The transaction thus did not just involve assignment of FTE's litigation claims, but transfer of Benchmark's assets as well. Dkt. No. 158 at 24.

Lateral Recovery LLC appears to be related to the lender Lateral U.S. Credit Opportunities Fund. Plaintiffs have produced evidence that Lateral Recovery LLC is owned by lender Lateral U.S. Credit Opportunities Fund. Dkt. No. 146-11 at 26-29. Richard de Silva, who signed the Foreclosure Agreement as Manager of Lateral Recovery LLC, also signed as Manager of each of the other Lateral entities on the transaction. *See* Foreclosure Agreement at

14. De Silva, who has been Managing Partner of Lateral Investment Management since 2014, Dkt. No. 146-11 at 11:7-13, does not consistently differentiate between the Lateral entities and repeatedly refers to them as "we," *e.g.* Dkt. No. 146-11 at 26:13-24 ("[W]e engaged in a strict foreclosure action . . . . And we had two companies that **[*55]** held that assets that we foreclosed on."); *id.* at 28:6-9 ("we were the senior lender to FTE"); *id.* at 36:22-37:6, ("we might be at 25 percent," describing the total investment of Lateral entities).

However, Lateral Recovery LLC is not the same entity as Lateral Investment Management or any of the Lateral entities which invested in FTE. Lateral Recovery LLC was incorporated shortly before the lawsuit to hold these litigation claims, JSMF ¶ 146; Dkt. No. 146-11 at 26-29; Dkt. No. 146-48, was not a lender, *see* Credit Agreement, and had no interests under the Credit Agreement, *see id.* Richard de Silva admitted that "Lateral Recovery is a Delaware limited liability company that was organized, among other reasons, for the specific purpose of taking possession of and pursing certain commercial claims belonging to [FTE]." Dkt. No. 146-48. Lateral Recovery was only assigned litigation claims, not any type of asset. *See* Dkt. No. 146-7 at 20:6-8; Foreclosure Agreement.

These undisputed facts do not entitle either party to summary judgment. The summary judgment record does not contain undisputed evidence regarding the negotiations that led to the challenged assignment. Under the caselaw outlined **[*56]** above, it cannot be sufficient to entitle Plaintiffs to summary judgment that Lateral Recovery LLC is owned by one of the Lenders and that it acquired the claims as part of a transaction in which the Lenders were able to foreclose on all of FTE's assets. The champerty test looks to the primary purpose of the assignee who obtains the claim, not to the purposes of others who may be related to the assignee. *See N.Y. Judiciary Law § 489(1)* (speaking to those who "solicit, buy or take an assignment of . . . . any claim or demand"); *BSC Assocs., LLC v. Leidos, Inc., 91 F. Supp. 3d 319, 328 (N.D.N.Y. 2015)* (refusing to consider the primary purpose of entities other than the assignee).

Thus, in *Fairchild Hiller*, the court looked to the purpose of the assignee, Fairchild, and held that the transaction was not champertous because "Fairchild's primary purpose . . . was to acquire Republic's operating assets" and "[t]he acquisition of the claim was . . . taken in order to induce Farmingdale to take part in the acquisition by purchasing Republic's non-operating assets." *270 N.E.2d at 693*. It was necessary to the result in *Fairchild Hiller* that Fairchild acquired the litigation claim not for the primary purpose of bringing a lawsuit but in order to facilitate a larger commercial transaction in which it had an interest. If, here, the claims were **[*57]** separated from the underlying contract at issue primarily so that Lateral Recovery LLC could bring suit, and it was a matter of indifference to the parties and to the transaction who would acquire the claims, then the assignment to Lateral Recovery LLC would be champertous. *See BSC Assocs., 91 F. Supp. 3d at 328*; *Koro Co. v. Bristol-Myers Co., 568 F. Supp. 280, 287 (D.D.C. 1983)* (distinguishing *Fairchild Hiller* on grounds that an assignment made in the context of a substantial commercial transaction "was admittedly made solely to enable plaintiff to bring an action on the claim"). Lateral U.S. Credit Opportunities Fund could not obtain the litigation claims from FTE and then, in a separate transaction, sell those claims to a newly-created entity who had no pre-existing proprietary interest in the claims for a share of the proceeds without running afoul of New York's champerty rules. *See Justinian Cap., 65 N.E.3d at 1254-56*; *PDVSA US Litig. Tr., 991 F.3d at 1193-95*; *Sharbat, 2023 U.S. Dist. LEXIS 1428, 2023 WL 34377, at *7*. There is no basis to believe that *Section 489* permits a company to do in one step what it is forbidden to do in two.

At the same time, however, there is evidence that the primary purpose of the transaction as a whole was not to gain the proceeds of litigation, but to protect the rights of Lateral entities under the Credit Agreement. The Foreclosure Agreement was a "substantial commercial transaction" aimed at protecting **[*58]** Lateral's preexisting rights, and there is evidence that would suggest that the transfer of the litigation claims was merely a method of achieving this purpose. *Fairchild Hiller, 270 N.E.2d at 693*. There is no genuine dispute that the Lenders had a pre-existing proprietary interest in FTE's claims. The claims that FTE assigned to Lateral Recovery against "various lenders under various merchant cash advance or other agreements for Indebtedness" specifically related to the Credit Agreement, because FTE's incurrence of debts under the MCA agreements was "not permitted under the Credit Agreement." Credit Agreement at 2. Given Lateral's security interest in substantially all of FTE's assets, it had an interest in the possibility that FTE could recover some part of the $50 million by holding accountable the individuals who had mismanaged the company. It is not irrelevant that Lateral Recovery appears to be a wholly-owned subsidiary of Lateral U.S. Credit Opportunities Fund. Assignment from a parent to a wholly-owned subsidiary is less clearly champertous, because it may be inferred that the subsidiary is taking on the claim not solely to bring litigation, but also to protect the proprietary interest it shares with the parent **[*59]** in the claim. *See generally Anisom Corp. v. Banque Exel, S. A., 40 A.D.2d 968, 338 N.Y.S.2d 848, 849 (1st Dep't 1972)* (holding that assignment from a parent to subsidiary is not champertous); *Prudential Oil Corp. 415 N.Y.S.2d at 218-19* (same, in

the context of a larger transaction).[27] Given the conflicting circumstances bearing on Lateral Recovery's purpose in this transaction, the Court is unable to conclude that summary judgment should be granted for either party.

However, the Court is able to reach a conclusion as to another aspect of the champerty analysis. Plaintiff argues that the transaction falls into the safe harbor provision of *Judiciary Law § 489(2)* because the transfer of litigation claims was in satisfaction of FTE's obligation to pay Lateral more than $50 million. *Id.* The Court disagrees. In its entirety, *Section 489(2)* states that:

> Except as set forth in subdivision three of this section,[28] the provisions of subdivision one of this section shall not apply to any assignment, purchase or transfer hereafter made of one or more bonds, promissory notes, bills of exchange, book debts, or other things in action, or any claims or demands, if such assignment, purchase or transfer included bonds, promissory notes, bills of exchange and/or book debts, issued by or enforceable against the same obligor (whether or not also issued by or enforceable **[*60]** against any other obligors), having an aggregate purchase price of at least five hundred thousand dollars, in which event the exemption provided by this subdivision shall apply as well to all other items, including other things in action, claims and demands, included in such assignment, purchase or transfer (but only if such other items are issued by or enforceable against the same obligor, or relate to or arise in connection with such bonds, promissory notes, bills of exchange and/or book debts or the issuance thereof).

The plain text of this provision does not apply to the transaction here. The provision states that section one shall not apply to an assignment if such assignment "included bonds, promissory notes, bills of exchange and/or book debts, issued by or enforceable against the same obligor (whether or not also issued by or enforceable against any other obligors), having an aggregate purchase price of at least five hundred thousand dollars." *N.Y. Judiciary Law § 489(2)*. The assignment here did not include "bonds, promissory notes, bills of exchange and/or book debts." *Id.* Rather, it included "commercial tort litigation claims, fraud claims, and insurance claims." Credit Agreement at 2. Bonds, notes **[*61]** and similar instruments are not identical to claims based on those instruments, and here only the latter were assigned. *See* Credit Agreement at 2; *cf. Bluebird Partners, 731 N.E.2d at 587* ("Bluebird did purchase the second series certificates in their entirety, and not just the rights to a lawsuit encompassed within the expressed terms of the instrument."). Therefore, the assignment cannot qualify for the safe harbor provision.

This reading is consistent with the description of the safe harbor provision by the New York Court of Appeals as a provision which "exempts the purchase or assignment of notes or other securities from the restrictions of *section 489(1)*." *Justinian Cap., 65 N.E.3d at 1257*. It is also consistent with the legislative purpose of "facilitat[ing] the fluidity of transactions" in "New York's debt-trading markets." *Id.* at 169 (citing *Assembly Mem. in Support, Bill Jacket, L. 2004, ch. 394 at 4*). A potential tort or fraud claim is meaningfully different from the fungible "payment obligations" fluidly traded on debt markets. *Id.* at 170. Within *Section 489(1)* and at other points in *Section 489(2)*, the legislature listed a set of relevant assignments and closed with "claim or demand." *N.Y. Judiciary Law §§ 489(1)*, *(2)*. Then in describing the items that needed to have "an aggregate purchase price of at least five hundred thousand dollars," the legislature set out a nearly identical list but **[*62]** omitted "any claim or demand." *N.Y. Judiciary Law § 489(2)*. The Court must presume this omission was intentional. An assignment solely of tort, fraud, and insurance claims cannot qualify for the safe harbor provision.

---

[27] Indeed, the Appellate Division, First Department appears to subscribe to the broad view that "champerty only prohibits the acquisition of a cause of action by a 'stranger' to the underlying dispute." *IKB Int'l S.A. v. Stanley, 225 A.D.3d 542, 207 N.Y.S.3d 488, 491 (1st Dep't 2024)*. Thus, champerty has been held not to apply to assignments from a parent to a subsidiary and from a former assignee back to the original assignor. *See Anisom Corp. v. Banque Exel, S. A., 40 A.D.2d 968, 338 N.Y.S.2d 848, 849 (1st Dep't 1972)* (parent to subsidiary); *Prudential Oil Corp., 415 N.Y.S.2d at 218* (parent to subsidiary); *IKB Int'l, 207 N.Y.S.3d at 491* (former assignee to original assignor). The First Department has also imputed an individual's proprietary interests to an LLC owned by that individual for the purposes of champerty analysis. *Red Tulip, LLC v. Neiva, 44 A.D.3d 204, 842 N.Y.S.2d 1, 8 (1st Dept 2007)*; *see also FragranceNet.com, Inc. v. FragranceX.com, Inc., 679 F. Supp. 2d 312 (E.D.N.Y. 2010)* (suggesting that a parent may have a preexisting propriety interest in a subsidiary's trademark).

