UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOLDEN FOOTHILL INSURANCE SERVICES, LLC, LIFE FACTOR II, LLC, LIFE SHARES II, LLC, EL DORADO HILLS INSURANCE SOLUTIONS, INC., LONE WOLF INSURANCE SERVICES, INC., ELDO INVESTMENTS, LLC, THE GENESIS LS FUND, LLC, KTL HOLDINGS, INC., and TATANISHA LEER<br><br>Plaintiffs,<br><br>   v.<br><br>SPIN CAPITAL, LLC, AVRUMI (a/k/a JOSH) LUBIN, BMF ADVANCE LLC, GAVRIEL YITZCHAKOV a/k/a GABE ISAACOV, HI BAR CAPITAL, LLC, YOEL GETTER a/k/a JOEL GETA, and YISROEL HERBST,<br><br>Defendants. | Civ. A. No.: 1:24-CV-08515 |

## <u>AMENDED COMPLAINT</u>

Plaintiffs Golden Foothill Insurance Services, LLC ("GFIS"), Life Factor II, LLC ("LF II"), Life Shares II, LLC ("LS II"), El Dorado Hills Insurance Solutions, Inc. ("El Dorado"), Lone Wolf Insurance Services, Inc. ("Lone Wolf"), ELDO Investments, LLC ("ELDO"), The Genesis Fund, LLC ("Genesis"), KTL Holdings, Inc. ("KTL", collectively the "Leer Companies, and Tatanisha Leer (collectively, "Plaintiffs") as and for their Amended Complaint against Spin Capital, LLC ("Spin"), Avrumi (a/k/a Josh) Lubin ("Lubin"), BMF Advance LLC ("BMF"), Gavriel Yitzchakov a/k/a Gabe Isaacov ("Gabe"), Hi Bar Capital, LLC ("Hi Bar"), Yoel Getter a/k/a Joel Geta ("Getter"), and Yisroel Herbst ("Herbst," collectively "Defendants") state as follows:

**NATURE OF ACTION**

1. This is a RICO action against three separate Enterprises operating cooperatively to induce Plaintiffs into entering into five usurious loans disguised as merchant cash advance agreements ("MCA Agreements") and then once the debt on those MCA Agreements exceeded $1 million, refinancing the usurious MCA debt into an artificially inflated Promissory Note with a facial principal of $2.7 million but actual principal of $1.3 million so that the Enterprises could effectively launder their usurious debt into a purportedly legitimate loan.

2. Each Enterprise played its part in the overall scheme to collect unlawful debt and then repackage that unlawful debt into a loan, asserting a usurious 60% interest rate, that misreported its principal as being above $2.5 million to try to legitimize the entire scheme.

3. First, Spin and Lubin formed their own enterprise (the "Spin Enterprise") which was responsible for soliciting and negotiating with Plaintiffs the terms and funding amounts of five MCA Agreements that the Spin Enterprise referred to Hi Bar and BMF for papering, all of which were entered into in March 2021.

4. The Spin Enterprise was also responsible for papering the Promissory Note used to launder the MCA Agreement debt into a purportedly legitimate loan with a facial principal of $2.7 million but an actual principal of approximately $1.3 million with a 60% annual interest rate.

5. BMF, run by Gabe, is part of a separate enterprise that also involves three of his brothers, Joseph Yitzchakov (a/k/a Joseph Isaacov), Simon Yitzchakov (a/k/a Simon Isaacov), and Binyamin Yitzchakov (a/k/a Ben Isaacov, collectively the "Isaacovs"), who together operate various MCA labels, including BMF, to fund usurious loans since 2017 (the "Isaacov Enterprise").

33974728v.1

6. Notably, Joseph Isaacov and the umbrella company for the Isaacov Enterprise, Funderz.Net, LLC, were recently found liable on summary judgment for collection of unlawful debt based on BMF MCA Agreements that are virtually indistinguishable from the three BMF MCA Agreements at issue here. *See Lateral Recovery LLC v. Funderz.net LLC*, 2024 U.S. Dist. LEXIS 176985, *77-78 (S.D.N.Y. Sept. 27, 2024).

7. Hi Bar, owned by Herbst and operated by Getter, constitutes a third separate RICO Enterprise (the "Hi Bar Enterprise") which, in this matter, coordinated with the Spin Enterprise to broker two MCA Agreements between Plaintiffs and Hi Bar.

8. The Hi Bar Enterprise then worked with the Spin Enterprise and BMF Enterprise in agreement to refinance the Plaintiffs' MCA debt with Hi Bar and BMF to be refinanced by the Spin Enterprise into the Promissory Note.

9. While the MCA Agreements were ostensibly purchases of the Leer Companies' future receivables, their form and how they were negotiated and serviced all demonstrate they are absolutely repayable loans with annual interest rates ranging from 331% to more than 600%.

10. The MCA Agreements provided BMF and Hi Bar with recourse in the event of the Leer Companies' bankruptcy through enforcement of the personal guaranties and having a security interest in all of the Leer Companies' assets.

11. The BMF MCA Agreements lacked any reconciliation provision and the one found in the Hi Bar MCA Agreements was illusory. Moreover, in practice, when the Leer Companies' receivables declined, Lubin simply negotiated a new payment rate at whatever maximum amount the Leer Companies could afford without regard to their actual receivables.

12. The MCA Agreements made it a default if the Leer Companies missed as little as one or two fixed daily payments.

-3-

33974728v.1

13. The MCA Agreements also placed the Leer Companies in default as soon as the next MCA Agreement was entered into as each MCA Agreement made it an event of default for the Leer Companies to secure any alternative financing.

14. The MCA Agreements' fixed daily remittance was purported to be a "good faith estimate" of the Leer Companies' receivables, but comparing the MCA Agreements to one another reveals that these estimates would vary even for MCA Agreements entered on the same day and their only pattern was to increase daily remittance as the repayment amount increased.

15. The MCA Agreements were negotiated with fixed terms as shown by correspondence between Leer Companies' officer Stefan Leer ("Stefan") and Lubin, Defendants' underwriting documents, and by simply dividing the repayment amount by the fixed daily payment.

16. The MCA Agreements failed to identify and specific receivables purchased by BMF or Hi Bar, and yet still made the Leer Companies responsible for collecting the receivables that BMF and Hi Bar purportedly purchased so that they could debit the daily remittance from the Leer Companies' bank account.

17. Because the MCA Agreements had such high interest and fixed daily payments, the Leer Companies, by design, struggled to maintain payments, at which point Spin and Lubin would coerce them into refinancing the MCA Agreement into a new one with higher fixed daily payments and a larger repayment.

18. Because of the MCA Agreements' prohibition on the Leer Companies securing alternative financing, Plaintiffs had little choice but to agree or risk being placed in default.

-4-

19.     With each refinanced MCA Agreement, the new advance would be used to pay off the prior debt, leaving the Leer Companies with only a fraction of the listed principal and still obligated to repay the full repayment amount in a matter of days.

20.     Defendants end goal was to continue this cycle of refinancing the MCA Agreements until the Plaintiffs' indebtedness to BMF and Hi Bar became large enough to repackage the debt into a loan that was intentionally designed to superficially exceed the $2.5 million safe harbor provision for commercial loans exempt from New York usury laws.

21.     To achieve this goal, once outstanding debt on the last two MCA Agreements entered with Hi Bar and BMF on March 25, 2021 was sufficiently large and the Leer Companies were struggling to maintain payments on both, the Spin Enterprise proposed refinancing this MCA debt into an official loan.

22.     With no other financial options available to them, Plaintiffs conceded to the proposal, and on June 16, 2021, Spin and GFIS, LF II, and LS II entered into a promissory note that would purportedly provide GFIS, LF II and LS II with $2.7 million in capital.

23.     However, as confirmed by Spin's own records, GFIS, LF II and LS II did not receive anything close to $2.7 million, rather Spin deducted (1) $200,000 as a bank fee for Lubin's "services" in providing the Promissory Note; (2) $580,597.00 to pay off MCA debt to Hi Bar; (3) $582,000 to pay off inflated MCA debt to BMF; and (4) $30,000 to pay off Spin's lawyers for drafting the Promissory Note.

24.     As a result, GFIS, LF II and LS II only received $1,307,403 as remaining capital for entering the Promissory Note, and $150,000 was deducted further as the first payment on June 18, 2021.

33974728v.1

25.     The Promissory Note assessed an annual interest rate of 60% and a default interest rate of 120%.

26.     In order to ensure against default, the Spin Enterprise required Plaintiffs to enter into various guaranties and security agreements in connection with the Promissory Note (collectively the "Transaction").

27.     For instance, on June 16, 2021, as part of the Transaction, Spin entered into a corporate payment guaranty with El Dorado, Lone Wolf, ELDO, Genesis and KTL (the "Corporate Guarantors") whereby the Corporate Guarantors guaranteed repayment of the Promissory Note (the "Corporate Guaranty").

28.     On June 16, 2021, Spin also entered into two separate personal guaranties with Stefan and Tatanisha Leer (the "Personal Guarantors") whereby they would be responsible for the Promissory Note obligations as well (the "Personal Guaranties").

29.     Lastly, on June 16, 2021, Spin entered into a security agreement with GFIS, LF II, LS II, the Corporate Guarantors and the Personal Guarantors whereby Spin purportedly obtained a security interest in nine (9) life insurance policies owned by either LF II or LS II, that had total death benefits then valued at $40,500,000 (the "Security Agreement").

30.     The Leer Companies were able to make the first five (5) installment payments on the Promissory Note, totaling $510,000, before the usurious 60% interest became too great a burden to bear and they failed to make payments thereafter.

31.     Spin has since placed Plaintiffs in default of the Promissory Note and is seeking more than $14 million (mostly interest) as the purported balance on the Promissory Note whereas Plaintiffs received less than $2 million in total on the five MCA Agreements and Promissory Note.

-6-

33974728v.1

## THE PARTIES

32.　At all relevant times, GFIS was a Delaware limited liability company with a principal place of business in California.

33.　At all relevant times, LF II was a Nevada limited liability company with a principal place of business in California.

34.　At all relevant times, LS II was a Delaware limited liability company with a principal place of business in California.

35.　At all relevant times, El Dorado was a California corporation with a principal place of business in California.

36.　At all relevant times, Lone Wolf was a Delaware corporation with a principal place of business in California.

37.　At all relevant times, ELDO was a Texas limited liability company with a principal place of business in California.

38.　At all relevant times, Genesis was a Texas limited liability company with a principal place of business in California.

39.　At all relevant times, KTL was a Texas corporation with a principal place of business in California.

40.　At all relevant times, Tatanisha Leer was domiciled and a resident of California.

41.　Spin is a limited liability company organized under the laws of the state of New Jersey with a principal place of business in New York.

42.　Lubin is domiciled and a resident of the state of New Jersey.

43.　BMF Advance is a limited liability company duly organized under the laws of New York with its principal place of business in Florida.

44. Gavriel Yitzchakov a/k/a Gabe Isaacov ("Gabe") is domiciled and a resident of the state of Florida.

45. Hi Bar is a limited liability company duly organized under the laws of New York with its principal place of business in New York.

46. Yoel Getter a/k/a Joel Geta ("Getter") is domiciled and resides in the state of Florida.

47. Upon information and belief, Yisroel Herbst ("Herbst") is domiciled and resides in the state of New York.

## **JURISDICTION**

48. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corrupt Organization Act, 17 U.S.C. §§ 1961-68.

49. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. 1332(a)(1) because each Plaintiff is a citizen of a different state than Defendants and the amount in controversy exceeds $2,000,000 exclusive and interest and costs.

50. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

51. Venue is also proper because each of the MCA Agreements and Promissory Note prescribed that suitable jurisdiction and venue for any dispute thereunder would lie with any New York court.

52. Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly

-8-

transacts business within the State of New York, and has purposefully availed itself/himself/herself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL ALLEGATIONS

### A. The Predatory MCA Industry

53. As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1] The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2] As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for. It's pretty much unregulated."[3]

54. The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.[4]

55. This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id*. ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[2] *Id*.

[3] *Id*.

[4] https://www.occ.gov/topics/supervision-and-examination/responsible-innovation/comments/comment-nclc-et-al.pdf (last accessed 2/15/22).

33974728v.1

regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

56. The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

## B. Background On The Parties

### i. *Background on Plaintiffs*

57. The Leer Companies operate in two fields of the insurance industry: (1) buying and selling insurance policies as brokers; and (2) life settlement whereby a Leer Company purchases whole life policies as an investment.

58. With life settlement, the Leer Companies often raise capital to pay the purchased life insurance premiums by issuing private placement memoranda whereby investors obtain an interest in the Leer Company owning the life insurance policy and receive a return on investment when the covered individual passes.

59. Sometimes, based on the insured individual's life expectancy and the costs of premiums on a policy, the Leer Companies have to let some policies lapse in order to prevent an ultimate loss on the investment.

60. Because of these two business models, Leer Companies did not have regular receivables; income streams were irregular and depended on the sale of life insurance policies, the supply of life insurance policies on the market, and the rate at which the insured of purchased life insurance policies would die.

61. COVID-19 hit the Leer Companies hard. New life insurance policies were not being issued or were made extremely difficult to sell due to high premiums. Meanwhile the supply

33974728v.1

of life insurance policies available to purchase dropped, resulting in a lack of new "receivables" being generated for the Leer Companies life settlement business.

62.     By 2020, the number of whole life insurance policies owned by the Leer Companies had declined, and by June 2021, the Leer Companies owned approximately a dozen who life insurance policies, which represented the Leer Companies' largest remaining asset during the pandemic.

### ii.   *Background on the Spin Enterprise*

63.     Spin is an LLC run by Lubin as its sole member and together they constitute, as defined in more detail below, a RICO enterprise (the "Spin Enterprise")

64.     Lubin characterizes Spin's primary business as brokering certain financial transactions, including MCA deals, with merchants and MCA funders in consideration for receiving a commission for the funder.

65.     Specifically, the Spin Enterprise collaborates with various MCA lender enterprises, such as the Isaacov Enterprise and the Hi Bar Enterprise, defined more fully below, to paper the MCA deals that the Spin Enterprise brokers.

66.     Lubin has testified that he does not even read the MCA agreements that he brokers with the assistance of the Isaacov Enterprise and Hi Bar Enterprise, yet he nevertheless charges exorbitant fees for his services in brokering the MCA deals, including the MCA Agreements here and the Promissory Note, which is nothing more than additional disguised interest.

67.     For instance, when underwriting the March 25, 2021 BMF MCA Agreement with the Gabe and BMF, Lubin wrote to Gabe that he is "got to try and get away with a 40k [Personal Service Fee] on the funding call," thereby establishing that Lubin arbitrarily sets his brokerage

-11-

fees on the MCA Agreements he brokers for the Isaacov Enterprise and Hi Bar Enterprise. *See* March 25, 2021 email chain between Lubin and Gabe, attached hereto as **Exhibit 1**.

68. Spin and Lubin have also been known to provide funding for the MCA deals papered by the Isaacov Enterprise and Hi Bar Enterprise.

### iii. *Background on the Isaacov Enterprise*

69. One MCA RICO Enterprise that the Spin Enterprise works closely with as a broker, underwriter, and funder of MCA Agreements that constitute unlawful debt is the Isaacov Enterprise, which operates BMF as one of its MCA labels through Gabe owning that particular entity.

70. BMF is just one of several MCA labels used by the Isaacov Enterprise, many of which are d/b/as of Funderz.Net LLC, and various Isaacov brothers each control their own MCA companies or d/b/as within the Funderz.Net LLC umbrella.

71. Gabe owns and operates BMF Advance and uses BMF Advance to paper MCA deals brokered and funded by the Spin Enterprise as well as engage in direct solicitation with merchants to enter into MCA agreements with the Isaacov Enterprise through BMF. .

72. The eldest brother, Jospeh Isaacov ("Joe"), holds himself out as the CEO of Hop Capital. *See* Joseph Isaacov's LinkedIn profile, attached hereto as **Exhibit 2.**

73. Per Funderz.Net LLC's filings with the New York Secretary of State, Hop Capital is one of the d/b/as Funderz.Net LLC uses in business. *See* Assumed Name History of Funderz.Net LLC from New York Secretary of State attached hereto as **Exhibit 3**.

74. Beinaymin Yitzchakov (a/k/a Ben Isaacov) ("Ben") holds himself out as the CEO of Panthers Capital. *See* Ben Isaacov's LinkedIn Profile, attached hereto as **Exhibit 4**. Panthers Capital is registered as one of Funderz.Net LLC's 18 d/b/as. *See* Ex. 3 at 1.

75. Simon Isaacov, the younger brother, serves as a direct funder for BMF.

76. Although each brother and MCA company/label they control maintains separate books and records from each other, the Isaacovs and their respective MCA companies, including BMF, form a cohesive unit to further the goals of the Isaacov Enterprise to collect unlawful debt.

77. For example, for a period of years, Joe provided high interest loans to Avantgarde Living Facility, an assisted living facility in California. Joe would later bring Gabe, his brother, who likewise funded Avantgarde multiple times through usurious loans disguised as MCA agreements. When Avantgarde could not pay its high interest loans due to the COVID-19 pandemic, Gabe demanded Avantgarde's owner give title to his a rare collection Trans Am as payment for the loans.

78. In separate instance, when Haymount Urgent Care, a North Carolina urgent care facility, could not afford to pay MCA agreements funded by Simon due to the Omicron, Simon flew to North Carolina and demanded to see the owner's watch collection, and asked to "borrow" one of the watches. When the victim insisted that the watch be papered as collateral for Simon's loans, Simon relented.

79. Significantly, on September 27, 2024, Judge Liman of the Southern District of New York granted summary judgment against Joe and Funderz.Net LLC on RICO claims for collection of unlawful debt based, in part, on MCA agreements papered by Gabe's company BMF. *See Lateral Recovery LLC v. Funderz.net LLC*, 2024 U.S. Dist. LEXIS 176985, *77-78 (S.D.N.Y. Sept. 27, 2024) (the "*Funderz* Decision"). A true and correct copy of the *Funderz* Decision is attached hereto as **Exhibit 5**. A true and correct copy of one of the BMF MCA agreements the *Funderz* Decision ruled to be a usurious loan as a matter of law is attached hereto as **Exhibit 6**. The *Funderz*

-13-

decision also found several MCA agreements papered by Joe's company HOP Capital were also usurious loans as a matter of law.

### iv. *Background on the Hi Bar Enterprise*

80. Hi Bar is owned by Herbst who, until a fallowing out described below in March 2022, worked with Getter to broker Hi Bar MCA agreements that were disguised usurious loans.

81. Hi Bar, Herbst and Getter constitute their own RICO Enterprise created for the purpose of collecting unlawful debt using Hi Bar MCA agreements that disguise their true nature of usurious loans (the "Hi Bar Enterprise").

82. In the instant matter, the Hi Bar Enterprise worked with the Spin Enterprise in having the Spin Enterprise broker, negotiate, help underwrite and fund two Hi Bar MCA Agreements entered into between Plaintiffs and Hi Bar in March 2021.

83. The Hi Bar Enterprise also worked with the Spin Enterprise to refinance the Hi Bar MCA debt in June 2021 into the usurious Promissory Note. The BMF Enterprise also participated in this and the three Enterprises pooled funding for the Promissory Note and expected to share the spoils of collecting on the Promissory Note's 120% default interest rate and take ownership of the $40 million worth of life insurance policies owned by the Leer Companies pursuant to the Security Agreement.

84. Since at least 2021 and continuing through the present, the Hi Bar Enterprise has had the common goal of collecting unlawful debt through disguising usurious loans as MCA agreements and soliciting merchants into entering into these agreements.

85. On March 29, 2022, Herbst (through Hi Bar) sued Getter, alleging that Getter was stealing money from Hi Bar and brokering deals for Hi Bar that were doomed to fail because, like here, the merchants were "mired in debt and days away from default on its obligations and ceasing

-14-

operations." *See* the complaint in *Hi Bar Capital LLC v. Yoel Getter*, 22-cv-1743 (E.D.N.Y.), attached hereto as **Exhibit 7**, at ¶ 26.

86.     Despite admitting that entering into these types of transactions was a "recipe for disaster," *id*., that is exactly what Hi Bar did here.  To be sure, Hi Bar knew that the Leer Companies was similarly "mired in debt" by simply reviewing the bank statements provided, and reviewing the number of other MCA positions disclosed by the Leer Companies.

### C.  Background On The MCA Agreements At Issue

87.     During the COVID-19 pandemic, specifically in early March 2021, Stefan was contacted unsolicited by Lubin, who offered to connect Stefan and the Leer Companies to what Lubin described as alternative lenders, specifically BMF and Hi Bar, who could offer short-term loans to the Leer Companies that would allow them to keep making payments on the life insurance policies that they owned.

88.     During this initial discussion, Stefan explained to Lubin the nature of the Leer Companies' business, the value of the various life insurance policies they presently owned, and how an influx of capital was desperately needed to avoid the Leer Companies losing the life insurance policies due to insufficient funds.

89.     Lubin knew the Leer Companies were having money problems when he solicited them to enter into the MCA Agreements.

90.     During the course of the MCA Agreements, Lubin learned about several of the life insurance policies owned by the Leer Companies and it was this that precipitated the discussion of the Promissory Note and Security Agreement later in June 2021.

33974728v.1

i. *March 2, 2021 BMF MCA Agreement*

91.    Given the Leer Companies' financial desperation, Plaintiffs accepted Lubin's offer to enter into what was understood as a short-term loan with BMF on March 2, 2021.

92.    Pursuant to the March 2, 2021 BMF MCA Agreement, attached hereto as **Exhibit 8**, the Leer Companies expected to receive $100,000, and were required to pay back $149,900 through fixed daily payments of $4,996.  Ex. 9 at 1, 8.

93.    The March 2, 2021 BMF MCA Agreement provided that the $4,996 daily remittance was a "good faith" estimate of 10% of the Leer Companies' daily receivables.  Ex. 9 at 1.  Thus, as of March 2, 2021, BMF estimated that the Leer Companies daily receivables were worth $49,960.

94.    The Leer Companies did not receive the full $100,000, however.  $20,000 was deducted as a purported bank fee.  *See* March 3, 2021 email from Gabe, attached hereto as **Exhibit 9.**

95.    When Lubin and Gabe underwrote the March 2, 2021 BMF MCA Agreement, they expressly set forth that the loan would have a term of 40 days.  *See* March 2, 2021 email chain between Lubin and Gabe attached hereto as **Exhibit 10**.  The 40-day term is also reflected by dividing the repayment amount ($149,900) by the daily payment ($4,996), which yields 30 business days or approximately 40 days total.

96.    As evidenced by the underwriting documents, Lubin and Getter provided the funding for the March 2, 2021 BMF MCA Agreement.  Ex. 10 at 1.

97.    The March 2, 2021 BMF MCA Agreement contained a "NO STACKING ADDENDUM" whereby the Leer Companies were "prohibited from initiating a cash advance or other loan products with another lender outside to BMF Advance, LLC.  Doing so will place me

in breach of contract and I will be liable for the entire amount owed to BMF Advance, LLC immediately, plus attorneys' fees, costs, liquidated damages and a default fee of $25,000 or 20% of the contract amount, whichever is greater."  Ex. 8 at 9.

98.  Under the March 2, 2021 BMF MCA Agreement, missing a single fixed payment would constitute an event of default.  Ex. 8 § 3.1(d).

99.  The March 2, 2021 BMF MCA Agreement also provided recourse in the event of bankruptcy as the personal guaranty provided that: "In the event that [BMF] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount."  Ex. 8 at 6.

100.  The March 2, 2021 MCA Agreement did not identify the specific receivables of the Leer Companies that BMF purportedly purchased.

101.  Despite BMF purportedly purchasing the Leer Companies' receivables, the Leer Defendants were still responsible for collecting the receivables.  Ex. 8 at 1 ("[BMF] will debit the Remittance each business day from one depositing bank account, which account must be acceptable to, and pre-approved by, [BMF] (the 'Account') into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as [BMF] receives payment in full of the Purchased Amount").

102.  The March 2, 2021 BMF MCA Agreement did not have a reconciliation provision.

103.  When viewed as a loan with an $80,000 principal and repayment term of 40 days, this March 2, 2021 BMF MCA Agreement assessed an annual interest rate of 425%.

104.  Not only was the BMF MCA Agreement usurious, BMF over collected on the loan by $972.  *See* pay run for March 2, 2021 BMF MCA Agreement attached hereto as **Exhibit 11**.

ii.  *March 10, 2021 Hi Bar MCA Agreement*

105.    The $80,000 advanced under the March 2, 2021 BMF MCA Agreement did not provide a long-term solution to the Leer Companies' need for capital to cover the premium payments on the life insurance policies they owned.

106.    At the same time, the Leer Defendants were prohibited from securing any other financing whatsoever under the first MCA Agreement's "NO STACKING ADDENDUM." Ex. 8 at 9.

107.    Thus, the Leer Companies had nowhere else to turn for additional financing other than Lubin, who shortly after the March 2, 2021 MCA Agreement pressured the Leer Defendants to enter into a second MCA Agreement with Hi Bar.

108.    Faced with no other options, the Leer Defendants entered into an MCA Agreement with Hi Bar on March 10, 2021, a true and correct copy of which is attached hereto as **Exhibit 12**.

109.    Pursuant to the March 10, 2021 Hi Bar MCA Agreement, the Leer Companies were to receive $220,000 as a principal and were obligated to repay $329,978 through fixed daily payments of $8,500.  Ex. 12 at 1.

110.    The March 10, 2021 Hi Bar MCA Agreement provided that this $8,500 fixed daily was a "good faith estimate" of 20% of the Leer Companies' daily receivables. Ex. 12 at 1.  Thus, as of March 10, 2021, Hi Bar estimated that the Leer Companies' daily receivables were worth $42,500.

111.    Like with the BMF MCA Agreement dated March 2, 2021, Stefan and Lubin negotiated the March 10, 2021 Hi Bar MCA Agreement as a short-term loan with a term of 39 days.  Dividing the repayment amount ($329,978) by the fixed daily payments ($8,500) also yields a term of 39 days.

-18-

112. The Leer Companies did not receive the full $220,000 provided in the Hi Bar MCA Agreement. Rather, $22,000 was deducted from the principal as a purported "Underwriting Fee." Ex. 12 at 8.

113. The March 10, 2021 Hi Bar MCA Agreement also provided that the Leer Defendants would be in default if they secured any alternative financing. Ex 12 § 3.1(i).

114. Under the March 10, 2021 Hi Bar MCA Agreement, missing two daily payments constituted a default. Ex. 12 at 8.

115. The March 10, 2021 Hi Bar MCA Agreement also provided recourse in the event of bankruptcy as the personal guaranty provided that: "In the event that [Hi Bar] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount." Ex. 12 at 6.

116. The March 10, 2021 Hi Bar MCA Agreement did not identify any specific receivables of the Leer Companies that were being purchase.

117. Despite Hi Bar being the purported purchaser of the Leer Companies' receivables, the Leer Defendants were responsible for collecting these purchased receivables to make payment to Hi Bar. Ex. 12 at 1 ("[Hi Bar] will debit the Remittance each business day from only one depositing bank account, which must be acceptable to, and pre-approved by, [Hi Bar] (the 'Account') into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as [Hi Bar] received payment in full of the Purchased Amount").

118. The March 10, 2021 Hi Bar MCA Agreement did have a nominal reconciliation provision, but it contained many qualifications and limitations, including: (a) no event of default

may have occurred; and (b) Hi Bar had full discretion to request additional documentation the failure to provide would result in a denial of the reconciliation Ex. 12 § 1.3.

119.   When Hi Bar performed ACH debits of the Leer Companies account to make payments on the MCA Agreement, the ACH debit would often read "PAYMENTS FOR LOAN." *See* March 12, 2021 email from Stefan to Lubin, attached hereto as **Exhibit 13**.

120.   When viewed as a loan with a $198,000 principal and a term of 39 business days, the March 10, 2021 Hi Bar MCA Agreement assessed an annual interest rate of approximately 506%.

### iii.   *March 12, 2021 BMF MCA Agreement*

121.   After entering into the first two MCA Agreements, the Leer Companies were paying off the two loans through BMF and Hi Bar withdrawing approximately $13,500/day.

122.   This was not sustainable given that COVID resulted in the Leer Companies generating little receivables and the only future revenue the Leer Companies could expect would be when one of the insured on a policy they owned passed away.

123.   Because the prior two MCA Agreements prohibited the Leer Companies from securing any other financing, Plaintiffs were placed in a situation where they had no option but to turn back to Lubin for additional financing in order to keep making premium payments on the life insurance policies they owned.

124.   Rather than entering into a wholly new MCA Agreement, this time Lubin offered to refinance the prior BMF MCA Agreement, which was executed on March 12, 2021, pursuant to which the Leer Companies would receive purportedly receive $220,000 and repay $329,780 through fixed daily payments of $8,500.  A true and correct copy of the March 12, 2021 BMF MCA Agreement is attached hereto as **Exhibit 14**.

125. According to the March 12, 2021 BMF MCA Agreement, the daily remittance of $8,500 was a "good faith estimate" of 10% of the daily value of the Leer Companies' receivables. Ex. 14 at 1. Thus, as of March 12, 2021, BMF estimated that the Leer Companies' daily receivables to be worth $85,000/day.

126. The Leer Companies did not receive anything close to the $220,000 principal set forth in the MCA Agreement. Rather, $114,928.00 was immediately deducted from this amount to pay off the balance on the March 2, 2021 BMF MCA Agreement. Ex. 14 at 13. Additional deductions were made for underwriting and origination fees. *Id.* at 7.

127. Thus, at most, the Leer Companies received $105,072 as principal under the March 10, 2021 BMF MCA Agreement.

128. Internal correspondence between Spin and BMF confirm that they designed the March 12, 2021 BMF MCA Agreement to have a finite term of 47 days. See March 12, 2021 email chain between Lubin and Gabe, attached hereto as **Exhibit 15.** This email chain also shows that the bank fee charged was arbitrarily made up by Gabe and Lubin. *Id*. at 1.

129. Pursuant to the March 12, 2021 BMF MCA Agreement, missing a single daily payment would result in a default. Ex. 14 § 3.1(d).

130. The March 12, 2021 BMF MCA Agreement contained the same "NO STACKING ADDENDUM" as the March 2, 2021 BMF MCA Agreement such that the Leer Defendants would be in breach if they secured any other type of financial product. Ex. 14 at 10.

131. BMF had recourse in the event the Leer Companies declared bankruptcy by making the personal guarantors liable for the remaining balance. Ex. 14 at 6 ("In the event [BMF] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because

-21-

that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount").

132. The March 12, 2021 BMF MCA Agreement did not have a reconciliation provision.

133. The March 12, 2021 BMF MCA Agreement did not identify any specific receivables of the Leer Companies that BMF purportedly purchased.

134. Despite BMF purportedly purchasing the Leer Companies' receivables, the Leer Defendants remained responsible for collecting these "purchased" receivables to make payments to BMF. Ex. 14 at 1 ("[BMF] will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, [BMF] (the 'Account') into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as [BMF] receives payment in full of the Purchased Amount").

135. Viewed as a loan with a principal of $105,072 and a repayment term of 47 days, the March 10, 2021 BMF MCA Agreement assessed an annual interest rate of 1,660%.

136. In addition to being usurious, BMF also over collected on the March 12, 2021 BMF MCA Agreement in the amount of $8,000. *See* pay run for March 12, 2021 BMF MCA Agreement attached hereto as **Exhibit 16**.

    iv. *March 25, 2021 BMF MCA Agreement*

137. Since this March 12, 2021 BMF MCA agreement only yielded the Leer Companies approximately an additional $100,000 in capital, while the Leer Companies continued to repay BMF and Hi Bar $17,000 per day, it was not long before the Leer Companies' capital was again depleted after using the funds to maintain payments on the Leer Companies' life insurance policies they owned.

33974728v.1

138. Given that both the March 10, 2021 Hi Bar and March 12, 2021 BMF MCA Agreement contained prohibitions under penalty of default if the Leer Companies secured any alternative financing, the Leer Defendants had nowhere to turn other than back to Lubin and Spin.

139. Consequently, on March 25, 2021, Lubin had the March 12, 2021 BMF MCA Agreement refinanced into a new loan whereby the Leer Companies would receive $400,000 and use $274,000 of that amount to pay off the prior BMF MCA balance, and still be obligated to repay $599,600 through daily payments of $25,000. A true and correct copy of the March 25, 2021 BMF MCA Agreement is attached hereto as **Exhibit 17**.

140. According to the March 25, 2021 BMF MCA Agreement, the $25,000 daily remittance was a "good faith estimate" of 10% of the value of the Leer Companies' daily receivables. Ex. 17 at 1, 8. Thus, as of March 25, 2021, BMF estimated that the Leer Companies' daily receivables were worth $250,000/day.

141. The Leer Companies did not even receive the full $126,000 under the March 25, 2021 BMF Agreement after paying off the prior BMF MCA; instead, they only netted $100,000. *See* March 26, 2021 email chain between Lubin and Gabe, attached hereto as **Exhibit 18**.

142. Dividing the Purchased Amount ($599,600) by the daily remittance ($25,000) creates a term of just 24 business days, or 31 days total. This fixed term of 24 business days was negotiated between Stefan and Lubin on March 22, 2021 via text messages, attached hereto as **Exhibit 19**.

143. Pursuant to the March 25, 2021 BMF MCA Agreement, missing a single daily payment would constitute an event of default. Ex. 17 § 3.1(d).

144. The March 25, 2021 BMF MCA Agreement contained the same "NO STACKING ADDENDUM" as the prior BMF MCA Agreement such that the Leer Defendants would be in breach if they secured any other type of financial product. Ex. 17 at 10.

145. BMF had recourse in the event the Leer Companies declared bankruptcy by making the personal guarantors liable for the remaining balance. Ex. 17 at 6 ("In the event [BMF] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount").

146. The March 25, 2021 BMF MCA Agreement did not have a reconciliation provision.

147. When Stefan made remittance adjustment requests to Lubin pursuant to this MCA Agreement, the two simply negotiated a new lower amount that was the most that the Leer Companies could afford at that time without any review of the Leer Companies' actual receivables. *See* May 24, 2021 text exchange between Stefan and Lubin, attached hereto as **Exhibit 20**.

148. The March 25, 2021 BMF MCA Agreement did not identify any specific receivables of the Leer Companies that BMF was purportedly purchasing.

149. The Leer Companies were responsible for collecting the receivables that BMF allegedly purchased, the same as all the prior MCA Agreements.

150. Viewed as a loan with a $100,000 principal and term of 31 days, the March 25, 2021 MCA Agreement assessed an annual interest rate of 5,882%.

151. In addition to being usurious, BMF also over collected on the March 25, 2021 MCA Agreement in the amount of $1,900. *See* pay run for March 25, 2021 BMF MCA Agreement attached hereto as **Exhibit 21**.

-24-

v. *March 25, 2021 Hi Bar MCA Agreement*

152.    The $100,000 principal provided by the March 25, 2021 BMF MCA Agreement was not sufficient to keep the Leer Companies operational.   At the same time, the MCA Agreements' prohibition on securing funding outside of BMF and Hi Bar gave Plaintiffs no choice but to return to Lubin for another MCA deal for their required funding.

153.    On March 25, 2021, the Leer Defendants also entered into another MCA Agreement with Hi Bar whereby the Leer Companies were to receive $400,000 and repay $599,600 through daily payments of $20,000, which was Hi Bar's "good faith estimate" of 20% of the daily value of the Leer Companies as of March 25, 2021.   A true and correct copy of the March 25, 2021 Hi Bar MCA Agreement is attached hereto as **Exhibit 22**.

154.    As of March 25, 2021, Hi Bar's estimate of the Leer Companies' daily receivables value was $100,000.

155.    Consequently, in less than one month, each MCA Agreement by the same two lenders, BMF and Hi Bar, had different "good faith estimates" of the Leer Companies' daily receivables, as reflected in the below chart:

| MCA Agreement | Daily Payment | Specified Percentage | Defendants' Estimation of FTE Receivables |
|---|---|---|---|
| 3/2/21 BMF | $4,996 | 10% | $49,960/day |
| 3/10/21 Hi Bar | $8,500 | 20% | $42,500/day |
| 3/12/21 BMF | $8,500 | 10% | $85,000/day |
| 3/25/21 BMF | $25,000 | 10% | $250,000/day |
| 3/25/21 Hi Bar | $20,000 | 20% | $100,000/day |

156.    The Leer Companies did not receive the full $400,000 principal provided by the March 25, 2021 Hi Bar MCA Agreement.   Over $80,000 was deducted for "Underwriting Fee" and a "UCC Filing Fee."   Ex. 22 at 8.

-25-

157.   The March 25, 2021 Hi Bar MCA Agreement provided that two missed payments would constitute an event of default.  Ex. 22 at 8.

158.   The Agreement provided recourse in the event the Leer Companies declared bankruptcy by holding the personal guarantors responsible for the outstanding balance.  Ex. 22 at 6 ("In the event that [Hi Bar] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount").

159.   Taking out any financing product from anyone other than Hi Bar would constitute an event of default under the MCA Agreement.  Ex. 22 § 3.1(i).

160.   The March 25, 2021 Hi Bar MCA Agreement did have a nominal reconciliation provision, but it contained many qualifications and limitations, including: (a) no event of default may have occurred; and (b) Hi Bar had full discretion to request additional documentation the failure to provide would result in a denial of the reconciliation.  Ex. 22 § 1.3.

161.   In practice, however, when Stefan and Lubin discussed making adjustments to the daily remittance, it was a discussion about the maximum the Leer Defendants could afford with no analysis of the Leer Companies' actual receivables.  Ex. 20.

162.   Dividing the MCA Agreement's Purchase Amount ($599,600) by the daily remittance ($20,000) yields a finite term of 30 business days, or 44 total days.

163.   The March 25, 2021 Hi Bar MCA Agreement did not identify any specific receivables being purchased from the Leer Companies.

164.     Like the prior four MCA Agreements, the March 25, 2021 Hi Bar MCA Agreement made the Leer Defendants responsible for collecting the receivables that Hi Bar purportedly purchased.  Ex. 22 at 1.

165.     Viewed as a loan with a $320,000 principal and term of 44 days, the March 25, 2021 Hi Bar MCA Agreement assessed an annual interest rate of 725%.

**D.  Similarities between the MCA Agreements Here And the Funderz MCA Agreements**

166.     As mentioned above, BMF MCA agreements have been ruled to be loans as a matter of law by a recent Southern District of New York decision.  Ex. 5.

167.     Both the MCA Agreements here and the Funderz BMF MCA agreement, professed that the daily remittance was a "good faith estimate" of the purchased percentage of the merchants' receivables.  *Compare* Ex. 6 at 1 *with* Ex. 8 at 1.

168.     As found by the *Funderz* court, the Funderz MCA agreements were not good faith estimates because the estimation would vary with MCA agreements entered on back-to-back days, Ex. 5 at *89-90, which is the same case here as evidence by the above chart.

169.     Both the MCA Agreements here and the Funderz BMF MCA Agreement provided recourse to the lender in the event of the merchant's bankruptcy through the personal guaranty. *Compare* Ex. 6 at 6 *with* Ex. 8 at 6.

170.     The BMF MCA Agreement in *Funderz* made two missed payments a default, Ex. 6 at 8, whereas the MCA Agreements here made one missed payment an event of default.  Ex. 8 § 3.1(d).

171.     Both the MCA Agreements here and the *Funderz* BMF MCA Agreement found to be a loan as a matter of law gave the lender a security interest in all of the merchant's assets. *Compare* Ex. 6 at 6 *with* Ex. 8 at 6.

-27-

172. The *Funderz* MCA Agreements had a completely illusory reconciliation provision that could be granted or denied in BMF's "sole discretion." Ex. 6 at 1. The BMF MCA Agreements here do not even have a reconciliation provision. *See generally* Ex. 8.

173. The *Funderz* BMF MCA Agreements nor the MCA Agreements here (i) failed to identify any specific receivables being purchased; and (ii) made it the merchant's responsibility to collect the receivables purportedly purchased by BMF. *Compare* Ex. 6 at 1 *with* Ex. 8 at 1.

**E. The MCA Agreements' Debt Is Refinanced Into The Promissory Note**

174. By May 2021, the Leer Companies were only able to make small daily payments of several hundred dollars that were negotiated between Lubin and Stefan without regard to the Leer Companies' actual receivables. Ex. 20.

175. Spin and Lubin were unhappy with this fact, and thus Lubin approached the Leer Defendants with a proposal to enter into a loan that would pay off the balance of the BMF and Hi Bar MCA Agreements.

176. To that end, on Jun 16, 2021, Golden Foothill, LF II and LS II entered into a purported $2.7 million promissory note (the "Promissory Note") with Spin that had an annual interest rate of 60%. A true and correct copy of the Promissory Note is attached hereto as **Exhibit 23**.

177. In connection with the Promissory Note, Spin required that Stefan and Tatanisha Leer execute personal guarantees, attached hereto as **Exhibits 24** and **25**, respectively.

178. Spin also required a corporate guaranty to be executed by El Dorado, Lone Wolf, ELDO, Genesis, and KTL (the "Corporate Guarantors"). A true and correct copy of the corporate guaranty is attached hereto as **Exhibit 26**.

-28-

179.    The most important component of the transaction for Spin and Lubin was acquiring a purported security interest in several of the Leer Companies' remaining life insurance policies they owned by executing a Security Agreement entered into between Spin, on the one hand, and Golden Foothill, LF II, LS II, the Corporate Guarantors and the Leers as personal guarantors as part of the Promissory Note's overall Transaction.  A true and correct copy of the Security Agreement is attached hereto as **Exhibit 27**.

180.    While the Promissory Note on its face contemplated a $2.7 million dollar loan, less than half that amount actually entered into any bank account of the Leer Companies.  Rather (1) $200,000 was immediately taken off as a fee for Lubin's services for "putting together the deal"; (2) $30,000 was allocated to Spin's attorneys to compensate them for drafting the transaction documents purportedly; (3) $582,000 went to pay off the Hi Bar MCA balance; and (4) $580,597 went to pay off the BMF MCA balance.  This left only $1,307,403 as the actual principal to the Leer Companies.  *See* Spin's Promissory Note distribution breakdown attached hereto as **Exhibit 28.**

181.    As reflected in the below text exchange between Stefan and Lubin, Defendants intentionally designed the Promissory Note to repackage prior usurious debt into a fictitious amount above $2.5 million purely to try to escape liability for the usurious MCA Agreements by artificially bringing the Promissory Note outside the scope of New York's criminal usury laws.

-29-



182.    The Promissory Note had a payment schedule whereby $150,000 payments were

due on June 18, 2021 and June 25, 2021, followed by $70,000 weekly payments from July 2, 2021,

33974728v.1

to August 6, 2021, and then weekly payments of $127,173.91 each week thereafter until the Promissory Note was scheduled to be paid in full by January 14, 2022. Ex. 23 at 6.

183.    The Leer Companies were able to make the first five payments, totaling approximately $510,000, but could not continue to make the onerous weekly payments given the high interest rate and the fact that they only received less than half the actual principal.

184.    As a result, Spin sued Plaintiffs and is presently seeking more than $14 million in damages for breach of the Promissory Note at the default interest rate of 120% annually while the Leer Companies received less than $2 million in total under all five MCA Agreements *and* the Promissory Note.

**FIRST CAUSE OF ACTION**
**(RICO: 18 U.S.C. § 1962)**

185.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.  The Unlawful Activity**

186.    All of the MCA Agreements provided that they were to be governed and construed under the laws of New York, Exs. 8, 12, 14. 17, and 22 §§ 4.5, which is also where Spin, BMF and Hi Bar have their principal place of business.

187.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

188.    In 1965, the New York Legislature commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

189.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation, titled An Investigation of the Loan-Shark Racket, brought to the attention of the New York Governor and the public the need for change in both, as well as for change in the

-31-

immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment.

190.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at an interest rate greater than twenty-five percent (25%) per annum.

191.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

192.    As noted above, loan sharks with full knowledge of the prior law, made it a policy to loan to corporations.

193.    The Investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

194.    Like with the instant MCA Agreements, the Report and New York case law has thus recognized that usurious loans are often disguised as other fictional funding devices designed to evade New York law.

195.    As the New York Court of Appeals recently held, "[w]hen determining whether a transaction is a loan, substance—not form—controls." *Adar Bays, LLC v. GeneSYS Id, Inc.*, 37 N.Y.3d 320, 335 (2021).

196.    Under recent Second Circuit authority, to determine whether MCAs are really loans, courts consider at least three, non-exhaustive factors: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241, *3 (2d Cir. June 8, 2023). Other factors New

33974728v.1

York law considers include: (4) whether lenders made sure the borrowers were in default immediately (5) whether the agreements identify particular revenue or accounts that were supposedly purchased; (6) whether the merchant is responsible for collecting the future receipts; (7) whether default is declared after just a few missed payments; (8) whether the daily payment rates appear to be good faith estimates of merchant's receivables; and (9) the MCA agreements are underwritten like loans.

197.    The MCA Agreements issued by Defendants hit for all of the above factors and are just another iteration of usurious lenders' decades-long schemes to evade New York usury laws by disguising loans as a purchase of receivables.

198.    First, each MCA Agreement gave BMF and Hi Bar direct recourse in the event that the Leer Companies declared bankruptcy by making Stefan and Tatanisha Leer, as personal guarantors, responsible for any amount outstanding.  Exs. 8, 12, 14. 17, and 22 at 6.  Courts applying New York law have construed this exact provision to render MCA agreements loans.  *See*, *e.g.*, *New Y-Capp v. Arch Cap. Funding LLC*, 2022 U.S. Dist. LEXIS 180309, *13 (S.D.N.Y. Sept. 30, 2022) ("provisions 'worked to ensure while bankruptcy may no longer have been an express default under the revised standard form of MCA Agreement, the guarantor continued to be absolutely liable for repayment in the event of a bankruptcy filing'").

199.    The MCA Agreements also granted BMF and Hi Bar a security interest in all of the Leer Companies assets.  Exs. 8, 12, 14. 17, and 22 at 5 ("Merchant and Guarantor(s) grant to [BMF/Hi Bar] a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory . . . now or hereafter owned or acquired by Merchant and/or Guarantor(s) [and] all proceeds . . . [and] any funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds").  Courts applying

-33-

33974728v.1

New York law have construed blanket security grants in the merchants' assets to amount to recourse in the event the merchant declares bankruptcy. *Akf, Inc. v. Haven Transp. Bus. Sols., Inc.*, 2024 U.S. Dist. LEXIS 103271, *18-19 (N.D.N.Y. June 11, 2024) (finding bankruptcy recourse for MCA lender where "it seems virtually certain that FundKite would be able to file a claim in any bankruptcy, as a secured creditor"); *MCA Servicing Co. v. Nic's Painting, LLC*, 2014 N.Y. Misc. LEXIS 2238, *12 (N.Y. Sup. Ct. Apr. 23, 2024) ("[A]lthough bankruptcy is not identified as an event of default, the agreement creates a security interest in every tangible asset of the business and allows for recovery personally against the Merchant's owner"); *Cloudfund, LLC v. Mobile Rehad, Inc.*, 2024 N.Y. Misc. LEXIS 4817, *12 (N.Y. Sup. Ct. May 1, 2024) (same).

200.    Second, the MCA Agreements were underwritten as loans having finite terms as evidenced by internal correspondence between Lubin and the other co-conspirators.  Exs. 10, 15. Each MCA Agreement also had a *de facto* term by simply dividing the repayment amount by the fixed daily payment, which New York courts have found to satisfy the finite term factor.  *Lateral Recovery LLC v. Queen Funding LLC*, 2022 U.S. Dist. LEXIS 129032, *16 (S.D.N.Y. July 20, 2022) ("a de facto term plausibly exists.  The period of payment can be easily calculated by dividing the amount FTE owes by the among of daily payments").

201.    Third, the BMF MCA Agreements completely lacked a reconciliation provision, and the Hi Bar MCA Agreements had an illusory provision because reconciliation could be denied if the Leer Companies did not provide BMF or Hi Bar with any and all documents that they may request as a condition for granting reconciliation.  This is a reconciliation feature several New York courts have found to be illusory and renders MCA agreements loans.  *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 248 n. 5 (S.D.N.Y. 2022); *Queen*, at *14-15; *Akf*, at *17.

33974728v.1

202. More importantly, in practice, Lubin did not perform reconciliations to adjust the MCA Agreements' daily remittance to reflect the Leer Companies' actual receivables. Instead, when Plaintiffs alerted Spin and Lubin that they could not maintain the daily payments, Lubin negotiated new daily payments as whatever amount the Leer Companies could afford to pay, without any review or discussion of the Leer Companies receivables. Ex. 20.

203. Finally, because each MCA Agreement made the Leer Companies securing any financing outside of BMF (or respectively Hi Bar), the Defendants ensured that the Leer Companies were in breach of the March 2, 2021 BMF MCA Agreement as soon as they executed the March 10, 2021 Hi Bar MCA Agreement. Because of this technical default that Defendants trapped Plaintiffs into, Defendants could always hold the Plaintiffs in default which would preclude them from any purported right to reconciliation or remittance adjustments under the MCA Agreements.

204. Fourth, the MCA Agreements' purported "good faith" estimate of the Leer Defendants is proven to be a sham when the MCA Agreements are compared side-by-side, per the chart below.

| MCA Agreement | Daily Payment | Specified Percentage | Defendants' Estimation of FTE Receivables |
|---|---|---|---|
| 3/2/21 BMF | $4,996 | 10% | $49,960/day |
| 3/10/21 Hi Bar | $8,500 | 20% | $42,500/day |
| 3/12/21 BMF | $8,500 | 10% | $85,000/day |
| 3/25/21 BMF | $25,000 | 10% | $250,000/day |
| 3/25/21 Hi Bar | $20,000 | 20% | $100,000/day |

205. Courts applying New York law have found, even as a matter of law on summary judgment, that MCA agreements with bad faith estimates of the merchant's receivables are loans. *Davis v. Richmond Capital Group*, 194 A.D.3d 516, 517 (1st Dep't 2021); *Lateral Recovery LLC v. Funderz.net LLC*, 2024 U.S. Dist. LEXIS 176985, *89 (S.D.N.Y. Sept. 27, 2024).

206. Fifth, the MCA Agreements failed to identify any specific receivables of the Leer Companies that they were purchasing while simultaneously making the Leer Companies responsible for collecting the receivables purportedly purchased by BMF and Hi Bar so that the lenders could debit the remittances from the Leer Companies' designated bank account. Exs. 8, 12, 14. 17, and 22 at 1. Courts applying New York law have found this feature to render MCA agreements loans as well. *Haymount*, at 249; *Funderz*, at *81-82.

207. Six, the MCA Agreements made missing as little as one to two missed daily payments an event of default. Exs. 8, 12, 14. 17, and 22 at 7 and §§ 3.1(d). Courts applying New York law have found *less onerous* default provisions render MCA agreements loans. *Davis*, at 517; *Queen*, at *18.

208. By drafting and servicing the MCA Agreements in the manner described above, Defendants ensure absolute repayment through (i) sham reconciliation provisions (if at all), (ii) recourse in the event of bankruptcy, (iii) having a complete security interest in all of the Leer Companies assets; and (iv) making if a default if the merchant missed one or two payments or takes any alternative funding.

209. Consequently, the MCA Agreements are usurious loans with interest rates ranging from 425%, on the low end, to 5,882%, on the high end, multiple worlds higher than New York's twenty-five percent (25%) criminal usury limit on commercial loans of less than $2.5 million principal, which constitutes unlawful debt for RICO purposes. 18 U.S.C. § 1961(6)(B).

210. By extension, the Promissory Note, with a true principal of approximately $1.3 million while imposing an annual interest rate of 60%, also is more than twice the New York criminal usury rate and also constitutes unlawful debt for RICO purposes.

33974728v.1

**B. Culpable Persons**

211.    Lubin, Gabe, Getter, and Herbst are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.

212.    At all relevant times, Lubin, Gabe, Getter, and Herbst were, and are, a person that exists separate and distinct from the Spin, Isaacov and Hi Bar Enterprises, described below.

213.    Lubin is the owner and sole managing member of Spin.  During the relevant time period, Lubin, had the Spin Enterprise serve as a broker for MCA lenders, solicited the unlawful debt transactions between the Plaintiffs and the Isaacov and Hi Bar Enterprises, negotiated the terms of the MCA Agreements with other Isaacov and Hi Bar Enterprise members, and providing funding for the MCA Agreements.

214.    Gabe is the CEO and principal owner of BMF and part of the Isaacov Enterprise. During the relevant time period, Gabe, along with Lubin, decided upon the terms of the MCA Agreements between BMF and the Plaintiffs and used BMF to paper the MCA Agreements with Plaintiffs.  Gabe also provided funding for the MCA Agreements all while acting as part of the Isaacov Enterprise.

215.    Gabe confirms he is BMF's owner in New York State court filings he makes in support of the Enterprise collecting unlawful debt.  *See*, *e.g.*, Affidavit of Gavriel Yitzchakov, dated August 29, 2023, filed in *BMF Advance, LLC v. Modern Concepts Construction, LLC et al.*, Index No. 505587/2023 (Sup. Ct. Kings Cnty.), attached hereto as **Exhibit 29**.

216.    As reflected here with the BMF MCA Agreements, and is a consistent pattern for BMF's servicing of MCA agreements generally, Gabe also ensures absolute repayment on MCA

33974728v.1

Agreements by routinely over-collecting from merchants, like the Leer Companies, by debiting their bank accounts *after* the MCA Agreement is paid off in full. Exs. 11, 16, and 21.

217.     Herbst is the owner and mastermind of the Hi Bar Enterprise, which Getter, during the relevant time period, worked for as a broker who also was involved in funding and underwriting MCA Agreements for the Hi Bar Enterprise.

218.     Through their respective operation of Spin, BMF, and Hi Bar, Lubin, Gabe, Getter, and Herbst solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in states that do not have usury laws, in addition to collecting unlawful debt from merchants situated in states that do have usury laws, such as California (where Plaintiffs resided) and New York (where Defendants operated out of).

219.     When the Enterprise has sufficiently trapped merchants into a series of usurious MCA Agreements, Spin, with funding provided by Gabe and Getter, repackage the MCA debt into a purportedly legitimate loan with a fictitious principal above $2.5 million in order to try to insulate their collection of unlawful debt.

## C. The Spin Enterprise

220.     Spin and Lubin constitute an Enterprise (the "Spin Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

221.     Spin and Lubin are associated-in-fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Spin Enterprise has the common goal of soliciting, funding, servicing, and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states, thereby constituting "unlawful debt" within the meaning of 18 U.S.C. § 1961(6)(B).

-38-

33974728v.1

222.     Since at least 2021 and continuing through the present, members of the Spin Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued by the Enterprise to small business throughout the United States.

223.     Over this period, the Spin Enterprise would hide the fact that it was actively involved in underwriting and funding the usurious loans disguised as MCA Agreements it brokered on behalf of the Isaacov Enterprise and Hi Bar Enterprise (defined below).

224.     This was intentionally done as part of the Spin Enterprise's hierarchy to ensure that corporate members of the Spin Enterprise were as insulated as possible from liability under the usurious MCA agreements by creating plausible deniability as to each specific member's liability and obligations under each specific MCA agreement.

225.     Indeed, through collaborating with the Isaacov Enterprise and Hi Bar Enterprise, the Spin Enterprise is able to confuse borrowers as to the Spin Enterprise's role in the MCA Agreements and avoid the borrowers learning about the Isaacov Enterprise's and Hi Bar's Enterprises members and principals by serving as a merchant-facing role.

226.     Because the Spin Enterprise is separate from the Isaacov Enterprise and Hi Bar Enterprise, the Enterprise is also able to effectively launder the MCA Agreements' usurious debt by having Spin come in and refinance the MCA debt into a purportedly legitimate loan intentionally designed to superficially exceed the scope of New York's usury laws.

227.     In essence, by keeping the Enterprises ostensibly separate, the Spin Enterprise can play the white knight for the borrowers who are trapped into the negative spiral of MCA agreements with BMF and Hi Bar only to be further fleeced by Spin who imposes usurious interests

-39-

on its refinanced loans for usurious MCA debt and extracts further consideration from borrowers in exchange, such as the Security Agreement Spin extracted from Plaintiffs which gave Spin an security interest in over $40 million worth of life insurance policies owned by the Leer Companies.

228.    The debt, including such debt evidenced by the MCA Agreements and Promissory Note, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d), and 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes, and (ii) the rates are more than twice the legal rate permitted under New York Penal Law § 190.40.

**D. The Roles Of The RICO Persons In Operating The Spin Enterprise, And Roles Of The Individual Companies Within The Spin Enterprise**

229.    Lubin and Spin have organized themselves and the Spin Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon lawful debts including as follows:

**i.    Avrumi (a/k/a Josh) Lubin**

230.    Lubin is the owner and the mastermind of the Spin Enterprise and the Culpable Person under RICO.  Lubin is responsible for the day-to-day operations of the Spin Enterprise and has final say on all business decisions of the Spin Enterprise including, without limitation, which usurious loans the Spin Enterprise will broker and fund, the ultimately payment terms, and the repayment term period for MCA Agreement.

231.    Lubin, through his company Spin and as broker to the Isaacov and Hi Bar Enterprises, brings potential merchant-victims to Gabe and Getter who then, collectively with Lubin, decide which company, BMF or Hi Bar, will paper the MCA agreement, and on what terms, the length of the loan, the repayment interest rate, and how the MCA agreement will be funded among the various Enterprise members.

-40-

33974728v.1

232.    In his capacity as the primary broker and merchant-facing contact person for the Enterprise, Lubin is responsible for identifying financially distressed merchants who make the ideal candidates for the Enterprise's predatory MCA Agreements.  In both external negotiations with merchants and internal underwriting practices with the Enterprise, Lubin describes the MCA agreements as having fixed terms with a specified interest rate over the MCA agreements' principal.

233.    Lubin, as the merchant-facing Enterprise member, also fields reconciliation and/or remittance adjustment requests from merchants, such as the Plaintiffs here, and instead of performing an analysis of the merchant's actual receivables, negotiates for the borrower to pay the absolute maximum the borrower can afford.  Ex. 20.

234.    Lubin is also the key Enterprise member involved in laundering the Enterprise's unlawful MCA debt into purported legitimate loans in amounts greater than $2.5 million for the explicit and admitted purpose of artificially placing the loan beyond the reach of New York's usury laws.

235.    In reality, as evidenced by the Promissory Note here, these loans invariably are just another unlawful debt instrument as (a) almost half the principal was to pay off prior usurious MCA debt; and (b) hundreds of thousands of more dollars were deducted as "fees" for Lubin simply setting up the boilerplate loans that he did no work to earn.

236.    Lubin has ultimately benefitted from the Spin Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

### ii.  Spin Capital

237.    Spin is a separate legal entity that has a legal existence separate and apart from the other members of the Spin Enterprise and maintains its own books and records.

-41-

33974728v.1

238.     Spin participates in and furthers the interests of the Spin Enterprise by (i) soliciting merchants to enter into MCA agreements with the Isaacov and Hi Bar Enterprises and other MCA lenders; (ii) provide funding for the MCA agreements the Spin Enterprise brokers; (iii) work with the MCA lenders, including the Isaacov and Hi Bar Enterprises, in setting the usurious terms of the MCA agreements during underwriting (iv) being the contact entity between merchants and MCA lenders like the Isaacov Enterprise and Hi Bar Enterprise; and (v) extend admitted loans to merchants once their MCA debt becomes high enough for the Spin Enterprise to attempt to repackage the debt into a loan with an artificial principal above $2.5 million to explicitly try to avoid application of New York's criminal usury laws.

239.     In this case, Spin, through Lubin, knowingly and intentionally; (i) solicited the Leer Defendants to enter into the MCA Agreements; (ii) worked with other members of the Issacov and Hi Bar Enterprises to underwrite the MCA Agreements, including setting their term and interest rates; (iii) convince the Leer Defendants to refinance their MCA debt into additional MCA Agreements and, ultimately, the Promissory Note; (iv) be the contact person between the Plaintiffs and the Isaacov and Hi Bar Enterprises, including fielding reconciliation requests from Plaintiffs and instead of providing reconciliation simply renegotiated the payment rate to the maximum the Leer Companies could pay.

### E.  The Isaacov Enterprise

240.     BMF, Gabe Isaacov, Joe Isaacov, Ben Isaacov and Simon Isaacov (the "Isaacov Brothers") constitute an Enterprise (the "Isaacov Enterprise") within the meaning of 18 U.S.C. § 1961(4) and 1962(c).

241.     BMF and the Isaacov brothers are associated-in-fact and through relations of ownership for the common purpose of carrying on an ongoing unlawful enterprise.

-42-

242. Specifically, the Isaacov Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge an interest at more than twice the enforceable rate under the laws of United States and other states.

243. Since at least 2017 and continuing through the present, the members of the Isaacov Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon lawful debt issued by the Isaacov Enterprise to small businesses throughout the United States.

244. Over this period the Isaacov Enterprise individuals would assume various fake names for themselves individually and trade names to do business under. This was done intentionally as part of the Isaacov Enterprise's hierarchy to ensure that corporate members of the Isaacov Enterprise were as insulated as possible from liability under the usurious MCA Agreements by creating plausible deniability as to each specific member's liability and involvement with each specific MCA Agreement.

245. Indeed, through use of various alter-ego identities for the individual members of the Isaacov Enterprise, the Isaacov Brothers intended to confuse borrowers as to which entity to contact and stall borrowers' efforts to get a full accounting of how the Isaacov Enterprise was automatically withdrawing monies from the borrowers' accounts.

246. The Isaacov Enterprise's use of alter-ego names for its members was orchestrated by the Isaacov Brothers, as the common thread between all these members and their alter-egos was that they were ultimately controlled and for the benefit of the Isaacovs.

247. The debt, including such debt evidenced by the BMF MCA Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d), and 18 U.S.C. § 1961(6), because

-43-

33974728v.1

(i) it violates applicable criminal usury statutes, and (ii) the rates are more than twice the legal rate permitted under New York Penal Law § 190.40.

### F. The Roles of the Isaacov Brothers In Operating The Isaacov Enterprise, And The Roles Of The Individual Companies Within The Enterprise

248.    The Isaacov Brothers, each a RICO Person, have organized themselves and the Isaacov Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

a.  **Joseph Isaacov**

249.    Together with the other Isaacov Brothers, Joe is responsible for the day-to-day operations of the Isaacov Enterprise, primarily through the assumed MCA label HOP Capital, and has final say on all financial decisions of the Isaacov Enterprise including, without limitation, which usurious loans the Isaacov Enterprise will fund, which brokers, like the Spin Enterprise, the Isaacov Enterprise will work with in soliciting its usurious loans, how such loans will be funded, which investors will fund each loan, and the ultimate payment terms, amount and period of each usurious loan.

250.    In his capacity as a member of the Isaacov Enterprise, and oldest brother, Joe, together with the other Isaacov Brothers, is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Isaacov Enterprise to accomplish its commons goals and purposes including: (i) the form of merchant agreements used by the Isaacov Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form security agreements and personal guaranties with bankruptcy recourse used by the Isaacov Enterprise to collect upon the

-44-

unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, BMF MCA Agreements extended to the Leer Companies.

251.    Joe has taken actions, and directed other members of the Isaacov Enterprise to take actions necessary to accomplish the overall goals and purposes of the Isaacov Enterprise, including directing the affairs of the Isaacov Enterprise, funding the Isaacov Enterprise, directing members of the Isaacov Enterprise to collect upon the unlawful loans and executing legal documents in support of the Isaacov Enterprise.

252.    Joe has ultimately benefitted from the Isaacov Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

b. **Gavriel Yitzchakov a/k/a Gabe Isaacov**

253.    Together with the other Isaacov Brothers, Gabe is responsible for the day-to-day operation of the Enterprise's MCA lending through his ownership and control of MCA deals the Enterprise papers using BMF.  Gabe has the final say on all Enterprise MCA agreements papered by BMF, including, without limitation, which usurious loans BMF will paper, how such loans will be funded, and, in coordination with Lubin, the ultimate payment terms and period of each usurious MCA agreement.

254.    In his capacity as a member of the Isaacov Enterprise, Gabe, together with his Isaacov Brothers, is responsible for creating, approving and implementing policies, practices and instrumentalities used by the Enterprise through BMF to accomplish its common goals and purposes to collect unlawful debt, including: (i) the form of the MCA agreements used by BMF to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Isaacov Enterprise's collection of unlawful debt; (ii) the method of collecting

33974728v.1

the daily payments via ACH withdrawals, including over-collecting via ACH withdrawals after the BMF MCA agreement is paid off; (iii) removing any reconciliation provision from the MCA agreements to ensure absolute repayment; and (iv) designing a broad security agreement and resource for bankruptcy against the personal guarantors to ensure absolute repayment even if the merchant declares bankruptcy. All such forms were used to make and collect upon unlawful loans, including, without limitation, the BMF MCA Agreements extended to the Leer Companies.

255. Gabe has also taken actions and, directed other members to the Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful BMF MCA Agreements, and executing legal documents in support of the Enterprise's collection of unlawful debt.

256. Gabe also works in retaining brokers, like the Spin Enterprise, to solicit merchants to enter into MCA Agreements with the Isaacov Enterprise, as was the case with the Plaintiffs and the BMF MCA Agreements.

257. Gabe has ultimately benefitted from the Isaacov Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

c. **Ben Isaacov**

258. Together with the other Isaacov Brothers, primarily through the assumed name Panthers Capital, Ben is responsible for the day-to-day operations of the Isaacov Enterprise and has final say on all financial decisions of the Isaacov Enterprise involving Panthers Capital, including, without limitation, which usurious loans the Isaacov Enterprise will fund on Panthers Capital paper, how such loans will be funded, which investors will fund each loan, and the ultimate payment terms, amount and period of each usurious loan.

33974728v.1

259.    In his capacity as one of the leaders of the Isaacov Enterprise and sibling to the other Isaacov Enterprise members, Ben, together with the other Isaacov Brothers, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Isaacov Enterprise to accomplish its common goals and purposes, including: (i) the form of Panthers Capital merchant agreements used by the Isaacov Enterprise to attempt to disguise the unlawful loans and receivable purchase agreements to avoid applicable usury laws and conceal the Isaacov Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) designing a broad security agreement and resource for bankruptcy against the personal guarantors to ensure absolute repayment even if the merchant declares bankruptcy.  All such forms were used to make and collect upon unlawful loans papered by Panthers Capital made by the Isaacov Enterprise.

260.    Ben has also taken actions, and directed other members of the Isaacov Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Isaacov Enterprise, funding the Isaacov Enterprise, and directing members of the Isaacov Enterprise to collect upon the unlawful loans and executing legal documents in support of the Isaacov Enterprise.

261.    Ben has ultimately benefitted from the Isaacov Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

d.  **Simon Isaacov**

262.    Simon is a funder for BMF and owns and operates a book of business separate and apart from BMF.  Together with the Isaacov Brothers, Simon is responsible for the day-to-day operations of the Isaacov Enterprise and has final say on all financial decisions of the Isaacov Enterprise including, without limitation, which usurious loans the Isaacov Enterprise will fund,

33974728v.1

how such loans will be funded, which investors will fund each loan, and the ultimate payment terms, amount and period of each usurious loan.

263. In his capacity as member of the Isaacov Enterprise and youngest brother, Simon, together with the other Isaacov Brothers, is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Isaacov Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Isaacov Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Isaacov Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) designing a broad security agreement and resource for bankruptcy against the personal guarantors to ensure absolute repayment even if the merchant declares bankruptcy. All such forms were used to make and collect upon unlawful loans papered by BMF made by the Isaacov Enterprise to the Plaintiffs.

264. Simon has ultimately benefitted from the Isaacov Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

e. **BMF**

265. BMF is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

266. BMF participates in and furthers the interests of the Isaacov Enterprise by (i) entering into agreements with the Spin Enterprise to have Spin solicit and broker Isaacov Enterprise MCA deals with merchants; (ii) pooling funds among the Isaacov Enterprise members to fund BMF MCA agreements; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the usurious loans disguised as BMF MCA agreements on behalf of the Isaacov Enterprise; (v) servicing the usurious

33974728v.1

loans; (vi) setting up and implementing the ACH withdrawals used by the Isaacov Enterprise to collect upon the unlawful debt, including engaging in cover collections; and (vii) obtaining judgments in its name to further collect upon the unlawful debt.

267.    In this case, BMF knowingly and intentionally: (i) worked with Spin and Lubin to solicit the Plaintiffs into entering into the BMF MCA Agreements; (ii) pooled funds from Isaacov Enterprise members to fund the BMF MCA Agreements; (iii) underwrote the BMF MCA Agreements; (iv) entered into three BMF MCA Agreements with Plaintiffs; (v) collected upon the unlawful debt evidenced by the BMF MCA Agreements by affecting ACH wire transfers from the Leer Companies' bank accounts, including over-collecting on each BMF MCA Agreement.

## G.  The Hi Bar Enterprise

268.    Hi Bar, Getter, and Herbst constitute an Enterprise (the "Hi Bar Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

269.    Hi Bar, Getter, and Herbst are associated in fact and through relations of ownership for the common purpose of carrying an ongoing unlawful enterprise.

270.    Specifically, the Hi Bar Enterprise has a common goal of soliciting, funding, servicing, and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

271.    Since at least 2021 and continuing through the present, the members of the Hi Bar Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued by the Hi Bar Enterprise to small businesses throughout the United States.

272.    The debt, including such debt evidenced by the two Hi Bar MCA Agreements entered between the Hi Bar Enterprise and Plaintiffs, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d), and 18 U.S.C. § 1961(1) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law § 190.40.

## H. The Roles Of The RICO Persons In Operating The Hi Bar Enterprise, And The Roles Of The Individual Companies Within The Hi Bar Enterprise

273.    Herbst and Getter have organized themselves and the Hi Bar Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

### i.    Yisroel Herbst

274.    Herbst is an owner and a mastermind of the Hi Bar Enterprise.  He is responsible for the day-to-day operations of the Hi Bar Enterprise and has final say on all business decisions of the Hi Bar Enterprise including, without limitation, which usurious loans the Hi Bar Enterprise will fund, how such loans will be funded, which investors will fund each loan, and the ultimate payment terms, amount and period of each usurious loan.

275.    In his capacity as mastermind of the Hi Bar Enterprise, Herbst is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Hi Bar Enterprise to accomplish its common goals and purposes including: (i) the form of the merchant agreements used by the Hi Bar Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Hi Bar Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) designing a broad security agreement and resource for bankruptcy against

-50-

the personal guarantors to ensure absolute repayment even if the merchant declares bankruptcy. All such forms were used to make and collect upon unlawful loans papered by Hi Bar made by the Hi Bar Enterprise to the Plaintiffs.

276. Herbst has also taken actions, and directed other members of the Hi Bar Enterprise to take actions necessary to accomplish the overall goals and purposes of the Hi Bar Enterprise including directing the affairs of the Hi Bar Enterprise, funding the Hi Bar Enterprise, directing members of the Hi Bar Enterprise to collect upon the unlawful loans, and executing legal documents in support of the Hi Bar Enterprise.

277. Herbst also plays a significant role in the Hi Bar Enterprise's unlawful collection tactics, including knowingly filing false and/or fraudulent affidavits in support of confessions of judgment against merchants that misrepresent or omit material facts concerning the MCA transaction.

278. Herbst has ultimately benefitted from the Hi Bar Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

### ii. Joel Geta a/k/a Yoel Getter

279. Getter was hired by Herbst to assist the Hi Bar Enterprise in soliciting merchants into entering into Hi Bar MCA agreements and conduct the day-to-day operations Hi Bar.

280. In his capacity as an officer of the Hi Bar Enterprise during the relevant time period, Getter is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Hi Bar Enterprise to accomplish its common goals and purposes including: (i) the form of the merchant agreements used by the Hi Bar Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Hi Bar Enterprise's collection of an unlawful debt; (ii) the method of collecting the

daily payments via ACH withdrawals; and (iii) designing a broad security agreement and resource for bankruptcy against the personal guarantors to ensure absolute repayment even if the merchant declares bankruptcy.  All such forms were used to make and collect upon unlawful loans papered by Hi Bar made by the Hi Bar Enterprise to the Plaintiffs.

281.    For instance, as part of this solicitation role for the Hi Bar Enterprise, Getter partnered with the Spin Enterprise to act and a broker for the Hi Bar Enterprise and bring in potential merchant victims to the Hi Bar Enterprise so that they could be induced into entering into Hi Bar MCA agreements, as was the case with the Plaintiffs here.

282.    Getter was also responsible for working with the Spin Enterprise in underwriting and setting the terms of the two Hi Bar MCA Agreements entered into with the Plaintiffs and provided some of the funding for the Hi Bar MCA Agreements and Promissory Note.

283.    Getter has ultimately benefitted from the Hi Bar Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

**vi.  Hi Bar**

284.    Hi Bar is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

285.    Hi Bar participates in and furthers the interests of the Enterprise by (i) entering into agreements with the Spin Enterprise to have Spin solicit and broker MCA deals with merchants; (ii) pooling funds among the Hi Bar Enterprise members to fund MCA agreements; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the usurious loans disguised as MCA agreements on behalf of the Hi Bar Enterprise; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Hi Bar Enterprise to collect upon the unlawful debt, including engaging

33974728v.1

in cover collections; and (vii) obtaining judgments in its name to further collect upon the unlawful debt.

286. In this case, Hi Bar knowingly and intentionally: (i) worked with Spin to solicit the Plaintiffs into entering into the Hi Bar MCA Agreements; (ii) pooled funds from the Hi Bar Enterprise members to fund the Hi Bar MCA Agreements; (iii) underwrote the Hi Bar MCA Agreements; (iv) entered into two MCA Agreements with Plaintiffs; (v) collected upon the unlawful debt evidenced by the Hi Bar MCA Agreements by affecting ACH wire transfers from the Leer Companies' bank accounts.

## I. Interstate Commerce

287. The three Enterprises are engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

288. Specifically, members of the Spin, Isaacov and Hi Bar Enterprises maintain offices in New York, New Jersey and Florida and use personal in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the respective Enterprises to entities across the United States, including California where the Leer Companies operated in the relevant time frame, via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

289. In the present case, all communications between the members of the three Enterprises and Plaintiffs were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications, including text messages between Stefan in California and Lubin in New Jersey and/or New York.

290. Specifically, the three Enterprises used interstate emails to original, underwrite, service and collect upon the MCA Agreements and Promissory Note, fund the advances under the

-53-

MCA Agreements and Promissory Note, and collect on the MCA Agreements through interstate ACH debits and on the Promissory Note through interstate wires.

291.   In addition, at the direction of Defendants, each MCA Agreement and the Transaction documents were executed by Plaintiffs in California and these executed copies were sent by email to Plaintiffs in New Jersey, New York and Florida, where the three Enterprises have their principal offices or where their members reside.

## J.   Injury And Causation

292.   Plaintiffs have and will continue to be injured in their business and property by reason of the three Enterprises' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than $827,730, the amount of the unlawful debt collected by the Isaacov and Hi Bar Enterprises from Plaintiffs on the MCA Agreements.

293.   In addition, Plaintiffs are entitled to damages to offset the amount of usurious interest being asserted by the Spin Enterprise on the Promissory Note, such that instead of charging 60% interest pre-default and 120% interest post-default, the Promissory Note charges interest at no greater than 25% given that the Promissory Note is truly a loan with a principal of approximately $1.3 million, well within the scope of New York's criminal usury laws for commercial loans.  The exact amount of these damages will be determined at trial.

294.   The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious MCA payments and the lawsuit filed by Spin to collect upon the usurious Promissory Note and take ownership of all of the Leer Companies' life insurance policies under the Security Agreement.

33974728v.1

295.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with (i) exposing and prosecuting Defendants' criminal activities; and (ii) defending themselves from Spin in a lawsuit brought to collect upon the Promissory Note and take ownership of all of the Leer Companies' life insurance policies under the Security Agreement.

296.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, at an amount to be determined at trial but no less than $2,483,190, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

297.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

298.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

299.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of their respective Enterprises and use of the various Enterprises to assist each other Enterprise, and frequent email communications among Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the MCA Agreements and Promissory Note, each Defendant knew the nature of the three Enterprises and each Defendant knew that the three Enterprises extended beyond each Defendant's individual role.

300.    Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

33974728v.1

301.   Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operations of the each of the three Enterprises' affairs in order to collect upon unlawful dets, including the MCA Agreements and Promissory Note, in violation of 18 U.S.C. § 1962(c).

302.   In particular, each Defendant was a knowing, willing, and active participant in the three Enterprises and their affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the MCA Agreements and Promissory Note.

303.   The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

304.   Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than $827,730.

305.   In addition, Plaintiffs are entitled to damages to offset the amount of usurious interest being asserted by Spin on the Promissory Note, such that instead of charging 60% interest pre-default and 120% interest post-default, the Promissory Note charges interest at no greater than 25% given that the Promissory Note is truly a loan with a principal of approximately $1.3 million, well within the scope of New York's criminal usury laws for commercial loans.  The exact amount of these damages will be determined at trial.

306.   The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious MCA payments and

the lawsuit filed by Spin to collect upon the usurious Promissory Note and take ownership of all of the Leer Companies' life insurance policies under the Security Agreement.

307. Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with (i) exposing and prosecuting Defendants' criminal activities; and (ii) defending themselves from Spin in a lawsuit brought to collect upon the Promissory Note and take ownership of all of the Leer Companies' life insurance policies under the Security Agreement.

308. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, at an amount to be determined at trial but no less than $2,483,190, plus costs and attorneys' fees from Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment in their favor against Defendants as follows:

a) Declaring each of the MCA Agreements and Promissory Note to be a usurious loan in violation of New York Penal Law § 190.40 and thus void and unenforceable;

b) Against Lubin, Gabe, Getter, and Herbst, joint and severally, on account of the First Cause of Action, in an amount to be determined at trial, but in no event less than $827,730., plus treble damages and attorneys' fees;

c) Against Lubin, Gabe, Getter, Herbst, Spin, BMF, and Hi Bar, joint and severally, on account of the Second Cause of Action, in an amount to be determined at trial, but in no event less than $827,730., plus treble damages and attorneys' fees;

d) Any further relief deemed appropriate by the Court.

Dated: November 11, 2024

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
Alex D. Corey
810 Seventh Avenue, Suite 500
New York, NY 10019
(215) 864-6329

-57-

33974728v.1

-58-

heskins@whiteandwilliams.com
coreya@whiteandwilliams.com
*Attorneys for Plaintiffs*

-58-

33974728v.1

# EXHIBIT 1

INDEX NO. 650582/2022
Case 1:24-cv-08855-SSS Document 11-1 Filed 2/28/24 Page 62 of 292
RECEIVED NYSCEF: 10/14/2024

**From:** "BMF BACKOFFICE" <funding@bmfcapitalllc.com>
**To:** "Gabe Isaacov" <gabe@bmfcapitalllc.com>, "Josh Lubin" <josh@spincapital.com>
**Subject:** Re: KTL Holdings Signed
**Date:** Tue, 30 Mar 2021 17:47:19 -0400
**Importance:** Normal

---

done

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Tuesday, March 30, 2021 12:04 PM
**To:** Josh Lubin <josh@spincapital.com>
**Cc:** BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Subject:** Re: KTL Holdings Signed

Chana pls switch debits to chas acocunt Josh pls send the chase account

Sent from my iPhone


On Mar 30, 2021, at 11:18 AM, Josh Lubin <josh@spincapital.com> wrote:


Please switch over debits to the chase account you wired too.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Sent:** Friday, March 26, 2021 1:58:43 PM
**To:** Josh Lubin <josh@spincapital.com>; Gabe Isaacov <gabe@bmfcapitalllc.com>
**Subject:** Re: KTL Holdings Signed

Yes, will be there shortly

*Chana Tach*
*Chief Financial Officer*
*Office Line: 646-979-1223*
*Email: Funding@bmfcapitalllc.com*
<Outlook-i41naa4h.png>

---

**From:** Josh Lubin <josh@spincapital.com>
**Sent:** Friday, March 26, 2021 1:57 PM
**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Subject:** Re: KTL Holdings Signed

To chase?

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

CONFIDENTIAL SPIN-00007418

INDEX NO. 650582/2022
RECEIVED NYSCEF: 10/14/2024

Case 1:24-cv-03553-AS Document 11-1 Filed 2/28/24 Page 61 of 292

**From:** BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Sent:** Friday, March 26, 2021 1:55:59 PM
**To:** Josh Lubin <josh@spincapital.com>; Gabe Isaacov <gabe@bmfcapitalllc.com>
**Subject:** Re: KTL Holdings Signed

SENT

*Chana Tach*
*Chief Financial Officer*
*Office Line: 646-979-1223*
*Email: Funding@bmfcapitalllc.com*
<Outlook-hmmx4pgh.png>

---

**From:** Josh Lubin <josh@spincapital.com>
**Sent:** Friday, March 26, 2021 12:29 PM
**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Subject:** RE: KTL Holdings Signed

Wire sent?

**From:** Josh Lubin
**Sent:** Friday, March 26, 2021 11:17 AM
**To:** 'Gabe Isaacov' <gabe@bmfcapitalllc.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Subject:** RE: KTL Holdings Signed

Wire to account attached and debit 20k a day from the same account.


El dorado hills ins solutions inc
4511 golden foothill pkwy
Suite 1
El dorado hills ca 95762

---

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Friday, March 26, 2021 10:27 AM
**To:** BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Cc:** Josh Lubin <josh@spincapital.com>
**Subject:** Fwd: KTL Holdings Signed

Chana pls wire 100K to merchant

Chana you should have the vc here already but Josh pls send the vc chana switch debit too 25k I believe it's @ 8k now will get you new fl #

Sent from my iPhone

Begin forwarded message:

 **From:** Josh Lubin <josh@spincapital.com>
 **Date:** March 25, 2021 at 4:58:15 PM EDT

CONFIDENTIAL

SPIN-00007419

Case 1:24-cv-03556-SSS   Document 11-1   Filed 2/28/24   Page 62 of 292

**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>

**Subject: KTL Holdings Signed**


100k Net going to try and get away with a 40k PSF on the funding call.


*Sincerely,*
*Josh Lubin*
*President*
*Spin Capital*
*Office:* 786-496-9502
**Cell:** 732-608-4905
josh@spincapital.com

CONFIDENTIAL                                        SPIN-00007420

# EXHIBIT 2



Document title: Joe Isaacov | LinkedIn
Capture URL: https://www.linkedin.com/in/joe-isaacov-10b78635/
Capture timestamp (UTC): Wed, 16 Mar 2022 13:23:02 GMT



Joe Isaacov
HOP CAPITAL
2,649 followers

Joe hasn't posted lately
Joe's recent posts and comments will be displayed here.

Show all activity →

## Experience

**Hop Capital**
7 yrs 1 mo

**Ceo Hop Capital**
Mar 2015 - Present · 7 yrs 1 mo

**ISO RELATIONS**
Mar 2015 - Present · 7 yrs 1 mo

## Skills

**Banking** · 63
Endorsed by Amber Kay and 3 others who are highly skilled at this

**Business Development** · 63
Endorsed by Jonathan A. and 3 others who are highly skilled at this

**Credit** · 56
Endorsed by JAMES DELICES and 3 others who are highly skilled at this

Show all 20 skills →

## Interests

**Influencers**   Companies   Groups

**Gary Vaynerchuk** in
Chairman of VaynerX, CEO of VaynerMedia, 5-Time NYT Bestselling Author, Text Me: 212-931-5731
5,022,115 followers

### People you may know

**Craig O'Neill**
Partner at White and Williams LLP
Connect

**Siobhan Cole**
Partner at White and Williams LLP
Connect

**Pat Ingram**
Technical Recruiter at Synerfac Technical Staffing
Connect

**Brett Tishler**
Experienced Attorney - Products Liability, Negligence, Personal Injury, Insurance.
Connect

**Matthew Ferrie**
Partner at White and William's LLP
Connect

Show more ∨

in LEARNING

Add new skills with these courses, free for 24 hours

**Photoshop 2021 New Features**
62,230 viewers

**Create an Animated Character in Blender 2.9**
49,281 viewers

**Get Promoted Faster: Grow Your Fan Club**
9,652 viewers

Show more on LinkedIn Learning

Promoted

**Walden Bachelor's Online**
Dedicated online learning with support, tuition savings, and resources. ⟩

**Santander Private Client**
Experience highly personalized banking, plus premium offers and benefits. ⟩

**Top Mobile App Developers**
Android, iOS, Swift, PHP, React, Node, Yii2, Laravel Developers ⟩

Linked**in**

About
Community Guidelines
Privacy & Terms ∨
Sales Solutions
Safety Center

Accessibility
Careers
Ad Choices
Mobile

Talent Solutions
Marketing Solutions
Advertising
Small Business

Questions?
Visit our Help Center

Manage your account and privacy
Go to your Settings.

Select Language
English (English)

LinkedIn Corporation © 2022

Messaging

Case 1:22-cv-09151-JSL Document 71-4 Filed 02/28/24 Page 66 of 292



Document title: Skills | Joe Isaacov | LinkedIn
Capture URL: https://www.linkedin.com/in/joe-isaacov-10b78635/details/skills/
Capture timestamp (UTC): Wed, 16 Mar 2022 13:27:18 GMT

# EXHIBIT 3

An official website of New York State.

Here's how you know ⌄



# Department of State
## Division of Corporations

## Entity Assumed Name History

Return to Results    Return to Search

**Entity Details** ⌃

**ENTITY NAME:** FUNDERZ.NET LLC

**DOS ID:** 4728927

**FOREIGN LEGAL NAME:**

**FICTITIOUS NAME:**

**ENTITY TYPE:** DOMESTIC LIMITED LIABILITY COMPANY

**DURATION DATE/LATEST DATE OF DISSOLUTION:**

**SECTIONOF LAW:** 203 LLC - LIMITED LIABILITY COMPANY LAW

**ENTITY STATUS:** ACTIVE

**DATE OF INITIAL DOS FILING:** 03/19/2015

**REASON FOR STATUS:**

**EFFECTIVE DATE INITIAL FILING:** 03/19/2015

**INACTIVE DATE:**

**FOREIGN FORMATION DATE:**

**STATEMENT STATUS:** PAST DUE

**COUNTY:** NEW YORK

**NEXT STATEMENT DUE DATE:** 03/31/2023

**JURISDICTION:** NEW YORK, UNITED STATES

**NFP CATEGORY:**

ENTITY DISPLAY    NAME HISTORY    FILING HISTORY    MERGER HISTORY    **ASSUMED NAME HISTORY**

Search

| File Date | Assumed Name | Assumed Name ID | Status | Principal Location |
|---|---|---|---|---|
| 12/06/2018 | ACH | 514815 | Active | |
| 11/02/2018 | SMART FUNDING CAPITAL | 514814 | Active | |
| 10/17/2018 | NET FUNDING | 514813 | Active | |
| 10/16/2018 | MASS CAPITAL | 514811 | Active | |
| 10/16/2018 | WESTWOOD FUNDING | 514812 | Active | |
| 10/04/2018 | CHROME CAPITAL | 514809 | Active | |
| 10/04/2018 | ARCH CAPITAL | 514810 | Active | |
| 06/20/2018 | MMFUNDINGGROUP | 514808 | Active | |
| 05/29/2018 | SILVER CAPITAL | 514807 | Active | |
| 05/04/2018 | PRECISION FUNDING | 514806 | Active | |
| 04/18/2018 | MMLENDINGGROUP | 514805 | Active | |
| 01/30/2018 | WG CAPITAL | 514803 | Active | |
| 01/30/2018 | MERCHANT FUNDING | 514804 | Active | |
| 11/10/2017 | PANTHERS CAPITAL | 514802 | Active | |
| 11/18/2016 | REGION CAPITAL | 514801 | Active | |

Rows per page: 15 ⌄    1-15 of 18    ‹    ›

An official website of New York State.
Here's how you know ⌄



# Department of State
## Division of Corporations

## Entity Assumed Name History

Return to Results     Return to Search

**Entity Details** ⌃

**ENTITY NAME:** FUNDERZ.NET LLC

**DOS ID:** 4728927

**FOREIGN LEGAL NAME:**

**FICTITIOUS NAME:**

**ENTITY TYPE:** DOMESTIC LIMITED LIABILITY COMPANY

**DURATION DATE/LATEST DATE OF DISSOLUTION:**

**SECTIONOF LAW:** 203 LLC - LIMITED LIABILITY COMPANY LAW

**ENTITY STATUS:** ACTIVE

**DATE OF INITIAL DOS FILING:** 03/19/2015

**REASON FOR STATUS:**

**EFFECTIVE DATE INITIAL FILING:** 03/19/2015

**INACTIVE DATE:**

**FOREIGN FORMATION DATE:**

**STATEMENT STATUS:** PAST DUE

**COUNTY:** NEW YORK

**NEXT STATEMENT DUE DATE:** 03/31/2023

**JURISDICTION:** NEW YORK, UNITED STATES

**NFP CATEGORY:**

ENTITY DISPLAY    NAME HISTORY    FILING HISTORY    MERGER HISTORY    ASSUMED NAME HISTORY

Search

| File Date | Assumed Name | Assumed Name ID | Status | Principal Location |
|-----------|--------------|-----------------|--------|--------------------|
| 11/18/2016 | KASH CAPITAL | 514800 | Active | |
| 04/14/2016 | HOP CAPITAL | 514799 | Active | |
| 09/29/2015 | EMPIRE FUNDING | 514798 | Active | |

Rows per page:  15  ▾        16-18 of 18        ‹    ›

Case 1:24-cv-08351-AS Document 11-1 Filed 02/28/25 Page 70 of 292

AgenciesApp DirectoryCountiesEventsProgramsServices

**FIND YOUR POLL SITE**
Early Voting for the General Election continues until Sunday, November 3.

# EXHIBIT 4



Document title: Benjamin Isaacov | LinkedIn
Capture URL: https://www.linkedin.com/in/benjamin-isaacov-86576310a/
Capture timestamp (UTC): Wed, 16 Mar 2022 13:35:48 GMT

Case 1:22-cv-09625-PGSL Document 71-447 Filed 02/28/24 Page 73 of 292



Document title: Benjamin Isaacov | LinkedIn
Capture URL: https://www.linkedin.com/in/benjamin-isaacov-86576310a/
Capture timestamp (UTC): Wed, 16 Mar 2022 13:35:48 GMT

# EXHIBIT 5

Case 1:24-cv-08555-ASS   Document 71-5   Filed 02/28/24   Page 74 of 292

🅐 Neutral
As of: November 1, 2024 9:13 PM Z

# *Lateral Recovery LLC v. Funderz.net, LLC*

United States District Court for the Southern District of New York

September 27, 2024, Decided; September 27, 2024, Filed

22-cv-2170 (LJL)

**Reporter**
2024 U.S. Dist. LEXIS 176985 *

LATERAL RECOVERY LLC, BENCHMARK BUILDERS, INC., FTE NETWORKS, INC., JUS-COM LLC, and FOCUS WIRELESS, LLC, Plaintiffs, -v- FUNDERZ.NET, LLC d/b/a HOP CAPITAL and d/b/a BUSINESS MERCHANT FUNDING, JOSEPH YITZCHAKOV a/k/a JOSEPH ISAACOV, GAVRIEL YITZCHAKOV a/k/a GABE ISAACOV, and JOHN AND JANE DOE INVESTORS, Defendants.

## Core Terms

Merchant, receivables, debits, reconciliation, enterprise, collection, lender, summary judgment, Funding, entities, credit agreement, Remittance, loans, champerty, default, parties, purchase price, bank account, Foreclosure, double, material fact, Receipts, records, pattern of racketeering activity, champertous, conspiracy, repayment, transactions, undisputed, borrower

**Counsel: [*1]** For Lateral Recovery LLC, Benchmark Builders, Inc., FTE Networks, Inc., Jus-Com LLC, Focus Wireless, LLC, Plaintiffs: Alex David Corey, White and Williams LLP, Philadelphia, PA; Shane R. Heskin, White & Williams, LLP(Philadelphia), Philadelphia, PA.

For Joseph Yitzchakov, also known as, Joseph Isaacov, Defendant: Mark W Stout, LEAD ATTORNEY, Padfield & Stout, LLP, Fort Worth, TX.

For Funderz.net, LLC d/b/a Hop Capital and d/b/a Business Merchant Funding, Joseph Yitzchakov a.k.a. Joseph Isaacov, Defendants: Hilda Piloto, LEAD ATTORNEY, Saul Ewing Arnstein & Lehr LLP (Miami), Miami, FL; Jennifer L. Beidel, LEAD ATTORNEY, New York, NY; Steven M. Dickstein, LEAD ATTORNEY, Saul Ewing LLP, Miami, FL; Steven William Wells, LEAD ATTORNEY, Lancaster, NY; Howard Foster, Foster PC, Chicago, IL; Ryan Michael Jerome, Stephanie L Denker, Saul Ewing LLP, New York, NY.

**Judges:** LEWIS J. LIMAN, United States District Judge.

**Opinion by:** LEWIS J. LIMAN

## Opinion

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

This matter comes before the Court on opposing motions for summary judgment. Plaintiffs Lateral Recovery, LLC ("Lateral," or when distinguished from other Lateral entities, "Lateral Recovery"), Benchmark Builders, Inc. **[*2]** ("Benchmark"), FTE Networks, Inc. ("FTE"), Jus-Com LLC ("Jus-Com"), and Focus Wireless, LLC ("Focus Wireless," and collectively with Lateral, Benchmark, FTE and Jus-Com, "Plaintiffs"), move for partial summary judgment pursuant to *Federal Rule of Civil Procedure 56(a)* on their first cause of action against Defendant Joseph

2024 U.S. Dist. LEXIS 176985, *2

Yitzchakov a/k/a/ Joseph Isaacov or Joseph Isaacoff ("Isaacoff,"[1] or "Defendant"), for collection of unlawful debt in violation of the *Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962*. Dkt. No. 145. Defendants Funderz.net, LLC d/b/a HOP Capital and d/b/a/ Business Merchant Funding ("Funderz," and with Isaacoff, "Defendants") and Isaacoff move for summary judgment on all claims against them and dismissal of the lawsuit. Dkt. No. 150.

For the following reasons, Plaintiffs' motion for summary judgment is granted in part and denied in part, and Defendants' cross-motion for summary judgment is also granted in part and denied in part.

## BACKGROUND

Facts are taken from the parties' joint statement of material facts under *Local Rule 56.1*. Dkt. No. 146 ("JSMF"), Plaintiffs' *Rule 56.1* statement of material facts, Dkt. No. 145 ("PSMF"), Defendants' *Rule 56.1* statement of material facts, Dkt. No. 153 ("DSMF"), and Defendants' counterstatement to Plaintiff's *Rule 56.1* statement, Dkt. No. 160. The facts are **[*3]** undisputed except where otherwise indicated.

### I. Funderz

Funderz is a New York limited liability company organized in March 2015. JSMF ¶ 1. The articles of organization are signed by "Joseph Isaacoff, Organizer." Dkt. No. 147-32 at 1. Isaacoff is the sole owner and member of Funderz and has full decision-making authority. JSMF ¶ 15; "DSMF" ¶ 11. Bank account applications for Funderz for the years 2016 and 2018 list Isaacoff's ownership percentage as "99%" and "100%." JSMF ¶¶ 4, 10. The applications list Isaacoff as the only member/manager of Funderz.[2] Dkt. No. 147-25 at 14-15, 39-40. They state that Funderz had 15 employees. JSMF ¶¶ 8, 13. However, Isaacoff states in his declaration that Funderz had no employees, only independent contracts who acted as agents or brokers. Dkt. No. 151 ("Isaacoff Decl.") ¶ 13. Between 2016 and 2019 and possibly at other times, Isaacoff's brother Gabriel Isaacoff ("Gabe") was one of these agents. Dkt. No. 157 ¶ 16.

Funderz has 18 registered d/b/a names on file with the New York State Division of Corporations, including Empire Funding, HOP Capital, and Panthers Capital. JSMF ¶ 2. The parties also agree that Funderz has done business as Business Merchant Funding **[*4]** or BMF. *See id.* ¶¶ 2, 51.[3] Several of Funderz's d/b/a names are the same or similar to independent LLC's incorporated in New York between 2017 and 2019. DSMF at 88 ¶¶ 1-5. Isaacoff's brother Ben Isaacoff a/k/a Benjamin Yitzchakov ("Ben") has submitted affidavits stating he is a representative of Panthers Capital, and his LinkedIn Profile listed him as CEO of Panthers Capital. Dkt. No. 147-68; Dkt. No. 44-7. Plaintiffs state that Ben therefore worked for Funderz d/b/a Panthers Capital, PSMF ¶¶ 54-57, but Defendants state that Ben in fact worked for the separately incorporated entity Panthers Capital LLC. Dkt. No. 160 ¶ 47; *see id.* at 88 ¶ 3.

---

[1] The Court uses "Isaacoff" rather than other versions of Defendant's name because Defendant uses the name "Isaacoff" on his sworn declaration in this litigation. Dkt. No. 151 ("Isaacoff Decl."). Isaacoff's brothers are referred to by their first names to distinguish them from Defendant.

[2] Defendants do not concede that Isaacoff was listed as the "only" member, stating that he was identified as "a member." Dkt. No. 160 ¶¶ 95, 99. However, the documents emphasize that "ALL OF THE MEMBERS/MANAGERS" of the LLC must sign. Dkt. No. 147-25 at 15, 40. Therefore, the fact that only Isaacoff signed the documents amounts to a statement that he was the only member of the LLC. In addition, Isaacoff stated in his declaration that he "was the sole member and owner of Funderz." Dkt. No. 151 ¶ 7.

[3] The Division of Corporations list only establishes that Funderz registered a d/b/a of "Merchant Funding." Dkt. No. 44-5. However, the parties' joint statement lists this entry as "[Business] Merchant Funding," and states that "Funderz d/b/a BMF" entered into the relevant agreements. JSMF ¶¶ 2, 51, 74, 92; *see* Dkt. No. 157 ¶ 13. Therefore, although "Business Merchant Funding" or "BMF" is not one of Funderz's official registered aliases, it is undisputed that Funderz did business under this name.

The parties refer to Funderz as being generally in the Merchant Cash Advance ("MCA") business. DSMF ¶ 7; PSMF ¶¶ 19, 30, 38. The precise nature of Funderz's business is a hotly contested issue in this litigation. Defendants state, based on Isaacoff's declaration, that Funderz "was in the business of advancing capital to small and mid-sized businesses." DSMF ¶ 7. As described by Isaacoff, Funderz would purchase "all or a portion of a merchant's future accounts receivables," and then "withdraw funds from the merchant's bank account until the purchase [*5] amount was repaid." Isaacoff Decl. ¶¶ 17-19. He states moreover that such a transaction "was not a loan nor was it intended to be construed as a loan." *Id.* ¶ 20.

Plaintiffs, by contrast, state that the nature of Funderz's business was to provide loans. PSMF ¶¶ 1-29. Plaintiffs refer to websites for "Empire Funding," "Hop Capital," "Panthers Capital," and other apparent aliases of Funderz. PSMF ¶¶ 4-5, 16-18, 23-26. These websites state that the companies provide "loans," or "lending." *Id.* Defendants note that at least some of these websites may be for similarly-named but separate LLCs, and that some of the websites also state that the companies provide "cash advance" or "merchant cash advance" products. Dkt. No. 160 ¶¶ 4-5, 16-18, 23-26. Bank account applications state that Funderz's business was to "provide small business loans" and "provide small business advance[s]." JSMF ¶¶ 5, 11. Isaacoff referred to Funderz as a "lender" or offering "loans" at certain places in his testimony. PSMF ¶¶ 27, 29. Isaacoff has also signed court affidavits stating that Funderz purchased receivables.[4] PSMF ¶¶ 8, 31. In one of the cases where Isaacoff signed an affidavit, in 2017, the creditor claimed that [*6] its agreement with Funderz was a usurious loan. Dkt. No. 147-78.

## II. FTE

FTE Networks, Inc. ("FTE") was a technology and telecommunications infrastructure company headquartered in Florida. JSMF ¶¶ 31-33. From December 2017 to December 2019, its stock was traded on the New York Stock Exchange. *Id.* ¶ 34. At all relevant times, FTE was affiliated with plaintiffs Benchmark, Jus-Com, and FocusWireless. *Id.* ¶ 25. FTE acquired Benchmark in April 2017. DSMF ¶ 1.

During the time of FTE's transactions with Funderz, David Scott Letham ("Letham") was FTE's CFO and Michael Palleschi ("Palleschi") was FTE's CEO and Chairman of the Board of Directors. JSMF ¶¶ 26-27. Both Lethem and Palleschi were indicted on criminal charges in 2021 related to defrauding investors, misappropriating company funds, and concealing an issuance of convertible notes. JSMF ¶ 37. Lethem and Palleschi pled guilty to these charges. *Id.* ¶ 38. Palleschi admitted as part of his guilty plea that while CEO of FTE from 2016 to 2019, he worked with others to misrepresent FTE's financial condition. *Id.* ¶ 39. At the time of FTE's transactions with Funderz, Lethem knew that FTE was not authorized to enter into merchant cash advance [*7] agreements. *Id.* ¶ 35.

## III. The Relevant Agreements

Funderz and FTE entered into six contracts between October 12 and November 8, 2018, labeled "Secured Merchant Agreements" ("SMAs"). Dkt. Nos. 147-1 ("First BMF Agreement"), 147-2 ("First HOP Agreement"), 147-3 ("Second BMF Agreement"), 147-4, 147-5, 147-6 ("Second HOP Agreement"), 147-7, 147-8, 147-9 ("Third BMF Agreement"), 147-10, 147-11 ("Third HOP Agreement"), 147-12.

Gabe brokered the contracts for Funderz. JSMF ¶ 48. Funderz's agreements were underwritten based on the merchant's creditworthiness, not the creditworthiness of any account debtor. *Id.* ¶ 42. Underwriting for the agreements included reviewing FTE's bank statements, voided checks, driver's licenses, application, some tax returns, and credit reports. *Id.* ¶ 43. During the period of October 1-15, 2018—immediately before the agreements—FTE's Bank of America account statement reflects payments to entities including Queen Funding, Green Capital, Capital Merchant Services, Argus Capital, and Franklin Funding. *Id.* ¶ 44; Dkt. No. 146-16.

---

[4] Defendants assert that Isaacoff signed one of the affidavits for Empire Funding, which is "not a party to this action." Dkt. No. 160 ¶ 6-8. However, Defendants concede that Funderz "used Empire Funding as an assumed name." *Id.* ¶ 4. Empire Funding is a party to this action, because Empire Funding is Funderz.

Payments to these entities are listed as "Preauthorized ACH Debit" and often recur in the same or similar amounts. Dkt. No. 146-16.[5] Isaacoff testified **[*8]** that Funderz reviewed this bank account statement as part of its underwriting. Isaacoff Decl. ¶ 33(c); see Dkt. No. 151-3. Isaacoff also stated that Funderz reviewed five other financial documents, Isaacoff Decl. ¶ 33, and provided as evidence an FTE bank account summary from August 2018, Dkt. No. 151-1, an FTE bank account summary from September 2018, Dkt. No. 151-2, a Benchmark transaction record from September 2018, Dkt. No. 151-4, an FTE bank account summary from September 2018, Dkt. No. 151-5, and a Jus-Com account summary from September 2018, Dkt. No. 151-6. Palleschi asserted his *Fifth Amendment* rights when asked whether he knew "if FTE accurately represented its receivables" to Funderz. JSMF ¶ 41. On October 15, 2018, an FTE employee sent Gabe a list of FTE's "Daily Note Payments," and Gabe responded by asking about the balances. JSMF ¶ 146; Dkt. No. 146-17. The employee responded that there was a balance of $185,000 on the Capital Merchant Services note, $117,500 on the Influx Capital note, and $117,500 on the Franklin Funding note. JSMF ¶ 146; Dkt. No. 146-17.

Each agreement was signed by Letham and Palleschi as "owners" of FTE and as guarantors. JSMF ¶¶ 52, 63, 75, 85, 92, 110.[6] FTE's **[*9]** assistant controller became aware of the first two agreements on or about October 16, 2018, shortly after they were signed. *Id.* ¶ 73. He stated that he when he saw a deposit into the FTE account, he would "most likely" ask the controller of FTE for documentation to support it. *Id.* ¶ 72. At the time of the agreements, FTE believed the agreements were legal. *Id.* ¶ 50; Dkt. No. 146-10 at 160:4-13.

The first agreement was signed on October 12, 2018, between FTE and Funderz under its assumed name Business Merchant Funding or BMF. JSMF ¶ 51. The agreement, like all subsequent agreements, provided generally that Funderz would purchase 10% of FTE's future receivables for a specified "Purchase Price," and that over time FTE would pay a specified "Receipts Purchased Amount." *Id.* ¶¶ 51, 62, 74, 84, 92, 109. For the First BMF Agreement, the Purchase Price was $500,000 and the Receipts Purchased Amount to be repaid was $728,500. First BMF Agreement at 3. The contract states that:

> Merchant hereby sells, assigns, and transfers to BMF[7] (making BMF the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights, and other **[*10]** obligations arising from or relating to the payment of monies from Merchant's customers and/or other third party payors (the "Receipts" defined as all payments made by cash, check, credit or debit card, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business) for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by Merchant to BMF.

First BMF Agreement at 3.

The agreement contains an explicit provision stating that the parties "agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan." *Id.* at 4. Further, it is explicitly agreed that the Purchase Price is in exchange for the Receipts and "equals the fair market value of the Receipts." *Id.* The same provision states that payments are "conditioned upon Merchant's sale of products . . . and the payment therefore by Merchant's customers" and shall not be "deemed as interest." *Id.* at 4.[8] Only FTE is listed as "the Merchant," *id.* at 3, but the agreement **[*11]** lists

---

[5] For example, there is a debit of $8,999 to Capital Merchant Services on each day that transactions are listed (there are no transactions listed on October 6-8 or 13-14). Dkt. No. 146-16. There is a debit of $8,999 to Green Capital on each day that transactions are listed. *Id.*

[6] Palleschi states that certain of the signatures were not his. JSMF ¶ 76, 111. The parties do not suggest that the accuracy of the signatures is material to any issue discussed here.

[7] The original agreements use "BMF" or "HC," abbreviations for Business Merchant Funding and Hop Capital. The agreements do not mention Funderz or state that the names on the agreement are aliases, although they provide that "Merchant hereby acknowledges and agrees that BMF [or HC] may be using 'doing business as' or 'd/b/a' names." *E.g.* Second HOP Agreement § 1.14.

Benchmark Builders, Inc., FTE Holdings LLC, Jus-Com, Inc. and Focus Venture Partner Inc. as "additional parties in whose assets seller has granted buyer a blanket security interest," *id.* at 13.

The agreement states that the Purchased Amount will be paid "by Merchant's irrevocably authorizing only one depositing account acceptable to BMF . . . to remit the percentage specified below . . . of the Merchant's settlement amounts due from each transaction, until such time as BMF receives payment in full of the Purchased Amount." First BMF Agreement at 3. FTE is required under the agreement to authorize BMF to ACH debit these remittances directly from FTE's account on a daily basis. *Id.* The daily remittance for this agreement is stated to be $14,999 per day, and payment records reflect that that amount was actually debited on a daily basis. JSMF ¶ 55; Dkt. No. 146-22.[9] Funderz characterizes this amount as a "good faith estimate" of 10% of FTE's receivables. DSMF ¶ 40; JSMF ¶¶ 94, 96. Plaintiffs contest this characterization. Dkt. No. 157 at ¶ 40. The agreement states that FTE "is responsible for ensuring that the specified percentage to be debited by BMF remains in the account and **[*12]** will be held responsible for any fees incurred by BMF resulting from a rejected ACH attempt." First BMF Agreement at 3.

The First BMF Agreement contains a reconciliation provision stating that:
> [U]pon the Merchant's request and receipt of the Merchant's monthly bank statements, BMF shall on or about the eighteenth day of each month reconcile the Merchant's account by either crediting or debiting the difference between the amount debited and the Specified Percentage, from or back to the Merchant's bank account so that the amount debited each month equals the Specified Percentage.

*Id.* However, an addendum to the agreement provides that:

> At the Merchant's option, within five (5) business following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby Business Merchant Funding may ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage. However, in order to effectuate this reconciliation, upon submitting the request for reconciliation to Business Merchant Funding . . . the Merchant must produce any and all evidence and documentation requested by Business Merchant Funding **[*13]** in its sole and absolute discretion, necessary to identify the appropriate amount of the Specified Percentage. . . .
> The Merchant specifically acknowledges that: (i) the Daily Payment and the potential reconciliation discussed above are being provided to the Merchant as a courtesy, and that Business Merchant Funding is under no obligation to provide the same.

*Id.* at 10. The addendum states that in case of any conflict between the addendum and the main agreement, "the terms of this Addendum shall govern and be controlling." *Id.* The addendum is signed by Lethem and Palleschi. *Id.*

The agreement states that it would have a term of one year, but be automatically renewed for successive one year terms. *Id.* at 4. FTE could terminate the agreement only by satisfying its obligations to BMF. *Id.*

---

[8] The provision further states that: "In the event that a court nonetheless determines that HC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and HC shall promptly refund to Merchant any interest received by HC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that HC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding." First BMF Agreement at 4. Under New York law, however, a clause "purporting to reduce the rate of interest to a non-usurious rate if the rate originally imposed was found to be usurious" cannot save a loan from being usurious. *Fred Schutzman Co. v. Park Slope Advanced Med., PLLC, 128 A.D.3d 1007, 9 N.Y.S.3d 682, 682 (2d Dep't 2015)*; *see Simsbury Fund, Inc. v. New St. Louis Assocs., 204 A.D.2d 182, 611 N.Y.S.2d 557, 558 (1st Dep't 1994)*.

[9] This number is not visible on the face of the agreement, but is listed on a separate printout from Funderz's internal database, which the parties agree "memorialize[s]" "various terms of the agreements." JSMF ¶ 54; Dkt. No. 146-21.

As part of the agreement, FTE warranted that the bank statements it provided fairly represented its financial condition, that it was in compliance with all laws, that it did not contemplate bankruptcy, and that the Receipts were not encumbered. *Id.* Violation of any of the terms of the agreement, including breach of warranty, constitutes an "Event of Default" under the agreement. *Id.* at 5. Appendix A to the **[\*14]** agreement, which lists applicable fees, states that a non-sufficient funds fee will be charged "[u]p to TWO TIMES ONLY before a default is declared." *Id.* at 9. Isaacoff testified that missing a payment or lowering payment would be a default, though he also testified that Funderz would work with the client "to make sure they're satisfied." JSMF ¶¶ 129-130. Other Events of Default include FTE admitting an inability to pay its debts, filing for bankruptcy, dissolution of the business, use of multiple depository accounts or change of depository account without consent, and default under the terms and conditions of any other agreement with BMF. First BMF Agreement § 3.1. If an Event of Default occurred, the entire Receipts Purchased Amount would immediately become due. *Id.* at 3.

In addition, the Guaranty agreement provided that upon any breach of the contract by FTE, admission of inability to pay debts, or bankruptcy proceeding, BMF would be able to collect from the Guarantors. *Id.* at 6. Lethem and Palleschi signed as guarantors. *Id.* at 7.

After the agreement was signed, Funderz deducted a $150,000 "Bank Fee" and transferred $350,000 to FTE. JSMF ¶ 61. The contract, and all subsequent contracts **[\*15]** in this action, lists an "ACH program fee" of $395 or 12% of the funded amount, as well as other assorted lesser fees. First BMF Agreement at 9. Plaintiffs assert that an additional fee not referenced in the contract was collected and paid to Gabe. PSMF ¶ 161. Defendants do not deny this, characterizing the fee as a broker's commission fee. Dkt. No. 160 ¶ 135.

The second agreement was entered into on October 15, 2018, between FTE and Funderz under its assumed name HOP Capital (the "First HOP Agreement"). *Id.* ¶ 62. This agreement stated that HOP purchased 10% of FTE's future receivables, listing a Purchase Price of $1,000,000 and a Receipts Purchased Amount of $1,459,000. *Id.* The daily payment under this agreement was $29,999 per day, and payment records reflect that that amount was actually debited on a daily basis. *Id.* ¶ 65; Dkt. No. 146-24. The terms of this agreement were otherwise identical or materially identical to the terms of the First BMF Agreement, including the addendum. *Compare* First BMF Agreement *with* First HOP Agreement.

On October 25, 2018, FTE entered into another agreement with Funderz under the name BMF (the "Second BMF Agreement"). JSMF ¶ 74. This agreement stated **[\*16]** that BMF purchased 10% of FTE's future receivables, listing a Purchase Price of $1,000,000 and a Receipts Purchased Amount of $1,499,000. *Id.* The daily payment under this agreement was $24,999 per day. *Id.* ¶ 78. Other than debits of $21,500 on October 31 and November 1, payment records show that $24,999 was actually debited on a daily basis. Dkt. No. 146-28. Of the amount paid to FTE under this agreement, $620,000 went to paying off the outstanding balance on the First BMF Agreement. JSMF ¶ 80. The Second BMF agreement was subject to the same terms and conditions as the First BMF Agreement. *Id.* ¶ 79.

Also on October 25, 2018, the same day as the Second BMF Agreement, FTE entered into another agreement with Funderz under the name HOP (the "Second HOP Agreement"). *Id.* ¶ 84. This agreement stated that HOP purchased 10% of FTE's future receivables, listing a Purchase Price of $1,750,000 and a Receipts Purchased Amount of $2,623,250. *Id.* The daily payment under this agreement was $39,999 per day. *Id.* ¶ 87. Other than a debit of $36,999 on October 31, payment records show that $39,999 was actually debited on a daily basis. Dkt. No. 146-32. Of the amount paid to FTE under this agreement, $1,249,000 **[\*17]** went to paying off the outstanding balance on the First Hop Agreement. *Id.* ¶ 89. The Second HOP Agreement was subject to the same terms and conditions as the First HOP Agreement. *Id.* ¶ 88.

On November 8, 2018, FTE entered into a third agreement with Funderz under the name BMF (the "Third BMF Agreement"). *Id.* ¶ 92. This agreement stated that BMF purchased 10% of FTE's future receivables, listing a purchase price of $1,550,000 and a Receipts Purchased Amount of $2,323,450. *Id.* The daily payment under this agreement was $38,724 per day, and payment records reflect that this amount was actually debited on a daily basis. *Id.* ¶ 95; Dkt. No. 146-35. Of the amount paid to FTE under this agreement, $1,281,900 went to paying off the outstanding balance on the Second BMF Agreement. JSMF ¶ 103.

The Third BMF Agreement had some different provisions than the previous agreements. Rather than stating that FTE transferred "all" of its future accounts, it stated that FTE transferred "the Purchased Percentage" of all of its future accounts. Third BMF Agreement at 3. It stated in the initial description of the transaction that:

> Merchant is selling a portion of a future revenue stream to BMF at a discount, **[*18]** not borrowing money from BMF, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by BMF. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. BMF is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and BMF assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give BMF a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4.

*Id.* The **[*19]** aforementioned Paragraph 1.4 further detailed that:

> If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to BMF to request a decrease in the Remittance. The amount shall be decreased if the amount received by BMF was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide BMF with viewing access to their bank account as well as all information reasonably requested by BMF to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page l of this Agreement.

*Id.* at 4. The addendum to this agreement did not add any superseding language regarding adjustment of the remittance amount. *See* Dkt. No. **[*20]** 147-10.

The Third BMF Agreement made the term of the agreement indefinite until the entire Purchased Amount was received, rather than being one year with successive yearly renewals. *See* Third BMF Agreement at 4. It also explicitly set out the daily payment as $38,724, debited Monday through Friday. Dkt. No. 147-10 at 2. It stated that "[i]f any payment date falls on a weekend of holiday . . . the payment may be executed on the next business day." *Id.*

In addition, bankruptcy was not included in this agreement as an Event of Default. JSMF ¶ 100. Similarly, bankruptcy was not made a condition for Funderz to recover from the Guarantors. *See* Third BMF Agreement at 7.[10] Although the Third BMF agreement retains the provision stating that FTE "is responsible for ensuring that the Agreed Remittance to be debited by BMF remains in the Account and will be held responsible for any fees incurred" as a result of insufficient funds, the Appendix listing those fees no longer states that the fee will only be charged two times before a default is declared. *Id.* at 4, 9. The terms and conditions of the Third BMF Agreement were otherwise similar or identical to the earlier agreements. *Compare* Third BMF Agreement **[*21]** *with* First BMF Agreement.

---

[10] The agreement retained a provision in the guaranty that if BMF needed to return any amount paid by FTE because it entered bankruptcy, the guarantor would be obligated for that amount. *See* Third BMF Agreement at 7.

On November 8 or 9, 2018,[11] FTE entered into a third agreement with HOP (the "Third HOP Agreement"). JSMF ¶ 109. This agreement stated that HOP purchased 10% of FTE's future receivables, listing a purchase price of $2,750,000 and a Receipts Purchased Amount of $4,122,250. *Id.* The daily payment under this agreement was listed as $69,999 per day. JSMF ¶ 113; Dkt. No. 146-37. The Third HOP Agreement had materially the same terms as the Third BMF Agreement. *Compare* Third BMF Agreement *with* Third HOP Agreement.

## IV. Payment and Payment Disputes

Funderz tracked payment of amounts due under the agreement in an internal database, FunderzLink. Dkt. No. 160 ¶ 181. A printout from that database shows columns for "Advance," equal to the Purchase Price, "Payback," equal to the Receipts Purchased Amount, and "Daily," equal to the daily payment. Dkt. No. 146-21. The printout also has a column with the heading "TERM," and the values in that column equal the number of days it would take to reach the Purchased Amount based on the daily payment. Dkt. No. 146-21.

The payment records for each deal are undisputed. Records for the First BMF Agreement show that FTE paid $14,999 each **[*22]**  business day between October 17 and October 29, 2018, at which time the remaining balance was eliminated by a payment credit of $650,000 presumably resulting from the Second BMF Agreement. Dkt. No. 146-22.[12] The payment record shows that FTE overpaid on this contract by $70,490. *Id.*; PSMF ¶ 79.

Records for the First HOP Agreement show that FTE paid $29,999 each business day between October 17 and October 29, 2018, at which point the remaining balance was largely eliminated by a payment credit of $1,200,000 presumably resulting from the Second HOP Agreement. Dkt. No. 146-24.[13] Records for the Second BMF Agreement show that FTE paid $21,500 on October 31 and November 1, and $24,999 each business day from November 1 to November 9, the day after the Third BMF Agreement. Dkt. No. 146-28. There are no further daily payments after that date, and two large payments, presumably resulting from the Third BMF Agreement, essentially wipe out the remaining balance. *Id.*[14] Records for the Second HOP Agreement show daily payments of $36,999 from October 31 to November 9, 2018, at which point there are no further daily payments and two large payments essentially wipe out the remaining balance. Dkt. No. **[*23]**  146-32.[15]

The daily payments for the Third HOP Agreement were more varied and span a longer period of time. Dkt. No. 146-37. In November, there were daily debits of $49,999,[16] followed by an increase in December to $69,999, no payment between January 22 and February 2, 2019, and daily payments of $20,000 or $30,000 after February 2, with a final payment of $2,306 on March 15, 2019. JSMF ¶ 126; *see* Dkt. No. 146-37. Some days within this period show multiple debits in the relevant amount. Dkt. No. 146-37. Plaintiffs state that there were 13 such double debits, which they refer to as "unauthorized." PSMF ¶ 76. Defendants do not dispute the number of double debits, but state that some were to make up for a holiday or lost weekday as permitted under the contract and others could have been authorized by FTE to speed up repayments. DSMF ¶¶ 76-83. The parties agree that FTE fully repaid the agreement. JSMF ¶ 123.

---

[11] The Joint Statement of Material Facts states that this agreement occurred on November 8. JSMF ¶ 109. Some of the signatures on the agreement are dated November 9. *See* Third HOP Agreement at 10.

[12] The Second BMF Agreement itself states that the balance transfer would be $626,000, and the reason for the apparent discrepancy is not explained. *See* Second BMF Agreement at 4.

[13] The balance was fully wiped out by one additional daily payment and a $40,990 payment marked "Transfer Deal Fund," which may also have been connected to the Second HOP Agreement. Dkt. No. 146-24.

[14] The record submitted shows a remaining balance of $65,100. Dkt. No. 146-28.

[15] The record submitted shows a remaining balance of $15,268. Dkt. No. 146-32.

[16] Isaacoff testified that this initial amount, which varied from the contractual amount of $69,999, may have been because "the back office made a mistake in the payments," or because "the client asked for . . . a deduction." Dkt. No. 146-6 at 94:5-14.

The payment records for the Third BMF Agreement show daily debits of $38,724 between November 13, 2018, and January 14, 2019. Dkt. No. 146-35. Some days in this period show multiple debits in that amount, including two days with four debits. *Id.* Plaintiffs state that there were 30 multiple **[*24]** debits, and Defendants do not dispute this number. Dkt. No. 160 at ¶ 75. Defendants again dispute whether the debits could have been authorized pursuant to the contract or by request of FTE. *Id.* ¶¶ 74-90.

On December 3, 2018, Lethem emailed Gabe stating that BMF had been taking double payments. Dkt. No. 147-45. Gabe responded: "[O]ur deal got stacked by other lenders when u said u won't do that. If you like us to stop the double pulls we need a refi done here." *Id.* Lethem responded that "I have a text from u saying you wouldn't do that if I took the last refi." *Id.* Gabe replied that "I am a very fair person. I will stop the double pulls lets do the refi net 1M." *Id.* Lethem stated that "being fair and honest would mean no double pulls," and Gabe agreed that "[a]s of Wednesday double pulls won't come out." *Id.* According to the undisputed payment records, there are still double debits after that date, for example four debits on January 2, 2019. Dkt. No. 146-35. Gabe suggested in his deposition that the merchant may have requested the double debits, but stated he was not aware of any communication that would show this. Dkt. No. 146-5 at 59. Isaacoff stated the multiple debits might be a **[*25]** "bank glitch," that the money might be properly collected if the merchant's receivables were higher than expected, or that the merchant agreed to the multiple debits. Dkt. No. 146-6 ("Isaacoff Dep.") at 113-118. He stated he had no supporting email or specific recollection of the client asking for four debits in one day. Isaacoff Dep. at 118:15-24.

On January 14, 2019, FTE employee Mike Hess raised concerns with Gabe via email regarding alleged overdraws by BMF. JSMF ¶ 131; Dkt. No. 147-22. Hess initially identified the overdrawn amount as $409,614 but followed up the same day revising the number to $89,688. Dkt. No. 147-22. Gabe said that the refund "will be in UR account tomorrow," but no refund occurred at that time. *Id.*; *see* JSMF ¶ 134. FTE counsel followed up on July 17, 2019. Dkt. No. 147-22. After some further discussion, the requested amount was refunded to FTE on or about July 31, 2019. *Id.*; JSMF ¶ 134.

There is no evidence that FTE ever requested reconciliation or a decreased remittance below the estimated daily amount based on the actual amount of its receivables. DSMF ¶ 61.[17] Funderz's corporate representative stated that she did not know if Funderz had a reconciliation department **[*26]** or had policies on how to perform reconciliations. PSFM ¶¶ 163-167. When asked how Funderz would know if a merchant was entitled to a reconciliation, she stated that the broker "would look over the bank statements to see if they had . . . issues with their revenue" or "any type of hardship." Dkt. No. 146-5 at 18:21-19:5. Gabe stated he could not recall ever refunding money pursuant to a reconciliation provision. Dkt. No. 146-4 at 199:5-21. Isaacoff stated that "requests for modification were routinely and normally approved if the merchant's documents support the modification." Isaacoff Decl. ¶ 24.

The total amount withdrawn by Funderz from FTE's bank account pursuant to the SMAs minus the amount deposited is between $5.8 and $5.9 million. JSMF ¶ 127.

In September 2019, FTE sent a document preservation notice to BMF at Gabe's email address, concerning only the BMF agreements. JSMF ¶ 135; Dkt. No. 146-39. Funderz's corporate representative testified that she had not seen the letter before preparing for the deposition. Dkt. No. 146-5 at 48:22-49:3. Funderz's representative additionally testified that responsive emails were lost because Funderz used a different server at the time of the **[*27]** transactions, and that server was "deleted" in early 2019. *Id.* at 42:1-44:13. She testified that she did not know why the server was changed at that time. *Id.* at 48:22-49:13. Isaacoff testified that the server was switched "after a long time of no use" because "we were out of business for a long time." Isaacoff Dep. at 237:7-21.

## V. Lateral Recovery

---

[17] FTE requested that Funderz cease double debits or overdrawing above the estimated daily amount—in other words, that FTE only collect the estimated daily amount. Dkt. No. 157 ¶ 61. However, these requests did not reference contractual provisions regarding reconciliation or remittance, and do not request that the daily value be altered below the estimated amount based on FTE's actual receipts. *See* Dkt. Nos. 147-22; 147-45.

In 2015, FTE affiliate Jus-Com, Inc. entered into a credit agreement with Lateral Juscom Feeder LLC ("Lateral Juscom"). JSMF ¶ 141; Dkt. No. 146-40 ("Credit Agreement"). FTE was also a party to the agreement, denominated a "Credit Party" and identified as the "holder (indirectly) of all of the Stock and Stock Equivalents of the Borrower [Jus-Com, Inc.]." Credit Agreement at 5. Lateral FTE Feeder LLC and Lateral U.S. Credit Opportunities Fund were additional Lenders. Dkt. No. 146-44 at 20-24.[18] Lateral Juscom was named administrative agent for the Lenders. Credit Agreement at 5. Under the Credit Agreement, the Lenders agreed to extend loans and other financial accommodations up to a maximum amount, which in July 2019 was approximately $50 million. JSMF ¶ 142.

Pursuant to this agreement, FTE granted a security interest to Lateral Juscom in "substantially **[*28]** all of its Property." Credit Agreement at 5. In or around July 2019, several months after making its last payments to Funderz, FTE defaulted on the Credit Agreement. JSMF ¶ 143; PSMF ¶ 273, *see* Dkt. No. 160 ¶ 246. On October 10, 2019, the parties to the Credit Agreement executed an agreement titled "Surrender of Collateral and Strict Foreclosure" (the "Foreclosure Agreement"). Dkt. No. 146-46 ("Foreclosure Agreement").

The Foreclosure Agreement recited that the lenders had perfected their security interest in substantially all of FTE's assets as well as in the assets of Benchmark, which had joined the agreement upon its purchase by FTE in 2017. Foreclosure Agreement 1-2. It then noted that FTE had failed to satisfy judgments issued against it in July 2019 and was in default under the Credit Agreement. *Id.* The total obligations to the lenders were acknowledged to be over $50 million. *Id.* § 2.1. In satisfaction of these obligations, the lenders agreed to accept transfer of certain assets to two entities: Benchmark Holdings LLC and Lateral Recovery LLC. *Id.* at 2. FTE's cash on hand and equity interests in Benchmark were transferred to Benchmark Holdings LLC. *Id.* Lateral Recovery LLC received **[*29]** the Credit Parties' interest in the "Litigation Claims," defined as:

> [C]ertain commercial tort litigation claims, fraud claims, and insurance claims against (a) various lenders under various merchant cash advance or other agreements for Indebtedness that was incurred but not permitted under the Credit Agreement . . . and (b) FTE's former management arising from the actions of certain officers and directors (i) in breach of their respective employment agreements, (ii) taken in violation of their fiduciary duties, and/or (iii) taken in contravention of the Credit Agreement resulting in a default thereunder.

*Id.* at 2. However, the agreement provided that after Lateral Recovery LLC received payments on the litigation claims of $25 million, any additional payments would be turned over to FTE. *Id.* § 6.2.

The Foreclosure Agreement was signed by Fred Sacramone, CEO of FTE, for FTE and for the Credit Parties, which included Plaintiffs Benchmark and Focus Wireless. *Id.* at 15.[19] It was signed by Richard de Silva as Manager of Lateral Juscom, Lateral Recovery LLC, and Benchmark Holdings LLC. *Id.* at 14. Lateral Juscom was listed as "Agent," Lateral Recovery LLC as "Lender" and "Foreclosing Lender" and **[*30]** Benchmark Holdings as "Lender" and "Foreclosing Lender." *Id.*

De Silva's deposition in this case describes the relationships between the entities involved in this agreement, as does the deposition of Lateral Recovery's corporate representative Anthony Cassano. Dkt. Nos. 146-7, 146-11. Lateral Investment Management, not a party to any agreement in this case, is a registered investment advisor and manager of funds which invest in a portfolio of companies, including FTE. Dkt. No. 146-7 at 9-12; Dkt. No. 146-11 at 12:13-18, 13:1, 14. Lateral U.S. Credit Opportunities Fund, one of the lenders on the Credit Agreement, is a fund managed by Lateral Investment Management. Dkt. No. 146-11 at 29:14-18. Lateral Juscom, the administrative agent on the Credit Agreement, was a "subset entity" within one of the other Lateral entities. Dkt. No. 146-11 at 17:12-13.

Lateral Recovery LLC is a company organized to hold assets as part of the FTE foreclosure. Dkt. No. 146-11 at 26-29. According to de Silva, it is owned by Lateral U.S. Credit Opportunities Fund. Dkt. No. 146-11 at 26-29. It was incorporated two days before the Foreclosure Agreement. JSMF ¶ 146. In an affidavit submitted in a separate case,

---

[18] ECF pagination is used for this document.

[19] ECF pagination.

de **[*31]** Silva stated that "Lateral Recovery is a Delaware limited liability company that was organized, among other reasons, for the specific purpose of taking possession of and pursing certain commercial claims belonging to Benchmark, FTE Networks, Inc., Jus-Com LLC, Focus Wireless, LLC and/or their subsidiaries or affiliates." Dkt. No. 146-48. Lateral Recovery LLC has no employees. Dkt. No. 146-11 at 29:21.[20] Benchmark Holdings, LLC, which de Silva refers to as "[t]he entity that took over Benchmark," is also a Lateral company. *Id.* at 28:19-29:6. All the Lateral companies are located in the same office. *Id.* at 30:2-3.

In 2021, FTE and Lateral Juscom, Lateral U.S. Credit Opportunities Fund, and other Lateral affiliates (the "Lateral Parties") entered into a Modification and Settlement Agreement. Dkt. No. 146-49. This agreement stated that the Lateral Parties would pay FTE "50% of any amounts received from [claims related to the merchant cash advance agreements] in excess of an annualized preferred return of 100% on any amounts invested or expended" by the Lateral Parties in pursuing the claims. *Id.* at 3 ¶ 3. Lateral Recovery LLC was not a party to this agreement. *See id.*

## PROCEDURAL HISTORY

Plaintiffs **[*32]** filed a complaint in this action on March 16, 2022, alleging civil RICO violations pursuant to *18 U.S.C. §§ 1961-68*. Dkt. No. 1. The complaint named as defendants BMF Advance, LLC, HOP Capital, LLC, Isaacov Investment, Inc, Joseph Yitzchakov aka Joseph Isaacov (here, "Isaacoff"), and Gavriel Yitzchakov aka Gabe Isaacov (here "Gabe"). *Id.* It also listed Ben Isaacov and Simon Isaacov as "culpable persons," and Panthers Capital as part of the RICO enterprise. *Id.* ¶¶ 123, 130.

HOP Capital, LLC and Isaacoff (the "HOP Defendants"), represented by the same counsel, sought permission to file a motion to dismiss on May 27, 2022. Dkt. No. 28. On the same day, BMF Advance, LLC, Isaacov Investment, Inc., and Gabe (the "BMF Defendants") sought permission to file their own motion to dismiss. Dkt. No. 29. The Court granted leave to file the motions. Dkt. No. 31.

Both sets of defendants moved to dismiss on July 21, 2022. Dkt. Nos. 35, 38. The motion by Isaacoff and HOP Capital, LLC stated that HOP Capital, LLC was properly named as Funderz.net, LLC, d/b/a HOP Capital, and this set of defendants was subsequently referred to as the "Funderz Defendants." Dkt. No. 36, 37.

These motions to dismiss were subsequently terminated **[*33]** due to the parties' agreement that Plaintiffs would file an amended complaint, which Plaintiffs did on August 8, 2022. Dkt. No. 42-44.[21] The Amended Complaint named Funderz.net LLC and John and Jane Doe Investors as additional defendants. Dkt. No. 44 ("Amended Compl."). It omitted Isaacov Investments, LLC, and recognized that Hop Capital, LLC and Business Merchant Funding (or BMF) were trade names of Funderz.net, LLC rather than independent defendants. *Id.* ¶ 16.

Gabe filed a motion to dismiss the amended complaint on September 22, 2022, and the Funderz Defendants filed a motion to dismiss on the same date. Dkt. Nos. 47, 49, 58. Plaintiffs responded opposing the motions, Dkt. No. 55, but Defendants then withdrew the motions before they were ruled on the court. Dkt. No. 58. On December 29, 2022, Defendants filed answers to the amended complaint. Dkt. Nos. 60-61. Defendants then sought leave to file a motion for judgment on the pleadings under *Federal Rule of Civil Procedure 12(c)*. Dkt. No. 62.

On January 26, 2023, while that motion remained pending, the case was reassigned to the Hon. Jennifer L. Rochon.[22] Dkt. No. 66. Leave was granted for Defendants to file motions for judgment on the pleadings, Dkt. No. 74, and Gabe and the **[*34]** Funderz Defendants filed such motions separately on March 23 or 24, 2023. Dkt. Nos. 87, 89. The Funderz Defendants argued that Plaintiffs incurably failed to allege several elements of the RICO claim and could not show that Defendants knew their conduct was illegal. Dkt. No. 91. Gabe argued that Plaintiffs could

---

[20] Lateral Investment Management's corporate representative testified that to his knowledge, Lateral Recovery LLC has no assets. Dkt. No. 146-7 at 20:6-8.

[21] Among other changes, the amended complaint added defendant Funderz.net, LLC. Dkt. No. 44 ¶ 17.

[22] The case was originally assigned to the Hon. Andrew L. Carter, Jr.

not show he knew that his conduct was illegal and did not plead he engaged in a pattern of racketeering under *18 U.S.C. § 1962(c)*. Dkt. No. 90. Plaintiffs opposed these motions, Dkt. No. 94, and Defendants replied, Dkt. Nos. 98-99.

Discovery proceeded during the pendency of the motions for judgment on the pleadings. Dkt. Nos. 102-123. On November 27, 2023, Plaintiffs expressed an intent to move for summary judgment. Dkt. No. 130. On December 22, 2023, the Funderz Defendants and Gabe separately sought leave to file summary judgment motions. Dkt. Nos. 132, 133.

On January 19, 2024, the court issued an order denying the motions for judgment on the pleadings. Dkt. No. 140. The court held the substance of the agreements adequately supported the plausibility of Plaintiff's allegations that the transactions were loans rather than purchases of receivables. *Id.* at 17-24. Plaintiffs also adequately pleaded **[*35]** that Defendants acted with the requisite scienter, *id.* at 25-26, and "sufficiently alleged the existence of a RICO enterprise consisting of the company Funderz, the Isaacovs, and the John and Jane Doe Investors," *id.* at

30. These allegations were sufficient to state a RICO claim based on collection of unlawful debt. *Id.* The court therefore did not examine whether Plaintiffs sufficiently pleaded a RICO violation based on wire fraud. *Id.* at 33-34.

On February 21, 2024, the parties stipulated to the voluntary dismissal of Gabe from the suit. Dkt. No. 144. Plaintiffs then submitted a motion for partial summary judgment on February 22, 2024, limited to Plaintiff's claims against Isaacoff based on collection of unlawful debt. Dkt. No. 145. The parties submitted a joint *Rule 56.1* statement with 41 attached exhibits. Dkt. No. 146. Plaintiffs also submitted their own *Rule 56.1* statement, a declaration of counsel with 74 attached exhibits, and a memorandum of law in support of their motion. Dkt. Nos. 147-149.

On the same day, Defendants submitted a motion for summary judgment on all claims. Dkt. No. 150. This motion was accompanied by Defendants' *Rule 56.1* statement, a declaration of Isaacoff with six attached exhibits, **[*36]** a declaration of counsel with five attached exhibits, and a memorandum of law in support. Dkt. Nos. 151-153.

On March 1, 2023, the case was reassigned to the Hon. Margaret M. Garnett. Dkt. No. 155. Plaintiffs filed a response to Defendants' *Rule 56.1* statement, a memorandum of law in opposition to Defendants' motion, and an associated declaration. Dkt. Nos. 157-160. Defendants filed a response to Plaintiffs' *Rule 56.1* statement and counterstatement of material facts, a memorandum of law in opposition to Plaintiff's motion, and an associated declaration of counsel with nine exhibits. Dkt. Nos. 157-162. Plaintiffs then filed a response to Defendants' counterstatement of material facts. Dkt. No. 164. Each side also filed a reply memorandum of law. Dkt. Nos. 163, 165.

The case was then reassigned to the undersigned on April 11, 2024. Dkt. No. 166. On August 2, 2024, the Court received Plaintiff's submission of supplemental authority, specifically the decision in *Oakshire Properties, LLC v. Argus Cap. Funding, LLC, 229 A.D.3d 1199 (4th Dep't 2024)*.

## LEGAL STANDARD

### I. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact **[*37]** and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.*

2d 202 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008)*, and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002)* (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)*. "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)* (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." *Fed. R. Civ. P. 56(c)(1)(A)*; *see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)*. To defeat a motion for summary judgment, the **[\*38]** non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996)* (internal citation omitted). "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate." *Am. Home Assurance Co. v. Jamaica, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006). Local Rule 56.1 of the Local Rules* for the Southern District prescribes the manner and method in which a party is to present undisputed issues of fact to the Court. The moving party must annex to its notice of motion "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." *Local Rule 56.1(a)*. The party opposing the motion for summary judgment is required to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." *Local Rule 56.1(b)*.[23] The statements "must be followed by citation to evidence which would be admissible, set forth as required by *Fed. R. Civ. P. 56(c)*." *Local Rule 56.1(d)*. The consequences of failure to follow these rules can be severe. "Each numbered paragraph in the statement of material **[\*39]** facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." *Local Rule 56.1(c)*.

Thus, a *Rule 56.1* statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz, 258 F.3d at 74*. If portions of a *Rule 56.1* counterstatement cite to no admissible evidence in support of its denials, the Court is instructed to disregard those portions and deem the factual statements in the original *Rule 56.1* statements admitted. *See, e.g., Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev., 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013)* (holding that denials that are not supported by citations to admissible record evidence are to be disregarded). When the non-moving party in certain instances fails to cite to any record evidence for its denials, the Court accepts the moving party's characterization of those facts in its 56.1 statement as undisputed. *See Colton v. N.Y. Div. of State Pol., 2017 U.S. Dist. LEXIS 220766, 2017 WL 5508911, at \*2 (N.D.N.Y. Feb. 8, 2017)* ("The failure to properly controvert a supported statement of fact by pointing to admissible evidence contravening the movant's evidence results in the movant's statement being deemed admitted."); *Knight v. N.Y.C. Hous. Auth., 2007 U.S. Dist. LEXIS 9148, 2007 WL 313435, at \*1 (S.D.N.Y. Feb. 2, 2007)* ("Pursuant to *Local Civil Rule 56.1* Defendant's statements are deemed to be admitted **[\*40]** where Plaintiff has failed to specifically controvert them with citations to the record.").

## II. RICO

Plaintiffs' Amended Complaint brings civil RICO claims under *18 U.S.C. § 1962(c)* and *(d)*. Amended Compl. ¶¶ 115-189.

---

[23] **Local Rule 56.1** was amended effective July 1, 2024, after all **Rule 56.1** statements were submitted in this action. The wording of **Local Rule 56.1** set forth here is the wording at the time the statements were submitted, which differs slightly from the wording of the current rule.

The RICO statute was passed in 1970 as "an aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 498, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)*. Although "[o]rganized crime was without a doubt Congress' major target," Congress "chose to enact a more general statute . . . broad[] enough to encompass a wide range of criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 246-48, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)*. Thus, the Supreme Court has held that the statute's purposes more generally encompass "protect[ing] a legitimate enterprise from those who would use unlawful acts to victimize it" and "protect[ing] the public from those would unlawfully use an enterprise (whether legitimate or illegitimate) as a vehicle through which unlawful activity is committed." *Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 164, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001)* (internal citations and quotations omitted). A RICO violation may be criminally prosecuted. *18 U.S.C. § 1963*. Alternatively, "[a]ny person injured in his business or property by reason of a violation" of the statute may sue in federal court and recover treble damages. *18 U.S.C. § 1964(c)*.

"To establish a RICO claim, a plaintiff must show: (1) a violation of **[*41]** the RICO statute, *18 U.S.C. § 1962*; (2) an injury to business or property; and (3) that the injury was caused by the violation of *Section 1962*." *DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001)* (citations and quotations omitted). Here, plaintiffs allege violations of *18 U.S.C. § 1962 (c)* and *(d)*. *Section 1962 (c)* provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*18 U.S.C. 1962(c)*.

To establish liability under this provision, a plaintiff must "prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner, 533 U.S. at 161*. A "person" is defined in the statute as "any individual or entity capable of holding a legal or beneficial interest in property." *18 U.S.C. § 1961(3)*. An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4)*.

"A corporate entity can be sued as a RICO 'person' or named as a RICO 'enterprise,' *see 18 U.S.C. § 1961(3)*, *(4)*, but the same **[*42]** entity cannot be both the RICO person and the enterprise." *U1it4less, Inc. v. Fedex Corp., 871 F.3d 199, 205 (2d Cir. 2017)*; *see Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 120-21 (2d Cir. 2013)* ("[A] corporate person cannot violate the statute by corrupting itself."). However, the distinctness requirement is satisfied "when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner." *Cedric Kushner, 533 U.S. at 164-65*. This accords with the statutory purpose of protecting the public from those who "run organization[s] in a manner detrimental to the public interest." *Id. at 165* (quoting S. Rep. No. 91-617, at 82 (1969)). The plaintiff must also establish that the enterprise was "engaged in . . . foreign or interstate commerce. *18 U.S.C. 1962(c)*. This element is rarely disputed, as "[t]he law in this Circuit does not require RICO plaintiffs to show more than a minimal effect on interstate commerce." *DeFalco, 244 F.3d at 309*.

*Section 1962(c)* then requires that the RICO person must "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." *18 U.S.C. 1962(c)*. To fulfill this requirement, the RICO person "must have some part in directing those affairs," although she need not have "primary responsibility." *Reves v. Ernst & Young, 507 U.S. 170, 179, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)*. Finally and importantly, the plaintiff must prove "a pattern of racketeering activity or collection of unlawful debt." *18 U.S.C. 1962(c)*. This language provides two **[*43]** paths to liability: either "a pattern of racketeering activity" or "a single instance of collection of unlawful debt." *United States v. Grote, 961 F.3d 105, 119 (2d Cir. 2020)*. "Racketeering activity" is defined in the statute to encompass a large number of state and federal offenses. *18 U.S.C. § 1961(1)*. A "pattern of racketeering activity" must include at least two such acts. *18 U.S.C. § 1961(5)*. For a claim to succeed under this prong, the "[p]redicate crimes must be related both to each other (termed 'horizontal relatedness') and to the enterprise as a whole ('vertical relatedness')." *Reich v. Lopez, 858 F.3d 55, 60 (2d Cir. 2017)* (quoting *United States v. Cain, 671 F.3d 271, 284 (2d Cir. 2012)*).

"Unlawful debt" is defined in the statute as:

[A] debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

*18 U.S.C. § 1961(6)*. To satisfy this definition, **[\*44]** a plaintiff must show that "[1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with 'the business of lending money . . . at a [usurious] rate,' and [3] the usurious rate was at least twice the enforceable rate." *Durante Bros. & Sons v. Flushing Nat. Bank, 755 F.2d 239, 248 (2d Cir. 1985)*. Under New York law, a loan is criminally usurious if the rate of interest is greater than 25% per annum. *N.Y. Penal Law § 190.40*. The usury law applies "only to loans or forbearances, not investments." *Seidel v. 18 E. 17th St. Owners, Inc., 79 N.Y.2d 735, 598 N.E.2d 7, 11, 586 N.Y.S.2d 240 (1992)*.

Plaintiffs also allege violations of *18 U.S.C. § 1962(d)*, which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of *subsection (a)*, *(b)*, or *(c)* of this section." This claim requires a showing that the defendant "agreed with at least one other entity to commit a substantive RICO offense." *Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 487 (2d Cir. 2014)*. The claim will fail if the agreed-upon acts, even if carried out, would not satisfy all the elements of a RICO offense. *See id. at 489*; *Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244-45 (2d Cir. 1999)*. Assuming that *Section 1962* was violated, Plaintiffs must show that this violation injured them in their business or property. *DeFalco, 244 F.3d at 305*.

**DISCUSSION**

**I. Assignment of Claims to Lateral**

A threshold issue is whether Lateral may properly bring RICO claims based on transactions between Funderz and FTE. Plaintiffs state **[\*45]** that Lateral can properly bring FTE's claims against Funderz as an assignee of those claims pursuant to the Foreclosure Agreement. Dkt. No. 149 at 25. Defendants argue that this assignment is void as a violation of New York's champerty statute, *Judiciary Law § 489*, and that Lateral lacks standing under the RICO statute. Dkt. No. 154 at 13-15.

**A. Champerty**

*New York Judiciary Law § 489(1)* provides that:

No person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon; provided however, that bills receivable, notes receivable, bills of exchange, judgments or other things in action may be solicited, bought, or assignment thereof taken, from any executor, administrator, assignee for the benefit of creditors, trustee or receiver in bankruptcy, or any other person or persons in charge **[\*46]** of the administration, settlement or compromise of any estate, through court actions, proceedings or otherwise. Nothing herein contained shall affect any assignment heretofore or hereafter taken by any moneyed corporation authorized to do business in the state of New York or its nominee pursuant to a subrogation agreement or a salvage operation, or by any corporation organized for religious, benevolent or charitable purposes.

*Section 489(2)* creates a safe harbor for any assignment, purchase or transfer "if such assignment, purchase, or transfer included bonds, promissory notes, bills of exchange and/or book debts, issued by or enforceable against the same obligor . . . having an aggregate purchase price of at least five hundred thousand dollars." *Judiciary Law § 489(2)*. New York's champerty statute is derived from the common-law doctrine of champerty, which prohibited "rendering aid in the prosecution of a suit under an agreement to share in the avails." *Sedgwick v. Stanton, 14 N.Y. 289, 299 (1856)*. One historical concern addressed by the doctrine is that lawyers would purchase and file claims as a vehicle for obtaining costs and fees. *See Bluebird Partners, L.P. v. First Fid. Bank, N.A., 94 N.Y.2d 726, 731 N.E.2d 581, 586, 709 N.Y.S.2d 865 (N.Y. 2000)*; *Wightman v. Catlin, 113 A.D. 24, 98 N.Y.S. 1071, 37 N.Y. Civ. Proc. R. 105 (2d Dep't 1906)*. However, the modern statute also seeks to "prevent or curtail the commercialization of or trading in litigation," preserving **[*47]** the idea of a lawsuit as a way of settling a dispute between parties rather than a marketable commodity. *Bluebird Partners, 731 N.E.2d at 582*; *see* Max Radin, *Maintenance By Champerty*, 24 Calif. L. Rev. 48, 48 (1935). In accordance with this aim, the statutory prohibition notably does not apply to isolated assignments of claims to individuals.[24] Rather, it prohibits the purchase of claims only by persons "engaged directly or indirectly in the business of collection or adjustment of claims," corporations, and associations. *N.Y. Judiciary Law § 489(1)*. An assignment which violates the statute is void, and a corporate officer who participates in a violation is guilty of a misdemeanor. *Id.*; *see Semi-Tech Litig., LLC v. Bankers Tr. Co., 272 F. Supp. 2d 319, 331 (S.D.N.Y. 2003)*.

A purchase is only champertous if the purchase is "with the intent *and* for the purpose" of bringing a lawsuit. *N.Y. Judiciary Law § 489(1)* (emphasis added). As interpreted by New York courts, this means that "a mere intent to bring a suit on a claim purchased does not constitute the offense." *Moses v. McDivitt, 88 N.Y. 62, 65 (1882)*. Rather, the crucial test for whether the statute has been violated is whether the party receiving the assignment had the "primary purpose" of bringing a lawsuit. *Justinian Cap. SPC v. WestLB AG, 28 N.Y.3d 160, 43 N.Y.S.3d 218, 65 N.E.3d 1253, 1256 (N.Y. 2016)* (quoting *Moses, 88 N.Y. at 65*). By contrast, if a potential lawsuit is "contingent" or "incidental" to some other purpose, there is no champerty. *Id.* (quoting *Moses, 88 N.Y. at 65*). Although **[*48]** application of this test is necessarily fact-specific, the cases where courts have addressed claims of champerty fall into several different categories.

First, courts have consistently found champerty where a corporation that is otherwise a stranger to the parties solicits or takes an assignment of a claim in exchange for the agreement it will share the proceeds of the litigation that ensues with the assignor. This is the prototypical picture of champerty. It is presumed in such circumstances that the assignment will sow "the 'strife, discord and harassment'" that the doctrine of champerty was designed to avoid. *Tr. For the Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding Corp., 13 N.Y.3d 190, 918 N.E.2d 889, 893, 890 N.Y.S.2d 377 (2009)* (quoting *Fairchild Hiller Corp. v. McDonnell Douglas Corp., 28 N.Y.2d 325, 270 N.E.2d 691, 693, 321 N.Y.S.2d 857 (1971)*). The law is indifferent to whether the consideration paid to the assignee is in the form of a cash sum certain paid at the moment of assignment or a percentage of the recovery to be paid after the litigation is concluded. *See, e.g., Sprung v. Jaffe, 3 N.Y.2d 539, 544, 147 N.E.2d 6, 169 N.Y.S.2d 456 (1957)* (cash payment); *Justinian Cap., 65 N.E.3d at 1254-56* (contingency). The assignment agreement in such cases often explicitly states that the assignee will sue and describes its consideration for doing so. *See Justinian Cap., 65 N.E.3d at 1254-56* (bank which wanted to avoid lawsuit for political reasons assigned claim to a shell company which would keep 20% of proceeds); *PDVSA US Litig. Tr. v. Lukoil Pan Americas, LLC, 991 F.3d 1187, 1193-95 (11th Cir. 2021)* (state-owned oil company assigned **[*49]** claims to a trust, which returned 34% of proceeds and paid 66% to attorneys and financers); *Refac Int'l, Ltd. v. Lotus Dev. Corp., 131 F.R.D. 56, 58-59*

---

[24] There is some authority suggesting that the statute applies indiscriminately to all persons. *See Aretakis v. Caesars Ent., 2018 U.S. Dist. LEXIS 29552, 2018 WL 1069450, at *9-10 (S.D.N.Y. Feb. 23, 2018)*; *see also Justinian Cap. SPC v. WestLB AG, 28 N.Y.3d 160, 43 N.Y.S.3d 218, 65 N.E.3d 1253, 1258 (2016)* ("*Section 489(1)* restricts individuals and companies from purchasing or taking an assignment of notes or other securities."). However, the text appears to prohibit only persons "engaged directly or indirectly in the business of collection and adjustment of claims" from taking an assignment with the purpose of bringing an action. *N.Y. Judiciary Law § 489(1)*. New York authority supports this interpretation. *See Traktman v. City of N.Y., 182 A.D.2d 814, 582 N.Y.S.2d 808, 814-15 (2d Dep't 1992)* (denying champerty defense because "the evidence presented fails to establish that the plaintiff is engaged in the business of collecting claims"); *Edrich v. Festinger, 2017 U.S. Dist. LEXIS 131576, 2017 WL 3575238, at *5-6 (E.D.N.Y. Aug. 17, 2017)* (same, and collecting cases).

*(S.D.N.Y. 1990)* (patent holder granted a 5% interest in patent to second company in exchange for explicit agreement that the second company would sue infringers); *Am. Optical Co. v. Curtiss, 56 F.R.D. 26, 28-29 (S.D.N.Y. 1971)* (university assigned patent claim to corporation on the condition that it would bring suit to vindicate the university's rights). There is no purpose to such assignments except bringing legal action. *See Elliott Assocs., L.P. v. Banco de la Nacion, 194 F.3d 363, 375-76 (2d Cir. 1999)*.

The same result generally has followed when multiple plaintiffs assign or sell their claims to an entity so that the entity can bring suit on the aggregated claims. *See Syracuse Mountains Corp. v. Petróleos de Venezuela S.A., 2024 U.S. Dist. LEXIS 136302, 2024 WL 3637997, at *1-4 (S.D.N.Y. Aug. 1, 2024); Sharbat v. Iovance Biotherapeutics, Inc., 2023 U.S. Dist. LEXIS 1428, 2023 WL 34377, at *7 (S.D.N.Y. Jan. 4, 2023); Richbell Info. Servs., Inc. v. Jupiter Partners, 280 A.D.2d 208, 723 N.Y.S.2d 134, 136-37 (1st Dep't 2001)*. The courts have concluded that, in such circumstances, preparing and bringing a lawsuit is "the 'very essence,' of [the transaction], not merely an incidental consequence," *Syracuse Mountains Corp., 2024 U.S. Dist. LEXIS 13630, 2024 WL 3637997, at *4* (quoting *Justinian Cap. 65 N.E.3d at 1257*), and thus have held the assignment or sale to be champertous.[25]

By contrast, courts have been far less skeptical when instead of purchasing a claim directly and nakedly, the plaintiff has acquired an asset whose value may be realized through a lawsuit. It is not champertous for a party "to acquire a debt instrument with the intent of obtaining payment, even should litigation become necessary." **[*50]** *Bluebird Partners, 731 N.E.2d at 587*; *see Love Funding Corp., 918 N.E.2d at 894* ("[I]f a party acquires a debt instrument for the purpose of enforcing it, that is not champerty simply because the party intends to do so by litigation."); *Elliott Assocs., 194 F.3d at 377* ("[T]he mischief *Section 489* was intended to remedy did not include the acquisition of debt with the motive of collecting it."). Were the rule otherwise, the distressed debt market would be frozen and "holders of debt instruments would have substantial difficulty selling those instruments if payment were not voluntarily forthcoming." *Elliott Assocs., 194 F.3d at 380*. The result would inure to the detriment not just of high-risk borrowers but of all borrowers, who would see their costs to borrow capital increase for fear that a high-risk loan once made could not be sold or assigned. *Id.*[26]

A debt purchase may still be champertous if made "for the very purpose of bringing . . . suit." *Justinian Cap., 65 N.E.3d at 1256* (quoting *Moses, 88 N.Y. at 65*). For example, an inference of champerty may be supportable if the purchase involves explicit statements of intent to sue at the time of the assignment, specific language in the assignment agreement related to litigation rights, and immediate suit on the claim after assignment. *Bluebird Partners, 731 N.E.2d at 588*. But even in such a case, the question of whether the transaction is "made with the intent and **[*51]** for *the* purpose (as contrasted to *a* purpose) of bringing an action or proceeding" generally presents an issue of fact. *Bluebird Partners, 731 N.E.2d at 587-588*; *see Love Funding, 918 N.E.2d at 894* ("The inquiry into purpose is a factual one"); *Fairchild Hiller, 270 N.E.2d at 693* ("[T]he question of intent and purpose of the purchaser or assignee of a claim is usually a factual one to be decided by the trier of facts.").

It follows from the primary purpose doctrine that the receipt of an assignment or a transfer by a party who has a "preexisting proprietary interest" in the claim is not champertous. *Love Funding, 918 N.E.2d at 895*. Where the party

---

[25] If managers or non-claimant shareholders of the new entity share in proceeds of the litigation, the aggregation scenario is hardly different from the prototypical picture of champerty. Outsiders are aiding in the prosecution of the claims in return for a share of proceeds. If the claimants themselves fully own and manage the new entity, the transaction becomes reciprocal. Each claimant partially aids in the prosecution of the claims of the others in return for a share of the proceeds. *See Syracuse Mountains Corp., 2024 U.S. Dist. LEXIS 13630, 2024 WL 3637997, at *2-6* ("Syracuse provided each Shareholder shares in Syracuse in proportion to its contribution to the total face value of all Notes and other debt instruments transferred. After all the Transfers had been made, the Shareholders collectively owned 100% of Syracuse's shares; each Shareholder held a pro rata share of Syracuse equal to its pro rata contribution of Notes.").

[26] In addition to a purpose of enforcement or collection, a party may also take an assignment of debt to cover risk or gain leverage in related transactions. *See Moses, 88 N.Y. at 67-68; Bluebird Partners, 731 N.E.2d at 588*. It may do so without risk of being found liable for champerty.

receiving the claim is acting "to protect its own interest" and has a "substantial, legitimate interest in the transactions involved in the suit," *id.*, its primary purpose in acquiring the claim cannot be said to bring litigation, even if the preexisting interest is beneficial and not legal and even if the means to protect its pre-existing interest is litigation, *see Promenade v. Schindler Elevator Corp., 39 A.D.3d 221, 834 N.Y.S.2d 97, 98-99 (1st Dep't 2007)* (claim or indemnification assigned as part of settlement of the main action); *Am. Bag & Metal Co. v. Alcan Aluminum Corp. (Alcan Sheet & Plate Div.), 115 A.D.2d 958, 497 N.Y.S.2d 787, 789 (1st Dep't 1985)* (assignment of breach of contract claims to the party that held the contract); *Bellarno Int'l Ltd. V. Irving Tr. Co., 165 A.D.2d 809, 560 N.Y.S.2d 287, 288 (1st Dep't 1990)* (assignment of wrongful payment claim from bank to account party).

Still another category of cases exists where a claim is conveyed as part of a larger business **[*52]** transaction in which other assets are exchanged. *See Fairchild Hiller, 270 N.E.2d at 692-93*. Two corporations can agree to a merger and can convey assets, including choses in action, into the resulting entity without fear that the transaction will be unwound as champertous. In *Fairchild Hiller*, for example, the assignment of a claim was "simply an incidental part of a substantial commercial transaction," namely an agreement by Fairchild and non-party Farmingdale to acquire and divide the assets of a third company, Republic. *Id. at 692*. As part of this transaction Fairchild agreed to take a certain claim held by Republic and turn over part 75% of the proceeds to Farmingdale. *Id.* The Court of Appeals held that in this context such an arrangement "can by no means be said to be champertous," because the clear purpose was "to induce Farmingdale to take part in the acquisition." *Id. at 693*. The case stands for a broader proposition. When the transfer of a claim is an incidental part of a non-litigation business strategy, it is not plausible that the primary purpose is litigation and the champerty statute is inapplicable as a matter of law. *See also Limpar Realty Corp. v. Uswiss Realty Holding, Inc., 112 A.D.2d 834, 492 N.Y.S.2d 754, 755 (1st Dep't 1985)* (champerty could not be inferred from the purchase of a mortgage in default when plaintiff had a clear business **[*53]** strategy of acquiring properties on the same block); *Prudential Oil Corp. v. Phillips Petroleum Co., 69 A.D.2d 763, 415 N.Y.S.2d 217, 218 (1st Dep't 1979)* (champerty not inferred from assignment of claim to subsidiary as "one small detail of corporate parent restructure"). Interpreting the statute to cover such transactions would "cast the potentiality of a champerty cloud too easily over modern business practices." *Bluebird Partners, 731 N.E.2d at 587*.

Applying these principles here, neither side has established a right to summary judgment. Genuine issues of fact exist as to whether the transaction pursuant to which Lateral Recovery LLC obtained its claims is champertous. Lateral Recovery LLC was assigned FTE's litigation claims in connection with the Foreclosure Agreement, a significant commercial transaction. In that agreement, Lateral U.S. Credit Opportunities Fund and other affiliated entities foreclosed on all of FTE's assets pursuant to the security interest in those assets (including these claims) which they had received in a prior loan deal with FTE (the Credit Agreement). *See* Foreclosure Agreement. FTE defaulted on the Credit Agreement while it had an outstanding debt of approximately $50 million to Lateral which it did not appear able to satisfy. *Id.* Lateral therefore attempted to enforce its "independent **[*54]** right[s]" under the Credit Agreement to foreclose on FTE's collateral and recover a portion of the lost value. *Love Funding, 918 N.E.2d at 894*. It did so in part by seeking a transfer of Benchmark's assets and cash on hand, and in part by seeking a transfer of the litigation claims. Credit Agreement at 2. The transaction thus did not just involve assignment of FTE's litigation claims, but transfer of Benchmark's assets as well. Dkt. No. 158 at 24.

Lateral Recovery LLC appears to be related to the lender Lateral U.S. Credit Opportunities Fund. Plaintiffs have produced evidence that Lateral Recovery LLC is owned by lender Lateral U.S. Credit Opportunities Fund. Dkt. No. 146-11 at 26-29. Richard de Silva, who signed the Foreclosure Agreement as Manager of Lateral Recovery LLC, also signed as Manager of each of the other Lateral entities on the transaction. *See* Foreclosure Agreement at

14. De Silva, who has been Managing Partner of Lateral Investment Management since 2014, Dkt. No. 146-11 at 11:7-13, does not consistently differentiate between the Lateral entities and repeatedly refers to them as "we," *e.g.* Dkt. No. 146-11 at 26:13-24 ("[W]e engaged in a strict foreclosure action . . . . And we had two companies that **[*55]** held that assets that we foreclosed on."); *id.* at 28:6-9 ("we were the senior lender to FTE"); *id.* at 36:22-37:6, ("we might be at 25 percent," describing the total investment of Lateral entities).

However, Lateral Recovery LLC is not the same entity as Lateral Investment Management or any of the Lateral entities which invested in FTE. Lateral Recovery LLC was incorporated shortly before the lawsuit to hold these litigation claims, JSMF ¶ 146; Dkt. No. 146-11 at 26-29; Dkt. No. 146-48, was not a lender, *see* Credit Agreement, and had no interests under the Credit Agreement, *see id.* Richard de Silva admitted that "Lateral Recovery is a Delaware limited liability company that was organized, among other reasons, for the specific purpose of taking possession of and pursing certain commercial claims belonging to [FTE]." Dkt. No. 146-48. Lateral Recovery was only assigned litigation claims, not any type of asset. *See* Dkt. No. 146-7 at 20:6-8; Foreclosure Agreement.

These undisputed facts do not entitle either party to summary judgment. The summary judgment record does not contain undisputed evidence regarding the negotiations that led to the challenged assignment. Under the caselaw outlined **[*56]** above, it cannot be sufficient to entitle Plaintiffs to summary judgment that Lateral Recovery LLC is owned by one of the Lenders and that it acquired the claims as part of a transaction in which the Lenders were able to foreclose on all of FTE's assets. The champerty test looks to the primary purpose of the assignee who obtains the claim, not to the purposes of others who may be related to the assignee. *See N.Y. Judiciary Law § 489(1)* (speaking to those who "solicit, buy or take an assignment of . . . . any claim or demand"); *BSC Assocs., LLC v. Leidos, Inc., 91 F. Supp. 3d 319, 328 (N.D.N.Y. 2015)* (refusing to consider the primary purpose of entities other than the assignee).

Thus, in *Fairchild Hiller*, the court looked to the purpose of the assignee, Fairchild, and held that the transaction was not champertous because "Fairchild's primary purpose . . . was to acquire Republic's operating assets" and "[t]he acquisition of the claim was . . . taken in order to induce Farmingdale to take part in the acquisition by purchasing Republic's non-operating assets." *270 N.E.2d at 693*. It was necessary to the result in *Fairchild Hiller* that Fairchild acquired the litigation claim not for the primary purpose of bringing a lawsuit but in order to facilitate a larger commercial transaction in which it had an interest. If, here, the claims were **[*57]** separated from the underlying contract at issue primarily so that Lateral Recovery LLC could bring suit, and it was a matter of indifference to the parties and to the transaction who would acquire the claims, then the assignment to Lateral Recovery LLC would be champertous. *See BSC Assocs., 91 F. Supp. 3d at 328*; *Koro Co. v. Bristol-Myers Co., 568 F. Supp. 280, 287 (D.D.C. 1983)* (distinguishing *Fairchild Hiller* on grounds that an assignment made in the context of a substantial commercial transaction "was admittedly made solely to enable plaintiff to bring an action on the claim"). Lateral U.S. Credit Opportunities Fund could not obtain the litigation claims from FTE and then, in a separate transaction, sell those claims to a newly-created entity who had no pre-existing proprietary interest in the claims for a share of the proceeds without running afoul of New York's champerty rules. *See Justinian Cap., 65 N.E.3d at 1254-56*; *PDVSA US Litig. Tr., 991 F.3d at 1193-95*; *Sharbat, 2023 U.S. Dist. LEXIS 1428, 2023 WL 34377, at *7*. There is no basis to believe that *Section 489* permits a company to do in one step what it is forbidden to do in two.

At the same time, however, there is evidence that the primary purpose of the transaction as a whole was not to gain the proceeds of litigation, but to protect the rights of Lateral entities under the Credit Agreement. The Foreclosure Agreement was a "substantial commercial transaction" aimed at protecting **[*58]** Lateral's preexisting rights, and there is evidence that would suggest that the transfer of the litigation claims was merely a method of achieving this purpose. *Fairchild Hiller, 270 N.E.2d at 693*. There is no genuine dispute that the Lenders had a pre-existing proprietary interest in FTE's claims. The claims that FTE assigned to Lateral Recovery against "various lenders under various merchant cash advance or other agreements for Indebtedness" specifically related to the Credit Agreement, because FTE's incurrence of debts under the MCA agreements was "not permitted under the Credit Agreement." Credit Agreement at 2. Given Lateral's security interest in substantially all of FTE's assets, it had an interest in the possibility that FTE could recover some part of the $50 million by holding accountable the individuals who had mismanaged the company. It is not irrelevant that Lateral Recovery appears to be a wholly-owned subsidiary of Lateral U.S. Credit Opportunities Fund. Assignment from a parent to a wholly-owned subsidiary is less clearly champertous, because it may be inferred that the subsidiary is taking on the claim not solely to bring litigation, but also to protect the proprietary interest it shares with the parent **[*59]** in the claim. *See generally Anisom Corp. v. Banque Exel, S. A., 40 A.D.2d 968, 338 N.Y.S.2d 848, 849 (1st Dep't 1972)* (holding that assignment from a parent to subsidiary is not champertous); *Prudential Oil Corp. 415 N.Y.S.2d at 218-19* (same, in

the context of a larger transaction).[27] Given the conflicting circumstances bearing on Lateral Recovery's purpose in this transaction, the Court is unable to conclude that summary judgment should be granted for either party.

However, the Court is able to reach a conclusion as to another aspect of the champerty analysis. Plaintiff argues that the transaction falls into the safe harbor provision of *Judiciary Law § 489(2)* because the transfer of litigation claims was in satisfaction of FTE's obligation to pay Lateral more than $50 million. *Id.* The Court disagrees. In its entirety, *Section 489(2)* states that:

> Except as set forth in subdivision three of this section,[28] the provisions of subdivision one of this section shall not apply to any assignment, purchase or transfer hereafter made of one or more bonds, promissory notes, bills of exchange, book debts, or other things in action, or any claims or demands, if such assignment, purchase or transfer included bonds, promissory notes, bills of exchange and/or book debts, issued by or enforceable against the same obligor (whether or not also issued by or enforceable **[*60]** against any other obligors), having an aggregate purchase price of at least five hundred thousand dollars, in which event the exemption provided by this subdivision shall apply as well to all other items, including other things in action, claims and demands, included in such assignment, purchase or transfer (but only if such other items are issued by or enforceable against the same obligor, or relate to or arise in connection with such bonds, promissory notes, bills of exchange and/or book debts or the issuance thereof).

The plain text of this provision does not apply to the transaction here. The provision states that section one shall not apply to an assignment if such assignment "included bonds, promissory notes, bills of exchange and/or book debts, issued by or enforceable against the same obligor (whether or not also issued by or enforceable against any other obligors), having an aggregate purchase price of at least five hundred thousand dollars." *N.Y. Judiciary Law § 489(2)*. The assignment here did not include "bonds, promissory notes, bills of exchange and/or book debts." *Id.* Rather, it included "commercial tort litigation claims, fraud claims, and insurance claims." Credit Agreement at 2. Bonds, notes **[*61]** and similar instruments are not identical to claims based on those instruments, and here only the latter were assigned. *See* Credit Agreement at 2; *cf. Bluebird Partners, 731 N.E.2d at 587* ("Bluebird did purchase the second series certificates in their entirety, and not just the rights to a lawsuit encompassed within the expressed terms of the instrument."). Therefore, the assignment cannot qualify for the safe harbor provision.

This reading is consistent with the description of the safe harbor provision by the New York Court of Appeals as a provision which "exempts the purchase or assignment of notes or other securities from the restrictions of *section 489(1)*." *Justinian Cap., 65 N.E.3d at 1257*. It is also consistent with the legislative purpose of "facilitat[ing] the fluidity of transactions" in "New York's debt-trading markets." *Id.* at 169 (citing *Assembly Mem. in Support, Bill Jacket, L. 2004, ch. 394 at 4*). A potential tort or fraud claim is meaningfully different from the fungible "payment obligations" fluidly traded on debt markets. *Id.* at 170. Within *Section 489(1)* and at other points in *Section 489(2)*, the legislature listed a set of relevant assignments and closed with "claim or demand." *N.Y. Judiciary Law §§ 489(1), (2)*. Then in describing the items that needed to have "an aggregate purchase price of at least five hundred thousand dollars," the legislature set out a nearly identical list but **[*62]** omitted "any claim or demand." *N.Y. Judiciary Law § 489(2)*. The Court must presume this omission was intentional. An assignment solely of tort, fraud, and insurance claims cannot qualify for the safe harbor provision.

---

[27] Indeed, the Appellate Division, First Department appears to subscribe to the broad view that "champerty only prohibits the acquisition of a cause of action by a 'stranger' to the underlying dispute." *IKB Int'l S.A. v. Stanley, 225 A.D.3d 542, 207 N.Y.S.3d 488, 491 (1st Dep't 2024)*. Thus, champerty has been held not to apply to assignments from a parent to a subsidiary and from a former assignee back to the original assignor. *See Anisom Corp. v. Banque Exel, S. A., 40 A.D.2d 968, 338 N.Y.S.2d 848, 849 (1st Dep't 1972)* (parent to subsidiary); *Prudential Oil Corp., 415 N.Y.S.2d at 218* (parent to subsidiary); *IKB Int'l, 207 N.Y.S.3d at 491* (former assignee to original assignor). The First Department has also imputed an individual's proprietary interests to an LLC owned by that individual for the purposes of champerty analysis. *Red Tulip, LLC v. Neiva, 44 A.D.3d 204, 842 N.Y.S.2d 1, 8 (1st Dept 2007)*; *see also FragranceNet.com, Inc. v. FragranceX.com, Inc., 679 F. Supp. 2d 312 (E.D.N.Y. 2010)* (suggesting that a parent may have a preexisting propriety interest in a subsidiary's trademark).

[28] Subdivision three concerns "[t]he rights of an indenture trustee, its agents and employees." *N.Y. Judiciary Law § 489(3)*.

## B. Standing

Defendants also argue that Lateral Recovery LLC lacks standing to sue because the assignment included only tort, fraud, and insurance claims, not contract or statutory claims. Dkt. No. 154 at 24. The Court has previously rejected this claim in construing this exact Foreclosure Agreement. *See Lateral Recovery, LLC v. Cap. Merch. Servs., LLC, 632 F. Supp. 3d 402, 442-445 (S.D.N.Y. 2022)*. As explained in that case, the meaning of "commercial tort claims" in the Foreclosure Agreement should be read in light of the definition of that term in *Article 9 of the Uniform Commercial Code*. *Id.* Under that definition, and consistent with a number of holdings stating that "commercial tort claims" include statutory claims and that RICO provides a statutory tort remedy, the assignment encompasses RICO claims. *See id.*

If the assignment were found to violate the champerty statute, it would be void, and Lateral would lack standing to sue. *See Semi-Tech Litig., 272 F. Supp. 2d at 331*. Lateral would be unable to continue as a Plaintiff because it is not the real party in interest. *See Fed. R. Civ. P. 17(a)*; *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l, 790 F.3d 411, 421-25 (2d Cir. 2015)*. The real party in interest would be the assignor, FTE. Because FTE is already a plaintiff **[*63]** in this action, FTE could continue to pursue the claims.

Defendants imply that FTE should not be able to continue the action, stating that "[t]he naming of FTE and its affiliates should not cure the clear violation of champerty." Dkt. No. 154 at 24. However, the proposition that a failed attempt at assignment should bar the real party in interest from pursuing its claims is unsustainable. Even if the real party in interest were not a plaintiff in the action, the Court would be obligated to provide a chance for the real party in interest to "ratify, join, or be substituted into the action" before dismissing the claims. *Fed. R. Civ. P. 17(a)(3)*; *see Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 20-21, 36 F. 1458 (2d Cir. 1997)*; *Refac Int'l, 131 F.R.D. at 58* (applying this rule in the context of a champertous assignment). A fortiori, when the real party in interest is already a plaintiff in the action, there is no reason to dismiss the real party in interest due to a mistake regarding the validity of an assignment.

Defendants' final standing argument is that Plaintiffs Benchmark, Jus-Com, and Focus Wireless lack standing because any harm to them was only derivative of harm to FTE. Dkt. No. 154 at 32. Plaintiffs respond that in each agreement, FTE granted Funderz a blanket security interest in Benchmark, Jus-Com, and **[*64]** Focus Wireless. Dkt. No. 158 at 25. To have standing to sue under *18 U.S.C. § 1964 (c)*, a plaintiff must show ""(1) a violation of *section 1962*; (2) injury to business or property; and (3) causation of the injury by the violation." *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 767 (2d Cir. 1994)*; *see also Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992)* (requiring proximate causation).

Defendants are correct that Benchmark, Jus-Com, and Focus Wireless have not shown standing to bring the RICO claims here. The purported violation of *Section 1962* is Funderz's collection of unlawful debt.[29] Benchmark, Jus-Com, and Focus Wireless show no injury resulting from this collection. The money was collected from FTE, not Benchmark, Jus-Com, or Focus Wireless. No action was ever taken on the security interest in Benchmark, Jus-Com, and Focus Wireless. Assuming that the granting of the security interest itself would be an injury,[30] it was not caused by the collection of unlawful debt. It preceded it. Moreover, injury cannot be inferred simply from the fact that Benchmark, Jus-Com and Focus Wireless were affiliated with FTE. Even if FTE's debts had a trickle-down effect on its affiliates, such an injury would be unlikely to meet the standard of proximate cause. *See Holmes, 503 U.S. at 271-73* (noting that those "directly injured" are generally "counted on to bring suit for the law's **[*65]**

---

[29] As discussed *infra*, Plaintiffs have not produced sufficient evidence to support a violation based on a pattern of racketeering activity.

[30] Defendants note that the agreements list "Jus-Com, Inc." and "Focus Venture Partners," which are not the corporate names of the plaintiffs here, Jus-Com, LLC and Focus Wireless, LLC. Dkt. No. 165 at 10 n.25. This issue is not material because even assuming the security interest is in Jus-Com, LLC and Focus Wireless, LLC, it is not sufficient to confer standing to bring the claims here.

vindication"). Benchmark, Jus-Com, and Focus Wireless have not shown injury and lack standing to bring these claims.

## II. RICO Claims

Plaintiffs state three theories of RICO recovery in their complaint: under *18 U.S.C. § 1962(c)* based on collection of unlawful debt, under *18 U.S.C. § 1962(c)* based on a pattern of racketeering activity, and under *18 U.S.C. § 1962(d)* for conspiracy to violate *Section 1962(c)*. Amended Compl. ¶¶ 115-189. However, Plaintiffs move for summary judgment only under *18 U.S.C. § 1962(c)* on the theory of collection of unlawful debt. Dkt. No. 145. Defendants cross-move for summary judgment on this claim. Dkt. No. 150. Defendants additionally move for summary judgment on Plaintiffs' remaining claims, under *Section 1962(c)* based on a pattern of racketeering activity and under *Section 1962(d)* based on conspiracy to violate *Section 1962(c)*. *Id.; see* Dkt. No. 154 at 20-23.

## A. Violation of *Section 1962(c)* by Collection of Unlawful Debt

The main claim to which the parties direct argument, and the only claim on which Plaintiffs move for summary judgment, is Plaintiffs' claim under *18 U.S.C. § 1962(c)* for collection of unlawful debt. The basis for this claim is that Isaacoff is a RICO person who conducted the affairs of Funderz, an enterprise which operated in interstate commerce providing usurious loans including the agreements at issue **[\*66]** here. Dkt. No. 149 at 1-3. Defendants contest three main elements of Plaintiff's primary RICO claim: whether Funderz is a RICO "enterprise," whether the SMA agreements are usurious loans, and whether Isaacoff had the requisite scienter. Dkt. Nos. 153, 162.

## 1. RICO "Person" and "Enterprise"

Plaintiffs argue that Isaacoff can be liable under RICO for managing the affairs of Funderz, a RICO "enterprise." Dkt. No. 149 at 21-23. Defendants argue that "[b]ecause the 'enterprise' alleged by Plaintiffs is a collection of Funderz and its employees carrying on its regular affairs, the distinctness requirement cannot be met." Dkt. No. 162 at 5-7. Defendants additionally argue that Plaintiffs fail to establish a RICO enterprise that is distinct from the alleged unlawful activity. Dkt. No. 162 at 8-9.

Plaintiffs allege a distinct RICO "person" and "enterprise." The RICO "person" that Plaintiffs seek to hold liable is Isaacoff. Dkt. No. 145; *see* Amended Compl. ¶ 129. The "enterprise" is Funderz.[31] Isaacoff has "all decision making authority with respect to Funderz," JSMF ¶ 15, but it is undisputed that Funderz is more than merely another name for Isaacoff. Funderz is a New York LLC, a "distinct legal **[\*67]** entity" from Isaacoff. *Cedric Kushner, 533 U.S. at 165*; *see* JSMF ¶ 1. Funderz has its own accounting ledgers and bank accounts. DSMF ¶ 14. It has "agents and brokers," including at all relevant times Isaacoff's brother Gabe. DSMF ¶¶ 15-16.

There is no dispute of material fact as to whether Funderz constitutes an "enterprise." The statutory definition of enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4)*. Funderz fits this definition on its face because it is an LLC, and thus a legal entity. JSMF ¶ 1; *see First Cap. Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004)* ("RICO requirements are most easily satisfied when the enterprise is a formal legal entity."). Even applying the standard for an association in fact enterprise, all that is needed is "a continuing unit that functions with a common purpose." *Boyle v. United States, 556 U.S. 938, 948, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009)*. Funderz was a corporation which set up bank accounts and contracted with agents for the purpose

---

[31] The Amended Complaint states that the enterprise is Funderz, the Isaacovs, and the John and Jane Doe Investors. Amended Compl. ¶ 138. Plaintiffs argue on the motion for summary judgment that "Funderz is a RICO Enterprise," and do not discuss the John and Jane Doe Investors. Dkt. No. 149 at 22. In deciding whether summary judgment may be granted for Plaintiffs, the Court therefore considers Funderz to be the RICO enterprise.

of "advancing capital to small and mid-sized businesses" between 2015 and 2020. DSMF ¶¶ 7-19. This is an enterprise within the meaning of the statute.

There is also no genuine dispute of material fact as to whether Isaacoff is a person "employed by **[\*68]** or associated with" Funderz who participated in "the conduct of such enterprise's affairs." *18 U.S.C. § 1962(c)*. Isaacoff is the sole owner and member of Funderz and had "all decision making authority with respect to Funderz." JSMF ¶ 15; DSMF ¶ 11. Therefore, the undisputed facts show that Isaacoff was a person who managed the affairs of a RICO enterprise.[32]

Defendants argue that Funderz is not sufficiently distinguishable from Isaacoff or from its purportedly illegal activities to constitute a RICO enterprise. Dkt. No. 162 at 5-9. The previous decision in this case rejected Defendants' arguments based on Supreme Court precedent. *See* Dkt. No. 140 at 27-30. It noted that under *Cedric Kushner*, RICO's distinctness requirement is met when the RICO "person" is the sole shareholder of a closely held corporation which constitutes the RICO "enterprise." *Id.* at 28 (citing *533 U.S. at 160*). This situation is distinguishable from one where the *company* is named as the RICO person, and the company together with its agents is named as the enterprise. *Id.* at 28-29 (citing *Cap. Merch. Servs., 632 F. Supp. 3d at 464*). Therefore, it would not violate the distinctness requirement for Isaacoff, who is a natural person, to be held liable as owner and manager of Funderz, the RICO enterprise. *Id.*

As to Defendants' **[\*69]** second argument, the opinion noted that "[t]he Supreme Court in *United States v. Turkette* expressly rejected the argument that RICO only applies to an enterprise that performs illegal acts. *Id.* at 30 (citing *452 U.S. 576, 580, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)*). At the pleading stage, Plaintiffs adequately alleged that Funderz, the Isaacoffs, and the John and Jane Doe investors formed an organized enterprise. *Id.* at 30.

The reasoning of this opinion is cogent and remains entirely applicable to the facts introduced on summary judgment. Consistent with the statutory purpose of protecting the public from "high-ranking individuals in an illegitimate criminal enterprise" an individual may be held civilly liable under RICO, just as he may be held criminally liable, for managing an enterprise which he owns or controls. *Cedric Kushner, 533 U.S. at 165*. The undisputed facts have shown that Isaacoff is the sole owner and member of Funderz and had "all decision making authority with respect to Funderz." JSMF ¶ 15; DSMF ¶ 11. The holding of *Cedric Kushner*, that *Section 1962(c)* "applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner," is directly on point as applied to Isaacoff and Funderz. *Id.* at 166.

Similarly, it is no issue that the entire business of **[\*70]** Funderz, according to Plaintiffs, was to make usurious loans. It would be perverse if the defendant could escape liability on the basis that the enterprise he controls only participates in criminal activity, and the Supreme Court has rejected this argument. *See Turkette, 452 U.S. at 581*. It is true that proof of the unlawful activity is not sufficient to establish existence of the enterprise. *Boyle, 556 U.S. at 947*. Here, however, Plaintiffs have not shown only isolated purportedly criminal transactions. The undisputed facts establish an underlying LLC connected to each transaction which does business through bank accounts and multiple agents and brokers. This is more than sufficient to show an enterprise.

### 2. Collection of Unlawful Debt

---

[32] Defendants do not dispute that Funderz also meets the statutory requirement of being engaged in interstate or foreign commerce. Funderz is a New York LLC, JSMF ¶ 1, and Gabe worked out of a New York office when representing Funderz on the agreements with FTE, a company headquartered in Florida. JSMF ¶¶ 31-33, 48; PSMF ¶ 206. Isaacoff lived in Florida during the time of the relevant agreements. PSMF ¶ 230. Funderz admittedly did business with merchants in states other than New York. Dkt. No. 160 ¶ 121. As part of the transactions discussed in this case, there were ACH credits and debits between FTE's bank account in Richmond, Virginia and Funderz's New York bank account or a bank account in Florida. PSMF ¶ 234. These facts are not disputed by Defendants, *see* Dkt. No. 160 ¶¶ 121, 204-208, and are sufficient to show a "minimal effect on interstate commerce." *DeFalco, 244 F.3d at 309*.

To prove collection of an unlawful debt within the meaning of the RICO statute, a defendant must show that "[1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with "the business of lending money ... at a [usurious] rate," and [3] the usurious rate was at least twice the enforceable rate." *Durante Bros, 755 F.2d at 248*. New York's criminal usury statute, *Penal Law § 190.40*, states that a person is guilty of criminal usury when . . . he knowingly charges, **[\*71]** takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum." *N.Y. Penal Law § 190.40*. Violation of the statute makes a debt unenforceable, as it leads to "complete invalidity of the loan instrument." *Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612, 621 (2021)*; *see N.Y. General Obligations Law § 5-511*.[33]

"Usury laws apply only to loans or forbearances, not investments." *Seidel, 598 N.E.2d at 11*. Defendants do not dispute that the SMAs would have a rate of interest above 50% per annum if characterized as loans,[34] but contend that they are purchases of future receivables, not loans. Dkt. No. 162 at 9-15; Dkt. No. 154 at 12-17; Dkt. No. 165 at 3-5.

When determining whether a transaction is a loan, a court must look to "substance—not form." *Adar Bays, 179 N.E.3d at 622*; *see Abir v. Malky, Inc., 59 A.D.3d 646, 649, 873 N.Y.S.2d 350 (2d Dep't 2009)* (transaction must be "considered in totality and judged by its real character" (quoting *Ujueta v. Euro-Quest Corp., 29 A.D.3d 895, 814 N.Y.S.2d 551, 552 (2d Dep't 2006)*)). "The root of the analysis is the transfer of risk." *Endico Potatoes Inc. v. CIT Group/Factoring Inc., 67 F.3d 1063, 1069 (2d Cir. 1995)*; *see Adar Bays, 179 N.E.3d at 622* ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders, not investors."). "The hallmark of a loan is that the lender 'is absolutely entitled to repayment under all circumstances,' or put otherwise, the 'principal sum is repayable absolutely.'" **[\*72]** *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, \*9 (S.D.N.Y. June 6, 2022)* (quoting *LG Funding, LLC v. United Senior Props. of Olathe, LLC, 181 A.D.3d 664, 122 N.Y.S.3d 309, 312 (2d Dep't 2020)*); *see Lateral Recovery LLC v. Queen Funding, LLC, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at \*4 (S.D.N.Y. July 20, 2022)*; *Colonial Funding Network, Inc. for TVT Cap., LLC v. Epazz, Inc., 252 F. Supp. 3d 274, 281 (S.D.N.Y. 2017)*. On the other hand, when repayment depends on the success or failure of the business, the transaction is not a loan because the creditor takes on the market risk. *See OriginClear Inc. v. GTR Source, LLC, 2021 U.S. Dist. LEXIS 239013, 2021 WL 5907878, at \*5 (W.D.N.Y. Dec. 14, 2021)*.

Under New York law, courts usually examine three factors in determining whether a transaction is a loan: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC, 2023 U.S. App. LEXIS 14241, 2023 WL 3882697, at \*2 (2d Cir. June 8, 2023)* (quoting *Principis Cap., LLC v. I Do, Inc., 201 A.D.3d 752, 160 N.Y.S.3d 325, 326-27 (2d Dep't 2022)*). These three factors provide "a guide to analysis," but the presence or absence of any one factor is not dispositive. *Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at \*9*. "Rather, the essential question under New York law is whether the contracting party 'is absolutely entitled to repayment under all circumstances.'" *Id.* (quoting *LG Funding, 122 N.Y.S.3d at 312*).

The Court must evaluate the relevant factors with regard to the six agreements at issue here.[35] The first four agreements ("October Agreements") have materially similar terms and may be evaluated together. These

---

[33] Usury is a crime on the part of the lender, not the borrower, and the debtor is "not *in pari delicto* with the usurer." *Hammelburger v. Foursome Inn Corp., 54 N.Y.2d 580, 431 N.E.2d 278, 284, 446 N.Y.S.2d 917 (1981)*. Defendants' attempt to assert an *in pari delicto* defense is therefore misplaced. Dkt. No. 162 at 20.

[34] Defendants do assert that the Third HOP Agreement is not subject to the usury law because that law does not apply to agreements of $2.5 million or more. Dkt. No. 162 at 15. This issue is discussed further below.

[35] Defendants suggest that "[b]ecause the November agreements paid off the amounts due and owing under the October agreements, . . . the only relevant agreements are the two November agreements," and cite to authority stating that "a

agreements are unambiguously loans. The last two agreements ("November Agreements") have materially similar terms to each other, but materially different terms to the October Agreements. The November Agreements **[\*73]** are not unambiguously usurious, and the relevant extrinsic evidence creates a genuine issue of material fact preventing summary judgment for either party.

### a. October Agreements

The first *Fleetwood Services* factor is the existence of a reconciliation provision. The crucial question in evaluating a reconciliation provision is whether it shifts risk to the buyer. In a true transaction for receivables, the buyer purchases a portion or percentage of the seller's future accounts. The buyer then "bears the risk of loss if receivables are not paid." *Queen Funding, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at \*5*. Regular payments may be due as an estimate of the seller's receivables, but if the seller has "less-than-expected or no revenues" a reconciliation provision should entitle the seller to a reduction in payments. *LG Funding, 122 N.Y.S.3d at 313*. If there is no opportunity for reconciliation, and payment is due "*irrespective* of [the seller's] accounts receivable," the buyer "faces no downside whatsoever aside from the risk that the borrower will fail to make the required payments," and the transaction "is in fact a loan." *Pro. Merch. Advance Cap., LLC v. C Care Servs., LLC, 2015 U.S. Dist. LEXIS 92035, 2015 WL 4392081, at \*4 (S.D.N.Y. July 15, 2015)*; *see also OriginClear Inc., 2021 U.S. Dist. LEXIS 239013, 2021 WL 5907878, at \*5* ("focusing on a reconciliation provision often allows a court to determine the risk to the funding company, and therefore, whether the **[\*74]** transaction is really a loan").

When a nominal reconciliation provision does not actually shift risk to the buyer, this "sham" reconciliation provision will not allow the transaction to escape the reach of the usury statute. *See Queen Funding, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at \*5*. A provision which places the reconciliation decision within the "sole discretion" of the buyer is a sham, because it does not alter the seller's absolute obligation to repay. *LG Funding, 122 N.Y.S.3d at 312*; *see New Y-Capp v. Arch Cap. Funding, LLC, 2022 U.S. Dist. LEXIS 180309, 2022 WL 4813962, at \*5 (S.D.N.Y. Sept. 30, 2022)*. By contrast, a reconciliation provision is not illusory when the buyer has "a clear contractual duty to modify the debited withdraw amounts to comply with the agreed upon specified percentage," such that failing to do so "would constitute a breach of contract." *OriginClear Inc., 2021 U.S. Dist. LEXIS 239013, 2021 WL 5907878, at \*6*; *see Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc., 2019 U.S. Dist. LEXIS 57527, 2019 WL 1473090, at \*5* ("The reconciliation clause provides that reconciliation is automatic, mandatory, and that there is no discretion for Plaintiff. There is no minimum payment, so if Defendants' accounts receivables were $0, then Plaintiff would receive $0.") (E.D.N.Y. Apr. 3, 2019).

The reconciliation provision in the October Agreements states that "[U]pon the Merchant's request and receipt of the Merchant's monthly bank statements, BMF shall on or about the eighteenth day of each month reconcile the Merchant's account by either crediting **[\*75]** or debiting the difference between the amount debited and the Specified Percentage." First BMF Agreement at 3. But the Addendum, which governs in case of conflict, states that:

> At the Merchant's option, within five (5) business following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby Business Merchant Funding may ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage. However, in order to effectuate this reconciliation, upon submitting the request for reconciliation to Business Merchant Funding . . . the Merchant must produce any and all evidence and documentation requested by Business Merchant Funding in its sole and absolute discretion, necessary to identify the appropriate amount of the Specified Percentage. . . .

---

subsequent contract regarding the same matter will supersede the prior contract." Dkt. No. 154 at 13 n.1. This authority is inapposite. Each contract is separately actionable under RICO, because the purported collection of unlawful debt occurred under each contract. Thus, under Plaintiffs' theory, RICO violations under those contracts would be complete. If anything, subsequent transactions may impact the quantum of RICO damages, *see generally Fleetwood Servs., LLC v. Ram Cap. Funding, LLC, 2022 U.S. Dist. LEXIS 148032, 2022 WL 3536128, at \*4-7 (S.D.N.Y. Aug. 17, 2022)*, but would not cure RICO violations that have already occurred.

> The Merchant specifically acknowledges that: (i) the Daily Payment and the potential reconciliation discussed above are being provided to the Merchant as a courtesy, and that Business Merchant Funding is under no obligation to provide the same.

*Id.* at 10. This reconciliation provision is clearly discretionary, as it explicitly states that reconciliation [*76] is "a courtesy" which BMF "is under no obligation to provide." *Id.*

Plaintiffs argue that the Addendum, which is clearly discretionary, "controls as a matter of law." Dkt. No. 163 at 5. Funderz argues that "the second provision does not conflict with the first provision." Dkt. No. 162 at 11. Rather, the provisions provide "two opportunities" for the merchant to request the reconciliation, and that Funderz is "required to reconcile on the eighteenth day of the month if a request is made" regardless of what happens with the discretionary request made by the fifth business day of the month. *Id.*

The Court need not decide which provision controls, because neither provision is sufficient to meaningfully shift risk to the buyer. In *Fleetwood Services*, the Second Circuit evaluated a reconciliation provision with nearly identical terms, namely that:

> RCF will debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the specified percentage. [*77]

*Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207 at *13*, aff'd, *2023 U.S. App. LEXIS 14241, 2023 WL 3882697*. The Second Circuit stated that this "nominal reconciliation provision does not, in fact, relieve [the borrower] of its obligation to pay [the lender] the daily amount due under the Agreement, nor does it qualify [the borrower's] rights to declare the full amount immediately due and payable and to collect against [the lender]." *Fleetwood Servs., 2023 U.S. App. LEXIS 14241, 2023 WL 3882697, at *2*. In other words, there were two issues with the provision which, in combination with each other and the remainder of the transaction, made it ineffective. First, the reconciliation provision could only be invoked on a monthly basis, while the merchant's account was debited daily in an unchangeable amount. Second, pursuant to other terms of the agreement the lender could declare a default based on a small number of missed daily payments, even if at the end of the month it turned out that those payments had overestimated the merchant's receivables. *See Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *14*. It does not matter if the merchant may nominally reconcile at the end of the month, because if its business takes a downturn it will be unable to make the daily payments and likely default before it reaches the end of the month.

The same is true here. Even assuming accounts can be reconciled at the end [*78] of each month, the agreements provide no way to adjust the daily payment except in Funderz's "sole discretion." First BMF Agreement at 3. Appendix A to the agreement specifically states that a non-sufficient funds fee will be charged "[u]p to TWO TIMES ONLY before a default is declared." *Id.* at 9. Therefore, if FTE's receivables took a downturn, it would continue to be responsible for the same daily payments, and if it was unable to make the payments Funderz would be able to declare a default at any time.[36] This shifts no meaningful risk to Funderz.

---

[36] Funderz suggests that "[t]he Agreements did not specifically provide that an 'event of default' occurs after a few missed payments," implying that the merchant might be able to escape default long enough to invoke the reconciliation provision. Dkt. No. 162 at 12 n.10. Initially, this argument appears to be largely foreclosed by *Fleetwood Services*, which interpreting a materially similar contract stated that the reconciliation provision did not "relieve [the merchant] of its "obligation to pay [the lender] the daily amount due under the Agreement." *2023 U.S. App. LEXIS 14241, 2023 WL 3882697, at *2*. Under the SMAs, violation of "any term or covenant" is an event of default. *See* First BMF Agreement § 3.1; Third BMF Agreement § 3.1. Therefore, assuming the merchant had an obligation to pay the daily amount, failure to do so would result in default. To the extent that this is ambiguous, as to the first four agreements any ambiguity is resolved by the language in the Appendix explicitly stating a default will be declared after two missed payments.

The second *Fleetwood Services* factor is whether the agreement has a finite term. "A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk associated with the receivables not being collectable." *Queen Funding, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *6*. The first four agreements have a stated term of one year, automatically renewed until the full amount is paid. First BMF Agreement at 4. However, this term carries little weight. When an agreement involves unchangeable daily payments regardless of the merchant's receivables, the loan has "a de facto fixed term . . . easily calculated **[*79]** by dividing the amount [the borrower] owes by the amount of daily payments." *Id.; see CMS, 632 F. Supp. 3d at 462* ("[I]f the reconciliation is unavailable, [and] the daily payment amount would never change, . . . the agreement would have a finite term."). As described above, the October Agreements provide no mechanism for FTE to change the daily payments. Therefore, the de facto actual term of the loan is the number of days it will take to reach the Purchased Amount, given the daily payment amount. As reflected in the Funderzlink printout, this term is between 49 and 65 days, depending on the agreement. *See* Dkt. No. 146-21. If FTE does not pay the loan within this time, it will almost inevitably be in default.

Funderz note that, in fact, the Purchased Amount sometimes took longer to repay than "initially contemplated." Dkt. No. 154 at 16; Dkt. No. 162 at 13. This does not necessarily weigh against the agreements being loans. The holder of a loan can allow a borrower to miss payments or restructure the payment schedule *in its discretion*, but this does not mean the holder bears risk or that the transaction is not a loan.[37] The question is whether the holder has an obligation to extend the repayment time if the merchant's **[*80]** receivables are insufficient. Even assuming that reconciliation here is governed by the mandatory provision, the holder's obligation to extend the repayment time is so limited as to be illusory. If the merchant invokes the reconciliation provision for a prior month and receives a refund of some part of its payments, the overall time to pay could be extended. However, as described above, the merchant would almost inevitably be in default before being able to invoke the provision. Moreover, because the daily payment amount would remain the same, the loan would become due again quickly rather than being extended indefinitely due to the Merchant's decrease in revenues. The term is fixed as a practical matter by the relationship between the daily payment and Purchased Amount, and Funderz's internal records suggest that this is how it was regarded. *See* Dkt. No. 146-21.

The third *Fleetwood Services* factor is recourse in case of bankruptcy. In a purchase of receivables, the buyer would generally bear the risk of the seller going bankrupt and having no further receivables. *See CMS, 632 F. Supp. 3d at 460-461* ("The merchant can close without owing the funder anything."). "This is in contrast to a lender, who may still **[*81]** have a claim against the merchant for amounts unpaid notwithstanding cessation of operations." *Id. at 460 n.7*.

In the October Agreements FTE bears the entire risk of bankruptcy. Bankruptcy is an Event of Default, as is the merchant seeking "reorganization, arrangement, adjustment, or composition of it or its debts." First BMF Agreement at 5. The dissolution or suspension of the business, or the sale of all or substantially all of its assets, is also an Event of Default, and makes the entire Purchased Amount come due. *Id.* Funderz can also recover from the guarantors in the event of bankruptcy. *Id.* at 6. These protections are fundamentally inconsistent with the idea that Funderz bears the risk of a downturn in FTE's business, and suggest a loan.

All three *Fleetwood Services* factors indicate that Funderz did not take on risk. Numerous other aspects of the agreement also suggest that the October Agreements were loans, not purchases of receivables. The agreements were underwritten based on the merchant's creditworthiness, not the creditworthiness of any account debtor. JSMF ¶ 42. The agreements purported to be for 10% of FTE's receivables, but no specific receivables were identified and the agreement in **[*82]** fact gave Funderz the right to "all of Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from Merchant's customers . . . as a result of Merchant's sale of goods or services." First BMF Agreement at 3. Moreover, the agreement made clear that FTE "is

---

[37] Similarly, representations by Isaacoff and Funderz that they would work with merchants or pause payments if the merchant was struggling are not necessarily inconsistent with the transactions being loans. *See* JSMF ¶¶ 129-130; Dkt. No. 146-5 at 18:21-19:5. To the extent that Funderz portrays the decision to give such relief as discretionary, *see* Dkt. No. 146-5 at 20:17-20, this in fact supports the transactions being loans.

responsible for ensuring that the specified percentage to be debited by BMF remains in the account and will be held responsible for any fees incurred by BMF resulting from a rejected ACH attempt." First BMF Agreement at 3. Read in tandem, these two provisions suggest that the agreement was aimed at taking money from FTE's account generally, not specifically collecting on receivables.

Perhaps most critically, comparison of the six agreements makes Funderz's characterization of the daily payment as a "good faith estimate" of 10% of FTE's receivables entirely unsustainable. DSMF ¶ 40; JSMF ¶¶ 94, 96. As noted in the previous opinion in this case, *see* Dkt. No. 140 at 23-24, the daily payment varied from $9,999 to $69,999 on agreements signed between October 15, 2018, and November 9, 2018. *Compare* First BMF Agreement *with* Third HOP Agreement. It is not tenable that FTE's receivables **[*83]** increased sevenfold in less than a month, especially at a time when the company was undisputably highly troubled. Even if it were possible to claim a sudden increase in revenue or a mistake in the earlier valuation, "estimates" of $14,999 and $39,999 were made in agreements signed *on the same day. Compare* Second BMF Agreement *with* Second HOP Agreement. The daily amount was not a good faith estimate of FTE's receivables. The only consistency in the daily payment amount is that it increased as the Purchased Amount increased. This is consistent with a loan to be repaid over a fixed period, not a purchase of receivables.

The October Agreements were unambiguously loans.

### b. November Agreements

The November Agreements are less straightforward. Taken in isolation and on its face, each November agreement is plausibly a genuine purchase of receivables. However, Plaintiffs introduce significant extrinsic evidence supporting an inference that the apparent purchase is merely a guise for continued usurious lending. This raises a material issue of fact as to whether the November Agreements were a cover for usury, precluding summary judgment for either party.

The appearance that a transaction is lawful **[*84]** on its face is relevant to a usury claim, but not dispositive. New York courts have distinguished between two types of usury claims: those in which "the nature of the transaction establishes the excessive charge," and those in which "the transaction on its face appears legal or is ambiguous." *Freitas v. Geddes Sav. & Loan Ass'n, 63 N.Y.2d 254, 471 N.E.2d 437, 446, 481 N.Y.S.2d 665 (1984)* (Simons, J., dissenting).[38] In the former case, there is no need for extrinsic evidence. In the latter case, however, "extrinsic evidence is necessary." *Id.*; *see Meaker v. Fiero, 145 N.Y. 165, 39 N.E. 714, 715 (N.Y. 1895)* ("The contract may be illegal in its nature, or may be shown to be so by extrinsic facts."). A court is not prevented from relying on such of the allegation is that the contract itself is merely cover for an underlying illegal agreement. *Aaron v. Mattikow, 146 F. Supp. 2d 263, 267 (E.D.N.Y. 2001)* ("[T]he parol evidence rule does not pertain to the defense of usury because . . . the Court's role is to uncover the true nature of the transaction."); *Von Haus v. Soule, 146 A.D. 731, 131 N.Y.S. 512, 513-14 (1st Dep't 1911)* ("[Parol evidence may be given to show that the transaction is tainted with usury, notwithstanding the fact that the writing would indicate that it was lawful."); *Stransky v. DiPalma, 137 A.D.3d 1734, 28 N.Y.S.3d 548, 549 (4th Dep't 2016)* (rejecting application of the parol evidence rule to an allegedly usurious agreement). This principle is related to the general rule that "[t]he parol evidence rule does not preclude the **[*85]** admission of evidence to show that an unambiguous contract is illegal." *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V., 28 F. Supp. 2d 126, 139 (S.D.N.Y. 1998)*, *aff'd*, 205 F.3d 1323 (2d Cir. 1999), and *aff'd*, 205 F.3d 1323 (2d Cir. 1999). "If a different rule prevailed, parties to illegal contracts could make them enforceable by the simple device of putting them in writing, using such words as would conceal or omit the illegal objects intended by them to be accomplished." *97 Fifth Ave. Corp. v. Schatzberg, 283 A.D. 407, 128 N.Y.S.2d 264, 266 (1st Dep't*

---

[38] *Freitas* concerned the standard for civil usury under *Banking Law § 380-e*. *See 471 N.E.2d at 441*. In declining to adopt the standard for criminal usury in the civil context, the majority opinion noted that Justice Simons' dissent "is akin to the standard utilized by New York's criminal usury statutes." *Id. at 444*. Based on this statement, the Second Circuit has relied on Justice Simons' dissent as an accurate statement of New York law applicable to criminal usury. *See United States v. Grote, 961 F.3d 105, 109 n.4 (2d Cir. 2020)*.

*1954)*; *see Stransky, 28 N.Y.S.3d at 549*. Here, if Funderz and FTE in fact agreed to a loan at usurious interest, writing down the transaction in a manner consistent with a sale of receivables would not defeat a usury claim. Both the agreement itself and the external facts are relevant to the determination of whether Funderz loaned monies to FTE at a usurious rate of interest. evidence by the parol evidence rule or other similar doctrines of contract law, because the nature

When usury is not clear from the face of a written agreement, "questions of usurious intent and whether a transaction is a 'cover for usury' are typically 'question[s] of fact.'" *Adar Bays, 179 N.E.3d at 625* (quoting *Hammelburger v. Foursome Inn Corp., 54 N.Y.2d 580, 431 N.E.2d 278, 284, 446 N.Y.S.2d 917 (1981)*). One party will argue that the agreement was intended as the writing suggests, and the other party will produce evidence that the writing was a cover for usury, creating an issue of fact for the jury. The November Agreements **[*86]** follow this pattern.

Summary judgment cannot be granted for Plaintiffs because each November Agreement facially "appears legal or is ambiguous." *Freitas, 471 N.E.2d at 446* (Simons, J., dissenting). The November Agreements change relevant provisions of the October Agreements in ways that make each transaction on their face a genuine purchase of receivables. In place of a reconciliation provision that allows a refund at the end of the month, the November Agreements contain provisions allowing adjustment to the daily payment (now termed the "Remittance").[39] Third BMF Agreement at 3-4. Initially, the agreement states that the remittance is set based on "the daily average revenues of Seller." *Id.* at 3. Subsequently, the remittance is "subject to adjustment." *Id.*

> [E]very two (2) calendar weeks . . . Merchant may give notice to BMF to request a decrease in the Remittance. The amount shall be decreased if the amount received by BMF was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the **[*87]** number of business days in the previous (2) calendar weeks. . . At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page l of this Agreement.

*Id.* at 4. Applied literally, this provision solves the issues with the previous agreements. The provision allows for adjustment of the daily amount. If FTE's business slows down and the daily amount becomes more than 10% of FTE's receivables, the amount can be lowered based on FTE's actual receipts. This shifts the risk of business downturn to Funderz. The adjustment provision appears to be mandatory, stating that if the Merchant gives notice and the amount is higher than the Purchased Percentage, the Remittance "shall" be modified. *Id.*[40]

The November Agreements change the term of the agreement from one year to a stated indefinite term. *See* Third BMF Agreement § 1.2. The adjustment provision supports this stated term, because if invoked it would allow FTE to slow down payments indefinitely. *See US Info. Grp. LLC v. EBF Holdings, LLC, 2023 U.S. Dist. LEXIS 169605, 2023 WL 6198803, *8 (S.D.N.Y. Sept. 22, 2023)*. The November Agreements remove bankruptcy as an Event of Default and a condition that allows **[*88]** Funderz to recover from the guarantors. JSMF ¶ 100; *see* Third BMF

---

[39] The previous decision in this case noted that this is an adjustment provision, rather than a reconciliation provision, and therefore the November Agreements "lack reconciliation provisions." Dkt. No. 140 at 21. The parties dispute this labeling, *see* Dkt. No. 162 at 10 n.8; Dkt. No. 163 at 4, but the terminology is not material. The issue is not whether the provisions are labeled reconciliation provisions or adjustment provisions, but whether they shift risk. It is relevant to the shifting of risk that there is no apparent mechanism for FTE to receive a refund for any overpayment in the November Agreements, as opposed to a change in the remittance going forward. However, the adjustment provision much more substantially shifts the risk in the opposite direction as detailed *infra*.

[40] The previous decision in this case described these provisions as "discretionary." Dkt. No. 140 at 18-19. The provision is discretionary in the sense that the Merchant need not request an adjustment, and if it is not requested Funderz is not required to provide it. However, if the adjustment is requested, the agreement states it shall be provided.

Agreement at 7. The agreements even remove the comment in the Appendix stating that the insufficient funds fee will only be charged twice before default is declared. Third BMF Agreement at 9.

These changes allow the November Agreements to be read as genuine contracts for the purchase of receivables. On its face, each agreement sets the daily payment based on an actual estimate of FTE's revenue that can change over time. If the business slows down FTE will be able to decrease the payment, and this adjustment means that the agreement has no definite term. Funderz will bear the risk that FTE goes out of business and is unable to pay.

Defendants also produce some extrinsic evidence supporting this interpretation. Although Funderz's corporate representative makes clear that there is not a standard, formalized, reconciliation process, she states that the broker would "look at the bank statements to see whether they had any decline in revenues," whether "they don't have healthy deposits," or whether they have "low receivables or no receivables." Dkt. No. 146-5 at 19:19-20:10. This testimony is consistent with the existence of **[\*89]** some sort of reconciliation process. Similarly, Isaacoff testified that the daily amount was set "based on his receivables" and "what the merchant agrees that he can afford," and that issues with this number in the case of FTE could have been based on fraud by FTE's principals. Isaacoff Dep. at 54:21-55:12; *see also* Isaacoff Decl. ¶ 24 ("Requests for modification were routinely and normally approved if the merchant's documents support the modification.").

At the same time, summary judgment cannot be granted for Defendants because Plaintiffs produce significant evidence suggesting that these facial changes were merely a disguise for continued usurious lending. Although the November Agreements explicitly state that the Initial Remittance is set based on "the daily average revenues of Seller," Third BMF Agreement at 3, a jury could readily find from the evidence discussed above that this is a sham. Taking the agreements as true leads to the highly improbable conclusion that Funderz's "good faith" estimate of FTE's daily receivables was $387,240 on November 8, 2018 (Third BMF Agreement) and $699,990 on November 8 or 9, 2018 (Third HOP Agreement). *See* Dkt. No. 140 at 23-24. If the Initial **[\*90]** Remittance was not a good faith estimate of receivables, this also supports an inference that the adjustment provision aimed at the same Remittance was not genuine. Funderz's corporate representative concedes that she is unaware of a reconciliation department or any reconciliation policies, and portrays any payment adjustments as dependent on the discretion of the broker, stating uncertainty as to whether such an adjustment could be required under the contract. Dkt. No. 146-5 at 18-22:13. Similarly, Gabe stated he could not recall ever refunding money pursuant to a reconciliation provision. Gabe Deposition at 199:5-21. This testimony is consistent with an inference that the provision was a sham.

FTE's failure to attempt to use the reconciliation provision further supports this inference. FTE was financially distressed from the start of these transactions, *see* Dkt. No. 146-16, and at least at some points did not make payments on the Third HOP Agreement at all. JSMF ¶ 126; *see* Dkt. No. 146-37. Moreover, FTE was concerned as early as December 3, 2018, with money being overdrawn from its account. Dkt. No. 147-45; *see* Dkt. No. 147-22 (additional concerns raised on January 14, 2019). But **[\*91]** FTE continued to make daily payments through March 15, 2019, without attempting to invoke the reconciliation provision. This suggests that FTE did not believe the provision was operative or that a change had occurred from the prior agreements.

Some aspects of the contracts themselves also support reading the risk-shifting provisions as illusory. The November Agreements still make breach of any term or condition an Event of Default, and specifically state that it will be an event of default if "Merchant shall enter into any financing agreements with any other party, including but not limited to: Loans, Merchant Cash Advances . . . ." Third BMF Agreement at § 3.1. They also require the Merchant to warrant that it has unencumbered title to all receipts. *Id.* § 2.10. However, as noted by Plaintiffs, FTE's bank account records from October support an inference that Plaintiff had preexisting agreements with a number of other MCA companies or similar entities, with daily debits from entities with names like Queen Funding, Green Capital, Capital Merchant Services, Argus Capital, and Franklin Funding. *Id.* ¶ 44; Dkt. No. 146-16. Therefore, Plaintiffs make a plausible argument that FTE was in default **[\*92]** from the beginning of the agreement. If so, then

both parties would have understood at the time of contracting that Funderz could declare default at any time if FTE attempted to assert its reconciliation rights, making that provision meaningless in practice.[41]

These agreements are also ambiguous as to whether missing a single payment or small number of payments would be an Event of Default. The initial transaction description states that BMF will bear the risk of the merchant "going bankrupt or going out of business, or experiencing a slowdown in business." Third BMF Agreement at 3. However, it is not clear how to square this language with the fact that the provision stating that "Merchant is responsible for ensuring that the Agreed Remittance to be debited by BMF remains in the account," the fact that a breach of any term or condition is a default, and Isaacoff's testimony that missing one payment would be a default. *Id.* at 3; JSMF ¶¶ 129-130. In case of a sudden downturn, FTE would still be obligated to make the payments for two weeks under the reconciliation provision in the November Agreements. Therefore, if a default could be declared after one or two days, the reconciliation provision **[*93]** could be largely illusory. It is notable that the daily payment amounts implied that the agreements here would be repaid in approximately two months, with the short term creating "a corresponding likelihood that the merchant's need for reconciliation might be urgent." *Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F. Supp. 3d 237, 248 (S.D.N.Y. 2022)*. If the merchant is certain to default in case of a downturn in business, the other protections in the agreement are irrelevant. *See In re GMI Grp., Inc., 606 B.R. 467, 487 (Bankr. N.D. Ga. 2019)* (finding the existence of a loan when, despite other factors indicating a purchase of receivables, "all of the protections . . . require that the Debtor not be in default" and "the Agreement contains a certainty of default").

Drawing all inferences in favor of Plaintiffs, a factfinder could infer that despite facial changes in the November Agreements, the actual agreement between the parties was akin to the previous four usurious loans. Drawing all inferences in favor of Defendants, a factfinder could infer that although the first four agreements were loans, in the November Agreements Funderz genuinely purchased a portion of FTE's receivables. Therefore, neither party is entitled to summary judgment on the issue of whether the November Agreements were cover for usurious loans.

### c. The Third [*94] HOP Agreement

However, Defendants additionally argue that the Third HOP Agreement is exempt from the usury law because it is for a sum of $2.5 million or more. Dkt. No. 154 at 13. Defendants are correct, and summary judgment must be granted in their favor on this agreement.

*New York General Obligations Law § 5-501(6)(b)* states that "[n]o law regulating the maximum rate of interest which may be charged, taken or received, including *section 190.40* and *section 190.42 of the penal law*, shall apply to any loan or forbearance in the amount of two million five hundred thousand dollars or more." *N.Y. General Obligations Law § 5-501(6)(b)*; *see Adar Bays, 179 N.E.3d at 619*. The Third HOP Agreement on its face states that that HOP purchased 10% of FTE's future receivables, listing a purchase price of $2,750,000. Third HOP Agreement at 3. Therefore, it is exempt from the usury law.

Plaintiffs argue that the $2,250,000 of this loan which was used as repayment of the prior loan should not be counted, noting that the amount in fact paid to FTE (after fees) was only $300,000. Dkt. No. 158 at 16. This argument is not economically sound. A dollar of forgiven debt is equivalent to a dollar in hand. Funderz could have paid the full $2,750,000 into FTE's bank account and had FTE pay back $2,250,000 on the outstanding loan—this would not have changed the character **[*95]** of the transaction.

---

[41] The reconciliation provision also places hurdles in the way of FTE exercising the right to adjust, including the need to "provide all information reasonably requested by [Funderz] to properly calculate the Merchant's Remittance," and to renew this request every two weeks on pain of the remittance returning to the daily amount. Third BMF Agreement at 4. These hurdles may potentially provide Funderz with "pretext for denying reconciliation." *Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022)*.

Plaintiffs also argue that in this particular situation, the repayment of the prior HOP loan should not be considered because the prior HOP loans were void ab initio. Dkt. No. 158 at 16. There is some logic to the idea that if Plaintiffs did not in fact owe anything to Defendants under the prior agreements, the purported loan forgiveness was illusory and should not count towards the usury cap. The argument also illuminates the issues created when a usurious lender can repeatedly stack loans on loans until the borrower is so far in debt that the money purportedly being "advanced" exceeds the usury threshold. Nevertheless, *N.Y. General Obligations Law § 5-501(6)(b)* sets a bright-line rule allowing borrowers and lenders to structure their conduct, and courts have rejected attempts to look through the face amount to determine the amount actually advanced. *See Alleon Cap. Partners, LLC v. Choudhry, 225 A.D.3d 578, 207 N.Y.S.3d 532 (2d Dep't 2024)* (rejecting usury claim when the stated amount was over $2.5 million, but only about $2.36 million was advanced after costs and fees); *SpecFin Mgmt. LLC v. Elhadidy, 201 A.D.3d 31, 158 N.Y.S.3d 366, 369-75 (3d Dep't 2021)* (agreement to provide "up to $2,500,000 in funding" fell within exemption); *Tides Edge Corp. v. Cent. Fed. Sav., F.S.B., 151 A.D.2d 741, 542 N.Y.S.2d 763, 764-65 (2d Dep't 1989)* (agreement to loan $4.25 million fell within exemption, even though amount actually advanced was less than $1 million).[42] The amount Funderz agreed **[*96]** to provide was over $2.5 million, so the transaction is exempt from the usury law.[43]

To summarize, summary judgment on the issue of whether the transaction is a usurious loan is granted for Defendants as to the Third HOP Agreement, for Plaintiffs as to the First and Second HOP and BMF Agreements, and for neither party as to the Third BMF Agreement.

### 3. Mens Rea

In *United States v. Biasucci*, the Second Circuit squarely stated that "RICO imposes no additional mens rea requirement beyond that found in the predicate crimes." *786 F.2d 504, 512 (2d Cir. 1986)*. Therefore, "we look to the scienter elements found in the statutory definitions of the predicate crimes to determine the degree of knowledge that must be proved to establish a RICO violation." *Id*; *see also United States v. Boylan, 620 F.2d 359, 361 (2d Cir. 1980)*; *United States v. Scotto, 641 F.2d 47, 56 (2d Cir. 1980)* ("The law at issue here does not demand willful violations of the RICO statute, nor does it require willful violations of the predicate offenses.").[44]

Applying that rule here, the only relevant mens rea requirement for this case is the mens rea for usury under *Penal Law § 190.40*. Under that statute, "[t]he general rule is that the intent required to establish usury is the general

---

[42] Plaintiffs argue that the face amount was reduced by a "Bank Fee" and "personal service fee." Dkt. No. 158 at 16. Because those two fees totaled only $200,000, the amount of the loan would still be greater than $2.5 million.

[43] As Plaintiffs note, Defendants did not raise *General Obligations Law § 5-501(6)(b)* in their answer to the Amended Complaint. *See* Dkt. No. 147-40 at ¶¶ 190-219. Because the answering party "must affirmatively state any avoidance or affirmative defense," *Fed.R.Civ.P. 8(c)(1)*, generally, "[f]ailure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 176 (2d Cir. 2014)*. However "a district court may entertain unpleaded affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Id.* (quoting *Rose v. AmSouth Bank of Fla., 391 F.3d 63, 65 (2d Cir.2004)*). Here, Defendants have not offered a reason for failing to earlier plead the defense. However, they contest that it is an affirmative defense at all, and note that Plaintiffs are not prejudiced. Dkt. No. 165 at 4. The Court agrees that the defense is properly considered. It raises a pure question of law, and Plaintiff is not plausibly prejudiced by being unable to take discovery on the issue. The defense is decisive of the issue and does not delay proceedings. Plaintiffs have had an opportunity to respond to the defense in their summary judgment papers and have done so, Dkt. No. 158 at 16-18, which is sufficient to allow them appropriate process.

[44] Several other circuits are in accord with the *Biasucci* rule. *See United States v. Blinder, 10 F.3d 1468, 1477 (9th Cir. 1993)*; *United States v. Pepe, 747 F.2d 632, 675-76 (11th Cir. 1984)*. In addition, several circuits have come to a similar conclusion that in interpreting an analogous statute, *18 U.S.C. § 1955*, which prohibits the conduct of a gambling business which is in violation of state law. *United States v. Lawson, 677 F.3d 629, 652 (4th Cir. 2012)*; *see United States v. Ables, 167 F.3d 1021, 1031 (6th Cir.1999)*; *United States v. Cyprian, 23 F.3d 1189, 1199 (7th Cir.1994)*.

intent to act contrary to the statute, not a specific intent to commit usury." *Freitas, 471 N.E.2d at 446* (Simons, **[*97]** J., dissenting); *see Fiedler v. Darrin, 50 N.Y. 437, 443 (1872)* ("The intent which enters into and is essential to constitute usury is simply the intent to take or reserve more than [the statutory maximum] for the loan or forbearance of money."). "If usury can be gleaned from the face of an instrument, intent will be implied and usury will be found as a matter of law." *Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc., 105 A.D.3d 178, 961 N.Y.S.2d 86, 89 (1st Dep't 2013)*. However, intent is not inferred when "the transaction on its face appears legal or is ambiguous." *Freitas, 471 N.E.2d at 446* (Simons, J., dissenting); *see Fiedler, 50 N.Y. at 443* ("There are cases in which an act is lawful or unlawful, depending upon the particular intent of the actor.") In such cases, "a corrupt intent must be established" through extrinsic evidence. *Freitas, 471 N.E.2d at 446*. Importantly, given the tendency of lenders to "extract unlawful interest rates through novel and increasingly sophisticated instruments," *Adar Bays, 179 N.E.3d at 627*, it is no defense against illegality that the usurer "intended to cover up his tracks . . . and could well have sworn that he did not intend to bring himself within the condemnation of the law." *Fiedler, 50 N.Y. at 444*. If usury is not clear from the face of the loan, usurious intent is a question of fact. *See Adar Bays, 179 N.E.3d at 623*; *Apollo Cap. Corp. v. Astra Veda Corp., 2024 U.S. Dist. LEXIS 141272, 2024 WL 3729093, at *5 (S.D.N.Y. Aug. 7, 2024)*; *Haymount Urgent Care, 609 F. Supp. 3d at 247*.

As to the October Agreements, usury is clear on the face of the agreements and usurious intent is therefore implied. **[*98]** *See Giventer v. Arnow, 37 N.Y.2d 305, 333 N.E.2d 366, 369, 372 N.Y.S.2d 63 (1975)* (intent requirement is satisfied when "the note itself establishes, on its face, clear evidence of usury"); *Matter of Dane's Est., 55 A.D.2d 224, 390 N.Y.S.2d 249, 250 (3d Dep't 1976)* ("The showing, as here, that the note reserves to the lender an illegal rate of interest satisfies respondents' burden of proving a usurious loan."); *Angelo v. Brenner, 90 A.D.2d 131, 457 N.Y.S.2d 630, 631 (3d Dep't 1982)* (intent requirement was satisfied when note was usurious on its face, even though "plaintiff was not aware that the rate was usurious"). This makes sense. Isaacoff knew that Funderz was giving money to FTE that would be repaid at an interest rate of hundreds of percent annually, at a fixed term, with no meaningful risk to Funderz. The intent to enter into such an agreement is the intent to commit usury, even if that word was not used. *See Fiedler, 50 N.Y. at 443* ("It will not avail one, who deliberately fires his neighbor's house, to swear that he did not intend to commit arson; and one who deliberately and intentionally secures to himself $1,650 at the end of four months, in return for a present advance of $1,500, cannot avoid the consequences of the act by testifying that he did not intend to take usury; that is, that he intended to give the transaction a different name from that which the law gives it.").

As to the Third BMF Agreement, usury **[*99]** is not clear on the face of the agreement. Therefore, as described above, whether the transaction is cover for a usurious loan is an issue of fact which turns on the intent of the parties. Largely for the reasons already stated, Plaintiff has not conclusively shown through extrinsic evidence that the Third BMF Agreement was intended to be cover for a usurious loan. Plaintiff offers evidence showing that Isaacoff sometimes described Funderz as a "lender" or providing "loans," PSMF ¶¶ 27-29, that websites allegedly associated with Funderz described Funderz's business as "loans," or "lending," PSMF ¶¶ 4-5, 16-18, 23-26, and that a bank account application describes Funderz's business as "loans." JSMF ¶ 5. However, at other points Isaacoff has stated that Funderz purchases receivables, PSMF ¶¶ 8, 31, including on bank account applications, JSMF ¶ 11. He swears that each agreement "was not a loan nor was it intended to be construed as a loan." Isaacoff Decl. ¶ 20. These opposing statements create a factual dispute regarding whether Isaacoff understood the agreement to be a loan. Importantly, this dispute is not fundamentally about labeling. The issue is not whether Isaacoff labeled the **[*100]** transaction as a legal "purchase" or an illegal "loan." The issue is whether the intent was for the money to be absolutely repayable, such that the formal purchase of receivables was merely a cover for usury, or whether the intent was an actual purchase of receivables as suggested by the face of the contract.[45]

---

[45] Defendants suggest that they are entitled to an adverse inference as to Isaacoff's mens rea due to Defendants' claims that emails, including communications with counsel, were lost due to a change in servers. Dkt. No. 149 at 14-15. On the contrary, Isaacoff asserts a mens rea defense based on advice of counsel. Dkt. No. 154 at 19-20; *see* DSMF ¶ 37. The Court does not address these arguments at this time, as they are not material to the Court's determination of this motion for summary judgment.

Defendants argue that a higher mens rea is required. In addition to the mens rea required for usury under *Penal Law § 190.40*, Defendants argue that Plaintiff must show "that the defendant acted with specific knowledge that his conduct was unlawful." Dkt. No. 154 at 18-20; *see* Dkt. No. 162 at 16-18. The basis for Defendant's argument is the Second Circuit's decision in *United States v. Grote, 961 F.3d 105 (2d Cir. 2020)*, which he states "held" that proof of specific knowledge is required in this situation. Dkt. No. 154 at 18.

In *Grote*, the Second Circuit noted that *Biasucci* "ostensibly adopted two incompatible state-of-mind standards." *Grote, 961 F.3d at 118*. Despite holding that "RICO imposes no mental state requirement beyond that required by the predicate state statute," *Biasucci* also stated in dicta that "RICO requires proof that the defendant acted willfully." *Id. at 119*. *Grote* suggested that *Biasucci*'s holding that RICO imposes no mental state requirement is "difficult **[*101]** to reconcile" with more recent Supreme Court cases setting out a "presumption [in the interpretation of criminal statutes] in favor of a scienter requirement," applicable to "each of the statutory elements that criminalize otherwise innocent conduct." *Id. at 118-19* (quoting *Elonis v. United States, 575 U.S. 723, 737, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015)*). The difficulty is "exacerbated" because a criminal RICO offense can be based on a civil usury statute, and many civil usury statutes have no mens rea element whatsoever. *Id. at 119*. Therefore, accepting the premise that "the scienter requirement for RICO unlawful debt collection is drawn from the underlying usury statute" leads to the conclusion that "a criminal RICO violation may carry no scienter requirement at all." *United States v. Moseley, 980 F.3d 9, 19 (2d Cir. 2020)*.

The Second Circuit did not resolve this difficulty, because the facts of the case did not require it to do so. *Grote, 961 F.3d at 121*; *see Moseley, 980 F.3d at 19* (same). It stated that "we express no view on whether willfulness or awareness of unlawfulness was required for conviction." *Grote, 961 F.3d at 117*. Defendants nevertheless argue that *Grote* implies that a RICO defendant must have specific knowledge of the unlawfulness of his conduct. Dkt. No. 154 at 18-19.

The Court is not convinced that *Grote* compels this result. Initially, the Second Circuit has not overruled either *Biasucci* **[*102]** or prior decisions which articulated the same principle, at least one of which explicitly stated that RICO does not require a mens rea of willfulness. *See United States v. Scotto, 641 F.2d 47, 56 (2d Cir. 1980)* ("The law at issue here does not demand willful violations of the RICO statute, nor does it require willful violations of the predicate offenses."). The Court must follow these decisions until and unless they are overruled. *See Grytsyk v. Morales, 527 F. Supp. 3d 639, 653-54 (S.D.N.Y. 2021)*; *United States v. Diaz, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015)*, *aff'd*, *854 F.3d 197 (2d Cir. 2017)*.

Moreover, the logic of *Grote* does not necessarily lead to Defendants' conclusion that willfulness will be required for any RICO violation based on unlawful debt collection. The primary concern articulated in *Grote* is the conflict between the "presumption in favor of a scienter requirement" for criminal statutes and the incorporation of usury statutes into RICO which have no scienter requirement. *Grote, 961 F.3d at 118* (quoting *Elonis, 575 U.S. at 737*); *see id. at 120* ("It is unclear whether the *Biasucci* court would have intended its holding, that "RICO imposes no additional mens rea requirement beyond that found in the predicate crimes," *Biasucci, 786 F.2d at 512*, to apply also to criminal RICO charges predicated on civil usury statutes such as these."). This problem can be solved by reading a scienter requirement into civil usury statutes which lack one. It does not necessarily **[*103]** require reading a willfulness requirement into criminal usury statutes, which already have a mens rea requirement. *Elonis* itself took care "not to say that a defendant must know that his conduct is illegal before he may be found guilty." *575 U.S. at 735*. It reiterated that a defendant usually need only "know the facts that make his conduct fit the definition of the offense," not "that those facts give rise to a crime." *Id.* (quoting *Staples v. United States, 511 U.S. 600, 608 n.3, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994)*. Applying a scienter requirement to "*each* of the statutory elements that criminalize otherwise innocent conduct" is not the same as creating a willfulness requirement. *Elonis, 575 U.S. at 737* (quoting *United States v. X-Citement Video, Inc., 513 U.S. 64, 72, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994)* (emphasis added)).

Here, the mens rea already present in the New York usury statute requires that the defendant have the intent to charge more than 25% interest on a loan. If the transaction involves an advancement of money absolutely repayable and charges more than 25% interest, such intent is presumed. This scienter requirement is sufficient to

distinguish between criminal and innocent conduct. A defendant may, despite advancing money which is absolutely repayable at a usurious rate, believe his transaction does not violate the law because it is not named a "loan" or avoids the law in some other way. **[\*104]** But this does not make the conduct innocent. The usury statute reflects a legislative judgment that advancing money absolutely repayable at a rate above 25% is reprehensible and punishable, regardless of how the transaction is named. *See Adar Bays, 179 N.E.3d at 627-28.* For RICO purposes the rate must be double, increasing the likelihood that only transactions which clearly transgress societal norms will be punished. Reading a willfulness requirement into the statute is not necessary to avoid punishing innocent conduct. In fact, such a requirement could be harmful, allowing clear usury to go unpunished simply because the usurer believed the law would not catch his new repackaging of excessive interest.[46]

*Biasucci* and related decisions have not been overruled or limited, and even if they are limited or clarified in the future it is not clear that such limitation or clarification would require imposing a willfulness requirement in this case. Therefore, the Court declines to add a willfulness requirement to the mens rea already required by *Penal Law § 190.40*.

## B. Violation of *Section 1962(c)* by a Pattern of Racketeering Activity

Plaintiffs also allege a RICO violation based on a pattern of racketeering activity, specifically related to the double **[\*105]** debiting of FTE's bank accounts. Dkt. No. 44 ¶¶ 145-148. Plaintiffs do not move for summary judgment on this claim, Dkt. No. 145, but Defendants do, Dkt. No. 150. The Court grants summary judgment for Defendants on this claim.

The predicate crime for Plaintiffs' pattern of racketeering activity claim is wire fraud under *18 U.S.C. § 1343*. Dkt. No. 44 ¶ 148. The elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the . . . wires to further the scheme." *United States v. Gatto, 986 F.3d 104, 113 (2d Cir. 2021)* (quoting *United States v. Binday, 804 F.3d 558, 569 (2d Cir. 2015)*). To prove a "pattern" of racketeering activity, Plaintiffs must also show "at least two acts of racketeering activity," *18 U.S.C. § 1961(5)*, that are "related" and "amount to or pose a threat of continued criminal activity." *DeFalco, 244 F.3d at 320* (quoting *H.J. Inc., 492 U.S. at 239*). There are two ways to show continuity. Closed-ended continuity involves "criminal activity that occurred over a long period of time in the past" and "generally requires that the crimes extend over at least two years." *Reich, 858 F.3d at 60*. Open-ended continuity involves criminal activity which projects into the future. *Id.* Open-ended continuity is satisfied when "the predicate acts were the regular way of operating that business," because "the continuity of the enterprise itself **[\*106]** projects criminal activity into the future." *Id.* (quoting *Cofacredit, 187 F.3d at 243*).

Plaintiffs primarily argue that Funderz engaged in mail fraud because "Defendants' double debits were intentional and conducted under the false pretense they would stop," Dkt. No. 158 at 21, and continuity is satisfied because "Funderz operated for at least 5 years," *id.* at 22. Defendants argue that this conduct "does not sound in fraud" and the predicate acts only extended over a few months. Dkt. No. 154 at 21.

The Court agrees that the relevant conduct does not sound in fraud. The "scheme to defraud" element of mail fraud requires "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC, 69 F. Supp. 3d 342, 362 (S.D.N.Y. 2014)* (quoting *United States v. Pierce, 224 F.3d 158, 165 (2d Cir. 2000)*). The

---

[46] If the Court is not required to import a willfulness requirement due to the concerns identified in *Elonis*, it is difficult to see where it would come from as a matter of statutory interpretation. *See Williams v. Big Picture Loans, LLC, 693 F. Supp. 3d 610, 631(E.D. Va. 2023)* ("*Section 1962(c)* does not mention willfulness."). As a threshold issue, *Section 1962(c)* encompasses both claims based on collection of unlawful debt and claims based on a pattern of racketeering activity. *See 18 U.S.C. § 1962(c)*. It seems unlikely that a willfulness requirement would apply to racketeering activities, some of which are quite serious crimes. But it is not clear what basis there would be in the statute for applying the requirement to unlawful debt only. The definition of "unlawful debt" in *18 U.S.C. § 1961(6)* also provides no obvious source for a willfulness requirement.

debits themselves are not fraud, because they do not involve deceit or misrepresentation. Simply taking money out of someone's account without authorization, without making a false representation, is akin to conversion. *See Citadel Mgmt., Inc. v. Telesis Tr., Inc., 123 F. Supp. 2d 133, 147-48 (S.D.N.Y. 2000)* ("Conversion is the 'exercise of unauthorized dominion over the property of another.'" (quoting *LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997)*)); *cf. Haymount Urgent Care, 609 F. Supp. 3d at 257* ("extracting unauthorized debits from [plaintiff's] bank accounts" supported **[*107]** a fraud claim when defendants used "misleading names calculated to evade stop payment orders").

Plaintiffs claim that the debits were conducted under the false pretense they would stop, as stated by Gabe in an email on December 3, 2019. Dkt. No. 147-45. However, Plaintiffs have not produced evidence to support an inference that this lie, assuming it was one, was material. "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir.1994)*. Viewed in the light most favorable to the Plaintiffs, the evidence shows that Funderz took unauthorized debits, Gabe falsely stated that this would stop, and subsequently Funderz took more unauthorized debits. There is no evidence that Gabe's statement was material in any way to Plaintiffs making a decision to allow Funderz to continue taking double debits. Gabe did not, for example, misleadingly induce FTE to believe that the payments were proper under the contract. There is no evidence Plaintiffs made a decision to allow Funderz to continue taking double debits at all. The fact that Gabe said the debits would stop and then they did not may show that he lied, but does not show **[*108]** a scheme to defraud.

This single email also does not show "at least two acts of racketeering activity," *18 U.S.C. § 1961(5)*. Nor is there evidence to support an inference that telling customers the debits would stop, as opposed to taking the debits in the first place, was "the regular way of operating that business." *Cofacredit, 187 F.3d at 243*. The double debits or Defendants' lies about them do not constitute a pattern of racketeering activity based on wire fraud.

Plaintiffs also advance an alternative theory of wire fraud, that "Defendants intentionally inserted a false statement in their HOP MCA Agreements that they were not loans" to "defraud merchants into unknowingly entering into loans." Dkt. No. 158 at 22 (citing First HOP Agreement § 1.9, Second HOP Agreement § 1.9, Third HOP Agreement § 1.10[47]). The specific allegedly false statement which Plaintiffs allude to is that "Merchant and HC agree that the Purchase Price under this Agreement . . . is not intended to be, nor shall it be construed as a loan." First HOP Agreement § 1.9.

This statement will not support a fraud claim. "[A] fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc., 471 F.3d 410, 416 (2d Cir. 2006)*. Therefore, "[m]isrepresentations made **[*109]** to induce a party to enter a contract are not actionable as fraud . . . unless they are 'collateral' to the contract induced." *Spinelli v. Nat'l Football League, 903 F.3d 185, 209 (2d Cir. 2018)*. When "the defendant simply misrepresented its intent to perform under a contract, no separate claim for fraud will lie, and the plaintiff must instead bring an action for breach of contract." *Id.* Here, the alleged misrepresentation is not collateral to the contract. It is part of the contract. The provision therefore must be interpreted in light of the entire agreement, giving "full meaning and effect to all of its provisions." *In re AMR Corp., 730 F.3d 88, 98 (2d Cir. 2013)* (quoting *PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir.1996)*). The provisions of the contract largely make out a loan. If in light of the entire contract the provision cited nevertheless places an obligation on Funderz not to treat the transaction as a loan, any remedy for Funderz's failure to do so lies in breach of contract. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996)*; *Int'l CableTel Inc. v. Le Groupe Videotron Ltee, 978 F. Supp. 483, 486-87 (S.D.N.Y. 1997)*; *Generation Next Fashions Ltd. v. JP Morgan Chase Bank, NA., 698 F. Supp. 3d 663, 686-87 (S.D.N.Y. 2023)*.

Because neither Plaintiffs' primary theory nor their alternative theory supports a pattern of racketeering activity on the evidence presented, summary judgment is granted for Defendants on this issue.

---

[47] This provision is cited by Plaintiffs as § 1.9, but it was renumbered in the Third HOP Agreement to § 1.10.

**C. Conspiracy Under *Section 1962(d)***

Plaintiffs' final claim is for conspiracy under *Section 1962(d)*. Dkt. No. 44 ¶¶ 180-189. Defendant moves for summary judgment on this claim on the **[*110]** bases that "the underlying substantive RICO violation to which it is bootstrapped fails" and that in any case it is barred by the intracorporate conspiracy doctrine. Dkt. No. 154 at 22. Defendant's first argument fails because the Court holds that the underlying RICO claims have merit. The Court also does not grant summary judgment for Defendant based on the intracorporate conspiracy doctrine.

"To establish the existence of a RICO conspiracy, a plaintiff must prove 'the existence of an agreement to violate RICO's substantive provisions.'" *Cofacredit, 187 F.3d at 244* (quoting *United States v. Sessa, 125 F.3d 68, 71 (2d Cir.1997)*). The intracorporate conspiracy doctrine states that "acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *Alix v. McKinsey & Co., 2023 U.S. Dist. LEXIS 145872, 2023 WL 5344892, at *22 (S.D.N.Y. Aug. 18, 2023)* (quoting *Kirwin v. Price Comm'cns Corp., 391 F.3d 1323, 1326 (11th Cir. 2004)*).

The Second Circuit has not decided whether the intracorporate conspiracy doctrine applies to RICO claims, and there is currently a circuit split on the issue. *See Alix, 2023 U.S. Dist. LEXIS 145872, 2023 WL 5344892, at *22-23* (discussing the split and collecting cases). The Court is persuaded by the reasoning of the opinions holding that the doctrine does not apply. *See id., Ashland Oil, Inc. v. Arnett, 875 F.2d 1271, 1281 (7th Cir. 1989)*; *Kirwin v. Price Commc'ns Corp., 391 F.3d 1323, 1326-27 (11th Cir. 2004)*; *Webster v. Omnitrition Int'l, Inc., 79 F.3d 776, 787 (9th Cir. 1996)*. In the antitrust context, application of the intracorporate conspiracy doctrine is consistent with the **[*111]** statutory goal of preventing collusion between supposed competitors. *See Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 770-772, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)*; *Ashland Oil, 875 F.2d at 1281*. The statute was not intended to prevent collaboration between parents and subsidiaries, which are not competitors but rather "share a common purpose." *Copperweld, 467 U.S. at 771*.

Applying the intracorporate conspiracy doctrine to claims under *Section 1962(d)* is not within the statutory purpose and would be difficult to reconcile with the Supreme Court's decision in *Cedric Kushner*. Confronting the related question of whether the employee of a RICO "enterprise" can be liable for running its affairs, the Supreme Court stated in that case that drawing a distinction "between employees acting within the scope of corporate authority and those acting outside that authority . . . is inconsistent with a basic statutory purpose," namely holding individuals accountable who direct a corporate enterprise to conduct illegal activity. *533 U.S. at 165*. Unlike the antitrust statute, RICO was not intended to allow loan sharking and racketeering within corporations, while prohibiting these activities outside of them. Rather, RICO seeks both to protect the public from unlawful corporations *and* to protect corporations from those who seek to corrupt them from within. *Id. at 164-65* (noting that the legislative history **[*112]** "refers frequently to the importance of undermining organized crime's influence upon legitimate businesses"). *Cedric Kushner* expressly distinguished *Copperweld* on this ground, stating that its holding "turns on specific antitrust objectives." *Id. at 166*

The same logic that makes the doctrine inapplicable to the person-entity distinction in *Section 1962(c)* should make it inapplicable to a conspiracy claim under *Section 1962(d)*. It would not make sense if the executive in *Cedric Kushner* could be liable for violating *Section 1962(c)* by unlawfully conducting the affairs of the corporation, but could not be liable under *Section 1962(d)* for agreeing with others to commit the same violation. The law views the agreement of two people to corrupt an organization together as a harm over and above the unlawful activity of an individual. This harm is not mitigated, and may be exacerbated, by the fact that the person an employee recruits into his criminal scheme is a member of the same organization. Moreover, an association which seeks to engage in criminal activity should not be able to escape conspiracy liability by incorporation. Defendants do not dispute that two or more persons could conspire to engage in racketeering through an association in fact. It would make no sense that the same two persons **[*113]** would enjoy immunity from such a claim through the simple expedient of incorporating the entity through which they agree to engage in their racketeering activity.

Absent application of the intracorporate conspiracy doctrine, there is evidence from which a jury could find an agreement to engage in the collection of unlawful debt through the enterprise of Funderz.

Plaintiffs additionally argue that even if the intracorporate conspiracy doctrine did apply, the conspiracy claim could survive based on evidence suggesting a conspiracy between Funderz and external investors. Dkt. No. 158 at 23. The evidence supporting such a conspiracy consists of emails between Gabe, Isaacoff, and outside individuals stating "Syndication Moshe $75k," "Syndication MOE 50k," and "Syndication: Mordy 50k Moshe 50k Lenny 50k Manny 25k Avi 25k Vincent 25k." Dkt. Nos. 147-27, 147-28, 147-31. The emails also contain basic details of the deals, including the funding amount and payback amount. Dkt. Nos. 147-28, 147-31. Viewed in the light most favorable to Plaintiffs, these facts are sufficient to infer an agreement that these outside investors would fund or syndicate deals with a usurious rate of interest, and Isaacoff [*114] and Gabe would carry them out. This is sufficient to meet the requirements of *Section 1962(d)*. An agreement to violate RICO can be inferred from "circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing." *City of N.Y. v. Chavez, 2012 U.S. Dist. LEXIS 42792, 2012 WL 1022283, at \*7 (S.D.N.Y. Mar. 26, 2012)*; *see also* *United States v. Yannotti, 541 F.3d 112, 122 (2d Cir. 2008)* (explaining that RICO conspirators need only agree to "the general criminal objective of a jointly undertaken scheme"). When each of the purported conspirators actually committed overt acts in furtherance of the scheme, the inference of an agreement is strong. *See* *Alix, 2023 U.S. Dist. LEXIS 145872, 2023 WL 5344892, at \*23*; *Angermeir v. Cohen, 14 F. Supp. 3d 134, 154-155 (S.D.N.Y. 2014)*. The RICO claim could therefore survive on this ground even if the intracorporate conspiracy doctrine were applicable.

* * *

To summarize, Plaintiffs are entitled to summary judgment on their claims based on collection of unlawful debt under the four agreements in October 2018. Defendants are entitled to summary judgment on the claims based on collection of unlawful debt under the Third HOP Agreement and the claims based on a pattern of racketeering activity. Whether the assignment of claims from FTE to Lateral Recovery constitutes champerty remains at issue, as does liability on the claims based on the Third BMF Agreement and on the claims of conspiracy under *18 U.S.C. § 1962(d)*. Benchmark, Jus-Com, [*115] and Focus Wireless lack standing and must be dismissed from the case.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Defendants' motion is granted as to the claims based on a pattern of racketeering activity and as to the standing of plaintiffs Benchmark, Jus-Com, and Focus Wireless. Defendants' motion is denied as to the claims for collection of unlawful debt, the claims for conspiracy under *Section 1962(d)*, and the issue of whether the assignment to Lateral Recovery violated New York's champerty statute.

Plaintiffs' motion is granted as to their claims against Isaacoff for collection of unlawful debt pursuant to the four agreements in October 2018. Plaintiffs' motion is denied as to the claims for collection of unlawful debt based on the two agreements in November 2018 and the issue of whether the assignment to Lateral Recovery violated New York's champerty statute.

The Clerk of Court is respectfully directed to close Dkt. Nos. 145 and 150.

SO ORDERED.

Dated: September 27, 2024

New York, New York

/s/ Lewis J. Liman

LEWIS J. LIMAN

United States District Judge

---

**End of Document**

# EXHIBIT 6



**BUSINESS MERCHANT FUNDING** ———— **SECURED MERCHANT AGREEMENT** ————

Agreement dated **10/12/2018**  between Business Merchant Funding ("BMF") and the merchant listed below ("the Merchant").

Merchant's Legal Name: **FTE NETWORKS,INC**

D/B/A: **FTE NETWORKS**

Physical Address: **999 VANDERBILT BEACH RD. STE 601**

City: **NAPLES**   State: **FL**   Zip: **34108**

☑ Same as Physical Address

Mailing Address: **999 VANDERBILT BEACH RD. STE 601**

City: **NAPLES**   State: **FL**   Zip: **34108**

Type of Entity (check one): ☑ Corporation ☐ Limited Liability Company ☐ Limited Liability Partnership ☐ Limited Partnership ☐ Sole Proprietor

## PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to BMF (making BMF the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, credit or debit card, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business), for the payment of Merchant's sale of goods or services until the amount specified below (the "Purchased Amount") has been delivered by Merchant to BMF. The Purchased Amount shall be paid to BMF by Merchant's irrevocably authorizing only one depositing account acceptable to BMF (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each transaction, until such time as BMF receives payment in full of the Purchased Amount. Merchant hereby authorizes BMF to ACH Debit the specified remittances from the merchant's bank account on a daily basis and will provide BMF with all required access codes, and monthly bank statements. Merchant understands that it is responsible for ensuring that the specified percentage to be debited by BMF remains in the account and will be held responsible for any fees incurred by BMF resulting from a rejected ACH attempt or an event of default. (See Appendix A).

BMF is not responsible for any overdrafts or rejected transactions that may result from BMF's ACH debiting the specified amounts under the terms of this agreement. BMF will either (i) debit the Specified Percentage on a daily basis, or (ii) if a Specific Daily Amount is specified hereunder, then BMF shall debit the Specific Daily Amount on each business day, and upon the Merchant's request and receipt of the Merchant's monthly bank statements, BMF shall on or about the eighteenth day of each month reconcile the Merchant's account by either crediting or debiting the difference between the amount debited and the Specified Percentage, from or back to the Merchant's bank account so that the amount debited each month equals the Specified Percentage. BMF may, upon Merchant's request, adjust the amount of any payment due under this Agreement at BMF's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between BMF and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this agreement is annexed hereto in Appendix A.

PURCHASE PRICE: **$500,000.00**   SPECIFIED PERCENTAGE: **10%**   RECEIPTS PURCHASED AMOUNT: **$729,500.00**

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH ON PAGE 2, THE "MERCHANT SECURITY AGREEMENT" AND "ADMINISTRATIVE FORM" HEREOF ARE HEREBY INCORPORATED HEREIN AND MADE A PART OF THIS MERCHANT AGREEMENT.

**MERCHANT #1** (Print Name)

By: First Name **DAVID SCOTT**   Last Name **LETHEM**

Title: **OWNER**

**MERCHANT #2** (Print Name)

By: First Name **MICHAEL C.**   Last Name **PALLESCHI**

Title: **OWNER**

**OWNER/GUARANTOR #1** (Print Name)

By: First Name **DAVID SCOTT**   Last Name **LETHEM**

Title: **OWNER**

**OWNER/GUARANTOR #2** (Print Name)

By: First Name **MICHAEL C.**   Last Name **PALLESCHI**

Title: **OWNER**

**BUSINESS MERCHANT FUNDING**
By (Company Officer): _____   Sales Associate Name (Signature): _____

To the extent set forth herein, each of the parties is obligated upon his, her or its execution of the Agreement to all terms of the Agreement, including the Additional Terms set forth below. Each of above-signed Merchant and Owner(s) represents that he or she is authorized to sign this Agreement for Merchant, legally binding said Merchant to repay this obligation and that the information provided herein and in all of BMF documents, forms and recorded interviews is true, accurate and complete in all respects. If any such information is false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and BMF and BMF shall be entitled to all remedies available under law. BMF may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant via Processor and/or Operator to BMF. An investigative report may be made in connection with the Agreement. Merchant and each of the above-signed Owners authorizes BMF, its agents and representatives and any credit-reporting agency engaged by BMF, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as Merchant and/or Owners(s) continue to have any obligation owed to BMF as a consequence of this Agreement or for BMF's ability to determine Merchant's eligibility to enter into any future agreement with Company.

ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION

# MERCHANT AGREEMENT TERMS AND CONDITIONS
## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to BMF, and appoint a Bank acceptable to BMF, to obtain electronic fund transfer services and/or "ACH" payments. Merchant shall provide BMF and/or its authorized agent with all of the information, authorizations and passwords necessary to verify Merchant's receivables, receipts and deposits into the account. Merchant shall authorize BMF and/or it's agent to deduct the amounts owed to BMF for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from electronic check transactions and to pay such amounts to BMF by permitting BMF to withdraw the specified percentages by ACH debiting of the account. The authorization shall be irrevocable absent BMF's written consent.

**1.2 Term of Agreement.** This Agreement shall have a term of one year. Upon the expiration of the term, this Agreement shall automatically renew for successive one-year terms, provided, however, that during the renewal term(s) Merchant may terminate this Agreement upon ninety days' prior written notice (effective upon receipt) to BMF, however, said termination of this Agreement shall not affect Merchant's responsibility to satisfy all outstanding obligations to BMF at the time of termination.Notwithstanding the foregoing, should Merchant elect to terminate this Agreement in accordance with this paragraph "1.2" herein, but Merchant shall fail to fully satisfy its obligation to BMF, then Merchant's termination shall have no effect, and this Agreement shall remain in full force and effect.

**1.3 Future Purchases.** BMF reserves the right to rescind the offer to make any purchase payments hereunder, in its sole discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) authorize BMF and its agents to investigate their financial responsibility and history, and will provide to BMF any bank or financial statements, tax returns, etc., as BMF deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. BMF is authorized to update such information and financial profiles from time to time as it deems appropriate.

**1.5 Transactional History.** Merchant authorizes their bank to provide BMF with Merchant's banking and/or credit-card processing history to determine qualification or continuation in this program.

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by BMF for monies owed to BMF from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by BMF.

**1.7 No Liability.** In no event will BMF be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, BMF and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and BMF agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from BMF to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement equals the fair market value of such Receipts. BMF has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to BMF in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts be deemed as interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that BMF has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and BMF shall promptly refund to Merchant any interest received by BMF in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that BMF not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

**1.10 Power of Attorney.** Merchant irrevocably appoints BMF as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to BMF from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to BMF; and (v) to file any claims or take any action or institute any proceeding which BMF may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

**1.11 Protections Against Default.** The following Protections 1 through 8 may be invoked by BMF, immediately and without notice to merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the BMF electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse to BMF; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check transactions to another processor; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God) transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of BMF, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to BMF; or (e) Merchant takes any action, fails to take any action, or offers any incentive --economic or otherwise --the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than checks that are settled through Processor. These protections are in addition to any other remedies available to BMF at law, in equity or otherwise pursuant to this Agreement. **Protection 1:** The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately. **Protection 2.** BMF may enforce the provisions of the Personal Guarantee of Performance against the Guarantor(s). **Protection 3.** Merchant shall, upon execution of this Agreement, deliver to BMF an executed confession of judgment in favor of BMF in the amount of the Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, BMF may enter that confession of judgment as a judgment with the Clerk of the Court and execute thereon. **Protection 4.** BMF may enforce its security interest in the Collateral identified in the Security Agreement herein. **Protection 5.** BMF may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which BMF shall recover judgment against Merchant, Merchant shall be liable for all of BMF's costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs. **Protection 6.** Merchant shall, upon execution of this Agreement, deliver to BMF an executed assignment of lease of Merchant's premises in favor of BMF. Upon breach of any provision in this paragraph 1.12, BMF may exercise its rights under such assignment of lease. **Protection 7.** BMF may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise, in an amount consistent with the Specified Percentage or Specific Daily Amount. **Protection 8.** BMF shall have the right, without waiving any of its rights and remedies and without notice to Merchant and/ or Guarantor(s), to notify Merchant's credit card processor of the sale of Receipts hereunder and to direct such credit card processor to make payment to BMF of all or any portion of the amounts received by such credit card processor on behalf of Merchant. Merchant hereby grants to BMF an irrevocable power-of-attorney, which power-of-attorney shall be coupled with an interest, and hereby appoints BMF or any of BMF's representatives as Merchant's attorney in- fact, to take any and all action necessary to direct such new or additional credit card processor to make payment to BMF as contemplated by this Section.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner, in respect of himself or herself personally, authorizes BMF to disclose information concerning Merchant's and each Owner's and/ or Guarantor(s)'s credit standing and business conduct only, to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant, Guarantor(s) and Owner(s) hereby waives to the maximum extent permitted by law any claim for damages against BMF or any of its affiliates relating to any (i) investigation undertaken by or on behalf of BMF as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by BMF, including this Agreement and any other BMF documentations (collectively, "Confidential Information") are proprietary and confidential information of BMF. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of BMF to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 1.13.

**1.14 D/B/A's**. Merchant hereby acknowledges and agrees that BMF may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between BMF and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

*Merchant represents, warrants and covenants that as of this date and during the term of this Agreement:*

**2.1 Financial Condition and Financial Information**. Its bank and financial statements, copies of which have been furnished to BMF, and future statements which will be furnished hereafter at the discretion of BMF, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise BMF of any material adverse change in its financial condition, operation or ownership. BMF may request statements at any time during the performance of this Agreement and the Merchant shall provide them to BMF within 5 business days. Merchant's failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals**. Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 Authorization**. Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance**. Merchant will maintain business-interruption insurance naming BMF as loss payee and additional insured in amounts and against risks as are satisfactory to BMF and shall provide BMF proof of such insurance upon request.

**2.5 Electronic Check Processing Agreement**. Merchant will not change its processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without BMF's prior written consent. Any such change shall be a material breach of this Agreement.

**2.6 Change of Name or Location**. Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and BMF or change any of its places of business.

**2.7 Estoppel Certificate**. Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from BMF to Merchant, execute, acknowledge and deliver to BMF and/or to any other person, person firm or corporation specified by BMF, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.8 No Bankruptcy**. As of the date of this Agreement, Merchant does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. In the event that the Merchant files for bankruptcy protection or is placed under an involuntary filing, Protections 2 and 3 are immediately invoked.

**2.9 Working Capital Funding**. Merchant shall further encumber the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales, with any party other than BMF.

**2.10 Unencumbered Receipts**. Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of BMF.

**2.11 Business Purpose**. Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12 Default Under Other Contracts**. Merchant's execution of and/or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) Merchant shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Guarantor(s); (e) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; (h) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (i) Merchant shall use multiple depository accounts without the prior written consent of BMF; (j) Merchant shall change its depositing account without the prior written consent of BMF; (k) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (l) Merchant shall default under any of the terms, covenants and conditions of any other agreement with BMF; or (m) Merchant shall fail to deposit its Receipts into the Account.

**3.2 Remedies**. In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, BMF may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy. All rights, powers and remedies of BMF in connection with this Agreement may be exercised at any time by BMF after the occurrence of an Event of Default, are

cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3 Costs**. Merchant shall pay to BMF all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of BMF's remedies set forth in Section 4.2 above, including but not limited to court costs and attorneys' fees.

**3.4 Required Notifications**. Merchant is required to give BMF written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give BMF seven (7) days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## IV. MISCELLANEOUS

**4.1 Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

**4.2 Assignment**. BMF may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices**. All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective only upon receipt.

**4.4 Waiver Remedies**. No failure on the part of BMF to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of BMF which consent may be withheld in BMF's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if BMF so elects, be instituted in any court sitting in New York State, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. Should a proceeding be initiated in any other forum, the parties waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Severability**. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.8 Entire Agreement**. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and Security Agreement hereto embody the entire agreement between Merchant and BMF and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.9 JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**4.10 CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**4.11 Facsimile Acceptance**. Facsimile signatures shall be deemed acceptable for all purposes.

 INITIALS:

## BUSINESS MERCHANT FUNDING - SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: FTE NETWORKS,INC

D/B/A: FTE NETWORKS

Physical Address: 999 VANDERBILT BEACH RD. STE 601

City: NAPLES                                    State: FL          Zip: 34108

Federal ID#: REDACTED

### SECURITY AGREEMENT

Security Interest. To secure Merchant's payment and performance obligations to BMF under the Merchant Agreement (the "Factoring Agreement"), Merchant hereby grants to BMF a security interest in (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC ("a" and "b" collectively, the "Collateral").

Cross-Collateral. To secure Guarantor's payment and performance obligations to BMF under this Security Agreement and Guaranty (the "Agreement"), Guarantor hereby grants BMF an additional security interest in _____

_____

_____

(the "Additional Collateral"). Guarantor understands that BMF will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Guarantor each acknowledge and agree that any security interest granted to BMF under any other agreement between Merchant or Guarantor and BMF (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as BMF deems necessary to perfect or maintain BMF's first priority security interest in the Collateral, the Additional Collateral and the Cross-Collateral, including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes BMF to file any financing statements deemed necessary by BMF to perfect or maintain BMF's security interest, which financing statement may contain notification that Merchant and Guarantor have granted a negative pledge to BMF with respect to the Collateral, the Additional Collateral and the Cross- Collateral, and that any subsequent lienor may be tortiously interfering with BMF's rights. Merchant and Guarantor shall be liable for and BMF may charge and collect all costs and expenses, including but not limited to attorney's fees, which may be incurred by BMF in protecting, preserving and enforcing BMF's security interest and rights. Merchant further acknowledges that BMF may use another legal name and/ or D/B/A when designating the Secured Party, when BMF files the above-referenced financing statement(s).

**Negative Pledge**. Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral, the Additional Collateral or the Cross-Collateral, as applicable.

**Consent to Enter Premises and Assign Lease**. BMF shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, BMF may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that BMF may enter into an agreement with Merchant's landlord giving BMF the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified Merchant capable of operating a business comparable to Merchant's at such premises.

**Remedies**. Upon any Event of Default, BMF may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise.

### GUARANTY

**Personal Guaranty of Performance**. The undersigned Guarantor(s) hereby guarantees to BMF, Merchant's performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due (i) at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement and the Merchant Agreement, and (ii) at the time Merchant admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts.

**Guarantor Waivers**. In the event that Merchant fails to make a payment or perform any obligation when due under the Merchant Agreement, BMF may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral, Additional Collateral or Cross-Collateral BMF may hold pursuant to this Agreement or any other guaranty.

BMF does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) BMF's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to BMF. In addition, BMF may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to BMF; (ii) release Merchant from its obligations to BMF; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to BMF under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation ; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that BMF must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

**Guarantor Acknowledgement**. Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/ She has consulted with counsel of its choice or has decided not to avail himself/ herself of that opportunity.

**Joint and Several Liability**. The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.



BUSINESS
MERCHANT
BMF FUNDING

## SECURITY AGREEMENT AND GUARANTY

**MERCHANT #1** (Print Name)

By: First Name DAVID SCOTT          Last Name LETHEM

Title: OWNER

SSN#: REDACTED

Driver's License Number: _____          SIGN HERE →

**MERCHANT #2** (Print Name)

By: First Name MICHAEL C.          Last Name PALLESCHI

Title: OWNER

SSN#: REDACTED

Driver's License Number: _____          SIGN HERE →

**OWNER/GUARANTOR #1** (Print Name)

By: First Name DAVID SCOTT          Last Name LETHEM

Title: OWNER

SSN#: REDACTED

Driver's License Number: _____          SIGN HERE →

**OWNER/GUARANTOR #2** (Print Name)

By: First Name MICHAEL C.          Last Name PALLESCHI

Title: OWNER

SSN#: REDACTED

Driver's License Number: _____          SIGN HERE →



BUSINESS
MERCHANT
FUNDING

Dear Merchant,

Thank you for accepting this offer from Business Merchant Funding. We look forward to being your funding partner for as long as you need.

Daily ACH Program:
Business Merchant Funding will require viewing access to your bank account, each business day, in order to calculate the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it. Business Merchant Funding will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.
*Be sure to indicate capital or lower case letters.

**Name of Bank:** REDACTED

**Bank Portal Website:** _____

**Username:** _____

**Password:** _____

**Security Question/Answer 1:** _____

**Security Question/Answer 2:** _____

**Security Question/Answer 3:** _____

**Any other information necessary to access your account:** _____
_____

*Please note: In the event that we are unable to access your account, we will take a daily estimated payment. An additional $39 fee will be assessed for each day we don't have access.*



**BUSINESS MERCHANT FUNDING**

## APPENDIX A: THE FEE STRUCTURE:

### A. Origination Fee
$295.00 -- to cover underwriting and related expenses.

### B. ACH Program Fee
$395.00 or 12% of the funded amount -- The ACH program is labor intensive and is not an automated process, requiring us to charge this fee to cover related costs.

### C. NSF Fee (Standard)
$35.00 (each) Up to TWO TIMES ONLY before a default is declared.

### D. Rejected ACH
$100.00 -- If a merchant directs the bank to reject our debit ACH.

### E. Bank Change Fee
$50.00 -- If a merchant requires a change of account to be debited requiring us to adjust our system.

### F. Blocked Account
$2,500.00 -- If a merchant blocks BMF's ACH debit of the Account, bounces more than 4 debits of the Account, or simultaneously uses multiple bank accounts or credit-card processors to process its receipts.

### G. Default Fee
$2,500.00 -- If a merchant changes bank accounts or switches to another creditcard processor without BMF's consent, or commits another default pursuant to the Agreement.

### H. Miscellaneous Service Fees
Merchant shall pay certain fees for services related to the origination and maintenance of accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or $0.00 for a bank ACH. The Current charge for the underwriting and origination of each Merchant Agreement is $295.00 paid from the funded amount. Merchant will be charged $25.00 for every additional change of their operating bank account once they are active with BMF. Additional copies of prior monthly statements will incur a fee of $10.00 each.

### I. Risk Assessment Fee
$249.00

### J. UCC Fee
$195.00

**MERCHANT #1** (Print Name)

By: First Name DAVID SCOTT          Last Name LETHEM

Title: OWNER

*SIGN HERE*

**MERCHANT #2** (Print Name)

By: First Name MICHAEL C.          Last Name PALLESCHI

Title: OWNER

*SIGN HERE*

BUSINESS
MERCHANT
BMF FUNDING

## ADDENDUM TO SECURED MERCHANT AGREEMENT

This Addendum is entered on 10/12/2018 , by and between Business Merchant Funding and FTE NETWORKS,INC
(the "Merchant").

1. Should any of the terms of this Addendum conflict with the terms of the agreement between Business Merchant Fund and the Merchant dated 10/12/2018 (the "Agreement"), then the terms of this Addendum shall govern and be controlling. Capitalized terms used herein but otherwise not defined, shall have the same definition as in the Agreement:

a. By signing below, the Merchant hereby requests and acknowledges that the Specified Percentage shall be revised to $ _____ per business day (the "Daily Payment") which the parties agree is a good-faith approximation of the Specified Percentage, based on the Merchant's receipts due to Business Merchant Funding pursuant the Agreement.

b. The Daily Payment is to be drawn via ACH payment, from the following bank account:

    i. Bank Account: REDACTED

    ii. Routing Number: REDACTED

    iii. Account Name: REDACTED

    iv. Bank Name: REDACTED

c. At the Merchant's option, within five (5) business following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby Business Merchant Funding may ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage. However, in order to effectuate this reconciliation, upon submitting the request for reconciliation to Business Merchant Funding – but in no event later than five (5) business days following the end of the calendar month – the Merchant must produce any and all evidence and documentation requested by Business Merchant Funding in its sole and absolute discretion, necessary to identify the appropriate amount of the Specified Percentage. The foregoing includes without limitation, any and all bank statements, merchant statements or other documents necessary to ascertain the amounts of the Specified Percentage, including login to the Merchant's bank account(s).

d. The Merchant specifically acknowledges that: (i) the Daily Payment and the potential reconciliation discussed above are being provided to the Merchant as a courtesy, and that Business Merchant Funding is under no obligation to provide same, and (ii) if the Merchant fails to furnish the requested documentation within five (5) business days following the end of a calendar month, then Business Merchant Funding shall not effectuate the reconciliation discussed above.

IN WITNESS WHEREOF, the parties have executed this Addendum to the Agreement as of the date first set forth above.

**MERCHANT #1** (Print Name)

By: First Name DAVID SCOTT      Last Name LETHEM

Title: OWNER

**MERCHANT #2** (Print Name)

By: First Name MICHAEL C.      Last Name PALLESCHI

Title: OWNER

**BUSINESS MERCHANT FUNDING**

By: _____

**This authorization is to remain in full force and effect until Business Merchant Funding receives written notification from the Merchant of its termination in such time and in such manner to afford Business Merchant Funding a reasonable opportunity to act on it. Revocation of this authorization prior to remittance of the balance owed pursuant to the Agreement shall constitute a breach thereunder.

## ACH AUTHORIZATION FORM

*All information on this form is required unless otherwise noted.*

**BUSINESS AUTHORIZED TO DEBIT/CREDIT ACCOUNT:**

FTE NETWORKS,INC
Authorized Business Name

Authorized Business Phone Number

999 VANDERBILT BEACH RD. STE 601
Authorized Business Address

NAPLES
City

FL
State

34108
Zip

**ACCOUNT HOLDER INFORMATION:**

DAVID SCOTT
Account Holder First Name

LETHEM
Account Holder Last Name

FTE NETWORKS
Account Holder DBA Name (If Business Account)

2 39-293-3790
Phone Number

Account Holder Address

City

State

Zip

**ACCOUNT HOLDER BANK INFORMATION:**

REDACTED

REDACTED
Branch City

REDACTED
State

REDACTED
Zip

How to find your Routing and Account Numbers on a check

REDACTED

REDACTED
Bank Routing Number (9 digits)

☐ Business Checking   ☐ Personal Checking   ☐ Savings

REDACTED
Bank Account Number

**TRANSACTION INFORMATION:**

Goods Purchased/Services Rendered

Amount of Transaction

Effective Date

☐ One-time   ☐ Recurring

Rate _____

No. of Transactions _____   or Open Ended ☐

**AUTHORIZATION:**

In exchange for products and/or services listed above the undersigned hereby authorizes:

to electronically draft via the Automated Clearing House system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writing by the undersigned account holder. The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder. I acknowledge that I am subject to a $25 reject fee if items are returned for insufficient funds.

Signature of Account Holder

DAVID SCOTT
First Name of Account Holder

LETHEM
Last Name of Account Holder

OWNER
Title of Account Holder

Date

BUSINESS
MERCHANT
BMF FUNDING

## BALANCE TRANSFER FORM

**Merchant Legal Name ("Merchant"):**  DAVID SCOTT                          LETHEM

**Merchant Title:**  OWNER

**Business Legal Name ("Business"):**  FTE NETWORKS,INC

**DBA:**  FTE NETWORKS

**Physical Address:**  999 VANDERBILT BEACH RD. STE 601

**City:**  NAPLES

**State:**  FL

**Zip Code:**  34108

**Date:**  10/12/2018

**Business Merchant Funding**
**680 Central Ave,**
**Cedarhurst, NY 11516**

**Date of new secured agreement:**  10/12/2018

**Date of previous secured agreement:**  _____

**Remaining RTR balance:**  0

To Whom It May Concern:

I, Merchant, on behalf of Business, hereby authorize Business Merchant Funding to debit the remaining RTR balance which is currently due and owing to Business Merchant Funding pursuant to the previous secured merchant agreement, entered into by and between Business Merchant Funding and business.

I acknowledge that as a result of the above-referenced debit, the amount paid to business by Business Merchant Funding pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.

Thank you,

SIGN HERE ➤ **By:** _____

**Merchant Legal Name:** DAVID SCOTT                          LETHEM

**Title:** OWNER

# EXHIBIT A

<u>LIST OF ADDITIONAL PARTIES IN WHOSE ASSETS SELLER HAS GRANTED BUYER A BLANKET SECURITY INTEREST:</u>

**BENCHMARK BUILDERS, INC. DBA BENCHMARK BUILDER**

237 W. 35TH STREET STE. 901 NEW YORK, NY 1001

EIN:

**FTE HOLDINGS LLC DBA FTE HOLDINGS**

999 V ANDERBILT BEACH RD. STE 601 NAPLES FL 34108

EIN:

**JUS-COM,INC.DBA FTE NETWORKS SERVICES**

999 V ANDERBILT BEACH RD. STE 601 NAPLES FL 34108

EIN

**FOCUS VENTURE PARTNER INC DB FOCUS VENTURE PARTNERS**

999 V ANDERBILT BEACH RD. STE 601 NAPLES FL 34108

EIN:

Buyer may file a UCC-1 financing statement with the appropriate Secretary of State(s) , reflecting a blanket security interest in the assets of the above-listed entities.

Dated: OCTOBER 12, 2018

By: _____

DAVID SCOTT LETHEM

By: _____

MICHAEL C. PALLESCHI

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF

*BUSINESS MERCHANT FUNDING*

Plaintiff,

-against-

FTE NETWORKS, INC DBA FTE NETWORKS
BENCHMARK BUILDERS INC DBA
BENCHMARK BUILDERS, FTE HOLDINGS, LLC
DBA FTE HOLDINGS, JUS-COM, INC FTE
NETWORK SERVICES, FOCUS VENTURE
PARTNERS INC DBA FOCUS VENTURE
PARTNERS, CROSSLAYER INC DBA
CROSSLAYER AND **DAVID SCOTT LETHEM**

Defendants.

Index No.

**AFFIDAVIT OF
CONFESSION OF JUDGMENT**

STATE OF *Florida*  )

                                          ) ss.:

COUNTY OF *Collier*  )

**DAVID SCOTT LETHEM** , being duly sworn upon my oath, deposes and says:

1. I am a principal, owner, and an officer of FTE NETWORKS,INC DBA FTE NETWORKS ("Merchant Defendant"), a CORPORATION located at 999 VANDERBILT BEACH RD.STE 6001 NAPLES, FL 34108 in the county of COLLIER, and as such, I have the authority to act on behalf of Merchant Defendant.

2. I am a principal, owner, and an officer of BENCHMARK BUILDERS,INC DBA BENCHMARK ("Merchant Defendant"), a CORPORATION located at 237 W 35TH STREET STE 901. NY 1001 in the county of NEW YORK and as such, I have the authority to act on behalf of Merchant Defendant.

3. I am a principal, owner, and an officer FTE HOLDINGS LLC DBA FTE HOLDINGS ("Merchant Defendant"), LIMITED LIABILITY COMPANY located at 999 VANDERBILT BEACH RD.STE 6001 NAPLES, FL 3410 in the county of COLLIER   and as such, I have the authority to act on behalf of Merchant Defendant.

4. I am a principal, owner, and an officer JUS-COM INC DBA FTE NETWORK SERVICES  ("Merchant Defendant"), CORPORATION  located at 999 VANDERBILT BEACH RD.STE 6001 NAPLES, FL 34108  in the county of COLLIER   and as such, I have the authority to act on behalf of Merchant Defendant.

**5.** I am a principal, owner, and an officer FOCUS VENTURES PARTNERS INC DBA FOCUS VENTURE PARTNERS ("Merchant Defendant"), CORPORATION located at 999 VANDERBILT BEACH RD.STE 6001 NAPLES, FL 34108 in the county of COLLIER and as such, I have the authority to act on behalf of Merchant Defendant.

**6.** I am a principal, owner, and an officer CROSSLAYER INC DBA CROSSLAYER ("Merchant Defendant"), CORPORATION located at 999 VANDERBILT BEACH RD.STE 6001 NAPLES, FL 34108 in the county of COLLIER and as such, I have the authority to act on behalf of Merchant Defendant.

7. I reside at 3490 WONDER VIEW PL, LOS ANGELES CA 90068 in the county of LOS ANGELES. I, individually, and on behalf of Merchant Defendant consent to this jurisdiction of this Court.

8. Merchant Defendant hereby confesses judgment and authorizes entry of judgment in favor of Plaintiff and against Defendants in the Federal District Court for the Southern District of New York, Supreme Court of the State of New York, County of New York, Supreme Court of the State of New York, County of Westchester, Supreme Court of the State of New York, County of Kings, Supreme Court of the State of New York, County of Nassau, Supreme Court of the State of New York, County of Richmond, Supreme Court of the State of New York, County of Rockland, Supreme Court of the State of New York, County of Erie, and/or Civil Court of the City of New York, County of New York, in the sum of **$729,500.00** less any payments timely made pursuant to the secured Merchant Agreement, dated October 15 2018plus legal fees to Plaintiff calculated at twenty five percent (25%) of the total of the aforesaid sums, costs, expenses and disbursements and interest at the rate of 16% per annum from October 1 2018, or the highest amount allowed by law, whichever is greater. Such amount shall be set forth in an affidavit to be executed by Plaintiff or an affirmation by Plaintiff's attorney, which shall be attached hereto at the time of entry of this Affidavit of Confession of Judgment.

9. In addition, I hereby confess judgment, individually and personally, jointly and severally, and authorize entry of judgment in favor of Plaintiff in the Federal District Court for the Southern District of New York, Supreme Court of the State of New York, County of New York, Supreme Court of the State of New York, County of Westchester, Supreme Court of the State of New York, County of Kings, Supreme Court of the State of New York, County of Nassau, Supreme Court of the State of New York, County of Richmond, Supreme Court of the State of New York, County of Rockland, Supreme Court of the State of New York, County of Erie, and/or Civil Court of the City of New York, County of New York, against the Defendant in the sum of **$729,500.00** less any payments timely made pursuant to the Merchant Agreement, dated October 15 2018plus legal fees to Plaintiff calculated at twenty five (25%) of the total of the aforesaid sums, costs, expenses and disbursements and interest at the rate of 16% per annum from October 15 2018 or the highest rate allowed by law, whichever is greater. Such amount

2

shall be set forth in an affidavit to be executed by Plaintiff or an affirmation by Plaintiff's attorney, which shall be attached hereto at the time of entry of this Confession of Judgment.

10. This confession of judgment is for a debt due to Plaintiff arising from Defendants' failure to pay to Plaintiff, Merchant Defendant's accounts-receivable, which were purchased by Plaintiff pursuant to the secured Merchant Agreement, dated October 15 2018and for Defendants' breach of the secured Merchant Agreement, plus agreed-upon interest, reasonable attorneys' fees, costs and disbursements, as agreed-upon by Merchant Defendant under the secured Merchant Agreement dated October 15 2018, of which supporting documents include a Personal Guarantee and a UCC-1 financing statement (s).

11. Merchant Defendant hereby agrees that the execution and delivery of this Affidavit of Confession of Judgment and any entry of judgment thereon shall be without prejudice to any and all rights of Plaintiff, who reserves all of its rights and remedies against Defendants.

12. If for any reason entry of judgment in the above specified amount or execution on the same is outside the jurisdiction of this Court, Merchant Defendant consents to the personal jurisdiction, entry of judgment, and execution thereon in any State or Federal Court of the United States of America.

13. I have been authorized by Merchant Defendant to sign this Affidavit of Confession of Judgment on this _15_ day of ___October___, 2018.

By: _____

**DAVID SCOTT LETHEM** individually, and on behalf of FTE NETWORKS, INC DBA FTE NETWORKS BENCHMARK BUILDERS INC DBA BENCHMARK BUILDERS, FTE HOLDINGS, LLC DBA FTE HOLDINGS, JUS-COM, INC FTE NETWORK SERVICES, FOCUS VENTURE PARTNERS INC DBA FOCUS VENTURE

_15_ Day of ___October___, 2018.

_____
Notary Public

OLGA BORRERO
MY COMMISSION # GG082935
EXPIRES March 14, 2021

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF
BUSINESS MERCHANT FUNDING

Plaintiff,

-against-

FTE NETWORKS, INC DBA FTE NETWORKS
BENCHMARK BUILDERS INC DBA
BENCHMARK BUILDERS, FTE HOLDINGS, LLC
DBA FTE HOLDINGS, JUS-COM, INC FTE
NETWORK SERVICES, FOCUS VENTURE
PARTNERS INC DBA FOCUS VENTURE
PARTNERS, CROSSLAYER INC DBA
CROSSLAYER AND **MICHAEL C PALLESCHI**

Defendants.

Index No.

**AFFIDAVIT OF
CONFESSION OF JUDGMENT**

STATE OF _Florida_ )
                          ) ss.:
COUNTY OF _Collier_ )

**MICHAEL C PALLESCHI**, being duly sworn upon my oath, deposes and says:

1. I am a principal, owner, and an officer of FTE NETWORKS,INC DBA FTE NETWORKS ("Merchant Defendant"), a CORPORATION located at 999 VANDERBILT BEACH RD.STE 6001 NAPLES, FL 34108 in the county of COLLIER, and as such, I have the authority to act on behalf of Merchant Defendant.

2. I am a principal, owner, and an officer of BENCHMARK BUILDERS,INC DBA BENCHMARK ("Merchant Defendant"), a CORPORATION located at 237 W 35TH STREET STE 901. NY 1001 in the county of NEW YORK and as such, I have the authority to act on behalf of Merchant Defendant.

3. I am a principal, owner, and an officer FTE HOLDINGS LLC DBA FTE HOLDINGS ("Merchant Defendant"), LIMITED LIABILITY COMPANY located at 999 VANDERBILT BEACH RD.STE 6001 NAPLES, FL 3410 in the county of COLLIER and as such, I have the authority to act on behalf of Merchant Defendant.

4. I am a principal, owner, and an officer JUS-COM INC DBA FTE NETWORK SERVICES ("Merchant Defendant"), CORPORATION located at 999 VANDERBILT BEACH RD.STE 6001 NAPLES, FL 34108 in the county of COLLIER and as such, I have the authority to act on behalf of Merchant Defendant.

**5.** I am a principal, owner, and an officer FOCUS VENTURES PARTNERS INC DBA FOCUS VENTURE PARTNERS ("Merchant Defendant"), CORPORATION located at 999 VANDERBILT BEACH RD.STE 6001 NAPLES, FL 34108 in the county of COLLIER and as such, I have the authority to act on behalf of Merchant Defendant.

**6.** I am a principal, owner, and an officer CROSSLAYER INC DBA CROSSLAYER ("Merchant Defendant"), CORPORATION located at 999 VANDERBILT BEACH RD.STE 6001 NAPLES, FL 34108 in the county of COLLIER and as such, I have the authority to act on behalf of Merchant Defendant.

7. I reside at 3490 WONDER VIEW PL, LOS ANGELES CA 90068 in the county of LOS ANGELES. I, individually, and on behalf of Merchant Defendant consent to this jurisdiction of this Court.

8. Merchant Defendant hereby confesses judgment and authorizes entry of judgment in favor of Plaintiff and against Defendants in the Federal District Court for the Southern District of New York, Supreme Court of the State of New York, County of New York, Supreme Court of the State of New York, County of Westchester, Supreme Court of the State of New York, County of Kings, Supreme Court of the State of New York, County of Nassau, Supreme Court of the State of New York, County of Richmond, Supreme Court of the State of New York, County of Rockland, Supreme Court of the State of New York, County of Erie, and/ or Civil Court of the City of New York, County of New York, in the sum of $729,500.00 less any payments timely made pursuant to the secured Merchant Agreement, dated October 15 2018plus legal fees to Plaintiff calculated at twenty five percent (25%) of the total of the aforesaid sums, costs, expenses and disbursements and interest at the rate of 16% per annum from October 1 2018, or the highest amount allowed by law, whichever is greater. Such amount shall be set forth in an affidavit to be executed by Plaintiff or an affirmation by Plaintiff's attorney, which shall be attached hereto at the time of entry of this Affidavit of Confession of Judgment.

9. In addition, I hereby confess judgment, individually and personally, jointly and severally, and authorize entry of judgment in favor of Plaintiff in the Federal District Court for the Southern District of New York, Supreme Court of the State of New York, County of New York, Supreme Court of the State of New York, County of Westchester, Supreme Court of the State of New York, County of Kings, Supreme Court of the State of New York, County of Nassau, Supreme Court of the State of New York, County of Richmond, Supreme Court of the State of New York, County of Rockland, Supreme Court of the State of New York, County of Erie, and/or Civil Court of the City of New York, County of New York, against the Defendant in the sum of $729,500.00 less any payments timely made pursuant to the Merchant Agreement, dated October 15 2018plus legal fees to Plaintiff calculated at twenty five (25%) of the total of the aforesaid sums, costs, expenses and disbursements and interest at the rate of 16% per annum from October 15 2018 or the highest rate allowed by law, whichever is greater. Such amount

2

shall be set forth in an affidavit to be executed by Plaintiff or an affirmation by Plaintiff's attorney, which shall be attached hereto at the time of entry of this Confession of Judgment.

10. This confession of judgment is for a debt due to Plaintiff arising from Defendants' failure to pay to Plaintiff, Merchant Defendant's accounts-receivable, which were purchased by Plaintiff pursuant to the secured Merchant Agreement, dated October 15 2018and for Defendants' breach of the secured Merchant Agreement, plus agreed-upon interest, reasonable attorneys' fees, costs and disbursements, as agreed-upon by Merchant Defendant under the secured Merchant Agreement dated October 15 2018, of which supporting documents include a Personal Guarantee and a UCC-1 financing statement (s).

11. Merchant Defendant hereby agrees that the execution and delivery of this Affidavit of Confession of Judgment and any entry of judgment thereon shall be without prejudice to any and all rights of Plaintiff, who reserves all of its rights and remedies against Defendants.

12. If for any reason entry of judgment in the above specified amount or execution on the same is outside the jurisdiction of this Court, Merchant Defendant consents to the personal jurisdiction, entry of judgment, and execution thereon in any State or Federal Court of the United States of America.

13. I have been authorized by Merchant Defendant to sign this Affidavit of Confession of Judgment on this _15_ day of ___October___, 2018.

By: _____

**Michael C Palleschi**, individually, and on behalf of FTE NETWORKS, INC DBA FTE NETWORKS BENCHMARK BUILDERS INC DBA BENCHMARK BUILDERS, FTE HOLDINGS, LLC DBA FTE HOLDINGS, JUS-COM, INC FTE NETWORK SERVICES, FOCUS VENTURE PARTNERS INC DBA FOCUS VENTURE

_15_ Day of ___October___, 2018.

_____
Notary Public

OLGA BORRERO
MY COMMISSION # GG082935
EXPIRES March 14, 2021

3

# EXHIBIT 7

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:24-cv-08855-LASLP Document 71-17 Filed 02/28/25 Page 133 of 292 #: 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

HI BAR CAPITAL LLC,

                   *Plaintiff,*

        -against-

YOEL GETTER,

                   *Defendant.*

-------------------------------------------------------------------X

Civil Action No. 22-cv-1743

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Hi Bar Capital LLC ("Plaintiff"), by its attorneys, Oved & Oved LLP, complaining of Defendant Yoel Getter ("Defendant"), alleges as follows:

**NATURE OF ACTION**

1. In early 2021, Plaintiff's principal sought to start a cash advance business that would purchase the future receivables of cash-starved companies by providing those companies with much needed funds to use as working capital. Given that these future receivables are speculative and not guaranteed, it was, and is, of the utmost importance that Plaintiff conduct extensive due diligence and underwriting on these companies to ensure that they are likely to use the capital provided by Plaintiff to successfully operate and generate receivables such that Plaintiff would be paid.

2. Around this time, Defendant held himself out to Plaintiff's principal as having extensive experience as a broker in the cash advance industry and represented that he had a large network of contacts, both brokers and business operators, that he could utilize to bring a consistent stream of deals to Plaintiff. In March 2021, Plaintiff hired Defendant as an independent contractor to use his network, experience and skills to source deals and operate Plaintiff's day-to-day business. Plaintiff agreed to compensate Defendant by paying him a commission of 50% of net profits earned by Plaintiff.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:24-cv-03851-AS   Document 1-17   Filed 02/28/24   Page 134 of 292 #: 2

3.      While Defendant initially succeeded in bringing in a high volume of deals with strong counterparts that generated significant future receivables from which Plaintiff collected payment, Defendant's greed and insatiable need for cash to fund his grandiose, outsized and unsustainable luxury lifestyle eventually caused Defendant to bilk Plaintiff out of millions of dollars.

4.      Specifically, Defendant damaged Plaintiff in excess of $10.5 million principally through four methods: (i) falsely holding himself out as an owner of Plaintiff and directing Plaintiff's customers to divert payments of least $500,000 from Plaintiff, directly to Defendant, including causing an entity he controls to operate under the assumed name of "Hi Bar Capital" – Plaintiff's legal name; (ii) causing Plaintiff to enter into over $6 million in deals with uncreditworthy companies that were about to become insolvent, knowing these companies would not generate future receivables, solely so that Defendant could collect in excess of $1 million in unearned commission payments from Plaintiff; (iii) extending and increasing transactions with existing customer-companies to make it appear as if receivables had been collected and profits had been earned to deceive Plaintiff into paying unaccrued profits to Defendant; and (iv) extorting Plaintiff into "advancing" profit share payments to Defendant upon Defendant's repeated threats to destroy and derail Plaintiff's business.

5.      Accordingly, Plaintiff brings this action to recover from Defendant in excess of $10.5 million in money damages caused by Defendant's breaches, theft and other misconduct.

## PARTIES

6.      Plaintiff Hi Bar Capital LLC is a New York limited liability company, whose sole member is a citizen of New York, residing in Kings County.  At all relevant times, Plaintiff maintained a principal place of business in Kings County, New York.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 11/20/2023

Case 1:24-cv-03855-SLS Document 1-17 Filed 02/28/24 Page 135 of 292 PageID #: 3

7. Defendant Yoel Getter, upon information and belief, is a citizen of Florida, residing at 56 Bal Bay Drive, Miami, Florida.

### JURISDICTION AND VENUE

8. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are domiciled in different states, and the amount in controversy exceeds $75,000.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

### FACTS

10. On February 9, 2021, Plaintiff's principal, Yisroel Herbst ("Herbst"), formed Plaintiff with the intent to operate a cash advance business.

11. Plaintiff's business purchases the future receivables of illiquid companies to provide them with the necessary working capital to continue to operate and grow their businesses. The cash advance business can be very risky because the receivables that Plaintiff would purchase do not presently exist and may never exist, and those that do exist may never be paid, which would leave Plaintiff with a loss on its purchase.

12. Herbst had little experience in the cash advance industry and sought to hire someone with significant experience in the field to find deals and conduct the day-to-day operations of the business.

13. In or around March 2021, Defendant held himself out to Herbst as having extensive experience as a broker in the cash advance industry. Defendant represented that he had a large network of potential clients as well as other brokers such that he could immediately bring in a large number of quality deals to Plaintiff.

14. Plaintiff agreed to work with Defendant as an independent contractor. In this role, Defendant was responsible for sourcing potential deals; conducting due diligence and underwriting

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:24-cv-03851-AS   Document 11-17   Filed 02/28/24   Page 30 of 292 #: 4

on potential customer-companies to ensure that they were creditworthy, well run, and likely to generate sufficient collectible future receivables to allow Plaintiff to earn a profit; preparing deal terms; and collecting receivables for Plaintiff.

15.     Plaintiff agreed to compensate Defendant by paying him a commission of 50% of all net profits earned by Plaintiff.  The parties agreed that these net profits would be calculated over 3-month intervals and Plaintiff would pay Defendant his share at the end of such 3-month periods.  For example, if Plaintiff paid $5 million to purchase certain future receivables between January 1 and March 31, and Plaintiff collected $7 million based on those transactions, Plaintiff would have accrued $2 million in gross profits, less expenses, resulting in a net profit amount from which 50% would be paid to Defendant once they were earned beginning on April 1.

16.     Initially, Defendant appeared to perform as advertised.  Defendant sourced a number of deals that Plaintiff funded by purchasing future receivables of companies that Defendant identified.  These companies generated the anticipated receivables that Plaintiff had purchased, and Plaintiff was able to earn a profit upon collection and pay Defendant his appropriate portion of net profits.

17.     Defendant, however, would soon begin to implement an elaborate and sophisticated scheme to swindle Plaintiff out of millions of dollars in unearned and improperly taken commission payments, while further damaging Plaintiff by deliberately causing Plaintiff to enter into transactions with uncreditworthy companies that had no realistic change of generating future receivables against which Plaintiff could collect solely so Defendant could claim Plaintiff owed Defendant commissions for "brokering" the deal.

18.     When Plaintiff hired Defendant, Defendant failed to disclose that he was cash-poor and unable to finance or sustain the ultra-luxury lifestyle that he led.  For example, in June 2021,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Defendant and a non-party jointly purchased a residence in which Defendant would reside in the exclusive enclave of Bal Harbour in Miami Beach, Florida. In connection with this transaction, Defendant agreed to pay the non-party a total of $2,255,023.57 through 21 weekly installments of $100,000 beginning on October 12, 2021, with the remaining balance due on March 15, 2022. To secure Defendant's payment obligations, Defendant executed an affidavit of confession of judgment in favor of the non-party in the amount of $2,255,023.57.

19. This approximate $2.3 million debt represents only a fraction of the money that Defendant owed, and continues to owe, to non-parties that Defendant has accrued in an attempt to maintain a well-heeled lifestyle that he simply cannot afford.

20. Rather than abate his careless spending, Defendant doubled down by deciding to turn Plaintiff into his personal piggy bank.

21. Defendant implemented his strategy through four primary methods.

22. First, Defendant falsely held himself out to numerous clients as an owner of Plaintiff and diverted payments intended for Plaintiff to himself. Defendant accomplished this by improperly directing such companies to make payments directly to him of the future receivables that Plaintiff had purchased. Upon information and belief, certain of Plaintiff's customers, including Jecov Freight Forwarding, LLC, Valley Manor LLC, Drosos and Associates PC, Premium 72 Capital, LLC, and RIS Construction Corp., were induced by Defendant's false and fraudulent representations that he owned Plaintiff to make payments in excess of $500,000 to Defendant, instead of to Plaintiff, who is lawfully entitled to the payment of such funds.[1]

---

[1] Plaintiff's investigation into Defendant remains ongoing and discovery will likely reveal that Defendant defrauded many other of Plaintiff's clients into wrongfully paying to Defendant millions of dollars rightfully due and owing to Plaintiff.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

23. Defendant went so far as to tell certain of Plaintiff's customers to deal with him and not Herbst because, Defendant falsely claimed, Herbst worked for Defendant and was merely an accountant.

24. In another transparent bid to defraud Plaintiff's customers into making payments to Defendant instead of Plaintiff, on or around May 13, 2021 and January 14, 2022, Defendant registered two entities he controls, first Quick Capital Inc. and then City Capital NY LLC, to conduct business under the assumed name of "Hi Bar Capital." This way, upon information and belief, Defendant could direct Plaintiff's customers to make payment to "Hi Bar Capital" – Plaintiff's legal name – while providing wiring instructions for the bank account of either Quick Capital Inc. or City Capital NY LLC, each "doing business as" Hi Bar Capital. Thus, Defendant would fraudulently induce Plaintiff's customers into wrongly believing they were making payments to Plaintiff, when, in reality, the money would go to entities controlled solely by Defendant.

25. Next, Defendant unlawfully bolstered the commissions he claimed that Plaintiff owed him by causing Plaintiff to enter into transactions worth in excess of $6 million with nearly defunct companies teetering on the edge of insolvency that were nearly certain to **not** generate collectible future receivables and, thus, leave Plaintiff not only without profit, but with 100% losses on its purchases.

26. For example, Defendant caused Plaintiff to purchase $1.4 million of future receivables from Fruit Street Health, Inc. ("Fruit Street"), despite the fact that Fruit Street was mired in debt and days away from defaulting on its obligations and ceasing business operations. While Defendant knew, or should have known, that causing Plaintiff to purchase Fruit Street's

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2     RECEIVED NYSCEF: 11/20/2023

future receivables was a recipe for financial disaster, Defendant bulled ahead with the transaction in order to demand that Plaintiff pay Defendant a commission for brokering the deal.

27.     While Plaintiff's investigation is ongoing, Defendant, upon information and belief, improperly caused Plaintiff to pay him approximately $1,000,000 in purported commissions for deals that Defendant knew, or should have known, would end up causing Plaintiff significant, if not total, losses.

28.     Third, Defendant deceived Plaintiff and Herbst by extending and increasing existing transactions to make it appear as if Plaintiff had collected receivables, despite no such funds being paid to Plaintiff, in order to defraud Plaintiff into paying Defendant based on non-existent profits.

29.     For example, if Plaintiff previously purchased $150,000 of future receivables from a company, but only collected $50,000 of such company's receivables, Plaintiff would not yet have earned a profit on that transaction.  To the contrary, Plaintiff would need to receive another $100,000 just for the deal to break even.  In such case, Defendant would offer the company to extend the transaction and increase the amount of receivables that Plaintiff would purchase by, for example, an additional $100,000. Thus, if properly journaled, Plaintiff's books would reflect that the company had open balances to Plaintiff totaling $200,000 ($100,000 owed on the first transaction and $100,000 owed on the second transaction).

30.     Not one to play by the book, Defendant instead played *with* the books by intentionally failing to properly account for such deals to Plaintiff.  Indeed, Defendant would manipulate the first $100,000 transaction to falsely reflect a $0 balance, thus, providing Plaintiff the false impression that (i) the first transaction had closed, (ii) that Plaintiff fully collected all of the outstanding receivables; and (iii) that Plaintiff earned a profit.  Defendant then used this

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

fabricated accounting to defraud Plaintiff into making payments to Defendant based on non-existent profits.

31.     Defendant, upon information and belief, implemented this fraudulent scheme on numerous occasions and unlawfully caused Plaintiff to pay to him in excess of $3 million.

32.     Finally, Defendant simply extorted Plaintiff.  Any time Defendant had an immediate need for cash to finance his lavish and luxurious lifestyle, Defendant demanded that Plaintiff pay to him an "advance" of Defendant's anticipated future commission  payments and threatened to destroy and derail Plaintiff's business if Plaintiff resisted.  Indeed, Defendant once threatened Herbst that he "will make sure all deals go bad on you."

33.     For example, in October 2021, Defendant demanded that Plaintiff "advance" Defendant over $2.2 million in weekly $100,000 payments so that Defendant could make the payments he owed on the ultra-luxury Bar Harbour mansion he had purchased.  When Plaintiff resisted, Defendant threatened to immediately (i) tell Plaintiff's existing customers to stop making payments on receivables; (ii) stop collecting any receivables on Plaintiff's behalf; and (iii) stop bringing any deals to Plaintiff and, instead, outsource them to competitors from whom Defendant could receive a commission.

34.     Faced with the immediate threat of the complete destruction of its business, Plaintiff agreed to pay the "advances" to Defendant.  However, it soon became clear that the "advances" Defendant demanded were nothing of the sort as Defendant refused to credit these payments against earned profits and continued to demand that Plaintiff pay him amounts that failed to acknowledge the significant advances made to Defendant.  Thus, Defendant demanded to Plaintiff double-pay him completely unwarranted sums.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

35.     Plaintiff subsequently learned of the foregoing wrongdoing and is presently attempting to remedy Defendants' breaches and misconduct, repair relationships with its customers harmed by Defendants' lies, fraud and deception, and prevent Defendant from stealing further millions from Plaintiff and others.

## AS AND FOR A FIRST CLAIM FOR RELIEF
**(Breach of Fiduciary Duty)**

36.     Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

37.     As Plaintiff's agent, Defendant owed fiduciary duties of loyalty and good faith to Plaintiff.

38.     Defendant breached his fiduciary duties by the disloyal conduct more fully described above, including, among other things, converting funds rightfully due and owing to Plaintiff for his own personal benefit, deceiving Plaintiff concerning the status of business transactions to fraudulently obtain unwarranted payments from Plaintiff, and knowingly causing Plaintiff to enter into financially unsound transactions solely to allow Defendant to receive commissions to which Defendant was otherwise not entitled.

39.     Defendant's disloyal conduct substantially violated the parties' agreement such that it permeated Defendant's service in its most material and substantial part and constituted a breach of Defendant's duty of loyalty and good faith to Plaintiff.

40.     By reason of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, but in no event less than $10.5 million, plus (i) disgorgement of all compensation paid to Defendant by Plaintiff during the period of Defendant's disloyalty and (ii) disgorgement by Defendant to Plaintiff of all profits made by Defendant during the period of disloyalty, along with costs, interest, expenses and attorneys' fees.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## AS AND FOR A SECOND CLAIM FOR RELIEF
**(Breach of Contract)**

41.     Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

42.     As set forth above, the parties entered into a contract pursuant to which Defendant, among other things, would source deals for Plaintiff and conduct the day-to-day operations of Plaintiff's business in exchange for receiving a commission of 50% of net profits earned by Plaintiff.

43.     As set forth above, Plaintiff fully performed under the parties' contract.

44.     As set forth above, Defendant breached the parties' contract

45.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $10.5 million, plus costs, interest, expenses and attorneys' fees.

## AS AND FOR A THIRD CLAIM FOR RELIEF
**(Conversion)**

46.     Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

47.     As set forth above, Plaintiff owns and has a property right in its profits and accounts receivables and has a right of possession to such funds that is superior to Defendant's right of possession.

48.     As set forth above, Defendant has no right to possess the funds that Defendant has pilfered from Plaintiff.

49.     As set forth above, Defendant's wrongful and intentional conduct dispossessed Plaintiff of its funds to the exclusion and denial of Plaintiff's rights and Defendant has converted such funds.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

50.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $10.5 million, plus costs, interest, expenses and attorneys' fees.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Money Had and Received)

51.     Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

52.     As set forth above, Defendants received in excess of $10.5 million belonging to Plaintiff and Defendant has benefitted from receipt of Plaintiff's money.

53.     In the alternative that the Court does not find that a contract existed between Plaintiff and Defendant, the Court should find that principles of equity and good conscience do not permit Defendants to retain the over $10.5 million paid by Plaintiff.

54.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $10.5 million, plus costs, interest, expenses and attorneys' fees.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment)

55.     Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

56.     As set forth above, Defendant has been unjustly enriched at Plaintiff's expense.

57.     In the alternative that the Court does not find that a contract existed between Plaintiff and Defendant, the Court should find that principles of equity and good conscience do not permit Defendant to retain the over $10.5 million paid by Plaintiff.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

58.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $10.5 million, plus costs, interest, expenses and attorneys' fees.

## JURY DEMAND

Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff hereby requests that the Court grant the following relief:

a.  Judgment in Plaintiff's favor and against Defendant in an amount to be determined at trial, but in no event less than $10.5 million, plus disgorgement of compensation and profits, and pre-judgment interest;

b.  Plaintiff's costs and disbursements incurred in this suit;

c.  Plaintiff's attorneys' fees to the full extent permitted by law; and

d.  Any such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       March 29, 2022

By:     s/ *Glen Lenihan*
        Terrence A. Oved, Esq.
        Darren Oved, Esq.
        Glen Lenihan, Esq.
        Jonathan A. Lynn, Esq.
        OVED & OVED LLP
        *Attorneys for Plaintiff*
        401 Greenwich Street
        New York, New York 10013
        Tel:  212.226.2700
        terry@oved.com
        darren@oved.com
        glenihan@oved.com
        jlynn@oved.com

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# EXHIBIT 8

Case 1:24-cv-08853-AS Document 11-8 Filed 02/28/24 Page 146 of 292

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE



# SECURED MERCHANT AGREEMENT

Agreement dated __03/02/2021__   between BMF Advance, LLC ("BAL") and the merchant listed below ("the Merchant").

**Merchant's Legal Name:** GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"

**D/B/A:** GOLDEN FOOTHILL INSURANCE SERVICES

**Physical Address:** 4511 GOLDEN FOOTHILL PKWY

**City:** EL DORADO                     **State:** CA        **Zip:** 95762

☑ Same as Physical Address
**Mailing Address:** 4511 GOLDEN FOOTHILL PKWY

**City:** EL DORADO                     **State:** CA        **Zip:** 95762

**Type of Entity** (check one): ☐ Corporation  ☑ Limited Liability Company  ☐ Limited Liability Partnership  ☐ Limited Partnership  ☐ Sole Proprietor

## PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to BAL (making BAL the absolute owner) in consideration of the "Purchase Price" specified above, the Purchased Percentage of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the "Purchased Amount has been delivered by or on behalf of Merchant to BAL.

Merchant is selling a portion of a future revenue stream to BAL at a discount, not borrowing money from BAL, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by BAL. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. BAL is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and BAL assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give BAL a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4.

BAL will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, BAL (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as BAL receives payment in full of the Purchased Amount. Merchant hereby authorizes BAL to ACH debit the Agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. BAL's payment of the Purchase Price shall be deemed the acceptance and performance by BAL of this Agreement. Merchant understands that it is responsible for ensuring that the Agreed Remittance to be debited by BAL remains in the Account and will be held responsible for any fees incurred by BAL resulting from a rejected ACH attempt or an Event of Default. BAL is not responsible for any overdrafts or rejected transactions that may result from BAL's ACH debiting the Agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between BAL and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A

**PURCHASE PRICE:** $100,000.00    **SPECIFIED PERCENTAGE:** 10% %    **RECEIPTS PURCHASED AMOUNT:** $149,900.00

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM" HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**MERCHANT #1** (Print Name)

**By:** First Name   STEFAN J            Last Name   LEER

Title:   OWNER                                     _Stefan Leer_
                                                   C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** First Name _____        Last Name _____

Title: _____

**OWNER/GUARANTOR #1** (Print Name)

**By:** First Name   STEFAN J            Last Name   LEER   — DocuSigned by:
                                                   _Stefan Leer_
Title:   OWNER                                     C3E57BC8474C4BB...

**OWNER/GUARANTOR #2** (Print Name)

**By:** First Name _____        Last Name _____

Title: _____

**BMF Advance, LLC**
**By (Company Officer):** _____        **Sales Associate Name (Signature):** _____

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**

Rev 09/18

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE

## MERCHANT AGREEMENT TERMS AND CONDITIONS

### 1 TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to BAL with a Bank acceptable to BAL to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to BAL with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide BAL and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes BAL and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to BAL for the receipts as specified herein and to pay such amounts to BAL. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by BAL or not. This additional authorization is not a waiver of BAL's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which BAL did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of BAL.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by BAL as per the terms of this Agreement.

**1.3 Future Purchase of Increments.** Subject to the terms of this Agreement, BAL offers to purchase additional Receipts in the "Increments" stated in on Page 1 of this Agreement, if any. BAL reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion.

**1.4 Adjustments to the Remittance.** If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to BAL to request a decrease in the Remittance. The amount shall be decreased if the amount received by BAL was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide BAL with viewing access to their bank account as well as all information reasonably requested by BAL to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined and limited) authorize BAL and its agents to investigate their financial responsibility and history, and will provide to BAL any authorizations, bank or financial statements, tax returns, etc., as BAL deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. BAL is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6 Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide BAL with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide BAL with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from BAL.

**1.7 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by BAL for monies owed to BAL from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by BAL.

**1.8 No Liability.** In no event will BAL be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of BAL's attorney's fees and expenses resulting therefrom.

**1.9 Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, BAL, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10 Sale of Receipts.** Merchant and BAL agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from BAL to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. BAL has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to BAL in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that BAL has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and BAL shall promptly refund to Merchant any interest received by BAL in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that BAL not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11 Power of Attorney.** Merchant irrevocably appoints BAL as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to BAL from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to BAL; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which BAL may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant and BAL is authorized to use Merchant's funds to pay for same; and (vii) BAL shall have the right, without waiving any of its rights and remedies and without notice to Merchant or any Owner/Guarantor, to notify any credit card processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of BAL's choosing in order to settle all obligations due to BAL under this Agreement.

**1.12 Protections against Default.** The following Protections 1 through 8 may be invoked by BAL immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the BAL electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to BAL; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without ( ) the express prior written consent of BAL, and (ii) the written agreement of any BAL or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to BAL; (e) Merchant takes any action, fails to take any action, or offers any incentive--economic or otherwise--the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Merchant fails to provide BAL with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from BAL. These protections are in addition to any other remedies available to BAL at law, in equity or otherwise pursuant to this Agreement.

 **INITIALS:** SL

Rev 09/18

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE

**Protection 1.** The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately

**Protection 2.** BAL may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes BAL to execute in the name of the Merchant a Confession of Judgment in favor of BAL in the amount of Purchased Amount stated in the Agreement. Upon an Event of Default, BAL may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** BAL may enforce its security interest in the Collateral.

**Protection 5.** The entire Purchased Amount and all fee (including reasonable attorney's fees) shall become immediately payable to BAL from Merchant.

**Protection 6.** BAL may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if BAL recovers a Judgment against Merchant, Merchant shall be liable for all of BAL's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to BAL. Upon breach of any provision in this Agreement, BAL may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. BAL may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to BAL.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes BAL to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that BAL obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against BAL or any of its affiliates relating to any (i)investigation undertaken by or on behalf of BAL as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by BAL, including this Agreement and any other BAL documents (collectively, "Confidential Information") are proprietary and confidential information of BAL. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of BAL to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles BAL to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity**. Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes BAL to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that BAL may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between BAL and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2     REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to BAL, and future statements which will be furnished hereafter at the discretion of BAL, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise BAL of any material adverse change in their financial condition, operation or ownership. BAL may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to BAL within five business days after request from BAL. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization**. Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal family, or household purposes.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without BAL's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and BAL, nor shall Merchant change any of its places of business without prior written consent by BAL.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from BAL to Merchant, execute, acknowledge and deliver to BAL and/or to any other person, firm or corporation specified by BAL, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of BAL.

**2.11 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13 Good Faith.** Merchant and Guarantors hereby affirm that Merchant is receiving the Purchase Price and selling BAL the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.

**3     EVENTS OF DEFAULT AND REMEDIES**

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a) Merchant or Guarantor shall violate any term or covenant in this Agreement;

(b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c) the sending of notice of termination by Merchant or verbally notifying BAL of its intent to breach this Agreement;

(d) the Merchant fails to give BAL 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, and the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e) Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by seller to any other party.

(f) Merchant shall transfer or sell all or substantially all of its assets;

(g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;

(h) Merchant shall use multiple depository accounts without the prior written consent of BAL

(i) Merchant shall change its depositing account without the prior written consent of BAL; or

(j) Merchant shall close its depositing account used for ACH debits without the prior written consent of BAL



INITIALS: [ SL ]

Rev 09/18

Case 1:24-cv-08551-AS Document 11-8 Filed 02/28/24 Page 49 of 292

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE

(k) Merchant's bank returns a code other than NSF cutting BAL from its collections

(l) Merchant shall default under any of the terms, covenants and conditions of any other agreement with BAL.

**3.2 Limited Personal Guaranty** In the Event of a Default, BAL will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to BAL for all of BAL's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4. hereof, BAL may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of BAL in connection with this Agreement may be exercised at any time by BAL after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to BAL all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of BAL`s remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give BAL written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give BAL seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## 4   MISCELLANEOUS

**4.1 Modifications: Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by BAL.

**4.2 Assignment.** BAL may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to BAL shall become effective only upon receipt by BAL. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of BAL to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof   or the exercise of any other right.   The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect:** Governing Law, Venue and Jurisdiction. This Agreement shall be binding upon and inure to the benefit of Merchant, BAL and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of BAL which consent may be withheld in BAL's sole discretion. BAL reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if BAL so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by BAL to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation,** etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and BAL and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10 JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11 CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE  PARTY WHO  INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR  OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH  THE CLASS OR REPRESENTATIVE ACTION.

**4.12 Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

INITIALS: SL

Rev 09/18

**FILED: NEW YORK COUNTY CLERK 06/24/2022 10:27 AM**
INDEX NO. 650582/2022
NYSCEF DOC. NO. 86
RECEIVED NYSCEF: 06/24/2022

Case 1:24-cv-08551-AS Document 11-8 Filed 12/18/24 Page 150 of 292

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE

## BMF Advance, LLC - SECURITY AGREEMENT AND GUARANTY

**Merchant's Legal Name:** GOLDEN FOOTHILL INSURANCE SERVICES LLC

**D/B/A:** GOLDEN FOOTHILL INSURANCE SERVICES

**Physical Address:** 4511 GOLDEN FOOTHILL PKWY

**City:** EL DORADO                                    **State:** CA                    **Zip:** 95762

**Federal ID#:** ███████

### SECURITY AGREEMENT

Security Interest. This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grants to BAL a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to BAL under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to BAL upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover BAL's entitlements under this Agreement, BAL is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of BAL's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, BAL or an affiliate of BAL. BAL is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by BAL without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. BAL shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, BAL has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets.

With respect to such security interests and liens, BAL will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from BAL written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor (s) agree(s) that this is a contract of recoupment and BAL is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by BAL. Merchant and Guarantor(s) agree(s) to execute and deliver to BAL such instruments and documents BAL may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. BAL is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to BAL under any other agreement between Merchant or Guarantor(s) and BAL (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as BAL deems necessary to perfect or maintain BAL's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes BAL to file any financing statements deemed necessary by BAL to perfect or maintain BAL's security interest. Merchant and Guarantor(s) shall be liable for, and BAL may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by BAL in protecting, preserving and enforcing BAL's security interest and rights.



INITIALS: SL

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Rev 09/18

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE



# GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

BAL as an additional inducement for BAL to enter into this Agreement, the undersigned Guarantor(s) hereby provides BAL with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement **unless** Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to BAL in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, BAL may seek recovery from Guarantors for all of BAL's losses and damages by enforcement of BAL's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral BAL may hold pursuant to this Agreement or any other guaranty.

BAL does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) BAL's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to BAL. In addition, BAL may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to BAL; (ii) release Merchant from its obligations to BAL; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to BAL under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that BAL must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**MERCHANT #1** (Print Name)

By: STEFAN J LEER , OWNER

(Print Name and Title)

SSN#: ██████

Driver's License Number: _____

**MERCHANT #2** (Print Name)

By: ,

(Print Name and Title)

SSN#: _____

Driver's License Number: _____

**OWNER/GUARANTOR #1** (Print Name)

By: STEFAN J LEER , OWNER

(Print Name and Title)

SSN#: ██████

Driver's License Number: _____

**OWNER/GUARANTOR #2** (Print Name)

By: _____

(Print Name and Title)

SSN#: _____

Driver's License Number: _____

Rev 09/18



## APPENDIX A: THE FEE STRUCTURE:

A. Origination Fee:  $295.00 to cover cost of Origination.

B. Underwriting Fee:  $499.00 or 12% of the proposed funding amount to cover underwriting and related expenses. This fee is deemed earned upon Seller signing the contracts. If for whatever reason, Funder determines, in its sole capacity, to cancel the deal, Merchant agrees that Funder may withdraw this non-refundable underwriting fee.

C. NSF Fee (Standard):  $50.00 (each)

D. Default Fee: $5,000.00 when Merchant breaches any terms of this agreement.

E. Blocked Account Fee: $5,000.00 when Merchant breaches the agreement by placing a Stop-Payment on Funder's ACH or closes the Account

F. Bank Change Fee: $50.00 when Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

G. Wire Fee: Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

H. ACH Program Fee:  $299.00  per month for the duration of the agreement.

I. Stacking Fee: 10% of Outstanding RTR or $25,000 whichever is greater. Additionally, taking on additional financing will be deemed a breach of this agreement upon which Funder may invoke all of its rights per the terms of the agreement including but not limited to filing the Confession of Judgment and executing thereon.

J. UCC Fee: $195.00

K. Miscellaneous Service Fees: Merchant agrees that it shall pay for certain services related to the origination and maintenance of the accounts. Merchant shall received their funding electronically to their Designated Account and shall be charged $50.00 per Fed Wire or $0.00 for an ACH.

**MERCHANT #1** (Print Name)

**By:** First Name STEFAN J_____    Last Name LEER_____

Title: OWNER_____

DocuSigned by:

Stefan leer

C3E57BC8474C4BB

**MERCHANT #2** (Print Name)

**By:** First Name_____    Last Name_____

Title: _____

Rev 09/18

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE



## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**DEFINITIONS:**

**BAL:** BMF Advance, LLC

**Seller:**  GOLDEN FOOTHILL INSURANCE SERVICES LLC

(Merchant's Legal Name)

**Merchant Agreement:**  Merchant Agreement between BAL and Seller, dated as of <u>2021-03-02</u>.

**Designated Checking Account:**

Bank Name: _____   Branch: _____

Tax ID: ▮▮▮▮▮▮▮

ABA: Routing: ▮▮▮▮▮▮▮   DDA: Account: ▮▮▮▮▮▮▮

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Seller should keep a copy of this important legal document for Seller's records.**

DISBURSMENT OF ADVANCE PROCEEDS. By signing below, Seller authorizes BAL to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Seller also authorizes BAL to collect amounts due from Seller under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

**In the amount of: $**  4,996.00          Daily

(or) Percentage of each Banking Deposit: _____ %

on the Following Days:          Monday-Friday

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Seller's financial institution for any reason, including without limitation insufficient funds, Seller understands that BAL may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Seller also authorizes BAL to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** BAL is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).

This Authorization Agreement is to remain in full force and effect until BAL has received written notification from Seller at the address set forth below at least 5 banking days prior of its termination to afford BAL a reasonable opportunity to act on it. The individual signing below on behalf of Seller certifies that he/she is an authorized signer on the Designate Checking Account. Seller will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Seller requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Seller:**  GOLDEN FOOTHILL INSURANCE SERVICES LLC

(Merchant's Legal Name)

**MERCHANT #1 (Print Name)**

By: Name:  STEFAN J LEER          Date:  3/2/2021

Title: OWNER

DocuSigned by:

*Stefan Leer*

C3E57BC8474C4BB...

**MERCHANT #2 (Print Name)**

By: Name: _____   Date: _____

Title: _____

Rev 09/18

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE



Dear Merchant,

Thank you for accepting an offer from BMF Advance, LLC. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step. After being completed and executed, please email the agreement to your funding specialist.

**Please provide information required for read-only access\* to your business account.**

*\*Be sure to indicate capital or lower case letters.*


**Bank Portal Website:** _____

**Username:** _____

**Password:** _____

**Security Question/Answer 1:** _____

**Security Question/Answer 2:** _____

**Security Question/Answer 3:** _____

**Any other information necessary to access your account:** _____

_____

INITIALS: SL

Rev 09/ 8

Doc Sign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE



## NO STACKING ADDENDUM

This Addendum entered on <u>03/02/2021</u> is to certify that I, <u>STEFAN J  LEER</u> as a representative of <u>GOLDEN FOOTHILL INSURANCE SERVICES LLC</u>, am prohibited from initiating a cash advance or other loan products with another lender outside to BMF Advance, LLC. Doing so will place me in a breach of contract and I will be liable for the entire amount owed to BMF Advance, LLC immediately, plus attorneys' fees, costs, liquidated damages and a default fee of $25,000 or 20% of the contract amount, whichever is greater.

Amounts received from any subsequent merchant cash advances will be subject to collections by BMF Advance, LLC to satisfy the outstanding account balance.

By their signatures below the parties agreed to be bound by this addendum.

**MERCHANT #1** (Print Name)

**By:** First Name STEFAN J _____ Last Name LEER _____

Title: OWNER _____

DocuSigned by:

*Stefan leer*
C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** First Name _____ Last Name _____

Title: _____

**\*\*This authorization is to remain in full force and effect until BMF Advance, LLC receives written notification from the Merchant of its termination in such time and in such manner to afford BMF Advance, LLC a reasonable opportunity to act on it. Revocation of this authorization prior to remittance of the balance owed pursuant to the Agreement shall constitute a breach thereunder.**

Rev 09/18

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE



## ADDENDUM

This Addendum is entered on <u>03/02/2021</u>, by and between, BMF Advance, LLC ("BAL") and <u>GOLDEN FOOTHILL INSURANCE SERVICES LLC</u> (the "Seller") and Funderslink, LLC.

Should any terms of this Addendum conflict with the Revenue Purchase Agreement dated <u>03/02/2021</u> the terms of this Addendum shall govern and be controlling. Capitalized terms used herein, but not otherwise defined, shall have the same definition as in the Revenue Purchase Agreement.

Seller warrants that it understands that BAL must engage a third-party, namely Funderslink, LLC, to manage the ACH withdrawals, reporting and deal tracking. For this service, Seller agrees to pay Funderslink, LLC a nominal fee of $299.00 per month. This amount is due on the first day of the Agreement and every subsequent thirty days until the Purchased Amount is paid in full to BAL.

**MERCHANT #1** (Print Name)

**By:** First Name STEFAN J     Last Name LEER

Title: OWNER

DocuSigned by:
*Stefan Leer*
C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** First Name _____ Last Name _____

Title: _____

Rev 09/18

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE



# ACH AUTHORIZATION FORM

*All information on this form is required unless otherwise noted.*

## BUSINESS AUTHORIZED TO DEBIT/CREDIT ACCOUNT:

BMF Advance, LLC
Authorized Business Name     Authorized Business Phone Number

Authorized Business Address     City     State     Zip

## ACCOUNT HOLDER INFORMATION:

STEFAN J     LEER     GOLDEN FOOTHILL INSURANCE SERVICES
Account Holder First Name     Account Holder Last Name     Account Holder DBA Name (If Business Account)     Phone Number

Account Holder Address

## ACCOUNT HOLDER BANK INFORMATION:

Account Holder's Bank Name     Branch City     State     Zip

How to find your Routing and Account Numbers on a check

⑈ 123456789 ⑈ 123456789 0123 ⑈     ☐ Business Checking   ☐ Personal Checking   ☐ Savings
Bank Routing Code    Bank Account Number

Bank Routing Number (9 digits)     Bank Account Number

## TRANSACTION INFORMATION:

Goods Purchased/Services Rendered

Amount of Transaction     3/2/2021
Effective Date

☐ One-time    ☐ Recurring

Rate _____

No. of Transactions _____ or Open Ended ☐

## AUTHORIZATION:

In exchange for products and/or services listed above the undersigned hereby authorizes:

to electronically draft via the Automated Clearing House system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writing by the undersigned account holder. The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder. I acknowledge that I am subject to a $25 reject fee if items are returned for insufficient funds.

DocuSigned by:

*Stefan Leer*
5C3E57BC8474C4BB...
Signature of Account Holder

STEFAN J     LEER     **OWNER**     3/2/2021
First Name of Account Holder     Last Name of Account Holder     Title of Account Holder     Date

Rev 09/18

Case 1:24-cv-00555-AS    Document 71-18    Filed 02/28/24    Page 158 of 292

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE



## BALANCE TRANSFER FORM

| | |
|---|---|
| **Merchant Legal Name ("Merchant"):** | STEFAN J LEER |
| **Merchant Title:** | OWNER |
| **Business Legal Name ("Business"):** | GOLDEN FOOTHILL INSURANCE SERVICES LLC |
| **DBA:** | GOLDEN FOOTHILL INSURANCE SERVICES |
| **Physical Address:** | 4511 GOLDEN FOOTHILL PKWY |
| **City:** | EL DORADO |
| **State:** | CA |
| **Zip Code:** | 95762 |
| **Date:** | 03/02/2021 |

**BMF Advance, LLC**
**1022 Avenue M.**
**Brooklyn, NY 11230**

| | |
|---|---|
| **Date of new secured agreement:** | 03/02/2021 |
| **Date of previous secured agreement:** | |
| **Remaining RTR balance:** | |

To Whom It May Concern:

I, Merchant, on behalf of Business, hereby authorize BMF Advance, LLC to debit the remaining RTR balance which is currently due and owing to BMF Advance, LLC pursuant to the previous secured merchant agreement, entered into by and between BMF Advance, LLC and business.

I acknowledge that as a result of the above-referenced debit, the amount paid to business by BMF Advance, LLC pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.

Thank you,

By: _Stefan Leer_
DocuSigned by:
C3E57BC8474C4BB.

Merchant Legal Name: STEFAN J LEER

Title: OWNER

Rev 09/18

Case 1:24-cv-00555-AS Document 1-18 Filed 02/28/24 Page 159 of 202

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE

**EXHIBIT B**

**ADDENDUM TO**
**THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY**

This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT and GUARANTY (this "Addendum")**, dated 0302/21, is entered into by and among **BMF ADVANCE** ("BMF") and

**Business Legal Name:** GOLDEN FOOTHILL INSURANCE SERVICES LLC
**D/B/A:** GOLDEN FOOTHILL INSURANCE SERVICES
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** LLC          **EIN #:** ▮▮▮▮▮▮▮
("Seller #1"); and

**Business Legal Name:** LONEWOLF INSURANCE SERVICES INC
**D/B/A:** LONEWOLF INSURANCE SERVICES
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** Corporation          **EIN #:** ▮▮▮▮▮▮▮
("Seller #2"); and

**Business Legal Name:** GENESIS LS FUND LLC
**D/B/A:** GENESIS LS FUND
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** LLC          **EIN #:** ▮▮▮▮▮▮▮
("Seller #3"); and

**Business Legal Name:** EL DORADO HILLS INSURANCE SOLUTIONS INC
**D/B/A:** EL DORADO HILLS INSURANCE SOLUTIONS
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** LLC          **EIN #:** ▮▮▮▮▮▮▮
("Seller #4"); and

**Business Legal Name:** KTL HOLDINGS INC
**D/B/A:** KTL HOLDINGS
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** Corporation          **EIN #:** ▮▮▮▮▮▮▮
("Seller #5").

**Name:** STEFAN J LEER                         ("Guarantor #1")
**Email:** STEFAN@KTLHOLDING.COM
**Phone:** (210) 259-1648
**Title:** Owner/Agent/Manager          **SSN:** ▮▮▮▮▮▮▮

Hereinafter: (i) Seller # 1 is referred to as the "Original Seller"; and (ii) Seller # 2, Seller # 3, Seller # 4 and Seller # 5 are referred to, individually and collectively, jointly and severally, as the "Additional Seller"; and (iii) the Original Seller and the Additional Seller are referred to, individually and collectively, jointly and severally, as the "Seller."

Page 1 of 3

DocuSign Envelope ID: 06269AAA-B783-42F1-956C-FE7CEEE265DE

# ACH/E-Check Authorization Form

All information on this form is required unless otherwise noted.

## Business Authorized to Debit/Credit Account:

Spin Capital LLC
Authorized Business Name

732-608-4905
Authorized Business Phone Number

1460 Arboretum Pkwy
Authorized Business Address

Lakewood
City

NJ
ST

Zip

## Account Holder Information:

Stefan Leer
Account Holder Name

KTL Holdings INC
Account Holder DBA Name (If Business Account)

Account Holder Phone

1300 Highland Ave #205
Account Holder Address

Manhattan Beach
City

CA
ST

90266
Zip

## Account Holder s Bank Information:

JP Morgan Chase
Account Holder's Bank Name

Branch City

ST

Zip

How to find your Routing and Account Numbers on a check:

|: 123456789 |: 12345678901 23 |"
Bank Routing Code          Bank Account Number

[X] Business Checking
[ ] Personal Checking
[ ] Savings

Bank Routing Number (9 digits)

Bank Account Number

## Transaction Information:

Origination Fee
Goods Purchased/Services Rendered

[X] One-time   [ ] Recurring

Rate _____

No. of Transactions __1__ or Open Ended [ ]

$ 7500
Amount of Transaction

3/2/2021
Effective Date

## Authorization:

In exchange for products and/or services listed above the undersigned hereby authorizes:

Spin Capital LLC

to electronically draft via the Automated Clearing House and/or E-Check system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writing by the undersigned account holder. The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder. I acknowledge that I am subject to a $39 reject fee if items are returned for insufficient funds.

DocuSigned by:

*Stefan Leer*
Signature of Account Holder

Stefan Leer
Name/Title of Account Holder

3/2/2021
Date

# EXHIBIT 9

Case 1:24-cv-03851-AS Document 11-9 Filed 02/28/25 Page 162 of 292

From: "Josh Lubin" <josh@spincapital.com>
To: "Isaac Lubin" <isaac@spincapital.com>
Subject: FW: FUNDING EMAIL-BMF ADV-GOLDEN FOOTHILL _5234
Date: Mon, 14 Mar 2022 10:31:59 -0400
Importance: Normal
Attachments: MTD1917.pdf; MTD6583.pdf; MTD8007.pdf; MTD8660.pdf; SIGNED_DOCS.pdf; DEC8660.pdf; FEB8660.pdf; JAN8660.pdf; KTL_VOIDED_CHECK.pdf; MTD0051.pdf

---

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Wednesday, March 3, 2021 1:15 PM
**To:** BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Cc:** Gabe Isaacov <gabe@bmfcapitalllc.com>; BMF Submissions <submissions@bmfcapitalllc.com>; Josh Lubin <josh@spincapital.com>
**Subject:** FUNDING EMAIL-BMF ADV-GOLDEN FOOTHILL _5234

# DATE 03/03/21
# BMF ADV-NEW-WIRE
# DEAL NAME: GOLDEN FOOTHILL _5234
# EIN: 82-4517607
# FUNDING: $100,000
# PAYBACK: $149,000
# DAILY:$4,996 START
# BANK FEE: $20,000
# SYNDICATION: SPIN CAPITAL $50% GETS HALF FEE
# NET TO MERCHANT: $80,000 WIRE
# Routing: 322271627
# Account: 23008660
# Merchant Name: STEFAN J LEER
# Merchant Number: 210-259-1648

CONFIDENTIAL

SPIN-00007067

# EXHIBIT 10

Case 1:24-cv-08551-AS Document 11-10 Filed 02/28/25 Page 164 of 292

**From:** "Gabe Isaacov" <gabe@bmfcapitalllc.com>
**To:** "Josh Lubin" <josh@spincapital.com>
**Subject:** RE: KT Holdings
**Date:** Tue, 02 Mar 2021 15:06:35 -0500
**Importance:** Normal
**Attachments:** GOLDEN_BMF_ADV.pdf

---

Contract attached.

**From:** Josh Lubin <josh@spincapital.com>
**Sent:** Tuesday, March 2, 2021 2:59 PM
**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Subject:** Re: KT Holdings

Need to get getter on board with me. 100kx2

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Tuesday, March 2, 2021 2:57:53 PM
**To:** Josh Lubin <josh@spincapital.com>
**Subject:** RE: KT Holdings

U sure u wanna fund this?

**From:** Josh Lubin <josh@spincapital.com>
**Sent:** Tuesday, March 2, 2021 2:54 PM
**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Subject:** RE: KT Holdings

West coast docs.

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Tuesday, March 2, 2021 2:37 PM
**To:** Josh Lubin <josh@spincapital.com>
**Subject:** Re: KT Holdings

West coast business capital

Sent from my iPhone

On Mar 2, 2021, at 2:35 PM, Josh Lubin <josh@spincapital.com> wrote:

What paper is the Yellowstone contract on?

CONFIDENTIAL                                                              SPIN-00007123

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Tuesday, March 2, 2021 2:35 PM
**To:** Josh Lubin <josh@spincapital.com>
**Subject:** Re: KT Holdings

You sent me global merchant.

Sent from my iPhone


On Mar 2, 2021, at 2:34 PM, Josh Lubin <josh@spincapital.com> wrote:


What paper is it on?

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Tuesday, March 2, 2021 2:34 PM
**To:** Josh Lubin <josh@spincapital.com>
**Subject:** Re: KT Holdings

Get me YSC contract here please

Sent from my iPhone


On Mar 2, 2021, at 2:20 PM, Josh Lubin <josh@spincapital.com> wrote:


Add all ein to the docs attached.

150k 1.499 40 days

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Tuesday, March 2, 2021 12:29 PM
**To:** Josh Lubin <josh@spincapital.com>
**Subject:** RE: KT Holdings

I need the transfer accounts below.

0051, 1917,6583, 8007,

**From:** Josh Lubin <josh@spincapital.com>
**Sent:** Tuesday, March 2, 2021 12:17 PM
**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Subject:** KT Holdings


<Pages 1, 13, 18.pdf>
<SS-4 Genesis .pdf>
<lonewolf ein.pdf>
<Ein KineticEl dorado .pdf>
<Golden Foothill Insurance Services EIN.pdf>

CONFIDENTIAL

CONFIDENTIAL                                                          SPIN-00007125

# EXHIBIT 11

# GOLDEN FOOTHILL INSURANCE SERVICES LLC

| Date | Ref # | Memo | Amount | Balance |
|------|-------|------|--------|---------|
| 3/4/2021 | | Starting Balance | $149,000.00 | $149,000.00 |
| 3/4/2021 | 1206329 | Payment | -$4,996.00 | $144,004.00 |
| 3/5/2021 | 1206679 | Payment | -$4,996.00 | $139,008.00 |
| 3/8/2021 | 1206810 | Payment | -$4,996.00 | $134,012.00 |
| 3/9/2021 | 1207023 | Payment | -$4,996.00 | $129,016.00 |
| 3/10/2021 | 1207480 | Payment | -$4,996.00 | $124,020.00 |
| 3/11/2021 | 1207483 | Payment | -$4,996.00 | $119,024.00 |
| 3/12/2021 | 1207216 | Payment | -$115,000.00 | $4,024.00 |
| 3/12/2021 | 1207766 | Payment | -$4,996.00 | -$972.00 |
| | | **Total** | **$149,972.00** | **($972.00)** |

*************

The information contained in these documents is confidential, privileged and only for the information of the intended recipient and may not be used, published or redistributed without the prior written consent of BMF ADVANCE . All Rights Reserved.

*************

CONFIDENTIAL                                                                         SPIN-00007181

# EXHIBIT 12

Case 1:24-cv-08555-AS   Document 11-12   Filed 02/28/24   Page 170 of 292

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

# HI BAR CAPITAL

### REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance (**"Agreement"**) dated 3/10/2021 _____ between **HI BAR CAPITAL** (**"HBC"**) the Merchant(s) listed below (**"Merchant"**) and the Individual(s) listed below (**"Guarantor"**)

### MERCHANT INFORMATION

Merchant's Legal Name: GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A"

D/B/A: GOLDEN FOOTHILL INSURANCE SERVICES AND ALL ENTITIES LISTED ON "EXHIBIT A"

State of Incorporation / Organization: CA

Type of Entity LLC

Physical Address: 4511 GOLDEN FOOTHILL PKWY

City: EL DORADO          State: CA          Zip: 95762          Business Phone:

Guarantor(s) Name: STEFAN LEER          Cellphone Number:          Email Address:

Mailing Address: 4511 GOLDEN FOOTHILL PKWY          City: EL DORADO          State: CA          Zip: 95762

**Purchase Price: $** 220,000.00          Purchased Percent 20          %          Purchased Amount: $ 329,978.00

Payment Frequency: DAILY          Remittance $ 8,500.00

In consideration of payment by HBC to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to HBC (making HBC the absolute owner) the Purchased Percentage of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to HBC.

Merchant is selling a portion of a future revenue stream to HBC at a discount, and is not borrowing money from HBC, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by HBC. The Remittance is a good faith estimate of HBC's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. HBC is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and HBC assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give HBC a reasonable and fair opportunity to receive the benefit of its bargain. HBC acknowledges that it may never receive the Purchased Amount if the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

HBC will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, HBC (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as HBC receives payment in full of the Purchased Amount. Merchant hereby authorizes HBC to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of HBC) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide HBC with all required access codes and monthly bank statements regarding the Account so that HBC may monitor the Account. HBC payment of the Purchase Price shall be deemed the acceptance and performance by HBC of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by HBC remains in the Account and will be held responsible for any fees incurred by HBC resulting from a rejected ACH attempt or an Event of Default. HBC is not responsible for any overdrafts or rejected transactions that may result from HBC's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between HBC and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**FOR THE MERCHANT (#1)** By: STEFAN LEER _____
(Print Name and Title)

DocuSigned by:
*Stefan Leer*
C3E57BC8474C4BB...          (Signature)

**FOR THE MERCHANT (#2)** By: _____
(Print Name and Title)

DocuSigned by:          (Signature)

**BY GUARANTOR(S) (#1)** By: STEFAN LEER _____
(Print Name and Title)

DocuSigned by:
*Stefan Leer*
C3E57BC8474C4BB...          (Signature)

**BY GUARANTOR(S) (#2)** By: _____
(Print Name and Title)

(Signature)

1

PROPERTY OF HI BAR CAPITAL

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

MERCHANT AGREEMENT TERMS AND CONDITIONS

**1          TERMS OF ENROLLMENT IN PROGRAM**

**1.1          Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to hbc with a Bank acceptable to hbc to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to HBC with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide HBC and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes HBC and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to HBC for the receipts as specified herein and to pay such amounts to HBC. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by HBC or not. This additional authorization is not a waiver of HBC's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which HBC did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of HBC.

**1.2          Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by HBC as per the terms of this Agreement.

**1.3          Reconciliation.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@hibarcapital.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. HBC retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by HBC within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by HBC shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with HBC's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

**1.4          Adjustments to the Remittance.** As long an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to HBC to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@hibarcapital.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. HBC retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide HBC with viewing access to their bank account as well as all information reasonably requested by HBC to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5          Financial Condition.** Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize HBC and its agents to investigate their financial responsibility and history, and will provide to HBC any authorizations, bank or financial statements, tax returns, etc., as HBC requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. HBC is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6          Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide HBC with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide HBC with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from HBC.

**1.7          Indemnification.** Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless HBC and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by HBC for monies owed to HBC from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by HBC.

**1.8          No Liability.** In no event will HBC be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)s will be jointly liable for all of HBC's attorney's fees and expenses resulting therefrom.

**1.9          Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, HBC, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action. **1.10          Sale of Receipts.** Merchant and HBC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from HBC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. HBC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that HBC's share of Receipts collected are being held by Merchant in trust and are the sole property of HBC until they are remitted to HBC. Payments made to HBC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to HBC full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. HBC hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of HBC for the purpose of collecting and delivering Receipts to HBC as required by this Agreement until HBC has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to HBC under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that HBC is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that HBC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and HBC shall promptly refund to Merchant any interest received by HBC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that HBC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11          Power of Attorney.** Merchant irrevocably appoints HBC and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to HBC from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to HBC; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which HBC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

**1.12          Protections against Default.** The following Protections 1 through 8 may be invoked by HBC immediately and without notice to Merchant in the event:
**(a)**
Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the HBC electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to HBC; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of HBC, and (ii) the written agreement of any HBC or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to HBC; (e) Merchant takes any action, fails

PROPERTY OF HI BAR CAPITAL          Initial(1): _SL_     Initial(2):_____

2

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide HBC with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from HBC, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to HBC at law, in equity or otherwise pursuant to this
Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** HBC may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes HBC to execute in the name of the Merchant a Confession of Judgment in favor of HBC pursuant to the terms of the Confession of Judgment. Upon an Event of Default, HBC may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** HBC may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** HBC may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** HBC may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if HBC recovers a Judgment against Merchant, Merchant shall be liable for all of HBC's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to HBC. Upon breach of any provision in this Agreement, HBC may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. HBC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HBC. **Protection 8.** HBC may debit Merchant's depository accounts wherever situated in such amounts as determined by HBC in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to HBC by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HBC.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes HBC to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that HBC obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against HBC or any of its affiliates relating to any (i)investigation undertaken by or on behalf of HBC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by HBC, including this Agreement and any other HBC documents (collectively, "Confidential Information") are proprietary and confidential information of HBC. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of HBC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles HBC to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s hereto all hereby authorizes HBC to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that HBC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between HBC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2       REPRESENTATIONS, WARRANTIES AND COVENANTS**
Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

2.1             **Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to HBC, and future statements which will be furnished hereafter at the discretion of HBC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise HBC of any material adverse change in their financial condition, operation or ownership. HBC may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to HBC within five business days after request from HBC. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

2.2             **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3             **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4             **Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

2.5             **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without HBC's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6             **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and HBC, nor shall Merchant change any of its places of business without prior written consent by HBC.

2.7             **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

2.8             **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from HBC to Merchant, execute, acknowledge and deliver to HBC and/or to any other person, firm or corporation specified by HBC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9             **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10             **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which HBC has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of HBC or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of HBC.

2.11             **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12             **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13             **Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling HBC the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

**3       EVENTS OF DEFAULT AND REMEDIES**

(a)    Events of Default. The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(b)    Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c)    the sending of notice of termination by Merchant or verbally notifying HBC of its intent to breach this Agreement;

(d)    the Merchant fails to give HBC 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored

3

PROPERTY OF HI BAR CAPITAL

Initial(1): _SL_    Initial(2):_____

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e)    Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by HBC;

(f)    Merchant shall voluntarily transfer or sell all or substantially all its assets.

(g)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant.

(h)    Merchant shall use multiple depository accounts without the prior written consent of HBC or takes any other action that intentionally interferes with or prevents HBC from receiving the Purchased Amount in accordance with the terms of this Agreement.

(i)    Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.

(j)    Merchant shall change its depositing account without the prior written consent of HBC; or

(k)    Merchant shall close its depositing account used for ACH debits without the prior written consent of HBC.

(l)    Merchant's bank returns a code other than NSF cutting HBC from its collections

(m)    Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.

(n)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with HBC.

**3.2    Limited Personal Guaranty** Upon the occurrence of an Event of Default, HBC will enforce its rights against the Guarantor(s)s of this transaction. Said Guarantor(s)s will jointly and severally liable to HBC for all of HBC's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3    **Remedies.** Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, HBC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of HBC in connection with this Agreement may be exercised at any time by HBC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4    **Attorney's Fees.** Upon the occurrence of an Event of Default, and HBC retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

3.5    **Costs.** Merchant shall pay to HBC all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of HBC's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.6    **Required Notifications.** Merchant is required to give HBC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give HBC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4    MISCELLANEOUS**

4.1    **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by HBC.

4.2    **Assignment.** HBC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3    **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to HBC shall become effective only upon receipt by HBC. Notices to Merchant shall become effective three days after mailing.

4.4    **Waiver Remedies.** No failure on the part of HBC to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5    Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and HBC and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of HBC which consent may be withheld in HBC's sole discretion. HBC reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HBC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by HBC to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by HBC by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

4.6    **Survival of Representation**, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7    **Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8    **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9    **Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s)s and HBC and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10    **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND    ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11    **CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12    **Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

Initial(1): **SL**    Initial(2):_____

Case 1:24-cv-08555-AS Document 11-12 Filed 02/28/2024 Page 76 of 292

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name: GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A"

D/B/A: GOLDEN FOOTHILL INSURANCE SERVICES AND ALL ENTITIES LISTED ON "EXHIBIT A" Federal ID#: ▮▮▮▮▮▮▮

Physical Address: 4511 GOLDEN FOOTHILL PKWY    City: EL DORADO    State: CA    Zip: 95762

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to HBC and HBC's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to HBC a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to HBC under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to HBC upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover HBC's entitlements under this Agreement, HBC is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of HBC's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, HBC or an affiliate of HBC is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to HBC for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due HBC under the Revenue Purchase Agreement. With respect to any such entity, HBC shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. HBC shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. HBC shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of HBC's rights, including without limitation, HBC's right to collect all accounts, and to notify any payment card processor or creditor of such entity that HBC has such rights in such entity's assets. Merchant also agrees that, at the HBC's discretion, HBC may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by HBC without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. HBC shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, HBC has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, HBC will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from HBC written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and HBC is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by HBC. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to HBC such instruments and documents HBC may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. HBC is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to HBC under any other agreement between Merchant or Guarantor(s)(s) and HBC (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as HBC deems necessary to perfect or maintain HBC's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes HBC to file any financing statements deemed necessary by HBC to perfect or maintain HBC's security interest. Merchant and Guarantor(s)(s) shall be liable for, and HBC may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by HBC in protecting, preserving and enforcing HBC's security interest and rights.

**Negative Pledge**. Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease**. HBC shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, HBC may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that HBC may enter into an agreement with Merchant's landlord giving HBC the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies**. Upon any Event of Default, HBC may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to HBC, whether by acceleration or otherwise.

5

PROPERTY OF HI BAR CAPITAL

Initial(1): SL    Initial(2): _____

Case 1:24-cv-06555-AS Document 11-12 Filed 02/28/24 Page 173 of 292

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

## GUARANTY OF PERFORMANCE

As an additional inducement for HBC to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides HBC with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to HBC in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor(s) Waivers**. In the event of a breach of the above, HBC may seek recovery from Guarantor(s)s for all of HBC's losses and damages by enforcement of HBC's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral HBC may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. HBC is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) HBC's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to HBC. In addition, HBC may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to HBC; (ii) release Merchant from its obligations to HBC;
(iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to HBC under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that HBC must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HBC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by HBC to transfer such proceeding to an Acceptable Forum.

The Merchant Guarantor(s) and Corporate Guarantor(s) acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail return receipt requested to the Mailing Address on Page 1 of this Agreement.

**FOR ALL MERCHANT(S) (#1)** By: STEFAN LEER
(Print Name and Title)

DocuSigned by:
Stefan Leer
C3E57BC8474C4BB...
(Signature)

SSN# ▓▓▓▓▓▓▓▓

**FOR ALL MERCHANT(S) (#2)** By: _____
(Print Name and Title)

_____
(Signature)

SSN#_____

**GUARANTOR(S) (#1)** By: STEFAN LEER
(Print Name and Title)

DocuSigned by:
Stefan Leer
C3E57BC8474C4BB...
(Signature)

SSN# ▓▓▓▓▓▓▓

**GUARANTOR(S) (#2)** By: _____
(Print Name and Title)

_____
(Signature)

SSN#_____

6

PROPERTY OF HI BAR CAPITAL

Case 1:24-cv-08555-AS Document 71-12 Filed 02/28/24 Page 178 of 292

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT), DIRECT PAYMENTS (ACH DEBITS), AND CHECK DEBIT

Merchant: GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A"

(Merchant's Legal Name)

Merchant Agreement: Merchant Agreement between HBC and Merchant, dated as of: 3/10/2021

Designated Checking Account:

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes HBC to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes HBC to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits or to initiate a Check Debit to the Designated Checking Account, as follows:**

Bank Name:_____ Branch:_____

Federal ID#: ▓▓▓▓▓_____

ABA: Routing:_____ DDA: Account:_____

Bank Name:_____ Branch:_____

Federal ID#:_____

ABA: Routing:_____ DDA: Account:_____

In the Amount of: $ 8,500.00

(Or) Percentage of each Banking Deposit: 20 %

On the Following Days: MONDAY-FRIDAY

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that HBC may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes HBC to initiate ACH entries to correct any erroneous payment transaction.

MISCELLANEOUS. HBC is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until HBC has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford HBC a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Merchant agrees** to be bound by the ACH Rules as defined by the National ACH Association (NACHA). Merchant understands that this authorization is to remain in full force and effect until HBC has received written notification from me of its termination at least five (5) business days prior to the payment due date. Merchant further understands that canceling their ACH authorization does not relieve them of the responsibility of paying account in full, and that if Merchant cancels or revokes this authorization before any remaining debt is paid in full, the HBC may take additional actions including legal actions to secure the debt.

GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A"

Merchant:_____

(Merchant's Legal Name)

Print Name: STEFAN LEER

Print Name: _Stefan Leer_
C3E57BC8474C4BB...

X_____
(Signature)

X_____
(Signature)

_____
(Title)

_____
(Title)

Date: 3/10/2021
(Month) (Day) (Year)

Date: 3/10/2021
(Month) (Day) (Year)

7

PROPERTY OF HI BAR CAPITAL

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

# APPENDIX A - THE FEE STRUCTURE:

**A.** **Underwriting Fee**: $ 21,999.00 to cover Underwriting and relates expenses.

**B.** **UCC Filing Fee:** $499.00 and arc not an automated process, requiring us to charge this fee to cover costs.

**C.** **NSF Fee Standard:** $50.00 (each) up to TWO TIMES ONLY before a default is declared.

**D.** **Bank Change Fee**: $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

**E.** **Blocked ACH Payment**: $5,000.00 This fee is applied when Merchant directs the bank to BLOCK our ACH Debits. Blocking ACH Debits will place Merchant's account in default.

**F.** **Default Fee:** Shall be applied to Merchant's account in the event that Merchant defaults under the terms of the Merchant Agreement.

**G.** **ACH Processing Fee**: $249.00 (or 10% of the contract amount, depending on size of advance) ACH's are labor intensive

**H.** **Account Management Fee:** At the end of each month, Merchant will pay to HBC an Account Management Fee. This fee will not be applied towards the reduction of the Purchased Amount. This monthly fee will equal the average of all the payments received as a Specified percentage of the Merchants settlement amount for that Month.

**I.** **Miscellaneous Service Fee:** Merchant shall pay certain fees for services related to the origination and maintenance of Accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or 0.00 for a bank ACH. The current charge for the underwriting and origination of each Merchant

**J.** **Working Capital Funding**: A fee of $5,000.00 or 10% shall be applied every time Merchant enters into any arrangement, agreement, or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than HBC

**K.** **Contract Service Fee:** Commencing at date funded (the "Start Date"), merchant shall pay a fee of $499.00 per month (the "Monthly Fee") the monthly fee is payable each month during the term of this agreement, at a minimum of three months.

**L.** **Attorney's Fee:** $10,000. When merchant breaches any term of this Agreement and HBC is required to retain counsel to enforce, defend or collect any term of this Agreement.

[ALL FEES ARE SUBJECT TO CHANGE]

**FOR THE MERCHANT (#1)** By: STEFAN LEER _____

(Print Name and Title)

DocuSigned by:

Stefan Leer
C3E57BC8474C4BB...

(Signature)

**FOR THE MERCHANT (#2)** By: _____

(Print Name and Title)

(Signature)

8

PROPERTY OF HI BAR CAPITAL

Case 1:24-cv-00515-AS    Document 71-12    Filed 02/28/24    Page 178 of 292

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from HBC. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

HBC will require viewing access s to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that  e w carefully safeguard your confidential information, and only essential personnel will have access to it.

HBC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

\* Be sure to indicate capital or lower-case letters.

Name of Bank: _____

Bank portal website:

Username: _____

Password: _____

Security Question / Answer 1:_____

Security Question /Answer 2: _____

Security Question / Answer 3: _____

Any other information necessary to access your account:

_____

STEFAN LEER                                              3/10/2021
_____        _____

FOR THE MERCHANT (#1) By:                               Date
DocuSigned by:
                                                        3/10/2021
Stefan Leer                                             _____
C3E57BC8474C4BB...
FOR THE MERCHANT (#2) By:                               Date

9

PROPERTY OF HI BAR CAPITAL

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

## EXHIBIT A

### ADDENDUM TO
### THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY

This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT and GUARANTY (this "Addendum")**, dated 3/12/2021 is entered into by and among **PROPERTY OF HI BAR CAPITAL** ("BUYER") and **Business Legal Name: GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A" LISTED ON EXHIBIT A** D/B/A: GOLDEN FOOTHILL INSURANCE SERVICES AND ALL ENTITIES LISTED ON "EXHIBIT A"

**Business Legal Name:**
**LONEWOLF INSURANCE SERVICES INC**
**Form of Business Entity: INC**

**EIN #:**
("Seller #1"); and

**Business Legal Name:**
**GENESIS LS FUND LLC**
**Form of Business Entity: LLC**

**EIN #:**
("Seller #2"); and

**Business Legal Name: EL DORADO HILLS INSURANCE SOLUTIONS INC**
**Form of Business Entity: INC**

**EIN #:**
("Seller #3"); and

**EIN #:**
("Seller #4"); and

**Business Legal Name: KTL HOLDINGS INC**
**Form of Business Entity: INC**

**EIN #:**
("Seller #5").

**Business Legal Name:**
**GOLDEN FOOTHILL INSURANCE SERVICES LLC**
**Form of Business Entity: LLC**

Signature: *Stefan Leer*
— DocuSigned by: —
C3E57BC8474C4BB...

**Name: STEFAN LEER**
**SSN:** ▮▮▮▮▮▮▮
**Email:**
**Phone:**
**Title:**

Hereinafter: (i) Seller # 1 is referred to as the "Original Seller"; and (ii) Seller # 2, Seller # 3 and Seller # 4 are referred to, individually and collectively, jointly and severally, as the "Additional Seller"; and (iii) the Original Seller and the Additional Seller are referred to, individually and collectively, jointly and severally, as the "Seller."

Hereinafter, Guarantor # 1 is referred to as the "Original Guarantor."

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

**W-I-T-N-E-S-S-E-T-H**

**WHEREAS**, BUYER, the Original Seller and the Original Guarantor entered into that certain FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT, dated 3/12/2021     (the "Agreement"); and

**WHEREAS**, the obligations of the Original Seller under the Agreement are further guaranteed by the Original Guarantor pursuant to the Personal Guaranty of Performance set forth as Exhibit

A to the Agreement (the "Guaranty"); and

**WHEREAS**, the parties hereto desire to amend and restate the Agreement by adding the name(s) of the Additional Seller as the parties to the Agreement, as if the Additional Seller were the signatories to the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged, the parties to this Addendum hereby agree to the foregoing and as follows:

Guarantor #1 Initials: [ _SL_ ]   Guarantor #2 Initials: [          ]

PROPERTY OF HI BAR CAPITAL

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

# ACH/E-Check Authorization Form

All information on this form is required unless otherwise noted.

## Business Authorized to Debit/Credit Account:

| | |
|---|---|
| Spin Capital LLC | 732-608-4905 |
| Authorized Business Name | Authorized Business Phone Number |
| 1460 Arboretum Pkwy | Lakewood      NJ |
| Authorized Business Address | City      ST      Zip |

## Account Holder Information:

| | | |
|---|---|---|
| Stefan Leer | Golden Foothill Insurance | |
| Account Holder Name | Account Holder DBA Name (If Business Account) | Account Holder Phone |
| 1300 Highland Ave #205 | Manhattan Beach | CA   90266 |
| Account Holder Address | City | ST   Zip |

## Account Holder s Bank Information:

| | |
|---|---|
| JP Morgan Chase | |
| Account Holder's Bank Name | Branch City    ST   Zip |

How to find your Routing and Account Numbers on a check:

⑈ 123456789 ⑈ 1234567890123 ⑈"
Bank Routing Code     Bank Account Number

[X] Business   Checking
[ ] Personal   Checking
[ ] Savings

Bank Routing Number (9 digits)

Bank Account Number

## Transaction Information:

| | |
|---|---|
| Origination Fee | |
| Goods Purchased/Services Rendered | |

[X] One-time    [ ] Recurring

Rate _____

No. of Transactions __1__ or Open Ended [ ]

| | |
|---|---|
| $ 8000 | 3/12/2021 |
| Amount of Transaction | Effective Date |

## Authorization:

In exchange for products and/or services listed above the undersigned hereby authorizes:

### Spin Capital LLC

to electronically draft via the Automated Clearing House and/or E-Check system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writing by the undersigned account holder. The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder. I acknowledge that I am subject to a $39 reject fee if items are returned for insufficient funds.

DocuSigned by:

*Stefan Leer*                   Stefan Leer                  3/12/2021

Signature of Account Holder          Name/Title of Account Holder          Date

# EXHIBIT 13

Message

| | |
|---|---|
| **From:** | Stefan Leer [stefan@lonewolfins.com] |
| on behalf of | Stefan Leer <stefan@lonewolfins.com> [stefan@lonewolfins.com] |
| **Sent:** | 3/12/2021 7:00:08 PM |
| **To:** | Josh Lubin [josh@spincapital.com] |
| **Subject:** | Confirmed released.... |

ending
Open information dialog: Pending

ONLINE DOMESTIC WIRE TRANSFER VIA: OPTIMUMBANK FL/067015096   Outgoing
A/C: HI BAR CAPITAL BROOKLYN NY 11204 US REF: ACH PAYMENTS       wire
FOR LOAN TRN: 3320131071ES 03/12                                 transfer  –$19,996.00

Thank you,

Stefan Leer
President & Owner

628.238.4700 | Bus

210.259.1648 | Cell
210.568.4029 | Fax

https://lonewolfins.com/index.html

LEER_0067006

# EXHIBIT 14

Case 1:24-cv-08555-SS    Document 11-14    Filed 02/28/25    Page 85 of 292

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D



## SECURED MERCHANT AGREEMENT

**Agreement dated** 3/12/21 **between BMF Advance, LLC ("BAL") and the merchant listed below ("the Merchant").**

**Merchant's Legal Name:** GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"

**D/B/A:** GOLDEN FOOTHILL INSURANCE SERVICES

**Physical Address:** 4511 GOLDEN FOOTHILL PKWY

**City:** EL DORADO    **State:** CA    **Zip:** 95762

☑ Same as Physical Address

**Mailing Address:** 4511 GOLDEN FOOTHILL PKWY

**City:** EL DORADO    **State:** CA    **Zip:** 95762

**Type of Entity (check one):** ☐ Corporation  ☑ Limited Liability Company  ☐ Limited Liability Partnership  ☐ Limited Partnership  ☐ Sole Proprietor

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to BAL (making BAL the absolute owner) in consideration of the "Purchase Price" specified above, the Purchased Percentage of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the "Purchased Amount has been delivered by or on behalf of Merchant to BAL.

Merchant is selling a portion of a future revenue stream to BAL at a discount, not borrowing money from BAL, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by BAL. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. BAL is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and BAL assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give BAL a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4.

BAL will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, BAL (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as BAL receives payment in full of the Purchased Amount. Merchant hereby authorizes BAL to ACH debit the Agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. BAL's payment of the Purchase Price shall be deemed the acceptance and performance by BAL of this Agreement. Merchant understands that it is responsible for ensuring that the Agreed Remittance to be debited by BAL remains in the Account and will be held responsible for any fees incurred by BAL resulting from a rejected ACH attempt or an Event of Default. BAL is not responsible for any overdrafts or rejected transactions that may result from BAL's ACH debiting the Agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between BAL and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A

| PURCHASE PRICE: | $220,000.00 | SPECIFIED PERCENTAGE: | 10% % | RECEIPTS PURCHASED AMOUNT: | $329,780.00 |

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM" HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**MERCHANT #1** (Print Name)

**By:** First Name STEFAN J    Last Name LEER    DocuSigned by:

Title: OWNER    Stefan Leer

C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** First Name    Last Name

Title:

**OWNER/GUARANTOR #1** (Print Name)

**By:** First Name STEFAN J    Last Name LEER    DocuSigned by:

Title: OWNER    Stefan Leer

C3E57BC8474C4BB...

**OWNER/GUARANTOR #2** (Print Name)

**By:** First Name    Last Name

Title:

**BMF Advance, LLC**
**By (Company Officer):**    **Sales Associate Name (Signature):**

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**

Rev 09/18

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

## MERCHANT AGREEMENT TERMS AND CONDITIONS

### 1    TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to BAL with a Bank acceptable to BAL to obtain electronic fund transfer services for the Account, and    (B) if applicable, execute an agreement acceptable to BAL with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide BAL and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes BAL and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to BAL for the receipts as specified herein and to pay such amounts to BAL. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by BAL or not. This additional authorization is not a waiver of BAL's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which BAL did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of BAL.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by BAL as per the terms of this Agreement.

**1.3 Future Purchase of Increments.** Subject to the terms of this Agreement, BAL offers to purchase additional Receipts in the "Increments" stated in on Page 1 of this Agreement, if any. BAL reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion.

**1.4 Adjustments to the Remittance.** If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to BAL to request a decrease in the Remittance. The amount shall be decreased if the amount received by BAL was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide BAL with viewing access to their bank account as well as all information reasonably requested by BAL to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined and limited) authorize BAL and its agents to investigate their financial responsibility and history, and will provide to BAL any authorizations, bank or financial statements, tax returns, etc., as BAL deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. BAL is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6 Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide BAL with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide BAL with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from BAL.

**1.7 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by BAL for monies owed to BAL from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by BAL.

**1.8 No Liability.** In no event will BAL be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of BAL's attorney's fees and expenses resulting therefrom.

**1.9 Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, BAL, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10 Sale of Receipts.** Merchant and BAL agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from BAL to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. BAL has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to BAL in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that BAL has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and BAL shall promptly refund to Merchant any interest received by BAL in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that BAL not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11 Power of Attorney.** Merchant irrevocably appoints BAL as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to BAL from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to BAL; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which BAL may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant and BAL is authorized to use Merchant's funds to pay for same; and (vii) BAL shall have the right, without waiving any of its rights and remedies and without notice to Merchant or any Owner/Guarantor, to notify any credit card processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of BAL's choosing in order to settle all obligations due to BAL under this Agreement.

**1.12 Protections against Default.** The following Protections 1 through 8 may be invoked by BAL immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the BAL electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to BAL; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of BAL, and (ii) the written agreement of any BAL or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to BAL; (e) Merchant takes any action, fails to take any action, or offers any incentive--economic or otherwise--the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Merchant fails to provide BAL with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from BAL. These protections are in addition to any other remedies available to BAL at law, in equity or otherwise pursuant to this Agreement.

 **INITIALS:** _SL_

Rev 09/18

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

**Protection 1.** The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** BAL may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes BAL to execute in the name of the Merchant a Confession of Judgment in favor of BAL in the amount of Purchased Amount stated in the Agreement. Upon an Event of Default, BAL may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** BAL may enforce its security interest in the Collateral.

**Protection 5.** The entire Purchased Amount and all fee (including reasonable attorney's fees) shall become immediately payable to BAL from Merchant.

**Protection 6.** BAL may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if BAL recovers a Judgment against Merchant, Merchant shall be liable for all of BAL's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to BAL. Upon breach of any provision in this Agreement, BAL may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. BAL may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to BAL.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes BAL to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that BAL obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against BAL or any of its affiliates relating to any (i)investigation undertaken by or on behalf of BAL as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by BAL, including this Agreement and any other BAL documents (collectively, "Confidential Information") are proprietary and confidential information of BAL. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of BAL to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles BAL to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes BAL to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that BAL may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between BAL and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2      REPRESENTATIONS, WARRANTIES AND COVENANTS**
Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to BAL, and future statements which will be furnished hereafter at the discretion of BAL, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise BAL of any material adverse change in their financial condition, operation or ownership. BAL may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to BAL within five business days after request from BAL. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without BAL's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and BAL, nor shall Merchant change any of its places of business without prior written consent by BAL.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from BAL to Merchant, execute, acknowledge and deliver to BAL and/or to any other person, firm or corporation specified by BAL, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of BAL.

**2.11 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13 Good Faith.** Merchant and Guarantors hereby affirm that Merchant is receiving the Purchase Price and selling BAL the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.

**3      EVENTS OF DEFAULT AND REMEDIES**
**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:
(a) Merchant or Guarantor shall violate any term or covenant in this Agreement;
(b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;
(c) the sending of notice of termination by Merchant or verbally notifying BAL of its intent to breach this Agreement;
(d) the Merchant fails to give BAL 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, and the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;
(e) Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by seller to any other party.
(f) Merchant shall transfer or sell all or substantially all of its assets;
(g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;
(h) Merchant shall use multiple depository accounts without the prior written consent of BAL
(i) Merchant shall change its depositing account without the prior written consent of BAL; or
(j) Merchant shall close its depositing account used for ACH debits without the prior written consent of BAL



INITIALS:  SL

Rev 09/18

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

(k) Merchant's bank returns a code other than NSF cutting BAL from its collections
(l) Merchant shall default under any of the terms, covenants and conditions of any other agreement with BAL.

**3.2 Limited Personal Guaranty** In the Event of a Default, BAL will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to BAL for all of BAL's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4. hereof, BAL may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of BAL in connection with this Agreement may be exercised at any time by BAL after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to BAL all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of BAL`s remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give BAL written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give BAL seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## 4 MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by BAL.

**4.2 Assignment.** BAL may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to BAL shall become effective only upon receipt by BAL. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of BAL to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect;** Governing Law, Venue and Jurisdiction. This Agreement shall be binding upon and inure to the benefit of Merchant, BAL and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of BAL which consent may be withheld in BAL's sole discretion. BAL reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if BAL so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by BAL to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation,** etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and BAL and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10 JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11 CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.12 Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.



INITIALS:

Rev 09/18

Case 1:24-cv-06555-AS Document 111-14 Filed 02/28/25 Page 180 of 292

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

## BMF Advance, LLC - SECURITY AGREEMENT AND GUARANTY

**Merchant's Legal Name:** GOLDEN FOOTHILL INSURANCE SERVICES LLC

**D/B/A:** GOLDEN FOOTHILL INSURANCE SERVICES

**Physical Address:** 4511 GOLDEN FOOTHILL PKWY

**City:** EL DORADO          **State:** CA          **Zip:** 95762

**Federal ID#:** ▮▮▮▮▮▮▮

## SECURITY AGREEMENT

Security Interest. This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grants to BAL a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to BAL under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to BAL upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover BAL's entitlements under this Agreement, BAL is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of BAL's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, BAL or an affiliate of BAL. BAL is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by BAL without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. BAL shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, BAL has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets.

With respect to such security interests and liens, BAL will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from BAL written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor (s) agree(s) that this is a contract of recoupment and BAL is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by BAL. Merchant and Guarantor(s) agree(s) to execute and deliver to BAL such instruments and documents BAL may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. BAL is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to BAL under any other agreement between Merchant or Guarantor(s) and BAL (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as BAL deems necessary to perfect or maintain BAL's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes BAL to file any financing statements deemed necessary by BAL to perfect or maintain BAL's security interest. Merchant and Guarantor(s) shall be liable for, and BAL may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by BAL in protecting, preserving and enforcing BAL's security interest and rights.



**INITIALS:** SL

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Rev 09/18

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D



## GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

BAL as an additional inducement for BAL to enter into this Agreement, the undersigned Guarantor(s) hereby provides BAL with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement **unless** Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to BAL in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, BAL may seek recovery from Guarantors for all of BAL's losses and damages by enforcement of BAL's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral BAL may hold pursuant to this Agreement or any other guaranty.

BAL does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) BAL's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to BAL. In addition, BAL may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to BAL; (ii) release Merchant from its obligations to BAL; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to BAL under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that BAL must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**MERCHANT #1** (Print Name)

By: STEFAN J LEER , OWNER
(Print Name and Title)

DocuSigned by:
*Stefan leer*
C3E57BC8474C4BB...

SSN#: ▇▇▇▇▇          Driver's License Number: _____

**MERCHANT #2** (Print Name)

By: ,
(Print Name and Title)

SSN#: _____          Driver's License Number: _____

**OWNER/GUARANTOR #1** (Print Name)

By: STEFAN J LEER , OWNER
(Print Name and Title)

DocuSigned by:
*Stefan leer*
C3E57BC8474C4BB...

SSN#: ▇▇▇▇▇          Driver's License Number: _____

**OWNER/GUARANTOR #2** (Print Name)

By: ,
(Print Name and Title)

SSN#: _____          Driver's License Number: _____

Rev 09/18

Case 1:24-cv-06555-VSS Document 11-14 Filed 02/28/24 Page 198 of 292

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D



## APPENDIX A: THE FEE STRUCTURE:

A. Origination Fee:  $295.00 to cover cost of Origination.

B. Underwriting Fee:  $499.00 or 12% of the proposed funding amount to cover underwriting and related expenses. This fee is deemed earned upon Seller signing the contracts. If for whatever reason, Funder determines, in its sole capacity, to cancel the deal, Merchant agrees that Funder may withdraw this non-refundable underwriting fee.

C. NSF Fee (Standard):  $50.00 (each)

D. Default Fee: $5,000.00 when Merchant breaches any terms of this agreement.

E. Blocked Account Fee: $5,000.00 when Merchant breaches the agreement by placing a Stop-Payment on Funder's ACH or closes the Account

F. Bank Change Fee: $50.00 when Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

G. Wire Fee: Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

H. ACH Program Fee:  $299.00  per month for the duration of the agreement.

I. Stacking Fee: 10% of Outstanding RTR or $25,000 whichever is greater. Additionally, taking on additional financing will be deemed a breach of this agreement upon which Funder may invoke all of its rights per the terms of the agreement including but not limited to filing the Confession of Judgment and executing thereon.

J. UCC Fee: $195.00

K. Miscellaneous Service Fees: Merchant agrees that it shall pay for certain services related to the origination and maintenance of the accounts. Merchant shall received their funding electronically to their Designated Account and shall be charged $50.00 per Fed Wire or $0.00 for an ACH.

**MERCHANT #1** (Print Name)

**By:** First Name STEFAN J _____  Last Name LEER _____

Title: OWNER _____

DocuSigned by:

*Stefan Leer*
C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** First Name _____  Last Name _____

Title: _____

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D



## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**DEFINITIONS:**

**BAL:** BMF Advance, LLC

**Seller:** GOLDEN FOOTHILL INSURANCE SERVICES LLC

        (Merchant's Legal Name)

**Merchant Agreement:** Merchant Agreement between BAL and Seller, dated as of <u>2021-03-02</u>.

**Designated Checking Account:**

| | |
|---|---|
| **Bank Name:** | **Branch:** |
| **Tax ID:** ▮▮▮▮▮▮ | |
| **ABA: Routing:** | **DDA: Account:** |

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Seller should keep a copy of this important legal document for Seller's records.**

DISBURSMENT OF ADVANCE PROCEEDS. By signing below, Seller authorizes BAL to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Seller also authorizes BAL to collect amounts due from Seller under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

**In the amount of: $**   8,500.00         Daily

(or) Percentage of each Banking Deposit: _____ %

on the Following Days:     Monday-Friday

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Seller's financial institution for any reason, including without limitation insufficient funds, Seller understands that BAL may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Seller also authorizes BAL to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** BAL is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).

This Authorization Agreement is to remain in full force and effect until BAL has received written notification from Seller at the address set forth below at least 5 banking days prior of its termination to afford BAL a reasonable opportunity to act on it. The individual signing below on behalf of Seller certifies that he/she is an authorized signer on the Designate Checking Account. Seller will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Seller requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Seller:** GOLDEN FOOTHILL INSURANCE SERVICES LLC

        (Merchant's Legal Name)

**MERCHANT #1** (Print Name)

**By:** Name:   STEFAN J LEER         Date:    3/12/2021

Title: OWNER       *Stefan leer*
                                        C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** Name: _____ Date: _____

Title: _____

Rev 09/18

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D



Dear Merchant,

Thank you for accepting an offer from BMF Advance, LLC. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step. After being completed and executed, please email the agreement to your funding specialist.

**Please provide information required for read-only access\* to your business account.**

*\*Be sure to indicate capital or lower case letters.*

**Bank Portal Website:** _____

**Username:** _____

**Password:** _____

**Security Question/Answer 1:** _____

**Security Question/Answer 2:** _____

**Security Question/Answer 3:** _____

**Any other information necessary to access your account:** _____

_____

**INITIALS:** SL

*Rev 09/18*

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D



## NO STACKING ADDENDUM

This Addendum entered on 3/12/21 is to certify that I, <u>STEFAN J  LEER</u>  as a representative of <u>GOLDEN FOOTHILL INSURANCE SERVICES LLC</u> , am prohibited from initiating a cash advance or other loan products with another lender outside to BMF Advance, LLC. Doing so will place me in a breach of contract and I will be liable for the entire amount owed to BMF Advance, LLC immediately, plus attorneys' fees, costs, liquidated damages and a default fee of $25,000 or 20% of the contract amount, whichever is greater.

Amounts received from any subsequent merchant cash advances will be subject to collections by BMF Advance, LLC to satisfy the outstanding account balance.

By their signatures below the parties agreed to be bound by this addendum.

**MERCHANT #1** (Print Name)

**By:** First Name <u>STEFAN J</u>           Last Name <u>LEER</u>

Title: <u>OWNER</u>

DocuSigned by:

*Stefan Leer*

C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** First Name _____           Last Name _____

Title: _____

**\*\*This authorization is to remain in full force and effect until BMF Advance, LLC receives written notification from the Merchant of its termination in such time and in such manner to afford BMF Advance, LLC a reasonable opportunity to act on it. Revocation of this authorization prior to remittance of the balance owed pursuant to the Agreement shall constitute a breach thereunder.**

Rev 09/18

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D



## ADDENDUM

This Addendum is entered on 3/12/21 by and between, BMF Advance, LLC ("BAL") and <u>GOLDEN FOOTHILL INSURANCE SERVICES LLC</u> (the "Seller") and Funderslink, LLC.

Should any terms of this Addendum conflict with the Revenue Purchase Agreement dated 3/12/21 the terms of this Addendum shall govern and be controlling. Capitalized terms used herein, but not otherwise defined, shall have the same definition as in the Revenue Purchase Agreement.

Seller warrants that it understands that BAL must engage a third-party, namely Funderslink, LLC, to manage the ACH withdrawals, reporting and deal tracking. For this service, Seller agrees to pay Funderslink, LLC a nominal fee of $299.00 per month. This amount is due on the first day of the Agreement and every subsequent thirty days until the Purchased Amount is paid in full to BAL.

**MERCHANT #1** (Print Name)

**By:** First Name <u>STEFAN J</u>          Last Name <u>LEER</u>

Title: <u>OWNER</u>

DocuSigned by:

_Stefan Leer_
C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** First Name _____          Last Name _____

Title: _____

Rev 09/18

FILED: NEW YORK COUNTY CLERK 06/24/2022 10:27 AM INDEX NO. 650582/2022
NYSCEF DOC. NO. 88 RECEIVED NYSCEF: 06/24/2022

Case 1:24-cv-00515-AS Document 11-14 Filed 02/28/24 Page 196 of 292

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D



# ACH AUTHORIZATION FORM

*All information on this form is required unless otherwise noted.*

## BUSINESS AUTHORIZED TO DEBIT/CREDIT ACCOUNT:

BMF Advance, LLC
Authorized Business Name | Authorized Business Phone Number

Authorized Business Address | City | State | Zip

## ACCOUNT HOLDER INFORMATION:

STEFAN J | LEER | GOLDEN FOOTHILL INSURANCE SERVICES |
Account Holder First Name | Account Holder Last Name | Account Holder DBA Name (If Business Account) | Phone Number

Account Holder Address

## ACCOUNT HOLDER BANK INFORMATION:

Account Holder's Bank Name | Branch City | State | Zip

How to find your Routing and Account Numbers on a check

| ⑈ 123456789 ⑈ 12345678901 23 ⑈ | ☐ Business Checking ☐ Personal Checking ☐ Savings |
| Bank Routing Code   Bank Account Number | |

Bank Routing Number (9 digits) | Bank Account Number

## TRANSACTION INFORMATION:

Goods Purchased/Services Rendered

| | ☐ One-time    ☐ Recurring |
| | Rate _____ |
| 3/12/21 | |
Amount of Transaction | Effective Date | No. of Transactions _____ or Open Ended ☐

## AUTHORIZATION:

In exchange for products and/or services listed above the undersigned hereby authorizes:

to electronically draft via the Automated Clearing House system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writing by the undersigned account holder. The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder. I acknowledge that I am subject to a $25 reject fee if items are returned for insufficient funds.

Signature of Account Holder

DocuSigned by:

*Stefan Leer*

57BC8474C4BB...

STEFAN J | LEER | OWNER |
First Name of Account Holder | Last Name of Account Holder | Title of Account Holder

Rev 09/18

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D



## BALANCE TRANSFER FORM

**Merchant Legal Name ("Merchant"):**   STEFAN J LEER

**Merchant Title:**   OWNER

**Business Legal Name ("Business"):**   GOLDEN FOOTHILL INSURANCE SERVICES LLC

**DBA:**   GOLDEN FOOTHILL INSURANCE SERVICES

**Physical Address:**   4511 GOLDEN FOOTHILL PKWY

**City:**   EL DORADO

**State:**   CA

**Zip Code:**   95762

**Date:**   3/12/21

**BMF Advance, LLC**
**1022 Avenue M.**
**Brooklyn, NY 11230**

**Date of new secured agreement:**   3/12/21

**Date of previous secured agreement:**   03/03/21

**Remaining RTR balance:**   $114,928.00

To Whom It May Concern:

I, Merchant, on behalf of Business, hereby authorize BMF Advance, LLC to debit the remaining RTR balance which is currently due and owing to BMF Advance, LLC pursuant to the previous secured merchant agreement, entered into by and between BMF Advance, LLC and business.

I acknowledge that as a result of the above-referenced debit, the amount paid to business by BMF Advance, LLC pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.

Thank you,

**By:** Stefan Leer
C3E57BC8474C4BB...

Merchant Legal Name:   STEFAN J LEER

Title:   OWNER

Rev 09/18

Case 1:24-cv-00515-AS Document 71-14 Filed 02/28/24 Page 195 of 292

DocuSign Envelope ID: F7F8CBA7-8D30-4E87-B919-604B19A1DA9D

**EXHIBIT B**

**ADDENDUM TO**
**THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY**

This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT and GUARANTY (this "Addendum")**, dated 3/12/21 is entered into by and among **BMF ADVANCE** ("BMF") and

**Business Legal Name:** GOLDEN FOOTHILL INSURANCE SERVICES LLC
**D/B/A:** GOLDEN FOOTHILL INSURANCE SERVICES
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** LLC                    **EIN #:** ▮▮▮▮▮
("Seller #1"); and

**Business Legal Name:** LONEWOLF INSURANCE SERVICES INC
**D/B/A:** LONEWOLF INSURANCE SERVICES
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** Corporation          **EIN #:** ▮▮▮▮▮
("Seller #2"); and

**Business Legal Name:** GENESIS LS FUND LLC
**D/B/A:** GENESIS LS FUND
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** LLC                    **EIN #:** ▮▮▮▮▮
("Seller #3"); and

**Business Legal Name:** EL DORADO HILLS INSURANCE SOLUTIONS INC
**D/B/A:** EL DORADO HILLS INSURANCE SOLUTIONS
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** LLC                    **EIN #:** ▮▮▮▮▮
("Seller #4"); and

**Business Legal Name:** KTL HOLDINGS INC
**D/B/A:** KTL HOLDINGS
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** Corporation          **EIN #:** ▮▮▮▮▮
("Seller #5").

*Stefan Leer*
DocuSigned by:
C3E57BC8474C4BB...
("Guarantor #1")

**Name:** STEFAN J LEER
**Email:** STEFAN@KTLHOLDING.COM
**Phone:** (210) 259-1648
**Title:** Owner/Agent/Manager                    **SSN:** ▮▮▮▮▮

Hereinafter: (i) Seller # 1 is referred to as the "Original Seller"; and (ii) Seller # 2, Seller # 3, Seller # 4 and Seller # 5 are referred to, individually and collectively, jointly and severally, as the "Additional Seller"; and (iii) the Original Seller and the Additional Seller are referred to, individually and collectively, jointly and severally, as the "Seller."

# EXHIBIT 15

**From:** "BMF Submissions" <submissions@bmfcapitalllc.com>
**To:** "Gabe Isaacov" <gabe@bmfcapitalllc.com>, "Josh Lubin" <josh@spincapital.com>, "BMF BACKOFFICE" <funding@bmfcapitalllc.com>
**Subject:** RE: FUNDING EMAIL-BMF ADV-GOLDEN FOOTHILL _5234
**Date:** Fri, 12 Mar 2021 12:16:57 -0500
**Importance:** Normal
**Attachments:** GOLDEN_BMF_ADV.pdf

---

See attached

---

**From:** Gabe Isaacov
**Sent:** Friday, March 12, 2021 12:12 PM
**To:** Josh Lubin <josh@spincapital.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Cc:** BMF Submissions <submissions@bmfcapitalllc.com>
**Subject:** RE: FUNDING EMAIL-BMF ADV-GOLDEN FOOTHILL _5234

Molly send 220k 1.499 8,500 daily

---

**From:** Josh Lubin <josh@spincapital.com>
**Sent:** Friday, March 12, 2021 12:11 PM
**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Cc:** BMF Submissions <submissions@bmfcapitalllc.com>
**Subject:** RE: FUNDING EMAIL-BMF ADV-GOLDEN FOOTHILL _5234

How many days??? DO WTVR U WANT. ILL GET IT DONE

---

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Friday, March 12, 2021 12:10 PM
**To:** Josh Lubin <josh@spincapital.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Cc:** BMF Submissions <submissions@bmfcapitalllc.com>
**Subject:** RE: FUNDING EMAIL-BMF ADV-GOLDEN FOOTHILL _5234

47 days???? How much bank fee?

---

**From:** Josh Lubin <josh@spincapital.com>
**Sent:** Friday, March 12, 2021 12:06 PM
**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Cc:** BMF Submissions <submissions@bmfcapitalllc.com>
**Subject:** RE: FUNDING EMAIL-BMF ADV-GOLDEN FOOTHILL _5234

Send refi docs 220k 1.499 6,999 daily

---

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Friday, March 12, 2021 12:01 PM
**To:** Josh Lubin <josh@spincapital.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Cc:** BMF Submissions <submissions@bmfcapitalllc.com>
**Subject:** RE: FUNDING EMAIL-BMF ADV-GOLDEN FOOTHILL _5234

$114,928 as of today

CONFIDENTIAL

**From:** Josh Lubin <josh@spincapital.com>
**Sent:** Friday, March 12, 2021 12:01 PM
**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Cc:** BMF Submissions <submissions@bmfcapitalllc.com>
**Subject:** RE: FUNDING EMAIL-BMF ADV-GOLDEN FOOTHILL _5234

Whats the balance?

---

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Wednesday, March 3, 2021 1:15 PM
**To:** BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Cc:** Gabe Isaacov <gabe@bmfcapitalllc.com>; BMF Submissions <submissions@bmfcapitalllc.com>; Josh Lubin <josh@spincapital.com>
**Subject:** FUNDING EMAIL-BMF ADV-GOLDEN FOOTHILL _5234

# DATE 03/03/21
# BMF ADV-NEW-WIRE
# DEAL NAME: GOLDEN FOOTHILL _5234
# EIN: 82-4517607
# FUNDING: $100,000
# PAYBACK: $149,000
# DAILY:$4,996 START
# BANK FEE: $20,000
# SYNDICATION: SPIN CAPITAL $50% GETS HALF FEE
# NET TO MERCHANT: $80,000 WIRE
# Routing: 322271627
# Account: 23008660
# Merchant Name: STEFAN J LEER
# Merchant Number: 210-259-1648

CONFIDENTIAL

SPIN-00007264

# EXHIBIT 16

FILED: NEW YORK COUNTY CLERK 10/14/2024 11:53 AM
INDEX NO. 650582/2022
NYSCEF DOC. NO. 702
RECEIVED NYSCEF: 10/14/2024
Case 1:24-cv-08551-AS Document 11-16 Filed 02/28/25 Page 203 of 292
5/2/2022 7:49:23 PM

## GOLDEN FOOTHILL INSURANCE SERVICES LLC

| Date | Ref # | Memo | Amount | Balance |
|------|-------|------|--------|---------|
| 3/13/2021 | | Starting Balance | $329,780.00 | $329,780.00 |
| 3/15/2021 | 1207769 | Payment | -$8,000.00 | $321,780.00 |
| 3/16/2021 | 1208609 | Payment | -$8,000.00 | $313,780.00 |
| 3/17/2021 | 1208612 | Payment | -$8,000.00 | $305,780.00 |
| 3/18/2021 | 1209409 | Payment | -$8,000.00 | $297,780.00 |
| 3/19/2021 | 1209412 | Payment | -$8,000.00 | $289,780.00 |
| 3/22/2021 | 1209415 | Payment | -$8,000.00 | $281,780.00 |
| 3/23/2021 | 1209418 | Payment | -$8,000.00 | $273,780.00 |
| 3/24/2021 | 1209421 | Payment | -$8,000.00 | $265,780.00 |
| 3/25/2021 | 1210524 | ACH Return | -$8,000.00 | $265,780.00 |
| 3/26/2021 | 1209107 | Payment | -$265,780.00 | $0.00 |
| 3/26/2021 | 1210523 | Payment | -$8,000.00 | -$8,000.00 |
| 5/26/2021 | 1217393 | ACH Return | $0.00 | -$8,000.00 |
| 5/27/2021 | 1217524 | ACH Return | $0.00 | -$8,000.00 |
| | | **Total** | **$345,780.00** | **($8,000.00)** |

*************

The information contained in these documents is confidential, privileged and only for the information of the intended recipient and may not be used, published or redistributed without the prior written consent of BMF ADVANCE . All Rights Reserved.

*************

CONFIDENTIAL
SPIN-00007182

# EXHIBIT 17

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A



## SECURED MERCHANT AGREEMENT

**Agreement dated** __3/25/21__ **between BMF Advance, LLC ("BAL") and the merchant listed below ("the Merchant").**

**Merchant's Legal Name:** GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"

**D/B/A:** GOLDEN FOOTHILL INSURANCE SERVICES

**Physical Address:** 4511 GOLDEN FOOTHILL PKWY

**City:** EL DORADO     **State:** CA     **Zip:** 95762

☑ Same as Physical Address
**Mailing Address:** 4511 GOLDEN FOOTHILL PKWY

**City:** EL DORADO     **State:** CA     **Zip:** 95762

**Type of Entity** (check one):  ☐ Corporation  ☑ Limited Liability Company  ☐ Limited Liability Partnership  ☐ Limited Partnership  ☐ Sole Proprietor

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to BAL (making BAL the absolute owner) in consideration of the "Purchase Price" specified above, the Purchased Percentage of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the "Purchased Amount has been delivered by or on behalf of Merchant to BAL.

Merchant is selling a portion of a future revenue stream to BAL at a discount, not borrowing money from BAL, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by BAL. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. BAL is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and BAL assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give BAL a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4.

BAL will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, BAL (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as BAL receives payment in full of the Purchased Amount. Merchant hereby authorizes BAL to ACH debit the Agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. BAL's payment of the Purchase Price shall be deemed the acceptance and performance by BAL of this Agreement. Merchant understands that it is responsible for ensuring that the Agreed Remittance to be debited by BAL remains in the Account and will be held responsible for any fees incurred by BAL resulting from a rejected ACH attempt or an Event of Default. BAL is not responsible for any overdrafts or rejected transactions that may result from BAL's ACH debiting the Agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between BAL and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A

**PURCHASE PRICE:** $400,000.00     **SPECIFIED PERCENTAGE:** 10% %     **RECEIPTS PURCHASED AMOUNT:** $599,600.00

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM" HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**MERCHANT #1** (Print Name)

**By:** First Name  STEFAN J     Last Name  LEER

_DocuSigned by:_ Stefan Leer  C3E57BC8474C4BB...

**Title:** OWNER

**MERCHANT #2** (Print Name)

**By:** First Name     Last Name

**Title:**

**OWNER/GUARANTOR #1** (Print Name)

**By:** First Name  STEFAN J     Last Name  LEER

_DocuSigned by:_ Stefan Leer  C3E57BC8474C4BB...

**Title:** OWNER

**OWNER/GUARANTOR #2** (Print Name)

**By:** First Name     Last Name

**Title:**

**BMF Advance, LLC**
**By (Company Officer):**     **Sales Associate Name (Signature):**

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**

Rev 09/18

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A

## MERCHANT AGREEMENT TERMS AND CONDITIONS

### 1  TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to BAL with a Bank acceptable to BAL to obtain electronic fund transfer services for the Account, and  (B) if applicable, execute an agreement acceptable to BAL with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide BAL and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes BAL and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to BAL for the receipts as specified herein and to pay such amounts to BAL. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by BAL or not. This additional authorization is not a waiver of BAL's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which BAL did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of BAL.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by BAL as per the terms of this Agreement.

**1.3 Future Purchase of Increments.** Subject to the terms of this Agreement, BAL offers to purchase additional Receipts in the "Increments" stated in on Page 1 of this Agreement, if any. BAL reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion.

**1.4 Adjustments to the Remittance.** If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to BAL to request a decrease in the Remittance. The amount shall be decreased if the amount received by BAL was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide BAL with viewing access to their bank account as well as all information reasonably requested by BAL to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined and limited) authorize BAL and its agents to investigate their financial responsibility and history, and will provide to BAL any authorizations, bank or financial statements, tax returns, etc., as BAL deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. BAL is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6 Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide BAL with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide BAL with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from BAL.

**1.7 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by BAL for monies owed to BAL from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by BAL.

**1.8 No Liability.** In no event will BAL be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of BAL's attorney's fees and expenses resulting therefrom.

**1.9 Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, BAL, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10 Sale of Receipts.** Merchant and BAL agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase

Price is not intended to be, nor shall it be construed as a loan from BAL to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. BAL has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to BAL in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that BAL has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and BAL shall promptly refund to Merchant any interest received by BAL in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that BAL not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11 Power of Attorney.** Merchant irrevocably appoints BAL as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to BAL from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to  BAL; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which BAL may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant and BAL is authorized to use Merchant's funds to pay for same; and (vii) BAL shall have the right, without waiving any of its rights and remedies and without notice to Merchant or any Owner/Guarantor, to notify any credit card processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of BAL's choosing in order to settle all obligations due to BAL under this Agreement.

**1.12 Protections against Default.** The following Protections 1 through 8 may be invoked by BAL immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of  checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the BAL electronic check processor;  (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to BAL; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of BAL, and (ii) the written agreement of any BAL or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to BAL; (e) Merchant takes any action, fails to take any action, or offers any incentive--economic or otherwise--the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Merchant fails to provide BAL with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from BAL. These protections are in addition to any other remedies available to BAL at law, in equity or otherwise pursuant to this Agreement.



**INITIALS:** SL

Rev 09/18

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A

**Protection 1.** The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** BAL may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes BAL to execute in the name of the Merchant a Confession of Judgment in favor of BAL in the amount of Purchased Amount stated in the Agreement. Upon an Event of Default, BAL may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** BAL may enforce its security interest in the Collateral.

**Protection 5.** The entire Purchased Amount and all fee (including reasonable attorney's fees) shall become immediately payable to BAL from Merchant.

**Protection 6.** BAL may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if BAL recovers a Judgment against Merchant, Merchant shall be liable for all of BAL's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to BAL. Upon breach of any provision in this Agreement, BAL may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. BAL may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to BAL.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes BAL to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that BAL obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against BAL or any of its affiliates relating to any (i)investigation undertaken by or on behalf of BAL as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by BAL, including this Agreement and any other BAL documents (collectively, "Confidential Information") are proprietary and confidential information of BAL. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of BAL to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles BAL to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity**. Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes BAL to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that BAL may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between BAL and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## 2    REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to BAL, and future statements which will be furnished hereafter at the discretion of BAL, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise BAL of any material adverse change in their financial condition, operation or ownership. BAL may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to BAL within five business days after request from BAL. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals**. Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without BAL's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and BAL, nor shall Merchant change any of its places of business without prior written consent by BAL.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8 Estoppel Certificate.**    Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from BAL to Merchant, execute, acknowledge and deliver to BAL and/or to any other person, firm or corporation specified by BAL, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Unencumbered Receipts**. Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of BAL.

**2.11 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13 Good Faith.** Merchant and Guarantors hereby affirm that Merchant is receiving the Purchase Price and selling BAL the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.

## 3    EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a) Merchant or Guarantor shall violate any term or covenant in this Agreement;

(b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c) the sending of notice of termination by Merchant or verbally notifying BAL of its intent to breach this Agreement;

(d) the Merchant fails to give BAL 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, and the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e) Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by seller to any other party.

(f) Merchant shall transfer or sell all or substantially all of its assets;

(g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;

(h) Merchant shall use multiple depository accounts without the prior written consent of BAL

(i) Merchant shall change its depositing account without the prior written consent of BAL; or

(j) Merchant shall close its depositing account used for ACH debits without the prior written consent of BAL

 **INITIALS:** ⌐DS SL⌐

Rev 09/18

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A

(k) Merchant's bank returns a code other than NSF cutting BAL from its collections
(I) Merchant shall default under any of the terms, covenants and conditions of any other agreement with BAL.

**3.2 Limited Personal Guaranty** In the Event of a Default BAL will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to BAL for all of BAL's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4. hereof, BAL may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of BAL in connection with this Agreement may be exercised at any time by BAL after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to BAL all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of BAL`s remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give BAL written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give BAL seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4    MISCELLANEOUS**
**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by BAL.

**4.2 Assignment.** BAL may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to BAL shall become effective only upon receipt by BAL. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of BAL to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof    or the exercise of any other right.   The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect;** Governing Law, Venue and Jurisdiction. This Agreement shall be binding upon and inure to the benefit of Merchant, BAL and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of BAL which consent may be withheld in BAL's sole discretion. BAL reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if BAL so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by BAL to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation** etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.
This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and BAL and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10 JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11 CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE  PARTY WHO  INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR  OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH  THE CLASS OR REPRESENTATIVE ACTION.

**4.12 Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

INITIALS: SL

Rev 09/18

Case 1:24-cv-00555-AS   Document 11-17   Filed 02/28/24   Page 200 of 202

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A

## BMF Advance, LLC - SECURITY AGREEMENT AND GUARANTY

**Merchant's Legal Name:** GOLDEN FOOTHILL INSURANCE SERVICES LLC

**D/B/A:** GOLDEN FOOTHILL INSURANCE SERVICES

**Physical Address:** 4511 GOLDEN FOOTHILL PKWY

**City:** EL DORADO                                    **State:** CA          **Zip:** 95762

**Federal ID#:** ███████

## SECURITY AGREEMENT

Security Interest. This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grants to BAL a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to BAL under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to BAL upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover BAL's entitlements under this Agreement, BAL is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of BAL's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, BAL or an affiliate of BAL. BAL is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by BAL without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. BAL shall have the right to notify account debtors at any time.  Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, BAL has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets.

With respect to such security interests and liens, BAL will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity.  Merchant will obtain from BAL written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor (s) agree(s) that this is a contract of recoupment and BAL is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by BAL. Merchant and Guarantor(s) agree(s) to execute and deliver to BAL such instruments and documents BAL may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement.  BAL is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to BAL under any other agreement between Merchant or Guarantor(s) and BAL (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as BAL deems necessary to perfect or maintain BAL's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes BAL to file any financing statements deemed necessary by BAL to perfect or maintain BAL's security interest. Merchant and Guarantor(s) shall be liable for, and BAL may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by BAL in protecting, preserving and enforcing BAL's security interest and rights.



INITIALS: SL

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

FILED: NEW YORK COUNTY CLERK 06/24/2022 10:27 AM          INDEX NO. 650582/2022
NYSCEF DOC. NO. 89                                        RECEIVED NYSCEF: 06/24/2022

Case 1:24-cv-00555-SS   Document 11-17   Filed 02/28/24   Page 210 of 292

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A



## GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

BAL as an additional inducement for BAL to enter into this Agreement, the undersigned Guarantor(s) hereby provides BAL with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement **unless** Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to BAL in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, BAL may seek recovery from Guarantors for all of BAL's losses and damages by enforcement of BAL's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral BAL may hold pursuant to this Agreement or any other guaranty.

BAL does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) BAL's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to BAL. In addition, BAL may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to BAL; (ii) release Merchant from its obligations to BAL; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to BAL under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that BAL must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (iii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**MERCHANT #1** (Print Name)

By: STEFAN J LEER , OWNER

(Print Name and Title)

SSN#: ███████          Driver's License Number: _____

DocuSigned by:
*Stefan Leer*
C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

By: _____

(Print Name and Title)

SSN#: _____          Driver's License Number: _____

**OWNER/GUARANTOR #1** (Print Name)

By: STEFAN J LEER , OWNER

(Print Name and Title)

SSN#: ███████          Driver's License Number: _____

DocuSigned by:
*Stefan Leer*
C3E57BC8474C4BB...

**OWNER/GUARANTOR #2** (Print Name)

By: _____

(Print Name and Title)

SSN#: _____          Driver's License Number: _____

Rev 09/18

Case 1:24-cv-00555-SS   Document 11-17   Filed 02/28/24   Page 218 of 292

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A



## APPENDIX A: THE FEE STRUCTURE:

A. Origination Fee:  $295.00 to cover cost of Origination.

B. Underwriting Fee:  $499.00 or 12% of the proposed funding amount to cover underwriting and related expenses. This fee is deemed earned upon Seller signing the contracts. If for whatever reason, Funder determines, in its sole capacity, to cancel the deal, Merchant agrees that Funder may withdraw this non-refundable underwriting fee.

C. NSF Fee (Standard):  $50.00 (each)

D. Default Fee: $5,000.00 when Merchant breaches any terms of this agreement.

E. Blocked Account Fee: $5,000.00 when Merchant breaches the agreement by placing a Stop-Payment on Funder's ACH or closes the Account

F. Bank Change Fee: $50.00 when Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

G. Wire Fee: Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

H. ACH Program Fee:  $299.00  per month for the duration of the agreement.

I. Stacking Fee: 10% of Outstanding RTR or $25,000 whichever is greater. Additionally, taking on additional financing will be deemed a breach of this agreement upon which Funder may invoke all of its rights per the terms of the agreement including but not limited to filing the Confession of Judgment and executing thereon.

J. UCC Fee: $195.00

K. Miscellaneous Service Fees: Merchant agrees that it shall pay for certain services related to the origination and maintenance of the accounts. Merchant shall received their funding electronically to their Designated Account and shall be charged $50.00 per Fed Wire or $0.00 for an ACH.

**MERCHANT #1** (Print Name)

**By:** First Name STEFAN J _____    Last Name LEER _____

Title: OWNER _____

DocuSigned by:
*Stefan leer*
C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** First Name _____    Last Name _____

Title: _____

Rev 09/18

Doc Sign Envelpe ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A



## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**DEFINITIONS:**

**BAL:** BMF Advance, LLC

**Seller:**    GOLDEN FOOTHILL INSURANCE SERVICES LLC
                    (Merchant's Legal Name)

**Merchant Agreement:** Merchant Agreement between BAL and Seller, dated as of 3/25/21

**Designated Checking Account:**

| | |
|---|---|
| **Bank Name:** | **Branch:** |
| **Tax ID:** ▇▇▇▇ | |
| **ABA: Routing:** | **DDA: Account:** |

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Seller should keep a copy of this important legal document for Seller's records.**

DISBURSMENT OF ADVANCE PROCEEDS. By signing below, Seller authorizes BAL to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Seller also authorizes BAL to collect amounts due from Seller under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

**In the amount of: $** 25,000.00                    Daily

(or) Percentage of each Banking Deposit: _____ %

on the Following Days:            Monday-Friday

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Seller's financial institution for any reason, including without limitation insufficient funds, Seller understands that BAL may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Seller also authorizes BAL to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** BAL is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).

This Authorization Agreement is to remain in full force and effect until BAL has received written notification from Seller at the address set forth below at least 5 banking days prior of its termination to afford BAL a reasonable opportunity to act on it. The individual signing below on behalf of Seller certifies that he/she is an authorized signer on the Designate Checking Account. Seller will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Seller requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Seller:**    GOLDEN FOOTHILL INSURANCE SERVICES LLC
                    (Merchant's Legal Name)

**MERCHANT #1** (Print Name)

**By:** Name:   STEFAN J LEER                              Date:   3/25/2021

Title: OWNER                                                                  *DocuSigned by:* Stefan leer
                                                                                        C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** Name: _____          Date: _____

Title: _____

Doc Sign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A



Dear Merchant,

Thank you for accepting an offer from BMF Advance, LLC. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step. After being completed and executed, please email the agreement to your funding specialist.

**Please provide information required for read-only access\* to your business account.**

*\*Be sure to indicate capital or lower case letters.*

**Bank Portal Website:** _____

**Username:** _____

**Password:** _____

**Security Question/Answer 1:** _____

**Security Question/Answer 2:** _____

**Security Question/Answer 3:** _____

**Any other information necessary to access your account:** _____

**INITIALS:** SL

Rev 09/18

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A



## NO STACKING ADDENDUM

This Addendum entered on 3/25/21 is to certify that I, <u>STEFAN J  LEER</u>  as a representative of <u>GOLDEN FOOTHILL INSURANCE SERVICES LLC</u> , am prohibited from initiating a cash advance or other loan products with another lender outside to BMF Advance, LLC. Doing so will place me in a breach of contract and I will be liable for the entire amount owed to BMF Advance, LLC immediately, plus attorneys' fees, costs, liquidated damages and a default fee of $25,000 or 20% of the contract amount, whichever is greater.

Amounts received from any subsequent merchant cash advances will be subject to collections by BMF Advance, LLC to satisfy the outstanding account balance.

By their signatures below the parties agreed to be bound by this addendum.

**MERCHANT #1** (Print Name)

**By:** First Name STEFAN J          Last Name LEER

Title:  OWNER

DocuSigned by:
*Stefan leer*
C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** First Name _____          Last Name _____

Title: _____

**\*\*This authorization is to remain in full force and effect until BMF Advance, LLC receives written notification from the Merchant of its termination in such time and in such manner to afford BMF Advance, LLC a reasonable opportunity to act on it. Revocation of this authorization prior to remittance of the balance owed pursuant to the Agreement shall constitute a breach thereunder.**

Rev 09/18

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A



## ADDENDUM

This Addendum is entered on 3/25/21 by and between, BMF Advance, LLC ("BAL") and GOLDEN FOOTHILL INSURANCE SERVICES LLC (the "Seller") and Funderslink, LLC.

Should any terms of this Addendum conflict with the Revenue Purchase Agreement dated 3/25/21 the terms of this Addendum shall govern and be controlling. Capitalized terms used herein, but not otherwise defined, shall have the same definition as in the Revenue Purchase Agreement.

Seller warrants that it understands that BAL must engage a third-party, namely Funderslink, LLC, to manage the ACH withdrawals, reporting and deal tracking. For this service, Seller agrees to pay Funderslink, LLC a nominal fee of $299.00 per month. This amount is due on the first day of the Agreement and every subsequent thirty days until the Purchased Amount is paid in full to BAL.

**MERCHANT #1** (Print Name)

**By:** First Name STEFAN J     Last Name LEER

Title: OWNER

DocuSigned by:

*Stefan leer*

C3E57BC8474C4BB...

**MERCHANT #2** (Print Name)

**By:** First Name _____     Last Name _____

Title: _____

Rev 09/18

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A



# ACH AUTHORIZATION FORM

*All information on this form is required unless otherwise noted.*

## BUSINESS AUTHORIZED TO DEBIT/CREDIT ACCOUNT:

BMF Advance, LLC
Authorized Business Name

Authorized Business Phone Number

Authorized Business Address          City          State          Zip

## ACCOUNT HOLDER INFORMATION:

| STEFAN J | LEER | GOLDEN FOOTHILL INSURANCE SERVICES | |
|---|---|---|---|
| Account Holder First Name | Account Holder Last Name | Account Holder DBA Name (If Business Account) | Phone Number |

Account Holder Address

## ACCOUNT HOLDER BANK INFORMATION:

Account Holder's Bank Name          Branch City          State          Zip

How to find your Routing and Account Numbers on a check

⑈ 123456789 ⑈ 12345678901 23 ⑈
Bank Routing Code      Bank Account Number

☐ Business Checking  ☐ Personal Checking  ☐ Savings

Bank Routing Number (9 digits)          Bank Account Number

## TRANSACTION INFORMATION:

Goods Purchased/Services Rendered

Amount of Transaction

3/25/21
Effective Date

☐ One-time      ☐ Recurring

Rate _____

No. of Transactions _____  or Open Ended ☐

## AUTHORIZATION:

In exchange for products and/or services listed above the undersigned hereby authorizes:

to electronically draft via the Automated Clearing House system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writing by the undersigned account holder. The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder. I acknowledge that I am subject to a $25 reject fee if items are returned for insufficient funds.

DocuSigned by:

*Stefan Leer*
Signature of Account Holder
C3E57BC8474C4BB...

| STEFAN J | LEER | OWNER | 3/25/2021 |
|---|---|---|---|
| First Name of Account Holder | Last Name of Account Holder | Title of Account Holder | Date |

Rev 09/18

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A



## BALANCE TRANSFER FORM

| | |
|---|---|
| **Merchant Legal Name ("Merchant"):** | STEFAN J LEER |
| **Merchant Title:** | OWNER |
| **Business Legal Name ("Business"):** | GOLDEN FOOTHILL INSURANCE SERVICES LLC |
| **DBA:** | GOLDEN FOOTHILL INSURANCE SERVICES |
| **Physical Address:** | 4511 GOLDEN FOOTHILL PKWY |
| **City:** | EL DORADO |
| **State:** | CA |
| **Zip Code:** | 95762 |
| **Date:** | 3/25/21 |

**BMF Advance, LLC**
**1022 Avenue M.**
**Brooklyn, NY 11230**

| | |
|---|---|
| **Date of new secured agreement:** | 3/25/21 |
| **Date of previous secured agreement:** | |
| **Remaining RTR balance:** | $274,000.00 |

To Whom It May Concern:

I, Merchant, on behalf of Business, hereby authorize BMF Advance, LLC to debit the remaining RTR balance which is currently due and owing to BMF Advance, LLC pursuant to the previous secured merchant agreement, entered into by and between BMF Advance, LLC and business.

I acknowledge that as a result of the above-referenced debit, the amount paid to business by BMF Advance, LLC pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.

Thank you,

By: *Stefan Leer*
C3E57BC8474C4BB...

Merchant Legal Name: STEFAN J LEER

Title: OWNER

Rev 09/18

Case 1:24-cv-08515-AS Document 11-17 Filed 02/28/24 Page 115 of 292

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A

**EXHIBIT B**

**ADDENDUM TO**
**THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY**

This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT and GUARANTY (this "Addendum")**, dated 3/25/21 is entered into by and among **BMF ADVANCE** ("BMF") and

**Business Legal Name:** GOLDEN FOOTHILL INSURANCE SERVICES LLC
**D/B/A:** GOLDEN FOOTHILL INSURANCE SERVICES
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** LLC                     **EIN #:** ▮▮▮▮▮▮
                                                      ("Seller #1"); and

**Business Legal Name:** LONEWOLF INSURANCE SERVICES INC
**D/B/A:** LONEWOLF INSURANCE SERVICES
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** Corporation              **EIN #:** ▮▮▮▮▮▮
                                                      ("Seller #2"); and

**Business Legal Name:** GENESIS LS FUND LLC
**D/B/A:** GENESIS LS FUND
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** LLC                     **EIN #:** ▮▮▮▮▮▮
                                                      ("Seller #3"); and

**Business Legal Name:** EL DORADO HILLS INSURANCE SOLUTIONS INC
**D/B/A:** EL DORADO HILLS INSURANCE SOLUTIONS
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
**Form of Business Entity:** LLC                     **EIN #:** ▮▮▮▮▮▮
                                                      ("Seller #4"); and

**Business Legal Name:** KTL HOLDINGS INC
**D/B/A:** KTL HOLDINGS
**Address:** 4511 GOLDEN FOOTHILL PKWY STE 1, EL DORADO HILLS, CA 95762
                                                      **EIN #:** ▮▮▮▮▮▮
**Form of Business Entity:** Corporation              ("Seller #5").

*DocuSigned by:*
*Stefan Leer*
C3E57BC8474C4BB...                                    ("Guarantor #1")
**Name:** STEFAN J LEER
**Email:** STEFAN@KTLHOLDING.COM
**Phone:** (210) 259-1648                             **SSN:** ▮▮▮▮▮▮
**Title:** Owner/Agent/Manager


LIFEFACTOR I LLC                    DRVN Holdings LLC
EIN: ▮▮▮▮▮                          EIN: ▮▮▮▮▮▮
4511 Golden Foothill Pkwy Ste 2     6009 WELCH AVE
El Dorado Hills, CA 95762-9804      FT WORTH, TX 76133

FILED: NEW YORK COUNTY CLERK 06/24/2022 10:27 AM

NYSCEF DOC. NO. 89

INDEX NO. 650582/2022

RECEIVED NYSCEF: 06/24/2022

DocuSign Envelope ID: EDB32D51-AB44-46E7-BECF-53E64D560C6A

# ACH/E-Check Authorization Form

All information on this form is required unless otherwise noted.

## Business Authorized to Debit/Credit Account:

Spin Capital LLC
Authorized Business Name

732-608-4905
Authorized Business Phone Number

1460 Arboretum Pkwy
Authorized Business Address

Lakewood
City

NJ
ST

Zip

## Account Holder Information:

Stefan Leer
Account Holder Name

El Dorado Hills Insurance Solutions INC
Account Holder DBA Name (If Business Account)

Account Holder Phone

1300 Highland Ave #205
Account Holder Address

Manhattan Beach
City

CA
ST

90266
Zip

## Account Holder s Bank Information:

US Bank
Account Holder's Bank Name

Branch City

ST

Zip

How to find your Routing and Account Numbers on a check:

⑆ 123456789 ⑆ 123456789O123 ⑈
Bank Routing Code          Bank Account Number

■ Business   Checking
☐ Personal   Checking
☐ Savings

Bank Routing Number (9 digits)

Bank Account Number

## Transaction Information:

Origination Fee
Goods Purchased/Services Rendered

■ One-time        ☐ Recurring

Rate _____

No. of Transactions __1__ or Open Ended ☐

$ 40,000
Amount of Transaction

3/25/2021
Effective Date

## Authorization:

In exchange for products and/or services listed above the undersigned hereby authorizes:

Spin Capital LLC

to electronically draft via the Automated Clearing House and/or E-Check system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writing by the undersigned account holder. The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder. I acknowledge that I am subject to a $39 reject fee if items are returned for insufficient funds.

DocuSigned by

*Stefan Leer*
Signature of Account Holder

Stefan Leer
Name/Title of Account Holder

3/25/2021
Date

# EXHIBIT 18

**From:** "BMF BACKOFFICE" <funding@bmfcapitalllc.com>
**To:** "Gabe Isaacov" <gabe@bmfcapitalllc.com>, "Josh Lubin" <josh@spincapital.com>
**Subject:** Re: KTL Holdings Signed
**Date:** Tue, 30 Mar 2021 17:47:19 -0400
**Importance:** Normal

---

done

---

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Tuesday, March 30, 2021 12:04 PM
**To:** Josh Lubin <josh@spincapital.com>
**Cc:** BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Subject:** Re: KTL Holdings Signed

Chana pls switch debits to chas acocunt Josh pls send the chase account

Sent from my iPhone


On Mar 30, 2021, at 11:18 AM, Josh Lubin <josh@spincapital.com> wrote:



Please switch over debits to the chase account you wired too.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Sent:** Friday, March 26, 2021 1:58:43 PM
**To:** Josh Lubin <josh@spincapital.com>; Gabe Isaacov <gabe@bmfcapitalllc.com>
**Subject:** Re: KTL Holdings Signed

Yes, will be there shortly

*Chana Tach*
*Chief Financial Officer*
*Office Line: 646-979-1223*
*Email: Funding@bmfcapitalllc.com*
<Outlook-i41naa4h.png>

---

**From:** Josh Lubin <josh@spincapital.com>
**Sent:** Friday, March 26, 2021 1:57 PM
**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Subject:** Re: KTL Holdings Signed

To chase?

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

CONFIDENTIAL                                                  SPIN-00007418

Case 1:24-cv-08551-AS Document 11-18 Filed 02/28/25 Page 223 of 292

**From:** BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Sent:** Friday, March 26, 2021 1:55:59 PM
**To:** Josh Lubin <josh@spincapital.com>; Gabe Isaacov <gabe@bmfcapitalllc.com>
**Subject:** Re: KTL Holdings Signed

SENT

*Chana Tach*
*Chief Financial Officer*
*Office Line: 646-979-1223*
*Email: Funding@bmfcapitalllc.com*
<Outlook-hmmx4pgh.png>

---

**From:** Josh Lubin <josh@spincapital.com>
**Sent:** Friday, March 26, 2021 12:29 PM
**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Subject:** RE: KTL Holdings Signed

Wire sent?

---

**From:** Josh Lubin
**Sent:** Friday, March 26, 2021 11:17 AM
**To:** 'Gabe Isaacov' <gabe@bmfcapitalllc.com>; BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Subject:** RE: KTL Holdings Signed

Wire to account attached and debit 20k a day from the same account.


El dorado hills ins solutions inc
4511 golden foothill pkwy
Suite 1
El dorado hills ca 95762

---

**From:** Gabe Isaacov <gabe@bmfcapitalllc.com>
**Sent:** Friday, March 26, 2021 10:27 AM
**To:** BMF BACKOFFICE <funding@bmfcapitalllc.com>
**Cc:** Josh Lubin <josh@spincapital.com>
**Subject:** Fwd: KTL Holdings Signed

Chana pls wire 100K to merchant

Chana you should have the vc here already but Josh pls send the vc chana switch debit too 25k I believe it's @ 8k now will get you new fl #

Sent from my iPhone

Begin forwarded message:

**From:** Josh Lubin <josh@spincapital.com>
**Date:** March 25, 2021 at 4:58:15 PM EDT

CONFIDENTIAL SPIN-00007419

Case 1:24-cv-08351-AS Document 11-18 Filed 02/28/25 Page 234 of 292

**To:** Gabe Isaacov <gabe@bmfcapitalllc.com>

**Subject: KTL Holdings Signed**

100k Net going to try and get away with a 40k PSF on the funding call.

*Sincerely,*
*Josh Lubin*
*President*
*Spin Capital*
*Office:* 786-496-9502
**Cell:** 732-608-4905
josh@spincapital.com

CONFIDENTIAL

SPIN-00007420

# EXHIBIT 19

Case 1:24-cv-08851-AS Document 11-19 Filed 02/28/25 Page 225 of 292

**03/22/2021**
**Participants: Stefan Leer KT Holdings (+12102591648); Josh Lubin**

Josh Lubin

Did slate fund?

03/22/2021 11:33 AM

Stefan Leer KT Holdings (+12102591648)

Not yet

03/22/2021 11:33 AM

Stefan Leer KT Holdings (+12102591648)

I need 200k today. Your money No split 200k pay back 300k Short term (24 days) But, need it today

03/22/2021 4:14 PM

Josh Lubin

Call me

03/22/2021 4:19 PM

CONFIDENTIAL

SPIN-00008784

# EXHIBIT 20

Case 1:24-cv-08851-AS Document 11-20 Filed 02/28/25 Page 227 of 292

**05/24/2021**
**Participants: Stefan Leer KT Holdings (+12102591648); Josh Lubin**

Josh Lubin

You're giving me no option but to file a judgement. I have absolutely no communication with you

05/24/2021 7:57 AM

Josh Lubin

Need a call from you asap

05/24/2021 8:01 AM

Stefan Leer KT Holdings (+12102591648)

The communication is: for another at least 10 days. Im cash poor!

05/24/2021 9:45 AM

Josh Lubin

Need to be on a daily for those 10 days.

05/24/2021 10:08 AM

Stefan Leer KT Holdings (+12102591648)

Ok. $250.00 per day

05/24/2021 10:15 AM

Josh Lubin

1k a day each

05/24/2021 10:17 AM

Josh Lubin

This is bull shit

05/24/2021 10:17 AM

Stefan Leer KT Holdings (+12102591648)

I cannot pull cash of a tree. Your negotiating with nothing for me to give u. U want to bounce?

05/24/2021 10:22 AM

SPIN-00006846

Case 1:24-cv-08851-AS   Document 11-20   Filed 02/28/25   Page 228 of 292

Josh Lubin

Make it 500 each for the next 10 days

05/24/2021 11:07 AM

Josh Lubin

And call me

05/24/2021 11:07 AM

Stefan Leer KT Holdings (+12102591648)

Im w/my wife all Day today. 10 year anniversary

05/24/2021 11:22 AM

SPIN-00006847

# EXHIBIT 21

# GOLDEN FOOTHILL INSURANCE SERVICES LLC

| Date | Ref # | Memo | Amount | Balance |
|------|-------|------|--------|---------|
| 3/27/2021 | | Starting Balance | $599,600.00 | $599,600.00 |
| 3/29/2021 | 1210540 | ACH Return | -$20,000.00 | $599,600.00 |
| 3/30/2021 | 1210541 | ACH Return | -$20,000.00 | $599,600.00 |
| 3/31/2021 | 1210542 | ACH Return | -$20,000.00 | $599,600.00 |
| 4/1/2021 | 1211134 | ACH Return | -$20,000.00 | $599,600.00 |
| 4/2/2021 | 1211135 | ACH Return | -$20,000.00 | $599,600.00 |
| 4/5/2021 | 1211136 | ACH Return | -$20,000.00 | $599,600.00 |
| 4/6/2021 | 1211137 | ACH Return | -$20,000.00 | $599,600.00 |
| 4/7/2021 | 1211138 | ACH Return | -$20,000.00 | $599,600.00 |
| 4/8/2021 | 1211634 | Payment | -$2,000.00 | $597,600.00 |
| 4/9/2021 | 1211637 | Payment | -$2,000.00 | $595,600.00 |
| 4/12/2021 | 1211640 | Payment | -$2,000.00 | $593,600.00 |
| 4/13/2021 | 1211928 | Payment | -$2,000.00 | $591,600.00 |
| 4/14/2021 | 1212185 | Payment | -$2,000.00 | $589,600.00 |
| 4/15/2021 | 1212188 | Payment | -$2,000.00 | $587,600.00 |
| 4/16/2021 | 1212453 | Payment | -$2,000.00 | $585,600.00 |
| 4/19/2021 | 1212611 | Payment | -$2,000.00 | $583,600.00 |
| 4/20/2021 | 1212775 | ACH Return | -$2,000.00 | $583,600.00 |
| 4/21/2021 | 1213032 | ACH Return | -$2,000.00 | $583,600.00 |
| 4/22/2021 | 1213033 | ACH Return | -$2,000.00 | $583,600.00 |
| 4/23/2021 | 1213147 | ACH Return | -$2,000.00 | $583,600.00 |
| 4/26/2021 | 1213301 | ACH Return | -$2,000.00 | $583,600.00 |
| 5/26/2021 | 1218907 | ACH Return | -$500.00 | $583,600.00 |
| 5/27/2021 | 1218908 | ACH Return | -$500.00 | $583,600.00 |
| 5/28/2021 | 1217939 | ACH Return | -$500.00 | $583,600.00 |
| 6/3/2021 | 1218905 | ACH Return | -$500.00 | $583,600.00 |
| 6/4/2021 | 1218906 | ACH Return | -$500.00 | $583,600.00 |
| 6/7/2021 | 1219106 | Payment | -$500.00 | $583,100.00 |
| 6/8/2021 | 1219109 | Payment | -$500.00 | $582,600.00 |
| 6/9/2021 | 1219451 | Payment | -$500.00 | $582,100.00 |
| 6/10/2021 | 1219570 | Payment | -$500.00 | $581,600.00 |
| 6/11/2021 | 1219776 | Payment | -$500.00 | $581,100.00 |
| 6/14/2021 | 1220982 | ACH Return | -$500.00 | $581,100.00 |
| 6/15/2021 | 1220980 | Payment | -$500.00 | $580,600.00 |
| 6/16/2021 | 1219779 | Payment | -$500.00 | $580,100.00 |
| 6/17/2021 | 1220082 | Payment | -$582,000.00 | -$1,900.00 |
| | | **Total** | **$774,500.00** | **($1,900.00)** |

*************

The information contained in these documents is confidential, privileged and only for the information of the intended recipient and may not be used, published or redistributed without the prior written consent of BMF ADVANCE . All Rights Reserved.

*************

CONFIDENTIAL

SPIN-00007183

# EXHIBIT 22

Case 1:24-cv-08555-AS    Document 11-22    Filed 02/28/2024    Page 232 of 292

DocuSign Envelope ID: 2DCE697D-388E-4854-BC32-AF76AA67458B

# HI BAR CAPITAL

## REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance (**"Agreement"**) dated 3/25/2021 between **HI BAR CAPITAL** (**"HBC"**) the Merchant(s) listed below (**"Merchant"**) and the Individual(s) listed below (**"Guarantor"**)

### MERCHANT INFORMATION

Merchant's Legal Name: GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A"

D/B/A: GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A"

State of Incorporation / Organization: CA

Type of Entity LLC

Physical Address: 4511 GOLDEN FOOTHILL PKWY

City: EL DORADO          State: CA          Zip: 95762          Business Phone:

Guarantor(s) Name: STEFAN LEER          Cellphone Number:          Email Address:

Mailing Address: 4511 GOLDEN FOOTHILL PKWY          City: EL DORADO          State: CA          Zip: 95762

**Purchase Price:** $ 400,000.00          Purchased Percent 20 %          Purchased Amount: $ 599,600.00

Payment Frequency: DAILY          Remittance $ 20,000.00

In consideration of payment by HBC to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to HBC (making HBC the absolute owner) the Purchased Percentage of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to HBC.

Merchant is selling a portion of a future revenue stream to HBC at a discount, and is not borrowing money from HBC, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by HBC. The Remittance is a good faith estimate of HBC's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. HBC is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and HBC assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give HBC a reasonable and fair opportunity to receive the benefit of its bargain. HBC acknowledges that it may never receive the Purchased Amount if the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

HBC will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, HBC (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as HBC receives payment in full of the Purchased Amount. Merchant hereby authorizes HBC to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of HBC) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide HBC with all required access codes and monthly bank statements regarding the Account so that HBC may monitor the Account. HBC payment of the Purchase Price shall be deemed the acceptance and performance by HBC of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by HBC remains in the Account and will be held responsible for any fees incurred by HBC resulting from a rejected ACH attempt or an Event of Default. HBC is not responsible for any overdrafts or rejected transactions that may result from HBC's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between HBC and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**FOR THE MERCHANT (#1)** By: STEFAN LEER
(Print Name and Title)

DocuSigned by: [signature]
6E2D9F75BB7A4A4... (Signature)

**FOR THE MERCHANT (#2)** By:
(Print Name and Title)

DocuSigned by: (Signature)

**BY GUARANTOR(S) (#1)** By: STEFAN LEER
(Print Name and Title)

DocuSigned by: [signature]
6E2D9F75BB7A4A4... (Signature)

**BY GUARANTOR(S) (#2)** By:
(Print Name and Title)          (Signature)

1

PROPERTY OF HI BAR CAPITAL

DocuSign Envelope ID: 2DCE697D-388E-4854-BC32-AF76AA67458B

**MERCHANT AGREEMENT TERMS AND CONDITIONS**

**1          TERMS OF ENROLLMENT IN PROGRAM**

**1.1          Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to hbc with a Bank acceptable to hbc to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to HBC with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide HBC and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes HBC and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to HBC for the receipts as specified herein and to pay such amounts to HBC. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by HBC or not. This additional authorization is not a waiver of HBC's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which HBC did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of HBC.

**1.2          Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by HBC as per the terms of this Agreement.

**1.3          Reconciliation.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@hibarcapital.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. HBC retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by HBC within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by HBC shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with HBC's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

**1.4          Adjustments to the Remittance.** As long an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to HBC to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@hibarcapital.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. HBC retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide HBC with viewing access to their bank account as well as all information reasonably requested by HBC to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5          Financial Condition.** Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize HBC and its agents to investigate their financial responsibility and history, and will provide to HBC any authorizations, bank or financial statements, tax returns, etc., as HBC requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. HBC is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6          Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide HBC with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide HBC with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from HBC.

**1.7          Indemnification.** Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless HBC and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by HBC for monies owed to HBC from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by HBC.

**1.8          No Liability.** In no event will HBC be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)s will be jointly liable for all of HBC's attorney's fees and expenses resulting therefrom.

**1.9          Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, HBC, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action. **1.10          Sale of Receipts.** Merchant and HBC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from HBC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. HBC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that HBC's share of Receipts collected are being held by Merchant in trust and are the sole property of HBC until they are remitted to HBC. Payments made to HBC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to HBC full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. HBC hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of HBC for the purpose of collecting and delivering Receipts to HBC as required by this Agreement until HBC has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to HBC under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that HBC is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that HBC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and HBC shall promptly refund to Merchant any interest received by HBC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that HBC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11          Power of Attorney.** Merchant irrevocably appoints HBC and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to HBC from Processor, or in the case of a violation by Merchant of Section 1 or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to HBC; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which HBC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by  merchant.

**1.12          Protections against Default.** The following Protections 1 through 8 may be invoked by HBC immediately and without notice to Merchant in the event:
**(a)**

Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the HBC electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to HBC; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of HBC, and (ii) the written agreement of any HBC or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to HBC; (e) Merchant takes any action, fails

PROPERTY OF HI BAR CAPITAL

Initial(1):          Initial(2):

2

DocuSign Envelope ID: 2DCE697D-388E-4854-BC32-AF76AA67458B

to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide HBC with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from HBC, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to HBC at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** HBC may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes HBC to execute in the name of the Merchant a Confession of Judgment in favor of HBC pursuant to the terms of the Confession of Judgment. Upon an Event of Default, HBC may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** HBC may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** HBC may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** HBC may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if HBC recovers a Judgment against Merchant, Merchant shall be liable for all of HBC's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to HBC. Upon breach of any provision in this Agreement, HBC may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. HBC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HBC. **Protection 8.** HBC may debit Merchant's depository accounts wherever situated in such amounts as determined by HBC in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to HBC by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HBC.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes HBC to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that HBC obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against HBC or any of its affiliates relating to any (i)investigation undertaken by or on behalf of HBC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by HBC, including this Agreement and any other HBC documents (collectively, "Confidential Information") are proprietary and confidential information of HBC. Accordingly, unless diselosure is required by law or court order, Merchant shall not disclose Confidential Information of HBC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles HBC to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s hereto all hereby authorizes HBC to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that HBC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between HBC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2          REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

2.1          **Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to HBC, and future statements which will be furnished hereafter at the discretion of HBC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise HBC of any material adverse change in their financial condition, operation or ownership. HBC may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to HBC within five business days after request from HBC. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

2.2          **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3          **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4          **Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

2.5          **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without HBC's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6          **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and HBC, nor shall Merchant change any of its places of business without prior written consent by HBC.

2.7          **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

2.8          **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from HBC to Merchant, execute, acknowledge and deliver to HBC and/or to any other person, firm or corporation specified by HBC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9          **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10          **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which HBC has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of HBC or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of HBC.

2.11          **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12          **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13          **Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling HBC the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

**3          EVENTS OF DEFAULT AND REMEDIES**

(a)          Events of Default. The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(b)          Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c)          the sending of notice of termination by Merchant or verbally notifying HBC of its intent to breach this Agreement;

(d)          the Merchant fails to give HBC 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored

3

Initial(1):_____  Initial(2):_____

Case 1:24-cv-08555-AS Document 11-22 Filed 02/28/24 Page 235 of 292

DocuSign Envelope ID: 2DCE697D-388E-4854-BC32-AF76AA67458B

by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e) Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by HBC,

(f) Merchant shall voluntarily transfer or sell all or substantially all its assets.

(g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant.

(h) Merchant shall use multiple depository accounts without the prior written consent of HBC or takes any other action that intentionally interferes with or prevents HBC from receiving the Purchased Amount in accordance with the terms of this Agreement.

(i) Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.

(j) Merchant shall change its depositing account without the prior written consent of HBC; or

(k) Merchant shall close its depositing account used for ACH debits without the prior written consent of HBC

(l) Merchant's bank returns a code other than NSF cutting HBC from its collections

(m) Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.

(n) Merchant shall default under any of the terms, covenants and conditions of any other agreement with HBC.

3.2 **Limited Personal Guaranty** Upon the occurrence of an Event of Default, HBC will enforce its rights against the Guarantor(s)s of this transaction. Said Guarantor(s)s will jointly and severally liable to HBC for all of HBC's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3 **Remedies.** Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, HBC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of HBC in connection with this Agreement may be exercised at any time by HBC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4 **Attorney's Fees.** Upon the occurrence of an Event of Default, and HBC retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

3.5 **Costs.** Merchant shall pay to HBC all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (c) the enforcement of HBC's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.6 **Required Notifications.** Merchant is required to give HBC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give HBC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4 MISCELLANEOUS**

4.1 **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by HBC.

4.2 **Assignment.** HBC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3 **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to HBC shall become effective only upon receipt by HBC. Notices to Merchant shall become effective three days after mailing.

4.4 **Waiver Remedies.** No failure on the part of HBC to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5 **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and HBC and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of HBC which consent may be withheld in HBC's sole discretion. HBC reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HBC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by HBC to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by HBC by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

4.6 **Survival of Representation,** etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7 **Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8 **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9 **Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s)s and HBC and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10 **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11 **CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12 **Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

Initial(1): _____ Initial(2): _____

Case 1:24-cv-08515-AS   Document 11-22   Filed 02/26/24   Page 236 of 292

DocuSign Envelope ID: 2DCE697D-388E-4854-BC32-AF76AA67458B

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name: GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A"

D/B/A: GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A"    Federal ID#: █████████

Physical Address: 4511 GOLDEN FOOTHILL PKWY        City: EL DORADO    State: CA        Zip: 95762

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to HBC and HBC's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to HBC a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to HBC under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to HBC upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover HBC's entitlements under this Agreement, HBC is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of HBC's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, HBC or an affiliate of HBC is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to HBC for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due HBC under the Revenue Purchase Agreement. With respect to any such entity, HBC shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. HBC shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. HBC shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of HBC's rights, including without limitation, HBC's right to collect all accounts, and to notify any payment card processor or creditor of such entity that HBC has such rights in such entity's assets. Merchant also agrees that, at the HBC's discretion, HBC may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by HBC without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. HBC shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, HBC has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, HBC will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from HBC written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and HBC is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by HBC. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to HBC such instruments and documents HBC may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. HBC is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to HBC under any other agreement between Merchant or Guarantor(s)(s) and HBC (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as HBC deems necessary to perfect or maintain HBC's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes HBC to file any financing statements deemed necessary by HBC to perfect or maintain HBC's security interest. Merchant and Guarantor(s)(s) shall be liable for, and HBC may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by HBC in protecting, preserving and enforcing HBC's security interest and rights.

**Negative Pledge.** Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** HBC shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, HBC may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that HBC may enter into an agreement with Merchant's landlord giving HBC the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, HBC may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to HBC, whether by acceleration or otherwise.

PROPERTY OF HI BAR CAPITAL

Initial(1): _____  Initial(2): _____

Case 1:24-cv-00555-AS   Document 11-22   Filed 02/28/24   Page 237 of 292

DocuSign Envelope ID: 2DCE697D-388E-4854-BC32-AF76AA67458B

## GUARANTY OF PERFORMANCE

As an additional inducement for HBC to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides HBC with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to HBC in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor(s) Waivers.** In the event of a breach of the above, HBC may seek recovery from Guarantor(s)s for all of HBC's losses and damages by enforcement of HBC's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral HBC may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. HBC is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) HBC's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to HBC. In addition, HBC may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to HBC; (ii) release Merchant from its obligations to HBC;
(iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to HBC under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that HBC must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HBC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by HBC to transfer such proceeding to an Acceptable Forum.

The Merchant Guarantor(s) and Corporate Guarantor(s) acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail return receipt requested to the Mailing Address on Page 1 of this Agreement.

**FOR ALL MERCHANT(S) (#1)** By: STEFAN LEER
(Print Name and Title)

DocuSigned by:
6E2D9F75BB7A4A4...
(Signature)

SSN# ████████

**FOR ALL MERCHANT(S) (#2)** By: _____
(Print Name and Title)

_____
(Signature)

SSN#_____

**GUARANTOR(S) (#1)** By: STEFAN LEER
(Print Name and Title)

DocuSigned by:
6E2D9F75BB7A4A4...
(Signature)

SSN# ████████

**GUARANTOR(S) (#2)** By: _____
(Print Name and Title)

_____
(Signature)

SSN#_____

6

Case 1:24-cv-08555-AS  Document 11-22  Filed 02/28/24  Page 238 of 292

DocuSign Envelope ID: 2DCE697D-388E-4854-BC32-AF76AA67458B

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT), DIRECT PAYMENTS (ACH DEBITS), AND CHECK DEBIT

Merchant: GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A"

(Merchant's Legal Name)

Merchant Agreement: Merchant Agreement between HBC and Merchant, dated as of: 3/25/2021

Designated Checking Account:

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes HBC to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes HBC to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits or to initiate a Check Debit to the Designated Checking Account, as follows:**

Bank Name:_____ Branch:_____

Federal ID#:▮▮▮▮▮▮▮_____

ABA: Routing:_____ DDA: Account:_____

Bank Name:_____ Branch:_____

Federal ID#:_____

ABA: Routing:_____ DDA: Account:_____

In the Amount of: $ 20,000.00

(Or) Percentage of each Banking Deposit: 20 %

On the Following Days: MONDAY-FRIDAY

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that HBC may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes HBC to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** HBC is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until HBC has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford HBC a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Merchant agrees** to be bound by the ACH Rules as defined by the National ACH Association (NACHA). Merchant understands that this authorization is to remain in full force and effect until HBC has received written notification from me of its termination at least five (5) business days prior to the payment due date. Merchant further understands that canceling their ACH authorization does not relieve them of the responsibility of paying account in full, and that if Merchant cancels or revokes this authorization before any remaining debt is paid in full, the HBC may take additional actions including legal actions to secure the debt.

GOLDEN FOOTHILL INSURANCE SERVICES LLC AND ALL ENTITIES LISTED ON "EXHIBIT A"

Merchant:_____

(Merchant's Legal Name)

Print Name: STEFAN LEER

X _____ (Signature) 6E2D9F75BB7A4A4...

(Title) _____

Date: 3/25/2021
(Month) (Day) (Year)

Print Name: _____

X _____
(Signature)

(Title) _____

Date: 3/25/2021
(Month) (Day) (Year)

7

PROPERTY OF HI BAR CAPITAL

Case 1:24-cv-00555-AS Document 11-22 Filed 02/28/24 Page 239 of 292

DocuSign Envelope ID: 2DCE697D-388E-4854-BC32-AF76AA67458B

# APPENDIX A - THE FEE STRUCTURE:

A. **Underwriting Fee**: $79,999 to cover Underwriting and relates expenses.

B. **UCC Filing Fee:** $499.00 and are not an automated process, requiring us to charge this fee to cover costs.

C. **NSF Fee Standard:** $50.00 (each) up to TWO TIMES ONLY before a default is declared.

D. **Bank Change Fee**: $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

E. **Blocked ACH Payment**: $5,000.00 This fee is applied when Merchant directs the bank to BLOCK our ACH Debits. Blocking ACH Debits will place Merchant's account in default.

F. **Default Fee:** Shall be applied to Merchant's account in the event that Merchant defaults under the terms of the Merchant Agreement.

G. **ACH Processing Fee**: $249.00 (or 10% of the contract amount, depending on size of advance) ACH's are labor intensive

H. **Account Management Fee:** At the end of each month, Merchant will pay to HBC an Account Management Fee. This fee will not be applied towards the reduction of the Purchased Amount. This monthly fee will equal the average of all the payments received as a Specified percentage of the Merchants settlement amount for that Month.

I. **Miscellaneous Service Fee:** Merchant shall pay certain fees for services related to the origination and maintenance of Accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or 0.00 for a bank ACH. The current charge for the underwriting and origination of each Merchant

J. **Working Capital Funding**: A fee of $5,000.00 or 10% shall be applied every time Merchant enters into any arrangement, agreement, or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than HBC

K. **Contract Service Fee:** Commencing at date funded (the "Start Date"), merchant shall pay a fee of $499.00 per month (the "Monthly Fee") the monthly fee is payable each month during the term of this agreement, at a minimum of three months.

L. **Attorney's Fee:** $10,000. When merchant breaches any term of this Agreement and HBC is required to retain counsel to enforce, defend or collect any term of this Agreement.

[ALL FEES ARE SUBJECT TO CHANGE]

**FOR THE MERCHANT (#1)** By: STEFAN LEER

DocuSigned by:

6E2D9F75BB7A4A4...

(Print Name and Title)         (Signature)

**FOR THE MERCHANT (#2)** By: _____

(Print Name and Title)         (Signature)

8

PROPERTY OF HI BAR CAPITAL

Case 1:24-cv-00515-AS Document 71-22 Filed 02/28/24 Page 240 of 292

DocuSign Envelope ID: 2DCE697D-388E-4854-BC32-AF76AA67458B

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from HBC. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

HBC will require viewing access s to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that  e w carefully safeguard your confidential information, and only essential personnel will have access to it.

HBC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower-case letters.

Name of Bank: _____ REDACTED _____

Bank portal website:

Username: _____ REDACTED _____

Password: _____ REDACTED _____

Security Question / Answer 1: REDACTED _____

Security Question /Answer 2: _____ REDACTED _____

Security Question / Answer 3: REDACTED _____

Any other information necessary to access your account:

_____

STEFAN LEER _____          3/25/2021 _____

FOR THE MERCHANT (#1) By: ┌─DocuSigned by:
                          │ [signature]
                          └─6E2D9F75BB7A4A4...          Date

_____          3/25/2021 _____

FOR THE MERCHANT (#2) By:          Date

9

PROPERTY OF HI BAR CAPITAL

# EXHIBIT 23

Case 1:24-cv-08551-AS Document 11-23 Filed 02/28/25 Page 242 of 292

# PROMISSORY NOTE

$2,700,000                                                                         June 16, 2021

**FOR VALUE RECEIVED**, Golden Foothill Insurance Services LLC, Life Factor II LLC and Life Shares II LLC with an address at 11500 S Eastern Avenue, Henderson, Nevada 89052 (each of the foregoing, collectively, "**Borrower**"), hereby unconditionally promises to pay to the order Spin Capital LLC with an address at 1276 50th St., Brooklyn, New York 11219, ("**Payee**" which term shall also include any subsequent holder of this Note), the principal sum of **TWO MILLION SEVEN HUNDRED THOUSAND DOLLARS** ($2,700,000.00) (the "**Principal Sum**"), in lawful money of the United States of America, together with interest thereon, in like money, to be computed from the date of this Promissory Note (this "**Note**") at the rate per annum and on the terms hereinafter set forth. All sums hereunder are payable to Payee at the address set forth above or such other location as Payee shall designate. The term "**Debt**" shall refer to the then outstanding Principal Sum, together with all accrued and unpaid interest thereon and any other amounts due to Payee under any of the Loan Documents. The term "**Guaranty**" shall refer to that certain Payment Guaranty, dated as of the date hereof, executed and delivered by STEFAN LEER ("Individual Guarantor") and by various other entities (collectively referred to as "Corporate Guarantors" and together with the Individual Guarantor, "Guarantor"), to Lender, as the same may be amended from time to time. The term "**Loan Documents**" shall refer to this Note, the Guaranty, and all other documents or instruments heretofore or hereafter executed and/or delivered to Lender for purposes of evidencing, securing, or perfecting the indebtedness evidenced by this Note.

1. **Interest Rate.** Until the Debt shall be repaid in full and so long as no Event of Default shall have occurred (in which case Default Interest shall be due in accordance with <u>Section 6),</u> the Principal Sum shall bear interest at the rate of five percent (5%) per month. Interest shall be calculated on the basis of a 30-day month and actual days elapsed for any partial months or periods. Whenever any interest payment to be made hereunder shall be stated to be due on a day that is not a Business Day (as defined below), the payment shall be made on the next succeeding Business Day.

2. **Principal and Interest Payments.** Payments representing principal and interest shall be paid in accordance with the schedule annexed hereto as Exhibit A, commencing Friday June 18, 2021 for a period of 31 weeks.

3. **Term.** The then remaining unpaid amount of the Debt shall be due and payable on January 14, 2022, (such date, the "**Maturity Date**"). Borrower shall not have any right to extend the Maturity Date.

4. **Manner of Payment.** All payments by Borrower hereunder shall be, whether at the Maturity Date or otherwise, paid in immediately available funds via automatic ACH withdrawal. All amounts payable under this Note are payable in lawful money of the United States during normal business hours on a Business Day. The term "**Business Day**" is defined to mean any day other than a Saturday, Sunday or other day on which banking institutions are authorized or obligated to close in New York City. Borrower shall receive credit for payments transferred to the account of Payee on the day of such transfer if such funds are received by Payee by 3:00 p.m. (New York time) on such day. In the absence of timely receipt, such funds shall be deemed to have been paid by Borrower on the next succeeding Business Day. Any amounts paid to Payee hereunder shall be applied (x) first, to any costs and expenses which Payee is entitled to receive hereunder, (y) second, to accrued and unpaid interest and (z) third, to the then outstanding Principal Sum. Notwithstanding the foregoing, at such times that an Event of Default has occurred, amounts paid to Payee hereunder shall be applied to the Debt in such priority as Payee determines in its sole discretion.

Case 1:24-cv-08551-AS Document 11-23 Filed 02/28/25 Page 243 of 292

5. **Event of Default, Acceleration**. Upon and at any time following the occurrence of any Event of Default, at the option of Payee and without notice, the entire Debt shall at once become due and payable, and the Payee may exercise any and all of its rights and remedies hereunder, or available at law or equity. The Payee may so accelerate such obligations and exercise such remedies at any time after the occurrence of any Event of Default, regardless of any prior forbearance.

Each of the following events shall constitute an event of default hereunder (each, an "**Event of Default**"):

(a) if any regular payment is not paid by Borrower on the day the same shall be due hereunder or if any other portion of the Debt (including the balance of the Debt upon maturity) is not paid by Borrower when the same shall be due hereunder;

(b) if any representation or warranty made in this Note, or any other Loan Documents, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Payee shall have been false in any material respect as of the date the representation or warranty was made;

(c) the occurrence of any breach of any other covenant or agreement contained in this Note or any other Loan Document (except those specified in this Section 4, which shall be subject to the terms thereof), which is not cured within two (2) business days after receipt of written notice of such default (except that no such notice or cure period shall apply if Payee reasonably believes for that such failure could result in a material impairment of the rights of Payee under this Note, or the other Loan Documents or if such failure is not reasonably susceptible to being cured during such two day (2) day period);

(d) if a receiver, liquidator or trustee shall be appointed for Borrower or Guarantor, or if Borrower or Guarantor shall be adjudicated to be bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Guarantor, or if any proceeding for the dissolution or liquidation of Borrower or Guarantor shall be instituted;

(e) the failure of Guarantor to pay any sums due under the Guaranty; or

(f) if there shall be the entry of a judgment against Borrower or Guarantor in excess of $5,000.00.

6. **Late Fee; Default Rate; Dishonored check**. (a) In the event any payment herein provided for shall become overdue for a period in excess of three (3) days or, if any check given by Borrower shall be dishonored, a late charge of ten-hundredths of one dollar ($0.10) for each dollar so overdue shall become immediately due to Payee as liquidated damages for failure to make prompt payment. Said late charges shall be computed from the due date (after applicable grace periods, if any) to the date of payment and shall be payable with the next installment of principal and/or interest. Payment and/or acceptance of any late charges shall not constitute a waiver of any default.

(b) If an Event of Default shall have occurred, then notwithstanding anything to the contrary contained herein, from and after the date of such Event of Default, interest on the then outstanding Principal Sum shall instead accrue at the Default Rate. The "**Default Rate**" is a rate of interest equal to the interest rate pursuant to Section 1 plus an additional five percent (5%) per month.

(c) A fee of $250.00 shall be assessed for each dishonored payment of Borrower.

(d) Upon the occurrence of an event an default, Borrower shall immediately be assessed a Default Fee in the amount of $25,000. Such Default Fee shall become immediately due and payable upon the occurrence of an event of default.

(e) Upon the occurrence of an event of default, Borrower shall be responsible for all Lenders costs and expenses in enforcing the terms of the Loan Documents including but not limited to reasonable attorneys fees calculate at 25% of the then current balance due.

Case 1:24-cv-08551-AS Document 11-23 Filed 02/28/25 Page 44 of 292

7.      **No Right to Prepayment**. The Debt may be not be prepaid by Borrower prior to August 15, 2021. After August 15, 2021, in the event Borrower wishes to prepay the debt, a Prepayment Penalty in the amount of $135,000 shall be assessed and be immediately due. Such Prepayment Penalty shall be paid contemporaneously with the payment of unpaid interest and principal. *Borrower confirms that it has read and understands the terms of this Section 6 and acknowledges and agrees that the foregoing provisions of this Section 7 are a material inducement for Payee's agreement to make the loan in accordance with the terms hereof.*

8.      **No Waiver**. No waiver by Payee of any of its rights or remedies hereunder or otherwise shall be considered a waiver of any other subsequent right or remedy of Payee; no delay or omission in the exercise or enforcement by Payee of any right or remedy shall ever be construed as a waiver of any right or remedy of Payee; and no exercise or enforcement of any such right or remedy shall ever be deemed to exhaust any right or remedy of Payee.

9.      **Limitation on Interest.** It is the intention of Borrower and Payee to conform strictly to the usury laws in force that are applicable to this Note. Accordingly, all agreement between Borrower and Payee, whether now existing or hereafter arising, and whether written or oral, are hereby limited so that in no contingency, whether by reason of acceleration of the maturity of this Note or otherwise, shall the interest (and all other sums that are deemed to be interest) contracted for, charged or received by Payee exceed the maximum amount permitted by applicable law. If, from any circumstances whatsoever, interest would otherwise be payable to Payee in excess of the maximum amount permitted by applicable law, the interest payable to Payee shall be reduced to the maximum amount permitted by applicable law; and if, from any circumstance whatsoever, Payee shall ever receive anything of value deemed interest by applicable law in excess of the maximum amount permitted by applicable law, the receipt of Payee of such excess interest shall be deemed a mistake and the same shall, at the option of Borrower, but so long as no Event of Default shall be continuing, either be refunded to Borrower or credited on the unpaid principal balance hereof; provided, however, that if an Event of Default shall have occurred and be continuing, and Payee shall receive excess interest during such period, Payee shall have the option, if permitted by applicable law, of either crediting such excess amount to the then outstanding Principal Sum, or refunding such excess to Borrower. If this Note is prepaid, unearned interest, if any, shall be canceled and, if theretofore paid, shall either be refunded to Borrower or credited on the balance hereof, as Payee shall elect, if permitted by applicable law. All interest paid or agreed to be paid to Payee shall, the extent allowed by applicable law, be amortized, prorated, allocated and spread throughout the full period until payment in full of the then outstanding Principal Sum (including the period of any extension) so that the interest for such full period shall not exceed the maximum amount permitted by applicable law.

10.      **Notice and Waiver of Presentment.** Borrower hereby waives presentment, demand, protest and notice of any kind, all of which are hereby expressly waived. No waiver or forbearance on the part of Payee to exercise any right hereunder shall operate as a waiver of that right.

11.      **Attorneys' Fees, Costs Of Collection**. Borrower shall pay to Payee on demand all out-of-pocket costs and expenses, including attorneys' fees calculated at 25% of the balance due upon an occurrence of an event of default, court costs and disbursements, incurred by Payee in collecting the indebtedness arising hereunder or as a consequence of any breach or default by Borrower hereunder, or otherwise as a consequence of any right evidenced or secured by this Note.

12.      **Applicable Law; Consent To Jurisdiction, Waiver of Jury Trial**. This Note shall be governed and construed in accordance with the laws of the State of New York without giving effect to conflict of laws principles thereof. All judicial actions, suits or proceedings brought against Borrower and its respective property with respect to obligations, liabilities or any other matter under or arising out of or in connection with this Note or for recognition or enforcement of any judgment rendered in any such proceedings, shall be brought in any trial or appellate state or federal court of competent jurisdiction in

the State of New York, unless another jurisdiction is required by law. Borrower accepts, generally and unconditionally, the exclusive jurisdiction of such courts and irrevocably waives, and agrees not to plead or claim, any objection that it may ever have to the venue of any such action or proceeding in any such court. Borrower irrevocably agrees that all process in any proceeding or any court arising out of or in connection with this Note or may be effected by mailing to Borrower a copy by registered or certified mail, return receipt requested, or any substantially similar form of mail, postage and fees fully prepaid, to Borrower at its address as set forth in the first paragraph hereof. Such service shall be effective upon receipt thereof, as evidenced by the return receipt. Such service shall be valid and binding service in every respect. Borrower shall not assert that such service did not constitute valid and binding service within the meaning of any applicable state or federal law, rule, regulation or the like. Nothing in this Note shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction. Borrower, to the full extent permitted by law, hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, waives, relinquishes and forever forgoes the right to a trial by jury in any action or proceeding based upon, arising out of, or in any way relating to this agreement or any conduct, act or omission of Payee, or any of its directors, officers, partners, members, employees, agents or attorneys, or any other persons affiliated with Payee, in each of the foregoing cases, whether sounding in contract, tort or otherwise.

13. **Notices**. All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") required, permitted, or desired to be given hereunder shall be in writing sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address set forth above, or to such other address as such party may hereafter specify in accordance with the provisions hereof. Any Notice shall be deemed to have been received: (a) three (3) Business Days after the date such Notice is mailed, (b) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (c) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties at the addresses hereinabove set forth or such other address designated by Borrower or Payee by 10 days prior notice.

14. **Time of the Essence**. Time shall be of the essence with respect to each of the obligations of Borrower contained herein.

15. **Joint and Several**. All of the obligations and liabilities of each Borrower hereunder shall be joint and several obligations of each of the Borrowers.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

Case 1:24-cv-08851-AS Document 11-23 Filed 02/28/25 Page 246 of 292

**IN WITNESS WHEREOF**, each Borrower has duly executed this Note as of the day and year first above written.

**BORROWER:**

GOLDEN FOOTHILLS INSURANCE SERVICES LLC

By: _____
     STEFAN LEER

LIFE FACTOR II LLC

By: _____
     STEFAN LEER

LIFE SHARES II LLC

By: _____
     STEFAN LEER

**ACKNOWLEDGMENT**

STATE OF _California_   )
                     )   ss.:
COUNTY OF _Orange_   )

On this, the 16 day of June, 2021, before me, the undersigned, personally appeared STEFAN LEER personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity as an authorized signatory of each of the foregoing entities, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

LAURIE ANN LEER-MARTINEZ
COMM. #2284701
Notary Public - California
El Dorado County
My Comm. Expires Apr. 8, 2023

Case 1:24-cv-08355-AS Document 11-23 Filed 02/28/25 Page 247 of 292

Payment Schedule

| Date | Amount |
|---|---|
| 18-Jun-21 | $ 150,000.00 |
| 25-Jun-21 | $ 150,000.00 |
| 2-Jul-21 | $ 70,000.00 |
| 9-Jul-21 | $ 70,000.00 |
| 16-Jul-21 | $ 70,000.00 |
| 23-Jul-21 | $ 70,000.00 |
| 30-Jul-21 | $ 70,000.00 |
| 6-Aug-21 | $ 70,000.00 |
| 13-Aug-21 | $ 127,173.91 |
| 20-Aug-21 | $ 127,173.91 |
| 27-Aug-21 | $ 127,173.91 |
| 3-Sep-21 | $ 127,173.91 |
| 10-Sep-21 | $ 127,173.91 |
| 17-Sep-21 | $ 127,173.91 |
| 24-Sep-21 | $ 127,173.91 |
| 1-Oct-21 | $ 127,173.91 |
| 8-Oct-21 | $ 127,173.91 |
| 15-Oct-21 | $ 127,173.91 |
| 22-Oct-21 | $ 127,173.91 |
| 29-Oct-21 | $ 127,173.91 |
| 5-Nov-21 | $ 127,173.91 |
| 12-Nov-21 | $ 127,173.91 |
| 19-Nov-21 | $ 127,173.91 |
| 26-Nov-21 | $ 127,173.91 |
| 3-Dec-21 | $ 127,173.91 |
| 10-Dec-21 | $ 127,173.91 |
| 17-Dec-21 | $ 127,173.91 |
| 24-Dec-21 | $ 127,173.91 |
| 31-Dec-21 | $ 127,173.91 |
| 7-Jan-22 | $ 127,173.91 |
| 14-Jan-22 | $ 127,173.98 |
| | |
| total | $3,645,000.00 |

# EXHIBIT 24

## PAYMENT GUARANTY

**THIS PAYMENT GUARANTY** (this "**Guaranty**") is executed as of June 16, 2021 by STEFAN LEER an individual residing at 8 San Remo, San Clemente CA 92673, ( "**Guarantor**") and Spin Capital LLC with an address at 1276 50th St Brooklyn New York 11219 (together with its successors and assigns, collectively, "**Lender**").

### W I T N E S S E T H:

A.        Pursuant to that certain Promissory Note, dated as of the date hereof, executed by olden Foothill Insurance Services LLC, Life Factor II LLC and Life Shares II LLC (collectively, "**Borrower**"), and payable to the order of Lender in the original principal amount of TWO MILLION SEVEN HUNDRED THOUSAND DOLLARS ($2,700,000.00) (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan ("**Loan**") which Loan is secured by that certain Loan Documents and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan (all such other instruments and documents, together with the Note and Security Agreement, and other documents collectively, the "**Loan Documents**").

B.        Lender's willingness to make the Loan, or otherwise extend credit, to Borrower is dependent upon each of the Guarantor's unconditional guaranty of payment and performance to Lender of the Guaranteed Obligations (as herein defined).

C.        Guarantor represents that he is a member and/or shareholder of Borrower, as applicable, and that Guarantor will directly benefit from Lender's making the Loan to Borrower.

D.        All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Documents.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower and the other Borrowers, and to extend such additional credit as Lender may from time to time extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor hereby agrees as follows:

### ARTICLE 1
### NATURE AND SCOPE OF GUARANTY

**Section 1.1        Guaranty of Obligation**.

(a)        Guarantor hereby, jointly and severally, irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

(b)        As used herein, the term "**Guaranteed Obligations**" means payment and performance of all of the obligations of Borrower under each of the Loan Documents, including, without limitation, for the repayment of the Loan and any other amounts owed to Lender in accordance with the terms thereof and payment of all indemnities owed to Lender by Borrower.

Case 1:24-cv-00855-AS Document 11-24 Filed 02/26/24 Page 250 of 292

    **Section 1.2**  <u>Nature of Guaranty</u>. This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor. The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note. Upon the indefeasible satisfaction in full of the Obligations (other than those which by their terms survive repayment of the Loan), Lender's rights under this Guaranty shall terminate.

    **Section 1.3**  <u>Payment By Guarantor</u>. If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, without notice from Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, all such notices being hereby waived by Guarantor, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Each demand may be made at any time coincident with or after the time payment of all or part of the Guaranteed Obligations is due and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

    **Section 1.4**  <u>No Duty To Pursue Others</u>. It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantors hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations (if any), (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

    **Section 1.5**  <u>Waivers</u>. Guarantor agrees to the provisions of the Loan Documents and, except as expressly provided herein, hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Mortgage or any other Loan Document, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory note or other document arising under the Loan Documents or in connection with the Property, (v) the occurrence of (A) any breach by Borrower of any of the terms or conditions of any of the Loan Documents, or (B) an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) the sale or foreclosure (or the posting or advertising for the sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, (ix) any other action at any time taken or omitted by Lender and (x) generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed.

    **Section 1.6**  <u>Payment of Expenses</u>. In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, the Guarantor shall, within three (3) days of demand by Lender, pay Lender all out-of-pocket costs and expenses (including court costs and reasonable attorneys' fees)

Case 1:24-cv-08555-AS    Document 11-24    Filed 02/28/2024    Page 254 of 292

incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder provided that Lender is the prevailing party in such action to collect or enforce same. The covenant contained in this Section 1.6 shall survive the payment and performance of the Guaranteed Obligations.

Section 1.7    **Effect of Bankruptcy**. In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain (or shall be reinstated to be) in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

Section 1.8    **Waiver of Subrogation, Reimbursement and Contribution**. Notwithstanding anything to the contrary contained in this Guaranty, until such time as the Obligations are no longer outstanding has been repaid in full, (other than these Obligations which by their terms survive repayment of the Loan) Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for the payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise (it being understood that Guarantor shall be entitled to exercise any of the foregoing rights following the date on which none of the Obligations remains outstanding.

**ARTICLE 2**
EVENTS AND CIRCUMSTANCES NOT REDUCING
OR DISCHARGING GUARANTORS' OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including, without limitation, rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1    **Modifications**. Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Mortgage, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

Section 2.2    **Adjustment**. Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or Guarantor.

Section 2.3    **Condition of Borrower or Guarantor**. The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the direct or indirect shareholders, partners or members, as applicable, of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

3

**Section 2.4    Invalidity of Guaranteed Obligations**.    The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including, without limitation, the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Mortgage or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Mortgage or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**Section 2.5    Release of Obligors**.  Any full or partial release of the liability of Borrower for the Guaranteed Obligations or any part thereof, or of any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support from any other Person, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons will be liable to pay or perform the Guaranteed Obligations or that Lender will look to other Persons to pay or perform the Guaranteed Obligations.

**Section 2.6    Other Collateral**.  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**Section 2.7    Release of Collateral**.   Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**Section 2.8    Care and Diligence**. The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (a) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**Section 2.9    Unenforceability**.  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by

4

Case 1:24-cv-08555-AS Document 111-24 Filed 02/28/25 Page 256 of 292

Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

**Section 2.10** **Merger**. The reorganization, merger or consolidation of Borrower or Guarantor into or with any other Person.

**Section 2.11** **Preference**. Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or to any other Person.

**Section 2.12** **Other Actions Taken or Omitted**. Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it being the unambiguous and unequivocal intention of Guarantor that Guarantors shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

**ARTICLE 3**
REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and to extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**Section 3.1** **Benefit**. Guarantor is an owner of a direct interest in Borrower and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**Section 3.2** **Familiarity and Reliance**. Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**Section 3.3** **No Representation By Lender**. Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**Section 3.4** **Guarantor's Financial Condition**. As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor (a) is solvent, (b) has assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and (c) has property and assets sufficient to satisfy and repay its obligations and liabilities, including the Guaranteed Obligations.

**Section 3.5** **Legality**. This Guaranty has been duly executed and delivered by or on behalf of Guarantor and is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or general principles of equity. The execution and delivery of this Guaranty by Guarantor and the performance of its

5

Case 1:24-cv-08555-AS   Document 11-24   Filed 02/28/24   Page 254 of 292

obligations hereunder will not conflict with any provision of any law or regulation to which Guarantor is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of Guarantor's organizational documents or any material agreement or instrument to which Guarantor is a party or by which it is bound, or any order or decree applicable to Guarantor. The execution and delivery of this Guaranty by Guarantor and the performance of its obligations hereunder do not, and will not, contravene or conflict with any applicable law, statute or regulation of any court or governmental agency or body having jurisdiction over Guarantor, or constitute a default under, or result in the breach of, any indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which any Guarantor is a party or which may be applicable to any Guarantor. There are no actions, suits or proceedings pending or, to the actual knowledge of Guarantor, threatened before or by any tribunal against or affecting Guarantor, which, if adversely determined, would materially and adversely affect Guarantor's ability to perform its obligations hereunder. All financial statements and information heretofore furnished to Lender by Guarantor do, and all financial statements and information hereafter furnished to Lender by Guarantor will, accurately present the financial condition of Guarantor as of their dates and the results of Guarantor's operations for the periods therein specified in all material respects, and, except as heretofore disclosed in writing to Lender, has Guarantor incurred any material liability, direct or indirect, fixed or contingent, which would materially and adversely affect such Guarantor's ability to perform its obligations hereunder.

Section 3.6 **Survival**. All representations, warranties and covenants made by Guarantor herein are a material inducement to Lender to enter into the other Loan Documents and shall survive the execution hereof and any bankruptcy, foreclosure, transfer of security or other event affecting Borrower, Guarantor, any other party, or any security for all or any part of the Guaranteed Obligations.

Section 3.7 **Personal Financial Statement**. Guarantor hereby covenants and agrees to provide to Lender a true, correct and complete certified personal financial statement of Guarantor and such other information as requested by Lender promptly after request.

**ARTICLE 4**
SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 4.1 **Subordination of All Guarantor Claims**. As used herein, the term **"Guarantor Claims"** shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, and whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be, created, or the manner in which they have been, or may hereafter be, acquired by Guarantor. The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. So long as any portion of the Obligations or the Guaranteed Obligations remain outstanding (other than those which by their terms survive repayment of the Loan), Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other Person any amount upon the Guarantor Claims.

Section 4.2 **Claims in Bankruptcy**. In the event of any receivership, bankruptcy, reorganization, arrangement, debtor's relief or other insolvency proceeding involving Guarantor as a debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to

6

Case 1:24-cv-08555-AS Document 11-24 Filed 02/26/24 Page 258 of 292

Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Obligations and the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**Section 4.3** **Payments Held in Trust**. Notwithstanding anything to the contrary contained in this Guaranty, in the event that Guarantor should receive any funds, payments, claims and/or distributions which are prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims and/or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**Section 4.4** **Liens Subordinate**. Until indefeasible payment in full of the Debt, Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's rights it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including, without limitation, the commencement of, or the joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on the assets of Borrower held by Guarantor.

**ARTICLE 5**

**5.1** **Waiver**. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. Subject to the further provisions of Section 5.5, no consent to departure from or waiver of any provision of this Guaranty shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2** **Notices**. All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "Notice") required, permitted, or desired to be given hereunder shall be in writing sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address set forth above, or to such other address as such party may hereafter specify in accordance with the provisions hereof. Any Notice shall be deemed to have been received: (a) three (3) Business Days after the date such Notice is mailed, (b) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (c) on the next Business Day if sent by an overnight commercial courier, in each case

7

addressed to the parties at the addresses hereinabove set forth or such other address designated by Guarantor or Lender by ten (10) days prior notice.

**5.3** **Governing Law**. This guaranty shall be governed by and construed in accordance with the laws of the State of New York.

**5.4** **Invalid Provisions**. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

**5.5** **Amendments**. This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

**5.6** **Parties Bound; Assignment**. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that no Guarantor may, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder.

**5.7** **Headings**. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**5.8** **Recitals**. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

**5.9** **Counterparts**. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

**5.10** **Rights and Remedies**. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy. Lender shall have, and may exercise, in addition to all other rights, privileges, or remedies available to it under this Guaranty and by law, the specific rights and remedies to sue for and obtain specific performance by the Guarantor of Guarantor's covenants and agreements set forth herein. Guarantor hereby agrees and acknowledges that this Guaranty is an instrument for the payment of money, and hereby consents that Lender, at its sole option, in the event of a default by Guarantor in the payment of any of the moneys due hereunder, shall have the right to bring a motion and/or action under New York CPLR Section 3213.

8

**5.11** <u>Entirety</u>. THIS GUARANTY EMBODIES THE FINAL AND ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THIS GUARANTY, AND NO COURSE OF DEALING BETWEEN ANY GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN ANY GUARANTOR AND LENDER.

**5.12** <u>Waiver of Right To Trial By Jury</u>. EACH PARTY HERETO AND ALL PERSONS CLAIMING BY, THROUGH OR UNDER SUCH PARTY EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY LENDER OR GUARANTOR, AS THE CASE MAY BE.

**5.13** <u>Reinstatement in Certain Circumstances</u>. If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise and such payment satisfied any Guaranteed Obligations, Guarantor's obligations hereunder with respect to such Guaranteed Obligations shall be reinstated as though such payment has been due but not made at such time.

**[NO FURTHER TEXT ON THIS PAGE]**

9

Case 1:24-cv-08515-AS Document 71-24 Filed 02/28/24 Page 258 of 292

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

STEFAN LEER

## ACKNOWLEDGMENT

STATE OF _California_ )
                 ) ss.:
COUNTY OF _Orange_ )

On this, the _16th_ day of June, 2021, before me, the undersigned, personally appeared Stefan Leer, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their individual capacity and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

(signature and office of individual taking acknowledgment)

LAURIE ANN LEER-MARTINEZ
COMM. #2284701
Notary Public - California
El Dorado County
My Comm. Expires Apr. 8, 2023

# EXHIBIT 25

Case 1:24-cv-00555-AS Document 11-25 Filed 02/28/24 Page 260 of 292

## PAYMENT GUARANTY

**THIS PAYMENT GUARANTY** (this "**Guaranty**") is executed as of June 16, 2021 by TATANISHA LAVONNE LEER an individual residing at  8 San Remo, San Clemente California 92673 ( "**Guarantor**") and Spin Capital LLC with an address at 1276 50th St Brooklyn New York 11219 (together with its successors and assigns, collectively, "**Lender**").

## W I T N E S S E T H:

A.       Pursuant to that certain Promissory Note, dated as of the date hereof, executed by olden Foothill Insurance Services LLC, Life Factor II LLC and Life Shares II LLC (collectively, "**Borrower**"), and payable to the order of Lender in the original principal amount of TWO MILLION SEVEN HUNDRED THOUSAND DOLLARS ($2,700,000.00) (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan ("**Loan**") which Loan is secured by that certain Loan Documents and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan (all such other instruments and documents, together with the Note and Security Agreement, and other documents collectively, the "**Loan Documents**").

B.       Lender's willingness to make the Loan, or otherwise extend credit, to Borrower is dependent upon each of the Guarantor's unconditional guaranty of payment and performance to Lender of the Guaranteed Obligations (as herein defined).

C.       Guarantor represents that he is a member and/or shareholder of Borrower, as applicable, and that Guarantor will directly benefit from Lender's making the Loan to Borrower.

D.       All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Documents.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower and the other Borrowers, and to extend such additional credit as Lender may from time to time extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor hereby agrees as follows:

## ARTICLE 1
### NATURE AND SCOPE OF GUARANTY

**Section 1.1**       **Guaranty of Obligation**.

(a)       Guarantor hereby, jointly and severally, irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

(b)       As used herein, the term "**Guaranteed Obligations**" means payment and performance of all of the obligations of Borrower under each of the Loan Documents, including, without limitation, for the repayment of the Loan and any other amounts owed to Lender in accordance with the terms thereof and payment of all indemnities owed to Lender by Borrower.

        **Section 1.2**    <u>Nature of Guaranty</u>.  This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor.  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.  Upon the indefeasible satisfaction in full of the Obligations (other than those which by their terms survive repayment of the Loan), Lender's rights under this Guaranty shall terminate.

        **Section 1.3**    <u>Payment By Guarantor</u>.  If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, without notice from Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, all such notices being hereby waived by Guarantor, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Each demand may be made at any time coincident with or after the time payment of all or part of the Guaranteed Obligations is due and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

        **Section 1.4**    <u>No Duty To Pursue Others</u>.  It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantors hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations (if any), (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations.  Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

        **Section 1.5**    <u>Waivers</u>.  Guarantor agrees to the provisions of the Loan Documents and, except as expressly provided herein, hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Mortgage or any other Loan Document, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory note or other document arising under the Loan Documents or in connection with the Property, (v) the occurrence of (A) any breach by Borrower of any of the terms or conditions of any of the Loan Documents, or (B) an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) the sale or foreclosure (or the posting or advertising for the sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, (ix) any other action at any time taken or omitted by Lender and (x) generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed.

        **Section 1.6**    <u>Payment of Expenses</u>.  In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, the Guarantor shall, within three (3) days of demand by Lender, pay Lender all out-of-pocket costs and expenses (including court costs and reasonable attorneys' fees)

2

incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder provided that Lender is the prevailing party in such action to collect or enforce same. The covenant contained in this Section 1.6 shall survive the payment and performance of the Guaranteed Obligations.

Section 1.7    **Effect of Bankruptcy**. In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain (or shall be reinstated to be) in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

Section 1.8    **Waiver of Subrogation, Reimbursement and Contribution**. Notwithstanding anything to the contrary contained in this Guaranty, until such time as the Obligations are no longer outstanding has been repaid in full, (other than these Obligations which by their terms survive repayment of the Loan) Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for the payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise (it being understood that Guarantor shall be entitled to exercise any of the foregoing rights following the date on which none of the Obligations remains outstanding.

**ARTICLE 2**
EVENTS AND CIRCUMSTANCES NOT REDUCING
OR DISCHARGING GUARANTORS' OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including, without limitation, rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1    **Modifications**. Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Mortgage, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

Section 2.2    **Adjustment**. Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or Guarantor.

Section 2.3    **Condition of Borrower or Guarantor**. The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the direct or indirect shareholders, partners or members, as applicable, of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

3

Case 1:24-cv-08555-AS Document 11-25 Filed 02/28/2024 Page 265 of 292

**Section 2.4** **Invalidity of Guaranteed Obligations**. The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including, without limitation, the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Mortgage or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Mortgage or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**Section 2.5** **Release of Obligors**. Any full or partial release of the liability of Borrower for the Guaranteed Obligations or any part thereof, or of any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support from any other Person, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons will be liable to pay or perform the Guaranteed Obligations or that Lender will look to other Persons to pay or perform the Guaranteed Obligations.

**Section 2.6** **Other Collateral**. The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**Section 2.7** **Release of Collateral**. Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**Section 2.8** **Care and Diligence**. The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (a) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**Section 2.9** **Unenforceability**. The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by

4

Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

**Section 2.10** **Merger**. The reorganization, merger or consolidation of Borrower or Guarantor into or with any other Person.

**Section 2.11** **Preference**. Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or to any other Person.

**Section 2.12** **Other Actions Taken or Omitted**. Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it being the unambiguous and unequivocal intention of Guarantor that Guarantors shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

**ARTICLE 3**
REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and to extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**Section 3.1** **Benefit**. Guarantor is an owner of a direct interest in Borrower and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**Section 3.2** **Familiarity and Reliance**. Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**Section 3.3** **No Representation By Lender**. Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**Section 3.4** **Guarantor's Financial Condition**. As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor (a) is solvent, (b) has assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and (c) has property and assets sufficient to satisfy and repay its obligations and liabilities, including the Guaranteed Obligations.

**Section 3.5** **Legality**. This Guaranty has been duly executed and delivered by or on behalf of Guarantor and is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or general principles of equity. The execution and delivery of this Guaranty by Guarantor and the performance of its

5

Case 1:24-cv-08555-AS   Document 11-25   Filed 02/28/24   Page 265 of 292

obligations hereunder will not conflict with any provision of any law or regulation to which Guarantor is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of Guarantor's organizational documents or any material agreement or instrument to which Guarantor is a party or by which it is bound, or any order or decree applicable to Guarantor. The execution and delivery of this Guaranty by Guarantor and the performance of its obligations hereunder do not, and will not, contravene or conflict with any applicable law, statute or regulation of any court or governmental agency or body having jurisdiction over Guarantor, or constitute a default under, or result in the breach of, any indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which any Guarantor is a party or which may be applicable to any Guarantor.  There are no actions, suits or proceedings pending or, to the actual knowledge of Guarantor, threatened before or by any tribunal against or affecting Guarantor, which, if adversely determined, would materially and adversely affect Guarantor's ability to perform its obligations hereunder. All financial statements and information heretofore furnished to Lender by Guarantor do, and all financial statements and information hereafter furnished to Lender by Guarantor will, accurately present the financial condition of Guarantor as of their dates and the results of Guarantor's operations for the periods therein specified in all material respects, and, except as heretofore disclosed in writing to Lender, has Guarantor incurred any material liability, direct or indirect, fixed or contingent, which would materially and adversely affect such Guarantor's ability to perform its obligations hereunder.

Section 3.6    **Survival**. All representations, warranties and covenants made by Guarantor herein are a material inducement to Lender to enter into the other Loan Documents and shall survive the execution hereof and any bankruptcy, foreclosure, transfer of security or other event affecting Borrower, Guarantor, any other party, or any security for all or any part of the Guaranteed Obligations.

Section 3.7    **Personal Financial Statement**. Guarantor hereby covenants and agrees to provide to Lender a true, correct and complete certified personal financial statement of Guarantor and such other information as requested by Lender promptly after request.

## ARTICLE 4
### SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 4.1    **Subordination of All Guarantor Claims**.  As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, and whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be, created, or the manner in which they have been, or may hereafter be, acquired by Guarantor.  The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.  So long as any portion of the Obligations or the Guaranteed Obligations remain outstanding (other than those which by their terms survive repayment of the Loan), Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other Person any amount upon the Guarantor Claims.

Section 4.2    **Claims in Bankruptcy**.  In the event of any receivership, bankruptcy, reorganization, arrangement, debtor's relief or other insolvency proceeding involving Guarantor as a debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims.  Guarantor hereby assigns such dividends and payments to

Case 1:24-cv-00855-AS   Document 111-25   Filed 02/28/2024   Page 268 of 292

Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Obligations and the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

Section 4.3 **Payments Held in Trust**. Notwithstanding anything to the contrary contained in this Guaranty, in the event that Guarantor should receive any funds, payments, claims and/or distributions which are prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims and/or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

Section 4.4 **Liens Subordinate**. Until indefeasible payment in full of the Debt, Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's rights it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including, without limitation, the commencement of, or the joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on the assets of Borrower held by Guarantor.

**ARTICLE 5**

**5.1 Waiver**. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. Subject to the further provisions of Section 5.5, no consent to departure from or waiver of any provision of this Guaranty shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2 Notices**. All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "Notice") required, permitted, or desired to be given hereunder shall be in writing sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address set forth above, or to such other address as such party may hereafter specify in accordance with the provisions hereof. Any Notice shall be deemed to have been received: (a) three (3) Business Days after the date such Notice is mailed, (b) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (c) on the next Business Day if sent by an overnight commercial courier, in each case

addressed to the parties at the addresses hereinabove set forth or such other address designated by Guarantor or Lender by ten (10) days prior notice.

       **5.3**     **Governing Law**.  This guaranty shall be governed by and construed in accordance with the laws of the State of New York.

       **5.4**     **Invalid Provisions**.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

       **5.5**     **Amendments**.  This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

       **5.6**     **Parties Bound; Assignment**.  This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that no Guarantor may, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder.

       **5.7**     **Headings**.  Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

       **5.8**     **Recitals**.  The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

       **5.9**     **Counterparts**.  To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto.  Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

       **5.10**     **Rights and Remedies**.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy. Lender shall have, and may exercise, in addition to all other rights, privileges, or remedies available to it under this Guaranty and by law, the specific rights and remedies to sue for and obtain specific performance by the Guarantor of Guarantor's covenants and agreements set forth herein. Guarantor hereby agrees and acknowledges that this Guaranty is an instrument for the payment of money, and hereby consents that Lender, at its sole option, in the event of a default by Guarantor in the payment of any of the moneys due hereunder, shall have the right to bring a motion and/or action under New York CPLR Section 3213.

8

5.11   **Entirety**.   THIS GUARANTY EMBODIES THE FINAL AND ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THIS GUARANTY, AND NO COURSE OF DEALING BETWEEN ANY GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT.   THERE ARE NO ORAL AGREEMENTS BETWEEN ANY GUARANTOR AND LENDER.

5.12   **Waiver of Right To Trial By Jury**. EACH PARTY HERETO AND ALL PERSONS CLAIMING BY, THROUGH OR UNDER SUCH PARTY EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY LENDER OR GUARANTOR, AS THE CASE MAY BE.

5.13   **Reinstatement in Certain Circumstances**. If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise and such payment satisfied any Guaranteed Obligations, Guarantor's obligations hereunder with respect to such Guaranteed Obligations shall be reinstated as though such payment has been due but not made at such time.

**[NO FURTHER TEXT ON THIS PAGE]**

Case 1:24-cv-06515-AS Document 71-25 Filed 02/28/24 Page 269 of 292

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

TATANISHA LAVONNE LEER

## ACKNOWLEDGMENT

STATE OF _California_ )
                              ) ss.:
COUNTY OF _Orange_ )

On this, the _16th_ day of June, 2021, before me, the undersigned, personally appeared TaTanisha Lavonne Leer, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their individual capacity and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

LAURIE ANN LEER-MARTINEZ
COMM. #2284701
Notary Public - California
El Dorado County
My Comm. Expires Apr. 8, 2023

(signature and office of individual taking acknowledgment)

# EXHIBIT 26

## PAYMENT GUARANTY

**THIS PAYMENT GUARANTY** (this "**Guaranty**") is executed as of June 16, 2021 by El Dorado Hills Insurance Solutions Inc, and LoneWolf Insurance Insurance Services Inc, and ELDO Investments LLC, and The Genesis LS Fund LLC, and KTL Holdings Inc. (collectively "**Guarantor**") and Spin Capital LLC with an address of 1276 50th St, Brooklyn NY 11219 (together with its successors and assigns, collectively, "**Lender**").

### W I T N E S S E T H:

A. Pursuant to that certain Promissory Note, dated as of the date hereof, executed by Golden Foothill Insurance Services LLC, Life Factor II LLC and Life Shares II LLC (collectively, "**Borrower**"), and payable to the order of Lender in the original principal amount of TWO MILLION SEVEN HUNDRED THOUSAND DOLLARS ($2,700,000.00) (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan ("**Loan**") which Loan is secured by a certain security agreement and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan (all such other instruments and documents, together with the Note, and all other documents executed in connection with this transaction collectively, the "**Loan Documents**").

B. Lender's willingness to make the Loan, or otherwise extend credit, to Borrower is dependent upon each of the Guarantor's unconditional guaranty of payment and performance to Lender of the Guaranteed Obligations (as herein defined).

C. Guarantor represents that he is a member and/or shareholder of Borrower, as applicable, and that Guarantor will directly benefit from Lender's making the Loan to Borrower.

D. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Documents.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower and the other Borrowers, and to extend such additional credit as Lender may from time to time extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor hereby agrees as follows:

### ARTICLE 1
### NATURE AND SCOPE OF GUARANTY

**Section 1.1** **Guaranty of Obligation**.

(a) Guarantor hereby, jointly and severally, irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

(b) As used herein, the term "**Guaranteed Obligations**" means payment and performance of all of the obligations of Borrower under each of the Loan Documents, including, without limitation, for the repayment of the Loan and any other amounts owed to Lender in accordance with the terms thereof and payment of all indemnities owed to Lender by Borrower.

Case 1:24-cv-08555-AS Document 11-26 Filed 02/28/24 Page 273 of 292

       **Section 1.2**    **Nature of Guaranty**.  This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor.  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.  Upon the indefeasible satisfaction in full of the Obligations (other than those which by their terms survive repayment of the Loan), Lender's rights under this Guaranty shall terminate.

       **Section 1.3**    **Payment By Guarantor**.  If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, within three (3) days of upon demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, all such notices being hereby waived by Guarantor, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Each demand may be made at any time coincident with or after the time payment of all or part of the Guaranteed Obligations is due and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

       **Section 1.4**    **No Duty To Pursue Others**.  It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantors hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations (if any), (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations.  Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

       **Section 1.5**    **Waivers**.  Guarantor agrees to the provisions of the Loan Documents and, except as expressly provided herein, hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Mortgage or any other Loan Document, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory note or other document arising under the Loan Documents or in connection with the Property, (v) the occurrence of (A) any breach by Borrower of any of the terms or conditions of any of the Loan Documents, or (B) an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) the sale or foreclosure (or the posting or advertising for the sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, (ix) any other action at any time taken or omitted by Lender and (x) generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed.

       **Section 1.6**    **Payment of Expenses**.  In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, the Guarantor shall, within three (3) days of demand by Lender, pay Lender all out-of-pocket costs and expenses (including court costs and reasonable attorneys' fees)

Case 1:24-cv-08555-AS   Document 11-26   Filed 02/28/24   Page 273 of 292

incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder provided that Lender is the prevailing party in such action to collect or enforce same. The covenant contained in this Section 1.6 shall survive the payment and performance of the Guaranteed Obligations.

Section 1.7    **Effect of Bankruptcy**. In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain (or shall be reinstated to be) in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

Section 1.8    **Waiver of Subrogation, Reimbursement and Contribution**. Notwithstanding anything to the contrary contained in this Guaranty, until such time as the Obligations are no longer outstanding has been repaid in full, (other than these Obligations which by their terms survive repayment of the Loan) Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for the payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise (it being understood that Guarantor shall be entitled to exercise any of the foregoing rights following the date on which none of the Obligations remains outstanding.

**ARTICLE 2**
EVENTS AND CIRCUMSTANCES NOT REDUCING
OR DISCHARGING GUARANTORS' OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including, without limitation, rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1    **Modifications**. Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Mortgage, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

Section 2.2    **Adjustment**. Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or Guarantor.

Section 2.3    **Condition of Borrower or Guarantor**. The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the direct or indirect shareholders, partners or members, as applicable, of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

3

Case 1:24-cv-06555-AS Document 11-26 Filed 02/28/24 Page 275 of 292

**Section 2.4** **Invalidity of Guaranteed Obligations**. The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including, without limitation, the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Mortgage or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Mortgage or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**Section 2.5** **Release of Obligors**. Any full or partial release of the liability of Borrower for the Guaranteed Obligations or any part thereof, or of any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support from any other Person, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons will be liable to pay or perform the Guaranteed Obligations or that Lender will look to other Persons to pay or perform the Guaranteed Obligations.

**Section 2.6** **Other Collateral**. The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**Section 2.7** **Release of Collateral**. Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**Section 2.8** **Care and Diligence**. The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (a) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**Section 2.9** **Unenforceability**. The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by

4

Case 1:24-cv-06555-AS   Document 11-26   Filed 02/28/24   Page 275 of 292

Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

**Section 2.10     Merger**.  The reorganization, merger or consolidation of Borrower or Guarantor into or with any other Person.

**Section 2.11     Preference**.  Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or to any other Person.

**Section 2.12     Other Actions Taken or Omitted**.  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it being the unambiguous and unequivocal intention of Guarantor that Guarantors shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES**

To induce Lender to enter into the Loan Documents and to extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**Section 3.1     Benefit**.  Guarantor is an owner of a direct interest in Borrower and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**Section 3.2     Familiarity and Reliance**.  Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**Section 3.3     No Representation By Lender**.  Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**Section 3.4     Guarantor's Financial Condition**.  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor (a) is solvent, (b) has assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and (c) has property and assets sufficient to satisfy and repay its obligations and liabilities, including the Guaranteed Obligations.

**Section 3.5     Legality**.  This Guaranty has been duly executed and delivered by or on behalf of Guarantor and is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or general principles of equity. The execution and delivery of this Guaranty by Guarantor and the performance of its

5

obligations hereunder will not conflict with any provision of any law or regulation to which Guarantor is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of Guarantor's organizational documents or any material agreement or instrument to which Guarantor is a party or by which it is bound, or any order or decree applicable to Guarantor. The execution and delivery of this Guaranty by Guarantor and the performance of its obligations hereunder do not, and will not, contravene or conflict with any applicable law, statute or regulation of any court or governmental agency or body having jurisdiction over Guarantor, or constitute a default under, or result in the breach of, any indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which any Guarantor is a party or which may be applicable to any Guarantor. There are no actions, suits or proceedings pending or, to the actual knowledge of Guarantor, threatened before or by any tribunal against or affecting Guarantor, which, if adversely determined, would materially and adversely affect Guarantor's ability to perform its obligations hereunder. All financial statements and information heretofore furnished to Lender by Guarantor do, and all financial statements and information hereafter furnished to Lender by Guarantor will, accurately present the financial condition of Guarantor as of their dates and the results of Guarantor's operations for the periods therein specified in all material respects, and, except as heretofore disclosed in writing to Lender, has Guarantor incurred any material liability, direct or indirect, fixed or contingent, which would materially and adversely affect such Guarantor's ability to perform its obligations hereunder.

**Section 3.6** <u>Survival</u>. All representations, warranties and covenants made by Guarantor herein are a material inducement to Lender to enter into the other Loan Documents and shall survive the execution hereof and any bankruptcy, foreclosure, transfer of security or other event affecting Borrower, Guarantor, any other party, or any security for all or any part of the Guaranteed Obligations.

**Section 3.7** <u>**Personal Financial Statement**</u>. Guarantor hereby covenants and agrees to provide to Lender a true, correct and complete certified personal financial statement of Guarantor and such other information as requested by Lender promptly after request.

**ARTICLE 4**
SUBORDINATION OF CERTAIN INDEBTEDNESS

**Section 4.1** <u>**Subordination of All Guarantor Claims**</u>. As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, and whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be, created, or the manner in which they have been, or may hereafter be, acquired by Guarantor. The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. So long as any portion of the Obligations or the Guaranteed Obligations remain outstanding (other than those which by their terms survive repayment of the Loan), Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other Person any amount upon the Guarantor Claims.

**Section 4.2** <u>**Claims in Bankruptcy**</u>. In the event of any receivership, bankruptcy, reorganization, arrangement, debtor's relief or other insolvency proceeding involving Guarantor as a debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to

6

Case 1:24-cv-08555-AS Document 11-26 Filed 02/26/2024 Page 278 of 292

Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Obligations and the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**Section 4.3** **Payments Held in Trust**. Notwithstanding anything to the contrary contained in this Guaranty, in the event that Guarantor should receive any funds, payments, claims and/or distributions which are prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims and/or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**Section 4.4** **Liens Subordinate**. Until indefeasible payment in full of the Debt, Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's rights it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including, without limitation, the commencement of, or the joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on the assets of Borrower held by Guarantor.

## ARTICLE 5

**5.1** **Waiver**. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. Subject to the further provisions of Section 5.5, no consent to departure from or waiver of any provision of this Guaranty shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2** **Notices**. All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "Notice") required, permitted, or desired to be given hereunder shall be in writing sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address set forth above, or to such other address as such party may hereafter specify in accordance with the provisions hereof. Any Notice shall be deemed to have been received: (a) three (3) Business Days after the date such Notice is mailed, (b) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (c) on the next Business Day if sent by an overnight commercial courier, in each case

7

Case 1:24-cv-08555-AS Document 11-26 Filed 02/28/24 Page 279 of 292

addressed to the parties at the addresses hereinabove set forth or such other address designated by Guarantor or Lender by ten (10) days prior notice.

**5.3** **Governing Law**. This guaranty shall be governed by and construed in accordance with the laws of the State of New York.

**5.4** **Invalid Provisions**. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

**5.5** **Amendments**. This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

**5.6** **Parties Bound; Assignment**. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that no Guarantor may, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder.

**5.7** **Headings**. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**5.8** **Recitals**. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

**5.9** **Counterparts**. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

**5.10** **Rights and Remedies**. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy. Lender shall have, and may exercise, in addition to all other rights, privileges, or remedies available to it under this Guaranty and by law, the specific rights and remedies to sue for and obtain specific performance by the Guarantor of Guarantor's covenants and agreements set forth herein. Guarantor hereby agrees and acknowledges that this Guaranty is an instrument for the payment of money, and hereby consents that Lender, at its sole option, in the event of a default by Guarantor in the payment of any of the moneys due hereunder, shall have the right to bring a motion and/or action under New York CPLR Section 3213.

8

**5.11**   **Entirety**.   THIS GUARANTY EMBODIES THE FINAL AND ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THIS GUARANTY, AND NO COURSE OF DEALING BETWEEN ANY GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT.   THERE ARE NO ORAL AGREEMENTS BETWEEN ANY GUARANTOR AND LENDER.

**5.12**   **Waiver of Right To Trial By Jury**.   EACH PARTY HERETO AND ALL PERSONS CLAIMING BY, THROUGH OR UNDER SUCH PARTY EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.   THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY LENDER OR GUARANTOR, AS THE CASE MAY BE.

**5.13**   **Reinstatement in Certain Circumstances**. If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise and such payment satisfied any Guaranteed Obligations, Guarantor's obligations hereunder with respect to such Guaranteed Obligations shall be reinstated as though such payment has been due but not made at such time.

**[NO FURTHER TEXT ON THIS PAGE]**

9

Case 1:24-cv-08515-AS   Document 71-26   Filed 02/28/25   Page 280 of 292

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

STEFAN LEER ON BEHALF OF EL DORADO HILLS INSURANCE SOLUTIONS INC, AND LONEWOLF INSURANCE SERVICES INC, AND ELDO INVESTMENTS LLC, AND THE GENESIS LS FUND LLC, AND KTL HOLDINGS INC.

**ACKNOWLEDGMENT**

STATE OF _California_ )
                                    ) ss.:
COUNTY OF _Orange_ )

On this, the _10th_ day of June 2021, before me, the undersigned, personally Stefan Leer, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their individual capacity and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

(signature and office of individual taking acknowledgment)

LAURIE ANN LEER-MARTINEZ
COMM. #2284701
Notary Public - California
El Dorado County
My Comm. Expires Apr. 8, 2023

# EXHIBIT 27

Case 1:24-cv-08351-AS Document 11-27 Filed 02/28/25 Page 282 of 292

## SECURITY AGREEMENT

This Security Agreement is made as of the 16th day of June, 2021, by and between Golden Foothill Insurance Services LLC, LIFE FACTOR II LLC and LIFE SHARES II LLC ("Corporate Borrower") El Dorado Hills Insurance Solutions Inc, and LoneWolf Insurance Insurance Services Inc, and ELDO Investments LLC, and The Genesis LS Fund LLC, and KTL Holdings Inc. ("Corporate Guarantors") and STEFAN LEER ("Guarantor") on the one hand and SPIN CAPITAL LLC ("Lender or Secured Party" collectively with Corporate Borrower, Corporate Guarantors and Guarantor, "the Parties")

Whereas on June 16, 2021 the Parties executed a certain Promissory Note where Corporate Borrower and Guarantor agreed to repay to Lender the sum of $2,700,000 plus interest at 5% (five percent) per month with the balance on the Note due on or before January 14, 2021;

AND Whereas, the in further consideration of said Promissory Note, the Corporate Borrower Corporate Guarantors and the Guarantor (collectively the "Debtors") agree to grant a security interest in accordance with the foregoing to Lender ("Secured Party").

Security Interest. This Agreement will constitute a security agreement under the Uniform Commercial Code. Debtors grant to the Secured Party a security interest in and lien upon all of their present and future: (a) accounts (the "Accounts Collateral"), chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by the Debtors, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) funds at any time in the Debtors' Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to the Secured Party under this Agreement and the Promissory Note (collectively the "Agreements"), including but not limited to all rights to receive any payments or credits under the Agreements. Additionally Secured Party is granted a security interest in all life insurance policies owned by the Debtors including but not limited to the following policies:

| Insured | Company | Policy Number | Death Benefit | Owner/Beneficiary |
|---|---|---|---|---|
| Gresham, Ronald | Zurich American Life Insurance Company | 177947 | $2,500,000.00 | Life Shares II LLC |
| Kellar, Edward | Zurich American Life Insurance Company | 170604 | $5,000,000.00 | Life Shares II LLC |
| Leer, William & Rae | Zurich American Life Insurance Company | 162865 | $2,000,000.00 | Life Shares II LLC |
| Perry, Jack & Leonora | Zurich American Life Insurance Company | 167060 | $1,000,000.00 | Life Shares II LLC |
| Sisam, Dorothy | Zurich American Life Insurance Company | 172953 | $5,000,000.00 | Life Shares II LLC |
| Sisam, Edwin & Dorothy | Zurich American Life Insurance Company | 172963 | $6,000,000.00 | Life Shares II LLC |
| Sisco, Frances | Accordia Life and Annuity Company | UL00020974 | $2,000,000.00 | Life Shares II LLC |
| Utsick, John | John Hancock Life Insurance Company | 59592683 | $2,000,000.00 | Life Factor II LLC |
| Utsick, John | Brighthouse Financial Life Insurance | 7447253 | $15,000,000.00 | Life Factor II LLC |

(collectively, the "Secured Assets"). Debtors agree to provide other security to the Secured Party upon request to secure Debtors' obligations under the Agreements. Debtors agree that, if at any time there are insufficient funds in Debtors' Account to cover the Secured Party's entitlements under the Agreements, Secured Party is granted a further security interest in all of Debtors' assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of Secured Party's entitlements under the Agreements and any other agreements now existing or later entered into between Debtors, and the Secured Party or an affiliate of the Secured Party. Secured Party is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by Secured Party without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Secured Party shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, Secured Party has control over and may direct the disposition of the Secured Assets, without further consent of Debtors. Debtors hereby represent and warrant that no other person or entity has a security interest in the Secured Assets.

With respect to such security interests and liens, Secured Party will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Debtors will obtain from Secured Party written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Debtors agree that this is a contract of recoupment and Secured Party is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets.

Case 1:24-cv-08551-AS Document 11-27 Filed 02/28/25 Page 283 of 292

Nevertheless, Debtors agree not to contest or object to any motion for relief from the automatic stay filed by Secured Party. Debtors agree to execute and deliver to Secured Party such instruments and documents Secured Party may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. Secured Party is authorized to execute all such instruments and documents in Debtors name.

Debtors each acknowledge and agree that any security interest granted to Funder under any other agreement between Debtors and Secured Party (the "Cross-Collateral") will secure the obligations hereunder and under the Agreements. Debtors each agree to execute any documents or take any action in connection with the Agreements as Secured Party deems necessary to perfect or maintain Secured Party's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Debtors each hereby authorizes Secured Party to file any financing statements deemed necessary by Secured Party to perfect or maintain Secured Party's security interest. Debtors shall be liable for, and Secured Party may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by Secured Party in protecting, preserving and enforcing Secured Party's security interest and rights.

**Negative Pledge**. Debtors each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease**. Secured Party shall have the right to cure Debtors' default in the payment of rent on the following terms. In the event Debtors are served with papers in an action against Debtors for nonpayment of rent or for summary eviction, Secured Party may execute its rights and remedies under the Assignment of Lease. Debtors also agree that Secured Party may enter into an agreement with Debtors' landlord giving Secured Party the right: (a) to enter Debtors' premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Debtors' lease to another qualified business capable of operating a business comparable to Debtors' at such premises.

**Remedies**. Upon any Event of Default, Secured Party may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to Secured Party, whether by acceleration or otherwise.

**IN WITNESS WHEREOF**, each Borrower has duly executed this Security Agreement as of the day and year first above written.

**BORROWER and GUARANTOR:**
By: _____
Stefan Leer individually on behalf of Debtors

**ACKNOWLEDGMENT**
STATE OF _California_       )
                           )   ss.:
COUNTY OF _Orange_         )

On this, the _10th_ day of June, 2021, before me, the undersigned, personally appeared Stefan Leer personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity as an authorized signatory of each of the foregoing entities, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

LAURIE ANN LEER-MARTINEZ
COMM. #2284701
Notary Public - California
El Dorado County
My Comm. Expires Apr. 8, 2023

# EXHIBIT 28

Case 1:24-cv-08851-AS   Document 11-28   Filed 02/28/25   Page 285 of 292

Report Run Date: 06/18/2021 09:59

## Wire Detail Report - SPIN CAPITAL LLC

### Fedwire

**spincap-SPIN CAPITAL LLC**

| Sequence Number | Confirmation# | Status | Amount |
|---|---|---|---|
| **30200871** | 20210618C1B76E1C001383 | Confirmed | $ 1,307,403.00 |

| | |
|---|---|
| Value Date: | 06/18/2021 |
| Send Date: | 06/18/2021 |
| Sender Reference: | Funding |
| Debit Account#: | 4362466504 |
| Recipient ID: | 3838581917 |
| Recipient Name: | The Genesis LS Fund, LLC |
| Recipient Address 1: | 4511 Golden Foothill Parkway Ste. 1 |
| Recipient Address 2: | El Dorado Hills, CA 95762 |
| Recipient Bank ID: | 021000021 |
| Recipient Bank Name: | JPMORGAN CHASE BANK, NA |
| Details of Payment Line 1: | LIFE FACTOR II LLC 2.7M FUNDING |

| Date/Time | User ID | Action |
|---|---|---|
| 06/17/2021 12:13 | sxlubin@spincap | create |
| 06/17/2021 17:17 | jxlubin@spincap | modify |
| 06/17/2021 17:47 | sxlubin@spincap | approve |

| Sequence Number | Confirmation# | Status | Amount |
|---|---|---|---|
| **30200853** | 20210617C1B76E1C003772 | Confirmed | $ 582,000.00 |

| | |
|---|---|
| Value Date: | 06/17/2021 |
| Send Date: | 06/17/2021 |
| Debit Account#: | 4362466504 |
| Reference for Beneficiary: | KTL Payoff |
| Recipient ID: | 0210018909 |
| Recipient Name: | BMF Advance LLC |
| Recipient Address 1: | 1820 AVEUNE M |
| Recipient Address 2: | BROOKLYN, NY 11230 |
| Recipient Bank ID: | 067015096 |
| Recipient Bank Name: | OPTIMUMBANK |
| Details of Payment Line 1: | KTL Payoff |

| Date/Time | User ID | Action |
|---|---|---|
| 06/17/2021 12:00 | jxlubin@spincap | create |
| 06/17/2021 12:01 | sxlubin@spincap | approve |

| Sequence Number | Confirmation# | Status | Amount |
|---|---|---|---|
| **30200858** | 20210617C1B76E1C004405 | Confirmed | $ 580,597.00 |

| | |
|---|---|
| Value Date: | 06/17/2021 |
| Send Date: | 06/17/2021 |
| Debit Account#: | 4362466504 |
| Reference for Beneficiary: | KTL payoff |
| Recipient ID: | 210022968 |
| Recipient Name: | Hi Bar Capital |
| Recipient Address 1: | 1825 65th street |
| Recipient Address 2: | Brooklyn NY 11204 |
| Recipient Bank ID: | 067015096 |
| Recipient Bank Name: | OPTIMUMBANK |
| Details of Payment Line 1: | KTL-Hi BAR payoff |

SPIN-00000010

Case 1:24-cv-08851-AS   Document 11-28   Filed 02/18/25   Page 36 of 292

**(Fedwire Continued)**

| Date/Time | User ID | Action |
|---|---|---|
| 06/17/2021 12:05 | sxlubin@spincap | create |
| 06/17/2021 14:08 | jxlubin@spincap | approve |

| Sequence Number | Confirmation# | | Status | Amount |
|---|---|---|---|---|
| **30201048** | 20210617C1B76E1C004470 | | Confirmed | $ 30,000.00 |

| | |
|---|---|
| Value Date: | 06/17/2021 |
| Send Date: | 06/17/2021 |
| Debit Account#: | 4362466504 |
| Recipient ID: | 152137953 |
| Recipient Name: | Berkpvitch & Bouskila, PLLC |
| Recipient Address 1: | 80 Broad St Suite 3303 |
| Recipient Address 2: | New Yrok, NY 10004 |
| Recipient Bank ID: | 021000021 |
| Recipient Bank Name: | JPMORGAN CHASE BANK, NA |
| Details of Payment Line 1: | KTL funding (legal fees) |

| Date/Time | User ID | Action |
|---|---|---|
| 06/17/2021 14:32 | jxlubin@spincap | create |
| 06/17/2021 14:33 | sxlubin@spincap | approve |

**Total:**  **$ 2,500,000.00**

**End Of Report**

**Filter Criteria:**

**Wire Payment IDs:**

30200853

30200858

30200871

30201048

SPIN-00000011

# EXHIBIT 29

Case 1:24-cv-08551-AS Document 11-29 Filed 02/18/25 Page 288 of 292

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

BMF ADVANCE, LLC,

                *Plaintiff,*

          -against-

MODERN CONCEPTS CONSTRUCTION, LLC d/b/a
MODERN CONCEPTS CONSTRUCTION, and
RAMAN DANNY CHOPRA,

                *Defendants.*

---

Index No.: 505587/2023

**AFFIDAVIT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

GAVRIEL YITZCHAKOV, being duly sworn, hereby deposes and states the following:

1. I am over the age of 18 and competent to testify in this proceeding. I am an owner of Plaintiff BMF ADVANCE, LLC ("Plaintiff") and, as such, I am fully familiar with the facts and circumstances stated herein. I am authorized to make this Affidavit on behalf of Plaintiff.

2. I have reviewed Plaintiff's books and records as they pertain to this file and am fully familiar with such. The business records annexed to this Affidavit are made in the regular course of business and are maintained under my supervision and control. The records were made at or around the time of the transactions reflected therein (or within a reasonable time thereafter). The information reflected in the records was given to the recorder by someone with personal knowledge and a business duty to transmit the information accurately.

3. I make this Affidavit in support of Plaintiff's motion for summary judgment against Defendants MODERN CONCEPTS CONSTRUCTION, LLC d/b/a MODERN CONCEPTS CONSTRUCTION ("Merchant") and RAMAN DANNY CHOPRA ("Guarantor") (together, "Defendants") in the amount of $1,189,250, plus interest from the date of default, attorney's fees,[1]

---

[1] If the Court grants Plaintiff's motion, Plaintiff's counsel will submit an Affirmation attesting to the reasonable attorney's fees incurred in connection with collection pursuant to Section 18.c of the Purchase Agreement.

Case 1:24-cv-08551-AS Document 11-29 Filed 02/28/25 Page 289 of 292

costs, and disbursements, and such other and further relief as this Court deems just and proper (the "Motion").

## SUMMARY OF FACTS AND CLAIMS

4. Plaintiff is a New York limited liability company engaged in the receivables financing business. On November 30, 2022, Plaintiff and Merchant entered into a Secured Purchase Agreement (the "Purchase Agreement") pursuant to which Plaintiff purchased 30% (the "Purchased Percentage") of Merchant's total future accounts receivable up to the sum of $1,420,000 (the "Purchase Amount")[2] in exchange for an upfront purchase price of $1,000,000 (the "Purchase Price"). A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit A**.

5. Merchant agreed to deliver the Purchase Amount to Plaintiff through a daily remittance of $17,750 (the "Remittance"), which amount was a good faith estimate of the Purchased Percentage of Merchant's average daily receipts. (Ex. A at p. 1). The Remittance was to be collected each business day and credited toward the Purchase Amount. (*See id*.)

6. The parties agreed that Plaintiff would debit the Remittance from one depositing bank account into which Merchant and its customers would deposit the receipts from all transactions (the "Account") until such time as Plaintiff received payment in full of the Purchase Amount. (*See id*.) Merchant agreed not to revoke its ACH authorization to Plaintiff or otherwise take any measure to interfere with Plaintiff's ability to collect the Remittance or any other payment due. (*See id*. §§ 1.1, 1.12).

---

[2] The Purchase Agreement includes an Addendum pursuant to which the parties agreed that the Purchase Amount would be reduced if it were delivered within certain timeframes.

- 2 -

Case 1:24-cv-08551-AS Document 11-29 Filed 02/28/25 Page 4 of 292

7.      The Purchase Agreement included a mandatory reconciliation provision pursuant to which the Remittance could be adjusted to more closely reflect the Purchased Percentage of Merchant's actual daily receipts. (*See id.*, Ex. A § 1.4). The Purchase Agreement specifically provided as follows:

> **Adjustments to the Remittance**. If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to [Plaintiff] to request a decrease in the Remittance. The amount shall be decreased if the amount received by [Plaintiff] was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide [Plaintiff] with viewing access to their bank account as well as all information reasonably requested by [Plaintiff] to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

(*Id.*) (bold and underline in original).

8.      Plaintiff was not required to perform a reconciliation unless Merchant made a request to Plaintiff in compliance with the Purchase Agreement and provided the necessary documents and information.  Merchant never made such a request or provided the necessary documents and information such that a reconciliation was never performed.

9.       Pursuant to a Security Agreement and Guaranty (the "Guaranty") executed in connection with the Purchase Agreement, Guarantor guaranteed the prompt and complete performance of Merchant's obligations to Plaintiff under the Purchase Agreement and agreed to be personally liable for all amounts due thereunder in the event of Merchant's default.  (*Id*. at pp. 7-8).

- 3 -

10. On November 30, 2022, Plaintiff funded the $1,000,000 Purchase Price (less applicable and disclosed upfront fees of $47,500). Proof of the funding of the Purchase Price is attached hereto as **Exhibit B**.

11. After receiving the Purchase Price, Merchant made remittances totaling only $230,750, leaving an outstanding balance of $1,189,250 on the Purchase Amount of its receivables. A remittance history, which is a business record kept in the ordinary course of Plaintiff's business, is attached hereto as **Exhibit C**.

12. As of January 5, 2023, Merchant defaulted under Section 3.1 of the Purchase Agreement by failing to give Plaintiff 24 hours advance notice on numerous occasions that there would be insufficient funds in the Account such that the ACH of the Remittance was not honored by Merchant's bank (specifically on December 6, 7, 8, 16, 20, 22, 23, 27, 28, 29, and 30, 2022, and January 3, 4, and 5, 2023). (*See* Ex. A § 3.1, Ex. C).

13. Guarantor breached the Guaranty by failing to perform Merchant's obligations to Plaintiff when Merchant defaulted.

14. Pursuant to the foregoing, Plaintiff seeks summary judgment in the amount of $1,189,250, plus reasonable attorneys' fees, interest from the date of default, costs, disbursements, and such other and further relief as this Court deems just and proper.

15. Based on the foregoing, it is respectfully requested that the Court grant the relief requested in the Motion.

_____
GAVRIEL YITZCHAKOV

- 4 -

Case 1:24-cv-08551-AS Document 11-29 Filed 02/18/25 Page 292 of 292

## ACKNOWLEDGMENT

STATE OF NEW YORK   )
                              ss:

COUNTY OF NEW YORK  )

On June 1, 2023, before me, the undersigned, personally appeared GAVRIEL YITZCHAKOV, the President of Plaintiff, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his representative capacity, and that by his signature on the instrument, he executed the instrument.

_Jonathan J. Tach_
Notary Public

-5-