Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 1 of 64

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | | |
|---|---|---|
| SPIN CAPITAL, LLC, | : | |
| | : | Index No. 650582/2022 |
| Plaintiff | : | |
| -against- | : | **AMENDED ANSWER TO** |
| | : | **AMENDED COMPLAINT AND** |
| GOLDEN FOOTHILL INSURANCE | : | **AFFIRMATIVE DEFENSES AND** |
| SERVICES, LLC, a DELAWARE LIMITED | : | **COUNTERCLAIMS** |
| LIABILITY COMPANY; LIFE FACTOR II, | : | |
| LLC, a NEVADA LIMITED LIABILITY | : | |
| COMPANY; LIFE SHARES II, LLC, a | : | |
| DELAWARE LIMITED LIABILITY | : | |
| COMPANY; EL DORADO HILLS | : | |
| INSURANCE SOLUTIONS, INC., a | : | |
| CALIFORNIA CORPORATION; LONE WOLF | : | |
| INSURANCE SERVICES, INC., A | : | |
| DELAWARE CORPORATION; ELDO | : | |
| INVESTMENTS, LLC, a TEXAS LIMITED | : | |
| LIABILITY COMPANY; THE GENESIS LS | : | |
| FUND, LLC, a TEXAS LIMITED LIABILITY | : | |
| COMPANY; KTL HOLDINGS, INC., a TEXAS | : | |
| CORPORATION; DRVN HOLDINGS, LLC, a | : | |
| TEXAS LIMITED LIABILITY COMPANY; | : | |
| LIFE SHARES 1019, LLC, a DELAWARE | : | |
| LIMITED LIABILITY COMPANY; ZURICH | : | |
| AMERICAN LIFE INSURANCE CO., an | : | |
| ILLINOIS CORPORATION; ACCORDIA LIFE | : | |
| AND ANNUITY COMPANY, an IOWA | : | |
| CORPORATION; JOHN HANCOCK LIFE | : | |
| INSURANCE COMPANY, a MICHIGAN | : | |
| CORPORATION; BRIGHTHOUSE LIFE | : | |
| INSURANCE CO., a DELAWARE | : | |
| CORPORATION; CAP FACTOR, LLC, a | : | |
| NEVADA LIMITED LIABILITY COMPANY; | : | |
| STEFAN LEER and TATANISHA LEER | | |
| | | |
| Defendants. | | |

1

GOLDEN FOOTHILL INSURANCE
SERVICES, LLC, a DELAWARE LIMITED
LIABILITY COMPANY; LIFE FACTOR II,
LLC, a NEVADA LIMITED LIABILITY
COMPANY; LIFE SHARES II, LLC, a
DELAWARE LIMITED LIABILITY
COMPANY; EL DORADO HILLS
INSURANCE SOLUTIONS, INC., a
CALIFORNIA CORPORATION; LONE WOLF
INSURANCE SERVICES, INC., A
DELAWARE CORPORATION; ELDO
INVESTMENTS, LLC, a TEXAS LIMITED
LIABILITY COMPANY; THE GENESIS LS
FUND, LLC, a TEXAS LIMITED LIABILITY
COMPANY; KTL HOLDINGS, INC., a TEXAS
CORPORATION; DRVN HOLDINGS, LLC, a
TEXAS LIMITED LIABILITY COMPANY;
LIFE SHARES 1019, LLC, a DELAWARE
LIMITED LIABILITY COMPANY, STEFAN
LEER and TATANISHA LEER

    Counterclaim Plaintiffs.

    -against-

SPIN CAPITAL, LLC,

    Counterclaim Defendant

    -and-

AVRUMI LUBIN

    Cross Claim Defendant,

Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II,

LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo

Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life

Shares 1019, LLC ("Company Defendants"), Stefan Leer and Tatanisha Leer (individual the

"Leers", with Company Defendants, the "Defendants"), by and through their attorneys White and

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 3 of 64

Williams LLP, hereby answer the amended complaint filed in the Supreme Court of the State of New York, County of New York Kings (NYSCEF 109), as follows:

## GENERAL STATEMENT

1.      Denied.  The transaction is a criminally usurious loan and is void ab initio.

## PARTIES

2.      Denied. By way of further answer the promissory note (a/k/a the "Loan" as Plaintiff refers to it) provides an address for Plaintiff of 1276 50th Street, Brooklyn, New York 11219.  On information and belief, this is a sham address used by Plaintiff to abuse New York's judicial system.

3.      Admitted. The transaction is a criminally usurious loan and is void ab initio.

4.      Admitted. The transaction is a criminally usurious loan and is void ab initio.

5.      Admitted. The transaction is a criminally usurious loan and is void ab initio.

6.      Admitted. The transaction is a criminally usurious loan and is void ab initio.

7.      Admitted. The transaction is a criminally usurious loan and is void ab initio.

8.      Admitted. The transaction is a criminally usurious loan and is void ab initio.

9.      Admitted. The transaction is a criminally usurious loan and is void ab initio.

10.      Admitted. The transaction is a criminally usurious loan and is void ab initio.

11.      Admitted. The transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

12.      Admitted. The transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

3

13.     Admitted.   The transaction, including the personal guaranty, is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

14.     Admitted.   The transaction, including the personal guaranty, is a criminally usurious loan and is void ab initio.

15.     Paragraph 15 is directed to a Defendant party other than the Defendant parties answering herein and therefore no response is required.

16.     Paragraph 16 is directed to a Defendant party other than the Defendant parties answering herein and therefore no response is required.

17.     Paragraph 17 is directed to a Defendant party other than the Defendant parties answering herein and therefore no response is required.

18.     Paragraph 18 is directed to a Defendant party other than the Defendant parties answering herein and therefore no response is required.

19.     Paragraph 19 is directed to a Defendant party other than the Defendant parties answering herein and therefore no response is required.

## JURISDICTION AND VENUE

20.     Denied.  The transaction is a criminally usurious loan and is void ab initio.

21.     Paragraph 21 is directed to a Defendant party other than the Defendant parties answering herein and therefore no response is required.

22.     Denied.  The transaction is a criminally usurious loan and is void ab initio.

23.     Denied.  The transaction is a criminally usurious loan and is void ab initio.

24.     Paragraph 24 is directed to a Defendant party other than the Defendant parties answering herein and therefore no response is required.

4

25.     Denied. The transaction is a criminally usurious loan and is void ab initio.

## FACTS

26.     Admitted in part, denied in part.  Defendants admit that on or about June 16, 2021, Plaintiff and Company Defendants entered into the Loan that intentionally and substantively functioned as a loan agreement.  The remaining allegations contained in paragraph 26 constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan in violation of the criminal laws of California, New Jersey, New York and Texas.

27.     Denied. The allegations contained in paragraph 27 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan in violation of the criminal laws of California, New Jersey, New York and Texas.

28.     Denied.  The allegations contained in paragraph 28 constitute legal conclusions which no response is required.  To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan in violation of the criminal laws of California, New Jersey, New York and Texas.

29.     Admitted in part, denied in part.  It is admitted that borrowers executed the security agreement, it is denied that the security agreement is legally enforceable. The transaction is a criminally usurious loan and is void ab initio.

30.     Admitted in part, denied in part.  It is admitted that borrowers executed the security agreement, it is denied that the security agreement is legally enforceable. The transaction is a criminally usurious loan and is void ab initio.

Case 1:24-cv-08515-AS Document 71-2 Filed 02/28/25 Page 6 of 64

31. Admitted in part, denied in part. It is admitted that borrowers executed the security agreement, it is denied that the security agreement is legally enforceable. The transaction is a criminally usurious loan and is void ab initio.

32. Admitted in part, denied in part. It is admitted that borrowers executed a corporate guarantee, it is denied that the guarantee is legally enforceable. The transaction is a criminally usurious loan and is void ab initio.

33. Admitted in part, denied in part. It is admitted that borrowers executed a corporate guarantee, it is denied that the guarantee is legally enforceable. The transaction is a criminally usurious loan and is void ab initio.

34. Admitted in part, denied in part. It is admitted that borrowers executed the personal guaranties, it is denied that the personal guaranties are legally enforceable. The transaction is a criminally usurious loan and is void ab initio.

