# EXHIBIT 10

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  CIVIL TERM PART 53
- - - - - - - - - - - - - - - - - - - - - - - - X

SPIN CAPITAL, LLC,

                        Plaintiff,

                                        INDEX NUMBER:
        - against -                       650582/22

GOLDEN FOOTHILL INSURANCE SERVICES, LLC,LIFE
FACTOR II, LLC,LIFE SHARES II, LLC,EL DORADO
HILLS INSURANCE SOLUTIONS, INC.,LONE WOLF
INSURANCE SERVICES, INC.,ELDO INVESTMENTS,
LLC,THE GENESIS LS FUND, LLC,KTL HOLDINGS,
INC.,ZURICH AMERICAN LIFE INSURANCE CO.,
ACCORDIA LIFE AND ANNUITY COMPANY, JOHN
HANCOCK LIFE INSURANCE COMPANY,
BRIGHTHOUSE LIFE INSURANCE CO., CAP FACTOR,
LLC,STEFAN LEER, TATANISHA LEER,

                        Defendant.

 - - - - - - - - - - - - - - - - - - - - - - - X

GOLDEN FOOTHILL INSURANCE SERVICES, LLC, LIFE
FACTOR II, LLC, LIFE SHARES II, LLC,
EL DORADO HILLS INSURANCE SOLUTIONS, INC.,
LONE WOLF INSURANCE SERVICES, INC.,
ELDO INVESTMENTS, LLC, THE GENESIS LS
FUND, LLC, KTL HOLDINGS, INC., STEFAN LEER,
TATANISHA LEER

                        Plaintiff,

        - against -

SPIN CAPITAL, LLC, AVRUMI LUBIN

                        Defendant.

 - - - - - - - - - - - - - - - - - - - - - - - X
                        60 Centre Street
                        New York, New York
                        January 4, 2024

BEFORE:

                    HONORABLE ANDREW BORROK, Justice


APPEARANCES:

     WELLS LAW P.C.
     Attorney for the Plaintiff
     229 Warner Rd
     Lancaster, New York 14086-1040
     BY: STEVEN WILLIAM WELLS, ESQ.,


     BRYAN CAVE LEIGHTON PAISNER LLP
     Attorney for the Plaintiff
     1290 Avenue of the Americas
     New York, New York 10104-0101
     BY:  LAITH J. HAMDAN, ESQ.,


     KLESTADT WINTERS JURELLER SOUTHARD & STEVENS
     Court Appointed Receiver
     570 Fashion Ave
     New York, New York 10018
     BY:  FREDERICK NELSON STEVENS, ESQ.,


     WHITE & WILLIAMS LLP
     Attorney for Defendant Golden Foothill
     7 Times Square, Ste 2900
     New York, New York 10036
     BY:  SHANE ROBERT HESKIN, ESQ.,


     MURRAY LEGAL, PLLC
     Attorney for Non-party Cross-Movant BMF
     170 Old Country, Ste 608
     Mineola, New York 11501
     BY:  CHRISTOPHER RYAN MURRAY, ESQ.,


     Appearances Continued:

3

DUSTIN DYER, ESQ.,
Attorney for Defendant Life Shares 1019
1501 Maple Ave, Ste 200
Richmond, Virginia 23226


KELLEY DRYE AND WARREN LLP
Attorney for Defendant John Hancock Life Insurance
175 Greenwich Street
New York, New York 10007
BY:   CAITLIN HICKEY, ESQ., Of Counsel
      JACLYN METZINGER, esq.,


d'ARCAMBAL OUSLEY & CUYLER BURK LLP
Attorneys for Defendant Brighthouse Life Insurance
40 Fulton Street, Ste 1501
New York, New York 10038
BY:   TIFFANY CELIA MILLIOEN, ESQ.,


IRMA T.  REBOSO SOLARES, ESQ.,
Attorney for Defendant Foothill Life Insurance
Carlton Fields, P.A.
2 Miami Central
1700 NW lst Ave, Ste 1200
Miami, Florida 33136-4118


PRYOR CASHMAN LLP
Attorney for the Defendant Cap Factor, LLC
7 Times Square
New York, New York 10036
BY:   DANIEL POHLMAN, ESQ.,

                         MONICA HORVATH
                   SENIOR COURT REPORTER

Proceedings

THE COURT: Spin Capital, Index Number 650582 of 2022.

Your appearances, for the record.

MR. HAMDAN: Laith Hamdan, Bryan Cave Leighton Paisner, for the plaintiff.

MR. WELLS: Steven Wells, Wells Law, PC, for the plaintiff.

MR. STEVENS: Fred Stevens, court appointed Receiver.

MR. HESKIN: Good morning, Your Honor.

Shane Heskin, on behalf of the Leer Defendants.

MR. MURRAY: Christopher Murray, on behalf of nonparty cross-movant, BMF.

MR. DYER: Dustin Dyer, on behalf of Life Shares 1019.

MS. MILLOEN: Tiffany Milloen, on behalf of Brighthouse Life Insurance Company.

MS. HICKEY: Good morning, Your Honor.

Caitlin Hickey, on behalf of John Hancock, Kelley Drye and Warren.

MS. SOLARES: Irma Solares, on behalf of Foothill Life Insurance Company.

MR. POHLMAN: Daniel Pohlman, on behalf of Cap Factor.

THE COURT:  Okay, good morning, to all of you.

5

Proceedings

There's a lot to talk about today. For starters, I just want to say to the folks that are in the courtroom, to, please, make sure you use the audio system and, please, talk into the microphone.  I appreciate that. That is actually the only way that the people that are appearing remotely, can hear you. The screen doesn't pick up ambient noise, so the only way that they will hear you, is if you speak into the microphone.

For the people that are remote, I would ask that you, please, keep your microphone muted, until and unless you want to speak to reduce the amount of feedback. It will make it a lot easier for our reporter. And I am sure she will appreciate that. She works hard.

Just one other thing.

I notice that there is one more person in the waiting room, if we can let them in, that would be super. Thank you.

Kelsey, did you want to put your appearance on the record; I know that you were just in the waiting room.  We just let you in.

MS. METZINGER: Sure.

Jaclyn Metzinger, from Kelley Drye and Warren, on behalf of John Hancock Life Insurance Company.

THE COURT: No problem.

Proceedings

I will repeat to you what I just said to your colleagues a few minutes ago. That when you are not speaking, please, mute the microphone to reduce the amount of feedback. But when you feel it is appropriate to be on the record, obviously, you can say what you need to say and all of that.

So, I was saying, that there's a lot to talk about in this case, and we are going to do that. We are going to spend some time together this morning.

We are going to start with the Protective Order, because I think it is going to open up a broader conversation about this case and sort of delve into the room about the counterclaims that I previously dismissed without prejudice.

You're up.

MR. WELLS: Shall I proceed, Your Honor?

THE COURT: Yes.

MR. WELLS:  Shall I stand, Your Honor?

THE COURT: No.

You just need to speak in to the microphone, so that everyone else can hear you.

MR. WELLS: So, Your Honor, we are here on a motion for a Protective Order, pursuant to the CPLR 103, to limit the scope of the deposition of Spin's representative, Mr. Lumen. And I think it's helpful to

Proceedings

go through a brief recitation of the facts and procedural history to determine how did we get here.

THE COURT: Sure.

MR. WELLS: For the purpose of this argument, I'm only going to speak to the claims regarding the enforceability for the breach of the Promissory Note and the guaranty. There's a lot of other claims relating to the insurance policies and priority disputes, but for the purpose of this motion, the only thing that's really relevant are the breach of contract claims.

THE COURT: I'm not sure I agree, but, go ahead.

MR. WELLS: So this is an action for breach of a $2.7 million Promissory Note.

It's not disputed by the Leer Defendants, that they executed the Note and the guaranty that they breached, that they only paid $510,000.

The Leer Defendants, filed an answer to the counterclaims. Now, the counterclaims have certain violations of the RICO Statute for collection of unlawful debt.

Now, if you look at the counterclaims, the first nine pages have nothing to do with this case.

THE COURT: Have nothing to do with what?

MR. WELLS: With the facts of this case.

They deal with the Merchant Cash Advance

Proceedings

Industry. In fact, they don't mention Spin.  They don't mention Hi-Bar.  They don't mention BMF.  The first nine pages is basically, here's some bad stuff that happened in the Merchant Cash Advance Industry, so the entire Merchant Cash Advance Industry is bad.  That's essentially, what they do, Your Honor.  This is not a Merchant Cash Advance case.

THE COURT: I think his point, is, that while I disagree whether or not the 2.7 million, facially, looks like it's the money order, it isn't the money.  I think his point, is that part of the underlying debt, whether it is new money or old money, is void because it violates the Usury Laws, as it relates to the Hi-Bar Merchant Cash Advance Agreement, such that he should be allowed to explore these topics in principal.

And if you can remember on the counterclaims, I had dismissed the counterclaims without prejudice, with a view that discovery would be permitted so that discovery would yield the basis upon which the counterclaims could be reasserted.  That they would have the ability to reassert appropriate counterclaims.  You had moved to dismiss the counterclaims under New York Law, claiming that New York Law applied to the agreements that were at issue in the Merchant Cash Advance Agreements. No one raised the choice of law

Proceedings

issue that Judge Rakoff advanced, in the Haymount case. I issued a decision, I think, in February.  Judge Rakoff issued a decision in August, months later, saying -- we don't need to talk about it now but -- indicating, that a Choice of Law Analysis may be appropriate as it relates to the value on a motion to dismiss claims that certain Hi-Bar Agreements, were usurious.

So, you know, the elephant in the room, at this point, is whether or not New York Law really applies to the Hi-Bar Agreements in the first instance and whether or not California Law really applies.

And isn't the $2.7 million cap, I guess, out of the usury analysis, in the first instance, which was the holding that I had, because no one said New York Law didn't apply, and there was no reason for the Court to sua sponte raise a choice of law issue. So I held that the 2.7 was exceeded.  I didn't think the attorneys fees were of interest and that it was exceeded. But there was never an intention by this Court to limit discovery. Had I wanted to do that, I would have dismissed the claims with prejudice, right?

MR. WELLS: Yes, Your Honor.

It was dismissed without prejudice.

May I speak to the California Law issue?

THE COURT: Sure.

MR. WELLS: So, yes, Justice Rakoff, issued a decision in Haymount, where he found, that since there was a chance that the designated state's law, New York, couldn't validate the contract, therefore, of course, the parties would enter into a contract where they agreed to a law that they deemed enforceable, that they had to do the Center of Gravity Test. And in that case, found the most sufficient contact was, I think, in North Carolina.

In this particular case --

THE COURT: He was very focused on where the borrower -- or seller -- of the receivables was located in that case, right; his focus was not on the lender/purchaser, it was on the location of the borrower.

And I understand the case isn't binding on this Court, in any event, but it is persuasive, his arguments relating to Choice of Law Analysis, and is really something that the Court should consider.

As you probably know, I did have occasion to consider the case in another case, which was the Richmond Capital case, which dealt with a totally different statute at issue, Executive Law 6312. And I found that the Greater Law Analysis was not related to the 63, it was totally inapposite with the 63 total

Proceedings

analysis.

MR. WELLS: And I would argue that Justice Rakoff's decision is not really relevant in this particular case, because where he found that there was a chance that the designated state law in New York, could invalidate the contract, Your Honor had already applied New York Law to the Promissory Note and found that it exceeded the Usury Capital and General Obligation's Law and also applied the Principis Test, which is binding on this Court to the two Merchant Cash Transactions at issue, and found that they passed all three factors. They had mandatory reconciliation, indefinite term and bankruptcy was not in event of default. It said that these are sales, they are not loans subject to Usury Laws.

THE COURT: Well, I didn't have occasion to look at the Hi-Bar Agreements. Remember, all I did, was in the way that you are now describing, that Merchant Cash Advance Agreements, were not front and center in that way in front of the Court. Just because there wasn't a record demonstrating that there wasn't a separate -- that the slash purchaser, or potential lender of the Hi-Bar Agreements weren't connected to this lender.  It looked to me, facially, as if like any refinance, the fact that you are using money to payoff old debt or old

obligations, didn't mean that money wasn't being advanced such that the $2.7 million cap was being exceeded. That was the analysis.  I think -- you know, I believe this is in the papers but -- you are really good lawyers -- I don't know if you and I, had that conversation, or if it was the colleague sitting to your left, but that's my recollection of the conversation that I had.

Anyway, so why shouldn't he be allowed?

Let's sort of get back to where we really need to be at this point or we will be here all day.

MR. WELLS: One thing I want to bring up to the Court, and I will move off that issue, is that it wasn't addressed and factored in to Judge Rakoff's decision, because he simply said, okay, there's a chance that the chosen designated state law of New York could invalidate the contract, I am going to move to a Center of Gravity Analysis. This is Statutory Law.  General Obligation's Law Section 5-1401, states that if there's a transaction over $250,000, the parties can specify New York Law, regardless of whether or not there's a reasonable relation. And there's Court of Appeals authority cited in our brief --

THE COURT:  Sounds like something which would definitely need to be fully briefed, but, don't forget,

in Judge Rakoff's case, they did designate a choice of law, in the agreements and Judge Rakoff said, notwithstanding the fact that there was a Choice of Law Provision in the agreements, he applied the Choice of Law Analysis, the Center of Gravity Analysis and didn't apply North Carolina Law.

MR. WELLS: But he did find that there was a chance that the designated state law would apply in the contract --

THE COURT: He found first under New York Law, so there's a conflict between New York Law and the law of a foreign jurisdiction, and such that the Center of Gravity Test, should be applied to determine which law should apply.

In this case, that would mean that your 2.7 million hard cap would save these agreements from Usury Analysis. California Law, has no such cap under the circumstances.

MR. WELLS: But I would address, there's a Court of Appeals case -- I don't have the page in the brief, but -- the Court of Appeals held, that there is no need for a Conflict of Law Analysis. It is obviated, where there's an express choice of law -- express choice of New York Law -- in the contract pursuant to General Obligation's Law 5-1401. That engaging in a Conflict of

Law Analysis -- which is what we are discussing right now -- would frustrate legislative purpose in binding precedent.

THE COURT: Well, like I said, it strikes me as this is the kind of thing that may well need to be briefed. It wasn't fully briefed the first time that the counterclaims were asserted in this case and it strikes me --

MR. WELLS: But --

THE COURT: Go ahead, sorry.

MR. WELLS: -- it is fully briefed, Your Honor, at Page 15 of our moving brief, NYSCEF Doc. 453. Our opposition brief to the Leer Defendants' motion to compel.

THE COURT: Okay, give me a second.

You said 415?

MR. WELLS: It is NYSCEF Doc. 453, beginning on the bottom of Page 15.

THE COURT: I missed that, and I apologize.

You said it is on Page 15?

MR. WELLS: Yes, the bottom of Page 15.

THE COURT: I apologize, if I missed it. I'm sorry.

Okay, so this is what's not fair to me about what it is that you are saying.

His argument, is that the underlying Hi-Bar Agreements should not be considered for the purposes of the $250,000 legislature safe harbor, if you will, about the Choice of Law Provision. If that's kicked out, the Hi-Bar Agreements for the purposes of that analysis about whether safe harbor applies, are you saying that the amount still exceeds $250,000?

