UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GOLDEN FOOTHILL INSURANCE SERVICES, LLC et al.,

                        Plaintiffs,

-against-

SPIN CAPITAL, LLC et al.,

                        Defendant.

24-cv-8515 (AS)

OPINION AND ORDER

---

ARUN SUBRAMANIAN, United States District Judge:

## BACKGROUND

This case concerns the Merchant Cash Advance (MCA) industry, which plaintiffs describe as "payday lending for businesses." Dkt. 11 ¶ 53. Plaintiffs are a group of companies that the complaint refers to collectively as the "Leer Companies," along with Tatanisha Leer, who executed a personal guaranty in connection with the agreements at issue in this case.

The Leer Companies operate in the insurance industry. *Id.* ¶ 57. They "buy[] and sell[] insurance policies as brokers" and "purchase[] whole life policies as an investment." *Id.* These business models provide for "irregular" income streams, which "depend[] on the sale of life insurance policies, the supply of life insurance policies on the market, and the rate at which the insured of purchased life insurance policies would die." *Id.* ¶ 60. During the COVID-19 pandemic, the Leer Companies had trouble selling new life insurance policies, and "the supply of life insurance policies available to purchase dropped," which "result[ed] in a lack of new 'receivables' being generated for the Leer Companies['] life settlement business." *Id.* ¶ 61. By June 2021, the Leer Companies' "largest remaining asset" was a tranche of approximately twelve life insurance policies. *Id.* ¶ 62.

In March 2021, the Leer Companies were contacted by defendant Avrumi Lubin, the sole member of Spin Capital LLC. *Id.* ¶¶ 63, 87. Lubin offered to connect the Leer Companies to "alternative lenders . . . who could offer short-term loans to the Leer Companies that would allow them to keep making payments on the life insurance policies that they owned." *Id.* ¶ 87.

Over the next month, the Leer Companies signed five MCA agreements with defendants BMF Advance, LLC and Hi Bar Capital, LLC, which purported to be purchases of the Leer Companies' receivables. First, on March 2, 2021, the Leer Companies entered into an MCA agreement with BMF, under which the Leer Companies expected to receive $100,000, and were required to pay back $149,900 "through fixed daily payments of $4,996." *Id.* ¶¶ 92. Per the agreement, the daily payment rate reflected "a 'good faith' estimate of 10% of the Leer Companies' daily receivables."

*Id.* ¶ 93. The agreement also provided that the Leer Companies were "prohibited from initiating a cash advance or other loan product with another lender outside [of] BMF," and that doing so would constitute a breach of contract. *Id.* ¶ 97.

The cash the Leer Companies received from the first MCA agreement "did not provide a long-term solution to the Leer Companies' need for capital to cover the premium payments on the life insurance policies they owned." *Id.* ¶ 105. They returned to Lubin, who "pressured" them to enter into a second MCA agreement on March 10, 2021, with Hi Bar. *Id.* ¶¶ 107–08. This time, the Leer Companies expected to receive $220,000, and to repay $329,978 through fixed daily payments of $8,500, which represented a "good faith estimate" of 20% of the Leer Companies' receivables. *Id.* ¶¶ 109–10. Like the first MCA agreement with BMF, the Hi Bar agreement provided that the Leer Companies would be in default "if they secured any alternative financing." *Id.* ¶ 113.

Together, these MCA agreements required the Leer Companies to pay approximately $13,500 a day, which proved unsustainable because "the Leer Companies [were] generating little receivables and the only future revenue [they] could expect would be when one of the insured[s] on a policy they owned passed away." *Id.* ¶¶ 121–22. The Leer Companies returned to Lubin, who "offered to refinance the prior BMF MCA [a]greement." *Id.* ¶ 124. Under the refinanced agreement, which was executed on March 12, 2021, the Leer Companies would receive $220,000, and repay $329,780 through fixed daily payments of $8,500, which represented a good faith estimate of 10% of the Leer Companies' receivables. *Id.* ¶¶ 124–25. $114,928 was deducted from the $220,000 principal to pay off the first MCA agreement with BMF. *Id.* ¶ 126.

