UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOLDEN FOOTHILL INSURANCE SERVICES, LLC et al | 24-cv-08515-AS |
| Plaintiffs | **ANSWER** |
| v. | |
| SPIN CAPITAL, LLC et al | |
| Defendants | |

Defendants Spin Capital, LLC and Avrumi (a/k/a Josh) Lubin answer plaintiffs' amended complaint as follows:

## **NATURE OF ACTION**

1.      This is a RICO action against three separate Enterprises operating cooperatively to induce Plaintiffs into entering into five usurious loans disguised as merchant cash advance agreements ("MCA Agreements") and then once the debt on those MCA Agreements exceeded $1 million, refinancing the usurious MCA debt into an artificially inflated Promissory Note with a facial principal of $2.7 million but actual principal of $1.3 million so that the Enterprises could effectively launder their usurious debt into a purportedly legitimate loan.

Answer: The allegations in ¶1 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶1.

2.      Each Enterprise played its part in the overall scheme to collect unlawful debt and then repackage that unlawful debt into a loan, asserting a usurious 60% interest rate, that misreported its principal as being above $2.5 million to try to legitimize the entire scheme.

Answer: The allegations in ¶2 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶2.

3.      First, Spin and Lubin formed their own enterprise (the "Spin Enterprise") which was responsible for soliciting and negotiating with Plaintiffs the terms and funding amounts of five MCA Agreements that the Spin Enterprise referred to Hi Bar and BMF for papering, all of which were entered into in March 2021.

Answer: Spin and Lubin admit that the five MCA Agreements that are the subject of this action were entered into in March 2021. The remaining allegations in ¶3 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the remaining allegations in ¶3.

4.      The Spin Enterprise was also responsible for papering the Promissory Note used to launder the MCA Agreement debt into a purportedly legitimate loan with a facial principal of $2.7 million but an actual principal of approximately $1.3 million with a 60% annual interest rate.

Answer: Spin and Lubin refer to the Promissory Note for a complete and in-context recital of its terms, state that the Promissory Note speaks for itself and deny the allegations in ¶4 to the extent inconsistent with its terms.  The remaining allegations in ¶4 are legal conclusions as to which no response is required.  To the extent a response is required, Spin and Lubin deny the remaining allegations in ¶4.

5.      BMF, run by Gabe, is part of a separate enterprise that also involves three of his brothers, Joseph Yitzchakov (a/k/a Joseph Isaacov), Simon Yitzchakov (a/k/a Simon Isaacov), and Binyamin Yitzchakov (a/k/a Ben Isaacov, collectively the "Isaacovs"), who together operate various MCA labels, including BMF, to fund usurious loans since 2017 (the "Isaacov Enterprise").

Answer: The allegations in ¶5 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶5.

6.      Notably, Joseph Isaacov and the umbrella company for the Isaacov Enterprise, Funderz.Net, LLC, were recently found liable on summary judgment for collection of unlawful debt based on BMF MCA Agreements that are virtually indistinguishable from the three BMF MCA Agreements at issue here. *See Lateral Recovery LLC v. Funderz.net LLC*, 2024 U.S. Dist. LEXIS 176985, *77-78 (S.D.N.Y. Sept. 27, 2024).

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶6.

7.      Hi Bar, owned by Herbst and operated by Getter, constitutes a third separate RICO Enterprise (the "Hi Bar Enterprise") which, in this matter, coordinated with the Spin Enterprise to broker two MCA Agreements between Plaintiffs and Hi Bar.

Answer: The allegations in ¶7 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶7.

8.      The Hi Bar Enterprise then worked with the Spin Enterprise and BMF Enterprise in agreement to refinance the Plaintiffs' MCA debt with Hi Bar and BMF to be refinanced by the Spin Enterprise into the Promissory Note.

Answer: The allegations in ¶8 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶8.

9.      While the MCA Agreements were ostensibly purchases of the Leer Companies' future receivables, their form and how they were negotiated and serviced all demonstrate they are absolutely repayable loans with annual interest rates ranging from 331% to more than 600%.

Answer: The allegations in ¶9 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶9.

10.      The MCA Agreements provided BMF and Hi Bar with recourse in the event of the Leer Companies' bankruptcy through enforcement of the personal guaranties and having a security interest in all of the Leer Companies' assets.

Answer: Spin and Lubin refer to the MCA Agreements for a complete and in-context recital

of their terms, state that the MCA Agreements speak for themselves and deny the allegations in

¶10 to the extent inconsistent with their terms.

11.      The BMF MCA Agreements lacked any reconciliation provision and the one found in the Hi Bar MCA Agreements was illusory. Moreover, in practice, when the Leer Companies' receivables declined, Lubin simply negotiated a new payment rate at whatever maximum amount the Leer Companies could afford without regard to their actual receivables.

Answer: The allegations in ¶11 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶11.

12.      The MCA Agreements made it a default if the Leer Companies missed as little as one or two fixed daily payments.

Answer: Spin and Lubin refer to the MCA Agreements for a complete and in-context recital

of their terms, state that the MCA Agreements speak for themselves and deny the allegations in

¶12 to the extent inconsistent with their terms.

13.      The MCA Agreements also placed the Leer Companies in default as soon as the next MCA Agreement was entered into as each MCA Agreement made it an event of default for the Leer Companies to secure any alternative financing.

Answer: Spin and Lubin refer to the MCA Agreements for a complete and in-context recital

of their terms, state that the MCA Agreements speak for themselves and deny the allegations in

¶13 to the extent inconsistent with their terms.

14.      The MCA Agreements' fixed daily remittance was purported to be a "good faith estimate" of the Leer Companies' receivables, but comparing the MCA Agreements to one another

reveals that these estimates would vary even for MCA Agreements entered on the same day and their only pattern was to increase daily remittance as the repayment amount increased.

Answer: Spin and Lubin refer to the MCA Agreements for a complete and in-context recital of their terms, state that the MCA Agreements speak for themselves and deny the allegations in ¶14 to the extent inconsistent with their terms.

15.    The MCA Agreements were negotiated with fixed terms as shown by correspondence between Leer Companies' officer Stefan Leer ("Stefan") and Lubin, Defendants' underwriting documents, and by simply dividing the repayment amount by the fixed daily payment.

Answer: The allegations in ¶15 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶15.

16.    The MCA Agreements failed to identify and specific receivables purchased by BMF or Hi Bar, and yet still made the Leer Companies responsible for collecting the receivables that BMF and Hi Bar purportedly purchased so that they could debit the daily remittance from the Leer Companies' bank account.

Answer: Spin and Lubin refer to the MCA Agreements for a complete and in-context recital of their terms, state that the MCA Agreements speak for themselves and deny the allegations in ¶16 to the extent inconsistent with their terms.

17.    Because the MCA Agreements had such high interest and fixed daily payments, the Leer Companies, by design, struggled to maintain payments, at which point Spin and Lubin would coerce them into refinancing the MCA Agreement into a new one with higher fixed daily payments and a larger repayment.

Answer: Spin and Lubin deny the allegations in ¶17.

18.    Because of the MCA Agreements' prohibition on the Leer Companies securing alternative financing, Plaintiffs had little choice but to agree or risk being placed in default.

Answer: The allegations in ¶18 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶18.

19.    With each refinanced MCA Agreement, the new advance would be used to pay off the prior debt, leaving the Leer Companies with only a fraction of the listed principal and still obligated to repay the full repayment amount in a matter of days.

Answer: The allegations in ¶19 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶19.

20.    Defendants end goal was to continue this cycle of refinancing the MCA Agreements until the Plaintiffs' indebtedness to BMF and Hi Bar became large enough to repackage the debt into a loan that was intentionally designed to superficially exceed the $2.5 million safe harbor provision for commercial loans exempt from New York usury laws.

Answer: Spin and Lubin deny the allegations in ¶20.

21.    To achieve this goal, once outstanding debt on the last two MCA Agreements entered with Hi Bar and BMF on March 25, 2021 was sufficiently large and the Leer Companies were struggling to maintain payments on both, the Spin Enterprise proposed refinancing this MCA debt into an official loan.

Answer: Spin and Lubin deny the allegations in ¶21.

22.    With no other financial options available to them, Plaintiffs conceded to the proposal, and on June 16, 2021, Spin and GFIS, LF II, and LS II entered into a promissory note that would purportedly provide GFIS, LF II and LS II with $2.7 million in capital.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations as to financial options available to Plaintiffs. As to the remaining allegations in ¶22, Spin and Lubin refer to the promissory note for a complete and in-context recital of its terms, state that the promissory note speaks for itself and deny the allegations in ¶22 to the extent inconsistent with its terms.

23.    However, as confirmed by Spin's own records, GFIS, LF II and LS II did not receive anything close to $2.7 million, rather Spin deducted (1) $200,000 as a bank fee for Lubin's "services" in providing the Promissory Note; (2) $580,597.00 to pay off MCA debt to Hi Bar; (3) $582,000 to pay off inflated MCA debt to BMF; and (4) $30,000 to pay off Spin's lawyers for drafting the Promissory Note.

Answer: Spin and Lubin refer to the referenced Spin records for a complete and in-context recital of their terms, state that the referenced Spin records speak for themselves and deny the allegations in ¶23 to the extent inconsistent with their terms.

24.    As a result, GFIS, LF II and LSII only received $1,307,403 as remaining capital for entering the Promissory Note, and $150,000 was deducted further as the first payment on June 18, 2021.

Answer: Spin and Lubin admit the allegations in ¶24.

25.    The Promissory Note assessed an annual interest rate of 60% and a default interest rate of 120%.

Answer: Spin and Lubin refer to the Promissory Note for a complete and in-context recital of their terms, state that the Promissory Note speaks for itself and deny the allegations in ¶25 to the extent inconsistent with its terms.

26.    In order to ensure against default, the Spin Enterprise required Plaintiffs to enter into various guaranties and security agreements in connection with the Promissory Note (collectively the "Transaction").

Answer: Spin and Lubin refer to the referenced guaranties and security agreements for a complete and in-context recital of their terms, state that the referenced guaranties and security agreements speak for themselves and deny the allegations in ¶26 to the extent inconsistent with their terms.

27.    For instance, on June 16, 2021, as part of the Transaction, Spin entered into a corporate payment guaranty with El Dorado, Lone Wolf, ELDO, Genesis and KTL (the "Corporate Guarantors") whereby the Corporate Guarantors guaranteed repayment of the Promissory Note (the "Corporate Guaranty").

Answer: Spin and Lubin refer to the Corporate Guaranty for a complete and in-context recital of its terms, state that the Corporate Guaranty speaks for itself and deny the allegations in ¶27 to the extent inconsistent with its terms.

28.    On June 16, 2021, Spin also entered into two separate personal guaranties with Stefan and Tatanisha Leer (the "Personal Guarantors") whereby they would be responsible for the Promissory Note obligations as well (the "Personal Guaranties").

Answer: Spin and Lubin refer to the Personal Guaranties for a complete and in-context recital of their terms, state that the Personal Guaranties speaks for themselves and deny the allegations in ¶28 to the extent inconsistent with their terms.

29.     Lastly, on June 16, 2021, Spin entered into a security agreement with GFIS, LF II, LS II, the Corporate Guarantors and the Personal Guarantors whereby Spin purportedly obtained a security interest in nine (9) life insurance policies owned by either LF II or LS II, that had total death benefits then valued at $40,500,000 (the "Security Agreement").

Answer: Spin and Lubin refer to the Security Agreement for a complete and in-context recital of its terms, state that the Security Agreement speaks for itself and deny the allegations in ¶29 to the extent inconsistent with its terms.

30.     The Leer Companies were able to make the first five (5) installment payments on the Promissory Note, totaling $510,000, before the usurious 60% interest became too great a burden to bear and they failed to make payments thereafter.

Answer: Spin and Lubin admit that the Leer Companies made the first five (5) installment payments on the Promissory Note, totaling $510,000, and that they failed to make payments thereafter.  Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶30.

31.     Spin has since placed Plaintiffs in default of the Promissory Note and is seeking more than $14 million (mostly interest) as the purported balance on the Promissory Note whereas Plaintiffs received less than $2 million in total on the five MCA Agreements and Promissory Note.

Answer: Spin and Lubin admit that Spin has placed Plaintiffs in default on the Promissory Note and that Spin is seeking more than $14 million (mostly interest) as the balance on the Promissory Note.  Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶31.

## THE PARTIES

32.     At all relevant times, GFIS was a Delaware limited liability company with a principal place of business in California.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶32.

33.    At all relevant times, LF II was a Nevada limited liability company with a principal place of business in California

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶33.

34.    At all relevant times, LS II was a Delaware limited liability company with a principal place of business in California.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶34.

35.    At all relevant times, El Dorado was a California corporation with a principal place of business in California.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶35.

36.    At all relevant times, Lone Wolf was a Delaware corporation with a principal place of business in California.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶36.

37.    At all relevant times, ELDO was a Texas limited liability company with a principal place of business in California.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶37.

38.    At all relevant times, Genesis was a Texas limited liability company with a principal place of business in California.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶38.

39.    At all relevant times, KTL was a Texas corporation with a principal place of business in California.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶39.

40.     At all relevant times, Tatanisha Leer was domiciled and a resident of California.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶40.

41.     Spin is a limited liability company organized under the laws of the state of New Jersey with a principal place of business in New York.

<u>Answer</u>: Spin and Lubin admit the allegations in ¶41.

42.     Lubin is domiciled and a resident of the State of New Jersey.

<u>Answer</u>: Spin and Lubin admit the allegations in ¶42.

