P8FDGolO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GOLDEN FOOTHILL INSURANCE
SERVICES, LLC, ET AL.,

                    Plaintiffs,

          v.                              24 CV 08515

SPIN CAPITAL, LLC, ET AL.,

                    Defendants.
                                          Oral Argument
------------------------------x
                                          New York, N.Y.
                                          August 15, 2025
                                          2:00 p.m.

Before:

                  HON. ARUN SUBRAMANIAN,

                                          District Judge

                         APPEARANCES

HESKIN & PROPER, PLLC
     Attorney for Plaintiffs
BY:  Shane Heskin

MURRAY LEGAL, PLLC
     Attorney for Defendants BMF Advance, LLC,
        and Gavriel Ytizchakov
BY:  PHILLIP SPINELLA

LETO LAW FIRM
     Attorney for Defendants Hi Bar Capital, LLC,
        and Yisroel Herbst
BY:  MATTHEW LETO

AMINI, LLC
     Attorney for Defendants Spin Capital, LLC,
        and Avrumi Lubin
BY:  JEFFREY S. CHUBAK

P8FDGolO

(Case called)

THE DEPUTY CLERK:  Can the parties please state your appearances?

MR. HESKIN:  Good afternoon, your Honor.  Shane Heskin on behalf of plaintiffs.

THE COURT:  Good afternoon.

For the defendants?

MR. SPINELLA:  Good afternoon, your Honor.  Phillip Spinella, with Murray Legal, for the defendants BMF Advance, LLC, and Gavriel Yitzchakov.

THE COURT:  Good afternoon.

MR. CHUBAK:  Good afternoon, your Honor.  Jeffrey Chubak on behalf of Spin Capital and Avrumi Lubin.

THE COURT:  You said Chubak?

MR. CHUBAK:  Yes.

MR. LETO:  Good afternoon, your Honor.  Matthew Leto from Leto Law Firm on behalf of defendants Hi Bar Capital and Yisroel Herbst.

THE COURT:  Good afternoon.

Very well.  Mr. Chubak and Mr. Leto, if you can just make sure that you're speaking directly into a microphone.  You can also use the lectern, but it makes it a lot easier for the court reporter to get your words down.

Is there a designated spokesman for the defendants here or it's just a free for all?

P8FDGolO

MR. SPINELLA:  I think it might depend on the issue.

THE COURT:  All right.  Well, Mr. Heskin, Justice Borrok initially dismissed your counterclaims without prejudice.  In 2024, he came back and made clear that it was without prejudice and that discovery may change things.  He cited to a decision from Judge Rakoff.

I agree with you that that particular decision had to do with choice of law questions, but, thinking broadly about that decision, Judge Rakoff had made certain conclusions about the underlying transactions being loans.  I assume that you'd say, well, for the same reasons that Judge Rakoff concluded that they would look like loans, we would say that these things are loans here.

So, given all that, and given that Justice Borrok was clearly trying to signal that these claims could possibly be alive in the case, why didn't you bring them in the state court case?

MR. HESKIN:  It's an excellent question.  So, to give you some background, before Judge Borrok decided our original motion, he had the New York Attorney General case, and he decided our motion before he had that case.  I was actually at the trial in the New York AG case, where he found that these were loans as a matter of law for all these other reasons that he previously didn't really understand and now he did, with the benefit of the New York AG.

P8FDGolO

I would have loved to have brought it before him, except it was too late in the process, and he ended up ultimately recusing himself.  He had to recuse himself because of a conflict with one of the law firms that was representing Lubin -- Spin Capital apparently made a job offer to him, so he had to recuse himself.  But, also --

THE COURT:  How is it too late in the process?  Because he pretty much indicated that you could bring the counterclaims back after discovery, so it wasn't too late in the process.  I mean, discovery was midstream, and he said, after discovery, you can come back, add these counterclaims back in.  You elected not to.

I'm not suggesting that that somehow is a forfeiture.  All right.  I'm just wondering what the thought process was in not bringing the claims in a state court proceeding where you're facing down a $15 million plus claim on the loan.

MR. HESKIN:  Sure.  They would have had to restart all of the discovery, because there weren't the other parties in the case.  So, in this case, we can join all the parties to the case, start discovery anew.  We didn't have -- we didn't have BMF in that case.  We didn't have the individuals that are behind BMF.  We didn't have Hi Bar or Mr. Herbst.

THE COURT:  You didn't have all the conspirators in the case.

MR. HESKIN:  Yes.

P8FDGolO

THE COURT:  Having litigated in New York State Court, you don't have people in the case, sometimes it's harder to get discovery from them, et cetera, and so you elected to file the case in Federal Court, and your point is, well, look, New York doesn't have compulsory counterclaims; we had the right to either refile in the state case or go to Federal Court, and we elected to do the latter.

MR. HESKIN:  That's exactly right, your Honor.

THE COURT:  All right.  Now, focusing on the preclusion defenses the defendants have raised, would you agree that if -- let's say, if you overcome the motions and we get to the middle of the discovery and the state court looks at your usury RICO defenses that you've asserted against the claim on the loan, and, for essentially the same reasons as Justice Borrok did initially, says, look, even with whatever you've given me on the summary judgment motions, these defenses are out, all right, would you agree at that point the defendants could, at the very least, raise preclusion as a reason why this case should be dismissed?

Meaning, you might say it's premature now because of everything that's happened in the state court or hasn't happened in the state court, but you're not saying they're just out of luck on preclusion defenses.  You're saying, look, we understand, as plaintiffs, the state court case is ongoing, and depending on what happens there, we might face this again, or,

P8FDGolO

alternatively, something might happen in the state court case, and we would be invoking preclusion against the defendants. All of that is true, correct?

MR. HESKIN: Respectfully, no, and I'll tell you why. Because the issue of usury, with respect to these MCAs, will never be decided by the state court, because Judge Borrok has already ruled that, even if I'm correct, that these are usurious loans, it doesn't impact at all whether or not the Spin Capital loan is usurious or not. So even -- I cannot raise that defense to the loan.

The only issue that's being addressed in the state court action is the loan, which is over $2.7 million. And the Court has already said, it doesn't matter whether or not it was a roll-up -- and, actually, I think, Judge Liman agreed with Judge Borrok's analysis in the *Funders'* case, which was another one of my cases, and he said, listen, once you're over the $2.5 million, it doesn't matter. It doesn't matter. It's a strict statute. You look at that.

So even if it was a roll over of the prior ones and it turned -- it was rolled into a higher one, it's not going to be a defense. So that issue as to whether or not the MCAs are loans will never be decided in the state court action.

THE COURT: What is that based on, like law of the case or something? Because, look, are you telling me that you are not -- excuse me, are you telling me that in the state

P8FDGolO

court case, you are going to accept before the state court judge Justice Borrok's prior rulings that, as to the loan, you look at what's on the face of it, and if what's on the face of it is above the $2.5 million, there's no usury?  Because if that's what you're telling me, then I don't really understand what it is that's at issue on summary judgment on the usury defense, because if you're basically telling me that it's kind of out of the case in the state court case, I mean, maybe it's sitting there as a live defense, but I would think that your position would be it doesn't really matter what happens with that defense, because it hasn't been decided yet for preclusion purposes.

