UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOLDEN FOOTHILL INSURANCE SERVICES, LLC, LIFE FACTOR II, LLC, LIFE SHARES II, LLC, EL DORADO HILLS INSURANCE SOLUTIONS, INC., LONE WOLF INSURANCE SERVICES, INC., ELDO INVESTMENTS, LLC, THE GENESIS LS FUND, LLC, KTL HOLDINGS, INC., and TATANISHA LEER<br><br>                    Plaintiffs,<br><br>     v.<br><br>SPIN CAPITAL, LLC, AVRUMI (a/k/a JOSH) LUBIN, BMF ADVANCE LLC, GAVRIEL YITZCHAKOV a/k/a GABE ISAACOV, HI BAR CAPITAL, LLC, YOEL GETTER a/k/a JOEL GETA, and YISROEL HERBST,<br><br>                    Defendants. | Civ. A. No.: 1:24-CV-08515 |

**PLANTIFFS' STATEMENT OF UNDSIPUTED MATERIAL FACTS IN
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AGAINST
DEFENDANTS LUBIN, SPIN CAPITAL, BMF ADVANCE, YITZCHACAOV AND A
<u>DEFAULT JUDGMENT AGAINST DEFENDANT YOEL GETTER</u>**

Plaintiffs Golden Foothill Insurance Services, LLC ("GFIS"), Life Factor II, LLC ("LF

II"), Life Shares II, LLC ("LS II"), El Dorado Hills Insurance Solutions, Inc. ("El Dorado"), Lone

Wolf Insurance Services, Inc. ("Lone Wolf"), ELDO Investments, LLC ("ELDO"), The Genesis

Fund, LLC ("Genesis"), KTL Holdings, Inc. ("KTL"), (the "Leer Companies), and Tatanisha Leer

(collectively, "Plaintiffs") submit this Statement of Undisputed Material Facts pursuant to Federal

Rule of Civil Procedure 56(c), in support of their motion for summary judgement against

Defendants Avrumi (a/k/a Josh) Lubin, BMF Advance, LLC, Gavriel Yitzchakov, and a default

judgment against Defendant Yoel Getter a/k/a Joel Geta. Each fact stated below is material to one

or more of Plaintiffs' claims and is supported by citation to admissible evidence or evidence that

Case 1:24-cv-08515-AS    Document 156    Filed 05/26/26    Page 2 of 29

can be presented in admissible form at trial:

## FACTUAL BACKROUND

### A. Background On The Parties

### i. *Background on Plaintiffs*

1.      The Leer Companies operate in two fields of the insurance industry: (1) buying and selling insurance policies as brokers; and (2) life settlement whereby a Leer Company purchases whole life policies as an investment. *See* Declaration of Stefan Leer, dated May 26, 2026, ¶¶ 3-4.

2.      With life settlement, the Leer Companies often raise capital to pay the purchased life insurance premiums by issuing private placement memoranda whereby investors obtain an interest in the Leer Company owning the life insurance policy and receive a return on investment when the covered individual passes. *Id.*, ¶ 5.

3.      Sometimes, based on the insured individual's life expectancy and the costs of premiums on a policy, the Leer Companies have to let some policies lapse in order to prevent an ultimate loss on the investment. *Id.*, ¶ 6.

4.      Because of these two business models, Leer Companies did not have regular receivables; income streams were irregular and depended on the sale of life insurance policies, the supply of life insurance policies on the market, and the rate at which the insured of purchased life insurance policies would die. *Id.*, ¶ 7.

5.      COVID-19 hit the Leer Companies hard.  New life insurance policies were not being issued or were made extremely difficult to sell due to high premiums.  Meanwhile the supply of life insurance policies available to purchase dropped, resulting in a lack of new "receivables" being generated for the Leer Companies life settlement business. *Id.*, ¶ 8.

6.      By 2020, the number of whole life insurance policies owned by the Leer Companies had declined, and by June 2021, the Leer Companies owned approximately a dozen who life

-2-

insurance policies, which represented the Leer Companies' largest remaining asset during the pandemic. *Id.*, ¶ 9.

### ii. *The Spin Enterprise*

7.    Spin is a limited liability company used by Lubin to conduct the affairs of his unlawful loansharking enterprise. Lubin and Spin, together, constitute a RICO enterprise (the "Spin Enterprise").  Declaration of Shane R. Heskin, Ex. 1 (jury verdict finding that Lubin dominated and controlled Spin Capital), Ex. 2 (Lubin Dep. Tr. I) at 41 (Q. Where is Spin Capital's current address, office location?  A. Wherever I'm located."); 50 ("I make money.  I don't do due diligence.  I'm a sales guy.); 60 ("Spin has done some MCAs, yeah"); 64 ("Yeah, I'm the owner"), 69-72 (describing bank accounts opened by Lubin), 72 ("Yes.  And I was the only person, and maybe my admin, to create a wire.  I was probably the only person with approval privileges."), 227-28 (admitting ACH checks sent to his home address in New Jersey), 242 (admitting Lubin was paid as broker and syndicate), 243 ("my services cost a lot of money").

8.    Lubin characterizes Spin's primary business as brokering financial transactions, including MCA deals, with merchants and MCA funders in consideration for receiving a commission and or syndication participation from the funder.  *Id.*, Ex. 2 at 22 ("A broker communicates with potential merchants and funders and works on getting documents signed, for a commission."), 29 ("I get paid a commission if I broker a deal."), ("I would make a commission or get upside for putting together the transaction and – yeah, I mean, I wasn't doing it for free."). Spin and Lubin are also in the business of lending and have at least three multi-million dollar judgments as a direct result.  *See* Heskin Decl., Ex. 3 ($7.2 million judgment by Franklin Capital), Ex. 1 ($6 million verdict by Franklin Capital), Ex. 4 ($7.5 million verdict by FVP Opportunity Fund), Ex. 5 ($8.8 million writ of execution).

