**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GOLDEN FOOTHILL INSURANCE SERVICES, LLC, LIFE FACTOR II, LLC, LIFE SHARES II, LLC, EL DORADO HILLS INSURANCE SOLUTIONS, INC., LONE WOLF INSURANCE SERVICES, INC., ELDO INVESTMENTS, LLC, THE GENESIS LS FUND, LLC, KTL HOLDINGS, INC., and TATANISHA LEER,<br><br>               Plaintiffs,<br>    v.<br>    SPIN CAPITAL, LLC, AVRUMI (a/k/a JOSH) LUBIN, BMF ADVANCE LLC, GAVRIEL YITZCHAKOV a/k/a GABE ISAACOV, HI BAR CAPITAL, LLC, YOEL GETTER a/k/a JOEL GETA, and YISROEL HERBST,<br><br>               Defendants. | Civ. A. No.: 1:24-CV-08515 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS LUBIN,**
**SPIN CAPITAL, BMF ADVANCE, AND YTIZCHAKOV AND A DEFAULT**
**JUDGMENT AGAINST DEFENDANT YOEL GETTER**

**HESKIN & PROPER PLLC**
Shane R. Heskin, Esq.
641 Lexington Avenue, 14th Floor
New York, NY 10022
shane@heskinproper.com
*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

Page(s)

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF UNDISPUTED FACTS ........................................................................4

    A. The Leer Companies' Business and COVID-19 Cashflow Crisis ...............................4

    B. The Spin Enterprise, Isaacov Enterprise, and Hi Bar Enterprise ...................................5

    C. The MCA Transactions at Issue ....................................................................................6

        1. The March 2, 2021 BMF MCA ...........................................................................6

        2. The March 10, 2021 Hi Bar MCA ........................................................................7

        3. The March 12, 2021 BMF MCA ..........................................................................7

        4. The March 25, 2021 BMF MCA ..........................................................................8

        5. The March 25, 2021 Hi Bar MCA ........................................................................9

    D. The Undisputed Facts Show That the MCAs Are Usurious Loans ...............................9

    E. Defendants Refused Meaningful Reconciliation and Used Payment Distress to Refinance the MCAs Into the Promissory Note ...............................................................10

    F. Defendants Refinance the MCAs and Unmask the Transactions as a Loan................11

    G. Plaintiffs' Damages from Defendants' Unlawful Collection of Debt..........................12

STANDARD...........................................................................................................................13

ARGUMENT ..........................................................................................................................13

    I. THE MCAS ARE LOANS AS A MATTER OF LAW ..............................................13

    A. The MCAs Are Usurious Loans Under Richmond, Greenwich, Funderz, Davis, Fleetwood, Haymount, Queen, LG Funding, and New Y-Capp......................................13

    B. Defendants Had Recourse in Bankruptcy and Through Guaranties and Security Interests ...............................................................................................................................15

    C. The MCAs Had Finite Terms........................................................................................16

D. The BMF MCAs Had No Reconciliation Provision and the Hi Bar Reconciliation Provisions Were Illusory..................................................................................................16

E. Defendants Ensured Day-One Default by Stacking MCAs While Requiring Unencumbered-Receivables Representations...................................................................17

F. The MCAs Did Not Identify Specific Receivables and Left Plaintiffs Responsible for Collection..........................................................................................................................18

G. One or Two Missed Payments Triggered Default .......................................................18

H. The Daily Payments Were Not Good-Faith Estimates of Receivables........................19

II. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR RICO CLAIM.................................................................................................................................20

A. Lubin, Issacov and Getter Are Culpable Persons Under RICO...................................20

B. Spin Is a RICO Enterprise and Participated With the BMF and Hi Bar Enterprises ....21

C. The Enterprise's Affairs Affected Interstate Commerce...............................................21

D. Defendants Conducted the Affairs of the Enterprise Through Collection of Unlawful Debt....................................................................................................................................21

E. The Debt Was Unenforceable Under New York Usury Law.........................................22

F. The Debt Was Incurred in Connection With the Business of Lending Money.............22

G. The Interest Rate Was at Least Twice the Enforceable Rate........................................22

H. Plaintiffs Were Injured in Their Business or Property..................................................23

III. PLAINTIFFS ARE ENTITLED TO DEFAULT JUDGMENT AGAINST GETTER ............................................................................................................................................23

CONCLUSION..........................................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adar Bays, LLC v. GeneSYS ID, Inc.,*
37 N.Y.3d 320, 333 (2021). ....................................................................................... 22

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 248 (1986). ......................................................................................... 13

*Cedric Kushner Promotions, Ltd. v. King,*
533 U.S. 158, 163-66 (2001). ........................................................................... 4, 20, 21

*Celotex Corp. v. Catrett,*
477 U.S. 317, 322-23 (1986). .................................................................................... 13

*City of New York v. Cyco.Net, Inc.,*
383 F. Supp. 2d 526, 524 (S.D.N.Y. 2005).............................................................. 21

*Crystal Springs Capital Inc. v. Big Thicket Coin, LLC,*
220 A.D.3d 745, 746-47 (2d Dep't 2023)........................................................... 14, 17

*Davis v. Richmond Capital Group, LLC,*
194 A.D.3d 516, 517 (1st Dep't 2021) ........................................................... 15, 19, 20

*Defalco v. Bernas,*
244 F.3d 286, 309 (2d Cir. 2001).............................................................................. 21

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank,*
755 F.2d 239, 248 (2d Cir. 1985).......................................................................... 20, 22

*Fleetwood Servs., LLC v. Ram Capital Funding LLC,*
2022 WL 3443583 (S.D.N.Y. Aug. 17, 2022)........................................................... 22

*Fleetwood Servs., LLC v. Richmond Capital Grp. LLC,*
2023 WL 3882697 (2d Cir. June 8, 2023). .......................................................... 14, 17

*Golden Foothill Ins. Servs., LLC v. Spin Cap., LLC,*
2025 U.S. Dist. LEXIS 160562, 2025 WL 2402616 (S.D.N.Y. Aug. 19, 2025)........ 15, 23

*Greenwich Retail Group LLC v. Moby Capital, LLC (In re Greenwich Retail Group LLC),*
2026 WL 482170 (Bankr. S.D.N.Y. Feb. 20, 2026)......................................... 3, 15, 16, 18

