*SPIN CAPITAL, LLC, et. al. v.*
*GOLDEN FOOTHILL INSURANCE SERVICES, LLC*

*AVRUMI LUBIN*
*July 25, 2024*

*NJL COURT REPORTING & VIDEO*
*501 KING AVENUE*
*CHERRY HILL, NJ  08002*
*856-910-0202*

Original File 072524las.txt
**Min-U-Script® with Word Index**

Page 1

SUPREME COURT OF NEW YORK
COUNTY OF NEW YORK
INDEX NO. 650582/2022

------------------------------------
SPIN CAPITAL, LLC,

                    Plaintiff

        vs.

GOLDEN FOOTHILL INSURANCE SERVICES,
LLC, a DELAWARE LIMITED LIABILITY
COMPANY, et al.,

                    Defendants

        and

GOLDEN FOOTHILL INSURANCE SERVICES,
LLC, a DELAWARE LIMITED LIABILITY
COMPANY, et al.,

            Counterclaim Plaintiffs

        -against-

SPIN CAPITAL, LLC,

            Counterclaim Defendant

        and

AVRUMI LUBIN,

            Cross Claim Defendant
------------------------------------

                    -----------------------
                    THURSDAY, JULY 25, 2024
                    -----------------------

Page 2

            Sworn deposition testimony of AVRUMI
LUBIN, taken stenographically via Zoom, by LuAnn
Farrow Schafer, CCR, RPR, on the above date, at
approximately 10:00 a.m.

                    ******

                NJL COURT REPORTING & VIDEO
                    501 KING AVENUE
            CHERRY HILL, NEW JERSEY   08002
                    856.910.0202
                DEPS@NJLONE.COM

Page 3

APPEARANCES:


PROSKAUER ROSE, LLC
BY:   DAVID A. PICON, ESQUIRE
      MATTHEW J. MORRIS, ESQUIRE
Eleven Times Square
New York, New York  10036
212.969.3000
dpicon@proskauer.com
--Counsel for the Plaintiff, Spin Capital and
  Avrumi Lubin


EM3 LAW
BY:   MARK E. SHURE, ESQUIRE
77 W. Wacker Drive
Suite 4500
Chicago, Illinois  60601
312.238.9200
mshure@em3law.com
--Counsel for the Plaintiff, Spin Capital and
  Avrumi Lubin


WHITE & WILLIAMS
BY:   SHANE R. HESKIN, ESQUIRE
1650 Market Street
Suite 1800
Philadelphia, Pennsylvania  19103
215.864.6329
heskins@whiteandwilliams.com
--Counsel for the Defendants and Counterclaim
  Plaintiffs, Golden Foothills Insurance Services,
  LLC; Life Factor II, LLC; Life Shares II, LLC;
  El Dorado Hills Insurance Solutions, Inc.; Lone
  Wolf Insurance Services, Inc.; Eldo Investments,
  LLC; The Genesis LS Fund, LLC; KTL Holdings,
  Inc.; Stefan Leer and Tatanisha Leer

Page 4

APPEARANCES:   (Continued)


KELLEY DRYE & WARREN, LLP
BY:   COLE M. DALY, ESQUIRE
Three World Trade Center
175 Greenwich Street
New York, New York  10007
212.808.7800
cdaly@kelleydrye.com
--Counsel for John Hancock Insurance


PRYOR CASHMAN, LLP
BY:   JOHN J. GIARDINO, ESQUIRE
Seven Times Square
40th Floor
New York, New York  10036
212.326.0829
jgiardino@pryorcashman.com
--Counsel for Cap Factor


CARLTON FIELDS
BY:   IRMA T. SOLARES, ESQUIRE
Two Miami Central
700 NW First Avenue
Suite 1200
Miami, Florida  33136
305.347.6843
isolares@carltonfields.com
--Counsel for Zurich American Life Insurance


ALSO PRESENT:   Stefan Leer

Page 5

I N D E X

Examination                                      Page
   AVRUMI LUBIN
      BY MR. HESKIN.............................7


              E X H I B I T S
No.               Description              Page
LUBIN-1      6/4/21 TEXT MESSAGE             148
LUBIN-2      4/28/21 E-MAIL                  152
LUBIN-3      4/26/20 E-MAIL                  155
LUBIN-4      4/6/21 TEXT MESSAGE THREAD      161
LUBIN-5      3/30/21 E-MAIL                  169
LUBIN-6      5/24/21 TEXT MESSAGE            169
LUBIN-7      4/2/21 TEXT MESSAGE             180
LUBIN-8      3/25/21 E-MAIL                  182
LUBIN-8A     4/7/21 E-MAIL                   188
LUBIN-9      3/12/21 E-MAIL                  195
LUBIN-10     3/2/22 BMF AGREEMENT            197
LUBIN-11     PAY RUN (972 OVER DEBIT)        217
LUBIN-12     3/10/21 HI BAR AGREEMENT        223
LUBIN-13     3/12/21 BMF AGREEMENT           229
LUBIN-14     SPIN BATES 00007182             232
LUBIN-15     3/12/21 E-MAIL THREAD           234

Page 6

EXHIBITS (CONTINUED)
LUBIN-16     3/25/21 BMF AGREEMENT           237
LUBIN-17     3/25/21 HI BAR AGREEMENT        244
LUBIN-18     PAY RUN (1,900 OVER DEBIT)      247
LUBIN-19     PROMISSORY NOTE                 250
LUBIN-20     6/16/21 E-MAIL                  258
LUBIN-21     PAYOUT SHEET TO BMF             263
LUBIN-22     WHATSAPP THREAD                 275
LUBIN-23     AFFIDAVIT                       277
LUBIN-24     NOTICE OF DEPOSITION            283

            (EXHIBIT ATTACHED)


MARKED QUESTIONS:  PAGE 44, LINE 25
                   PAGE 47, LINE 15

Page 7

P R O C E E D I N G S
       - - - - - -
      AVRUMI LUBIN, after having been first duly sworn, was examined and testified as follows:
       - - - - - -
          EXAMINATION
       - - - - - -
BY MR. HESKIN:
      Q.    Good morning, Mr. Lubin.  How are you doing today?
      A.    Good morning.  I'm doing okay.  How are you?
      Q.    Good.  Can you just state your full name, for the record.
      A.    Yes.  Josh Lubin.
      Q.    Is that your real name or an alias?
      A.    Josh Avrumi Lubin.  I go by Josh, but my legal name is Avrumi Lubin.
      Q.    Okay.  What is your current address?  Where do you live?
      A.    1460 Arboretum Parkway, Lakewood, New Jersey 08701.
      Q.    Okay.  Do you have, do you have a Florida address, as well?
      A.    No.

Page 8

      Q.    You don't?  You don't reside in Florida, at all?
      MR. PICON: Objection to the form of the question.
      THE WITNESS: No, not as a resident.  Not yet, at least.
BY MR. HESKIN:
      Q.    Do you live there part-time?
      A.    No.
      Q.    Do you frequent Miami a lot?
      A.    In the winter I'm --
      MR. PICON: Objection to form.
      THE WITNESS: I go there a nice amount of times.
BY MR. HESKIN:
      Q.    Okay.  Do you understand you're here as the corporate representative for Spin Capital?
      A.    Yes.
      Q.    Okay.  How many times have you had your deposition taken before?
      A.    I don't recall exactly.  A few times.
      Q.    Have you ever testified at trial?
      A.    Yeah.
      Q.    Have you ever testified at an arbitration?

Page 9

A.    No.

Q.    When did you testify at trial?

A.    I don't remember exact, exact dates. Maybe a year ago.

Q.    In what kind of case?

A.    In a bankruptcy case.

Q.    What was the purpose of your testimony?

A.    What was the -- I went there as Spin, I think as a representative for Spin.  It was about, having a claim against an estate.

Q.    Which merchant?

A.    Jet Oilfield Services.

Q.    Jet Oilfield Services.
       Where are they located?

A.    The trial was in Texas, in Austin.  I don't -- I think that -- I think they may be located in Louisiana.

Q.    Okay.  How much was the claim that Spin submitted?

A.    A few million dollars.

Q.    Did that claim get approved?

A.    In one of the -- in one estate, yes; in one estate, it's fighting in a litigated battle, in litigation.

Q.    What are the reasons for them fighting?

Page 10

MR. PICON: Object to the form.
       Just one question here, Shane:  What topic is this question relevant to?  I've kind of given you some leeway, but it just seems --

MR. HESKIN: It goes to the MCAs.

BY MR. HESKIN:

Q.    This was an MCA; right?

A.    Yes.

MR. PICON: So my question is what topic are you specifically saying it goes to?

MR. HESKIN: It goes to their practices and procedures with respect to MCA hearings.  They put in a claim and he testified in this trial.  We're entitled to explore his credibility.

MR. PICON: I'm just asking which topic.  So --

MR. HESKIN: Well, it doesn't even matter.  Listen, you're not going to ask me what topic it applies to every question.  He is here in his personal capacity, as well.  And he's clearly got personal knowledge of this, so he can answer the questions.

THE WITNESS: So go ahead.

MR. PICON: No, hold on a second.

Page 11

You're fine to tell me that you're taking a deposition in his personal capacity, but you don't do it at the same time, because then we get an unclear record.  All I've asked you --

MR. HESKIN: Hold on.  We do it all the time.

MR. PICON: I'll ask you not to interrupt me.

MR. HESKIN: When I ask a question, I'll make it very clear --

MR. PICON: Can I finish my point, please?  All I'm asking for is to tell me, in this case, what particular topic you're --

MR. HESKIN: I'm not doing that.  I'm not doing that.

MR. PICON: Okay.  Well, at some point I may direct him not to answer, if you won't identify the topic.

MR. HESKIN: Okay.

BY MR. HESKIN:

Q.    So I forgot what my question was, so let's just start with was -- the estate is disputing your claim, you testified to that; correct?  Spin's claim?

A.    No.

Page 12

Q.    You said they were fighting it?

A.    I'm fighting them.  On fraudulent transfer.

Q.    Okay.

A.    Yeah, it's not going to be an interesting trial for you.

Q.    Why would it be an interesting trial for me or not be an interesting trial for me?

A.    I don't know.  I just -- just from your statements.

Q.    I'm just fact gathering.

A.    How does that --

MR. PICON: Stop.  No.

BY MR. HESKIN:

Q.    What was the nature of the claim that you submitted?

A.    You've got to ask my attorneys.  I think it's like transferring equity to shareholders when defrauding Spin.  I don't know how the actual thing -- yeah, I have an attorney dealing with it.

Q.    Okay.  You're saying they defrauded Spin; right?

A.    Some of the shareholders -- I don't remember exactly.

Q.    How did they defraud Spin?

Page 13

A.    They transferred some of the equity to different shareholders.

Q.    Okay.  Well, isn't that a direct breach of the contract?

MR. PICON: Object to the form of the question.  Calls for a legal conclusion.

THE WITNESS: I don't know.  It was after, after the bankruptcy estate was filed, the transfer happened, after there was already a claim against -- I don't know, you've got to talk to a lawyer.

BY MR. HESKIN:

Q.    Okay.  Did Spin put in a claim for, under its MCA, in the bankruptcy?

A.    I think so.  I'm not -- I don't know the exact details.

Q.    What was the nature of the claim?

MR. PICON: Object to the form.  Asked and answered.

THE WITNESS: I don't -- I don't know. I didn't fill out the proof of claim.

BY MR. HESKIN:

Q.    You didn't sign it?

A.    No.

Q.    Who authorized it to be filed?

Page 14

A.    My lawyer.

Q.    Did it get any approval from anyone at Spin Capital, to file?

A.    They spoke with me on the phone about it.

Q.    Okay.  So you had a conversation with your lawyer and you ultimately agreed to file the proof of claim?

A.    Yes.

Q.    What was the basis for filing a proof of claim under an MCA agreement?

A.    I --

MR. PICON: Object to the form.  Slow down, so I can get my objection on the record.

It's the third time it has been asked.

THE WITNESS: I don't know.

BY MR. HESKIN:

Q.    Well, you understand that it is -- is bankruptcy, the filing of bankruptcy a breach of the MCA agreement?

MR. PICON: Object to the form of the question.  Legal conclusion.

THE WITNESS: I'm not here to define an MCA contract or different people's MCA contracts. That would be something I would discuss with my

Page 15

attorney.

But I don't believe bankruptcy -- to answer your question, I don't believe bankruptcy is an event of default.  I think it is specifically not an event.

I think it is specifically listed that it's not an event of default, but I'm not looking to get into defining any mechanics of an MCA agreement.

BY MR. HESKIN:

Q.    Well, I want to understand if bankruptcy is not an event of default, what's the basis of submitting a claim in bankruptcy?

MR. PICON: Objection to the form. Asked and answered.  You can answer.

THE WITNESS: You can ask my attorney. I'm sure he can give you a long explanation of your question.  But I'm not a lawyer and I'm not here to define mechanics of an instrument called MCA, revenue purchase agreement.  Yeah.  That's --

BY MR. HESKIN:

Q.    You're not familiar with it?

MR. PICON: Object to the form.

THE WITNESS: I didn't say --

MR. PICON: Mischaracterizes his testimony.

Page 16

THE WITNESS: I said I'm not here to define the mechanics of an MCA.  Spin didn't issue any MCAs in this matter.  And not only that, if I was getting into the mechanics or the provisions of an MCA, that would be something I would discuss with my attorney, not an opposing attorney.

BY MR. HESKIN:

Q.    You just said Spin didn't issue any MCAs.

A.    In this specific matter.

Q.    Okay.

A.    Spin or myself did not issue any MCAs, sir, correct.  Or any affiliates of Spin.  Which there are none.

Q.    Okay.  Well, who did?

MR. PICON: Object to the form.

THE WITNESS: That would be a question for your client, not for me.

BY MR. HESKIN:

Q.    Weren't you the broker on all of the MCAs at issue in this case?

A.    All of which MCAs?

Q.    That were issued to the Leer defendants.

A.    No.  Not all of his MCAs.  Maybe I was

Page 17

broker on some of them.

Q.    Well, you understand there's five MCAs that are at issue in litigation; right?

MR. PICON: Object to the form of the question.

THE WITNESS: I believe I'm aware of that, yes.

BY MR. HESKIN:

Q.    How are you?

A.    Sorry?

Q.    How are you aware of that?

A.    How?  I was the broker on some MCAs with Mr. Nerin Ozentes.

Q.    Okay.  You were the broker.  Which MCAs were you the broker on?

A.    If you show the MCAs to me, I -- what's the name -- what's your question?

Q.    I'm saying you're saying you were the broker on certain MCAs that were at issue in this litigation and I'm asking you to identify them.

A.    You don't have the documents?

Q.    Oh, I do.

A.    Oh, so you want to identify them for me?

Q.    I want you to.  You're the one who

Page 18

signed an affidavit in this case saying, attesting to the truth of their contents, so identify them. Tell me which ones there are.

MR. PICON: Object to the form of the question.

THE WITNESS: I don't have the --

MR. PICON: Hold on.  Objection to the form of the question.  Argumentative.

MR. HESKIN: That's it.  That's it.

MR. PICON: Shane --

MR. HESKIN: Object to form.  You can object to form.  You can object to scope.  I'm not going to have these, these coaching objections.

MR. PICON: First off, there is no coaching.  The witness testified if you want to show them to him, he's happy --

MR. HESKIN: I don't need this. That's coaching.

MR. PICON: Listen, he --

MR. HESKIN: David, he can say I can't answer your question without seeing the documents. And if that's his answer, that's his answer.

MR. PICON: That's basically what he was telling you.

I'll tell you what, if you keep

Page 19

interrupting me, we'll do this deposition before Justice Borrok or anyone --

MR. HESKIN: We sure will.

MR. PICON: Yeah.

MR. HESKIN: And we'll see if he allows any of your coaching objections.

MR. PICON: It is not coaching objections.

MR. HESKIN: I'd love to have this witness before Judge Borrok and take his deposition before Judge Borrok.  Love to do that.  You want to do that?

MR. PICON: Good.  Proceed, please.

MR. HESKIN: Got it.

BY MR. HESKIN:

Q.    Mr. Lubin, let me ask you this:  How many -- how many MCAs did you broker with the Leer defendants?

A.    I believe there was multiple.  I'm sure you have the documents in front of you.  If you want to show them to me, I can tell you if I was the broker on them.

Q.    Can you not answer my question without seeing the documents?

A.    I just answered your question.

Page 20

Q.    Can you not answer my question without me showing you the documents?

MR. PICON: Object to the form.

THE WITNESS: How did I not answer your question?

BY MR. HESKIN:

Q.    I'm asking you, how many MCAs did you broker to my client?

A.    I don't want to give you the wrong answer.  It was a few.  And if you show me the document, I can tell you if I believe I was the broker on it or not.

Q.    What did you do to prepare for today's deposition?

A.    I went through a mountain of text messages.  I went through a bunch of MCA agreements. There may have one or two MCA agreements missing. I'm not sure.  And I'm telling you -- yeah, we went --

Q.    When did you go through these MCA agreements?

A.    I spent hours.  Monday last week.  I went through a lot of -- I don't know.  There is a lot of documents that you have; right?

Q.    Okay.  So you looked at the MCA

Page 21

agreements on Monday; right?

A. I don't know if it was Monday. I think then we were reviewing messages.

Shane, if you have documents, which you should have in front of you, and you want to show them to me, I can tell you if I believe I was the broker on them or not.

I'm not sure -- yeah, I'm answering all your questions.

Q. Okay. So as you sit here today, you can't identify how many MCAs you brokered to my client, the Leer defendants?

MR. PICON: Object to the form of the question.

BY MR. HESKIN:

Q. Is that correct?

MR. PICON: Object to the form of the question. It mischaracterizes his testimony. Asked and answered.

THE WITNESS: I told you there were a few agreements. I don't want to give you an exact number and be wrong.

BY MR. HESKIN:

Q. Okay. So you can't. Got it.

When did you first broker an agreement

Page 22

with my client?

A. Sometime in 2021, maybe. I don't know the exact date.

Q. Okay. So you said you brokered these MCA agreements. Was that the extent of your involvement?

A. Yeah.

Q. Was that the --

A. What's the context of --

Q. Is that the extent of Spin's involvement, as well?

MR. PICON: Object to the form.

THE WITNESS: I think -- I don't fully understand what you're asking. You've got to -- yeah, explain to me what you're asking.

BY MR. HESKIN:

Q. Do you know what a broker is?

A. I believe so, yes.

Q. All right. Tell me what a broker does.

A. A broker communicates with potential merchants and funders and works on getting documents signed, for a commission.

Q. Okay. And so with respect to the MCA agreements only, is it your testimony that Spin's role and your role was exclusively as a broker?

Page 23

A. Repeat your question.

Q. With respect to the MCAs -- and there are five of them. So I reviewed the agreements and I can remember how many there are. There were five.

With respect to the five MCA agreements, is it your testimony that Spin's role was exclusively as a broker?

MR. PICON: Object to the form. You can answer.

THE WITNESS: I believe that was my role, yes.

BY MR. HESKIN:

Q. Okay. Are you on any medication that's preventing you from testifying truthfully today?

A. No.

Q. Anything that's impacting or impairing your memory?

A. No. But you're asking me things from a few years ago, so I'm not going to fully remember them. Like -- yeah.

Q. Okay. So in 2021, how did you come into contact with Stefan Leer?

A. I'm assuming that I, I reached out to him. That would probably be the case.

Q. How? How did you get his name?

Page 24

A. People, funders would send me leads and I would reach out to them. So I -- I'm assuming I cold called him. That's likely what happened.

Q. And you don't know how you got his number?

MR. PICON: Object to the form.

THE WITNESS: I don't remember exactly how I got his number. I know potentially from a few places. Yeah, I would get it from funders.

BY MR. HESKIN:

Q. Did you get it from John Braun?

A. No.

Q. Did you get it from Yosef Brezel?

A. No.

Q. Did you get it from Isaac Wolf?

A. No.

Q. Did you get it from Joe Kroll?

A. I don't know who that is.

Q. Okay. But you do know Mr. -- did you get it from any of the Isaacovs?

A. It's possible. It's possible I got it from Gabe.

Q. Possible you got it from Ben?

A. No; I never did any business with Ben.

Q. You never did any business with Ben?

Page 25

A. That's correct.

Q. Okay. Why didn't you do any business with Ben?

MR. PICON: Object to the form.

THE WITNESS: I don't know, maybe -- maybe you should teach me business, Shane.

I don't know. I just never did any business with him. I don't have that type of relationship with him.

BY MR. HESKIN:

Q. Are you afraid of him?

A. What?

Q. Are you afraid of Ben Isaacov? Is that the reason why you didn't do any business with him?

A. I'm not sure what you're asking me. No, I'm not afraid -- I don't think I'm -- no, I'm not afraid of Ben Isaacov.

What does Ben Isaacov have to do with this?

Q. Did Ben Isaacov ever threaten you?

MR. PICON: Object to the form.

THE WITNESS: I have no idea.

MR. PICON: There's no relevance to this, whatsoever.

BY MR. HESKIN:

Page 26

Q. There absolutely is. You're aware of threats that Ben Isaacov made to Stefan Leer, are you not?

A. There was, like, some type of -- I don't remember the full details, but something was threatening -- I don't remember the context of what happened there.

Q. Do you remember any texts where there's a reference to Ben Isaacov being a tiger in the Russian mafia?

MR. PICON: What relevance does this have to the lawsuit and --

MR. HESKIN: It's in the text messages that you guys produced.

MR. PICON: It doesn't make it relevant.

MR. HESKIN: It absolutely does.

THE WITNESS: I don't remember --

MR. PICON: You can answer.

THE WITNESS: I don't remember that.

BY MR. HESKIN:

Q. Did my client not share that text message thread with you in a WhatsApp chat?

A. Possibly, but I probably didn't read it.

Page 27

Q. You probably didn't read it? How about, did you respond to it?

A. I don't know. It's possible. It doesn't refresh my memory. I remember that there was something, Ben Isaacov had -- I think he was owed money or something. I don't remember.

Why would I care about what Ben Isaacov -- I care about me, not like -- that deal had nothing to do with -- I wasn't the broker on it. Please go ahead.

Q. Okay. You understand that Ben is Gabe Isaacov's brother; right?

MR. PICON: Object to form.

THE WITNESS: What does that have to do with anything?

BY MR. HESKIN:

Q. Do you understand that Ben is Gabe Isaacov's brother?

A. Yes, I'm aware that Ben is Gabe Isaacov's brother.

Q. Okay. And Gabe Isaacov is the one that gave you the lead on this; right?

MR. PICON: Object to form.

THE WITNESS: I said it's possible. I don't fully recall, but it's a big possibility it

Page 28

came from him.

BY MR. HESKIN:

Q. Okay. And Ben Isaacov had syndication in this deal, didn't he?

MR. PICON: Object to the form.

THE WITNESS: No, not that I'm aware of. In my --

BY MR. HESKIN:

Q. I'm sorry, Gabe Isaacov had a syndication in the BMF; right?

MR. PICON: Object to the form.

THE WITNESS: I can't answer on behalf of Gabe Isaacov or BMF. I can answer on my behalf or Spin's behalf.

BY MR. HESKIN:

Q. Okay.

A. Yeah.

Q. You don't know?

A. I don't know what your question is.

Q. Okay.

A. Don't give me the speculative question. Ask me a question and I'll give you the correct answer.

Q. Got it.

MR. PICON: Answer his questions.

Page 29

BY MR. HESKIN:

Q. Why did you reach out to Stefan Leer and ask him if he wanted an MCA?

A. There was money problems, likely, I assume. It's a speculative question again.

Q. Did you want to make money?

A. I get paid a commission if I broker a deal.

Q. Okay.

A. What are you -- yeah, ask me --

MR. PICON: Relax. Answer his questions. Okay?

THE WITNESS: Okay.

BY MR. HESKIN:

Q. So you reached out to him because you wanted to make money; is that your testimony?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't fully understand your question, but I would reach out to someone to put them in contact with a funder, and I would make a commission or get upside for putting together the transaction and -- yeah, I mean, I wasn't doing it for free.

BY MR. HESKIN:

Page 30

Q. Okay. Did you ask Mr. Leer what his financial condition was, at the time?

A. I know I -- are you referring to the life settlements that Spin was -- had as collateral? I'm not sure what you're referring to.

Q. No, I'm asking at the time you reached out to Mr. Leer.

A. For the first time?

Q. For the first MCA, did you ask him what his financial condition was?

A. I don't remember my conversations with Mr. Leer, other than chasing Mr. Leer down for payments when he was in default. Other than that, I'll need something that's going to refresh my memory.

Q. Is that something a broker does, is chase down merchants when they're in default?

A. Yes. Yeah. Most -- a lot times brokers don't do it, because it's not so nice. Sometimes your commissions get called back. Sometimes your commission is only paid once the deal is, whatever, past a certain point. Every funder has different ways they structure it.

Q. Did you have an ISO agreement with BMF?

MR. PICON: Object to the form of the

Page 31

question.

THE WITNESS: A written agreement?

BY MR. HESKIN:

Q. Yeah.

A. Like on paper?

Q. Yes.

A. I don't know.

Q. Okay. Did you have an ISO agreement with Hi Bar Capital?

A. I don't know. I don't think I -- I don't know.

Q. Well --

A. What --

MR. PICON: Let him ask you a question. Okay?

THE WITNESS: Go ahead.

BY MR. HESKIN:

Q. There is no written agreement with either Hi Bar Capital or BMF, to your knowledge?

MR. PICON: Object to the form.

THE WITNESS: I don't want to guess over here. I don't think so.

BY MR. HESKIN:

Q. Well, how did they determine what commission you'd make?

Page 32

A. We would structure it on the phone and they would put it in an e-mail. Is that what type of agreement you're referring to?

Q. No. Have you ever -- you're familiar with what an ISO agreement looks like; right?

MR. PICON: Object to the form of the question.

THE WITNESS: I -- familiar in what sense? Yeah, I've heard of it. I know what it is.

BY MR. HESKIN:

Q. Do you --

A. Have I read them? No.

Q. Do you enter into ISO agreements on behalf of Spin Capital?

A. I probably did. I don't recall which funders required me to do it.

My concept was more like of -- I intended to broker a lot of deals with each funder, and my security was that if they didn't pay me my commission, they would not get my deals. So I never really cared about getting an ISO agreement signed.

Q. Okay. So when you contacted Mr. Leer, what did he tell you, as to his financial status?

MR. PICON: Object to the form. Asked and answered.

Page 33

THE WITNESS: I already answered. I have no recollection. I don't know. I don't remember. Like, this is a few --

BY MR. HESKIN:

Q. Okay.

A. This is what, three years ago?

Q. What did you do to determine his financial status?

MR. PICON: Object to the form. Assumes facts not in evidence.

THE WITNESS: Sorry, what's your question?

BY MR. HESKIN:

Q. What did you do to determine his financial status?

A. I hired a lawyer to do the due diligence. You're talking about the collateral?

Q. I'm talking about MCAs. Right now all I'm --

A. That's not my responsibility, MCAs.

Q. Well, you're the broker; right?

A. I would put them in contact with -- every funder has different requirements for what they need for their due diligence. I would put them in contact with the funders, directly. Sometimes I

Page 34

would ask for some bank statements and the rest of the information would get done direct -- the funder would get it done directly with the merchant, without regard.

Q. You didn't negotiate the terms of the MCAs?

A. No.

Q. I don't have text messages with you and Mr. Leer, negotiating the express terms of the MCAs?

MR. PICON: Object to the form of the question.

THE WITNESS: I'm not sure which text messages you're referring to, but brokers like to talk. And I don't know if I insinuated like I was negotiating any terms, but what I would be -- the funders would make offers and my job would be to try to get it signed.

Sometimes the merchant would counter the offer and I would go back to the funder and ask them, this is what the merchant says he needs to get a deal done, and they would make a decision whether or not to make a new offer or not.

Sometimes if they felt like there was a lot of risk, they would just say no, the offer stays as is.

Page 35

BY MR. HESKIN:

Q. Okay.

A. I don't remember the -- yeah. You're asking me for your specific client. I don't remember.

Q. Well, whose benefit were you looking out for as the broker in this case? Were you looking out for your best interest or were you looking out for the merchant's best interest?

MR. PICON: Object to the form of the question.

THE WITNESS: I'm not an attorney. I don't represent the merchant. I'm looking out for a neutral -- I take a neutral position. I'm looking out for my own interest. I want to get paid my commission and at the same time if there's payment issues, I would assist in getting the funders paid, sometimes. Again, that leads back to my own interests, because I can get my commission revoked.

BY MR. HESKIN:

Q. Okay. Did you tell Mr. Leer you were getting a kickback?

MR. PICON: Object to the form of the question, the statement about a kickback.

Page 36

THE WITNESS: I'm not sure what your question is.

BY MR. HESKIN:

Q. Did you tell Mr. Leer that you were getting paid a commission on these?

A. I have no idea. I don't remember. I'm assuming Mr. Leer -- if you want me to speculate, I assume Mr. Leer didn't think I was working for free.

MR. PICON: Don't speculate.

THE WITNESS: Yeah.

BY MR. HESKIN:

Q. Did Mr. Leer know that you were involved in any of the MCAs?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't know.

BY MR. HESKIN:

Q. Do you know if you were involved in any of the MCAs?

MR. PICON: Object to the form of the question.

THE WITNESS: I'm not sure, which MCA?

BY MR. HESKIN:

Q. The five MCAs at issue.

Page 37

A.   I don't know what your question is.

Q.   Okay.  Well, we already got testimony from you, saying you acted as, exclusively as a broker; right?

A.   Yes.

Q.   Okay.

A.   In what capacity?

But yeah, go ahead.

Q.   That's okay.  What did you do to earn the fee, the broker fee?

A.   I'm not sure which fee you're --

Q.   Sir, I don't understand this.  So Gabe Isaacov gives you the lead, you call the merchant, sign him up, and then he pays you a fee for signing him up?

MR. PICON: Objection to the form.

BY MR. HESKIN:

Q.   Is that how it works?

MR. PICON: Mischaracterizes his testimony.

THE WITNESS: Every funder had a different structure of how they paid it.  Sometimes it would be 50 percent of the upside.  Sometimes it would be 12 percent of the funding amount.  Sometimes we would get paid 50 percent, on an

Page 38

obligation 50 percent paid.  Every funder had it structured differently.

BY MR. HESKIN:

Q.   How did Gabe have it structured?

A.   With Gabe, if he sent me the lead he would give me -- he would give me 50 percent of the profits on the deal.  Not paid up front, but paid later on.  It was a deal-by-deal basis.

Q.   So you got 50 percent of the profits and a broker fee?

A.   No.  I would just get one.

With who, with Gabe?

Q.   Yes, with Gabe.  With Gabe.

A.   Yeah, it wouldn't always be 50 percent.  Sometimes it would be less, depending on the size of the deal.  But yeah, he wouldn't pay another fee on top of that.

Q.   So you got a 50 percent syndication in the deal; is that it?  Is that fair?

MR. PICON: Object to the form of the question.

THE WITNESS: You can call it 50 percent participation.  50 percent of the upside.  I wouldn't have to put up any money.  But it was a deal -- it wasn't always 50 percent.  Sometimes it

Page 39

was 20 percent.  Every deal -- it was a deal-by-deal basis.

BY MR. HESKIN:

Q.   What were the percentages with respect to the Leer MCAs?

A.   I believe for Leer it was 50 percent of the upside.

Q.   So for each of the --

A.   Wait, wait, wait.  For the BMF agreements?

Q.   Yes, for BMF.

A.   I believe it -- I believe it was 50 percent.

Q.   And who funded the BMF agreements?

A.   I think, Gabe.

I don't know what your question is.

Q.   What entity funded the MCA agreements?

A.   Which, the BMF ones?

Q.   Yes, the BMF ones.

A.   You just said it.  What am I missing?

Q.   Was it BMF?

A.   I'm not sure what your question is.

Q.   I'm asking who actually funded the BMF deals.

A.   Like, whose money was it?

Page 40

Q.   Yeah.

A.   I don't know.  On the contract it just says BMF.  Right?

Q.   I understand that's what it says on the contracts, but who actually put the money in the account?

A.   You've got to ask BMF that question. I assume, Gabe.  I don't know.  I don't know who Gabe's bank is.  I don't -- I'm not sure what your question is.

Q.   Okay.

A.   Tell me what -- explain to me what you're asking.

MR. PICON: Let him ask the questions. Okay?  Just answer his questions.

THE WITNESS: I don't rep --

MR. PICON: Just answer his questions.

BY MR. HESKIN:

Q.   Okay.  Let's talk a little bit about Joel Getter.  Do you know who he is?

A.   Yeah.

Q.   Who is he?

A.   He ran Hi Bar Capital.

Q.   Where is Hi Bar Capital located?

A.   I don't know.  I think they winded

Page 41

down operations. I don't know.

Q. Where were they at the time of the Leer transactions?

A. Where was Joel? Joel I think worked in Florida. I think they had an office in Brooklyn. Yeah.

Q. Did he have an office with our friend Braun?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't think so.

BY MR. HESKIN:

Q. Did he have an office with Isaac Wolf?

MR. PICON: Object to the form.

THE WITNESS: I don't think so.

BY MR. HESKIN:

Q. You don't know where his New York office is?

A. I think --

MR. PICON: Whose? Object to the form.

THE WITNESS: Whose? Whose office are you talking about?

BY MR. HESKIN:

Q. BMF.

Page 42

A. BMF?

Q. Not BMF. I'm sorry, Hi Bar Capital. The Hi Bar that's operated by Joel.

A. Joel had an office in Florida. And I believe that Hi Bar had an office in New York, too, maybe like a back office or administrative office. I don't think it had anything to do with the people's names you're mentioning. And my point of contact was Joel, which he was located in Florida.

Q. And the back office happened to be in Brooklyn?

A. Yes, I believe it was in Brooklyn. But not in the same offices of the people that you're talking about.

Q. How do you know that?

A. Because I used to sublet an office there. They didn't have an office there.

Q. When did you sublet an office there?

A. Like December 2019. I think I may even still have it, but I haven't been there in over a year.

Q. You continue to sublet it?

A. Do I con -- I don't think I paid rent on it in a year, but I don't know, I have to check. I'll have to look into it.

Page 43

Q. Where is Spin Capital's current address, office location?

A. Wherever I'm located.

Q. And right now you're located in Jersey?

A. Yeah. Right this second I'm in New York City, but yeah.

Q. So your office is in New York City right now?

A. It doesn't have an office.

Q. Spin does not have an office?

MR. PICON: Object to the form.

THE WITNESS: No. No.

BY MR. HESKIN:

Q. Okay. Does Spin have any employees?

A. Yeah, one employee. Two, including me.

Q. Who?

A. Isaac Lubin.

Q. Who is Isaac?

A. He's my first cousin. He handles, like, making taxes. Yeah.

Q. Who is the other?

A. Josh Lubin.

Q. You?

A. Uh-huh.

Page 44

Q. Okay. Are you W-2?

A. I'm on a W-2. I think so.

Q. Is Isaac on a W-2?

A. I don't know. These are accounting questions, but I -- this -- it's just two employees.

Q. Does Spin file taxes?

A. Yes.

Q. When is the last time you filed taxes?

MR. PICON: Object to the form.

THE WITNESS: It files every year.

BY MR. HESKIN:

Q. Did they file taxes in 2023?

A. They may have filed an extension. I have to ask my accountant. This is not, like, my department.

BY MR. HESKIN:

Q. Did Spin file taxes in 2022?

MR. PICON: What's the relevance of that question, Shane?

THE WITNESS: Yes.

BY MR. HESKIN:

Q. It did?

A. Yeah.

(Marked for a ruling)

Q. Okay. Was there an operating loss or

Case 1:24-cv-08515-AS    Document 160-2    Filed 05/26/26    Page 13 of 98
SPIN CAPITAL, LLC, et. al. v.                                                    AVRUMI LUBIN
GOLDEN FOOTHILL INSURANCE SERVICES, LLC                                          July 25, 2024

Page 45

a profit?

MR. PICON: Object to the form. What's the relevance to this line of questioning?

THE WITNESS: I would have to ask my accountant.

MR. PICON: Let me get an answer.

MR. HESKIN: He can answer. He can answer.

MR. PICON: You're not going to state the relevance?

MR. HESKIN: I'm not going to get into a relevance --

MR. PICON: There are rules.

Let me ask the Court Reporter to mark it for a ruling.

Go ahead.

MR. HESKIN: Okay.

MR. PICON: You don't have to answer it.

MR. HESKIN: Excuse me?

MR. PICON: I told him -- I'm directing him not to answer.

MR. HESKIN: Oh, really?

MR. PICON: Yeah. You won't state the relevance of whether they filed tax returns? No,

Page 46

I'm not going to let him answer that question.

MR. HESKIN: I'm not going to get into a debate with you about explaining the relevance of every one of my questions or any of my questions. You know as well as I do instructing the witness not to answer is sanctionable. You absolutely --

MR. PICON: And asking harassment questions is sanctionable, and I will happily make a motion --

MR. HESKIN: Okay, got it.

MR. PICON: Maybe you can explain to the judge why you are asking questions about whether tax returns were filed by Spin in the year 2022. So go ahead, proceed at your peril.

MR. HESKIN: Got it.

BY MR. HESKIN:

Q. Were you involved in filing the tax returns in 2022?

A. I would have -- no; I had an accountant handle that.

Q. Did you review the tax forms before they were filed?

A. I probably -- maybe on the phone, someone discussed it with me. Yeah, I'm not sure what your question is.

Page 47

Q. Well, who authorized the taxes to be filed? Do you know if someone has to sign --

A. Right.

Q. -- the tax form?

A. Right. I have the accountant sign off on it.

Q. You didn't sign them?

A. I don't remember.

Q. Do you remember physically signing tax forms on behalf of Spin Capital in 2022 or '23?

A. It's possible I signed them. I don't know the answer to your question. I'd have to make a phone call for that.

(Marked for a ruling)

Q. Okay. Did you file tax returns in 2021?

MR. PICON: Okay, I'm going to direct you not to answer.

Let's mark it for a ruling.

That's it. You won't give me the relevance and I see none, so I'm directing him not to answer.

And feel free to make whatever motion you think. I will make a motion for protective order. This is harassment.

Page 48

MR. HESKIN: Okay.

BY MR. HESKIN:

Q. Mr. Lubin, are you going to follow your lawyer's instruction not to answer my questions?

A. I filed a tax return. I don't know what you're asking.

MR. PICON: He's asking you a different question. You've got to follow my direction not to answer the question.

THE WITNESS: Yeah, sure.

MR. HESKIN: Okay.

BY MR. HESKIN:

Q. What is your educational background?

A. I don't really have much of an educational background. I didn't go to college.

Q. Did you go to high school?

A. Yeah, but I didn't -- yeah, I didn't finish high school, no.

Q. What's the last year you finished?

A. In 10th grade.

Q. Okay. What kind of special -- what kind of experience do you have in purchasing receivables? What qualifies you to do that?

MR. PICON: Object to the form of the question.

Case 1:24-cv-08515-AS   Document 160-2   Filed 05/26/26   Page 14 of 98
SPIN CAPITAL, LLC, et. al. v.                                         AVRUMI LUBIN
GOLDEN FOOTHILL INSURANCE SERVICES, LLC                              July 25, 2024

Page 49

THE WITNESS: I'm not sure what your question is.

BY MR. HESKIN:

Q.   Okay.  What kind of work experience have you had?  What did you do after you dropped out of high school in 10th grade?

A.   I worked in like real estate management.  I was a travel agent.  And I'm a good salesperson.  So that's what qualified me.  I'm a natural.

Q.   Okay.

A.   I like to believe I'm good, you know.

Q.   So you have no financial experience, whatsoever?

MR. PICON: Object to the form of the question.

THE WITNESS: I'm not sure what your question is.

BY MR. HESKIN:

Q.   Okay.  Well, how would you assess whether a merchant can afford the terms of an MCA that you're advocating the merchant to take?

MR. PICON: Object to the form of the question.

THE WITNESS: When did I say that I

Page 50

assess -- I'm not sure what -- when did I say I assess -- I do due diligence on the agreements?

BY MR. HESKIN:

Q.   Maybe you don't.

A.   Okay.

Q.   Maybe you don't.  Do you not assess the --

A.   I make money.  I don't do due diligence.  I'm a sales guy.

Q.   Okay.  So your only concern is whether or not the merchant agrees to take the money?

MR. PICON: Object to form of the question.

THE WITNESS: You're asking me to speculate, but yeah.

BY MR. HESKIN:

Q.   Yes, so before --

A.   My --

MR. PICON: Let him finish the question.

BY MR. HESKIN:

Q.   Before you send a contract to the merchant that you're brokering, is it fair to say that you do no due diligence or analysis as to whether or not the merchant can actually afford the

Page 51

terms that you're providing?

MR. PICON: Can I hear the question back, please?

THE WITNESS: What?

MR. PICON: Let the Court Reporter -- the Court Reporter is going to read back the question.

(Whereupon, the pending question was read back by the Court Reporter, as follows:

"Q. Before you send a contract to the merchant that you're brokering, is it fair to say that you do no due diligence or analysis as to whether or not the merchant can actually afford the terms that you're providing?

THE WITNESS: Okay.  So every funder would have different -- they would request sometimes I get an accounts receivable report or last three to six months bank statements, but I wouldn't be doing the due diligence, no, absolutely not.

Like, that's not my responsibility.  On the deal I'm brokering, like, why am I -- personally, that's not something I do.  I'm a broker.  But they would request -- sometimes they would request certain documents and sometimes the funders would get the documents directly from the

Page 52

merchants.  They do income verification logs and things like that.

But I definitely wasn't assessing whether -- yeah, that wasn't my -- I'm a broker.  I'm not -- that's not my field.

Besides, I wouldn't be able to be cold calling people all day.  But yeah.

MR. PICON: Just answer his questions.

BY MR. HESKIN:

Q.   Do you review the contracts that you are brokering before you ask the merchant to execute them?

A.   I don't know if I review them or not.  I think it would be the merchant's responsibility to retain an attorney.  And it would be the funder's responsibility to make sure their docs are correct.  What does it have to do with me?

Q.   Okay.  So you don't review the contracts before having the merchant sign them?

MR. PICON: Objection to form.  Asked and answered.

THE WITNESS: I don't think it's my department.

Would I sometimes check what the funding amount is?  It's possible.  I don't know.  I

Case 1:24-cv-08515-AS    Document 160-2    Filed 05/26/26    Page 15 of 98
SPIN CAPITAL, LLC, et. al. v.                                                    AVRUMI LUBIN
GOLDEN FOOTHILL INSURANCE SERVICES, LLC                                          July 25, 2024

Page 53

don't know.

BY MR. HESKIN:

Q. Okay. And you don't think it's relevant as to whether or not to check the terms of the agreements that you're recommending a merchant enter into?

MR. PICON: Object to the form.

THE WITNESS: You're asking me for an opinion, now?

BY MR. HESKIN:

Q. Yeah.

MR. PICON: Object to the form.

THE WITNESS: As a broker?

BY MR. HESKIN:

Q. Yeah, as a broker.

A. I don't know. I'm not sure how to answer your question.

If it's relevant for the broker to review it?

Q. Yes.

A. Why is it relevant for the broker?

Q. Do you not know what you're selling to the merchants? Do you not review it?

MR. PICON: Object to the form of the question.

Page 54

THE WITNESS: I believe --

MR. PICON: Asked and answered.

THE WITNESS: We discuss the potential terms on the phone. Before I would send docs, I would get on the phone with the merchant and the funder, and once there's a deal on the table that's when you send out docs. At that point, why are you reviewing them? The docs should hopefully say what the funder said he was going to put on them and the merchant said he is going to sign.

BY MR. HESKIN:

Q. Let me ask you this: Did Joel know that you were brokering a deal side by side with Gabe?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't know. I don't think I hid it from him, if that's your question.

BY MR. HESKIN:

Q. Did you tell him?

A. Probably. I -- yeah, I'm a transparent guy. Probably, yeah. Assuming -- I don't know. Yeah, I probably told him.

Q. Okay. Do you have a record of telling him that?

Page 55

A. You mean a written record?

Q. Yeah, a written record.

A. It would have been on the phone. If I -- yeah, I don't know. I don't know if I had a written record, but I probably told him.

Q. Did you ever provide a copy of the BMF contract to Joel?

A. I don't know.

Q. Have you ever reviewed the BMF MCA contracts?

MR. PICON: Object to the form. Which one?

THE WITNESS: What's your question?

BY MR. HESKIN:

Q. Have you ever, prior to entering into the MCAs with the Leer defendants, did you ever review the BMF MCA agreements?

MR. PICON: Object to the form. He didn't enter into the agreements.

THE WITNESS: I'm confused by your question.

BY MR. HESKIN:

Q. Let me ask you this: Prior to sending the contracts to the Leer defendants, did you review the contracts?

Page 56

A. I probably didn't, but -- yeah.

Q. Okay.

A. Did I look at the funding? I don't know. Yeah.

Q. Did you know if those contracts had bankruptcy as an event of default?

A. I have no idea. That's -- I can't answer on behalf of -- I don't know.

Q. Okay. Did those contracts have any prohibitions against stacking?

A. These are questions you would have to ask my lawyer. I believe -- yeah, my lawyer would have that answer. I didn't personally review it. I likely hired someone to -- I actually did hire someone to review the documents for me. Yeah.

Q. You hired someone to review the BMF and Hi Bar docs?

A. Prior to entering into the Spin loan, yes.

Q. I'm not talking about that. I'm talking about prior to having --

A. Sending it to Leer?

Q. The MCAs. I'm talking only about the MCAs.

A. Okay.

Page 57

Q.   Did you hire an attorney to review those, before you sent them?

A.   That's not my responsibility.  That would be the funder's and merchant's responsibility.

Q.   Okay.

A.   Prior to entering the Spin MCAs, I have had attorneys review the docs, yes.

Q.   Review what docs?

A.   Spin MCA docs.

Q.   Okay.  Well, these weren't Spin MCA docs.  These were --

A.   Yeah, that's what I told you.  Yeah, no, we didn't have an attorney, before I send out the contract.

Q.   Okay.  So no attorney reviewed the BMF agreements; correct?

MR. PICON: Object to the form.

THE WITNESS: Like, not at the time that they were sent, likely not.  I don't know.

BY MR. HESKIN:

Q.   Okay.  And the same with Hi Bar, no attorneys reviewed those before you sent them out?

A.   It could be Hi Bar had an attorney and it could be Leer had an attorney, but I can't answer on behalf of either one of those parties, or BMF.

Page 58

Q.   You're familiar with the term stacking; right?

A.   I believe -- yes, I believe so.

Q.   Would you explain to me what that is.

A.   I think it has to be defined, to some extent, but it's usually -- I don't know.  I'm not going to explain it.  I don't know.  I would have to ask an attorney.

Q.   Well, when I asked you do you understand the word stacking and you said yes, what was in your mind when you said the word yes?

A.   I think it refers to taking another obligation behind -- it depends.  I think it has to be defined in the contract.

Q.   Did you bother to check and see if any of these contracts had a stacking prohibition?

MR. PICON: Object to the form.

THE WITNESS: That wouldn't be -- that wouldn't be my responsibility, my job or my liability.  Yeah, that would have nothing to do with me.  No, I likely didn't check or didn't care.

BY MR. HESKIN:

Q.   Are you aware that by then brokering the BMF and Hi Bar deal side by side, you caused Leer to be in default from day one?  Are you aware

Page 59

of that?

MR. PICON: Object to the form of the question.  Calls for a legal conclusion.

THE WITNESS: Yeah --

MR. PICON: Mischaracterizes the agreements.

THE WITNESS: You're asking me a legal question again, but I assume if both the funders know about it, a provision like that wouldn't be valid.  But I'm not here to make any legal conclusion or define someone else's contract.

Yeah, I'm not defining any contract.

BY MR. HESKIN:

Q.   Okay.  Well, the contracts that you brokered have a reputable warranty in them that say that --

A.   Okay, so --

MR. PICON: Hold on.  Let him finish his question.

Q.   -- the Leer defendants have clear and full title to all of the receivables that they're selling, do they not?

MR. PICON: Object to the form of the question.

THE WITNESS: I can't answer on behalf

Page 60

of Hi Bar, BMF or Mr. Leer and his entities.

I think you can review the documents.  They speak for themselves.  And, yeah.

BY MR. HESKIN:

Q.   Okay.  How did -- who determined the amounts of the daily payments on the MCAs?

A.   I don't know.  Each company would be responsible for that.  Yeah.

Q.   All right.  So I'd have to go ask Gabe and Joel; is that correct?

A.   Yeah.  They probably have underwriters.  I don't know the exact details.  You're asking me who defined how many -- yeah, that's -- I didn't do their due diligence.  No, I don't work for BMF or Hi Bar.

I would convey maybe terms that Leer and his entities maybe requested.  I don't know.

Q.   Okay.  Well, Spin has its own MCAs; right?

A.   Spin has done some MCAs, yeah.

Q.   Okay.  Have you reviewed your own MCAs?

A.   I would have an attorney do that.

Q.   I'm asking have you reviewed your own MCAs?

A.   I just answered your question.  I

Page 61

would have an attorney review my MCAs.

Q.    So the answer to my question is no?

A.    **The answer, I would pay someone to review it for me.  It's not no.**

Q.    The answer to my question is actually no.  Have you ever reviewed one of your own contracts?

MR. PICON: Object to the form of the question.

THE WITNESS: I answered the question already.

BY MR. HESKIN:

Q.    Okay.  Do you even know what the terms of your own MCA contracts say?

MR. PICON: Object to the form.

THE WITNESS: The documents speak for themselves.

BY MR. HESKIN:

Q.    I'm asking you whether you know the terms of your own contracts.

A.    **That would be something I discuss with my attorney, which would be privileged, not something I discuss with you.**

Q.    No, no.  Whether you've reviewed it or not is not privileged.  And whether you understand

Page 62

the terms of your own contracts is not privileged.  And your lawyer is not objecting on grounds of privilege.

So you've answered my question.

A.    **Anything I reviewed with my attorney would be privileged.**

MR. PICON: Don't argue with him.  Just answer his questions, if you can.

THE WITNESS: Go ahead.

BY MR. HESKIN:

Q.    Have you reviewed the terms of your own contracts?

MR. PICON: Object to the form.  Asked and answered.

THE WITNESS: I told you I would pay an attorney to review them for me.  And I didn't -- the Spin MCA contracts, you're asking about?

BY MR. HESKIN:

Q.    Yes.

A.    **Okay.  I answered it.**

**Yeah, I would pay an attorney to review it for me and maybe discussed some of the provisions on the phone with my attorney.  All that would be privileged.**

Q.    Who was your attorney?

Page 63

A.    **I have discussed it with Steve Wells, with a few attorneys.**

Q.    Who wrote your contracts?

A.    **I think it's combination of attorneys. I'd have to look into it.**

Q.    When were they written?

A.    **I don't remember.**

Q.    How long have you been doing MCAs?

A.    **Since like --**

MR. PICON: Object to form.

A.    **-- around 20, end of 2018.**

Q.    Are you still doing MCAs?

MR. PICON: Object to the form.  What are you talking about, brokering or funding?  Or both?

MR. HESKIN: Funding.

BY MR. HESKIN:

Q.    Are you still funding MCAs?

A.    **No.  At Spin?**

Q.    Spin.

A.    **No.**

Q.    When is the last MCA that Spin funded?

A.    **I don't remember.  Like a year ago, over a year ago.  Over a year ago?**

Q.    '23, is that fair, or '22?

Page 64

A.    **No, '23.**

Q.    Why did it stop doing MCAs?

A.    **It's just not my -- it's too much logistics for me.  I'm a broker.  I'm better at just staying a broker and not having to deal with guys like Shane Heskin suing you, you know.  Yeah, I'd rather just stay as a broker.  I don't have to deal with down payments or headaches or defaults.  It's not --**

Q.    I thought you just testified a little while back that part of your broker's job is to chase down bounced payments.

MR. PICON: Object to the form.

THE WITNESS: It's assisting, maybe. It's not -- it's just not my department.  I'm good at brokering.  Yeah.

BY MR. HESKIN:

Q.    Okay.  Does Spin have any assets?

A.    **It's possible.**

Q.    Well, you're the president and CEO of Spin; right?

MR. PICON: Object to the form.

THE WITNESS: Yeah.  I'm the owner.

BY MR. HESKIN:

Q.    Okay.  Does Spin have any bank

Page 65

accounts?

A.    Yeah.

Q.    Where are they?

MR. PICON: What's the relevance of where Spin's bank accounts are?

THE WITNESS: I believe --

MR. PICON: Hang or a second.

What's the relevance?  Are you going to state the relevance?

MR. HESKIN: Why do I have to explain to you the relevance of all my questions?  I'll be apparent when I make my motion.

BY MR. HESKIN:

Q.    Go ahead, where are your bank accounts located?

MR. PICON: Hold on.  Hold on.  Hold on.  Hold on.  Hold on a second.

So I've asked you three times now and only three times about tax returns and about bank accounts.  Okay?  And about some earlier questions that have no relevance whatsoever.  And so it's not every question.

MR. HESKIN: David -- David, I'll tell you what --

MR. PICON: Stop interrupting me.

Page 66

MR. HESKIN: -- let's excuse the witness.  Stop it.  Excuse the witness and I'll tell you and we'll put it on the record.

MR. PICON: Fine.

MR. HESKIN: Excuse the witness.

MR. PICON: We'll excuse the witness.  You need to go outside.  Okay?

THE WITNESS: Okay.

MR. PICON: I'll tell you when he's left.

(Whereupon, witness leaves the deposition).

MR. PICON: Go ahead.

MR. HESKIN: Okay.  This all goes to the sham nature of this Choice-of-Law provision.  This guy just testified that he is located in New Jersey.  His bank -- there are no assets, there's no connection to New York, whatsoever, and California law applies.

You know that's our position.  And where he files his tax returns is directly relevant to that.  You can go ahead and object, but you're dead wrong on it.

MR. PICON: Okay.

MR. HESKIN: So, yes, these are all

Page 67

relevant questions.

MR. PICON: First off, calm yourself down for two seconds.  Okay?  You're getting yourself all worked up.

You're saying that it is relevant where he files tax returns?

MR. HESKIN: Yeah.

MR. PICON: As to whether --

MR. HESKIN: He is claiming it's a New Jersey company, and I want to see the assets showing that he has any connection to New York.  He just testified that he subleases a space in New York, but he's never been there, never -- doesn't go there.  It's a complete and utter sham, David.

MR. PICON: Nothing is an utter sham, whatsoever.

Hang on a second.  I want to confer with my counsel.

Can you hear me?  Can you hear me?

MR. SHURE: Yes.

MR. PICON: So can you hear me now?

MR. HESKIN: I can hear you.

MR. PICON: Okay.  So whether -- you were asking questions about whether or not he made a profit or a loss.  That's irrelevant to it.

Page 68

If you want to ask him whether he remembers filing, which I think he's already answered, you can have that question, now that you've stated some relevance.

I don't agree it's relevant, but you've at least given me your explanation.  You want to ask him that?  You're free to ask him that now.  I'll let you go back and ask those questions.

MR. HESKIN: Okay, but, David, I don't want -- I shouldn't have to explain the relevancy of every single one of my questions.  You know relevancy is not a proper objection, certainly not a proper basis to instruct the witness not to answer.  It's entirely improper and it's unduly delaying these proceedings.

MR. PICON: Again, you've said three times I don't have to explain all my questions.  There have been three discrete areas, over an hour now, that I've raised it, and only three.  And, frankly, harassment is a basis on which to direct the witness not to answer.

I've now said you can ask him those questions.  Not about whether there is a profit or loss.  And feel free to do that.

I'll bring him back in.

Page 69

BY MR. HESKIN:

Q. Welcome back, Mr. Lubin.

A. Hey.

Q. Okay. I was asking you about the bank accounts. Where are they located?

A. Spin's bank accounts?

Q. Yeah.

A. Optimum and Bank of America.

Q. Okay. And where were they opened up?

A. I don't remember.

Q. Who opened them up?

A. Me, Spin.

Q. When did you open them up?

A. I don't remember.

Q. Did you open them up when you were located in New Jersey?

A. No, I opened them up when I was working out of New York. I don't remember the exact date.

Q. Are they still active?

A. I believe so.

Q. Is there any money in those accounts?

A. As of today, I don't know, I have to

Page 70

check. Spin's not that active, but yeah.

Q. Okay. Did these Spin accounts fund the Leer transaction?

MR. PICON: Object to the form. Which one?

BY MR. HESKIN:

Q. I'm talking about the loan.

A. Yes. I may have -- I was at TD Bank at that time. But yes, the Spin account funded the loan.

Q. So Spin had a bank account at TD Bank?

A. Yeah.

Q. And where was that account located?

A. What?

Q. Where was the TD Bank account located?

A. At TD Bank.

Q. What state?

A. I have no -- it was -- it was treasury management. It was opened -- probably the New York office. It was opened online through the Internet. You don't go in to an actual branch to open an account.

Q. It was opened in the name of Spin Capital?

A. Yes.

Page 71

Q. And it's your testimony that Spin Capital is the one that funded the 2.7 million dollar Leer loan at issue?

MR. PICON: Object to the form of the question.

THE WITNESS: Yes.

BY MR. HESKIN:

Q. You sure about that?

A. I'm not -- it sounds like such a simple question, but at the same time it sounds like you're trying to trick me, so just tell me what you're asking me.

Q. I'm asking if Spin Capital actually funded this loan.

A. Yes. Am I missing something here?

Q. Okay. Spin Capital funded it?

MR. PICON: Object to the form of the question.

THE WITNESS: Yes, Spin Capital funded this loan.

BY MR. HESKIN:

Q. Okay.

A. And I --

Q. Through a Spin Capital bank -- through A Spin Capital bank account?

Page 72

A. Yes. And I was the only person, and maybe my admin, to create a wire. I was probably the only person with approval privileges.

Q. Okay. Where were you located when you approved that wire?

A. Probably in Brooklyn, New York.

Q. Probably?

A. Yes, in Brooklyn, New York.

Q. How do you know that?

A. Because I was spending four days a week there. I was probably there. I think I can recall being there, yeah.

Q. Okay. So that -- and wasn't that -- is that the location where you were subletting with Wolf and his gang?

MR. PICON: Object to the form.

THE WITNESS: Not Wolf.

MR. PICON: Mischaracterizes his testimony.

BY MR. HESKIN:

Q. Who?

A. Yosef Brezel.

Q. Okay. And you know Yosef Brezel is John Braun's first cousin; right?

MR. PICON: Object to the form of the

Page 73

question.

THE WITNESS: I think you're wrong, first of all, but no. I think they're related, distant cousins, but I don't know. Yeah. I don't think they're first cousins.

BY MR. HESKIN:

Q. Okay.

A. But I'm not -- yeah.

Q. Did you ever see John Braun visit your office when you were there four days a week?

MR. PICON: Object to the form of the question.

THE WITNESS: Maybe once or twice. And like, in like a year period.

BY MR. HESKIN:

Q. What was he doing there?

A. I have no idea.

Q. Do you have any communications with Mr. Braun?

A. I never did any business with Mr. Braun.

Q. Did you have any text messages with Mr. Braun?

A. I don't think I have text messages. I think I've spoken to him a few times, but no. Yeah.

Page 74

Q. You've never had any text messages with Mr. Braun?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't recall.

BY MR. HESKIN:

Q. Have you ever had any WhatsApp communications with Mr. Braun?

A. I don't believe so.

Q. You've had WhatsApp communications with Mr. Brezel; correct?

A. Likely, yes.

Q. When you were -- tell me what the space looked like in New York, that you were subletting.

A. I had my own office there, my own room. It wasn't like a glass room, so like it was more -- I had a window, and I kind of did my own thing there. It's a one-man show. Like, most of my business had nothing to do with Brezel. I mean, yeah.

Q. Sir, during this time period --

A. I brokered some deals for him.

MR. PICON: Answer his questions. Okay?

THE WITNESS: Go ahead.

Page 75

BY MR. HESKIN:

Q. Where were you living?

MR. PICON: At what time period?

BY MR. HESKIN:

Q. 2021.

A. In 14 -- my residence in New Jersey.

Q. Where in New Jersey?

A. I gave you that address already.

Q. Okay, you did.

How long of a drive was it from your New Jersey address to the Brooklyn address?

A. Like, it depends on the traffic, but like an hour and 10 minutes.

Q. Okay.

A. An hour.

Q. Why did you drive an hour and 10 minutes four days a week to go to New York?

MR. PICON: Objection to the form.

THE WITNESS: I'm not sure what the question is. Why not?

BY MR. HESKIN:

Q. What was the purpose? If you could -- couldn't you do whatever you were doing there at your home in New Jersey?

MR. PICON: Object to the form.

Page 76

THE WITNESS: People like going -- I know there are some people that work from home, especially since Covid, but there are people who enjoy going out to an office.

BY MR. HESKIN:

Q. Okay. Were there people there? I thought you testified earlier you had a desk and it was you there in your office.

A. I was the only person in my office, but outside of my office there were people.

Q. Who?

A. The other private offices, I don't remember. Yatzi Brezel had an office a few doors down, a few offices down.

Q. Anyone else?

A. Yes. I don't know the names.

Q. Who?

MR. PICON: He just said he doesn't know the names.

THE WITNESS: I don't know. Back office people. I don't know their names. But I know it wasn't Isaac Wolf. That I can tell you.

MR. HESKIN: Oh?

MR. PICON: Whenever you find a good breaking point, let's take five. We have been going

Page 77

over an hour.

MR. HESKIN: Yeah.  Just give me a second.  I just want to finish up on these banks.

BY MR. HESKIN:

Q.    When is the last time there has been a transaction in the Spin bank accounts?

A.    I don't know.

Q.    As you sit here today, you don't know if there is any actual --

A.    You're talking about MCA transactions?

Q.    I'm talking about any transaction whatsoever.  Has there been a deposit?  Has there been a withdrawal?

A.    Well, there's legal fees that have to get paid from there and stuff like that, so yeah.  And there's payroll once a week.  But it --

Q.    And that comes out of a Spin bank account?

A.    Yes.

Q.    Do you know the bank account number?

A.    Not off the top of my head, no.

Q.    Who's getting paid, you and Isaac?

A.    Correct.

Q.    Okay.  Is your grandfather involved in Spin?

Page 78

MR. PICON: Object to the form of the question.

THE WITNESS: What?

BY MR. HESKIN:

Q.    Is your grandfather involved in Spin?

MR. PICON: Same objection.

THE WITNESS: I don't -- no.

BY MR. HESKIN:

Q.    He's never invested money in it?

A.    No.  I don't know how -- no.  Next, next question.

Q.    Has your father ever invested money in Spin?

MR. PICON: Object to the form of the question.  What relevance does that have, who has invested in it?

THE WITNESS: Yes.

MR. HESKIN: Well, I want to know -- it actually goes into who is actually putting the money into these accounts.  Because I have reason to believe the testimony he has given is not true.

MR. PICON: What relevance is it?  Spin funded the account.  It says it on the document.  I don't get your point.

THE WITNESS: What's not true?

Page 79

MR. PICON: Just relax.

MR. HESKIN: David, you're wrong.

MR. PICON: Well, we will see.  But I think these questions, again, are just -- make no sense and they're not relevant, but I'm going to give you a little leeway.

THE WITNESS: Um --

MR. PICON: Just let him ask the question.

THE WITNESS: So what's the question?

BY MR. HESKIN:

Q.    Has your father ever funded, in any way, any Spin deal?

A.    I don't think so.

Q.    Okay.  Does your father or grandfather, do they have a financial interest in any of the Leer transactions?

A.    No.  Not -- no.

Q.    Okay.  Can you identify all of the persons or entities that have a financial stake in the Leer transactions?

MR. PICON: When you say the Leer transactions, which ones?

MR. HESKIN: Let's talk about the loan.

Page 80

MR. PICON: The loan.

THE WITNESS: The loan?  All the people that have a financial interest in it?

BY MR. HESKIN:

Q.    Yes.

A.    As of today?

Q.    At the time of the loan.

A.    At the time of the loan?  So like participation?

Q.    Anyone that invested money in it.

A.    Just Gabe Isaacov and Hi Bar.

Q.    And that would be Joel Getter?

A.    I don't know.  I don't know who -- that interest doesn't exist anymore, but I don't know.

Q.    Okay.  Hi Bar doesn't exist anymore?

A.    Hi Bar winded down operations, yeah, and they don't -- they -- that interest doesn't exist.

Q.    So who would get paid on the loan if Hi Bar doesn't exist?  Who does it go to?

A.    It would go to me.

Q.    Did you buy out Hi Bar's interest?

A.    It's -- yeah.  It's complicated.  They owe me, Hi Bar owes me money, but yeah.

Page 81

Q.    All right.  So you bought out Hi Bar's interest?

MR. PICON: Object to the form of the question.

BY MR. HESKIN:

Q.    Did you buy out Gabe's interest, as well?

A.    No.

Q.    Okay.  So right now it's 50 percent to you and 50 percent to Gabe?

MR. PICON: Object to the form.

THE WITNESS: It's -- it's not fully figured out.

BY MR. HESKIN:

Q.    Well, what is it, as you sit here today?

MR. PICON: Object to the form.

THE WITNESS: It's not fully figured out.  Yeah.

BY MR. HESKIN:

Q.    Well, I want to know who, who has -- who should be the proper plaintiff here.  So tell me whose got the financial interests in this loan.  Is it -- it's not -- you told me it's no longer Hi Bar; right?

Page 82

MR. PICON: Object to the form of the question.  You're asking for a legal conclusion.  The plaintiff is Spin Capital.

MR. HESKIN: Okay.

THE WITNESS: Okay.  No document is -- Hi Bar doesn't have any documented interest, or Gabe -- it's complicated.  It has to be documented.  And it would be like 75 percent me and 25 percent Gabe.  But it happens to be -- it's not that -- it has to get figured out.

But Spin is the plaintiff over here.  Spin is the funder.  Spin is the one that retained an attorney to draft docs.  And I was the representative of Spin on those transactions.

BY MR. HESKIN:

Q.    Was there a retainer for the attorney?

A.    There was a $30,000 fee that was paid. I think the attorney hired a California law firm, as well.  I don't know the full details, for due diligence.

Q.    Did you actually have a physical document, retainer, with the lawyer that laid out the $30,000 fee?

A.    I don't remember.  I don't think there is a retainer.  Maybe it was an invoice.  I don't

Page 83

know.

Q.    When was the $30,000 fee agreed?

MR. PICON: Objection to form.

THE WITNESS: Before the loan was issued.

BY MR. HESKIN:

Q.    And how was that determined?

A.    I believe your client had an attorney that dealt with Bouskila.

Q.    My client had an attorney that dealt with Bouskila and agreed to pay Bouskila $30,000, that's your understanding?

A.    I believe you client signed, yes, for Spin to pay -- that he would pay the legal fees, correct.

Q.    Was Bouskila representing my client?

A.    No.  But a lot -- the borrowers pay the lender's fees a lot of time.  Forget about a high risk loan like this one, but I think with big banks, the borrowers a lot of times have to pay the lender's closing fees, legal fees.

Q.    Who was Bouskila representing?  Was he representing Leer or --

A.    No, he was representing Spin, yes. And your client was paying Spin's legal fees, so to

Page 84

draft the loan and for the UCC research and due diligence and look at the policies, et cetera.

Q.    And why did he do that?

MR. PICON: Why did who do what?

THE WITNESS: I can't answer on behalf of your client.

BY MR. HESKIN:

Q.    I'm asking why did Leer agree to pay the $30,000?

MR. PICON: Object to the form of the question.

THE WITNESS: Why not?

MR. PICON: Is this a good breaking point?  We've been going for --

MR. HESKIN: Hold on, hold on. Actually, I'm almost there.

MR. PICON: Okay.

BY MR. HESKIN:

Q.    So do you understand whether or not Mr. Leer was required to pay the 30K or he just agreed to pay the 30K?

MR. PICON: Object to the form of the question.

THE WITNESS: What's your question? Leer instructed me to wire those funds to Bouskila,

Page 85

out of the proceeds.

Like, Leer was -- yeah, Leer was -- he didn't just instruct me to pay the legal fees. I believe that his signature says to pay the legal fees, in the loan docs.

BY MR. HESKIN:

Q. Okay. Did the loan docs require him to pay Bouskila's fees?

MR. PICON: Object to the form.

THE WITNESS: Yes.

MR. PICON: Calls for a legal conclusion.

BY MR. HESKIN:

Q. They did?

A. Yes.

MR. PICON: Object to the form.

THE WITNESS: Yes, 100 percent.

BY MR. HESKIN:

Q. Did you review the loan docs before they were signed?

A. I paid an attorney to do that.

Q. Okay. Who instructed Leer to pay the 30K to Berkovitch?

MR. PICON: Object to the form.

THE WITNESS: Leer instructed Spin to

Page 86

wire 30K to Berkovitch and it would get deducted from -- it's on the disbursement schedule.

Leer instructed me, as a representative of Spin, to wire the $30,000 to Berkovitch.

I think he had a lawyer, Kirk Walker or something, who dealt with Bouskila. I don't remember.

MR. HESKIN: Okay. This is a good time to break. We'll come back to it.

Let's do 10 minutes?

MR. PICON: Sure. Sounds good.

(Whereupon, a recess was taken).

BY MR. HESKIN:

Q. Welcome back, Mr. Lubin.

A. Hey.

Q. Okay. I want to go back to the bank statements. So how is Spin currently being funded?

MR. PICON: Object to the form.

THE WITNESS: I'm not sure what your question is.

BY MR. HESKIN:

Q. Well, how is it making money?

A. I had -- it funded a bunch of deals. I had to put money, personally, into it. I don't

Page 87

know.

Q. How is money getting into its bank accounts right now?

MR. PICON: Object to the form.

THE WITNESS: I don't have an exact answer to your question. Depending -- depending on the time.

BY MR. HESKIN:

Q. Well, how about in the last month, how did money get into -- has any money gotten into its account in the last month?

MR. PICON: Objection.

THE WITNESS: I've --

MR. PICON: Hold on.

There's no relevance to this question.

MR. HESKIN: There is. There is.

MR. PICON: And it doesn't relate to the issue that we discussed when the witness was not in the room, to which I won't refer to. If that's what you're thinking --

MR. HESKIN: It does.

MR. PICON: Okay.

MR. HESKIN: I'll get into it.

MR. PICON: Then I'm going to direct him not to answer, because it does not relate to

Page 88

that.

MR. HESKIN: It does.

MR. PICON: Okay. I've directed him. This is harassment. That's what this is.

MR. HESKIN: Okay.

BY MR. HESKIN:

Q. Did you personally put in money to the Spin accounts, in the last year?

MR. PICON: Directing you not to answer it.

THE WITNESS: It's possible.

MR. PICON: I said I'm directing you not to answer the question.

THE WITNESS: Oh.

BY MR. HESKIN:

Q. You understand that the receiver's getting paid advances to pay premiums in this case; right?

A. Yes.

Q. Who is making those payments?

A. I've been making the payments.

Q. You, personally?

A. Not me, person -- it's -- how it's -- I can't remember the exact answer to your question, but if you want to -- yeah, go ahead.

Page 89

Me, personally?  It's part -- it's being advanced -- I don't know how to answer your question.  You have got to get more specific.

Q.    I don't --

A.    I mean --

MR. PICON: Let him ask the question.

THE WITNESS: Yeah.

BY MR. HESKIN:

Q.    I don't know how easier of a question I can get.  Are you personally paying the receiver the money?

A.    I mean, Spin is paying the money and it comes from -- I made arrangements with Gabe to -- I put out the first, like 1.5 million dollars, approximately, and then I worked a deal, which hasn't really been fully worked -- with Gabe, that hasn't -- yeah, it's not fully worked out, but yeah, the money has been coming.  I'm not sure where he has been getting the money from.

Q.    Okay.  The 1.5 million dollars that was put up, is that your personal money?

MR. PICON: Object to the form.

THE WITNESS: That's a legal question.  It may -- I think it is.  I think it's my personal money.  I'm not sure.  Spin's money?  I don't know.

Page 90

That's a legal question.

BY MR. HESKIN:

Q.    Does it come from your personal account and go into a Spin account or does it go directly from your personal account to the receiver?

A.    No, it goes from --

MR. PICON: Object to the form.

THE WITNESS: Right now?

BY MR. HESKIN:

Q.    Yeah.  In the last year.  How does the receiver get paid?

MR. PICON: Object to the form.  Asked and answered.

THE WITNESS: Spin sends a wire.  The money gets -- whatever, it comes from a Spin account.

BY MR. HESKIN:

Q.    Okay.  And how did the money get into that Spin account?

MR. PICON: Object to the form.  Asked and answered.

THE WITNESS: From Gabe.  Gabe took care of it.  I'm not sure how.

BY MR. HESKIN:

Q.    Okay.  After, after your 1.5 was put in

Page 91

there?

A.    Yeah.

Q.    And did you have any investors in that 1.5 million?

MR. PICON: Object to the form of the question.

THE WITNESS: No.

BY MR. HESKIN:

Q.    All right.  And if the pay-out comes, if Leer pays back the loan, who does that money go to?

MR. PICON: Object to the form of the question.  Asked and answered.

THE WITNESS: It goes to me.  I'll have to figure out -- I mean, it goes to me and Gabe.  I have to figure out exactly what the exact structure is.

BY MR. HESKIN:

Q.    All right.  And what experience do you have in the life insurance business?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't have any.

BY MR. HESKIN:

Q.    Okay.  Have you hired anyone to look at

Page 92

the policies that are being paid right now?

A.    Yeah, my -- I hired the same attorney that I hired to draft the docs.

Q.    Okay.  Is someone reviewing the medical records --

A.    I think --

MR. PICON: Let him finish the question, please, Josh.

BY MR. HESKIN:

Q.    Is someone reviewing the medical records of the persons insured under these premiums, to ensure that it's going to be profitable to continue making these premium payments?

MR. PICON: Object to the form of the question.

THE WITNESS: I think my attorney reviewed or worked with someone to review some of the medical records.  It was very -- it all had to be done very, very quick.  I think the estimated value was -- the loan was intended to be over-collateralized.  I think the estimated value is 4- to 5 million dollars, at the time.

BY MR. HESKIN:

Q.    That's not really an answer to my question.  My question --

Case 1:24-cv-08515-AS    Document 160-2    Filed 05/26/26    Page 25 of 98
SPIN CAPITAL, LLC, et. al. v.                                                    AVRUMI LUBIN
GOLDEN FOOTHILL INSURANCE SERVICES, LLC                                          July 25, 2024

Page 93

A.    I think --

MR. PICON: Let him ask the question. Okay?

THE WITNESS: Okay.

MR. PICON: Don't interrupt him and he won't interrupt you.

BY MR. HESKIN:

Q.    Okay.  So you understand that premiums are being paid on these policies; right?

A.    Yeah.

Q.    Okay.  And you're the one that -- are you the one that's authorized these premiums to be paid?

MR. PICON: Object to the form.

THE WITNESS: I guess so, yeah.

BY MR. HESKIN:

Q.    Okay.  Are you doing any analysis to understand whether or not it would even be profitable to continue to make these payments?

MR. PICON: Object to the form of the question.

THE WITNESS: We attempted to do an analysis, but your client refused to cooperate.  So we've just been doing our best to preserve the collateral, at this point.

Page 94

BY MR. HESKIN:

Q.    Do you have any idea as to whether or not you're throwing good money going after bad?

MR. PICON: Object to the form of that question.  Asked and answered.

THE WITNESS: We don't have another option, do we?

BY MR. HESKIN:

Q.    You could request the medical records and perform an analysis; right?

A.    We did request the medical records and your client refused to cooperate.

Q.    When?  When did my client refuse to cooperate?

A.    I think there was a motion to compel granted from the receiver trying to get the medical records, to do an analysis.

Q.    Are you saying that the receiver is unable to get this analysis?

A.    Yeah.  He told -- the receiver has been trying to get the medical records.  It's to try to get this case resolved and get an estimated value on the collateral.

Q.    What's the total amount due on the loan?

Page 95

A.    I'm not sure.  I have to -- the numbers have to be calculated.  They haven't been calculated, yeah, in a year or two.

Q.    Do you know your demand?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't have the exact calculation, but if we're ready to get this resolved and get the collateral evaluated, I'm sure my attorneys can figure out what the balance is within a few weeks or less.

BY MR. HESKIN:

Q.    What's your understanding of the collateral?  Is it your understanding that you just get to take the policies?

MR. PICON: Object to the form of the question.  Which policies?

MR. HESKIN: The life insurance policies.

MR. PICON: Which life insurance policies?

THE WITNESS: I'm not sure what your question is, to be honest.  So it was my -- go ahead.

BY MR. HESKIN:

Page 96

Q.    There are life insurance policies that were used to collateralize the loan, according to you; right?

A.    Yes.

Q.    Okay.  And is it your understanding that Spin gets the full pay-outs under all those policies now, because of the default?

MR. PICON: Object to the form of the question.  Calls for a legal conclusion.

THE WITNESS: That's a question for my lawyers.

BY MR. HESKIN:

Q.    I'm asking for your position in this case.

MR. PICON: Same objection.

THE WITNESS: I think -- yeah, I got to talk to my lawyers about that.

BY MR. HESKIN:

Q.    Well, you don't know whether or not your claim is for the full policy rights or for the loan amount plus interest?

MR. PICON: Object to the form of the question.

THE WITNESS: That's a legal question. I don't know what the damages are.  I don't know how

Page 97

they're going to be calculated. I know there is also premium payments. I don't know. I would have to sit down and discuss that with my lawyer. But I believe the damages are significant.

BY MR. HESKIN:

Q. How much in actual principal has Spin laid out?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't have the exact number in front of me. I think it's like 2.7 million dollars.

BY MR. HESKIN:

Q. In principal?

A. Correct.

Q. That's 2.7 million dollars that came out of Spin's bank account?

A. That's not what you just asked me. But the principal amount is about 2.7 million dollars.

Q. What's the actual amount of money that Spin put out onto the street, that money, the amount of money that actually came out of its bank account?

A. That wire --

MR. PICON: Objection to the form of

Page 98

the question.

THE WITNESS: How much was the Spin wire? 2.5 million dollars. There was the origination fee for $200,000 which is included in the principal.

BY MR. HESKIN:

Q. Who did that 200K go to?

A. Me.

Q. For doing what?

A. For putting together the deal, from dealing with attorneys. Yeah.

Q. So the 200K went directly in your pocket?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't know if it went directly in my pocket, but it was a fee that I was charging. It may have gone directly in my pocket. I don't know.

BY MR. HESKIN:

Q. How much money went to -- so tell me how the money flow happened when the payments were coming in. What bank account did it go into and what happened to the money from there?

MR. PICON: Objection to form. We're

Page 99

talking about the Spin loan still; right?

THE WITNESS: I would have to look into it.

MR. PICON: Stop.
Money coming in?

MR. HESKIN: Yeah.

BY MR. HESKIN:

Q. When Leer paid back the loan what bank account did he pay it to?

A. I believe he paid it to Spin TD or Bank of America. I don't remember, at the time.

Q. Okay. And then when money, when that money would come in, what would you do with it?

MR. PICON: Objection to form.

THE WITNESS: It would -- I would have to -- exact tracing? It probably went into the account. I don't know. It went to -- I'm not sure. I'd have to look into it.

BY MR. HESKIN:

Q. Did you disburse any of that money to yourself or to Gabe or to Joel?

A. Probably not. It would probably be there for a few weeks and maybe it would get put on a sheet -- my admin is only part-time.
You're talking about internally? Like

Page 100

the physical money may have stayed in that account and it might have gotten applied to people that participated or invested in the deal. I don't know.

Q. Well, how many people participated or invested in the deal?

MR. PICON: Objection to form. Asked and answered.

THE WITNESS: Three, including me.

BY MR. HESKIN:

Q. Who is paying for your attorneys?

MR. PICON: Objection to the form. How is that at all relevant?

BY MR. HESKIN:

Q. Is it coming out of a Spin account?

A. It's possible.

Q. Or are you personally paying it? Is Gabe paying it? Who's paying the attorneys?

MR. PICON: What relevance is that whatsoever, who's paying for his lawyers?

THE WITNESS: I don't know.

MR. PICON: You don't have to answer it.

BY MR. HESKIN:

Q. Do you get invoices?

A. It's possible.

Page 101

Q. Does Spin Capital get invoices for the attorneys?

A. I told you it's possible.

Q. Well, you are the president and CEO of Spin Capital; right?

A. Titles are irrelevant, but I'm a member, yeah. I'm the only member.

Q. You're the only member; right?

A. Yes.

Q. Are you claiming that the Leer defendants have to pay your attorney's fees in this action?

MR. PICON: Objection to the form.

THE WITNESS: That's a legal question, but I believe that the Leer defendants are obligated to pay my attorney's fees, correct, per the contract.

BY MR. HESKIN:

Q. How much of -- what's that amount, today?

A. I don't have an exact number, but it's a lot of money.

Q. Have they been paid?

A. I believe so, yes.

Q. But you don't know who's paid them?

Page 102

A. I'm assuming Spin pays it. I don't understand what your question is.

Q. Well, I'm just trying to find out --

A. Yeah, paid by Spin. It's billed to Spin and it's paid by Spin, yeah.

Q. Okay. So if I were to get a record of those invoice payments or wire payments, they would show that they're coming from a Spin account?

MR. PICON: Objection to form.

THE WITNESS: Yes.

BY MR. HESKIN:

Q. Okay. Are you aware that there is a cap on the fees that can be charged in this case?

MR. PICON: Object to the form of the question. Calls for a legal conclusion.

THE WITNESS: I don't believe that's the case. And that would be something I would discuss with my attorneys.

BY MR. HESKIN:

Q. Have you reviewed the contract?

MR. PICON: Object to the form. Asked and answered.

BY MR. HESKIN:

Q. Have you?

A. I have hired attorneys to review it.

Page 103

Yeah, I've taken a brief look at it, yes.

Q. Okay. Did you read the part that said that the attorney's fees are liquidated at 25 percent of the funded amount?

MR. PICON: Object to the form of the question.

THE WITNESS: I'm not defining what the document says. I disagree with -- that there is a cap on the legal fees. There is also a provision for preserving the collateral. Yeah, there's a bunch of different -- yeah, I'm not defining what the -- the document speaks for itself. You can go fight with my attorneys.

BY MR. HESKIN:

Q. Okay. As the 30 -- as the corporate representative, how much in attorney's fees are you seeking today?

A. I don't know what --

MR. PICON: Asked and answered.

A. -- the exact number is, but it's a significant amount of money.

Q. Okay. Do you --

A. It's a significant amount of money.

Q. As the corporate representative, how much is due and owing under the loan?

Page 104

MR. PICON: Asked and answered.

THE WITNESS: I already answered that question. I don't have an answer, at this moment.

BY MR. HESKIN:

Q. What did you do to prepare for that question?

A. I didn't cal -- this is -- what did I do to prepare? I did not calculate the balance. It hasn't been calculated. I think when -- it takes time. Yeah. There's a lot of legal fees. I don't think it's been calculated in over a year. But as soon as this matter is going to get resolved, I'm sure it will get calculated very quickly.

Q. Okay. Does Spin currently have any lawsuits outstanding against it?

A. I think it may have a few. I have to -- I have to double check. I try to stay out of the lawsuits as much as possible. I think the majority of them, of any lawsuits were dismissed.

Q. Okay. How many lawsuits are you personally involved in?

MR. PICON: Personally, meaning he's named personally?

THE WITNESS: I don't know.

BY MR. HESKIN:

Page 105

Q.   Yeah, you, personally.

A.   That are active?

MR. PICON: He's asking you, personally. He's not asking about Spin, now. You, personally.

THE WITNESS: Without Spin being in it?

BY MR. HESKIN:

Q.   Just you, personally.

A.   I think zero.

Q.   Zero?

A.   I think so.

Q.   Is it your testimony that you have zero legal proceedings against you right now?

A.   No.

MR. PICON: Other than this case; right, Shane?

THE WITNESS: No, you're talking about -- Spin has legal proceedings, with maybe Josh Lubin listed as an individual, I'm not sure. But you're talking about legal proceedings where Spin is not a defendant, as well?

BY MR. HESKIN:

Q.   Just you.

A.   I don't think there's any. That are

Page 106

just -- I think they all have Spin in them.

Q.   There are zero legal proceedings, as of right now, against Josh Lubin, personally?

A.   No, there is, with Spin. I think there's a few. There's one from you. Another one from you.

Q.   Unrelated to Spin, where it's just you, personally.

A.   I'm not -- not that I recall. I don't know. I don't want to answer your question incorrectly. I don't want to guess. I don't think so.

Q.   There are no legal proceedings against you in the State of Florida?

MR. PICON: Objection to the form.

THE WITNESS: That's with Spin.

BY MR. HESKIN:

Q.   Just you.

A.   I don't think just me, no. That case that you're referring to has Spin listed in there, too.

Q.   Have you been to the State of Florida since -- in 2024?

A.   I was just there on Monday.

Q.   How many times have you been --

Page 107

A.   Not on Monday. I don't know. How many times in the last six months? Not many.

Q.   And it's your testimony --

A.   Maybe January I was there, or December. I don't remember.

Q.   And it's your testimony that you have had zero legal proceedings brought against you, personally, in the State of Florida, in 2024?

MR. PICON: You're talking about civil proceedings?

THE WITNESS: You're talking about civil proceedings?

BY MR. HESKIN:

Q.   I'm talking about any proceedings.

A.   Oh, so that's another question. There may have been, yeah.

Q.   Well, what other proceeding is there?

MR. PICON: Hold on. What relevance would a non-civil proceeding have to this case?

MR. HESKIN: Credibility.

MR. PICON: Credibility?

MR. HESKIN: Yeah. He just testified that he didn't have any legal proceedings against him, at all, and I happen to know that he lied to me just now, under oath.

Page 108

MR. PICON: No, I think he misunderstood, until you made the clarification, because he said --

MR. HESKIN: Well, then that's why we will --

MR. PICON: Let me finish my thought. Stop talking for a moment.

He said civil proceeding. If you are now referring -- when you said legal proceedings, he didn't take it that way, because all day we have been talking about civil proceedings.

So you're now asking him about non-civil proceedings and my question is what relevance, then you responded credibility.

So he misunderstood your question. There's no --

MR. HESKIN: Okay. Well, we can -- we can let the fact finder figure out whether or not there was a lapse in memory or misunderstanding.

BY MR. HESKIN:

Q.   So do you want to now correct your statement to my prior question?

A.   Yes. There's a proceeding, I believe the -- I believe it was dropped on Monday.

Q.   Is that the only non-civil legal

Page 109

proceeding that was ever filed against you?

A. In my lifetime? I -- I don't think I need to answer that question.

I think the answer to the question is no. I don't know. But, yeah, are you -- not in Florida? Are you talking New York, New Jersey?

Q. I'm talking about anywhere.

MR. PICON: It's just a yes or no, do you know of any non-civil proceeding? Just yes or no. He's not asking you what it is, just do you know.

THE WITNESS: There may have been something when I was a juvenile, but that's not --

BY MR. HESKIN:

Q. I'm not interested in that. I'm not interested in that.

Anything within the last five years?

A. Not -- there was -- there was an incident, but there was no case.

MR. PICON: He's just asking about proceedings, actual proceedings brought that are non-civil in nature. That's all. Not anything about the rest, just an actual proceeding.

THE WITNESS: Oh. In the last five years? No, I don't think so.

Page 110

BY MR. HESKIN:

Q. Okay. How many -- so you mentioned a civil proceeding in Florida. What's that about?

A. That's with Spin.

Q. Okay, it's with Spin. What's it about?

A. It's a civil RICO proceeding, like what you're bringing.

Q. Who's bringing it?

MR. PICON: Excuse me, what's the question?

MR. HESKIN: Who is bringing it?

MR. PICON: Who is the plaintiff?

THE WITNESS: The bankruptcy trustee.

BY MR. HESKIN:

Q. What's the name of it?

A. I don't know. You can go -- you know how to look this stuff up yourself.

Q. You don't know who is suing you, the merchant that's suing you?

A. Oh, it's Excell Auto Group.

It's a frivolous claim, though. Next.

Q. Why is it frivolous?

A. They already ruled on it in another state. It's frivolous.

Q. Who ruled on it in another state?

Page 111

A. In New York, it was already ruled on.

Q. The Excell Auto Group case was ruled on?

A. Uh-huh.

Q. Yes?

A. Yep.

Q. So it's your understanding that the United States Bankruptcy Trustee is bringing a frivolous lawsuit?

A. Yes.

Q. Are any of the Go Fund -- is Go Fund involved in that case?

A. Which case? Not in my case.

Q. In the trustee case?

A. Not in my case.

Q. Okay. Your case is just Excell Auto Group and Spin?

A. I believe so, yeah.

Q. Who makes all the decisions with respect to Spin Capital?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't know what your -- explain to me what your question is.

BY MR. HESKIN:

Page 112

Q. Who has authority to make all business decisions with respect to Spin Capital?

A. In what respect? In like sending a bank wire? That's me, in my sole discretion.

Q. Who has authority to enter into MCA deals or broker deals?

A. The broker deals? Just me.

Q. And the bank accounts, those were all opened up through you?

A. Yeah.

Q. Correct?

A. Uh-huh.

Q. All right. How did Spin get a merchant bank account? Is it through a processor?

MR. PICON: Objection to the form.

THE WITNESS: Yeah, with the -- with Optimum Bank.

BY MR. HESKIN:

Q. They have their own processor?

MR. PICON: Object to the form. Who's the they?

THE WITNESS: Who?

BY MR. HESKIN:

Q. Optimum.

A. Yeah, Optimum has their own processer.

SPIN CAPITAL, LLC, et. al. v.
GOLDEN FOOTHILL INSURANCE SERVICES, LLC

AVRUMI LUBIN
July 25, 2024

Page 113

Yeah.

Q.    Have there ever been any complaints by Optimum, from merchants, that Spin had overcharged or over-debited?

A.    No.

MR. PICON: Objection to form, as to relevance.

BY MR. HESKIN:

Q.    What branch at Optimum do you deal with?

A.    I told you --

MR. PICON: Object to form.

A.    -- I've never been to an Optimum branch.

Q.    Have you ever had any contact with Optimum?

A.    Yeah.  It's all done remotely.  I believe their only branches are in Florida.  I believe.  I could be wrong about that, though.  I don't know.

Q.    The payments from Spin, were they, in this case or from the Leer defendants, were they sent to the Optimum bank account in Florida?

MR. PICON: You're talking about the Spin loan or Hi Bar?

Page 114

MR. HESKIN: Yeah, Spin, the Spin loan.

THE WITNESS: I think they were -- I don't have -- I think they were all sent to either TD Bank or Bank of America.  I don't remember if Bank of America existed yet.  I don't think money was -- I could be wrong, but I believe it was all, it was all to Spin TD.

I believe your client wired the funds.

MR. PICON: Wait for him to ask the question.

BY MR. HESKIN:

Q.    What were you saying?

A.    I believe your client wired the funds.

Q.    All right.  What's Genesis LS Fund?

A.    It's one of the defendants in this case.

Q.    What do they do?

A.    That's a question for your own client.  He's the gentleman who's in the industry.

Q.    Well, you purchased or you brokered -- you brokered an agreement that purportedly purchased their receivables, no?

MR. PICON: Objection to the form.

THE WITNESS: What does that have to

Page 115

do with what business the Genesis LS Fund is in?

BY MR. HESKIN:

Q.    I'm just trying to see if you even understood what they do, what receipts you were purchasing.

A.    I didn't purchase any receipts, sir.  I can't answer on behalf of BMF or Hi Bar.  Spin did not purchase any receipts here.

Q.    You brokered --

A.    Spin is just one entity.  Yeah.

Q.    You brokered an agreement that did purchase those receipts; right?

A.    That's possible.  What does that have to do with anything?

Q.    I want to know how -- did you get bank statements from Genesis LS Fund?

MR. PICON: Objection to the form.

THE WITNESS: I don't remember.  I mean, we can, you know, ask BMF or Hi Bar.

BY MR. HESKIN:

Q.    Is the Genesis LS Fund even operating?

MR. PICON: Objection to form.

THE WITNESS: I have no -- I didn't do any of the due diligence here.  I believe MCA funders would have done a bank verification log in

Page 116

and download all the statements.  But I didn't need to do that for the Spin loan.  I had an attorney.  Yeah.

BY MR. HESKIN:

Q.    Okay.  Who is KTL Holdings?

A.    I believe it's one of the defendants in this case.

Q.    What do they do?

A.    I don't know.  That's a question for your own client.  That's in the life settlement, maybe brokerage or life settlements, I don't know.

Q.    Okay.  Did you ever get bank statements from KTL Holdings?

MR. PICON: Same question, are you talking about in the Spin loan or MCA agreements, which one?

BY MR. HESKIN:

Q.    On the MCA agreements.

A.    I have no idea.  I don't -- yeah, it's not my department.  It's very possible.  There was a bunch of entities.  I don't know if the funders got the bank statements themselves or maybe Mr. Leer sent them to me and I forwarded it to the funders.  I honestly -- yeah.

Q.    What does Eldorado Hills Insurance

Page 117

Solutions, Inc. Do?

A.    I think it's one of the affiliated defendants.

Q.    Do you know where they're located?

A.    I have no idea.  Oh, I think, California.

Q.    Okay.  And what about Lone Wolf Insurance Services, what do they do?

A.    Same -- I think -- I don't know. Something in the insurance field, insurance brokerage field or something.

Q.    Okay.  What were their annual revenues?

A.    You're asking the wrong person.

Q.    Didn't you give a 2.7 million dollar loan to them?

A.    That had nothing to do with how much revenue -- it was collateral, and the collateral was allegedly worth, potentially, over $5 million.  It doesn't make a difference whether the guy had a bank statement, no bank statement.  Yeah.

Q.    Okay.  So Golden Foothill Insurance --

A.    Does your client have the bank statements?

MR. PICON: Don't ask the questions. You're here to answer the question.  He's here to

Page 118

ask them.

THE WITNESS: Yeah.

BY MR. HESKIN:

Q.    So Golden Foothill Insurance Services, what do they do?

A.    The same answer as the other entities that you asked me about.

Q.    What do they do?

A.    I don't know, but the name sounds like they're in the insurance service industry.

Q.    What are their revenues?  What were their revenues at the time you issued this loan?

A.    I don't believe my attorney checked what their revenues were for any of the entities.

Q.    Did you check?

A.    No.

Q.    Did you ask?

A.    I'd have to ask my attorney.  I don't know.  I didn't check, myself.  I don't think -- I don't think my attorney checked.

Q.    Okay.  Did you have any understanding of the ability of these companies to repay the 2.7 million dollar loan?

A.    That wasn't my primary focus.  I think I believed I was over-collat -- that Spin was

Page 119

over-collateralized.  Yeah.

Q.    Okay.  Are you licensed to provide loans in California?

MR. PICON: Object to the form of the question.

THE WITNESS: No.

BY MR. HESKIN:

Q.    Have you ever been licensed to provide loans in California?

MR. PICON: Same objection.

THE WITNESS: No.

BY MR. HESKIN:

Q.    Same questions for Spin, Spin is not licensed to provide loans in California; right?

A.    That's correct, on behalf of Spin, yeah.

Q.    And BMF is not licensed to provide loans in California, either?

MR. PICON: Same objection.

THE WITNESS: You have to ask BMF that.

BY MR. HESKIN:

Q.    Okay.  Is Hi Bar licensed to provide loans in California?

A.    I have no idea.

Page 120

Q.    You knew these entities were located in California, at the time; right?

MR. PICON: Object to the form of the question.

THE WITNESS: I didn't -- I don't know the answer to your question.  I knew Leer was located in California.  The entities and their businesses or office locations, yeah, I don't know.

BY MR. HESKIN:

Q.    And your communications with Mr. Leer were with him in California; right?

MR. PICON: Object to the form of the question.  What do you mean?  Was Mr. Lubin in California or --

MR. HESKIN: No, no, no.

MR. PICON: -- was Mr. Leer?

BY MR. HESKIN:

Q.    Mr. Leer was located in California. When you would communicate with Mr. Leer, you would communicate with him while he was physically located in California; correct?

A.    It's very possible.

Q.    And your communications that you had with Mr. Leer were when you were physically located in New Jersey; right?

Case 1:24-cv-08515-AS    Document 160-2    Filed 05/26/26    Page 32 of 98
SPIN CAPITAL, LLC, et. al. v.                                          AVRUMI LUBIN
GOLDEN FOOTHILL INSURANCE SERVICES, LLC                               July 25, 2024

Page 121

MR. PICON: Object to the form of the question.

THE WITNESS: They probably would have been in New York, but yeah.

BY MR. HESKIN:

Q. At 1:00 in the morning, it would have been in New York?

MR. PICON: Object to the form of the question.

THE WITNESS: Hey, I have no idea.

BY MR. HESKIN:

Q. Do you understand that at the time of these MCAs that you put my client in, that he had other MCAs, as well?

MR. PICON: Object to the form of the question. Put him into? He was a broker, he's testified.

BY MR. HESKIN:

Q. Okay.

A. Yeah, I was just a broker. Do I believe there were others? I think Mr. Leer was very familiar with the MCA space. I think there was -- there were other positions, but I would be in no position whatsoever to -- that would be the funders' responsibility on their own, to do their own due

Page 122

diligence, whether it was current positions or not, but yeah.

Q. I'm just asking, did you know he had other MCA positions at the time?

A. I think I knew. I think he made me aware of it.

Q. Okay.

A. Did I convey that to BMF or Hi Bar? No, I'm not saying that. That's their own -- they got to do their own due diligence.

Q. So you knew that Leer had other MCAs, but you didn't trouble to share that with BMF or Hi Bar; is that your understanding?

MR. PICON: Objection to form. It mischaracterizes his testimony. He never said he knew.

So go ahead, you can answer.

THE WITNESS: First of all, I never said I hid anything from BMF or Hi Bar. I'm not even saying I knew for sure. But I'm saying I think that Leer, it wasn't his first time taking an MCA, there was either potentially previous MCAs he took or maybe he -- I don't know. It's not -- it's not -- yeah, it's not something I would focus on, that's for sure.

Page 123

BY MR. HESKIN:

Q. Isn't it typical that that's how you get your leads, is from other -- the fact that he had other MCAs out there?

MR. PICON: Object to the form.

THE WITNESS: I don't have an answer for your question.

BY MR. HESKIN:

Q. Well, you knew he had an MCA with Ben Isaacov; right?

MR. PICON: Object to the form.

THE WITNESS: I don't think -- I think that came later on, after the Spin loan. But yeah. But who cares? Yeah.

BY MR. HESKIN:

Q. And you also understood that this company, the companies that you were lending to were financially stressed; right?

MR. PICON: Object to the form of the question.

THE WITNESS: Are you talking about the Spin loan?

BY MR. HESKIN:

Q. Yes.

Page 124

A. I was very aware that he was in default with Hi Bar and BMF and that there was significant risk, yes.

Q. Okay.

A. And I think -- yeah.

Q. So the client was in default and financial stress, based on MCAs that you put him in; right?

MR. PICON: Object to the form of the question.

THE WITNESS: I was the broker on the deal.

MR. PICON: That mischaracterizes his testimony.

THE WITNESS: And you're talking about entities that potentially, allegedly had a lot of collateral. I thought there was significant risk. It appears there was a lot more risk than I anticipated. And were those entities tight on cash? I'm sure they were. It wasn't -- that's not -- yeah.

BY MR. HESKIN:

Q. Well, didn't my client actually send you text messages showing you that his bank accounts were in the negative?

Page 125

MR. PICON: Objection to form.

THE WITNESS: That's irrelevant as to whether the collateral is worth money or not. Yeah. Was -- was the specific entities not so trustworthy? Yeah, I'm sure they were. I'm sure there was a lot of risk. Turns out there was a lot more risk than anticipated.

BY MR. HESKIN:

Q. Well, they're sending you -- I just don't understand how you thought that any of these companies could afford to repay the 2.7 million dollars.

A. If this --

Q. How did you think they were able to pay?

A. That's not my job, to think about it. That's your client's job. You know, my job is to see if there's collateral. And personally, purportedly, if you look at the messages themselves, they would allege there would be millions of dollars coming in in the near future and this wasn't a big deal.

Yeah, that's -- I don't know. My responsibility is not --

Q. Did you ever get any bank statements before, from any of these companies, prior to

Page 126

issuing the 2.7 million dollar loan?

A. I'd have to ask my attorney. I don't -- I don't know. I don't think so. I don't know. That's the truth.

Q. But you understood that they were having cash flow issues; right?

MR. PICON: Object to the form of the question.

THE WITNESS: I understood that your client was in default with BMF and Hi Bar.

BY MR. HESKIN:

Q. Okay.

A. And was alleging that he had cash flow issues, yes.

Q. Okay. And were there any threats made to my client, of legal action, if he didn't pay Hi Bar or BMF?

MR. PICON: Objection to form.

THE WITNESS: I can't answer on behalf of those companies. Yeah.

BY MR. HESKIN:

Q. And you weren't copied on e-mails where there were legal threats made to my client?

A. I don't think so. But even if I was, I don't see how that -- yeah, like...

Page 127

Q. Did you demand that Mr. Leer continue to make --

A. I tried to help --

Q. -- payments?

A. I tried to help him get back on payments or after he was in default, to structure a payment plan. It's not something I wanted to do, but the funders would put pressure on me, kind of like you put us in this deal, or maybe I hadn't sent it for commission. Maybe I was focused on closing the next deal. Yeah, I'm sure I reached out to him a bunch of times.

Q. Okay. So when he sent you bank statements showing you that he had negative cash flow, you would share that with the MCA lenders; right?

MR. PICON: Object to the form of the question. He didn't testify that he got bank statements.

THE WITNESS: No, I don't know. I mean, it's possible I didn't, it's possible I did. Either way --

BY MR. HESKIN:

Q. Okay. Well --

A. -- I had no physical liability, to

Page 128

where I was obligated to forward statements or screen shots that Leer would send me, to the funders.

Q. Did you ever tell Mr. Leer that you were the lender behind all these loans?

MR. PICON: Object to the form the question. Calls for a legal conclusion.

THE WITNESS: No, I --

MR. PICON: Mischaracterizes his testimony.

THE WITNESS: I don't believe -- I believe I told Mr. Leer that if the deals don't get paid, I'm going to have my commission revoked or my 50 percent upside, potential upside in the BMF transactions. I think he was aware of that.

But I -- I don't think I lied to him. I don't know.

BY MR. HESKIN:

Q. You never told him that you were the owner of BMF and Hi Bar?

A. No. I don't believe I would ever -- that's not the case, so why would I tell him that? I don't think I would tell him that.

Q. Did you ever share a screen shot of a bank account with potentially over 50 million dollars in it?

Page 129

MR. PICON: Objection to form. Whose?

THE WITNESS: It's possible. It wouldn't be my bank account, though. I don't have 50 million dollars in my bank account.

BY MR. HESKIN:

Q. Whose bank account was it?

MR. PICON: Object to the form.

THE WITNESS: I don't know. Maybe -- I don't know.

BY MR. HESKIN:

Q. Well, did you represent to my client that it was your bank account?

MR. PICON: What bank account? You haven't established anything, Shane. You've got to have a predicate for the question.

THE WITNESS: It wouldn't be my bank account. It was an electronic -- did I possibly -- I still don't think I sent it. I know what you're talking about.

BY MR. HESKIN:

Q. Okay. You know what I'm talking about, so --

A. I'm not sure, but -- I don't know which -- is it this client?

Q. Yeah.

Page 130

A. It wouldn't be my bank account.

Q. Well, whose bank account was it?

A. It's irrelevant.

MR. PICON: Object to the form of the question.

BY MR. HESKIN:

Q. Why are you sending my client a bank account showing that you've got 50 million dollars?

MR. PICON: Object to the form. It mischaracterizes his testimony. He never said he sent a bank statement to Stefan Leer, much less that it had 50 million dollars, much less that it was his account. You're just messing up his testimony.

THE WITNESS: If, indeed, I did do something like that.

MR. HESKIN: Thank you for testifying on behalf of the witness.

MR. PICON: I'm not testifying. I'm simply saying you are misstating the record and you can't make a record like this, because it's objectionable. You have to take his answers and not misstate them in your questions.

BY MR. HESKIN:

Q. Did you ever send a text message to my client showing him a bank account with

Page 131

$48,092,806.27 in it?

A. I know -- if I sent -- if I sent something like that, it wasn't my bank account. And and I was maybe doing it to try to get the guy to pick up my calls, so I could get a deal on it, make a commission, like what I -- if I use specific words, it's irrelevant.

Yeah. But if I did something that was able to get someone's attention, letting them know there's money --

MR. PICON: He's asking you do you remember doing such a thing. That's what he's asking. Yes or no, do you?

THE WITNESS: I've definitely done things like that before.

MR. PICON: No, he's asking you do you remember doing it with Mr. Leer.

THE WITNESS: With Leer?

MR. PICON: Yes. Do you remember sending it to him?

THE WITNESS: Not with -- show me the messages.

MR. PICON: Just answer the question. Do you remember, yes or no, that's what he's asking.

THE WITNESS: I don't know.

Page 132

MR. PICON: Okay.

BY MR. HESKIN:

Q. Did you ever threaten my client with legal action if he didn't pay?

MR. PICON: MCAs or with respect to the Spin loan?

BY MR. HESKIN:

Q. Let's start with the MCAs.

A. I have no idea. I don't know.

Q. Do you have a Capital One account?

A. No.

Q. Who has a Capital One account?

MR. PICON: Object to the form.

THE WITNESS: I'm sure a lot of people do. Do you have a Capital One account? I don't know.

BY MR. HESKIN:

Q. Does your father have a Capital One account?

MR. PICON: Object to the form.

THE WITNESS: I have no idea.

BY MR. HESKIN:

Q. Does your grandfather have a Capital One account?

MR. PICON: Same objection.

Page 133

THE WITNESS: I don't know.

BY MR. HESKIN:

Q. Okay. The account with all this money in it that you flash to merchants, who owns that account?

MR. PICON: Object to the form of the question.

THE WITNESS: I have no idea.

BY MR. HESKIN:

Q. Is it a Capital One account?

MR. PICON: Same objection.

THE WITNESS: Well, I told you I don't know.

BY MR. HESKIN:

Q. All right. How long have you been aware of the 2.5 million dollar exception?

MR. PICON: Object to the form of the question.

BY MR. HESKIN:

Q. You can answer.

A. I don't know. It's something an attorney would have told me.

Q. You don't know how long you've known about it?

A. No.

Page 134

Q. Did you know about it at the time you entered into the loan with my client?

A. It would have been a conversation I had with my attorney, which would be privileged. But I sure did know that this loan was a legitimate and legal loan, yes.

Q. Okay. That just fit within the 2.5 million dollar exception; right, just barely?

MR. PICON: Object to the form of the question.

THE WITNESS: I answered the question.

BY MR. HESKIN:

Q. Did you ever text that 2.5 million dollar exception to my client?

A. I'm aware of that text message. I reviewed it with my attorney. Yeah. What's your question?

Q. Have you done other loans in excess of 2.5 million dollars with other clients?

A. No. This is it.

Q. This is the only loan that you've done in excess of 2.5 million dollars?

A. Uh-huh.

Q. Have you ever done any other loans with any other clients?

Page 135

A. No. Spin we're talking about? No.

Q. Okay. What about any other companies that you own or control?

A. I answered the question correctly.

Q. You've never done any other loans?

A. No, not -- maybe I brokered to other companies that I don't own or control, but no.

Q. But you've done MCAs, multiple MCAs; correct?

MR. PICON: Object to the form.

THE WITNESS: Possibly. I didn't do any MCAs with your client. Spin never issued any MCAs. Yeah.

BY MR. HESKIN:

Q. Okay. But you're in multiple litigations across the State of New York and Florida, with respect to MCAs that Spin Capital did; right?

MR. PICON: Object to the form.

THE WITNESS: Possible.

MR. PICON: It mischaracterizes his testimony.

BY MR. HESKIN:

Q. And you're the only one that would have authorized the filing of those lawsuits; right?

Page 136

A. Likely. Sometimes it's signed by an attorney, but yeah, I would have been the one that directed an attorney to do his due diligence and file a lawsuit.

Q. Okay. And would you approximate the number of lawsuits that Spin Capital is currently engaged in is in excess of 40?

A. No.

MR. PICON: Objection.

THE WITNESS: I don't think it's that many.

BY MR. HESKIN:

Q. How many do you think it is?

A. Probably under 20.

Oh, active? A lot less than that. A few. Most of them are either resolved or -- yeah.

Q. Did you ever brag about the number of lawsuits that you've engaged in, with my client, Stefan Leer?

MR. PICON: Brag -- wait. About litigation with Stefan Leer or --

BY MR. HESKIN:

Q. No, about the number of lawsuits that you're engaged in.

A. Maybe he was threatening to sue me.

Page 137

It could be how I'd respond already. I don't know.

MR. PICON: Don't speculate. Do you know?

THE WITNESS: I don't remember. I don't know.

BY MR. HESKIN:

Q. Is that something you typically do, is brag about the number of lawsuits that you have?

A. No. No. Lawsuits are not funny. I definitely don't like to get intimidated by people threatening to file them.

Q. Do you currently have a malpractice suit against Berkovitch, relating to this loan?

A. I don't think so.

Q. Did you assert a malpractice claim against Berkovitch?

MR. PICON: Object to the form of the question. Assert? Do you mean filed?

THE WITNESS: I don't think a claim was filed.

BY MR. HESKIN:

Q. You mean the claim was filed in court, but made through his insurance carrier?

A. I don't know. I'm not sure. I have to ask my attorney.

Page 138

Q. Are you alleging that the Berkovitch law firm committed malpractice, with respect to this loan?

A. In what aspect? I think, too, that's a legal conclusion. My understanding, when I did this loan, is that if there was a default, I could take ownership of the policies right away and not have to sit and litigate like this.

But yeah, I'm not making any conclusions on the perfection of the security interest.

BY MR. HESKIN:

Q. Okay. Well, isn't there an e-mail specifically from you, saying that you weren't going to send in the transfer documents unless and until there was a default?

MR. PICON: Object to the form of the question.

BY MR. HESKIN:

Q. Didn't you agree to that?

A. I didn't have an option but to agree to that. Mr. Leer wouldn't sign the documents and the loan was already funded by then.

Q. You sent an agreement saying no problem, didn't you?

Page 139

A. I sent an e-mail, yeah, saying no problem. Yeah, whatever. Yeah, go ahead.

Q. Okay. So did you ever send in those letters?

MR. PICON: Object to the form. What letters?

BY MR. HESKIN:

Q. The transfer forms to the insurance companies.

A. I believe my attorneys sent them in.

Q. Which attorneys?

A. Berkovitch Bouskila.

Q. When?

A. As soon as there was a default.

Q. But you knew there was going to be a default, didn't you?

MR. PICON: Object to the form of the question.

THE WITNESS: What? What's your question?

BY MR. HESKIN:

Q. You knew there was going to be a default, didn't you?

A. No, I didn't. I disagree.

Q. What are you laughing at? Why are you

Page 140

laughing?

A. Because you're making things up.

MR. PICON: It's a silly question.

THE WITNESS: Yeah. I didn't know -- no, if the collateral was worth as much as he claimed it was worth, then no, there wouldn't be a default.

I was actually very surprised and so was Berkovitch, when there was a default. It kind of looked like your client took this deal because he thought he was going to be able to screw me and wiggle his way out of it. That's what it appears to me. Yeah.

BY MR. HESKIN:

Q. And where was he coming up with this money to pay the loans?

A. The guy purportedly had millions of dollars in potential assets --

Q. Okay.

A. -- but he couldn't come up with it.

And I think he could have came up with it, but your client was trying to screw Spin. That's what happened over here.

Q. That's what you think happened?

A. A hundred percent. There's no

Page 141

other -- it doesn't make sense, other than that.

Q. Okay. He sent you -- he couldn't afford to make the MCA payments; right?

MR. PICON: Object to the form of the question.

BY MR. HESKIN:

Q. Right?

A. That's -- he was in default with BMF, from my understanding, yes.

Q. But you knew that; right?

A. What?

MR. PICON: Knew what?

BY MR. HESKIN:

Q. You knew he couldn't afford the MCA payments; right?

MR. PICON: Object to the form of the question.

THE WITNESS: I knew that he couldn't afford the payments?

BY MR. HESKIN:

Q. Yeah.

A. Or I knew that BMF and Hi Bar was telling me that this guy wasn't paying?

What's your question?

Q. You knew he couldn't afford to make the

Page 142

MCA payments; correct?

A. I didn't know -- nothing -- it's not my responsibility. I don't -- I didn't do the due diligence on it. Did I know at the time of the Spin loan that this, that he was in default, that your client was in default or his affiliated entities were in default with BMF and Hi Bar? Yes, I was aware of that. Your client also directed Spin to use part of the proceeds to pay off those agreements.

But I didn't know nothing about whether he could afford the payments or not. As a matter of fact, I thought the exact opposite. If the collateral was actually worth what your client was alleging it to be worth, then he would never default.

Q. These are life insurance premiums; right? Policies?

A. What?

Q. People have to pass away, right, in order for them to come into fruition; right?

MR. PICON: Object to the form of the question.

THE WITNESS: You're talking these specific assets? Yeah, I think there's a blanket security agreement in the loan for all assets, not

Page 143

just life insurance policies, but yeah.

BY MR. HESKIN:

Q. And so if people didn't pass away, he wasn't going to be able to make the payments; right?

MR. PICON: Object to the form?

THE WITNESS: I mean, your client had a lot of -- maybe still does, a lot of exotic cars, nice houses. He was supposed to put up a real estate property in Texas as part of the loan, but we thought there was enough collateral just with the policies.

No, you're absolutely wrong. No, your client had the ability to pay this loan, but he thought that he cannot pay it and maybe settle it for a few hundred grand, and it turns out he was wrong. That's what's going on here.

BY MR. HESKIN:

Q. Okay. So you expected him to sell personal assets to continue to make payments on this loan?

MR. PICON: He never said that.

THE WITNESS: I never said that. He's a sophisticated businessman, and if there's X amount of money in collateral, reportedly worth, you know, you know, 5-plus million dollars, he would figure

Page 144

out how to get it paid, or liquidate some assets.

No, I did not think your client was going to default, but the exact opposite. I even told him when I did the loan, the reason I'm making you put so much collateral up is so you don't default.

BY MR. HESKIN:

Q. Okay. When he couldn't make the payments, you negotiated the reduced payments; right?

MR. PICON: Object to the form. Are we talking about the Spin loan?

MR. HESKIN: No, the MCAs.

MR. PICON: Okay.

Objection to form. It definitely mischaracterizes his testimony.

THE WITNESS: I didn't negotiate it. Did I try to get a deal done? I would convey, you know, what Mr. Leer and the funders -- to be honest, I don't think there was anything to negotiate.

From my recollection, he stopped paying BMF and Hi Bar and basically said go screw yourself, this is how much you're getting a day or you're getting nothing. I think that's exactly what happened.

Page 145

I conveyed that to BMF and Hi Bar. I don't think it was -- there was no negotiation. They kept -- I believe BMF and Hi Bar kept on trying to -- or were asking me to get updated bank statements. I tried. They tried. And your client refused to cooperate, even though I believe he's mandatory, supposed to.

Yeah, who cares? That's -- yeah.

BY MR. HESKIN:

Q. How did you calculate the new payment?

MR. PICON: Object to the form. Misstates his testimony.

THE WITNESS: I can't answer on behalf of BMF and Hi Bar. And I don't believe they cal -- had an opportunity -- I don't know, that's on them. From my understanding, your client just said either take it or "F you," you're not getting -- or you're getting zero. That's -- yeah, I believe he was -- yeah, he was in default with them. They didn't give him an option to reconcile.

BY MR. HESKIN:

Q. He didn't -- so, wait. You're the broker on the deal; right?

A. Right.

Q. Okay. And he thinks he's putting

Page 146

everything through you. Did he ever have any direct communication with BMF or Hi Bar?

MR. PICON: Object to the form.

THE WITNESS: 100 percent, yes.

BY MR. HESKIN:

Q. He did?

A. Of course.

Q. He had direct communications with Gabe and --

A. I don't know about with Gabe, but definitely with Gabe's underwriters or people, yes, of course.

Q. He did?

A. Earlier, I was reading messages a few days ago and you see me texting Gabe's admin's phone number a few times. So obviously, he did, yeah. I don't fully recall, asking me today, but yeah, I'm assuming he spoke to someone at Hi Bar, too.

Q. Okay. Let me get this straight. You've got no ownership interest in the Hi Bar or BMF MCAs; right? You're just a broker?

MR. PICON: Object to the form. You can answer.

THE WITNESS: Yeah. Do I have like a membership interest in those companies? Absolutely

Page 147

not.

BY MR. HESKIN:

Q. Okay. And you're telling me right now that you never told my client that you were the one that controlled those companies? That's your testimony?

A. It sounds like a trick question to me. I don't want to give you the wrong answer, but I definitely don't own BMF or Hi Bar and I'm definitely not an authorized representative of any of those companies, so yeah, that's, you know, under oath and for the record, that's 100 percent fact.

Q. Under oath, you're not an authorized representative of BMF or Hi Bar; correct?

A. Correct.

MR. PICON: You're talking about on the MCAs? What are you talking about?

MR. HESKIN: On the MCAs.

MR. PICON: He was the broker.

THE WITNESS: Right.

BY MR. HESKIN:

Q. Got it.

A. I don't make any decisions, I have no employment in any of those companies, yeah.

MR. HESKIN: I'd like to mark as

Page 148

exhibit number 1 an e-mail -- or a text message between Josh Lubin and Stefan Leer, dated June 4, 2021.

(Whereupon, Exhibit Lubin-1 was marked for identification).

BY MR. HESKIN:

Q. Is this your text message between you and my client?

MR. PICON: Can you scroll so we can see the whole text message?

THE WITNESS: It appears to be my next message.

MR. PICON: Well, let him scroll, so we can see the whole thing.

THE WITNESS: I see that there. That's fine. Go ahead.

BY MR. HESKIN:

Q. Is this a text message that you sent to my client?

A. It appears to be. I don't dispute that it's not.

Q. You just testified 30 seconds ago that you weren't on authorized representative of BMF or Hi Bar; correct?

A. Correct.

Case 1:24-cv-08515-AS   Document 160-2   Filed 05/26/26   Page 39 of 98
SPIN CAPITAL, LLC, et. al. v.                                    AVRUMI LUBIN
GOLDEN FOOTHILL INSURANCE SERVICES, LLC                          July 25, 2024

Page 149

Q.   And you just testified all day that you're not an owner and have no control of Hi Bar or BMF; right?

A.   That's correct.

Q.   Why are you threatening to freeze my client's accounts then?

A.   That's probably as an incentive for me to -- either I didn't get paid my commission yet or my commission could get pulled back, and I have an incentive for these deals to pay, and your client was not -- I'm assuming wasn't paying BMF and Hi Bar, and that's why I was sending messages like that.

Q.   But here it says you're freezing them.

A.   Okay.  That's just the way I talk. I'm a broker.

Q.   That's the way you talk?

A.   Yeah.

Q.   Okay.  And you advised him to --

A.   I informed him I'm freezing them -- yeah.

Q.   Well, this is on 6/4; right?

A.   Uh-huh.

Q.   6/4/21 you're threatening to freeze everything, get a good attorney; right?

A.   Right.  I'm trying to get him back on

Page 150

payments.  I'm saying -- is there a judgment by BMF or Hi Bar or even a lawsuit -- I don't think there is -- against your client?  I was just -- I was just talking, to try to get a resolution.

Q.   Was this just talking?

A.   What, you're saying it isn't?  Does it look like I threatened physical harm over here? What's the issue?

Q.   Okay.  Hold on.  Let me pull up another document.

THE WITNESS: Just talking, right. Again, what you're accusing me --

MR. PICON: Josh, there's no question.

THE WITNESS: Yeah.

MR. HESKIN: Hold on one second.  I'm trying to -- did I take my screen share down?

MR. PICON: No, it's still there.

MR. HESKIN: You can see my --

THE WITNESS: I still see your screen.

MR. HESKIN: All right.  Let me stop sharing.

BY MR. HESKIN:

Q.   Okay.  Do you know if Hi Bar has any offices in Texas?

A.   Not that I'm aware of.

Page 151

Q.   Do they have any -- do they have a Choice-of-Law clause that says they can freeze bank accounts out of Texas?

MR. PICON: Object to the form.

THE WITNESS: I have -- I have no idea.

BY MR. HESKIN:

Q.   Did you review -- you already said you didn't review it; right?

A.   No.

MR. PICON: Review what?

THE WITNESS: Review what, first of all?  Yeah.

BY MR. HESKIN:

Q.   All right.  So here is -- what about BMF, does BMF have any offices in Texas?

A.   Not that I'm aware of.  I'm not saying they don't.  I can't answer on behalf of BMF, but yeah.

Q.   Gabe lives in Florida, doesn't he?

A.   Yes.

Q.   As far as you know, you're not aware of any office that he has in Texas; right?

A.   You got to ask him.  I can't answer on his behalf, but not that I'm aware of, correct.

Page 152

MR. HESKIN: Okay.  Let me mark as exhibit number 2 an e-mail that's dated April 28, 2021, sent by John Montoya, at the Regent Law Firm.

(Whereupon, Exhibit Lubin-2 was marked for identification).

BY MR. HESKIN:

Q.   Are you familiar with the Regent Law Firm?

A.   Yeah, I've heard of them.

Q.   Have you ever used them?

A.   I used them on like two cases.

Q.   Do you know that they're located in Texas?

A.   Yeah.  They domesticated a New York judgment for me, to Texas.

Q.   And do you see here it says:  This is John, with Regent & Associates Law Firm.  We have been retained to file suit against you, in regards to your defaulted cash advances from BMF Advance; do you see that?

A.   Yes, I see.  I see this e-mail, yeah.

Q.   And it says:  Failure to set up suitable arrangements for repayment will result in constable visits; do you see that?

A.   Yeah.

Page 153

Q.    Client vendor freezes, business and personal property seizures to satisfy the amount owed of $588,600; do you see that?

A.    Yes.

Q.    Why would there be a constable visit when the business doesn't have any money to pay?

MR. PICON: Objection to form. You're asking this witness? It's not his e-mail.

MR. HESKIN: He's negotiating on their behalf. I'll tie it together. I'll tie it together.

MR. PICON: He just said he was not negotiating --

THE WITNESS: I'm not -- first of all, this e-mail wasn't sent --

MR. PICON: That wasn't his testimony.

THE WITNESS: This e-mail wasn't sent to me.

BY MR. HESKIN:

Q.    It wasn't?

A.    Even if I was copied on this e-mail, I would never read it.

Q.    Why did it come from your files then?

A.    Maybe it's in my e-mail. I don't know. Maybe they forwarded it to me. I have no

Page 154

idea. I'm just saying this is not my department.
Yeah. You're talking to the wrong guy, Shane.

Q.    Well, hold on. I thought you're negotiating the payment terms --

A.    I never said I'm -- I never said I'm negotiating. Okay? I'm trying to get a resolution for a deal that either, maybe I have an incentive to get a commission. I don't know if I was paid it at the time or not paid it.

But I have a financial incentive, potentially, in both of these deals, at the time. I don't remember. But if I got an e-mail like this, I wouldn't even read the e-mail. I would just -- I would maybe get pressure from BMF and Hi Bar to try to get them back on payments or something like that.

But I can't answer on behalf of BMF. And I'm sure if you ask BMF about this, he would have no idea what you're talking about.

Q.    Okay. Here's an e-mail with you; do you see this?

MR. PICON: Where?

THE WITNESS: Where?

MR. HESKIN: Let me see. Okay, that's not it. Let me get it here. It's 31.

Page 155

BY MR. HESKIN:

Q.    This is you negotiating the payments; right?

MR. PICON: Shane, we're still looking at a John Montoya e-mail.

MR. HESKIN: I'm looking at --

MR. PICON: Well, what you're looking at doesn't matter. What we're looking at matters.

THE WITNESS: Look, your client making a demand that he is only going to pay --

MR. PICON: Josh, stop. Stop. Let him get the document up.

MR. HESKIN: Do you see this? Can you see this document?

MR. PICON: Now that we see a document, can you scroll down --

MR. HESKIN: Hold on. I'm going to mark it, first.

Exhibit number 3, it's an e-mail to Josh Lubin, copying Joel Geta, dated April 26, 2020.

(Whereupon, Exhibit Lubin-3 was marked for identification).

BY MR. HESKIN:

Q.    Okay. Do you recall this e-mail?

A.    I read this e-mail. I reviewed it,

Page 156

recently. And what's going on here is Mr. Leer sends an e-mail, copying Joel on there, and he says: As I told Josh -- and pretty much at this period, there was a lot of communications going back with me, with Hi Bar and BMF putting pressure on me to try to get them back on payments, and I responded.

He basically -- your client sends an e-mail as if this is what Josh instructed me to do. And I responded back, I did not agree to that. I told you to call me and never heard from you.

Pretty much, I didn't want Hi Bar thinking that I agreed to something that they never agreed to.

Q.    Okay. But here he is, here's Leer telling you he's got no cash flow, stop debiting because it's just causing fees, he doesn't have any money; right?

MR. PICON: That mischaracterizes the document and the testimony.

THE WITNESS: That's a statement your client is making.

BY MR. HESKIN:

Q.    Okay.

A.    He's probably full of shit. But he wouldn't provide any -- I believe there was a lot

Page 157

of -- I kept on trying to get him on the phone to -- yeah, BMF and Hi Bar were trying to do the same, to try to get bank statements, to actually see that there's no, that there's no cash coming in.

Q.    He never sent you a screen shot of his payments?

MR. PICON: Object to the form.

BY MR. HESKIN:

Q.    His bank accounts?

A.    He sent a screen shot of what he wanted BMF and Hi Bar to see, but I don't think -- I don't believe he cooperated. But it wouldn't be my department, anyway, to know whether he cooperated or not.

I know that when Spin issued the loan, I did not trust your client and made sure it to be over-collateralized for that specific reason.

Q.    Okay. So you didn't, you didn't trust my client, so you put in, you gave him a 2.7 million dollar loan just, what, 10 days after this?

A.    I think it was a few months after this, but no, I didn't see -- it wasn't -- I thought your client was a liar.

What's the problem with that?

Q.    Say that again.

Page 158

A.    I thought he was dis -- I didn't take his word for anything.

Q.    Okay.

A.    Yeah.

MR. PICON: And just one thing. We have been going on for about an hour and-a-half. In the next five or 10 minutes can we take lunch? It's getting lunchtime.

MR. HESKIN: Yeah.

THE WITNESS: I thought he was dishonest.

MR. PICON: Just answer the question. Okay?

BY MR. HESKIN:

Q.    You think my client is dishonest?

A.    Yeah.

I'm not a judge, but that's my opinion.

Q.    How did you -- how did you reach the number of $2,000 per day?

MR. PICON: What $2,000 a day? What are you talking about?

BY MR. HESKIN:

Q.    Yeah, did my client ultimately get the payments lowered to $2,000 a day? Didn't you

Page 159

negotiate that?

MR. PICON: Are you referring to the MCA agreements?

MR. HESKIN: The MCA agreements.

THE WITNESS: I don't see where you're talking about. Your screen is still shared, by the way, with the e-mails from April 26.

BY MR. HESKIN:

Q.    Okay.

A.    I'm not sure what exactly you're talking about, but I believe, at the time, any default -- this is my understanding.

You asked me a question. I believe that when your client defaulted on BMF and Hi Bar, he didn't cooperate with them whatsoever and he basically said take this or you're getting zero.

That was my understanding and that was part of the risk analysis that was done when giving a loan for 2.7 million dollars, is that this guy, you can't take his word for anything. Basically, yeah.

Q.    I'm talking about the MCAs, when --

A.    I don't think he gave --

MR. PICON: Let him finish his question, please, Josh. Okay?

Page 160

BY MR. HESKIN:

Q.    When he's telling you I've got no money in my account, here are my bank statements, I can't afford to pay it, stop debiting because they're just going to bounce, how did you go from $20,000 per day to $2,000 per day? How did you come up with that calculation?

MR. PICON: Objection to form. Misstates the testimony. It also misstates the documents. You can answer, if you know.

THE WITNESS: I never had any debits for $20,000. Spin never had any debits, didn't issue any MCAs there. Yeah, so -- but as I mentioned to you, on the BMF and Hi Bar MCAs, from my understanding -- it wouldn't be my responsibility. I can't speak on their behalf.

From my understanding, Leer wouldn't cooperate with them whatsoever, and basically would tell me to tell them this is what they're getting or they're not getting a penny.

And this is after not paying for a few weeks and after being significantly in default. That's my understanding. But I can't speak on their behalf.

Q.    You didn't have any $20,000 debits and

Page 161

you never turned any $20,000 debits off; right?

A.    **Correct.**

MR. HESKIN: Okay.  Let me mark this as exhibit number 4.

(Whereupon, Exhibit Lubin-4 was marked for identification).

**BY MR. HESKIN:**

Q.    Okay.  This is a text chain, dated April 6, 2021, where -- I don't know if I'm reading this correctly -- it says under the name Josh Lubin, I'm not debiting 20K, I turned off.

I turned off.  I will tell Hi Bar to, as well.

How did you turn off something that you weren't doing?

A.    **I made a misstatement.  What do you want me to tell you?  I think you know very good and well -- yeah, that I don't --**

Q.    I know very good and well that my client is taking the position --

MR. LEER: You're a fucking liar.

Q.    -- that you told him all along these were your deals, you're the owner of these companies, you control them and you're making all the decisions.  And it certainly looks like, from

Page 162

these text messages, my client is telling the truth.

MR. PICON: Object to the form of the question.  You can make your argument to the judge, but that's not a proper question.  That's not even a question.

MR. LEER: You also have $49 million.

MR. HESKIN: Stefan.

MR. PICON: It's probably a good time for a break, guys.

MR. HESKIN: Yeah, it's not a bad time.

MR. PICON: Okay.

MR. HESKIN: All right.  So it's 1:07 now.  Do you want to come back at 2:00?

MR. PICON: Sounds good.

MR. HESKIN: 2:00, all right.

MR. PICON: Thank you.

MR. LEER: Try being a little more honest, Josh, next time.

(Whereupon, a luncheon recess was taken).

**BY MR. HESKIN:**

Q.    Welcome back, Mr. Lubin.

A.    **Hey.**

Q.    Okay.  So I just want to go back over a

Page 163

few things.  You said you didn't have any syndication in these, the BMF or the Hi Bar MCA agreements; correct?

MR. PICON: Object to the form.  It mischaracterizes his testimony.

THE WITNESS: I said I had -- in the Hi Bar deal, I don't remember, there was probably a 12 percent commission or, I don't know, paid up front or on the back end; and with the BMF deals, I believe it was Spin would receive 50 percent of the profits on the back end.

**BY MR. HESKIN:**

Q.    And you didn't have to put in any money on that?

A.    **No, I didn't put up -- no, Spin wouldn't put up any money.**

Q.    Okay.

A.    **BMF would put up a hundred percent -- yeah.  Sorry, go ahead.**

Q.    Say that again.  BMF would put up a hundred percent of it?

A.    **I believe so.  I don't know if BMF has a line of credit or whatever, but yeah.**

Q.    Okay.  Who did the funding calls for those deals?

Page 164

A.    **I don't recall.**

Q.    It wasn't you?

A.    **It might have been.  I don't know.  It might not have been any funding calls.**

Q.    Why would you do the funding call on behalf of BMF or Hi Bar?

MR. PICON: Object to the form of the question.

THE WITNESS: I never did any funding calls at all.

**BY MR. HESKIN:**

Q.    Okay.

A.    **Yeah.**

Q.    Got it.  Let me see this.  6A, let me share this.  Okay.  Here's an e-mail from you to Gabe Isaacov, and it's dated March 25, 2021.  And it says in here, to Gabe, from you, signed by you -- that's your signature; right?

MR. PICON: Object to the form.

THE WITNESS: Okay, go ahead.

**BY MR. HESKIN:**

Q.    100K net, going to try and get away with a 40K PSF on the funding call; do you see that?

A.    **That might be a typo.  I -- yes, I see what you're showing me.  I don't have an answer.  I**

Page 165

definitely never -- never did a funding call for BMF, in my life. Not just this deal, not on any deal. But go ahead.

Q. What's the 40,000 PSF?

A. I don't know. Maybe it stands for professional service fee. I don't know.

Q. And that would go to you; right?

A. Not always. Depending on the situation, sometimes it would go to me or --

Q. So --

A. On a deal like this, it probably wouldn't. It would probably get split 50 -- I don't know.

Q. 40 -- so let me get this straight. The client is netting 100K and you're trying to charge also a $40,000 personal service fee?

MR. PICON: Object to the form of the question.

BY MR. HESKIN:

Q. Is that how I'm reading it? I mean --

A. I'm not looking to speculate either, to guess. Yes. Yeah.

Q. What are you doing so special that you deserve a $40,000 personal service fee on netting this merchant $100,000?

Page 166

MR. PICON: Object to the form of the question.

THE WITNESS: I'm not looking to speculate, but, listen, I charge a lot for my services, that's for sure. I'm not cheap, you know.

BY MR. HESKIN:

Q. And this guy, he's getting 100K and he's got to pay back what, 150?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't have an answer for you.

BY MR. HESKIN:

Q. And then that would be -- so he's actually getting 60, because he has to pay a 40K fee to you. So that's 60, pay back 150?

A. It sounds like --

MR. PICON: Object to the form. There's not even a question.

BY MR. HESKIN:

Q. Sounds good. Sounds good.

A. You're speculating. Yeah, that's what's going on here.

Q. Okay.

MR. LEER: You know it, too, fucker.

Page 167

MR. HESKIN: Hey, hey, hey, hey.

MR. PICON: Shane, if you can't control him, I'm going to ask you to take him off.

MR. HESKIN: Stefan, you got to be on mute. Just put yourself on mute.

MR. LEER: Now, it can't help, but he is.

MR. HESKIN: Just --

MR. PICON: One more time and we --

MR. HESKIN: Stefan.

MR. LEER: I'm muted, sir.

MR. HESKIN: He's muted.

MR. PICON: Fine.

BY MR. HESKIN:

Q. Why are -- and then here it is you're giving instructions, wire to the account attached and debit 20K a day from the same account; do you see that?

Why are you giving those instructions?

A. Because I think the contract had a different daily amount. I think it said 25k and I was telling him to do 20K, something like that.

Q. Why are you making these decisions?

A. Because it was already signed and BMF agreed to it. So I was reminding him to do that.

Page 168

Q. Okay.

A. Again, you're making me speculate. Yeah, something like that, to that extent.

MR. PICON: Don't speculate. Just --

THE WITNESS: Yeah.

MR. PICON: -- if you know the answer, answer his question. If you don't, tell him you don't. It's that simple.

BY MR. HESKIN:

Q. Okay. And, again, we talked about you didn't have any authority to act on their behalf; right, BMF's or Hi Bar's?

MR. PICON: Object to the form. Mischaracterizes his testimony.

THE WITNESS: I had no authority to act on behalf of any of those companies, as a representative. Besides as a broker or act as a broker on behalf of a lot of companies, brokers would convey what the merchant says to the funder and vice versa, but yeah.

MR. HESKIN: All right. So let me mark that as exhibit 5. And that was the e-mail. Now, let me just make sure I've got it. That was -- what's the date of that e-mail?

THE WITNESS: March 30th.

Page 169

MR. PICON: He's not asking you.

THE WITNESS: Oh.

(Whereupon, Exhibit Lubin-5 was marked for identification).

MR. HESKIN: Now I want to share another one. Let me see if I can do it. Let's mark this as exhibit number 6; right? It's a text message between you and my client, Stefan, dated May 24, 2021.

THE WITNESS: Yeah.

(Whereupon, Exhibit Lubin-6 was marked for identification).

BY MR. HESKIN:

Q. How come it says -- it says: You're giving me no option but to file a judgment.

How are you going to file a judgment?

MR. PICON: Object to the form.

THE WITNESS: I don't think -- yeah, first of all, I definitely wouldn't be able to file a judgment. I don't think Hi Bar or BMF ever had a lawsuit on file, but I was acting as a broker and getting put pressure, likely from both of the MCA companies, and I'm -- and I'm trying to work out a resolution.

BY MR. HESKIN:

Page 170

Q. You're threatening to file a judgment. You know confessions of judgment were outlawed in California and New York; right?

MR. PICON: Objection to the form of the question.

BY MR. HESKIN:

Q. Right?

MR. PICON: Objection to the form. Calls for a legal conclusion.

THE WITNESS: What's that --

BY MR. HESKIN:

Q. You are aware -- let me ask you this: You are aware confessions of judgment are illegal against out-of-state debtors in New York; correct?

MR. PICON: Objection to form.

THE WITNESS: I think I'm aware of that, yes.

BY MR. HESKIN:

Q. Okay. And you're aware that confessions of judgment are also illegal in California; right?

A. I don't know.

MR. PICON: Object to the form.

THE WITNESS: You're asking -- you're -- you're asking a legal question.

Page 171

BY MR. HESKIN:

Q. Well, tell me how, how are you going to get a judgment? How are you going to file a judgment?

A. I never said -- I maybe told that to your client, to try to get him back -- to try to get a resolution, but it could be there was no way to actually file a judgment. That's not really relevant.

Q. Okay. If it's not relevant, why are you suing?

A. I was trying to do my best to get a resolution in place, doing that, yeah.

Q. Okay. This is on May 24, 2021 you're threatening to file a judgment against my client. Can you remind me of the date of the 2.7 million dollar loan that you entered into with my client?

A. I believe you have the date correct, but, yeah, it was, I think, a couple, a month or two after this.

Q. How about a few weeks after this, wasn't it?

A. Sure. Go ahead.

Q. Okay. And then he says he needs at least 10 days, I'm cash poor; do you see that?

Page 172

A. I see what you're showing me, sure.

Q. And you say in response: Need to be on daily for those 10 days; right?

A. That's what it appears I said, sure.

Q. Well, what's your basis for having to be on a daily? Did you read the contract? Do you understand how the contract works?

MR. PICON: Objection to form. Asked and answered.

THE WITNESS: I think Leer was understanding that I was talking for the two MCA companies. Who cares? How is this relevant?

MR. PICON: Forget about relevance. I'll make the relevance objections.

THE WITNESS: Yeah.

MR. PICON: Just answer his questions, if you can.

BY MR. HESKIN:

Q. Why are you insisting -- he's telling you he doesn't have any money to pay you the daily, he needs a pause, and you're saying too bad, so sad, I still need the dailies; right?

MR. PICON: Objection to form.

THE WITNESS: I believe --

MR. PICON: Misstates the document.

Page 173

THE WITNESS: I believe at this time I didn't -- I believe Hi Bar, BMF and myself did not, did not believe what your -- did not believe your client, at this point.

BY MR. HESKIN:

Q. Okay.

A. Well, I think everyone felt that your client was very dishonest. So him saying that he doesn't have any money, without providing updated statements --

Q. He is so dishonest that you give him 2.7 million dollars three weeks later?

MR. PICON: Objection to the form. Asked and answered.

THE WITNESS: Yeah.

BY MR. HESKIN:

Q. I mean, really, you're calling my client a crook and dishonest and then three weeks later you give him 2.7 million dollars; is that your story?

MR. PICON: Objection to the form.

THE WITNESS: I told you when I gave your client 2.7 million dollars, I didn't take his word for anything, which is why I was over-collateralized and my lawyer -- I was

Page 174

over-collateralized, purportedly over-collateralized.

BY MR. HESKIN:

Q. At the time you were making these threats to file a judgment, which is against the law in New York, you knew he had these policies, didn't you?

MR. PICON: Objection to the form.

THE WITNESS: I don't know.

BY MR. HESKIN:

Q. You know, I have e-mails where he provided them to you, prior to this, and he offered to give a collateralized loan. You knew that, didn't you?

MR. PICON: Same objection.

THE WITNESS: What's your point? I don't understand, what's your point?

BY MR. HESKIN:

Q. My point --

A. Is that a question? What's your question?

Q. My point is you knew he had these policies at the time you threatened to file a judgment against him, three weeks before he signed it, entered into this 2.7 million dollar loan with

Page 175

you; right?

A. I don't know what you're saying is true, but even if it is, I don't see -- I don't understand what your question is. You're just asking me to speculate.

Q. Got it. Well, he says he can do 250 per day; do you see that?

A. Sure.

Q. Okay. And that's at 10:15 a.m.; do you see that?

A. Yes, I see that.

Q. How did you calculate a thousand dollars per day in two minutes?

MR. PICON: Object to the form. Misstates the document.

THE WITNESS: There doesn't appear to be any calculation over here.

BY MR. HESKIN:

Q. Yeah, it doesn't, you're right. You just arbitrarily picked that number out of the sky; right?

MR. PICON: Object to the form.

THE WITNESS: I have no -- first of all, I think that the payments -- I'm not speculating. What are you talking about? Ask me a

Page 176

question.

BY MR. HESKIN:

Q. How did you come up with a thousand dollars a day?

MR. PICON: Object to the form.

THE WITNESS: I don't recall. But I believe that the payments were, I don't know, maybe they were 2,000 a day and they got cut and I just came up with a number in half. I'm not speculating.

BY MR. HESKIN:

Q. Is this how --

MR. PICON: If you don't know, say you don't know. Don't speculate.

BY MR. HESKIN:

Q. How do you respond to him a second later? Is that how legitimate businesses talk to people?

MR. PICON: Object to the form.

BY MR. HESKIN:

Q. I want you to read it. Read it into the record, what you said next, after a thousand dollars a day. I want you to read it into the record.

A. Why don't you read it into the record.

MR. PICON: You can read it into the

Page 177

record.

THE WITNESS: Yeah, why don't you read it into the record, Shane.

MR. HESKIN: They're your words. You don't want to repeat your words?

MR. PICON: No, we're not here -- we're here to answer questions. We're not here to do dictation.

BY MR. HESKIN:

Q. Are those your words?

A. They're purported to be my words. Do you think --

Q. Is that normally, is that normally how you talk to customers?

A. Do you have a question for me?

Q. Yeah, I asked you is that how you normally talk to customers?

MR. PICON: What, specifically, are you referring to?

MR. HESKIN: Where he says: This is bullshit.

MR. PICON: Yeah. Do you want to look at your client's e-mails? If we're talking about profanity --

MR. HESKIN: Hold on a second.

Page 178

THE WITNESS: Normally, do I, do I talk to clients that are full of shit like that? I probably do. It wouldn't surprise me if you showed me other messages that show those type of words.

I still don't understand your question.

BY MR. HESKIN:

Q. So then he says: I cannot pull cash out of a tree. You're negotiating with nothing for me to give you. You want to bounce. And your response is: Make it 500 each for the next 10 days; do you see that?

A. I see what you're showing me, sure. What is your question?

Q. How did you come up with 500?

MR. PICON: Object to the form.

THE WITNESS: I have no idea. I have no responsibility to make any decisions on behalf of BMF and Hi Bar.

You know what, give me a question.

MR. PICON: Relax. He's asking questions.

THE WITNESS: No.

MR. PICON: You just answer to the best of your ability.

Page 179

BY MR. HESKIN:

Q. Well, you're saying these aren't your deals, that you're not in it?

MR. PICON: Objection to form.

BY MR. HESKIN:

Q. You never represented to my client --

MR. PICON: Shane, Shane --

Q. -- that you had full authority to act on behalf and that you aren't the owner of BMF or Hi Bar; right?

That's your story and you're sticking to it?

MR. PICON: He's answered that four times.

BY MR. HESKIN:

Q. Yeah. That's your story and you're sticking to it; right, Mr. Lubin?

A. Yes.

Q. Okay.

MR. PICON: You need to stop with the snide remarks, Shane. It's beneath lawyers. Let's focus --

MR. HESKIN: Listen. Listen, I've never had -- I'm not even going to comment.

MR. PICON: Yeah, that would be a good

Page 180

idea.

MR. HESKIN: Not even going to comment. Let's just go to the next exhibit.

This is exhibit number 7. This is a text chain that's dated April 2, 2021.

(Whereupon, Exhibit Lubin-7 was marked for identification).

BY MR. HESKIN:

Q. Mr. Lubin, these are your text messages with my client; right?

A. They purport to be my text messages with your client, correct.

Q. Okay. And it says you took --

A. I don't dispute that they are.

Q. Well, hold on. It says: You took four shit deals behind me. What does "me" mean?

A. I don't recall, at this moment. I mean, that, it was referring to Hi Bar and BMF and I was the broker on those deals, and he probably took deals -- he may have taken deals that are worse terms than the BMF and Hi Bar deals.

I don't know, Shane, you're asking me questions that I'd have to speculate. I'm not going to speculate. I send a lot of messages, a lot of text messages. I don't fully recall all the

Page 181

messages that I sent.

Q.    In the English dictionary who does "me" refer to?

MR. PICON: Objection to the form.  He gave you the answer.

MR. HESKIN: I want to know what --

MR. PICON: Why play games?  Come on.

THE WITNESS: In the English dictionary it may mean something else than when the broker is speaking to a client on -- yeah, on a deal that they are -- it's loose talk.  Nice.

BY MR. HESKIN:

Q.    So when you say you took four shit deals behind me, he was supposed to understand that to be BMF and Hi Bar?  Someone else, not you?

MR. PICON: Object to the form of the question.

THE WITNESS: I'm not looking to speculate.

BY MR. HESKIN:

Q.    Okay.  Well, how about the next one?  Let's go to the next one.  Why don't you pay "me" in full by next week, who is "me" in that sentence?

A.    I had an upside in the deal and -- I don't know.  Who cares?

Page 182

Q.    Well, who does Mr. Leer think he's paying?

MR. PICON: Object to the form of the question.  It calls for speculation.

THE WITNESS: Yeah, I'm not going to guess, speculate.

BY MR. HESKIN:

Q.    Okay.  You asked him to pay you; right?

MR. PICON: Object to the form of the question.

MR. HESKIN: Let's look at another one.  Okay.  Exhibit number 8 is an e-mail dated March 25, from Josh to Molly Cohen and Gabe Isaacov.

(Whereupon, Exhibit Lubin-8 was marked for identification).

BY MR. HESKIN:

Q.    That's you; right?

A.    Yeah, it appears I sent e-mail.

Q.    Okay.  And that's one of the MCA deals at issue in this case; right?

A.    It appears to be that.

Q.    How did you come up with 1.499, 20K daily?

MR. PICON: Object to the form.

THE WITNESS: I didn't come up with

Page 183

that.  I probably discussed it with Gabe and with your client, and those are the numbers that they came up with and gave -- and I conveyed it to Gabe's admin.

BY MR. HESKIN:

Q.    How did you come up with the $20,000 a day?

MR. PICON: Object to the form of the question.  He said he didn't come up with it.

THE WITNESS: I never came up with the 20 -- yeah.

BY MR. HESKIN:

Q.    Well, you had -- you just said you had conversations with Gabe.  What did he say?  How did he come up with it?

A.    I can't answer on behalf of Gabe.  But since I was acting as a broker on the deal, I likely worked a deal between Mr. Leer and with BMF.  How they came up with it, I don't know.

Q.    Are you not supposed to be the most knowledgeable on this deal?  Aren't you the broker?  Aren't you the one that's supposed to know everything?

A.    The broker is not responsible for doing any due diligence.

Page 184

MR. PICON: Object to the form.

THE WITNESS: At least I never took on that responsibility.  I never -- yeah, I never would.

BY MR. HESKIN:

Q.    You never did a log on, you never reviewed bank statements?

MR. PICON: Shane, are we talking about this --

MR. HESKIN: Yeah, in this case.

MR. PICON: This MCA agreement?

THE WITNESS: No, absolutely not.

BY MR. HESKIN:

Q.    Absolutely not?

A.    Yeah.  I don't remember -- I don't know.  Shane, that's not me.

Q.    Mr. Picon didn't tell you never use, never testify in absolutes?

MR. PICON: Objection to form.  Come on, Shane.

THE WITNESS: It's possible that I may have reviewed a bank statement a few times in my life.  Even on Spin deals, I would, Spin MCA deals, I would hire people.  It's just not Josh Lubin, my friend.  I don't remember.  I'm not a reviewing of

Page 185

bank statements type of guy.

BY MR. HESKIN:

Q.   Okay.  Well --

A.   Yeah.

Q.   Tell me what the nature of this deal is.  What is it?

MR. PICON: Object to the form of the question.

THE WITNESS: What do you -- what do you mean?  On what aspect?

BY MR. HESKIN:

Q.   What's the transaction?  What are you doing?

MR. PICON: Object to the form.

THE WITNESS: Being a broker.  You have a merchant that wants these X specific terms, you have a funder.  I don't recall these conversations.

That's my job as a broker.  That's what I'm doing all day, I just communicate with people on the phone.  I don't review documents.  Yeah, that's not something that I do.

BY MR. HESKIN:

Q.   Okay.  Who's Life Factor II?

A.   I believe it's one of Leer's entities.

Page 186

Q.   Okay.  What do they do?

A.   I don't know.

Q.   Did you get bank statements --

A.   You're asking me to speculate.  I don't know.

Q.   Did you get bank statements from Life Factor II?

A.   I have no idea.

Q.   Okay.  What's DRVN Holdings?

A.   I definitely didn't -- I don't know.  I think, one of Mr. Leer's entities.

Q.   Okay.  Did you get bank statements from DRVN Holdings?

A.   I have no idea.  Even if I have, I don't recall reviewing any bank statements like that, and it would have been at the request of BMF or Hi Bar.

MR. PICON: Just answer his questions.

THE WITNESS: Yeah.

BY MR. HESKIN:

Q.   Okay.  What percentage of the receivables were you buying?  Were you buying receivables?

MR. PICON: Objection to form.

THE WITNESS: No.  Spin didn't issue

Page 187

any MCAs there.  I'm just a broker on those MCAs.

BY MR. HESKIN:

Q.   Okay.  Was BMF buying receivables?

A.   I believe BMF and Hi Bar were buying receivables, but I cannot answer on their behalf.

Q.   Okay.  What percentage of receivables were they buying?

A.   I don't know.  You got to -- either you have the documents and they speak for themselves or you can call BMF and Hi Bar and ask them.

Q.   Well, you're aware that he, Mr. Leer, had other MCAs out there at the same time; right?

A.   I may or may not have been aware of that.  Yeah.  I believe I was aware of that, but yeah.

Q.   Okay.  Do you know what a side-by-side deal is?

A.   I think that's when -- my understanding, that's a description that funders maybe use when, when they're each -- I don't know.  When they're each funding the same merchant.  I'm not going to describe something.  Yeah.

MR. HESKIN: What is this?  This is number 26.  Let's do 29.  Let's see what this says.

So now we're on exhibit 8?

Page 188

(Whereupon, an off the record discussion to clarify exhibit markings).

(Whereupon, Exhibit Lubin-8A was marked for identification).

MR. PICON: We don't see a different one, Shane.

THE WITNESS: We're still seeing the same one.

MR. HESKIN: Yeah, I just have to go like this.

BY MR. HESKIN:

Q.   So exhibit number 8A is an e-mail dated April 7, 2021.  Okay?

MR. PICON: Can we see the whole thing?  Let him see it, if you would.

THE WITNESS: No, I see it.

MR. PICON: No, but there are pieces to it.

THE WITNESS: Oh.

BY MR. HESKIN:

Q.   And it says:  Josh, you're sending voided check for us to turn on debits for 2K daily; right?

A.   I see that, yes.

Q.   Okay.  And what was the basis for the

Page 189

2K daily?

MR. PICON: Object to the form of the question.

THE WITNESS: I'm not sure what you're asking.

BY MR. HESKIN:

Q. Why -- how did you calculate 2K?

A. That would have been --

MR. PICON: Object to the form. Mischaracterizes his testimony.

MR. HESKIN: It says it right here.

THE WITNESS: So I wouldn't be the one that calculated --

MR. PICON: Nobody calculated it.

THE WITNESS: BMF or Spin, I don't know if anybody calculated anything. From the way it looks like, your client said take this or you're getting nothing. But who knows? I can't answer for BMF or Hi Bar. Yeah.

BY MR. HESKIN:

Q. You didn't personally negotiate this 2K?

MR. PICON: Objection to form.

THE WITNESS: I think your own client basically said that, this is what he's paying.

Page 190

BY MR. HESKIN:

Q. He didn't negotiate that directly with you?

MR. PICON: Objection to form.

THE WITNESS: I don't have the ability to speak on behalf of BMF or Hi Bar. I'm acting as a mere broker on the transactions, like --

BY MR. HESKIN:

Q. Well, you do know I have text messages where you're negotiating the 2K; right?

MR. PICON: Objection to form.

THE WITNESS: That's the way you're reading them. I don't have the ability to negotiate on something, I don't have that authority.

BY MR. HESKIN:

Q. Oh, okay.

A. I'm a broker on a deal.

Q. Okay. So I have text messages where you're negotiating a 2K fee and then I've got an e-mail where you're instructing them to change it to 2K, but you don't have the authority for that?

MR. PICON: Do you want to testify and I can ask you questions? Come on, ask him questions.

MR. HESKIN: No, I'm just --

Page 191

MR. PICON: Show him what you have. If you want to show him something, show him something.

THE WITNESS: Oh, yeah, please -- Josh, please send these so we can debit 2K a day. Who sent this e-mail?

BY MR. HESKIN:

Q. It's in response. Josh, you're sending voided checks to turn on debits for 2K daily.

A. April 6th, what are you talking about? He's making two demands for me to send him a voided check for 2K daily.

Q. Yeah, who came up with the 2K daily?

A. Either your client or BMF.

Like, what's your question? Ask a question.

Q. Josh Lubin, right here. Yes, merchant -- it should be "is" trying to convince me to write him an e-mail that I won't -- that I won't debit.

A. Yeah.

Q. -- for then 2K a day for 30 days. Trying to do two weeks. I'm on it.

Do you see that? So the merchant wants a 30 day reduction to 2K?

Page 192

A. I'm having a hard time reading my own e-mail.

Q. Oh, I can see why.

A. Yeah.

MR. PICON: Shane, come on. Really?

THE WITNESS: It seems like I made a bunch of typos. Who cares?

MR. PICON: We have an ethical obligation. Snide remarks are unnecessary.

MR. HESKIN: I think I have a little liberty with this witness.

MR. PICON: Look, you have liberty to act like a professional. Please.

MR. HESKIN: All right.

BY MR. HESKIN:

Q. So this is another typo, is that your testimony?

MR. PICON: That's not what his testimony is.

THE WITNESS: I didn't say -- there's a bunch of typos throughout the sentences, where I am having having a hard time -- he has been demanding me to send a voided check for 2K. This is what I'm reading. I don't recall this. He sends a few e-mails and I said,

Page 193

yeah, merchant is trying to convince me to write I won't debit for 2K a day for 30 days. Trying to do two weeks. I'm on it.

I'm trying to get this resolved. Look at the next e-mail, we've been on it for two weeks.

BY MR. HESKIN:

Q. Hold on. You're saying you're trying to go from 30 days to two weeks. What's your financial basis for not believing your client and saying that it should only be two weeks and not 30 days?

MR. PICON: Objection to the form of the question.

THE WITNESS: Okay. Mr. Heskin, BMF and Hi Bar were likely asking me to get updated bank statements at this time, likely trying to have people in their own company get updated bank statements, as well.

From my recollection on this deal, your client wouldn't cooperate whatsoever with updated bank statements and then basically just -- yeah. So I don't know how they came up with -- I don't know if BMF or Hi Bar ended up getting updated bank statements or not, but I cannot speak on their behalf and -- yeah.

Page 194

BY MR. HESKIN:

Q. Okay. Do you see on here how it says syndication, Spin Capital, 50 percent?

A. Yes, I see that.

Q. And you get half of the fee on top of it?

MR. PICON: Object to the form. On top of what?

THE WITNESS: I think I get just 50 percent of -- there's no memorialized, written document with me and BMF, but I think my understanding was it would be 50 percent of the upside down the middle, probably including the fee. I don't want to describe -- yeah, exactly. Yeah, the -- yeah, something like that.

BY MR. HESKIN:

Q. Something like what, you get 50 percent and you get half of the bank fee?

A. I don't know which, if there was an origination fee, maybe a PSF. I don't know which fee, but yeah, that's what it appears to look like.

Q. Okay. What does that say there?

A. This is -- a lot of the terms are verbal. Yeah.

MR. PICON: You're flipping around,

Page 195

Shane. Can you identify the document?

MR. HESKIN: Yeah.

MR. PICON: Because he can't read it if you're going to flip around.

MR. HESKIN: Yeah, I'm going to the next one. I'm on 9; right? This is an e-mail, dated March 12, 2021. The date is -- oh, it says a bank fee of $25,000 and then again, syndication.

(Whereupon, Exhibit Lubin-9 was marked for identification).

MR. PICON: Sorry, Shane, but we can't see who it's from.

MR. HESKIN: Gabe.

MR. PICON: Okay.

BY MR. HESKIN:

Q. And syndicated, it indicates 50 percent syndication to Spin; do you see that? And then half the fee?

A. So what's your question?

Q. You read it the same way as the last one; right?

MR. PICON: Object to the form of the question.

THE WITNESS: I'm not sure what your question is.

Page 196

BY MR. HESKIN:

Q. You get 50 percent of the profits and then you get 50 percent of the bank fee of $25,000?

A. I believe, yeah. Yeah, I believe that's the case. Something like that.

Q. Okay. Tell me how the bank fee works. Is that deducted off the funding amount?

A. I'm not describing any -- probably. I don't --

MR. PICON: Don't speculate.

THE WITNESS: No, I'm not going to speculate on that.

MR. PICON: Just answer the question. If you know, tell him. If you don't know, tell him you don't know.

THE WITNESS: Probably.

BY MR. HESKIN:

Q. You don't know how it works?

A. A lot of times it's like that. Not always.

Q. Okay. Just so we have a clean record, a lot of times the $25,000 gets taken out of the advanced money; right?

MR. PICON: Object to the form.

THE WITNESS: I don't know. This is,

Page 197

like, not my department.  You realize that; right?

BY MR. HESKIN:

Q.    Yet you're getting half the bank fee of $25,000 and half the profits, but not your department?

MR. PICON: Asked and answered.

THE WITNESS: It's not my department.  Whether the fee comes off the top or whether Spin debits it, I don't recall what happened exactly on this transaction.

On any -- whatever.  Yeah.  But it would likely --

MR. PICON: Stop with the likely.

THE WITNESS: Yeah.

MR. PICON: Answer his question, what you know.  Okay?

MR. HESKIN: Okay.  Exhibit number 10, this is a BMF agreement.

(Whereupon, Exhibit Lubin-10 was marked for identification).

MR. PICON: Do you want to show him the whole agreement?

BY MR. HESKIN:

Q.    Well, have you ever seen one of these?

A.    I never read the whole contract, but

Page 198

okay, go ahead.

Q.    Okay.  Let's take it page by page.

A.    That's a waste of time.

MR. PICON: Stop.

BY MR. HESKIN:

Q.    This one is dated March 2, 2022; right?

A.    That appears so, yeah.

Q.    What is this doing?

MR. PICON: Object to the form.

THE WITNESS: The document speaks for itself.  I'm not going to define it.

BY MR. HESKIN:

Q.    Okay.  The first one says:  Merchant hereby sells, assigns and transfers to BAL in consideration for the purchase price specified above, purchase percentage of all of merchant's future accounts.  Okay?  And the specified percentage there is 10 percent; do you see that?

MR. PICON: You've read so far part of the terms.

MR. HESKIN: Yeah, that's common language.

THE WITNESS: Yeah, this document speaks for itself.  In no way am I going to define another company's document.  I probably won't even

Page 199

define my own, a Spin document, that I had -- that I paid an attorney to draft.  So go ahead.

BY MR. HESKIN:

Q.    Okay.  So you don't know what it means, is that --

A.    I'm not going to make any determination on what this contract means or what it is, whatsoever.

Q.    The question --

A.    Shane, I'm just not getting into it.  It's not happening.

Q.    Okay.  That's good.

A.    It's not my company.  It's not my document.  I wasn't paid to review this document.  This is a document that you probably alleged is X and other people allege is something else.

There is no way are you putting me in the middle of this.  It's just not my department.

Q.    Did you review this document --

A.    No.

Q.    -- in preparation for today's deposition?

A.    I -- I did not re -- I saw that it was in the exhibit.  I didn't review all the terms of the document.  And even if I did, I ain't defining

Page 200

somebody else's document.

This is a legal question.

Q.    All right.  So your attorneys gave you a copy of this document, in preparation for today's deposition?

A.    There is copies of a few documents that are like this.

Q.    Okay.  You didn't trouble to read it?

MR. PICON: Object to the form of the question.

THE WITNESS: I'm not -- just to correct the record, I believe --

MR. PICON: Go ahead.

THE WITNESS: I believe the judge on this specific case already determined that these are valid and legal contracts.  Not only that, I hired an attorney before I did a -- yeah.

MR. PICON: Thank you very much.  I'll do the legal arguments.  You just answer the questions.

MR. HESKIN: No, I'd love for him to continue what he was saying.

BY MR. HESKIN:

Q.    Go ahead, what's your understanding?

Page 201

A. Go ahead, ask me questions.

Q. What did the judge rule on this case?

A. I think -- I don't know. I'm not looking at the final judge's ruling. I think the judge determined these are valid and legitimate agreements.

Q. How did you get that understanding?

A. I would have spoken to my attorney. That would be attorney-client privilege.

Q. I think the attorney-client privilege has just been waived.

MR. PICON: No, it hasn't.

MR. HESKIN: He volunteered -- he just volunteered your advice.

MR. PICON: No, he didn't volunteer anybody's advice.

THE WITNESS: Yeah.

BY MR. HESKIN:

Q. All right. Exhibit B, this underwriting fee, do you see that?

MR. PICON: No, we don't.

THE WITNESS: No, I see Exhibit B.

MR. PICON: We see Appendix A.

THE WITNESS: Appendix A.

BY MR. HESKIN:

Page 202

Q. Appendix A, but B, underwriting fee, do you see that?

A. I see that.

Q. How is that underwriting fee determined?

A. I don't know.

Q. How am I supposed to know what the underwriting fee is? It's either 499 or 12 percent?

A. Shane, I'm not answering questions on behalf of a company I have no authority to answer, and it's just not something I -- yeah.

Q. This is a contract that you're brokering to my client. You can't explain to him what these terms mean?

A. I don't recall.

MR. PICON: Hold on. Object to the form. He has told you a million times that he didn't review the document, he didn't try to understand the document. He was being a broker for a deal.

If you want to ask questions, ask the questions of whose document it is.

THE WITNESS: Not only that --

MR. PICON: You're asking this witness --

Page 203

THE WITNESS: I'm just a broker. I'm not --

MR. PICON: Stop. You made your point.

THE WITNESS: Yeah.

BY MR. HESKIN:

Q. Who negotiated the 4,996 per day?

A. I don't recall. Probably it was between your client and BMF or Hi Bar.

Q. Well, this one is with BMF. All right?

A. It's possible that this one is with BMF. Okay, sure, what's your point?

Q. I'm just trying --

A. He should have had an attorney. Your own client should have had an attorney. Next. This has nothing to do with me.

Q. I'm trying to understand how you came up with 4,996.

MR. PICON: Object to the form. He didn't testify that way, Shane.

THE WITNESS: Yeah. What do you think? I never came up with this. I didn't draft this document. I didn't review this document. My job was to get this document signed and convey terms back and forth between your client and the merchant

Page 204

providers.

BY MR. HESKIN:

Q. Okay. So there's an e-mail from Gabe to you, or from Gabe to my client, calculating the 4,996; is that your testimony?

MR. PICON: Object to the form of the question.

THE WITNESS: I answered your question a bunch of times.

BY MR. HESKIN:

Q. If that's what happened --

A. And it's under oath. I answered --

MR. PICON: Just answer the question.

THE WITNESS: Yeah.

MR. PICON: Don't give commentary. Just answer his questions. Just answer his questions. He wants --

BY MR. HESKIN:

Q. Is there an e-mail where that number is calculated?

A. I have no idea. I don't know.

Q. Here's an addendum. And is it your testimony that you didn't read this no stacking addendum?

A. It's my testimony that I did not

SPIN CAPITAL, LLC, et. al. v.
GOLDEN FOOTHILL INSURANCE SERVICES, LLC

AVRUMI LUBIN
July 25, 2024

Page 205

review any pages from the whole document.

Q.   Okay.  Well, let me read it for you.
Because I think it's sort of important.

A.   I think you should read it to BMF.
Yeah.

MR. PICON: Stop.  Answer the question.

BY MR. HESKIN:

Q.   This addendum entered on 3/2/22 is to certify I, Stefan Leer, as a representative of Golden Foothill Insurance Services, am prohibited from initiating a cash advance or other loan products with another lender outside to BMF Advance, LLC.

Doing so will place me in breach of contract and I will be liable for the entire amount owed to BMF Advance immediately, plus attorney's fees, costs, liquidated damages and a default fee of $25,000 or 20 percent of the contract amount, whichever is greater.

Do you see that now?

A.   Sure.

Q.   Okay.  Did you broker another deal with my client, with someone other than BMF Advance --

A.   Did I sign --

Page 206

Q.   -- after, after this?

A.   Did I sign this document?

MR. PICON: No, he didn't ask you that.

Repeat the question, please.

BY MR. HESKIN:

Q.   Did you broker another deal with my client, with someone other than BMF Advance?

A.   I believe I have.

Q.   And it was with Hi Bar; right?

A.   Yes.

Q.   Okay.  And at the time you did that, you didn't -- you weren't aware that you were prohibited from doing so?

MR. PICON: Object to the form.

THE WITNESS: No, I don't believe I was aware, correct.

And not only that, I think -- yeah.

BY MR. HESKIN:

Q.   You think what?

A.   I may have let them know about each other, which would -- which would make me not having an issue with BMF or Hi Bar.

Q.   Do you have that document?

MR. PICON: What document?

Page 207

THE WITNESS: I didn't say it's a document.  But if I notified both of the funders about each other, that provision wouldn't be valid and I can have no liability to BMF or Hi Bar.

BY MR. HESKIN:

Q.   Oh, but my client would be liable; right?

MR. PICON: Objection to form.

THE WITNESS: That's your client's problem.

MR. PICON: That's a legal conclusion.

THE WITNESS: Yeah.

BY MR. HESKIN:

Q.   Okay.  And this has got an addendum with a bunch of companies.  Do you know what any of these companies do?

MR. PICON: Asked and answered.

THE WITNESS: I believe they're in that insurance and brokerage field.

BY MR. HESKIN:

Q.   Okay.  And there's an ACH authorization form on there; right?

MR. PICON: Object to the form.

THE WITNESS: Yes.

MR. PICON: You're asking him to look

Page 208

at the document and he's told you he didn't review the document, so what are you asking?

BY MR. HESKIN:

Q.   Well, I thought -- I thought your testimony today is pretty strange.  But I thought you testified earlier, under oath, under penalty of perjury, that Spin Capital was located in Brooklyn, at the time of these MCA transactions?

MR. PICON: That's --

BY MR. HESKIN:

Q.   I mean, maybe the record says something different, but --

MR. PICON: So once again, you can say whatever you want, but what's your question?

BY MR. HESKIN:

Q.   Which is true?  Which one is true, your testimony given under oath or this ACH form that says your location is Lakewood, New Jersey?  Which one is true?

MR. PICON: Objection to the form.

THE WITNESS: Well, it was a mailing address for New Jersey, but the physical address was was and still is in Brooklyn.

BY MR. HESKIN:

Q.   Got it.

Page 209

A.    Yeah.

Q.    So this is bank fraud?

MR. PICON: Objection.

THE WITNESS: Bank fraud?  What do you want from me?

MR. PICON: Look --

MR. HESKIN: I'm just --

MR. PICON: No, no, no, no.

THE WITNESS: I'm telling the truth.

MR. PICON: Shane, I would love you to ask that question in front of Justice Borrok.

MR. HESKIN: I would love to show this to Justice Borrok.

MR. PICON: He would sanction you for even suggesting it.

MR. HESKIN: Oh?

MR. PICON: Yep, that's right.

MR. HESKIN: Are you kidding me?

THE WITNESS: This is my home address. Shane --

BY MR. HESKIN:

Q.    Oh, this is your home address.  Okay, I got it.

So Spin Capital is located at your house?

Page 210

MR. PICON: No.

THE WITNESS: No, I just told you it's not.  What are you asking stupid questions for?

MR. PICON: You can try to spin it any way you want to and --

MR. HESKIN: Okay.  All right.

MR. PICON: No.  No, no.  You've asked the same question literally a thousand times, every single question.  We should have been done by now. Because all you've done is try to reformulate the same question.  Now you're just wasting people's time.

MR. HESKIN: David --

MR. PICON: You're creating a record where you're testifying, not this witness.

MR. LEER: David, your client --

MR. PICON: Now we're going to court. Stefan, we're going to court.

MR. LEER: Today --

MR. PICON: No, no.  We're calling the court.  He can't control himself.  You can't control your witness.  You should get him off the screen. He's got to get off the screen.

We're not going until he's off the screen.

Page 211

MR. HESKIN: He's muted.

MR. PICON: No.

MR. HESKIN: He is on mute.

MR. PICON: I'm telling you, I've given him his last warning.  If he goes off mute and says anything again --

MR. HESKIN: Okay, I got it.  And, David, listen, I'm not the one -- you know, this document speaks for itself.  Okay?  I understand you're upset.

MR. PICON: I'm not upset at all.  I'm upset with your questions, because your questions are absurd, they're misleading and they're just plain wrong.

MR. HESKIN: Okay.

MR. PICON: The record says what he said.  He has testified where his office was. You're doing your best.  I get what you're trying to do, but you're doing it very deceptively and dishonestly.  Okay?

BY MR. HESKIN:

Q.    Okay.  Let's talk about this.  The KTL Holdings, that's in California; right?

A.    It appears to be, correct.

Q.    Okay.  So this is a wire that is going

Page 212

from California to New Jersey; right?

A.    What?

Q.    It's a wire ACH authorization form --

A.    This says authorization from KTL to Spin, correct.

Q.    Yeah.  And it gave two addresses, for California and New Jersey; right?

MR. PICON: Objection to form.  That's not at all what it says and that's a legal question.

THE WITNESS: It might be a mistake on the document.  Okay, whatever.  Go ahead, what is your question?

BY MR. HESKIN:

Q.    Okay.  So this Lakewood, New Jersey, 1460 Arboretum Parkway, that's where you live?

A.    Yeah, that's my home address.

Q.    Okay.  And the $7,500 fee, this is an origination fee?

MR. PICON: Object to the form.

THE WITNESS: This is, yeah, origination or, yeah, or services rendered, yeah.

BY MR. HESKIN:

Q.    Okay.  This is being charged to my client, in addition to the money that you were getting on the back end from BMF?

SPIN CAPITAL, LLC, et. al. v.
GOLDEN FOOTHILL INSURANCE SERVICES, LLC

AVRUMI LUBIN
July 25, 2024

Page 213

MR. PICON: Object to the form.

THE WITNESS: I don't know that. I don't recall how this specific transaction went down. It -- I may have debited Mr. Leer's bank account or it may have came off the top or it may have bounced. There could be a bunch of -- I don't know. But yeah.

MR. HESKIN: All right. Here is an exhibit. So exhibit number 11 is a pay run that was produced by your company. Do you see the Bates stamp at the end?

A. What? Oh, it was produced by my company, okay. But it is not a Spin document. It appears to be a BMF document.

Q. Produced by Spin; right?

MR. PICON: That's what he said.

THE WITNESS: I don't know. It could be.

MR. PICON: He said it was produced by Spin. He said that.

THE WITNESS: It's dated -- yeah. Yeah.

MR. PICON: It's not his document, though. So are you trying to confuse him and trying to get him to say it's his document? What are we

Page 214

doing here, Shane?

MR. HESKIN: Can you let me ask questions? I'm saying, I'm pointing out that it was produced by him. Okay? Let me get to the next question.

THE WITNESS: Okay.

BY MR. HESKIN:

Q. How did you get a copy? How did you get access to this document?

A. I don't know. I'd have to ask my attorneys.

Q. Did you have access to BMF's accounts, accounting information?

A. No. I probably -- somebody, one of my -- either -- my attorneys probably requested it direct from BMF. It says 5/2/2022.

Q. So your attorneys have the authority to request documents from BMF; is that your understanding?

MR. PICON: Objection to form.

THE WITNESS: I probably gave them authority, yeah, for discovery on this.

BY MR. HESKIN:

Q. How do you have authority to give your attorneys permission to get documents from BMF if

Page 215

you don't control BMF?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't -- Shane, I don't have the answer to your question. This is not a Spin document. How did it come? I have no -- I don't know. Like, who cares? How is that relevant?

BY MR. HESKIN:

Q. Well, this one shows --

A. Oh, you think I'm lying about it being a -- that's really a Spin document? What's your question?

Q. Well, here's a problem. A small problem, maybe. Small problem that may be a big problem.

It shows that you over-collected for 972.

MR. PICON: Object to the form of the question.

THE WITNESS: I don't have an answer for your question. Firstly, you made a statement which is false.

BY MR. HESKIN:

Q. Is this accurate, that you over-collected by $972?

Page 216

A. It's not my document and I can't speak on behalf of BMF.

Q. Okay. Well, according to my math, that would bring you under the 2.5 million dollar threshold exception.

MR. PICON: Objection to the form of the question.

THE WITNESS: It's not --

BY MR. HESKIN:

Q. I think you've got a problem.

MR. PICON: You're testifying, not asking questions, Shane.

BY MR. HESKIN:

Q. I think you've got a problem, don't you?

MR. PICON: Objection to the form.

THE WITNESS: I can't -- I can't speak on behalf of a company that I don't own.

MR. HESKIN: Okay. That's what happens when they're so close to the line. Let's look at the next one.

MR. PICON: Stop with the comments, Shane.

MR. HESKIN: Okay.

THE WITNESS: You're making false

Page 217

statements.  You got to ask questions.

MR. PICON: You just answer the questions.

MR. HESKIN: I think we talked about this one already.

(Whereupon, Exhibit Lubin-11 was marked for identification).

BY MR. HESKIN:

Q.    Contract attached.  Oh, here it is: Need to get -- oh, there it is.  Need to get Getter on board with "me."

MR. PICON: Do you want to show us the document?

MR. HESKIN: Oh, I'm sorry, I'm sorry. Yeah, this is a good one.  I do want to share this. Here is another one referring to "me."

MR. PICON: Do you want to show him the whole document?

MR. HESKIN: Well, let's just start at the top.

MR. PICON: Give him some context. I'd like you to do so.

MR. HESKIN: Okay.  Gabe Isaacov --

MR. PICON: That's the top of the document.  Can you scroll to the bottom of the

Page 218

document, so we can see the whole thing?

BY MR. HESKIN:

Q.    March 2, 2021, do you see that?

MR. PICON: Wait a second.  Can we see the entire document?

MR. HESKIN: It's there.

MR. PICON: Let's go back, so we can see the entire document.

Okay.  All right, fine.  Is that the entire document?  Yes?  No?

MR. HESKIN: Hold on.  We're going through it.

MR. PICON: Okay, good.  Now let's get the question.

MR. HESKIN: Well, listen, I'm glad you made me go through it, because I caught stuff I I didn't even think about.  That's great.

BY MR. HESKIN:

Q.    So Josh Lubin, it starts out -- I haven't gone through the chronology.  It sounds like someone provided bank statements to Josh.  It looks like Genesis, Lone Wolf, Connecticut, Golden Foothill Services.

MR. PICON: That sounds like a statement, not a question, once again.

Page 219

BY MR. HESKIN:

Q.    Did you get those bank statements from my client?

MR. PICON: What bank statements?  It assumes a fact not in evidence.

BY MR. HESKIN:

Q.    These attachments, what are these?

A.    I'm assuming whatever they are, they came from your client and I likely forwarded them, whatever it is.

Ask me a question.

Q.    Okay.  And then he says: I need to transfer accounts below.

Remember we were, we were saying, talking earlier that I expected to see an e-mail from Gabe, to you, calculating the per day ones, the how much it would be per day; right?  Since he's the one that's doing all the calculations; right?

Do you remember that conversation?

A.    I think he had employees that would do it for him, but I'm not speaking on behalf of Gabe. Sure, go ahead.

Q.    Well, who is the author of this?

MR. PICON: Author of what?

BY MR. HESKIN:

Page 220

Q.    150K, 1.499, 40 days.

A.    That says me.  I wrote e-mail.

Q.    Oh, okay.  All right.  So how did you come up with the 40 days?

MR. PICON: Object to the form of the question.

THE WITNESS: Probably phone negotiations back and forth, with Mr. Leer.  I don't -- I don't know.  I think that maybe that's an estimated term that BMF and Mr. Leer wanted to pay the receipts at.  Like, what do you want me to tell you?

BY MR. HESKIN:

Q.    Here's an interesting one from Gabe, Gabe Isaacov, next one, get me YSC contract here, please.  Is that the Yellowstone?

A.    That's probably what he was referring to.

Q.    Okay.

A.    I think so.  I can't speak on his behalf, but sure.

Q.    So you knew that he had already done an MCA with Yellowstone; right?

MR. PICON: Object to the form.

THE WITNESS: It looks like Gabe knew

Page 221

that, okay, sure.

BY MR. HESKIN:

Q.   West Coast Business Capital?

A.   I don't -- what's your question?

Q.   Okay.  Why is it --

A.   Does it appear like --

MR. PICON: Stop.  Just answer his questions, Josh.  Okay?

BY MR. HESKIN:

Q.   So here's my big question.  All day you're saying it's Gabe does this, Gabe does that, Gabe is the one that makes the decision.  So tell me this, why is Gabe writing "you sure you want to fund this?"

March 2, at 2:57 p.m. -- yes, March 2, at 2:57 p.m. he writes to you:  "You sure you want to fund this?"

Who is the "you" in that?

MR. PICON: Objection to form.

THE WITNESS: I'm not going to speak on behalf of Gabe, but he could be asking me, like --

Q.   So the "you" in that is really "me"; right?

A.   It sounds like that to me.

Page 222

Q.   And then the next one --

A.   But the way I read it is this sounds like a bad idea.

Q.   Okay.  But then it says, I don't know, it says:  "Need to get Getter on board with me."  Who is the "me" in that sentence?

MR. PICON: Same objection.

THE WITNESS: He's probably talking about myself, trying to -- as the broker, to -- I don't know.

Ask me a question, a normal -- yeah.

BY MR. HESKIN:

Q.   So what it sounds like to me -- tell me if I'm wrong -- Getter didn't know that he was stacking and you both included a non-stacking addendum that put my client in breach from day 1.  That's what it looks like to me.

MR. PICON: Objection.  It misstates the document and misstates his testimony.

THE WITNESS: These are -- do you represent Getter now, all of a sudden?

Like, what's going on here?

BY MR. HESKIN:

Q.   Well, I mean, it's an interesting document here.  "Need to get Getter on board with

Page 223

me" and then your testimony is "me" doesn't really mean "me," "me" means Gabe; right?

A.   I don't know.

MR. PICON: Objection to form.  That's not his testimony.

THE WITNESS: I don't know.

BY MR. HESKIN:

Q.   I'm asking, does "me" mean Gabe or you?

MR. PICON: Object to the form.

THE WITNESS: I don't know.  I don't recall.

BY MR. HESKIN:

Q.   Okay.  100K x2, do you know what that means?

A.   I don't want to speculate.

MR. HESKIN: Okay, let's go to the next one.  So the Hi Bar -- let's go to exhibit number 12.

(Whereupon, Exhibit Lubin-12 was marked for identification).

BY MR. HESKIN:

Q.   This is the Hi Bar agreement, dated 3/10/2021.

A.   Okay.

Q.   Okay.  And we already saw from the

Page 224

prior agreement that the Leer companies has already sold at least 10 percent of their receivables to BMF; right?

A.   Yes.  It's possible, sure.

Q.   Well, can you answer me this question: How can he, if he already sold 10 percent of his receivables to BMF, how does he now sell and assign all of his receivables to Hi Bar?

MR. PICON: Object to the form of the question.  Misstates the document.

THE WITNESS: I'm not defining what the contract says.  That's first of all.  Second of all, with the BMF and the Hi Bar contracts, there's a big possibility I never even seen them.  Like, the DocuSigns were likely sent out from these companies directly and I just basically brokered the terms of the deal.  My job was to get it signed.

Other than that, like, I did not -- I did not review these documents, whatsoever.

BY MR. HESKIN:

Q.   Okay.  Let's just read the first line: In consideration of payment by HBC, a merchant, of the purchase price set forth above, merchant hereby sells, assigns and transfers to HBC, making HBC the absolute owner, the purchase percentage of all of

Page 225

merchant's payments, receipts and funds paid or received on the account of merchant from time on time thereafter?  How is that possible?

MR. PICON: Objection to form.

THE WITNESS: I'm not defining this document.  That's a legal question, Shane.

MR. HESKIN: Okay.  Oh, is this thing not going through?  I have to load it up again.

MR. PICON: In about five or so minutes can we take a break?  We've been going about an hour and 15, almost.

MR. HESKIN: Yeah, that makes sense.  Let me pull this up, first.  I lost it.

(Pause).

Can you guys see it now?

MR. PICON: What are we supposed to be seeing?  We see a document.

MR. HESKIN: The Hi Bar agreement.

MR. PICON: You have to lower it.  We can't see it.  Now you're on page 5.

MR. HESKIN: Yep.  Yep, that's where I am.

MR. PICON: Okay.  Well, we don't know if it's the Hi Bar agreement.

MR. HESKIN: It's the same one we were

Page 226

talking about.

MR. PICON: Oh, the same one?

MR. HESKIN: Yeah, it's the same one.

BY MR. HESKIN:

Q.    So on this one it's $8,500 per day.  Okay?  And that's for 20 percent of the receivables from the front and then there is an underwriting fee of $21,999.  Who gets that?

MR. PICON: Object to the form of the question.

THE WITNESS: I can't answer on behalf of Hi Bar.

BY MR. HESKIN:

Q.    Did Hi Bar do the underwriting on this?

A.    That would be their responsibility, correct.

Q.    How many employees does Hi Bar have?

A.    At this time that this deal was done?

Q.    Yeah.

A.    I don't know, maybe, maybe a dozen or two.  I don't know.  I can't answer.  I don't own Hi Bar.

Q.    Well, who did you deal with at Hi Bar?

A.    I didn't work at Hi Bar, either.  I told you before.

Page 227

Q.    Who did you deal with?

A.    Joel.

Q.    Anyone else?

A.    Majority, just, I think just Joel.  I ended up speaking to other people later down the line, after they winded down operations, but...

Q.    You're aware that, what's his name, Joel Herbst claims that he wasn't the rightful owner of Hi Bar?

MR. PICON: Who wasn't?

BY MR. HESKIN:

Q.    There was a dispute; right?

A.    There was a dispute or something like that, yeah.

Q.    All right.  So here's another ACH check authorization form.  It's to Spin Capital.  Can you read the city and state listed for Spin Capital on this one?

A.    Shane, we went through this, like -- it says Lakewood, New Jersey.

Q.    Okay.  Is that another mistake?

A.    Is that a what?

MR. PICON: Object to the form.

BY MR. HESKIN:

Q.    Is that a typo?

Page 228

MR. PICON: Object to the form.

THE WITNESS: That's the mailing address.  And that's my home address, as well.  Go ahead.

BY MR. HESKIN:

Q.    So in addition to the 21,999 there's an $8,000 origination fee; do you see that?

A.    Yeah, I see where you're showing me, yeah.

Q.    Who gets that?

MR. PICON: Object to the form.

THE WITNESS: That would probably go to me.  But I don't know exactly what happened or recall exactly what happened with this transaction.  Or whatever, with Spin, yeah.

BY MR. HESKIN:

Q.    Okay.  So let's go here.  That was dated, that was dated March 10, '21.  Now let's go to the next one, BMF, which is March 12, '21.  This is just 10 days after; right?

MR. PICON: We're looking at the same document.  We have not seen --

MR. HESKIN: No, no, no.  I'll give you --

MR. PICON: Well, you can't ask him

Page 229

the question without putting it in front of him.

MR. HESKIN: Exhibit number 13, we're on now.

(Whereupon, Exhibit Lubin-13 was marked for identification).

BY MR. HESKIN:

Q. This is the merchant agreement dated 3/12/21. This is the one with BMF; right?

A. Appears to be.

Q. Did you broker this deal?

A. Likely.

Q. Okay. And it's purporting to purchase 10 percent; right?

A. I'm not defining someone else's document. The documents speak for themselves.

Q. Okay. And this one says 8,500 daily; do you see that?

A. I answered the question. I see what you're showing me.

Q. Okay. And, again, you have no idea how he calculated the 8,500 daily?

A. That's not my responsibility.

Q. Well, the one just 10 days earlier was 4,996 per day; do you recall that?

A. I think -- what, do you have a

Page 230

question for me?

Q. Yes.

MR. PICON: Just answer the question.

BY MR. HESKIN:

Q. I'm just trying to figure out the math, because 10 days ago 10 percent equals 5,000 and then it now equals 8,500. I'm just trying to figure out how you get to those numbers.

A. You keep saying you.

MR. PICON: Object to the form. He didn't get the numbers.

THE WITNESS: I'm not -- I can't answer questions on behalf of BMF or Hi Bar. And you keep on doing this. You already have me testifying under oath like 50 times --

Q. Okay.

A. -- that --

Q. These are deals that you're brokering. So on March 10, just two days prior to that 20 percent of his receivables equals 8,500 per day, yet two days later 10 percent, which is half that amount, equals 8,500.

I mean, I can't get my head around that. Can you explain it?

MR. PICON: Same objection.

Page 231

MR. HESKIN: I don't know, maybe he has an explanation for it.

BY MR. HESKIN:

Q. Do you?

A. Shane, the documents speak for themselves.

Q. Listen, I'm just --

MR. PICON: He gave you an explanation.

THE WITNESS: You maybe have your perspective. I'm definitely not going to give a perspective on behalf of BMF or Hi Bar.

BY MR. HESKIN:

Q. Okay. Or "you" or "me"?

MR. PICON: Object to the form.

THE WITNESS: I'm not giving a perspective at all. Me, on behalf of Spin Capital, is not giving a perspective or defining BMF or Hi Bar documents. No way. Like, I don't think you're allowed to ask, but yeah.

BY MR. HESKIN:

Q. And this one also has a no stacking addendum; right?

A. Possible. You appear to be showing me something like that.

Page 232

Shane, these documents speak for themselves.

Q. Okay.

MR. PICON: Good time for a break?

MR. HESKIN: Right after I get through this one. Balance transfer form. I think that's okay.

Yeah, I think we can, now is a good time. Let's come back in 10, so say around 3:30?

MR. PICON: Sure.

(Whereupon, a short recess was taken).

BY MR. HESKIN:

Q. Welcome back, Mr. Lubin.

A. Thanks.

MR. HESKIN: Can I mark this, I'm showing you Exhibit 14. This is Bates number Spin 00007182.

(Whereupon, Exhibit Lubin-14 was marked for identification).

BY MR. HESKIN:

Q. And this is another accounting; right?

MR. PICON: Object to the form of the question.

BY MR. HESKIN:

Q. I mean -- right, this is another

SPIN CAPITAL, LLC, et. al. v.
GOLDEN FOOTHILL INSURANCE SERVICES, LLC

AVRUMI LUBIN
July 25, 2024

Page 233

accounting from BMF?  Right?

A.    That's what it appears to be.

Q.    It looks like there's another over-debit of $8,000 in this one; right?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't know.

BY MR. HESKIN:

Q.    You've got no reason to dispute that; right?  Or contradict the fact they over-collected this $8,000; right?

MR. PICON: Object to the form of the question.  There's nothing that this document says that $8,000 was over-collected.

MR. HESKIN: Except for the $8,000 in parentheses, and that's the universal sign for negative; right?

MR. PICON: That's your interpretation of what this document is.  It's neither your document, my document, nor this witness's document.

BY MR. HESKIN:

Q.    Do you have any basis to refute the accuracy of this document?

MR. PICON: Object to the form.

THE WITNESS: These are questions for

Page 234

BMF.

BY MR. HESKIN:

Q.    Last I checked, was BMF a party to this case?

MR. PICON: Object to the form.

THE WITNESS: Excuse me?

MR. HESKIN: All right.  Let's go to the next one.  So let's share this next one, because this one actually sort of supports -- you know, at least on this one it supports what you're saying.

We're on 15 now.

(Whereupon, Exhibit Lubin-15 was marked for identification).

BY MR. HESKIN:

Q.    So this is an e-mail chain dated March 12, 2021 and it's, you know, it's got in here, you know, where my mouse is:  "Josh Lubin, to Gabe, send re-fi docs, 1.499, 6,999 daily; do you see that?

A.    Sure.

Q.    How did you come up with the 6,999?

MR. PICON: Object to the form of the question.

THE WITNESS: I maybe spoke to Mr. Leer and relayed it to BMF.  I don't know.

BY MR. HESKIN:

Page 235

Q.    Okay.  Then --

A.    Yeah, I don't know.

Q.    And then in response Gabe says:  47 days, how much bank fee?  These are questions; right?

A.    One of them -- I don't know.  I'm not going to define Gabe's e-mail.

Q.    He's asking you how much the bank fee is; right?

A.    I don't know if he's asking me.  I don't know.

Q.    Well, you say here:  Do whatever you want.  I'll get it done.

A.    Okay.

Q.    Okay.

A.    It appears that's what I said, sure.

Q.    So it went from $7,000 a day to $8,500 a day; do you see that?

MR. PICON: Object to the form of the question.

BY MR. HESKIN:

Q.    Do you see that right now?

A.    Are you asking me something or telling me something?  What's your question?

Q.    I want to know how you guys got to both

Page 236

numbers.  Like, how do you get to $7,000 a day and Gabe gets to 8,500 a day?  Is it, like, just picked from the air?

MR. PICON: Object to the form of the question.  He didn't say he got to it.

THE WITNESS: I may have conveyed what your client asked for and Gabe may have said no and decided that he wanted to do X.  Or BMF or his underwriter.  I don't know.  I don't make decisions on behalf of BMF, whatsoever.

BY MR. HESKIN:

Q.    I mean, forgive me if I don't know how these things work, but aren't these things supposed to be calculated based on the actual percentage of receivables being purchased?

A.    Are you asking me or are you telling me?

Q.    I'm asking you.

A.    I'm not --

Q.    I'm not in the business, you are.

A.    I'm not here to define anyone's underwriting guidelines or policies.  Especially companies I don't know the underwriting guidelines or policies.  So, yeah.

Q.    Okay.  So as you sit here today, you

Page 237

have no idea how he came up with the 8,500 per day?

A.   That's not what I said.  First of all, I wouldn't have an idea.  I don't do the due diligence.  It's not my responsibility.  It's not my job.  Yeah.

Q.   Okay.  And you don't have any idea who came up with this 7,000 figure?

A.   How Gabe came up with a number?

Q.   No, you.  I'm looking at the one where you --

A.   Oh, I don't remember.  I probably spoke to your client and he requested it at those -- at that specific daily and -- I don't know.  I'm not going to speculate.

MR. HESKIN: Okay.  Now we're on 16.  It's the BMF agreement, 3/25/21.

(Whereupon, Exhibit Lubin-16 was marked for identification).

BY MR. HESKIN:

Q.   So the last agreement was August 12.  This one's -- or, I mean March 12.  This one is March 25, less than two weeks later; right?

MR. PICON: You're testifying again, Shane.

MR. HESKIN: I'm asking him a

Page 238

question.

BY MR. HESKIN:

Q.   Is it less than two weeks later?

A.   I don't --

Q.   Did I do the math on that right?

A.   Shane, I'm not interpreting BMF's document.

Q.   You can't figure out the number of days between March 12 and March 25?

A.   I told you I'm not interpreting a document that is being presented.

Q.   Okay.  So on this one it's BMF again, right, same party that you brokered on March 12; right?

A.   What's your question?

Q.   It's the same party; right?  We're talking about the same BMF; right?

A.   Sure.

Q.   Okay.  And the specified percentage is, again, 10 percent; right?

A.   Shane, I'm not interpreting their document.

Q.   I'm not asking you to.  I'm just saying the percentage here states 10 percent; right?

MR. PICON: You're just asking him to

Page 239

read the document?  Is that what you want?

BY MR. HESKIN:

Q.   And now it's, the daily amount is $25,000 per day; right?

A.   It appears to show that this document shows $25,000, but I'm not going to interpret the document.  Go ahead.

Q.   Okay.  How do you go from $8,500 a day to $25,000 per day in less than two weeks?  I mean, did the Leer companies have some big windfall in receipts that occurred in those two weeks, that you're aware of?

MR. PICON: Object to the form of the question.

THE WITNESS: This is not my document.  I didn't do due diligence here, and I don't have an answer for you, Mr. Heskin.

BY MR. HESKIN:

Q.   This has a no stacking clause again; right?  Right?

A.   It appears to be showing a no stacking addendum, it's titled, sure.

Q.   Again, this is something you didn't review?

A.   Correct.

Page 240

Q.   Okay.  And there's another ACH form?

A.   Correct.

Q.   And again, this one again says your address is New Jersey; right?

MR. PICON: Object to the form.

THE WITNESS: The mailing address is Lakewood, New Jersey, correct, for Spin.

BY MR. HESKIN:

Q.   You say, you keep on repeating, saying it's the mailing address.  Can you read what it says under 1460 Arboretum Parkway?  Just read the words directly beneath that.

A.   Authorized business address.  I don't think that's a false statement, whatsoever, that there, no.

Q.   And there's an origination fee?

A.   Correct.

Q.   Do you remember that -- okay.  Who gets that?

MR. PICON: Object to the form.

THE WITNESS: I don't believe anyone got it.

BY MR. HESKIN:

Q.   You don't believe anyone got that?

A.   I don't know.  I just don't recall.  I

Page 241

think this bounced, to be honest. But I don't -- yeah.

Q. It's supposed to go to you; right?

MR. PICON: Object to the form.

BY MR. HESKIN:

Q. I mean, you say this isn't your document, but --

A. Maybe I have to split it, but I don't think I received this at all, so it's irrelevant. I'm not going to speculate on something that Spin never received.

Q. Well, how do you know that Spin never received it?

A. I'm pretty sure I recall it bouncing. It's a significant sum. I could be wrong. I don't know. As I recall, I don't think I ever received it.

Q. Say that again.

A. I don't -- I don't think I ever received it.

Q. Well, what was it for? What did you do for it?

MR. PICON: Object to the form of the question.

THE WITNESS: Sorry?

BY MR. HESKIN:

Page 242

Q. What's it for? I mean, what did you do? Because it seems like you're getting paid on both ends of this; right?

MR. PICON: Objection to form.

BY MR. HESKIN:

Q. I mean, you're getting paid three ways, actually.

A. Well, I --

Q. Hold on. Let me list the ways in which I think you're --

A. Shane --

Q. -- profiting. You get a percentage of the bank fee from BMF; right?

A. Right.

Q. You're getting a 50 percent syndication on the deal from BMF; right? On profits; right?

MR. PICON: Object to the form.

THE WITNESS: I get 50 percent of the upside, yeah.

BY MR. HESKIN:

Q. And then you get this $40,000 professional fee.

MR. PICON: Object to the form.

BY MR. HESKIN:

Q. Origination fee.

Page 243

MR. PICON: He already testified he didn't get it.

THE WITNESS: I never got it, but I'm saying if I would have got it, it's for -- you know, I call a few hundred people a day and you don't -- and I deserve to be comp -- my services cost a lot of money. I'm not cheap.

BY MR. HESKIN:

Q. So when you were charging Mr. Leer 40 grand for professional services --

A. I never got it.

Q. When you're charging him, did you disclose to him the fact that you were also syndicating in the deal and also getting paid on the back end from BMF? Did you disclose that?

MR. PICON: Objection. Object to the form of the question.

THE WITNESS: I don't know.

BY MR. HESKIN:

Q. Did you not think that was important for Mr. Leer to understand, that you were making money on both ends of the deal?

MR. PICON: Object to the form of the question. It assumes a fact not in evidence.

THE WITNESS: You're asking for a

Page 244

legal conclusion. It's possible I did or didn't tell him. I don't think it's relevant. You asked me for my opinion.

BY MR. HESKIN:

Q. You didn't think it was relevant to tell him?

A. I don't know, Shane.

Q. Listen, it's okay.

MR. HESKIN: I think we went through this one. Let's mark this as exhibit number 17. This is the Hi Bar agreement, dated 3/25/21.

(Whereupon, Exhibit Lubin-17 was marked for identification).

BY MR. HESKIN:

Q. This is another one you brokered; right?

A. I'm not the -- probably, sure.

Q. And right on the face of it, it says purchase percentage is 20 percent and the daily remittance is $20,000 per day?

A. That's what it appears to show.

Q. Okay. And again, you have no idea how that was calculated; right?

A. I have no idea, correct.

Page 245

Q.   Excuse me?

A.   **I have no idea how Hi Bar calculated that number.**

Q.   Did you have any communications with them about it?

A.   **I don't recall.**

Q.   Okay.  And then on Exhibit A it's got an underwriting fee of $80,000; is that right?  Did I read that right?

A.   **That's what it appears, appears to show.**

Q.   What was done to earn that?

MR. PICON: Objection to form.

THE WITNESS: You have to ask Hi Bar.

BY MR. HESKIN:

Q.   This is a deal that you brokered.  Who got the $80,000?

A.   **I didn't get the $80,000.  I don't know if the $80,000 was even charged.  You got to ask -- these are questions for Hi Bar.**

Q.   You don't think that shocks the conscience?

MR. PICON: Objection to the form of the question.

BY MR. HESKIN:

Page 246

Q.   I'm asking.  You're brokering the business.  Do you believe that shocks the conscience?

MR. PICON: Same objection.

BY MR. HESKIN:

Q.   Does it shock your conscience?

MR. PICON: Same objection.

THE WITNESS: These are questions for Hi Bar.

BY MR. HESKIN:

Q.   I'm asking you.  You're the broker on this deal, that this merchant is getting -- we'll look at the net amount that they ultimately get.  So it's $400,000 and you're charging $80,000 -- and the pay back is 600.  So that's a 1.5 deal.  And it gets even worse when you're only getting 320, because you're charging 80 grand in underwriting.

You don't think that shocks the conscience?

MR. PICON: Object to the form of the question.

THE WITNESS: Shane, I'm not going --

MR. PICON: Hold on.  You're testifying now.  And he's not charging any of that.  This is not his deal.  He told that you before.

Page 247

MR. HESKIN: He brokered it.

MR. PICON: So, he brokered it.  He's not --

BY MR. HESKIN:

Q.   Okay.  Is this typical in the industry, to charge 80 grand on a 400K deal?

MR. PICON: Object to the form of the question.

THE WITNESS: Shane, you got to ask Hi Bar these questions.  I can't answer.  I don't know what risk factors they took in.  And I don't know that this fee was even charged.  There's so much I don't know, so how am I supposed to give you an opinion, based -- you're asking me for an opinion.  You're asking me to speculate on something that's not my document and -- yeah.

MR. HESKIN: Okay.  So what am I on, 18 now?

THE WITNESS: The document hasn't changed.

MR. PICON: He's talking to the Court Reporter.

THE WITNESS: Oh.

(Whereupon, Exhibit Lubin-18 was marked for identification).

Page 248

BY MR. HESKIN:

Q.   Here's a pay run from BMF that was produced by you and it's showing another 1,900 in over-collections; do you see that?

MR. PICON: Say that again.

THE WITNESS: It's a BMF document.  I'm not going to interpret what it shows.  Those would be questions for BMF.  Yeah.

BY MR. HESKIN:

Q.   You get 50 percent on all the profits; right?

A.   **Correct.**

Q.   So you get 50 percent of the over-collections, too; right?

MR. PICON: Object to the form of the question.  It assumes facts not in evidence.

THE WITNESS: I don't know -- I don't agree with your question.

BY MR. HESKIN:

Q.   I mean, we've looked at --

A.   **You're just making --**

Q.   We looked at three BMF pay runs that were produced by you, today, didn't we?

A.   **I believe so.**

Q.   And all three of them show

Page 249

over-collections; correct?

MR. PICON: Object to the form of the question.

THE WITNESS: These are not my documents and, yeah, I'm not going to interpret what -- this is an internal document. I don't know if there's bounce fees. I don't know if there's default fees. I don't know if there's legal fees. I don't know what it is, but these are questions for BMF.

BY MR. HESKIN:

Q. Okay. You've got, as you sit here today, you've got no reason to refute these numbers?

MR. PICON: Object to the form of the question.

THE WITNESS: It's not my document, Shane.

BY MR. HESKIN:

Q. I'm just asking a question. You've got no basis, as you sit here today, to refute these numbers; correct?

MR. PICON: Same objection.

BY MR. HESKIN:

Q. Correct?

MR. PICON: Same objection.

Page 250

THE WITNESS: This is not my document.

MR. HESKIN: Okay. I'm on 19 now?

(Whereupon, Exhibit Lubin-19 was marked for identification).

BY MR. HESKIN:

Q. This is the promissory note at issue?

A. It appears to be, sure.

Q. Okay. And it has your address as 127 50th Street, Brooklyn, New York?

A. Okay.

Q. Is that true?

A. I think it might be 49th Street. Yeah, it's the same building. I'm pretty sure.

Q. Is that address registered with New York, the State of New York, as your address?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't know. I'm pretty sure Spin is registered to do business in New York.

BY MR. HESKIN:

Q. What's the address that they list for their address with the State?

A. I don't know. It might be -- it might be 49th Street, but it's the same building, it's just

Page 251

two entrances. There's an entrance on 50th Street and an entrance on 49th Street.

Q. Sir, now you've got on here 5 percent per month; do you see that?

A. Okay.

MR. PICON: Do you want to point him to it?

BY MR. HESKIN:

Q. Yes, principal. The interest rate, it says 5 percent per month; do you see that?

A. Yes.

Q. Okay. What was your understanding, at the time, of what that annual interest rate would be?

MR. PICON: Object to the form. You can answer.

THE WITNESS: Sorry?

BY MR. HESKIN:

Q. What did you believe the annual interest rate would be on 5 percent per month?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't think I calculated it annually.

BY MR. HESKIN:

Page 252

Q. Can you do 5 times 12?

MR. PICON: Are you asking him to do it, Shane?

THE WITNESS: Yeah.

BY MR. HESKIN:

Q. I'm asking can you do basic math, can you do 5 times 12?

A. Yeah, it -- okay. Oh, 5 times 12 is 60 percent.

Q. Okay. And the default rate, if there was default it goes up to -- it doubles; right?

MR. PICON: Objection to form.

THE WITNESS: It's 10 percent a month, yeah.

BY MR. HESKIN:

Q. So that would be 120 percent; right?

A. The loan wasn't intended to be a 12 month loan, so I'm not sure why we would calculate it annually.

Q. What was it intended to be?

A. Either five or seven months. I forgot.

Q. Okay. And do you see E?

D, it has a $25,000 default fee; right?

Page 253

A.    Right.

Q.    So upon a default, the interest rate doubles, it goes from 60 to 120 percent annual; right?

A.    Okay.

Q.    And then you tack on 25K default fee; right?

A.    Okay.

Q.    And then another 25 percent of the balance due for attorney's fees, doesn't it say that?

MR. PICON: When incurred, balance due.

THE WITNESS: Yes, I see that.

BY MR. HESKIN:

Q.    Okay.  And it's your position that you get 25 percent and even more than that in attorney's fees?  Or is it capped at the 25 percent?  What's your position?

MR. PICON: Object to the form.  Calls for a legal conclusion.

THE WITNESS: That's a question you have to ask my lawyers.

BY MR. HESKIN:

Q.    What was your intent at the time?

Page 254

A.    I hired a lawyer.  My intent was my lawyer was doing their job.

Q.    What's your assertion in this litigation, is it capped at the 25 percent or do you get 25 percent for attorney's fees?

MR. PICON: Objection to form.

THE WITNESS: I'd have to discuss it with my attorneys.

BY MR. HESKIN:

Q.    Aren't you the corporate designee on the damages being sought in this case?

A.    What's your point?

Q.    I'm asking --

A.    I'm not making a legal conclusion.

Q.    If you're not the one to tell me that, who is?

A.    I just told you I -- I'm not here to make a legal conclusion on something that appears you're going to be disputing the language of what something says.  I'm not -- that's a legal question.

Q.    And that -- am I reading this one right?  Did you put in here $135,000 pre-payment penalty?

MR. PICON: Objection to form.

THE WITNESS: I'm not --

Page 255

MR. HESKIN: That, that I missed.  That makes it usurious.

MR. PICON: Shane, are you going to testify all day or are you going to ask questions?  Come on.

THE WITNESS: Okay.  Do you want me to help you out?

BY MR. HESKIN:

Q.    Sure.

A.    Yes, the 135 was intended to be there.

Q.    Okay.

A.    Yeah.  The 135 pre-payment penalty.

Q.    So if you pay it off early --

A.    But before the --

Q.    -- there's a 135,000 penalty?

A.    I forget how long the exact period was, but yeah, if it was a five month period or whatever it was, there would be $135,000 pre-payment penalty.

That's pretty cheap.  Banks charge a lot more than that, Shane.

BY MR. HESKIN:

Q.    Banks charge $200,000 origination fees on a 2.5 million dollar loan?

A.    I called it a pre-payment penalty.

Page 256

Now you're calling it an origination fee.

Q.    So you're saying this is a cheap interest rate?

A.    I never said that.

MR. PICON: Objection to form.

THE WITNESS: I think there was a lot of risk.

BY MR. HESKIN:

Q.    Okay.  And do you see on this acknowledgment form that's signed, it's got a California notary?  This was signed and executed in the State of California?

MR. PICON: Object to the form of the question.  It speaks for itself.

THE WITNESS: That's what you're showing me.

BY MR. HESKIN:

Q.    You knew that --

A.    I'm not disputing it, what you're saying.  You're making a statement.

Q.    You knew he was located in California; right?

A.    I knew that his residence --

MR. PICON: Objection to form.

THE WITNESS: I knew that his

Page 257

residence was in California, I believe Los Angeles, the Los Angeles Metro area.

BY MR. HESKIN:

Q. Okay. Where in this agreement does it require my client to pay Berkovitch's $30,000?

MR. PICON: Objection to the form of the question. It calls for a legal conclusion.

BY MR. HESKIN:

Q. No, I'm just asking where in here does it say that?

A. I don't know --

MR. PICON: Hold on a second. Objection to the form. It calls for a legal conclusion.

BY MR. HESKIN:

Q. Can you point me to the provision in here that requires him to pay Berkovitch's $30,000?

A. I'm not --

MR. PICON: Same objection.

THE WITNESS: I'm not looking -- there's a disbursement schedule and there's also a provision or two. I'm not -- this is -- I'd have to look at the order, the judge's order, or ask my lawyers. I'm not defining any -- yeah, I'm not making any legal conclusion.

Page 258

BY MR. HESKIN:

Q. Are you unable to point to a provision here that allows you to charge the $30,000?

MR. PICON: He already testified to a provision.

BY MR. HESKIN:

Q. In this contract?

A. I don't know if it's a promissory note or -- it's in this contract. There's a bunch of different documents for the contract. It appears you're withholding the disbursement schedule that shows also the legal fees in there.

MR. HESKIN: Okay. Let me go to this one. I'm on exhibit 20 now.

(Whereupon, Exhibit Lubin-20 was marked for identification).

BY MR. HESKIN:

Q. I'm handing -- we're marking as exhibit 20 an e-mail, dated June 16, 2021, that's between you, Josh, Berkovitch and Getter; right?

MR. PICON: No, he's Josh.

THE WITNESS: I'm Josh. Yeah, it appears to be the case, but yeah -- if you can just scroll down?

Yeah, go ahead.

Page 259

BY MR. HESKIN:

Q. I'm a little confused, here. On the portion that says Tuesday, June 15, 2021 you wrote: Hi Bar and BMF pay off letter attached. Put in the docs. I get 15 percent of the profits on the John Utsick policies when he sells.

Where is that note? Where is that in the agreement?

MR. PICON: Object to the form.

THE WITNESS: I think he forgot to put it in the agreement, but it's supposed to be in there. That was -- yeah, that was part of the deal I made with your client.

BY MR. HESKIN:

Q. So in addition to the 120 percent default interest, the pre-payment penalty, the 25 percent attorney's fees, you were also supposed to get 15 percent of the Utsick policies?

A. Something like that.

Q. Hmmm. Did you sue your lawyer for malpractice, for not including that term in the agreement?

A. No.

Q. Okay. Did you ever raise that issue with my client, that that wasn't included in the

Page 260

agreement?

A. I don't recall. I don't remember.

Q. Well, it says yes, it's on the security agreement, so Life Shares II with 7 policies on the docs.

MR. PICON: Is there a question?

BY MR. HESKIN:

Q. So who's syndicated -- who's syndicated in this deal?

MR. PICON: Object to the form of the question.

THE WITNESS: The participation was Hi Bar and BMF.

BY MR. HESKIN:

Q. And Spin?

A. Yeah, and me.

Q. Okay. And in what relation?

A. What's that?

Q. In what relation? How much did you have? How much did Hi Bar have? How much did BMF have?

MR. PICON: Object to the form.

THE WITNESS: My investment was -- Hi Bar invested 50 percent; I invested 25 percent; and Gabe invested 25 percent.

Page 261

BY MR. HESKIN:

Q.   Okay.  And there was a disbursement of approximately 1.3 million dollars; do you recall that?

A.   **I believe it was 2.7 million dollars.**

Q.   But the net disbursement was about 1.3; right?

MR. PICON: Objection to the form of the question.

THE WITNESS: You're not -- are you telling me something?  What are you saying?

BY MR. HESKIN:

Q.   I'm asking if you remember.

MR. PICON: Object to the form.

THE WITNESS: I don't remember the exact numbers.  If you can show me the disbursement exhibit, we can see it.  And -- but it was -- it was -- after the origination fees, it was about 2.5 million dollars net.

BY MR. HESKIN:

Q.   Okay.  There was a $200,000 bank fee; right?

MR. PICON: Objection to the form of the question.

THE WITNESS: I charged a fee of

Page 262

$200,000, correct.

BY MR. HESKIN:

Q.   Okay.  What did you do to earn it?

A.   **I put together the whole deal.**

Q.   Just like you put together the five other MCAs?

MR. PICON: Object to the form of the question.  Assumes facts not in evidence.

THE WITNESS: I worked my ass off, putting together the deal, putting together the money, dealing with your client, dealing with an attorney.  Yeah, my fees aren't cheap.

BY MR. HESKIN:

Q.   Okay.  So I assume you got the full $200,000 for all your work?

A.   **I don't -- it's -- I don't recall.**

Q.   Well, you just testified that you were the one that did all the work, so I assume you got all the bank fee; right?

MR. PICON: Object to the form of the question.

THE WITNESS: I may have had to split it with other people.  I don't remember exactly what happened.  But the intent was for me to get the whole bank fee.  And then when I have to raise

Page 263

money, it could be the investors would ask for a portion of the bank fee.  I don't recall.  I don't remember exactly.  Of my hard earned fee.

BY MR. HESKIN:

Q.   Your hard earned fee?

A.   **Yes.**

Q.   Were there expenses incurred for that, like hard expenses?

A.   **My time.**

Q.   Just your time?

A.   **There's a lot of work put into it.  I put a lot of work into it.  What do you mean?**

Q.   Okay.  So it's just your time?

MR. PICON: Object to the form of the question.

THE WITNESS: Maybe some other resources, too.  You know, I don't know.

BY MR. HESKIN:

Q.   Well, this is your opportunity to identify them.  So any other hard costs?

A.   **Time is money, Mr. Heskin.**

Q.   I hear you.  Time is money.

MR. HESKIN: Let me pull up one more document.  Now we're on 21.

(Whereupon, Exhibit Lubin-21 was

Page 264

marked for identification).

BY MR. HESKIN:

Q.   Okay.  Let me share this with you.

Do you see this pay out sheet?  Is this a pay out sheet?

MR. PICON: Can we see the whole document?

BY MR. HESKIN:

Q.   It's an e-mail dated June 18, 2021?

MR. PICON: Can we see the whole document?  It looks like there's a part of it that's not shown.

MR. HESKIN: Okay.

MR. PICON: Just scroll all the way down, just so we can see.

MR. HESKIN: Sure.

THE WITNESS: Okay.  What did you ask?

BY MR. HESKIN:

Q.   First of all, who is Uzi Schamila?

A.   **Someone that handled the bookkeeping, a third-party bookkeeping firm.**

Q.   Okay.  She's not an employee of Spin?

A.   **No.**

Q.   Okay.  And in here, net to merchants, 1.307 million; right?  And it's got a pay off --

Page 265

A.    What are you --
Q.    It's a pay off to BMF of 582?
MR. PICON: I think he asked you where this --
THE WITNESS: Yeah, that's what was wired.  Okay, go ahead.  The whole amount is 2.5 million.
BY MR. HESKIN:
Q.    Okay.
A.    Also, 2.7 with the origination fee.
Q.    And this legal fee of $30,000, that was wired to Berkovitch; right?
A.    Yes.
Q.    But you can't provide a retainer agreement agreeing to the $30,000 fee owed to him; right?
MR. PICON: Objection to the form.
THE WITNESS: It's in the contract, your client's contract.  I think we provided the wire confirmation.
BY MR. HESKIN:
Q.    That's not the question I asked.  I asked you don't have a retainer between you and Berkovitch or an invoice from Steve Berkovitch, charging you $30,000; right?

Page 266

MR. PICON: Objection to form.
THE WITNESS: I don't know.
BY MR. HESKIN:
Q.    Do you?  Because I haven't seen it.
A.    I don't remember.
Q.    Okay.  So how did you come up with the $30,000?
MR. PICON: Object to the form.  It assumes facts not in evidence.
THE WITNESS: It's in the -- it's in the loan agreement.
BY MR. HESKIN:
Q.    It's in the loan agreement?
A.    Yes.
Q.    Okay.  The one we just looked at?
A.    I don't -- the one -- it's in the disbursements schedule and it's one of the provisions.
What's the question?
Q.    I'm asking --
A.    Look at the whole agreement.  There's a bunch of different exhibits for the agreement.
Q.    I understand there's a disbursement, but that disbursement schedule is different than the contract.  And my question is do you have an invoice

Page 267

showing that Berkovitch actually incurred and charged you $30,000 for services rendered?
MR. PICON: Object to the form of the question.
THE WITNESS: I don't know.
BY MR. HESKIN:
Q.    Okay.  That's perfectly fine.  Okay.  And it's got a pay off to BMF of 582; right?
A.    Yeah.
Q.    Okay.  And if BMF wasn't actually owed 582, BMF was actually owed like, let's say 570, that would bring the total net below 2.5, wouldn't it?
MR. PICON: Object to the form.  Calls for a legal conclusion.  Hypothetical.
THE WITNESS: Your client instructed me and signed an addendum to wire BMF these dollar amounts.  And I hired an attorney to do all the work.
BY MR. HESKIN:
Q.    Based on pay off letters that were provided to them, that were inflated; right?
MR. PICON: Object to the form of the question.
THE WITNESS: I don't have an answer for you.  I disagree with your statement.

Page 268

BY MR. HESKIN:
Q.    Well, I guess the math will, the math will be what it is.  So --
A.    So what are you asking me?
MR. PICON: Just answer the questions.
BY MR. HESKIN:
Q.    I'm not asking you anything.  Syndication here is 25 percent to BMF and -- gee, I guess, I guess I was right.  I guess BMF is getting 25 percent of the hard earned bank fee that you earned?
A.    I guess so.  Yeah, I guess so.  I don't --
Q.    And Hi Bar is getting 50 percent of the hard earned work that you did; right?
A.    It is what it is.  Sometimes you got to give up part of your fee to get the deal done.
Q.    Okay.  Are you aware of any costs, hard costs that they had, to reimburse them for this bank fee?
MR. PICON: Objection to form.
THE WITNESS: I'm not speaking on behalf of companies that I don't own.
BY MR. HESKIN:
Q.    Okay.  We can be clear, that the bank

SPIN CAPITAL, LLC, et. al. v.
GOLDEN FOOTHILL INSURANCE SERVICES, LLC

AVRUMI LUBIN
July 25, 2024

Page 269

didn't charge you $200,000; right?

MR. PICON: What's that question?

BY MR. HESKIN:

Q.   Did your bank charge you $200,000?

MR. PICON: For what?

MR. HESKIN: For the wire.

MR. PICON: Shane --

MR. HESKIN: I just want a clear record. It says bank fee.

BY MR. HESKIN:

Q.   It says bank fee; right?

A.   **Yeah, what I wrote. That's not what the loan documents say.**

Q.   I understand. It says bank fee and I just want to be clear, there's no bank fee?

MR. PICON: Object to the form of the question.

THE WITNESS: Mr. Heskin, it's, the loan documents -- I don't remember if it says origination fee or what it is.

BY MR. HESKIN:

Q.   I'm looking at your document and your document calls it a bank fee, and I just want to be clear, there's no bank fee; right?

MR. PICON: Same objection.

Page 270

THE WITNESS: It's how you define it. Define it. Where is bank fee defined?

BY MR. HESKIN:

Q.   It says bank fee. I just want to make sure your bank didn't charge you $200,000.

A.   **Oh, no, my bank didn't charge -- no, my bank did not charge me a $200,000 fee.**

MR. HESKIN: Okay. All right.

It is 4:19. Let's take a 10 minute break. I think I'm almost done. I just have a little wrap up to do, but it shouldn't be long. So now is a good time to take a break.

MR. PICON: Great. Thank you.

MR. HESKIN: Okay.

(Whereupon, a short recess was taken).

BY MR. HESKIN:

Q.   So, welcome back, Mr. Lubin. Can you just walk me through how the transactions, the MCA transactions occurred?

MR. PICON: Object to the form of the question.

THE WITNESS: What do you mean?

BY MR. HESKIN:

Q.   Just walk me through the steps.

MR. PICON: Same objection.

Page 271

BY MR. HESKIN:

Q.   You brokered them. Walk me through the steps.

A.   **I don't recall exactly how the transactions went down. I probably -- I'm assuming I cold called Mr. Leer. It's possible he was referred to me, but more than likely I cold called him.**

**And -- there's not much I can walk you through. My job is talking to people. That's what I'm good at. I would try to -- it could be I requested bank statements from him. Yeah, I maybe sent a few funders. Probably not more than a few funders.**

Q.   Okay. So once you would send the bank statements to BMF and Hi Bar, and then it's your understanding that Hi Bar and BMF would do all the underwriting, they would do the funding call and then they would send the contracts out; right?

A.   **Every funder has different --**

MR. PICON: Wait. Object to the form of the question. It misstates the testimony. Go ahead.

THE WITNESS: Every funder would have different ways they do stuff. Sometimes they would ask that I send the docs. Sometimes some funders

Page 272

are more strict and require that the funder sends the docs DocuSign or ESign or whatever it is.

Everyone had different -- it was more like a deal-by-deal basis. If it was a larger deal, you know, different funders would ask for different things. Usually the funders had a practice of -- most funders have a practice of doing like bank verification, where they would download the merchant's activity.

The practices were kind of like a deal-by-deal basis. And I would put the merchant in contact with the funders.

Does that mean Gabe, directly, or Joel? It could have been administrators. I don't fully -- I don't recall exactly how these specific transactions went down.

BY MR. HESKIN:

Q.   Who sent the contracts to Mr. Leer? Was it you or was it BMF or Hi Bar?

A.   **May have been me, may have been BMF, may have been Hi Bar. I don't remember.**

Q.   Do you know?

A.   **Sorry?**

Q.   Do you know who sent them?

A.   **I just answered the question. I said**

Page 273

it may have -- it was either me, BMF or Hi Bar.  Or a combination of two people, BMF and Hi Bar.

Q.  Okay.  As you sit here today, you can't say whether it was you, Hi Bar or BMF?

A.  This was a few years ago.  You realize that; right?

Q.  Okay.

MR. PICON: Josh, yes or no.

THE WITNESS: I don't remember.

BY MR. HESKIN:

Q.  Okay.  Well, have you searched your business records?

A.  I hired a third-party company.  I gave them access to everything.

Q.  Who?

A.  Something like Everlaw?

THE WITNESS: Right, Mark?

BY MR. HESKIN:

Q.  What's it called?

A.  I think it was called Everlaw.  I don't want -- it's not -- I'm not -- I've done a few of these before, so I don't remember the exact name of the company, but like I gave them access to my phone, my e-mail, the cloud, everything.

Q.  When did you do that?

Page 274

A.  I don't know.  I don't remember.  It's a while ago.  Like a year and-a-half ago.  Maybe even three years ago.  Maybe, I don't know, a year ago.  I don't remember.

MR. PICON: Then just say you don't remember.

THE WITNESS: I don't remember.

MR. PICON: He doesn't want you to speculate.  If you know, tell him.

THE WITNESS: I don't remember.

MR. PICON: Otherwise, don't.

THE WITNESS: I don't remember.

BY MR. HESKIN:

Q.  Okay.  Did you ever get an instruction not to destroy documents related to this case, from counsel?

A.  Yeah, I'm assuming.  Yeah.

Q.  Do you know when that was?

A.  I don't remember.

Q.  Have you destroyed any documents related to this litigation --

A.  No.

Q.  -- since, since the start of this litigation?

A.  No.

Page 275

Q.  Okay.  Have you had -- have you -- what kind -- do you use WhatsApp?

A.  I -- sometimes.

Q.  Do you use WhatsApp for your business?

A.  I believe I communicated with your client on WhatsApp.

MR. HESKIN: Okay.  I'm on 22 now.

(Whereupon, Exhibit Lubin-22 was marked for identification).

BY MR. HESKIN:

Q.  Here's an e-mail dated February -- or a text, this is a WhatsApp conversation; right?

A.  Yeah.

Q.  And this is with Stefan Leer and you; right?

A.  That's what it -- yes.

Q.  Okay.  It's got a bunch of text messages, and then can you explain this last one?

A.  It appears to be a message that I deleted.  On WhatsApp you only have -- it's a feature that you have on WhatsApp.  You can only use it if the message was sent in a few minutes.  If you by mistake sent the wrong message, you can -- you have an option to delete it and it deletes on the other person's, on your client's end, as well.

Page 276

What's your question?  This was deleted minutes after it was sent.

Q.  Why did you delete that message?

A.  Maybe I sent it to the wrong person.  There can be multiple reasons.  Maybe I sent the wrong message.

Q.  Do you recall what you said in that message?

A.  I have no idea.

Q.  Are there any other WhatsApp messages that you've gone back and deleted?

A.  You only have a few minutes --

MR. PICON: His testimony was you can't go back.  His testimony was you can do it within a few minutes.

MR. HESKIN: I understand that's what his testimony is.

THE WITNESS: Okay.  Did I -- it would be something if you sent the wrong message, you would delete it.

MR. PICON: He's just asking do you remember doing that --

THE WITNESS: No, I don't remember if I've done it again.

BY MR. HESKIN:

Page 277

Q. Do you typically go back and delete messages on WhatsApp?

MR. PICON: Object to the form.

THE WITNESS: If I sent the wrong message to a person and I was being impulsive, I would delete my message, correct.

BY MR. HESKIN:

Q. Let me -- so we talked about, earlier, about who sent the contracts. And your testimony is as you sit here today, you can't say, one way or the other, who sent them; is that fair?

A. I said it's very possible it was me. I'm not going to say it was me, if it wasn't me. It would be either me, Hi Bar or BMF. It wouldn't be anybody else.

MR. HESKIN: All right. Let's mark this as exhibit number 23.

(Whereupon, Exhibit Lubin-23 was marked for identification).

BY MR. HESKIN:

Q. This is an affidavit you signed and filed in this action. Do you recall doing that?

A. What's your question?

Q. Do you recall signing an affidavit in this case?

Page 278

A. Yeah. I don't remember exactly what the affidavit said, but...

Q. Well, let's look at it. I, Avrumi Lubin -- that's you; right?

A. Yes.

Q. It says you're president of Spin; right?

A. Yes.

Q. And it says: I make this affidavit on the basis of personal knowledge and Spin's business records.

A. Okay.

Q. Okay. Do you know what you were attaching?

A. I got the agreements from, from -- I requested them from BMF and Hi Bar.

Q. That's your memory? Your testimony is now that you requested them from BMF and Hi Bar?

A. Could be the lawyers requested them from BMF and Hi Bar.

What's your question?

Q. Well, my question is what is it, did you get these from your own business records or did you get these from BMF and Hi Bar's business records?

Page 279

Because you're telling the Court --

A. I remember my attorneys told me to get these agreements from the funders.

Q. Well, then why doesn't it say that these are based on the records of BMF and Hi Bar? Why does it say it's based on your business records?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't know what you're asking me.

BY MR. HESKIN:

Q. Well, were these documents in your files or were they --

A. They were attached to the motion to dismiss, and I signed an affidavit saying that these are true and correct, that these are the agreements between these companies, that I was a broker on.

Q. But it's saying it's based on your business records, yours, Spin's business records. Is that true?

MR. PICON: Object to the form of the question.

THE WITNESS: After Spin requested them from these companies, it would be in my records; right?

Page 280

BY MR. HESKIN:

Q. When did you request them?

A. Probably a few weeks before this document was signed.

Q. So these documents weren't already in your business records?

A. No. I mean, maybe it might be in my e-mails from around the dates that -- I don't know if I sent them or maybe I was copied on it. But if I wanted to get it easy, I would just ask the two companies and they can get it, put it together very quickly.

Q. Okay. So apparently, you've got the ability to ask BMF and Hi Bar for information. Did you ask them to produce information related to this transaction, in connection with our document requests?

MR. PICON: Objection to the form. What document requests?

THE WITNESS: What are you asking?

BY MR. HESKIN:

Q. Are you -- well, you understand that the Leer defendants issued document requests to Spin; right?

A. At this point they're not going to --

Page 281

I don't know if I can -- at the time that this motion to dismiss was filed -- I don't have a relationship with, with Hi Bar anymore.

I don't know, how did -- what's your question?

Q. Well, my question is, apparently, you had access to their business records at the time you filed this affidavit, and we submitted a --

A. No.

Q. -- document request that requested their business records. And, apparently, you had care, custody and control over them and could have requested them. My question is did you?

MR. PICON: Objection to the form. That's your testimony. All he said is he believed he asked them for copies of the agreements. He doesn't have care, custody or control. He never said such a thing. This is you testifying again.

BY MR. HESKIN:

Q. Did you ask them?

A. I believe I asked both of them. I got the agreements. I think BMF, we got maybe the payment history, but Hi Bar I think was more of an issue of getting the documents, since they winded down operations.

Page 282

Q. What about the underwriting documents that Hi Bar and BMF did, could you call them up and say hey, give me the underwriting documents?

MR. PICON: Object to the form of the question.

THE WITNESS: I have no obligation to do that.

BY MR. HESKIN:

Q. I'm not asking if you have an obligation. I'm asking could you?

MR. PICON: Object to form.

BY MR. HESKIN:

Q. Would they give it to you?

MR. PICON: Is he capable of doing it, is that your question?

BY MR. HESKIN:

Q. Would they give them to you?

MR. PICON: That's speculation.

THE WITNESS: Yeah.

BY MR. HESKIN:

Q. Well, they gave you these documents, apparently.

A. At this point, I don't know if they would give me anything. You start adding them to the lawsuits and stuff like -- I don't know. Hi Bar

Page 283

personally wouldn't give me anything, at this point. The company doesn't exist.

Q. Well, we all know what --

A. You can ask me questions for Spin. I don't know if they will give me, if BMF will give me anything.

Q. Did you speak --

MR. HESKIN: Well, let me mark this. This is the deposition notice in this case.

(Whereupon, Exhibit Lubin-24 was marked for identification).

BY MR. HESKIN:

Q. Do you remember, did you ever review the deposition notice for Spin Capital?

A. I believe I reviewed it with my attorneys.

Q. Okay. And you're the corporate witness that's being put up on behalf of Spin Capital; right?

A. Yes.

Q. Okay. And did you reach out to Gabe Isaacov and ask him for details about the MCAs, in preparation for today's deposition?

MR. PICON: Objection to form. As you know, we wrote you a letter, he has no obligation to

Page 284

do that, as a corporate representative of Spin.

BY MR. HESKIN:

Q. Did you do it?

A. I didn't understand. Can you repeat your question?

Q. Did you speak with Gabe Isaacov, in preparation for today's deposition?

A. No.

Q. Did you speak with Joel Getter, in preparation for today's deposition?

A. No.

Q. Could you have?

A. Are you talking about --

MR. PICON: Objection to form.

A. -- recently or a couple years ago?

Q. Right now. Could you pick up Gabe's number and call him?

MR. PICON: Objection to the form of the question.

THE WITNESS: You're threatening to sue these people. They're not going to talk to me about this anymore. They're going to say talk to their attorney.

BY MR. HESKIN:

Q. Did they say that to you?

Page 285

A.    I think like a year ago, I don't know, as soon as you started threatening to sue them, they don't talk to me about this stuff anymore.  But Hi Bar doesn't exist anymore, so yeah.

Gabe wouldn't talk about this.  He would tell me to talk to his attorney.

Q.    Okay.  Did you try to talk to his attorney?  Who is his attorney?

MR. PICON: Object to the form.

THE WITNESS: I don't know.

BY MR. HESKIN:

Q.    Okay.  What did you do to prepare --

A.    I went --

Q.    -- yourself to testify on the topics noticed in this deposition?

MR. PICON: Can you repeat the question?  I think he started to talk before you finished.

BY MR. HESKIN:

Q.    What did you do to prepare yourself to testify on the topics noticed in this notice of deposition?

A.    We went through boatloads of documents, all the text messages, there's a lot, between me and Mr. Leer.  We went through these

Page 286

binders.  Yeah, spent a lot of time.

Q.    Okay.  How much time?

A.    Probably 15 hours, maybe even 20.

Q.    Okay.  And that's how many times -- that's how long you spent with Mr. Picon and your attorneys?

A.    Yeah.  It might even be more.  It's a lot of time.

Q.    Okay.  Did you do any additional work, outside of meeting with your attorneys?

A.    No.

Q.    On topic 44, has there been any demands from any regulatory agencies against Spin?

A.    No.

Q.    You haven't gotten any subpoenas?

A.    What's your question?

MR. PICON: Yeah, your question, you said --

BY MR. HESKIN:

Q.    Have you gotten any notice of investigation?

MR. PICON: Are you talking about investigations?

BY MR. HESKIN:

Q.    Have you gotten any notice of

Page 287

investigation?

A.    No, I never got -- not where Spin is a target, no.

Q.    Have you gotten subpoenas where Spin is not a target?

A.    Not related -- not MCA related activity.  I have, I have a merchant that had gone to -- I've had some, yeah.  Nothing to do with MCA related.

I think one of them is your client.

Q.    What's that?

A.    No, nothing.  Go ahead.

Q.    What communications have you had with Cap Factor?

A.    At what time period?

MR. PICON: Hang on a second.  What time period are you talking?

BY MR. HESKIN:

Q.    You can tell me any communications you've had.  Have you had any communications with Cap Factor?

A.    Yeah, they wanted to get the -- they wanted to get the case resolved.

MR. PICON: You shouldn't go into settlement discussions.

Page 288

BY MR. HESKIN:

Q.    Other than settlement discussions, have you had any other communications with Cap Factor?

A.    Not that I recall.

Q.    Okay.  Well, in your amended complaint you allege that there were transfers to Cap Factor without any consideration.  What's the basis for that?

A.    That's something I -- you've got -- that's a legal question.  You've got to ask my attorneys.

Q.    Well, this is my turn to ask you.

A.    Okay.

Q.    I want to know, do you have any actual facts to support that?

MR. PICON: Object to the form.

THE WITNESS: I discussed it with my attorneys, and that would be attorney-client privilege.

BY MR. HESKIN:

Q.    Well, it's alleged on information and belief, and I'm just asking you do you have any facts supporting your allegation that there was no consideration given for the transfers?

A.    I'm not going into full details.  As I

Page 289

told you, this -- yeah, it's my attorney's job to do the due diligence.

Q. Listen, this is a 30(b)(6) deposition. I'm entitled to ask the facts that you have that support the allegations in your complaint, and this is your time to tell me.

So do you have any facts to support your claim that there was no consideration given to Cap Factor?

A. It's something I would have discussed with my attorney. They went through a ton of discovery. I didn't review it. And I don't have an answer for your question.

Q. Well, facts, facts are not --

A. I'm assuming -- I'm assuming my attorneys did their due diligence by looking through discovery. I don't know.

Q. Okay.

A. This would be a privileged area.

Q. Well, your lawyer is not objecting on the grounds of privilege, so you can answer.

A. I think my lawyers did their due diligence.

Q. So you want me to put your lawyer on the stand?

Page 290

MR. PICON: Object to the form of the question. I guess this just doesn't want to end.

MR. HESKIN: Okay, I'm going through these topics, real quick, and making sure I hit everything.

BY MR. HESKIN:

Q. Do you do any advertising?

A. No.

Q. Okay. When is the last time you've been to the so called New York office?

MR. PICON: Object to the form of the question.

THE WITNESS: I don't know. It's been a few months.

BY MR. HESKIN:

Q. Who would be able to be a witness, to tell me the last time you were there?

MR. PICON: Object to the form of the question.

THE WITNESS: I can go there today.

BY MR. HESKIN:

Q. I'm just asking, who was there the last time you were there?

A. I don't remember.

Q. Do you keep a computer there?

Page 291

A. Yes.

Q. Do you keep business records there?

A. No. Everything is on the cloud.

Q. Okay. Do you get mail there?

A. Yeah, I've gotten some mail there before.

Q. Do you get business mail there?

A. I don't really get much business mail. Yeah. Most of it comes -- goes to New Jersey, the mail.

Q. Do you have mail forwarded to your New Jersey address?

A. I'm not sure.

Q. Okay. Well, why did you stop going to New York?

Because you testified earlier that you like going there to hang out with people and talk.

MR. PICON: Object to the form of the question. Misstates his testimony.

THE WITNESS: What's your question?

BY MR. HESKIN:

Q. Why did you stop going to New York?

A. I haven't been working as much as I used to be, I used to do work.

Q. You've stopped working?

Page 292

MR. PICON: Object to the form of the question. Misstates his testimony.

THE WITNESS: Remotely.

BY MR. HESKIN:

Q. Have you -- you continue to be a broker on deals; right?

A. Not like I used to. No way. No, not even close.

Q. Why the slow down?

A. Guys like you, that overwhelmed me, you know.

Q. Guys like me?

A. Yeah.

Q. Am I the one that's suing you in this action?

A. You're the one representing a client and suing me in this action.

Q. My client has got counterclaims against you?

A. Your client did have counterclaims.

Q. Is he currently suing you, now?

A. No.

Q. Do you expect him to?

MR. PICON: Object to the form.

Are these the questions you want to

SPIN CAPITAL, LLC, et. al. v.
GOLDEN FOOTHILL INSURANCE SERVICES, LLC

AVRUMI LUBIN
July 25, 2024

Page 293

ask at 5:00, whether my client expects your client to sue him?

MR. HESKIN: He's saying the reason he is out of the business is because people like me are suing him.

THE WITNESS: And I'm just lazy. I became lazy, the last year.

MR. HESKIN: Okay. Listen, David, I've got no desire to go down this road, but your client opened the door. Okay?

MR. PICON: It's not even a question. It just doesn't make any sense at this hour --

MR. HESKIN: It does. It does.

THE WITNESS: All right, what's the question?

MR. HESKIN: There is none. Listen, I'm done. I thank you for your time. And I guess we'll see you at the time of trial.

MR. PICON: Thank you for your time, folks.

THE WITNESS: Thank you. Nice meeting you. Have a good day.

(Whereupon, deposition concludes at 5:00 p.m.)

Page 294

REPORTER'S CERTIFICATE

I, LUANN FARROW SCHAFER, a Certified Court Reporter, certify that the foregoing is a true and accurate transcript of the proceedings held before me, at the time, place and on the date hereinbefore set forth.

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition was taken.

Further, I am not a relative, nor employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

LUANN FARROW SCHAFER, CCR, RPR
License No. XI01363

DATE: AUGUST 2, 2024

Case 1:24-cv-08515-AS   Document 160-2   Filed 05/26/26   Page 76 of 98
SPIN CAPITAL, LLC, et. al. v.
GOLDEN FOOTHILL INSURANCE SERVICES, LLC
AVRUMI LUBIN
July 25, 2024

## $

**$100,000 (1)**
165:25
**$135,000 (2)**
254:22;255:18
**$2,000 (4)**
158:20,21,25;160:6
**$20,000 (6)**
160:5,12,25;161:1;
183:6;244:21
**$200,000 (9)**
98:4;255:23;261:21;
262:1,15;269:1,4;
270:5,7
**$21,999 (1)**
226:8
**$25,000 (9)**
195:8;196:3,22;
197:4;205:19;239:4,6,
9;252:24
**$30,000 (14)**
82:17,23;83:2,11;
84:9;86:4;257:5,17;
258:3;265:11,15,25;
266:7;267:2
**$40,000 (3)**
165:16,24;242:21
**$400,000 (1)**
246:14
**$48,092,806.27 (1)**
131:1
**$49 (1)**
162:6
**$5 (1)**
117:18
**$588,600 (1)**
153:3
**$7,000 (2)**
235:17;236:1
**$7,500 (1)**
212:17
**$8,000 (5)**
228:7;233:4,11,14,
15
**$8,500 (3)**
226:5;235:17;239:8
**$80,000 (5)**
245:8,17,18,19;
246:14
**$972 (1)**
215:25

## A

**ability (6)**
118:22;143:13;
178:25;190:5,13;
280:14
**able (7)**
52:6;125:14;131:9;
140:11;143:4;169:19;

290:16
**above (2)**
198:16;224:23
**absolute (1)**
224:25
**absolutely (8)**
26:1,17;46:6;51:19;
143:12;146:25;184:12,
14
**absolutes (1)**
184:18
**absurd (1)**
211:13
**access (5)**
214:9,12;273:14,23;
281:7
**according (2)**
96:2;216:3
**account (52)**
40:6;70:9,11,13,15,
22;71:25;77:18,20;
78:23;87:11;90:3,4,5,
16,19;97:17,23;98:23;
99:9,17;100:1,14;
102:8;112:14;113:23;
128:24;129:3,4,6,12,
13,17;130:1,2,8,13,25;
131:3;132:10,12,15,19,
24;133:3,5,10;160:3;
167:16,17;213:5;225:2
**accountant (4)**
44:14;45:5;46:20;
47:5
**accounting (4)**
44:4;214:13;232:21;
233:1
**accounts (21)**
51:17;65:1,5,14,20;
69:7,8,24;70:2;77:6;
78:20;87:3;88:8;112:8;
124:24;149:6;151:3;
157:9;198:17;214:12;
219:13
**accuracy (1)**
233:23
**accurate (1)**
215:24
**accusing (1)**
150:12
**ACH (5)**
207:21;208:17;
212:3;227:15;240:1
**acknowledgment (1)**
256:10
**across (1)**
135:16
**act (5)**
168:11,16,17;179:8;
192:13
**acted (1)**
37:3
**acting (3)**
169:21;183:17;190:6

**action (6)**
101:12;126:16;
132:4;277:22;292:15,
17
**active (4)**
69:22;70:1;105:2;
136:15
**activity (2)**
272:9;287:7
**actual (9)**
12:19;70:21;77:9;
97:6,21;109:21,23;
236:14;288:14
**actually (23)**
39:23;40:5;50:25;
51:13;56:14;61:5;
71:13;78:19,19;82:21;
84:16;97:23;124:23;
140:8;142:13;157:3;
166:15;171:8;234:9;
242:7;267:1,10,11
**addendum (8)**
204:22,24;205:9;
207:14;222:16;231:23;
239:22;267:16
**adding (1)**
282:24
**addition (3)**
212:24;228:6;259:15
**additional (1)**
286:9
**address (23)**
7:19,24;43:2;75:8,
11,11;208:22,22;
209:19,22;212:16;
228:3,3;240:4,6,10,13;
250:8,14,15,22,23;
291:12
**addresses (1)**
212:6
**admin (3)**
72:2;99:24;183:4
**administrative (1)**
42:6
**administrators (1)**
272:14
**admin's (1)**
146:15
**Advance (6)**
152:19;205:12,13,
17,24;206:8
**advanced (2)**
89:2;196:23
**advances (2)**
88:17;152:19
**advertising (1)**
290:7
**advice (2)**
201:14,16
**advised (1)**
149:18
**advocating (1)**
49:22

**affidavit (7)**
18:1;277:21,24;
278:2,9;279:15;281:8
**affiliated (2)**
117:2;142:6
**affiliates (1)**
16:13
**afford (10)**
49:21;50:25;51:13;
125:11;141:3,14,19,25;
142:11;160:4
**afraid (4)**
25:11,13,16,17
**again (28)**
29:5;35:18;59:8;
68:16;79:4;150:12;
157:25;163:20;168:2,
10;195:8;208:13;
211:6;218:25;225:8;
229:20;237:23;238:12,
20;239:19,23;240:3,3;
241:17;244:23;248:5;
276:24;281:18
**against (20)**
9:10;13:10;56:10;
104:15;105:14;106:3,
13;107:7,23;109:1;
137:13,16;150:3;
152:18;170:14;171:15;
174:5,24;286:13;
292:18
**agencies (1)**
286:13
**agent (1)**
49:8
**ago (16)**
9:4;23:19;33:6;
63:23,24,24;146:15;
148:22;230:6;273:5;
274:2,2,3,3;284:15;
285:1
**agree (6)**
68:5;84:8;138:20,21;
156:9;248:18
**agreed (7)**
14:7;83:2,11;84:21;
156:12,13;167:25
**agreeing (1)**
265:15
**agreement (38)**
14:11,20;15:8,19;
21:25;30:24;31:2,8,18;
32:3,5,21;114:22;
115:11;138:24;142:25;
184:11;197:18,22;
223:22;224:1;225:18,
24;229:7;237:16,20;
244:11;257:4;259:8,
11,22;260:1,4;265:15;
266:11,13,21,22
**agreements (31)**
20:16,17,21;21:1,21;
22:5,24;23:3,6;32:13;

39:10,14,17;50:2;53:5;
55:17,19;57:16;59:6;
116:15,18;142:9;
159:3,4;163:3;201:6;
278:15;279:3,16;
281:16,22
**agrees (1)**
50:11
**ahead (33)**
10:24;27:10;31:16;
37:8;45:16;46:14;62:9;
65:14;66:13,22;74:25;
88:25;95:24;122:17;
139:2;148:16;163:19;
164:20;165:3;171:23;
198:1;199:2;200:14,
25;201:1;212:11;
219:22;228:4;239:7;
258:25;265:6;271:22;
287:12
**ain't (1)**
199:25
**air (1)**
236:3
**alias (1)**
7:16
**allegation (1)**
288:23
**allegations (1)**
289:5
**allege (3)**
125:20;199:16;288:6
**alleged (2)**
199:15;288:21
**allegedly (2)**
117:18;124:16
**alleging (3)**
126:13;138:1;142:14
**allowed (1)**
231:20
**allows (2)**
19:6;258:3
**almost (3)**
84:16;225:11;270:10
**along (1)**
161:22
**always (4)**
38:14,25;165:8;
196:20
**amended (1)**
288:5
**America (4)**
69:10;99:11;114:5,6
**amount (22)**
8:13;37:24;52:25;
94:24;96:21;97:19,21,
22;101:19;103:4,21,
23;143:23;153:2;
167:21;196:7;205:16,
19;230:22;239:3;
246:13;265:6
**amounts (2)**
60:6;267:17

**analysis (8)**
50:24;51:12;93:17,
23;94:10,17,19;159:18
**and-a-half (2)**
158:6;274:2
**Angeles (2)**
257:1,2
**annual (4)**
117:12;251:13,19;
253:3
**annually (2)**
251:24;252:19
**answered (34)**
13:19;15:14;19:25;
21:19;32:25;33:1;
52:21;54:2;60:25;
61:10;62:4,14,20;68:3;
90:13,21;91:13;94:5;
100:7;102:22;103:19;
104:1,2;134:11;135:4;
172:9;173:14;179:13;
197:6;204:8,12;
207:17;229:18;272:25
**anticipated (2)**
124:19;125:7
**anymore (6)**
80:14,16;281:3;
284:22;285:3,4
**apparent (1)**
65:12
**apparently (4)**
280:13;281:6,11;
282:22
**appear (3)**
175:16;221:6;231:24
**appears (24)**
124:18;140:12;
148:11,20;172:4;
182:18,21;194:21;
198:7;211:24;213:14;
229:9;233:2;235:16;
239:5,21;244:22;
245:10,10;250:7;
254:18;258:10,23;
275:19
**Appendix (3)**
201:23,24;202:1
**applied (1)**
100:2
**applies (2)**
10:20;66:19
**approval (2)**
14:2;72:3
**approved (2)**
9:21;72:5
**approximate (1)**
136:5
**approximately (2)**
89:15;261:3
**April (7)**
152:2;155:20;159:7;
161:9;180:5;188:13;
191:10

**arbitrarily (1)**
175:20
**arbitration (1)**
8:25
**Arboretum (3)**
7:21;212:15;240:11
**area (2)**
257:2;289:19
**areas (1)**
68:18
**argue (1)**
62:7
**argument (1)**
162:3
**Argumentative (1)**
18:8
**arguments (1)**
200:20
**around (6)**
63:11;194:25;195:4;
230:23;232:9;280:8
**arrangements (2)**
89:13;152:23
**aspect (2)**
138:4;185:10
**ass (1)**
262:9
**assert (2)**
137:15,18
**assertion (1)**
254:3
**assess (4)**
49:20;50:1,2,6
**assessing (1)**
52:3
**assets (8)**
64:18;66:17;67:10;
140:18;142:24,25;
143:19;144:1
**assign (1)**
224:7
**assigns (2)**
198:14;224:24
**assist (1)**
35:17
**assisting (1)**
64:14
**Associates (1)**
152:17
**assume (6)**
29:5;36:8;40:8;59:8;
262:14,18
**Assumes (6)**
33:10;219:5;243:24;
248:16;262:8;266:9
**assuming (12)**
23:23;24:2;36:7;
54:22;102:1;146:18;
149:11;219:8;271:5;
274:17;289:15,15
**attached (4)**
167:16;217:9;259:4;
279:14

**attaching (1)**
278:14
**attachments (1)**
219:7
**attempted (1)**
93:22
**attention (1)**
131:9
**attesting (1)**
18:1
**attorney (53)**
12:20;15:1,15;16:6,
6;35:12;52:15;57:1,13,
15,23,24;58:8;60:22;
61:1,22;62:5,16,21,23,
25;82:13,16,18;83:8,
10;85:21;92:2,16;
116:2;118:13,18,20;
126:2;133:22;134:4,
16;136:2,3;137:25;
149:24;199:2;200:18;
201:8;203:14,15;
262:12;267:17;284:23;
285:6,8,8;289:11
**attorney-client (3)**
201:9,10;288:18
**attorneys (28)**
12:17;57:7,22;63:2,
4;95:10;98:11;100:10,
17;101:2;102:18,25;
103:13;139:10,11;
200:3;214:11,15,17,25;
254:8;279:2;283:16;
286:6,10;288:11,18;
289:16
**attorney's (10)**
101:11,16;103:3,16;
205:17;253:10,17;
254:5;259:17;289:1
**August (1)**
237:20
**Austin (1)**
9:15
**author (2)**
219:23,24
**authority (11)**
112:1,5;168:11,15;
179:8;190:14,21;
202:10;214:17,22,24
**authorization (4)**
207:21;212:3,4;
227:16
**authorized (8)**
13:25;47:1;93:12;
135:25;147:10,13;
148:23;240:13
**Auto (3)**
110:20;111:2,16
**AVRUMI (4)**
7:3,17,18;278:3
**aware (30)**
17:6,11;26:1;27:19;
28:6;58:23,25;102:12;

122:6;124:1;128:14;
133:16;134:15;142:7;
150:25;151:17,22,25;
170:12,13,16,19;
187:11,13,14;206:13,
17;227:7;239:12;
268:18
**away (4)**
138:7;142:19;143:3;
164:22

## B

**back (45)**
30:20;34:19;35:18;
42:6,10;51:3,6,9;
64:11;68:8,25;69:4;
76:20;86:10,15,17;
91:10;99:8;127:5;
149:9,25;154:16;
156:4,6,9;162:14,23,
25;163:9,11;166:8,16;
171:6;203:25;212:25;
218:7;220:8;232:9,13;
243:15;246:15;270:17;
276:11,14;277:1
**background (2)**
48:13,15
**bad (4)**
94:3;162:10;172:21;
222:3
**BAL (1)**
198:14
**balance (5)**
95:10;104:8;232:6;
253:10,12
**bank (112)**
34:1;40:9;51:18;
64:25;65:5,14,19;
66:17;69:6,8,10;70:8,
11,11,15,16;71:24,25;
77:6,17,20;86:17;87:2;
97:17,23;98:23;99:8,
11;112:4,8,14,17;
113:23;114:5,5,6;
115:15,25;116:12,22;
117:19,20,22;124:24;
125:24;127:13,18;
128:24;129:3,4,6,12,
13,16;130:1,2,7,11,25;
131:3;145:4;151:2;
157:3,9;160:3;184:7,
22;185:1;186:3,6,12,
15;193:15,17,21,24;
194:18;195:8;196:3,6;
197:3;209:2,4;213:4;
218:21;219:2,4;235:4,
8;242:13;261:21;
262:19,25;263:2;
268:10,19,25;269:4,9,
11,14,15,23,24;270:2,
4,5,6,7;271:11,14;
272:7

**bankruptcy (12)**
9:6;13:8,14;14:19,
19;15:2,3,11,12;56:6;
110:13;111:8
**banks (4)**
77:3;83:19;255:20,
23
**Bar (121)**
31:9,19;40:23,24;
42:2,3,5;56:17;57:21,
23;58:24;60:1,15;
80:11,16,17,21,25;
81:24;82:6;113:25;
115:7,19;119:23;
122:8,13,19;124:2;
126:10,17;128:19;
141:22;142:7;144:22;
145:1,3,14;146:2,18,
20;147:9,14;148:24;
149:2,11;150:2,23;
154:15;156:5,11;
157:2,11;159:14;
160:14;161:12;163:2,
7;164:6;169:20;173:2;
178:19;179:10;180:18,
21;181:15;186:17;
187:4,10;189:19;
190:6;193:15,23;
203:9;206:10,23;
207:4;223:17,22;
224:8,13;225:18,24;
226:12,14,17,22,23,24;
227:9;230:13;231:12,
19;244:11;245:2,14,
20;246:9;247:10;
259:4;260:13,20,24;
268:14;271:15,16;
272:19,21;273:1,2,4;
277:14;278:16,18,20;
279:5;280:14;281:3,
23;282:2,25;285:4
**barely (1)**
134:8
**Bar's (4)**
80:23;81:1;168:12;
278:24
**based (7)**
124:7;236:14;
247:14;267:20;279:5,
6,18
**basic (1)**
252:6
**basically (9)**
18:23;144:22;156:7;
159:16,20;160:18;
189:25;193:21;224:16
**basis (15)**
14:10;15:12;38:8;
39:2;68:13,20;172:5;
188:25;193:9;233:22;
249:20;272:4,11;
278:10;288:7
**Bates (2)**

213:10;232:16
**battle (1)**
    9:23
**became (1)**
    293:7
**behalf (43)**
    28:12,13,14;32:14;
    47:10;56:8;57:25;
    59:25;84:5;115:7;
    119:15;126:19;130:17;
    145:13;151:18,25;
    153:10;154:17;160:16,
    24;164:6;168:11,16,
    18;178:18;179:9;
    183:16;187:5;190:6;
    193:25;202:10;216:2,
    18;219:21;220:21;
    221:21;226:11;230:13;
    231:12,17;236:10;
    268:23;283:18
**behind (4)**
    58:13;128:4;180:16;
    181:14
**belief (1)**
    288:22
**believing (1)**
    193:9
**below (2)**
    219:13;267:12
**Ben (17)**
    24:23,24,25;25:3,13,
    17,18,20;26:2,9;27:5,7,
    11,17,19;28:3;123:9
**beneath (2)**
    179:21;240:12
**benefit (1)**
    35:6
**Berkovitch (13)**
    85:23;86:1,5;137:13,
    16;138:1;139:12;
    140:9;258:20;265:12,
    24,24;267:1
**Berkovitch's (2)**
    257:5,17
**Besides (2)**
    52:6;168:17
**best (6)**
    35:8,9;93:24;171:12;
    178:25;211:18
**better (1)**
    64:4
**big (7)**
    27:25;83:19;125:21;
    215:14;221:10;224:14;
    239:10
**billed (1)**
    102:4
**binders (1)**
    286:1
**bit (1)**
    40:19
**blanket (1)**
    142:24

**BMF (162)**
    28:10,13;30:24;
    31:19;39:9,11,14,18,
    19,21,23;40:3,7;41:25;
    42:1,2;55:6,9,17;
    56:16;57:15,25;58:24;
    60:1,15;115:7,19;
    119:17,20;122:8,12,19;
    124:2;126:10,17;
    128:13,19;141:8,22;
    142:7;144:22;145:1,3,
    14;146:2,21;147:9,14;
    148:23;149:3,11;
    150:1;151:16,16,18;
    152:19;154:15,17,18;
    156:5;157:2,11;
    159:14;160:14;163:2,
    9,18,20,22;164:6;
    165:1;167:24;169:20;
    173:2;178:19;179:9;
    180:18,21;181:15;
    183:18;186:16;187:3,
    4,10;189:15,19;190:6;
    191:14;193:14,23;
    194:11;197:18;203:9,
    10,12;205:4,13,17,24;
    206:8,23;207:4;
    212:25;213:14;214:16,
    18,25;215:1;216:2;
    220:10;224:3,7,13;
    228:19;229:8;230:13;
    231:12,18;233:1;
    234:1,3,24;236:8,10;
    237:16;238:12,17;
    242:13,16;243:15;
    248:2,6,8,22;249:10;
    259:4;260:13,20;
    265:2;267:8,10,11,16;
    268:8,9;271:15,16;
    272:19,20;273:1,2,4;
    277:14;278:16,18,20,
    24;279:5;280:14;
    281:22;282:2;283:5
**BMF's (3)**
    168:12;214:12;238:6
**board (3)**
    217:11;222:5,25
**boatloads (1)**
    285:23
**bookkeeping (2)**
    264:20,21
**Borrok (5)**
    19:2,10,11;209:11,
    13
**borrowers (2)**
    83:17,20
**both (10)**
    59:8;63:15;154:12;
    169:22;207:2;222:15;
    235:25;242:3;243:22;
    281:21
**bother (1)**
    58:15

**bottom (1)**
    217:25
**bought (1)**
    81:1
**bounce (3)**
    160:5;178:10;249:7
**bounced (3)**
    64:12;213:6;241:1
**bouncing (1)**
    241:14
**Bouskila (8)**
    83:9,11,11,16,22;
    84:25;86:7;139:12
**Bouskila's (1)**
    85:8
**brag (3)**
    136:17,20;137:8
**branch (3)**
    70:21;113:9,14
**branches (1)**
    113:18
**Braun (8)**
    24:11;41:8;73:9,19,
    21,23;74:2,8
**Braun's (1)**
    72:24
**breach (4)**
    13:3;14:19;205:15;
    222:16
**break (6)**
    86:10;162:9;225:10;
    232:4;270:10,12
**breaking (2)**
    76:25;84:13
**Brezel (6)**
    24:13;72:22,23;
    74:11,19;76:13
**brief (1)**
    103:1
**bring (3)**
    68:25;216:4;267:12
**bringing (4)**
    110:7,8,11;111:8
**broker (66)**
    16:20;17:1,12,14,15,
    19;19:17,22;20:8,12;
    21:7,25;22:17,19,20,
    25;23:7;27:9;29:7;
    30:16;32:18;33:21;
    35:7;37:4,10;38:10;
    51:23;52:4;53:13,15,
    18,21;64:4,5,7;112:6,7;
    121:16,20;124:11;
    145:23;146:21;147:19;
    149:15;168:17,18;
    169:21;180:19;181:10;
    183:17,21,24;185:15,
    19;187:1;190:7,17;
    202:19;203:1;205:23;
    206:7;222:9;229:10;
    246:11;279:17;292:5
**brokerage (3)**
    116:11;117:10;

    207:19
**brokered (16)**
    21:11;22:4;59:15;
    74:22;114:21,22;
    115:9,11;135:6;
    224:16;238:13;244:16;
    245:16;247:1,2;271:2
**brokering (11)**
    50:23;51:11,21;
    52:11;54:13;58:23;
    63:14;64:16;202:13;
    230:18;246:1
**brokers (3)**
    30:19;34:13;168:18
**broker's (1)**
    64:11
**Brooklyn (9)**
    41:5;42:11,12;72:6,
    8;75:11;208:7,23;
    250:9
**brother (3)**
    27:12,18,20
**brought (2)**
    107:7;109:21
**building (2)**
    250:13,25
**bullshit (1)**
    177:21
**bunch (13)**
    20:16;86:24;103:11;
    116:21;127:12;192:7,
    21;204:9;207:15;
    213:6;258:9;266:22;
    275:17
**business (33)**
    24:24,25;25:2,6,8,
    14;73:20;74:19;91:20;
    112:1;115:1;153:1,6;
    221:3;236:20;240:13;
    246:2;250:19;273:12;
    275:4;278:10,23,24;
    279:6,19,19;280:6;
    281:7,11;291:2,7,8;
    293:4
**businesses (2)**
    120:8;176:16
**businessman (1)**
    143:23
**buy (2)**
    80:23;81:6
**buying (5)**
    186:22,22;187:3,4,7

---

**C**

---

**cal (2)**
    104:7;145:14
**calculate (5)**
    104:8;145:10;
    175:12;189:7;252:18
**calculated (15)**
    95:2,3;97:1;104:9,
    11,13;189:13,14,16;

    204:20;229:21;236:14;
    244:24;245:2;251:24
**calculating (2)**
    204:4;219:16
**calculation (3)**
    95:8;160:7;175:17
**calculations (1)**
    219:18
**California (23)**
    66:18;82:18;117:6;
    119:3,9,14,18,24;
    120:2,7,11,14,18,21;
    170:3,21;211:23;
    212:1,7;256:11,12,21;
    257:1
**call (12)**
    37:13;38:22;47:13;
    156:10;164:5,23;
    165:1;187:10;243:5;
    271:17;282:2;284:17
**called (9)**
    15:18;24:3;30:20;
    255:25;271:6,7;
    273:19,20;290:10
**calling (4)**
    52:7;173:17;210:20;
    256:1
**Calls (17)**
    13:6;59:3;85:11;
    96:9;102:15;128:6;
    131:5;163:24;164:4,
    10;170:9;182:4;
    253:20;257:7,13;
    267:13;269:23
**calm (1)**
    67:2
**came (18)**
    28:1;97:16,23;
    123:13;140:21;176:9;
    183:3,10,19;191:13;
    193:22;203:17,22;
    213:5;219:9;237:1,7,8
**Can (116)**
    7:13;10:22;11:11;
    14:14;15:14,15,16;
    18:11,12,20;19:21,23;
    20:1,11;21:6;23:4,9;
    26:19;28:13;35:19;
    38:22;45:7,7;46:11;
    49:21;50:25;51:2,13;
    60:2;62:8;66:22;67:19,
    19,21,22;68:3,22;
    72:11;76:22;79:19;
    89:10;95:10;102:13;
    103:12;108:17,18;
    110:16;115:19;122:17;
    133:20;146:23;148:9,
    9,14;150:18;151:2;
    155:13,16;158:7;
    160:10;162:3;169:6;
    171:16;172:17;175:6;
    176:25;187:10;188:14;
    190:23;191:5;192:3;

195:1;207:4;208:13;
210:4;214:2;217:25;
218:1,4,7;224:5,6;
225:10,15;227:16;
230:24;232:8,15;
240:10;251:16;252:1,
6,6;257:16;258:23;
261:16,17;264:6,10,15;
268:25;270:17;271:8;
275:18,21,23;276:5,14;
280:11;281:1;283:4;
284:4;285:16;287:19;
289:21;290:20
**cap (7)**
102:13;103:9;
287:14,21;288:3,6;
289:9
**capable (1)**
282:14
**capacity (3)**
10:21;11:2;37:7
**Capital (38)**
8:17;14:3;31:9,19;
32:14;40:23,24;42:2;
47:10;70:24;71:2,13,
16,19,24,25;82:3;
101:1,5;111:20;112:2;
132:10,12,15,18,23;
133:10;135:17;136:6;
194:3;208:7;209:24;
221:3;227:16,17;
231:17;283:14,18
**Capital's (1)**
43:1
**capped (2)**
253:18;254:4
**care (6)**
27:7,8;58:21;90:23;
281:12,17
**cared (1)**
32:21
**cares (6)**
123:14;145:8;
172:12;181:25;192:7;
215:7
**carrier (1)**
137:23
**cars (1)**
143:7
**case (39)**
9:5,6;11:13;16:21;
18:1;23:24;35:7;88:17;
94:22;96:14;102:13,
17;105:16;106:19;
107:19;109:19;111:2,
12,13,13,14,15,16;
113:22;114:17;116:7;
128:21;182:20;184:10;
196:5;200:16;201:2;
234:4;254:11;258:23;
274:15;277:25;283:9;
287:23
**cases (1)**

152:11
**cash (10)**
124:19;126:6,13;
127:14;152:19;156:15;
157:4;171:25;178:8;
205:12
**caught (1)**
218:16
**caused (1)**
58:24
**causing (1)**
156:16
**CEO (2)**
64:20;101:4
**certain (3)**
17:19;30:22;51:24
**certainly (2)**
68:12;161:25
**certify (1)**
205:10
**cetera (1)**
84:2
**chain (3)**
161:8;180:5;234:15
**change (1)**
190:20
**changed (1)**
247:20
**charge (11)**
165:15;166:4;247:6;
255:20,23;258:3;
269:1,4;270:5,6,7
**charged (6)**
102:13;212:23;
245:19;247:12;261:25;
267:2
**charging (7)**
98:18;243:9,12;
246:14,17,24;265:25
**chase (2)**
30:17;64:12
**chasing (1)**
30:12
**chat (1)**
26:23
**cheap (5)**
166:5;243:7;255:20;
256:2;262:12
**check (13)**
42:24;52:24;53:4;
58:15,21;70:1;104:17;
118:15,19;188:22;
191:12;192:23;227:15
**checked (3)**
118:13,20;234:3
**checks (1)**
191:9
**Choice-of-Law (2)**
66:15;151:2
**chronology (1)**
218:20
**City (3)**
43:6,7;227:17

**civil (6)**
107:9,12;108:8,11;
110:3,6
**claim (20)**
9:10,18,21;10:13;
11:23,24;12:15;13:9,
13,17,21;14:8,11;
15:12;96:20;110:21;
137:15,19,22;289:8
**claimed (1)**
140:6
**claiming (2)**
67:9;101:10
**claims (1)**
227:8
**clarification (1)**
108:2
**clarify (1)**
188:2
**clause (2)**
151:2;239:19
**clean (1)**
196:21
**clear (6)**
11:10;59:20;268:25;
269:8,15,24
**clearly (1)**
10:21
**client (109)**
16:18;20:8;21:12;
22:1;26:22;35:4;83:8,
10,13,16,25;84:6;
93:23;94:12,13;114:9,
14,19;116:10;117:22;
121:13;124:6,23;
126:10,16,23;129:11,
24;130:7,25;132:3;
134:2,14;135:12;
136:18;140:10,22;
142:6,8,13;143:6,13;
144:2;145:5,16;147:4;
148:8,19;149:10;
150:3;153:1;155:9;
156:7,21;157:16,19,23;
158:15,24;159:14;
161:20;162:1;165:15;
169:8;171:6,15,17;
173:4,8,18,23;179:6;
180:10,12;181:10;
183:2;189:17,24;
191:14;193:9,20;
202:13;203:9,15,25;
204:4;205:24;206:8;
207:6;210:16;212:24;
219:3,9;222:16;236:7;
237:12;257:5;259:13,
25;262:11;267:15;
275:6;287:10;292:16,
18,20;293:1,1,10
**clients (3)**
134:19,25;178:2
**client's (6)**
125:17;149:6;

177:23;207:9;265:19;
275:25
**close (2)**
216:20;292:8
**closing (2)**
83:21;127:10
**cloud (2)**
273:24;291:3
**coaching (5)**
18:13,15,18;19:6,7
**Coast (1)**
221:3
**Cohen (1)**
182:13
**cold (4)**
24:3;52:6;271:6,7
**collateral (17)**
30:4;33:17;93:25;
94:23;95:9,14;103:10;
117:17,17;124:17;
125:3,18;140:5;
142:13;143:10,24;
144:5
**collateralize (1)**
96:2
**collateralized (1)**
174:13
**college (1)**
48:15
**combination (2)**
63:4;273:2
**coming (8)**
89:18;98:23;99:5;
100:14;102:8;125:20;
140:15;157:4
**comment (2)**
179:24;180:3
**commentary (1)**
204:15
**comments (1)**
216:22
**commission (16)**
22:22;29:7,22;30:21;
31:25;32:20;35:16,19;
36:5;127:10;128:12;
131:6;149:8,9;154:9;
163:8
**commissions (1)**
30:20
**committed (1)**
138:2
**common (1)**
198:21
**communicate (3)**
120:19,20;185:20
**communicated (1)**
275:5
**communicates (1)**
22:20
**communication (1)**
146:2
**communications (12)**
73:18;74:8,10;

120:10,23;146:8;
156:4;245:4;287:13,
19,20;288:3
**comp (1)**
243:6
**companies (27)**
118:22;123:17;
125:11,25;126:20;
135:2,7;139:9;146:25;
147:5,11,24;161:24;
168:16,18;169:23;
172:12;207:15,16;
224:1,15;236:23;
239:10;268:23;279:17,
24;280:11
**company (12)**
60:7;67:10;123:17;
193:17;199:13;202:10;
213:10,13;216:18;
273:13,23;283:2
**company's (1)**
198:25
**compel (1)**
94:15
**complaint (2)**
288:5;289:5
**complaints (1)**
113:2
**complete (1)**
67:14
**complicated (2)**
80:24;82:7
**computer (1)**
290:25
**con (1)**
42:23
**concept (1)**
32:17
**concern (1)**
50:10
**concludes (1)**
293:23
**conclusion (20)**
13:6;14:22;59:3,11;
82:2;85:12;96:9;
102:15;128:6;138:5;
170:9;207:11;244:1;
253:21;254:14,18;
257:7,14,25;267:14
**conclusions (1)**
138:10
**condition (2)**
30:2,10
**confer (1)**
67:17
**confessions (3)**
170:2,13,20
**confirmation (1)**
265:20
**confuse (1)**
213:24
**confused (2)**
55:20;259:2

Case 1:24-cv-08515-AS    Document 160-2    Filed 05/26/26    Page 80 of 98
SPIN CAPITAL, LLC, et. al. v.                                                    AVRUMI LUBIN
GOLDEN FOOTHILL INSURANCE SERVICES, LLC                                          July 25, 2024

**Connecticut (1)**
218:22
**connection (3)**
66:18;67:11;280:16
**conscience (4)**
245:22;246:3,6,19
**consideration (5)**
198:15;224:22;
288:7,24;289:8
**constable (2)**
152:24;153:5
**contact (7)**
23:22;29:21;33:22,
25;42:8;113:15;272:12
**contacted (1)**
32:22
**contents (1)**
18:2
**context (3)**
22:9;26:6;217:21
**continue (7)**
42:22;92:13;93:19;
127:1;143:19;200:23;
292:5
**contract (29)**
13:4;14:24;40:2;
50:22;51:10;55:7;
57:14;58:14;59:11,12;
101:17;102:20;167:20;
172:6,7;197:25;199:7;
202:12;205:16,19;
217:9;220:15;224:12;
258:7,9,10;265:18,19;
266:25
**contracts (23)**
14:24;40:5;52:10,19;
55:10,24,25;56:5,9;
58:16;59:14;61:7,14,
20;62:1,12,17;63:3;
200:17;224:13;271:18;
272:18;277:9
**contradict (1)**
233:10
**control (10)**
135:3,7;149:2;
161:24;167:3;210:21,
21;215:1;281:12,17
**controlled (1)**
147:5
**conversation (4)**
14:6;134:3;219:19;
275:12
**conversations (3)**
30:11;183:14;185:18
**convey (5)**
60:16;122:8;144:18;
168:19;203:24
**conveyed (3)**
145:1;183:3;236:6
**convince (2)**
191:18;193:1
**cooperate (7)**
93:23;94:12,14;

145:6;159:15;160:18;
193:20
**cooperated (2)**
157:12,13
**copied (3)**
126:22;153:21;280:9
**copies (2)**
200:7;281:16
**copy (3)**
55:6;200:4;214:8
**copying (2)**
155:20;156:2
**corporate (6)**
8:17;103:15,24;
254:10;283:17;284:1
**correctly (2)**
135:4;161:10
**cost (1)**
243:6
**costs (4)**
205:18;263:20;
268:18,19
**counsel (2)**
67:18;274:16
**counter (1)**
34:18
**counterclaims (2)**
292:18,20
**couple (2)**
171:19;284:15
**course (2)**
146:7,12
**Court (10)**
45:14;51:5,6,9;
137:22;210:17,18,21;
247:21;279:1
**cousin (2)**
43:20;72:24
**cousins (2)**
73:4,5
**Covid (1)**
76:3
**create (1)**
72:2
**creating (1)**
210:14
**credibility (4)**
10:15;107:20,21;
108:14
**credit (1)**
163:23
**crook (1)**
173:18
**current (3)**
7:19;43:1;122:1
**currently (5)**
86:18;104:14;136:6;
137:12;292:21
**custody (2)**
281:12,17
**customers (2)**
177:14,17
**cut (1)**

176:8

## D

**dailies (1)**
172:22
**daily (17)**
60:6;167:21;172:3,6,
20;182:23;188:22;
189:1;191:9,12,13;
229:16,21;234:18;
237:13;239:3;244:20
**damages (4)**
96:25;97:4;205:18;
254:11
**date (6)**
22:3;69:21;168:24;
171:16,18;195:7
**dated (21)**
148:2;152:2;155:20;
161:8;164:16;169:8;
180:5;182:12;188:12;
195:7;198:6;213:21;
223:22;228:18,18;
229:7;234:15;244:11;
258:19;264:9;275:11
**dates (2)**
9:3;280:8
**David (10)**
18:20;65:23,23;
67:14;68:9;79:2;
210:13,16;211:8;293:8
**day (42)**
52:7;58:25;108:10;
144:23;149:1;158:20,
21,25;160:5,6;167:17;
175:7,13;176:4,8,22;
183:7;185:20;191:5,
22,25;193:2;203:7;
219:16,17;221:10;
222:16;226:5;229:24;
230:20;235:17,18;
236:1,2;237:1;239:4,8,
9;243:5;244:21;255:4;
293:22
**days (21)**
72:10;73:10;75:17;
146:15;157:20;171:25;
172:3;178:11;191:22;
193:2,8,11;220:1,4;
228:20;229:23;230:6,
19,21;235:4;238:8
**dead (1)**
66:23
**deal (66)**
27:8;28:4;29:8;
30:21;34:21;38:7,16,
19,25;39:1;51:21;54:6,
13;58:24;64:5,7;79:13;
89:15;98:10;100:3,5;
113:9;124:12;125:21;
127:9,11;131:5;
140:10;144:18;145:23;

154:8;163:7;165:2,2,
11;181:10,24;183:17,
18,21;185:5;187:17;
190:17;193:19;202:20;
205:23;206:7;224:17;
226:18,23;227:1;
229:10;242:16;243:14,
22;245:16;246:12,15,
25;247:6;259:12;
260:9;262:4,10;
268:17;272:4
**deal-by-deal (4)**
38:8;39:1;272:4,11
**dealing (4)**
12:20;98:11;262:11,
11
**deals (26)**
32:18,20;39:24;
74:22;86:24;112:6,6,7;
128:11;149:10;154:12;
161:23;163:9,25;
179:3;180:16,19,20,20,
21;181:14;182:19;
184:23,23;230:18;
292:6
**dealt (3)**
83:9,10;86:7
**debate (1)**
46:3
**debit (4)**
167:17;191:5,20;
193:2
**debited (1)**
213:4
**debiting (3)**
156:15;160:4;161:11
**debits (7)**
160:11,12,25;161:1;
188:22;191:9;197:9
**debtors (1)**
170:14
**December (2)**
42:19;107:5
**deceptively (1)**
211:19
**decided (1)**
236:8
**decision (2)**
34:21;221:12
**decisions (7)**
111:19;112:2;
147:23;161:25;167:23;
178:18;236:9
**deducted (2)**
86:1;196:7
**default (37)**
15:4,7,11;30:13,17;
56:6;58:25;96:7;124:2,
6;126:10;127:6;138:6,
16;139:14,16,23;140:7,
9;141:8;142:5,6,7,15;
144:3,6;145:19;
159:12;160:22;205:18;

249:8;252:10,11,24;
253:2,6;259:16
**defaulted (2)**
152:19;159:14
**defaults (1)**
64:8
**defendant (1)**
105:22
**defendants (13)**
16:24;19:18;21:12;
55:16,24;59:20;
101:11,15;113:22;
114:16;116:6;117:3;
280:23
**define (11)**
14:23;15:18;16:2;
59:11;198:11,24;
199:1;235:7;236:21;
270:1,2
**defined (4)**
58:5,14;60:13;270:2
**defining (10)**
15:8;59:12;103:7,11;
199:25;224:11;225:5;
229:14;231:18;257:24
**definitely (11)**
52:3;131:14;137:10;
144:15;146:11;147:9,
9;165:1;169:19;
186:10;231:11
**defraud (1)**
12:25
**defrauded (1)**
12:21
**defrauding (1)**
12:19
**delaying (1)**
68:14
**delete (5)**
275:24;276:3,20;
277:1,6
**deleted (3)**
275:20;276:2,11
**deletes (1)**
275:24
**demand (3)**
95:4;127:1;155:10
**demanding (1)**
192:23
**demands (2)**
191:11;286:12
**department (10)**
44:15;52:23;64:15;
116:20;154:1;157:13;
197:1,5,7;199:18
**depending (4)**
38:15;87:6,6;165:8
**depends (2)**
58:13;75:12
**deposit (1)**
77:12
**deposition (18)**
8:20;11:2;19:1,10;

20:14;66:12;69:2;
199:22;200:6;283:9,
14,23;284:7,10;285:15,
22;289:3;293:23
**describe (2)**
187:22;194:14
**describing (1)**
196:8
**description (1)**
187:19
**deserve (2)**
165:24;243:6
**designee (1)**
254:10
**desire (1)**
293:9
**desk (1)**
76:7
**destroy (1)**
274:15
**destroyed (1)**
274:20
**details (6)**
13:16;26:5;60:12;
82:19;283:22;288:25
**determination (1)**
199:7
**determine (3)**
31:24;33:7,14
**determined (5)**
60:5;83:7;200:16;
201:5;202:5
**dictation (1)**
177:8
**dictionary (2)**
181:2,9
**difference (1)**
117:19
**different (19)**
13:2;14:24;30:23;
33:23;37:22;48:8;
51:16;103:11;167:21;
188:5;208:12;258:10;
266:22,24;271:19,24;
272:3,5,5
**differently (1)**
38:2
**diligence (21)**
33:17,24;50:2,9,24;
51:12,19;60:14;82:20;
84:2;115:24;122:1,10;
136:3;142:4;183:25;
237:4;239:16;289:2,
16,23
**direct (9)**
11:17;13:3;34:2;
47:17;68:20;87:24;
146:1,8;214:16
**directed (3)**
88:3;136:3;142:8
**directing (4)**
45:22;47:21;88:9,12
**direction (1)**

48:9
**directly (12)**
33:25;34:3;51:25;
66:21;90:4;98:12,17,
18;190:2;224:16;
240:12;272:13
**dis (1)**
158:1
**disagree (3)**
103:8;139:24;267:25
**disburse (1)**
99:20
**disbursement (8)**
86:2;257:21;258:11;
261:2,6,16;266:23,24
**disbursements (1)**
266:17
**disclose (2)**
243:13,15
**discovery (3)**
214:22;289:12,17
**discrete (1)**
68:18
**discretion (1)**
112:4
**discuss (8)**
14:25;16:5;54:3;
61:21,23;97:3;102:18;
254:7
**discussed (7)**
46:24;62:22;63:1;
87:18;183:1;288:17;
289:10
**discussion (1)**
188:2
**discussions (2)**
287:25;288:2
**dishonest (5)**
158:11,15;173:8,11,
18
**dishonestly (1)**
211:20
**dismiss (2)**
279:15;281:2
**dismissed (1)**
104:19
**dispute (5)**
148:20;180:14;
227:12,13;233:9
**disputing (3)**
11:22;254:19;256:19
**distant (1)**
73:4
**docs (19)**
52:16;54:4,7,8;
56:17;57:7,8,9,11;
82:13;85:5,7,19;92:3;
234:18;259:5;260:5;
271:25;272:2
**document (93)**
20:11;78:24;82:5,22;
103:8,12;150:10;
155:12,14,16;156:19;

172:25;175:15;194:11;
195:1;198:10,23,25;
199:1,14,14,15,19,25;
200:1,4;202:18,19,22;
203:23,23,24;205:1;
206:2,24,25;207:2;
208:1,2;211:9;212:11;
213:13,14,23,25;214:9;
215:6,11;216:1;
217:13,18,25;218:1,5,
8,10;222:19,25;
224:10;225:6,17;
228:22;229:15;233:13,
19,20,20,20,23;238:7,
11,22;239:1,5,7,15;
241:7;247:16,19;
248:6;249:6,16;250:1;
263:24;264:7,11;
269:22,23;280:4,16,19,
23;281:10
**documented (2)**
82:6,7
**documents (39)**
17:21;18:21;19:20,
24;20:2,24;21:4;22:21;
51:24,25;56:15;60:2;
61:16;138:15,22;
160:10;185:21;187:9;
200:7;214:18,25;
224:19;229:15;231:5,
19;232:1;249:5;
258:10;269:13,19;
274:15,20;279:12;
280:5;281:24;282:1,3,
21;285:24
**DocuSign (1)**
272:2
**DocuSigns (1)**
224:15
**dollar (13)**
71:3;117:14;118:23;
126:1;133:16;134:8,
14;157:20;171:17;
174:25;216:4;255:24;
267:16
**dollars (28)**
9:20;89:14,20;92:22;
97:12,16,20;98:3;
125:12,20;128:25;
129:4;130:8,12;
134:19,22;140:18;
143:25;159:19;173:12,
19,23;175:13;176:4,
22;261:3,5,19
**domesticated (1)**
152:14
**done (26)**
34:2,3,21;60:20;
92:19;113:17;115:25;
131:14;134:18,21,24;
135:5,8;144:18;
159:18;210:9,10;
220:22;226:18;235:13;

245:12;268:17;270:10;
273:21;276:24;293:17
**door (1)**
293:10
**doors (1)**
76:13
**double (1)**
104:17
**doubles (2)**
252:11;253:3
**down (24)**
14:14;30:12,17;41:1;
64:8,12;67:3;76:14,14;
80:17;97:3;150:16;
155:16;194:13;213:4;
227:5,6;258:24;
264:15;271:5;272:16;
281:25;292:9;293:9
**download (2)**
116:1;272:8
**dozen (1)**
226:20
**draft (5)**
82:13;84:1;92:3;
199:2;203:22
**drive (2)**
75:10,16
**dropped (2)**
49:5;108:24
**DRVN (2)**
186:9,13
**due (25)**
33:16,24;50:2,8,24;
51:12,19;60:14;82:19;
84:1;94:24;103:25;
115:24;121:25;122:10;
136:3;142:3;183:25;
237:3;239:16;253:10,
13;289:2,16,22
**duly (1)**
7:4
**during (1)**
74:21

**E**

**earlier (8)**
65:20;76:7;146:14;
208:6;219:15;229:23;
277:8;291:16
**early (1)**
255:13
**earn (3)**
37:9;245:12;262:3
**earned (5)**
263:3,5;268:10,11,
15
**easier (1)**
89:9
**easy (1)**
280:10
**educational (2)**
48:13,15

**either (19)**
31:19;57:25;114:4;
119:18;122:22;127:22;
136:16;145:17;149:8;
154:8;165:21;187:8;
191:14;202:8;214:15;
226:24;252:21;273:1;
277:14
**Eldorado (1)**
116:25
**electronic (1)**
129:17
**else (6)**
76:15;181:9,15;
199:16;227:3;277:15
**else's (3)**
59:11;200:1;229:14
**e-mail (42)**
32:2;138:13;139:1;
148:1;152:2,21;153:8,
15,17,21,24;154:13,14,
20;155:5,19,24,25;
156:2,8;164:15;
168:22,24;182:12,18;
188:12;190:20;191:6,
19;192:2;193:5;195:6;
204:3,19;219:15;
220:2;234:15;235:7;
258:19;264:9;273:24;
275:11
**e-mails (6)**
126:22;159:7;
174:11;177:23;192:25;
280:8
**employee (2)**
43:15;264:22
**employees (4)**
43:14;44:5;219:20;
226:17
**employment (1)**
147:24
**end (8)**
63:11;163:9,11;
212:25;213:11;243:15;
275:25;290:2
**ended (2)**
193:23;227:5
**ends (2)**
242:3;243:22
**engaged (3)**
136:7,18,24
**English (2)**
181:2,8
**enjoy (1)**
76:4
**enough (1)**
143:10
**ensure (1)**
92:12
**enter (4)**
32:13;53:6;55:19;
112:5
**entered (4)**

Case 1:24-cv-08515-AS    Document 160-2    Filed 05/26/26    Page 82 of 98
SPIN CAPITAL, LLC, et. al. v.
GOLDEN FOOTHILL INSURANCE SERVICES, LLC
AVRUMI LUBIN
July 25, 2024

134:2;171:17;
174:25;205:9
**entering (3)**
55:15;56:18;57:6
**entire (4)**
205:16;218:5,8,10
**entirely (1)**
68:14
**entities (14)**
60:1,17;79:20;
116:21;118:6,14;
120:1,7;124:16,19;
125:4;142:6;185:25;
186:11
**entitled (2)**
10:14;289:4
**entity (2)**
39:17;115:10
**entrance (2)**
251:1,2
**entrances (1)**
251:1
**equals (4)**
230:6,7,20,22
**equity (2)**
12:18;13:1
**ESign (1)**
272:2
**especially (2)**
76:3;236:22
**established (1)**
129:14
**estate (7)**
9:10,22,23;11:22;
13:8;49:7;143:9
**estimated (4)**
92:19,21;94:22;
220:10
**et (1)**
84:2
**ethical (1)**
192:8
**evaluated (1)**
95:9
**even (34)**
10:18;42:20;61:13;
93:18;115:3,21;
122:20;126:24;144:3;
145:6;150:2;153:21;
154:14;162:4;166:19;
175:3;179:24;180:2;
184:23;186:14;198:25;
199:25;209:15;218:17;
224:14;245:19;246:16;
247:12;253:17;274:2;
286:3,7;292:8;293:11
**event (5)**
15:4,5,7,11;56:6
**Everlaw (2)**
273:16,20
**everyone (2)**
173:7;272:3
**evidence (6)**

33:10;219:5;243:24;
248:16;262:8;266:9
**exact (20)**
9:3,3;13:16;21:21;
22:3;60:12;69:20;87:5;
88:24;91:16;95:7;
97:10;99:16;101:21;
103:20;142:12;144:3;
255:16;261:16;273:22
**exactly (15)**
8:21;12:24;24:7;
91:16;144:24;159:10;
194:15;197:9;228:13,
14;262:23;263:3;
271:4;272:15;278:1
**EXAMINATION (1)**
7:6
**examined (1)**
7:4
**Excell (3)**
110:20;111:2,16
**Except (1)**
233:15
**exception (4)**
133:16;134:8,14;
216:5
**excess (3)**
134:18,22;136:7
**exclusively (3)**
22:25;23:7;37:3
**Excuse (8)**
45:20;66:1,2,5,6;
110:9;234:6;245:1
**execute (1)**
52:11
**executed (1)**
256:11
**exhibit (52)**
148:1,4;152:2,4;
155:19,21;161:4,5;
168:22;169:3,7,11;
180:3,4,6;182:12,14;
187:25;188:2,3,12;
195:9;197:17,19;
199:24;201:19,22;
213:9,9;217:6;223:17,
19;229:2,4;232:16,18;
234:12;237:17;244:10,
13;245:7;247:24;
250:3;258:14,15,18;
261:17;263:25;275:8;
277:17,18;283:10
**exhibits (1)**
266:22
**exist (6)**
80:14,16,19,21;
283:2;285:4
**existed (1)**
114:6
**exotic (1)**
143:7
**expect (1)**
292:23

**expected (2)**
143:18;219:15
**expects (1)**
293:1
**expenses (2)**
263:7,8
**experience (4)**
48:22;49:4,13;91:19
**explain (12)**
22:15;40:12;46:11;
58:4,7;65:10;68:10,17;
111:24;202:13;230:24;
275:18
**explaining (1)**
46:3
**explanation (4)**
15:16;68:6;231:2,9
**explore (1)**
10:14
**express (1)**
34:9
**extension (1)**
44:13
**extent (4)**
22:5,10;58:6;168:3

## F

**face (1)**
244:19
**fact (9)**
12:11;108:18;123:3;
142:12;147:12;219:5;
233:10;243:13,24
**Factor (7)**
185:24;186:7;
287:14,21;288:3,6;
289:9
**factors (1)**
247:11
**facts (10)**
33:10;248:16;262:8;
266:9;288:15,23;
289:4,7,14,14
**Failure (1)**
152:22
**fair (5)**
38:19;50:23;51:11;
63:25;277:11
**false (3)**
215:22;216:25;
240:14
**familiar (6)**
15:21;32:4,8;58:1;
121:22;152:7
**far (2)**
151:22;198:19
**father (4)**
78:12;79:12,15;
132:18
**feature (1)**
275:20
**February (1)**

275:11
**fee (70)**
37:10,10,11,14;
38:10,17;82:17,23;
83:2;98:4,17;165:6,16,
24;166:15;190:19;
194:5,13,18,20,21;
195:8,18;196:3,6;
197:3,8;201:20;202:1,
4,8;205:18;212:17,18;
226:7;228:7;235:4,8;
240:16;242:13,22,25;
245:8;247:12;252:24;
253:6;256:1;261:21,
25;262:19,25;263:2,3,
5;265:10,11,15;268:10,
17,20,23,24;270:2,4,7
**feel (2)**
47:23;68:24
**fees (29)**
77:14;83:14,18,21,
21,25;85:3,5,8;101:11,
16;102:13;103:3,9,16;
104:10;156:16;205:18;
249:7,8,8;253:10,18;
254:5;255:23;258:12;
259:17;261:18;262:12
**felt (2)**
34:23;173:7
**few (36)**
8:21;9:20;20:10;
21:21;23:19;24:8;33:3;
63:2;73:25;76:13,14;
95:11;99:23;104:16;
106:5;136:16;143:15;
146:14,16;157:21;
160:21;163:1;171:21;
184:22;192:25;200:7;
243:5;271:12,12;
273:5,21;275:22;
276:12,15;280:3;
290:14
**field (4)**
52:5;117:10,11;
207:19
**fight (1)**
103:13
**fighting (4)**
9:23,25;12:1,2
**figure (9)**
91:15,16;95:10;
108:18;143:25;230:5,
7;237:7;238:8
**figured (3)**
81:13,18;82:10
**file (19)**
14:3,7;44:6,12,17;
47:15;136:3;137:11;
152:18;169:15,16,19,
21;170:1;171:3,8,15;
174:5,23
**filed (16)**

13:8,25;44:8,13;
45:25;46:13,22;47:2;
48:5;109:1;137:18,20,
22;277:22;281:2,8
**files (5)**
44:10;66:21;67:6;
153:23;279:13
**filing (5)**
14:10,19;46:17;68:2;
135:25
**fill (1)**
13:21
**final (1)**
201:4
**financial (13)**
30:2,10;32:23;33:8,
15;49:13;79:16,20;
80:3;81:23;124:7;
154:11;193:9
**financially (1)**
123:19
**find (2)**
76:24;102:3
**finder (1)**
108:18
**fine (6)**
11:1;66:4;148:16;
167:13;218:9;267:7
**finish (8)**
11:11;48:18;50:19;
59:18;77:3;92:7;108:6;
159:24
**finished (2)**
48:19;285:18
**firm (6)**
82:18;138:2;152:3,8,
17;264:21
**first (24)**
7:3;18:14;21:25;
30:8,9;43:20;67:2;
72:24;73:3,5;89:14;
122:18,21;151:12;
153:14;155:18;169:19;
175:23;198:13;224:12,
21;225:13;237:2;
264:19
**Firstly (1)**
215:21
**fit (1)**
134:7
**five (13)**
17:2;23:3,4,5;36:25;
76:25;109:17,24;
158:7;225:9;252:21;
255:17;262:5
**flash (1)**
133:4
**flip (1)**
195:4
**flipping (1)**
194:25
**Florida (14)**
7:24;8:2;41:5;42:4,

9;106:14,22;107:8;
109:6;110:3;113:18,
23;135:17;151:20
**flow (5)**
98:22;126:6,13;
127:15;156:15
**focus (3)**
118:24;122:24;
179:22
**focused (1)**
127:10
**folks (1)**
293:20
**follow (2)**
48:3,8
**follows (2)**
7:4;51:9
**Foothill (4)**
117:21;118:4;
205:11;218:23
**Forget (3)**
83:18;172:13;255:16
**forgive (1)**
236:12
**forgot (3)**
11:21;252:22;259:10
**form (328)**
8:3,12;10:1;13:5,18;
14:13,21;15:13,22;
16:16;17:4;18:4,8,11,
12;20:3;21:13,17;
22:12;23:8;24:6;25:4,
21;27:13,23;28:5,11;
29:17;30:25;31:20;
32:6,24;33:9;34:10;
35:10,24;36:15,21;
37:16;38:20;41:9,14,
21;43:11;44:9;45:2;
47:4;48:24;49:15,23;
50:12;52:20;53:7,12,
24;54:15;55:11,18;
57:17;58:17;59:2,23;
61:8,15;62:13;63:10,
13;64:13,22;70:4;71:4,
17;72:16,25;73:11;
74:3;75:18,25;78:1,14;
81:3,11,17;82:1;83:3;
84:10,22;85:9,16,24;
86:19;87:4;89:22;90:7,
12,20;91:5,12,21;
92:14;93:14,20;94:4;
95:5,16;96:8,22;97:8,
25;98:14,25;99:14;
100:6,11;101:13;
102:9,14,21;103:5;
106:15;111:21;112:15,
20;113:6,12;114:24;
115:17,22;119:4;
120:3,12;121:1,8,15;
122:14;123:5,11,20;
124:9;125:1;126:7,18;
127:17;128:5;129:1,7;
130:4,9;132:13,20;

133:6,17;134:9;
135:10,19;137:17;
138:17;139:5,17;
141:4,16;142:21;
143:5;144:11,15;
145:11;146:3,22;
151:4;153:7;157:7;
160:8;162:2;163:4;
164:7,19;165:17;
166:1,9,18;168:13;
169:17;170:4,8,15,23;
172:8,23;173:13,21;
174:8;175:14,22;
176:5,18;178:16;
179:4;181:4,16;182:3,
9,24;183:8;184:1,19;
185:7,14;186:24;
189:2,9,23;190:4,11;
193:12;194:7;195:22;
196:24;198:9;200:10;
202:17;203:19;204:6;
206:15;207:8,22,23;
208:17,20;212:3,8,19;
213:1;214:20;215:2,
18;216:6,16;220:5,24;
221:19;223:4,9;224:9;
225:4;226:9;227:16,
23;228:1,11;230:10;
231:15;232:6,22;
233:5,12,24;234:5,21;
235:19;236:4;239:13;
240:1,5,20;241:4,22;
242:4,17,23;243:17,23;
245:13,23;246:20;
247:7;248:15;249:2,
14;250:16;251:15,21;
252:12;253:20;254:6,
24;256:5,10,13,24;
257:6,13;259:9;
260:10,22;261:8,14,23;
262:7,20;263:14;
265:17;266:1,8;267:3,
13,22;268:21;269:16;
270:20;271:20;277:3;
279:7,21;280:18;
281:14;282:4,11;
283:24;284:14,18;
285:9;288:16;290:1,
11,18;291:18;292:1,24
**forms (3)**
46:21;47:10;139:8
**forth (3)**
203:25;220:8;224:23
**forward (1)**
128:1
**forwarded (4)**
116:23;153:25;
219:9;291:11
**four (6)**
72:10;73:10;75:17;
179:13;180:15;181:13
**frankly (1)**
68:20

**fraud (2)**
209:2,4
**fraudulent (1)**
12:2
**free (5)**
29:24;36:9;47:23;
68:7,24
**freeze (3)**
149:5,23;151:2
**freezes (1)**
153:1
**freezing (2)**
149:13,19
**frequent (1)**
8:10
**friend (2)**
41:7;184:25
**frivolous (4)**
110:21,22,24;111:9
**front (8)**
19:20;21:5;38:7;
97:11;163:9;209:11;
226:7;229:1
**fruition (1)**
142:20
**fucker (1)**
166:25
**fucking (1)**
161:21
**full (12)**
7:13;26:5;59:21;
82:19;96:6,20;156:24;
178:2;179:8;181:23;
262:14;288:25
**fully (11)**
22:13;23:19;27:25;
29:19;81:12,18;89:16,
17;146:17;180:25;
272:15
**fund (9)**
70:2;111:11,11;
114:15;115:1,16,21;
221:13,17
**funded (15)**
39:14,17,23;63:22;
70:9;71:2,14,16,19;
78:23;79:12;86:18,24;
103:4;138:23
**funder (17)**
29:21;30:22;32:18;
33:23;34:2,19;37:21;
38:1;51:15;54:6,9;
82:12;168:19;185:17;
271:19,23;272:1
**funders (25)**
22:21;24:1,9;32:16;
33:25;34:16;35:18;
51:25;59:8;115:25;
116:21,23;127:8;
128:2;144:19;187:19;
207:2;271:12,13,25;
272:5,6,7,12;279:3
**funders' (1)**

121:24
**funder's (2)**
52:15;57:4
**funding (15)**
37:24;52:25;56:3;
63:14,16,18;163:24;
164:4,5,9,23;165:1;
187:21;196:7;271:17
**funds (4)**
84:25;114:9,14;
225:1
**funny (1)**
137:9
**future (2)**
125:21;198:17

## G

**Gabe (63)**
24:22;27:11,17,19,
21;28:9,13;37:12;38:4,
5,12,13,13;39:15;40:8;
54:14;60:9;80:11;
81:10;82:7,9;89:13,16;
90:22,22;91:16;99:21;
100:17;146:8,10;
151:20;164:16,17;
182:13;183:1,14,16;
195:13;204:3,4;
217:23;219:16,21;
220:14,15,25;221:11,
11,12,13,21;223:2,8;
234:17;235:3;236:2,7;
237:8;260:25;272:13;
283:21;284:6;285:5
**Gabe's (7)**
40:9;81:6;146:11,15;
183:3;235:7;284:16
**games (1)**
181:7
**gang (1)**
72:15
**gathering (1)**
12:11
**gave (14)**
27:22;75:8;157:19;
159:23;173:22;181:5;
183:3;200:3;212:6;
214:21;231:8;273:13,
23;282:21
**gee (1)**
268:8
**Genesis (5)**
114:15;115:1,16,21;
218:22
**gentleman (1)**
114:20
**Geta (1)**
155:20
**gets (8)**
90:15;96:6;196:22;
226:8;228:10;236:2;
240:18;246:15

**Getter (9)**
40:20;80:12;217:10;
222:5,14,21,25;258:20;
284:9
**given (7)**
10:4;68:6;78:21;
208:17;211:5;288:24;
289:8
**gives (1)**
37:13
**giving (6)**
159:18;167:16,19;
169:15;231:16,18
**glad (1)**
218:15
**glass (1)**
74:16
**goes (12)**
10:5,10,11;66:14;
78:19;90:6;91:14,15;
211:5;252:11;253:3;
291:9
**Golden (4)**
117:21;118:4;
205:11;218:22
**Good (28)**
7:9,11,13;19:13;
49:8,12;64:15;76:24;
84:13;86:9,12;94:3;
149:24;161:17,19;
162:8,15;166:21,21;
179:25;199:12;217:15;
218:13;232:4,8;
270:12;271:10;293:22
**grade (2)**
48:20;49:6
**grand (4)**
143:15;243:10;
246:17;247:6
**grandfather (4)**
77:24;78:5;79:15;
132:23
**granted (1)**
94:16
**great (2)**
218:17;270:13
**greater (1)**
205:20
**grounds (2)**
62:2;289:21
**Group (3)**
110:20;111:2,17
**guess (13)**
31:21;93:15;106:11;
165:22;182:6;268:2,9,
9,9,12,12;290:2;293:17
**guidelines (2)**
236:22,23
**guy (11)**
50:9;54:22;66:16;
117:19;131:4;140:17;
141:23;154:3;159:19;
166:7;185:1

## H

**guys (7)**
26:14;64:5;162:9;
225:15;235:25;292:10,
12

**half (7)**
176:9;194:5,18;
195:17;197:3,4;230:21
**handing (1)**
258:18
**handle (1)**
46:20
**handled (1)**
264:20
**handles (1)**
43:20
**Hang (4)**
65:7;67:17;287:16;
291:17
**happen (1)**
107:24
**happened (14)**
13:9;24:3;26:7;
42:10;98:22,24;
140:23,24;144:25;
197:9;204:11;228:13,
14;262:24
**happening (1)**
199:11
**happens (2)**
82:9;216:19
**happily (1)**
46:8
**happy (1)**
18:16
**harassment (4)**
46:7;47:25;68:20;
88:4
**hard (9)**
192:1,22;263:3,5,8,
20;268:10,15,18
**harm (1)**
150:7
**HBC (3)**
224:22,24,24
**head (2)**
77:21;230:23
**headaches (1)**
64:8
**hear (6)**
51:2;67:19,19,21,22;
263:22
**heard (3)**
32:9;152:9;156:10
**hearings (1)**
10:13
**help (4)**
127:3,5;167:6;255:7
**Herbst (1)**
227:8
**hereby (2)**

198:14;224:23
**Here's (10)**
154:20;156:14;
164:15;204:22;215:13;
220:14;221:10;227:15;
248:2;275:11
**HESKIN (644)**
7:8;8:7,15;10:5,6,11,
18;11:5,9,14,19,20;
12:14;13:12,22;14:17;
15:9,20;16:7,19;17:8;
18:9,11,17,20;19:3,5,9,
14,15;20:6;21:15,23;
22:16;23:12;24:10;
25:10,25;26:13,17,21;
27:16;28:2,8,15;29:1,
14,25;31:3,17,23;
32:10;33:4,13;35:1,21;
36:3,12,18,24;37:17;
38:3;39:3;40:18;41:12,
16,24;43:13;44:11,16,
21;45:7,11,17,20,23;
46:2,10,15,16;48:1,2,
11,12;49:3,19;50:3,16,
21;52:9;53:2,10,14;
54:11,19;55:14,22;
57:20;58:22;59:13;
60:4;61:12,18;62:10,
18;63:16,17;64:6,17,
24;65:10,13,23;66:1,5,
14,25;67:7,9,22;68:9;
69:3;70:6;71:7,21;
72:20;73:6,15;74:6;
75:1,4,21;76:5,23;77:2,
4;78:4,8,18;79:2,11,24;
80:4;81:5,14,20;82:4,
15;83:6;84:7,15,18;
85:6,13,18;86:9,14,22;
87:8,16,21,23;88:2,5,6,
15;89:8;90:2,9,17,24;
91:8,18,24;92:9,23;
93:7,16;94:1,8;95:12,
18,25;96:12,18;97:5,
13;98:6,20;99:6,7,19;
100:9,13,23;101:18;
102:11,19,23;103:14;
104:4,25;105:8,23;
106:17;107:13,20,22;
108:4,17,20;109:14;
110:1,11,14;111:25;
112:18,23;113:8;
114:1,12;115:2,20;
116:4,17;118:3;119:7,
12,22;120:9,15,17;
121:5,11,18;123:1,8,
15,24;124:22;125:8;
126:11,21;127:23;
128:17;129:5,10,20;
130:6,16,23;132:2,7,
17,22;133:2,9,14,19;
134:12;135:14,23;
136:12,22;137:6,21;
138:12,19;139:7,21;

140:14;141:6,13,20;
143:2,17;144:7,13;
145:9,21;146:5;147:2,
18,21,25;148:6,17;
150:15,18,20,22;151:7,
14;152:1,6;153:9,19;
154:24;155:1,6,13,17,
23;156:22;157:8;
158:9,14,23;159:4,8;
160:1;161:3,7;162:7,
10,13,16,22;163:12;
164:11,21;165:19;
166:6,13,20;167:1,4,8,
10,12,14;168:9,21;
169:5,13,25;170:6,11,
18;171:1;172:18;
173:5,16;174:3,10,18;
175:18;176:2,10,14,19;
177:4,9,20,25;178:7;
179:1,5,15,23;180:2,8;
181:6,12,20;182:7,11,
16;183:5,12;184:5,10,
13;185:2,11,23;
186:20;187:2,23;
188:9,11,20;189:6,11,
20;190:1,8,15,25;
191:7;192:10,14,15;
193:6,14;194:1,16;
195:2,5,13,15;196:1,
17;197:2,17,23;198:5,
12,21;199:3;200:22,
24;201:13,18,25;
203:6;204:2,10,18;
205:8;206:6,19;207:5,
13,20;208:3,10,15,24;
209:7,12,16,18,21;
210:6,13;211:1,3,7,15,
21;212:13,22;213:8;
214:2,7,23;215:8,23;
216:9,13,19,24;217:4,
8,14,19,23;218:2,6,11,
15,18;219:1,6,25;
220:13;221:2,9;
222:12,23;223:7,12,16,
21;224:20;225:7,12,18,
21,25;226:3,4,13;
227:11,24;228:5,16,23;
229:2,6;230:4;231:1,3,
13,21;232:5,12,15,20,
24;233:8,15,21;234:2,
7,14,25;235:21;
236:11;237:15,19,25;
238:2;239:2,17,18;
240:8,23;241:5,25;
242:5,20,24;243:8,19;
244:4,9,15;245:15,25;
246:5,10;247:1,4,17;
248:1,9,19;249:11,18,
23;250:2,5,21;251:8,
18,25;252:5,15;253:15,
24;254:9;255:1,8,22;
256:8,17;257:3,8,15;
258:1,6,13,17;259:1,

14;260:7,14;261:1,12,
20;262:2,13;263:4,18,
21,23;264:2,8,13,16,
18;265:8,21;266:3,12;
267:6,19;268:1,6,24;
269:3,6,8,10,18,21;
270:3,8,14,16,23;
271:1;272:17;273:10,
18;274:13;275:7,10;
276:16,25;277:7,16,20;
279:11;280:1,21;
281:19;282:8,12,16,20;
283:8,12;284:2,24;
285:11,19;286:19,24;
287:18;288:1,20;
290:3,6,15,21;291:21;
292:4;293:3,8,13,16
**Hey (9)**
69:5;86:16;121:10;
162:24;167:1,1,1,1;
282:3
**Hi (125)**
31:9,19;40:23,24;
42:2,3,5;56:17;57:21,
23;58:24;60:1,15;
80:11,16,17,21,23,25;
81:1,24;82:6;113:25;
115:7,19;119:23;
122:8,12,19;124:2;
126:10,16;128:19;
141:22;142:7;144:22;
145:1,3,14;146:2,18,
20;147:9,14;148:24;
149:2,11;150:2,23;
154:15;156:5,11;
157:2,11;159:14;
160:14;161:12;163:2,
7;164:6;168:12;
169:20;173:2;178:19;
179:9;180:18,21;
181:15;186:16;187:4,
10;189:19;190:6;
193:15,23;203:9;
206:10,23;207:4;
223:17,22;224:8,13;
225:18,24;226:12,14,
17,21,23,24;227:9;
230:13;231:12,18;
244:11;245:2,14,20;
246:9;247:10;259:4;
260:12,20,23;268:14;
271:15,16;272:19,21;
273:1,2,4;277:14;
278:16,18,20,24;279:5;
280:14;281:3,23;
282:2,25;285:3
**hid (2)**
54:18;122:19
**high (4)**
48:16,18;49:6;83:18
**Hills (1)**
116:25
**himself (1)**

210:21
**hire (3)**
56:14;57:1;184:24
**hired (12)**
33:16;56:14,16;
82:18;91:25;92:2,3;
102:25;200:17;254:1;
267:17;273:13
**history (1)**
281:23
**hit (1)**
290:4
**Hmmm (1)**
259:20
**hold (25)**
10:25;11:5;18:7;
59:18;65:16,16,16,17,
17;84:15,15;87:14;
107:18;150:9,15;
154:4;155:17;177:25;
180:15;193:7;202:16;
218:11;242:9;246:23;
257:12
**Holdings (5)**
116:5,13;186:9,13;
211:23
**home (6)**
75:24;76:2;209:19,
22;212:16;228:3
**honest (4)**
95:23;144:19;
162:19;241:1
**honestly (1)**
116:24
**hopefully (1)**
54:8
**hour (8)**
68:18;75:13,15,16;
77:1;158:6;225:11;
293:12
**hours (2)**
20:22;286:3
**house (1)**
209:25
**houses (1)**
143:8
**hundred (5)**
140:25;143:15;
163:18,21;243:5
**Hypothetical (1)**
267:14

## I

**idea (29)**
25:22;36:6;56:7;
73:17;94:2;116:19;
117:5;119:25;121:10;
132:9,21;133:8;151:6;
154:1,19;178:17;
180:1;186:8,14;
204:21;222:3;229:20;
237:1,3,6;244:23,25;

Case 1:24-cv-08515-AS    Document 160-2    Filed 05/26/26    Page 85 of 98
SPIN CAPITAL, LLC, et. al. v.                                                      AVRUMI LUBIN
GOLDEN FOOTHILL INSURANCE SERVICES, LLC                                            July 25, 2024

245:2;276:9
**identification (25)**
148:5;152:5;155:22;
161:6;169:4,12;180:7;
182:15;188:4;195:10;
197:20;217:7;223:20;
229:5;232:19;234:13;
237:18;244:14;247:25;
250:4;258:16;264:1;
275:9;277:19;283:11
**identify (8)**
11:18;17:20,23;18:2;
21:11;79:19;195:1;
263:20
**II (3)**
185:24;186:7;260:4
**illegal (2)**
170:13,20
**immediately (1)**
205:17
**impacting (1)**
23:16
**impairing (1)**
23:16
**important (2)**
205:3;243:20
**improper (1)**
68:14
**impulsive (1)**
277:5
**Inc (1)**
117:1
**incentive (4)**
149:7,10;154:8,11
**incident (1)**
109:19
**included (3)**
98:4;222:15;259:25
**including (4)**
43:15;100:8;194:13;
259:21
**income (1)**
52:1
**incorrectly (1)**
106:11
**incurred (3)**
253:12;263:7;267:1
**indeed (1)**
130:14
**indicates (1)**
195:16
**individual (1)**
105:20
**industry (3)**
114:20;118:10;247:5
**inflated (1)**
267:21
**information (5)**
34:2;214:13;280:14,
15;288:21
**informed (1)**
149:19
**initiating (1)**

205:12
**insinuated (1)**
34:14
**insisting (1)**
172:19
**instruct (2)**
68:13;85:3
**instructed (6)**
84:25;85:22,25;86:3;
156:8;267:15
**instructing (2)**
46:5;190:20
**instruction (2)**
48:4;274:14
**instructions (2)**
167:16,19
**instrument (1)**
15:18
**insurance (17)**
91:20;95:18,20;96:1;
116:25;117:8,10,10,21;
118:4,10;137:23;
139:8;142:16;143:1;
205:11;207:19
**insured (1)**
92:11
**intended (5)**
32:18;92:20;252:17,
20;255:10
**intent (3)**
253:25;254:1;262:24
**interest (21)**
35:8,9,15;79:16;
80:3,14,18,23;81:2,6;
82:6;96:21;138:11;
146:20,25;251:9,13,20;
253:2;256:3;259:16
**interested (2)**
109:15,16
**interesting (5)**
12:6,7,8;220:14;
222:24
**interests (2)**
35:19;81:23
**internal (1)**
249:6
**internally (1)**
99:25
**Internet (1)**
70:20
**interpret (3)**
239:6;248:7;249:5
**interpretation (1)**
233:18
**interpreting (3)**
238:6,10,21
**interrupt (3)**
11:8;93:5,6
**interrupting (2)**
19:1;65:25
**intimidated (1)**
137:10
**into (41)**

15:8;16:4;23:22;
32:13;42:25;45:11;
46:2;53:6;55:15,19;
56:18;63:5;78:19,20;
86:25;87:2,10,10,23;
90:4,18;98:23;99:3,16,
18;112:5;121:16;
134:2;142:20;171:17;
174:25;176:20,22,24,
25;177:3;199:10;
263:11,12;287:24;
288:25
**invested (9)**
78:9,12,16;80:10;
100:3,5;260:24,24,25
**investigation (2)**
286:21;287:1
**investigations (1)**
286:23
**investment (1)**
260:23
**investors (2)**
91:3;263:1
**invoice (4)**
82:25;102:7;265:24;
266:25
**invoices (2)**
100:24;101:1
**involved (7)**
36:14,19;46:17;
77:24;78:5;104:21;
111:12
**involvement (2)**
22:6,11
**irrelevant (6)**
67:25;101:6;125:2;
130:3;131:7;241:9
**Isaac (7)**
24:15;41:13;43:18,
19;44:3;76:22;77:22
**Isaacov (21)**
25:13,17,18,20;26:2,
9;27:5,8,21;28:3,9,13;
37:13;80:11;123:10;
164:16;182:13;217:23;
220:15;283:22;284:6
**Isaacovs (1)**
24:20
**Isaacov's (3)**
27:12,18,20
**ISO (5)**
30:24;31:8;32:5,13,
21
**issue (17)**
16:2,8,12,21;17:3,
19;36:25;71:3;87:18;
150:8;160:13;182:20;
186:25;206:23;250:6;
259:24;281:24
**issued (6)**
16:23;83:5;118:12;
135:12;157:15;280:23
**issues (3)**

35:17;126:6,14
**issuing (1)**
126:1

## J

**January (1)**
107:4
**Jersey (21)**
7:22;43:4;66:17;
67:10;69:18;75:6,7,11,
24;109:6;120:25;
208:18,22;212:1,7,14;
227:20;240:4,7;291:9,
12
**Jet (2)**
9:12,13
**job (13)**
34:16;58:19;64:11;
125:16,17,17;185:19;
203:24;224:17;237:5;
254:2;271:9;289:1
**Joe (1)**
24:17
**Joel (18)**
40:20;41:4,4;42:3,4,
9;54:12;55:7;60:10;
80:12;99:21;155:20;
156:2;227:2,4,8;
272:14;284:9
**John (7)**
24:11;72:24;73:9;
152:3,17;155:5;259:5
**Josh (30)**
7:15,17,17;43:23;
92:8;105:19;106:3;
148:2;150:13;155:11,
20;156:3,8;159:25;
161:10;162:19;182:13;
184:24;188:21;191:5,
8,17;218:19,21;221:8;
234:17;258:20,21,22;
273:8
**Judge (8)**
19:10,11;46:12;
158:17;162:3;200:15;
201:2,5
**judge's (2)**
201:4;257:23
**judgment (15)**
150:1;152:15;
169:15,16,20;170:1,2,
13,20;171:3,4,8,15;
174:5,24
**June (4)**
148:2;258:19;259:3;
264:9
**Justice (3)**
19:2;209:11,13
**juvenile (1)**
109:13

## K

**keep (6)**
18:25;230:9,14;
240:9;290:25;291:2
**kept (3)**
145:3,3;157:1
**kickback (2)**
35:23,25
**kidding (1)**
209:18
**kind (10)**
9:5;10:3;48:21,22;
49:4;74:17;127:8;
140:9;272:10;275:2
**Kirk (1)**
86:6
**knew (24)**
120:1,6;122:5,11,16,
20;123:9;139:15,22;
141:10,12,14,18,22,25;
174:6,13,22;220:22,25;
256:18,21,23,25
**knowledge (3)**
10:22;31:19;278:10
**knowledgeable (1)**
183:21
**known (1)**
133:23
**knows (1)**
189:18
**Kroll (1)**
24:17
**KTL (4)**
116:5,13;211:22;
212:4

## L

**laid (2)**
82:22;97:7
**Lakewood (5)**
7:21;208:18;212:14;
227:20;240:7
**language (2)**
198:22;254:19
**lapse (1)**
108:19
**larger (1)**
272:4
**last (22)**
20:22;44:8;48:19;
51:17;63:22;77:5;87:9,
11;88:8;90:10;107:2;
109:17,24;195:20;
211:5;234:3;237:20;
275:18;290:9,17,22;
293:7
**later (9)**
38:8;123:13;173:12,
19;176:16;227:5;
230:21;237:22;238:3

**laughing (2)**
139:25;140:1
**law (7)**
66:19;82:18;138:2;
152:3,7,17;174:5
**lawsuit (5)**
26:12;111:9;136:4;
150:2;169:21
**lawsuits (11)**
104:15,18,19,20;
135:25;136:6,18,23;
137:8,9;282:25
**lawyer (17)**
13:11;14:1,7;15:17;
33:16;56:12,12;62:2;
82:22;86:6;97:3;
173:25;254:1,2;
259:20;289:20,24
**lawyers (8)**
96:11,17;100:19;
179:21;253:23;257:24;
278:19;289:22
**lawyer's (1)**
48:4
**lazy (2)**
293:6,7
**lead (3)**
27:22;37:13;38:5
**leads (3)**
24:1;35:18;123:3
**least (6)**
8:6;68:6;171:25;
184:2;224:2;234:10
**leaves (1)**
66:11
**Leer (97)**
16:23;19:17;21:12;
23:22;26:2;29:2;30:1,
7,12,12;32:22;34:9;
35:22;36:4,7,8,13;39:5,
6;41:2;55:16,24;56:22;
57:24;58:25;59:20;
60:1,16;70:3;71:3;
79:16,21,22;83:23;
84:8,20,25;85:2,2,22,
25;86:3;91:10;99:8;
101:10,15;113:22;
116:22;120:6,10,16,18,
19,24;121:21;122:11,
21;127:1;128:2,3,11;
130:11;131:17,18;
136:19,21;138:22;
144:19;148:2;156:1,
14;160:17;161:21;
162:6,18;166:25;
167:6,11;172:10;
182:1;183:18;187:11;
205:10;210:16,19;
220:8,10;224:1;
234:24;239:10;243:9,
21;271:6;272:18;
275:14;280:23;285:25
**Leer's (3)**

185:25;186:11;213:4
**leeway (2)**
10:4;79:6
**left (1)**
66:10
**legal (58)**
7:18;13:6;14:22;
59:3,7,10;77:14;82:2;
83:14,21,25;85:3,4,11;
89:23;90:1;96:9,24;
101:14;102:15;103:9;
104:10;105:14,19,21;
106:2,13;107:7,23;
108:9,25;126:16,23;
128:6;132:4;134:6;
138:5;170:9,25;200:2,
17,20;207:11;212:9;
225:6;244:1;249:8;
253:21;254:14,18,20;
257:7,13,25;258:12;
265:11;267:14;288:10
**legitimate (3)**
134:5;176:16;201:5
**lender (2)**
128:4;205:13
**lenders (1)**
127:15
**lender's (2)**
83:18,20
**lending (1)**
123:18
**less (8)**
38:15;95:11;130:11,
12;136:15;237:22;
238:3;239:9
**letter (2)**
259:4;283:25
**letters (3)**
139:4,6;267:20
**letting (1)**
131:9
**liability (3)**
58:20;127:25;207:4
**liable (2)**
205:16;207:6
**liar (2)**
157:23;161:21
**liberty (2)**
192:11,12
**licensed (5)**
119:2,8,14,17,23
**lied (2)**
107:24;128:15
**life (14)**
30:4;91:20;95:18,20;
96:1;116:10,11;
142:16;143:1;165:2;
184:23;185:24;186:6;
260:4
**lifetime (1)**
109:2
**likely (17)**
24:3;29:4;56:14;

57:19;58:21;74:12;
136:1;169:22;183:17;
193:15,16;197:12,13;
219:9;224:15;229:11;
271:7
**line (5)**
45:3;163:23;216:20;
224:21;227:6
**liquidate (1)**
144:1
**liquidated (2)**
103:3;205:18
**list (2)**
242:9;250:22
**listed (4)**
15:6;105:20;106:20;
227:17
**Listen (12)**
10:19;18:19;166:4;
179:23,23;211:8;
218:15;231:7;244:8;
289:3;293:8,16
**literally (1)**
210:8
**litigate (1)**
138:8
**litigated (1)**
9:23
**litigation (7)**
9:24;17:3,20;136:21;
254:4;274:21,24
**litigations (1)**
135:16
**little (7)**
40:19;64:10;79:6;
162:18;192:10;259:2;
270:11
**live (3)**
7:20;8:8;212:15
**lives (1)**
151:20
**living (1)**
75:2
**LLC (1)**
205:14
**load (1)**
225:8
**loan (67)**
56:18;70:7,10;71:3,
14,20;79:25;80:1,2,7,8,
20;81:23;83:4,19;84:1;
85:5,7,19;91:10;92:20;
94:25;96:2,21;99:1,8;
103:25;113:25;114:2;
116:2,15;117:15;
118:12,23;123:13,23;
126:1;132:6;134:2,5,6,
21;137:13;138:3,6,23;
142:5,25;143:9,13,20;
144:4,12;157:15,20;
159:19;171:17;174:13,
25;205:12;252:17,18;
255:24;266:11,13;

269:13,19
**loans (10)**
119:3,9,14,18,24;
128:4;134:18,24;
135:5;140:16
**located (23)**
9:14,16;40:24;42:9;
43:3,4;65:15;66:16;
69:7,18;70:13,15;72:4;
117:4;120:1,7,18,20,
24;152:12;208:7;
209:24;256:21
**location (3)**
43:2;72:14;208:18
**locations (1)**
120:8
**log (2)**
115:25;184:6
**logistics (1)**
64:4
**logs (1)**
52:1
**Lone (2)**
117:7;218:22
**long (8)**
15:16;63:8;75:10;
133:15,23;255:16;
270:11;286:5
**longer (1)**
81:24
**look (24)**
42:25;56:3;63:5;
84:2;91:25;99:2,18;
103:1;110:17;125:19;
150:7;155:9;177:22;
182:11;192:12;193:4;
194:21;207:25;209:6;
216:20;246:13;257:23;
266:21;278:3
**looked (6)**
20:25;74:14;140:10;
248:20,22;266:15
**looking (19)**
15:7;35:6,8,9,13,15;
155:4,6,7,8;165:21;
166:3;181:18;201:4;
228:21;237:9;257:20;
269:22;289:16
**looks (8)**
32:5;161:25;189:17;
218:21;220:25;222:17;
233:3;264:11
**loose (1)**
181:11
**Los (2)**
257:1,2
**loss (3)**
44:25;67:25;68:24
**lost (1)**
225:13
**lot (36)**
8:10;20:23,24;30:18;
32:18;34:24;83:17,18,

20;101:22;104:10;
124:16,18;125:5,6;
132:14;136:15;143:7,
7;156:4,25;166:4;
168:18;180:24,24;
194:23;196:19,22;
243:6;255:21;256:6;
263:11,12;285:24;
286:1,8
**Louisiana (1)**
9:17
**love (5)**
19:9,11;200:22;
209:10,12
**lower (1)**
225:19
**lowered (1)**
158:25
**LS (4)**
114:15;115:1,16,21
**LUBIN (27)**
7:3,9,15,17,18;
19:16;43:18,23;48:3;
69:4;86:15;105:20;
106:3;120:13;148:2;
155:20;161:10;162:23;
179:17;180:9;184:24;
191:17;218:19;232:13;
234:17;270:17;278:4
**Lubin-1 (1)**
148:4
**Lubin-10 (1)**
197:19
**Lubin-11 (1)**
217:6
**Lubin-12 (1)**
223:19
**Lubin-13 (1)**
229:4
**Lubin-14 (1)**
232:18
**Lubin-15 (1)**
234:12
**Lubin-16 (1)**
237:17
**Lubin-17 (1)**
244:13
**Lubin-18 (1)**
247:24
**Lubin-19 (1)**
250:3
**Lubin-2 (1)**
152:4
**Lubin-20 (1)**
258:15
**Lubin-21 (1)**
263:25
**Lubin-22 (1)**
275:8
**Lubin-23 (1)**
277:18
**Lubin-24 (1)**
283:10

Case 1:24-cv-08515-AS    Document 160-2    Filed 05/26/26    Page 87 of 98
SPIN CAPITAL, LLC, et. al. v.                                          AVRUMI LUBIN
GOLDEN FOOTHILL INSURANCE SERVICES, LLC                                July 25, 2024

**Lubin-3 (1)**
155:21
**Lubin-4 (1)**
161:5
**Lubin-5 (1)**
169:3
**Lubin-6 (1)**
169:11
**Lubin-7 (1)**
180:6
**Lubin-8 (1)**
182:14
**Lubin-8A (1)**
188:3
**Lubin-9 (1)**
195:9
**lunch (1)**
158:7
**luncheon (1)**
162:20
**lunchtime (1)**
158:8
**lying (1)**
215:10

**M**

**mafia (1)**
26:10
**mail (6)**
291:4,5,7,8,10,11
**mailing (4)**
208:21;228:2;240:6,
10
**majority (2)**
104:19;227:4
**makes (4)**
111:19;221:12;
225:12;255:2
**making (23)**
43:21;86:23;88:20,
21;92:13;138:9;140:2;
144:4;155:9;156:21;
161:24;167:23;168:2;
174:4;191:11;216:25;
224:24;243:21;248:21;
254:14;256:20;257:25;
290:4
**malpractice (4)**
137:12,15;138:2;
259:21
**management (2)**
49:8;70:19
**mandatory (1)**
145:7
**many (17)**
8:19;19:17,17;20:7;
21:11;23:4;60:13;
100:4;104:20;106:25;
107:2,2;110:2;136:11,
13;226:17;286:4
**March (17)**
164:16;168:25;

182:12;195:7;198:6;
218:3;221:15,15;
228:18,19;230:19;
234:15;237:21,22;
238:9,9,13
**mark (13)**
45:14;47:19;147:25;
152:1;155:18;161:3;
168:22;169:6;232:15;
244:10;273:17;277:16;
283:8
**Marked (27)**
44:24;47:14;148:4;
152:4;155:21;161:5;
169:3,11;180:6;
182:14;188:4;195:9;
197:20;217:7;223:20;
229:5;232:19;234:13;
237:18;244:14;247:25;
250:4;258:16;264:1;
275:9;277:19;283:11
**marking (1)**
258:18
**markings (1)**
188:2
**math (6)**
216:3;230:5;238:5;
252:6;268:2,2
**matter (6)**
10:19;16:3,10;
104:12;142:12;155:8
**matters (1)**
155:8
**may (31)**
9:16;11:17;20:17;
42:19;44:13;70:8;
89:24;98:18;100:1;
104:16;107:16;109:12;
169:8;171:14;180:20;
181:9;184:21;187:13,
13;206:21;213:4,5,5;
215:14;236:6,7;
262:22;272:20,20,21;
273:1
**Maybe (59)**
9:4;16:25;22:2;25:5,
6;42:6;46:11,23;50:4,
6;60:16,17;62:22;
64:14;72:2;73:13;
82:25;99:23;105:19;
107:4;116:11,22;
122:23;127:9,10;
129:8;131:4;135:6;
136:25;143:7,14;
153:24,25;154:8,15;
165:5;171:5;176:7;
187:20;194:20;208:11;
215:14;220:9;226:20,
20;231:1,10;234:23;
241:8;263:16;271:11;
274:2,3;276:4,5;280:7,
9;281:22;286:3
**MCA (56)**

10:7,12;13:14;14:11,
20,24,24;15:8,18;16:2,
5;20:16,17,20,25;22:5,
23;23:5;29:3;30:9;
36:23;39:17;49:21;
55:9,17;57:9,10;61:14;
62:17;63:22;77:10;
112:5;115:24;116:15,
18;121:22;122:4,21;
123:9;127:15;141:3,
14;142:1;159:3,4;
163:2;169:22;172:11;
182:19;184:11,23;
208:8;220:23;270:18;
287:6,8
**MCAs (63)**
10:5;16:3,9,12,21,22,
25;17:2,12,14,16,19;
19:17;20:7;21:11;23:2;
33:18,20;34:6,9;36:14,
20,25;39:5;55:16;
56:23,24;57:6;60:6,18,
20,21,24;61:1;63:8,12,
18;64:2;121:13,14;
122:11,22;123:4;
124:7;132:5,8;135:8,8,
12,13,17;144:13;
146:21;147:17,18;
159:22;160:13,14;
187:1,1,12;262:6;
283:22
**mean (36)**
29:23;55:1;74:19;
89:5,12;91:15;115:19;
120:13;127:21;137:18,
22;143:6;165:20;
173:17;180:16,18;
181:9;185:10;202:14;
208:11;222:24;223:2,
8;230:23;232:25;
236:12;237:21;239:9;
241:6;242:1,6;248:20;
263:12;270:22;272:13;
280:7
**meaning (1)**
104:22
**means (4)**
199:4,7;223:2,14
**mechanics (4)**
15:8,18;16:2,4
**medical (7)**
92:4,10,18;94:9,11,
16,21
**medication (1)**
23:13
**meeting (2)**
286:10;293:21
**member (3)**
101:7,7,8
**membership (1)**
146:25
**memorialized (1)**
194:10

**memory (5)**
23:17;27:4;30:15;
108:19;278:17
**mentioned (2)**
110:2;160:14
**mentioning (1)**
42:8
**merchant (36)**
9:11;34:3,18,20;
35:13;37:13;49:21,22;
50:11,23,25;51:11,13;
52:11,19;53:5;54:5,10;
110:19;112:13;165:25;
168:19;185:16;187:21;
191:18,24;193:1;
198:13;203:25;224:22,
23;225:2;229:7;
246:12;272:11;287:7
**merchants (7)**
22:21;30:17;52:1;
53:23;113:3;133:4;
264:24
**merchant's (6)**
35:9;52:14;57:4;
198:16;225:1;272:9
**mere (1)**
190:7
**message (18)**
26:23;130:24;
134:15;148:1,7,10,12,
18;169:8;275:19,22,
23;276:3,6,8,19;277:5,
6
**messages (26)**
20:16;21:3;26:13;
34:8,13;73:22,24;74:1;
124:24;125:19;131:22;
146:14;149:12;162:1;
178:4;180:9,11,24,25;
181:1;190:9,18;
275:18;276:10;277:2;
285:24
**messing (1)**
130:13
**Metro (1)**
257:2
**Miami (1)**
8:10
**middle (2)**
194:13;199:18
**might (10)**
100:2;164:3,4,24;
212:10;250:12,24,24;
280:7;286:7
**million (41)**
9:20;71:2;89:14,20;
91:4;92:22;97:12,16,
19;98:3;117:14,18;
118:23;125:11;126:1;
128:24;129:4;130:8,
12;133:16;134:8,13,19,
22;143:25;157:19;
159:19;162:6;171:16;

173:12,19,23;174:25;
202:17;216:4;255:24;
261:3,5,19;264:25;
265:7
**millions (2)**
125:20;140:17
**mind (1)**
58:11
**minute (1)**
270:9
**minutes (10)**
75:13,17;86:11;
158:7;175:13;225:10;
275:22;276:2,12,15
**Mischaracterizes (15)**
15:24;21:18;37:19;
59:5;72:18;122:15;
124:13;128:8;130:10;
135:21;144:16;156:18;
163:5;168:14;189:10
**misleading (1)**
211:13
**missed (1)**
255:1
**missing (3)**
20:17;39:20;71:15
**misstate (1)**
130:22
**misstatement (1)**
161:16
**Misstates (11)**
145:12;160:9,9;
172:25;175:15;222:18,
19;224:10;271:21;
291:19;292:2
**misstating (1)**
130:19
**mistake (3)**
212:10;227:21;
275:23
**misunderstanding (1)**
108:19
**misunderstood (2)**
108:2,15
**Molly (1)**
182:13
**moment (3)**
104:3;108:7;180:17
**Monday (6)**
20:22;21:1,2;106:24;
107:1;108:24
**money (67)**
27:6;29:4,6,16;
38:24;39:25;40:5;50:8,
11;69:24;78:9,12,20;
80:10,25;86:23,25;
87:2,10,10;88:7;89:11,
12,17,19,21,25,25;
90:15,18;91:10;94:3;
97:21,22,23;98:21,22,
24;99:5,12,13,20;
100:1;101:22;103:21,
23;114:6;125:3;

131:10;133:3;140:16;
143:24;153:6;156:17;
160:2;163:13,16;
172:20;173:9;196:23;
212:24;243:7,22;
262:11;263:1,21,22
**month (9)**
87:9,11;171:19;
251:4,10,20;252:13,18;
255:17
**months (5)**
51:18;107:2;157:21;
252:21;290:14
**Montoya (2)**
152:3;155:5
**more (16)**
32:17;74:17;89:3;
124:18;125:6;162:18;
167:9;253:17;255:21;
263:23;271:7,12;
272:1,3;281:23;286:7
**morning (3)**
7:9,11;121:6
**Most (6)**
30:18;74:18;136:16;
183:20;272:7;291:9
**motion (7)**
46:9;47:23,24;65:12;
94:15;279:14;281:1
**mountain (1)**
20:15
**mouse (1)**
234:17
**much (30)**
9:18;48:14;64:3;
97:6;98:2,21;101:19;
103:16,25;104:18;
117:16;130:11,12;
140:5;144:5,23;156:3,
11;200:19;219:17;
235:4,8;247:13;
260:19,20,20;271:8;
286:2;291:8,23
**multiple (4)**
19:19;135:8,15;
276:5
**mute (4)**
167:5,5;211:3,5
**muted (3)**
167:11,12;211:1
**myself (4)**
16:12;118:19;173:2;
222:9

# N

**name (11)**
7:14,16,18;17:17;
23:25;70:23;110:15;
118:9;161:10;227:7;
273:22
**named (1)**
104:23

**names (4)**
42:8;76:16,19,21
**natural (1)**
49:10
**nature (5)**
12:15;13:17;66:15;
109:22;185:5
**near (1)**
125:21
**need (14)**
18:17;30:14;33:24;
66:7;109:3;116:1;
172:2,22;179:20;
217:10,10;219:12;
222:5,25
**needs (3)**
34:20;171:24;172:21
**negative (3)**
124:25;127:14;
233:17
**negotiate (7)**
34:5;144:17,20;
159:1;189:21;190:2,13
**negotiated (2)**
144:9;203:7
**negotiating (10)**
34:9,15;153:9,13;
154:5,7;155:2;178:9;
190:10,19
**negotiation (1)**
145:2
**negotiations (1)**
220:8
**neither (1)**
233:19
**Nerin (1)**
17:13
**net (6)**
164:22;246:13;
261:6,19;264:24;
267:12
**netting (2)**
165:15,24
**neutral (2)**
35:14,14
**New (51)**
7:21;34:22;41:17;
42:5;43:5,7;66:16,18;
67:9,11,12;69:18,20;
70:19;72:6,8;74:14;
75:6,7,11,17,24;109:6,
6;111:1;120:25;121:4,
7;135:16;145:10;
152:14;170:3,14;
174:6;208:18,22;
212:1,7,14;227:20;
240:4,7;250:9,14,15,
19;290:10;291:9,11,15,
22
**Next (24)**
78:10,11;110:21;
127:11;148:11;158:7;
162:19;176:21;178:11;

180:3;181:21,22,23;
193:5;195:6;203:15;
214:4;216:21;220:15;
222:1;223:17;228:19;
234:8,8
**nice (5)**
8:13;30:19;143:8;
181:11;293:21
**Nobody (1)**
189:14
**non-civil (5)**
107:19;108:13,25;
109:9,22
**none (3)**
16:14;47:21;293:16
**non-stacking (1)**
222:15
**nor (1)**
233:20
**normal (1)**
222:11
**normally (4)**
177:13,13,17;178:1
**notary (1)**
256:11
**note (3)**
250:6;258:8;259:7
**notice (5)**
283:9,14;285:21;
286:20,25
**noticed (2)**
285:15,21
**notified (1)**
207:2
**number (36)**
21:22;24:5,8;77:20;
97:11;101:21;103:20;
136:6,17,23;137:8;
146:16;148:1;152:2;
155:19;158:20;161:4;
169:7;175:20;176:9;
180:4;182:12;187:24;
188:12;197:17;204:19;
213:9;223:18;229:2;
232:16;237:8;238:8;
244:10;245:3;277:17;
284:17
**numbers (8)**
95:2;183:2;230:8,11;
236:1;249:13,21;
261:16

# O

**oath (7)**
107:25;147:11,13;
204:12;208:6,17;
230:15
**Object (249)**
10:1;13:5,18;14:13,
21;15:22;16:16;17:4;
18:4,11,12,12;20:3;
21:13,17;22:12;23:8;

24:6;25:4,21;27:13,23;
28:5,11;29:17;30:25;
31:20;32:6,24;33:9;
34:10;35:10,24;36:15,
21;38:20;41:9,14,20;
43:11;44:9;45:2;48:24;
49:15,23;50:12;53:7,
12,24;54:15;55:11,18;
57:17;58:17;59:2,23;
61:8,15;62:13;63:10,
13;64:13,22;66:22;
70:4;71:4,17;72:16,25;
73:11;74:3;75:25;78:1,
14;81:3,11,17;82:1;
84:10,22;85:9,16,24;
86:19;87:4;89:22;90:7,
12,20;91:5,12,21;
92:14;93:14,20;94:4;
95:5,16;96:8,22;97:8;
98:14;102:14,21;
103:5;111:21;112:20;
113:12;119:4;120:3,
12;121:1,8,15;123:5,
11,20;124:9;126:7;
127:17;128:5;129:7;
130:4,9;132:13,20;
133:6,17;134:9;
135:10,19;137:17;
138:17;139:5,17;
141:4,16;142:21;
143:5;144:11;145:11;
146:3,22;151:4;157:7;
162:2;163:4;164:7,19;
165:17;166:1,9,18;
168:13;169:17;170:23;
175:14,22;176:5,18;
178:16;181:16;182:3,
9,24;183:8;184:1;
185:7,14;189:2,9;
194:7;195:22;196:24;
198:9;200:10;202:16;
203:19;204:6;206:15;
207:23;212:19;213:1;
215:2,18;220:5,24;
223:9;224:9;226:9;
227:23;228:1,11;
230:10;231:15;232:22;
233:5,12,24;234:5,21;
235:19;236:4;239:13;
240:5,20;241:4,22;
242:17,23;243:16,23;
246:20;247:7;248:15;
249:2,14;250:16;
251:15,21;253:20;
256:13;259:9;260:10,
22;261:14;262:7,20;
263:14;266:8;267:3,
13,22;269:16;270:20;
271:20;277:3;279:7,
21;282:4,11;285:9;
288:16;290:1,11,18;
291:18;292:1,24
**objecting (2)**

62:2;289:20
**Objection (96)**
8:3,12;14:14;15:13;
18:7;37:16;52:20;
68:12;75:18;78:6;83:3;
87:12;96:15;97:25;
98:25;99:14;100:6,11;
101:13;102:9;106:15;
112:15;113:6;114:24;
115:17,22;119:10,19;
122:14;125:1;126:18;
129:1;132:25;133:11;
136:9;144:15;153:7;
160:8;170:4,8,15;
172:8,23;173:13,21;
174:8,15;179:4;181:4;
184:19;186:24;189:23;
190:4,11;193:12;
207:8;208:20;209:3;
212:8;214:20;216:6,
16;221:19;222:7,18;
223:4;225:4;230:25;
242:4;243:16;245:13,
23;246:4,7;249:22,25;
252:12;254:6,24;
256:5,24;257:6,13,19;
261:8,23;265:17;
266:1;268:21;269:25;
270:25;280:18;281:14;
283:24;284:14,18
**objectionable (1)**
130:21
**objections (4)**
18:13;19:6,8;172:14
**obligated (2)**
101:15;128:1
**obligation (6)**
38:1;58:13;192:9;
282:6,10;283:25
**obviously (1)**
146:16
**occurred (2)**
239:11;270:19
**off (25)**
18:14;47:5;67:2;
77:21;142:9;161:1,11,
12,14;167:3;188:1;
196:7;197:8;210:22,
23,24;211:5;213:5;
255:13;259:4;262:9;
264:25;265:2;267:8,20
**offer (3)**
34:19,22,24
**offered (1)**
174:12
**offers (1)**
34:16
**office (30)**
41:5,7,13,18,22;42:4,
5,6,6,10,16,17,18;43:2,
7,9,10;70:20;73:10;
74:15;76:4,8,9,10,13,
21;120:8;151:23;

211:17;290:10
**offices (5)**
42:13;76:12,14;
150:24;151:16
**Oilfield (2)**
9:12,13
**once (7)**
30:21;54:6;73:13;
77:16;208:13;218:25;
271:14
**one (109)**
9:22,22,23;10:2;
17:25;20:17;27:21;
38:11;43:15;46:4;
55:12;57:25;58:25;
61:6;68:11;70:5;71:2;
82:12;83:19;93:11,12;
106:5,5;114:16;
115:10;116:6,16;
117:2;132:10,12,15,18,
24;133:10;135:24;
136:2;147:4;150:15;
158:5;167:9;169:6;
181:21,22;182:11,19;
183:22;185:25;186:11;
188:6,8;189:12;195:6,
21;197:24;198:6,13;
203:10,11;208:16,19;
211:8;214:14;215:9;
216:21;217:5,15,16;
219:18;220:14,15;
221:12;222:1;223:17;
225:25;226:2,3,5;
227:18;228:19;229:8,
16,23;231:22;232:6;
233:4;234:8,8,9,10;
235:6;237:9,21;
238:12;240:3;244:10,
16;254:15,21;258:14;
262:18;263:23;266:15,
16,17;275:18;277:10;
287:10;292:14,16
**one-man (1)**
74:18
**ones (5)**
18:3;39:18,19;79:23;
219:16
**one's (1)**
237:21
**online (1)**
70:20
**only (26)**
16:3;22:24;30:21;
50:10;56:23;65:19;
68:19;72:1,3;76:9;
99:24;101:7,8;108:25;
113:18;134:21;135:24;
155:10;193:10;200:17;
202:23;206:18;246:16;
275:20,21;276:12
**onto (1)**
97:22
**open (3)**

69:15,17;70:21
**opened (8)**
69:11,13,19;70:19,
20,23;112:9;293:10
**operated (1)**
42:3
**operating (2)**
44:25;115:21
**operations (4)**
41:1;80:17;227:6;
281:25
**opinion (5)**
53:9;158:18;244:3;
247:14,15
**opportunity (2)**
145:15;263:19
**opposing (1)**
16:6
**opposite (2)**
142:12;144:3
**Optimum (9)**
69:10;112:17,24,25;
113:3,9,13,16,23
**option (5)**
94:7;138:21;145:20;
169:15;275:24
**order (4)**
47:25;142:20;
257:23,23
**origination (12)**
98:4;194:20;212:18,
21;228:7;240:16;
242:25;255:23;256:1;
261:18;265:10;269:20
**others (1)**
121:21
**Otherwise (1)**
274:11
**out (65)**
13:21;23:23;24:2;
29:2,15,20;30:7;35:7,8,
9,13,15;49:5;54:7;
57:13,22;69:20;76:4;
77:17;80:23;81:1,6,13,
19;82:10,22;85:1;
89:14,17;91:15,16;
95:10;97:7,17,22,23;
100:14;102:3;104:17;
108:18;123:4;125:6;
127:11;140:12;143:15;
144:1;151:3;169:23;
175:20;178:9;187:12;
196:22;214:3;218:19;
224:15;230:5,7;238:8;
255:7;264:4,5;271:18;
283:21;291:17;293:4
**outlawed (1)**
170:2
**out-of-state (1)**
170:14
**outside (4)**
66:7;76:10;205:13;
286:10

**outstanding (1)**
104:15
**over (15)**
31:22;42:20;63:24,
24;68:18;77:1;82:11;
104:11;117:18;128:24;
140:23;150:7;162:25;
175:17;281:12
**overcharged (1)**
113:3
**over-collat (1)**
118:25
**over-collateralized (6)**
92:21;119:1;157:17;
173:25;174:1,2
**over-collected (4)**
215:16,25;233:10,14
**over-collections (3)**
248:4,14;249:1
**over-debit (1)**
233:4
**over-debited (1)**
113:4
**overwhelmed (1)**
292:10
**owe (1)**
80:25
**owed (6)**
27:5;153:3;205:17;
265:15;267:10,11
**owes (1)**
80:25
**owing (1)**
103:25
**own (33)**
35:15,19;60:18,21,
23;61:6,14,20;62:1,11;
74:15,15,17;112:19,25;
114:19;116:10;121:25,
25;122:9,10;135:3,7;
147:9;189:24;192:1;
193:17;199:1;203:15;
216:18;226:21;268:23;
278:23
**owner (7)**
64:23;128:19;149:2;
161:23;179:9;224:25;
227:8
**ownership (2)**
138:7;146:20
**owns (1)**
133:4
**Ozentes (1)**
17:13

**P**

**page (3)**
198:2,2;225:20
**pages (1)**
205:1
**paid (39)**
29:7;30:21;35:15,18;

36:5;37:22,25;38:1,7,
7;42:23;77:15,22;
80:20;82:17;85:21;
88:17;90:11;92:1;93:9,
13;99:8,10;101:23,25;
102:4,5;128:12;144:1;
149:8;154:9,10;163:8;
199:2,14;225:1;242:2,
6;243:14
**paper (1)**
31:5
**parentheses (1)**
233:16
**Parkway (3)**
7:21;212:15;240:11
**part (10)**
64:11;89:1;103:2;
142:8;143:9;159:18;
198:19;259:12;264:11;
268:17
**participated (2)**
100:3,4
**participation (3)**
38:23;80:9;260:12
**particular (1)**
11:13
**parties (1)**
57:25
**part-time (2)**
8:8;99:24
**party (3)**
234:3;238:13,16
**pass (2)**
142:19;143:3
**past (1)**
30:22
**pause (2)**
172:21;225:14
**pay (53)**
32:19;38:16;61:3;
62:15,21;83:11,14,14,
17,20;84:8,20,21;85:3,
4,8,22;88:17;99:9;
101:11,16;125:15;
126:16;132:4;140:16;
142:9;143:13,14;
149:10;153:6;155:10;
160:4;166:8,15,16;
172:20;181:22;182:8;
213:9;220:10;246:15;
248:2,22;255:13;
257:5,17;259:4;264:4,
5,25;265:2;267:8,20
**paying (14)**
83:25;89:10,12;
100:10,16,17,17,19;
141:23;144:22;149:11;
160:21;182:2;189:25
**payment (6)**
35:17;127:7;145:10;
154:5;224:22;281:23
**payments (33)**
30:13;60:6;64:8,12;

88:20,21;92:13;93:19;
97:2;98:22;102:7,7;
113:21;127:4,6;141:3,
15,19;142:1,11;143:4,
19;144:9,9;150:1;
154:16;155:2;156:6;
157:6;158:25;175:24;
176:7;225:1
**pay-out (1)**
91:9
**pay-outs (1)**
96:6
**payroll (1)**
77:16
**pays (3)**
37:14;91:10;102:1
**penalty (7)**
208:6;254:23;
255:12,15,19,25;
259:16
**pending (1)**
51:8
**penny (1)**
160:20
**People (30)**
24:1;42:13;52:7;
76:1,2,3,6,10,21;80:3;
100:2,4;132:14;
137:10;142:19;143:3;
146:11;176:17;184:24;
185:21;193:17;199:16;
227:5;243:5;262:23;
271:9;273:2;284:21;
291:17;293:4
**people's (3)**
14:24;42:7;210:11
**per (19)**
101:16;158:20;
160:5,6;175:7,13;
203:7;219:16,17;
226:5;229:24;230:20;
237:1;239:4,9;244:21;
251:4,10,20
**percent (74)**
37:23,24,25;38:1,6,9,
15,18,23,23,25;39:1,6,
13;81:9,10;82:8,8;
85:17;103:4;128:13;
140:25;146:4;147:12;
163:8,10,18,21;194:3,
10,12,17;195:16;196:2,
3;198:18;202:8;
205:19;224:2,6;226:6;
229:13;230:6,20,21;
238:20,24;242:15,18;
244:20;248:10,13;
251:3,10,20;252:9,13,
16;253:3,9,17,18;
254:4,5;259:5,15,17,
18;260:24,24,25;268:8,
10,14
**percentage (10)**
186:21;187:6;

198:16,18;224:25;
236:14;238:19,24;
242:12;244:20
**percentages (1)**
    39:4
**perfection (1)**
    138:10
**perfectly (1)**
    267:7
**perform (1)**
    94:10
**peril (1)**
    46:14
**period (8)**
    73:14;74:21;75:3;
    156:3;255:16,17;
    287:15,17
**perjury (1)**
    208:7
**permission (1)**
    214:25
**person (7)**
    72:1,3;76:9;88:23;
    117:13;276:4;277:5
**personal (12)**
    10:21,22;11:2;89:21,
    24;90:3,5;143:19;
    153:2;165:16,24;
    278:10
**personally (21)**
    51:22;56:13;86:25;
    88:7,22;89:1,10;
    100:16;104:21,22,23;
    105:1,4,5,9;106:3,8;
    107:8;125:18;189:21;
    283:1
**persons (2)**
    79:20;92:11
**person's (1)**
    275:25
**perspective (4)**
    231:11,12,17,18
**phone (13)**
    14:4;32:1;46:23;
    47:13;54:4,5;55:3;
    62:23;146:15;157:1;
    185:21;220:7;273:24
**physical (5)**
    82:21;100:1;127:25;
    150:7;208:22
**physically (3)**
    47:9;120:20,24
**pick (2)**
    131:5;284:16
**picked (2)**
    175:20;236:2
**PICON (637)**
    8:3,12;10:1,9,16,25;
    11:7,11,16;12:13;13:5,
    18;14:13,21;15:13,22,
    24;16:16;17:4;18:4,7,
    10,14,19,23;19:4,7,13;
    20:3;21:13,17;22:12;

23:8;24:6;25:4,21,23;
26:11,15,19;27:13,23;
28:5,11,25;29:11,17;
30:25;31:14,20;32:6,
24;33:9;34:10;35:10,
24;36:10,15,21;37:16,
19;38:20;40:14,17;
41:9,14,20;43:11;44:9,
18;45:2,6,9,13,18,21,
24;46:7,11;47:17;48:7,
24;49:15,23;50:12,19;
51:2,5;52:8,20;53:7,12,
24;54:2,15;55:11,18;
57:17;58:17;59:2,5,18,
23;61:8,15;62:7,13;
63:10,13;64:13,22;
65:4,7,16,25;66:4,6,9,
13,24;67:2,8,15,21,23;
68:16;70:4;71:4,17;
72:16,18,25;73:11;
74:3,23;75:3,18,25;
76:18,24;78:1,6,14,22;
79:1,3,8,22;80:1;81:3,
11,17;82:1;83:3;84:4,
10,13,17,22;85:9,11,
16,24;86:12,19;87:4,
12,14,17,22,24;88:3,9,
12;89:6,22;90:7,12,20;
91:5,12,21;92:7,14;
93:2,5,14,20;94:4;95:5,
16,20;96:8,15,22;97:8,
25;98:14,25;99:4,14;
100:6,11,18,21;101:13;
102:9,14,21;103:5,19;
104:1,22;105:3,16;
106:15;107:9,18,21;
108:1,6;109:8,20;
110:9,12;111:21;
112:15,20;113:6,12,24;
114:10,24;115:17,22;
116:14;117:24;119:4,
10,19;120:3,12,16;
121:1,8,15;122:14;
123:5,11,20;124:9,13;
125:1;126:7,18;
127:17;128:5,8;129:1,
7,13;130:4,9,18;
131:11,16,19,23;132:1,
5,13,20,25;133:6,11,
17;134:9;135:10,19,
21;136:9,20;137:2,17;
138:17;139:5,17;
140:3;141:4,12,16;
142:21;143:5,21;
144:11,14;145:11;
146:3,22;147:16,19;
148:9,13;150:13,17;
151:4,11;153:7,12,16;
154:22;155:4,7,11,15;
156:18;157:7;158:5,
12,21;159:2,24;160:8;
162:2,8,12,15,17;
163:4;164:7,19;

165:17;166:1,9,18;
167:2,9,13;168:4,6,13;
169:1,17;170:4,8,15,
23;172:8,13,16,23,25;
173:13,21;174:8,15;
175:14,22;176:5,12,18,
25;177:6,18,22;178:16,
21,24;179:4,7,13,20,
25;181:4,7,16;182:3,9,
24;183:8;184:1,8,11,
17,19;185:7,14;186:18,
24;188:5,14,17;189:2,
9,14,23;190:4,11,22;
191:1;192:5,8,12,18;
193:12;194:7,25;
195:3,11,14,22;196:10,
13,24;197:6,13,15,21;
198:4,9,19;200:10,14,
19;201:12,15,21,23;
202:16,24;203:3,19;
204:6,13,15;205:6;
206:3,15,25;207:8,11,
17,23,25;208:9,13,20;
209:3,6,8,10,14,17;
210:1,4,7,14,17,20;
211:2,4,11,16;212:8,
19;213:1,16,19,23;
214:20;215:2,18;
216:6,11,16,22;217:2,
12,17,21,24;218:4,7,
13,24;219:4,24;220:5,
24;221:7,19;222:7,18;
223:4,9;224:9;225:4,9,
16,19,23;226:2,9;
227:10,23;228:1,11,21,
25;230:3,10,25;231:8,
15;232:4,10,22;233:5,
12,18,24;234:5,21;
235:19;236:4;237:23;
238:25;239:13;240:5,
20;241:4,22;242:4,17,
23;243:1,16,23;245:13,
23;246:4,7,20,23;
247:2,7,21;248:5,15;
249:2,14,22,25;250:16;
251:6,15,21;252:2,12;
253:12,20;254:6,24;
255:3;256:5,13,24;
257:6,12,19;258:4,21;
259:9;260:6,10,22;
261:8,14,23;262:7,20;
263:14;264:6,10,14;
265:3,17;266:1,8;
267:3,13,22;268:5,21;
269:2,5,7,16,25;
270:13,20,25;271:20;
273:8;274:5,8,11;
276:13,21;277:3;
279:7,21;280:18;
281:14;282:4,11,14,18;
283:24;284:14,18;
285:9,16;286:5,17,22;
287:16,24;288:16;

290:1,11,18;291:18;
292:1,24;293:11,19
**pieces (1)**
    188:17
**place (2)**
    171:13;205:15
**places (1)**
    24:9
**plain (1)**
    211:14
**plaintiff (4)**
    81:22;82:3,11;
    110:12
**plan (1)**
    127:7
**play (1)**
    181:7
**please (11)**
    11:12;19:13;27:10;
    51:3;92:8;159:25;
    191:4,5;192:13;206:5;
    220:16
**plus (2)**
    96:21;205:17
**pm (3)**
    221:15,16;293:24
**pocket (3)**
    98:13,17,18
**point (23)**
    11:11,16;30:22;42:8;
    54:7;76:25;78:24;
    84:14;93:25;173:4;
    174:16,17,19,22;203:4,
    12;251:6;254:12;
    257:16;258:2;280:25;
    282:23;283:1
**pointing (1)**
    214:3
**policies (20)**
    84:2;92:1;93:9;
    95:15,17,19,21;96:1,7;
    138:7;142:17;143:1,
    11;174:6,23;236:22,
    24;259:6,18;260:4
**policy (1)**
    96:20
**poor (1)**
    171:25
**portion (2)**
    259:3;263:2
**position (7)**
    35:14;66:20;96:13;
    121:24;161:20;253:16,
    19
**positions (3)**
    121:23;122:1,4
**possibility (2)**
    27:25;224:14
**possible (28)**
    24:21,21,23;27:3,24;
    47:11;52:25;64:19;
    88:11;100:15,25;
    101:3;104:18;115:13;

116:20;120:22;127:21,
21;129:2;135:20;
184:21;203:11;224:4;
225:3;231:24;244:1;
271:6;277:12
**Possibly (3)**
    26:24;129:17;135:11
**potential (4)**
    22:20;54:3;128:13;
    140:18
**potentially (6)**
    24:8;117:18;122:22;
    124:16;128:24;154:12
**practice (2)**
    272:6,7
**practices (2)**
    10:12;272:10
**predicate (1)**
    129:15
**premium (2)**
    92:13;97:2
**premiums (5)**
    88:17;92:11;93:8,12;
    142:16
**preparation (5)**
    199:21;200:4;
    283:23;284:7,10
**prepare (5)**
    20:13;104:5,8;
    285:12,20
**pre-payment (5)**
    254:22;255:12,18,
    25;259:16
**presented (1)**
    238:11
**preserve (1)**
    93:24
**preserving (1)**
    103:10
**president (3)**
    64:20;101:4;278:6
**pressure (4)**
    127:8;154:15;156:5;
    169:22
**pretty (7)**
    156:3,11;208:5;
    241:14;250:13,19;
    255:20
**preventing (1)**
    23:14
**previous (1)**
    122:22
**price (2)**
    198:15;224:23
**primary (1)**
    118:24
**principal (5)**
    97:6,14,19;98:5;
    251:9
**prior (10)**
    55:15,23;56:18,21;
    57:6;108:22;125:25;
    174:12;224:1;230:19

**private (1)**
76:12
**privilege (5)**
62:3;201:9,10;
288:19;289:21
**privileged (7)**
61:22,25;62:1,6,24;
134:4;289:19
**privileges (1)**
72:3
**probably (49)**
23:24;26:24;27:1;
32:15;46:23;54:21,22,
23;55:5;56:1;60:11;
70:19;72:2,6,7,11;
99:16,22,22;121:3;
136:14;149:7;156:24;
162:8;163:7;165:11,
12;178:3;180:19;
183:1;194:13;196:8,
16;198:25;199:15;
203:8;214:14,15,21;
220:7,17;222:8;
228:12;237:11;244:18;
271:5,12;280:3;286:3
**problem (10)**
138:25;139:2;
157:24;207:10;215:13,
14,14,15;216:10,14
**problems (1)**
29:4
**procedures (1)**
10:12
**Proceed (2)**
19:13;46:14
**proceeding (9)**
107:17,19;108:8,23;
109:1,9,23;110:3,6
**proceedings (17)**
68:15;69:2;105:14,
19,21;106:2,13;107:7,
10,12,14,23;108:9,11,
13;109:21,21
**proceeds (2)**
85:1;142:9
**processer (1)**
112:25
**processor (2)**
112:14,19
**produce (1)**
280:15
**produced (8)**
26:14;213:10,12,15,
19;214:4;248:3,23
**products (1)**
205:13
**profanity (1)**
177:24
**professional (4)**
165:6;192:13;
242:22;243:10
**profit (3)**
45:1;67:25;68:23

**profitable (2)**
92:12;93:19
**profiting (1)**
242:12
**profits (8)**
38:7,9;163:11;196:2;
197:4;242:16;248:10;
259:5
**prohibited (2)**
205:11;206:14
**prohibition (1)**
58:16
**prohibitions (1)**
56:10
**promissory (2)**
250:6;258:8
**proof (3)**
13:21;14:8,10
**proper (4)**
68:12,13;81:22;
162:4
**property (2)**
143:9;153:2
**protective (1)**
47:24
**provide (8)**
55:6;119:2,8,14,17,
23;156:25;265:14
**provided (4)**
174:12;218:21;
265:19;267:21
**providers (1)**
204:1
**providing (3)**
51:1,14;173:9
**provision (8)**
59:9;66:15;103:9;
207:3;257:16,22;
258:2,5
**provisions (3)**
16:4;62:23;266:18
**PSF (3)**
164:23;165:4;194:20
**pull (4)**
150:9;178:8;225:13;
263:23
**pulled (1)**
149:9
**purchase (10)**
15:19;115:6,8,12;
198:15,16;224:23,25;
229:12;244:20
**purchased (3)**
114:21,22;236:15
**purchasing (2)**
48:22;115:5
**purport (1)**
180:11
**purported (1)**
177:11
**purportedly (4)**
114:22;125:18;
140:17;174:1

**purporting (1)**
229:12
**purpose (2)**
9:7;75:22
**put (44)**
10:13;13:13;29:21;
32:2;33:22,24;38:24;
40:5;54:9;66:3;86:25;
88:7;89:14,21;90:25;
97:22;99:23;121:13,
16;124:7;127:8,9;
143:8;144:5;157:19;
163:13,15,16,18,20;
167:5;169:22;222:16;
254:22;259:4,10;
262:4,5;263:11,12;
272:11;280:11;283:18;
289:24
**putting (9)**
29:22;78:19;98:10;
145:25;156:5;199:17;
229:1;262:10,10

# Q

**qualified (1)**
49:9
**qualifies (1)**
48:23
**quick (2)**
92:19;290:4
**quickly (2)**
104:13;280:12

# R

**raise (2)**
259:24;262:25
**raised (1)**
68:19
**ran (1)**
40:23
**rate (6)**
251:9,13,20;252:10;
253:2;256:3
**rather (1)**
64:7
**re (1)**
199:23
**reach (5)**
24:2;29:2,20;158:19;
283:21
**reached (4)**
23:23;29:15;30:6;
127:11
**read (31)**
26:24;27:1;32:12;
51:6,9;103:2;153:22;
154:14;155:25;172:6;
176:20,20,22,24,25;
177:2;195:3,20;
197:25;198:19;200:9;
204:23;205:2,4;222:2;

224:21;227:17;239:1;
240:10,11;245:9
**reading (7)**
146:14;161:9;
165:20;190:13;192:1,
24;254:21
**ready (1)**
95:8
**real (4)**
7:16;49:7;143:8;
290:4
**realize (2)**
197:1;273:5
**really (12)**
32:21;45:23;48:14;
89:16;92:24;171:8;
173:17;192:5;215:11;
221:23;223:1;291:8
**reason (7)**
25:14;78:20;144:4;
157:17;233:9;249:13;
293:3
**reasons (2)**
9:25;276:5
**recall (36)**
8:21;27:25;32:15;
72:12;74:5;106:9;
146:17;155:24;164:1;
176:6;180:17,25;
185:17;186:15;192:25;
197:9;202:15;203:8;
213:3;223:11;228:14;
229:24;240:25;241:14,
16;245:6;260:2;261:3;
262:16;263:2;271:4;
272:15;276:7;277:22,
24;288:4
**receipts (7)**
115:4,6,8,12;220:11;
225:1;239:11
**receivable (1)**
51:17
**receivables (14)**
48:23;59:21;114:23;
186:22,23;187:3,5,6;
224:2,7,8;226:6;
230:20;236:15
**receive (1)**
163:10
**received (6)**
225:2;241:9,11,13,
16,19
**receiver (6)**
89:10;90:5,11;94:16,
18,20
**receiver's (1)**
88:16
**recently (2)**
156:1;284:15
**recess (4)**
86:13;162:20;
232:11;270:15
**recollection (3)**

33:2;144:21;193:19
**recommending (1)**
53:5
**reconcile (1)**
145:20
**record (24)**
7:14;11:4;14:14;
54:24;55:1,2,5;66:3;
102:6;130:19,20;
147:12;176:21,23,24;
177:1,3;188:1;196:21;
200:13;208:11;210:14;
211:16;269:9
**records (20)**
92:5,11,18;94:9,11,
17,21;273:12;278:11,
23,25;279:5,6,19,19,
25;280:6;281:7,11;
291:2
**reduced (1)**
144:9
**reduction (1)**
191:25
**refer (2)**
87:19;181:3
**reference (1)**
26:9
**referred (1)**
271:6
**referring (11)**
30:3,5;32:3;34:13;
106:20;108:9;159:2;
177:19;180:18;217:16;
220:17
**refers (1)**
58:12
**re-fi (1)**
234:18
**reformulate (1)**
210:10
**refresh (2)**
27:4;30:14
**refuse (1)**
94:13
**refused (3)**
93:23;94:12;145:6
**refute (3)**
233:22;249:13,20
**regard (1)**
34:4
**regards (1)**
152:18
**Regent (3)**
152:3,7,17
**registered (2)**
250:14,19
**regulatory (1)**
286:13
**reimburse (1)**
268:19
**rejoins (1)**
69:1
**relate (2)**

87:17,25
**related (7)**
73:3;274:15,21;
280:15;287:6,6,9
**relating (1)**
137:13
**relation (2)**
260:17,19
**relationship (2)**
25:9;281:2
**Relax (3)**
29:11;79:1;178:21
**relayed (1)**
234:24
**relevance (24)**
25:23;26:11;44:18;
45:3,10,12,25;46:3;
47:21;65:4,8,9,11,21;
68:4;78:15,22;87:15;
100:18;107:18;108:14;
113:7;172:13,14
**relevancy (2)**
68:10,12
**relevant (17)**
10:3;26:16;53:4,18,
21;66:21;67:1,5;68:5;
79:5;100:12;171:9,10;
172:12;215:7;244:2,5
**remarks (2)**
179:21;192:9
**remember (68)**
9:3;12:24;23:4,19;
24:7;26:5,6,8,18,20;
27:4,6;30:11;33:3;
35:3,5;36:6;47:8,9;
63:7,23;69:12,16,20;
76:13;82:24;86:8;
88:24;99:11;107:5;
114:5;115:18;131:12,
17,19,24;137:4;
154:13;163:7;184:15,
25;219:14,19;237:11;
240:18;260:2;261:13,
15;262:23;263:3;
266:5;269:19;272:21;
273:9,22;274:1,4,6,7,
10,12,19;276:22,23;
278:1;279:2;283:13;
290:24
**remembers (1)**
68:2
**remind (1)**
171:16
**reminding (1)**
167:25
**remittance (1)**
244:21
**remotely (2)**
113:17;292:3
**rendered (2)**
212:21;267:2
**rent (1)**
42:23

**rep (1)**
40:16
**repay (2)**
118:22;125:11
**repayment (1)**
152:23
**Repeat (5)**
23:1;177:5;206:5;
284:4;285:16
**repeating (1)**
240:9
**report (1)**
51:17
**reportedly (1)**
143:24
**Reporter (5)**
45:14;51:5,6,9;
247:22
**represent (3)**
35:13;129:11;222:21
**representative (12)**
8:17;9:9;82:14;86:4;
103:16,24;147:10,14;
148:23;168:17;205:10;
284:1
**represented (1)**
179:6
**representing (5)**
83:16,22,23,24;
292:16
**reputable (1)**
59:15
**request (9)**
51:16,23,24;94:9,11;
186:16;214:18;280:2;
281:10
**requested (10)**
60:17;214:15;
237:12;271:11;278:16,
18,19;279:23;281:10,
13
**requests (3)**
280:17,19,23
**require (3)**
85:7;257:5;272:1
**required (2)**
32:16;84:20
**requirements (1)**
33:23
**requires (1)**
257:17
**research (1)**
84:1
**reside (1)**
8:1
**residence (3)**
75:6;256:23;257:1
**resident (1)**
8:5
**resolution (5)**
150:4;154:7;169:24;
171:7,13
**resolved (6)**

94:22;95:8;104:12;
136:16;193:4;287:23
**resources (1)**
263:17
**respect (11)**
10:12;22:23;23:2,5;
39:4;111:20;112:2,3;
132:5;135:17;138:2
**respond (3)**
27:2;137:1;176:15
**responded (3)**
108:14;156:6,9
**response (4)**
172:2;178:11;191:8;
235:3
**responsibility (16)**
33:20;51:20;52:14,
16;57:3,4;58:19;
121:25;125:23;142:3;
160:16;178:18;184:3;
226:15;229:22;237:4
**responsible (2)**
60:8;183:24
**rest (2)**
34:1;109:23
**result (1)**
152:23
**retain (1)**
52:15
**retained (2)**
82:12;152:18
**retainer (5)**
82:16,22,25;265:14,
23
**return (1)**
48:5
**returns (7)**
45:25;46:13,18;
47:15;65:19;66:21;
67:6
**revenue (2)**
15:19;117:17
**revenues (4)**
117:12;118:11,12,14
**review (38)**
46:21;52:10,13,18;
53:19,23;55:17,24;
56:13,15,16;57:1,7,8;
60:2;61:1,4;62:16,22;
85:19;92:17;102:25;
151:8,9,11,12;185:21;
199:14,19,24;202:18;
203:23;205:1;208:1;
224:19;239:24;283:13;
289:12
**reviewed (17)**
23:3;55:9;57:15,22;
60:21,23;61:6,24;62:5,
11;92:17;102:20;
134:16;155:25;184:7,
22;283:15
**reviewing (6)**
21:3;54:8;92:4,10;

184:25;186:15
**revoked (2)**
35:20;128:12
**RICO (1)**
110:6
**right (219)**
10:7;12:22;17:3;
20:24;21:1;22:19;
27:12,22;28:10;32:5;
33:18,21;37:4;40:3;
43:4,5,8;47:3,5;58:2;
60:9,19;64:21;72:24;
81:1,9,25;87:3;88:18;
90:8;91:9,19;92:1;
93:9;94:10;96:3;99:1;
101:5,8;105:14,17;
106:3;112:13;114:15;
115:12;119:14;120:2,
11,25;123:10,19;
124:8;126:6;127:16;
133:15;134:8;135:18,
25;138:7;141:3,7,10,
15;142:17,19,20;
143:4;144:10;145:23,
24;146:21;147:3,20;
149:3,21,24,25;150:11,
20;151:9,15,23;155:3;
156:17;161:1;162:13,
16;164:18;165:7;
168:12,21;169:7;
170:3,7,21;172:3,22;
175:1,19,21;179:10,17;
180:10;182:8,17,20;
187:12;188:23;189:11;
190:10;191:17;192:14;
195:6,21;196:23;
197:1;198:6;200:3;
201:19;203:10;206:10;
207:7,22;209:17;
210:6;211:23;212:1,7;
213:8,15;218:9;
219:17,18;220:3,23;
221:24;223:2;224:3;
227:12,15;228:20;
229:8,13;231:23;
232:5,21,25;233:1,4,
10,11,17;234:7;235:5,
9,22;237:22;238:5,13,
14,16,17,20,24;239:4,
20,20;240:4;241:3;
242:3,13,14,16,16;
244:17,19,24;245:8,9;
248:11,14;252:11,16,
25;253:1,4,7;254:22;
256:22;258:20;261:7,
22;262:19;264:25;
265:12,16,25;267:8,21;
268:9,15;269:1,11,24;
270:8;271:18;273:6,
17;275:12,15;277:16;
278:4,7;279:25;
280:24;283:19;284:16;
292:6;293:14

**rightful (1)**
227:8
**rights (1)**
96:20
**risk (10)**
34:24;83:19;124:3,
17,18;125:6,6;159:18;
247:11;256:7
**road (1)**
293:9
**role (4)**
22:25,25;23:6,11
**room (3)**
74:16,16;87:19
**rule (1)**
201:2
**ruled (4)**
110:23,25;111:1,2
**rules (1)**
45:13
**ruling (5)**
44:24;45:15;47:14,
19;201:4
**run (2)**
213:9;248:2
**runs (1)**
248:22
**Russian (1)**
26:10

## S

**sad (1)**
172:21
**sales (1)**
50:9
**salesperson (1)**
49:9
**same (43)**
11:3;35:16;42:13;
57:21;71:10;78:6;92:2;
96:15;116:14;117:9;
118:6;119:10,13,19;
132:25;133:11;157:2;
167:17;174:15;187:12,
21;188:8;195:20;
210:8,11;222:7;
225:25;226:2,3;
228:21;230:25;238:13,
16,17;246:4,7;249:22,
25;250:13,25;257:19;
269:25;270:25
**sanction (1)**
209:14
**sanctionable (2)**
46:6,8
**satisfy (1)**
153:2
**saw (2)**
199:23;223:25
**saying (41)**
10:10;12:21;17:18,
18;18:1;37:3;67:5;

94:18;114:13;122:9,
20,20;130:19;138:14,
24;139:1;150:1,6;
151:17;154:1;172:21;
173:8;175:2;179:2;
193:7,10;200:23;
214:3;219:14;221:11;
230:9;234:10;238:23;
240:9;243:4;256:2,20;
261:11;279:15,18;
293:3
**Schamila (1)**
264:19
**schedule (5)**
86:2;257:21;258:11;
266:17,24
**school (3)**
48:16,18;49:6
**scope (1)**
18:12
**screen (10)**
128:1,23;150:16,19;
157:5,10;159:6;
210:22,23,25
**screw (3)**
140:11,22;144:22
**scroll (6)**
148:9,13;155:16;
217:25;258:24;264:14
**searched (1)**
273:11
**second (13)**
10:25;43:5;65:7,17;
67:17;77:3;150:15;
176:15;177:25;218:4;
224:12;257:12;287:16
**seconds (2)**
67:3;148:22
**security (4)**
32:19;138:10;
142:25;260:3
**seeing (4)**
18:21;19:24;188:7;
225:17
**seeking (1)**
103:17
**seems (3)**
10:4;192:6;242:2
**seizures (1)**
153:2
**sell (2)**
143:18;224:7
**selling (2)**
53:22;59:22
**sells (3)**
198:14;224:24;259:6
**send (19)**
24:1;50:22;51:10;
54:4,7;57:13;124:23;
128:2;130:24;138:15;
139:3;180:24;191:5,
11;192:23;234:17;
271:14,18,25

**sending (9)**
55:23;56:22;112:3;
125:9;130:7;131:20;
149:12;188:21;191:8
**sends (5)**
90:14;156:1,7;
192:25;272:1
**sense (5)**
32:9;79:5;141:1;
225:12;293:12
**sent (40)**
38:5;57:2,19,22;
113:23;114:4;116:22;
127:9,13;129:18;
130:11;131:2,2;
138:24;139:1,10;
141:2;148:18;152:3;
153:15,17;157:5,10;
181:1;182:18;191:6;
224:15;271:12;272:18,
24;275:22,23;276:2,4,
5,19;277:4,9,11;280:9
**sentence (2)**
181:23;222:6
**sentences (1)**
192:21
**service (4)**
118:10;165:6,16,24
**Services (11)**
9:12,13;117:8;118:4;
166:5;205:11;212:21;
218:23;243:6,10;267:2
**set (2)**
152:22;224:23
**settle (1)**
143:14
**settlement (3)**
116:10;287:25;288:2
**settlements (2)**
30:4;116:11
**seven (1)**
252:21
**sham (3)**
66:15;67:14,15
**Shane (48)**
10:2;18:10;21:4;
25:6;44:19;64:6;
105:17;129:14;154:3;
155:4;167:2;177:3;
179:7,7,21;180:22;
184:8,16,20;188:6;
192:5;195:1,11;
199:10;202:9;203:20;
209:10,20;214:1;
215:4;216:12,23;
225:6;227:19;231:5;
232:1;237:24;238:6,
21;242:11;244:7;
246:22;247:9;249:17;
252:3;255:3,21;269:7
**share (10)**
26:22;122:12;
127:15;128:23;150:16;

164:15;169:5;217:15;
234:8;264:3
**shared (1)**
159:6
**shareholders (3)**
12:18,23;13:2
**Shares (1)**
260:4
**sharing (1)**
150:21
**sheet (3)**
99:24;264:4,5
**shit (4)**
156:24;178:2;
180:16;181:13
**shock (1)**
246:6
**shocks (3)**
245:21;246:2,18
**short (2)**
232:11;270:15
**shot (3)**
128:23;157:5,10
**shots (1)**
128:2
**show (21)**
17:16;18:15;19:21;
20:10;21:6;74:18;
102:8;131:21;178:4;
191:1,2,2;197:21;
209:12;217:12,17;
239:5;244:22;245:11;
248:25;261:16
**showed (1)**
178:3
**showing (17)**
20:2;67:10;124:24;
127:14;130:8,25;
164:25;172:1;178:13;
228:8;229:19;231:24;
232:16;239:21;248:3;
256:16;267:1
**shown (1)**
264:12
**shows (5)**
215:9,16;239:6;
248:7;258:12
**SHURE (1)**
67:20
**side (4)**
54:13,13;58:24,24
**side-by-side (1)**
187:16
**sign (11)**
13:23;37:14;47:2,5,
7;52:19;54:10;138:22;
205:25;206:2;233:16
**signature (2)**
85:4;164:18
**signed (19)**
18:1;22:22;32:21;
34:17;47:11;83:13;
85:20;136:1;164:17;

167:24;174:24;203:24;
224:17;256:10,11;
267:16;277:21;279:15;
280:4
**significant (6)**
97:4;103:21,23;
124:3,17;241:15
**significantly (1)**
160:22
**signing (3)**
37:14;47:9;277:24
**silly (1)**
140:3
**simple (2)**
71:10;168:8
**simply (1)**
130:19
**single (2)**
68:11;210:9
**sit (10)**
21:10;77:8;81:15;
97:3;138:8;236:25;
249:12,20;273:3;
277:10
**situation (1)**
165:9
**six (2)**
51:18;107:2
**size (1)**
38:16
**sky (1)**
175:20
**Slow (2)**
14:13;292:9
**small (2)**
215:13,14
**snide (2)**
179:21;192:9
**sold (2)**
224:2,6
**sole (1)**
112:4
**Solutions (1)**
117:1
**somebody (2)**
200:1;214:14
**someone (18)**
29:20;46:24;47:2;
56:14,15,16;59:11;
61:3;92:4,10,17;
146:18;181:15;205:24;
206:8;218:21;229:14;
264:20
**someone's (1)**
131:9
**Sometime (1)**
22:2
**Sometimes (21)**
30:20,21;33:25;
34:18,23;35:18;37:22,
23,25;38:15,25;51:16,
23,24;52:24;136:1;
165:9;268:16;271:24,

25;275:3
**soon (3)**
104:12;139:14;285:2
**sophisticated (1)**
143:23
**Sorry (11)**
17:10;28:9;33:11;
42:2;163:19;195:11;
217:14,14;241:24;
251:17;272:23
**sort (2)**
205:3;234:9
**sought (1)**
254:11
**sounds (14)**
71:9,10;86:12;118:9;
147:7;162:15;166:17,
21,21;218:20,24;
221:25;222:2,13
**space (3)**
67:12;74:13;121:22
**speak (17)**
60:3;61:16;160:16,
23;187:9;190:6;
193:24;216:1,17;
220:20;221:20;229:15;
231:5;232:1;283:7;
284:6,9
**speaking (4)**
181:10;219:21;
227:5;268:22
**speaks (5)**
103:12;198:10,24;
211:9;256:14
**special (2)**
48:21;165:23
**specific (12)**
16:10;35:4;89:3;
125:4;131:6;142:24;
157:17;185:16;200:16;
213:3;237:13;272:15
**specifically (5)**
10:10;15:4,6;138:14;
177:18
**specified (3)**
198:15,17;238:19
**speculate (22)**
36:7,10;50:15;137:2;
165:21;166:4;168:2,4;
175:5;176:13;180:23,
24;181:19;182:6;
186:4;196:10,12;
223:15;237:14;241:10;
247:15;274:9
**speculating (3)**
166:22;175:25;176:9
**speculation (2)**
182:4;282:18
**speculative (2)**
28:21;29:5
**spending (1)**
72:10
**spent (3)**

20:22;286:1,5
**Spin (166)**
8:17;9:8,9,19;12:19,
22,25;13:13;14:3;16:2,
8,12,13;30:4;32:14;
43:1,10,14;44:6,17;
46:13;47:10;56:18;
57:6,9,10;60:18,20;
62:17;63:19,20,22;
64:18,21,25;69:14;
70:2,9,11,23;71:1,13,
16,19,24,25;77:6,17,
25;78:5,13,23;79:13;
82:3,11,12,12,14;
83:14,24;85:25;86:4,
18;88:8;89:12;90:4,14,
15,19;96:6;97:6,22;
98:2;99:1,10;100:14;
101:1,5;102:1,4,5,5,8;
104:14;105:4,6,19,21;
106:1,4,7,16,20;110:4,
5;111:17,20;112:2,13;
113:3,21,25;114:1,1,8;
115:7,10;116:2,15;
118:25;119:13,13,15;
123:13,23;132:6;
135:1,12,17;136:6;
140:22;142:4,8;
144:12;157:15;160:12;
163:10,15;184:23,23;
186:25;189:15;194:3;
195:17;197:8;199:1;
208:7;209:24;210:4;
212:5;213:13,15,20;
215:6,11;227:16,17;
228:15;231:17;232:16;
240:7;241:10,12;
250:19;260:15;264:22;
278:6;279:23;280:24;
283:4,14,18;284:1;
286:13;287:2,4
**Spin's (13)**
11:23;22:10,24;23:6;
28:14;65:5;69:8;70:1;
83:25;89:25;97:17;
278:10;279:19
**split (3)**
165:12;241:8;262:22
**spoke (4)**
14:4;146:18;234:23;
237:12
**spoken (2)**
73:25;201:8
**stacking (9)**
56:10;58:1,10,16;
204:23;222:15;231:22;
239:19,21
**stake (1)**
79:20
**stamp (1)**
213:11
**stand (1)**
289:25

**stands (1)**
165:5
**start (5)**
11:22;132:8;217:19;
274:23;282:24
**started (2)**
285:2,17
**starts (1)**
218:19
**state (15)**
7:13;45:9,24;65:9;
70:17;106:14,22;
107:8;110:24,25;
135:16;227:17;250:15,
23;256:12
**stated (1)**
68:4
**statement (12)**
35:25;108:22;
117:20,20;130:11;
156:20;184:22;215:21;
218:25;240:14;256:20;
267:25
**statements (33)**
12:10;34:1;51:18;
86:18;115:16;116:1,
12,22;117:23;125:24;
127:14,19;128:1;
145:5;157:3;160:3;
173:10;184:7;185:1;
186:3,6,12,15;193:16,
18,21,24;217:1;
218:21;219:2,4;
271:11,15
**States (2)**
111:8;238:24
**status (3)**
32:23;33:8,15
**stay (2)**
64:7;104:17
**stayed (1)**
100:1
**staying (1)**
64:5
**stays (1)**
34:25
**Stefan (14)**
23:22;26:2;29:2;
130:11;136:19,21;
148:2;162:7;167:4,10;
169:8;205:10;210:18;
275:14
**steps (2)**
270:24;271:3
**Steve (2)**
63:1;265:24
**sticking (2)**
179:11,17
**still (15)**
42:20;63:12,18;
69:22;99:1;129:18;
143:7;150:17,19;
155:4;159:6;172:22;

178:5;188:7;208:23
**Stop (20)**
12:13;64:2;65:25;
66:2;99:4;108:7;
150:20;155:11,11;
156:15;160:4;179:20;
197:13;198:4;203:3;
205:6;216:22;221:7;
291:14,22
**stopped (2)**
144:21;291:25
**story (3)**
173:20;179:11,16
**straight (2)**
146:19;165:14
**strange (1)**
208:5
**street (6)**
97:22;250:9,12,25;
251:1,2
**stress (1)**
124:7
**stressed (1)**
123:19
**strict (1)**
272:1
**structure (5)**
30:23;32:1;37:22;
91:17;127:6
**structured (2)**
38:2,4
**stuff (6)**
77:15;110:17;
218:16;271:24;282:25;
285:3
**stupid (1)**
210:3
**subleases (1)**
67:12
**sublet (3)**
42:16,18,22
**subletting (2)**
72:14;74:14
**submitted (3)**
9:19;12:16;281:8
**submitting (1)**
15:12
**subpoenas (2)**
286:15;287:4
**sudden (1)**
222:21
**sue (5)**
136:25;259:20;
284:21;285:2;293:2
**suggesting (1)**
209:15
**suing (8)**
64:6;110:18,19;
171:11;292:14,17,21;
293:5
**suit (2)**
137:13;152:18
**suitable (1)**

152:23
**sum (1)**
241:15
**support (3)**
288:15;289:5,7
**supporting (1)**
288:23
**supports (2)**
234:9,10
**supposed (12)**
143:8;145:7;181:14;
183:20,22;202:7;
225:16;236:13;241:3;
247:13;259:11,17
**sure (79)**
15:16;19:3,20;20:18;
21:8;25:15;30:5;34:12;
36:1,23;37:11;39:22;
40:9;46:24;48:10;49:1,
17;50:1;52:16;53:16;
71:8;75:19;86:12,20;
89:18,25;90:23;95:1,9,
22;99:17;104:13;
105:20;122:20,25;
124:20;125:5,5;
127:11;129:23;132:14;
134:5;137:24;154:18;
157:16;159:10;166:5;
168:23;171:23;172:1,
4;175:8;178:13;189:4;
195:24;203:12;205:22;
219:22;220:21;221:1,
13,16;224:4;232:10;
234:19;235:16;238:18;
239:22;241:14;244:18;
250:7,13,19;252:18;
255:9;264:16;270:5;
290:4;291:13
**surprise (1)**
178:3
**surprised (1)**
140:8
**sworn (1)**
7:4
**syndicated (3)**
195:16;260:8,8
**syndicating (1)**
243:14
**syndication (9)**
28:3,10;38:18;163:2;
194:3;195:8,17;
242:15;268:8

**T**

**table (1)**
54:6
**tack (1)**
253:6
**talk (21)**
13:10;34:14;40:19;
79:24;96:17;149:14,
16;176:16;177:14,17;

178:2;181:11;211:22;
284:21,22;285:3,5,6,7,
17;291:17
**talked (3)**
168:10;217:4;277:8
**talking (56)**
33:17,18;41:23;
42:14;56:20,21,23;
63:14;70:7;77:10,11;
99:1,25;105:18,21;
107:9,11,14;108:7,11;
109:6,7;113:24;
116:15;123:22;124:15;
129:19,21;135:1;
142:23;144:12;147:16,
17;150:4,5,11;154:2,
19;158:22;159:6,11,
22;172:11;175:25;
177:23;184:8;191:10;
219:15;222:8;226:1;
238:17;247:21;271:9;
284:13;286:22;287:17
**target (2)**
287:3,5
**tax (11)**
45:25;46:13,17,21;
47:4,9,15;48:5;65:19;
66:21;67:6
**taxes (6)**
43:21;44:6,8,12,17;
47:1
**TD (7)**
70:8,11,15,16;99:10;
114:5,8
**teach (1)**
25:6
**telling (16)**
18:24;20:18;54:24;
141:23;147:3;156:15;
160:2;162:1;167:22;
172:19;209:9;211:4;
235:23;236:16;261:11;
279:1
**term (3)**
58:1;220:10;259:21
**terms (22)**
34:5,9,15;49:21;
51:1,14;53:4;54:4;
60:16;61:13,20;62:1,
11;154:5;180:20;
185:16;194:23;198:20;
199:24;202:14;203:24;
224:16
**testified (20)**
7:4;8:22,24;10:13;
11:23;18:15;64:10;
66:16;67:12;76:7;
107:22;121:17;148:22;
149:1;208:6;211:17;
243:1;258:4;262:17;
291:16
**testify (8)**
9:2;127:18;184:18;

190:22;203:20;255:4;
285:14,21
**testifying (9)**
23:14;130:16,18;
210:15;216:11;230:15;
237:23;246:24;281:18
**testimony (48)**
9:7;15:25;21:18;
22:24;23:6;29:16;37:2,
20;71:1;72:19;78:21;
105:13;107:3,6;
122:15;124:14;128:9;
130:10,13;135:22;
144:16;145:12;147:6;
153:16;156:19;160:9;
163:5;168:14;189:10;
192:17,19;204:5,23,25;
208:5,17;222:19;
223:1,5;271:21;
276:13,14,17;277:9;
278:17;281:15;291:19;
292:2
**Texas (8)**
9:15;143:9;150:24;
151:3,16,23;152:13,15
**texting (1)**
146:15
**texts (1)**
26:8
**Thanks (1)**
232:14
**thereafter (1)**
225:3
**thinking (2)**
87:20;156:12
**third (1)**
14:15
**third-party (2)**
264:21;273:13
**though (5)**
110:21;113:19;
129:3;145:6;213:24
**thought (16)**
64:10;76:7;108:6;
124:17;125:10;140:11;
142:12;143:10,14;
154:4;157:22;158:1,
10;208:4,4,5
**thousand (4)**
175:12;176:3,21;
210:8
**thread (1)**
26:23
**threaten (2)**
25:20;132:3
**threatened (2)**
150:7;174:23
**threatening (9)**
26:6;136:25;137:11;
149:5,23;170:1;
171:15;284:20;285:2
**threats (4)**
26:2;126:15,23;

174:5
**three (15)**
33:6;51:17;65:18,19;
68:16,18,19;100:8;
173:12,18;174:24;
242:6;248:22,25;274:3
**threshold (1)**
216:5
**throughout (1)**
192:21
**throwing (1)**
94:3
**tie (2)**
153:10,10
**tiger (1)**
26:9
**tight (1)**
124:19
**times (25)**
8:14,19,21;30:18;
65:18,19;68:17;73:25;
83:20;106:25;107:2;
127:12;146:16;179:14;
184:22;196:19,22;
202:17;204:9;210:8;
230:15;252:1,7,8;
286:4
**title (1)**
59:21
**titled (1)**
239:22
**Titles (1)**
101:6
**today (19)**
7:10;21:10;23:14;
69:25;77:8;80:6;81:16;
101:20;103:17;146:17;
208:5;210:19;236:25;
248:23;249:13,20;
273:3;277:10;290:20
**today's (6)**
20:13;199:21;200:5;
283:23;284:7,10
**together (9)**
29:22;98:10;153:10,
11;262:4,5,10,10;
280:11
**told (30)**
21:20;45:21;54:23;
55:5;57:12;62:15;
81:24;94:20;101:3;
113:11;128:11,18;
133:12,22;144:4;
147:4;156:3,10;
161:22;171:5;173:22;
202:17;208:1;210:2;
226:25;238:10;246:25;
254:17;279:2;289:1
**ton (1)**
289:11
**took (9)**
90:22;122:22;
140:10;180:13,15,19;

181:13;184:2;247:11
**top (8)**
38:17;77:21;194:5,8;
197:8;213:5;217:20,24
**topic (7)**
10:3,10,17,20;11:13,
18;286:12
**topics (3)**
285:14,21;290:4
**total (2)**
94:24;267:12
**tracing (1)**
99:16
**traffic (1)**
75:12
**transaction (9)**
29:23;70:3;77:6,11;
185:12;197:10;213:3;
228:14;280:16
**transactions (13)**
41:3;77:10;79:17,21,
23;82:14;128:14;
190:7;208:8;270:18,
19;271:5;272:16
**transfer (6)**
12:3;13:9;138:15;
139:8;219:13;232:6
**transferred (1)**
13:1
**transferring (1)**
12:18
**transfers (4)**
198:14;224:24;
288:6,24
**transparent (1)**
54:22
**travel (1)**
49:8
**treasury (1)**
70:18
**tree (1)**
178:9
**trial (8)**
8:22;9:2,15;10:14;
12:6,7,8;293:18
**trick (2)**
71:11;147:7
**tried (4)**
127:3,5;145:5,5
**trouble (2)**
122:12;200:9
**true (9)**
78:21,25;175:3;
208:16,16,19;250:11;
279:16,20
**trust (2)**
157:16,18
**trustee (3)**
110:13;111:8,14
**trustworthy (1)**
125:4
**truth (4)**
18:2;126:4;162:1;

209:9
**truthfully (1)**
23:14
**try (18)**
34:16;94:21;104:17;
131:4;144:18;150:4;
154:15;156:5;157:3;
162:18;164:22;171:6,
6;202:18;210:4,10;
271:10;285:7
**trying (30)**
71:11;94:16,21;
102:3;115:3;140:22;
145:3;149:25;150:16;
154:7;157:1,2;165:15;
169:23;171:12;191:18,
23;193:1,2,4,7,16;
203:13,17;211:18;
213:24,24;222:9;
230:5,7
**Tuesday (1)**
259:3
**turn (4)**
161:14;188:22;
191:9;288:12
**turned (3)**
161:1,11,12
**Turns (2)**
125:6;143:15
**twice (1)**
73:13
**two (27)**
20:17;43:15;44:5;
67:3;95:3;152:11;
171:19;172:11;175:13;
191:11,23;193:3,5,8,
10;212:6;226:21;
230:19,21;237:22;
238:3;239:9,11;251:1;
257:22;273:2;280:10
**type (5)**
25:8;26:4;32:2;
178:4;185:1
**typical (2)**
123:2;247:5
**typically (2)**
137:7;277:1
**typo (3)**
164:24;192:16;
227:25
**typos (2)**
192:7,21

## U

**UCC (1)**
84:1
**ultimately (3)**
14:7;158:24;246:13
**Um (1)**
79:7
**unable (2)**
94:19;258:2

**unclear (1)**
11:4
**under (17)**
13:14;14:11;92:11;
96:6;103:25;107:25;
136:14;147:11,13;
161:10;204:12;208:6,
6,17;216:4;230:15;
240:11
**understood (4)**
115:4;123:16;126:5,
9
**underwriter (1)**
236:9
**underwriters (2)**
60:12;146:11
**underwriting (13)**
201:20;202:1,4,8;
226:7,14;236:22,23;
245:8;246:17;271:17;
282:1,3
**unduly (1)**
68:14
**United (1)**
111:8
**universal (1)**
233:16
**unless (1)**
138:15
**unnecessary (1)**
192:9
**Unrelated (1)**
106:7
**up (63)**
37:14,15;38:7,24;
67:4;69:11,13,15,17,
19;77:3;89:21;110:17;
112:9;130:13;131:5;
140:2,15,20,21;143:8;
144:5;150:9;152:22;
155:12;160:6;163:8,
15,16,18,20;176:3,9;
178:15;182:22,25;
183:3,6,9,10,15,19;
191:13;193:22,23;
203:18,22;220:4;
225:8,13;227:5;
234:20;237:1,7,8;
252:11;263:23;266:6;
268:17;270:11;282:2;
283:18;284:16
**updated (6)**
145:4;173:9;193:15,
17,21,23
**upon (1)**
253:2
**upset (3)**
211:10,11,12
**upside (9)**
29:22;37:23;38:23;
39:7;128:13,13;
181:24;194:13;242:19
**use (7)**

SPIN CAPITAL, LLC, et. al. v.
GOLDEN FOOTHILL INSURANCE SERVICES, LLC

AVRUMI LUBIN
July 25, 2024

131:6;142:8;184:17;
187:20;275:2,4,21
**used (7)**
42:16;96:2;152:10,
11;291:24,24;292:7
**usually (2)**
58:6;272:6
**usurious (1)**
255:2
**Utsick (2)**
259:6,18
**utter (2)**
67:14,15
**Uzi (1)**
264:19

**V**

**valid (4)**
59:10;200:17;201:5;
207:3
**value (3)**
92:20,21;94:22
**vendor (1)**
153:1
**verbal (1)**
194:24
**verification (3)**
52:1;115:25;272:8
**versa (1)**
168:20
**vice (1)**
168:20
**visit (2)**
73:9;153:5
**visits (1)**
152:24
**voided (4)**
188:22;191:9,11;
192:23
**volunteer (1)**
201:15
**volunteered (2)**
201:13,14

**W**

**W-2 (3)**
44:1,2,3
**wait (8)**
39:9,9,9;114:10;
136:20;145:22;218:4;
271:20
**waived (1)**
201:11
**walk (4)**
270:18,24;271:2,8
**Walker (1)**
86:6
**wants (3)**
185:16;191:25;
204:17
**warning (1)**

211:5
**warranty (1)**
59:15
**waste (1)**
198:3
**wasting (1)**
210:11
**way (20)**
79:13;108:10;
127:22;140:12;149:14,
16;159:7;171:7;
189:16;190:12;195:20;
198:24;199:17;203:20;
210:5;222:2;231:19;
264:14;277:10;292:7
**ways (4)**
30:23;242:6,9;
271:24
**week (6)**
20:22;72:11;73:10;
75:17;77:16;181:23
**weeks (17)**
95:11;99:23;160:22;
171:21;173:12,18;
174:24;191:23;193:3,
5,8,10;237:22;238:3;
239:9,11;280:3
**Welcome (5)**
69:4;86:15;162:23;
232:13;270:17
**Wells (1)**
63:1
**Weren't (8)**
16:20;57:10;126:22;
138:14;148:23;161:15;
206:13;280:5
**West (1)**
221:3
**what's (70)**
15:11;17:17,17;22:9;
33:11;44:18;45:3;
48:19;55:13;65:4,8;
78:25;79:10;84:24;
94:24;95:13;97:21;
101:19;110:3,5,9,15;
114:15;134:16;139:19;
141:24;143:16;150:8;
156:1;157:24;165:4;
166:23;168:24;170:10;
172:5;174:16,17,20;
185:12;186:9;191:15;
193:8;195:19;200:25;
203:12;208:14;215:11;
221:4;222:22;227:7;
235:24;238:15;242:1;
250:22;253:18;254:3,
12;260:18;266:19;
269:2;273:19;276:1;
277:23;278:21;281:4;
286:16;287:11;288:7;
291:20;293:14
**WhatsApp (11)**
26:23;74:7,10;275:2,

4,6,12,20,21;276:10;
277:2
**whatsoever (15)**
25:24;49:14;65:21;
66:18;67:16;77:12;
100:19;121:24;159:15;
160:18;193:20;199:8;
224:19;236:10;240:14
**Whenever (1)**
76:24
**Whereupon (34)**
51:8;66:11;69:1;
86:13;148:4;152:4;
155:21;161:5;162:20;
169:3,11;180:6;
182:14;188:1,3;195:9;
197:19;217:6;223:19;
229:4;232:11,18;
234:12;237:17;244:13;
247:24;250:3;258:15;
263:25;270:15;275:8;
277:18;283:10;293:23
**Wherever (1)**
43:3
**whichever (1)**
205:20
**whole (14)**
148:10,14;188:14;
197:22,25;205:1;
217:18;218:1;262:4,
25;264:6,10;265:6;
266:21
**Who's (10)**
77:22;100:17,19;
101:25;110:8;112:20;
114:20;185:24;260:8,8
**whose (10)**
35:6;39:25;41:20,22,
22;81:23;129:1,6;
130:2;202:22
**wiggle (1)**
140:12
**winded (4)**
40:25;80:17;227:6;
281:24
**windfall (1)**
239:10
**window (1)**
74:17
**winter (1)**
8:11
**wire (16)**
72:2,5;84:25;86:1,4;
90:14;97:24;98:3;
102:7;112:4;167:16;
211:25;212:3;265:20;
267:16;269:6
**wired (4)**
114:9,14;265:6,12
**withdrawal (1)**
77:13
**withholding (1)**
258:11

**within (4)**
95:10;109:17;134:7;
276:15
**without (8)**
18:21;19:23;20:1;
34:3;105:6;173:9;
229:1;288:7
**WITNESS (435)**
8:5,13;10:24;13:7,
20;14:16,23;15:15,23;
16:1,17;17:6;18:6,15;
19:10;20:4;21:20;
22:13;23:10;24:7;25:5,
22;26:18,20;27:14,24;
28:6,12;29:13,19;31:2,
16,21;32:8;33:1,11;
34:12;35:12;36:1,11,
17,23;37:21;38:22;
40:16;41:11,15,22;
43:12;44:10,20;45:4;
46:5;48:10;49:1,17,25;
50:14;51:4,15;52:22;
53:8,13;54:1,3,17;
55:13,20;57:18;58:18;
59:4,7,25;61:10,16;
62:9,15;64:14,23;65:6;
66:2,2,5,6,8,11;68:13,
21;69:1;71:6,19;72:17;
73:2,13;74:5,25;75:19;
76:1,20;78:3,7,17,25;
79:7,10;80:2;81:12,18;
82:5;83:4;84:5,12,24;
85:10,17,25;86:20;
87:5,13,18;88:11,14;
89:7,23;90:8,14,22;
91:7,14,23;92:16;93:4,
15,22;94:6;95:7,22;
96:10,16,24;97:10;
98:2,16;99:2,15;100:8,
20;101:14;102:10,16;
103:7;104:2,24;105:6,
18;106:16;107:11;
109:12,24;110:13;
111:23;112:16,22;
114:3,25;115:18,23;
118:2;119:6,11,20;
120:5;121:3,10;
122:18;123:6,12,22;
124:11,15;125:2;
126:9,19;127:20;
128:7,10;129:2,8,16;
130:14,17;131:14,18,
21,25;132:14,21;133:1,
8,12;134:11;135:11,
20;136:10;137:4,19;
139:19;140:4;141:18;
142:23;143:6,22;
144:17;145:13;146:4,
24;147:20;148:11,15;
150:11,14,19;151:5,12;
153:8,14,17;154:23;
155:9;156:20;158:10;
159:5;160:11;163:6;

164:9,20;166:3,11;
168:5,15,25;169:2,10,
18;170:10,16,24;
172:10,15,24;173:1,15,
22;174:9,16;175:16,
23;176:6;177:2;178:1,
17,23;181:8,18;182:5,
25;183:10;184:2,12,
21;185:9,15;186:19,
25;188:7,16,19;189:4,
12,15,24;190:5,12;
191:4;192:6,11,20;
193:14;194:9;195:24;
196:11,16,25;197:7,14;
198:10,23;200:12,15;
201:17,22,24;202:23,
25;203:1,5,21;204:8,
14;206:16;207:1,9,12,
18,24;208:21;209:4,9,
19;210:2,15,22;212:10,
20;213:2,17,21;214:6,
21;215:4,20;216:8,17,
25;220:7,25;221:20;
222:8,20;223:6,10;
224:11;225:5;226:11;
228:2,12;230:12;
231:10,16;233:7,25;
234:6,23;236:6;
239:15;240:6,21;
241:24;242:18;243:3,
18,25;245:14;246:8,
22;247:9,19,23;248:6,
17;249:4,16;250:1,18;
251:17,23;252:4,13;
253:14,22;254:7,25;
255:6;256:6,15,25;
257:20;258:22;259:10;
260:12,23;261:10,15,
25;262:9,22;263:16;
264:17;265:5,18;
266:2,10;267:5,15,24;
268:22;269:18;270:1,
22;271:23;273:9,17;
274:7,10,12;276:18,23;
277:4;279:9,23;
280:20;282:6,19;
283:17;284:20;285:10;
288:17;290:13,16,20;
291:20;292:3;293:6,
14,21
**witness's (1)**
233:20
**Wolf (7)**
24:15;41:13;72:15,
17;76:22;117:7;218:22
**word (5)**
58:10,11;158:2;
159:20;173:24
**words (7)**
131:6;177:4,5,10,11;
178:4;240:11
**work (14)**
49:4;60:15;76:2;

169:23;226:24;236:13;
262:15,18;263:11,12;
267:18;268:15;286:9;
291:24
**worked (9)**
41:4;49:7;67:4;
89:15,16,17;92:17;
183:18;262:9
**working (4)**
36:8;69:20;291:23,
25
**works (5)**
22:21;37:18;172:7;
196:6,18
**worse (2)**
180:20;246:16
**worth (7)**
117:18;125:3;140:5,
6;142:13,14;143:24
**wrap (1)**
270:11
**write (2)**
191:19;193:1
**writes (1)**
221:16
**writing (1)**
221:13
**written (7)**
31:2,18;55:1,2,5;
63:6;194:10
**wrong (20)**
20:9;21:22;66:23;
73:2;79:2;113:19;
114:7;117:13;143:12,
16;147:8;154:2;
211:14;222:14;241:15;
275:23;276:4,6,19;
277:4
**wrote (5)**
63:3;220:2;259:3;
269:12;283:25

**X**

**x2 (1)**
223:13

**Y**

**Yatzi (1)**
76:13
**year (18)**
9:4;42:21,24;44:10;
46:13;48:19;63:23,24,
24;73:14;88:8;90:10;
95:3;104:11;274:2,3;
285:1;293:7
**years (7)**
23:19;33:6;109:17,
25;273:5;274:3;284:15
**Yellowstone (2)**
220:16,23
**Yep (4)**

111:6;209:17;
225:21,21
**York (29)**
41:17;42:5;43:6,7;
66:18;67:11,12;69:20;
70:19;72:6,8;74:14;
75:17;109:6;111:1;
121:4,7;135:16;
152:14;170:3,14;
174:6;250:9,15,15,20;
290:10;291:15,22
**Yosef (3)**
24:13;72:22,23
**YSC (1)**
220:15

**Z**

**zero (7)**
105:10,11,13;106:2;
107:7;145:18;159:16

**0**

**00007182 (1)**
232:17
**08701 (1)**
7:22

**1**

**1 (2)**
148:1;222:16
**1,900 (1)**
248:3
**1.3 (2)**
261:3,6
**1.307 (1)**
264:25
**1.499 (3)**
182:22;220:1;234:18
**1.5 (5)**
89:14,20;90:25;91:4;
246:15
**1:00 (1)**
121:6
**1:07 (1)**
162:13
**10 (25)**
75:13,16;86:11;
157:20;158:7;171:25;
172:3;178:11;197:17;
198:18;224:2,6;
228:18,20;229:13,23;
230:6,6,19,21;232:9;
238:20,24;252:13;
270:9
**10:15 (1)**
175:9
**100 (3)**
85:17;146:4;147:12
**100K (4)**
164:22;165:15;

166:7;223:13
**10th (2)**
48:20;49:6
**11 (1)**
213:9
**12 (15)**
37:24;163:8;195:7;
202:8;223:18;228:19;
234:16;237:20,21;
238:9,13;252:1,7,8,17
**120 (3)**
252:16;253:3;259:15
**127 (1)**
250:8
**13 (1)**
229:2
**135 (2)**
255:10,12
**135,000 (1)**
255:15
**14 (2)**
75:6;232:16
**1460 (3)**
7:21;212:15;240:11
**15 (6)**
225:11;234:11;
259:3,5,18;286:3
**150 (2)**
166:8,16
**150K (1)**
220:1
**16 (2)**
237:15;258:19
**17 (1)**
244:10
**18 (2)**
247:17;264:9
**19 (1)**
250:2

**2**

**2 (6)**
152:2;180:5;198:6;
218:3;221:15,15
**2,000 (1)**
176:8
**2.5 (11)**
98:3;133:16;134:7,
13,19,22;216:4;
255:24;261:18;265:6;
267:12
**2.7 (17)**
71:2;97:11,16,19;
117:14;118:22;125:11;
126:1;157:19;159:19;
171:16;173:12,19,23;
174:25;261:5;265:10
**2:00 (2)**
162:14,16
**2:57 (2)**
221:15,16
**20 (11)**

39:1;63:11;136:14;
183:11;205:19;226:6;
230:19;244:20;258:14,
19;286:3
**200K (2)**
98:7,12
**2018 (1)**
63:11
**2019 (1)**
42:19
**2020 (1)**
155:20
**2021 (18)**
22:2;23:21;47:16;
75:5;148:3;152:3;
161:9;164:16;169:9;
171:14;180:5;188:13;
195:7;218:3;234:16;
258:19;259:3;264:9
**2022 (5)**
44:17;46:13,18;
47:10;198:6
**2023 (1)**
44:12
**2024 (2)**
106:23;107:8
**20K (4)**
161:11;167:17,22;
182:22
**21 (3)**
228:18,19;263:24
**21,999 (1)**
228:6
**22 (2)**
63:25;275:7
**23 (4)**
47:10;63:25;64:1;
277:17
**24 (2)**
169:9;171:14
**25 (16)**
82:8;103:3;164:16;
182:12;237:22;238:9;
253:9,17,18;254:4,5;
259:16;260:24,25;
268:8,10
**250 (1)**
175:6
**25k (2)**
167:21;253:6
**26 (3)**
155:20;159:7;187:24
**28 (1)**
152:2
**29 (1)**
187:24
**2K (15)**
188:22;189:1,7,22;
190:10,19,21;191:5,9,
12,13,22,25;192:23;
193:2

**3**

**3 (1)**
155:19
**3/10/2021 (1)**
223:23
**3/12/21 (1)**
229:8
**3/2/22 (1)**
205:9
**3/25/21 (2)**
237:16;244:12
**3:30 (1)**
232:9
**30 (7)**
103:15;148:22;
191:22,25;193:2,8,10
**30b6 (1)**
289:3
**30K (4)**
84:20,21;85:23;86:1
**30th (1)**
168:25
**31 (1)**
154:25
**320 (1)**
246:16

**4**

**4 (2)**
148:2;161:4
**4- (1)**
92:22
**4,996 (4)**
203:7,18;204:5;
229:24
**4:19 (1)**
270:9
**40 (5)**
136:7;165:14;220:1,
4;243:9
**40,000 (1)**
165:4
**400K (1)**
247:6
**40K (2)**
164:23;166:15
**44 (1)**
286:12
**47 (1)**
235:3
**499 (1)**
202:8
**49th (3)**
250:12,25;251:2

**5**

**5 (9)**
92:22;168:22;
225:20;251:3,10,20;

252:1,7,8
**5,000 (1)**
  230:6
**5/2/2022 (1)**
  214:16
**5:00 (2)**
  293:1,24
**50 (35)**
  37:23,25;38:1,6,9,14,
  18,22,23,25;39:6,12;
  81:9,10;128:13,24;
  129:4;130:8,12;
  163:10;165:12;194:3,
  9,12,17;195:16;196:2,
  3;230:15;242:15,18;
  248:10,13;260:24;
  268:14
**500 (2)**
  178:11,15
**50th (2)**
  250:9;251:1
**570 (1)**
  267:11
**582 (3)**
  265:2;267:8,11
**5-plus (1)**
  143:25

**6**

**6 (2)**
  161:9;169:7
**6,999 (2)**
  234:18,20
**6/4 (1)**
  149:21
**6/4/21 (1)**
  149:23
**60 (4)**
  166:15,16;252:9;
  253:3
**600 (1)**
  246:15
**6A (1)**
  164:14
**6th (1)**
  191:10

**7**

**7 (3)**
  180:4;188:13;260:4
**7,000 (1)**
  237:7
**75 (1)**
  82:8

**8**

**8 (2)**
  182:12;187:25
**8,500 (7)**
  229:16,21;230:7,20,

22;236:2;237:1
**80 (2)**
  246:17;247:6
**8A (1)**
  188:12

**9**

**9 (1)**
  195:6
**972 (1)**
  215:17