**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**
**BUSINESS COURT**

**FRANKLIN CAPITAL GROUP, LLC,**

        **Plaintiff,**

                                   **Case No. 22-193300-CB**
**v**                                   **Hon. Michael Warren**

**SPIN CAPITAL LLC and HI BAR**
**CAPITAL, LLC,**

        **Defendants.**

---

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

**At a session of said Court, held in the**
**County of Oakland, State of Michigan**
**March 12, 2025**

**PRESENT: HON. MICHAEL WARREN**

---

**OVERVIEW**

This dispute revolves around an Assignment of Obligations and Merchant Documents dated November 1, 2021 (the "Assignment Agreement"), between Plaintiff Franklin Capital Funding, LLC ("Franklin") and Defendant Spin Capital LLC ("Spin"). Pursuant to an Opinion and Order Granting Plaintiff Franklin Capital Funding, LLC's Motion for Summary Disposition Against Defendant Spin Capital LLC dated April 23, 2024 (the "Summary Disposition Opinion and Order"), the Court found that on or about November 3, 2021, nonparty Excell Auto Group, Inc. ("Excell") executed and delivered

to Franklin a Promissory Note evidencing a loan in the amount of $6,000,000, a Loan Agreement, and Continuing Security Agreement as security for the loan. Franklin perfected its security interests by filing UCC-1 financing statements with the State of Florida. Concurrent with the making of its loan to Excell and its affiliates Karma of Palm Beach, Inc. and Karma of Broward, Inc. (collectively, the "Debtor"), Franklin purchased from Spin, and Spin sold and assigned to Franklin, Debtor's merchant cash advance obligations owing to Spin pursuant to the Assignment Agreement by which Spin assigned to Franklin all of its right, title, and interest under its agreements with Debtor; Franklin and Spin agreed Franklin could file UCC-3 assignments; and Spin agreed (1) Spin would not make additional loans or advances to Debtor or any other entity which Franklin does business or has a recorded financing statement and (2) Spin would not accept any payments from Debtor. Despite the Assignment Agreement, Spin continued to accept payments from Debtor. The Court also ruled that there is no genuine issue of material fact that (a) Franklin and Spin executed the Assignment Agreement; the Assignment Agreement prevented Spin from taking or accepting further payments from Debtor; and Spin improperly debited from the accounts of Debtor and continued to accept payments from Debtor in breach of the Assignment Agreement and (b) despite the Assignment Agreement and Franklin's more senior security interest, Spin intentionally converted Franklin's collateral by knowingly directing Excell to transfer funds to Spin which contained Franklin's collateral, including cash proceeds in which Franklin held a higher priority security interest, and that Spin colluded with Excell to convert Franklin's collateral for its own use and to violate Franklin's rights in Spin's collateral. The Court

2

subsequently denied Franklin's Motion for Entry of Judgment Against Defendant Spin Capital LLC and set the matter for trial on the issue of damages.

The Court conducted the trial on November 15 and 18, 2024. These Findings of Fact and Conclusions of Law follow.[1]

## DEFENDANT'S REQUEST TO ADJOURN

All but at the end of the trial, Josh Lubin of Spin asked to adjourn the trial so he could hire a new lawyer. That request was appropriately declined. The Court elaborates. This case was filed on March 25, 2022. The Court conducted trial on November 15 and 18, 2024. In between:

- ✓ The case had been removed to federal court and returned to this Court.

- ✓ On July 18, 2022 Shanna M. Kaminiski filed an appearance on behalf of Spin.

- ✓ The case was reopened on July 22, 2022.

- ✓ A motion for summary disposition was filed on August 18, 2022 by now dismissed Defendant Hi-Bar Capital LLC.

- ✓ The parties submitted a Joint Case Management Plan on October 7, 2022.

- ✓ After various legal maneuvers, the Court issued an Opinion and Order regarding Hi-Bar's motion for summary disposition on March 2, 2023.