[28] Subdivision three concerns "[t]he rights of an indenture trustee, its agents and employees." *N.Y. Judiciary Law § 489(3)*.

## B. Standing

Defendants also argue that Lateral Recovery LLC lacks standing to sue because the assignment included only tort, fraud, and insurance claims, not contract or statutory claims. Dkt. No. 154 at 24. The Court has previously rejected this claim in construing this exact Foreclosure Agreement. *See Lateral Recovery, LLC v. Cap. Merch. Servs., LLC, 632 F. Supp. 3d 402, 442-445 (S.D.N.Y. 2022)*. As explained in that case, the meaning of "commercial tort claims" in the Foreclosure Agreement should be read in light of the definition of that term in *Article 9 of the Uniform Commercial Code*. *Id.* Under that definition, and consistent with a number of holdings stating that "commercial tort claims" include statutory claims and that RICO provides a statutory tort remedy, the assignment encompasses RICO claims. *See id.*

If the assignment were found to violate the champerty statute, it would be void, and Lateral would lack standing to sue. *See Semi-Tech Litig., 272 F. Supp. 2d at 331*. Lateral would be unable to continue as a Plaintiff because it is not the real party in interest. *See Fed. R. Civ. P. 17(a)*; *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l, 790 F.3d 411, 421-25 (2d Cir. 2015)*. The real party in interest would be the assignor, FTE. Because FTE is already a plaintiff **[\*63]** in this action, FTE could continue to pursue the claims.

Defendants imply that FTE should not be able to continue the action, stating that "[t]he naming of FTE and its affiliates should not cure the clear violation of champerty." Dkt. No. 154 at 24. However, the proposition that a failed attempt at assignment should bar the real party in interest from pursuing its claims is unsustainable. Even if the real party in interest were not a plaintiff in the action, the Court would be obligated to provide a chance for the real party in interest to "ratify, join, or be substituted into the action" before dismissing the claims. *Fed. R. Civ. P. 17(a)(3)*; *see Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 20-21, 36 F. 1458 (2d Cir. 1997)*; *Refac Int'l, 131 F.R.D. at 58* (applying this rule in the context of a champertous assignment). A fortiori, when the real party in interest is already a plaintiff in the action, there is no reason to dismiss the real party in interest due to a mistake regarding the validity of an assignment.

Defendants' final standing argument is that Plaintiffs Benchmark, Jus-Com, and Focus Wireless lack standing because any harm to them was only derivative of harm to FTE. Dkt. No. 154 at 32. Plaintiffs respond that in each agreement, FTE granted Funderz a blanket security interest in Benchmark, Jus-Com, and **[\*64]** Focus Wireless. Dkt. No. 158 at 25. To have standing to sue under *18 U.S.C. § 1964 (c)*, a plaintiff must show ""(1) a violation of *section 1962*; (2) injury to business or property; and (3) causation of the injury by the violation." *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 767 (2d Cir. 1994)*; *see also Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992)* (requiring proximate causation).

Defendants are correct that Benchmark, Jus-Com, and Focus Wireless have not shown standing to bring the RICO claims here. The purported violation of *Section 1962* is Funderz's collection of unlawful debt.[29] Benchmark, Jus-Com, and Focus Wireless show no injury resulting from this collection. The money was collected from FTE, not Benchmark, Jus-Com, or Focus Wireless. No action was ever taken on the security interest in Benchmark, Jus-Com, and Focus Wireless. Assuming that the granting of the security interest itself would be an injury,[30] it was not caused by the collection of unlawful debt. It preceded it. Moreover, injury cannot be inferred simply from the fact that Benchmark, Jus-Com and Focus Wireless were affiliated with FTE. Even if FTE's debts had a trickle-down effect on its affiliates, such an injury would be unlikely to meet the standard of proximate cause. *See Holmes, 503 U.S. at 271-73* (noting that those "directly injured" are generally "counted on to bring suit for the law's **[\*65]**

---

[29] As discussed *infra*, Plaintiffs have not produced sufficient evidence to support a violation based on a pattern of racketeering activity.

[30] Defendants note that the agreements list "Jus-Com, Inc." and "Focus Venture Partners," which are not the corporate names of the plaintiffs here, Jus-Com, LLC and Focus Wireless, LLC. Dkt. No. 165 at 10 n.25. This issue is not material because even assuming the security interest is in Jus-Com, LLC and Focus Wireless, LLC, it is not sufficient to confer standing to bring the claims here.

vindication"). Benchmark, Jus-Com, and Focus Wireless have not shown injury and lack standing to bring these claims.

## II. RICO Claims

Plaintiffs state three theories of RICO recovery in their complaint: under *18 U.S.C. § 1962(c)* based on collection of unlawful debt, under *18 U.S.C. § 1962(c)* based on a pattern of racketeering activity, and under *18 U.S.C. § 1962(d)* for conspiracy to violate *Section 1962(c)*. Amended Compl. ¶¶ 115-189. However, Plaintiffs move for summary judgment only under *18 U.S.C. § 1962(c)* on the theory of collection of unlawful debt. Dkt. No. 145. Defendants cross-move for summary judgment on this claim. Dkt. No. 150. Defendants additionally move for summary judgment on Plaintiffs' remaining claims, under *Section 1962(c)* based on a pattern of racketeering activity and under *Section 1962(d)* based on conspiracy to violate *Section 1962(c)*. *Id.; see* Dkt. No. 154 at 20-23.

## A. Violation of *Section 1962(c)* by Collection of Unlawful Debt

The main claim to which the parties direct argument, and the only claim on which Plaintiffs move for summary judgment, is Plaintiffs' claim under *18 U.S.C. § 1962(c)* for collection of unlawful debt. The basis for this claim is that Isaacoff is a RICO person who conducted the affairs of Funderz, an enterprise which operated in interstate commerce providing usurious loans including the agreements at issue **[*66]** here. Dkt. No. 149 at 1-3. Defendants contest three main elements of Plaintiff's primary RICO claim: whether Funderz is a RICO "enterprise," whether the SMA agreements are usurious loans, and whether Isaacoff had the requisite scienter. Dkt. Nos. 153, 162.

### 1. RICO "Person" and "Enterprise"

Plaintiffs argue that Isaacoff can be liable under RICO for managing the affairs of Funderz, a RICO "enterprise." Dkt. No. 149 at 21-23. Defendants argue that "[b]ecause the 'enterprise' alleged by Plaintiffs is a collection of Funderz and its employees carrying on its regular affairs, the distinctness requirement cannot be met." Dkt. No. 162 at 5-7. Defendants additionally argue that Plaintiffs fail to establish a RICO enterprise that is distinct from the alleged unlawful activity. Dkt. No. 162 at 8-9.

Plaintiffs allege a distinct RICO "person" and "enterprise." The RICO "person" that Plaintiffs seek to hold liable is Isaacoff. Dkt. No. 145; *see* Amended Compl. ¶ 129. The "enterprise" is Funderz.[31] Isaacoff has "all decision making authority with respect to Funderz," JSMF ¶ 15, but it is undisputed that Funderz is more than merely another name for Isaacoff. Funderz is a New York LLC, a "distinct legal **[*67]** entity" from Isaacoff. *Cedric Kushner, 533 U.S. at 165*; *see* JSMF ¶ 1. Funderz has its own accounting ledgers and bank accounts. DSMF ¶ 14. It has "agents and brokers," including at all relevant times Isaacoff's brother Gabe. DSMF ¶¶ 15-16.

There is no dispute of material fact as to whether Funderz constitutes an "enterprise." The statutory definition of enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4)*. Funderz fits this definition on its face because it is an LLC, and thus a legal entity. JSMF ¶ 1; *see First Cap. Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004)* ("RICO requirements are most easily satisfied when the enterprise is a formal legal entity."). Even applying the standard for an association in fact enterprise, all that is needed is "a continuing unit that functions with a common purpose." *Boyle v. United States, 556 U.S. 938, 948, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009)*. Funderz was a corporation which set up bank accounts and contracted with agents for the purpose

---

[31] The Amended Complaint states that the enterprise is Funderz, the Isaacovs, and the John and Jane Doe Investors. Amended Compl. ¶ 138. Plaintiffs argue on the motion for summary judgment that "Funderz is a RICO Enterprise," and do not discuss the John and Jane Doe Investors. Dkt. No. 149 at 22. In deciding whether summary judgment may be granted for Plaintiffs, the Court therefore considers Funderz to be the RICO enterprise.

of "advancing capital to small and mid-sized businesses" between 2015 and 2020. DSMF ¶¶ 7-19. This is an enterprise within the meaning of the statute.

There is also no genuine dispute of material fact as to whether Isaacoff is a person "employed by [*68] or associated with" Funderz who participated in "the conduct of such enterprise's affairs." *18 U.S.C. § 1962(c)*. Isaacoff is the sole owner and member of Funderz and had "all decision making authority with respect to Funderz." JSMF ¶ 15; DSMF ¶ 11. Therefore, the undisputed facts show that Isaacoff was a person who managed the affairs of a RICO enterprise.[32]

Defendants argue that Funderz is not sufficiently distinguishable from Isaacoff or from its purportedly illegal activities to constitute a RICO enterprise. Dkt. No. 162 at 5-9. The previous decision in this case rejected Defendants' arguments based on Supreme Court precedent. *See* Dkt. No. 140 at 27-30. It noted that under *Cedric Kushner*, RICO's distinctness requirement is met when the RICO "person" is the sole shareholder of a closely held corporation which constitutes the RICO "enterprise." *Id.* at 28 (citing *533 U.S. at 160*). This situation is distinguishable from one where the *company* is named as the RICO person, and the company together with its agents is named as the enterprise. *Id.* at 28-29 (citing *Cap. Merch. Servs., 632 F. Supp. 3d at 464*). Therefore, it would not violate the distinctness requirement for Isaacoff, who is a natural person, to be held liable as owner and manager of Funderz, the RICO enterprise. *Id.*

As to Defendants' [*69] second argument, the opinion noted that "[t]he Supreme Court in *United States v. Turkette* expressly rejected the argument that RICO only applies to an enterprise that performs illegal acts. *Id.* at 30 (citing *452 U.S. 576, 580, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)*). At the pleading stage, Plaintiffs adequately alleged that Funderz, the Isaacoffs, and the John and Jane Doe investors formed an organized enterprise. *Id.* at 30.

The reasoning of this opinion is cogent and remains entirely applicable to the facts introduced on summary judgment. Consistent with the statutory purpose of protecting the public from "high-ranking individuals in an illegitimate criminal enterprise" an individual may be held civilly liable under RICO, just as he may be held criminally liable, for managing an enterprise which he owns or controls. *Cedric Kushner, 533 U.S. at 165*. The undisputed facts have shown that Isaacoff is the sole owner and member of Funderz and had "all decision making authority with respect to Funderz." JSMF ¶ 15; DSMF ¶ 11. The holding of *Cedric Kushner*, that *Section 1962(c)* "applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner," is directly on point as applied to Isaacoff and Funderz. *Id.* at 166.