35. Admitted in part, denied in part. It is admitted that borrowers executed the personal guaranties, it is denied that the personal guaranties are legally enforceable. The transaction is a criminally usurious loan and is void ab initio.

36. Admitted in part, denied in part. It is admitted that borrowers executed collateral assignments, it is denied that the collateral assignments are legally enforceable. The transaction is a criminally usurious loan and is void ab initio.[1]

37. Admitted in part, denied in part. It is admitted that borrowers executed collateral assignments, it is denied that the collateral assignments are legally enforceable. The transaction is a criminally usurious loan and is void ab initio.

---

[1] Note, paragraph 36 of the Amended Complaint is misnumbered as 3, followed by 37.

6

Case 1:24-cv-08515-AS Document 71-2 Filed 02/28/25 Page 7 of 64

38. Admitted in part, denied in part. It is admitted that Defendants made the payments alleged in paragraph 38. The remainder of the allegations contained in paragraph 38 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

39. Denied. The allegations contained in paragraph 39 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

40. Admitted in part, denied in part. It is admitted that counsel for Spin Capital sent a notice of default. The remaining allegations contained in paragraph 40 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

41. Admitted.

42. Admitted in part, denied in part. It is admitted that counsel for Spin Capital sent a letter to Defendant Leer. The remaining allegations contained in paragraph 42 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

43. Admitted.

44. Denied. The transaction is a criminally usurious loan and is void ab initio.

45. Denied.

46. Denied.

47. Denied.

7

48.     Admitted in part, denied in part.  It is admitted that Zurich sent a letter to Life Shares.  The remaining allegations contained in paragraph 48 pertaining to Life Shares are denied. To the extent paragraph 48 contains allegations with respect to Zurich, Spin Capital and Cap Factor, those allegations pertain to parties other than answering Defendants and no response is required.

49.     Denied.

50.     Denied due to lack of knowledge or information.  Paragraph 50 pertains to conduct alleged to have occurred between Cap Factor and Spin Capital and is therefore beyond the answering Defendants' knowledge or information and is consequently denied.

**FIRST CAUSE OF ACTION**
**Breach of Promissory Note against Borrowers**

51.     Answering Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer, repeat the answers contained in the paragraphs above as if fully restated.

52.     Denied. The allegations contained in paragraph 52 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio.

53.     Denied.  The allegations contained in paragraph 53 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio.

8

54. Denied. The allegations contained in paragraph 54 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

55. Denied. The allegations contained in paragraph 55 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

**SECOND CAUSE OF ACTION**
**Breach of Corporate Guaranty against Corporate Guarantors**
**(EDHIS, Lone Wolf, ELDO, Genesis and KTL)**

56. Answering Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer, repeat the answers contained in the paragraphs above as if fully restated.

57. Denied. The allegations contained in paragraph 57 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

58. Denied. The allegations contained in paragraph 58 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

**THIRD CAUSE OF ACTION**
**(Breach of Personal Guaranties against S. Leer and T. Leer)**

59. Answering Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN

9

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 10 of 64

Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer repeat the answers contained in the paragraphs above as if fully restated.

60.    Denied.  The allegations contained in paragraph 60 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio.

61.    Denied.  The allegations contained in paragraph 61 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio.

## FOURTH CAUSE OF ACTION
## VOIDABLE TRANSFERS OF ZURICH POLICIES
### (Against Life Shares, DRVN, Cap Factor and Zurich)

62.    Answering Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer, repeat the answers contained in the paragraphs above as if fully restated.

63.    Denied. The allegations contained in paragraph 63 constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio.

64.    Admitted.

65.    Denied. The allegations contained in paragraph 65 constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio.

10

66. Denied. The allegations contained in paragraph 66 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

67. Denied. The allegations contained in paragraph 67 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

68. Denied. The allegations contained in paragraph 68 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

69. Denied. The allegations contained in paragraph 69 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

70. Denied. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

71. Denied. The allegations contained in paragraph 69* [sic] constitute legal conclusions to which no response is required.[2] To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

72. The allegations contained in paragraph 70* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.

---

[2] The Amended Complaint repeats a paragraph 69 after its paragraph 70, thus rendering the remaining paragraphs are numbered out of sequence by a magnitude of 2. Paragraphs in referenced in the Amended Complaint which are misnumbered will be identified herein with *.

11

Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

73.    The allegations contained in paragraph 71* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

74.    Denied to the extent paragraph 72* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

75.    The allegations contained in paragraph 73* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

76.    Denied to the extent paragraph 74* makes allegations against answering Defendant Life Shares and DVRN.  The transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.  As to the remaining allegations in paragraph 74 pertaining to non-answering defendant Cap Factor, answering Defendants lack sufficient knowledge or information to answer and are therefore denied.

77.    The allegations contained in paragraph 75* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations.

12

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 13 of 64

Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

78.    The allegations contained in paragraph 76* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations. In addition, to the extent there are allegations contained in paragraph 76*, they pertain to non-answering defendant Zurich and no response is required.

### FIFTH CAUSE OF ACTION
### VOIDABLE TRANSFER OF JOHN HANCOCK POLICY
### (Against Life Factor, LS 1019, and John Hancock)

79.    Answering Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer, repeat the answers contained in the paragraphs above as if fully restated.

80.    Denied.  The allegations contained in paragraph 78* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

81.    Paragraph 79* is admitted.

82.    Denied.  The allegations contained in paragraph 80* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

13

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 14 of 64

83. Denied. The allegations contained in paragraph 81* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

84. Denied. The allegations contained in paragraph 82* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

85. Denied. The allegations contained in paragraph 83* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

86. Denied. The allegations contained in paragraph 84* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

87. The allegations in paragraph 85* are denied. The transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

88. Denied. The allegations contained in paragraph 86* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

14

Case 1:24-cv-08515-AS   Document 71-2   Filed 02/28/25   Page 15 of 64

89.     Denied. The allegations contained in paragraph 87* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

90.     Denied.  The allegations contained in paragraph 88* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

91.     Denied.  The allegations contained in paragraph 89* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

92.     The allegations contained in paragraph 90* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations. In addition, to the extent there are allegations contained in paragraph 90*, they pertain to non-answering defendant John Hancock and no response is required.

### SIXTH CAUSE OF ACTION
### VOIDABLE TRANSFER OF BRIGHTHOUSE POLICY
### (Against Life Factor, LS 1019, and Brighthouse)

93.     Answering Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer, repeat the answers contained in the paragraphs above as if fully restated.

15

94. Paragraph 92* is denied. The transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

95. Denied. The allegations contained in paragraph 93* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

96. Denied. The allegations contained in paragraph 94* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

97. Denied. The allegations contained in paragraph 95* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

98. Denied. The allegations contained in paragraph 96* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

99. The allegations contained in paragraph 97* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. In addition, to the extent there are allegations contained in paragraph 97*, they pertain to non-answering defendant Brighthouse and no response is required.

16

## SEVENTH CAUSE OF ACTION
## DECLARATORY JUDGMENT ON ZURICH POLICIES
### (Against Zurich, Life Shares and Cap Factor)

100.    Answering Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer, repeat the answers contained in the paragraphs above as if fully restated.

101.    Denied.  The allegations contained in paragraph 99* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

102.    Denied. The allegations contained in paragraph 100* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

103.    Denied. The allegations contained in paragraph 101* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

104.    Paragraph *102 (a-e) is denied. The allegations contained in paragraph 58 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is

17

void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

105. The allegations contained in paragraph 103* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. In addition, to the extent there are allegations contained in paragraph 103*, they pertain to non-answering defendant Zurich and no response is required.

**EIGHTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT ON ACCORDIA POLICY**
**(Against Accordia and Life Shares)**

106. Answering Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer, repeat the answers contained in the paragraphs above as if fully restated.

107. Denied. The allegations contained in paragraph 105* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

108. Denied. The allegations contained in paragraph 106* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

109. Denied. The allegations contained in paragraph 107* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those

18

allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

110. Paragraph 108* (a-e) is denied. The allegations contained in paragraph 108* (a-e) constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

111. The allegations contained in paragraph 109* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations. In addition, to the extent there are allegations contained in paragraph 109*, they pertain to non-answering defendant Accordia and no response is required.