MR. WELLS: You mean, $2.5 million, Your Honor?

THE COURT: No, 250,000, because that's --

MR. WELLS: Well, I mean, I think all these contracts would exceed $250,000. I mean, this is a $2.7 million loan, even if you knocked out the Hi-Bar entity.

THE COURT: Well, it wouldn't be 2.7 if you knocked out the Hi-Bar.

MR. WELLS: It would still be over $250,000, which was the requirement for General Obligations Law 5-1401, which says that we can designate New York and the commercial parties need have some predictability, and if you are doing transactions of this size, even if you don't have a reasonable relation to this state -- in which case, we do -- you can designate the state's law and rely on it --

THE COURT: I'm not so sure.

Just to be clear, I haven't had occasion to

Proceedings

consider whether or not I would have found in any event. Even if I did do what the defendants in this case are asking me to do, I'm not convinced at this moment, that California Law would apply to the transaction in any event. I think that there's compelling argument to be made, that New York Law should apply regardless. I just haven't had occasion to think about it in that way.

MR. WELLS: And, Your Honor, I believe, based on the case law and the Court of Appeals case law and statutory law, that you don't get to the Conflict of Law Analysis in this case.  You just don't get there.

THE COURT: I'm not sure.

MR. WELLS: The legislature says, if you are doing transactions of this size, if you want to use New York, use New York, and apply New York Law.

Your Honor found that the loan in this case is not subject to Usury Laws. Your Honor, did also do the Principis Analysis on the two Merchant Cash Advance Agreements.

THE COURT: Well, what I did was, I did the analysis as to whether or not the requirements were there as to the reconciliation and stuff like that, but, regardless, my contemplation, was that discovery would go forward continually, which included the Hi-Bar Agreements, such that they could look at issues like

Proceedings

whether or not there were fixed payments, whether or not there was reconciliation, whether or not all the things that were provided for in the agreement, were in fact the way that the parties conducted themselves, such that the agreements were valid.  And, if not, that Mr. Heskin, would, on behalf of his clients, reassert the counterclaims as it relates to usury claims then demonstrated to me that there wasn't $2.7 million that was at issue in this case such that under New York Law, it wouldn't fall under the safe harbor.  But I never intended to cut discovery.  If I had wanted to do that, I would have dismissed the claims with prejudice.  And I didn't do that.

MR. WELLS: To your first point though, you know, those two Merchant Cash Advance Contracts that were satisfied with the portion of the loan proceeds, those aren't Spin contracts, those are --

THE COURT:  But they may or may not be Spin contracts, that's the point.

MR. WELLS: They are between the Leer Defendants, and Hi-Bar and Leer Defendants.

THE COURT: Well, I don't know what the relationship is between Hi-Bar, and Spin. I mean, he's entitled to explore that.

MR. WELLS: Well, okay, but what we have here

18

Proceedings

today, is the scope of discovery, right, the deposition topics -- the bank subpoenas, we will get in to -- I mean, it is so overly broad.

THE COURT: I agree.

MR. WELLS: You know, everything, expenses, MCA Practices, in general, all these, it is not disputed, that Spin -- there's no Spin Merchant Cash Advance Agreement at issue in this case anywhere, right, no.  If anyone --

THE COURT: Well, I don't know.

I mean, that's what his point is, is that the Hi-Bar Agreements are a mess.  Isn't that what you have basically been telling me, is that the Hi-Bar Agreements are also Spin agreements?

MR. HESKIN: Yes.

And I, respectfully, direct the Court's attention to Docket Entry 334.

THE COURT: Okay.

MR. HESKIN: And what this document shows, is this is the Syndication Agreement, on the loan --

THE COURT:  You said 334?

MR. HESKIN: Yes, 34.

THE COURT: I apologize.

MR. HESKIN: I may have misstated it, Your Honor.

Proceedings

THE COURT: No, that's fine.  It's okay.

All right, so this is just a payoff amount?

MR. HESKIN: If you look at the last two entries or the last three entries, Syndication BMF, 25 percent, Syndication Hi-Bar, 50 percent. So they are participated in. They are not only paying off their old loans, they are participating in their new loan.

THE COURT: Who is the "they" in your sentence?

MR. HESKIN: BMF, and Hi-Bar.

So, BMF, and Hi-Bar, all the Merchant Cash Advances -- and there were five -- all got paid off their debts, and then they roll it up in to this final loan, and guess who is participating in that -- we didn't have this document before, this was produced in the litigation -- BMF, and Hi-Bar.  And Spin, is taking 25 percent of the cut.

And, just quickly, on the $250,000, we can brief that issue, but I just want to point out that the first two MCA's at issue, which are Docket Entries 189 and 190, are in the amount of $100,000 and $220,000, so if we knocked out just one of those, if we just knocked out one dollar on one of those --

THE COURT: You would have the Safe Harbor Issue point.

MR. HESKIN: Exactly.

Proceedings

And then I just want to say one thing, what you have done in this case, is entirely consistent with what other judges have done in Federal Courts.

I had a case in the Eastern District, where the court dismissed the usury claims, and said, listen, go take discovery, come back to me and I will let you recertify. And Judge Rakoff, neither of us -- both of us, both sides say, New York Law applies. New York Law applies. He decided the motions to dismiss. He said, listen, both of you guys are saying New York Law applies. I will decide the motion to dismiss on New York Law, but that's to be determined. And he had it in his head -- he made the decision on his own -- he said, listen, you guys are wrong. I'm going to apply my way --

THE COURT: He's a very smart jurist.

Look, you know, I understand that he did what he did, and what Judge Liman did. You are talking about legal giants. You know, these guys are very, very, smart people. I am just a State Court Judge, here in Part 53. I haven't yet had occasion to look at the issue in the way that it was certified. And I think you are all aware about Mr. Heskin, considering. But one of the things that you don't know, is that Mr. Heskin has spent a significant amount of time in Part 53. He sat here

Proceedings

through the entire Richmond Capital proceeding to see what I was going to do.  One of the Broad Defendants, one of the Richmond Capital Group defendants, raised the Haymount case to me. I didn't know at the time, what his views were in this case, I don't know, but, in any event, he was in courtroom the whole time for weeks.

MR. WELLS: I was aware of that, Your Honor.

Mr. Heskin, and I, have been doing this dance for over sixty years in New York State.

THE COURT: Oh, have you?

MR. WELLS: Yes.

THE COURT: Well, you both are very nice guys, and I wish you both could win, but, unfortunately, you both can't win.  That's the business.

Look, the bottom line here, is, I didn't intend -- we can talk about whether or not the breadth of what it is that Mr. Heskin is looking for is too much as it relates to exploring the theories as it relates to these agreements and the potential counterclaims.  That's certainly the appropriate conversation for us to have and whether or not discovery should proceed in stages, but I can't grant your Protective Order, cutting off his ability to examine whether or not this in fact really is debt or not.  I can't do that.

MR. WELLS: Can we limit it; I mean --

Proceedings

THE COURT: So let's talk about ways that you think it should be limited.

Maybe the two of you should meet and confer, as to a staged way of proceeding under the circumstances, and I can certainly craft an order which denies the motion without prejudice, based on the scope of discovery, directs the lawyers to get together to talk about a more targeted scope and have you report back to me in like two weeks or something like that.

Does that seem like a fair way of going?

MR. HESKIN: Sure.

And as far as the bank statements, the one thing I would like, is any transfers among BMF, Hi-Bar, and Spin, related to these transactions.

THE COURT: Well, I think you are entitled to understand the relationship between the parties. That, you are entitled to for all the reasons that we have now talked about ad nauseam.

MR. WELLS: Yes.

Spin, specific to this case; I mean, I get it, but --

THE COURT: Yes, in this case, as it relates to the parties that are involved in this case. The defendants in this case is the way that I am going to say it.  That's right.

Proceedings

MR. WELLS: But the whole realm of persons and entities?

THE COURT: No, no, no, no.

This isn't an investigative proceeding that will be involved with the Attorney General.  I did that once, and I hope, I don't have to do that a second time. It was exhausting.

MR. WELLS: Right.

THE COURT: So I think that deals with the first thing that we had to talk about today.

You know, based on what you have, I would say, that if you think you are in a position to reassert the counterclaims in this point, you certainly should have filed a motion seeking leave to do so.

MR. HESKIN: So, Your Honor, I do believe we have the basis to do that.  It is just a question of whether or not you want us to take complete discovery and take the deposition before we do anything. I think, we have, based on the documents I showed you, and documents --

THE COURT: Well, I think you should at least get this discovery first, so that you are able to make a more compelling, complete record, as to why you are unable to go forward, because there are two possibilities, where he moves to dismiss against your

Proceedings

counterclaim.

One, is that I am going to agree with him, that you don't have enough and you are going to be unhappy. The other one, is that I will agree with you and then they will go to the Appellate Division. And if he goes to the Appellate Division and you have an incomplete record, you may find yourself still unhappy, because the Appellate Division may disagree with what it is that I think at that point as to whether or not you stated a counterclaim.  And, also, because of the counterclaim, you are asserting, right, before you assert a RICO counterclaim.  I don't know if that is your intention or if it is something a little bit less so.

MR. HESKIN: Sure.

I actually think that you are better off under California Law.

THE COURT: Okay, great.

MR. HESKIN: And, so, I think the appropriate time to address that, the appropriate time to address that, would be at a deposition.

THE COURT: Sounds like a question for a guy sitting in this chair a couple of months from now, but, not the guy sitting in this chair right now.

MR. HESKIN: But that is what we will brief.  I think your approach makes sense.

Proceedings

THE COURT: It may still be the same guy, but, nevertheless, it is not a question for me today at this point.

MR. HESKIN: Exactly.

Okay.

THE COURT: So let's keep going.

We are going to now talk about your motion, the contempt motion, the Receiver's motion. I think that's important to talk about. Particularly, as it relates to the Hancock distribution. That, I think, is important.

MR. HESKIN: And, Your Honor, if I may.

So I had entered an appearance for all of the parties initially, and at the time of the distribution, the parties, the clients, said, listen, there may be a conflict, and, so, I wound up between Life Shares 1019, and you had given this distribution and at that time, Mr. Dyer was retained to make that analysis as independent counsel.  And, so, he's here to represent Life Shares 1019, LLC.  The only problem with that, is he is admitted in California and has been unable to file a pro hac vice motion on behalf of Life Shares 1019, because Life Shares 1019, is not on the docket and he has called me and we tried to figure out how we get him admitted.  So I ask that you allow him to be heard or --

THE COURT: Well, he could have moved by Order

Proceedings

to Show Cause, to file a pro hac vice motion, regardless, whether or not he was on the docket, but they are in the caption, they are a defendant in the case.

I understand your argument about service and stuff like that and personal jurisdiction. I understand that whoever wrote the papers, called it subject matter jurisdiction, but I understand what you are saying. I don't know that it affects the contempt issue that the Receiver is facing, because didn't Mr. Leer, himself, cause the distribution of the Hancock -- I mean, isn't he the person that -- he is certainly subject to the jurisdiction of this Court, and if he caused the distribution, he darn well better get that distribution enhanced by a Receiver.

MR. HESKIN: Sure.

Do you mind; I'll happy to answer the question.

THE COURT: Well, I don't know. I mean, you know, Mr. Dyer can certainly bring a motion by Order to Show Cause.

You are listed as counsel on the docket, so whatever you want to do is okay with me.

MR. HESKIN: If it's okay, could you hear from Mr. Dyer.

THE COURT: Did you file a pro hac motion or

Proceedings

bring an Order to Show Cause, Mr. Dyer.

MR. DYER: I intend to do so, Your Honor.

But courts, obviously, reject that initially, and then we have kind of been in a dance with the Clerk's Office in the last two weeks on how is the best way for me to do it. I have all the paperwork setup and I will file it today.

THE COURT: That's great, I really appreciate that. No problem.

Look, the Receiver hasn't really been in the case yet, but I just want to sort of jump into the 12th hour. Mr. Leer, caused this distribution and he's subject to the jurisdiction of this Court. And if he caused the distribution here, why can't he cause the -- regardless of whether or not Mr. Heskin, is ultimately successful in his mission to invalidate these Loan Documents, which, he may be, I had issued a clear and direct unequivocal order, preventing exactly this from happening, and I don't understand why, under the circumstances, that Mr. Leer, who was enjoined could do this. I just don't get it. I must be missing something.

This Leer Defendant, this entity, was a defendant in the caption in this case. The Hancock, was on the schedule of insurance policies that I spoke to. It seems very straightforward, to me. What is it that I

Proceedings

am missing; why can't we fix this guy giving the Receiver the proceeds now, so that I don't have to do something mean and nasty?

MR. DYER: Your Honor, well, Mr. Leer, was individually enjoined from doing this, but, Mr. Leer, is acting as a fiduciary in Life Shares 1019 --

THE COURT: Do I have to issue an arrest warrant for Mr. Leer, today?

Let's just cut to it, I'm not going to play with this, I want the money in the hands of the Receiver now.

MR. HESKIN: So, the money -- my understanding, is that the money is in an escrow account and has not been touched, and we will --

THE COURT: It needs to the be in the hands of the Receiver now.

MR. HESKIN: We will recommend --

THE COURT: If it is not in the hands of the Receiver by tomorrow morning, I am going to let the Receiver e-mail me and I will hold Mr. Leer in criminal contempt.

Are we clear?

MR. HESKIN: Understood, Your Honor.

THE COURT: There you go, the mean and nasty. I knew it would come out at some point.  Now, I feel like

Proceedings

Judge Rakoff.  I knew it would happen at some point.

I wasn't saying that he is mean and nasty, but, he's a tough cookie.

MR. STEVENS:  He can be.

THE COURT: Do you want to be heard?

MR. STEVENS:  Your Honor, I know better than to snatch defeat out of the jaws of victory, but there were a couple of other components to the motion and I would be remiss, if I didn't bring up the Brighthouse policy, which is also on the same insured.  And the issue really, is going to be one of cost to all the parties, that everybody is in agreement, with the exception of the defendants in the case, that those proceeds can be paid to me, but, Brighthouse, I think, intelligently, once they release from everybody, in order to turn those proceeds over to me because they don't want to face the same kind of issues that are at play here. The problem that we have, is that we now have a competing lawsuit, in which I am named as the principal party in Federal Court across the street, an interpleader action commenced by Brighthouse, in order to interplead a determination with respect to the rights of those policy proceeds.

It seems to me, that the same obligation, the same obligation that exists on the agents of Life

Proceedings

Share 1019, if not Life Share 1019, itself -- which I clearly think it does -- to cooperate with the tone and tenor of Your Honor's order, and explicit instructions to cooperate in getting me the proceeds. Again, I, like the Court, don't care who wins, but I think it makes next to no sense to have us all spending money on matters that are squarely before this Court, and that this Court can decide whether money can simply be turned over to me.  So I think the exact same obligations --

THE COURT: Can I ask that whoever is not muted on the Teams, please, mute for a second; only because it is creating a tremendous amount of feedback.  And, then, if you want to speak, it is no problem, I will give you the opportunity to speak.  But it is making it hard to hear.

Thank you.