On March 25, 2021, the Leer Companies returned to Lubin and refinanced the BMF agreement again. *Id.* ¶ 139. This time, the Leer Companies would receive $400,000 and repay $599,600 through daily payments of $25,000, which, again, purportedly represented a "good faith estimate" of 10% of the Leer Companies' daily receivables. *Id.* ¶¶ 139–40. Finally, that same day, the Leer Companies entered into another MCA agreement with Hi Bar, under which the Leer Companies would receive $400,000 and repay $599,600 through daily payments of $20,000, which was Hi Bar's "good faith estimate" of 20% of the daily value of the Leer Companies' receivables. *Id.* ¶ 153.

By May 2021, the Leer Companies could only make small daily payments of a few hundred dollars on the MCA agreements, so Lubin proposed that they take out a loan to pay off the balance. *Id.* ¶¶ 174–75. Accordingly, in June, the Leer Companies, through Golden Foothill Insurance Services, LLC, Life Factor II, LLC, and Life Shares II, LLC, entered into a $2.7 million loan with Spin Capital, with an annual interest rate of 60%. *Id.* ¶ 176. Tatanisha and Stefan Leer executed personal guaranties in connection with the loan, *id.* ¶ 177, while El Dorado Insurance Solutions, Inc., Lone Wolf Insurance Services, Inc., ELDO Investments, LLC, The Genesis LS Fund, LLC, and KTL Holdings, Inc. executed corporate guaranties, *id.* ¶ 178. As part of the transaction, Spin obtained a security interest in the Leer Companies' remaining life insurance policies. *Id.* ¶ 179.

After a few weeks, the Leer Companies were unable to make the payments due on the loan. *Id.* ¶ 182. Spin sued the Leer Companies in state court for breach of the promissory note associated

2

with the loan, seeking more than $14 million in damages. *Id.* ¶ 184. The Leer Companies counterclaimed for violation of and conspiracy to violate the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962. Dkt. 76-2 ¶¶ 89–164.

The state court dismissed the RICO claims on February 28, 2023, holding that "the counterclaims fail to state a claim that the Counterclaim Defendants engaged in a pattern of racketeering activity or collection of an unlawful debt." *See Spin Cap., LLC v. Golden Foothill Ins. Servs., LLC*, 2023 WL 2265717, at *1 (N.Y. Sup. Ct. Feb. 28, 2023). Noting that the RICO claims required a threshold showing of usury under state law, the court explained that "the face amount of the Loan . . . is $2.7 million and this amount exceeds the $2.5 million threshold to which New York's usury laws apply." *Id.* (citing N.Y. Gen. Oblig. Law § 5-501(6)(b)). The court rejected the Leer Companies' argument "that certain portions of the Loan should be recharacterized such that the Loan is subject to the usury laws." *Id.*

Specifically, the court rejected the argument that the MCA purchase agreements were loans or should be recharacterized as loans.[1] The court explained that "revenue purchase transactions like the Purchase Agreements are not loans where the obligation to repay the principal sum is not absolute," and "[i]n determining whether repayment is absolute or contingent, courts weigh three factors: (i) whether there is a reconciliation provision in the agreement, (ii) whether the agreement has a finite term, and (iii) whether there is any recourse if the merchant declares bankruptcy." *Id.* at *3. The court held that the purchase agreements were not loans because they met all three of these criteria: "(i) they all contained mandatory reconciliation provisions to ensure that payments were made based on the *specific percentage* of the accounts receivable that were sold in the Purchase Agreements, (ii) the Purchase Agreements did not have a finite term because the reconciliation provisions ensured that the amounts due were contingent on the sales and as such the term of the agreement would fluctuate based on the amount earned and (iii) the Purchase Agreements all contained provisions expressly stating that a declaration of bankruptcy did not constitute an event of default." *Id.* The court also held that "it d[id] not appear that there is any basis for the allegation that the reconciliation process was a sham . . . because on the record before the Court, it does not appear that the Counterclaim Plaintiffs even allege that they requested a reconciliation or adjustment of the payments and that it was done improperly." *Id.*

On January 4, 2024, the court clarified that "[t]he motion to dismiss the counterclaims was granted without prejudice and the intention was that the Defendants would be entitled to seek appropriate proportional discovery as to the underlying debt and, if appropriate, reassert counterclaims." Dkt. 76-3 at 2. The court also noted Judge Rakoff's decision in *Haymount Urgent Care PC v. GoFund Advance, LLC*, 690 F. Supp. 3d 167 (S.D.N.Y. 2023), which postdated the motion to dismiss the counterclaims, and in the state court's view, "raise[d] questions not previously considered by this Court." Dkt. 76-3 at 2.