43.     BMF Advance is a limited liability company duly organized under the laws of New York with its principal place of business in Florida.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶43.

44.     Gavriel Yitzchakov a/k/a Gabe Isaacov ("Gabe") is domiciled and a resident of the state of Florida.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶44.

45.     Hi Bar is a limited liability company duly organized under the laws of New York with its principal place of business in New York.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶45.

46.     Yoel Getter a/k/a Joel Geta ("Getter") is domiciled and resides in the state of Florida.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶46.

47.     Upon information and belief, Yisroel Herbst ("Herbst") is domiciled and resides in the state of New York.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶47.

## JURISDICTION

48.    This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corrupt Organization Act, 17 U.S.C. §§ 1961-68.

Answer: Spin and Lubin admit the allegations in ¶48.

49.    This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. 1332(a)(1) because each Plaintiff is a citizen of a different state than Defendants and the amount in controversy exceeds $2,000,000 exclusive and interest and costs.

Answer: Spin and Lubin deny that the amount in controversy exceeds $2 million exclusive of interest and costs.  The remaining allegations in ¶49 are legal conclusions as to which no response is required.  To the extent a response is required, Spin and Lubin deny the remaining allegations in ¶49.

50.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶50.

51.    Venue is also proper because each of the MCA Agreements and Promissory Note prescribed that suitable jurisdiction and venue for any dispute thereunder would lie with any New York court.

Answer: Spin and Lubin refer to the MCA Agreements and Promissory Note for a complete and in-context recital of their terms, state that the MCA Agreements and Promissory Note speak for themselves and deny the allegations in ¶51 to the extent inconsistent with their terms.

52.    Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and has purposefully availed itself/himself/herself of the jurisdiction of this Court for the specific transactions at issue.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶52.

## FACTUAL ALLEGATIONS

### A.    The Predatory MCA Industry

53.    As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's." The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for. It's pretty much unregulated."

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶53.

54.    The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶54.

55.    This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id*. ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶55.

56.    The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶56.

**B.    Background on the Parties**

      **i.**    ***Background on Plaintiffs***

57.    The Leer Companies operate in two fields of the insurance industry: (1) buying and selling insurance policies as brokers; and (2) life settlement whereby a Leer Company purchases whole life policies as an investment.

Answer: Spin and Lubin admit that the Leer Companies operated in the referenced two insurance industry fields: (1) buying and selling insurance policies as brokers; and (2) life settlement whereby a Leer Company purchases whole life policies as an investment.  Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶57.

58.    With life settlement, the Leer Companies often raise capital to pay the purchased life insurance premiums by issuing private placement memoranda whereby investors obtain an interest in the Leer Company owning the life insurance policy and receive a return on investment when the covered individual passes.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶58.

59.    Sometimes, based on the insured individual's life expectancy and the costs of premiums on a policy, the Leer Companies have to let some policies lapse in order to prevent an ultimate loss on the investment.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶59.

60.    Because of these two business models, Leer Companies did not have regular receivables; income streams were irregular and depended on the sale of life insurance policies, the supply of life insurance policies on the market, and the rate at which the insured of purchased life insurance policies would die.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶60.

61.    COVID-19 hit the Leer Companies hard. New life insurance policies were not being issued or were made extremely difficult to sell due to high premiums. Meanwhile the supply of

life insurance policies available to purchase dropped, resulting in a lack of new "receivables" being generated for the Leer Companies life settlement business.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶61.

62.    By 2020, the number of whole life insurance policies owned by the Leer Companies had declined, and by June 2021, the Leer Companies owned approximately a dozen who life insurance policies, which represented the Leer Companies' largest remaining asset during the pandemic.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶62.

ii.    ***Background on the Spin Enterprise***

63.    Spin is an LLC run by Lubin as its sole member and together they constitute, as defined in more detail below, a RICO enterprise (the "Spin Enterprise")

Answer: Spin and Lubin admit that Spin is an LLC run by Lubin as its sole member.  The remaining allegations in ¶63 are legal conclusions as to which no response is required.  To the extent a response is required, Spin and Lubin deny the remaining allegations in ¶63.

64.    Lubin characterizes Spin's primary business as brokering certain financial transactions, including MCA deals, with merchants and MCA funders in consideration for receiving a commission for the funder.

Answer: Spin and Lubin admit the allegations in ¶64.

65.    Specifically, the Spin Enterprise collaborates with various MCA lender enterprises, such as the Isaacov Enterprise and the Hi Bar Enterprise, defined more fully below, to paper the MCA deals that the Spin Enterprise brokers.

Answer: Spin and Lubin admit Spin relied on purchasers to paper MCA deals that it brokered.  Spin and Lubin deny the remaining allegations in ¶65.

66.    Lubin has testified that he does not even read the MCA agreements that he brokers with the assistance of the Isaacov Enterprise and Hi Bar Enterprise, yet he nevertheless charges exorbitant fees for his services in brokering the MCA deals, including the MCA Agreements here and the Promissory Note, which is nothing more than additional disguised interest.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶66.

67.    For instance, when underwriting the March 25, 2021 BMF MCA Agreement with the Gabe and BMF, Lubin wrote to Gabe that he is "got to try and get away with a 40k [Personal Service Fee] on the funding call," thereby establishing that Lubin arbitrarily sets his brokerage fees on the MCA Agreements he brokers for the Isaacov Enterprise and Hi Bar Enterprise. *See* March 25, 2021 email chain between Lubin and Gabe, attached hereto as **Exhibit 1**.

Answer: Spin and Lubin denies that Lubin arbitrarily sets his brokerage fees on MCA Agreements he brokers.  As to the remaining allegations in ¶67, Spin and Lubin refer to the referenced email chain for a complete and in-context recital of their terms, state that the email chain speaks for itself and deny the allegations in ¶67 to the extent inconsistent with the same.

68.    Spin and Lubin have also been known to provide funding for the MCA deals papered by the Isaacov Enterprise and Hi Bar Enterprise.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶68.

### iii.    *Background on the Isaacov Enterprise*

69.    One MCA RICO Enterprise that the Spin Enterprise works closely with as a broker, underwriter, and funder of MCA Agreements that constitute unlawful debt is the Isaacov Enterprise, which operates BMF as one of its MCA labels through Gabe owning that particular entity.

Answer: Spin and Lubin admit that Spin worked with BMF and Gabe as a broker of MCA transactions.  Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegation that Gabe owns BMF.  Spin and Lubin deny the remaining allegations in ¶69.

70.    BMF is just one of several MCA labels used by the Isaacov Enterprise, many of which are d/b/a of Funderz.Net LLC, and various Isaacov brothers each control their own MCA companies or d/b/a within the Funderz.Net LLC umbrella.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶70.

71.    Gabe owns and operates BMF Advance and uses BMF Advance to paper MCA deals brokered and funded by the Spin Enterprise as well as engage in direct solicitation with merchants to enter into MCA agreements with the Isaacov Enterprise through BMF.

Answer: Spin and Lubin admit that Spin brokered certain MCA deals BMF entered into. Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶71.

72.    The eldest brother, Jospeh Isaacov ("Joe"), holds himself out as the CEO of Hop Capital. *See* Joseph Isaacov's LinkedIn profile, attached hereto as **Exhibit 2.**

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶72.

73.    Per Funderz.Net LLC's filings with the New York Secretary of State, Hop Capital is one of the d/b/as Funderz.Net LLC uses in business. *See* Assumed Name History of Funderz.Net LLC from New York Secretary of State attached hereto as **Exhibit 3**.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶73.

74.    Binyamin Yitzchakov (a/k/a Ben Isaacov) ("Ben") holds himself out as the CEO of Panthers Capital. *See* Ben Isaacov's LinkedIn Profile, attached hereto as **Exhibit 4**. Panthers Capital is registered as one of Funderz.Net LLC's 18 d/b/as. *See* Ex. 3 at 1.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶74.

75.    Simon Isaacov, the younger brother, serves as a direct funder for BMF.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶75.

76.    Although each brother and MCA company/label they control maintains separate books and records from each other, the Isaacovs and their respective MCA companies, including BMF, form a cohesive unit to further the goals of the Isaacov Enterprise to collect unlawful debt.

Answer: The allegations in ¶76 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶76.

77.    For example, for a period of years, Joe provided high interest loans to Avantgarde Living Facility, an assisted living facility in California. Joe would later bring Gabe, his brother, who likewise funded Avantgarde multiple times through usurious loans disguised as MCA agreements. When Avantgarde could not pay its high interest loans due to the COVID-19 pandemic, Gabe demanded Avantgarde's owner give title to his a rare collection Trans Am as payment for the loans

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶77.

78.    In separate instance, when Haymount Urgent Care, a North Carolina urgent care facility, could not afford to pay MCA agreements funded by Simon due to the Omicron, Simon flew to North Carolina and demanded to see the owner's watch collection, and asked to "borrow" one of the watches. When the victim insisted that the watch be papered as collateral for Simon's loans, Simon relented.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶78.

79.    Significantly, on September 27, 2024, Judge Liman of the Southern District of New York granted summary judgment against Joe and Funderz.Net LLC on RICO claims for collection of unlawful debt based, in part, on MCA agreements papered by Gabe's company BMF. *See Lateral Recovery LLC v. Funderz.net LLC*, 2024 U.S. Dist. LEXIS 176985, *77-78 (S.D.N.Y. Sept. 27, 2024) (the "*Funderz* Decision"). A true and correct copy of the *Funderz* Decision is attached hereto as **Exhibit 5**. A true and correct copy of one of the BMF MCA agreements the *Funderz* Decision ruled to be a usurious loan as a matter of law is attached hereto as **Exhibit 6**. The *Funderz* decision also found several MCA agreements papered by Joe's company HOP Capital were also usurious loans as a matter of law.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶79.

iv.    ***Background on the Hi Bar Enterprise***

80.    Hi Bar is owned by Herbst who, until a fallowing out described below in March 2022, worked with Getter to broker Hi Bar MCA agreements that were disguised usurious loans.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶80.

81.     Hi Bar, Herbst and Getter constitute their own RICO Enterprise created for the purpose of collecting unlawful debt using Hi Bar MCA agreements that disguise their true nature of usurious loans (the "Hi Bar Enterprise").

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶81.

82.     In the instant matter, the Hi Bar Enterprise worked with the Spin Enterprise in having the Spin Enterprise broker, negotiate, help underwrite and fund two Hi Bar MCA Agreements entered into between Plaintiffs and Hi Bar in March 2021.

Answer: Spin and Lubin deny the allegations in ¶82.

83.     The Hi Bar Enterprise also worked with the Spin Enterprise to refinance the Hi Bar MCA debt in June 2021 into the usurious Promissory Note. The BMF Enterprise also participated in this and the three Enterprises pooled funding for the Promissory Note and expected to share the spoils of collecting on the Promissory Note's 120% default interest rate and take ownership of the $40 million worth of life insurance policies owned by the Leer Companies pursuant to the Security Agreement.

Answer: Spin and Lubin admit that Spin, Hi Bar and BMF pooled funding for the Promissory Note.  Spin and Lubin deny the remaining allegations in ¶83.

84.     Since at least 2021 and continuing through the present, the Hi Bar Enterprise has had the common goal of collecting unlawful debt through disguising usurious loans as MCA agreements and soliciting merchants into entering into these agreements.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶84.

85.     On March 29, 2022, Herbst (through Hi Bar) sued Getter, alleging that Getter was stealing money from Hi Bar and brokering deals for Hi Bar that were doomed to fail because, like here, the merchants were "mired in debt and days away from default on its obligations and ceasing operations." *See* the complaint in *Hi Bar Capital LLC v. Yoel Getter*, 22-cv-1743 (E.D.N.Y.), attached hereto as **Exhibit 7**, at ¶ 26.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶85.

86.     Despite admitting that entering into these types of transactions was a "recipe for disaster," *id*., that is exactly what Hi Bar did here. To be sure, Hi Bar knew that the Leer Companies

was similarly "mired in debt" by simply reviewing the bank statements provided, and reviewing the number of other MCA positions disclosed by the Leer Companies.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶86.

### C.    Background on the MCA Agreements at Issue

87.    During the COVID-19 pandemic, specifically in early March 2021, Stefan was contacted unsolicited by Lubin, who offered to connect Stefan and the Leer Companies to what Lubin described as alternative lenders, specifically BMF and Hi Bar, who could offer short-term loans to the Leer Companies that would allow them to keep making payments on the life insurance policies that they owned.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶87.

88.    During this initial discussion, Stefan explained to Lubin the nature of the Leer Companies' business, the value of the various life insurance policies they presently owned, and how an influx of capital was desperately needed to avoid the Leer Companies losing the life insurance policies due to insufficient funds.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶88.

89.    Lubin knew the Leer Companies were having money problems when he solicited them to enter into the MCA Agreements.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶89.

90.    During the course of the MCA Agreements, Lubin learned about several of the life insurance policies owned by the Leer Companies and it was this that precipitated the discussion of the Promissory Note and Security Agreement later in June 2021.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶90.

i.    *March 2, 2021 BMF MCA Agreement*

91.    Given the Leer Companies' financial desperation, Plaintiffs accepted Lubin's offer to enter into what was understood as a short-term loan with BMF on March 2, 2021.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶91.

92.    Pursuant to the March 2, 2021 BMF MCA Agreement, attached hereto as **Exhibit 8**, the Leer Companies expected to receive $100,000, and were required to pay back $149,900 through fixed daily payments of $4,996. Ex. 9 at 1, 8.