Maybe we will, at the end of the day, in the state court case, say that, for the same kind of reasons that we're talking about here, once the MCA agreements are recharacterized properly as loans, and usurious ones, then that gives rise to a host of potential implications for purposes of the loan; and to the extent that Judge Borrok initial determined otherwise, he made clear in 2024 that was without prejudice, and that he hadn't considered some later rulings, and you should refile whatever you're going to refile -- I mean, the invitation to refile the counterclaims by Justice Borrok suggests that whatever he previously said about the counterclaims might not be binding.  That's the way that one might read that.  But it's a question of what you're planning to do with the state court

P8FDGolO

case.

MR. HESKIN:  So, in the state court case, as it is right now, I'd be bound by the law of the case, because Judge Borrok has said it doesn't matter how I characterize --

THE COURT:  Let's say the oral argument on the summary judgment motions that are pending, you're not telling me that you're going to say, we get it, we're bound, but we don't need to address the usury issue?  You're going to try to challenge it, right?

MR. HESKIN:  What we've argued is it was unconscionable, so that it was procedurally and substantively unconscionable, the fact that they used these prior predatory MCA agreements to trick them into taking out that loan.  So we did argue unconscionability, both procedurally and substantively.

THE COURT:  So, are you telling me, to be very clear about it, that in the state court case, you are not raising a usury defense any longer?

MR. HESKIN:  I can't say that, because I haven't dropped it, right?  So that issue's been decided.  If he decides on the unconscionability, perhaps that issue, you know, doesn't have to get raised.  Let's say, well, if he moves --

THE COURT:  Well, if it's unconscionable, that's a separate issue, whether the loan and note would be unconscionable for whatever reasons you say, but that's

P8FDGolO

separate and apart from the usury defense.  I'm just talking about the usury defense.

Are you telling me you're dropping that defense in the state court case, or are you saying, no, we're going to make whatever arguments we can make to keep that in the state court case, but for other reasons you've raised in your papers and that have come up in the grounds for preclusion here, because it hasn't been decided, it is still there, and so there's nothing to consider at that point?  Two worlds.  Which world are we in?

MR. HESKIN:  I'd say right now I'm precluded from doing it based on law of the case.  I would preserve that to argue on appeal if I had to.  I would say it is relevant.  It should have been considered, but it was not.  And so there will never be a decision on that usury issue, whether they're usurious or not, until it goes up on appeal, if it ever gets there.

THE COURT:  So what happens if, based on what you're telling me now, the state judge -- and what's the new state judge's name?  Justice Bannon; is that right?

MR. HESKIN:  Bannon, yes.

THE COURT:  Okay.  So if Justice Bannon says, well, you're not arguing that I should look at this issue anew despite the 2024 ruling, so I take it that you're conceding that law of the case applies, so judgment as to the usury

P8FDGolO

defense, at that point the defendants could come back to me and say, motion for summary judgment on issue preclusion. Why not?

MR. HESKIN: What would be the issue preclusion on the loans if she never decides the issue on the MCAs?

THE COURT: You conceded law of the case. I mean, once you concede law of the case and you get a final judgment on the merits based on Justice Borrok's prior ruling, right -- you say Justice Borrok's prior ruling was without prejudice, okay?

MR. HESKIN: Yes.

THE COURT: I'm saying, once you don't contest it and it gets to the end of the road, and Justice Bannon says judgment on the usury defense, that is not without prejudice anymore. That is with prejudice. So you can challenge it on appeal if you want to, but it's a "with prejudice" dismissal. That's what summary judgment is.

MR. HESKIN: Agree, but only as to the defense of whether or not the loan at issue, which is a straight loan, okay, is subject to a -- whether you can say or not, as a matter of law, right, that the prior MCAs don't count towards the principal amount to get it above the 2.5. That's a purely legal issue as to whether or not you can count those. It has nothing to do with whether or not their loans or not. It's just -- judge Borrok's initial decision was, I don't care how you characterize them, if it's 2.5 on the face, I don't even

P8FDGolO

look at it.  So it's --

THE COURT:  Okay.  Let me make sure I understand.  I think I see where you're going.  So, in Justice Borrok's initial ruling, what you were arguing is, putting aside the attorneys' fees and the closing costs, that the amount of the face of the note that was going to repay the prior MCA agreements, that that should not be considered, because that was based on the -- you should recharacterize those MCA agreements as usurious loans, and once you take that out of the equation, then it goes under the $2.5 million?

MR. HESKIN:  That was my argument --

THE COURT:  That was at least one argument?

MR. HESKIN:  Yes.

THE COURT:  Now, separately, you had to argue --

MR. HESKIN:  They go hand-in-hand.

THE COURT:  -- that the MCA agreements were usurious.

MR. HESKIN:  Yes.

THE COURT:  But he decided both of those things, so he said both -- just look at what's on the face, so it's $2.7 million, doesn't really matter.  I think he went on to say, that you could not, at least based on the face of the pleadings, recharacterize the MCA agreements as usurious loans. He said both of those things.

MR. HESKIN:  He did.

THE COURT:  So, if you're going to go say law of the

P8FDGolO

case and get to a final judgment, and Justice Bannon puts the stamp down that says "dismissed," why wouldn't it encompass both of those two things, the second of which is live and at issue here?

MR. HESKIN:  Okay.  So, first of all, they'd be based on pure questions of law, which aren't subject to res judicata or issue preclusion -- so it would be based on a pure question of law, which are not subject, under controlling New York law, to res judicata or issue preclusion.

THE COURT:  So a pure question of law may not be subject to preclusion, but application of the law to the MCA agreements that are at issue in this case is mixed question of law and fact as to which preclusion does apply.  I mean, there's just no question about it.  It's black letter law.

So, look, I'm really just asking you what you're planning to do in the state court proceeding, and my understanding generally is that you have every intent to preserve the arguments that the MCA agreements are, in fact, usurious, okay, because that's what this case is about, right?

MR. HESKIN:  That --

THE COURT:  That's at least one of the elements that you have to show?

MR. HESKIN:  It's -- I don't have to show it in that case.

THE COURT:  No.  I'm -- first, I'm talking about this

P8FDGolO

case.  You have to show it here, right?

MR. HESKIN:  I do have to, yes.

THE COURT:  Justice Borrok, in addition to talking about the loan, went on to say that the MCA agreements could not be recharacterized as loans.  I mean, I have the ruling right here.  I don't to need to parrot it back to you.  He said that.

MR. HESKIN:  As pled.

THE COURT:  I understand that, and so that's why I'm saying, you made that argument because you thought that if they are re-characterized as loans, then the proper application of the law to the transactions at issue would mean that the note would go under the $2.5 million for purposes of the usury analysis.

MR. HESKIN:  Correct.

THE COURT:  So I'm saying that is a defense to the claim on the loan, and so if that's going to be at issue on summary judgment, then if you just concede it, then why wouldn't the defendants be able to come back here and say issue preclusion?  That's what I'm saying.