9.      The Spin Enterprise conspires with various MCA lender enterprises, such as the Isaacov Enterprise and the Hi Bar Enterprise to paper the MCA deals that the Spin Enterprise brokers.  *Id.*, Ex. 1 (verdict finding that Lubin dominated and controlled both Spin Capital and Hi Bar), Ex. 2 at 26 ("You're aware of threats that Ben Isaacov made to Stefan Leer, are you not?  A. There was, like, some type of—I don't remember the full details, but something was threatening— I don't remember the context of what happened there."), 27 ("Yes, I'm aware that Ben is Gabe Isaacov's brother."), 28-29 (admitting Leer lead came from Gabe), 123 ("Well, you knew he had an MCA with Ben Isaacov, right?  A. But who cares?  Yeah."), 38 ("With Gabe, if he sent me the lead he would give me—he would give me 50 percent of the profits of the deal.") ("You can call it 50 percent participation. 50 percent of the upside.  I wouldn't have to put up any money."), 39 ("I believe for Leer it was 50 percent of the upside."), 82 (describing new formula would give Spin 75% interest and BMF 25%), 151 ("Q. Gabe lives in Florida, doesn't he?  A. Yes."); Ex. 6 (email detailing syndication participation in $2.7 million Promissory Note); Ex. 7 (wire detail showing Promissory Note paid off BMF and Hi Bar MCAs), Ex. 8 (informing Gabe that "I need to get getter on board with me.  100kx2.").

10.      Lubin put his own personal money into the Promissory Note.  *See id.*, Ex. 9, at 17 ("I laid out the first $3 million in this deal."), ("I laid out the first few million in legal fees."), 18 ("In the MCA agreements, there's a profit sharing, but in the loan, I'm pretty sure I had to put up the money myself. Q. You came out of pocket and paid?  A. 600 grand, yeah.").

11.      Lubin does not even read the MCA agreements that he brokers with the assistance of the Isaacov Enterprise and Hi Bar Enterprise and does not know how the MCAs even work, yet he nevertheless charges exorbitant fees for his services in brokering the MCA deals, including the MCA Agreements here and the Promissory Note, which is nothing more than additional disguised

interest. *Id.*, Ex. 2, at 48-49 (detailing educational and work history), 50 ("I make money. I don't do due diligence. I'm a sales guy."), 52 ("I don't know if I review them or not."), 56 ("Q. Do you know if those contracts had bankruptcy as an event of default? A. I have no idea"), 197-203 (admitting he never read BMF and Hi Bar agreements and does not know how they operate), 244-45 (admitting know idea how daily payment is calculated).

12.    Lubin directly participated in each MCA deal on behalf of BMF and Hi Bar and Lubin held himself out as the lender. *Id.*, Ex. 10 ("going to try and get away with a 40k [Personal Service Fee] on the funding call"), Ex. 11 (What's App) ("U took 4 shit deals behind me."), ("Why don't you pay me in full by next week?"), ("I didn't file."), Ex. 12 ("Merchant trying to get me to send him an email that I won't debit for then 2k a day for 30 days. Trying to do 2 weeks. I'm on it."), Ex. 13 ("$400k 1.499 20k Daily"), Ex. 14 ("You're giving me no option but to file a judgment."), Ex. 15 ("Can I do 2k each"), ("im not debiting 20k. i turned off. I will tell hi bar too as well."), Ex. 16 (email with Leer, Lubin and Getter requesting to pause payments due to lack of cash flow), Ex. 17 ("I'm freezing everything. I advise you get a good attorney."), ("I have no option but to take the legal route."), (u owe me money and im sick and tired of your games…. at this point its worth it to freeze everything and fight it out in court, while momney is on hold."), Ex. 18 (Lubin affirmation attaching all five MCAs based on Spin's business records).

### iii. *The Isaacov Enterprise*

13.    The Spin Enterprise conspires with and actively participates in the BMF Enterprise as a broker, underwriter, and funder of MCA Agreements. *See supra* ¶¶ 9-10; *see also* Heskin Decl., Ex. 19, *Lateral Recovery LLC v. Funderz.net, LLC*, 2024 U.S. Dist. LEXIS 176985 (S.D.N.Y. Sept. 27, 2024) (finding that BMF was part of Isaacov Enterprise).

14.     BMF is just one of several MCA labels used by the Isaacov Enterprise, many of which are d/b/as of Funderz.Net LLC, and various Isaacov brothers each control their own MCA companies or d/b/as within the Funderz.Net LLC umbrella.  *See* Heskin Decl., Exs. 19, 20.

15.     Gabe owns and operates BMF Advance and uses BMF Advance to paper MCA deals brokered and funded by the Spin Enterprise as well as engage in direct solicitation with merchants to enter into MCA agreements with the Isaacov Enterprise through BMF.  *See* Heskin Decl., Ex. 21 ¶ 1 (Isaacov Affidavit).

16.     The eldest brother, Joseph Isaacov ("Joe"), holds himself out as the CEO of Hop Capital.  *See Funderz,* 2024 U.S. Dist. LEXIS 176985, *77-78. *See* Heskin Decl., Exs. 19, 22.

17.     Beinaymin Yitzchakov (a/k/a Ben Isaacov) ("Ben") holds himself out as the CEO of Panthers Capital.  *See* Heskin Decl., Ex. 23, (Ben Isaacov's LinkedIn Profile).  Panthers Capital is registered as one of Funderz.Net LLC's 18 d/b/as.  *See* Heskin Decl., Ex 20.

18.     Panthers also entered into an MCA Agreement with the Leer Companies on March 16, 2021, purporting to purchase 10% of Leer's receivables.  *See* Heskin Decl., Ex. 24.

19.     Significantly, on September 27, 2024, Judge Liman of the Southern District of New York granted summary judgment against Joe and Funderz.Net LLC on RICO claims for collection of unlawful debt based, in part, on MCA agreements papered by Gabe's company BMF.  The *Funderz* decision also found several MCA agreements papered by Joe's company HOP Capital were also usurious loans. *Id.*, Ex. 19, *Funderz.net LLC*, 2024 U.S. Dist. LEXIS 176985, *77-78.