*Haggiag v. Brown*,
728 F. Supp. 286, 295 (S.D.N.Y. 1990)...........................................................................21

*Haymount Urgent Care PC v. GoFund Advance, LLC*,
609 F. Supp. 3d 237 (S.D.N.Y. 2022).............................................. 15, 17,18, 19

*Lateral Recovery LLC v. Funderz.Net, LLC*,
2024 U.S. Dist. LEXIS 10134, 2024 WL 216533 (S.D.N.Y. Jan. 19, 2024) ............. 19, 20

*Lateral Recovery LLC v. Funderz.net, LLC*,
2024 U.S. Dist. LEXIS 176985 (S.D.N.Y. Sept. 27, 2024)..............................................11

*Lateral Recovery LLC v. Queen Funding LLC*,
2022 WL 2829913 (S.D.N.Y. July 20, 2022) ....................................................... 15, 17, 19

*Lateral Recovery, LLC v. Cap. Mech. Servs. LLC*,
632 F. Supp. 3d 402 (S.D.N.Y. 2022)..................................................................... 15, 16

*LG Funding, LLC v. United Senior Props. of Olathe, LLC*,
181 A.D.3d 664, 665-66 (2d Dep't 2020)................................................................. 15, 16

*New Y-Capp v. Arch Cap. Funding, LLC*,
2022 U.S. Dist. LEXIS 180309, 2022 WL 4813962 (S.D.N.Y. 2022)................. 15, 16, 17

*People v. Richmond Capital Group LLC*,
246 A.D.3d 585 (1st Dep't 2026) ............................................................................. passim

*Reves v. Ernst & Young*,
507 U.S. 170, 178-79 (1993). ............................................................................................21

*Stochastic Decisions, Inc. v. DiDomenico*,
995 F.2d 1158, 1167 (2d Cir. 1993)..................................................................................23

Plaintiffs Golden Foothill Insurance Services, LLC ("GFIS"), Life Factor II, LLC ("LF II"), Life Shares II, LLC ("LS II"), El Dorado Hills Insurance Solutions, Inc. ("El Dorado"), Lone Wolf Insurance Services, Inc. ("Lone Wolf"), ELDO Investments, LLC ("ELDO"), The Genesis Fund, LLC ("Genesis"), KTL Holdings, Inc. ("KTL"), and Tatanisha Leer (collectively, "Plaintiffs") submit this Memorandum of Law in support of their motion for summary judgement against Defendants Avrumi (a/k/a Josh), BMF Advance, LLC, Gavriel Yitzchakov, and a default judgment against Defendant Yoel Getter a/k/a Joel Geta.

## PRELIMINARY STATEMENT

Defendants Getter and Lubin are no strangers to lawsuits involving their conspiracy to commit fraud using their alter egos Spin Capital and Hi Bar. A Florida jury recently found that Lubin dominated and controlled both Spin Capital and Hi Bar in furtherance of his fraudulent scheme with Getter, awarding $6 million in damages. Getter did not even contest his domination and control of Hi Bar. Neither is the Isaacov Enterprise, which was the subject of a RICO summary judgment in *Funderz*. The existence of a RICO Enterprise cannot be credibly disputed.

Nor can Defendants credibly dispute that the five merchant cash advance agreements at issue were loans. Their own documents prove that the agreements were not negotiated, underwritten, or serviced as purchases of future receivables. They were short-term, fixed-payment loans carrying annual interest rates exceeding 500%. Plaintiffs entered the transactions in March 2021, during the COVID-19 pandemic, when the Leer Companies' life-insurance business had severely irregular income and needed capital to preserve valuable life insurance policies.

The undisputed record shows that Lubin solicited Plaintiffs, negotiated the MCA terms, coordinated with BMF, Isaacov, Hi Bar and Getter, and then after threatening to destroy Plaintiffs through constables, judgments, UCC liens and bank freezes, forced Plaintiffs to refinance the

MCA balances into a purported $2.7 million Spin promissory note. And once above New York's $2.5 million threshold for criminal usury, Defendants called the transactions what they were loans. Defendants did not purchase receivables. They imposed fixed daily payments, selected arbitrary payoff periods, required Plaintiffs to represent that receivables were unencumbered while knowingly stacking additional MCA obligations on those same receivables, and retained full recourse through default provisions, security interests, and personal guaranties.

Recent controlling authority from New York's Appellate Division confirms that the MCAs are loans as a matter of law. In *People v. Richmond Capital Group LLC*, 246 A.D.3d 585 (1st Dep't 2026), a case brought by New York's Attorney General, the First Department held that MCA agreements were properly characterized as loans because, like here, reconciliation was not performed in practice, daily payments were fixed and did not represent good-faith estimates of receivables, default triggered the full uncollected amount, and funders could enforce personal guaranties. The bankruptcy court in *Greenwich Retail Group LLC v. Moby Capital, LLC (In re Greenwich Retail Group LLC)*, 2026 WL 482170 (Bankr. S.D.N.Y. Feb. 20, 2026) reached the same unavoidable result, recognizing that New York law looks to substance, not labels; that the inquiry is not a mechanical scorecard; that the core issue is whether real receivables risk was transferred; and that theoretical contingencies or ordinary credit risks cannot exempt a transaction from usury law. Those decisions compel the same result on this record.

Indeed, this Court in accord already holding that the allegations here support a finding that the MCAs are disguised loans. The evidence supporting those allegations likewise supports summary judgment: the wildly inconsistent receivables estimates, the emails discussing repayment days, the guaranty recourse, the day-one default/stacking theory, and the sham reconciliation evidence is confirmed by undisputed documents and testimony.

-2-

The structure of the scheme is straightforward. First, Lubin solicited Plaintiffs into five MCA transactions with BMF and Hi Bar. Second, Defendants extracted fixed daily payments from Plaintiffs at rates that bore no relationship to actual receivables. Third, when Plaintiffs could no longer pay, Spin and Lubin repackaged the MCA debt into a facially $2.7 million Promissory Note with a 60% annual interest rate, while less than half that amount entered Plaintiffs' accounts and the rest was deducted for fees and MCA payoff amounts. Fourth, Spin now seeks more than $25 million  almost exclusively interest  on that note, even though Plaintiffs received less than $2 million in total across all five MCAs and the note.