---

[1] This trial was sandwiched between other trials. Because of yet more intervening trials, docket congestion, holidays, vacation, Supreme Court mandated continuing legal education, painful IT issues, Oakland County Bar presentations, and other excuses the parties could not care less about, the issuance of these Findings of Fact and Conclusions of Law was significantly delayed. More importantly, the defense of the action was intriguing, and the Court performed an exacting analysis of the same.

- ✓ An attempt to amend the Complaint was denied.

- ✓ The Court conducted a status conference.

- ✓ A scheduling order was issued on June 23, 2023 (much delayed because of the jurisdictional motion for summary disposition filed by Hi-Bar among other things).

- ✓ Franklin filed its motion for summary disposition on November 30, 2023.

- ✓ The parties were sanctioned for failing to timely facilitate on January 10, 2024.

- ✓ A motion to compel mediation was granted on February 20, 2024.

- ✓ Spin's motion for summary disposition was granted on April 23, 2024.

- ✓ Spin filed a motion for reconsideration (which was denied).

- ✓ The Court denied the Plaintiff's motion for entry of a judgment (which actually was an untimely disguised motion for summary disposition).

- ✓ The Court conducted two days of trial.

Denying Lubin's request for an adjournment just before the end of the trial so he could hire a new lawyer was fully within the Court's discretion. See, e.g., *Wykoff v Winisky*, 9 Mich App 662, 669 (1968) (holding that where defense counsel moved to withdraw at the beginning of trial and defendants requested a continuance to hire a new attorney, the trial court did not abuse its discretion in permitting defense counsel to withdraw but denying the request for continuance (essentially requiring defendants to represent themselves) because "had the defendants acted with reasonable diligence, they had ample time to obtain counsel in whom they had confidence"); *Webster v Webster*,

4

unpublished per curiam opinion of the Court of Appeals, issued December 1, 2009 (Docket No. 285848) (holding that the trial court did not abuse its discretion in allowing defendant's attorney to withdraw on day of trial because "[t]he trial court's decision was not outside the range of reasonable and principled outcomes [and] the record establishes that defendant's desire to dismiss [his attorney] was yet another attempt to delay the proceedings").

Unlike *Webster* and *Wycoff,* Lubin did not ask for an adjournment of trial until the trial was almost over. His dissatisfaction with his counsel only arose when he was apparently displeased with the handling of the trial itself. Obviously, if this had been a jury trial, such a request would have been rejected in light of the untimeliness of the request and the burden it would place on the Court and jury. That this was a bench trial does not materially change the analysis. Spin did not act with reasonable diligence in seeking new counsel. In fact, the same lawyer represented Spin for July 18, 2022 through trial on November 18, 2024. As noted above, there was nearly two and half years of litigation with the same counsel. No reasonable diligence was exercised, and the request was too belated.

Although unnecessary to the Court's decision, it was obvious to this Court as a factfinder that Lubin has no credibility whatsoever, and his request can fairly be considered an ungrounded delay tactic to escape the record he helped create.

## **FINDINGS OF FACT**

The Court makes the following general findings regarding the credibility, demeanor, veracity, vocal tone and expression, tonality, honesty, motivations and perceptions of the witnesses:

➢ *Scott Zankl.* Zankl's testimony was straightforward, genuine, and authentic. He was knowledgeable and had no incentive to mislead the Court or otherwise lie. Unless otherwise indicated by the Findings of Fact, his testimony is afforded great weight and credibility.

➢ *Josh Lubin.* His testimony was less than credible. He was evasive, rude, arrogant, and purposefully deceitful. He repeatedly testified that the Plaintiff's questions and theory of the case were a "fairy tale." To the contrary, the only fabrications and fantasies here were his. Unless otherwise indicated by the Findings of Fact, his testimony is afforded no weight or credibility.