Similarly, it is no issue that the entire business of [*70] Funderz, according to Plaintiffs, was to make usurious loans. It would be perverse if the defendant could escape liability on the basis that the enterprise he controls only participates in criminal activity, and the Supreme Court has rejected this argument. *See Turkette, 452 U.S. at 581*. It is true that proof of the unlawful activity is not sufficient to establish existence of the enterprise. *Boyle, 556 U.S. at 947*. Here, however, Plaintiffs have not shown only isolated purportedly criminal transactions. The undisputed facts establish an underlying LLC connected to each transaction which does business through bank accounts and multiple agents and brokers. This is more than sufficient to show an enterprise.

## 2. Collection of Unlawful Debt

---

[32] Defendants do not dispute that Funderz also meets the statutory requirement of being engaged in interstate or foreign commerce. Funderz is a New York LLC, JSMF ¶ 1, and Gabe worked out of a New York office when representing Funderz on the agreements with FTE, a company headquartered in Florida. JSMF ¶¶ 31-33, 48; PSMF ¶ 206. Isaacoff lived in Florida during the time of the relevant agreements. PSMF ¶ 230. Funderz admittedly did business with merchants in states other than New York. Dkt. No. 160 ¶ 121. As part of the transactions discussed in this case, there were ACH credits and debits between FTE's bank account in Richmond, Virginia and Funderz's New York bank account or a bank account in Florida. PSMF ¶ 234. These facts are not disputed by Defendants, *see* Dkt. No. 160 ¶¶ 121, 204-208, and are sufficient to show a "minimal effect on interstate commerce." *DeFalco, 244 F.3d at 309*.

To prove collection of an unlawful debt within the meaning of the RICO statute, a defendant must show that "[1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with "the business of lending money ... at a [usurious] rate," and [3] the usurious rate was at least twice the enforceable rate." *Durante Bros, 755 F.2d at 248*. New York's criminal usury statute, *Penal Law § 190.40*, states that a person is guilty of criminal usury when . . . he knowingly charges, **[\*71]** takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum." *N.Y. Penal Law § 190.40*. Violation of the statute makes a debt unenforceable, as it leads to "complete invalidity of the loan instrument." *Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612, 621 (2021)*; *see N.Y. General Obligations Law § 5-511*.[33]

"Usury laws apply only to loans or forbearances, not investments." *Seidel, 598 N.E.2d at 11*. Defendants do not dispute that the SMAs would have a rate of interest above 50% per annum if characterized as loans,[34] but contend that they are purchases of future receivables, not loans. Dkt. No. 162 at 9-15; Dkt. No. 154 at 12-17; Dkt. No. 165 at 3-5.

When determining whether a transaction is a loan, a court must look to "substance—not form." *Adar Bays, 179 N.E.3d at 622*; *see Abir v. Malky, Inc., 59 A.D.3d 646, 649, 873 N.Y.S.2d 350 (2d Dep't 2009)* (transaction must be "considered in totality and judged by its real character" (quoting *Ujueta v. Euro-Quest Corp., 29 A.D.3d 895, 814 N.Y.S.2d 551, 552 (2d Dep't 2006)*)). "The root of the analysis is the transfer of risk." *Endico Potatoes Inc. v. CIT Group/Factoring Inc., 67 F.3d 1063, 1069 (2d Cir. 1995)*; *see Adar Bays, 179 N.E.3d at 622* ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders, not investors."). "The hallmark of a loan is that the lender 'is absolutely entitled to repayment under all circumstances,' or put otherwise, the 'principal sum is repayable absolutely.'" **[\*72]** *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, \*9 (S.D.N.Y. June 6, 2022)* (quoting *LG Funding, LLC v. United Senior Props. of Olathe, LLC, 181 A.D.3d 664, 122 N.Y.S.3d 309, 312 (2d Dep't 2020)*); *see Lateral Recovery LLC v. Queen Funding, LLC, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at \*4 (S.D.N.Y. July 20, 2022)*; *Colonial Funding Network, Inc. for TVT Cap., LLC v. Epazz, Inc., 252 F. Supp. 3d 274, 281 (S.D.N.Y. 2017)*. On the other hand, when repayment depends on the success or failure of the business, the transaction is not a loan because the creditor takes on the market risk. *See OriginClear Inc. v. GTR Source, LLC, 2021 U.S. Dist. LEXIS 239013, 2021 WL 5907878, at \*5 (W.D.N.Y. Dec. 14, 2021)*.

Under New York law, courts usually examine three factors in determining whether a transaction is a loan: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC, 2023 U.S. App. LEXIS 14241, 2023 WL 3882697, at \*2 (2d Cir. June 8, 2023)* (quoting *Principis Cap., LLC v. I Do, Inc., 201 A.D.3d 752, 160 N.Y.S.3d 325, 326-27 (2d Dep't 2022)*). These three factors provide "a guide to analysis," but the presence or absence of any one factor is not dispositive. *Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at \*9*. "Rather, the essential question under New York law is whether the contracting party 'is absolutely entitled to repayment under all circumstances.'" *Id.* (quoting *LG Funding, 122 N.Y.S.3d at 312*).

The Court must evaluate the relevant factors with regard to the six agreements at issue here.[35] The first four agreements ("October Agreements") have materially similar terms and may be evaluated together. These

---

[33] Usury is a crime on the part of the lender, not the borrower, and the debtor is "not *in pari delicto* with the usurer." *Hammelburger v. Foursome Inn Corp., 54 N.Y.2d 580, 431 N.E.2d 278, 284, 446 N.Y.S.2d 917 (1981)*. Defendants' attempt to assert an *in pari delicto* defense is therefore misplaced. Dkt. No. 162 at 20.

[34] Defendants do assert that the Third HOP Agreement is not subject to the usury law because that law does not apply to agreements of $2.5 million or more. Dkt. No. 162 at 15. This issue is discussed further below.

[35] Defendants suggest that "[b]ecause the November agreements paid off the amounts due and owing under the October agreements, . . . the only relevant agreements are the two November agreements," and cite to authority stating that "a

agreements are unambiguously loans. The last two agreements ("November Agreements") have materially similar terms to each other, but materially different terms to the October Agreements. The November Agreements **[*73]** are not unambiguously usurious, and the relevant extrinsic evidence creates a genuine issue of material fact preventing summary judgment for either party.

### a. October Agreements

The first *Fleetwood Services* factor is the existence of a reconciliation provision. The crucial question in evaluating a reconciliation provision is whether it shifts risk to the buyer. In a true transaction for receivables, the buyer purchases a portion or percentage of the seller's future accounts. The buyer then "bears the risk of loss if receivables are not paid." *Queen Funding, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *5*. Regular payments may be due as an estimate of the seller's receivables, but if the seller has "less-than-expected or no revenues" a reconciliation provision should entitle the seller to a reduction in payments. *LG Funding, 122 N.Y.S.3d at 313*. If there is no opportunity for reconciliation, and payment is due "*irrespective* of [the seller's] accounts receivable," the buyer "faces no downside whatsoever aside from the risk that the borrower will fail to make the required payments," and the transaction "is in fact a loan." *Pro. Merch. Advance Cap., LLC v. C Care Servs., LLC, 2015 U.S. Dist. LEXIS 92035, 2015 WL 4392081, at *4 (S.D.N.Y. July 15, 2015)*; *see also OriginClear Inc., 2021 U.S. Dist. LEXIS 239013, 2021 WL 5907878, at *5* ("focusing on a reconciliation provision often allows a court to determine the risk to the funding company, and therefore, whether the **[*74]** transaction is really a loan").

When a nominal reconciliation provision does not actually shift risk to the buyer, this "sham" reconciliation provision will not allow the transaction to escape the reach of the usury statute. *See Queen Funding, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *5*. A provision which places the reconciliation decision within the "sole discretion" of the buyer is a sham, because it does not alter the seller's absolute obligation to repay. *LG Funding, 122 N.Y.S.3d at 312*; *see New Y-Capp v. Arch Cap. Funding, LLC, 2022 U.S. Dist. LEXIS 180309, 2022 WL 4813962, at *5 (S.D.N.Y. Sept. 30, 2022)*. By contrast, a reconciliation provision is not illusory when the buyer has "a clear contractual duty to modify the debited withdraw amounts to comply with the agreed upon specified percentage," such that failing to do so "would constitute a breach of contract." *OriginClear Inc., 2021 U.S. Dist. LEXIS 239013, 2021 WL 5907878, at *6*; *see Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc., 2019 U.S. Dist. LEXIS 57527, 2019 WL 1473090, at *5* ("The reconciliation clause provides that reconciliation is automatic, mandatory, and that there is no discretion for Plaintiff. There is no minimum payment, so if Defendants' accounts receivables were $0, then Plaintiff would receive $0.") (E.D.N.Y. Apr. 3, 2019).

The reconciliation provision in the October Agreements states that "[U]pon the Merchant's request and receipt of the Merchant's monthly bank statements, BMF shall on or about the eighteenth day of each month reconcile the Merchant's account by either crediting **[*75]** or debiting the difference between the amount debited and the Specified Percentage." First BMF Agreement at 3. But the Addendum, which governs in case of conflict, states that:

> At the Merchant's option, within five (5) business following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby Business Merchant Funding may ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage. However, in order to effectuate this reconciliation, upon submitting the request for reconciliation to Business Merchant Funding . . . the Merchant must produce any and all evidence and documentation requested by Business Merchant Funding in its sole and absolute discretion, necessary to identify the appropriate amount of the Specified Percentage. . . .

---

subsequent contract regarding the same matter will supersede the prior contract." Dkt. No. 154 at 13 n.1. This authority is inapposite. Each contract is separately actionable under RICO, because the purported collection of unlawful debt occurred under each contract. Thus, under Plaintiffs' theory, RICO violations under those contracts would be complete. If anything, subsequent transactions may impact the quantum of RICO damages, *see generally Fleetwood Servs., LLC v. Ram Cap. Funding, LLC, 2022 U.S. Dist. LEXIS 148032, 2022 WL 3536128, at *4-7 (S.D.N.Y. Aug. 17, 2022)*, but would not cure RICO violations that have already occurred.

> The Merchant specifically acknowledges that: (i) the Daily Payment and the potential reconciliation discussed above are being provided to the Merchant as a courtesy, and that Business Merchant Funding is under no obligation to provide the same.