**NINTH CAUSE OF ACTION**
**FOR DECLARATORY JUDGMENT ON JOHN HANCOCK POLICY**
**(Against John Hancock, LS 1019, Cap Factor and Life Factor)**

112. Answering Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer, repeat the answers contained in the paragraphs above as if fully restated.

113. Denied. The allegations contained in paragraph 111* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio.

19

114.    Denied. The allegations contained in paragraph 112* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.

115.    Denied. The allegations contained in paragraph 113* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio.

116.    Paragraph 114* (a-e) is denied. The allegations contained in paragraph 114* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.  Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

117.    The allegations contained in paragraph 115* constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny those allegations. In addition, to the extent there are allegations contained in paragraph 115*, they pertain to non-answering defendant John Hancock and no response is required.

## TENTH CAUSE OF ACTION
## DECLARATORY JUDGMENT ON BRIGHTHOUSE POLICY
### (Against Brighthouse, LS 1019 and Life Factor)

118.    Answering Defendants, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer, repeat the answers contained in the paragraphs above as if fully restated.

20

119. Denied. The allegations contained in paragraph 117* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

120. Denied. The allegations contained in paragraph 118* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.

121. Denied. The allegations contained in paragraph 119* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio.

122. Paragraph 120* (a-e) is denied. The allegations contained in paragraph 120* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. Moreover, the transaction is a criminally usurious loan and is void ab initio, and any alleged collateral promised thereunder that allegedly was transferred is not voidable.

123. The allegations contained in paragraph 121* constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations. In addition, to the extent there are allegations contained in paragraph 121*, they pertain to non-answering defendant Brighthouse and no response is required.

### AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses and reserve the right to assert others that may emerge as the case proceeds:

21

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 22 of 64

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

The Loan is void ab initio because it charges interest in excess of 25% in violation of N.Y. Penal Law §190.40. The actual amount of the "Note" was no more than $2,320,000. Although the face of the Loan states that the loan amount was $2,700,000, that is a sham in order to evade the usury laws of New York.

The amount actually funded was $1,307,403 on June 18, 2021. *See* Ex. 1:



In addition to the loan amount actually funded, Spin Capital also purported to pay:

➢ $582,000 to BMF Advance LLC (an affiliate of Plaintiff and Lubin); *See id.*

➢ $580,597 to Hi-Bar LLC (an affiliate of Plaintiff and Lubin); *See id.*

➢ $30,000 to Berkovitch & Bouskila, PLLC (the attorneys of Plaintiff and Lubin); *See id.*

➢ $200,000 to Spin Capital as a "Closing Fee."

The Closing Fee and attorneys' fees were sham fees designed to conceal additional interest charges. Nothing in the Promissory Note obligated the borrowers to pay attorneys' fees or other

22

Case 1:24-cv-08515-AS Document 71-2 Filed 02/28/25 Page 23 of 64

costs except in the event of a default and Spin Capital did not provide any services or incur costs to be offset by the Closing Fee.

In addition, the purported funding in cash of $1,307,403 was also a sham. According to Plaintiff's own complaint, Plaintiff charged $150,000 on the same day it purportedly funded the $1,307,403. *See* NYSCEF #2, Ex. 2:

FILED: NEW YORK COUNTY CLERK 02/09/2022 03:40 PM          INDEX NO. 650582/2022
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 02/09/2022

Payment Schedule
Date        Amount
18-Jun-21  $  150,000.00

Indeed, the $150,000 was in fact paid and received on the same day of funding. *See* Ex. 3. *See also Freitas v. Geddes S&L Ass'n*, 63 N.Y.2d 254 (1984) (holding sham fees considered interest). Stripped of these sham fees and charges the principle amount of the Loan was actually no more than $2,320,000, bringing it well within the limitations of Gen. Oblig. Law § 5-501(6)(b).

**AS AND FOR A SECOND AFFIRMATIVE DEFENSE**

The interest charged by Plaintiff is in excess of the maximum interest rates permitted by California's criminal threshold for usury under Stats. 1919, p. lxxxiii, § 2; and Stats. 1919, p. lxxxiii, § 3 and Article XV, § 1 of the California Constitution, (the higher of 10%, or 5% plus the prevailing rate of the Federal Reserve Bank).

**AS AND FOR A THIRD AFFIRMATIVE DEFENSE**

Tex. Fin. Code §305.001(a-1) and §305.003 each provide that a creditor who contracts for, charges, or receives interest greater than the legal maximum is liable to the obligor for an amount that is equal to three times the difference between the maximum allowable legal interest and the total amount of interest charged. The maximum interest rate allowed under Tex. Fin. Code §303.009(c) is 28%. The Loan at issue charges interest that is twice the maximum 28% permitted

23

by Texas law.  In addition, Tex. Fin. Code § 305.004(a) provides that: "In addition to the amount determined under Section 305.003, a creditor who charges and receives legal interest that is greater than twice the amount authorized by this subtitle is liable to the obligor for: (1) the principal amount on which the interest is charged and received; and (2) the interest and all other amounts charged and received.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

The loan charges interest in excess of 50% in violation of N.J. Rev. Stat. § 2C:21-19.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

The Loan is unenforceable on the grounds of unconscionability because, among other things and without limitation, Plaintiff knowingly preyed upon a financially distressed company, the Loan charges a usurious rate of interest, and conceals the true nature of the transaction.

The Loan is procedurally unconscionable because, among other things, Plaintiff (i) misrepresented the Loan amount value on the Promissory Note; (ii) structured the Loan designed to ensure Borrower would invariably default as a result of usurious interest rates; and (iii) used high-pressure sales tactics on Defendants knowing Defendants were faced with economic duress on account of the COVID-19 pandemic; (iv) targeted Defendants because they were already indebted to Plaintiff for failing to maintain payments on the criminally usurious Merchant Cash Agreements ("MCA(s)") that the Corporate Defendants had previously entered into with Plaintiff's affiliated companies, which prohibited the Corporate Defendants from securing new financing from any source other than a company controlled by Plaintiff.

The Loan is substantively unconscionable because, among other things, Plaintiff (i) has transferred all risk in the event Borrower's receivables do not equal the daily fixed rate to Borrower; (ii) included a one-sided liquidated attorney's fees provision that is calculated by "25%

24

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 25 of 64

of the then current balance due" upon the occurrence of an event of default rather than reasonable fees; (iii) removed the reconciliation and remittance provisions that existed in the underlying MCA debt instruments that were discharged with this Loan; and (iv) applied, on the face of the Loan, a usurious interest rate of 60% per annum.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962I and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under California, New Jersey, New York and Texas.

## AS FOR A SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred as they arise out of a series of illegal and unconscionable loan contracts. *See Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021) ("Although the GTR and CMS agreements are described "as "factoring" agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, — NE3d —, 2021 NY Slip Op 05616 [2021])."); *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-cv-5120 (LJL), 2022

25

U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022) (granting summary judgment on RICO claims based on MCA being a usurious loan).

At the time of the loan transaction at issue here, Plaintiff knew that answering Defendants had entered into a series of MCA loans with affiliates of Plaintiff.  It was Plaintiff's plan all along to lure Answering Defendants into a series of unlawful loans through disguised MCA agreements. At all relevant times, Plaintiff had usurious intent and treated the MCA agreements as absolutely repayable loans.   Among other things, Plaintiff knew that Answering Defendants had sold and pledged all of their existing and future receivables to other affiliated or related entities of Plaintiff. Thus, at the time of the transaction, Answering Defendants had no receivables in which to sell, and Plaintiff knew that answering Defendants had no receivables to sell.  Instead, the form of the transaction was a sham dictated by Plaintiff to disguise the true nature of the transaction and to evade the criminal usury laws of California, New Jersey, New York and Texas.  Each of the MCA transactions is a criminally usurious loan, which is void ab initio.

As proof of the sham, Plaintiff calculated the Purchase Price and Purchased Amount based on the principal amount loaned and the principal and interest to be repaid.  The use of these terms was unilaterally dictated by Plaintiff and was intended to disguise the true nature of the transaction. Further the Initial Estimated Payment was unilaterally dictated by Plaintiff based on the term in which it intended to be repaid.