MR. STEVENS: Thank you, Your Honor.

The good news, is the monies are safe, because they are either going to be in Brighthouse's hands, or deposited with the Federal Court, but it is the exact same obligations that exist on the parties with respect to debt, where the funds should be turned over to me, and the parties can fight over who is entitled to them and what happened here.

THE COURT: It sounds like something that -- I

don't know who the judge is that has been assigned the case in the Southern District, but they are very smart, and they understand that there's a prior pending proceeding in front of me as it relates to the issues, that I have issued an order as to what is supposed to happen as relates to these proceeds.  And I imagine that they will defer to this Court on the issue, but, you will have to see what it is that they say.  And, you know, obviously, I appreciate their appropriate consideration under the circumstances.

Who's the judge?

MR. STEVENS: Judge Ho, H-O.  I forget the first name.  He is fairly new.

THE COURT: Okay.

I'm sure Judge Ho, will do a very good job and make a very good, sound, decision, under the circumstances.

I can't do more than that. I can't do anything about the case that is pending in Federal Court.

MR. STEVENS: No.  No, you can't.

My argument, is that the Receiver Order, clearly, requires the same instruction on the agents, if not Life Shares, itself, to cooperate, that I obtain the proceeds.  It's a reasonable cooperation.  And what's required by Your Honor is to release right now and make

Proceedings

sure the funds are turned over to me.

THE COURT: I agree with you.

The Brighthouse funds should be turned over to you as part of the order that I previously issued.

I think they have sought relief in Federal Court. We will see what it is that the Federal Court does. I think that, presumably, the Federal Court will defer decision back to me.  And if they don't turn the proceeds over to you, as they are supposed to do, I will hold them in contempt at that time.

So I think, pending what happens in the Federal Court, I have to hold your motion in abeyance as it relates to the Brighthouse issue until Judge Ho, speaks to the issue.

MR. STEVENS: Understood, Your Honor.

THE COURT: I think that's the only thing that I can do out of respect for my colleague across the street.

MR. STEVENS: I, absolutely, understand, Your Honor.

It was as much a matter of cost, than doing something that makes sense.

THE COURT: No, I agree with you.

This is the court of primary jurisdiction as it relates to the dispute between the parties.  This case

Proceedings

has been pending in my part for some time. I have had occasion to think about the issue. This is not the first commercial Cash Agreement case that I have dealt with and it is certainly not the first case in the nine years that I have been a judge, that I appointed a Receiver. I am well familiar with the way that a Receiver gets supported.  I could have limited your authority.  I chose not to. I give you the typical general priorities as it relates to what Receivers do.  I think you are doing everything you are supposed to do, and, hopefully, Judge Ho, will do what I would do if I ever get the phone call from the President of the United States, and somehow make my way through the process and find my way over there. I'm not holding my breath for this at this point of my career.

MR. STEVENS: Thank you, Your Honor.

I just will note one thing, that I will likely be seeking a modification to the Receiver Order, in that regard, to the extent that the Receiver Order, which is typical, did authorize me to retain counsel. There was generally no need.

THE COURT: And you should.

I mean, at this point, what you should do, is you should bring an Order to Show Cause, seeking to retain counsel, where the parties will have to bare the

Proceedings

cost of you hiring lawyers.

MR. STEVENS: Understood, Your Honor.  And I will do that.

Thank you.

THE COURT: Yeah, it is pretty standard.

MR. STEVENS: Agreed.

I just figured, I would wait for this to bring it up.

THE COURT: Yeah.

I can do what's normal.  I would like to think that Part 53 is normal on most days.

MR. STEVENS: Thank you, Your Honor.

THE COURT: Okay, you brought a motion for fees as it relates to having to bring it and the motion is granted.

MR. STEVENS: Thank you, Your Honor.

THE COURT: Okay, so your motion for appropriate fees and payment of expenses is granted.

MR. STEVENS: Thank you, Your Honor.

THE COURT: Okay, so we sort of dealt with motion 19 already, right, your motion to compel BMF, and Hi-Bar, we sort of discussed that.

MR. HESKIN: I think, Mr. Dyer, wanted to say one more thing.

THE COURT: Oh, did he?

Proceedings

Go ahead, Mr. Dyer.

MR. DYER: Thank you, Your Honor.

So just that I understand, we didn't really get in to the issue, I was just told that to deposit.

What is the basis, that an individual in a lawsuit controls the acts of the LLC here, because if Mr. Leer -- all it took was an order for Mr. Leer, to compel him to act for all of his businesses, despite the separation -- why was there a need to file this on behalf of all of the other entities, or to include Life Shares 1019, at any point; all they had to do under this current pending ruling, is address this simply with respect to Leer, and it would affect all of the businesses and cause him to forfeit.

THE COURT: I don't agree with what it is that you said.

The holding, is that Mr. Leer, was enjoined, and that Mr. Leer, violated the direct order by acting to cause the distribution of the proceeds that were subject to the injunction.

The injunction wasn't limited to Mr. Leer, nor, did it need to be limited to Mr. Leer. For all I knew, at the time that I had issued the injunction, there may have been other people that were able to act on behalf of these entities and enjoin these entities.

Proceedings

Right, counsel?

You have to talk.  She can't take nods on the record.  You have got to say something.

MR. HAMDAN: Yes, Your Honor.

THE COURT: There you go.

So, Mr. Leer, was not in a position to issue the authorizations that he issued with respect to the Hancock proceeds, and he violated a court order that was clear, direct and unequivocal as it relates to do so. And he did so in a willful and contumacious way.  And if he doesn't cause those proceeds to get in the hands of the Receiver, as I said to you before, I'm going to hold him in criminal contempt because to the extent that there had been any confusion, I am now clearing up that confusion for Mr. Leer; he is going to cause those proceeds to be deposited with the Receiver under the circumstances. That's what I'm saying to you.

That doesn't mean that the plaintiffs in this case, when they came here seeking an appointment of a Receiver, which I granted and seeking monies to be deposited with the Receiver during the pendency of the lawsuit, so that Mr. Leer didn't abscond with them, that the injunction was limited to Mr. Leer, or whether it should have been limited. If you think that the injunction should be modified, you can move by Order to

Proceedings

Show Cause. You can seek a modification as it relates to the injunction and the Receiver's Order. But the order was very clear in terms of what it was intended to do under the circumstances and it was violated.

MR. DYER: Okay, thank you, for the clarification.

I don't want to bring out the mean and nasty. I was just wanting to know how Mr. Leer, in his individual capacity, is affected as the Officer of Life Shares 1019.

I'm not sure, I agree with the Court's order, but, I respect the order.

THE COURT: I appreciate that.

Did we have to talk about the subpoenas; it can be part of the conversation that the two of you have.

MR. HESKIN: Well, Mr. Murray, represents --

THE COURT: Oh, Hi-Bar?

MR. MURRAY: No.

I represent BMF, Your Honor.

THE COURT: Okay.

MR. HESKIN: And all we want, is for them to respond to the subpoena. And if Mr. Murray, based on this conversation, is willing to agree that they will respond as to the scope, I think, we can probably --

THE COURT: Unless, Mr. Murray wants to be

Proceedings

heard, I think the two of you should meet and confer as it relates to the breadth of what it is that you are looking for.

MR. MURRAY: Your Honor, if I may.

I do want to be heard because the motion that was made against my client was not only to compel a response, but for contempt.

The motion as directed against BMF, is jurisdictionally, void, is a nullity, for all intents and purposes. None of the requisite Judiciary Law Notices are contained on the face of the motion, so it is instantly void.

Furthermore, a contempt application is required to be personally served on my client. They are not even claiming it was personally served. They are claiming service happened through the Secretary of State. That is not personal service. It doesn't count. So, once again, their application is void.

In so far as they are claiming they served the subpoena on my client, Your Honor, there is two things here that I guess are threshold issues.

One, is my client never received the subpoenas. And, number 2, insofar as they are claiming they served the subpoenas on my client, it's undisputed, they never served the nonparty witness fees. The law is

Proceedings

unequivocal, notwithstanding Mr. Heskin's citation to the loan in the absence of a trial court decision, they were required to pay the witness fee prior to the return date on the face of their subpoena, if they issued a subpoena at all, because we never received it. But the fact remains, is, we claim unequivocally, that we never received it, and, Mr. Heskin, says they never paid it. The subpoenas themselves are a nullity. If he wants to reach out and confer with us about a potential new subpoena, we would certainly entertain that. But for it to be deemed served today, at this point, it is void, and their motion should be quashed.

THE COURT: Okay, you want to reserve your subpoenas, Mr. Heskin?

MR. HESKIN: I would love to, if Mr. Murray is willing to accept service.

MR. MURRAY: I don't agree to agree to that right now, Your Honor. That would be something I have to speak to my client about.

MR. HESKIN: The answer is, we think our service is proper.

Mr. Getters, is in Florida, but his company is located in New York. And the service agent, is a mail and drop, so you can't personally serve a mail and drop, but we have served it. We issued it, we served the

Proceedings

Secretary of State, on the subpoena.

THE COURT: Can you move for alternative service by Order to Show Cause?

MR. HESKIN: If Mr. Murray is going to make me do that, I will, but I'm asking him --

THE COURT: Well, it sounds like he doesn't have authority.  So you need to move by Order to Show Cause to seek alternative service under the circumstances.

MR. HESKIN: Okay.

Understood, Your Honor.

THE COURT: So you will do that, and, so, we will deny motion 19 without prejudice as it relates to BMF.

MR. HESKIN: Thank you, Your Honor.

MR. MURRAY: Thank you, Your Honor.

MR. HESKIN: And, I believe, Hi-Bar, is unopposed.

MR. WELLS: Well, we oppose the motion.

THE COURT: Well, I'm assuming, that the two of you, are going to get together and talk.

MR. WELLS: We will work it out.

MR. HESKIN: Are you going to be able to deal with revisions?

MR. WELLS: Well, I can agree to what plaintiff believes is appropriate, as far as getting discovery,

Proceedings

and facts relating to the claim in this case.

THE COURT: Let's talk about what's appropriate for the conversation when the two of you get together.

I don't think exploring the entire business loan would be appropriate under the circumstances. I don't think that all the bank records under the circumstances would be appropriate.

What I think would be appropriate, is proportional discovery to the claims -- the potential counterclaims -- in this case.  And that would include the relationship between Hi-Bar, and Spin, any payments, any participation, to the extent would be participation, under New York Law, anything having to do with Citibank, and the Chase loan.  I think that bank records as it relates to how the payments were processed, how the financial process with Hi-Bar payments would be appropriate, to see whether or not they would bear any relationship to the accounts receivables at issue in the case, see whether or not the fees that were charged as it relates to the Hi-Bar agreements were in line with what the agreements provide would be appropriate.

Those are the types of things that I would envision.  I'm probably not adding to the laundry list of everything, but, I think that to the extent that you are claiming that the Hi-Bar Agreements are disguised

Proceedings

loans that are over the threshold and each one of them is void, such that you can't use new money to pay off a void agreement, then, you know, that's the kind of thing I think that you should explore with regards to Hi-Bar.

MR. HESKIN: Yes, Your Honor.

One thing -- and, I'm assuming, they don't exist, but -- if they do exist, I would ask for any communications between any of the BMF Defendants, Hi-Bar with Jonathan Braun.

THE COURT: That's the problem with John Braun, that is what I'm having trouble understanding.

There was an e-mail that I asked about early on in this case, where John Braun was identified in the e-mail. And as you recall, I asked the Attorney General, whether or not they were going to seek to intercede in this case, and show up here, because for whatever reason, and they were not inclined to do so. And they didn't give me a reason why not, but they didn't do that. And I'm having trouble understanding -- I understand the papers, where they say about somehow moving against Mr. Braun, based on the prior finding in the Richmond Capital case, the question is, what do you have, other than that one e-mail that connects Mr. Braun to this situation?

MR. HESKIN: There's a lot.

Proceedings

So, Jonathan Braun, was released in January or February of 2001. These loans, these MCA's began in March --

THE COURT: He was released; what do you mean?

MR. HESKIN: Released from prison.

THE COURT: Okay.

MR. HESKIN: Isaac Wolf and --

THE COURT: In 2001, you said?

MR. HESKIN: In 2021.  My bad.

THE COURT:  Yeah, there was an article at the time that he was released.

MR. HESKIN: I believe, there was a New York Times article, that spoke about your decision in that case.

So, shortly thereafter, these MCA's were entered into with Yosef Brezel, and Yosef Brezel, and Spin, are connected. Joseph Brezel, is Braun's cousin. Yosef Brezel, was sent a copy of the Life Shares agreements from Spin. Josh Lubin, was operating out of the offices of John Braun's enterprise.  The same office --

THE COURT: I think what you are entitled to for today's purposes, is if you -- look, you may or may not reveal a relationship with Mr. Braun, based on discovery that you are permitted to take. I don't think you are

Proceedings

permitted to take discovery, specifically, as it relates to Mr. Braun, based on the fact that a family member may have some relationship. That's too tenuous. On the other hand, to the extent that Hi-Bar, has any e-mails discussing the foundation of the Marchant Cash Agreement, as it relates to your client and that's discussed, that certainly would be within the scope of discovery. And that may reveal Mr. Braun, or it may not reveal Mr. Braun. If it does, then we would have a very different conversation about discovery as it relates to Mr. Braun. But I think for today's purposes, I don't think that plaintiff's counsel is wrong, in that discovery needs to be proportionate to what is actually at issue and what it is that you are saying.

MR. HESKIN: Yes.

THE COURT: But I won't make you redact Mr. Braun's statement --

MR. WELLS: I mean, we will redact it, but there were allegations that Mr. Braun did bad things in the MCA Agreement, and there's a cousin, right, in the MCA --

THE COURT: Well, I have no idea what discovery is going to reveal. There may be information in litigation database, that already holds the answer to what might be involved, in fact --

Proceedings

MR. WELLS: We were never hiding anything.

THE COURT: But, I will tell you, if I were a betting man -- and I am not a betting man -- if I were though, I would have guessed, that all of these e-mails from Hi-Bar, are already on somebody's litigation database, and they have already done a search and they know what might or might not come up as it relates to these insurance policy transactions.

So, look, if it is going to come up, it will get disclosed.  If it is not going to come up as it relates to the Leer Defendant transactions, then it isn't there.  And that's fine.

MR. HESKIN: That's all I'm asking, is for them --

THE COURT: Well, you are asking for a lot more than that.

MR. WELLS: Yes, you are asking for way more than that.

THE COURT: And I am saying, it's a bit broad, and I'm agreeing with part of what plaintiff is saying, as it relates to their concern.

MR. HESKIN: All I'm asking, is, if there are any communications relating to this transaction with Leer.

THE COURT: Well, these transactions, the

Proceedings

Hi-Bar, and other.

MR. HESKIN: Yes.

THE COURT: And the fees related to the transactions.

MR. WELLS: Not High Bar's general MCA practice.

THE COURT: I didn't say that.  I didn't say that.  I didn't say that.

MR. HESKIN: And, presumably, they don't exist.

THE COURT: What?

MR. HESKIN: Presumably, they don't exist.