---

[1] Plaintiffs argued in state court that if the earlier MCA agreements were usurious loans, then the part of the subsequent $2.7 million loan that went to paying them off shouldn't be counted, and the loan was under the $2.5 million limit for usury.

Rather than reassert their counterclaims in state court, the Leer Companies filed suit in federal court on November 8, 2024, alleging that defendants violated and conspired to violate the RICO statute. *See* Dkt. 11 ¶¶ 185–308. BMF, its principal Gavriel Yitzchakov, Spin Capital, and its principal Lubin, now move to dismiss. *See* Dkts. 69, 72. Hi Bar Capital and its principal Yisroel Herbst join in Spin's motion. *See* Dkt. 81. The remaining defendant, Yoel Getter, has not appeared. *See* Dkt. 67.

Shortly after defendants filed their motions to dismiss, plaintiffs voluntarily dismissed "the branch of their [complaint] . . . that seeks to declare the Promissory Note to be a usurious loan . . . and thus void and unenforceable." Dkt. 78. In other words, for the purposes of this action, plaintiffs argue that the MCA agreements, and not the $2.7 million note, are the unlawful debt underlying their RICO claims.

## LEGAL STANDARDS

To survive a motion to dismiss for failure to state a claim, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 298–99 (2d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 299 (quoting *Iqbal*, 556 U.S. at 678). When evaluating whether a complaint clears this bar, the Court must "accept[] all factual allegations in the complaint as true[] and draw[] all reasonable inferences in the plaintiff's favor." *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

As for a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (cleaned up).

## DISCUSSION

### I. Claim and Issue Preclusion

Defendants argue that the complaint should be dismissed under the doctrines of claim preclusion (*res judicata*) and issue preclusion (collateral estoppel). "[A] federal court [must] refer to the preclusion law of the State in which judgment was rendered" in determining "[t]he preclusive effect of a state court judgment in a subsequent federal lawsuit." *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). Under New York law, claim preclusion "precludes a party from litigating 'a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter.'" *Josey v. Goord*, 880 N.E.2d 18, 20 (N.Y. 2007) (citation omitted). "Under New York's transactional approach to the rule, 'once a claim is

4

brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.'" *Id.* (citation omitted).

Claim preclusion does not apply here because the dismissal of the RICO claims in state court was without prejudice, and "where the court specifies that the dismissal is without prejudice, res judicata does not preclude assertion of the same claim or issue in a second proceeding." *Coleman v. Coleman*, 767 N.Y.S.2d 169, 170 (3d Dep't 2003). As the New York Court of Appeals has explained, "[i]t would be inequitable to preclude a party from asserting a claim under the principle of res judicata, where, as in this case, '[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action.'" *Parker v. Blauvelt Volunteer Fire Co., Inc.*, 712 N.E.2d 647, 650 (N.Y. 1999) (second alteration in original) (quoting Restatement (Second) of Judgments § 26(1)(b)); *see also Landau v. LaRossa, Mitchell & Ross*, 892 N.E.2d 380, 384 (N.Y. 2008) ("In properly seeking to deny a litigant 'two days in court,' courts must be careful not to deprive him of one." (citation omitted)).

As for issue preclusion, which is "a component of the broader doctrine of [r]es judicata," *Gramatan Home Invs. Corp. v. Lopez*, 386 N.E.2d 1328, 1331 (N.Y. 1979), this doctrine "bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006).

Defendants argue that plaintiffs are precluded from arguing that the MCA agreements were disguised loans because this issue was necessarily decided by the state court in dismissing the RICO counterclaims, is decisive of the current action, and plaintiffs had a full and fair opportunity to litigate it in state court. Plaintiffs argue that issue preclusion does not apply here because under New York law "issue preclusion is inapplicable to pure questions of law." *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 988 F.3d 634, 642 (2d Cir. 2021).