Answer: Spin and Lubin refer to the March 2, 2021 BMF MCA Agreement for a complete

and in-context recital of its terms, state that the March 2, 2021 BMF MCA Agreement speaks for

itself and deny the allegations in ¶92 to the extent inconsistent with its terms.

93.    The March 2, 2021 BMF MCA Agreement provided that the $4,996 daily remittance was a "good faith" estimate of 10% of the Leer Companies' daily receivables. Ex. 9 at 1. Thus, as of March 2, 2021, BMF estimated that the Leer Companies daily receivables were worth $49,960.

Answer: Spin and Lubin refer to the March 2, 2021 BMF MCA Agreement for a complete

and in-context recital of its terms, state that the March 2, 2021 BMF MCA Agreement speaks for

itself and deny the allegations in ¶92 to the extent inconsistent with its terms.

94.    The Leer Companies did not receive the full $100,000, however. $20,000 was deducted as a purported bank fee. *See* March 3, 2021 email from Gabe, attached hereto as **Exhibit 9.**

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶94.

95.    When Lubin and Gabe underwrote the March 2, 2021 BMF MCA Agreement, they expressly set forth that the loan would have a term of 40 days. *See* March 2, 2021 email chain between Lubin and Gabe attached hereto as **Exhibit 10**. The 40-day term is also reflected by dividing the repayment amount ($149,900) by the daily payment ($4,996), which yields 30 business days or approximately 40 days total.

Answer: The allegation that Lubin and Gabe agreed that the March 2, 2021 BMF MCA

Agreement was a loan is a legal conclusion as to which no response is required. To the extent a

response is required, Lubin and Spin deny said allegations. As to the remaining allegations in ¶95,

Spin and Lubin refer to the March 2, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 2, 2021 BMF MCA Agreement speaks for itself and deny the remaining allegations in ¶95 to the extent inconsistent with its terms.

96.    As evidenced by the underwriting documents, Lubin and Getter provided the funding for the March 2, 2021 BMF MCA Agreement. Ex. 10 at 1.

Answer: Spin and Lubin deny the allegations in ¶96.

97.    The March 2, 2021 BMF MCA Agreement contained a "NO STACKING ADDENDUM" whereby the Leer Companies were "prohibited from initiating a cash advance or other loan products with another lender outside to BMF Advance, LLC. Doing so will place me in breach of contract and I will be liable for the entire amount owed to BMF Advance, LLC immediately, plus attorneys' fees, costs, liquidated damages and a default fee of $25,000 or 20% of the contract amount, whichever is greater." Ex. 8 at 9.

Answer: Spin and Lubin refer to the March 2, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 2, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶97 to the extent inconsistent with its terms.

98.    Under the March 2, 2021 BMF MCA Agreement, missing a single fixed payment would constitute an event of default. Ex. 8 § 3.1(d).

Answer: Spin and Lubin refer to the March 2, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 2, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶98 to the extent inconsistent with its terms.

99.    The March 2, 2021 BMF MCA Agreement also provided recourse in the event of bankruptcy as the personal guaranty provided that: "In the event that [BMF] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount." Ex. 8 at 6.

Answer: The allegations in ¶99 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶99.

100.    The March 2, 2021 MCA Agreement did not identify the specific receivables of the Leer Companies that BMF purportedly purchased.

<u>Answer</u>: Spin and Lubin refer to the March 2, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 2, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶100 to the extent inconsistent with its terms.

101.    Despite BMF purportedly purchasing the Leer Companies' receivables, the Leer Defendants were still responsible for collecting the receivables. Ex. 8 at 1 ("[BMF] will debit the Remittance each business day from one depositing bank account, which account must be acceptable to, and pre-approved by, [BMF] (the 'Account') into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as [BMF] receives payment in full of the Purchased Amount").

<u>Answer</u>: Spin and Lubin refer to the March 2, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 2, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶101 to the extent inconsistent with its terms.

102.    The March 2, 2021 BMF MCA Agreement did not have a reconciliation provision.

<u>Answer</u>: Spin and Lubin refer to the March 2, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 2, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶102 to the extent inconsistent with its terms.

103.    When viewed as a loan with an $80,000 principal and repayment term of 40 days, this March 2, 2021 BMF MCA Agreement assessed an annual interest rate of 425%.

<u>Answer</u>: The allegations in ¶103 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶103.

104.    Not only was the BMF MCA Agreement usurious, BMF over collected on the loan by $972. *See* pay run for March 2, 2021 BMF MCA Agreement attached hereto as **Exhibit 11**.

<u>Answer</u>: The allegations in ¶104, that the BMF MCA Agreement is a usurious loan, is a legal conclusion as to which no response is required.  To the extent a response is required, Spin and Lubin deny said allegations.  Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶104, that BMF over-collected by $972.

### ii.    *March 2, 2021 Hi Bar MCA Agreement*

105.    The $80,000 advanced under the March 2, 2021 BMF MCA Agreement did not provide a long-term solution to the Leer Companies' need for capital to cover the premium payments on the life insurance policies they owned.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶105.

106.    At the same time, the Leer Defendants were prohibited from securing any other financing whatsoever under the first MCA Agreement's "NO STACKING ADDENDUM." Ex. 8 at 9.

<u>Answer</u>: Spin and Lubin refer to the March 2, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 2, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶106 to the extent inconsistent with its terms.

107.    Thus, the Leer Companies had nowhere else to turn for additional financing other than Lubin, who shortly after the March 2, 2021 MCA Agreement pressured the Leer Defendants to enter into a second MCA Agreement with Hi Bar.

<u>Answer</u>: Spin and Lubin deny that they pressured the Leer Defendants to enter into a second MCA Agreement with Hi Bar.  Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶107.

108.    Faced with no other options, the Leer Defendants entered into an MCA Agreement with Hi Bar on March 10, 2021, a true and correct copy of which is attached hereto as **Exhibit 12**.

<u>Answer</u>: Spin and Lubin admit that the Leer Defendants entered into the March 10, 2021 Hi Bar MCA Agreement.  Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶108.

109.    Pursuant to the March 10, 2021 Hi Bar MCA Agreement, the Leer Companies were to receive $220,000 as a principal and were obligated to repay $329,978 through fixed daily payments of $8,500. Ex. 12 at 1.

<u>Answer</u>: Spin and Lubin refer to the March 10, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 10, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶109 to the extent inconsistent with its terms.

110.    The March 10, 2021 Hi Bar MCA Agreement provided that this $8,500 fixed daily was a "good faith estimate" of 20% of the Leer Companies' daily receivables. Ex. 12 at 1. Thus, as of March 10, 2021, Hi Bar estimated that the Leer Companies' daily receivables were worth $42,500.

Answer: Spin and Lubin refer to the March 10, 2021 Hi Bar MCA Agreement for a

complete and in-context recital of its terms, state that the March 10, 2021 Hi Bar MCA Agreement

speaks for itself and deny the allegations in ¶110 to the extent inconsistent with its terms.

111.    Like with the BMF MCA Agreement dated March 2, 2021, Stefan and Lubin negotiated the March 10, 2021 Hi Bar MCA Agreement as a short-term loan with a term of 39 days. Dividing the repayment amount ($329,978) by the fixed daily payments ($8,500) also yields a term of 39 days.

Answer: The allegations that the March 10, 2021 Hi Bar MCA Agreement was negotiated

as a short-term loan is a legal conclusion as to which no response is required.  To the extent a

response is required, Spin and Lubin deny said allegations.  As to the remaining allegations in

¶111, Spin and Lubin refer to the March 10, 2021 Hi Bar MCA Agreement for a complete and in-

context recital of its terms, state that the March 10, 2021 Hi Bar MCA Agreement speaks for itself

and deny the remaining allegations in ¶111 to the extent inconsistent with its terms.

112.    The Leer Companies did not receive the full $220,000 provided in the Hi Bar MCA Agreement. Rather, $22,000 was deducted from the principal as a purported "Underwriting Fee." Ex. 12 at 8.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶112.

113.    The March 10, 2021 Hi Bar MCA Agreement also provided that the Leer Defendants would be in default if they secured any alternative financing. Ex 12 § 3.1(i).

Answer: Spin and Lubin refer to the March 10, 2021 Hi Bar MCA Agreement for a

complete and in-context recital of its terms, state that the March 10, 2021 Hi Bar MCA Agreement

speaks for itself and deny the allegations in ¶111 to the extent inconsistent with its terms.

114.    Under the March 10, 2021 Hi Bar MCA Agreement, missing two daily payments constituted a default. Ex. 12 at 8.

<u>Answer</u>: Spin and Lubin refer to the March 10, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 10, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶111 to the extent inconsistent with its terms.

115.    The March 10, 2021 Hi Bar MCA Agreement also provided recourse in the event of bankruptcy as the personal guaranty provided that: "In the event that [Hi Bar] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount." Ex. 12 at 6.

<u>Answer</u>: The allegations in ¶115 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶115.

116.    The March 10, 2021 Hi Bar MCA Agreement did not identify any specific receivables of the Leer Companies that were being purchase.

<u>Answer</u>: Spin and Lubin refer to the March 10, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 10, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶116 to the extent inconsistent with its terms.

117.    Despite Hi Bar being the purported purchaser of the Leer Companies' receivables, the Leer Defendants were responsible for collecting these purchased receivables to make payment to Hi Bar. Ex. 12 at 1 ("[Hi Bar] will debit the Remittance each business day from only one depositing bank account, which must be acceptable to, and pre-approved by, [Hi Bar] (the 'Account') into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as [Hi Bar] received payment in full of the Purchased Amount").

<u>Answer</u>: Spin and Lubin refer to the March 10, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 10, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶117 to the extent inconsistent with its terms.

118.    The March 10, 2021 Hi Bar MCA Agreement did have a nominal reconciliation provision, but it contained many qualifications and limitations, including: (a) no event of default

may have occurred; and (b) Hi Bar had full discretion to request additional documentation the failure to provide would result in a denial of the reconciliation Ex. 12 § 1.3.

Answer: Spin and Lubin refer to the March 10, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 10, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶117 to the extent inconsistent with its terms.

119.    When Hi Bar performed ACH debits of the Leer Companies account to make payments on the MCA Agreement, the ACH debit would often read "PAYMENTS FOR LOAN." *See* March 12, 2021 email from Stefan to Lubin, attached hereto as **Exhibit 13**.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶119.

120.    When viewed as a loan with a $198,000 principal and a term of 39 business days, the March 10, 2021 Hi Bar MCA Agreement assessed an annual interest rate of approximately 506%

Answer: The allegations in ¶120 are legal conclusion as to which no response is required. To the extent a response is required Spin and Lubin deny the allegations in ¶120.

### iii.    *March 12, 2021 BMF MCA Agreement*

121.    After entering into the first two MCA Agreements, the Leer Companies were paying off the two loans through BMF and Hi Bar withdrawing approximately $13,500/day.

Answer: The allegation that the first two MCA Agreements are loans is a legal conclusion as to which no response is required.  To the extent a response is required, Spin and Lubin deny said allegations.  Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶121, including that after entering into the first two MCA Agreements, BMF and Hi Bar were withdrawing $13,500/day.

122.    This was not sustainable given that COVID resulted in the Leer Companies generating little receivables and the only future revenue the Leer Companies could expect would be when one of the insured on a policy they owned passed away.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶122.

123.    Because the prior two MCA Agreements prohibited the Leer Companies from securing any other financing, Plaintiffs were placed in a situation where they had no option but to turn back to Lubin for additional financing in order to keep making premium payments on the life insurance policies they owned.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶123.

124.    Rather than entering into a wholly new MCA Agreement, this time Lubin offered to refinance the prior BMF MCA Agreement, which was executed on March 12, 2021, pursuant to which the Leer Companies would receive purportedly receive $220,000 and repay $329,780 through fixed daily payments of $8,500. A true and correct copy of the March 12, 2021 BMF MCA Agreement is attached hereto as **Exhibit 14**.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegation that Lubin offered to refinance the prior BMF MCA Agreement.  As to the remaining allegations in ¶124, Spin and Lubin refer to the March 12, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 12, 2021 BMF MCA Agreement speaks for itself and deny the remaining allegations in ¶124 to the extent inconsistent with its terms.

125.    According to the March 12, 2021 BMF MCA Agreement, the daily remittance of $8,500 was a "good faith estimate" of 10% of the daily value of the Leer Companies' receivables. Ex. 14 at 1. Thus, as of March 12, 2021, BMF estimated that the Leer Companies' daily receivables to be worth $85,000/day.

Answer: Spin and Lubin refer to the March 12, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 12, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶125 to the extent inconsistent with its terms.

126.    The Leer Companies did not receive anything close to the $220,000 principal set forth in the MCA Agreement. Rather, $114,928.00 was immediately deducted from this amount to pay off the balance on the March 2, 2021 BMF MCA Agreement. Ex. 14 at 13. Additional deductions were made for underwriting and origination fees. *Id.* at 7.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶126.  As to the remaining allegations in ¶126, Spin and Lubin refer to the March 2, 2021 BMF MCA Agreement for a complete and in-context recital of its terms,

state that the March 2, 2021 BMF MCA Agreement speaks for itself and deny the remaining allegations in ¶126 to the extent inconsistent with its terms.

127.    Thus, at most, the Leer Companies received $105,072 as principal under the March 10, 2021 BMF MCA Agreement.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶127.

128.    Internal correspondence between Spin and BMF confirm that they designed the March 12, 2021 BMF MCA Agreement to have a finite term of 47 days. See March 12, 2021 email chain between Lubin and Gabe, attached hereto as **Exhibit 15.** This email chain also shows that the bank fee charged was arbitrarily made up by Gabe and Lubin. *Id*. at 1.