You're telling me you're not going to challenge that, but he made that determination.

MR. HESKIN:  But he rejected it based on the fact that it doesn't even matter whether you count it, so --

THE COURT:  Well, he said both.

P8FDGolO

MR. HESKIN:  He did.

THE COURT:  I know you've read it carefully and you've gone over it, but there would have been no reason for him to venture into the question of whether the MCA agreements were usurious loans or not if he just stopped and said, when we have a loan, proper New York law is that you just look at the face of the loan; if it's above $2.5 million, then the New York cap applies.  If he just said that, I'm with you, but he didn't just say that.  He said, if it's above the $2.5 million, you have to consider all parts of it the transaction, everything that's on the face, and you don't go underneath the surface; and then he said, and, also, the MCA agreements cannot be recharacterized as usurious loans.

We're getting a little far afield here, but I'm just puzzled by the representation I'm hearing that you are not going to challenge in the state court that second -- or at least preserve that second issue.  If there's a hearing or if there's something else that happened --

MR. HESKIN:  Well, the appeal --

THE COURT:  If there's a hearing on the summary judgment motion, you're not going to make any efforts to preserve that issue before the state court, so you're saying the only remedy is on appeal.  But what I'm asking is if you take judgment from the trial court on the issue of the MCA agreements, because Justice Borrok talked about it, then why

P8FDGolO

wouldn't the defendant be able to come back here and say issue preclusion?  Are you saying they need to have a final judgment that's gone up on appeal and everything like that?

MR. HESKIN:  I think it depends on the grounds in which the Court addresses that, and so now that you're explaining that a little bit better, it's refreshing my memory as to the status in the state court action.  There is summary judgment motions pending before the Court, and we did raise the issue that the prior MCAs are unconscionable.  We also raised the issue that California law applies, and, therefore, the $2.5 million cap doesn't apply.  I can't remember -- so I don't want to mislead the Court -- I can't remember whether or not we still argued that the MCAs themselves are usurious loans and therefore get below the $2.5 million cap.  I don't think we did, because I believe we would have been precluded based on his prior ruling.

THE COURT:  Well, forget about the particularities of this -- of everything you're talking about, but, as a general matter, if a court rejects a preclusion defense on a rule 12(b)(6) motion, then the defendants can always raise that again on summary judgment.  It's their defense, and, normally, where you raise defenses would be on a summary judgment motion. You don't disagree with that, right?

MR. HESKIN:  I don't disagree with that concept, but it also depends on how the Court decides the summary judgment

P8FDGolO

motion.  If the Court says, I'm not considering whether or not the MCAs are loans, because even if they --

THE COURT:  No.  I'm saying a summary judgment here, just to be very clear --

MR. HESKIN:  All right.

THE COURT:  -- I'm just saying the defendants have raised issue preclusion and claim preclusion here on a motion to dismiss.  Even if, for the reasons you've stated in your papers, I did not accept that argument for purposes of a motion to dismiss, would you agree the defendants can raise that on summary judgment in this case if they want to?  I mean, you'll oppose it, but they can raise it, right?

MR. HESKIN:  They can raise it, and we'll see who gets to judgment first, right?  This is state court.  Who knows.  This case has been going on for three years now.

THE COURT:  That's my next question.  What's your best guess when the summary judgment motions will be resolved and when a trial will be scheduled in the state court case?

MR. HESKIN:  It's a very good question.  I don't know, because it has a very unique procedural posture right now.  Right now, all of the attorneys for Spin Capital have withdrawn as counsel, and in state court, you can't be -- you can't prosecute an action without counsel.  So right now there's no counsel for Spin.  It can't even go forward right now.

THE COURT:  Have you moved for a default judgment in

P8FDGolO

the state court case?

MR. HESKIN:  Not yet, because there's a competing motion to intervene, and so what happened was all the attorneys withdrew and then Mr. Lubin tried to file a motion to substitute himself in as counsel by assigning the claims to him individually, and then there was another motion brought by another entity who purportedly was assigned the rights of the *Spin Capital* case and BMF and all those claims.  And so that issue has to be decided as to who even has standing to bring those claims.  And who knows?  Like, I don't know, the state court -- we've had argument on that.  I want to say it was last November when we had argument on the summary judgment motions, and then since then, a lot of strange things have happened since then.  I actually had to bring in an order to show cause to get an injunction against Mr. Lubin from emailing me personally, because he was sending emails to judges, the U.S. Attorneys, various, at all hours of the night, and so --

THE COURT:  Your client, Mr. Leer, has a criminal contempt that was affirmed by the First Department in the state court as well.

MR. HESKIN:  That's correct.

THE COURT:  All right.

MR. HESKIN:  It's very --

THE COURT:  So to the defense counsel who's here today, are you all involved in the state court case, or no?

P8FDGolO

MR. CHUBAK:  Your Honor, we represent -- I'm just going to move the microphone.

THE COURT:  That's fine.

MR. CHUBAK:  Jeffrey Chubak, of Amini, LLC, on behalf of Spin Capital.  We represented Spin Capital in the state court action through the -- until we argued the summary judgment motion.

THE COURT:  Then you withdrew?

MR. CHUBAK:  We withdrew.  That's correct.

THE COURT:  But you're here.

MR. CHUBAK:  We didn't withdraw from the federal action, the interpleader action that's pending before Judge Ho, and this action.  It's an issue, but --

THE COURT:  Well, teach me -- what's in front of Judge Ho?

MR. CHUBAK:  There's an interpleader action.  One of -- the subject of the state court action is life insurance policies, and there was a -- one of the policies paid out.  And there was a dispute over who should get the funds, and the insurance company, Brighthouse, interpleaded the funds.  And those interpleaded funds have since been paid over to the receiver in the state court action.

THE COURT:  So is that case effectively done?

MR. HESKIN:  Yes, it's done.

MR. CHUBAK:  For all intents and purposes, yes.

P8FDGolO

THE COURT:  Okay.

MR. CHUBAK:  It concluded after -- I'm not sure of the timing, I don't recall, relative to our withdrawal.

THE COURT:  Mr. Heskin, other than the life insurance policies, do your clients have $20 million at the end of the day to pay to the defendants on the state court action?

MR. HESKIN:  There's actually $10 million -- almost $10 million sitting in a receiver that's been paid out under these claims.  But what you have to understand here is we do have an unconscionability defense.  So, there was approximately $1.3 million in principal outstanding, and they're seeking over $15 million, or $20 million in total damages on an advance of $1.3 million.  So we -- I would find it hard to believe that that will ultimately be the case --

THE COURT:  Have there been attempts to settle all of these cases?

MR. HESKIN:  There should be.  If the lawyers could get in a room and settle it, we would have this settled.  We've got it settled, but we need a decision maker on the other side that has authority to settle.  And Mr. Lubin, with all due respect, as long as he's making decisions or has the ability to control it, it's never going to happen.  We've already tried. He's the one that wants $20 million on this claim, which just can never happen, for a lot of reasons.