### iv. *The Hi Bar Enterprise*

20.     Hi Bar is dominated and controlled by Getter. *See* Heskin Decl., Ex. 1 (state court verdict finding that Getter dominated and controlled Hi Bar); Ex. 2 ("Q. Who is [Joel Getter]? A. He ran Hi Bar Capital."), 41 ("Joel I think worked in Florida.  I think he had an office in

Brooklyn."), 42 ("And my point of contact was Joel, which he was located in Florida."), 80 (describing buyout of Hi Bar's interest), 227 ("Q. Who did you deal with [at Hi Bar]? A. Joel."), Exs. 9 at 12 ("He was the guy that ran Hi Bar. Q. Yel Getter was? A. Yeah."), 13 ("Yeah, he was the guy that ran the operations, yes.").

21.     Yisroel Herbst also had decision-making authority and negotiated a buyout of the Leer Promissory Note directly with Lubin. *See id.*, Ex. 9 ("Yeah, I made a deal with Herbst.").

22.     In the instant matter, the Hi Bar Enterprise worked with the Spin Enterprise in having the Spin Enterprise broker, negotiate, help underwrite and fund two Hi Bar MCA Agreements entered into between Plaintiffs and Hi Bar in March 2021. *See* Heskin Decl., *supra* ¶¶ 9-10; Exs. 25-29.

23.     The Hi Bar Enterprise also worked with the Spin Enterprise to refinance the Hi Bar MCA debt in June 2021 into the usurious Promissory Note. *Id.*, Ex. 30.

24.     The three Enterprises pooled funding for the Promissory Note and expected to share the spoils of collecting on the Promissory Note's 120% default interest rate and take ownership of the $40 million worth of life insurance policies owned by the Leer Companies pursuant to the Security Agreement. *Id.*, Ex. 6.

25.     Since at least 2021 and continuing through the present, the Hi Bar Enterprise has had the common goal of collecting unlawful debt through disguising usurious loans as MCA agreements and soliciting merchants into entering into these agreements. *See id.*; *see also HI Bar Capital LLC v. Parkway Dental Servs.*, LLC, 2022 N.Y. Misc. LEXIS 5814, *1, 2022 NY Slip Op 32934(U), 1 (N.Y. Sup. Ct. Aug. 25, 2022) (vacating judgment on basis that Hi-Bar MCA agreements were usurious loans and adopting more persuasive federal court standard).).

26.     On March 29, 2022, Herbst (through Hi Bar) sued Getter, alleging that Getter was stealing money from Hi Bar and brokering deals for Hi Bar that were doomed to fail because, like here, the merchants were "mired in debt and days away from default on its obligations and ceasing operations." *Id.*, Ex. 31 (Hi Bar complaint against Getter).

27.     Despite admitting that entering into these types of transactions was a "recipe for disaster," *id.*, that is exactly what Hi Bar did here.  To be sure, Hi Bar knew that the Leer Companies were similarly "mired in debt." *See* Heskin Decl., Ex. 9 at 29-30 ("Q. Why did you reach out to Stefan Leer and ask him if he wanted an MCA? A. There was money problems, likely, I assume."), 187 ("Q.  Well, you're aware that he, Mr. Leer, had other MCAs out there at the same time, right? A. I may or may not have been aware of that. Yeah, I believe I was aware of that, but yeah."); Ex. 32 (stating "U sure u want to fund this?" after acknowledging existing MCA with Yellowstone affiliate West Coast), Ex. 24 (Panthers); Ex 33 (United), Ex. 34 (West Coast); Ex. 54 (GFE).

## B.  The MCA Agreements At Issue

28.     During the COVID-19 pandemic, specifically in early March 2021, Stefan was contacted unsolicited by Lubin, who offered to connect Stefan and the Leer Companies to what Lubin described as alternative lenders, specifically BMF and Hi Bar, who could offer short-term loans to the Leer Companies that would allow them to keep making payments on the life insurance policies that they owned.  *See* Leer Decl., ¶ 10.

29.     During this initial discussion, Stefan explained to Lubin the nature of the Leer Companies' business, the value of the various life insurance policies they presently owned, and how an influx of capital was desperately needed to avoid the Leer Companies losing the life insurance policies due to insufficient funds. *See* Leer Decl. ¶ 11.

30.     Lubin knew the Leer Companies were having money problems when he solicited them to enter into the MCA Agreements.  *See* Leer Decl. ¶ 12; *supra* ¶ 27.

31.     During the course of the MCA Agreements, Lubin learned about several of the life insurance policies owned by the Leer Companies and it was this that precipitated the discussion of the Promissory Note and Security Agreement later in June 2021. *See* Leer Decl. ¶ 12.

   i.  ***March 2, 2021 BMF MCA Agreement***

32.     Given the Leer Companies' financial desperation, Plaintiffs accepted Lubin's offer to enter into what was understood as a short-term loan with BMF on March 2, 2021. *See* Heskin Decl., Ex. 25; Leer Decl. ¶ 13.

33.     Pursuant to the March 2, 2021 BMF MCA Agreement, the Leer Companies expected to receive $100,000 and were required to pay back $149,900 through fixed daily payments of $4,996. *Id.,* Ex. 25 at 1, 6, 9; Ex. 36; Ex. 53 (40 days).

34.     The March 2, 2021 BMF MCA Agreement provided that the $4,996 daily remittance was a "good faith" estimate of 10% of the Leer Companies' daily receivables.  Ex. 25 at 1.  Thus, as of March 2, 2021, BMF estimated that the Leer Companies daily receivables were worth $49,960.  *Id*.

35.     The Leer Companies did not receive the full $100,000 because $20,000 was deducted as a purported bank fee. *See* Heskin Decl., Ex. 36.

36.     When Lubin and Gabe underwrote the March 2, 2021 BMF MCA Agreement, they expressly set forth that the loan would have a term of 40 days.  *See* Heskin Decl., Ex. 8.  The 40-day term is also reflected by dividing the repayment amount ($149,900) by the daily payment ($4,996), which yields 30 business days or approximately 40 days total.  *See id.*, Ex. 25.

37. As evidenced by the underwriting documents, Lubin and Gabe provided the funding for the March 2, 2021 BMF MCA Agreement. *See* Heskin Decl., Ex. 36.

38. The March 2, 2021 BMF MCA Agreement contained a "NO STACKING ADDENDUM" whereby the Leer Companies were "prohibited from initiating a cash advance or other loan products with another lender outside to BMF Advance, LLC. Doing so will place me in breach of contract and I will be liable for the entire amount owed to BMF Advance, LLC immediately, plus attorneys' fees, costs, liquidated damages and a default fee of $25,000 or 20% of the contract amount, whichever is greater." *Id*., Ex. 25.