The RICO claim is equally straightforward. RICO applies where a person conducts an enterprise's affairs through the collection of unlawful debt. 18 U.S.C. § 1962(c). A natural person who owns and operates a corporation may be the RICO "person," while the corporation may be the RICO "enterprise." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163-66 (2001). Here, Lubin is a natural person and Spin is a legally distinct LLC. Lubin indisputably conducted Spin's affairs, and coordinated with BMF and Hi Bar, to collect unlawful debt. Plaintiffs are therefore entitled to summary judgment against Lubin and default judgment against Spin (which is unrepresented) and Getter (who failed to answer). The same analysis applies to Gabe and Getter and their respective alter egos BMF and Hi Bar.

The damages are likewise undisputed. According to Defendants' own documents, the amount paid over principal on the MCAs alone is $852,730 and the amount Plaintiffs have incurred to defend against the Promissory Note, including this defensive action, is $924,889.53. The total is $1,777,619.53, which trebled is $5,332,858.59.

## STATEMENT OF UNDISPUTED FACTS

### A. The Leer Companies' Business and COVID-19 Cashflow Crisis

The Leer Companies operate in two parts of the life-insurance industry: they broker the purchase and sale of insurance policies and they purchase whole life policies as life-settlement investments. In the life-settlement business, the Leer Companies raised capital to pay policy premiums through private placement memoranda, with investors receiving an interest in the company that owned the policy and a return when the insured died. Because those business models depended on policy sales, the availability of policies to purchase, premium levels, and the timing of insured deaths, the Leer Companies did not have regular receivables. SUMF ¶¶ 1-4.

COVID-19 severely impaired the Leer Companies' business. New life insurance policies were not being issued or were difficult to sell because of high premiums, while the supply of policies available for purchase dropped. By June 2021, the Leer Companies owned approximately a dozen whole life insurance policies, which represented their largest remaining assets during the pandemic. SUMF ¶¶ 5-6.

In early March 2021, Stefan Leer was contacted unsolicited by Avrumi a/k/a Josh Lubin, who offered to connect the Leer Companies to BMF Advance LLC and Hi Bar Capital LLC for what Lubin described as alternative, short-term loans to allow the Leer Companies to continue paying premiums on their life insurance policies. Stefan explained the nature of the Leer Companies' business, the value of the policies, and the urgent need for capital to avoid losing those policies. Lubin knew the Leer Companies were having money problems when he solicited them into the MCA transactions. SUMF ¶¶ 28-31.

-4-

**B. The Spin Enterprise, Isaacov Enterprise, and Hi Bar Enterprise**

Spin Capital is a limited liability company used by Lubin to conduct the affairs of the Spin Enterprise. Lubin dominated Spin, opened and controlled its bank accounts, approved wires, received ACH checks at his home, and was paid as both broker and syndicate participant. Spin and Lubin brokered MCA transactions, received commissions and syndication participation, and also engaged in lending, resulting in multiple multi-million-dollar judgments. SUMF ¶¶ 7-8.

The Spin Enterprise conspired with the Isaacov Enterprise and the Hi Bar Enterprise, to paper the MCA deals that Spin brokered and syndicated. Lubin admitted that the Leer lead came from Gabe Isaacov, that he expected to receive a share of the upside from deals involving Gabe, and that Spin participated in the MCA and Promissory Note transactions. Lubin also put his own personal money into the Promissory Note. SUMF ¶¶ 9-10.

Lubin did not read the MCA agreements he brokered, did not know how the MCAs operated, and did not know how daily payments were calculated, yet he charged substantial fees for his role. He directly participated in each MCA deal on behalf of BMF and Hi Bar, held himself out to Stefan as the lender or party in control, threatened enforcement, instructed payment reductions and pauses, discussed debits, and attached the five MCAs to an affirmation based on Spin's business records. SUMF ¶¶ 11-12.

BMF is part of the Isaacov Enterprise. BMF is one of multiple MCA labels used by the Isaacov Enterprise; Gabe Isaacov owns and operates BMF and used it to paper MCA deals brokered and funded by Spin. The Isaacov Enterprise also included other Isaacov-related MCA labels, including Hop Capital and Panthers Capital, and Panthers entered a separate MCA with the Leer Companies on March 16, 2021. SUMF ¶¶ 13-19.

Hi Bar was dominated and controlled by Yoel Getter, who ran Hi Bar's operations and was Lubin's point of contact, while Yisroel Herbst also had decision-making authority and negotiated with Lubin over a buyout of Hi Bar's interest. The Hi Bar Enterprise worked with the Spin Enterprise to broker, underwrite, fund, and service two Hi Bar MCA Agreements and later to refinance the Hi Bar MCA debt into the Promissory Note. The Enterprises pooled funding for the Promissory Note and expected to share in collection of the 120% default interest and the life insurance collateral. SUMF ¶¶ 20-24.

The Hi Bar Enterprise is in the business of collecting debt through MCA agreements. Hi Bar itself later sued Getter, alleging that he caused Hi Bar to enter deals with merchants that were "mired in debt and days away from default." The same was true here: Hi Bar and Lubin knew the Leer Companies were financially distressed and had other MCA positions, including with Panthers, United, West Coast, and GFE. SUMF ¶¶ 25-27

**C. The MCA Transactions at Issue**

*1. The March 2, 2021 BMF MCA*

On March 2, 2021, the Leer Companies accepted what they understood to be a short-term loan with BMF. The agreement listed a $100,000 purchase price, required repayment of $149,900, and imposed fixed daily payments of $4,996. The $4,996 daily payment was purportedly a good faith estimate of 10% of daily receivables, implying $49,960 in daily receivables. The Leer Companies did not receive the full $100,000 because BMF deducted a $20,000 "bank fee," leaving $80,000 in actual principal. SUMF ¶¶ 32-35.

The March 2 BMF MCA was underwritten as a fixed 40-day transaction. It contained a no stacking addendum prohibiting the Leer Companies from taking other cash advances or loans outside BMF; made one missed payment an event of default; provided bankruptcy recourse

through the personal guaranty; failed to identify any specific receivables being purchased; left the Leer Companies responsible for collecting receivables; and contained no reconciliation provision. Viewed as a loan with $80,000 in principal and a 40-day term, it carried a 570% annual interest rate, and BMF over-collected by $972. SUMF ¶¶ 36-45.