The Court makes the specific Findings of Fact based on the Court's assessment of the credibility, demeanor, veracity, vocal tone and expression, tonality, and honesty of the witnesses and the exhibits before it by a preponderance of evidence (unless otherwise indicated) as well as the Court's findings in its Summary Disposition Opinion and Order:

➢ Spin loaned Excell funds. Subsequently, in November 2021, Franklin also loaned funds to Excell. When Franklin made the loan, it bought out from Spin the debts that the Debtor owed Spin. Spin agreed it would no longer do any business with the Debtor. Franklin obtained a security interest in Excell's accounts receivables as collateral to secure the loan. Spin also agreed it would not interfere with Franklin's collateral.

➢ Pursuant to the foregoing, Franklin loaned $6,000,000 to Excell which was documented in a Promissory Note (Term Loan) (the "Note") and a loan agreement dated November 3, 2021 (the "Loan Agreement"). In executing the Loan Agreement, Excell represented and warranted to Franklin that it would not incur any debts beyond its ability to pay, that there were no other non-permitted security interests covering its assets, and that Excell would keep its assets unencumbered. The parties intended to sweep in three prior loan transactions between Spin and Franklin, one each consummated in June, July, and August of 2021. As security for the loan, Excell executed and delivered to Franklin a Continuing Security Agreement dated November 3, 2021 (the "Security Agreement"), in which it granted Franklin a security interest in the following collateral (the "Collateral"):

(a)   all of Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights . . . Software . . . present and future . . .

(b)   all present and future insurance claims relating to any of the above;

(c)   all Goods, Instruments . . ., Documents . . ., policies and certificates of insurance, Deposit Accounts, and money or other property . . . which are now or later in possession of [Franklin], or to which [Franklin] now or later controls possession by documents or otherwise;

(d)   all present and future books, records, and data of [Excell] relating to any of the above; and

(e)   all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations

7

> and rights arising out of, any of the above, including but not limited to stock rights, subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a professional transfer by Debtor.

➤ Under the Assignment Agreement, Excell represented and warranted that:

> (h)      It is or will become the owner of the Collateral free and clear from any liens, encumbrances or security interests, except for this security interest and existing liens disclosed to and accepted by [Franklin] in writing, and will defend the Collateral against all claims and demands of all persons at any time claiming any interest in it;
> **(i)      No person, other than [Franklin], has possession or control (as defined in the UCCC) of the Collateral;**
> **(j)      It will keep the Collateral free of liens, encumbrances and other security interests. . . .**

➤ Franklin perfected its security interests by filing three UCC-1 statements.

➤ At the same time, Franklin purchased from Spin the debt Excell owed to Spin under the Assignment Agreement. Paragraph 30 of the Complaint alleges that this purchase included "any claims, rights or actions [Spin] may have (whether known or unknown to [Spin] as of the date hereof) against any third party arising in connection with, or otherwise related to, [its agreements with Spin] or the Obligations [then owing to Spin]." The

8

agreement also allowed Franklin to file UCC-3 assignments, which were so filed.

➢ In executing the Assignment Agreement, Spin further acknowledged that Franklin is in its business of making secured commercial loans and agreed:

> **On and after the date of this Agreement, Assigner covenants to Assignee that, so long as Assignee has a UCC financing statement filed on record against any of the Credit Parties or any other person or entity, whether or not related to the Credit Parties (any such Credit Party, person or entity, a "Debtor") that includes language notifying parties that further sales, assignments, pledges or encumbrances with respect to the collateral described in Assignee's UCC financing statement are prohibited, or words of similar import:  (a) Assignor shall not purchase any portion of accounts, future accounts, contract rights, future sales, receipts or other obligations from such Debtor, (b) Assignor shall not extend credit to such Debtor, (c) Assignor shall not take a security interest in the assets of such Debtor,** and (d) if Assignor violates any of the provisions of clauses (a), (b), or (c), its debt and lien shall be subordinate and it shall be subject to a permanent standstill and it shall not take any legal action or otherwise exercise any rights or remedies against such Debtor. **Assignor further covenants and agrees that it shall not accept any payment from any of the Credit Parties on account of, or related to, the Obligations . . ., and Assignor acknowledges and agrees that any such payments, if received, shall be held in trust for the benefit of [Franklin] and promptly paid over to [Franklin] in the form received** (with proper endorsements or assignment if necessary). (emphasis added).