*Id.* at 10. This reconciliation provision is clearly discretionary, as it explicitly states that reconciliation **[*76]** is "a courtesy" which BMF "is under no obligation to provide." *Id.*

Plaintiffs argue that the Addendum, which is clearly discretionary, "controls as a matter of law." Dkt. No. 163 at 5. Funderz argues that "the second provision does not conflict with the first provision." Dkt. No. 162 at 11. Rather, the provisions provide "two opportunities" for the merchant to request the reconciliation, and that Funderz is "required to reconcile on the eighteenth day of the month if a request is made" regardless of what happens with the discretionary request made by the fifth business day of the month. *Id.*

The Court need not decide which provision controls, because neither provision is sufficient to meaningfully shift risk to the buyer. In *Fleetwood Services*, the Second Circuit evaluated a reconciliation provision with nearly identical terms, namely that:

> RCF will debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the specified percentage. **[*77]**

*Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207 at \*13*, aff'd, *2023 U.S. App. LEXIS 14241, 2023 WL 3882697*. The Second Circuit stated that this "nominal reconciliation provision does not, in fact, relieve [the borrower] of its obligation to pay [the lender] the daily amount due under the Agreement, nor does it qualify [the borrower's] rights to declare the full amount immediately due and payable and to collect against [the lender]." *Fleetwood Servs., 2023 U.S. App. LEXIS 14241, 2023 WL 3882697, at \*2*. In other words, there were two issues with the provision which, in combination with each other and the remainder of the transaction, made it ineffective. First, the reconciliation provision could only be invoked on a monthly basis, while the merchant's account was debited daily in an unchangeable amount. Second, pursuant to other terms of the agreement the lender could declare a default based on a small number of missed daily payments, even if at the end of the month it turned out that those payments had overestimated the merchant's receivables. *See Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at \*14*. It does not matter if the merchant may nominally reconcile at the end of the month, because if its business takes a downturn it will be unable to make the daily payments and likely default before it reaches the end of the month.

The same is true here. Even assuming accounts can be reconciled at the end **[*78]** of each month, the agreements provide no way to adjust the daily payment except in Funderz's "sole discretion." First BMF Agreement at 3. Appendix A to the agreement specifically states that a non-sufficient funds fee will be charged "[u]p to TWO TIMES ONLY before a default is declared." *Id.* at 9. Therefore, if FTE's receivables took a downturn, it would continue to be responsible for the same daily payments, and if it was unable to make the payments Funderz would be able to declare a default at any time.[36] This shifts no meaningful risk to Funderz.

---

[36] Funderz suggests that "[t]he Agreements did not specifically provide that an 'event of default' occurs after a few missed payments," implying that the merchant might be able to escape default long enough to invoke the reconciliation provision. Dkt. No. 162 at 12 n.10. Initially, this argument appears to be largely foreclosed by *Fleetwood Services*, which interpreting a materially similar contract stated that the reconciliation provision did not "relieve [the merchant] of its "obligation to pay [the lender] the daily amount due under the Agreement." *2023 U.S. App. LEXIS 14241, 2023 WL 3882697, at \*2*. Under the SMAs, violation of "any term or covenant" is an event of default. *See* First BMF Agreement § 3.1; Third BMF Agreement § 3.1. Therefore, assuming the merchant had an obligation to pay the daily amount, failure to do so would result in default. To the extent that this is ambiguous, as to the first four agreements any ambiguity is resolved by the language in the Appendix explicitly stating a default will be declared after two missed payments.

The second *Fleetwood Services* factor is whether the agreement has a finite term. "A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk associated with the receivables not being collectable." *Queen Funding, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *6*. The first four agreements have a stated term of one year, automatically renewed until the full amount is paid. First BMF Agreement at 4. However, this term carries little weight. When an agreement involves unchangeable daily payments regardless of the merchant's receivables, the loan has "a de facto fixed term . . . easily calculated **[*79]** by dividing the amount [the borrower] owes by the amount of daily payments." *Id.; see CMS, 632 F. Supp. 3d at 462* ("[I]f the reconciliation is unavailable, [and] the daily payment amount would never change, . . . the agreement would have a finite term."). As described above, the October Agreements provide no mechanism for FTE to change the daily payments. Therefore, the de facto actual term of the loan is the number of days it will take to reach the Purchased Amount, given the daily payment amount. As reflected in the Funderzlink printout, this term is between 49 and 65 days, depending on the agreement. *See* Dkt. No. 146-21. If FTE does not pay the loan within this time, it will almost inevitably be in default.

Funderz note that, in fact, the Purchased Amount sometimes took longer to repay than "initially contemplated." Dkt. No. 154 at 16; Dkt. No. 162 at 13. This does not necessarily weigh against the agreements being loans. The holder of a loan can allow a borrower to miss payments or restructure the payment schedule *in its discretion*, but this does not mean the holder bears risk or that the transaction is not a loan.[37] The question is whether the holder has an obligation to extend the repayment time if the merchant's **[*80]** receivables are insufficient. Even assuming that reconciliation here is governed by the mandatory provision, the holder's obligation to extend the repayment time is so limited as to be illusory. If the merchant invokes the reconciliation provision for a prior month and receives a refund of some part of its payments, the overall time to pay could be extended. However, as described above, the merchant would almost inevitably be in default before being able to invoke the provision. Moreover, because the daily payment amount would remain the same, the loan would become due again quickly rather than being extended indefinitely due to the Merchant's decrease in revenues. The term is fixed as a practical matter by the relationship between the daily payment and Purchased Amount, and Funderz's internal records suggest that this is how it was regarded. *See* Dkt. No. 146-21.

The third *Fleetwood Services* factor is recourse in case of bankruptcy. In a purchase of receivables, the buyer would generally bear the risk of the seller going bankrupt and having no further receivables. *See CMS, 632 F. Supp. 3d at 460-461* ("The merchant can close without owing the funder anything."). "This is in contrast to a lender, who may still **[*81]** have a claim against the merchant for amounts unpaid notwithstanding cessation of operations." *Id. at 460 n.7*.

In the October Agreements FTE bears the entire risk of bankruptcy. Bankruptcy is an Event of Default, as is the merchant seeking "reorganization, arrangement, adjustment, or composition of it or its debts." First BMF Agreement at 5. The dissolution or suspension of the business, or the sale of all or substantially all of its assets, is also an Event of Default, and makes the entire Purchased Amount come due. *Id.* Funderz can also recover from the guarantors in the event of bankruptcy. *Id.* at 6. These protections are fundamentally inconsistent with the idea that Funderz bears the risk of a downturn in FTE's business, and suggest a loan.

All three *Fleetwood Services* factors indicate that Funderz did not take on risk. Numerous other aspects of the agreement also suggest that the October Agreements were loans, not purchases of receivables. The agreements were underwritten based on the merchant's creditworthiness, not the creditworthiness of any account debtor. JSMF ¶ 42. The agreements purported to be for 10% of FTE's receivables, but no specific receivables were identified and the agreement in **[*82]** fact gave Funderz the right to "all of Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from Merchant's customers . . . as a result of Merchant's sale of goods or services." First BMF Agreement at 3. Moreover, the agreement made clear that FTE "is

---

[37] Similarly, representations by Isaacoff and Funderz that they would work with merchants or pause payments if the merchant was struggling are not necessarily inconsistent with the transactions being loans. *See* JSMF ¶¶ 129-130; Dkt. No. 146-5 at 18:21-19:5. To the extent that Funderz portrays the decision to give such relief as discretionary, *see* Dkt. No. 146-5 at 20:17-20, this in fact supports the transactions being loans.

responsible for ensuring that the specified percentage to be debited by BMF remains in the account and will be held responsible for any fees incurred by BMF resulting from a rejected ACH attempt." First BMF Agreement at 3. Read in tandem, these two provisions suggest that the agreement was aimed at taking money from FTE's account generally, not specifically collecting on receivables.

Perhaps most critically, comparison of the six agreements makes Funderz's characterization of the daily payment as a "good faith estimate" of 10% of FTE's receivables entirely unsustainable. DSMF ¶ 40; JSMF ¶¶ 94, 96. As noted in the previous opinion in this case, *see* Dkt. No. 140 at 23-24, the daily payment varied from $9,999 to $69,999 on agreements signed between October 15, 2018, and November 9, 2018. *Compare* First BMF Agreement *with* Third HOP Agreement. It is not tenable that FTE's receivables **[*83]** increased sevenfold in less than a month, especially at a time when the company was undisputably highly troubled. Even if it were possible to claim a sudden increase in revenue or a mistake in the earlier valuation, "estimates" of $14,999 and $39,999 were made in agreements signed *on the same day. Compare* Second BMF Agreement *with* Second HOP Agreement. The daily amount was not a good faith estimate of FTE's receivables. The only consistency in the daily payment amount is that it increased as the Purchased Amount increased. This is consistent with a loan to be repaid over a fixed period, not a purchase of receivables.

The October Agreements were unambiguously loans.

### b. November Agreements

The November Agreements are less straightforward. Taken in isolation and on its face, each November agreement is plausibly a genuine purchase of receivables. However, Plaintiffs introduce significant extrinsic evidence supporting an inference that the apparent purchase is merely a guise for continued usurious lending. This raises a material issue of fact as to whether the November Agreements were a cover for usury, precluding summary judgment for either party.

The appearance that a transaction is lawful **[*84]** on its face is relevant to a usury claim, but not dispositive. New York courts have distinguished between two types of usury claims: those in which "the nature of the transaction establishes the excessive charge," and those in which "the transaction on its face appears legal or is ambiguous." *Freitas v. Geddes Sav. & Loan Ass'n, 63 N.Y.2d 254, 471 N.E.2d 437, 446, 481 N.Y.S.2d 665 (1984)* (Simons, J., dissenting).[38] In the former case, there is no need for extrinsic evidence. In the latter case, however, "extrinsic evidence is necessary." *Id.*; *see Meaker v. Fiero, 145 N.Y. 165, 39 N.E. 714, 715 (N.Y. 1895)* ("The contract may be illegal in its nature, or may be shown to be so by extrinsic facts."). A court is not prevented from relying on such of the allegation is that the contract itself is merely cover for an underlying illegal agreement. *Aaron v. Mattikow, 146 F. Supp. 2d 263, 267 (E.D.N.Y. 2001)* ("[T]he parol evidence rule does not pertain to the defense of usury because . . . the Court's role is to uncover the true nature of the transaction."); *Von Haus v. Soule, 146 A.D. 731, 131 N.Y.S. 512, 513-14 (1st Dep't 1911)* ("[Parol evidence may be given to show that the transaction is tainted with usury, notwithstanding the fact that the writing would indicate that it was lawful."); *Stransky v. DiPalma, 137 A.D.3d 1734, 28 N.Y.S.3d 548, 549 (4th Dep't 2016)* (rejecting application of the parol evidence rule to an allegedly usurious agreement). This principle is related to the general rule that "[t]he parol evidence rule does not preclude the **[*85]** admission of evidence to show that an unambiguous contract is illegal." *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V., 28 F. Supp. 2d 126, 139 (S.D.N.Y. 1998),* aff'd, 205 F.3d 1323 (2d Cir. 1999), and aff'd, 205 F.3d 1323 (2d Cir. 1999). "If a different rule prevailed, parties to illegal contracts could make them enforceable by the simple device of putting them in writing, using such words as would conceal or omit the illegal objects intended by them to be accomplished." *97 Fifth Ave. Corp. v. Schatzberg, 283 A.D. 407, 128 N.Y.S.2d 264, 266 (1st Dep't*

---

[38] *Freitas* concerned the standard for civil usury under *Banking Law § 380-e*. *See 471 N.E.2d at 441*. In declining to adopt the standard for criminal usury in the civil context, the majority opinion noted that Justice Simons' dissent "is akin to the standard utilized by New York's criminal usury statutes." *Id. at 444*. Based on this statement, the Second Circuit has relied on Justice Simons' dissent as an accurate statement of New York law applicable to criminal usury. *See United States v. Grote, 961 F.3d 105, 109 n.4 (2d Cir. 2020)*.