Significantly, once the collective amount owed to Plaintiff and its affiliates exceeded New York's usury threshold of $2,500,000, Plaintiff admitted that the transactions were really absolutely repayable loans, and papered the transaction as such, believing (incorrectly) it was immune from New York's usury laws.  It is not.

26

Case 1:24-cv-08515-AS     Document 71-2     Filed 02/28/25     Page 27 of 64

## AMENDED COUNTERCLAIM AND CROSS CLAIMS

Counterclaim Plaintiffs, Golden Foothill Insurance Services, LLC, Life Factor II, LLC, Life Shares II, LLC, El Dorado Hills Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., Eldo Investments, LLC, The Genesis LS Fund, LLC, KTL Holdings, Inc., DRVN Holdings, LLC, Life Shares 1019, LLC, Stefan Leer and Tatanisha Leer, ("Counterclaim Plaintiffs") as and for their Amended Counterclaim against Counterclaim Defendant, Spin Capital, LLC ("Spin Capital") and claims against Additional Defendant Avrumi Lubin ("Lubin"), incorporate their Amended Answer and Affirmative Defenses herein, and state as a follows:

## NATURE OF ACTION

1. This is a RICO action against a predatory lender, Avrumi Lubin, who operates an unlawful lending enterprise ("the Enterprise") through a series of related merchant cash advance ("MCA") companies ("Spin Capital, LLC, BMF Advance, LLC, and Hi Bar Capital, LLC").

2. Counterclaim Plaintiffs were victimized by Lubin, a predatory lender, who intentionally and systematically took advantage of Counterclaim Plaintiffs at a time when they were experiencing cash-flow issues in the middle of the COVID-19 Pandemic.

3. The MCA companies run by Lubin are not currently regulated by the government and the fees, penalties and interest rates are not subject to any regulatory oversight—although it is coming soon.[3]

4. Lubin and other MCA companies use this lack of regulatory oversight to evade state usury laws by creating agreements that are wholly misleading, and intended to deceive courts around the country into believing the agreements do not constitute a loan transaction but, rather, the purchase of future receivables to which usury laws do not apply.

---

[3]    https://www.consumerfinance.gov/about-us/newsroom/cfpb-invokes-dormant-authority-to-examine-nonbank-companies-posing-risks-to-consumers/

27

Case 1:24-cv-08515-AS   Document 71-2   Filed 02/28/25   Page 28 of 64

5. In reality, no receivables are assigned or transferred, the small businesses continue to collect the proceeds thereof and the amounts advanced are repaid through daily payments by the small businesses at annualized rates that exceed 100% and, in other cases, may exceed 300%.

6. Here, in sum and substance, the Enterprise, through Lubin, purported to advance Counterclaim Plaintiffs more than $4 million under six sham agreements falsely labeled Revenue Purchase Agreements and Secured Merchant Agreements on March 2, 2021, March 10, 2021, March 12, 2021, March 25, 2021 (two agreements) and June 16, 2021.

7. On the face of these sham agreements, Counterclaim Plaintiffs were to repay Lubin and his affiliated companies through fixed payments resulting in interest rates in excess of 100%.

8. The maxim interest allowed under New York law, the controlling law of the agreements, is 25%. The maxim amount permitted under Texas law is 28%. The maximum allowed under California law is 10%. The maximum allowed under New Jersey law is 50%.

9. The terms and conditions of these agreements are wholly inaccurate, and knowingly designed and/or used by the Enterprise to deceive courts and law enforcement into believing the agreements do not contemplate a loan transaction so that they do not trigger the usury laws of various states, including California, New Jersey, New York and Texas.

10. A central component of the scheme includes pushing cash poor businesses to the point that they cannot meet their obligations under existing MCA agreements, at which point the Enterprise offers new advances with even more unconscionable terms, trapping their victims into a negative feedback loop before pushing businesses and their individual owners towards a financial cliff.

28

Case 1:24-cv-08515-AS   Document 71-2   Filed 02/28/25   Page 29 of 64

11.     Eventually, the terms become too oppressive, small businesses default, and the Enterprise aggressively pursues small businesses and their individual owners for repayment of the amounts due under the loans, often employing threatening, deceptive, and illegal collection tactics.

12.     In the end, these victims face certain financial ruin while the Enterprise levels threats of legal action in order to recover not only the principal advanced, but also interest at rates exceeding 100%, which rate is far greater than any interest permitted by applicable law.

13.     The conduct by the Enterprise has resulted in a national epidemic that has sparked the attention of former Governor Cuomo, the New York State Legislature, the New York Attorney General, the New Jersey Attorney General, the Federal Trade Commission, and the United States Congress.

14.     Indeed, a member of New York's highest court, just recently noted in *dicta* that transactions like here more closely resemble loans subject to New York's usury laws rather than bona fide sales of receivables:

> Although the GTR and CMS agreements are described as "factoring" agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, — NE3d —, 2021 NY Slip Op 05616 [2021]). Nevertheless, for the purpose of these certified questions, we are asked to assume the judgments rendered on those agreements are valid.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021).

15.     New York's highest court is not alone. The Attorneys General of both New York and New Jersey each filed separate actions against others using the same sham form of MCA

29

agreement, alleging that the transactions are disguised loans subject to this state's usury laws. *See* Exs. 4-5.

16.     Of course, the transactions here were always meant to be loans and not sales of receivables, and the parties performed just as if the transactions were loans.

17.     To be sure, once Lubin had trapped Counterclaim Plaintiffs into a never-ending spiral of debt exceeding New York's usury threshold of $2,500,000, Lubin called the transaction what it was—an absolutely repayable loan.

18.     Lubin is liable as a culpable person under 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because the loans (i) violate applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under California, New Jersey, New York and Texas.

## FACTUAL ALLEGATIONS

### A.     The Predatory MCA Industry

19.     The Merchant Cash Advance ("MCA") industry spawned from the 2008 Financial Crisis.  One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[4] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

20.     As Bloomberg previously reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[5]  The MCA industry is a breeding ground for "brokers convicted of stock scams,

---

[4] https://www.sec.gov/litigation/admin/2008/34-58574.pdf
[5] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

30

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 31 of 64

insider trading, embezzlement, gambling, and dealing ecstasy." *Id.* As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for. It's pretty much unregulated." *Id.*

### B.    The Sham.

21.    Many states, like New York, have laws prohibiting the predatory interest rates. In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables." MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts. The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences.

### C.    The Bloomberg Awakening.

22.    For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all changed on November 20, 2018 when Bloomberg News and renowned journalist Bethany McLean published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[6]

---

[6]    *https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-16835117.html*

31

23. As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

24. Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story."[7] As explained by Professor Hosea Harvey from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[8]

25. Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.[9]

26. On July 31, 2020, the Securities and Exchange Commission shut down an MCA company located in Philadelphia. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."[10] The FBI soon thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.[11]

27. On August 3, 2020, the Federal Trade Commission filed a complaint against David Glass's company Yellowstone.[12] Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." *Id.*

---

https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=60

[6] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping

[10] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm

[11] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html

[12] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small

32

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 33 of 64

28.    On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[13]

29.    On December 8, 2020, New Jersey also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."[14]

30.    On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[15]

**D.    The Sea Change in Law.**

31.    Prior to the Bloomberg Awakening, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA companies.  Courts primarily denied those attempts on the procedural basis that a plenary action must be filed instead of merely seeking to vacate by motion.  One court went so far as to sanction the attorney for even bringing the motion.  *See, e.g*, *Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty. Jun. 25, 2018) (citing

---

[13] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf.
[14]    https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/
[15] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/

33

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 34 of 64

*Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct., Erie Cty. Oct. 6, 2017)).