So what I'm asking --

THE COURT: No, no. Presumably, they do exist. And, presumably, there are records that relates as to Hi-Bar, and whatever, you know. There has to be.  I mean --

MR. HESKIN: No, I get, those exist.  And, presumably, those that exist don't involve Braun, presumably.

THE COURT: I don't know that whether or not Mr. Braun is involved in this case or not, at the end of the day matters, to be quite frank with you.

Let's talk this through.

If Mr. Braun is involved in this transaction, from my perspective, it's okay, maybe you get a deposition.  Who cares.

Proceedings

What ultimately will matter under the circumstances, is in applying applicable law, whether or not your counterclaims are legitimate or they are not legitimate when you assert them, and whether or not the plaintiffs are entitled to what it is that they seek in the case.  That has almost nothing to do with Mr. Braun in the context of this action. This is not a 6312 action against Mr. Braun, where I will be ordering -- that's not this case.  I did that case, as I said before, and I still have a piece of that case as it turns out, which I will be hearing in February -- stay tuned -- or maybe March, I don't know.  The briefing was just extended to February.

Are we good, are we done?

MR. HESKIN: We're good.

Well, I will see.

MR. WELLS: I have one issue.

So what's going to happen with the bank subpoenas, because if they have been served on the bank, I want to make sure and we can submit something with regards to the documents --

THE COURT: You guys should meet and confer as it relates to this stuff. I honestly think that you guys should direct a review of the statements to remove anything not relevant to them.  Do your own relevance

48

Proceedings

review as it relates to transactions not at issue in this case.  And what I mean by, this case, is as it relates to where we all are going to be there for reasserting counterclaims in this case.

Does anybody in TV land need to be heard at this point, or are we all good at this point?

(Whereupon, there was no response.)

Okay, thank you.

I hope everyone had a very Happy New Year.  I look forward to seeing all of you in TV land, or maybe in person at some point. It's a wonderful building, and I'm supposed to encourage you to come to the building and take advantage of it. This is my strong pitch to come to Part 53. On the other hand, if it is more efficient to do what it is that you are doing from where you are, I'm totally cool with that too.  So whatever you want to do.

Thank you. Thanks, everyone.

Bye.

MR. HESKIN: Thank you, Your Honor.

MR. MURRAY: Thank you, Your Honor.

MR. WELLS: Thank you, Your Honor.

*       *       *

49

THE ABOVE IS CERTIFIED TO BE
A TRUE AND ACCURATE TRANSCRIPT
OF THE PROCEEDING RECORDED BY ME

*Monica S. Horvath*

MONICA HORVATH
SENIOR COURT REPORTER

1

## $

**$100,000** [1] - 19:20
**$220,000** [1] - 19:20
**$250,000** [6] - 12:20, 15:3, 15:7, 15:11, 15:16, 19:17
**$510,000** [1] - 7:16

## 1

**10007** [1] - 3:6
**10018** [1] - 2:14
**10036** [2] - 2:18, 3:17
**10038** [1] - 3:9
**10104-0101** [1] - 2:10
**1019** [11] - 3:1, 4:15, 25:15, 25:19, 25:21, 25:22, 28:6, 30:1, 35:11, 37:10
**103** [1] - 6:23
**11501** [1] - 2:21
**1200** [1] - 3:14
**1290** [1] - 2:9
**12th** [1] - 27:11
**14086-1040** [1] - 2:6
**15** [4] - 14:12, 14:18, 14:20, 14:21
**1501** [2] - 3:2, 3:9
**170** [1] - 2:21
**1700** [1] - 3:14
**175** [1] - 3:5
**189** [1] - 19:19
**19** [2] - 34:21, 40:12
**190** [1] - 19:20

## 2

**2** [2] - 3:13, 38:23
**2.5** [1] - 15:8
**2.7** [9] - 7:13, 8:9, 9:12, 9:17, 12:2, 13:16, 15:12, 15:14, 17:8
**200** [1] - 3:2
**2001** [2] - 43:2, 43:8
**2021** [1] - 43:9
**2022** [1] - 4:2
**2024** [1] - 1:23
**229** [1] - 2:6
**23226** [1] - 3:2
**25** [2] - 19:4, 19:16
**250,000** [1] - 15:9
**2900** [1] - 2:17

## 3

**33136-4118** [1] - 3:14
**334** [2] - 18:17, 18:21
**34** [1] - 18:22

## 4

**4** [1] - 1:23
**40** [1] - 3:9
**415** [1] - 14:16
**453** [2] - 14:12, 14:17

## 5

**5-1401** [3] - 12:19, 13:25, 15:18
**50** [1] - 19:5
**53** [5] - 1:1, 20:21, 20:25, 34:11, 48:14
**570** [1] - 2:13

## 6

**60** [1] - 1:22
**608** [1] - 2:21
**63** [2] - 10:25
**6312** [2] - 10:23, 47:7
**650582** [1] - 4:1
**650582/22** [1] - 1:5

## 7

**7** [2] - 2:17, 3:17

## A

**abeyance** [1] - 32:12
**ability** [2] - 8:21, 21:23
**able** [3] - 23:22, 35:24, 40:22
**ABOVE** [1] - 49:2
**abscond** [1] - 36:22
**absence** [1] - 39:2
**absolutely** [1] - 32:19
**accept** [1] - 39:16
**ACCORDIA** [1] - 1:9
**account** [1] - 28:13
**accounts** [1] - 41:18
**ACCURATE** [1] - 49:2
**act** [2] - 35:8, 35:24
**acting** [2] - 28:6, 35:18
**action** [4] - 7:12, 29:20, 47:7
**acts** [1] - 35:6
**ad** [1] - 22:18
**adding** [1] - 41:23
**address** [4] - 13:19, 24:19, 35:12
**addressed** [1] - 12:14
**admitted** [2] - 25:20, 25:24
**Advance** [10] - 7:25, 8:4, 8:5, 8:7, 8:14, 8:25, 11:19, 16:18, 17:15, 18:8
**advanced** [2] - 9:1, 12:2
**Advances** [1] - 19:11
**advantage** [1] - 48:13
**affect** [1] - 35:13
**affected** [1] - 37:9
**affects** [1] - 26:9
**agent** [1] - 39:23
**agents** [2] - 29:25, 31:22
**ago** [1] - 6:2
**agree** [12] - 7:11, 18:4, 24:2, 24:4, 32:2, 32:23, 35:15, 37:11, 37:23, 39:17, 40:24
**agreed** [2] - 10:6, 34:6
**agreeing** [1] - 45:20
**Agreement** [6] - 8:14, 18:8, 18:20, 33:3, 44:6, 44:20
**agreement** [3] - 17:3, 29:12, 42:3
**agreements** [10] - 8:24, 13:2, 13:4, 13:16, 17:5, 18:14, 21:19, 41:20, 41:21, 43:19
**Agreements** [13] - 8:25, 9:7, 9:10, 11:17, 11:19, 11:23, 15:2, 15:5, 16:19, 16:25, 18:12, 18:13, 41:25
**ahead** [3] - 7:11, 14:10, 35:1
**allegations** [1] - 44:19
**allow** [1] - 25:24
**allowed** [2] - 8:15, 12:9
**almost** [1] - 47:6
**alternative** [2] - 40:2, 40:8
**ambient** [1] - 5:7
**AMERICAN** [1] - 1:8
**Americas** [1] - 2:9
**amount** [7] - 5:12, 6:4, 15:7, 19:2, 19:20, 20:25, 30:12
**Analysis** [11] - 9:5, 10:18, 10:24, 12:18, 13:5, 13:17, 13:22, 14:1, 16:11, 16:18
**analysis** [6] - 9:13, 11:1, 12:3, 15:5, 16:21, 25:17
**AND** [3] - 1:9, 3:4, 49:2
**ANDREW** [1] - 2:2
**ANNUITY** [1] - 1:9
**answer** [4] - 7:17, 26:17, 39:20, 44:24
**anyway** [1] - 12:9
**apologize** [3] - 14:19, 14:22, 18:23
**Appeals** [4] - 12:22, 13:20, 13:21, 16:9
**appearance** [2] - 5:19, 25:12
**APPEARANCES** [1] - 2:4
**appearances** [2] - 2:23, 4:3
**appearing** [1] - 5:6
**Appellate** [3] - 24:5, 24:6, 24:8
**applicable** [1] - 47:2
**application** [2] - 38:13, 38:18
**applied** [5] - 8:23, 11:6, 11:9, 13:4, 13:13
**applies** [6] - 9:9, 9:11, 15:6, 20:8, 20:9, 20:11
**apply** [8] - 9:15, 13:6, 13:8, 13:14, 16:4, 16:6, 16:15, 20:14
**applying** [1] - 47:2
**appointed** [2] - 4:8, 33:5
**Appointed** [1] - 2:13
**appointment** [1] - 36:19
**appreciate** [5] - 5:5, 5:14, 27:8, 31:9, 37:13
**approach** [1] - 24:25
**appropriate** [15] - 6:4, 8:21, 9:5, 21:20, 24:18, 24:19, 31:9, 34:17, 40:25, 41:2, 41:5, 41:7, 41:8, 41:17, 41:21
**argue** [1] - 11:2
**argument** [5] - 7:4, 15:1, 16:5, 26:5, 31:21
**arguments** [1] - 10:17
**arrest** [1] - 28:7
**article** [2] - 43:10, 43:13
**assert** [2] - 24:11, 47:4
**asserted** [1] - 14:7
**asserting** [1] - 24:11
**assigned** [1] - 31:1
**assuming** [2] - 40:19, 42:6
**attention** [1] - 18:17
**Attorney** [8] - 2:5, 2:9, 3:1, 3:5, 3:12, 3:16, 23:5, 42:14
**attorney** [2] - 2:17, 2:20
**attorneys** [2] - 3:8, 9:17
**audio** [1] - 5:3
**August** [1] - 9:3
**authority** [3] - 12:22, 33:7, 40:7
**authorizations** [1] - 36:7
**authorize** [1] - 33:20
**Ave** [3] - 2:13, 3:2, 3:14
**Avenue** [1] - 2:9
**AVRUMI** [1] - 1:19
**aware** [2] - 20:23, 21:7

## B

**bad** [4] - 8:3, 8:5, 43:9, 44:19
**bank** [6] - 18:2, 22:12, 41:6, 41:14, 47:18, 47:19
**bankruptcy** [1] - 11:13
**Bar** [33] - 8:2, 8:13, 9:7, 9:10, 11:17, 11:23, 15:1, 15:5, 15:12, 15:15, 16:24, 17:21, 17:23, 18:12, 18:13, 19:5, 19:9, 19:10, 19:15, 22:13, 34:22, 37:17, 40:16, 41:11, 41:16, 41:20, 41:25, 42:4, 42:8, 44:4, 45:5, 46:1, 46:14
**Bar's** [1] - 46:5
**bare** [1] - 33:25
**based** [8] - 16:8, 22:6, 23:11, 23:19, 37:22, 42:21, 43:24, 44:2
**basis** [3] - 8:19, 23:16, 35:5
**BE** [1] - 49:2
**bear** [1] - 41:17
**BEFORE** [1] - 2:1
**began** [1] - 43:2
**beginning** [1] - 14:17
**behalf** [12] - 4:11, 4:12, 4:14, 4:16, 4:19, 4:21, 4:23, 5:24, 17:6, 25:21, 35:10, 35:24
**believes** [1] - 40:25
**best** [1] - 27:5
**better** [3] - 24:15, 26:14, 29:6

**betting** [2] - 45:3
**between** [8] - 13:11, 17:20, 17:23, 22:16, 25:15, 32:25, 41:11, 42:8
**binding** [3] - 10:16, 11:9, 14:2
**bit** [2] - 24:13, 45:19
**BMF** [13] - 2:20, 4:13, 8:2, 19:4, 19:9, 19:10, 19:15, 22:13, 34:21, 37:19, 38:8, 40:13, 42:8
**BORROK** [1] - 2:2
**borrower** [2] - 10:12, 10:15
**bottom** [3] - 14:18, 14:21, 21:15
**Braun** [17] - 42:9, 42:10, 42:13, 42:21, 42:23, 43:1, 43:24, 44:2, 44:8, 44:9, 44:11, 44:19, 46:17, 46:20, 46:23, 47:6, 47:8
**Braun's** [3] - 43:17, 43:20, 44:17
**breach** [3] - 7:6, 7:10, 7:12
**breached** [1] - 7:16
**breadth** [2] - 21:16, 38:2
**breath** [1] - 33:14
**Brezel** [4] - 43:16, 43:17, 43:18
**brief** [7] - 7:1, 12:23, 13:20, 14:12, 14:13, 19:18, 24:24
**briefed** [4] - 12:25, 14:6, 14:11
**briefing** [1] - 47:12
**BRIGHTHOUSE** [1] - 1:10
**Brighthouse** [7] - 3:8, 4:17, 29:9, 29:14, 29:21, 32:3, 32:13
**Brighthouse's** [1] - 30:19
**bring** [8] - 12:12, 26:19, 27:1, 29:9, 33:24, 34:7, 34:14, 37:7
**Broad** [1] - 21:2
**broad** [2] - 18:3, 45:19
**broader** [1] - 6:11
**brought** [1] - 34:13
**Bryan** [1] - 4:4
**BRYAN** [1] - 2:8
**building** [2] - 48:11, 48:12

**BURK** [1] - 3:8
**business** [2] - 21:14, 41:4
**businesses** [2] - 35:8, 35:14
**BY** [8] - 2:7, 2:10, 2:14, 2:18, 3:6, 3:10, 3:18, 49:3
**bye** [1] - 48:19

**C**

**Caitlin** [1] - 4:19
**CAITLIN** [1] - 3:6
**California** [6] - 9:11, 9:24, 13:17, 16:4, 24:16, 25:20
**Cap** [2] - 3:16, 4:24
**CAP** [1] - 1:10
**cap** [4] - 9:12, 12:2, 13:16, 13:17
**capacity** [1] - 37:9
**Capital** [6] - 4:1, 10:22, 11:8, 21:1, 21:3, 42:22
**CAPITAL** [2] - 1:3, 1:19
**caption** [2] - 26:3, 27:23
**care** [1] - 30:5
**career** [1] - 33:15
**cares** [1] - 46:25
**Carlton** [1] - 3:13
**Carolina** [2] - 10:9, 13:6
**case** [59] - 6:8, 6:12, 7:22, 7:24, 8:7, 9:1, 10:7, 10:10, 10:13, 10:16, 10:21, 10:22, 11:4, 13:1, 13:15, 13:20, 14:7, 15:22, 16:2, 16:9, 16:11, 16:16, 17:9, 18:8, 20:2, 20:4, 21:4, 21:5, 22:20, 22:22, 22:23, 22:24, 26:4, 27:11, 27:23, 29:13, 31:2, 31:19, 32:25, 33:3, 33:4, 36:19, 41:1, 41:10, 41:19, 42:13, 42:16, 42:22, 43:14, 46:20, 47:6, 47:9, 47:10, 48:2, 48:4
**Cash** [14] - 7:25, 8:4, 8:5, 8:7, 8:14, 8:24, 11:10, 11:18, 16:18, 17:15, 18:7, 19:10, 33:3, 44:5
**CASHMAN** [1] - 3:16