The court disagrees with plaintiffs that the issue decided by the state court was a pure question of law. Whether the MCA agreements were disguised loans turns on the features of the agreements, which raise hotly disputed questions of fact. The New York Court of Appeals has held that issue preclusion is "at least theoretically" available for mixed questions of law and fact. *See Am. Home. Assurance Co. v. Int'l Ins. Co.*, 684 N.E.2d 14, 16 n.1 (N.Y. 1997).

But the Court agrees that issue preclusion doesn't apply here for a separate reason. The state court concluded that the pleadings there failed to demonstrate that the reconciliation provisions of the MCA agreements—which purportedly rendered them true-blue purchase agreements, not loans—were shams. It explained that "on the record before the Court, it does not appear that the Counterclaim Plaintiffs . . . allege that they requested a reconciliation or adjustment of the payments and that it was done improperly." *Spin Cap., LLC*, 2023 WL 2265717, at *3. In their federal complaint, plaintiffs attach new exhibits to the complaint, which they say show that defendants "randomly picked the daily payment out of thin air based on their unilateral desired term" and that

5

plaintiffs requested reconciliation, which Lubin "refus[ed] until [p]laintiffs agreed to a larger daily payment without any discussion or calculation of actual receivables." Dkt. 77 at 8; *see also* Dkt. 11-20; Dkt. 11-15. The state court obviously didn't decide whether *this* record is sufficient to allege that that the MCA agreements were loans.

The New York Court of Appeals has cautioned against a "mechanical application of issue preclusion" and explained that "a court must examine 'the realities of litigation'" and "[c]onsider[] the facts of each case." *Simmons v. Trans Express Inc.*, 170 N.E.3d 733, 737 (N.Y. 2021). Here, the state court plainly intended that plaintiffs could reassert their counterclaims with the benefit of more information, which is precisely what they have done. The court also explicitly contemplated that certain issues not raised by the parties but addressed in *Haymount Urgent Care* could alter its conclusion on the merits of plaintiffs' counterclaims. Moreover, as defendants point out, plaintiffs have "raised usury and RICO as affirmative defenses" in the state court action. Dkt. 84 at 8; *see* Dkt. 76-2 at 22–25. Although plaintiffs were not certain at oral argument whether or how they plan to assert these affirmative defenses, the issues are live, which means that the state court could ultimately rule in the Leer Companies' favor on the very issue defendants claim is precluded. At this juncture, plaintiffs are not precluded from arguing that the MCA agreements are disguised loans.

## II. *Rooker-Feldman* Doctrine

Defendants argue that the Court lacks jurisdiction under the *Rooker-Feldman* doctrine. The principle underlying this doctrine is that "within the federal judicial system, only the Supreme Court may review state-court decisions." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005). The doctrine "does not deprive a district court of subject-matter jurisdiction 'simply because a party attempts to litigate in federal court a matter previously litigated in state court.'" *Id.* at 86 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005)). Instead, four requirements must be met for the doctrine to apply:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"— i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

*Id.* at 85 (alterations in original) (quoting *Exxon Mobil*, 544 U.S. at 284).

The first requirement is not met here. As the Second Circuit has explained, a plaintiff has not "'lost' in state court such that it can fairly be said that he complains of injuries caused by the state court judgment" if his dismissal in state court was not on the merits. *See Edwards v. McMillen Cap., LLC*, 952 F.3d 32, 35–36 (2d Cir. 2020). "Because, under [New York] law, [plaintiffs' counterclaims] w[ere] not dismissed on the merits, [plaintiffs] could have refiled [them] in state court." *Id.* at 36. "Instead [plaintiffs] decided to pursue [the counterclaims] in federal court." *Id.* The *Rooker-Feldman* doctrine "does not preclude [plaintiffs] from doing so." *Id.*