Answer: Spin and Lubin refer to Exhibit 15 for a complete and in-context recital of the referenced email chain, state that said email chain speaks for itself and deny the allegations in ¶128 to the extent inconsistent with its contents.

129.    Pursuant to the March 12, 2021 BMF MCA Agreement, missing a single daily payment would result in a default. Ex. 14 § 3.1(d).

Answer: Spin and Lubin refer to the March 12, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 12, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶129 to the extent inconsistent with its terms.

130.    The March 12, 2021 BMF MCA Agreement contained the same "NO STACKING ADDENDUM" as the March 2, 2021 BMF MCA Agreement such that the Leer Defendants would be in breach if they secured any other type of financial product. Ex. 14 at 10.

Answer: Spin and Lubin refer to the March 12, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 12, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶130 to the extent inconsistent with its terms.

131.    BMF had recourse in the event the Leer Companies declared bankruptcy by making the personal guarantors liable for the remaining balance. Ex. 14 at 6 ("In the event [BMF] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because

that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount").

<u>Answer</u>: The allegations in ¶131 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶131.

132.    The March 12, 2021 BMF MCA Agreement did not have a reconciliation provision.

<u>Answer</u>: Spin and Lubin refer to the March 12, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 12, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶132 to the extent inconsistent with its terms.

133.    The March 12, 2021 BMF MCA Agreement did not identify any specific receivables of the Leer Companies that BMF purportedly purchased.

<u>Answer</u>: Spin and Lubin refer to the March 12, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 12, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶133 to the extent inconsistent with its terms.

134.    Despite BMF purportedly purchasing the Leer Companies' receivables, the Leer Defendants remained responsible for collecting these "purchased" receivables to make payments to BMF. Ex. 14 at 1 ("[BMF] will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, [BMF] (the 'Account') into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as [BMF] receives payment in full of the Purchased Amount").

<u>Answer</u>: Spin and Lubin refer to the March 12, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 12, 2021 BMF MCA Agreement speaks for itself and deny the allegations in ¶133 to the extent inconsistent with its terms.

135.    Viewed as a loan with a principal of $105,072 and a repayment term of 47 days, the March 10, 2021 BMF MCA Agreement assessed an annual interest rate of 1,660%.

<u>Answer</u>: The allegations in ¶135 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶135.

136. In addition to being usurious, BMF also over collected on the March 12, 2021 BMF MCA Agreement in the amount of $8,000. *See* pay run for March 12, 2021 BMF MCA Agreement attached hereto as **Exhibit 16**.

Answer: The allegations that the BMF MCA Agreement is a usurious loan is a legal conclusion as to which no response is required. To the extent a response is required, Spin and Lubin deny said allegations. Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶136, that BMF over-collected on the March 12, 2021 BMF MCA Agreement in the amount of $8,000.

iv.    *March 25, 2021 BMF MCA Agreement*

137. Since this March 12, 2021 BMF MCA agreement only yielded the Leer Companies approximately an additional $100,000 in capital, while the Leer Companies continued to repay BMF and Hi Bar $17,000 per day, it was not long before the Leer Companies' capital was again depleted after using the funds to maintain payments on the Leer Companies' life insurance policies they owned.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶137.

138. Given that both the March 10, 2021 Hi Bar and March 12, 2021 BMF MCA Agreement contained prohibitions under penalty of default if the Leer Companies secured any alternative financing, the Leer Defendants had nowhere to turn other than back to Lubin and Spin.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶138.

139. Consequently, on March 25, 2021, Lubin had the March 12, 2021 BMF MCA Agreement refinanced into a new loan whereby the Leer Companies would receive $400,000 and use $274,000 of that amount to pay off the prior BMF MCA balance, and still be obligated to repay $599,600 through daily payments of $25,000. A true and correct copy of the March 25, 2021 BMF MCA Agreement is attached hereto as **Exhibit 17**.

Answer: The allegations that the March 12, 2021 BMF MCA Agreement was refinanced into a new loan by the March 25, 2021 BMF MCA Agreement is a legal conclusion as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations. As to the remaining allegations in ¶139, Spin and Lubin refer to the March 25, 2021 BMF MCA Agreement for a complete and in-context recital of its terms, state that the March 25, 2021 BMF

MCA Agreement speaks for itself and deny the allegations in ¶139 to the extent inconsistent with

its terms.

140.    According to the March 25, 2021 BMF MCA Agreement, the $25,000 daily remittance was a "good faith estimate" of 10% of the value of the Leer Companies' daily receivables. Ex. 17 at 1, 8. Thus, as of March 25, 2021, BMF estimated that the Leer Companies' daily receivables were worth $250,000/day

Answer: Spin and Lubin refer to the March 25, 2021 BMF MCA Agreement for a complete

and in-context recital of its terms, state that the March 25, 2021 BMF MCA Agreement speaks for

itself and deny the allegations in ¶140 to the extent inconsistent with its terms.

141.    The Leer Companies did not even receive the full $126,000 under the March 25, 2021 BMF Agreement after paying off the prior BMF MCA; instead, they only netted $100,000.*See* March 26, 2021 email chain between Lubin and Gabe, attached hereto as **Exhibit 18.**

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶141.

142.    Dividing the Purchased Amount ($599,600) by the daily remittance ($25,000) creates a term of just 24 business days, or 31 days total. This fixed term of 24 business days was negotiated between Stefan and Lubin on March 22, 2021 via text messages, attached hereto as **Exhibit 19**.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegation that the referenced term was negotiated between Stefan and Lubin on

March 22, 2021 via text messages in Exhibit 19.  As to the remaining allegations in ¶142, Spin and

Lubin refer to the March 25, 2021 BMF MCA Agreement for a complete and in-context recital of

its terms, state that the March 25, 2021 BMF MCA Agreement speaks for itself and deny the

allegations in ¶142 to the extent inconsistent with its terms.

143.    Pursuant to the March 25, 2021 BMF MCA Agreement, missing a single daily payment would constitute an event of default. Ex. 17 § 3.1(d).

Answer: Spin and Lubin refer to the March 25, 2021 BMF MCA Agreement for a complete

and in-context recital of its terms, state that the March 25, 2021 BMF MCA Agreement speaks for

itself and deny the allegations in ¶143 to the extent inconsistent with its terms.

144.    The March 25, 2021 BMF MCA Agreement contained the same "NO STACKING ADDENDUM" as the prior BMF MCA Agreement such that the Leer Defendants would be in breach if they secured any other type of financial product. Ex. 17 at 10.

Answer: Spin and Lubin refer to the March 25, 2021 BMF MCA Agreement for a complete

and in-context recital of its terms, state that the March 25, 2021 BMF MCA Agreement speaks for

itself and deny the allegations in ¶144 to the extent inconsistent with its terms.

145.    BMF had recourse in the event the Leer Companies declared bankruptcy by making the personal guarantors liable for the remaining balance. Ex. 17 at 6 ("In the event [BMF] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount").

Answer: The allegations in ¶145 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶145.

146.    The March 25, 2021 BMF MCA Agreement did not have a reconciliation provision.

Answer: Spin and Lubin refer to the March 25, 2021 BMF MCA Agreement for a complete

and in-context recital of its terms, state that the March 25, 2021 BMF MCA Agreement speaks for

itself and deny the allegations in ¶146 to the extent inconsistent with its terms.

147.    When Stefan made remittance adjustment requests to Lubin pursuant to this MCA Agreement, the two simply negotiated a new lower amount that was the most that the Leer Companies could afford at that time without any review of the Leer Companies' actual receivables. *See* May 24, 2021 text exchange between Stefan and Lubin, attached hereto as **Exhibit 20**.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶147.

148.    The March 25, 2021 BMF MCA Agreement did not identify any specific receivables of the Leer Companies that BMF was purportedly purchasing.

Answer: Spin and Lubin refer to the March 25, 2021 BMF MCA Agreement for a complete

and in-context recital of its terms, state that the March 25, 2021 BMF MCA Agreement speaks for

itself and deny the allegations in ¶148 to the extent inconsistent with its terms.

149.    The March 25, 2021 BMF MCA Agreement did not identify any specific receivables of the Leer Companies that BMF was purportedly purchasing.

Answer: Spin and Lubin refer to the March 25, 2021 BMF MCA Agreement for a complete

and in-context recital of its terms, state that the March 25, 2021 BMF MCA Agreement speaks for

itself and deny the allegations in ¶149 to the extent inconsistent with its terms.

150.    Viewed as a loan with a $100,000 principal and term of 31 days, the March 25, 2021 MCA Agreement assessed an annual interest rate of 5,882%.

Answer: The allegations in ¶150 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶150.

151.    In addition to being usurious, BMF also over collected on the March 25, 2021 MCA Agreement in the amount of $1,900. *See* pay run for March 25, 2021 BMF MCA Agreement attached hereto as **Exhibit 21**.

Answer: The allegations in ¶151, that the March 25, 2021 BMF MCA Agreement is

usurious, is a legal conclusion as to which no response is required.  To the extent a response is

required, Spin and Lubin deny said allegations.  Spin and Lubin lack knowledge or information

sufficient to form a belief about the truth of the remaining allegations in ¶151, that BMF over-

collected by $1,900.

**v.    *March 25, 2021 BMF MCA Agreement***

152.    The $100,000 principal provided by the March 25, 2021 BMF MCA Agreement was not sufficient to keep the Leer Companies operational. At the same time, the MCA Agreements' prohibition on securing funding outside of BMF and Hi Bar gave Plaintiffs no choice but to return to Lubin for another MCA deal for their required funding.

Answer: As to the allegation that the MCA Agreements prohibited securing funding

outside of BMF and Hi Bar, Spin and Lubin refer to the March 25, 2021 BMF MCA Agreement

for a complete and in-context recital of its terms, state that the March 25, 2021 BMF MCA

Agreement speaks for itself and deny said allegation to the extent inconsistent with its terms.  Spin

and Lubin lack knowledge or information sufficient to form a belief about the truth of the

remaining allegations in ¶152.

153.    On March 25, 2021, the Leer Defendants also entered into another MCA Agreement with Hi Bar whereby the Leer Companies were to receive $400,000 and repay $599,600 through daily payments of $20,000, which was Hi Bar's "good faith estimate" of 20% of the daily value of the Leer Companies as of March 25, 2021. A true and correct copy of the March 25, 2021 Hi Bar MCA Agreement is attached hereto as **Exhibit 22**.

Answer: Spin and Lubin admit that on March 25, 2021, the Leer Defendants entered into the March 25, 2021 Hi Bar MCA Agreement. Spin and Lubin refer to the March 25, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 25, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶153 to the extent inconsistent with its terms.

154.    As of March 25, 2021, Hi Bar's estimate of the Leer Companies' daily receivables value was $100,000.

Answer: Spin and Lubin refer to the March 25, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 25, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶154 to the extent inconsistent with its terms.

155.    Consequently, in less than one month, each MCA Agreement by the same two lenders, BMF and Hi Bar, had different "good faith estimates" of the Leer Companies' daily receivables, as reflected in the below chart:

| MCA Agreement | Daily Payment | Specified Percentage | Defendants' Estimation of FTE Receivables |
|---|---|---|---|
| 3/2/21 BMF | $4,996 | 10% | $49,960/day |
| 3/10/21 Hi Bar | $8,500 | 20% | $42,500/day |
| 3/12/21 BMF | $8,500 | 10% | $85,000/day |
| 3/25/21 BMF | $25,000 | 10% | $250,000/day |
| 3/25/21 Hi Bar | $20,000 | 20% | $100,000/day |

Answer: Spin and Lubin refer to the MCA Agreements for a complete and in-context recital of their terms, state that the MCA Agreements speaks for themselves and deny the allegations in ¶155 to the extent inconsistent with their terms.

156.    The Leer Companies did not receive the full $400,000 principal provided by the March 25, 2021 Hi Bar MCA Agreement. Over $80,000 was deducted for "Underwriting Fee" and a "UCC Filing Fee." Ex. 22 at 8.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶156.

157.    The March 25, 2021 Hi Bar MCA Agreement provided that two missed payments would constitute an event of default. Ex. 22 at 8.

<u>Answer</u>: Spin and Lubin refer to the March 25, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 25, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶157 to the extent inconsistent with its terms.

158.    The Agreement provided recourse in the event the Leer Companies declared bankruptcy by holding the personal guarantors responsible for the outstanding balance. Ex. 22 at 6 ("In the event that [Hi Bar] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount").

<u>Answer</u>: The allegations in ¶158 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶158.

159.    Taking out any financing product from anyone other than Hi Bar would constitute an event of default under the MCA Agreement. Ex. 22 § 3.1(i).

<u>Answer</u>: Spin and Lubin refer to the March 25, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 25, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶159 to the extent inconsistent with its terms.

160.    The March 25, 2021 Hi Bar MCA Agreement did have a nominal reconciliation provision, but it contained many qualifications and limitations, including: (a) no event of default may have occurred; and (b) Hi Bar had full discretion to request additional documentation the failure to provide would result in a denial of the reconciliation. Ex. 22 § 1.3.

<u>Answer</u>: Spin and Lubin refer to the March 25, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 25, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶160 to the extent inconsistent with its terms.