THE COURT:  So, Mr. Chubak, I think that's your

P8FDGolO

client, right?

MR. CHUBAK:  Yes, your Honor.

THE COURT:  You're representing Mr. Lubin?

MR. CHUBAK:  That's correct, your Honor.

THE COURT:  See, you kind of pause when you say that, so is there some issue I need to know about?

MR. CHUBAK:  I pause because we withdrew in the state court action on account of nonpayment issues, and I can't make any assurance that we're not going to make a motion in this case.  But, under the circumstances, we're still counsel of record.

THE COURT:  Okay.  You're here with us today --

MR. CHUBAK:  Yes.

THE COURT:  -- in body and spirit, but you're telling me, you're letting me know that we'll see what happens after this hearing?

MR. CHUBAK:  That's one way of putting it, your Honor.

THE COURT:  All right.  Let me turn to the defendants, whoever wants to take this one.  Explain to me, based on what is in the complaint, what has been said in the *Funderz* cases -- not just the *Funderz* cases but a lot of other cases, why isn't all of this just a dressed up loan sharking enterprise given what the plaintiffs have alleged?

We haven't had discovery.  We haven't had fact finding.  But just given what the plaintiffs have alleged,

P8FDGo1O

haven't they alleged this is a dressed up loan sharking enterprise? Who wants to take that? There's no takers. I'll start with --

MR. LETO: Again, this is Matthew Leto on behalf of Hi Bar Capital. In our view, the allegations that have been made in the complaint, at least as it relates to Hi Bar, do not overcome the three prong test that is necessary to show that this is, in fact, a loan, because if this is not a loan, all of the RICO usury claims automatically will fall off. And just on the face of the documents, and even if we look at the allegations, they don't overcome this test.

And I'll be specific with respect to the Hi Bar Capital agreement, because I represent Hi Bar Capital. And one of them is at document 11-12, so it's Exhibit 12 to the amended complaint. And if we look at the case law on what they need to prove, they really have to show that there's an absolute right to repayment under all circumstances. I'm paraphrasing what the case law states, but that's generally what it is to who that it's loan.

And in this merchant cash advance agreement, it actually says the opposite, and there are actually no allegations in the complaint that show this was not being followed. And I'll just be clear. One of the first things we have to show is that it can be recognized and there can be a difference in the remittance. This is a mandatory provision

P8FDGolO

under sections 1.3 and 1.4 of the merchant agreement.

So, in some of the cases that are cited by Mr. Heskin, there are differences that don't appear in this document.  For instance, there's different timeframes, there's only certain times that it can happen.  That doesn't happen in the Hi Bar agreement.  Really, at any time, at any time the plaintiff can submit a request in writing to a particular email address and they can reconcile retroactively payments that have been made.

THE COURT:  Why doesn't this run into *People v. Richmond Capital Group*, in which the Court said the predatory lenders made sure their borrowers were in default on day one of the MCAs by requiring that the borrowers falsely represent that the collateral, i.e. the accounts receivable, was free and clear of all other loans, and as you know, in order to be able to reconcile, you cannot be in default.  So the argument goes that, yes, the agreements say what they say, but underneath the surface, if you just look at the facts, you have a situation, and there's emails and other material that's in the complaint, that that wasn't how things operated in practice.  In practice, it was designed that there would be multiple MCA agreements, so there would be a default from day one, and you can just take even like a single month, in March of 2021, and look at the daily payments and the receivables to know that those were just contrived, that this was a short-term loan at an extremely high interest rate.  This is what was alleged in the complaint.  I'm

P8FDGolO

saying you can prove that that's all false, and I know you will during discovery, you'll do your best to try to prove that, but I'm saying that's what's alleged in the complaint.  There are decisions, like the one I just mentioned, that say, look, if you look underneath the surface, there was an effort to paper over these attributes of those transactions, but when we look at the substance and not the form, which I'm required to do, then the three elements can be met.  At this point, all I'm trying to determine is whether there's a plausible allegation that those three elements could be met.

MR. LETO:  Understood, your Honor.  And with respect to the reconciliation and remittance issue, and I think the dispositive -- the differences in some of the cases cited, is there's no allegations that anybody sought reconciliation or an adjustment to Hi Bar.  There's no allegation in the complaint about that.

The only document that's cited by Mr. Heskin to say that they asked for that was a text message between Mr. Lubin and the principal of the plaintiff, but there is nothing else -- and Mr. Lubin is not Hi Bar.  So there's nothing that shows that they requested reconciliation or a change in the remittance from Hi Bar, which again would be mandatory.  And under the case law, it's only illusory if you actually attempt it and it's rejected for whatever reason.  So, that is something that is absolutely missing from this complaint that I

P8FDGolO

think differs from some of the other cases on it.

In addition to that, with respect to it being on default --

THE COURT:  You don't think when Mr. Lubin is talking to Leer and just telling him "let's make it 500 each for the next 10 days," that doesn't sound kind of like what you might imagine a loan shark saying to someone that's been loaned money?  I mean, just to bring this down to the real world, doesn't that sound a little bit like loan sharking?

MR. LETO:  I don't think it would be loan sharking.  I think it's somebody trying to change the payment terms with somebody that they're -- somebody owes them money.  But Mr. Lubin, again, is not Hi Bar.  So the allegations of the complaint don't relate to Hi Bar ever rejecting an attempt by Leer to change the payments.

THE COURT:  I think the plaintiff alleges everybody is conspiring with everybody here.  That's why they raise the RICO conspiracy claim, as well as they say everybody, including Spin Capital and Mr. Lubin, they're responsible with Hi Bar and the other MCA agreement providers, because this was all part of the same operation; that you issue the MCA agreements; if that doesn't work, you try to get those paid off through a note that can then be enforced in court that's above the $2.5 million usury limit, so no usury defense can be interposed, and then you're free and clear, and you can press forward with your

P8FDGolO

enforcement action and then go back after the people that you've given money to without having to worry about the usury issue.  That's the general --

MR. LETO:  I couldn't agree more, that is the gist of what the complaint says, but, still, when you want to show that there's an illusory provision and that it's not going to be followed, you still have to allege an attempt was made.  So having one text message from May of 2021, and whether talking about a different amount of payments is not following the reconciliation or adjustment or remittance paragraphs, which is something, again, that Hi Bar would have to, mandatory, it shall change if the information is submitted.

So, again, you can't show it's illusory unless you actually attempt to do it, and there's no allegation in this complaint that the plaintiffs ever attempted to do so.

THE COURT:  Why isn't that a factual question?  I mean, we're here in Federal Court.  *Twombly* controls, and the only thing really I'm here to decide is whether there's a plausible allegation in this complaint.

Let me ask Mr. Heskin, is it your understanding that the plaintiffs attempted to reconcile the agreements and that they were not able to given the terms of those agreements and the other circumstances here?

MR. HESKIN:  The answer is absolutely yes, it's alleged.  He's showed them their bank account, said "I can't

P8FDGolO

pay. Here are my bank statements, the negative balances." We showed them as exhibits. They said, "too bad. Pay me. What can you pay even though you've got a negative balance?"