39. Under the March 2, 2021 BMF MCA Agreement, missing a single fixed payment would constitute an event of default. *See id.*

40. The March 2, 2021 BMF MCA Agreement also provided recourse in the event of bankruptcy as the personal guaranty provided that: "In the event that [BMF] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount." *Id*.

41. The March 2, 2021 MCA did not identify the specific receivables of the Leer Companies that BMF purportedly purchased. *Id*.

42. Despite BMF purportedly purchasing the Leer Companies' receivables, the Leer Defendants were still responsible for collecting the receivables. *Id.* at 1 ("[BMF] will debit the Remittance each business day from one depositing bank account, which account must be acceptable to, and pre-approved by, [BMF] (the 'Account') into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as [BMF] receives payment in full of the Purchased Amount").

43.     The March 2, 2021 BMF MCA did not have a reconciliation provision. *Id*.

44.     When viewed as a loan with an $80,000 principal and repayment term of 40 days, this March 2, 2021 BMF MCA Agreement assessed an annual interest rate of 570%. *See People v. Richmond Capital Group LLC*, 80 Misc. 3d 1213(A), at *20 (N.Y. Sup. Ct. 2023) ("As set forth in the expert affidavit of Chansoo Song and various court decisions (NYSCEF Doc. No. 50, P 12), the formula to calculate the applicable interest rate is (A/P)/(T/M) where A is interest amount, P is the principal amount, T is the number of days in the term, and M is the number of business days in a year."); Heskin Decl., Ex. 38.

45.     BMF over collected on the loan by $972. *See id.,* Ex. 43.

ii.  ***March 10, 2021 Hi Bar MCA Agreement***

46.     The Leer Defendants entered into an MCA Agreement with Hi Bar on March 10, 2021. *See* Heskin Decl., Ex. 26.

47.     Pursuant to the March 10, 2021 Hi Bar MCA Agreement, the Leer Companies were to receive $220,000 as a principal and were obligated to repay $329,978 through fixed daily payments of $8,500. *Id*.

48.     The March 10, 2021 Hi Bar MCA Agreement provided that this $8,500 fixed daily was a "good faith estimate" of 20% of the Leer Companies' daily receivables. *Id*. Thus, as of March 10, 2021, Hi Bar estimated that the Leer Companies' daily receivables were worth $42,500. *Id*.

49.     Like with the BMF MCA Agreement dated March 2, 2021, Stefan and Lubin negotiated the March 10, 2021 Hi Bar MCA Agreement as a short-term loan with a term of 39 days. Dividing the repayment amount ($329,978) by the fixed daily payments ($8,500) also yields a term of 39 days. *Id*.; *see also* Ex. 43 (describing wire as loan payment).

50. The Leer Companies did not receive the full $220,000 provided in the Hi Bar MCA Agreement. Rather, $22,000 was deducted from the principal as a purported "Underwriting Fee." *Id*., Ex. 26 at 8.

51. The March 10, 2021 Hi Bar MCA Agreement also provided that the Leer Defendants would be in default if they secured any alternative financing. *Id.,* § 3.1(i).

52. Under the March 10, 2021 Hi Bar MCA Agreement, missing two daily payments constituted a default. *Id.* at 8.

53. The March 10, 2021 Hi Bar MCA Agreement also provided recourse in the event of bankruptcy as the personal guaranty provided that: "In the event that [Hi Bar] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount." *Id.* at 6.

54. The March 10, 2021 Hi Bar MCA Agreement did not identify any specific receivables of the Leer Companies that were being purchase. *Id*.

55. Despite Hi Bar being the purported purchaser of the Leer Companies' receivables, the Leer Defendants were responsible for collecting these purchased receivables to make payment to Hi Bar. *Id.* at 1 ("[Hi Bar] will debit the Remittance each business day from only one depositing bank account, which must be acceptable to, and pre-approved by, [Hi Bar] (the 'Account') into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as [Hi Bar] received payment in full of the Purchased Amount").

56. The March 10, 2021 Hi Bar MCA Agreement did have a nominal reconciliation provision, but it contained many qualifications and limitations, including: (a) no event of default

may have occurred; and (b) Hi Bar had full discretion to request additional documentation the failure to provide would result in a denial of the reconciliation  *Id.* § 1.3.

57.    When Hi Bar performed ACH debits of the Leer Companies account to make payments on the MCA Agreement, the ACH debit would often read "PAYMENTS FOR LOAN." *See* Heskin Decl., Ex. 46, Ex. 47 (negotiating 24-day term).

58.    When viewed as a loan with a $198,000 principal and a term of 39 business days, the March 10, 2021 Hi Bar MCA Agreement assessed an annual interest rate of 553%.  Heskin Decl., Ex. 39 (Interest Rate Calculation).

### iii.   *March 12, 2021 BMF MCA Agreement*

59.    After entering into the first two MCA Agreements, the Leer Companies were paying off the two loans through BMF and Hi Bar withdrawing approximately $13,500/day.  *See* Heskin Decl., Exs. 25-26.

60.    This was not sustainable given that COVID resulted in the Leer Companies generating little receivables and the only future revenue the Leer Companies could expect would be when one of the insured on a policy they owned passed away.  *See* Leer Decl. ¶ 15.

61.    Rather than entering into a wholly new MCA Agreement, Lubin offered to refinance the prior BMF MCA Agreement, which was executed on March 12, 2021, pursuant to which the Leer Companies would receive purportedly receive $220,000 and repay $329,780 through fixed daily payments of $8,500. *See id.*, Ex. 27, Ex. 48 (describing MCA as "refi"), 49 ("send refi docs").

62.    According to the March 12, 2021 BMF MCA, the daily remittance of $8,500 was a "good faith estimate" of 10% of the daily value of the Leer Companies' receivables.  Ex. 27 at 1.  Thus, as of March 12, 2021, BMF estimated that the Leer Companies' daily receivables to be worth $85,000/day. *Id*.

63.     The number of days, however, was not based on a good faith estimate.  Instead, it was based on "whatever" BMF want to charge. *Id.*, Ex. 50 ("How many days???  DO WTVR YOU WANT. ILL GET IT DONE.").