2. *The March 10, 2021 Hi Bar MCA*

On March 10, 2021, the Leer Companies entered into a Hi Bar MCA. The agreement listed a $220,000 purchase price, required repayment of $329,978, and imposed fixed daily payments of $8,500. The $8,500 daily payment was purportedly a good-faith estimate of 20% of daily receivables, implying $42,500 in daily receivables. The transaction was negotiated as a 39-day short-term loan, and Hi Bar deducted a $22,000 underwriting fee, leaving $198,000 in principal. SUMF ¶¶ 46-50.

The March 10 Hi Bar MCA made it a default for the Leer Companies to obtain alternative financing, made two missed payments a default, provided bankruptcy recourse through the personal guaranty, failed to identify specific receivables, and required the Leer Companies to collect the receivables that Hi Bar supposedly purchased. Although the agreement contained a nominal reconciliation provision, reconciliation was unavailable after default and subject to Hi Bar's document demands. Hi Bar ACH debits often read "PAYMENTS FOR LOAN." Viewed as a loan with $198,000 in principal and a 39-business-day term, the agreement carried a 553% annual interest rate. SUMF ¶¶ 51-58.

3. *The March 12, 2021 BMF MCA*

After the first two MCA Agreements, the Leer Companies were paying approximately $13,500 per day to BMF and Hi Bar. That payment burden was unsustainable given the Leer Companies' limited receivables and dependence on irregular life-insurance events. Rather than

entering a wholly new transaction, Lubin offered to refinance the first BMF MCA into a March 12, 2021 BMF MCA, under which the Leer Companies would purportedly receive $220,000 and repay $329,780 through fixed daily payments of $8,500. SUMF ¶¶ 59-61.

The March 12 BMF MCA represented that the $8,500 daily payment was a good-faith estimate of 10% of daily receivables, implying $85,000 in daily receivables, but the number of days was not derived from receivables; it was based on whatever BMF wanted to charge. BMF deducted $114,928 to pay off the March 2 BMF MCA and charged $25,000 in fees, leaving $195,000 in principal. SUMF ¶¶ 62-66.

The March 12 BMF MCA made one missed payment a default, contained the same no stacking addendum, provided bankruptcy recourse through personal guaranties, contained no reconciliation provision, failed to identify specific receivables, and left the Leer Companies responsible for collection. Viewed as a loan with $195,000 in principal and a 47-day term, it carried a 382% annual interest rate, and BMF over-collected by $8,000. SUMF ¶¶ 67-74.

### 4. The March 25, 2021 BMF MCA

The March 12 BMF MCA yielded only approximately $100,000 in additional capital, while the Leer Companies continued paying BMF and Hi Bar $17,000 per day. By March 25, 2021, the Leer Companies' capital had again been depleted. Lubin then had the March 12 BMF MCA refinanced into a new BMF transaction under which the Leer Companies would receive $400,000 on paper, use $274,000 to pay off the prior BMF balance, and repay $599,600 through fixed daily payments of $25,000. SUMF ¶¶ 75-76.

The March 25 BMF MCA represented that the $25,000 daily payment was a good-faith estimate of 10% of daily receivables, implying $250,000 in daily receivables. After the payoff and fees, however, the Leer Companies netted only $100,000. Dividing the $599,600 purchased

-8-

amount by the $25,000 daily payment yields a fixed term of 24 business days, or 31 total days, and the 24-business-day term was negotiated by text between Stefan and Lubin. SUMF ¶¶ 77-79.

The March 25 BMF MCA made one missed payment a default, contained the same no stacking addendum, provided bankruptcy recourse through the personal guaranties, had no reconciliation provision, failed to identify specific receivables, and left the Leer Companies responsible for collection. Viewed as a loan with $370,000 in principal and a 24-business-day term, it carried a 667% annual interest rate, and BMF over-collected by $1,900. SUMF ¶¶ 80-87.

*5. The March 25, 2021 Hi Bar MCA*

The $100,000 net principal from the March 25 BMF MCA was still insufficient to keep the Leer Companies operational. On March 25, 2021, the Leer Companies entered into another Hi Bar MCA under which they were to receive $400,000 and repay $599,600 through fixed daily payments of $20,000. Hi Bar claimed that the $20,000 daily payment was a good-faith estimate of 20% of daily receivables, implying $100,000 in daily receivables. SUMF ¶¶ 88-90.

Hi Bar deducted $79,999 as an underwriting fee. The agreement made two missed payments a default, provided bankruptcy recourse through personal guaranties, made outside financing an event of default, contained only a nominal reconciliation provision subject to default and document-demand limitations, yielded a 30-business-day or 44-total-day term when divided by the daily payment, failed to identify specific receivables, and left the Leer Companies responsible for collection. Viewed as a loan with $320,001 in principal and a 30-business-day term, it carried a 757% annual interest rate. SUMF ¶¶ 92-100.

**D. The Undisputed Facts Show That the MCAs Are Usurious Loans**

The five MCA Agreements used radically inconsistent "good faith" estimates of the Leer Companies' receivables in less than one month. The March 2 BMF MCA implied $49,960 in daily

receivables; the March 10 Hi Bar MCA implied $42,500; the March 12 BMF MCA implied $85,000; the March 25 BMF MCA implied $250,000; and the March 25 Hi Bar MCA implied $100,000. Those figures show that the daily payment was tied to the repayment amount and selected term, not to actual receivables. SUMF ¶ 91. The figures were:

| MCA Agreement | Daily Payment | Specified Percentage | Defendants' Implied Estimate of Receivables |
|---|---|---|---|
| 3/2/21 BMF | $4,996 | 10% | $49,960/day |
| 3/10/21 Hi Bar | $8,500 | 20% | $42,500/day |
| 3/12/21 BMF | $8,500 | 10% | $85,000/day |
| 3/25/21 BMF | $25,000 | 10% | $250,000/day |
| 3/25/21 Hi Bar | $20,000 | 20% | $100,000/day |

The only consistent pattern was that the daily remittance increased as the repayment amount increased, confirming that daily payments were selected to achieve fixed repayment and not to approximate actual receivables. SUMF ¶¶ 14-15, 130, 178; *Lateral Recovery LLC v. Funderz.net, LLC*, 2024 U.S. Dist. LEXIS 176985, *15 (S.D.N.Y. Sept. 27, 2024).