➢ Prior to closing on the loan to Excell, Excell had obtained a merchant cash advance from Spin, and Excell was aware that Franklin would not loan

funds to Excell if it had an unpaid and outstanding merchant cash advance. A representative of both Spin and Hi Bar – Josh Lubin – advised Excell to transfer the balance on its merchant cash advance from Spin to Hi Bar. Lubin stated that he also had an interest in Hi Bar and that, once the balance was transferred to Hi Bar, Spin could issue a payoff letter to falsely represent to Franklin that the merchant cash advance had been paid off. After closing on the loan from Franklin, Spin and its related entities threatened Excell to enter into additional merchant cash advance agreements and demanded additional payments. Despite assigning to Franklin all of the rights under its agreements with Excell, Spin, among other related merchant cash advance companies, including Hi Bar, continued to pursue the purchase of the accounts, future accounts, contract rights, future sales, receipts or other obligations of Excell and the extension of credit to Excell. In doing so, Spin sought to avoid the provision in the Assignment Agreement prohibiting such activity by funding through affiliated entities. Spin and Hi Bar conspired with Excell to enter into new funding agreements and to obtain funds from Excell, without Franklin's consent or approval, after executing the Assignment Agreement. The funds that Spin has obtained, debited, or sought to seize from the accounts of Excell constituted or contained Franklin's Collateral, including identifiable cash proceeds from accounts receivable in which Franklin held a higher priority security interest. Spin knew that Franklin held the most senior

10

security interest in the accounts when it debited, obtained, or sought to seize funds from Excell and its affiliates and was aware that its actions – directly or indirectly – breached its agreements with Franklin. On October 21, 2021, approximately $2,114,312.50 of debt was owed by Excel to Spin, which was concealed from Franklin. The Assignment Agreement signed by Josh Lubin falsely stated that the amount of such debt was $1.00. Lubin purposefully lied about the amount in the Assignment Agreement.

➢ Spin breached its contract with Franklin when it—directly or through shell entities controlled by it, including Hi Bar—continued to enter into purchase agreements or other funding agreements with Excell or its affiliates and to debit funds or attempt to obtain or seize funds from the accounts of Excell or its affiliates when it did not pay such funds to Franklin.

➢ Spin knew that Franklin, as assignee was the senior secured creditor as to the accounts of Excell and despite that knowledge, Spin retained and converted Franklin's Collateral for its own use when it debited, obtained, or seized the accounts of Excell or its affiliates, which constitute and contain Franklin's Collateral, thereby interfering with Franklin's rights as the senior secured creditor.

➢ A series of text messages, bank records, wire transfer records, and other financial records reveal that Spin took additional payments from Excell

11

following execution of the Assignment Agreement on November 1, 2021, which totaled at least $1,800,000. Lubin clearly was orchestrating attempts to hide these payments from Franklin. He knew that if he was caught, "we all get fucked."

➢ Excell went bankrupt and Franklin did not recoup the $1,800,000 from Excell.

In its motion for summary disposition, Franklin argued that under the Assignment Agreement, Spin agreed not to lend or accept payments from Excell and yet continued to do so either directly or through lawyer Steven Zakharyayev. Pursuant to the Summary Disposition Opinion and Order the Court found "Despite the Assignment Agreement, Spin continued to accept payments from" Excell, and "There is no genuine issue of material fact that [Franklin] and Spin executed the Assignment Agreement; the Assignment Agreement prevented Spin from taking or accepting further payments from [Excell]; and Spin improperly debited the accounts of [Excell] ([Franklin's] customer Excell and its affiliates) and continued to accept payments from [Excell] in breach of the Assignment Agreement." The Court also found "There is no genuine issue of material fact that despite the Assignment and [Franklin's] more senior security interest, Spin intentionally converted [Franklin's] collateral by knowingly directing [Excell] to transfer funds to Spin which contained [Franklin's] collateral, including cash proceeds in which [Franklin] held a higher priority interest." Summary disposition as to liability was granted.