*1954)*; *see Stransky, 28 N.Y.S.3d at 549*. Here, if Funderz and FTE in fact agreed to a loan at usurious interest, writing down the transaction in a manner consistent with a sale of receivables would not defeat a usury claim. Both the agreement itself and the external facts are relevant to the determination of whether Funderz loaned monies to FTE at a usurious rate of interest. evidence by the parol evidence rule or other similar doctrines of contract law, because the nature

When usury is not clear from the face of a written agreement, "questions of usurious intent and whether a transaction is a 'cover for usury' are typically 'question[s] of fact.'" *Adar Bays, 179 N.E.3d at 625* (quoting *Hammelburger v. Foursome Inn Corp., 54 N.Y.2d 580, 431 N.E.2d 278, 284, 446 N.Y.S.2d 917 (1981)*). One party will argue that the agreement was intended as the writing suggests, and the other party will produce evidence that the writing was a cover for usury, creating an issue of fact for the jury. The November Agreements **[*86]** follow this pattern.

Summary judgment cannot be granted for Plaintiffs because each November Agreement facially "appears legal or is ambiguous." *Freitas, 471 N.E.2d at 446* (Simons, J., dissenting). The November Agreements change relevant provisions of the October Agreements in ways that make each transaction on their face a genuine purchase of receivables. In place of a reconciliation provision that allows a refund at the end of the month, the November Agreements contain provisions allowing adjustment to the daily payment (now termed the "Remittance").[39] Third BMF Agreement at 3-4. Initially, the agreement states that the remittance is set based on "the daily average revenues of Seller." *Id.* at 3. Subsequently, the remittance is "subject to adjustment." *Id.*

> [E]very two (2) calendar weeks . . . Merchant may give notice to BMF to request a decrease in the Remittance. The amount shall be decreased if the amount received by BMF was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the **[*87]** number of business days in the previous (2) calendar weeks. . . At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page l of this Agreement.

*Id.* at 4. Applied literally, this provision solves the issues with the previous agreements. The provision allows for adjustment of the daily amount. If FTE's business slows down and the daily amount becomes more than 10% of FTE's receivables, the amount can be lowered based on FTE's actual receipts. This shifts the risk of business downturn to Funderz. The adjustment provision appears to be mandatory, stating that if the Merchant gives notice and the amount is higher than the Purchased Percentage, the Remittance "shall" be modified. *Id.*[40]

The November Agreements change the term of the agreement from one year to a stated indefinite term. *See* Third BMF Agreement § 1.2. The adjustment provision supports this stated term, because if invoked it would allow FTE to slow down payments indefinitely. *See US Info. Grp. LLC v. EBF Holdings, LLC, 2023 U.S. Dist. LEXIS 169605, 2023 WL 6198803, *8 (S.D.N.Y. Sept. 22, 2023)*. The November Agreements remove bankruptcy as an Event of Default and a condition that allows **[*88]** Funderz to recover from the guarantors. JSMF ¶ 100; *see* Third BMF

---

[39] The previous decision in this case noted that this is an adjustment provision, rather than a reconciliation provision, and therefore the November Agreements "lack reconciliation provisions." Dkt. No. 140 at 21. The parties dispute this labeling, *see* Dkt. No. 162 at 10 n.8; Dkt. No. 163 at 4, but the terminology is not material. The issue is not whether the provisions are labeled reconciliation provisions or adjustment provisions, but whether they shift risk. It is relevant to the shifting of risk that there is no apparent mechanism for FTE to receive a refund for any overpayment in the November Agreements, as opposed to a change in the remittance going forward. However, the adjustment provision much more substantially shifts the risk in the opposite direction as detailed *infra*.

[40] The previous decision in this case described these provisions as "discretionary." Dkt. No. 140 at 18-19. The provision is discretionary in the sense that the Merchant need not request an adjustment, and if it is not requested Funderz is not required to provide it. However, if the adjustment is requested, the agreement states it shall be provided.

Agreement at 7. The agreements even remove the comment in the Appendix stating that the insufficient funds fee will only be charged twice before default is declared. Third BMF Agreement at 9.

These changes allow the November Agreements to be read as genuine contracts for the purchase of receivables. On its face, each agreement sets the daily payment based on an actual estimate of FTE's revenue that can change over time. If the business slows down FTE will be able to decrease the payment, and this adjustment means that the agreement has no definite term. Funderz will bear the risk that FTE goes out of business and is unable to pay.

Defendants also produce some extrinsic evidence supporting this interpretation. Although Funderz's corporate representative makes clear that there is not a standard, formalized, reconciliation process, she states that the broker would "look at the bank statements to see whether they had any decline in revenues," whether "they don't have healthy deposits," or whether they have "low receivables or no receivables." Dkt. No. 146-5 at 19:19-20:10. This testimony is consistent with the existence of **[\*89]** some sort of reconciliation process. Similarly, Isaacoff testified that the daily amount was set "based on his receivables" and "what the merchant agrees that he can afford," and that issues with this number in the case of FTE could have been based on fraud by FTE's principals. Isaacoff Dep. at 54:21-55:12; *see also* Isaacoff Decl. ¶ 24 ("Requests for modification were routinely and normally approved if the merchant's documents support the modification.").

At the same time, summary judgment cannot be granted for Defendants because Plaintiffs produce significant evidence suggesting that these facial changes were merely a disguise for continued usurious lending. Although the November Agreements explicitly state that the Initial Remittance is set based on "the daily average revenues of Seller," Third BMF Agreement at 3, a jury could readily find from the evidence discussed above that this is a sham. Taking the agreements as true leads to the highly improbable conclusion that Funderz's "good faith" estimate of FTE's daily receivables was $387,240 on November 8, 2018 (Third BMF Agreement) and $699,990 on November 8 or 9, 2018 (Third HOP Agreement). *See* Dkt. No. 140 at 23-24. If the Initial **[\*90]** Remittance was not a good faith estimate of receivables, this also supports an inference that the adjustment provision aimed at the same Remittance was not genuine. Funderz's corporate representative concedes that she is unaware of a reconciliation department or any reconciliation policies, and portrays any payment adjustments as dependent on the discretion of the broker, stating uncertainty as to whether such an adjustment could be required under the contract. Dkt. No. 146-5 at 18-22:13. Similarly, Gabe stated he could not recall ever refunding money pursuant to a reconciliation provision. Gabe Deposition at 199:5-21. This testimony is consistent with an inference that the provision was a sham.

FTE's failure to attempt to use the reconciliation provision further supports this inference. FTE was financially distressed from the start of these transactions, *see* Dkt. No. 146-16, and at least at some points did not make payments on the Third HOP Agreement at all. JSMF ¶ 126; *see* Dkt. No. 146-37. Moreover, FTE was concerned as early as December 3, 2018, with money being overdrawn from its account. Dkt. No. 147-45; *see* Dkt. No. 147-22 (additional concerns raised on January 14, 2019). But **[\*91]** FTE continued to make daily payments through March 15, 2019, without attempting to invoke the reconciliation provision. This suggests that FTE did not believe the provision was operative or that a change had occurred from the prior agreements.

Some aspects of the contracts themselves also support reading the risk-shifting provisions as illusory. The November Agreements still make breach of any term or condition an Event of Default, and specifically state that it will be an event of default if "Merchant shall enter into any financing agreements with any other party, including but not limited to: Loans, Merchant Cash Advances . . . ." Third BMF Agreement at § 3.1. They also require the Merchant to warrant that it has unencumbered title to all receipts. *Id.* § 2.10. However, as noted by Plaintiffs, FTE's bank account records from October support an inference that Plaintiff had preexisting agreements with a number of other MCA companies or similar entities, with daily debits from entities with names like Queen Funding, Green Capital, Capital Merchant Services, Argus Capital, and Franklin Funding. *Id.* ¶ 44; Dkt. No. 146-16. Therefore, Plaintiffs make a plausible argument that FTE was in default **[\*92]** from the beginning of the agreement. If so, then

both parties would have understood at the time of contracting that Funderz could declare default at any time if FTE attempted to assert its reconciliation rights, making that provision meaningless in practice.[41]

These agreements are also ambiguous as to whether missing a single payment or small number of payments would be an Event of Default. The initial transaction description states that BMF will bear the risk of the merchant "going bankrupt or going out of business, or experiencing a slowdown in business." Third BMF Agreement at 3. However, it is not clear how to square this language with the fact that the provision stating that "Merchant is responsible for ensuring that the Agreed Remittance to be debited by BMF remains in the account," the fact that a breach of any term or condition is a default, and Isaacoff's testimony that missing one payment would be a default. *Id.* at 3; JSMF ¶¶ 129-130. In case of a sudden downturn, FTE would still be obligated to make the payments for two weeks under the reconciliation provision in the November Agreements. Therefore, if a default could be declared after one or two days, the reconciliation provision **[*93]** could be largely illusory. It is notable that the daily payment amounts implied that the agreements here would be repaid in approximately two months, with the short term creating "a corresponding likelihood that the merchant's need for reconciliation might be urgent." *Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F. Supp. 3d 237, 248 (S.D.N.Y. 2022)*. If the merchant is certain to default in case of a downturn in business, the other protections in the agreement are irrelevant. *See In re GMI Grp., Inc., 606 B.R. 467, 487 (Bankr. N.D. Ga. 2019)* (finding the existence of a loan when, despite other factors indicating a purchase of receivables, "all of the protections . . . require that the Debtor not be in default" and "the Agreement contains a certainty of default").

Drawing all inferences in favor of Plaintiffs, a factfinder could infer that despite facial changes in the November Agreements, the actual agreement between the parties was akin to the previous four usurious loans. Drawing all inferences in favor of Defendants, a factfinder could infer that although the first four agreements were loans, in the November Agreements Funderz genuinely purchased a portion of FTE's receivables. Therefore, neither party is entitled to summary judgment on the issue of whether the November Agreements were cover for usurious loans.