32.     The tide has since turned in the wake of the Bloomberg articles.  Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings.[16]  *See McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty. Nov. 19, 2019). Notably, Judge Nowak reversed his own prior decision in *Yellowstone Capital, LLC v. Jevin*, *supra*, where he previously held that the very same Yellowstone agreement was not a loan as a matter of law.  This time, upon further reflection, Judge Nowak not only upheld the claims of usury, but also upheld the RICO claims.  Numerous courts have followed suit.  *See, e.g., Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty., April 9, 2021) (upholding RICO claims); *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122 N.Y.S.3d 309 (2d Dep't. 2020); *Matter of AH Wines Inc., v. C6 Capital Funding LLC*, 2020 N.Y. Misc. LEXIS 4642 (N.Y. Sup. Ct. Ont. Cty. Aug. 19, 2020); *American Resources Corp. v. C6 Capital, LLC*, 2020 N.Y. Misc. LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); *Funding Metrics LLC v. NRO Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); *Funding Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019).

33.     Numerous federal courts have also joined the revolution.  *See Lateral Recovery LLC v. Queen Funding, LLC, 21 Civ. 9607 (LGS),* 2022 U.S. Dist. LEXIS 129032 (S.D.N.Y. July 20, 2022), *Haymount Urgent Care PC v. God Fund Advance, LLC,* 22-cv-1245 (JSR), 2022 U.S.

---

[16] Notably, FundKite also appears to be forum shopping, choosing to file suit in Upstate New York instead of its home of Manhattan, apparently fearing the more liberal political leanings of its own residence.

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 35 of 64

Dist. LEXIS 112768 (S.D.N.Y. June 27, 2022) (upholding RICO claims under MCA agreement);

*Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, No. 20-cv-5120 (LJL), 2022 U.S. Dist.

LEXIS 100837 (S.D.N.Y. June 6, 2022) (granting summary judgment on RICO claims based on

MCA being a usurious loan); *Fleetwood Servs., LLC v. Ram Capital Funding LLC*, 2021 U.S. Dist.

LEXIS 94381 (S.D.N.Y. 2021) (upholding RICO claims under MCA agreement); *Fleetwood*

*Servs., LLC v. Complete Bus. Sols. Grp*., 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston*

*v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same); *Davis v.*

*Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone*

*Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO

claims).

**D.      The MCA Agreement Are Substantively And Procedurally Unconscionable.**

34.      The Enterprise agreements (the "MCA Agreements") are unconscionable contracts

of adhesion that are not negotiated at arms-length.

35.      Instead, they contain one-sided terms that prey upon the desperation of the small

business and their individual owners and help conceal the fact that the transactions (collectively,

the "Transactions"), including those involving Spin Capital and Lubin, are really loans.

36.      Among these one-sided terms, the MCA Agreements include:  (1) a provision

giving the MCA company the irrevocable right to withdraw money directly from the merchant's

bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a

provision preventing the merchant from transferring, (3) moving or selling the business or any

assets without permission from the MCA company, (4) a one-sided attorneys' fees provision

obligating the merchant to pay the MCA company's attorneys' fees but not the other way around,

(5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction

35

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 36 of 64

under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to notify any credit card processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of [the Enterprise's] choosing" without notifying borrower, (15) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…," and (16) an illusory remittance provision that did not bind the MCA company to make accurate remittances and limited a borrower's ability to request a subsequent remittance.

37.    The MCA Agreements are also unconscionable because they contain numerous knowingly false statements.  Among these knowingly false statements are that:  (1) the transaction is not a loan, (2) the fixed daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee, and (4) the lender actually has a functioning reconciliation and remittance department when in reality there is no staffing or monitoring of the email provided to borrowers to request reconciliation.

38.    The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) only allowing the merchant two

36

reconciliation requests per month while leaving it in the lender's discretion whether to actually award any reconciliation, (2) preventing the merchant from obtaining other financing, and (3) requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

39.     The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.  Among these improper penalties, the MCA Agreements (1) entitle the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

### E.     The Enterprise Uses a Sham Reconciliation Provision to Disguise the Loans.

40.     In order to evade state usury laws, the Enterprise includes a sham reconciliation provision to give the appearance that the loans do not have a definite term.

41.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

42.     For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under a legitimate reconciliation provision.

43.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith

37

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 38 of 64

estimate of the percentage of receivables purchased. By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

44. For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

45. On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

46. Moreover, the MCAs reconciliation provisions do not guarantee an accurate remittance, but merely provide that that "shall be modified to more closely reflect the Merchant's actual receipts."

47. In addition, the remittance provisions restrict the borrower's ability to request a subsequent remittance until two weeks have passed from the first remittance, or otherwise borrower must accept an arbitrary pre-set amount, which, upon information and belief, the Enterprise never actually awards under any circumstance.

### E. The Enterprise Intentionally Disguised the True Nature of the Transaction.

48. Despite their documented form, the Transactions are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a) The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws. Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b) The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount. The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly

38

Case 1:24-cv-08515-AS Document 71-2 Filed 02/28/25 Page 39 of 64

Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)     The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Enterprise did not purchase actual receivable, but actually purchase "all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant . . . Merchant is selling a portion of a future revenue stream";

(h)     The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(i)     The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables; and

(j)     The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

## THE UNDERLYING TRANSACTIONS

39

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 40 of 64

### A.    Counterclaim Plaintiffs.

49.    Counterclaim Plaintiffs and their individual owners (the "Leers") are engaged in the insurance services business.

50.    As a direct result of the pandemic, Counterclaim Plaintiffs found themselves in desperate need of cash to keep up with customer demands.

51.    Enter Lubin.

52.    Unable to secure necessary financing based on its current revenue stream, Counterclaim Plaintiffs and its individual owners were offered quick, short-term financing by Lubin, who identified Counterclaim Plaintiffs as potential victims of predatory lending because of the Counterclaim Plaintiffs' economic duress during COVID-19.

53.    In late April/early March 2021, unsolicited, Lubin contacted the Leers by telephone and offered to provide Stefan Leer and the Counterclaim Plaintiffs with short-term financing through one or more companies owned and/or controlled by Lubin.

54.    During these initial conversations, Lubin advised Stefan Leer that he was a "lender" who invested his own money directly into transactions; not a broker who merely passed the information along to a lender in exchange of a commission.

55.    Lubin further represented that he had ownership interest in a several companies, including BMF Advance, LLC ("BMF") and Hi Bar Capital, and he would decide on whose "paper" the transactions were to be written.  Lubin assured Stefan Leer that cutting out the broker would save time and money because he, Lubin, made all the decisions concerning funding and the administration of the transactions into which he invested.   In other words, Lubin controlled the Enterprise.

Case 1:24-cv-08515-AS Document 71-2 Filed 02/28/25 Page 41 of 64

**Agreements with BMF Advance, LLC**

56. One of the MCA companies used by Lubin was BMF.

57. As a direct inducement by Lubin, Counterclaim Plaintiffs entered into their first transaction with BMF on March 2, 2021. On the face of the agreement, BMF advanced Counterclaim Plaintiffs $100,000.00 (disguised as the "Purchase Price") but required Counterclaim Plaintiffs to payback a total of $149,900.00 (disguised as the "Purchased Amount") over just 30 business days. To be sure, the agreement requires fixed daily payments of $4,996.00 (which was disguised as a good-faith estimate of 10% of the merchant's receivables). Simple math demonstrates that the intended term on its face was just 30 business days ($149,900/$4,996,000=30). That equates to an interest rate in excess of 435%.

58. Significantly, Counterclaim Plaintiffs paid this usurious interest rate on this March 2, 2021 MCA while the MCA agreement had a face value far below $2,500,000.

59. As a direct inducement by Lubin, Counterclaim Plaintiffs entered into their second agreement with BMF on March 12, 2021. On the face of the agreement, BMF advanced Counterclaim Plaintiffs $220,000.00 (disguised as the "Purchase Price") but required Counterclaim Plaintiffs to payback a total of $329,780.00 (disguised as the "Purchased Amount") over just 39 business days. To be sure, the agreement requires fixed daily payments of $8,500.00 (which was disguised as a good-faith estimate of 10% of the merchant's receivables). Simple math demonstrates that the intended term on its face was just 39 business days ($329,780/$8,500=39). That equates to an interest rate in excess of 331%.

60. Significantly, Counterclaim Plaintiffs paid this usurious interest rate on this March 12, 2021 MCA while the MCA agreement had a face value far below $2,500,000.