**caused** [3] - 26:13, 27:12, 27:14
**CAVE** [1] - 2:8
**Cave** [1] - 4:4
**CELIA** [1] - 3:10
**center** [1] - 11:19
**Center** [4] - 10:7, 12:17, 13:5, 13:12
**Central** [1] - 3:13
**Centre** [1] - 1:22
**certain** [2] - 7:18, 9:7
**certainly** [8] - 21:20, 22:5, 23:13, 26:12, 26:19, 33:4, 39:10, 44:7
**certified** [1] - 20:22
**CERTIFIED** [1] - 49:2
**chair** [2] - 24:22, 24:23
**chance** [4] - 10:3, 11:5, 12:15, 13:8
**charged** [1] - 41:19
**Chase** [1] - 41:14
**choice** [5] - 8:25, 9:16, 13:1, 13:23
**Choice** [5] - 9:5, 10:18, 13:3, 13:4, 15:4
**chose** [1] - 33:8
**chosen** [1] - 12:16
**CHRISTOPHER** [1] - 2:22
**Christopher** [1] - 4:12
**circumstances** [11] - 13:18, 22:4, 27:20, 31:10, 31:17, 36:17, 37:4, 40:8, 41:5, 41:7, 47:2
**citation** [1] - 39:1
**cited** [1] - 12:22
**Citibank** [1] - 41:13
**CIVIL** [1] - 1:1
**claim** [2] - 39:6, 41:1
**claiming** [6] - 8:23, 38:15, 38:19, 38:23, 41:25
**claims** [9] - 7:5, 7:7, 7:10, 9:6, 9:20, 17:7, 17:12, 20:5, 41:9
**clarification** [1] - 37:6
**clear** [5] - 15:25, 27:17, 28:22, 36:9, 37:3
**clearing** [1] - 36:14
**clearly** [2] - 30:2, 31:22
**Clerk's** [1] - 27:5
**client** [7] - 38:6, 38:14, 38:20, 38:22, 38:24, 39:19, 44:6

**clients** [2] - 17:6, 25:14
**CO** [2] - 1:8, 1:10
**colleague** [2] - 12:6, 32:17
**colleagues** [1] - 6:2
**collection** [1] - 7:19
**commenced** [1] - 29:21
**commercial** [2] - 15:19, 33:3
**communications** [2] - 42:8, 45:23
**COMPANY** [2] - 1:9, 1:9
**Company** [3] - 4:17, 4:22, 5:24
**company** [1] - 39:22
**compel** [4] - 14:14, 34:21, 35:8, 38:6
**compelling** [2] - 16:5, 23:23
**competing** [1] - 29:18
**complete** [2] - 23:17, 23:23
**components** [1] - 29:8
**concern** [1] - 45:21
**conducted** [1] - 17:4
**confer** [4] - 22:3, 38:1, 39:9, 47:22
**conflict** [2] - 13:11, 25:15
**Conflict** [3] - 13:22, 13:25, 16:10
**confusion** [2] - 36:14, 36:15
**connected** [2] - 11:23, 43:17
**connects** [1] - 42:23
**consider** [3] - 10:19, 10:21, 16:1
**consideration** [1] - 31:10
**considered** [1] - 15:2
**considering** [1] - 20:23
**consistent** [1] - 20:2
**contact** [1] - 10:8
**contained** [1] - 38:11
**contemplation** [1] - 16:23
**contempt** [7] - 25:8, 26:9, 28:21, 32:10, 36:13, 38:7, 38:13
**context** [1] - 47:7
**continually** [1] - 16:24
**Continued** [1] - 2:23
**contract** [7] - 7:10, 10:4, 10:5, 11:6, 12:17, 13:9, 13:24

**contracts** [3] - 15:11, 17:17, 17:19
**Contracts** [1] - 17:15
**controls** [1] - 35:6
**contumacious** [1] - 36:10
**conversation** [8] - 6:12, 12:6, 12:7, 21:20, 37:15, 37:23, 41:3, 44:10
**convinced** [1] - 16:3
**cookie** [1] - 29:3
**cool** [1] - 48:16
**cooperate** [3] - 30:2, 30:4, 31:23
**cooperation** [1] - 31:24
**copy** [1] - 43:18
**cost** [3] - 29:11, 32:21, 34:1
**counsel** [6] - 25:18, 26:21, 33:20, 33:25, 36:1, 44:12
**Counsel** [1] - 3:6
**count** [1] - 38:17
**counterclaim** [4] - 24:1, 24:10, 24:12
**counterclaims** [16] - 6:13, 7:18, 7:21, 8:16, 8:17, 8:20, 8:21, 8:22, 14:7, 17:7, 21:19, 23:13, 41:10, 47:3, 48:4
**Country** [1] - 2:21
**COUNTY** [1] - 1:1
**couple** [2] - 24:22, 29:8
**course** [1] - 10:4
**COURT** [102] - 1:1, 3:24, 4:1, 4:25, 5:25, 6:17, 6:19, 7:3, 7:11, 7:23, 8:8, 9:25, 10:11, 11:16, 12:24, 13:10, 14:4, 14:10, 14:15, 14:19, 14:22, 15:9, 15:14, 15:24, 16:12, 16:20, 17:18, 17:22, 18:4, 18:10, 18:18, 18:21, 18:23, 19:1, 19:8, 19:23, 20:16, 21:10, 21:12, 22:1, 22:15, 22:22, 23:3, 23:9, 23:21, 24:17, 24:21, 25:1, 25:6, 25:25, 26:18, 26:25, 27:8, 28:7, 28:15, 28:18, 28:24, 29:5, 30:10, 30:25, 31:14, 32:2, 32:16, 32:23, 33:22, 34:5,

3

34:9, 34:13, 34:17, 34:20, 34:25, 35:15, 36:5, 37:13, 37:17, 37:20, 37:25, 39:13, 40:2, 40:6, 40:11, 40:19, 41:2, 42:10, 43:4, 43:6, 43:8, 43:10, 43:22, 44:16, 44:22, 45:2, 45:15, 45:19, 45:25, 46:3, 46:6, 46:9, 46:12, 46:19, 47:22, 49:5
**court** [5] - 4:8, 20:5, 32:24, 36:8, 39:2
**Court** [26] - 2:13, 9:15, 9:19, 10:17, 10:19, 11:10, 11:20, 12:13, 12:22, 13:19, 13:21, 16:9, 20:20, 26:13, 27:13, 29:20, 30:5, 30:7, 30:8, 30:20, 31:7, 31:19, 32:6, 32:7, 32:12
**Court's** [2] - 18:16, 37:11
**courtroom** [2] - 5:3, 21:6
**courts** [1] - 27:3
**Courts** [1] - 20:3
**cousin** [2] - 43:17, 44:20
**CPLR** [1] - 6:23
**craft** [1] - 22:5
**creating** [1] - 30:12
**criminal** [2] - 28:20, 36:13
**Cross** [1] - 2:20
**cross** [1] - 4:13
**Cross-Movant** [1] - 2:20
**cross-movant** [1] - 4:13
**current** [1] - 35:12
**cut** [3] - 17:11, 19:16, 28:9
**cutting** [1] - 21:22
**CUYLER** [1] - 3:8

**D**

**d'ARCAMBAL** [1] - 3:8
**dance** [2] - 21:8, 27:4
**Daniel** [1] - 4:23
**DANIEL** [1] - 3:18
**darn** [1] - 26:14
**database** [2] - 44:24, 45:6
**date** [1] - 39:4
**days** [1] - 34:11

**deal** [2] - 7:25, 40:22
**deals** [1] - 23:9
**dealt** [3] - 10:22, 33:3, 34:20
**debt** [5] - 7:20, 8:11, 11:25, 21:24, 30:22
**debts** [1] - 19:12
**decide** [2] - 20:11, 30:8
**decided** [1] - 20:9
**decision** [10] - 9:2, 9:3, 10:2, 11:3, 12:14, 20:13, 31:16, 32:8, 39:2, 43:13
**deemed** [2] - 10:6, 39:11
**default** [1] - 11:13
**defeat** [1] - 29:7
**defendant** [2] - 26:3, 27:23
**Defendant** [10] - 1:11, 1:20, 2:17, 3:1, 3:5, 3:8, 3:12, 3:16, 27:22, 45:11
**defendants** [4] - 16:2, 21:3, 22:24, 29:13
**Defendants** [7] - 4:11, 7:14, 7:17, 17:21, 21:2, 42:8
**Defendants'** [1] - 14:13
**defer** [2] - 31:7, 32:8
**definitely** [1] - 12:25
**delve** [1] - 6:12
**demonstrated** [1] - 17:8
**demonstrating** [1] - 11:21
**denies** [1] - 22:5
**deny** [1] - 40:12
**deposit** [1] - 35:4
**deposited** [3] - 30:20, 36:16, 36:21
**deposition** [5] - 6:24, 18:1, 23:18, 24:20, 46:25
**describing** [1] - 11:18
**designate** [3] - 13:1, 15:18, 15:23
**designated** [4] - 10:3, 11:5, 12:16, 13:8
**despite** [1] - 35:8
**determination** [1] - 29:22
**determine** [2] - 7:2, 13:13
**determined** [1] - 20:12
**different** [2] - 10:23, 44:10
**direct** [5] - 18:16,

27:18, 35:18, 36:9, 47:24
**directed** [1] - 38:8
**directs** [1] - 22:7
**disagree** [2] - 8:9, 24:8
**disclosed** [1] - 45:10
**discovery** [19] - 8:18, 8:19, 9:19, 16:23, 17:11, 18:1, 20:6, 21:21, 22:7, 23:17, 23:22, 40:25, 41:9, 43:24, 44:1, 44:8, 44:10, 44:13, 44:22
**discussed** [2] - 34:22, 44:7
**discussing** [2] - 14:1, 44:5
**disguised** [1] - 41:25
**dismiss** [5] - 8:22, 9:6, 20:9, 20:11, 23:25
**dismissed** [6] - 6:13, 8:17, 9:20, 9:23, 17:12, 20:5
**dispute** [1] - 32:25
**disputed** [2] - 7:14, 18:7
**disputes** [1] - 7:8
**distribution** [9] - 25:10, 25:13, 25:16, 26:11, 26:14, 27:12, 27:14, 35:19
**District** [2] - 20:4, 31:2
**Division** [3] - 24:5, 24:6, 24:8
**Doc** [2] - 14:12, 14:17
**Docket** [2] - 18:17, 19:19
**docket** [3] - 25:22, 26:2, 26:21
**document** [2] - 18:19, 19:14
**documents** [3] - 23:19, 23:20, 47:21
**Documents** [1] - 27:17
**dollar** [1] - 19:22
**done** [4] - 20:2, 20:3, 45:6, 47:14
**DORADO** [2] - 1:6, 1:14
**drop** [2] - 39:24
**Drye** [2] - 4:20, 5:23
**DRYE** [1] - 3:4
**during** [1] - 36:21
**Dustin** [1] - 4:14
**DUSTIN** [1] - 3:1
**Dyer** [7] - 4:14, 25:17, 26:19, 26:24, 27:1, 34:23, 35:1

**DYER** [6] - 3:1, 4:14, 27:2, 28:4, 35:2, 37:5

**E**

**e-mail** [4] - 28:20, 42:12, 42:14, 42:23
**e-mails** [2] - 44:4, 45:4
**early** [1] - 42:12
**easier** [1] - 5:13
**Eastern** [1] - 20:4
**efficient** [1] - 48:15
**either** [1] - 30:19
**EL** [1] - 1:14
**ELDO** [1] - 1:15
**elephant** [1] - 9:8
**encourage** [1] - 48:12
**end** [1] - 46:20
**enforceability** [1] - 7:6
**enforceable** [1] - 10:6
**engaging** [1] - 13:25
**enhanced** [1] - 26:15
**enjoin** [1] - 35:25
**enjoined** [3] - 27:20, 28:5, 35:17
**enter** [1] - 10:5
**entered** [2] - 25:12, 43:16
**enterprise** [1] - 43:20
**entertain** [1] - 39:10
**entire** [3] - 8:4, 21:1, 41:4
**entirely** [1] - 20:2
**entities** [4] - 23:2, 35:10, 35:25
**entitled** [6] - 17:24, 22:15, 22:17, 30:23, 43:22, 47:5
**entity** [2] - 15:13, 27:22
**entries** [2] - 19:3, 19:4
**Entries** [1] - 19:19
**Entry** [1] - 18:17
**envision** [1] - 41:23
**escrow** [1] - 28:13
**ESQ** [10] - 2:7, 2:10, 2:14, 2:18, 2:22, 3:1, 3:6, 3:10, 3:12, 3:18
**esq** [1] - 3:7
**essentially** [1] - 8:6
**event** [5] - 10:17, 11:13, 16:1, 16:5, 21:6
**exact** [2] - 30:9, 30:20
**exactly** [3] - 19:25, 25:4, 27:18
**examine** [1] - 21:23
**exceed** [1] - 15:11
**exceeded** [4] - 9:17,

9:18, 11:8, 12:3
**exceeds** [1] - 15:7
**exception** [1] - 29:12
**executed** [1] - 7:15
**Executive** [1] - 10:23
**exhausting** [1] - 23:7
**exist** [8] - 30:21, 42:7, 46:8, 46:10, 46:12, 46:16, 46:17
**exists** [1] - 29:25
**expenses** [2] - 18:5, 34:18
**explicit** [1] - 30:3
**explore** [3] - 8:15, 17:24, 42:4
**exploring** [2] - 21:18, 41:4
**express** [2] - 13:23
**extended** [1] - 47:12
**extent** [5] - 33:19, 36:13, 41:12, 41:24, 44:4

**F**

**face** [3] - 29:16, 38:11, 39:4
**facially** [2] - 8:9, 11:24
**facing** [1] - 26:10
**fact** [8] - 8:1, 11:25, 13:3, 17:3, 21:23, 39:6, 44:2, 44:25
**FACTOR** [3] - 1:6, 1:10, 1:14
**Factor** [2] - 3:16, 4:24
**factored** [1] - 12:14
**factors** [1] - 11:11
**facts** [3] - 7:1, 7:24, 41:1
**fair** [2] - 14:24, 22:10
**fairly** [1] - 31:13
**fall** [1] - 17:10
**familiar** [1] - 33:6
**family** [1] - 44:2
**far** [3] - 22:12, 38:19, 40:25
**Fashion** [1] - 2:13
**February** [4] - 9:2, 43:2, 47:11, 47:13
**Federal** [8] - 20:3, 29:19, 30:20, 31:19, 32:5, 32:6, 32:7, 32:12
**fee** [1] - 39:3
**feedback** [3] - 5:13, 6:4, 30:12
**fees** [6] - 9:17, 34:13, 34:18, 38:25, 41:19, 46:3
**few** [1] - 6:2