6

### III.    *Colorado River* Abstention

In *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), the Supreme Court described "principles" that "govern in situations involving the contemporaneous exercise of concurrent jurisdictions . . . by state and federal courts." *Id.* at 817. "Those principles dictate that, in one of 'a few extraordinary and narrow exceptions,' district courts may abstain from exercising federal jurisdiction over a case due to a parallel state court proceeding." *Riggi v. Charlie Rose Inc.*, 777 F. Supp. 3d 356, 362 (S.D.N.Y. 2025) (citation omitted). Determining whether to abstain requires a two-step analysis: first, the court "must determine whether the state and federal actions are . . . 'parallel,' or in other words, that 'substantially the same parties are contemporaneously litigating substantially the same issue in [another] forum[].'" *Id.* (alterations in original) (quoting *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 862 F. Supp. 2d 170, 182 (E.D.N.Y. 2012)). If the actions are indeed parallel, the court "proceed[s] to the second step, which involves the balancing of six factors that are to be 'heavily weighted in favor of the exercise of jurisdiction.'" *Id.* (quoting *First Keystone*, 862 F. Supp. 2d at 182). "A motion to dismiss based on *Colorado River* is considered as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)." *Id.* at 361 (citation omitted).

Here, plaintiffs argue that the state and federal actions are not in parallel because they involve different parties and claims. Dkt. 77 at 11. Several of the defendants here are not parties to the state action, and several of the parties in the state action are not parties here. *Id.* Plaintiffs also say that "the [s]tate [a]ction does not include any of the claims asserted here and involves issues not present here, such as avoiding transfers and declaratory judgments on insurance parties." *Id.*

But "[p]erfect symmetry of parties and issues is not required." *Dalzell Mgmt. Co., Inc. v. Bardonia Plaza, LLC*, 923 F. Supp. 2d 590, 597 (S.D.N.Y. 2013) (alteration in original) (citation omitted). "Rather, parallelism is achieved where there is a substantial likelihood that the state litigation will dispose of *all* claims presented in the federal case." *Id.* (citation omitted).

Plaintiffs say that the state case will not dispose of the claims presented here because the RICO counterclaims were dismissed. Defendants point to that very dismissal to seek abstention. They alternatively respond that the without-prejudice dismissal did not "remove[] the issue[s] from the state court case" because plaintiffs have "raised usury and RICO as affirmative defenses." Dkt. 84 at 8.

The Court disagrees with defendants that the state and federal cases are in parallel based on the now-dismissed counterclaims. Again, that dismissal was without prejudice, which under New York law is not a dismissal on the merits. And plaintiffs were not obligated to reassert their counterclaims in the state suit, given that New York does not have a compulsory counterclaim rule. *See Paramount Pictures Corp. v. Allianz Risk Transfer AG*, 96 N.E.3d 737, 751 (N.Y. 2018) (Rivera, J., concurring) ("New York is a permissive counterclaim jurisdiction, which reflects a legislative preference to maximize party forum selection.").

Even if the pending usury and RICO defenses in the state case are grounds to find these cases in parallel, the Court would not abstain from exercising its jurisdiction, because the *Colorado River*

factors do not weigh "decisively in favor of abstention." *Riggi*, 777 F. Supp. 3d at 362. "Those factors are '(1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.'" *Id.* at 365 (quoting *Woodford v. Cmty. Action Agency of Greene Cnty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001)).

Although defendants point out that "the state court appointed a receiver over life insurance policies listed in the Security Agreement," Dkt. 73 at 12, it is not clear how that impacts this case, and plaintiffs have dropped their claims directed to the promissory note. Moreover, the federal forum is not inconvenient. Accordingly, the first two factors "counsel against abstention." *Riggi*, 777 F. Supp. 3d at 365.

The third factor "is implicated only where ordinary preclusion doctrines will not supply an orderly resolution to the parallel cases." *Id.* Defendants do not explain why claim or issue preclusion cannot prevent the risk of inconsistent outcomes here. While those defenses may not be grounds for dismissal at this stage, depending on future developments in the state case, defendants may have grounds to reprise them at summary judgment.

The fourth factor weighs in favor of abstention, given that "the state proceeding was filed first and has proceeded further than the federal action." *Id.* at 366. Fact discovery in the state case closed on August 1, 2024, Dkt. 76 ¶ 15, and Spin and Lubin have moved for summary judgment, "seek[ing] to dispose of the usury defense," Dkt. 73 at 2.