161.    In practice, however, when Stefan and Lubin discussed making adjustments to the daily remittance, it was a discussion about the maximum the Leer Defendants could afford with no analysis of the Leer Companies' actual receivables. Ex. 20.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶161, except as to the communications described in Exhibit 20.  As to said communications, Spin and Lubin refer to Exhibit 20 for a complete and in-context recital of same, state that Exhibit 20 speaks for itself and deny the allegations in ¶161 to the extent inconsistent with same.

162.    Dividing the MCA Agreement's Purchase Amount ($599,600) by the daily remittance ($20,000) yields a finite term of 30 business days, or 44 total days.

Answer: Spin and Lubin refer to the March 25, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 25, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶162 to the extent inconsistent with its terms.

163.    The March 25, 2021 Hi Bar MCA Agreement did not identify any specific receivables being purchased from the Leer Companies.

Answer: Spin and Lubin refer to the March 25, 2021 Hi Bar MCA Agreement for a complete and in-context recital of its terms, state that the March 25, 2021 Hi Bar MCA Agreement speaks for itself and deny the allegations in ¶163 to the extent inconsistent with its terms.

164.    Like the prior four MCA Agreements, the March 25, 2021 Hi Bar MCA Agreement made the Leer Defendants responsible for collecting the receivables that Hi Bar purportedly purchased. Ex. 22 at 1.

Answer: Spin and Lubin refer to the MCA Agreements for a complete and in-context recital of its terms, state that the MCA Agreements speaks for themselves and deny the allegations in ¶164 to the extent inconsistent with their terms.

165.    When viewed as a loan with a $320,000 principal and a term of 44 business days, the March 25, 2021 Hi Bar MCA Agreement assessed an annual interest rate of 725%.

Answer: The allegations in ¶165 are legal conclusion as to which no response is required. To the extent a response is required Spin and Lubin deny the allegations in ¶165.

**D.      Similarities Between the MCA Agreements Here and the Funderz MCA Agreements**

166.      As mentioned above, BMF MCA agreements have been ruled to be loans as a matter of law by a recent Southern District of New York decision. Ex. 5.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶166.

167.      Both the MCA Agreements here and the Funderz BMF MCA agreement, professed that the daily remittance was a "good faith estimate" of the purchased percentage of the merchants' receivables. *Compare* Ex. 6 at 1 *with* Ex. 8 at 1.

<u>Answer</u>: Spin and Lubin refer to the MCA Agreements here and the Funderz BMF MCA

Agreement for a complete and in-context recital of their terms, state that the MCA Agreements

here and the Funderz BMF MCA Agreement speak for themselves and deny the allegations in

¶167 to the extent inconsistent with their terms.

168.      As found by the *Funderz* court, the Funderz MCA agreements were not good faith estimates because the estimation would vary with MCA agreements entered on back-to-back days, Ex. 5 at *89-90, which is the same case here as evidence by the above chart.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶168.

169.      Both the MCA Agreements here and the Funderz BMF MCA Agreement provided recourse to the lender in the event of the merchant's bankruptcy through the personal guaranty. *Compare* Ex. 6 at 6 *with* Ex. 8 at 6.

<u>Answer</u>: Spin and Lubin refer to the MCA Agreements here and the Funderz BMF MCA

Agreement for a complete and in-context recital of their terms, state that the MCA Agreements

here and the Funderz BMF MCA Agreement speak for themselves and deny the allegations in

¶169 to the extent inconsistent with their terms.

170.      The BMF MCA Agreement in *Funderz* made two missed payments a default, Ex. 6 at 8, whereas the MCA Agreements here made one missed payment an event of default. Ex. 8 § 3.1(d).

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶170.

171.    Both the MCA Agreements here and the *Funderz* BMF MCA Agreement found to be a loan as a matter of law gave the lender a security interest in all of the merchant's assets. *Compare* Ex. 6 at 6 *with* Ex. 8 at 6.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶171.

172.    The *Funderz* MCA Agreements had a completely illusory reconciliation provision that could be granted or denied in BMF's "sole discretion." Ex. 6 at 1. The BMF MCA Agreements here do not even have a reconciliation provision. *See generally* Ex. 8.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶172.

173.    The *Funderz* BMF MCA Agreements nor the MCA Agreements here (i) failed to identify any specific receivables being purchased; and (ii) made it the merchant's responsibility to collect the receivables purportedly purchased by BMF. *Compare* Ex. 6 at 1 *with* Ex. 8 at 1.

Answer: Spin and Lubin refer to the BMF MCA Agreements here and the Funderz BMF MCA Agreement for a complete and in-context recital of their terms, state that the MCA Agreements here and the Funderz BMF MCA Agreement speak for themselves and deny the allegations in ¶173 to the extent inconsistent with their terms.

**E.    The MCA Agreements' Debt is Refinanced Into the Promissory Note**

174.    By May 2021, the Leer Companies were only able to make small daily payments of several hundred dollars that were negotiated between Lubin and Stefan without regard to the Leer Companies' actual receivables. Ex. 20.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶174.

175.    Spin and Lubin were unhappy with this fact, and thus Lubin approached the Leer Defendants with a proposal to enter into a loan that would pay off the balance of the BMF and Hi Bar MCA Agreements

Answer: Spin and Lubin admit that Lubin approached the Leer Defendants with a proposal to enter into a loan that would pay off the balance of the BMF and Hi Bar MCA Agreements. Spin and Lubin deny the remaining allegations in ¶175.

176.    To that end, on June 16, 2021, Golden Foothill, LF II and LS II entered into a purported $2.7 million promissory note (the "Promissory Note") with Spin that had an annual interest rate of 60%. A true and correct copy of the Promissory Note is attached hereto as **Exhibit 23**.

Answer: Spin and Lubin admit that on June 16, 2021, Golden Foothill, LF II and LS II entered into the Promissory Note with Spin.   As to the particular terms of the Promissory Note, Spin and Lubin refer to the Promissory Note for a complete and in-context recital of its terms, state that the Promissory Note speaks for itself and deny the allegations in ¶176 to the extent inconsistent with its terms.

177.    In connection with the Promissory Note, Spin required that Stefan and Tatanisha Leer execute personal guarantees, attached hereto as **Exhibits 24** and **25**, respectively.

Answer: Spin and Lubin admit the allegations in ¶177.

178.    Spin also required a corporate guaranty to be executed by El Dorado, Lone Wolf, ELDO, Genesis, and KTL (the "Corporate Guarantors"). A true and correct copy of the corporate guaranty is attached hereto as **Exhibit 26**.

Answer: Spin and Lubin admit the allegations in ¶178.

179.    The most important component of the transaction for Spin and Lubin was acquiring a purported security interest in several of the Leer Companies' remaining life insurance policies they owned by executing a Security Agreement entered into between Spin, on the one hand, and Golden Foothill, LF II, LS II, the Corporate Guarantors and the Leers as personal guarantors as part of the Promissory Note's overall Transaction. A true and correct copy of the Security Agreement is attached hereto as **Exhibit 27**.

Answer: Spin and Lubin admit that the referenced Security Agreement was executed by the respective parties thereto as part of the Promissory Note's overall Transaction.  Spin and Lubin deny that the security interest in the remaining life insurance policies owned by the Leer Companies was the most important component of the transaction.  As to the remaining allegations in ¶179, Spin and Lubin refer to the Security Agreement for a complete and in-context recital of its terms, state that the Security Agreement speaks for itself and deny the remaining allegations in ¶179 to the extent inconsistent with its terms.

180.    While the Promissory Note on its face contemplated a $2.7 million dollar loan, less than half that amount actually entered into any bank account of the Leer Companies. Rather (1)

$200,000 was immediately taken off as a fee for Lubin's services for "putting together the deal"; (2) $30,000 was allocated to Spin's attorneys to compensate them for drafting the transaction documents purportedly; (3) $582,000 went to pay off the Hi Bar MCA balance; and (4) $580,597 went to pay off the BMF MCA balance. This left only $1,307,403 as the actual principal to the Leer Companies. *See* Spin's Promissory Note distribution breakdown attached hereto as **Exhibit 28.**

Answer: Spin and Lubin refer to Exhibit 28 for a complete description of how $2.5 million of the loan proceeds were disbursed, and to the Promissory Note for a complete and in-context recital of terms concerning the $200,000 fee, state that said documents speak for themselves and deny the allegations in ¶180 to the extent inconsistent with same.

181.    As reflected in the below text exchange between Stefan and Lubin, Defendants intentionally designed the Promissory Note to repackage prior usurious debt into a fictitious amount above $2.5 million purely to try to escape liability for the usurious MCA Agreements by artificially bringing the Promissory Note outside the scope of New York's criminal usury laws.

[Image omitted]

Answer: Spin and Lubin deny the allegations in ¶181.

182.    The Promissory Note had a payment schedule whereby $150,000 payments were due on June 18, 2021 and June 25, 2021, followed by $70,000 weekly payments from July 2, 2021, to August 6, 2021, and then weekly payments of $127,173.91 each week thereafter until the Promissory Note was scheduled to be paid in full by January 14, 2022. Ex. 23 at 6.

Answer: Spin and Lubin refer to the Promissory Note and the referenced payment schedule for a complete and in-context recital of their terms, state that the Promissory Note including the referenced payment schedule speaks for itself and deny the allegations in ¶182 to the extent inconsistent with its terms.

183.    The Leer Companies were able to make the first five payments, totaling approximately $510,000, but could not continue to make the onerous weekly payments given the high interest rate and the fact that they only received less than half the actual principal.

Answer: Spin and Lubin admit that the Leer Companies were able to make the first five payments, totaling approximately $510,000. Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶183.

184.    As a result, Spin sued Plaintiffs and is presently seeking more than $14 million in damages for breach of the Promissory Note at the default interest rate of 120% annually while the

Leer Companies received less than $2 million in total under all five MCA Agreements *and* the Promissory Note.

Answer: Spin and Lubin admit that Spin commenced an action against Plaintiffs seeking more than $14 million in damages for breach of the Promissory Note at the default interest rate of 120% annually. Spin and Lubin deny that the Leer Companies received less than $2 million in total under all five MCA Agreements and the Promissory Note.

**FIRST CAUSE OF ACTION**
**(RICO: 18 U.S.C. § 1962)**

185. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

Answer: Spin and Lubin repeat and re-allege their responses to the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity**

186. All of the MCA Agreements provided that they were to be governed and construed under the laws of New York, Exs. 8, 12, 14. 17, and 22 §§ 4.5, which is also where Spin, BMF and Hi Bar have their principal place of business.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegation that Spin, BMF and Hi Bar all have their principal place of business in New York. As to the remaining allegations in ¶186, Spin and Lubin refer to the MCA Agreements for a complete and in-context recital of their terms, state that the MCA Agreements for themselves and deny the allegations in ¶186 to the extent inconsistent with their terms.

187. More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶187.

188. In 1965, the New York Legislature commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶188.

189.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation, titled An Investigation of the Loan-Shark Racket, brought to the attention of the New York Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶189.

190.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at an interest rate greater than twenty-five percent (25%) per annum.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶190.

191.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶191.

192.    As noted above, loan sharks with full knowledge of the prior law, made it a policy to loan to corporations.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶192.

193.    The Investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶193.

194.    Like with the instant MCA Agreements, the Report and New York case law has thus recognized that usurious loans are often disguised as other fictional funding devices designed to evade New York law.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶194.

195.    As the New York Court of Appeals recently held, "[w]hen determining whether a transaction is a loan, substance—not form—controls." *Adar Bays, LLC v. GeneSYS Id, Inc.*, 37 N.Y.3d 320, 335 (2021).

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶195.

196.    Under recent Second Circuit authority, to determine whether MCAs are really loans, courts consider at least three, non-exhaustive factors: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241, *3 (2d Cir. June 8, 2023). Other factors New York law considers include: (4) whether lenders made sure the borrowers were in default immediately (5) whether the agreements identify particular revenue or accounts that were supposedly purchased; (6) whether the merchant is responsible for collecting the future receipts; (7) whether default is declared after just a few missed payments; (8) whether the daily payment rates appear to be good faith estimates of merchant's receivables; and (9) the MCA agreements are underwritten like loans.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶196.

197.    The MCA Agreements issued by Defendants hit for all of the above factors and are just another iteration of usurious lenders' decades-long schemes to evade New York usury laws by disguising loans as a purchase of receivables

Answer: The allegations in ¶197 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶197.

198.    First, each MCA Agreement gave BMF and Hi Bar direct recourse in the event that the Leer Companies declared bankruptcy by making Stefan and Tatanisha Leer, as personal guarantors, responsible for any amount outstanding. Exs. 8, 12, 14. 17, and 22 at 6. Courts applying New York law have construed this exact provision to render MCA agreements loans. *See, e.g.*, *New Y-Capp v. Arch Cap. Funding LLC*, 2022 U.S. Dist. LEXIS 180309, *13 (S.D.N.Y. Sept. 30, 2022) ("provisions 'worked to ensure while bankruptcy may no longer have been an express default under the revised standard form of MCA Agreement, the guarantor continued to be absolutely liable for repayment in the event of a bankruptcy filing").

Answer: The allegations in ¶198 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶198.