This is the middle of COVID when all the business is at its worst, like they weren't even operating. And, two, in Judge Liman's decision in *Funderz*, I believe he specifically addresses this issue and says, "that's not the law. You don't have to show that you actually made the request to show that the reconciliation provision was illusory."

Second of all, in *Parkway v. Dennil -- v. Hi Bar*, that was, again, another one of my cases, the Court said, "I'm following the more reasoned approach of the federal courts." That was the exact same agreement, and the reconciliation provision was illusory in that case. And in this case, because it says that default -- if you miss just two payments, that's an event of default, but when you ask for a reconciliation, they don't have to respond for five days, and, therefore, you still have an obligation to make those payments.

So, you put in the request for reconciliation. They don't have to grant it for five days. But if you miss the payments for those two days, in between the five days when they have to get back to you, that's an event of default, and then you don't have to reconcile.

Plus, if you look at the allegations and the exhibits here, they were in default from day one, because they were side

P8FDGolO

by side, and there's emails saying "we're going to be side by side with you." And so you had agreements at the same time from Hi Bar and BMF at the exact same time saying that -- making reps and warranties that you had free and clear title, which you can't possibly do. So they were in default from day one. They all knew it. And Mr. Lubin was the broker on both of them.

THE COURT: What was the date of the loan, meaning the $2.7 million?

MR. HESKIN: The 2.7, I believe it was in --

MR. CHUBAK: June 16, 2021.

MR. HESKIN: June, yes. So the MCA I believe started in March, and then there was a series of five of them rapid fire.

THE COURT: What was the interest rate on the loan?

MR. HESKIN: On the loan, it was 60 percent, with a 120 percent default rate, and their position is not only do they get the 120 percent, they get $600,000 in attorneys' fees, plus their actual attorneys' fees, plus they get all the policies. So all of the policies that were secured, they get all the policies, and they get 120 percent interest, and attorneys' fees. It's as unconscionable as you get. And, again, on a $1.3 million advance.

THE COURT: Right.

Mr. Spinella, is that right?

P8FDGolO

MR. SPINELLA:  Yes, that's right.  May I?

THE COURT:  Of course.

MR. SPINELLA:  Phillip Spinella, for BMF Advance and Gavriel Yitzchakov.  I just want to kind of un-angle some of this and to go back to what you said at first.  We are here on the RICO claims, right?  So these agreements need to be usurious for that RICO claim to be viable.  You've stated I think pretty succinctly sort of the scheme that's being alleged here, but we have the decision in state court that they're not usurious on its face.  That is very, very much in keeping with all the New York State law that controls here.  Unless, in all circumstances, the lender is entitled to repayment, it's not a loan.  Okay?

What is being talked about right now is we're creating hypothetical scenarios for situations where certain parties might I guess commit some kind of fraudulent scheme.  That doesn't give rise to a RICO claim, because it doesn't make the agreement usurious.

THE COURT:  Yes, but I'm not here to make that ultimate determination, and, in fact, Justice Borrok came back one year after he made that initial determination and said, maybe I was a little bit too hasty; what I really meant to say is I'm dismissing the counterclaims without prejudice, because on the face of those pleadings, which are not these pleadings, there wasn't a factual basis stated to allege the elements that

P8FDGolO

you would need to allege.  But he said it was without prejudice, and he let it move forward.  At this stage, based on what has been alleged in this complaint, text messages, emails, we're talking about a deeper and more -- given allegations --

MR. SPINELLA:  I --

THE COURT:  Just wait.

MR. SPINELLA:  Sorry.  I didn't mean to --

THE COURT:  Other allegations that would support the argument and the plausibility of the allegation that these are usurious, I'm not making that determination now.  You're going to fight it during discovery, and they're going to try to fight it in discovery, and we'll see what happens.  You may be right at the end of the day that there's not a factual predicate to say that these are usurious.

MR. SPINELLA:  But if the argument is that there is an interstitial spaces in these agreements from which facts could arise, and I understand Judge Borrok's discovery order essentially saying "I'd like to see what the facts are."  It references *Haymount*, which, as you said, is choice of law, so it's very, very open ended to what those facts may be.

THE COURT:  But if you go back to Judge --

MR. SPINELLA:  Just to --

THE COURT:  Hold on.  If you go back to Judge Rakoff's prior decisions, there was a reason why he made the choice of law point, because, depending what law you use, it looked like

P8FDGolO

loans.

Look, there's the legal points which have all been made in the papers, and then there's just the general question. If you just looked at these transactions and you looked at the communications, what would you think that these are, right? Because that's what *Twombly* asks us to do, to use our common sense, and the allegations in the complaint, and ask if we take those allegations in the light most favorable to the plaintiff, is there an argument that these are usurious loans?  Is it plausible, right?

The plaintiff is saying, yes, it's not only just plausible.  There's not interstitial space.  He's saying that there's no other way to look at these things other than that they were usurious, short term loans that were then used as a mechanism to be rolled up into a note that could evade the usury protections and then be used to enforce against the plaintiffs.  That's what they're arguing.

MR. SPINELLA:  So if I have this straight, though, and I think this is in plaintiff's papers, essentially, the injury that's being pled is the loan.  That's what they say.  The injury is the loan, and the mechanism to get to that injury were these MCA agreements.  All right?  So that is their theory of the case essentially.

THE COURT:  No, that's not their theory of the case. Their theory of the case is that the injury to business is that

P8FDGolO

they had to pay off the usury MCA agreements, which has been recognized in a number of cases as being a quintessential injury under the RICO statute.  Of course it is, because one of the things the RICO statute was initially designed to be about was loan sharking, right?  That was what it was about.  So when people had to go back and pay these things -- it doesn't matter what happened afterwards.  It doesn't matter where got the money.  But they had to repay them, and they repaid these usurious transactions.  For that reason, it is a quintessential business injury.  That's what they're saying.

Now, what they're able to seek in terms of damages, I understand from a damages perspective they say, well, if you accept that and we're able to show that and we're able to win on that, then the consequences are we can get back any money we have to pay in the state court case, everything else.  I'm not faced with that question right now.  You raised a standing question, and a question whether the elements of the RICO statute had been met, and I'm saying having to pay off a usurious transaction, that's black letter RICO law.

MR. SPINELLA:  Okay.  I think it's a good way to talk about the damages, which I would like to address, because that is an accurate statement of law.  Of course, I'm not going to argue about that.  However, the question that I guess that gives rise to is what will constitute the damages, right?  Because we can agree that if they have suffered no

P8FDGolO

out-of-pocket damages due to this fraudulent scheme which is essentially what RICO persons commit RICO -- through a RICO enterprise harm to business or property through the predicate racketeering acts or collection of unlawful debt, okay?  So, the collection of unlawful debt here has to mean that we collected more than they received through the scheme.

Now, if the scheme is the MCA agreements have to get paid off by the loan, then the loan money, right, that's provided should count in the RICO damages calculation.  I don't know if there's any way to avoid that given the theory of the case is that we're rolling it up into this loan.  Okay?