64.     The Leer Companies did not receive anything close to the $220,000 principal set forth in the MCA Agreement.  Rather, $114,928 was immediately deducted from this amount to pay off the balance on the March 2, 2021 BMF MCA Agreement.

65.     BMF also charged $25,000 in fees. *Id*, Ex. 36 (funding email).

66.     Thus, the Leer Companies received $195,000 as principal under the March 10, 2021 BMF MCA Agreement. *Id.*

67.     Pursuant to the March 12, 2021 BMF MCA Agreement, missing a single daily payment would result in a default.  *Id.,* Ex. 27 § 3.1(d).

68.     The March 12, 2021 BMF MCA Agreement contained the same "NO STACKING ADDENDUM" as the March 2, 2021 BMF MCA Agreement such that the Leer Defendants would be in breach if they secured any other type of financial product.  *Id.* at 10.

69.     BMF had recourse in the event the Leer Companies declared bankruptcy by making the personal guarantors liable for the remaining balance.  *Id.* at 6 ("In the event [BMF] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount").

70.     The March 12, 2021 BMF MCA did not have a reconciliation provision. *Id*.

71.     The March 12, 2021 BMF MCA did not identify any specific receivables of the Leer Companies that BMF purportedly purchased. *Id.*

72.     Despite BMF purportedly purchasing the Leer Companies' receivables, the Leer Defendants remained responsible for collecting these "purchased" receivables to make payments to BMF.  *Id.* at 1 ("[BMF] will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, [BMF] (the 'Account') into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as [BMF] receives payment in full of the Purchased Amount").

73.     Viewed as a loan with a principal of $195,000 and a repayment term of 47 days, the March 12, 2021 BMF MCA Agreement assessed an annual interest rate of 382%. Heskin Decl., Ex. 40 (Interest Calculation).

74.     BMF over collected on the March 12, 2021 BMF MCA in the amount of $8,000. *Id.*, Ex. 19.

iv.  ***March 25, 2021 BMF MCA Agreement***

75.     Since this March 12, 2021 BMF MCA agreement only yielded the Leer Companies approximately an additional $100,000 in capital, while the Leer Companies continued to repay BMF and Hi Bar $17,000 per day, it was not long before the Leer Companies' capital was again depleted after using the funds to maintain payments on the Leer Companies' life insurance policies they owned.  *See* Leer Decl., ¶16.

76.     Consequently, on March 25, 2021, Lubin had the March 12, 2021 BMF MCA Agreement refinanced into a new loan whereby the Leer Companies would receive $400,000 on paper and use $274,000 of that amount to pay off the prior BMF MCA balance and still be obligated to repay $599,600 through daily payments of $25,000. *Id.*, Ex. 28.

77.     According to the March 25, 2021 BMF MCA, the $25,000 daily remittance was a "good faith estimate" of 10% of the value of the Leer Companies' daily receivables.  *Id.* at 1, 8.

Thus, as of March 25, 2021, BMF estimated that the Leer Companies' daily receivables were worth $250,000/day. *Id.*

78.    The Leer Companies did not receive the full $126,000 under the March 25, 2021 BMF Agreement after paying off the prior BMF MCA; instead, they only netted $100,000 due to arbitrary fees charged. *Id.*, Exs. 37, 51.

79.    Dividing the Purchased Amount ($599,600) by the daily remittance ($25,000) creates a term of just 24 business days, or 31 days total.  This fixed term of 24 business days was negotiated between Stefan and Lubin on March 22, 2021 via text messages. *Id.*, Exs. 47.

80.    Pursuant to the March 25, 2021 BMF MCA, missing a single daily payment would constitute an event of default.  *See id*, Ex. 28 § 3.1(d).

81.    The March 25, 2021 BMF MCA contained the same "NO STACKING ADDENDUM" as the prior BMF MCA Agreement such that the Leer Defendants would be in breach if they secured any other type of financial product. *Id*. at 10.

82.    BMF had recourse in the event the Leer Companies declared bankruptcy by making the personal guarantors liable for the remaining balance. *Id.* at 6 ("In the event [BMF] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount").

83.    The March 25, 2021 BMF MCA did not have a reconciliation provision. *Id*.

84.    The March 25, 2021 BMF MCA did not identify any specific receivables of the Leer Companies that BMF was purportedly purchasing.  *Id*.

85.    The Leer Companies were responsible for collecting the receivables that BMF allegedly purchased, the same as all the prior MCA Agreements.  *Id*.

86.    Viewed as a loan with a $370,000 principal and term of 24 business days, the March 25, 2021 MCA Agreement assessed an annual interest rate of 667%. *Id*., Ex. 41.

87.    BMF over collected on the March 25 MCA in the amount of $1,900. *Id*., Ex. 45.

v.  *March 25, 2021 Hi Bar MCA Agreement*

88.    The $100,000 principal provided by the March 25, 2021 BMF MCA Agreement was not sufficient to keep the Leer Companies operational. Leer Decl., ¶ 17.

89.    On March 25, 2021, the Leer Defendants also entered into another MCA Agreement with Hi Bar whereby the Leer Companies were to receive $400,000 and repay $599,600 through daily payments of $20,000, which was Hi Bar's "good faith estimate" of 20% of the daily value of the Leer Companies as of March 25, 2021. *Id*., Ex. 29.

90.    As of March 25, 2021, Hi Bar's estimate of the Leer Companies' daily receivables value was $100,000. *Id*.

91.    Consequently, in less than one month, each MCA Agreement by the same two lenders, BMF and Hi Bar, had different "good faith estimates" of the Leer Companies' daily receivables, as reflected in the below chart: *Id*., Exs. 25-29.

| MCA Agreement | Daily Payment | Specified Percentage | Defendants' Estimation of FTE Receivables |
|---|---|---|---|
| 3/2/21 BMF | $4,996 | 10% | $49,960/day |
| 3/10/21 Hi Bar | $8,500 | 20% | $42,500/day |
| 3/12/21 BMF | $8,500 | 10% | $85,000/day |
| 3/25/21 BMF | $25,000 | 10% | $250,000/day |
| 3/25/21 Hi Bar | $20,000 | 20% | $100,000/day |

92.    The Leer Companies did not receive the full $400,000 principal provided by the March 25, 2021 Hi Bar MCA Agreement. $79,999 was deducted for "Underwriting Fee." *Id*., Ex. 29 at 8.