The BMF MCAs here also mirror the BMF agreements held to be loans as a matter of law in Funderz. Both professed to use "good faith" estimates of receivables, used estimates that varied across closely timed agreements, provided bankruptcy recourse through guaranties, gave the lender a security interest in all assets, failed to identify specific receivables, and made the merchant responsible for collection. The Funderz BMF agreements had an illusory reconciliation provision; the BMF agreements here had none. SUMF ¶¶ 101-08.

### E. Defendants Refused Meaningful Reconciliation and Used Payment Distress to Refinance the MCAs Into the Promissory Note

The Enterprises did not honor their purported reconciliation and adjustment mechanisms. On March 30, 2021, Lubin instructed Leer to wire missed payments to Hi Bar and BMF and provided wire instructions for both. On April 2, 2021, after Leer said the daily payments were

-10-

unsustainable and asked to unwind the last Hi Bar transaction by repaying what he received, Lubin refused unless Leer repaid the entire $600,000 balance; warned that Getter would file on him; said the matter had already been sent to counsel; and warned that UCC letters had gone out to freeze the Leer Companies' accounts. SUMF ¶¶ 109-10.

On April 6, 2021, Leer told Lubin that there were insufficient funds to continue fixed daily payments and asked to reduce payments to $1,000 per day for both Hi Bar and BMF. Rather than analyze receivables, Lubin arbitrarily asked whether Leer could pay $2,000 each. Leer offered bank statements and requested written confirmation of the reduction, but Lubin refused and stated only that he had turned off the $20,000 debits. SUMF ¶ 111.

The Leer Companies then began bouncing payments. Lubin told Leer that Hi Bar would debit twice the following day, demanded $2,000 wires to both Hi Bar and BMF, and was shown screenshots reflecting insufficient funds and a negative account balance. Hi Bar declared default based on two missed payments and filed a UCC lien. BMF also declared default, sent the file to a Texas attorney for collection, threatened a constable visit, and ultimately Lubin arbitrarily agreed to reduce payments to $500 for 10 days. SUMF ¶¶ 112-15.

### F. Defendants Refinance the MCAs and Unmask the Transactions as a Loan

On June 4, 2021, dissatisfied with the reduced payments that Leer could afford, Lubin threatened to freeze everything and advised Leer to get an attorney. Shortly thereafter, Lubin proposed a loan to pay off the BMF and Hi Bar MCA balances, secured by life insurance collateral. The Leer Companies capitulated and, on June 16, 2021, entered into a purported $2.7 million Promissory Note with Spin at 60% annual interest. SUMF ¶¶ 116-18.

In connection with the Promissory Note, Spin required personal guaranties from Stefan and Tatanisha Leer, a corporate guaranty from El Dorado, Lone Wolf, ELDO, Genesis, and KTL, and

-11-

a Security Agreement granting Spin a security interest in the Leer Companies' life insurance policies. SUMF ¶¶ 119-21.

Although the Promissory Note was facially for $2.7 million, less than half of that amount entered a Leer Companies bank account. Spin deducted $200,000 as Lubin's fee for "putting together the deal," $30,000 for Spin's attorneys, $582,000 to pay off the Hi Bar MCA balance, and $580,597 to pay off the BMF MCA balance, leaving only $1,307,403 in actual principal to the Leer Companies. The note required two $150,000 payments, then weekly $70,000 payments, then weekly $127,173.91 payments through January 14, 2022. SUMF ¶¶ 122-23.

The Leer Companies made the first five payments, totaling approximately $510,000, but could not continue paying because of the high interest rate and because they received less than half of the stated principal. Spin then sued Plaintiffs and now seeks more than $25 million at the 120% default interest rate, although the Leer Companies received less than $2 million total under all five MCA Agreements and the Promissory Note. SUMF ¶¶ 124-25.

### G. Plaintiffs' Damages from Defendants' Unlawful Collection of Debt

Plaintiffs were injured by the unlawful MCA payments. The five MCA loans had face amounts totaling $1.34 million, fees deducted totaling $173,072, net principal totaling $1,166,928, collections totaling $2,019,730, and paid-over-principal damages of $852,730. SUMF ¶ 148.

Plaintiffs were further injured by Spin's interest and charges under the Promissory Note. As of September 19, 2023, Spin's claimed note damages were $13,228,338.90, including principal balance, default interest, enforcement costs, interest on enforcement costs, premiums and receiver payments, interest on those amounts, late fees, and default fees. With additional default interest through May 26, 2026, the total costs and interest charged on the Promissory Note were

-12-

$25,571,866.23. Plaintiffs also incurred $924,889.53 in attorneys' fees and costs defending against Spin's action to collect on the Promissory Note and the life-insurance collateral. SUMF ¶¶ 149-58

## STANDARD

Summary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome under the governing law, and a dispute is genuine only if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the movant satisfies its burden, the opposing party must set forth specific facts showing a genuine issue for trial and may not rest on speculation, conclusory denials, or unsupported assertions. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Where the relevant documents are undisputed and the question is the legal character of the transaction, summary judgment is appropriate. Courts applying New York law look beyond labels to the substance of the transaction. If a purported merchant cash advance lacks genuine risk shifting and repayment is absolute or functionally fixed, the agreement is a loan. *Crystal Springs Capital Inc. v. Big Thicket Coin*, LLC, 220 A.D.3d 745, 746-47 (2d Dep't 2023) (holding MCA loan as a matter of law).

## ARGUMENT

### I. THE MCAS ARE LOANS AS A MATTER OF LAW

#### A. The MCAs Are Usurious Loans Under Richmond, Greenwich, Funderz, Davis, Fleetwood, Haymount, Queen, LG Funding, and New Y-Capp

All evidence involving the negotiation, underwriting, servicing, and enforcement of the MCA Agreements demonstrates that they were loans. Defendants internally negotiated fixed

-13-

payments and fixed terms, not purchased percentages of receivables. SUMF ¶¶ 36, 49, 63, 79, 97. The MCA terms themselves then confirm that repayment was absolute or functionally absolute.