## CONCLUSIONS OF LAW

### I
### The Arguments

At trial, Spin argued that Franklin was trying a different case than it won in summary disposition, and that no damages flowed from the previously determined breach of contract and conversion. Franklin jeered at that suggestion, arguing that the damages flowed exactly from the Court's prior ruling. Spin argued that it never received Excell funds after the Assignment Agreement was entered. In its Trial Brief, Spin argued that "nothing was received by Spin after the Assignment Agreement was entered into and, as such, there was no damage to Plaintiff." Spin argues that it entered into three commercial financing transactions with Excell in June 2021, July 2021, and August 2021. It claims that by November 1, 2021, the date of the Assignment Agreement, "Excell's obligations under all three of the transactions had been satisfied." Spin argued that "The Assignment Agreement, by its express terms, assigned to Franklin the June and July agreements only." Franklin countered that payments by Excell were accepted after November 1, 2021. As the Findings of Fact reveal, Spins' argument is belied by reality.

### II
### The Damages Flow from the Complaint

The Complaint alleges that Spin loaned Excell funds. Subsequently, in November 2021, Franklin also loaned money to Excell. When Franklin made the loan, it bought from

13

Spin the debts that Excell owed Spin. Spin agreed it would no longer do any business

with Excell. Franklin obtained a security interest in Excell's accounts receivables as

collateral to secure the loan. Spin also agreed it would not interfere with Franklin's

collateral.

Pursuant to the foregoing, Franklin loaned $6,000,000 to Excell which was

documented in the Note and the Loan Agreement. Paragraph 23 of the Complaint alleges

"In executing the Loan Agreement, Excell represented and warranted to Franklin that it

would not incur any debts beyond its ability to pay, that there were no other non-

permitted security interests covering its assets, and that Excell would keep its assets

unencumbered." Paragraph 24 avers:

> As security for the loan, [Excell] executed and delivered to Franklin a Continuing Security Agreement dated November 3, 2021 ("Security Agreement"), in which they granted Franklin a security interest in the following collateral ("Collateral"):

> (f)    all of Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights . . . , Software . . . present and future . . .
> (g)    all present and future insurance claims relating to any of the above;
> (h)    all Goods, Instruments . . ., Documents . . ., policies and certificates of insurance, Deposit Accounts, and money or other property . . .which are now or later in possession of [Franklin], or to which [Franklin] now or later controls possession by documents or otherwise;
> (i)    all present and future books, records, and data of [Excell] relating to any of the above; and
> (j)    all present and future accessions, additions and attachments    to,    proceeds,    parts,    products,

14

replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights, subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a professional transfer by Debtor.

Paragraph 25 of the Complaint avers (emphasis in original):

[Excell] represented and warranted that:

     (h)    It is or will become the owner of the Collateral free and clear from any liens, encumbrances or security interests, except for this security interest and existing liens disclosed to and accepted by [Franklin] in writing, and will defend the Collateral against all claims and demands of all persons at any time claiming any interest in it;

     **(i)    No person, other than [Franklin], has possession or control (as defined in the UCCC) of the Collateral;**

     **(j)    It will keep the Collateral free of liens, encumbrances and other security interests. . . .**

(emphasis added).

The Complaint alleges that Franklin perfected its security interests by filing three UCC-1 statements.