**c. The Third [*94]  HOP Agreement**

However, Defendants additionally argue that the Third HOP Agreement is exempt from the usury law because it is for a sum of $2.5 million or more. Dkt. No. 154 at 13. Defendants are correct, and summary judgment must be granted in their favor on this agreement.

*New York General Obligations Law § 5-501(6)(b)* states that "[n]o law regulating the maximum rate of interest which may be charged, taken or received, including *section 190.40* and *section 190.42 of the penal law*, shall apply to any loan or forbearance in the amount of two million five hundred thousand dollars or more." *N.Y. General Obligations Law § 5-501(6)(b)*; *see Adar Bays, 179 N.E.3d at 619*. The Third HOP Agreement on its face states that that HOP purchased 10% of FTE's future receivables, listing a purchase price of $2,750,000. Third HOP Agreement at 3. Therefore, it is exempt from the usury law.

Plaintiffs argue that the $2,250,000 of this loan which was used as repayment of the prior loan should not be counted, noting that the amount in fact paid to FTE (after fees) was only $300,000. Dkt. No. 158 at 16. This argument is not economically sound. A dollar of forgiven debt is equivalent to a dollar in hand. Funderz could have paid the full $2,750,000 into FTE's bank account and had FTE pay back $2,250,000 on the outstanding loan—this would not have changed the character **[*95]** of the transaction.

---

[41] The reconciliation provision also places hurdles in the way of FTE exercising the right to adjust, including the need to "provide all information reasonably requested by [Funderz] to properly calculate the Merchant's Remittance," and to renew this request every two weeks on pain of the remittance returning to the daily amount. Third BMF Agreement at 4. These hurdles may potentially provide Funderz with "pretext for denying reconciliation." *Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022)*.

2024 U.S. Dist. LEXIS 176985, *95

Plaintiffs also argue that in this particular situation, the repayment of the prior HOP loan should not be considered because the prior HOP loans were void ab initio. Dkt. No. 158 at 16. There is some logic to the idea that if Plaintiffs did not in fact owe anything to Defendants under the prior agreements, the purported loan forgiveness was illusory and should not count towards the usury cap. The argument also illuminates the issues created when a usurious lender can repeatedly stack loans on loans until the borrower is so far in debt that the money purportedly being "advanced" exceeds the usury threshold. Nevertheless, *N.Y. General Obligations Law § 5-501(6)(b)* sets a bright-line rule allowing borrowers and lenders to structure their conduct, and courts have rejected attempts to look through the face amount to determine the amount actually advanced. *See Alleon Cap. Partners, LLC v. Choudhry, 225 A.D.3d 578, 207 N.Y.S.3d 532 (2d Dep't 2024)* (rejecting usury claim when the stated amount was over $2.5 million, but only about $2.36 million was advanced after costs and fees); *SpecFin Mgmt. LLC v. Elhadidy, 201 A.D.3d 31, 158 N.Y.S.3d 366, 369-75 (3d Dep't 2021)* (agreement to provide "up to $2,500,000 in funding" fell within exemption); *Tides Edge Corp. v. Cent. Fed. Sav., F.S.B., 151 A.D.2d 741, 542 N.Y.S.2d 763, 764-65 (2d Dep't 1989)* (agreement to loan $4.25 million fell within exemption, even though amount actually advanced was less than $1 million).[42] The amount Funderz agreed **[*96]** to provide was over $2.5 million, so the transaction is exempt from the usury law.[43]

To summarize, summary judgment on the issue of whether the transaction is a usurious loan is granted for Defendants as to the Third HOP Agreement, for Plaintiffs as to the First and Second HOP and BMF Agreements, and for neither party as to the Third BMF Agreement.

### 3. Mens Rea

In *United States v. Biasucci*, the Second Circuit squarely stated that "RICO imposes no additional mens rea requirement beyond that found in the predicate crimes." *786 F.2d 504, 512 (2d Cir. 1986)*. Therefore, "we look to the scienter elements found in the statutory definitions of the predicate crimes to determine the degree of knowledge that must be proved to establish a RICO violation." *Id*; *see also United States v. Boylan, 620 F.2d 359, 361 (2d Cir. 1980)*; *United States v. Scotto, 641 F.2d 47, 56 (2d Cir. 1980)* ("The law at issue here does not demand willful violations of the RICO statute, nor does it require willful violations of the predicate offenses.").[44]

Applying that rule here, the only relevant mens rea requirement for this case is the mens rea for usury under *Penal Law § 190.40*. Under that statute, "[t]he general rule is that the intent required to establish usury is the general

---

[42] Plaintiffs argue that the face amount was reduced by a "Bank Fee" and "personal service fee." Dkt. No. 158 at 16. Because those two fees totaled only $200,000, the amount of the loan would still be greater than $2.5 million.

[43] As Plaintiffs note, Defendants did not raise *General Obligations Law § 5-501(6)(b)* in their answer to the Amended Complaint. *See* Dkt. No. 147-40 at ¶¶ 190-219. Because the answering party "must affirmatively state any avoidance or affirmative defense," *Fed.R.Civ.P. 8(c)(1)*, generally, "[f]ailure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 176 (2d Cir. 2014)*. However "a district court may entertain unpleaded affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Id.* (quoting *Rose v. AmSouth Bank of Fla., 391 F.3d 63, 65 (2d Cir.2004)*). Here, Defendants have not offered a reason for failing to earlier plead the defense. However, they contest that it is an affirmative defense at all, and note that Plaintiffs are not prejudiced. Dkt. No. 165 at 4. The Court agrees that the defense is properly considered. It raises a pure question of law, and Plaintiff is not plausibly prejudiced by being unable to take discovery on the issue. The defense is decisive of the issue and does not delay proceedings. Plaintiffs have had an opportunity to respond to the defense in their summary judgment papers and have done so, Dkt. No. 158 at 16-18, which is sufficient to allow them appropriate process.

[44] Several other circuits are in accord with the *Biasucci* rule. *See United States v. Blinder, 10 F.3d 1468, 1477 (9th Cir. 1993)*; *United States v. Pepe, 747 F.2d 632, 675-76 (11th Cir. 1984)*. In addition, several circuits have come to a similar conclusion that in interpreting an analogous statute, *18 U.S.C. § 1955*, which prohibits the conduct of a gambling business which is in violation of state law. *United States v. Lawson, 677 F.3d 629, 652 (4th Cir. 2012)*; *see United States v. Ables, 167 F.3d 1021, 1031 (6th Cir.1999)*; *United States v. Cyprian, 23 F.3d 1189, 1199 (7th Cir.1994)*.

intent to act contrary to the statute, not a specific intent to commit usury." *Freitas, 471 N.E.2d at 446* (Simons, **[\*97]** J., dissenting); *see Fiedler v. Darrin, 50 N.Y. 437, 443 (1872)* ("The intent which enters into and is essential to constitute usury is simply the intent to take or reserve more than [the statutory maximum] for the loan or forbearance of money."). "If usury can be gleaned from the face of an instrument, intent will be implied and usury will be found as a matter of law." *Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc., 105 A.D.3d 178, 961 N.Y.S.2d 86, 89 (1st Dep't 2013)*. However, intent is not inferred when "the transaction on its face appears legal or is ambiguous." *Freitas, 471 N.E.2d at 446* (Simons, J., dissenting); *see Fiedler, 50 N.Y. at 443* ("There are cases in which an act is lawful or unlawful, depending upon the particular intent of the actor.") In such cases, "a corrupt intent must be established" through extrinsic evidence. *Freitas, 471 N.E.2d at 446*. Importantly, given the tendency of lenders to "extract unlawful interest rates through novel and increasingly sophisticated instruments," *Adar Bays, 179 N.E.3d at 627*, it is no defense against illegality that the usurer "intended to cover up his tracks . . . and could well have sworn that he did not intend to bring himself within the condemnation of the law." *Fiedler, 50 N.Y. at 444*. If usury is not clear from the face of the loan, usurious intent is a question of fact. *See Adar Bays, 179 N.E.3d at 623*; *Apollo Cap. Corp. v. Astra Veda Corp., 2024 U.S. Dist. LEXIS 141272, 2024 WL 3729093, at \*5 (S.D.N.Y. Aug. 7, 2024)*; *Haymount Urgent Care, 609 F. Supp. 3d at 247*.

As to the October Agreements, usury is clear on the face of the agreements and usurious intent is therefore implied. **[\*98]**  *See Giventer v. Arnow, 37 N.Y.2d 305, 333 N.E.2d 366, 369, 372 N.Y.S.2d 63 (1975)* (intent requirement is satisfied when "the note itself establishes, on its face, clear evidence of usury"); *Matter of Dane's Est., 55 A.D.2d 224, 390 N.Y.S.2d 249, 250 (3d Dep't 1976)* ("The showing, as here, that the note reserves to the lender an illegal rate of interest satisfies respondents' burden of proving a usurious loan."); *Angelo v. Brenner, 90 A.D.2d 131, 457 N.Y.S.2d 630, 631 (3d Dep't 1982)* (intent requirement was satisfied when note was usurious on its face, even though "plaintiff was not aware that the rate was usurious"). This makes sense. Isaacoff knew that Funderz was giving money to FTE that would be repaid at an interest rate of hundreds of percent annually, at a fixed term, with no meaningful risk to Funderz. The intent to enter into such an agreement is the intent to commit usury, even if that word was not used. *See Fiedler, 50 N.Y. at 443* ("It will not avail one, who deliberately fires his neighbor's house, to swear that he did not intend to commit arson; and one who deliberately and intentionally secures to himself $1,650 at the end of four months, in return for a present advance of $1,500, cannot avoid the consequences of the act by testifying that he did not intend to take usury; that is, that he intended to give the transaction a different name from that which the law gives it.").

As to the Third BMF Agreement, usury **[\*99]**  is not clear on the face of the agreement. Therefore, as described above, whether the transaction is cover for a usurious loan is an issue of fact which turns on the intent of the parties. Largely for the reasons already stated, Plaintiff has not conclusively shown through extrinsic evidence that the Third BMF Agreement was intended to be cover for a usurious loan. Plaintiff offers evidence showing that Isaacoff sometimes described Funderz as a "lender" or providing "loans," PSMF ¶¶ 27-29, that websites allegedly associated with Funderz described Funderz's business as "loans," or "lending," PSMF ¶¶ 4-5, 16-18, 23-26, and that a bank account application describes Funderz's business as "loans." JSMF ¶ 5. However, at other points Isaacoff has stated that Funderz purchases receivables, PSMF ¶¶ 8, 31, including on bank account applications, JSMF ¶ 11. He swears that each agreement "was not a loan nor was it intended to be construed as a loan." Isaacoff Decl. ¶ 20. These opposing statements create a factual dispute regarding whether Isaacoff understood the agreement to be a loan. Importantly, this dispute is not fundamentally about labeling. The issue is not whether Isaacoff labeled the **[\*100]**  transaction as a legal "purchase" or an illegal "loan." The issue is whether the intent was for the money to be absolutely repayable, such that the formal purchase of receivables was merely a cover for usury, or whether the intent was an actual purchase of receivables as suggested by the face of the contract.[45]

---

[45] Defendants suggest that they are entitled to an adverse inference as to Isaacoff's mens rea due to Defendants' claims that emails, including communications with counsel, were lost due to a change in servers. Dkt. No. 149 at 14-15. On the contrary, Isaacoff asserts a mens rea defense based on advice of counsel. Dkt. No. 154 at 19-20; *see* DSMF ¶ 37. The Court does not address these arguments at this time, as they are not material to the Court's determination of this motion for summary judgment.