41

61. As a direct inducement by Lubin, Counterclaim Plaintiffs entered into their third agreement with BMF on March 25, 2021. On the face of the agreement, BMF advanced Counterclaim Plaintiffs $400,000.00 (disguised as the "Purchase Price") but required Counterclaim Plaintiffs to payback a total of $599,600.00 (disguised as the "Purchased Amount") over just 24 business days. To be sure, the agreement requires fixed daily payments of $25,000.00 (which was disguised as a good-faith estimate of 10% of the merchant's receivables). Simple math demonstrates that the intended term on its face was just 24 business days ($$599,000/$25,000=24). That equates to an interest rate in excess of 600%.

62. Significantly, Counterclaim Plaintiffs paid this usurious interest rate on this March 25, 2021 MCA while the MCA agreement had a face value far below $2,500,000.

### Agreements with HI-Bar Capital

63. One of the other MCA companies Lubin used was Hi-Bar Capital.

64. As a direct inducement by Lubin, Counterclaim Plaintiffs entered into their first transaction with Hi-Bar Capital on March 10, 2021. On the face of the agreement, Hi-Bar advanced Counterclaim Plaintiffs $220,000.00 (disguised as the "Purchase Price") but required Counterclaim Plaintiffs to payback a total of $329,978.00 (disguised as the "Purchased Amount") over just 39 business days. To be sure, the agreement requires fixed daily payments of $8,500.00 (which was disguised as a good-faith estimate of 20% of the merchant's receivables). Simple math demonstrates that the intended term on its face was just 39 business days ($329,978/$8,500=39). That equates to an interest rate in excess of 331%.

65. Significantly, Counterclaim Plaintiffs paid this usurious interest rate on this March 10, 2021 MCA while the MCA agreement had a face value far below $2,500,000.

42

66.     As a direct inducement by Lubin, Counterclaim Plaintiffs entered into their second agreement with Hi-Bar Capital on March 25, 2021.  On the face of the agreement, Hi-Bar advanced Counterclaim Plaintiffs $400,000.00 (disguised as the "Purchase Price") but required Counterclaim Plaintiffs to payback a total of $599,600.00 (disguised as the "Purchased Amount") over just 30 business days.  To be sure, the agreement requires fixed daily payments of $20,000.00 (which was disguised as a good-faith estimate of 20% of the merchant's receivables).  Simple math demonstrates that the intended term on its face was just 30 business days ($599,600/$20,000=30). That equates to an interest rate in excess of 500%.

67.     Significantly, Counterclaim Plaintiffs paid this usurious interest rate on this March 25, 2021 MCA while the MCA agreement had a face value far below $2,500,000.

68.     In sum, Counterclaim Plaintiffs paid usurious interest rates on five separate MCAs that each (i) had a usurious interest rate in excess of 100%; and (ii) had a principal well below $2,500,000, not including the exorbitant fees paid to Lubin and the Enterprise that were assessed after each MCA was executed, which further lowered the MCA agreements' Payment Amounts.

**Agreement with Counterclaim Defendant Spin Capital**

69.     Another one of the other companies used by Lubin to further his unlawful lending scheme was Spin Capital, LLC ("Spin Capital").

70.     Spin Capital is actually an MCA company and uses sham MCA forms when the amount being lent is less than New York's usury cap of $2,500,000.  *See*, *e.g*., Ex. 6.

71.     When the loan amount exceeds $2,500,000, however, Lubin calls the transaction what it is—a loan.

72.     Here, in an attempt to disguise the prior MCA loans that he previously entered into with Counterclaim Plaintiffs, Lubin attempted to roll them up into a single "Promissory Note" in

43

excess of New York's usury cap of $2,500,000, dated June 16, 2021, that Lubin and the Enterprise readily admit is a "Loan."

73. The Promissory Note is a complete sham.

74. In reality, Lubin used the Loan to disguise the prior MCA agreements the Enterprise entered into with Counterclaim Plaintiffs and then used approximately half of the Loan value to pay the usurious and criminal debt on the BMF and Hi Bar Capital MCAs.

75. The Promissory Note/Loan does nothing to alter the dispositive and undisputed fact that Counterclaim Plaintiffs paid usurious rates on loans Plaintiff disguised as MCAs which each MCA had face values far below New York's usury cap of $2,500,000.

76. Indeed, initially, Lubin told Stefan Leer that Spin Capital would loan the Counterclaim Plaintiffs substantially less than $2,500,000. Shortly thereafter, Lubin contacted Stefan Leer and told him that the amount of the loan would have to be raised to $2,700,000 for "legal reasons," i.e. – circumvent application of New York's usury laws, and that the loan would be structure so that the face amount was $2,700,000, but the Counterclaim Plaintiffs would never actually see anything close that amount.

77. Notably, in now suing Counterclaim Plaintiffs on this Note, Spin Capital fails to disclose that the Loan amount on the face of the Loan, $2,700,000, was never actually advanced to Counterclaim Plaintiffs. Instead, it was disbursed, on paper, to BMF and Hi-Bar Capital:

➢ $582,000 to BMF (an affiliate of Plaintiff and Lubin); *See id.*

➢ $580,597 to Hi-Bar Capital (an affiliate of Plaintiff and Lubin); *See id.*

78. Also not disclosed to the Court is that the total amount actually disbursed was only $1,307,403 in actual cash. *See* Ex. 1:

44



79.     Also not disclosed to the Court is that Spin Capital deducted $30,000 from the disbursement amount for the cost of Spin Capital's own purported attorney's fees which are nowhere provide for in the Promissory Note.

80.     On top of that, Spin Capital charged the Counterclaim Plaintiffs a $200,000 "Closing Fee" that is neither provided for in the Promissory Note nor intended to cover any costs related to the transaction.  Plain and simple, the "Closing Fee" was interested disguised as a "Closing Fee" to artificially pump the amount of the loan above the $2,500,000 usury threshold.

81.     Incredibly, Spin Capital is now claiming that its attorney committed malpractice in drafting the loan document at issue:

45

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 46 of 64



82.    Significantly, the text messages with Lubin clearly show that he was aware of the

$2,500,000 usury cap, *see* Ex. 7:

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 47 of 64



83.     Thus, Lubin clearly had usurious intent when attempting to disguise the Loan amount to appear as though it was in excess of $2,500,000.

47

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 48 of 64

84.    But as Spin Capital's own complaint admits, $150,000 was charged and paid on the very same day as the Loan was funded.  *See* NYSCEF #2, Ex. 2.

85.    Thus, even if not counting the amounts used to satisfy the criminally usurious BMF and Hi-Bar MCA loans, the most that was actually advanced to Counterclaim Plaintiffs was $2,320,000, bringing the transaction within NY Penal Law 190.40 and 190.42.

86.    On its face, the agreement charges an interest rate of at least 60%:

> 1. **Interest Rate.** Until the Debt shall be repaid in full and so long as no Event of Default shall have occurred (in which case Default Interest shall be due in accordance with Section 6), the Principal Sum shall bear interest at the rate of five percent (5%) per month. Interest shall be calculated on the basis of a 30-day month and actual days elapsed for any partial months or periods. Whenever any interest payment to be made hereunder shall be stated to be due on a day that is not a Business Day (as defined below), the payment shall be made on the next succeeding Business Day.

87.    Moreover, prior to executing the Loan, Counterclaim Plaintiffs had already begun paying usurious rates on the MCAs – which were functionally loans – that each had values far below $2,500,000.

88.    The Loan is therefore void ab initio as a matter of law.  *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 35 N.Y.3d 996, 149 N.E.3d 432, 125 N.Y.S.3d 671 (2020).

## FIRST CAUSE OF ACTION

### (RICO:  18 U.S.C. § 1962)

89.    Counterclaim Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

90.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

91.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

48

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 49 of 64

92.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

93.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

94.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

95.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

96.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

97.     Like here, this was a purely artificial device used by the loan-shark to evade the law—an evasion that the Legislature sought to prevent.

98.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Person.**

99.     Lubin is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

49

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 50 of 64

100.    At all relevant times Lubin was, and is, a person that exists separate and distinct from the Enterprise, described below.