4

**fiduciary** [1] - 28:6
**Fields** [1] - 3:13
**fight** [1] - 30:23
**figure** [1] - 25:23
**figured** [1] - 34:7
**file** [5] - 25:20, 26:1, 26:25, 27:7, 35:9
**filed** [2] - 7:17, 23:14
**final** [1] - 19:12
**financial** [1] - 41:16
**fine** [2] - 19:1, 45:12
**first** [13] - 7:22, 8:2, 9:10, 9:13, 13:10, 14:6, 17:14, 19:19, 23:9, 23:22, 31:12, 33:2, 33:4
**five** [1] - 19:11
**fix** [1] - 28:1
**fixed** [1] - 17:1
**Florida** [2] - 3:14, 39:22
**focus** [1] - 10:13
**focused** [1] - 10:11
**folks** [1] - 5:2
**FOOTHILL** [2] - 1:6, 1:13
**Foothill** [3] - 2:17, 3:12, 4:22
**foreign** [1] - 13:12
**forfeit** [1] - 35:14
**forget** [2] - 12:25, 31:12
**forward** [3] - 16:24, 23:24, 48:10
**foundation** [1] - 44:5
**frank** [1] - 46:21
**Fred** [1] - 4:8
**FREDERICK** [1] - 2:14
**front** [3] - 11:19, 11:20, 31:4
**frustrate** [1] - 14:2
**fully** [3] - 12:25, 14:6, 14:11
**Fulton** [1] - 3:9
**FUND** [2] - 1:8, 1:16
**funds** [3] - 30:22, 32:1, 32:3
**furthermore** [1] - 38:13

**G**

**general** [3] - 18:6, 33:8, 46:5
**General** [6] - 11:8, 12:18, 13:24, 15:17, 23:5, 42:15
**generally** [1] - 33:21
**GENESIS** [2] - 1:8, 1:15

**Getters** [1] - 39:22
**giants** [1] - 20:19
**given** [1] - 25:16
**GOLDEN** [2] - 1:6, 1:13
**Golden** [1] - 2:17
**grant** [1] - 21:22
**granted** [3] - 34:15, 34:18, 36:20
**Gravity** [4] - 10:7, 12:17, 13:5, 13:13
**great** [2] - 24:17, 27:8
**Greater** [1] - 10:24
**Greenwich** [1] - 3:5
**Group** [1] - 21:3
**guaranty** [2] - 7:7, 7:15
**guess** [3] - 9:12, 19:13, 38:21
**guessed** [1] - 45:4
**guy** [4] - 24:21, 24:23, 25:1, 28:1
**guys** [6] - 20:10, 20:14, 20:19, 21:12, 47:22, 47:23

**H**

**H-O** [1] - 31:12
**hac** [3] - 25:21, 26:1, 26:25
**Hamdan** [1] - 4:4
**HAMDAN** [3] - 2:10, 4:4, 36:4
**HANCOCK** [1] - 1:9
**Hancock** [7] - 3:5, 4:19, 5:24, 25:10, 26:11, 27:23, 36:8
**hand** [2] - 44:4, 48:14
**hands** [5] - 28:10, 28:15, 28:18, 30:19, 36:11
**Happy** [1] - 48:9
**happy** [1] - 26:17
**harbor** [3] - 15:3, 15:6, 17:10
**Harbor** [1] - 19:23
**hard** [3] - 5:14, 13:16, 30:14
**Haymount** [3] - 9:1, 10:2, 21:4
**head** [1] - 20:13
**hear** [5] - 5:6, 5:8, 6:21, 26:23, 30:15
**heard** [5] - 25:24, 29:5, 38:1, 38:5, 48:5
**hearing** [1] - 47:11
**held** [2] - 9:16, 13:21
**helpful** [1] - 6:25

**HESKIN** [46] - 2:18, 4:10, 18:15, 18:19, 18:22, 18:24, 19:3, 19:9, 19:25, 22:11, 23:15, 24:14, 24:18, 24:24, 25:4, 25:11, 26:16, 26:23, 28:12, 28:17, 28:23, 34:23, 37:16, 37:21, 39:15, 39:20, 40:4, 40:9, 40:14, 40:16, 40:22, 42:5, 42:25, 43:5, 43:7, 43:9, 43:12, 44:15, 45:13, 45:22, 46:2, 46:8, 46:10, 46:16, 47:15, 48:20
**Heskin** [9] - 4:11, 17:6, 20:23, 20:24, 21:8, 21:17, 27:15, 39:7, 39:14
**Heskin's** [1] - 39:1
**Hi** [33] - 8:2, 8:13, 9:7, 9:10, 11:17, 11:23, 15:1, 15:5, 15:12, 15:15, 16:24, 17:21, 17:23, 18:12, 18:13, 19:5, 19:9, 19:10, 19:15, 22:13, 34:22, 37:17, 40:16, 41:11, 41:16, 41:20, 41:25, 42:4, 42:8, 44:4, 45:5, 46:1, 46:14
**Hi-Bar** [33] - 8:2, 8:13, 9:7, 9:10, 11:17, 11:23, 15:1, 15:5, 15:12, 15:15, 16:24, 17:21, 17:23, 18:12, 18:13, 19:5, 19:9, 19:10, 19:15, 22:13, 34:22, 37:17, 40:16, 41:11, 41:16, 41:20, 41:25, 42:4, 42:8, 44:4, 45:5, 46:1, 46:14
**Hickey** [1] - 4:19
**HICKEY** [2] - 3:6, 4:18
**hiding** [1] - 45:1
**High** [1] - 46:5
**HILLS** [2] - 1:7, 1:14
**himself** [1] - 26:10
**hiring** [1] - 34:1
**history** [1] - 7:2
**Ho** [4] - 31:12, 31:15, 32:13, 33:11
**hold** [4] - 28:20, 32:10, 32:12, 36:12
**holding** [3] - 9:14, 33:14, 35:17
**HOLDINGS** [2] - 1:8, 1:16

**holds** [1] - 44:24
**honestly** [1] - 47:23
**Honor** [43] - 4:10, 4:18, 6:16, 6:18, 6:22, 8:6, 9:22, 11:6, 14:11, 15:8, 16:8, 16:16, 16:17, 18:25, 21:7, 23:15, 25:11, 27:2, 28:4, 28:23, 29:6, 30:17, 31:25, 32:15, 32:20, 33:16, 34:2, 34:12, 34:16, 34:19, 35:2, 36:4, 37:19, 38:4, 38:20, 39:18, 40:10, 40:14, 40:15, 42:5, 48:20, 48:21, 48:22
**Honor's** [1] - 30:3
**HONORABLE** [1] - 2:2
**hope** [2] - 23:6, 48:9
**hopefully** [1] - 33:10
**HORVATH** [2] - 3:24, 49:5
**hour** [1] - 27:12

**I**

**idea** [1] - 44:22
**identified** [1] - 42:13
**II** [4] - 1:6, 1:14
**imagine** [1] - 31:6
**important** [2] - 25:9, 25:10
**inapposite** [1] - 10:25
**INC** [3] - 1:14, 1:15, 1:16
**INC.,ELDO** [1] - 1:7
**INC.,LONE** [1] - 1:7
**INC.,ZURICH** [1] - 1:8
**inclined** [1] - 42:17
**include** [2] - 35:10, 41:10
**included** [1] - 16:24
**incomplete** [1] - 24:6
**indefinite** [1] - 11:12
**independent** [1] - 25:18
**INDEX** [1] - 1:4
**Index** [1] - 4:1
**indicating** [1] - 9:4
**individual** [2] - 35:5, 37:9
**individually** [1] - 28:5
**Industry** [3] - 8:1, 8:4, 8:5
**information** [1] - 44:23
**injunction** [6] - 35:20, 35:21, 35:23, 36:23, 36:25, 37:2

**insofar** [1] - 38:23
**instance** [2] - 9:10, 9:13
**instantly** [1] - 38:12
**instruction** [1] - 31:22
**instructions** [1] - 30:3
**insurance** [3] - 7:8, 27:24, 45:8
**INSURANCE** [9] - 1:6, 1:7, 1:7, 1:8, 1:9, 1:10, 1:13, 1:14, 1:15
**Insurance** [6] - 3:5, 3:8, 3:12, 4:17, 4:22, 5:24
**insured** [1] - 29:10
**intelligently** [1] - 29:14
**intend** [2] - 21:15, 27:2
**intended** [2] - 17:11, 37:3
**intention** [2] - 9:19, 24:12
**intents** [1] - 38:9
**intercede** [1] - 42:16
**interest** [1] - 9:18
**interplead** [1] - 29:21
**interpleader** [1] - 29:20
**invalidate** [3] - 11:6, 12:16, 27:16
**investigative** [1] - 23:4
**INVESTMENTS** [2] - 1:7, 1:15
**involve** [1] - 46:17
**involved** [5] - 22:23, 23:5, 44:25, 46:20, 46:23
**IRMA** [1] - 3:12
**Irma** [1] - 4:21
**IS** [1] - 49:2
**Isaac** [1] - 43:7
**issue** [25] - 8:24, 9:1, 9:16, 9:24, 10:23, 11:11, 12:13, 17:9, 18:8, 19:18, 19:19, 20:21, 26:9, 28:7, 29:10, 31:7, 32:13, 32:14, 33:2, 35:4, 36:6, 41:18, 44:14, 47:17, 48:1
**Issue** [1] - 19:23
**issued** [10] - 9:2, 9:3, 10:1, 27:17, 31:5, 32:4, 35:23, 36:7, 39:4, 39:25
**issues** [4] - 16:25, 29:17, 31:4, 38:21

5

**itself** [2] - 30:1, 31:23

## J

**JACLYN** [1] - 3:7
**Jaclyn** [1] - 5:23
**January** [2] - 1:23, 43:1
**jaws** [1] - 29:7
**job** [1] - 31:15
**JOHN** [1] - 1:9
**John** [6] - 3:5, 4:19, 5:24, 42:10, 42:13, 43:20
**Jonathan** [2] - 42:9, 43:1
**Joseph** [1] - 43:17
**Josh** [1] - 43:19
**Judge** [13] - 9:1, 9:2, 12:14, 13:1, 13:2, 20:7, 20:18, 20:20, 29:1, 31:12, 31:15, 32:13, 33:11
**judge** [3] - 31:1, 31:11, 33:5
**judges** [1] - 20:3
**Judiciary** [1] - 38:10
**jump** [1] - 27:11
**JURELLER** [1] - 2:12
**jurisdiction** [6] - 13:12, 26:6, 26:8, 26:13, 27:13, 32:24
**jurisdictionally** [1] - 38:9
**jurist** [1] - 20:16
**Justice** [3] - 2:2, 10:1, 11:3

## K

**keep** [2] - 5:11, 25:6
**KELLEY** [1] - 3:4
**Kelley** [2] - 4:20, 5:23
**Kelsey** [1] - 5:19
**kicked** [1] - 15:4
**kind** [4] - 14:5, 27:4, 29:17, 42:3
**KLESTADT** [1] - 2:12
**knocked** [4] - 15:12, 15:15, 19:21
**KTL** [1] - 1:16

## L

**Laith** [1] - 4:4
**LAITH** [1] - 2:10
**Lancaster** [1] - 2:6
**land** [2] - 48:5, 48:10
**last** [3] - 19:3, 19:4, 27:5

**laundry** [1] - 41:23
**law** [17] - 8:25, 9:16, 10:3, 10:6, 11:5, 12:16, 13:2, 13:8, 13:11, 13:13, 13:23, 15:23, 16:9, 16:10, 38:25, 47:2
**Law** [40] - 4:6, 8:23, 9:5, 9:9, 9:11, 9:14, 9:24, 10:18, 10:23, 10:24, 11:7, 11:8, 12:18, 12:19, 12:20, 13:3, 13:5, 13:6, 13:10, 13:11, 13:17, 13:22, 13:24, 13:25, 14:1, 15:4, 15:18, 16:4, 16:6, 16:10, 16:15, 17:9, 20:8, 20:10, 20:12, 24:16, 38:10, 41:13
**LAW** [1] - 2:5
**Laws** [3] - 8:13, 11:15, 16:17
**lawsuit** [3] - 29:18, 35:6, 36:22
**lawyers** [3] - 12:5, 22:7, 34:1
**least** [1] - 23:21
**leave** [1] - 23:14
**LEER** [4] - 1:10, 1:16, 1:16
**Leer** [28] - 4:11, 7:14, 7:17, 14:13, 17:20, 17:21, 26:10, 27:12, 27:20, 27:22, 28:4, 28:5, 28:8, 28:20, 35:7, 35:13, 35:17, 35:18, 35:21, 35:22, 36:6, 36:15, 36:22, 36:23, 37:8, 45:11, 45:24
**left** [1] - 12:7
**legal** [1] - 20:19
**LEGAL** [1] - 2:20
**legislative** [1] - 14:2
**legislature** [2] - 15:3, 16:13
**legitimate** [2] - 47:3, 47:4
**Leighton** [1] - 4:4
**LEIGHTON** [1] - 2:8
**lender** [2] - 11:22, 11:23
**lender/purchaser** [1] - 10:14
**less** [1] - 24:13
**LIFE** [6] - 1:8, 1:9, 1:9, 1:10, 1:13, 1:14
**Life** [19] - 3:1, 3:5, 3:8, 3:12, 4:14, 4:17,

4:22, 5:24, 25:15, 25:19, 25:21, 25:22, 28:6, 29:25, 30:1, 31:23, 35:10, 37:10, 43:18
**likely** [1] - 33:17
**Liman** [1] - 20:18
**limit** [3] - 6:24, 9:19, 21:25
**limited** [6] - 22:2, 33:7, 35:21, 35:22, 36:23, 36:24
**line** [2] - 21:15, 41:20
**list** [1] - 41:23
**listed** [1] - 26:21
**listen** [4] - 20:5, 20:10, 20:14, 25:14
**litigation** [3] - 19:15, 44:24, 45:5
**LLC** [10] - 1:3, 1:13, 1:14, 1:15, 1:16, 1:19, 3:16, 25:19, 35:6
**LLC,EL** [1] - 1:6
**LLC,KTL** [1] - 1:8
**LLC,LIFE** [2] - 1:6, 1:6
**LLC,STEFAN** [1] - 1:10
**LLC,THE** [1] - 1:8
**LLP** [5] - 2:8, 2:16, 3:4, 3:8, 3:16
**Loan** [1] - 27:16
**loan** [9] - 15:12, 16:16, 17:16, 18:20, 19:7, 19:13, 39:2, 41:5, 41:14
**loans** [4] - 11:14, 19:6, 42:1, 43:2
**located** [2] - 10:12, 39:23
**location** [1] - 10:14
**LONE** [1] - 1:15
**look** [11] - 7:21, 11:16, 16:25, 19:3, 20:17, 20:21, 21:15, 27:10, 43:23, 45:9, 48:10
**looked** [1] - 11:24
**looking** [2] - 21:17, 38:3
**looks** [1] - 8:9
**love** [1] - 39:15
**LS** [2] - 1:8, 1:15
**lst** [1] - 3:14
**Lubin** [1] - 43:19
**LUBIN** [1] - 1:19
**lumen** [1] - 6:25