The fifth factor is neutral. Plaintiffs sue under a federal statute, which makes it unlawful for a person "employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate . . . in the conduct of such enterprise's affairs through . . . collection of unlawful debts." 18 U.S.C. § 1962(c). "Unlawful debt," in turn, is defined as "debt . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and . . . which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." *Id.* § 1961(6). So state law provides the rules of decision about what constitutes unlawful debt, but federal-law issues are still present, and the state-law issues are not "novel or particularly complex." *Riggi*, 777 F. Supp. 3d at 367 (citation omitted).

The sixth factor weighs in favor of abstention, given that plaintiffs have failed to demonstrate that the state court cannot protect their procedural and substantive rights. *See JPMorgan Chase Bank, N.A. v. Avara US Holdings LLC*, 2024 WL 709068, at *7 (S.D.N.Y. Feb. 21, 2024). But this factor is "significant only if it militates in favor of federal jurisdiction" and is "thus of little weight here." *Zemsky v. City of New York*, 821 F.2d 148, 153 (2d Cir. 1987). Balancing these factors, they do not weigh decisively in favor of abstention.

8

IV. **"Unlawful Debt"**

Defendants argue that plaintiffs have failed to state a RICO claim because they have failed to plead that the MCA agreements constitute "unlawful debt" under the RICO statute. As discussed above, the statute defines "unlawful debt" as "debt . . . which is unenforceable under State or Federal law . . . because of the laws relating to usury, and . . . which was incurred in connection with . . . the business of lending money . . . at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

Because "where there is no loan, there can be no usury," *Principis Cap. LLC v. I Do., Inc.*, 160 N.Y.S.3d 325, 326 (2d Dep't 2022) (citation omitted), the fundamental question is whether the MCA agreements are loans.

"When determining whether a transaction is a loan, a court must look to 'substance—not form.'" *Lateral Recovery LLC v. Funderz.net, LLC*, 2024 WL 4350369, at *25 (S.D.N.Y. Sept. 27, 2024) (citation omitted).[2] "The root of the analysis is the transfer of risk." *Id.* (citation omitted). "The hallmark of a loan is that the lender 'is absolutely entitled to repayment under all circumstances.'" *Id.* (citation omitted). "Under New York law, courts usually examine three factors in determining whether a transaction is a loan: '(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.'" *Id.* at *26 (quoting *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023)). These factors "guide" the analysis, "but the presence or absence of any one factor is not dispositive." *Id.* And even for an agreement that appears "lawful on its face," "significant extrinsic evidence supporting an inference that the apparent purchase is merely a guise for continued usurious lending" can show that the contract is illegal. *Id.* at *30.

Plaintiffs say that although the MCA agreements may technically meet these three requirements, multiple features of the agreements suggest that they were covers for usurious lending. For example, the lenders' "good faith estimates" of the Leer Companies' daily receivables, as are reflected in the chart below, "d[o] not appear to [actually] represent a good faith estimate of receivables." *Davis v. Richmond Cap. Grp., LLC*, 150 N.Y.S.3d 2, 4 (1st Dep't 2021).

| MCA Agreement | Daily Payment | Specified Percentage | Defendants' Estimation of Receivables |
|---|---|---|---|
| 3/2/21 BMF | $4,996 | 10% | $49,960/day |
| 3/10/21 Hi Bar | $8,500 | 20% | $42,500/day |
| 3/12/21 BMF | $8,500 | 10% | $85,000/day |

---

[2] The Hi Bar defendants point out that the MCA agreements provide that "the Purchase Price is not intended to be, nor shall it be construed as a loan from [Hi Bar] to Merchant." Dkt. 81 at 3. But the Second Circuit has rejected the argument that this language is dispositive under New York law. *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023).

| 3/25/21 BMF | $25,000 | 10% | $250,000/day |
| 3/25/21 Hi Bar | $20,000 | 20% | $100,000/day |

Plaintiffs have plausibly alleged that "[i]t is not tenable that [the Leer Companies'] receivables increased" at this rate "in less than a month, especially at a time when the company was . . . highly troubled," *Funderz.net*, 2024 WL 4350369, at *29, and instead, that the daily payment amount "is consistent with a loan to be repaid over a fixed period, not a purchase of receivables." *Id.* Plaintiffs also attached as an exhibit to the complaint an email exchange between Lubin and BMF in which they appear to be discussing the terms of the March 12, 2021 agreement based on the number of days it would take to repay it. *See* Dkt 11-15 ("Send refi docs 220k 1.499 6,999 daily" "47 days???? How much bank fee?" "How many days??? DO WTVR U WANT. ILL GET IT DONE").