199.    The MCA Agreements also granted BMF and Hi Bar a security interest in all of the Leer Companies assets. Exs. 8, 12, 14. 17, and 22 at 5 ("Merchant and Guarantor(s) grant to [BMF/Hi Bar] a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory . . . now or hereafter owned or acquired

by Merchant and/or Guarantor(s) [and] all proceeds . . . [and] any funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds"). Courts applying New York law have construed blanket security grants in the merchants' assets to amount to recourse in the event the merchant declares bankruptcy. *Akf, Inc. v. Haven Transp. Bus. Sols., Inc.*, 2024 U.S. Dist. LEXIS 103271, *18-19 (N.D.N.Y. June 11, 2024) (finding bankruptcy recourse for MCA lender where "it seems virtually certain that FundKite would be able to file a claim in any bankruptcy, as a secured creditor"); *MCA Servicing Co. v. Nic's Painting, LLC*, 2014 N.Y. Misc. LEXIS 2238, *12 (N.Y. Sup. Ct. Apr. 23, 2024) ("[A]lthough bankruptcy is not identified as an event of default, the agreement creates a security interest in every tangible asset of the business and allows for recovery personally against the Merchant's owner"); *Cloudfund, LLC v. Mobile Rehad, Inc.*, 2024 N.Y. Misc. LEXIS 4817, *12 (N.Y. Sup. Ct. May 1, 2024) (same).

<u>Answer</u>: The allegations in ¶199 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin lack knowledge or information sufficient to

form a belief about the truth of the allegations in ¶199.

200.    Second, the MCA Agreements were underwritten as loans having finite terms as evidenced by internal correspondence between Lubin and the other co-conspirators. Exs. 10, 15. Each MCA Agreement also had a *de facto* term by simply dividing the repayment amount by the fixed daily payment, which New York courts have found to satisfy the finite term factor. *Lateral Recovery LLC v. Queen Funding LLC*, 2022 U.S. Dist. LEXIS 129032, *16 (S.D.N.Y. July 20, 2022) ("a de facto term plausibly exists. The period of payment can be easily calculated by dividing the amount FTE owes by the among of daily payments").

<u>Answer</u>: The allegations in ¶200 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶200.

201.    Third, the BMF MCA Agreements completely lacked a reconciliation provision, and the Hi Bar MCA Agreements had an illusory provision because reconciliation could be denied if the Leer Companies did not provide BMF or Hi Bar with any and all documents that they may request as a condition for granting reconciliation. This is a reconciliation feature several New York courts have found to be illusory and renders MCA agreements loans. *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 248 n. 5 (S.D.N.Y. 2022); *Queen*, at *14-15; *Akf*, at *17.

<u>Answer</u>: The allegations in ¶201 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶201.

202.    More importantly, in practice, Lubin did not perform reconciliations to adjust the MCA Agreements' daily remittance to reflect the Leer Companies' actual receivables. Instead, when Plaintiffs alerted Spin and Lubin that they could not maintain the daily payments, Lubin

negotiated new daily payments as whatever amount the Leer Companies could afford to pay, without any review or discussion of the Leer Companies receivables. Ex. 20.

Answer: Spin and Lubin refer to Exhibit 20 for a complete and in-context recital of its contents, state that Exhibit 20 speaks for itself and deny the allegations concerning Exhibit 20 to the extent inconsistent with same. Spin and Lubin deny the remaining allegations in ¶202.

203. Finally, because each MCA Agreement made the Leer Companies securing any financing outside of BMF (or respectively Hi Bar), the Defendants ensured that the Leer Companies were in breach of the March 2, 2021 BMF MCA Agreement as soon as they executed the March 10, 2021 Hi Bar MCA Agreement. Because of this technical default that Defendants trapped Plaintiffs into, Defendants could always hold the Plaintiffs in default which would preclude them from any purported right to reconciliation or remittance adjustments under the MCA Agreements.

Answer: The allegations in ¶203 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶203.

204. Fourth, the MCA Agreements' purported "good faith" estimate of the Leer Defendants is proven to be a sham when the MCA Agreements are compared side-by-side, per the chart below

| MCA Agreement | Daily Payment | Specified Percentage | Defendants' Estimation of FTE Receivables |
|---|---|---|---|
| 3/2/21 BMF | $4,996 | 10% | $49,960/day |
| 3/10/21 Hi Bar | $8,500 | 20% | $42,500/day |
| 3/12/21 BMF | $8,500 | 10% | $85,000/day |
| 3/25/21 BMF | $25,000 | 10% | $250,000/day |
| 3/25/21 Hi Bar | $20,000 | 20% | $100,000/day |

Answer: The allegations in ¶204 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶204.

205. Courts applying New York law have found, even as a matter of law on summary judgment, that MCA agreements with bad faith estimates of the merchant's receivables are loans. *Davis v. Richmond Capital Group*, 194 A.D.3d 516, 517 (1st Dep't 2021); *Lateral Recovery LLC v. Funderz.net LLC*, 2024 U.S. Dist. LEXIS 176985, *89 (S.D.N.Y. Sept. 27, 2024).

Answer: The allegations in ¶205 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶205.

206.    Fifth, the MCA Agreements failed to identify any specific receivables of the Leer Companies that they were purchasing while simultaneously making the Leer Companies responsible for collecting the receivables purportedly purchased by BMF and Hi Bar so that the lenders could debit the remittances from the Leer Companies' designated bank account. Exs. 8, 12, 14. 17, and 22 at 1. Courts applying New York law have found this feature to render MCA agreements loans as well. *Haymount*, at 249; *Funderz*, at *81-82.

Answer: The allegation that Courts applying New York law have found the referenced feature to render the MCA agreements loans is a legal conclusion as to which no response is required.  To the extent a response is required, Spin and Lubin deny said allegation.  As to the remaining allegations in ¶206, Spin and Lubin refer to the MCA Agreements for a complete and in-context recital of their terms, state that the MCA Agreements speak for themselves and deny the allegations in ¶206 to the extent inconsistent with their terms.

207.    Six, the MCA Agreements made missing as little as one to two missed daily payments an event of default. Exs. 8, 12, 14. 17, and 22 at 7 and §§ 3.1(d). Courts applying New York law have found *less onerous* default provisions render MCA agreements loans. *Davis*, at 517; *Queen*, at *18.

Answer: The allegation that Courts applying New York law have found less onerous default provisions to render MCA agreements loans is a legal conclusion as to which no response is required.  To the extent a response is required, Spin and Lubin deny said allegation.  As to the remaining allegations in ¶207, Spin and Lubin refer to the MCA Agreements for a complete and in-context recital of their terms, state that the MCA Agreements speak for themselves and deny the allegations in ¶207 to the extent inconsistent with their terms.

208.    By drafting and servicing the MCA Agreements in the manner described above, Defendants ensure absolute repayment through (i) sham reconciliation provisions (if at all), (ii) recourse in the event of bankruptcy, (iii) having a complete security interest in all of the Leer Companies assets; and (iv) making if a default if the merchant missed one or two payments or takes any alternative funding.

Answer: The allegations in ¶208 are legal conclusions as to which no response is required.  To the extent a response is required, Spin and Lubin deny the allegations in ¶208.

209.    Consequently, the MCA Agreements are usurious loans with interest rates ranging from 425%, on the low end, to 5,882%, on the high end, multiple worlds higher than New York's

twenty-five percent (25%) criminal usury limit on commercial loans of less than $2.5 million principal, which constitutes unlawful debt for RICO purposes. 18 U.S.C. § 1961(6)(B).

Answer: The allegations in ¶209 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶209.

210.    By extension, the Promissory Note, with a true principal of approximately $1.3 million while imposing an annual interest rate of 60%, also is more than twice the New York criminal usury rate and also constitutes unlawful debt for RICO purposes

Answer: The allegations in ¶210 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶210.

**B.    Culpable Persons**

211.    Lubin, Gabe, Getter, and Herbst are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.

Answer: The allegations in ¶211 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶211.

212.    At all relevant times, Lubin, Gabe, Getter, and Herbst were, and are, a person that exists separate and distinct from the Spin, Isaacov and Hi Bar Enterprises, described below.

Answer: The allegations in ¶212 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶212.

213.    Lubin is the owner and sole managing member of Spin. During the relevant time period, Lubin, had the Spin Enterprise serve as a broker for MCA lenders, solicited the unlawful debt transactions between the Plaintiffs and the Isaacov and Hi Bar Enterprises, negotiated the terms of the MCA Agreements with other Isaacov and Hi Bar Enterprise members, and providing funding for the MCA Agreements.

Answer: Spin and Lubin admit that Lubin is the owner and sole manager of Spin, and that during the relevant time period, Spin and Lubin served as a broker for the MCA funders.  The allegation that the MCA Agreements are unlawful debt transactions is a legal conclusion as to which no response is required.  To the extent a response is required, Spin and Lubin deny the allegations that the MCA Agreements are unlawful debt transactions.  Spin and Lubin deny the remaining allegations in ¶213.

214.    Gabe is the CEO and principal owner of BMF and part of the Isaacov Enterprise. During the relevant time period, Gabe, along with Lubin, decided upon the terms of the MCA Agreements between BMF and the Plaintiffs and used BMF to paper the MCA Agreements with Plaintiffs. Gabe also provided funding for the MCA Agreements all while acting as part of the Isaacov Enterprise.

Answer: Spin and Lubin deny that Lubin decided upon the terms of the MCA Agreements

between BMF and the Plaintiffs.  Spin and Lubin lack knowledge or information sufficient to form

a belief about the truth of the remaining allegations in ¶214.

215.    Gabe confirms he is BMF's owner in New York State court filings he makes in support of the Enterprise collecting unlawful debt. *See, e.g.*, Affidavit of Gavriel Yitzchakov, dated August 29, 2023, filed in *BMF Advance, LLC v. Modern Concepts Construction, LLC et al.*, Index No. 505587/2023 (Sup. Ct. Kings Cnty.), attached hereto as **Exhibit 29**.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶215.

216.    As reflected here with the BMF MCA Agreements, and is a consistent pattern for BMF's servicing of MCA agreements generally, Gabe also ensures absolute repayment on MCA Agreements by routinely over-collecting from merchants, like the Leer Companies, by debiting their bank accounts *after* the MCA Agreement is paid off in full. Exs. 11, 16, and 21.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶216.

217.    Herbst is the owner and mastermind of the Hi Bar Enterprise, which Getter, during the relevant time period, worked for as a broker who also was involved in funding and underwriting MCA Agreements for the Hi Bar Enterprise.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶217.

218.    Through their respective operation of Spin, BMF, and Hi Bar, Lubin, Gabe, Getter, and Herbst solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in states that do not have usury laws, in addition to collecting unlawful debt from merchants situated in states that do have usury laws, such as California (where Plaintiffs resided) and New York (where Defendants operated out of).

Answer: The allegations in ¶218 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶218.

219.    When the Enterprise has sufficiently trapped merchants into a series of usurious MCA Agreements, Spin, with funding provided by Gabe and Getter, repackage the MCA debt into a purportedly legitimate loan with a fictitious principal above $2.5 million in order to try to insulate their collection of unlawful debt.

Answer: The allegations in ¶219 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶219.

**C.    The Spin Enterprise**

220.    Spin and Lubin constitute an Enterprise (the "Spin Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

Answer: The allegations in ¶220 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶220.

221.    Spin and Lubin are associated-in-fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Spin Enterprise has the common goal of soliciting, funding, servicing, and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states, thereby constituting "unlawful debt" within the meaning of 18 U.S.C. § 1961(6)(B).

Answer: The allegations in ¶221 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶221.

222.    Since at least 2021 and continuing through the present, members of the Spin Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued by the Enterprise to small business throughout the United States.

Answer: Spin and Lubin deny the allegations in ¶222.

223.    Over this period, the Spin Enterprise would hide the fact that it was actively involved in underwriting and funding the usurious loans disguised as MCA Agreements it brokered on behalf of the Isaacov Enterprise and Hi Bar Enterprise (defined below).

Answer: Spin and Lubin deny the allegations in ¶223.

224.    This was intentionally done as part of the Spin Enterprise's hierarchy to ensure that corporate members of the Spin Enterprise were as insulated as possible from liability under the usurious MCA agreements by creating plausible deniability as to each specific member's liability and obligations under each specific MCA agreement.

Answer: Spin and Lubin deny the allegations in ¶224.

225.    Indeed, through collaborating with the Isaacov Enterprise and Hi Bar Enterprise, the Spin Enterprise is able to confuse borrowers as to the Spin Enterprise's role in the MCA Agreements and avoid the borrowers learning about the Isaacov Enterprise's and Hi Bar's Enterprises members and principals by serving as a merchant-facing role.

Answer: Spin and Lubin deny the allegations in ¶225.

226.    Because the Spin Enterprise is separate from the Isaacov Enterprise and Hi Bar Enterprise, the Enterprise is also able to effectively launder the MCA Agreements' usurious debt by having Spin come in and refinance the MCA debt into a purportedly legitimate loan intentionally designed to superficially exceed the scope of New York's usury laws.

Answer: The allegations in ¶226 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶226.

227.    In essence, by keeping the Enterprises ostensibly separate, the Spin Enterprise can play the white knight for the borrowers who are trapped into the negative spiral of MCA agreements with BMF and Hi Bar only to be further fleeced by Spin who imposes usurious interests.

Answer: Spin and Lubin deny the allegations in ¶227.

228.    The debt, including such debt evidenced by the MCA Agreements and Promissory Note, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d), and 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes, and (ii) the rates are more than twice the legal rate permitted under New York Penal Law § 190.40.

Answer: The allegations in ¶228 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶228.

**D.    The Roles Of the RICO Persons in Operating The Spin Enterprise, and Roles of The Individual Companies Within the Spin Enterprise**

229.    Lubin and Spin have organized themselves and the Spin Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon lawful debts including as follows:

Answer: The allegations in ¶229 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶229.