On the face of the complaint, you can see that they've received far more than they paid back, and I know that, because you can go to the paragraphs, I can point them out, to just show why it's there.  If you look at paragraphs 94 and 105, they admit to receiving 80k from the first BMF deal; paragraph 127, that's 105k they admit to receiving, and this is like they received it after all the deductions and whatnot; paragraph 120, we have 198k that they say they received; $105,072 in paragraph 127; paragraph 141, $100,000; paragraph 165, they say approximately $320,000, and use that figure later; paragraph 180, $1.3 million -- $1,307,400.03, that they received on the loan.  So, you add all that up and you get to about $2.2 million.

You look at the losses pled in paragraph 292, they're

P8FDGolO

pleading the losses of the $827,000 that they paid into the Hi Bar and BMF agreements. All right. So, clearly, they've received an amount of money that is far, far more than they paid back, and even if they were to say, okay, we also paid X on the loan, they've still paid more than that -- they've still received more than that. And that's all on the face of the complaint. So that's -- I think I almost want to start with that. That's a threshold issue here that is pled on the face, right? So the facts as pled demonstrate no out-of-pocket loss.

I think it's likely that's why the stip of discontinuance was filed in which plaintiffs dropped in this proceeding the usury argument as to the Spin Capital loan, but that's actually neither here nor there. If, as you've stated, as plaintiff's counsel has stated, the scheme is to roll it up into the loan, then you have to consider the loan proceeds. So, at that point, like I've said, I've cited to the paragraphs, you can add all that up in the face of the complaint and see there are no RICO damages here.

THE COURT: Well, if it's a damages argument, then, sure, you can make that argument at summary judgment. Damages is not something that I decide now. Are you making an Article III standing issue --

MR. SPINELLA: No. I'm saying they haven't pled a viable RICO claim, because if you don't plead out-of-pocket -- if you can't show them, and they haven't pled them, my point is

P8FDGolO

if they kept vaguer, perhaps it could survive, but they've pled the numbers, so --

THE COURT:  What's the case that says -- give me the case.  And I'll look it up right now.

MR. SPINELLA:  Okay.  *McLaughlin v. American Tobacco*.

THE COURT:  Hang on a second.

MR. SPINELLA:  Oh, sorry.  I'm going to give you a cite as well.  My apologies.

THE COURT:  All right.  Give me the citation.

MR. SPINELLA:  Yeah.  So, that's 522 F.3d 215, and the quote I'm about to give is at 227.  So there it's, a plaintiff asserting a claim under 18, U.S.C., 1964(c) must allege actual, quantifiable injury.  Okay.  So that's the first proposition.

Now, we know that actual, quantifiable injury, for RICO purposes, means, and this requires actual out-of-pocket financial loss, and "actual out-of-pocket financial loss" is a quote from *FDNY* --

THE COURT:  This particular case has been abrogated, but do you have a later -- do you have a different cite for this proposition?

MR. SPINELLA:  Yes, *Dornberger* in S.D.N.Y., 1967.  That's 961 F. Supp. 506, at 521.  So, right, you need an actual out-of-pocket financial loss.

THE COURT:  Hold on a second.

MR. SPINELLA:  Of course.  My apologies.

P8FDGolO

THE COURT:  All right.  Mr. Heskin, how do you respond to this particular argument on out-of-pocket losses?

MR. HESKIN:  Sure.  And I believe Judge Liman addressed this issue in the *Fleetwood* decision, which was affirmed by the Second Circuit.  They are correct that the damages are the amount over the principal paid.  Now, there are several flaws in their argument.  First off, they fully repaid all five MCAs.  They have fully repaid them.  The damages on those are $825,000.  They've also suffered damages in the amount of an attorneys' fees in excess of $700,000 for defending against the loan in the state court action.  Plus, they've got the damages of the policies, the money that they've lost by paying -- having the receiver be appointed in the state court action.  And they're facing a $15 million liability.

They're alleging right now that our clients owe more than $20 million on the loan.  That's clearly damages.  And on the MCAs, they've cleared -- you look at each one of those, those are all fully paid off.  And they spent more than $825,000, which is alleged in our complaint.

In addition, you have individuals, the other companies, that are guarantors, are also receiving -- had to incur attorneys' fees to defend against the state court action, and they didn't receive any of the money under the MCAs or the loan.  So those individual guarantors have at least suffered damages in the amount of attorneys' fees.

P8FDGolO

THE COURT:  All right.  So your position is you can show out-of-pocket damages right now, sitting here today --

MR. HESKIN:  Yes.

THE COURT:  -- and you're certainly going to be able to show potentially additional damages when we get to the end of the road at summary judgment or trial, right?

MR. HESKIN:  Absolutely.

THE COURT:  Mr. Spinella, just to go back to what we talked about, this is cognizable damages, because I'm looking at the damages -- it would obviously be unfair to impose a treble damages remedy where plaintiff is in a better position than he otherwise would have been.

So my question for you is, given everything that we've heard from Mr. Heskin, isn't that a question for discovery?  Like, go prove your case.  You say that they're in a better financial position?  Then you will win on summary judgment.

MR. SPINELLA:  Yes, I believe that's true.  And the key issue here, and I think you see that to try to manufacture a viable RICO claim, they need these fees that they're purportedly expending prosecuting the suit.  If you look at the phrasing in the complaint, it says -- sorry, the phrase used -- I don't have it right in front of me -- is the costs incurred in enforcing -- you know, enforcing and disclosing essentially are violations.  And I wish I could find it.  I have it written down right here I believe, and my apologies for not having it

P8FDGolO

immediately to hand.

Here we go.  Okay.  Paragraph 295.  My apologies.  The damages incurred -- plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting defendant's criminal activities.  So that's one prong of what they're saying here.  They're saying they are incurring costs defending the loan agreement.  The thing here is, and this fails at the threshold, because obviously where legal damages -- the legal fees may constitute RICO damages when they are the proximate consequence of a RICO violation.

Now, if you look at what that has meant in the case law, for instance, I'd like to give you a cite to *Bankers Trust Co. v. Rhoades*, (2d Cir. 1988), 859 F.2d 1096.  Okay.  So there they held, essentially, attorneys' fees were part of a RICO damage calculation.  It was a situation where the fees --

THE COURT:  What was that cite again?

MR. SPINELLA:  Sorry.  Attorneys' fees --

THE COURT:  What was the cite?

MR. SPINELLA:  Sorry.  *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096.  So, in this case, essentially, and the cite I have is to 1105 there to 6.  So here, with respect to the RICO claim, right, for attorneys' fees, the Second Circuit held that a party may recover the past legal fees that are incurred for attempts to collect a judgment which had been frustrated by the actions constituted in the RICO violation, right?  So the RICO

P8FDGolO

violation is approximate, because here it's a situation where the fees had been incurred in connection prior to the litigation.  All right?

THE COURT:  Yes.