93.     The March 25, 2021 Hi Bar MCA Agreement provided that two missed payments would constitute an event of default.  *Id.* at 8.

94.     The Agreement provided recourse in the event the Leer Companies declared bankruptcy by holding the personal guarantors responsible for the outstanding balance.  *Id.* at 6 ("In the event that [Hi Bar] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount").

95.     Taking out any financing product from anyone other than Hi Bar would constitute an event of default under the MCA Agreement.  *Id*. § 3.1(i).

96.     The March 25, 2021 Hi Bar MCA Agreement did have a nominal reconciliation provision, but it contained many qualifications and limitations, including: (a) no event of default may have occurred; and (b) Hi Bar had full discretion to request additional documentation the failure to provide would result in a denial of the reconciliation.  *Id.* § 1.3.

97.     Dividing the Purchase Amount ($599,600) by the daily remittance ($20,000) yields a finite term of 30 business days, or 44 total days.  *Id*.

98.     The March 25, 2021 Hi Bar MCA Agreement did not identify any specific receivables being purchased from the Leer Companies.  *Id*.

99.     The March 25, 2021 Hi Bar MCA made the Leer Defendants responsible for collecting the receivables that Hi Bar purportedly purchased.  *Id*. at 1.

100.     Viewed as a loan with a $320,001 principal and term of 30 business days, the March 25, 2021 Hi Bar MCA Agreement assessed an annual interest rate of 757%.  *Id.* at Ex. 42.

### C. Similarities between the MCA Agreements Here and the Funderz MCA Agreements

101.    The BMF MCA agreements have been ruled to be loans as a matter of law in *Funderz. Compare id*, Exs. 19, 52 *with* Exs. 25, 27, 28.

102.    Both the MCA Agreements here and the Funderz BMF MCA agreement, professed that the daily remittance was a "good faith estimate" of the purchased percentage of the merchants' receivables. *Id.*

103.    As found by the *Funderz* court, the Funderz MCA agreements were not good faith estimates because the estimation would vary with MCA agreements entered on back-to-back days, Ex. at *89-90, which is the same case here as evidence by the above chart. *Id.*

104.    Both the MCA Agreements here and the Funderz BMF MCA Agreement provided recourse to the lender in the event of the merchant's bankruptcy through the personal guaranty. *Compare* Ex. 52 *with* Exs. 25, 27, 28.

105.    The BMF MCA Agreement in *Funderz* made two missed payments a default, Ex. 52 at 8, whereas the MCA Agreements here made one missed payment an event of default. *Id.*, Exs. 25, 27, 28.

106.    Both the MCA Agreements here and the *Funderz* BMF MCA Agreement found to be a loan as a matter of law gave the lender a security interest in all of the merchant's assets. *Compare* Ex. 52 *with* Exs. 25, 27, 28 at 6.

107.    The *Funderz* MCA Agreements had a completely illusory reconciliation provision that could be granted or denied in BMF's "sole discretion." *Id.* at 1. The BMF MCA Agreements here do not even have a reconciliation provision. *Id.*

108.    The *Funderz* BMF MCA Agreements nor the MCA Agreements here (i) failed to identify any specific receivables being purchased; and (ii) made it the merchant's responsibility to collect the receivables purportedly purchased by BMF.  *Id.*

**D. The Enterprises Used Their Failure to Honor Their Reconciliation Provisions by Refinancing the MCAs Into The Promissory Note**

109.    On March 30, 2021, Lubin instructed Leer to wire missed payments to Hi Bar and BMF and provided wire instructions for both.  *Id.*, Ex. 55.

110.    On April 2, 2021, Leer informed Lubin that the daily payments were not sustainable and requested to unwind the last Hi Bar transaction by repaying what was received.  *Id.*, Ex. 11. Lubin refused to unwind it unless Leer paid back the full $600,000 due and owing.  *Id.*  When Leer informed Lubin that he could not possibly repay the full amount and that the transactions with Hi Bar and BMF were some of the worst deals ever, Lubin warned Leer that Getter would file on him because he "doesn't give a fuck" and that he already sent it to an attorney for enforcement, and that UCC letters had already gone out to freeze the Leer Companies accounts.  *Id.*  Lubin further cautioned Leer that "U have no idea what's coming."  *Id.*

111.    On April 6, 2021, Leer informed Lubin that he had insufficient funds to continue the fixed daily payments and to reduce the payments to $1,000 per day for both Hi Bar and BMF, and that the parties would negotiate a fair payoff when his deals come in within 3-4 weeks.  *Id.*, Ex. 15.  Lubin responded by arbitrarily requesting if he could do "$2k each" and did not request bank statements or conduct any analysis of the receivables.  *Id.*  Nonetheless, Leer stated that he would send bank statements and requested an email confirming the reduction in payments.  Lubin refused to send an email and simply said that he turned off the $20k payments and that he was a man of his word.  *Id.*

112.    On or around April 22, 2021, the Leer Companies started bouncing payments due to insufficient funds.  *See* Ex. 56.  Lubin informed Leer that Hi Bar would debit twice the following day.  In response, Leer requested a pause due to insufficient funds.  *Id.*

113.    On April 26, 2021, Lubin demanded that Leer immediately wire $2,000 each to Hi Bar and BMF.  *See* Ex. 57.  Leer responded with a screenshot of his bank accounts showing insufficient funds and a negative balance on one.  *Id.*

114.    In response, Hi Bar declared a default due to the two missed payments and filed a UCC lien.  *Id.*, Ex. 58.

115.    On or before April 28, 2021, BMF also declared a default and sent the file to a Texas attorney for collection, who threatened Leer with a visit by a "constable" if he did not pay.  *Id.*, Ex. 59.  Ultimately, Lubin arbitrarily agreed to reduce payments to $500 for 10 days.  *Id.*, Ex. 60.