Courts consider at least three non-exhaustive factors in determining whether an MCA is a loan: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023). Other non-exhaustive factors include whether the agreements identify particular revenue or accounts purchased; whether the merchant remains responsible for collecting future receipts; whether default is declared after only a few missed payments; whether daily payment rates appear to be good-faith estimates of receivables; whether the merchant is placed in default from inception by false "unencumbered receivables" representations; and whether the agreements were underwritten like loans. *See Richmond Capital*, 246 A.D.3d 585 (1st Dep't 2026); *Davis v. Richmond Capital Group, LLC*, 194 A.D.3d 516, 517 (1st Dep't 2021); *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 665-66 (2d Dep't 2020); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237 (S.D.N.Y. 2022); *Lateral Recovery LLC v. Queen Funding LLC*, 2022 WL 2829913 (S.D.N.Y. July 20, 2022); *Lateral Recovery, LLC v. Cap. Mech. Servs. LLC*, 632 F. Supp. 3d 402 (S.D.N.Y. 2022); *New Y-Capp v. Arch Cap. Funding, LLC, 2022 U.S. Dist. LEXIS 180309, 2022 WL 4813962.*

*Richmond* is now controlling First Department authority. There, the First Department affirmed liability because agreements styled as MCAs were properly characterized as loans where reconciliation was not performed in practice, daily payments were fixed and not good-faith estimates of receivables, reconciliation requests were discretionary or denied, bankruptcy or

business interruption triggered default, the full uncollected amount became due upon default, and the funders could enforce personal guarantees. 246 A.D.3d 585.

*Greenwich* is equally instructive. The SDNY bankruptcy court explained that New York courts do not mechanically tally MCA factors as if they were a scorecard. The inquiry is "a comprehensive and heavily contextual endeavor" focused on substance, real risk, and whether the transaction has the features expected of a true sale. *Greenwich* held that theoretical contingencies and ordinary credit risk do not exempt a transaction from usury law; the risk transferred must be real, substantial, and different from the risk every lender takes. 2026 WL 482170.

This Court adopted the same framework, holding that Plaintiffs plausibly alleged that the MCA Agreements were loans based on the wildly inconsistent receivables estimates, fixed repayment-day emails, guaranty recourse, day-one default, and sham reconciliation allegations. *Golden Foothill Ins. Servs., LLC v. Spin Cap., LLC*, 2025 U.S. Dist. LEXIS 160562, *1, 2025 WL 2402616 (S.D.N.Y. Aug. 19, 2025).  Discovery now confirms those facts.

### B. Defendants Had Recourse in Bankruptcy and Through Guaranties and Security Interests

The MCA Agreements provided recourse to BMF and Hi Bar if the Leer Companies declared bankruptcy. Each agreement made the guarantors liable for amounts that BMF or Hi Bar had to return because the merchant or another guarantor became subject to bankruptcy or similar proceedings. SUMF ¶¶ 40, 53, 69, 82, 94, 104. The agreements also granted BMF and Hi Bar security interests in all of the Leer Companies' assets. SUMF ¶¶ 40, 53, 69, 82, 94, 106.

Bankruptcy recourse through guaranties is a recognized factor showing an MCA is a loan. *LG Funding*, 181 A.D.3d at 665-66; *Cap. Mech. Servs. LLC*, 632 F. Supp. 3d at 456; *New Y-Capp v. Arch Cap. Funding, LLC*, 2022 U.S. Dist. LEXIS 180309, *13 (S.D.N.Y. Sept. 30,

2022). *Richmond* confirms the same point: the First Department held MCAs were loans where defaults caused the full uncollected amount to become due and allowed the funders to enforce personal guarantees. *Greenwich* likewise explains that guaranties are suggestive of loans when they are not limited by the contingent nature of the merchant's obligation.

This Court likewise correctly recognized that the guaranty recourse alleged here is "fundmentally inconsistent" with the idea that BMF and Hi Bar bore the risk of a downturn in the Leer Companies' business. The summary-judgment record establishes that recourse as a matter of contract and practice.

### C. The MCAs Had Finite Terms

Defendants intended the MCA Agreements to have finite terms. Internal correspondence and underwriting materials reflected fixed repayment periods, including the 40-day term for the March 2 BMF MCA and the 47-day term for the March 12 BMF MCA. SUMF ¶¶ 36, 63. The remaining agreements had de facto finite terms because the repayment amount divided by the fixed daily payment yields a fixed payoff period. SUMF ¶¶ 49, 79, 97.

Courts applying New York law hold that a de facto term plausibly exists where the payoff period can be calculated by dividing the total amount owed by the fixed daily payment. *Queen*, 2022 WL 2829913, at *5; *Haymount*, 609 F. Supp. 3d at 248 n.5. Here, the terms are not merely calculable; they were actually negotiated and used by Defendants. SUMF, ¶ 57.

### D. The BMF MCAs Had No Reconciliation Provision and the Hi Bar Reconciliation Provisions Were Illusory

The BMF MCA Agreements had no reconciliation provision at all. SUMF ¶¶ 43, 70, 83, 107. The Hi Bar MCA Agreements had nominal reconciliation provisions, but they were illusory

because reconciliation was unavailable after any event of default and could be denied if Plaintiffs failed to provide any documents requested by Hi Bar. SUMF ¶¶ 56, 96.

Numerous courts have held that discretionary or conditional reconciliation provisions are illusory and support treating MCAs as loans. *Fleetwood*, 2023 WL 3882697, at *2; *Haymount*, 609 F. Supp. 3d at 248 n.5; *Queen*, 2022 WL 2829913, at *4-5; *New Y-Capp*, 2022 WL 4485182, at *4. *Crystal Springs*, 220 A.D.3d 745, 746-47, likewise treated the funder's lack of obligation to reconcile as indicative of a loan.

The factual record is even stronger because reconciliation was not performed in practice. When Plaintiffs sought payment relief, Lubin negotiated fixed daily amounts based on what the Leer Companies could afford, without any review of receivables. SUMF ¶¶ 109-15. *Richmond* is controlling on this point: reconciliation provisions do not save an MCA where reconciliation was not actually performed, requests were denied or discretionary, and the funder continued enforcing fixed payments.

### E. Defendants Ensured Day-One Default by Stacking MCAs While Requiring Unencumbered-Receivables Representations

Each MCA Agreement prohibited Plaintiffs from obtaining alternative financing and made such financing an event of default. SUMF ¶¶ 38, 51, 68, 81, 95. Defendants nevertheless caused Plaintiffs to enter overlapping BMF and Hi Bar MCAs on the same receivables. *Id.* By doing so, Defendants ensured that Plaintiffs were in default from the moment they entered the next MCA Agreement.