The Complaint alleges that at the same time, Franklin purchased from Spin the debt Excell owed to Spin under the Assignment Agreement. Paragraph 30 of the Complaint alleges that this purchase included "any claims, rights or actions [Spin] may have (whether known or unknown to [Spin] as of the date hereof) against any third party

15

arising in connection with, or otherwise related to, [its agreements with Spin] or the Obligations [then owing to Spin]." The agreement also allowed Franklin to file UCC-3 assignments, which were so filed. Paragraph 33 of the Complaint alleges:

In executing the Assignment Agreement, Spin further acknowledged that Franklin is in its business of making secured commercial loans and agreed:

**On and after the date of this Agreement, Assigner covenants to Assignee that, so long as Assignee has a UCC financing statement filed on record against any of the Credit Parties or any other person or entity, whether or not related to the Credit Parties (any such Credit Party, person or entity, a "Debtor") that includes language notifying parties that further sales, assignments, pledges or encumbrances with respect to the collateral described in Assignee's UCC financing statement are prohibited, or words of similar import: (a) Assignor shall not purchase any portion of accounts, future accounts, contract rights, future sales, receipts or other obligations from such Debtor, (b) Assignor shall not extend credit to such Debtor, (c) Assignor shall not take a security interest in the assets of such Debtor,** and (d) if Assignor violates any of the provisions of clauses (a), (b), or (c), its debt and lien shall be subordinate and it shall be subject to a permanent standstill and it shall not take any legal action or otherwise exercise any rights or remedies against such Debtor. Assignor further covenants and agrees that it shall not accept any payment from any of the Credit Parties on account of, or related to, the Obligations . . ., and **Assignor acknowledges and agrees that any such payments, if received, shall be held in trust for the benefit of [Franklin] and promptly paid over to [Franklin] in the form received** (with proper endorsements or assignment if necessary). (emphasis added).

The Complaint alleges that "Franklin has learned that, prior to closing on its loan to Excell, Excell had obtained a merchant cash advance from Spin, and it was aware that Franklin would not loan funds to Excell if it had an unpaid and outstanding merchant

16

cash advance," "a representative of both Spin and Hi Bar – Josh Lubin – advised Excell to transfer the balance on its merchant cash advance from Spin to Hi Bar. Lubin stated that he also had an interest in Hi Bar and that, once the balance was transferred to Hi Bar, Spin could issue a payoff letter to falsely represent to Franklin that the merchant cash advance had been paid off," "after closing on the loan from Franklin, Spin and its related entities threatened [Excell] to enter into additional merchant cash advance agreements and demanded additional payments," and "Despite assigning to Franklin all of the rights under its agreements with [Excell], Spin, among other related merchant cash advance companies, including Hi Bar, continued to pursue the purchase of the accounts, future accounts, contract rights, future sales, receipts or other obligations of [Excell] and the extension of credit to [Excell]." The Complaint alleges that "In doing so, Spin sought to avoid the provision in the Assignment Agreement prohibiting such activity by funding through affiliated entities," "Spin and Hi Bar conspired with Excell to enter into new funding agreements and to obtain from Excell without Franklin's consent or approval after executing the Assignment Agreement," "There can be little doubt that Hi Bar . . . is merely a shell for Spin and/or its common investors and management." The Complaint continues that "The funds that defendants have obtained, debited, or sought to seize from the accounts of [Excell] constituted or contained Franklin's Collateral, including identifiable cash proceeds from their accounts receivable in which Franklin held a higher priority security interest" and the Defendants knew that "Franklin held the most senior security interest in the accounts when they are debited, obtained, or sought to seize funds

17

from Excell and its affiliates and were aware that their actions – directly or indirectly – breached their agreements with Franklin."

Count I of the Complaint also alleges that "Spin breached its contract with Franklin when it—directly or through shell entities controlled by it, including Hi Bar—continued to enter into purchase agreements or other funding agreements with Excell or its affiliates and to debit funds or attempt to obtain or seize funds from the accounts of Excell or its affiliates when it did not pay such funds to Franklin," and "Franklin has suffered damages in the amount of the funds debited, obtained, or seized from Excell or its affiliates that constitute Franklin's Collateral, the consideration paid to Spin under the Assignment Agreement, and all related and consequential damages."