Defendants argue that a higher mens rea is required. In addition to the mens rea required for usury under *Penal Law § 190.40*, Defendants argue that Plaintiff must show "that the defendant acted with specific knowledge that his conduct was unlawful." Dkt. No. 154 at 18-20; *see* Dkt. No. 162 at 16-18. The basis for Defendant's argument is the Second Circuit's decision in *United States v. Grote, 961 F.3d 105 (2d Cir. 2020)*, which he states "held" that proof of specific knowledge is required in this situation. Dkt. No. 154 at 18.

In *Grote*, the Second Circuit noted that *Biasucci* "ostensibly adopted two incompatible state-of-mind standards." *Grote, 961 F.3d at 118*. Despite holding that "RICO imposes no mental state requirement beyond that required by the predicate state statute," *Biasucci* also stated in dicta that "RICO requires proof that the defendant acted willfully." *Id. at 119*. *Grote* suggested that *Biasucci*'s holding that RICO imposes no mental state requirement is "difficult **[*101]** to reconcile" with more recent Supreme Court cases setting out a "presumption [in the interpretation of criminal statutes] in favor of a scienter requirement," applicable to "each of the statutory elements that criminalize otherwise innocent conduct." *Id. at 118-19* (quoting *Elonis v. United States, 575 U.S. 723, 737, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015)*). The difficulty is "exacerbated" because a criminal RICO offense can be based on a civil usury statute, and many civil usury statutes have no mens rea element whatsoever. *Id. at 119*. Therefore, accepting the premise that "the scienter requirement for RICO unlawful debt collection is drawn from the underlying usury statute" leads to the conclusion that "a criminal RICO violation may carry no scienter requirement at all." *United States v. Moseley, 980 F.3d 9, 19 (2d Cir. 2020)*.

The Second Circuit did not resolve this difficulty, because the facts of the case did not require it to do so. *Grote, 961 F.3d at 121*; *see Moseley, 980 F.3d at 19* (same). It stated that "we express no view on whether willfulness or awareness of unlawfulness was required for conviction." *Grote, 961 F.3d at 117*. Defendants nevertheless argue that *Grote* implies that a RICO defendant must have specific knowledge of the unlawfulness of his conduct. Dkt. No. 154 at 18-19.

The Court is not convinced that *Grote* compels this result. Initially, the Second Circuit has not overruled either *Biasucci* **[*102]** or prior decisions which articulated the same principle, at least one of which explicitly stated that RICO does not require a mens rea of willfulness. *See United States v. Scotto, 641 F.2d 47, 56 (2d Cir. 1980)* ("The law at issue here does not demand willful violations of the RICO statute, nor does it require willful violations of the predicate offenses."). The Court must follow these decisions until and unless they are overruled. *See Grytsyk v. Morales, 527 F. Supp. 3d 639, 653-54 (S.D.N.Y. 2021)*; *United States v. Diaz, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015)*, *aff'd*, *854 F.3d 197 (2d Cir. 2017)*.

Moreover, the logic of *Grote* does not necessarily lead to Defendants' conclusion that willfulness will be required for any RICO violation based on unlawful debt collection. The primary concern articulated in *Grote* is the conflict between the "presumption in favor of a scienter requirement" for criminal statutes and the incorporation of usury statutes into RICO which have no scienter requirement. *Grote, 961 F.3d at 118* (quoting *Elonis, 575 U.S. at 737*); *see id. at 120* ("It is unclear whether the *Biasucci* court would have intended its holding, that "RICO imposes no additional mens rea requirement beyond that found in the predicate crimes," *Biasucci, 786 F.2d at 512*, to apply also to criminal RICO charges predicated on civil usury statutes such as these."). This problem can be solved by reading a scienter requirement into civil usury statutes which lack one. It does not necessarily **[*103]** require reading a willfulness requirement into criminal usury statutes, which already have a mens rea requirement. *Elonis* itself took care "not to say that a defendant must know that his conduct is illegal before he may be found guilty." *575 U.S. at 735*. It reiterated that a defendant usually need only "know the facts that make his conduct fit the definition of the offense," not "that those facts give rise to a crime." *Id.* (quoting *Staples v. United States, 511 U.S. 600, 608 n.3, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994)*. Applying a scienter requirement to "*each* of the statutory elements that criminalize otherwise innocent conduct" is not the same as creating a willfulness requirement. *Elonis, 575 U.S. at 737* (quoting *United States v. X-Citement Video, Inc., 513 U.S. 64, 72, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994)* (emphasis added)).

Here, the mens rea already present in the New York usury statute requires that the defendant have the intent to charge more than 25% interest on a loan. If the transaction involves an advancement of money absolutely repayable and charges more than 25% interest, such intent is presumed. This scienter requirement is sufficient to

distinguish between criminal and innocent conduct. A defendant may, despite advancing money which is absolutely repayable at a usurious rate, believe his transaction does not violate the law because it is not named a "loan" or avoids the law in some other way. **[\*104]** But this does not make the conduct innocent. The usury statute reflects a legislative judgment that advancing money absolutely repayable at a rate above 25% is reprehensible and punishable, regardless of how the transaction is named. *See Adar Bays, 179 N.E.3d at 627-28*. For RICO purposes the rate must be double, increasing the likelihood that only transactions which clearly transgress societal norms will be punished. Reading a willfulness requirement into the statute is not necessary to avoid punishing innocent conduct. In fact, such a requirement could be harmful, allowing clear usury to go unpunished simply because the usurer believed the law would not catch his new repackaging of excessive interest.[46]

*Biasucci* and related decisions have not been overruled or limited, and even if they are limited or clarified in the future it is not clear that such limitation or clarification would require imposing a willfulness requirement in this case. Therefore, the Court declines to add a willfulness requirement to the mens rea already required by *Penal Law § 190.40*.

## B. Violation of *Section 1962(c)* by a Pattern of Racketeering Activity

Plaintiffs also allege a RICO violation based on a pattern of racketeering activity, specifically related to the double **[\*105]** debiting of FTE's bank accounts. Dkt. No. 44 ¶¶ 145-148. Plaintiffs do not move for summary judgment on this claim, Dkt. No. 145, but Defendants do, Dkt. No. 150. The Court grants summary judgment for Defendants on this claim.

The predicate crime for Plaintiffs' pattern of racketeering activity claim is wire fraud under *18 U.S.C. § 1343*. Dkt. No. 44 ¶ 148. The elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the . . . wires to further the scheme." *United States v. Gatto, 986 F.3d 104, 113 (2d Cir. 2021)* (quoting *United States v. Binday, 804 F.3d 558, 569 (2d Cir. 2015)*). To prove a "pattern" of racketeering activity, Plaintiffs must also show "at least two acts of racketeering activity," *18 U.S.C. § 1961(5)*, that are "related" and "amount to or pose a threat of continued criminal activity." *DeFalco, 244 F.3d at 320* (quoting *H.J. Inc., 492 U.S. at 239*). There are two ways to show continuity. Closed-ended continuity involves "criminal activity that occurred over a long period of time in the past" and "generally requires that the crimes extend over at least two years." *Reich, 858 F.3d at 60*. Open-ended continuity involves criminal activity which projects into the future. *Id.* Open-ended continuity is satisfied when "the predicate acts were the regular way of operating that business," because "the continuity of the enterprise itself **[\*106]** projects criminal activity into the future." *Id.* (quoting *Cofacredit, 187 F.3d at 243*).

Plaintiffs primarily argue that Funderz engaged in mail fraud because "Defendants' double debits were intentional and conducted under the false pretense they would stop," Dkt. No. 158 at 21, and continuity is satisfied because "Funderz operated for at least 5 years," *id.* at 22. Defendants argue that this conduct "does not sound in fraud" and the predicate acts only extended over a few months. Dkt. No. 154 at 21.

The Court agrees that the relevant conduct does not sound in fraud. The "scheme to defraud" element of mail fraud requires "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC, 69 F. Supp. 3d 342, 362 (S.D.N.Y. 2014)* (quoting *United States v. Pierce, 224 F.3d 158, 165 (2d Cir. 2000)*). The

---

[46] If the Court is not required to import a willfulness requirement due to the concerns identified in *Elonis*, it is difficult to see where it would come from as a matter of statutory interpretation. *See Williams v. Big Picture Loans, LLC, 693 F. Supp. 3d 610, 631(E.D. Va. 2023)* ("*Section 1962(c)* does not mention willfulness."). As a threshold issue, *Section 1962(c)* encompasses both claims based on collection of unlawful debt and claims based on a pattern of racketeering activity. *See 18 U.S.C. § 1962(c)*. It seems unlikely that a willfulness requirement would apply to racketeering activities, some of which are quite serious crimes. But it is not clear what basis there would be in the statute for applying the requirement to unlawful debt only. The definition of "unlawful debt" in *18 U.S.C. § 1961(6)* also provides no obvious source for a willfulness requirement.

debits themselves are not fraud, because they do not involve deceit or misrepresentation. Simply taking money out of someone's account without authorization, without making a false representation, is akin to conversion. *See Citadel Mgmt., Inc. v. Telesis Tr., Inc., 123 F. Supp. 2d 133, 147-48 (S.D.N.Y. 2000)* ("Conversion is the 'exercise of unauthorized dominion over the property of another.'" (quoting *LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997)*)); *cf. Haymount Urgent Care, 609 F. Supp. 3d at 257* ("extracting unauthorized debits from [plaintiff's] bank accounts" supported **[*107]** a fraud claim when defendants used "misleading names calculated to evade stop payment orders").