101.    Lubin has an ownership interest in Spin Capital and is the mastermind of the Enterprise.  Upon information and belief, the Enterprise consists of sham companies, including BMF and Hi Bar Capital, that Lubin created, without adhering to corporate formalities, designed to insulate Lubin personally from the Enterprise crimes.

102.    Lubin controlls the Enterprise and ensured that each of its members functioned in a way as to maximize the amount of money the Enterprise could extract from Counterclaim Plaintiffs.

103.    Through his operation of Spin Capital and its affiliates BMF and Hi-Bar Capital, Lubin solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

104.    Lubin orchestrates the Enterprise such that each company within the Enterprise maximizes the amount of money fleeced from borrowers.  Lubin accomplishes this by orchestrating the individual members of the Enterprise to solicit Counterclaim Plaintiffs to enter into increasingly unconscionable MCAs which were made necessary by the prior MCA that placed Counterclaim Plaintiffs in financial duress.

105.    Lubin makes Counterclaim Plaintiffs and similarly unfortunate borrowers enter into this negative feedback loop of increasingly usurious and unconscionable loans by structuring the MCA agreements to only allow borrowers to retain additional financing from the Enterprise. Indeed, a borrower's securing other financing triggers a default event under the unconscionable MCAs.  This is the Enterprises main business model.

### C. The Enterprise.

106. Spin Capital is a company duly organized under the laws of New Jersey that together with its affiliates, upon information and belief, has fewer than ten employees.

107. Spin Capital and its affiliates, including BMF and Hi Bar Capital, constitute an Enterprise (the previously referenced "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

108. Spin Capital and its affiliates are associated in fact through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states. The Enterprise relies on more than one MCA company so that it can solicit borrowers into subsequent MCA agreements with additional members of the Enterprise, thereby maximizing the total amount of the usurious loans issued by the Enterprise.

109. Since at least 2019 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

110. While each of the Enterprise members solicit and enter into MCA agreements with victim borrowers in their own name, they identify and select their victims collectively and once one Enterprise company has identified and entered into an MCA agreement with a victim borrower, other members of the Enterprise will focus on that same borrower to maximize the Enterprise's haul just as was done here with the Counterclaim Plaintiffs entering into multiple

51

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 52 of 64

agreements with BMF and Hi Bar Capital before entering into a final usurious agreement with Spin Capital.

111.    The Enterprise is intentionally operated to place hapless borrowers into a negative feedback loop where the original MCA's usurious rates and other one-sided provisions render the borrower in financial distress, but simultaneously provide that the borrower may only obtain new financing from the Enterprise.   Invariably, as here, the subsequent MCAs are even more unconscionable both procedurally as the borrower is already under duress and substantively as the Enterprise imposes even more onerous terms and rates on the borrower in subsequent MCAs.

112.    The Enterprise knowingly deceives the borrowers into believing they are not binding themselves into a loan by (i) misrepresenting that the term is indefinite, when the fixed daily payments render the MCA with a finite term; and (ii) falsely representing that the Enterprise has a remittance and reconciliation department and providing a deceptively illusory reconciliation provisions in the MCAs.

113.    The debt, including such debt evidenced by the MCA agreements entered into by the Counterclaim Plaintiffs with BMF and Hi Bar, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under the laws of California, New Jersey, New York and Texas.

114.    Since at least 2019 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

52

115. The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c). The Enterprise has solicited small businesses across the country as part of its racketeering activity since at least 2019.

116. Specifically, Lubin and the Enterprise's scheme to defraud consisted of, among other things, (i) misrepresenting that the MCAs were not loans by claiming that the MCA did not have a definite term when, in fact, the fix daily payment rate rendered the term finite as a matter of mathematics; (ii) that the daily fixed payment was a good faith estimation of the borrower's daily receivables, (iii) misrepresenting that Lubin and the Enterprise had a reconciliation and remittance departments; and (iv) misrepresenting that Lubin and the Enterprise would reconcile the borrower's fix daily payments with its actual receivables, when in fact, the Enterprise knew at the time of entering into the MCA agreements that it had no intention of honoring any reconciliation requests.

117. The promise that the MCA agreements had real and meaningful reconciliation departments was a material inducement for entering into the MCA agreements because the Counterclaim Plaintiffs recognized that the only way the fixed daily payment in each MCA agreement would be remotely achievable, was if it was adjustable to actual receivables.

118. Indeed, the Enterprise consistently described the MCA Agreements to the Counterclaim Defendants prior to execution as agreements to purchase future receivables, and the Enterprise touted the reconciliation provision as the borrower's risk insurance in inducing the Counterclaim Plaintiffs to sign.

53

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 54 of 64

119. Counterclaim Plaintiffs relied on these representations in executing the MCAs and the promise of good faith remittance and reconciliation was a material factor for Counterclaim Plaintiffs' execution of the MCAs.

120. However, upon information and belief, the Enterprise does not have any reconciliation remittance department, and there is no agent or employee of the Enterprise who is responsible for that task. Upon information and belief, the Enterprise has never honored a reconciliation or remittance request under any circumstances, and does not even respond to such requests from borrowers.

121. The Enterprise knew there would be no reconciliation for Counterclaim Plaintiffs under any circumstance because in their 4 or more years of operating this scheme, upon information and belief, the Enterprise has never issued a reconciliation to any borrower, including Counterclaim Plaintiffs.

122. Lubin and the Enterprise committed this scheme with each of the five MCAs entered into with Counterclaim Plaintiffs over the year of 2021, and, upon information and belief, the Enterprise has been operating in this capacity continuously over the past 4 years.

123. Moreover, the Enterprise will continue this criminal activity into the foreseeable future. All of the MCA Agreements, as well as Spin Capital's template MCA agreements, impose a default event on borrowers should they seek financing outside the Enterprise. Thus, the Enterprise clearly envisions locking in all future borrowers into the same negative feedback loop that trapped Counterclaim Plaintiffs, thereby continuing their criminal enterprise. Moreover, the use of boiler-plate usurious loans disguised as MCA agreements further demonstrates that the Enterprise's criminal activity is their core business and will persist as long as the Enterprise does.

54

Case 1:24-cv-08515-AS   Document 71-2   Filed 02/28/25   Page 55 of 64

124.    Finally, Lubin and the Enterprise relied on the use of interstate mail or wires to further this fraudulent scheme as the MCAs were circulated electronically between the parties which resided in separate states.

**D.      The Role of the Culpable Person and Members of the Enterprise.**

125.    The RICO Person, Lubin, has organized himself and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

### i.       Avrumi Lubin

126.    Lubin is an owner and the mastermind of the Enterprise and the Culpable Person under RICO.  Lubin is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, and the ultimate payment terms, amount and period of each usurious loan. As he repeatedly advised

127.    In his capacity as the mastermind of the Enterprise, Lubin is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to the Counterclaim Plaintiffs.

55

128.    In creating the MCAs, Lubin orchestrates the Enterprise to act as a unit in its criminal collection of "debts" from Counterclaim Plaintiffs and similarly situated borrowers by prohibiting borrowers from retaining additional financing from anyone other than the Enterprise. Thus, Lubin intentionally creates a negative feedback loop whereby borrowers are coerced by the Enterprise into entering into increasingly unconscionable MCAs with other members of the Enterprise after the borrower invariably fails to make payments under the first MCA agreement, all by design.  Indeed, should any borrower try to secure non-Enterprise funding, under the terms of the MCAs the borrower would immediately be in default.

129.    Lubin has also intentionally failed to create any actual remittance or reconciliation department among any member of the Enterprise, but nevertheless represented having such a department to would-be borrowers.  Given that reconciliation is a significant and necessary factor to avoid the MCAs being construed as usurious loans, Lubin furthered the Enterprises criminal behavior by misleading borrowers as to the services the Enterprise could and would provide, and provided a false security that borrower's fixed daily payment rates are not definite and do not have a finite term.

130.    Lubin has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.  For instance, Lubin directs which MCA company will solicit and enter into which victim borrower and on which terms, and he further orchestrates the terms of the subsequent MCAs used to refinance earlier MCAs that the borrowers defaulted on, as is the Enterprise's design.