## M

**mail** [6] - 28:20, 39:23,

39:24, 42:12, 42:14, 42:23
**mails** [2] - 44:4, 45:4
**man** [2] - 45:3
**mandatory** [1] - 11:12
**Maple** [1] - 3:2
**March** [2] - 43:3, 47:12
**Marchant** [1] - 44:5
**matter** [3] - 26:7, 32:21, 47:1
**matters** [2] - 30:7, 46:21
**MCA** [4] - 18:6, 44:20, 44:21, 46:5
**MCA's** [3] - 19:19, 43:2, 43:15
**ME** [1] - 49:3
**mean** [22] - 12:1, 13:15, 15:8, 15:10, 15:11, 17:23, 18:3, 18:11, 21:25, 22:20, 26:11, 26:18, 28:3, 28:24, 29:2, 33:23, 36:18, 37:7, 43:4, 44:18, 46:15, 48:2
**meet** [3] - 22:3, 38:1, 47:22
**member** [1] - 44:2
**mention** [3] - 8:1, 8:2
**Merchant** [12] - 7:25, 8:4, 8:5, 8:7, 8:14, 8:24, 11:10, 11:18, 16:18, 17:15, 18:7, 19:10
**mess** [1] - 18:12
**Metzinger** [1] - 5:23
**METZINGER** [2] - 3:7, 5:22
**Miami** [2] - 3:13, 3:14
**microphone** [5] - 5:4, 5:9, 5:11, 6:3, 6:20
**might** [3] - 44:25, 45:7
**MILLIOEN** [1] - 3:10
**million** [8] - 7:13, 8:9, 9:12, 12:2, 13:16, 15:8, 15:12, 17:8
**MILLOEN** [1] - 4:16
**Milloen** [1] - 4:16
**mind** [1] - 26:17
**Mineola** [1] - 2:21
**minutes** [1] - 6:2
**missed** [2] - 14:19, 14:22
**missing** [2] - 27:21, 28:1
**mission** [1] - 27:16
**misstated** [1] - 18:24
**modification** [2] - 33:18, 37:1
**modified** [1] - 36:25

**moment** [1] - 16:3
**money** [12] - 8:10, 8:12, 11:25, 12:1, 28:10, 28:12, 28:13, 30:6, 30:8, 42:2
**MONICA** [2] - 3:24, 49:5
**monies** [2] - 30:18, 36:20
**months** [2] - 9:3, 24:22
**morning** [5] - 4:10, 4:18, 4:25, 6:9, 28:19
**most** [2] - 10:8, 34:11
**motion** [27] - 6:23, 7:9, 9:6, 14:13, 20:11, 22:6, 23:14, 25:7, 25:8, 25:21, 26:1, 26:19, 26:25, 29:8, 32:12, 34:13, 34:14, 34:17, 34:21, 38:5, 38:8, 38:11, 39:12, 40:12, 40:18
**motions** [1] - 20:9
**Movant** [1] - 2:20
**movant** [1] - 4:13
**move** [5] - 12:13, 12:17, 36:25, 40:2, 40:7
**moved** [2] - 8:22, 25:25
**moves** [1] - 23:25
**moving** [2] - 14:12, 42:21
**MR** [114] - 4:4, 4:6, 4:8, 4:10, 4:12, 4:14, 4:23, 6:16, 6:18, 6:22, 7:4, 7:12, 7:24, 9:22, 10:1, 11:2, 12:12, 13:7, 13:19, 14:9, 14:11, 14:17, 14:21, 15:8, 15:10, 15:16, 16:8, 16:13, 17:14, 17:20, 17:25, 18:5, 18:15, 18:19, 18:22, 18:24, 19:3, 19:9, 19:25, 21:7, 21:11, 21:25, 22:11, 22:19, 23:1, 23:8, 23:15, 24:14, 24:18, 24:24, 25:4, 25:11, 26:16, 26:23, 27:2, 28:4, 28:12, 28:17, 28:23, 29:4, 29:6, 30:17, 31:12, 31:20, 32:15, 32:19, 33:16, 34:2, 34:6, 34:12, 34:16, 34:19, 34:23, 35:2, 36:4, 37:5,

37:16, 37:18, 37:21, 38:4, 39:15, 39:17, 39:20, 40:4, 40:9, 40:14, 40:15, 40:16, 40:18, 40:21, 40:22, 40:24, 42:5, 42:25, 43:5, 43:7, 43:9, 43:12, 44:15, 44:18, 45:1, 45:13, 45:17, 45:22, 46:2, 46:5, 46:8, 46:10, 46:16, 47:15, 47:17, 48:20, 48:21, 48:22
**MS** [4] - 4:16, 4:18, 4:21, 5:22
**MURRAY** [8] - 2:20, 2:22, 4:12, 37:18, 38:4, 39:17, 40:15, 48:21
**Murray** [6] - 4:12, 37:16, 37:22, 37:25, 39:15, 40:4
**must** [1] - 27:21
**mute** [2] - 6:3, 30:11
**muted** [2] - 5:11, 30:10

## N

**name** [1] - 31:13
**named** [1] - 29:19
**nasty** [4] - 28:3, 28:24, 29:2, 37:7
**nauseam** [1] - 22:18
**need** [13] - 6:6, 6:20, 9:4, 12:10, 12:25, 13:21, 14:5, 15:19, 33:21, 35:9, 35:22, 40:7, 48:5
**needs** [2] - 28:15, 44:13
**NELSON** [1] - 2:14
**never** [8] - 9:19, 17:10, 38:22, 38:24, 39:5, 39:6, 39:7, 45:1
**nevertheless** [1] - 25:2
**NEW** [2] - 1:1, 1:1
**new** [5] - 8:12, 19:7, 31:13, 39:9, 42:2
**New** [43] - 1:22, 2:6, 2:10, 2:14, 2:18, 2:21, 3:6, 3:9, 3:17, 8:23, 9:9, 9:14, 10:3, 11:5, 11:7, 12:16, 12:20, 13:10, 13:11, 13:24, 15:18, 16:6, 16:15, 17:9, 20:8, 20:10, 20:12, 21:9, 39:23, 41:13, 43:12,

48:9
**news** [1] - 30:18
**next** [1] - 30:6
**nice** [1] - 21:12
**nine** [3] - 7:22, 8:2, 33:4
**noise** [1] - 5:7
**Non** [1] - 2:20
**Non-party** [1] - 2:20
**none** [1] - 38:10
**nonparty** [2] - 4:13, 38:25
**normal** [2] - 34:10, 34:11
**North** [2] - 10:9, 13:6
**Note** [4] - 7:6, 7:13, 7:15, 11:7
**note** [1] - 33:17
**nothing** [3] - 7:22, 7:23, 47:6
**notice** [1] - 5:16
**Notices** [1] - 38:11
**notwithstanding** [2] - 13:3, 39:1
**nullity** [2] - 38:9, 39:8
**Number** [1] - 4:1
**NUMBER** [1] - 1:4
**number** [1] - 38:23
**NW** [1] - 3:14
**NYSCEF** [2] - 14:12, 14:17

## O

**obligation** [2] - 29:24, 29:25
**Obligation's** [3] - 11:8, 12:18, 13:25
**Obligations** [1] - 15:17
**obligations** [3] - 12:1, 30:9, 30:21
**obtain** [1] - 31:23
**obviated** [1] - 13:22
**obviously** [3] - 6:5, 27:3, 31:9
**occasion** [6] - 10:20, 11:16, 15:25, 16:7, 20:21, 33:2
**OF** [4] - 1:1, 1:1, 49:3
**Office** [1] - 27:5
**office** [1] - 43:20
**Officer** [1] - 37:9
**offices** [1] - 43:20
**Old** [1] - 2:21
**old** [4] - 8:12, 11:25, 19:6
**once** [3] - 23:6, 29:15, 38:17
**one** [23] - 5:15, 5:16,

8:25, 9:14, 12:12, 19:21, 19:22, 20:1, 20:23, 21:2, 21:3, 22:12, 24:2, 24:4, 29:11, 33:17, 34:24, 38:22, 42:1, 42:6, 42:23, 47:17
**open** [1] - 6:11
**operating** [1] - 43:19
**opportunity** [1] - 30:14
**oppose** [1] - 40:18
**opposition** [1] - 14:13
**Order** [14] - 6:11, 6:23, 21:22, 25:25, 26:19, 27:1, 31:21, 33:18, 33:19, 33:24, 36:25, 37:2, 40:3, 40:7
**order** [14] - 8:10, 22:5, 27:18, 29:15, 29:21, 30:3, 31:5, 32:4, 35:7, 35:18, 36:8, 37:2, 37:11, 37:12
**ordering** [1] - 47:8
**OUSLEY** [1] - 3:8
**overly** [1] - 18:3
**own** [2] - 20:13, 47:25

## P

**P.A** [1] - 3:13
**P.C** [1] - 2:5
**page** [1] - 13:20
**Page** [4] - 14:12, 14:18, 14:20, 14:21
**pages** [2] - 7:22, 8:3
**paid** [4] - 7:16, 19:11, 29:14, 39:7
**Paisner** [1] - 4:5
**PAISNER** [1] - 2:8
**papers** [3] - 12:4, 26:7, 42:20
**paperwork** [1] - 27:6
**PART** [1] - 1:1
**part** [5] - 8:11, 32:4, 33:1, 37:15, 45:20
**Part** [4] - 20:21, 20:25, 34:11, 48:14
**participated** [1] - 19:5
**participating** [2] - 19:7, 19:13
**participation** [2] - 41:12
**particular** [2] - 10:10, 11:4
**particularly** [1] - 25:9
**parties** [13] - 10:5, 12:20, 15:19, 17:4, 22:16, 22:23, 25:13, 25:14, 29:11, 30:21,

30:23, 32:25, 33:25
**party** [2] - 2:20, 29:19
**passed** [1] - 11:11
**pay** [2] - 39:3, 42:2
**paying** [1] - 19:6
**payment** [1] - 34:18
**payments** [4] - 17:1, 41:11, 41:15, 41:16
**payoff** [2] - 11:25, 19:2
**PC** [1] - 4:6
**pendency** [1] - 36:21
**pending** [5] - 31:3, 31:19, 32:11, 33:1, 35:12
**people** [4] - 5:6, 5:10, 20:20, 35:24
**percent** [3] - 19:4, 19:5, 19:16
**permitted** [3] - 8:18, 43:25, 44:1
**person** [3] - 5:16, 26:12, 48:11
**personal** [2] - 26:6, 38:17
**personally** [3] - 38:14, 38:15, 39:24
**persons** [1] - 23:1
**perspective** [1] - 46:24
**persuasive** [1] - 10:17
**phone** [1] - 33:12
**pick** [1] - 5:7
**piece** [1] - 47:10
**pitch** [1] - 48:13
**Plaintiff** [4] - 1:4, 1:17, 2:5, 2:9
**plaintiff** [4] - 4:5, 4:7, 40:24, 45:20
**plaintiff's** [1] - 44:12
**plaintiffs** [2] - 36:18, 47:5
**play** [2] - 28:9, 29:17
**PLLC** [1] - 2:20
**POHLMAN** [2] - 3:18, 4:23
**Pohlman** [1] - 4:23
**point** [21] - 8:8, 8:11, 9:9, 12:11, 17:14, 17:19, 18:11, 19:18, 19:24, 23:13, 24:9, 25:3, 28:25, 29:1, 33:15, 33:23, 35:11, 39:11, 48:6, 48:11
**policies** [2] - 7:8, 27:24
**policy** [3] - 29:9, 29:22, 45:8
**portion** [1] - 17:16
**position** [2] - 23:12,

36:6
**possibilities** [1] - 23:25
**potential** [4] - 11:22, 21:19, 39:9, 41:9
**practice** [1] - 46:5
**Practices** [1] - 18:6
**precedent** [1] - 14:3
**predictability** [1] - 15:20
**prejudice** [7] - 6:14, 8:17, 9:21, 9:23, 17:12, 22:6, 40:12
**President** [1] - 33:12
**presumably** [7] - 32:7, 46:8, 46:10, 46:12, 46:13, 46:17, 46:18
**pretty** [1] - 34:5
**preventing** [1] - 27:18
**previously** [2] - 6:13, 32:4
**primary** [1] - 32:24
**principal** [2] - 8:15, 29:19
**Principis** [2] - 11:9, 16:18
**priorities** [1] - 33:8
**priority** [1] - 7:8
**prison** [1] - 43:5
**pro** [3] - 25:21, 26:1, 26:25
**problem** [6] - 5:25, 25:19, 27:9, 29:17, 30:13, 42:10
**procedural** [1] - 7:2
**proceed** [2] - 6:16, 21:21
**proceeding** [4] - 21:1, 22:4, 23:4, 31:4
**PROCEEDING** [1] - 49:3
**proceeds** [13] - 17:16, 28:2, 29:13, 29:16, 29:23, 30:4, 31:6, 31:24, 32:9, 35:19, 36:8, 36:11, 36:16
**process** [2] - 33:13, 41:16
**processed** [1] - 41:15
**produced** [1] - 19:14
**Promissory** [3] - 7:6, 7:13, 11:7
**proper** [1] - 39:21
**proportional** [1] - 41:9
**proportionate** [1] - 44:13
**Protective** [3] - 6:10, 6:23, 21:22
**provide** [1] - 41:21
**provided** [1] - 17:3

**Provision** [2] - 13:4, 15:4
**PRYOR** [1] - 3:16
**purchaser** [1] - 11:22
**purpose** [3] - 7:4, 7:9, 14:2
**purposes** [5] - 15:2, 15:5, 38:10, 43:23, 44:11
**pursuant** [2] - 6:23, 13:24
**put** [1] - 5:19

## Q

**quashed** [1] - 39:12
**quickly** [1] - 19:17
**quite** [1] - 46:21

## R

**raise** [1] - 9:16
**raised** [2] - 8:25, 21:3
**Rakoff** [6] - 9:1, 9:2, 10:1, 13:2, 20:7, 29:1
**Rakoff's** [3] - 11:3, 12:14, 13:1
**Rd** [1] - 2:6
**reach** [1] - 39:9
**really** [12] - 7:9, 9:9, 9:11, 10:18, 11:3, 12:4, 12:10, 21:23, 27:8, 27:10, 29:11, 35:3
**realm** [1] - 23:1
**reason** [3] - 9:15, 42:17, 42:18
**reasonable** [3] - 12:21, 15:21, 31:24
**reasons** [1] - 22:17
**reassert** [3] - 8:21, 17:6, 23:12
**reasserted** [1] - 8:20
**reasserting** [1] - 48:4
**REBOSO** [1] - 3:12
**receivables** [2] - 10:12, 41:18
**received** [3] - 38:22, 39:5, 39:7
**Receiver** [19] - 2:13, 4:9, 26:10, 26:15, 27:10, 28:2, 28:10, 28:16, 28:19, 28:20, 31:21, 33:5, 33:6, 33:18, 33:19, 36:12, 36:16, 36:20, 36:21
**Receiver's** [2] - 25:8, 37:2
**Receivers** [1] - 33:9