Moreover, although each agreement provides that bankruptcy does not constitute an event of default, plaintiffs allege that the agreements still provide recourse if the Leer Companies declare bankruptcy, because the lenders could hold the personal guarantors liable for the outstanding balances. Dkt. 11 ¶ 169. This "protection" is "fundamentally inconsistent with the idea that [BMF and Hi Bar] b[ore] the risk of a downturn in [the Leer Companies'] business." *See Funderz.net*, 2024 WL 4350369, at *29.

Plaintiffs also say that the reconciliation provisions in each agreement were shams. The reconciliation provisions entitled the Leer Companies to request a reconciliation only if an event of default had not occurred. But plaintiffs say that the lenders knew that an "event of default" had occurred from the jump because plaintiffs were forced to falsely warrant in each agreement that they had "good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of [BMF]." Dkt. 76-4 § 2.10; Dkt. 76-7 § 2.10 (similar language in Hi Bar agreement); *see also People v. Richmond Cap. Grp. LLC*, 2023 WL 6053768, at *4 (N.Y. Sup. Ct. Sept. 15, 2023) ("The Predatory Lenders made sure that their Borrowers were in default on Day 1 of the MCAs by requiring that the Borrowers falsely represent that the collateral (*i.e.*, the accounts receivable) was free and clear of all other loans . . . and that they would not pledge those assets to others."). In support, plaintiffs point to an email between Yitzchakov and Lubin in which Yitzchakov asked "U sure u wanna fund this?" and Lubin responded "Need to get [G]etter [of Hi Bar Capital] on board with me. 100kx2." Dkt. 11-10. Plaintiffs say that this email shows that BMF and Hi Bar "knew they were putting Plaintiffs in default from day one because they purposely had Plaintiffs pledge their receivables to two different MCA companies at the same time." Dkt. 77 at 2.

Additionally, in a text message conversation between Lubin and Stefan Leer, the parties negotiated a new daily rate without any reference to the Leer Companies' receivables or to the formal reconciliation process described in the agreement:

10

| | |
|---|---|
| Lubin: | You're giving me no option but to file a judgement. I have absolutely no communication with you. |
| Lubin: | Need a call from you asap |
| Leer: | The communication is: for another at least 10 days. Im cash poor! |
| Lubin: | Need to be on a daily for those 10 days. |
| Leer: | Ok, $250.00 per day |
| Lubin: | 1k a day each |
| Lubin: | This is bull shit |
| Leer: | I cannot pull cash of [sic] a tree. Your [sic] negotiating with nothing for me to give u. U want to bounce? |
| Lubin: | Make it 500 each for the next 10 days |
| Lubin: | And call me |

Dkt. 11-20.

Defendants do not address these arguments, relying on the state court's decision and reasoning to shield them from liability. But as discussed above, the Court is not bound by the state court's analysis of the issue, which was based on different pleadings in a different case. Plaintiffs have plausibly alleged that the MCA agreements were in substance loans, even if they appeared on their face to be purchases of the Leer Companies' receivables.

### V. RICO Claim Elements

Spin and Lubin argue that plaintiffs have failed to plead a cognizable injury. "To establish a civil RICO claim for unlawful debt collection, a plaintiff must allege . . . injury to plaintiff's business or property." *Moss v. MBO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 297 (E.D.N.Y. 2017). Defendants argue that plaintiffs have not suffered an injury to their business because they have "gained on the transactions at issue." Dkt. 73 at 16. Although plaintiffs allege that they were injured by "the amount of the unlawful debt collected . . . on the MCA Agreements," Dkt. 11 ¶ 292, defendants allege "on the face of the MCAs and the Promissory Note, [plaintiffs] received far more than was paid." Dkt. 73 at 16.