**i.    *Avrumi (a/k/a Josh) Lubin***

230.    Lubin is the owner and the mastermind of the Spin Enterprise and the Culpable Person under RICO. Lubin is responsible for the day-to-day operations of the Spin Enterprise and has final say on all business decisions of the Spin Enterprise including, without limitation, which

usurious loans the Spin Enterprise will broker and fund, the ultimately payment terms, and the repayment term period for MCA Agreement.

Answer: Spin and Lubin admit that Lubin is the owner of Spin and is responsible for its day-to-day operations and has final say on Spin's business decisions. The remaining allegations in ¶230 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the remaining allegations in ¶230.

231.    Lubin, through his company Spin and as broker to the Isaacov and Hi Bar Enterprises, brings potential merchant-victims to Gabe and Getter who then, collectively with Lubin, decide which company, BMF or Hi Bar, will paper the MCA agreement, and on what terms, the length of the loan, the repayment interest rate, and how the MCA agreement will be funded among the various Enterprise members.

Answer: Spin and Lubin deny the allegations in ¶231.

232.    In his capacity as the primary broker and merchant-facing contact person for the Enterprise, Lubin is responsible for identifying financially distressed merchants who make the ideal candidates for the Enterprise's predatory MCA Agreements. In both external negotiations with merchants and internal underwriting practices with the Enterprise, Lubin describes the MCA agreements as having fixed terms with a specified interest rate over the MCA agreements' principal.

Answer: Spin and Lubin deny the allegations in ¶232.

233.    Lubin, as the merchant-facing Enterprise member, also fields reconciliation and/or remittance adjustment requests from merchants, such as the Plaintiffs here, and instead of performing an analysis of the merchant's actual receivables, negotiates for the borrower to pay the absolute maximum the borrower can afford. Ex. 20.

Answer: Spin and Lubin deny the allegations in ¶233.

234.    Lubin is also the key Enterprise member involved in laundering the Enterprise's unlawful MCA debt into purported legitimate loans in amounts greater than $2.5 million for the explicit and admitted purpose of artificially placing the loan beyond the reach of New York's usury laws.

Answer: The allegations in ¶234 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶234.

235.    In reality, as evidenced by the Promissory Note here, these loans invariably are just another unlawful debt instrument as (a) almost half the principal was to pay off prior usurious

MCA debt; and (b) hundreds of thousands of more dollars were deducted as "fees" for Lubin simply setting up the boilerplate loans that he did no work to earn.

Answer: The allegations in ¶235 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶235.

236.    Lubin has ultimately benefitted from the Spin Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

Answer: Spin and Lubin deny the allegations in ¶236.

### ii.  *Avrumi (a/k/a Josh) Lubin*

237.    Spin is a separate legal entity that has a legal existence separate and apart from the other members of the Spin Enterprise and maintains its own books and records.

Answer: Spin and Lubin admit that Spin is a separate legal entity that has a legal existence

separate and apart from Lubin, the sole other alleged member of the Spin Enterprise, and that Spin

maintains its own books and records.

238.    Spin participates in and furthers the interests of the Spin Enterprise by (i) soliciting merchants to enter into MCA agreements with the Isaacov and Hi Bar Enterprises and other MCA lenders; (ii) provide funding for the MCA agreements the Spin Enterprise brokers; (iii) work with the MCA lenders, including the Isaacov and Hi Bar Enterprises, in setting the usurious terms of the MCA agreements during underwriting (iv) being the contact entity between merchants and MCA lenders like the Isaacov Enterprise and Hi Bar Enterprise; and (v) extend admitted loans to merchants once their MCA debt becomes high enough for the Spin Enterprise to attempt to repackage the debt into a loan with an artificial principal above $2.5 million to explicitly try to avoid application of New York's criminal usury laws.

Answer: Spin and Lubin admit that Spin has solicited merchants to enter into MCA

agreements and funded certain MCA agreements which that they have brokered.  Spin and Lubin

deny the remaining allegations in ¶238.

239.    In this case, Spin, through Lubin, knowingly and intentionally; (i) solicited the Leer Defendants to enter into the MCA Agreements; (ii) worked with other members of the Isaacov and Hi Bar Enterprises to underwrite the MCA Agreements, including setting their term and interest rates; (iii) convince the Leer Defendants to refinance their MCA debt into additional MCA Agreements and, ultimately, the Promissory Note; (iv) be the contact person between the Plaintiffs and the Isaacov and Hi Bar Enterprises, including fielding reconciliation requests from Plaintiffs

and instead of providing reconciliation simply renegotiated the payment rate to the maximum the Leer Companies could pay.

Answer: Spin and Lubin admit that Spin through Lubin solicited the Leer Defendants to enter into the MCA Agreements. Spin and Lubin deny the remaining allegations in ¶239.

## E.    The Isaacov Enterprise

240.    BMF, Gabe Isaacov, Joe Isaacov, Ben Isaacov and Simon Isaacov (the "Isaacov Brothers") constitute an Enterprise (the "Isaacov Enterprise") within the meaning of 18 U.S.C. § 1961(4) and 1962(c).

Answer: The allegations in ¶240 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the remaining allegations in ¶240.

241.    BMF and the Isaacov brothers are associated-in-fact and through relations of ownership for the common purpose of carrying on an ongoing unlawful enterprise.

Answer: The allegations in ¶241 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶241.

242.    Specifically, the Isaacov Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge an interest at more than twice the enforceable rate under the laws of United States and other states.

Answer: The allegations in ¶242 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶242.

243.    Since at least 2017 and continuing through the present, the members of the Isaacov Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon lawful debt issued by the Isaacov Enterprise to small businesses throughout the United States.

Answer: The allegations in ¶243 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶243.

244.    Over this period the Isaacov Enterprise individuals would assume various fake names for themselves individually and trade names to do business under. This was done intentionally as part of the Isaacov Enterprise's hierarchy to ensure that corporate members of the Isaacov Enterprise were as insulated as possible from liability under the usurious MCA Agreements by creating plausible deniability as to each specific member's liability and involvement with each specific MCA Agreement.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶244.

245.    Indeed, through use of various alter-ego identities for the individual members of the Isaacov Enterprise, the Isaacov Brothers intended to confuse borrowers as to which entity to contact and stall borrowers' efforts to get a full accounting of how the Isaacov Enterprise was automatically withdrawing monies from the borrowers' accounts.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶245.

246.    The Isaacov Enterprise's use of alter-ego names for its members was orchestrated by the Isaacov Brothers, as the common thread between all these members and their alter-egos was that they were ultimately controlled and for the benefit of the Isaacovs.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶246.

247.    The debt, including such debt evidenced by the BMF MCA Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d), and 18 U.S.C. § 1961(6), because (i) it violates applicable criminal usury statutes, and (ii) the rates are more than twice the legal rate permitted under New York Penal Law § 190.40.

Answer: The allegations in ¶247 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶247.

## F.    The Roles of the Isaacov Brothers in Operating the Isaacov Enterprise, And The Roles Of The Individual Companies Within The Enterprise

248.    The Isaacov Brothers, each a RICO Person, have organized themselves and the Isaacov Enterprise into a cohesive group with specific and assigned responsibilities and a

command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

Answer: The allegations in ¶248 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin lack knowledge or information sufficient to

form a belief about the truth of the allegations in ¶248.

### a.    Joseph Isaacov

249.    Together with the other Isaacov Brothers, Joe is responsible for the day-to-day operations of the Isaacov Enterprise, primarily through the assumed MCA label HOP Capital, and has final say on all financial decisions of the Isaacov Enterprise including, without limitation, which usurious loans the Isaacov Enterprise will fund, which brokers, like the Spin Enterprise, the Isaacov Enterprise will work with in soliciting its usurious loans, how such loans will be funded, which investors will fund each loan, and the ultimate payment terms, amount and period of each usurious loan.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶249.

250.    In his capacity as a member of the Isaacov Enterprise, and oldest brother, Joe, together with the other Isaacov Brothers, is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Isaacov Enterprise to accomplish its commons goals and purposes including: (i) the form of merchant agreements used by the Isaacov Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form security agreements and personal guaranties with bankruptcy recourse used by the Isaacov Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, BMF MCA Agreements extended to the Leer Companies.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶250.

251.    Joe has taken actions, and directed other members of the Isaacov Enterprise to take actions necessary to accomplish the overall goals and purposes of the Isaacov Enterprise, including directing the affairs of the Isaacov Enterprise, funding the Isaacov Enterprise, directing members of the Isaacov Enterprise to collect upon the unlawful loans and executing legal documents in support of the Isaacov Enterprise.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶251.

252.     Joe has ultimately benefitted from the Isaacov Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶252.

### b.     Gavriel Yitzchakov a/k/a Gabe Isaacov

253.     Together with the other Isaacov Brothers, Gabe is responsible for the day-to-day operation of the Enterprise's MCA lending through his ownership and control of MCA deals the Enterprise papers using BMF. Gabe has the final say on all Enterprise MCA agreements papered by BMF, including, without limitation, which usurious loans BMF will paper, how such loans will be funded, and, in coordination with Lubin, the ultimate payment terms and period of each usurious MCA agreement.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶253.

254.     In his capacity as a member of the Isaacov Enterprise, Gabe, together with his Isaacov Brothers, is responsible for creating, approving and implementing policies, practices and instrumentalities used by the Enterprise through BMF to accomplish its common goals and purposes to collect unlawful debt, including: (i) the form of the MCA agreements used by BMF to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Isaacov Enterprise's collection of unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals, including over-collecting via ACH withdrawals after the BMF MCA agreement is paid off; (iii) removing any reconciliation provision from the MCA agreements to ensure absolute repayment; and (iv) designing a broad security agreement and resource for bankruptcy against the personal guarantors to ensure absolute repayment even if the merchant declares bankruptcy. All such forms were used to make and collect upon unlawful loans, including, without limitation, the BMF MCA Agreements extended to the Leer Companies.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶254.

255.     Gabe has also taken actions and, directed other members to the Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful BMF MCA Agreements, and executing legal documents in support of the Enterprise's collection of unlawful debt.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶255.

256.    Gabe also works in retaining brokers, like the Spin Enterprise, to solicit merchants to enter into MCA Agreements with the Isaacov Enterprise, as was the case with the Plaintiffs and the BMF MCA Agreements.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶256.

257.    Gabe has ultimately benefitted from the Isaacov Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶257.

c.    Ben Isaacov

258.    Together with the other Isaacov Brothers, primarily through the assumed name Panthers Capital, Ben is responsible for the day-to-day operations of the Isaacov Enterprise and has final say on all financial decisions of the Isaacov Enterprise involving Panthers Capital, including, without limitation, which usurious loans the Isaacov Enterprise will fund on Panthers Capital paper, how such loans will be funded, which investors will fund each loan, and the ultimate payment terms, amount and period of each usurious loan.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶258.

259.    In his capacity as one of the leaders of the Isaacov Enterprise and sibling to the other Isaacov Enterprise members, Ben, together with the other Isaacov Brothers, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Isaacov Enterprise to accomplish its common goals and purposes, including: (i) the form of Panthers Capital merchant agreements used by the Isaacov Enterprise to attempt to disguise the unlawful loans and receivable purchase agreements to avoid applicable usury laws and conceal the Isaacov Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) designing a broad security agreement and resource for bankruptcy against the personal guarantors to ensure absolute repayment even if the merchant declares bankruptcy. All such forms were used to make and collect upon unlawful loans papered by Panthers Capital made by the Isaacov Enterprise.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶259.

260.    Ben has also taken actions, and directed other members of the Isaacov Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Isaacov Enterprise, funding the Isaacov Enterprise, and directing

members of the Isaacov Enterprise to collect upon the unlawful loans and executing legal documents in support of the Isaacov Enterprise.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶260.

261. Ben has ultimately benefitted from the Isaacov Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶261.

**d.    Simon Isaacov**

262. Simon is a funder for BMF and owns and operates a book of business separate and apart from BMF. Together with the Isaacov Brothers, Simon is responsible for the day-to-day operations of the Isaacov Enterprise and has final say on all financial decisions of the Isaacov Enterprise including, without limitation, which usurious loans the Isaacov Enterprise will fund, how such loans will be funded, which investors will fund each loan, and the ultimate payment terms, amount and period of each usurious loan.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶262.

263. In his capacity as member of the Isaacov Enterprise and youngest brother, Simon, together with the other Isaacov Brothers, is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Isaacov Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Isaacov Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Isaacov Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) designing a broad security agreement and resource for bankruptcy against the personal guarantors to ensure absolute repayment even if the merchant declares bankruptcy. All such forms were used to make and collect upon unlawful loans papered by BMF made by the Isaacov Enterprise to the Plaintiffs.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶263.

264. Simon has ultimately benefited from the Isaacov Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶264.

e.    **BMF**

265.    BMF is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶265.

266.    BMF participates in and furthers the interests of the Isaacov Enterprise by (i) entering into agreements with the Spin Enterprise to have Spin solicit and broker Isaacov Enterprise MCA deals with merchants; (ii) pooling funds among the Isaacov Enterprise members to fund BMF MCA agreements; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the usurious loans disguised as BMF MCA agreements on behalf of the Isaacov Enterprise; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Isaacov Enterprise to collect upon the unlawful debt, including engaging in cover collections; and (vii) obtaining judgments in its name to further collect upon the unlawful debt.

Answer: Spin and Lubin admit that Spin solicited and brokered MCA deals with merchants. Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶266.

267.    In this case, BMF knowingly and intentionally: (i) worked with Spin and Lubin to solicit the Plaintiffs into entering into the BMF MCA Agreements; (ii) pooled funds from Isaacov Enterprise members to fund the BMF MCA Agreements; (iii) underwrote the BMF MCA Agreements; (iv) entered into three BMF MCA Agreements with Plaintiffs; (v) collected upon the unlawful debt evidenced by the BMF MCA Agreements by affecting ACH wire transfers from the Leer Companies' bank accounts, including over-collecting on each BMF MCA Agreement.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶267.