MR. SPINELLA:  So they're suing on things that are sum certain, not hypothetical, not that were within their control after the alleged violations, right?  That's what they're alleging here --

THE COURT:  I think -- well, just to kind of maybe tie a bow on this, that kind of argument, proximate causation is clearly a fact argument that is not traditionally resolved on a motion to dismiss.  For present purposes, in paragraphs 292 through 296, to the extent that there is a requirement that the plaintiff plead that they were injured in their business or property and that they had suffered current out-of-pocket losses, it does say that here.

Now, you may argue that that's wrong and that the facts will show that the plaintiff is in better shape financially than they would have been absent these MCA agreements, but that's a fact battle to be addressed on summary judgment, not one to be addressed on the motion to dismiss.

MR. SPINELLA:  May I ask just a question?

THE COURT:  Yes.

MR. SPINELLA:  I'm trying to consider how this plays out.  So, under this interpretation, I think, and the problem

P8FDGolO

with this is the treble value, the settlement value of cases like RICO, that's why it's not supposed to be garden variety fraud, et cetera.  So here what could happen, like the plaintiff here could manufacture a viable RICO claim by when they were not -- when they were in a position, where they were in a financially better off position because of the alleged behavior than create legal fees to then later, in summary judgment stage, right, now they've expended enough fees to have a viable RICO claim -- if that's the position, then as long as we defend this case, we are adding to the possibility that they have created a viable RICO claim, so that's the trouble for me with that position.

THE COURT:  All right.  Mr. Heskin, what's your response?  What's your best case here to address this kind of situation where, look, there's the attorneys' fees and other things, but those are consequence of efforts to evade repayment or to deal with the consequences of the MCA agreements in the form of the loan.  All right?

I'm not trying to box you in.  I'm just saying that's what we're talking about here.  But in terms of just dollars, your clients have received a lot of dollars from the defendants either through the MCA agreements or the loans, and those are greater than the amounts that you paid back, right?  So how do we deal with that?

MR. HESKIN:  So, it all depends on whether or -- at

P8FDGolO

this stage, I believe, they're judicially estopped from arguing that our client is liable for $20 million on the note, right? They've pled that in the underlying state action. They've issued interrogatory responses saying they're liable for the $13 million. They can't now come to you and say there's no damages, because there hasn't been a finding on it. They're alleging that we owe $13 million on that note, so there could be a finding that we owe -- we only owe principal on that, or we only owe something else.

THE COURT: Let me stop you there, and maybe I'm just overcomplicating this and we are all overcomplicating this with the discussion of legal fees and everything else. If we just think about the MCA agreements, right, how much money did your clients get on the MCA agreements?

MR. HESKIN: The calculation in our papers, I don't have it memorized, because there's five of them, but we overpaid eight hundred --

THE COURT: How much did you receive?

MR. HESKIN: $862,000 less than that. I don't have the -- it was -- they might have gotten, let's say --

THE COURT: Anyone on the defense side, do you know how much was --

MR. HESKIN: I believe it's --

THE COURT: What was the purchase amount?

MR. HESKIN: There might be a chart in here. It's

P8FDGolO

$862,000 more than we've paid, more than we've received, and the chart -- that's just daily payments.

THE COURT:  So are we talking about 500 grand, in that ballpark?

MR. HESKIN:  The total amounts we've received, I'd have to look at the -- it's in the complaint.  If I can recall, it would be probably they received $2 million and paid back 2.82, or something like that.

THE COURT:  Wait.  Hold on.

MR. HESKIN:  They would have received $2 million, and would have paid back $2.82 million.

THE COURT:  When you say "they," I don't know who you're talking about.

MR. HESKIN:  That's the other problem.

THE COURT:  Hold on.  How many MCA agreements?  Five MCA agreements?

MR. HESKIN:  Five.

THE COURT:  How much did the people who were selling their receivables, all right, how much money did they get back if you count the five MCAs?

MR. HESKIN:  I want to say it was approximately $2 million, what they received, and they paid back 2.8.

THE COURT:  The 2.8, when you say they repaid 2.8 --

MR. HESKIN:  Yes.

THE COURT:  -- that is the one point --

P8FDGolO

MR. HESKIN:  I don't mean to interrupt, but I pointed to the --

THE COURT:  Mr. Spinella, can you --

MR. SPINELLA:  Yes.  I'm just trying to help.

MR. HESKIN:  I'm not going to cite all of them again, unless you want me to, but what I wrote down prior to coming here was around $828,000 was advanced under the five, okay, and under the loan, separately, there was $1.3 million in change.

THE COURT:  I'm not talking about --

MR. SPINELLA:  I'm just saying, because I took the number --

THE COURT:  You and I are not talking about the loan.

MR. SPINELLA:  Yes.

THE COURT:  I think Mr. Heskin might have been talking about the loan.  You're saying it's around 800, in that ballpark?

MR. SPINELLA:  828 I think is right.

THE COURT:  828.

MR. SPINELLA:  On the CMA agreement.

MR. HESKIN:  Over the --

THE COURT:  Hold on.

MR. SPINELLA:  What they received --

THE COURT:  Hold on.  We can't -- for the court reporter's sake, just one at a time.

MR. SPINELLA:  All I'm saying --

P8FDGolO

THE COURT:  On the MCAs, that's all I wanted to know. Then, as part of the loan, 1,162,000 -- or, sorry, 1.16 million of the loan face amount went to repay the MCA agreements, correct?  That's within Justice Borrok's decision.

MR. CHUBAK:  Yes.

THE COURT:  Okay.  So there you go, out-of-pocket loss on the MCA agreements, because that's what they're complaining about.  It doesn't matter where they got the money and what happened after the fact.  It's a loan to you.  It could have been a loan from some other person.  They might have gone and had to get some unscrupulous lender to give them the money. But in terms of what we're talking about on the transactions at issue, they're saying they got 800 grand or change on the MCA agreements, and they had to pay out 1.16 million.  Now they're facing all the burdens and the consequences of that.

You can argue down the line none of that is cognizable, that other stuff, but they're saying, at a basic level, look, that's the basic usury here, and so that gives us standing to proceed on a RICO claim.  That would be consistent with all the other cases that I've cited in terms of the payment of usurious interest being a cognizable injury and consistent with the cases you've just cited to me that have the requirement of the out-of-pocket loss.

The other stuff that happened, the loan and everything else, that's side show, because you could get -- imagine if, to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P8FDGolO

repay these transactions, Mr. Heskin's clients went to Citibank and they got a jumbo $20 million loan, because they were totally liquid and JPMorgan really wanted them as clients. So they got $20 million. Okay. You couldn't walk in here and say, well, they actually don't have a RICO claim, because they got a $20 million loan from JPMorgan, because they'd have to go back and pay that off.

MR. SPINELLA: Is JPMorgan part of the RICO conspiracy that's being alleged in this scenario? Because that's the scenario. Spin is being alleged culpable under the RICO statute, Spin and Lubin, so they are a part of this scheme, so he's trying to -- plaintiff is trying to get liability attached to Spin and Lubin without counting the $1.3 million plaintiff netted from the loan as part of what they've suffered because of the scheme.