116.    On June 4, 2021, unhappy with the reduced payments Leer could afford, Lubin texted Leer threatening that:  "I'm freezing everything.  I advise you get a good attorney."  *Id.*, Ex. 17.  Leer responded by showing that payment Hi Bar had attempted to pull $500 debits using another name Gold Capital.  *Id.*, Ex. 70 (showing Getter controls Gold Cap and is still in the business of unlawful, predatory and fraudulent lending).

117.    Shortly thereafter, Lubin approached Leer with a proposal to enter into a loan that would pay off the balance of the BMF and Hi Bar MCA Agreements, secured by collateral in certain life insurance policies.  *See* Leer Decl. ¶ 19.

118.    On June 16, 2021, the Leer Companies capitulated, and entered into a purported $2.7 million promissory note (the "Promissory Note") with Spin that had an annual interest rate of 60%.  *Id.*, Ex. 30.

119.    In connection with the Promissory Note, Spin required that Stefan and Tatanisha Leer execute personal guarantees. *Id.*, Exs. 61, 62.

120.    Spin also required a corporate guaranty to be executed by El Dorado, Lone Wolf, ELDO, Genesis, and KTL (the "Corporate Guarantors"). *See id.*, Ex. 63.

121.    The most important component of the transaction for Spin and Lubin was acquiring a purported security interest in several of the Leer Companies' remaining life insurance policies they owned by executing a Security Agreement entered into between Spin, on the one hand, and Golden Foothill, LF II, LS II, the Corporate Guarantors and the Leers as personal guarantors as part of the Promissory Note's overall Transaction.. *Id.*, Ex. 64.

122.    While the Promissory Note on its face contemplated a $2.7 million dollar loan, less than half that amount actually entered into any bank account of the Leer Companies.  Rather (1) $200,000 was immediately taken off as a fee for Lubin's services for "putting together the deal"; (2) $30,000 was allocated to Spin's attorneys to compensate them for drafting the transaction documents purportedly; (3) $582,000 went to pay off the Hi Bar MCA balance; and (4) $580,597 went to pay off the BMF MCA balance.  This left only $1,307,403 as the actual principal to the Leer Companies. *Id.*, Exs. 65.

123.    The Promissory Note had a payment schedule whereby $150,000 payments were due on June 18, 2021 and June 25, 2021, followed by $70,000 weekly payments from July 2, 2021, to August 6, 2021, and then weekly payments of $127,173.91 each week thereafter until the Promissory Note was scheduled to be paid in full by January 14, 2022. *Id.* Ex. 30 at Ex. A.

124.    The Leer Companies were able to make the first five payments, totaling approximately $510,000, but could not continue to make the onerous weekly payments given the

high interest rate and the fact that they only received less than half the actual principal.  *See* Leer Decl. ¶ 21.

125.    As a result, Spin sued Plaintiffs and is presently seeking more than $25 million in damages for breach of the Promissory Note at the default interest rate of 120% annually while the Leer Companies received less than $2 million in total under all five MCA Agreements *and* the Promissory Note. *Id.*, Exs. 30, 67 (Spin Interrogatory Responses).

## FIRST CAUSE OF ACTION
### (RICO: 18 U.S.C. § 1962)

### A.  The Unlawful Activity

126.    Defendants are in the business of lending. *See supra* ¶¶ 8-27.

127.    All of the MCA Agreements provided that they were to be governed and construed under the laws of New York. *Id.*, Exs. 25-29, at § 4.5.

### B.  Culpable Persons

128.    Lubin is the owner and sole managing member of Spin.  During the relevant time period, Lubin, had the Spin Enterprise serve as a broker for MCA lenders, solicited the unlawful debt transactions between the Plaintiffs and the Isaacov and Hi Bar Enterprises, negotiated the terms of the MCA Agreements with other Isaacov and Hi Bar Enterprise members, and providing funding for the MCA Agreements.  *See supra* ¶¶ 8-12.

129.    Gabe is the CEO and principal owner of BMF and part of the Isaacov Enterprise. During the relevant time period, Gabe, along with Lubin, decided upon the terms of the MCA Agreements between BMF and the Plaintiffs and used BMF to paper the MCA Agreements with Plaintiffs.  Gabe also provided funding for the MCA Agreements all while acting as part of the Isaacov Enterprise.  *See supra* ¶¶ 13-19.

130.    Herbst is the owner of the Hi Bar Enterprise, which Getter, during the relevant time period, operated the business affairs of the Enterprise.  *See supra* ¶¶ 20-27.

131.    Through their respective operation of Spin, BMF, and Hi Bar, Lubin, Gabe, Getter, and Herbst solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in states that do not have usury laws, in addition to collecting unlawful debt from merchants situated in states that do have usury laws, such as California (where Plaintiffs resided) and New York (where Defendants operated out of).,  *See supra* ¶¶ 8-27.

132.    When the Enterprise has sufficiently trapped merchants into a series of usurious MCA Agreements, Spin, with funding provided by Gabe and Getter, repackage the MCA debt into a purportedly legitimate loan with a fictitious principal above $2.5 million in order to try to insulate their collection of unlawful debt. *See supra* ¶¶ 28-126.

133.    Since at least 2021 and continuing through the present, members of the Spin Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued by the Enterprise to small business throughout the United States.  *See supra* ¶¶ 8-27.

### C.    Interstate Commerce

134.    The three Enterprises are engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities. *See supra* ¶¶ 8-27.

135.    Specifically, members of the Spin, Isaacov and Hi Bar Enterprises maintain offices in New York, New Jersey and Florida and use personal in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the respective Enterprises to entities across the United States, including California where the Leer Companies operated in the relevant

time frame, via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house. *Id.*

136.    In the present case, all communications between the members of the three Enterprises and Plaintiffs were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications, including text messages between Stefan in California and Lubin in New Jersey and/or New York.  *Id.*

137.    Specifically, the three Enterprises used interstate emails to original, underwrite, service and collect upon the MCA Agreements and Promissory Note, fund the advances under the MCA Agreements and Promissory Note, and collect on the MCA Agreements through interstate ACH debits and on the Promissory Note through interstate wires. *Id.*

138.    In addition, at the direction of Defendants, each MCA Agreement and the Promissory Note documents were executed by Plaintiffs in California and these executed copies were sent by email to Plaintiffs in New Jersey, New York and Florida, where the three Enterprises have their principal offices or where their members reside. *Id.*

### D.    Injury And Causation

139.    Plaintiffs have and will continue to be injured in their business and property by reason of the three Enterprises' violations of 18 U.S.C. § 1962(c) in the amount of the unlawful debt collected by the Isaacov and Hi Bar Enterprises from Plaintiffs on the MCA Agreements. *See supra* ¶¶ 28-126.