This is precisely the predatory structure condemned in *Richmond*. The trial-level *Richmond* decision recognized that MCA lenders made borrowers default on day one by requiring representations that receivables were free and clear while knowing those receivables were already

-17-

encumbered. *People v. Richmond Capital Group LLC*, 80 Misc. 3d 1213(A) (N.Y. Sup. Ct. 2023), aff'd, 246 A.D.3d 585 (1st Dep't 2026). *Greenwich* applied the same principle, holding that a material breach from execution based on false representations about unencumbered receivables supported the conclusion that the funder had full recourse from the outset and that the transaction was a loan rather than a sale.

This Court has already recognized the significance of Plaintiffs' allegation that Defendants knew they were putting Plaintiffs in default from day one because Plaintiffs were caused to pledge receivables to BMF and Hi Bar at the same time. On summary judgment, that record is undisputed.

### F. The MCAs Did Not Identify Specific Receivables and Left Plaintiffs Responsible for Collection

The MCA Agreements did not identify any specific receivables purportedly being purchased. SUMF ¶¶ 41, 54, 71, 84, 98, 108. Instead, they broadly purported to purchase future receipts while leaving Plaintiffs responsible for collecting those receipts and depositing them into accounts from which BMF and Hi Bar would debit fixed daily payments. SUMF ¶¶ 42, 55, 72, 85, 99, 108.

*Haymount* held that an MCA's failure to identify particular revenues or accounts and its leaving merchants responsible for collection supports recharacterizing the transaction as a loan. 609 F. Supp. 3d at 249. *Greenwich* likewise instructs courts to ask whether the transaction has the features one would expect in a sale. A true receivables buyer identifies what it is buying and assumes the risk of noncollection. Defendants did neither.

### G. One or Two Missed Payments Triggered Default

Missing as little as one daily payment under the BMF MCA Agreements, or two daily payments under the Hi Bar MCA Agreements, constituted default. SUMF ¶¶ 39, 52, 67, 80, 93,

105. Courts repeatedly find similar or less onerous missed-payment defaults indicative of loans. *Davis*, 194 A.D.3d at 517; *Queen*, 2022 WL 2829913, at *6; *Haymount*, 609 F. Supp. 3d at 249; *Cap. Mech. Servs.*, 632 F. Supp. 3d at 458. *Richmond* again confirms the point: repeated nonpayment and interruption or termination of business triggered default, and upon default the full balance became due with guaranty recourse.

### H. The Daily Payments Were Not Good-Faith Estimates of Receivables

The MCA Agreements stated that the fixed daily payments were good-faith estimates of purchased percentages of receivables. But the record proves the opposite. The daily payments bore no rational relationship to the Leer Companies' actual receivables and instead tracked the amount Defendants wanted to recover and the time in which they wanted to recover it. SUMF ¶¶ 36, 49, 63, 79, 91, 97.

The side-by-side chart is dispositive. In less than one month, BMF and Hi Bar purportedly estimated the Leer Companies' daily receivables at $49,960, then $42,500, then $85,000, then $250,000, then $100,000. SUMF ¶ 91. Two of those conflicting estimates were made on the same day. Id. The only consistent pattern was that daily payment increased as the repayment amount increased. SUMF ¶ 91. *Lateral Recovery LLC v. Funderz.Net, LLC*, 2024 U.S. Dist. LEXIS 10134, *34, 2024 WL 216533 (S.D.N.Y. Jan. 19, 2024) ("The fact that Funderz's supposed good-faith estimate of FTE's daily receivables varied so widely, even when the Agreements were executed on back-to back days or even on the same day, indicates to the Court that the Agreements were not based on good-faith estimates of receivables.") (citing *Davis*, 194 A.D.3d 516, 150 N.Y.S.3d 2, 4 (among other things, "the selection of daily payment rates that did not appear to represent a good faith estimate of receivables" indicated that agreements were loans).

*Davis* held that daily payment rates that do not appear to represent good-faith estimates of receivables support recharacterizing MCAs as loans. *Id. Funderz* held the same on summary judgment where estimates varied across closely timed agreements. *Funderz.Net, LLC*, 2024 WL 4350369, at *29. *Richmond* likewise affirmed liability where daily payments were fixed and did not represent good-faith estimates of receivables. Here, Defendants' own emails and the agreements' facial math establish the same result.

## II. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR RICO CLAIM

Plaintiffs are entitled to summary judgment on their RICO claim because the undisputed facts establish each element: (1) Lubin, Isaacov and Getter are culpable persons; (2) Spin is a RICO enterprise and the Spin Enterprise also associated with BMF and Hi Bar; (3) the enterprise's activities affected interstate commerce; (4) Lubin, Isaacov and Getter conducted the enterprise's affairs through collection of unlawful debt; (5) the debt was unenforceable because of New York usury law; (6) the debt was incurred in connection with the business of lending money; (7) the usurious rate was at least twice the enforceable rate; and (8) Plaintiffs were injured in their business or property. *See Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985).

### A. Lubin, Issacov and Getter Are Culpable Persons Under RICO

RICO defines a "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Lubin, Isaacov and Getter are individuals and therefore each a RICO person. SUMF ¶¶ 7, 128. As the sole member and operator of Spin, he is distinct from Spin for RICO purposes. *Cedric Kushner*, 533 U.S. at 163. The same applies to Isaacov and Getter. Each is separate and distinct from BMF and Hi Bar.

-20-

**B. Spin Is a RICO Enterprise and Participated With the BMF and Hi Bar Enterprises**

RICO defines "enterprise" to include any corporation, association, or other legal entity, and any group of individuals associated in fact. 18 U.S.C. § 1961(4). A corporation or LLC may be the enterprise, while its owner or employee may be the culpable person who conducts its affairs. *Cedric Kushner*, 533 U.S. at 163-66

Spin is a distinct LLC. Pls.' SUMF ¶ 38. Spin and Lubin also constituted an associated in fact Spin Enterprise with the common purpose of soliciting, funding, servicing, and collecting upon usurious loans disguised as MCA transactions. SUMF ¶¶ 7-12, 133-38. The Spin Enterprise worked with the Isaacov Enterprise and Hi Bar Enterprise, and vice versa, to broker, underwrite, fund, service, and refinance the MCA Agreements. SUMF ¶¶ 13-27.