Count IV alleges "Defendants had actual or constructive knowledge that Franklin, as assignee was the senior secured creditor as to the accounts of Excell and its affiliates" and "Despite that knowledge, defendants retained, converted, stole, and/or embezzled Franklin's Collateral for their own use when they debited, obtained, or seized the accounts of Excell or its affiliates, which constitute and contain Franklin's Collateral, thereby interfering with Franklin's rights as the senior secured creditor." Count IV further alleges that "Franklin has been damaged as a result of defendants' actions because they have taken Collateral that rightfully belongs to Franklin, which Franklin has been unable to recover" which amounts to conversion. Count V basically duplicates Count IV as statutory conversion.

In its motion for summary disposition, Franklin argued that under the Assignment Agreement, Spin agreed not to lend or accept payments from Excell and yet continued to do so either directly or through lawyer Steven Zakharyayev.  Pursuant to the Summary Disposition Opinion and Order, the Court found "Despite the Assignment Agreement, Spin continued to accept payments from" Excell, and "There is no genuine issue of material fact that [Franklin] and Spin executed the Assignment Agreement; the Assignment Agreement prevented Spin from taking or accepting further payments from [Excell]; and Spin improperly debited the accounts of [Excell] ([Franklin's] customer Excell and its affiliates) and continued to accept payments from [Excell] in breach of the Assignment Agreement." The Court also found "There is no genuine issue of material fact that despite the Assignment and [Franklin's] more senior security interest, Spin intentionally converted [Franklin's] collateral by knowingly directing [Excell]to transfer funds to Spin which contained [Franklin's] collateral, including cash proceeds in which [Franklin] held a higher priority interest." Summary disposition as to liability was granted.

In its Trial Brief, Spin argued that "nothing was received by Spin after the Assignment Agreement was entered into and, as such, there was no damage to Plaintiff." Spin argues that it entered into three commercial financing transactions with Excell: June, 2021, July 2021, and August 2021. It claims that by November 1, 2021, the date of the Assignment Agreement, "Excell's obligations under all three of the transactions had been

satisfied." Spin argued that "The Assignment Agreement, by its express terms, assigned to Franklin the June and July agreements only."

First, Spin's argument could have been made at the time of the Court's ruling for summary disposition, but Spin failed to respond to the motion. It is relitigating liability, not damages.

Second, the Assignment Agreement provides that the Spin is assigning to Franklin all monies owing to Spin from Excell for the June 1, 2021 agreement, the July 9, 2021 agreement, and "*all* rights of [Spin] under *any similar or related documents* (including, without limitation, any guaranties, security agreements, forebearance agreements, settlement agreements, and judgments), including with respect to all collateral securing the obligations of [Excell] . . . ." (emphasis added). This provision clearly sweeps in the August 2021 transaction. This is so because the Assignment Agreement is effective on November 1, 2021. To the extent there is an ambiguity to its inclusion of the August 2021 transaction, as the Findings of Fact reveal, the parties intended to include the August, 2021 transaction as well.

Third, and most importantly, even if the Assignment Agreement did not include the August 2021 transaction, Spin violated the Assignment Agreement by engaging in $1,800,000 worth of transactions with Excel that were hidden from Franklin. All of that activity occurred after November 1, 2021 and it all violated the covenants reviewed above. Among those covenants are "(a) Assignor shall not purchase any portion of

20

accounts, future accounts, contract rights, future sales, receipts or other obligations from such Debtor, (b) Assignor shall not extend credit to such Debtor, [and] (c) Assignor shall not take a security interest in the assets of such Debtor . . . ." This is exactly what Spin did in the amount of $1,800,000.

**III**
**The Law**

**A**
**Damages for Breach of Contract**

"The goal in awarding damages for breach of contract is to give the innocent party the benefit of his bargain—to place him in a position equivalent to that which he would have attained had the contract been performed." *Tel-Ex Plaza, Inc v Hardees Restaurants, Inc,* 76 Mich App 131, 134 (1977). See also *Jim-Bob v Mehling,* 178 Mich App 71, 98 (1989) ("It is well settled that the appropriate measure of damages for breach of a contract, such as a lease, is that which would place the injured party in as good a position as it would have been in had the promised performance been rendered"); M Civ JI 142.31 (Contract Damages – Benefit of Bargain) ("Contract damages are intended to give the party the benefit of the party's bargain by awarding him a sum of money that will, to the extent possible, put [ him / her / it ] in as good a position as [ he / she / it ] would have been in had the contract been fully performed. The injured party should receive those damages naturally arising from the breach. [ Name of party ] cannot recover a greater amount as damages than [ he / she / it ] could have gained by the full performance of the contract").