Plaintiffs claim that the debits were conducted under the false pretense they would stop, as stated by Gabe in an email on December 3, 2019. Dkt. No. 147-45. However, Plaintiffs have not produced evidence to support an inference that this lie, assuming it was one, was material. "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir.1994)*. Viewed in the light most favorable to the Plaintiffs, the evidence shows that Funderz took unauthorized debits, Gabe falsely stated that this would stop, and subsequently Funderz took more unauthorized debits. There is no evidence that Gabe's statement was material in any way to Plaintiffs making a decision to allow Funderz to continue taking double debits. Gabe did not, for example, misleadingly induce FTE to believe that the payments were proper under the contract. There is no evidence Plaintiffs made a decision to allow Funderz to continue taking double debits at all. The fact that Gabe said the debits would stop and then they did not may show that he lied, but does not show **[*108]** a scheme to defraud.

This single email also does not show "at least two acts of racketeering activity," *18 U.S.C. § 1961(5)*. Nor is there evidence to support an inference that telling customers the debits would stop, as opposed to taking the debits in the first place, was "the regular way of operating that business." *Cofacredit, 187 F.3d at 243*. The double debits or Defendants' lies about them do not constitute a pattern of racketeering activity based on wire fraud.

Plaintiffs also advance an alternative theory of wire fraud, that "Defendants intentionally inserted a false statement in their HOP MCA Agreements that they were not loans" to "defraud merchants into unknowingly entering into loans." Dkt. No. 158 at 22 (citing First HOP Agreement § 1.9, Second HOP Agreement § 1.9, Third HOP Agreement § 1.10[47]). The specific allegedly false statement which Plaintiffs allude to is that "Merchant and HC agree that the Purchase Price under this Agreement . . . is not intended to be, nor shall it be construed as a loan." First HOP Agreement § 1.9.

This statement will not support a fraud claim. "[A] fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc., 471 F.3d 410, 416 (2d Cir. 2006)*. Therefore, "[m]isrepresentations made **[*109]** to induce a party to enter a contract are not actionable as fraud . . . unless they are 'collateral' to the contract induced." *Spinelli v. Nat'l Football League, 903 F.3d 185, 209 (2d Cir. 2018)*. When "the defendant simply misrepresented its intent to perform under a contract, no separate claim for fraud will lie, and the plaintiff must instead bring an action for breach of contract." *Id.* Here, the alleged misrepresentation is not collateral to the contract. It is part of the contract. The provision therefore must be interpreted in light of the entire agreement, giving "full meaning and effect to all of its provisions." *In re AMR Corp., 730 F.3d 88, 98 (2d Cir. 2013)* (quoting *PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir.1996)*). The provisions of the contract largely make out a loan. If in light of the entire contract the provision cited nevertheless places an obligation on Funderz not to treat the transaction as a loan, any remedy for Funderz's failure to do so lies in breach of contract. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996)*; *Int'l CableTel Inc. v. Le Groupe Videotron Ltee, 978 F. Supp. 483, 486-87 (S.D.N.Y. 1997)*; *Generation Next Fashions Ltd. v. JP Morgan Chase Bank, NA., 698 F. Supp. 3d 663, 686-87 (S.D.N.Y. 2023)*.

Because neither Plaintiffs' primary theory nor their alternative theory supports a pattern of racketeering activity on the evidence presented, summary judgment is granted for Defendants on this issue.

---

[47] This provision is cited by Plaintiffs as § 1.9, but it was renumbered in the Third HOP Agreement to § 1.10.

## C. Conspiracy Under *Section 1962(d)*

Plaintiffs' final claim is for conspiracy under *Section 1962(d)*. Dkt. No. 44 ¶¶ 180-189. Defendant moves for summary judgment on this claim on the **[*110]** bases that "the underlying substantive RICO violation to which it is bootstrapped fails" and that in any case it is barred by the intracorporate conspiracy doctrine. Dkt. No. 154 at 22. Defendant's first argument fails because the Court holds that the underlying RICO claims have merit. The Court also does not grant summary judgment for Defendant based on the intracorporate conspiracy doctrine.

"To establish the existence of a RICO conspiracy, a plaintiff must prove 'the existence of an agreement to violate RICO's substantive provisions.'" *Cofacredit, 187 F.3d at 244* (quoting *United States v. Sessa, 125 F.3d 68, 71 (2d Cir.1997)*). The intracorporate conspiracy doctrine states that "acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *Alix v. McKinsey & Co., 2023 U.S. Dist. LEXIS 145872, 2023 WL 5344892, at *22 (S.D.N.Y. Aug. 18, 2023)* (quoting *Kirwin v. Price Comm'cns Corp., 391 F.3d 1323, 1326 (11th Cir. 2004)*).

The Second Circuit has not decided whether the intracorporate conspiracy doctrine applies to RICO claims, and there is currently a circuit split on the issue. *See Alix, 2023 U.S. Dist. LEXIS 145872, 2023 WL 5344892, at *22-23* (discussing the split and collecting cases). The Court is persuaded by the reasoning of the opinions holding that the doctrine does not apply. *See id., Ashland Oil, Inc. v. Arnett, 875 F.2d 1271, 1281 (7th Cir. 1989)*; *Kirwin v. Price Commc'ns Corp., 391 F.3d 1323, 1326-27 (11th Cir. 2004)*; *Webster v. Omnitrition Int'l, Inc., 79 F.3d 776, 787 (9th Cir. 1996)*. In the antitrust context, application of the intracorporate conspiracy doctrine is consistent with the **[*111]** statutory goal of preventing collusion between supposed competitors. *See Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 770-772, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)*; *Ashland Oil, 875 F.2d at 1281*. The statute was not intended to prevent collaboration between parents and subsidiaries, which are not competitors but rather "share a common purpose." *Copperweld, 467 U.S. at 771*.

Applying the intracorporate conspiracy doctrine to claims under *Section 1962(d)* is not within the statutory purpose and would be difficult to reconcile with the Supreme Court's decision in *Cedric Kushner*. Confronting the related question of whether the employee of a RICO "enterprise" can be liable for running its affairs, the Supreme Court stated in that case that drawing a distinction "between employees acting within the scope of corporate authority and those acting outside that authority . . . is inconsistent with a basic statutory purpose," namely holding individuals accountable who direct a corporate enterprise to conduct illegal activity. *533 U.S. at 165*. Unlike the antitrust statute, RICO was not intended to allow loan sharking and racketeering within corporations, while prohibiting these activities outside of them. Rather, RICO seeks both to protect the public from unlawful corporations *and* to protect corporations from those who seek to corrupt them from within. *Id. at 164-65* (noting that the legislative history **[*112]** "refers frequently to the importance of undermining organized crime's influence upon legitimate businesses"). *Cedric Kushner* expressly distinguished *Copperweld* on this ground, stating that its holding "turns on specific antitrust objectives." *Id. at 166*

The same logic that makes the doctrine inapplicable to the person-entity distinction in *Section 1962(c)* should make it inapplicable to a conspiracy claim under *Section 1962(d)*. It would not make sense if the executive in *Cedric Kushner* could be liable for violating *Section 1962(c)* by unlawfully conducting the affairs of the corporation, but could not be liable under *Section 1962(d)* for agreeing with others to commit the same violation. The law views the agreement of two people to corrupt an organization together as a harm over and above the unlawful activity of an individual. This harm is not mitigated, and may be exacerbated, by the fact that the person an employee recruits into his criminal scheme is a member of the same organization. Moreover, an association which seeks to engage in criminal activity should not be able to escape conspiracy liability by incorporation. Defendants do not dispute that two or more persons could conspire to engage in racketeering through an association in fact. It would make no sense that the same two persons **[*113]** would enjoy immunity from such a claim through the simple expedient of incorporating the entity through which they agree to engage in their racketeering activity.

Absent application of the intracorporate conspiracy doctrine, there is evidence from which a jury could find an agreement to engage in the collection of unlawful debt through the enterprise of Funderz.

Plaintiffs additionally argue that even if the intracorporate conspiracy doctrine did apply, the conspiracy claim could survive based on evidence suggesting a conspiracy between Funderz and external investors. Dkt. No. 158 at 23. The evidence supporting such a conspiracy consists of emails between Gabe, Isaacoff, and outside individuals stating "Syndication Moshe $75k," "Syndication MOE 50k," and "Syndication: Mordy 50k Moshe 50k Lenny 50k Manny 25k Avi 25k Vincent 25k." Dkt. Nos. 147-27, 147-28, 147-31. The emails also contain basic details of the deals, including the funding amount and payback amount. Dkt. Nos. 147-28, 147-31. Viewed in the light most favorable to Plaintiffs, these facts are sufficient to infer an agreement that these outside investors would fund or syndicate deals with a usurious rate of interest, and Isaacoff **[*114]** and Gabe would carry them out. This is sufficient to meet the requirements of *Section 1962(d)*. An agreement to violate RICO can be inferred from "circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing." *City of N.Y. v. Chavez, 2012 U.S. Dist. LEXIS 42792, 2012 WL 1022283, at *7 (S.D.N.Y. Mar. 26, 2012)*; *see also* *United States v. Yannotti, 541 F.3d 112, 122 (2d Cir. 2008)* (explaining that RICO conspirators need only agree to "the general criminal objective of a jointly undertaken scheme"). When each of the purported conspirators actually committed overt acts in furtherance of the scheme, the inference of an agreement is strong. *See* *Alix, 2023 U.S. Dist. LEXIS 145872, 2023 WL 5344892, at *23*; *Angermeir v. Cohen, 14 F. Supp. 3d 134, 154-155 (S.D.N.Y. 2014)*. The RICO claim could therefore survive on this ground even if the intracorporate conspiracy doctrine were applicable.

* * *

To summarize, Plaintiffs are entitled to summary judgment on their claims based on collection of unlawful debt under the four agreements in October 2018. Defendants are entitled to summary judgment on the claims based on collection of unlawful debt under the Third HOP Agreement and the claims based on a pattern of racketeering activity. Whether the assignment of claims from FTE to Lateral Recovery constitutes champerty remains at issue, as does liability on the claims based on the Third BMF Agreement and on the claims of conspiracy under *18 U.S.C. § 1962(d)*. Benchmark, Jus-Com, **[*115]** and Focus Wireless lack standing and must be dismissed from the case.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Defendants' motion is granted as to the claims based on a pattern of racketeering activity and as to the standing of plaintiffs Benchmark, Jus-Com, and Focus Wireless. Defendants' motion is denied as to the claims for collection of unlawful debt, the claims for conspiracy under *Section 1962(d)*, and the issue of whether the assignment to Lateral Recovery violated New York's champerty statute.

Plaintiffs' motion is granted as to their claims against Isaacoff for collection of unlawful debt pursuant to the four agreements in October 2018. Plaintiffs' motion is denied as to the claims for collection of unlawful debt based on the two agreements in November 2018 and the issue of whether the assignment to Lateral Recovery violated New York's champerty statute.

The Clerk of Court is respectfully directed to close Dkt. Nos. 145 and 150.

SO ORDERED.

Dated: September 27, 2024

New York, New York

/s/ Lewis J. Liman

LEWIS J. LIMAN

United States District Judge

---

**End of Document**