56

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 57 of 64

131. Indeed, in this case, virtually all of the Enterprise's communications with the Counterclaim Plaintiffs have been through Lubin. Among other things: (i) Lubin initially contacted Stephan Leer, (ii) Lubin negotiated the terms of the subject agreements, (iii) Lubin decided on which company's "paper" the agreements would be written, (iv) Lubin dictated that payment amounts and terms; and (v) Lubin has been primarily responsible for collecting.

132. Lubin has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the Enterprise.

### ii. Spin Capital

133. Spin Capital is organized under the laws of New Jersey and maintains officers, books, records, and bank accounts independent of Lubin.

134. Lubin has operated Spin Capital as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, Spin Capital has: (i) solicited borrowers for the Enterprise's usurious loans; (ii) pooled the funds of investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (vii) obtained judgments in its name to further collect upon the unlawful debt.

135. In this case, Spin Capital, through Lubin: (i) solicited borrowers; (ii) underwrote the Agreements; (iii) entered into the Agreements; and (vi) collected upon the unlawful debt evidenced by the Agreements by effecting wire transfers from the bank accounts of Counterclaim Plaintiffs.

57

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 58 of 64

### v.    The Affiliates

136.    The Affiliates, BMF and Hi-Bar Capital, are separate organizations comprised of individual investors who maintain separate officers, books, records, and bank accounts independent of Lubin and Spin Capital.

137.    Directly and through their members, agent officers, and/or employees, the Affiliates have been and continue to be responsible for providing the Enterprise with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

138.    The Affiliates serve to maximize the monetary collection by directly entering into a series of MCA agreements with the victim borrower, as the MCA agreements prohibit a borrower from securing financing outside the Enterprise once the victim borrower executes the first MCA agreement.

139.    The Affiliates ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Affiliates according to their level of participation in the usurious loans.  Moreover, the Affiliates benefit by the Enterprise using subsequent MCA agreements with victim borrowers to satisfy pre-existing debt owed to the Affiliates under earlier MCA agreements, thereby creating a negative feedback loop for victim borrowers.

140.    In each of the transactions at issue here, Lubin solicited the loans and used the Affiliates as a white label to cover up the true lenders of the transaction.  In each of the transactions

58

Case 1:24-cv-08515-AS     Document 71-2     Filed 02/28/25     Page 59 of 64

at issue, Lubin himself provided at least 50% of the funds advanced, and received at least 50% of the criminally usurious profits.

### E.      Interstate Commerce

141.     The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

142.     Specifically, members of the Enterprise maintain offices in New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in California, New York and Texas, including Counterclaim Plaintiffs, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

143.     In the present case, all communications between the members of the Enterprise, and Counterclaim Plaintiffs were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the payments via interstate electronic ACH debits or wires.

144.     In addition, at the direction of Defendants, each of the MCA Agreements was executed in states outside of New Jersey, and original copies of the MCA Agreements were sent from California to the Enterprise, through Lubin, at his office in New Jersey via electronic mail.

### F.      Injury and Causation.

145.     Counterclaim Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

59

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 60 of 64

146.     The injuries to the Counterclaim Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962 include, but are not limited to, the improperly collected criminally usurious loan payments, which is at least $2,368,858.00.

147.     Counterclaim Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

148.     In addition to incurring their own attorneys' fees, Defendants have also incurred damages through their obligation to indemnify other Defendants to this Action, such as Cap Factor, for their own attorneys' fees incurred in defending against this Action as well as defending against Spin Capital's attempts to foreclose upon the collateral purportedly assigned under the Promissory Note.

149.     Pursuant to 18 U.S.C. § 1964(c), Counterclaim Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

150.     Counterclaim Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

151.     Counterclaim Defendant, the Affiliates and Lubin have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of the Enterprise to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

152.     By and through each of the Enterprise Member's business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Counterclaim Defendant, Lubin and the Affiliates concerning the underwriting, funding, servicing and collection of the unlawful loans, including the

60

Agreements, Counterclaim Defendant, Lubin and the Affiliates knew the nature of the Enterprise and Counterclaim Defendant, Lubin and the Affiliates knew that the Enterprise extended beyond each Enterprise Member's individual role. Moreover, through the same connections and coordination, Counterclaim Defendant, Lubin and the Affiliates knew that the other Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

153. Counterclaim Defendant, Lubin and the Affiliates agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, Counterclaim Defendant, Lubin and the Affiliates were knowing, willing, and active participants in the Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

154. The individual members of the Enterprise intentionally and knowingly acted as a unit in their execution of their conspiracy, as evidenced by the fact that each MCA Agreement prohibited the borrower(s) from securing finance from any entity other than a member of the Enterprise. This ensured that any borrower would be stuck in a negative feedback loop whereby each subsequent MCA Agreement would leave the borrower in worse financial conditions with the only "life raft" being an even more unconscionable and usurious MCA Agreement from the same Enterprise.

155. By trapping borrowers into this negative feedback loop, the Enterprise seeks to render the borrower at the complete mercy of the Enterprise. The first MCA Agreement operates as a hook while subsequent agreements gut the borrower through increasingly usurious, arbitrary

61

Case 1:24-cv-08515-AS   Document 71-2   Filed 02/28/25   Page 62 of 64

and capricious fixed daily rates that in no way are tied to any actual purchased receivables by the Enterprise.

156. The Enterprise further conspires to deprive borrowers of state usury law protections by agreeing, among themselves, to bundle the MCA obligations (after they have been incurred and usurious payments have already been made) into a single Loan purportedly above the $2,500,000 limit for New York usury laws to apply.

157. However, the Enterprise knew prior to the execution of the Loan that the actual balance and actual sums disbursed to the borrower would be far less than this $2,500,000 threshold. In reality, the Enterprise had already baked-in exorbitant fees that would immediately reduce the balance of the Note well below $2,500,000, and the Enterprise admits that only $1,307,403 was distributed to Counterclaim Plaintiffs while the remainder paid off the usurious MCA debts to BMF and Hi Bar Capital.

158. Thus, Counterclaim Defendant, Lubin and the Affiliates agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

159. The participation and agreement of Counterclaim Defendant, Lubin and the Affiliates and each Enterprise Member was necessary to allow the commission of this scheme.

160. Counterclaim Plaintiffs have been and will continue to be injured in their business and property by reason of the Counterclaim Defendant's, Lubin's and the Affiliates' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

161. The injuries to Counterclaim Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not

Case 1:24-cv-08515-AS    Document 71-2    Filed 02/28/25    Page 63 of 64

limited to, the improperly collected criminally usurious loan payments, which is at least $2,368,858.00.

162.    Counterclaim Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Counterclaim Defendant, Lubin and the Affiliates' criminal activities.

163.    In addition to incurring their own attorneys' fees, Defendants have also incurred damages through their obligation to indemnify other Defendants to this Action, such as Cap Factor, for their own attorneys' fees incurred in defending against this Action as well as defending against Spin Capital's attempts to foreclose upon the collateral purportedly assigned under the Promissory Note.

164.    Pursuant to 18 U.S.C. § 1964(c), Counterclaim Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Counterclaim Defendant and Lubin.

### PRAYER FOR RELIEF

**WHEREFORE**, Counterclaim Plaintiffs demand judgment in their favor against Counterclaim Defendant and Lubin as follows:

a)    Declaring each of Counterclaim Plaintiffs' agreements with Counterclaim Defendant and Additional Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)    On the First Count, awarding actual damages against Lubin, in an amount to be determined at trial, but in no event less than $2,368,858.00, together with attorneys fees and treble damages;

c)    On the Second Count, awarding actual damages against Lubin and Spin Capital, in an amount to be determined at trial, but in no event less $2,368,858.00, together with attorneys fees and treble damages;

d)    Any further relief deemed appropriate by the Court.

63

Case 1:24-cv-08515-AS   Document 71-2   Filed 02/28/25   Page 64 of 64

Date: August 3, 2022

Respectfully submitted,
**WHITE & WILLIAMS LLP**

Shane R. Heskin
7 Times Square, Suite 2900
New York, New York 10036
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Defendants*

64

29229613v.1