**recertify** [1] - 20:7
**recitation** [1] - 7:1
**recollection** [1] - 12:7
**recommend** [1] - 28:17
**reconciliation** [3] - 11:12, 16:22, 17:2
**record** [7] - 4:3, 5:20, 6:5, 11:21, 23:23, 24:7, 36:3
**RECORDED** [1] - 49:3
**records** [3] - 41:6, 41:14, 46:13
**redact** [2] - 44:16, 44:18
**reduce** [2] - 5:12, 6:3
**refinance** [1] - 11:24
**regard** [1] - 33:19
**regarding** [1] - 7:5
**regardless** [5] - 12:21, 16:6, 16:23, 26:2, 27:15
**regards** [2] - 42:4, 47:21
**reject** [1] - 27:3
**related** [3] - 10:24, 22:14, 46:3
**relates** [29] - 8:13, 9:6, 17:7, 21:18, 22:22, 25:9, 31:4, 31:6, 32:13, 32:25, 33:9, 34:14, 36:9, 37:1, 38:2, 40:12, 41:15, 41:20, 44:1, 44:6, 44:10, 45:7, 45:11, 45:21, 46:13, 47:23, 48:1, 48:3
**relating** [4] - 7:7, 10:18, 41:1, 45:23
**relation** [2] - 12:22, 15:21
**relationship** [6] - 17:23, 22:16, 41:11, 41:18, 43:24, 44:3
**release** [2] - 29:15, 31:25
**released** [4] - 43:1, 43:4, 43:5, 43:11
**relevance** [1] - 47:25
**relevant** [3] - 7:10, 11:3, 47:25
**relief** [1] - 32:5
**rely** [1] - 15:23
**remains** [1] - 39:6
**remember** [2] - 8:16, 11:17
**remiss** [1] - 29:9
**remote** [1] - 5:10
**remotely** [1] - 5:6
**remove** [1] - 47:24

**repeat** [1] - 6:1
**report** [1] - 22:8
**REPORTER** [2] - 3:24, 49:5
**reporter** [1] - 5:13
**represent** [2] - 25:18, 37:19
**representative** [1] - 6:25
**represents** [1] - 37:16
**required** [3] - 31:25, 38:13, 39:3
**requirement** [1] - 15:17
**requirements** [1] - 16:21
**requires** [1] - 31:22
**requisite** [1] - 38:10
**reserve** [1] - 39:13
**respect** [6] - 29:22, 30:21, 32:17, 35:13, 36:7, 37:12
**respectfully** [1] - 18:16
**respond** [2] - 37:22, 37:24
**response** [2] - 38:7, 48:7
**retain** [2] - 33:20, 33:25
**retained** [1] - 25:17
**return** [1] - 39:3
**reveal** [4] - 43:24, 44:8, 44:9, 44:23
**review** [2] - 47:24, 48:1
**revisions** [1] - 40:23
**Richmond** [5] - 3:2, 10:22, 21:1, 21:3, 42:22
**RICO** [2] - 7:19, 24:11
**rights** [1] - 29:22
**ROBERT** [1] - 2:18
**roll** [1] - 19:12
**room** [4] - 5:17, 5:21, 6:13, 9:8
**ruling** [1] - 35:12
**RYAN** [1] - 2:22

## S

**safe** [4] - 15:3, 15:6, 17:10, 30:18
**Safe** [1] - 19:23
**sales** [1] - 11:14
**sat** [1] - 20:25
**satisfied** [1] - 17:16
**save** [1] - 13:16
**schedule** [1] - 27:24
**scope** [6] - 6:24, 18:1,

22:6, 22:8, 37:24, 44:7
**screen** [1] - 5:7
**search** [1] - 45:6
**second** [3] - 14:15, 23:6, 30:11
**Secretary** [2] - 38:16, 40:1
**Section** [1] - 12:19
**see** [6] - 21:1, 31:8, 32:6, 41:17, 41:19, 47:16
**seeing** [1] - 48:10
**seek** [4] - 37:1, 40:8, 42:15, 47:5
**seeking** [5] - 23:14, 33:18, 33:24, 36:19, 36:20
**seem** [1] - 22:10
**seller** [1] - 10:12
**SENIOR** [2] - 3:24, 49:5
**sense** [3] - 24:25, 30:6, 32:22
**sent** [1] - 43:18
**sentence** [1] - 19:8
**separate** [1] - 11:21
**separation** [1] - 35:9
**serve** [1] - 39:24
**served** [9] - 38:14, 38:15, 38:19, 38:23, 38:25, 39:11, 39:25, 47:19
**service** [8] - 26:5, 38:16, 38:17, 39:16, 39:20, 39:23, 40:2, 40:8
**SERVICES** [4] - 1:6, 1:7, 1:13, 1:15
**setup** [1] - 27:6
**shall** [2] - 6:16, 6:18
**Shane** [1] - 4:11
**SHANE** [1] - 2:18
**Share** [2] - 30:1
**SHARES** [2] - 1:6, 1:14
**Shares** [11] - 3:1, 4:14, 25:15, 25:19, 25:21, 25:22, 28:6, 31:23, 35:11, 37:10, 43:18
**shortly** [1] - 43:15
**Show** [7] - 26:1, 26:20, 27:1, 33:24, 37:1, 40:3, 40:7
**show** [1] - 42:16
**showed** [1] - 23:19
**shows** [1] - 18:19
**sides** [1] - 20:8
**significant** [1] - 20:25
**simply** [3] - 12:15,

30:8, 35:12
**sitting** [3] - 12:6, 24:22, 24:23
**situation** [1] - 42:24
**sixty** [1] - 21:9
**size** [2] - 15:21, 16:14
**slash** [1] - 11:22
**smart** [3] - 20:16, 20:20, 31:2
**snatch** [1] - 29:7
**SOLARES** [2] - 3:12, 4:21
**Solares** [1] - 4:21
**SOLUTIONS** [2] - 1:7, 1:14
**sorry** [2] - 14:10, 14:23
**sort** [5] - 6:12, 12:10, 27:11, 34:20, 34:22
**sought** [1] - 32:5
**sound** [1] - 31:16
**sounds** [4] - 12:24, 24:21, 30:25, 40:6
**SOUTHARD** [1] - 2:12
**Southern** [1] - 31:2
**speaking** [1] - 6:3
**speaks** [1] - 32:14
**specific** [1] - 22:20
**specifically** [1] - 44:1
**specify** [1] - 12:20
**spend** [1] - 6:9
**spending** [1] - 30:6
**spent** [1] - 20:24
**Spin** [14] - 4:1, 8:1, 17:17, 17:18, 17:23, 18:7, 18:14, 19:15, 22:14, 22:20, 41:11, 43:17, 43:19
**SPIN** [2] - 1:3, 1:19
**Spin's** [1] - 6:24
**sponte** [1] - 9:16
**Square** [2] - 2:17, 3:17
**squarely** [1] - 30:7
**staged** [1] - 22:4
**stages** [1] - 21:21
**stand** [1] - 6:18
**standard** [1] - 34:5
**start** [1] - 6:10
**starters** [1] - 5:2
**STATE** [1] - 1:1
**state** [4] - 11:5, 12:16, 13:8, 15:22
**State** [4] - 20:20, 21:9, 38:16, 40:1
**state's** [2] - 10:3, 15:23
**statement** [1] - 44:17
**statements** [2] - 22:12, 47:24

States [1] - 33:12
states [1] - 12:19
Statute [1] - 7:19
statute [1] - 10:23
statutory [1] - 16:10
Statutory [1] - 12:18
stay [1] - 47:11
Ste [5] - 2:17, 2:21, 3:2, 3:9, 3:14
STEFAN [1] - 1:16
STEVEN [1] - 2:7
Steven [1] - 4:6
STEVENS [16] - 2:12, 2:14, 4:8, 29:4, 29:6, 30:17, 31:12, 31:20, 32:15, 32:19, 33:16, 34:2, 34:6, 34:12, 34:16, 34:19
Stevens [1] - 4:8
still [5] - 15:7, 15:16, 24:7, 25:1, 47:10
straightforward [1] - 27:25
Street [3] - 1:22, 3:5, 3:9
street [2] - 29:20, 32:18
strikes [2] - 14:4, 14:7
strong [1] - 48:13
stuff [4] - 8:3, 16:22, 26:6, 47:23
sua [1] - 9:16
subject [6] - 11:14, 16:17, 26:7, 26:12, 27:13, 35:20
submit [1] - 47:20
subpoena [6] - 37:22, 38:20, 39:4, 39:5, 39:10, 40:1
subpoenas [7] - 18:2, 37:14, 38:22, 38:24, 39:8, 39:14, 47:19
successful [1] - 27:16
sufficient [1] - 10:8
super [1] - 5:18
supported [1] - 33:7
supposed [4] - 31:5, 32:9, 33:10, 48:12
SUPREME [1] - 1:1
Syndication [3] - 18:20, 19:4, 19:5
system [1] - 5:4

## T

targeted [1] - 22:8
TATANISHA [2] - 1:10, 1:16
Teams [1] - 30:11
tenor [1] - 30:3

tenuous [1] - 44:3
term [1] - 11:12
TERM [1] - 1:1
terms [1] - 37:3
Test [3] - 10:7, 11:9, 13:13
THE [103] - 1:1, 1:15, 4:1, 4:25, 5:25, 6:17, 6:19, 7:3, 7:11, 7:23, 8:8, 9:25, 10:11, 11:16, 12:24, 13:10, 14:4, 14:10, 14:15, 14:19, 14:22, 15:9, 15:14, 15:24, 16:12, 16:20, 17:18, 17:22, 18:4, 18:10, 18:18, 18:21, 18:23, 19:1, 19:8, 19:23, 20:16, 21:10, 21:12, 22:1, 22:15, 22:22, 23:3, 23:9, 23:21, 24:17, 24:21, 25:1, 25:6, 25:25, 26:18, 26:25, 27:8, 28:7, 28:15, 28:18, 28:24, 29:5, 30:10, 30:25, 31:14, 32:2, 32:16, 32:23, 33:22, 34:5, 34:9, 34:13, 34:17, 34:20, 34:25, 35:15, 36:5, 37:13, 37:17, 37:20, 37:25, 39:13, 40:2, 40:6, 40:11, 40:19, 41:2, 42:10, 43:4, 43:6, 43:8, 43:10, 43:22, 44:16, 44:22, 45:2, 45:15, 45:19, 45:25, 46:3, 46:6, 46:9, 46:12, 46:19, 47:22, 49:2, 49:3
themselves [2] - 17:4, 39:8
theories [1] - 21:18
thereafter [1] - 43:15
therefore [1] - 10:4
three [2] - 11:11, 19:4
threshold [2] - 38:21, 42:1
TIFFANY [1] - 3:10
Tiffany [1] - 4:16
TO [1] - 49:2
today [7] - 5:1, 18:1, 23:10, 25:2, 27:7, 28:8, 39:11
today's [2] - 43:23, 44:11
together [4] - 6:9, 22:7, 40:20, 41:3
tomorrow [1] - 28:19
tone [1] - 30:2

took [1] - 35:7
topics [2] - 8:15, 18:2
total [1] - 10:25
totally [3] - 10:22, 10:25, 48:16
touched [1] - 28:14
tough [1] - 29:3
transaction [4] - 12:19, 16:4, 45:23, 46:23
Transactions [1] - 11:10
transactions [8] - 15:20, 16:14, 22:14, 45:8, 45:11, 45:25, 46:4, 48:1
TRANSCRIPT [1] - 49:2
transfers [1] - 22:13
tremendous [1] - 30:12
trial [1] - 39:2
tried [1] - 25:23
trouble [2] - 42:11, 42:19
TRUE [1] - 49:2
tuned [1] - 47:11
turn [2] - 29:15, 32:8
turned [4] - 30:8, 30:22, 32:1, 32:3
turns [1] - 47:10
TV [2] - 48:5, 48:10
two [14] - 11:10, 16:18, 17:15, 19:3, 19:19, 22:3, 22:9, 23:24, 27:5, 37:15, 38:1, 38:20, 40:19, 41:3
types [1] - 41:22
typical [2] - 33:8, 33:20

## U

ultimately [2] - 27:15, 47:1
unable [2] - 23:24, 25:20
under [18] - 8:22, 13:10, 13:17, 17:9, 17:10, 22:4, 24:15, 27:19, 31:10, 31:16, 35:11, 36:16, 37:4, 40:8, 41:5, 41:6, 41:13, 47:1
underlying [2] - 8:11, 15:1
understood [4] - 28:23, 32:15, 34:2, 40:10

undisputed [1] - 38:24
unequivocal [3] - 27:18, 36:9, 39:1
unequivocally [1] - 39:6
unfortunately [1] - 21:13
unhappy [2] - 24:3, 24:7
United [1] - 33:12
unlawful [1] - 7:20
unless [2] - 5:12, 37:25
unopposed [1] - 40:17
up [13] - 5:7, 6:11, 6:15, 12:12, 19:12, 25:15, 29:9, 34:8, 36:14, 42:16, 45:7, 45:9, 45:10
usurious [1] - 9:7
Usury [5] - 8:13, 11:8, 11:14, 13:17, 16:17
usury [3] - 9:13, 17:7, 20:5

## V

valid [1] - 17:5
validate [1] - 10:4
value [1] - 9:6
vice [2] - 25:21, 26:1
victory [1] - 29:7
view [1] - 8:18
views [1] - 21:5
violated [3] - 35:18, 36:8, 37:4
violates [1] - 8:13
violations [1] - 7:19
Virginia [1] - 3:2
void [7] - 8:12, 38:9, 38:12, 38:18, 39:11, 42:2, 42:3

## W

wait [1] - 34:7
waiting [2] - 5:17, 5:20
wants [2] - 37:25, 39:8
Warner [1] - 2:6
warrant [1] - 28:7
Warren [2] - 4:20, 5:23
WARREN [1] - 3:4
ways [1] - 22:1
weeks [3] - 21:6, 22:9, 27:5
Wells [2] - 4:6
WELLS [43] - 2:5, 2:7, 4:6, 6:16, 6:18, 6:22, 7:4, 7:12, 7:24, 9:22, 10:1, 11:2, 12:12,

13:7, 13:19, 14:9, 14:11, 14:17, 14:21, 15:8, 15:10, 15:16, 16:8, 16:13, 17:14, 17:20, 17:25, 18:5, 21:7, 21:11, 21:25, 22:19, 23:1, 23:8, 40:18, 40:21, 40:24, 44:18, 45:1, 45:17, 46:5, 47:17, 48:22
WHITE [1] - 2:16
whole [2] - 21:6, 23:1
willful [1] - 36:10
WILLIAM [1] - 2:7
WILLIAMS [1] - 2:16
willing [2] - 37:23, 39:16
win [2] - 21:13, 21:14
wins [1] - 30:5
WINTERS [1] - 2:12
wish [1] - 21:13
witness [2] - 38:25, 39:3
Wolf [1] - 43:7
WOLF [2] - 1:7, 1:15
wonderful [1] - 48:11
works [1] - 5:14
wound [1] - 25:15
wrote [1] - 26:7

## Y

Year [1] - 48:9
years [2] - 21:9, 33:4
yield [1] - 8:19
YORK [2] - 1:1, 1:1
York [42] - 1:22, 2:6, 2:10, 2:14, 2:18, 2:21, 3:6, 3:9, 3:17, 8:23, 9:9, 9:14, 10:3, 11:5, 11:7, 12:16, 12:20, 13:10, 13:11, 13:24, 15:18, 16:6, 16:15, 17:9, 20:8, 20:10, 20:12, 21:9, 39:23, 41:13, 43:12
Yosef [3] - 43:16, 43:18
yourself [1] - 24:7