This argument fails. "Plaintiffs plead allegedly fraudulent agreements or usurious debt. All of plaintiffs' payments pursuant to the Merchant Agreements apparently have been made," and "[w]hat amounted to allegedly fraudulent or usurious interest payments represent concrete injury and damage sufficient to establish standing." *Lateral Recovery LLC v. Queen Funding, LLC*, 2022 WL 2829913, at *7 (S.D.N.Y. July 20, 2022). That plaintiffs ultimately made these payments by taking out a separate loan from defendants is irrelevant; however they got the money, they paid off the MCA agreements and fully paid what they allege were usurious payments. What damages are cognizable based on this theory is a question for discovery and summary judgment.

11

Spin and Lubin separately argue that the complaint fails to allege that they were involved in the "collection of unlawful debt." The RICO statute makes it unlawful for a person "employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate . . . in the conduct of such enterprise's affairs through . . . collection of unlawful debt." 18 U.S.C. § 1962(c). Spin and Lubin say that the only debt they are trying to "collect" on is the promissory note. And because plaintiffs have dropped their claims as to the note, Spin and Lubin say that there is no allegation that defendants are trying to "collect" on anything unlawful. *See* Dkt. 85 at 1.

As the Second Circuit has explained, however, "all that RICO requires is proof that a debt existed, that it was unenforceable under New York's usury laws, that it was incurred in connection with the business of lending money at more than twice the legal rate, that the defendant aided collection of the debt *in some manner*, and that the defendant acted knowingly, willfully and unlawfully." *United States v. Biasucci*, 786 F.2d 504, 513 (2d Cir. 1986) (emphasis added). Here, plaintiffs plausibly allege that defendants, including Spin and Lubin, worked collaboratively to push and then collect on the unlawful MCA-agreement debt by inducing plaintiffs to take out a loan to cover the balance of the agreements. Whether or not plaintiffs directly challenge the promissory note in this case is irrelevant to defendants' liability for their conduct with respect to the original MCA agreements.

## VI. Service

Finally, defendant Gavriel Yitzchakov argues that the complaint should be dismissed as against him "because Plaintiffs failed to effect service of process in the manner required by [N.Y. C.P.L.R. §] 308(4)," New York's "nail and mail" statute. Dkt. 70 at 11. The statute provides that, "where [in-person service] cannot be made with due diligence," service can be made

> by affixing the summons to the door of either the actual place of business, dwelling place or usual place of abode within the state of the person to be served and by either mailing the summons to such person at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business in an envelope bearing the legend "personal and confidential". . . .

N.Y. C.P.L.R. § 308(4). Yitzchakov argues that plaintiffs did not comply with the mailing requirements for service because "[t]here is no sworn statement of a first class mailing" to his residence. Dkt. 70 at 12. But after plaintiffs pointed out in opposition that the statute requires first-class mailing to a "place of business," but not to a person's residence, Yitzchakov abandoned this argument in reply.

Yitzchakov also argues that plaintiffs failed to prove that in-person service could not be made with "due diligence." The Court disagrees. Plaintiffs' process server attested that five attempts were made to serve Yitzchakov at home, some of which were during working hours, and some of which were in the evening, including 7:35 PM, 6:37 PM, and 7:45 PM. Dkt. 76-17. These attempts were spread out from December 16, 2024, to January 8, 2025. *Id.* This is sufficient to meet the due diligence requirement. *See Wells Fargo Bank, N.A. v. Enitan*, 158 N.Y.S.3d 214, 217 (2d Dep't

2021) ("The due diligence requirement may be met with 'a few visits on different occasions and at different times to the defendant's residence or place of business when the defendant could reasonably be expected to be found at such location at those times.'" (citation omitted)).

## CONCLUSION

For these reasons, the motions to dismiss the complaint are DENIED.

The Clerk of Court is directed to terminate Dkts. 69 and 72.

SO ORDERED.

Dated: August 19, 2025
New York, New York

ARUN SUBRAMANIAN<br>United States District Judge