## G.    The Hi Bar Enterprise

268.    Hi Bar, Getter, and Herbst constitute an Enterprise (the "Hi Bar Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

Answer: The allegations in ¶268 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶268.

269.    Hi Bar, Getter, and Herbst are associated in fact and through relations of ownership for the common purpose of carrying an ongoing unlawful enterprise.

Answer: The allegations in ¶269 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶269.

270.    Specifically, the Hi Bar Enterprise has a common goal of soliciting, funding, servicing, and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶270.

271.    Since at least 2021 and continuing through the present, the members of the Hi Bar Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued by the Hi Bar Enterprise to small businesses throughout the United States.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶271.

272.    The debt, including such debt evidenced by the two Hi Bar MCA Agreements entered between the Hi Bar Enterprise and Plaintiffs, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d), and 18 U.S.C. § 1961(1) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law § 190.40.

Answer: The allegations in ¶272 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶272.

## H.    The Roles of the RICO Persons in Operating the Hi Bar Enterprise, And The Roles Of the Individual Companies Within The Hi Bar Enterprise

273.    Herbst and Getter have organized themselves and the Hi Bar Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

Answer: The allegations in ¶273 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶273.

### i.    Yisroel Herbst

274.    Herbst is an owner and a mastermind of the Hi Bar Enterprise. He is responsible for the day-to-day operations of the Hi Bar Enterprise and has final say on all business decisions of the Hi Bar Enterprise including, without limitation, which usurious loans the Hi Bar Enterprise will fund, how such loans will be funded, which investors will fund each loan, and the ultimate payment terms, amount and period of each usurious loan.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶274.

275.    In his capacity as mastermind of the Hi Bar Enterprise, Herbst is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Hi Bar Enterprise to accomplish its common goals and purposes including: (i) the form of the merchant agreements used by the Hi Bar Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Hi Bar Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) designing a broad security agreement and resource for bankruptcy against the personal guarantors to ensure absolute repayment even if the merchant declares bankruptcy. All such forms were used to make and collect upon unlawful loans papered by Hi Bar made by the Hi Bar Enterprise to the Plaintiffs.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶275.

276.    Herbst has also taken actions, and directed other members of the Hi Bar Enterprise to take actions necessary to accomplish the overall goals and purposes of the Hi Bar Enterprise including directing the affairs of the Hi Bar Enterprise, funding the Hi Bar Enterprise, directing members of the Hi Bar Enterprise to collect upon the unlawful loans, and executing legal documents in support of the Hi Bar Enterprise.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶276.

277.    Herbst also plays a significant role in the Hi Bar Enterprise's unlawful collection tactics, including knowingly filing false and/or fraudulent affidavits in support of confessions of judgment against merchants that misrepresent or omit material facts concerning the MCA transaction.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶277.

278.    Herbst has ultimately benefitted from the Hi Bar Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶278.

### ii.    Joel Geta a/k/a Yoel Getter

279.    Getter was hired by Herbst to assist the Hi Bar Enterprise in soliciting merchants into entering into Hi Bar MCA agreements and conduct the day-to-day operations Hi Bar.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶279.

280.    In his capacity as an officer of the Hi Bar Enterprise during the relevant time period, Getter is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Hi Bar Enterprise to accomplish its common goals and purposes including: (i) the form of the merchant agreements used by the Hi Bar Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Hi Bar Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) designing a broad security agreement and resource for bankruptcy against the personal guarantors to ensure absolute repayment even if the merchant declares bankruptcy. All such forms were used to make and collect upon unlawful loans papered by Hi Bar made by the Hi Bar Enterprise to the Plaintiffs.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶280.

281.    For instance, as part of this solicitation role for the Hi Bar Enterprise, Getter partnered with the Spin Enterprise to act and a broker for the Hi Bar Enterprise and bring in potential merchant victims to the Hi Bar Enterprise so that they could be induced into entering into Hi Bar MCA agreements, as was the case with the Plaintiffs here.

<u>Answer</u>: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶281.

282.    Getter was also responsible for working with the Spin Enterprise in underwriting and setting the terms of the two Hi Bar MCA Agreements entered into with the Plaintiffs and provided some of the funding for the Hi Bar MCA Agreements and Promissory Note.

<u>Answer</u>: Spin and Lubin deny that they underwrote or set the terms of the two Hi Bar MCA

Agreements entered into with the Plaintiffs, and that they provided some of the funding for the Hi

Bar MCA Agreements. Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶282.

283.    Getter has ultimately benefitted from the Hi Bar Enterprise's collection of unlawful debt by having part of the proceeds funneled to him personally.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶283.

**iii.    Hi Bar**

284.    Hi Bar is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶284.

285.    Hi Bar participates in and furthers the interests of the Enterprise by (i) entering into agreements with the Spin Enterprise to have Spin solicit and broker MCA deals with merchants; (ii) pooling funds among the Hi Bar Enterprise members to fund MCA agreements; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the usurious loans disguised as MCA agreements on behalf of the Hi Bar Enterprise; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Hi Bar Enterprise to collect upon the unlawful debt, including engaging in cover collections; and (vii) obtaining judgments in its name to further collect upon the unlawful debt.

Answer: Spin and Lubin admit that Spin has brokered MCA deals with merchants. Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶285.

286.    In this case, Hi Bar knowingly and intentionally: (i) worked with Spin to solicit the Plaintiffs into entering into the Hi Bar MCA Agreements; (ii) pooled funds from the Hi Bar Enterprise members to fund the Hi Bar MCA Agreements; (iii) underwrote the Hi Bar MCA Agreements; (iv) entered into two MCA Agreements with Plaintiffs; (v) collected upon the unlawful debt evidenced by the Hi Bar MCA Agreements by affecting ACH wire transfers from the Leer Companies' bank accounts.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in ¶286.

I.    **Interstate Commerce**

287.    The three Enterprises are engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

Answer: The allegations in ¶287 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶287.

288.    Specifically, members of the Spin, Isaacov and Hi Bar Enterprises maintain offices in New York, New Jersey and Florida and use personal [sic] in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the respective Enterprises to entities across the United States, including California where the Leer Companies operated in the relevant time frame, via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations concerning the Isaacov and Hi Bar Enterprises.  Spin and Lubin admit

that Spin maintains offices in New York and New Jersey.  Spin and Lubin deny the remaining

allegations in ¶288.

289.    In the present case, all communications between the members of the three Enterprises and Plaintiffs were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications, including text messages between Stefan in California and Lubin in New Jersey and/or New York.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations concerning communications not involving Spin or Lubin.  Spin and

Lubin admit that their own communications were by email, mail and text messages, including text

messages between Stefan in California and Lubin in California and Lubin in New Jersey and/or

New York.  Spin and Lubin deny the remaining allegations in ¶289.

290.    Specifically, the three Enterprises used interstate emails to original [sic], underwrite, service and collect upon the MCA Agreements and Promissory Note, fund the advances under the MCA Agreements and Promissory Note, and collect on the MCA Agreements through interstate ACH debits and on the Promissory Note through interstate wires.

Answer: Spin and Lubin deny the allegations in ¶290.

291.    In addition, at the direction of Defendants, each MCA Agreement and the Transaction documents were executed by Plaintiffs in California and these executed copies were

sent by email to Plaintiffs in New Jersey, New York and Florida, where the three Enterprises have their principal offices or where their members reside.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about the truth of the allegations in ¶291.

## J.    Interstate Commerce

292.    Plaintiffs have and will continue to be injured in their business and property by reason of the three Enterprises' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than $827,730, the amount of the unlawful debt collected by the Isaacov and Hi Bar Enterprises from Plaintiffs on the MCA Agreements.

Answer: The allegations in ¶292 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶292.

293.    In addition, Plaintiffs are entitled to damages to offset the amount of usurious interest being asserted by the Spin Enterprise on the Promissory Note, such that instead of charging 60% interest pre-default and 120% interest post-default, the Promissory Note charges interest at no greater than 25% given that the Promissory Note is truly a loan with a principal of approximately $1.3 million, well within the scope of New York's criminal usury laws for commercial loans. The exact amount of these damages will be determined at trial.

Answer: The allegations in ¶293 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶293.

294.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious MCA payments and the lawsuit filed by Spin to collect upon the usurious Promissory Note and take ownership of all of the Leer Companies' life insurance policies under the Security Agreement.

Answer: The allegations in ¶294 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶294.

295.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with (i) exposing and prosecuting Defendants' criminal activities; and (ii) defending themselves from Spin in a lawsuit brought to collect upon the Promissory Note and take ownership of all of the Leer Companies' life insurance policies under the Security Agreement.

Answer: The allegations in ¶295 are legal conclusions as to which no response is required. To the extent a response is required, Spin and Lubin deny the allegations in ¶295.

296.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, at an amount to be determined at trial but no less than $2,483,190, plus costs and attorneys' fees from Defendants.

Answer: The allegations in ¶296 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶296.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

297.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

Answer: Spin and Lubin repeat and re-allege their responses to the allegations of each of

the foregoing paragraphs.

298.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

Answer: The allegations in ¶298 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶298.

299.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of their respective Enterprises and use of the various Enterprises to assist each other Enterprise, and frequent email communications among Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the MCA Agreements and Promissory Note, each Defendant knew the nature of the three Enterprises and each Defendant knew that the three Enterprises extended beyond each Defendant's individual role.

Answer: Spin and Lubin lack knowledge or information sufficient to form a belief about

the truth of the allegations in ¶299.

300.    Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

Answer: The allegations in ¶300 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶300.

301.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operations of the each of the three Enterprises' affairs in order to collect upon

unlawful dets, including the MCA Agreements and Promissory Note, in violation of 18 U.S.C. § 1962(c).

     <u>Answer</u>: The allegations in ¶301 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶301.

     302.    In particular, each Defendant was a knowing, willing, and active participant in the three Enterprises and their affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the MCA Agreements and Promissory Note.

     <u>Answer</u>: The allegations in ¶302 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin state that they lack knowledge or information

sufficient to form a belief about the truth of the allegations in ¶302.

     303.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

     <u>Answer</u>: The allegations in ¶303 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶303.

     304.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than $827,730.

     <u>Answer</u>: The allegations in ¶304 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶304.

     305.    In addition, Plaintiffs are entitled to damages to offset the amount of usurious interest being asserted by Spin on the Promissory Note, such that instead of charging 60% interest pre-default and 120% interest post-default, the Promissory Note charges interest at no greater than 25% given that the Promissory Note is truly a loan with a principal of approximately $1.3 million, well within the scope of New York's criminal usury laws for commercial loans. The exact amount of these damages will be determined at trial.

     <u>Answer</u>: The allegations in ¶305 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶305.

     306.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious MCA payments and

the lawsuit filed by Spin to collect upon the usurious Promissory Note and take ownership of all of the Leer Companies' life insurance policies under the Security Agreement.

Answer: The allegations in ¶306 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶306.

307.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with (i) exposing and prosecuting Defendants' criminal activities; and (ii) defending themselves from Spin in a lawsuit brought to collect upon the Promissory Note and take ownership of all of the Leer Companies' life insurance policies under the Security Agreement.

Answer: The allegations in ¶307 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶307.

308.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, at an amount to be determined at trial but no less than $2,483,190, plus costs and attorneys' fees from Defendants.

Answer: The allegations in ¶308 are legal conclusions as to which no response is required.

To the extent a response is required, Spin and Lubin deny the allegations in ¶308.

## **AFFIRMATIVE DEFENSES**

1.    Failure to state a claim upon which relief can be granted under 18 U.S.C. § 1962.

2.    The BMF and Hi Bar MCA Agreements are not loans and did not give rise to unlawful debt.

3.    The Spin loan purged the BMF and Hi Bar MCA Agreements of any usurious taint.

4.    Ratification and waiver.

5.    Failure to plead an enterprise distinct from a corporation and its managers/officers.

6.    Plaintiffs have not adequately pleaded involvement by Spin or Lubin in any RICO enterprise.

7.    Plaintiffs suffered no out-of-pocket damages as required to satisfy the injury to business or property element.

8.    Plaintiffs' claims are not ripe.

9.      Spin is not a qualifying RICO "person".

10.     The RICO conspiracy claim fails, for lack of primary liability and lack of agreement to commit predicate acts.

11.     All claims brought on behalf of any plaintiff that did not remit any funds pursuant to the MCA Agreements or the Spin loan fail for lack of standing.

12.     Any RICO liability must be setoff against the over $2.1 million money judgment (Index 650582/2022, NYSCEF #764) entered against Leer, on account of his refusal to return around $2 million in life insurance policy proceeds constituting collateral for Spin's loan.

WHEREFORE, the amended complaint should be dismissed with prejudice, judgment should be entered in favor of Spin and Lubin, and against Plaintiffs on the first and second cause of action, and Spin and Lubin should be awarded attorneys' fees and costs to the extent permitted by law and granted such other and further relief as the Court deems just and proper.


Dated: New York, NY                          Amini LLC
       September 2, 2025

                                             /s/ Jeffrey Chubak
                                             Jeffrey Chubak
                                             131 West 35th Street
                                             12th Floor
                                             New York, NY 10001
                                             (212) 490-4700
                                             jchubak@aminillc.com
                                             Attorneys for Defendants Spin Capital, LLC
                                             and Avrumi (a/k/a Josh) Lubin