THE COURT: Yes. That's a separate issue as to whether Spin and Lubin are responsible for attempts to collect an unlawful debt if the loan, as the plaintiffs have made clear, is not being challenged as usurious in this lawsuit. They've got allegations, their complaint is replete with them, that Spin and Lubin weren't just responsible for the loan, that they were also part and parcel with the other stuff. So, they're just saying you were part of the initial conspiracy that had to do with the MCA agreements, which is what we're challenging.

P8FDGolO

Mr. Heskin, am I right about that or am I missing something?

MR. HESKIN:  That's correct, your Honor.

THE COURT:  All right.  Here's what we're going to do, because we've been here quite a while.  The motions to dismiss will be denied, and we will issue a written decision that addresses all the parties' arguments.  That should be issued if not today, it should be out by Monday.  So, you'll see that.

In terms of discovery, what we'll do is we will use the same proposal that the parties came up with.  We will give you credit for the time during which this case was stayed.  So we'll add that into the case management plan, and issue that plan, so you'll have a discovery schedule in place.

Do we have a protective order in this case?  Let me ask the defendants, do we have one and do we need one?

MR. LETO:  I don't think we need one at this point, your Honor, on behalf of Hi Bar.

THE COURT:  All right.

MR. SPINELLA:  I would have to think about it, but I will cosign for the --

THE COURT:  Well, I'll make it easy for you, because our website has a protective order we usually use.  It's good for all time zones.  So if you want to use it, you can put in a letter saying, "can you please put in the protective order you have on your website," and there you go.

P8FDGolO

Aside from that, Mr. Heskin, any issues I can help you with -- oh, yes. I wanted to address settlement. You said you want to try to get to the table with somebody.

MR. HESKIN: I would love to have this matter referred for a settlement conference through the magistrate program. I think that might help.

MR. LETO: I'm in 100 percent agreement with that, your Honor.

MR. SPINELLA: Sorry. Yes, agreed.

THE COURT: All right. Well, what about Mr. Chubak? Am I pronouncing that right?

MR. CHUBAK: Chubak. Who's not in the state court action anymore.

THE COURT: You're here.

MR. CHUBAK: Of course, your Honor.

THE COURT: All right. Look, what I'm going to ask everyone to do is to talk to their clients, all right? Let me give you a little understanding of how things work here on the federal side. You're going to have essentially five to six months of discovery, and then we're going to go to summary judgment motions. I decide those very quickly. So it isn't a situation where you're going to be here three years from now getting a decision on summary judgment. You're going to be getting a decision on summary judgment in 2026, and if you do and it's denied, then you're going to be trying this case in

P8FDGolO

2026.  Okay?  You're going to have six or eight or 10 jurors in that box to decide these issues, and that's what's going to happen.  Maybe you prevail on summary judgment, in which case you'll win and this case will be over.  But that's what's going to happen.

I just want to let everyone know what the timeframe of this is going to be.  So we're going to get to the finish line in 2026.  The way I handle discovery is you can't avoid it on either side, so if Mr. Heskin's clients are hiding documents, hiding discovery, then I will expect defense lawyers to contact chambers and we'll have you in within 24 to 48 hours and we will figure it out, I will figure it out and get you a prompt ruling.  Same thing, Mr. Heskin, if you are finding missing documents on the defendants' side, then you can come to me and we will figure it out very quickly.  So we try to keep these things moving.

In terms of settlement, with that said, please talk to your clients.  If your clients are on board and everybody is on board with the reference to the magistrate judge, I will do it.  But there's very limited resources in this courthouse, and so I hate to do it if the folks are going to come in to see the magistrate judge and it's a no go from the beginning.  So if you've spoken to your clients and they're open to the process, then everyone should put in a joint letter, and I will make the reference, and I'll even try to get it done sooner than later,

P8FDGolO

because I know that you've had these issues around for a long time.

Mr. Heskin.

MR. HESKIN:  Yes.  And one of the things that maybe would speed things up, because I know the state court is going very, very, very slowly, is I know there's a motion to intervene in the state court action.  Perhaps there could be a similar motion brought in this action as to who has the authority to settle, and if that's brought quickly before your Honor and that's decided --

THE COURT:  I don't understand what you mean by motion to intervene.  I see three lawyers here for the defense, and I assume that their clients have authority to settle here, so what am I missing?

MR. HESKIN:  So we don't know who has the authority to settle on behalf of Spin.  In the state court action, BMF or one of BMF's subsidiaries has made a motion to intervene, saying they have authority to settle that case, which would include this case.

So, I'll talk to them after, but I just wanted to just flag for you that there may be a motion to intervene that's brought in this case by the person who says they have the authority to control the settlement of the Spin Capital case, and if this Court could decide that issue quickly, it would help speed up settlement.

P8FDGolO

So, right now that issue is before the state court. The state court hasn't moved. I'll suggest to them that that motion be brought here.

THE COURT: How would I decide who has the authority to settle on behalf of the LLC? It's a corporate dispute.

Mr. Chubak, what's going on here?

MR. CHUBAK: Your Honor, this has to do with post summary judgment motions made in the state court action. I really don't think we need to get into it right now. I'm happy to engage with Mr. Heskin about this matter.

THE COURT: If that's an issue that's holding up settlement discussions in this case, then, Mr. Heskin, I'll make you in charge of this. So you'll speak with Mr. Chubak.

MR. HESKIN: Yes.

THE COURT: You have honest brokers at the table here.

MR. HESKIN: Absolutely.

THE COURT: So if there is an issue as to who has settlement authority as to Spin Capital, and it's something I could resolve, I'll expect you to lead the charge, bring it to my attention. You can do that by joint letter motion, and we'll figure it out.

MR. HESKIN: Okay. Thank you, your Honor.

THE COURT: Mr. Spinella.

MR. SPINELLA: One last thing, and not actually about what we discussed earlier with regard to motions for summary

P8FDGolO

judgment, because I don't want to create more work in the short term.  There is a pure question of law, and it wasn't briefed, but it's on the face of the complaint and it could warrant an amendment.  And I don't want that to happen too far down the road, because then it complicates everything, as I'm sure everyone knows.

There's -- the RICO persons are pled as the individuals, but RICO conspiracy culpability, they're seeking damages from the entities as well.  Just as a matter of law -- and, like I said, it could be a short summary judgment motion, but I'd rather make it sooner than later -- only RICO persons can have RICO liabilities.  So to the extent that the conspiracy relief is seeking liability against the entities, that's a non-starter as pled.

THE COURT:  Why don't you speak with Mr. Heskin and let him know what your argument is.

Mr. Heskin, you have an honest broker on the other side, too, so I think that if you have a great argument and he doesn't have a response, I'm sure that you would amend the complaint, and maybe you'd agree to that.  If he doesn't, then you can make an application, first by letter, letting me know what it is you're planning to file.  We'll see Mr. Heskin's response, and if it's a viable motion, we'll certainly hear it.

MR. HESKIN:  And this issue was addressed by Judge Liman in I believe it was the *Funderz* case on the RICO persons

P8FDGolO

and the RICO conspiracy with the corporation, so I think it's correctly pled.

THE COURT:  All right.  Well, thank you very much. Have a great weekend.  Thank you for coming in.

(Adjourned)