140.    Plaintiffs have further been injured by the amount of interest charged by the Promissory Note. *See supra* ¶¶ 109-26.

141.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to,

hundreds of thousands of dollars in improperly collected criminally usurious MCA payments and the lawsuit filed by Spin to collect upon the usurious Promissory Note and take ownership of all of the Leer Companies' life insurance policies under the Security Agreement. *See supra* ¶¶ 27-126.

142.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with (i) exposing and prosecuting Defendants' criminal activities; and (ii) defending themselves from Spin in a lawsuit brought to collect upon the Promissory Note and take ownership of the Leer Companies' life insurance policies under the Security Agreement. *See* Heskin Decl., Ex. 68 (invoices).

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

143.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of their respective Enterprises and use of the various Enterprises to assist each other Enterprise, and frequent email communications among Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the MCA Agreements and Promissory Note, each Defendant knew the nature of the three Enterprises and each Defendant knew that the three Enterprises extended beyond each Defendant's individual role.  *See supra* ¶¶ 8-27.

144.    Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).  *See supra* ¶¶ 8-27.

145.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operations of the each of the three Enterprises' affairs in order to collect upon unlawful dets, including the MCA Agreements and Promissory Note, in violation of 18 U.S.C. § 1962(c).  *See supra* ¶¶ 8-27.

146.    In particular, each Defendant was a knowing, willing, and active participant in the three Enterprises and their affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the MCA Agreements and Promissory Note. *See supra* ¶¶ 8-27.

147.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.  *See supra* ¶¶ 8-27.

## DAMAGES

148.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in the amount of $852,730 on the MCA Loans: *See* Heskin Decl., Exs. 11-25; calculation based on MCA face amounts, fees, net principal, and collection records.

| MCA | Face Amount | Fees Deducted | Net Principal | Amount Collected | Paid Over Principal |
|---|---|---|---|---|---|
| 3/2/21 BMF | $100,000 | $20,000 | $80,000 | $150,872 | $70,872 |
| 3/10/21 Hi Bar | $220,000 | $22,000 | $198,000 | $329,978 | $131,978 |
| 3/12/21 BMF | $220,000 | $25,000 | $194,928 | $337,780 | $142,780 |
| 3/25/21 BMF | $400,000 | $26,000 | $374,000 | $601,500 | $227,500 |
| 3/25/21 Hi Bar | $400,000 | $80,000 | $320,000 | $599,600 | $279,600 |
| **Total** | **$1,340,000** | **$173,072** | **$1,166,928** | **$2,019,730** | **$852,730** |

149.    In addition, Plaintiffs suffered damages int the amount of interest charged by Spin on the Promissory Note.  *See* Heskin Decl., Exs. 26, 31; Spin damages computation / interrogatory responses Heskin Decl. ¶ 10.

150.    As of September 19, 2023, the exact amount of these damages on the Promissory Note was $13,228, 338.90, including:

a.    $2,349,657.53, reflecting the principal loan balance of $2,700,000.00, less the portion of the $510,000.00 paid by defendants that is attributable to principal,

b.    $6,164,332.88, reflecting interest on item (a), as of September 15, 2023, at the default interest rate of 10% per month.

c.    **$1,314,189.31**, reflecting enforcement costs incurred by Spin in connection with this Action, through September 6, 2023.

d.    $1,230,561.79, reflecting interest on item (c), as of September 15, 2023, at the default interest rate of 10% per month.

e.    **$877,433.57**, reflecting insurance policy premium payments and amounts paid by Spin to the court-appointed receiver, through July 10, 2023, to protect Spin's interest in its collateral.

f.    $589,163.81, reflecting interest on item (e), as of September 15, 2023, at the default interest rate of 10% per month.

g.    **$28,000.00**, reflecting late fees incurred under Section 6(a) of the Promissory Note.

h.    **$675,000.00**, reflecting default fees incurred under Section 6(d) of the Promissory Note.

151.    The default interest of 120% incurred on the Promissory Note from September 15, 2023 through May 26, 2026 is $7,601,303.04. *See* Heskin Decl., Exs. 30, 67.

152.    Thus, the total interest damages on the Promissory Note incurred totals: **$13,765,635.92** ($7,601,303 + $6,164,332.88). *See id*.

153.    The default interest of 120% on the costs in item (c) from September 15, 2023 through May 26, 2026 is $4,252,466.34. *See id*.

154.    The total interest charged on the attorney's fees in item (c) totals: **$5,483,028.13** ($4,252,466.34 + $1,230,561.79). *See id*.

155.    The default interest of 120% on the costs in item (e) from September 15, 2023 through May 26, 2026 is $2,839,435.49. *See id*.

156.    The total interest charged on the costs in item (e) totals: **$3,428,599.30** ($2,839,435.49 + $589,163.81). *See id*.

157.    The total damages on the Promissory Note are as follows:

| Interest on Promissory Note | $13,765,635.92 |
|---|---|
| Interest on Attorney's Fees | $5,483,028.13 |
| Interest on Costs/Premiums | $3,428,599.30 |
| Premiums Charged | $877,433.57 |
| Attorney's Fees Charged | $1,314,189.31 |
| Default Fees Charged | $675,000 |
| Late Fee Charged | $28,000 |
| **Total Costs and Interest Charged:** | **$25,571,866.23** |

158.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with defending themselves from Spin in a lawsuit brought to collect upon the Promissory Note and take ownership of all of the Leer Companies' life insurance policies under the Security Agreement.  The total is $924,889.53. *See* Heskin Decl., Ex. 68.

Date: May 26, 2026

**HESKIN & PROPER PLLC**

By: _____

Shane R. Heskin, Esq.
641 Lexington Avenue, 14th Floor
New York, NY 10022
shane@heskinproper.com
*Attorneys for Plaintiffs*