**C. The Enterprise's Affairs Affected Interstate Commerce**

The interstate-commerce nexus under RICO is minimal. *Defalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) . Use of interstate wires, banks, ACH processing, email, and agreements involving parties in different states satisfies the requirement. *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 524 (S.D.N.Y. 2005)*v*; *Haggiag v. Brown*, 728 F. Supp. 286, 295 (S.D.N.Y. 1990). Here, Defendants used emails, wire communications, ACH debits, banking channels, and MCA agreements governed by New York law to solicit, fund, and collect payments from Plaintiffs. SUMF ¶¶ 28-100, 126-27, 131-32. That is more than sufficient.

**D. Defendants Conducted the Affairs of the Enterprise Through Collection of Unlawful Debt**

A person conducts an enterprise's affairs when he participates in the operation or management of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 178-79 (1993). The defendant need only have "some part in directing" the enterprise's affairs. SUMF at 179.

-21-

Defendants did far more. They solicited Plaintiffs, negotiated the MCA terms, coordinated with each other, communicated with Plaintiffs about payment reductions, and then caused Spin to refinance the MCA debt into the Promissory Note. SUMF ¶¶ 7-12, 28-31, 36, 61-63, 75-79, 109-25, 128, 132-38. This Court already rejected Defendants' argument that they did not participate in collection of unlawful debt, holding that Plaintiffs alleged they worked collaboratively to push and collect on the unlawful MCA debt by inducing Plaintiffs to take out the Spin loan to cover the MCA balances. The undisputed record now proves that allegation.

### E. The Debt Was Unenforceable Under New York Usury Law

Loans proved to violate New York's criminal usury statute are void. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 333 (2021). Once the MCA Agreements are correctly characterized as loans, they are unenforceable because they imposed interest rates far exceeding New York's 25% criminal usury limit. SUMF ¶¶ 44, 58, 73, 86, 100, 126-27.

### F. The Debt Was Incurred in Connection With the Business of Lending Money

The "business of lending money" requirement excludes isolated or occasional usurious transactions by persons not in the lending business. *Durante Bros.*, 755 F.2d at 250. This case does not involve an isolated transaction. Spin's primary business included brokering MCA deals, and it collaborated with BMF and Hi Bar in repeated MCA transactions, which are also in the business of lending. SUMF ¶¶ 7-27, 128-32. BMF and Hi Bar were MCA funders. SUMF ¶¶ 13-27. The five MCA Agreements were part of an ongoing business model of funding, brokering, servicing, and collecting short-term debt. SUMF ¶¶ 7-27, 133-38.

### G. The Interest Rate Was at Least Twice the Enforceable Rate

RICO's unlawful-debt provision requires a rate at least twice the enforceable rate. 18 U.S.C. § 1961(6). New York criminal usury is 25% annually; twice that rate is 50%. The MCA

Agreements here charged annual rates of approximately 425%, 506%, 1,660%, 5,882%, and 725%. Pls.' SUMF ¶¶ 44, 58, 73, 86, 100, 126-27. Those rates are many multiples of RICO's threshold.

### H. Plaintiffs Were Injured in Their Business or Property

Plaintiffs were injured by payments made on unlawful debt. This Court already rejected Defendants' argument that Plaintiffs suffered no injury because they supposedly received more than they paid, holding that alleged usurious interest payments constitute concrete injury and damage sufficient to establish standing. *Spin Cap.*, 2025 WL 2402616, at *27 ("That plaintiffs ultimately made these payments by taking out a separate loan from defendants is irrelevant; however they got the money, they paid off the MCA agreements and fully paid what they allege were usurious payments.").

Plaintiffs were damaged by the amounts collected under the MCA Agreements ($852,802, SUMF ¶ 148), and the consequential injuries caused by the refinancing scheme, including the Promissory Note obligations ($25,571,866.23, SUMF ¶ 157). SUMF ¶¶ 118-25, 44-45, 58, 73-74, 86-87, 100, 148-57. *See Fleetwood Servs., LLC v. Ram Capital Funding LLC*, 2022 WL 3443583, at *6 (S.D.N.Y. Aug. 17, 2022) (RICO damages include the amount debited less the amount received and enjoyed, trebled under 18 U.S.C. § 1964(c)). Plaintiffs were also damaged by incurring $924,889.53 in attorneys' fees. Pls.' SUMF ¶ 158; *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993) (attorneys' fees incurred in defending actions proximately caused by RICO violations may constitute RICO damages).

### III. PLAINTIFFS ARE ENTITLED TO DEFAULT JUDGMENT AGAINST GETTER

Plaintiffs also seek default judgment against Getter. *See* ECF# 67 (clerk's default); Heskin Decl., Ex. 69. The undisputed facts and well-pleaded allegations establish Getter's participation in

the collection of unlawful debt. Spin papered and funded the Promissory Note, refinanced the MCA debt, and now seeks to collect more than $25 million on the resulting obligation. SUMF ¶¶ 7-12, 20-27, 109-25, 133-38. Getter participated in funding or brokering MCA transactions, including as part of the Hi Bar Enterprise, and the underwriting documents reflect his role in the March 2, 2021 BMF MCA funding. SUMF ¶¶ 20-27, 37, 128-32.

Because the factual allegations and record establish that the underlying debts were unlawful and Getter participated in the scheme to collect them, default judgment should be entered against Defendants and Getter, jointly and severally with Defendants, including treble damages, attorneys' fees, costs, and any additional recoverable consequential damages.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment against Defendants Lubin, Spin Capital, BMF Advance, and Isaacov, and enter default judgment against Defendant Getter, award Plaintiffs damages under RICO in the amount of $852,802 on the amount paid over principal on the five MCA, and $924,889.53 incurred in attorney's fees for defending against Spin's claims on the Promissory Note for a total $1,777,619.53, which trebled is $5,332,858.59.

In addition, the Court should declare that Plaintiffs are entitled to treble the amount of interest, costs, and future attorneys' fees incurred on the Promissory Note.

Plaintiffs are also entitled to any attorney's fees and costs for prosecuting this action that are not awarded as defensive in nature.

-24-

Date: May 26, 2026

**HESKIN & PROPER PLLC**

By: _____

Shane R. Heskin, Esq.
641 Lexington Avenue, 14th Floor
New York, NY 10022
shane@heskinproper.com
*Attorneys for Plaintiffs*

-25-