21

The Assignment Agreement specifically provided that (1) Spin was to engage in no further transactions with Excell and (2) Spin's monetary and other assets were not to be encumbered by any such transactions so that they could be used to collateralize Franklin's loan to Spin. Spin violated that obligation to the tune of $1,800,000, and now those funds are no longer recoverable as collateral. As such, the $1,800,000 is an appropriate award. Spin does not actually challenge this theory of damages. Instead, it simply argues that no such transactions occured. That defense is completely belied by the Findings of Fact.

Any other argument is deemed abandoned. "Trial Courts are not the research assistants of the litigants; the parties have a duty to fully present legal arguments for its resolution of their dispute." *Walters v Nadell*, 481 Mich 377, 388 (2008). The failure to join the argument with analysis or authority abandons the argument. See, e.g., *Mudge v Macomb Co*, 458 Mich 87, 105 (1998); *Mitcham v City of Detroit*, 355 Mich 182, 203 (1959); *Houghton v Keller*, 256 Mich App 336, 339-340 (2003); *People v Odom*, 327 Mich App 297, 311 (2019) ("As a preliminary matter, defendant has failed to identify any authority that requires a trial court to consider a motion for substitute counsel before it may consider any subsequently filed motion by the attorney who was the subject of the motion for substitution. Accordingly, defendant has abandoned this issue. See *People v Martin*, 271 Mich App 280, 315 (2006)"); MCR 2.119(A)(2) ("A motion or response to a motion that presents an issue of law must be accompanied by a brief citing the authority on which it is based").

22

**B**
**Conversion**

Likewise, Spin does not argue that the $1,800,000 of funds which it loaned to Excell and which was lost is not appropriately awarded as conversion damages. An award of treble damages under MCL 600.2919a is permissive and discretionary. See e.g., *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc,* 303 Mich App 441, 449-450 (2013);[2] *Hoffenblum v Hoffenblum,* 308 Mich App 102, 117 (2014), citing *Id.* ("an award of treble damages is within a court's discretion"). Because Spin surreptitiously converted the funds, in direct violation of the Assignment Agreement, and knew what it was doing was improper and dishonest, the Court exercises its discretion to award treble damages. The whole point of treble damages is to deter and sanction such improper behavior in connection with monetary damages. See, e.g., *Alken-Ziegler, Inc v Hague*, 283 Mich App 99, 104 (2009) ("Indeed, MCL 600.2919a is a punitive statute that provides for recovery of three times the amount embezzled. Punitive damages reflect a worthy public policy consideration of punishing dishonest defendants and setting an example for similar wrongdoers").

---

[2] Leave to appeal the Court of Appeals decision was granted on *other grounds* in *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 497 Mich 864 (2014), and the issue on which leave was granted was affirmed and the matter remanded in *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 497 Mich 337 (2015) ("*Aroma Wines II*").

## IV
## Attorney Fees

On the record, the parties agreed to bifurcate the issue of attorney fees. Attorney fees shall be determined as follows: (1) a stipulation from the parties to be submitted no later than May 16, 2025 or (2) continuation of trial to be held on May 30, 2025 at 1:30 pm.

## **ORDER**

In light of the foregoing Findings of Fact and Conclusions of law, Franklin Capital Funding, LLC is hereby awarded $1,800,000 in contractual damages and $5,400,000 in conversion damages. Franklin Capital Funding, LLC is awarded contractual attorney fees which shall be fixed in the manner set forth above. A final judgment shall be entered once attorney fees are fixed.

/s/ Michael Warren

_____

**HON. MICHAEL WARREN**
**CIRCUIT COURT JUDGE**



24