*GOLDEN FOOTHILL INSURANCE SERVICES, LLC, et. al. v.*
*SPIN CAPITAL, LLC, et. al.*

*AVRUMI LUBIN*
*April 17, 2026*

*NJL COURT REPORTING & VIDEO*
*501 KING AVENUE*
*CHERRY HILL, NJ  08002*
*856-910-0202*

Original File 041726ku.txt
**Min-U-Script® with Word Index**

1

```
                 ---------------------------------
                 IN THE U.S. DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
                 ---------------------------------


 -------------------------------
 GOLDEN FOOTHILL INSURANCE       )
 SERVICES, LLC, et. al.          )
                                 )
                 Plaintiff,      ) 1:24-cv-08515
                                 )
     - vs -                      )
                                 )
 SPIN CAPITAL, LLC. et. al.      )
                                 )
                 Defendants.     )
 -------------------------------
```

```
                 ---------------------------------
                    FRIDAY, APRIL 17, 2026
                 ---------------------------------
```

Deposition of AVRUMI LUBIN, held via videoconference, commencing at 11:00 a.m., on the above date, before Karen M. Unghire, Court Reporter and Notary Public.

- - -

NJL Court Reporting & Video
501 King Avenue
Cherry Hill, New Jersey   08002
856-910-0202
Deps@njlone.com

2

A P P E A R A N C E S (via videoconference)


HESKIN & PROPER, PLLC
BY:  SHANE R. HESKIN, ESQUIRE
641 Lexington Avenue
14th Floor
New York, NY  10022
917-362-1313
shane@heskinproper.com
--Representing the Plaintiff



AVRUMI LUBIN
josh@tetonfunding.com
--Pro Se Litigant



MURRAY LEGAL, PLLC
BY:  PHILLIP SPINELLA, ESQUIRE
170 Old Country Road
Suite 608
Mineola, NY  11501
pspinella@murraylegalpllc.com
--Representing the Defendants, BMF Advance, LLC and
Gavriel Yitzchakov, a/k/a Gabe Isaacov

3

                            I N D E X


WITNESS                                              PAGE

     AVRUMI LUBIN

EXAMINATION BY:

     MR. HESKIN                                        4




                        E X H I B I T S

I.D.                                                 PAGE


                 (NO EXHIBITS MARKED)

4

- - -

P R O C E E D I N G S

- - -

AVRUMI LUBIN, having been duly sworn, was examined and testified as follows:

- - -

E X A M I N A T I O N

- - -

BY MR. HESKIN:

Q.   Hi, Mr. Lubin, how are you doing today?

A.   I'm good.  How are you, Mr. Heskin?

Q.   I'm hanging in there.  So I think we can cut a lot of this short simply because you gave a deposition previously in the state court action. Do you remember that?

A.   Yeah, a lot of that would relate to this.

Q.   Sure.  And so in the state court action, just for clarity of the record.  Just so you know, I just want to give some ground rules, just a reminder, and I'm terrible at this, don't take this the wrong way.  There's a Court Reporter here and she's taking everything we say down and we're going to be very conversational, but you just have to be careful and wait for me to finish my question and

5

then I've got to remember to wait for you to finish your answer so she can take us both down.  Okay?

A.    Understood, yes.  I'm also terrible at that.

Q.    And we're going to violate it probably ten to 20 times today and the Court Reporter I'm sure will raise her hand and say stop it.

So just for frame of reference, the state court action, we're involved in a related state court action in New York City state court and the original caption was I believe Spin versus Golden Foothill.  Do you recall that?

A.    Yes.

Q.    And I believe at the time that we took your deposition, I think that was still the caption, do you remember that, it was Spin versus Golden Foothill?

A.    I don't recall exactly when it got changed, but, yeah, I have no reason -- yeah.

Q.    And so we can agree that you gave truthful and honest testimony in that case, right?

A.    Yeah.

Q.    So that's just going to cut out a lot of my questions.  So I don't have to replow that. You gave testimony, it was truthful and honest, we

6

asked those questions and we can just skip all that. And this might even be less than an hour.  We can really speed this up.  The only real questions I have is what happened after that deposition.  Okay?

So my understanding is that there was some transaction where Spin transferred the rights to this action, the state court action, to you, do you remember that?

A.    Yeah.

Q.    And then you transferred those to Teton, is that correct?

A.    I don't think that's how it was done.

Q.    Can you just help me out on that? What's your understanding of how it was done?

A.    I think it was, I'm not absolutely sure, but it was transferred to me individually, you know, due to enforcement issues and I don't recall exactly how it went down after that, but -- I don't know.  It's a little compound.  I have to talk to a lawyer on exactly how.  I signed a pending motion to substitute the plaintiff to myself individually.

Q.    So whether it was transferred to you and then transferred to Teton, ultimately the rights were transferred to Teton, right?

A.    No, because Teton never -- there was a

7

deal laid out and Teton didn't -- there was no consideration.  It's a little complicated, but it never really went into effect.

Q.    So who owns the rights today?

A.    My settlement rights, I have full discretion, 100% of the settlement rights.

Q.    And I'm not talking about supplement rights.  Who owns the rights to the claims?

A.    You're saying is it Teton or is it me individually?  I think it's me individually because the Teton never went into effect.  There was no consideration.  I had to do a few things, right, send a wire for X-amount of money and never did those things.

Q.    So only you hold the rights to the claims that are at issue in the state court action?

A.    Yeah, my sole discretion, correct.

Q.    But not just in your own sole discretion, but you're the one that owns that they were never transferred to Teton, right?

A.    I don't think it goes into effect because Teton didn't comply with -- the members of Teton didn't comply, I'm one member.  Even in Teton, I own 100%, I control 100% of the litigation rights or settlement rights.  I have to talk to a lawyer,

8

but yeah, I don't think it ever went into effect, the transfer to Teton.

Q.    And you don't think it went into effect because the other member, which is Gabe Isaacov, right?

A.    You have to pay consideration, yeah, you have to send out -- there was terms sent.  You don't have all the docs, right?

Q.    I have them.

A.    You have them?

Q.    Yeah.

A.    Letter agreement, right?

Q.    There was a letter agreement.

A.    And it was never complied with.  So I think in order to make a transfer, there needs to be consideration.

Q.    So it's your position and your understanding as you sit here today that that transfer was never consummated so that the true party in interest of the rights --

A.    It's not relevant to this specific case and it's something I'm going to have to sit down and talk to a lawyer about.

Q.    But what's your position?  What's your understanding and your position as to whether or not

9

Teton has the rights to the claims that are at issue in the state court action or whether it's you personally individually?

A.    I don't think it's related to -- I don't think it's relevant to this deposition.

Q.    I'll disagree.

A.    Ask another question.

Q.    So my understanding based on your testimony is that originally Spin owned the rights, that's a corporation that is owned entirely by you, right?

A.    Yeah, I believe so.

Q.    And then at some point in the litigation, you transferred the rights from Spin Capital to you individually, right?

A.    Correct.

Q.    And then at some point you transferred those rights to Teton under an agreement and in order to transfer those rights, they had to pay consideration for that to consummate and they never paid that consideration and so, in your view, that transfer was never made and, therefore, the rights to those claims sit with you still, correct?

A.    I'm not saying that.  There's a lot of moving parts with that subject and I don't think

it's related to any of these lawsuits whatsoever, you know, that would have to be a separate topic, but I do control 100% of the litigation and settlement rights for Teton and obviously for myself as an individual and there's more moving parts with that.  I'm not going to get into an analysis about that, yeah, there's other factors, yeah.

Q.    But, again, this is just you individually and so I'm entitled to know what your individual understanding is.  So as you sit here today, do you believe the rights were transferred to Teton or whether or not you still retain those rights?

A.    I don't think it's relevant whatsoever.

Q.    I'll tell you why it's relevant.  It's relevant because the claims that we're asserting here in the federal court action stem from that.

A.    But you're not asserting claims against Teton, you're asserting claims against Spin and me as an individually, right?

Q.    Exactly.  So if you own those, right, it matters.  If Teton owns those shares, maybe it doesn't, maybe it does, but clearly if you still own those rights, then it does matter.  So that's why

11

I'm asking the question.

A.    There's too many moving parts for me to get into that topic right now.  You're going to have to move on to another topic.

Q.    What's your understanding of the consideration that was given and --

A.    Shane, you have to move on to another topic.

Q.    I'm sorry, I'm not moving on.

A.    You have no legal right to ask questions about this.

Q.    I do.

A.    No, you don't.

Q.    We can disagree.

A.    It's not related whatsoever to you or your client at all.

Q.    Well, whether you believe it or not, it's improper for you to refuse to answer a question and if we have to --

A.    Take it to the court.  Next subject.

Q.    Who are the members of Teton?

A.    Me and Mr. Isaacov.

Q.    So my understanding is that Mr. Isaacov is also the sole owner of BMF Advance as well, right?

A.    I've never seen the corporate docs, so.

Q.    What's your understanding?

A.    Yeah, I think that's my understanding. It's my understanding.  I never looked into it, yeah.  So yeah.  That's the way I assume, correct. I don't think I've ever asked him.

Q.    And Yisroel Herbst, he's the individual that owns and controls Hi Bar, correct?

A.    I think that's more complex, but he's one of them, yeah.

Q.    And you know who Yoel Getter is?

A.    Yeah, I used to work with him years ago, yeah.

Q.    Do you still work with him?

A.    No.

Q.    Do you still have a good relationship with him?

A.    Yeah.  I don't do business with him.

Q.    What was his relationship with the underlying Hi Bar transactions?

A.    They have their own dispute.  I don't know.  He was the guy that ran Hi Bar.

Q.    Yoel Getter was?

A.    Yeah.

13

Q.      So he was the one that you reported to when you were negotiating --

A.      Reported to?

Q.      -- or transacting the underlying Hi Bar --

A.      Yeah, he was the guy that ran the operations, yes.

Q.      Who was the party, who put the money in for Hi Bar, was that Yoel or was it Yisroel?

A.      There's a whole lawsuit about that.  I think it was Yisroel and a few other parties.  I don't think Yoel put up the money.

Q.      But your contact with him was, with Hi Bar was Yoel Getter, right?

A.      Apparently, yeah.

Q.      And you understand that Hi Bar and BMF would end up being a participating interest or a syndicate in the loan that was ultimately issued and is subject to the state court action, correct?

A.      I don't know the exact structure, but yeah, Gabe was definitely involved.  Hi Bar not so much.  It was complicated, yeah.

Q.      Well, according to the syndication sheets and the e-mails, Hi Bar had a 50% syndication right, BMF had a 25% syndication right and Spin had

a 25% syndication right.  Do you recall that?

A.    It's possible I wrote an e-mail like that.

Q.    There was an e-mail where it identified the syndication rights.

A.    Okay.  So what's your question.  Go ahead.

Q.    So at some point those rights ended up getting resolved or transferred, right, because if Hi Bar had 50%, BMF had 25% and you had 25%, at some point those rights had to come to you, right?

A.    I'm sorry?

Q.    So you filed an affidavit in the state court saying that Spin Capital had 100% ownership of all the rights to the loan, okay, but there are documents that state that Hi Bar had 50%, BMF had 25% and that Spin only had 25%.  So my question is, at some point the 50% --

A.    Participation rights, there's different type of rights, but I'm not sure what you're asking.  Can you ask me a question?

Q.    At some point those participation rights got transferred to Spin Capital, right?

A.    You mean to me as an individual.

Q.    Let me ask you this.  Hi Bar has a 50%

15

participation right in the current loan.  Do they still have that 50% participation?

A.    No.

Q.    Exactly.  So if they don't have it anymore, what happened, tell me how that 50% went from --

A.    Hi Bar didn't want to put up money for legal fees or premiums and they didn't want to have anything to do with the sale.  So I worked a deal with them two years ago already, yeah.  Tell me what you're trying to ask me.  Go ahead.  I tried to tell you that they really didn't have much to do with this deal and you mentioned this e-mail that was probably sent a few months before then, but yeah.

Q.    Listen, I'm trying to get a clear record and an understanding of how it went from 50% to zero and how Spin's participation went from 25% to 100%, okay?  That's what --

A.    Yeah, I made a deal with Mr. Herbst.

Q.    What was the deal?

A.    I think the deal was I have to pay him -- it's documented.

Q.    I know what the terms of that deal were.  I'm asking you if you know what the terms of that deal were?

16

A.    I don't recall off the top of my head.

Q.    Are you going to honor that deal?

A.    I'm not sure what your question is. You know, I'm going to pay. Hi Bar owes me money. So that's a separate issue, but yeah.

Q.    What do you mean Hi Bar owes you money?

A.    Hi Bar owes me money.  What's the problem, what's the big deal.

Q.    How much do they owe you?

A.    More than the dollar amount for that agreement.

Q.    What's the dollar amount for that agreement?

A.    I don't know, maybe like 800,000 or 1.2 million or something like that.

Q.    Could it be a million?

A.    Yeah.  Is it a million?

Q.    Could be a million.

A.    Okay, somewhere in that ballpark range, yeah.  Hi Bar owes me a lot of money.  How much, I don't know.  It's irrelevant.  What does it have to do with you?

Q.    Well, it may very well be relevant to this litigation.  You understand that the claims in this action result from --

17

A.    Hi Bar owes me money from years ago, not anything new.

Q.    The agreement was that if you recover any amounts, that they get the first million dollars, isn't that right?

A.    After I recover -- I don't know.  I don't fully recall.

Q.    You say after you recover your principal, you didn't put any money to this deal, did you?

A.    I did.

Q.    You put personal into the original?

A.    Of course I put up personal money, yeah.  I laid out the first $3 million in this deal.

Q.    According to your testimony in the state court action, you have a 25% right and that was as your role as a broker and that's something that BMF gave you, do you remember that testimony?

A.    Wait.  One more time?  I was supposed to on MC transactions and I guess on the loan too, but --

Q.    Yeah, so you didn't actually come out of pocket any amount in principal for --

A.    Of course I did.  I laid out the first few million dollars in legal fees.

Q.    That's not my question.

A.    Not only that, I don't think I got paid commissions up front.  I still never got paid them, the commissions were structured to get paid on the back end.

Q.    The commissions were 25%, correct?

A.    No.

Q.    Your prior testimony was your commissions --

A.    You're talking about in where, in the BMF MCAs or are you talking about in the loan?

Q.    I'm talking about both, and if there's a distinction, let me know.

A.    In the MCA agreements, there's a profit sharing, but in the loan, I'm pretty sure I had to put up the money myself.

Q.    You came out of pocket and paid?

A.    600 grand, yeah.

Q.    You wrote a check or sent a wire for 600 grand to fund that deal?

A.    Yeah, I think so.  I don't remember the exact structure, but I'm pretty sure.  Not for, the MCAs, I didn't have to put up any money because I had a deal for the loan.  I'm pretty sure I did.

Q.    So your understanding is that you put

19

up $600,000 in that deal directly?

A.    Me personally?

Q.    Yeah.

A.    I don't recall the exact number. Yeah, I believe so, but I believe I had to put up money in that deal.

Q.    You had $600,000 at that time?

A.    Yeah.

Q.    What bank account would that have come from?

A.    Either TD or Bank of America.  I mean, I own 100% of Spin and Spin would keep a few million dollars in cash on hand at all times.  Yeah, that would be my money.

Q.    So Spin's money was your money?

A.    I mean, it's yeah, most of it, yeah. It would be my money unless it's a participant's money.

Q.    And you have a specific recollection that you sent a wire for $600,000?

A.    I'm pretty sure.  I would be sending the wire to Leer, but I'm pretty sure that I had to fund 25% of that deal.

Q.    So you sent $600,000 to Stefan Leer?

A.    No, I would go send whatever I had to

20

send to Stefan Leer to execute the deal, but I don't fully recall, but I think I put up, yeah.  I think for the loan I had to put up money.  Why wouldn't I have.

Q.    Those wires would have been produced in the state court action, right?

A.    I don't think those are physical wires.  It came out of Spin Capital's bank account.

Q.    And you understand that there were document requests that were made in this action, right?

A.    Right, and you have them, but there was a wire that went to pay off BMF, Hi Bar, right, and your client is a distribution agreement, a disbursement agreement.  Now, how did Spin get that money to -- I'm pretty sure 25% of it came from Spin, which is me.

Q.    Did you do a search for your records to --

A.    I didn't wire any 600 grand.  It would have came from Spin's accounts.  It's my money.

Q.    Did you search for Spin's records and produce a copy of that wire in this case?

A.    To Leer, yeah, of course, it's in the court.  It's in summary judgment.

Q.    I'm talking about in the federal court action.  We're now in the federal court.

A.    Oh, I don't know anything about the federal court action.  I'm working on getting the file from the attorneys.  I cannot answer any questions.  I don't know what was produced in the federal court action.  I'm trying that dispute myself.

Q.    You've made best friends with ChatGPT.

A.    Yeah, ChatGPT is great.

Q.    So do you plan on litigating the rest of this case with you and ChatGPT?

A.    The New York Bar is doing some of my writing and it's not really -- yeah, there's a disclosure, but I have the New York Bar assisting me.

Q.    And you're proceeding pro se, is that because you don't have funds to hire an attorney?

A.    It's a complicated situation, Mr. Heskin.  It's a civil rights issue.

Q.    A civil rights issue, okay.

A.    Yeah.

Q.    Can you explain that to me, what are the civil rights issues?

A.    You're going to have to go to another

22

topic.

Q.    So do you recall the e-mails that you sent around to me and probably 50 other people that included the DOJ and judges and clerks and attorneys from 40 different law firms?

A.    What's your question?

Q.    First I'm setting it up.  Do you recall that e-mail, that series of e-mails that you sent?

A.    I have no reason to believe that that didn't happen, but yeah, go ahead, what's your question.

Q.    And you threatened to sue everybody, including the DOJ?

A.    Okay, go ahead.

Q.    Well, I'm trying to understand why you think that there's some massive conspiracy, including the DOJ, chambers, judges, the U.S. attorney's office, et cetera, that are all out to get you?  I'm just trying to understand and how it all relates, how all these cases are related?

A.    I'm not here to speculate, but if you've lived in a hornet's nest like I did the last four years and change, you would think like that as well, but I'm not going to get into that topic.  I can't legally get into that topic.  So you're going

23

to have to move on to another topic.

Q.    Well, you did send around --

A.    I didn't know what was going on at the time.  I got more clarity since then and you're going to have to move on to another topic.

Q.    But you'll agree that you did send out e-mails accusing everybody, attorneys, U.S. attorneys, the DOJ and various judges of engaging in some sort of massive conspiracy against you, right?

A.    I didn't say that, no.  I accused one, that's it, one judge.

Q.    Which judge?

A.    Michael Warren from Michigan.

Q.    And why did you accuse him of engaging in some massive conspiracy?

A.    He issued a stupid ruling.  This is not relevant to --

Q.    Why do you think the DOJ has a conspiracy against you?

A.    I don't think the DOJ has a conspiracy against me.

Q.    You alleged in an e-mail that they were engaged in a massive conspiracy.  I have it. Do you want me to pull it up?

A.    No, it's not relevant.

Q.    Well, I'm just asking why you think that the DOJ has a conspiracy with judges and the U.S. attorney's office?

A.    I never used the word conspiracy. You're using the word conspiracy.  I never used the word conspiracy and it has to run its course, Shane. It is what it is.  Next.

Q.    Have you filed a complaint against the DOJ alleging them of improper --

A.    Oh, the inspector general's office?

Q.    Have you, yeah.

A.    Yes, I have, but you're talking about the DOJ, like you're talking about the criminal DOJ or the civil DOJ?  This is really not a topic we're going to get into, Mr. Heskin.

Q.    I want to understand.  Let me ask you this.  Do you recall a couple weeks ago where I asked you can you please give me a global settlement demand to try to resolve this, do you remember that?

A.    Yeah, and I said I can't, these cases are all related.

Q.    Okay, exactly.  So that's why I'm asking these questions is because I asked you to try to resolve this on a global basis.  I said can you try to give me a demand and then all of a sudden

you're saying that these are all related, including your claims against the DOJ, a judge sitting in Michigan --

A.    That's not what I said.

Q.    Hold on.  Let me finish my question.

A.    That's not what I said.

Q.    Against various attorneys, including attorneys that represented you in the past are all involved in this massive conspiracy, okay, and then when I try to resolve this, you said I have to, in order to resolve this, I have to resolve this against all of them, right?  Right?

A.    When I said all related, I mean all Spin Capital's obligations.  I didn't say any of those words.  You're taking words out of my mouth and, Shane, it's a complicated situation and it has to run its course.  I don't know, like you're going to try to get me to say something I'm not allowed to say.  Next, you have to move on to another.  And I never used the word conspiracy. I don't know why you're so obsessed with that word.

Q.    So, listen, I'm trying to --

A.    There's no conspiracy.  Next.  That's not something we're talking about.

Q.    You're telling me in order to resolve

this case, I have to resolve cases about claims --

A.    I was saying how am I going to resolve --

Q.    You got to stop.  I have to resolve claims related to you against the U.S. attorney's office, the department of justice and your claims against a judge sitting in Michigan and your claims against almost every other lawyer that's ever represented you, okay, because you have allegations against --

A.    Mr. Heskin, why are you mentioning my lawyers, okay, or my previous lawyers.  What does that have to do with anything.  Whether they have exposure or not, what does that have -- I never said that they have exposure.

Q.    Stop it.  Maybe because you sent me ten different e-mails over the course of a weekend copying your lawyers and threatening to sue every single one of your lawyers and I had to get an injunction against you to stop it.  Do you remember that?  Do you remember there's a court order in the state court action where I had to get an injunction for you to stop e-mailing me at 3:00 in the morning, do you remember that?

A.    Okay, go ahead, Shane, so what's your

point?

Q.    So that's why I'm asking these questions.  That's why it's related and that's why I'm entitled to know.

A.    You're not entitled to know --

Q.    I don't want to have to deal with your claims against judges, the U.S. Department of Justice and the U.S. attorneys, I want to deal with the claims that are actually at issue in this case, do you understand that?

A.    Okay, so you deal with the claims that are at issue.  I don't know why you're mentioning stupid things.

Q.    Because I want to try to resolve this and I can't resolve this, trying to resolve the cases that are right here in front of us when I have to deal with --

A.    No, when I said that they're all related, I meant all the Spin Capital obligations are all related to each other.  Next, okay.

Q.    So when I'm talking about resolving this case, we can talk about just the claims involved between my client and your client, right?

A.    I mean, yeah.

Q.    But there are other people, right, like

who also represent --

A. Shane, it's above my pay grade, this whole -- yeah, it is what it is. There's nothing I can do.

Q. But you say it's all related. So are you telling me that you don't have the power to resolve the claims at issue in either the state court action or the federal court action that we're involved in?

A. That's the thing, I'm told it's a ruling on the rights, like who's the real party of interest, how can I settle. In a few months from now I can potentially settle. There's going to be a ruling on the rights from the chief bankruptcy judge of the Southern District of Florida. That's going to come down in like two months from now, but for the next two months, I can't.

Q. So help me with that because I want to know --

A. I can't, I can't sign any documents for the next two months on behalf of Spin, no, no way.

Q. So tell me what's going on in the Southern District of Florida action? What's being decided?

29

A.    Spin's litigation rights.  The judge has indicated that he's ruling in my favor.  As a matter of fact, the Franklin parties' attorneys tried to argue that the claim is moot and they didn't even want to pursue it anymore and the judge said this claim is listed throughout the whole lawsuit and I have no option, I have to determine because that creates judicial estoppel.

Q.    What about for Teton, was that at issue in the Southern District of Florida?

A.    I'm not sure.

Q.    Is there anything preventing you from resolving --

A.    Yeah, this is a mistake, but there's another ruling where I don't have any personal rights, that's why I'm pro se.  It's in the judge's order and he signed it and it's due process and that's also another issue that's getting dealt with.  Yeah, these are complicated.  It is what it is, yeah.

Q.    Let's just step back.  The one against you personally, where are those rights being litigated right now, is that also being litigated in Florida?

A.    The judge already -- that's in

30

Florida, as well, correct.

Q.     So the Florida judge --

A.     That's in Florida state court and I'm dealing with the appellate -- they're all very aware of the situation.  I don't think they thought it would expand outside their state, but yeah.

Q.     So that's the state court judge where there's a ten and a half million dollar judgment against you personally, right?

A.     Correct.

Q.     And there's a ten and a half million dollar judgment against Spin Capital as well, right?

A.     No, they legally removed Spin Capital from the case the day before the trial.

Q.     So it's just against you personally?

A.     Yeah, and they haven't been enforced. There's criminal exposure on there, but go ahead.

Q.     And then there's a five and a half million dollar judgment against you in Michigan, right?

A.     I think that's against Spin, yeah.

Q.     And it's against you personally too, as well?

A.     No.

Q.     Are you sure about that?

31

A.    Yeah, I'm positive.

Q.    So it's five and a half million dollars, as least as far as you know, at least against Spin Capital?

A.    These aren't valid judgments.

Q.    I understand that you think they're invalid judgments, but the judgments that were entered by a judge in Michigan who you think is in some sort of conspiracy --

A.    It's a default judgment, but, believe me, he issued a ruling which we're not allowing -- the Florida judge didn't do anything wrong.  I'm talking about the Michigan judge issued his own opinion and it wasn't a one-page opinion, he went into like the whole rabbit hole, which that own opinion wouldn't allow Spin to be adequately -- wouldn't legally be able to protect its own interests.

Q.    Your attorneys right before the summary judgment motions were --

A.    Forget about the judgment.  Before the judgment, he issued an opinion, okay, that wouldn't allow Spin to be able to protect its own interests and he's not a dummy.  So when a judge goes that far into issuing an order where a company can't protect

itself --

Q.     Were you represented by counsel?

A.     Yes, but counsel couldn't protect me. He issued a ruling where Spin couldn't protect itself.  Now you're telling me he's not in trouble. Of course he's in trouble.

Q.     And he issued the ruling because you were in default, right?

A.     No, this is way before the default. This is Michigan, they're known as corrupt, the courts over there in the state court, not federal courts.  They don't have the best court system. It's not like New York, but who cares, Shane, that's irrelevant.  Did he think it was going to expand outside of his state, I doubt it, but you don't issue a ruling where I'm talking to the chief bankruptcy judge in Florida, that that's an invalid ruling right away.  He warned people to stay very far away from that ruling.  It's already a few years ago when he said this.  He said that ruling is incorrect.

Q.     Well, wasn't there a ruling very recently within the last several months entering a judgment against you for five and a half million dollars in Michigan?

A.      No, it was two years ago.

Q.      It was two years ago?

A.      A year and a half ago, yeah.

Q.      And what's the status of that, is it on appeal?

A.      Yeah, but the appellate lawyers -- yeah, but the appellate court ruled that the lawyers can't withdraw.  It's complicated.  Yeah, the appellate court is trying to clean it up.

Q.      So the lawyers in that Michigan case, they were trying to withdraw as counsel, right?

A.      They successfully did, a few of them, and then the appellate court intervened or something and said that this has to be, it's due process, it has to assess -- basically, it has to get dealt with.  They issued a ruling which prevented the current attorneys from withdrawing.

Q.      So your attorneys wanted to withdraw from representing you, but now they're being forced to represent you because --

A.      You're talking about in Michigan?  It has nothing to do with money.  There's a ruling. They're violating the judge's ruling if they protect Spin's interests.  It gets a little complicated.

34

Q.    Are you paying those lawyers in Michigan?

A.    They have money, they have a retainer, yeah.

Q.    You paid them?

A.    Yeah.

Q.    Is one of the issues that they raised in seeking to withdraw as counsel is the fact that they weren't getting paid from you?

A.    No.

Q.    If it wasn't payment, was it because they had an ethical dispute as to the way to proceed with the case, is that the reason?

A.    It's complicated.  It's above my pay grade, but yeah, based on the judge's ruling, yeah, you're basically violating the court's order if you protect Spin's interest.

Q.    And in Florida, are you represented by counsel in Florida?

A.    No, I'm representing myself pro se.

Q.    Do you understand that there was a default judgment entered against Spin because they weren't represented by counsel in Florida?

A.    Yeah, I'm represented, I'll filling it out myself.

35

Q.     And you understand that --

A.     There's a default judgment entered while being represented by counsel.  Counsel didn't respond or something, yeah.

Q.     In Florida?

A.     Yeah, counsel couldn't respond because they stuck in language in the court order that says that Avrumi Lubin has no rights in the United States and the judge signed it.

Q.     And you've seen in that action, in the federal court action in just about every state in the country, that corporations can't be represented pro se, right?

A.     Yes, correct, corporations cannot be represented pro se, but there's a way around it, but you can assign corporations as an individual, you can do in New York state court.

Q.     So that's why you tried to do that in the state court, is you assigned it to yourself so that you could represent those interests on an individual capacity, right?

A.     You're saying is that why, so I can enforce those rights?

Q.     Yeah, so you could represent the rights without an attorney?

A.    I don't know if that's the specific reason.

Q.    Isn't it true that you tried to get around the injunctive order of you contacting counsel by saying I'm entitled to act pro se and so therefore I have the right to contact counsel?

A.    No, I didn't try to get around.  I was noticed into the case.  What do you mean?  Attorneys have a fiduciary duty to their client.  They're required by law to communicate with their client, correct?

Q.    Yes.

A.    So when you have issues like that, yeah, it's nothing to do with a contempt order.

Q.    How many lawyers have you retained to represent one of your companies over the last five years?

A.    I don't know.

Q.    Is it more than ten?

A.    Yeah.

Q.    Is it more than 20?

A.    Yeah.

Q.    Of those 20 attorneys, how many of those attorneys did you not accuse of trying to conspire against you?

37

A.    Shane, I have no idea what you're talking about.

Q.    Haven't you alleged that almost every single attorney that's ever represented you has tried to conspire against you?

A.    Where did I allege that?

Q.    Didn't you allege that Mr. Berkovitch tried to conspire against you in the original settlement of one of the cases that you and I had together?

A.    No.  Mr. Heskin, you have a good imagination, but I didn't allege --

Q.    I got the e-mail.

A.    I didn't allege that any attorneys tried to conspire against me.

Q.    You know Matt Leto, right?

A.    Yeah, there's evidence of him conspiring against me, but I still didn't allege that.

Q.    You didn't allege that in an e-mail that I was copied on accusing Mr. Leto of engaging in a conspiracy?  Did I just not read that right?

A.    No, there's evidence on the docket of him conspiring against me, yeah.  It's a collusive summary judgment, but I still didn't make those

38

allegations.  I didn't file a lawsuit saying that.

Q.    But you said it in an e-mail copying 40 to 50 people including judges.

A.    No, no, I have not used the word conspiracy.  You're so obsessed about that there's a conspiracy going on here.

Q.    I'm just trying to figure out why you can't get a lawyer, another lawyer, to represent you?  Is it possibly because every lawyer that has ever represented you or one of your companies you have accused them of --

A.    Who says I can't get a lawyer to represent me?

Q.    Do you have a lawyer representing you in the federal case?

A.    No, I don't.

Q.    Do you have a lawyer representing you in the state case?

A.    On an individual basis, no.

MR. HESKIN:  And the Court Reporter, is anyone representing Teton right now?

THE WITNESS:  What's your question?

BY MR. HESKIN:

Q.    My question is, you can't get a lawyer because you threatened to sue?

A.     No, I didn't.  I didn't threaten to sue anybody.  What are you talking about?

Q.     You don't have a lawyer, let's be clear, you do not have a lawyer representing you right now, and I'm talking about Teton, in the state court action because they withdrew as counsel because they had a fundamental disagreement with you, right?

A.     That's not why, no, Shane.  I'm not getting into why.  It's all related to this -- it's above my pay grade.  Next.  People play stupid games.  It is what it is.  It has to run its course. Shane, it has to run its course, okay.

Q.     I hear you.  Just let me ask the question, let's try to make this quick.

A.     These attorneys are good people.  What are you talking about?  People are put in an uncomfortable position.  All these attorneys, they're good people.  Like what are you saying?

Q.     Do you have an attorney representing Teton in the state court action right now as we sit here today?

A.     I do have counsel on record, but they -- no, they're not -- Shane, you shouldn't -- this is not something you talk about.  You leave it

40

alone.

Q.      They've withdrawn as counsel, right?

A.      In the state court action, no.

Q.      Yes.  Mr. Chubak moved to withdraw as counsel and that motion was granted.  Do you not know that?

A.      When?

Q.      Months ago.

A.      And he noticed back in.

Q.      And he noticed back in.  Is he currently representing you on the state court action?

A.      Yes, technically he is, but --

Q.      Is he getting paid?

A.      No, he steered to file a motion to withdraw.  Shane, you're not asking me questions about this, okay.  You have to move on to another topic.  I'm not answering questions about this.

Q.      I'm going to ask you now in the federal court action, Mr. Chubak moved to withdraw in the federal court action, too, right?  Right?

A.      Yes.

Q.      And that motion was granted, right?

A.      Correct.

Q.      So as of right now, you do not have any

41

attorney representing Teton or Spin Capital in the federal court action, right?

A.    Correct.

Q.    And so right now the only one representing anyone in the federal court action is you and you individually pro se, right?

A.    Correct.

Q.    And you're aware that there are summary judgment motions due within like 21 days, right?

A.    Something like that, yeah.  You're trying to figure out -- what are you --

Q.    Don't try to get in my head and what I'm thinking, okay.

A.    You're trying to ask me things that I'm not supposed to be talking about, leave it alone.

Q.    I got it.  Do you remember there was a settlement conference in the state court action?

A.    A few months ago, yeah.

Q.    And there were parameters, I believe it was like, I think you guys would have gotten -- well, the Leer entities would have gotten 3.5 million plus 30% of the rights to the John Hancock claim and then 35% of the rights to the remaining policies, do you remember that?

42

A.      I don't remember the exact structure, but what's your question, go ahead.

Q.      My question is this.  If I can get that deal back on the table, do you have the authority and ability to accept that and execute that?

A.      Nothing can get settled for at least 45 to 60 days until there's a ruling on Spin's rights.  So either way, it's going to have to wait a couple months.  In a couple months from now, that would be a decision that would be up to me whether I want to make or not, but right now things have to be put on guardrails before there's any settlement discussion.

Q.      So right now you are unable to --

A.      I don't want to settle right now, no.

Q.      I'm not asking whether you want to. I'm asking whether you're able based on right now whether or not you have the authority to make a settlement decision right now or whether or not you are legally prohibited from doing that because of some injunctive order that's been issued in the State of Florida?

A.      Are you talking about me individually or Spin or both?

Q.      I'm talking about on Teton.  The issues

that are at issue in this case, Teton, both the state court and federal court, are you right now legally prohibited from exercising any authority over the rights of Teton with respect to the claims in both of those actions?

A.   I have to discuss that with a lawyer.

Q.   Which lawyer?

A.   I'm not sure what you're trying to ask me.

Q.   Because I thought that you weren't represented by any attorney in Florida and if you're not represented by any attorney in Florida, my question is which lawyer?

A.   Unfortunately, it's a situation where a lawyer can't give me legal advice.

Q.   So I guess the lawyer you're going to ask is ChatGPT?

A.   No, there's the New York City Bar, they're giving me advice.

Q.   So it's your testimony that the New York City Bar is going to give you legal advice about a procedure in the State of Florida, is that your understanding?

A.   No, that I don't know if they're going to do.  I don't think they'll do outside the state,

44

but it's a complicated situation, Mr. Heskin.

Q. It is a complicated situation and unfortunately I'm stuck in the middle of it because I'd love to settle this case and get it resolved, okay? Do you understand why I'm frustrated?

A. I'm not the one that created this whole hornet's nest. It is what it is.

Q. So it's your understanding that in a couple of months time you're going to have your issues resolved in state court one way or the other and I'll either be dealing with you in a couple of months or I'll be dealing with whoever the court says has the rights to those down in Florida, right?

A. It doesn't mean I would want to settle it.

Q. So you do want to settle the case?

A. I didn't say that. I said whether it's ruled by a court that I own 100% of Spin's litigation rights, that doesn't necessarily mean I'm going to settle.

Q. So when I was asking you a question earlier whether or not --

A. I'm not thinking about whether I'm going to settle.

Q. So when I was asking you earlier about

45

whether or not I could get that prior settlement and principal back on the table, whether that's something you would be willing to consider, your response was I can't do anything for two months because of what happened in Florida?

A.    No, I didn't.  That's not my response. That was a different topic.  First of all, there was no settlement reached and, second of all, I'm not looking to settle this case right now.  I got so many other issues that I'm dealing with, I don't even want to let this case take up space in my head. I'm trying to get things on guardrails.  I care about me, I'm protecting me.

MR. HESKIN:  You know what, I think that's all I need.  So, Mr. Lubin, I thank you for your time and we'll see you in court, buddy.

THE WITNESS:  Yeah.

- - -

(DEPOSITION CONCLUDED - 12:05 P.M.)

- - -

46

C E R T I F I C A T E

I, KAREN M. UNGHIRE, Court Reporter - Notary Public, do hereby certify that the proceedings, evidence, and objections noted are contained fully and accurately in the notes taken by me of the preceding deposition, and that this copy is a correct transcript of the same.

_____

KAREN M. UNGHIRE

COURT REPORTER - NOTARY PUBLIC

Case 1:24-cv-08515-AS    Document 160-9    Filed 05/26/26    Page 48 of 53

GOLDEN FOOTHILL INSURANCE SERVICES, LLC, et. al. v.
SPIN CAPITAL, LLC, et. al.

AVRUMI LUBIN
April 17, 2026

**$**

**$3 (1)**
17:14
**$600,000 (4)**
19:1,7,20,24

**A**

**ability (1)**
42:5
**able (3)**
31:17,23;42:17
**above (3)**
28:2;34:14;39:11
**absolutely (1)**
6:15
**accept (1)**
42:5
**according (2)**
13:23;17:15
**account (2)**
19:9;20:8
**accounts (1)**
20:21
**accuse (2)**
23:14;36:24
**accused (2)**
23:10;38:11
**accusing (2)**
23:7;37:21
**act (1)**
36:5
**action (32)**
4:14,19;5:9,10;6:7,
7;7:16;9:2;10:18;
13:19;16:25;17:16;
20:6,10;21:2,4,7;
26:22;28:8,8,24;
35:10,11;39:6,21;
40:3,12,20,21;41:2,5,
18
**actions (1)**
43:5
**actually (2)**
17:22;27:9
**adequately (1)**
31:16
**Advance (1)**
11:24
**advice (3)**
43:15,19,21
**affidavit (1)**
14:13
**again (1)**
10:8
**against (31)**
10:20,20;23:9,19,
21;24:8;25:2,7,12;
26:5,7,8,10,20;27:7;
29:21;30:9,12,15,19,
21,22;31:4;32:24;

34:22;36:25;37:5,8,
15,18,24
**ago (10)**
12:14;15:10;17:1;
24:17;32:20;33:1,2,
3;40:8;41:19
**agree (2)**
5:20;23:6
**agreement (8)**
8:12,13;9:18;
16:11,13;17:3;20:14,
15
**agreements (1)**
18:14
**ahead (7)**
14:7;15:11;22:10,
14;26:25;30:17;42:2
**allegations (2)**
26:9;38:1
**allege (6)**
37:6,7,12,14,18,20
**alleged (2)**
23:22;37:3
**alleging (1)**
24:9
**allow (2)**
31:16,23
**allowed (1)**
25:18
**allowing (1)**
31:11
**almost (2)**
26:8;37:3
**alone (2)**
40:1;41:16
**America (1)**
19:11
**amount (3)**
16:10,12;17:23
**amounts (1)**
17:4
**analysis (1)**
10:6
**anymore (2)**
15:5;29:5
**Apparently (1)**
13:15
**appeal (1)**
33:5
**appellate (5)**
30:4;33:6,7,9,13
**argue (1)**
29:4
**around (5)**
22:3;23:2;35:15;
36:4,7
**asserting (3)**
10:17,19,20
**assess (1)**
33:15
**assign (1)**
35:16
**assigned (1)**

**35:19**
**assisting (1)**
21:15
**assume (1)**
12:6
**attorney (7)**
21:18;35:25;37:4;
39:20;41:1;43:11,12
**attorneys (17)**
21:5;22:4;23:7,8;
25:7,8;27:8;29:3;
31:19;33:17,18;36:8,
23,24;37:14;39:16,18
**attorney's (3)**
22:18;24:3;26:5
**authority (3)**
42:4,18;43:3
**AVRUMI (2)**
4:4;35:8
**aware (2)**
30:4;41:8
**away (2)**
32:18,19

**B**

**back (6)**
18:5;29:21;40:9,
10;42:4;45:2
**ballpark (1)**
16:19
**bank (3)**
19:9,11;20:8
**bankruptcy (2)**
28:14;32:17
**Bar (23)**
12:9,21,23;13:5,9,
14,16,21,24;14:10,
16,25;15:7;16:4,6,7,
20;17:1;20:13;21:13,
15;43:18,21
**based (3)**
9:8;34:15;42:17
**basically (2)**
33:15;34:16
**basis (2)**
24:24;38:19
**behalf (1)**
28:21
**Berkovitch (1)**
37:7
**best (2)**
21:9;32:12
**big (1)**
16:8
**BMF (8)**
11:24;13:16,25;
14:10,17;17:18;
18:11;20:13
**both (5)**
5:2;18:12;42:24;
43:1,5
**broker (1)**

**17:17**
**buddy (1)**
45:16
**business (1)**
12:19

**C**

**came (4)**
18:17;20:8,16,21
**can (20)**
4:13;5:2,20;6:1,2,
13;11:14;14:21;
21:23;24:18,24;
27:22;28:4,12,13;
35:16,17,22;42:3,6
**capacity (1)**
35:21
**Capital (8)**
9:15;14:14,23;
27:19;30:12,13;31:4;
41:1
**Capital's (2)**
20:8;25:14
**caption (2)**
5:11,15
**care (1)**
45:12
**careful (1)**
4:25
**cares (1)**
32:13
**case (18)**
5:21;8:22;20:23;
21:12;26:1;27:9,22;
30:14;33:10;34:13;
36:8;38:15,18;43:1;
44:4,16;45:9,11
**cases (5)**
22:20;24:20;26:1;
27:16;37:9
**cash (1)**
19:13
**cetera (1)**
22:18
**chambers (1)**
22:17
**change (1)**
22:23
**changed (1)**
5:19
**ChatGPT (4)**
21:9,10,12;43:17
**check (1)**
18:19
**chief (2)**
28:14;32:16
**Chubak (2)**
40:4,20
**City (3)**
5:10;43:18,21
**civil (4)**
21:20,21,24;24:14

**claim (3)**
29:4,6;41:24
**claims (19)**
7:8,16;9:1,23;
10:17,19,20;16:24;
25:2;26:1,5,6,7;27:7,
9,11,22;28:7;43:4
**clarity (2)**
4:19;23:4
**clean (1)**
33:9
**clear (2)**
15:15;39:4
**clearly (1)**
10:24
**clerks (1)**
22:4
**client (6)**
11:16;20:14;27:23,
23;36:9,10
**collusive (1)**
37:24
**commissions (4)**
18:3,4,6,9
**communicate (1)**
36:10
**companies (2)**
36:16;38:10
**company (1)**
31:25
**complaint (1)**
24:8
**complex (1)**
12:10
**complicated (10)**
7:2;13:22;21:19;
25:16;29:19;33:8,25;
34:14;44:1,2
**complied (1)**
8:14
**comply (2)**
7:22,23
**compound (1)**
6:19
**CONCLUDED (1)**
45:19
**conference (1)**
41:18
**consider (1)**
45:3
**consideration (7)**
7:2,12;8:6,16;9:20,
21;11:6
**conspiracy (17)**
22:16;23:9,15,19,
20,23;24:2,4,5,6;
25:9,20,23;31:9;
37:22;38:5,6
**conspire (4)**
36:25;37:5,8,15
**conspiring (2)**
37:18,24
**consummate (1)**

Case 1:24-cv-08515-AS    Document 160-9    Filed 05/26/26    Page 49 of 53
GOLDEN FOOTHILL INSURANCE SERVICES, LLC, et. al. v.
SPIN CAPITAL, LLC, et. al.

AVRUMI LUBIN
April 17, 2026

9:20
**consummated (1)**
    8:19
**contact (2)**
    13:13;36:6
**contacting (1)**
    36:4
**contempt (1)**
    36:14
**control (2)**
    7:24;10:3
**controls (1)**
    12:9
**conversational (1)**
    4:24
**copied (1)**
    37:21
**copy (1)**
    20:23
**copying (2)**
    26:18;38:2
**corporate (1)**
    12:1
**corporation (1)**
    9:10
**corporations (3)**
    35:12,14,16
**corrupt (1)**
    32:10
**counsel (15)**
    32:2,3;33:11;34:8,
    19,23;35:3,3,6;36:5,
    6;39:6,23;40:2,5
**country (1)**
    35:12
**couple (5)**
    24:17;42:9,9;44:9,
    11
**course (9)**
    17:13,24;20:24;
    24:6;25:17;26:17;
    32:6;39:12,13
**court (52)**
    4:14,18,22;5:6,9,
    10,10;6:7;7:16;9:2;
    10:18;11:20;13:19;
    14:14;17:16;20:6,25;
    21:1,2,4,7;26:21,22;
    28:8,8;30:3,7;32:11,
    12;33:7,9,13;35:7,11,
    17,19;38:20;39:6,21;
    40:3,11,20,21;41:2,5,
    18;43:2,2;44:10,12,
    18;45:16
**courts (2)**
    32:11,12
**court's (1)**
    34:16
**created (1)**
    44:6
**creates (1)**
    29:8
**criminal (2)**

24:13;30:17
**current (2)**
    15:1;33:17
**currently (1)**
    40:11
**cut (2)**
    4:13;5:23

**D**

**day (1)**
    30:14
**days (2)**
    41:9;42:7
**deal (23)**
    7:1;15:9,13,19,20,
    21,23,25;16:2,8;17:9,
    14;18:20,24;19:1,6,
    23;20:1;27:6,8,11,17;
    42:4
**dealing (4)**
    30:4;44:11,12;
    45:10
**dealt (2)**
    29:18;33:15
**decided (1)**
    28:25
**decision (2)**
    42:10,19
**default (5)**
    31:10;32:8,9;
    34:22;35:2
**definitely (1)**
    13:21
**demand (2)**
    24:19,25
**department (2)**
    26:6;27:7
**deposition (5)**
    4:14;5:15;6:4;9:5;
    45:19
**determine (1)**
    29:7
**different (4)**
    14:20;22:5;26:17;
    45:7
**directly (1)**
    19:1
**disagree (2)**
    9:6;11:14
**disagreement (1)**
    39:7
**disbursement (1)**
    20:15
**disclosure (1)**
    21:15
**discretion (3)**
    7:6,17,19
**discuss (1)**
    43:6
**discussion (1)**
    42:13
**dispute (3)**

12:22;21:7;34:12
**distinction (1)**
    18:13
**distribution (1)**
    20:14
**District (3)**
    28:15,24;29:10
**docket (1)**
    37:23
**docs (2)**
    8:8;12:1
**document (1)**
    20:10
**documented (1)**
    15:22
**documents (2)**
    14:16;28:20
**DOJ (12)**
    22:4,13,17;23:8,18,
    20;24:2,9,13,13,14;
    25:2
**dollar (5)**
    16:10,12;30:8,12,
    19
**dollars (5)**
    17:5,25;19:13;
    31:3;32:25
**done (2)**
    6:12,14
**doubt (1)**
    32:15
**down (6)**
    4:23;5:2;6:18;
    8:23;28:16;44:13
**due (4)**
    6:17;29:17;33:14;
    41:9
**duly (1)**
    4:4
**dummy (1)**
    31:24
**duty (1)**
    36:9

**E**

**earlier (2)**
    44:22,25
**effect (5)**
    7:3,11,21;8:1,3
**Either (4)**
    19:11;28:7;42:8;
    44:11
**e-mail (8)**
    14:2,4;15:13;22:8;
    23:22;37:13,20;38:2
**e-mailing (1)**
    26:23
**e-mails (5)**
    13:24;22:2,8;23:7;
    26:17
**end (2)**
    13:17;18:5

**ended (1)**
    14:8
**enforce (1)**
    35:23
**enforced (1)**
    30:16
**enforcement (1)**
    6:17
**engaged (1)**
    23:23
**engaging (3)**
    23:8,14;37:21
**entered (3)**
    31:8;34:22;35:2
**entering (1)**
    32:23
**entirely (1)**
    9:10
**entities (1)**
    41:22
**entitled (4)**
    10:9;27:4,5;36:5
**estoppel (1)**
    29:8
**et (1)**
    22:18
**ethical (1)**
    34:12
**even (4)**
    6:2;7:23;29:5;
    45:11
**everybody (2)**
    22:12;23:7
**evidence (2)**
    37:17,23
**exact (4)**
    13:20;18:22;19:4;
    42:1
**exactly (6)**
    5:18;6:18,20;
    10:22;15:4;24:22
**examined (1)**
    4:5
**execute (2)**
    20:1;42:5
**exercising (1)**
    43:3
**expand (2)**
    30:6;32:14
**explain (1)**
    21:23
**exposure (3)**
    26:14,15;30:17

**F**

**fact (2)**
    29:3;34:8
**factors (1)**
    10:7
**far (3)**
    31:3,24;32:19
**favor (1)**

29:2
**federal (14)**
    10:18;21:1,2,4,7;
    28:8;32:11;35:11;
    38:15;40:19,21;41:2,
    5;43:2
**fees (2)**
    15:8;17:25
**few (9)**
    7:12;13:11;15:14;
    17:25;19:12;28:12;
    32:19;33:12;41:19
**fiduciary (1)**
    36:9
**figure (2)**
    38:7;41:11
**file (3)**
    21:5;38:1;40:15
**filed (2)**
    14:13;24:8
**filling (1)**
    34:24
**finish (3)**
    4:25;5:1;25:5
**firms (1)**
    22:5
**first (5)**
    17:4,14,24;22:7;
    45:7
**five (4)**
    30:18;31:2;32:24;
    36:16
**Florida (19)**
    28:15,24;29:10,24;
    30:1,2,3;31:12;
    32:17;34:18,19,23;
    35:5;42:22;43:11,12,
    22;44:13;45:5
**follows (1)**
    4:5
**Foothill (2)**
    5:12,17
**forced (1)**
    33:19
**Forget (1)**
    31:21
**four (1)**
    22:23
**frame (1)**
    5:8
**Franklin (1)**
    29:3
**friends (1)**
    21:9
**front (2)**
    18:3;27:16
**frustrated (1)**
    44:5
**full (1)**
    7:5
**fully (2)**
    17:7;20:2
**fund (2)**

Case 1:24-cv-08515-AS    Document 160-9    Filed 05/26/26    Page 50 of 53
GOLDEN FOOTHILL INSURANCE SERVICES, LLC, et. al. v.    AVRUMI LUBIN
SPIN CAPITAL, LLC, et. al.    April 17, 2026

18:20;19:23
**fundamental (1)**
39:7
**funds (1)**
21:18

### G

**Gabe (2)**
8:4;13:21
**games (1)**
39:12
**gave (4)**
4:13;5:20,25;17:18
**general's (1)**
24:10
**gets (1)**
33:24
**Getter (3)**
12:12,24;13:14
**given (1)**
11:6
**giving (1)**
43:19
**global (2)**
24:18,24
**goes (2)**
7:21;31:24
**Golden (2)**
5:12,16
**good (5)**
4:11;12:17;37:11;
39:16,19
**grade (3)**
28:2;34:15;39:11
**grand (3)**
18:18,20;20:20
**granted (2)**
40:5,23
**great (1)**
21:10
**ground (1)**
4:20
**guardrails (2)**
42:12;45:12
**guess (2)**
17:20;43:16
**guy (2)**
12:23;13:6
**guys (1)**
41:21

### H

**half (6)**
30:8,11,18;31:2;
32:24;33:3
**Hancock (1)**
41:24
**hand (2)**
5:7;19:13
**hanging (1)**
4:12

**happen (1)**
22:10
**happened (3)**
6:4;15:5;45:5
**head (3)**
16:1;41:12;45:11
**hear (1)**
39:14
**help (2)**
6:13;28:18
**Herbst (2)**
12:8;15:19
**HESKIN (10)**
4:9,11;21:20;
24:15;26:11;37:11;
38:20,23;44:1;45:14
**Hi (20)**
4:10;12:9,21,23;
13:4,9,13,16,21,24;
14:10,16,25;15:7;
16:4,6,7,20;17:1;
20:13
**hire (1)**
21:18
**hold (2)**
7:15;25:5
**hole (1)**
31:15
**honest (2)**
5:21,25
**honor (1)**
16:2
**hornet's (2)**
22:22;44:7
**hour (1)**
6:2

### I

**idea (1)**
37:1
**identified (1)**
14:4
**imagination (1)**
37:12
**improper (2)**
11:18;24:9
**included (1)**
22:4
**including (5)**
22:13,17;25:1,7;
38:3
**incorrect (1)**
32:21
**indicated (1)**
29:2
**individual (7)**
10:5,10;12:8;
14:24;35:16,21;
38:19
**individually (10)**
6:16,21;7:10,10;
9:3,15;10:9,21;41:6;

42:23
**injunction (2)**
26:20,22
**injunctive (2)**
36:4;42:21
**inspector (1)**
24:10
**interest (4)**
8:20;13:17;28:12;
34:17
**interests (4)**
31:18,23;33:24;
35:20
**intervened (1)**
33:13
**into (16)**
7:3,11,21;8:1,3;
10:6;11:3;12:5;
17:12;22:24,25;
24:15;31:15,25;36:8;
39:10
**invalid (2)**
31:7;32:17
**involved (5)**
5:9;13:21;25:9;
27:23;28:9
**irrelevant (2)**
16:21;32:14
**Isaacov (3)**
8:4;11:22,24
**issue (12)**
7:16;9:1;16:5;
21:20,21;27:9,12;
28:7;29:9,18;32:16;
43:1
**issued (9)**
13:18;23:16;31:11,
13,22;32:4,7;33:16;
42:21
**issues (7)**
6:17;21:24;34:7;
36:13;42:25;44:10;
45:10
**issuing (1)**
31:25

### J

**John (1)**
41:23
**judge (16)**
23:11,12;25:2;
26:7;28:14;29:1,5,
25;30:2,7;31:8,12,13,
24;32:17;35:9
**judges (6)**
22:4,17;23:8;24:2;
27:7;38:3
**judge's (3)**
29:16;33:23;34:15
**judgment (13)**
20:25;30:8,12,19;
31:10,20,21,22;

32:24;34:22;35:2;
37:25;41:9
**judgments (3)**
31:5,7,7
**judicial (1)**
29:8
**justice (2)**
26:6;27:8

### K

**keep (1)**
19:12
**known (1)**
32:10

### L

**laid (3)**
7:1;17:14,24
**language (1)**
35:7
**last (3)**
22:22;32:23;36:16
**law (2)**
22:5;36:10
**lawsuit (3)**
13:10;29:7;38:1
**lawsuits (1)**
10:1
**lawyer (18)**
6:20;7:25;8:23;
26:8;38:8,8,9,12,14,
17,24;39:3,4;43:6,7,
13,15,16
**lawyers (9)**
26:12,12,18,19;
33:6,7,10;34:1;36:15
**least (3)**
31:3,3;42:6
**leave (2)**
39:25;41:15
**Leer (5)**
19:22,24;20:1,24;
41:22
**legal (5)**
11:10;15:8;17:25;
43:15,21
**legally (5)**
22:25;30:13;31:17;
42:20;43:3
**less (1)**
6:2
**Leto (2)**
37:16,21
**Letter (2)**
8:12,13
**listed (1)**
29:6
**Listen (2)**
15:15;25:22
**litigated (2)**
29:23,23

**litigating (1)**
21:11
**litigation (6)**
7:24;9:14;10:3;
16:24;29:1;44:19
**little (3)**
6:19;7:2;33:24
**lived (1)**
22:22
**loan (8)**
13:18;14:15;15:1;
17:20;18:11,15,24;
20:3
**looked (1)**
12:5
**looking (1)**
45:9
**lot (5)**
4:13,16;5:23;9:24;
16:20
**love (1)**
44:4
**LUBIN (4)**
4:4,10;35:8;45:15

### M

**many (4)**
11:2;36:15,23;
45:10
**massive (5)**
22:16;23:9,15,23;
25:9
**Matt (1)**
37:16
**matter (2)**
10:25;29:3
**matters (1)**
10:23
**may (1)**
16:23
**maybe (4)**
10:23,24;16:14;
26:16
**MC (1)**
17:20
**MCA (1)**
18:14
**MCAs (2)**
18:11,23
**mean (9)**
14:24;16:6;19:11,
16:25;13;27:24;36:8;
44:14,19
**meant (1)**
27:19
**member (2)**
7:23;8:4
**members (2)**
7:22;11:21
**mentioned (1)**
15:13
**mentioning (2)**

Case 1:24-cv-08515-AS    Document 160-9    Filed 05/26/26    Page 51 of 53
GOLDEN FOOTHILL INSURANCE SERVICES, LLC, et. al. v.    AVRUMI LUBIN
SPIN CAPITAL, LLC, et. al.    April 17, 2026

26:11;27:12
**Michael (1)**
    23:13
**Michigan (11)**
    23:13;25:3;26:7;
    30:19;31:8,13;32:10,
    25;33:10,21;34:2
**middle (1)**
    44:3
**might (1)**
    6:2
**million (14)**
    16:15,16,17,18;
    17:4,14,25;19:12;
    30:8,11,19;31:2;
    32:24;41:23
**mistake (1)**
    29:14
**money (24)**
    7:13;13:8,12;15:7;
    16:4,6,7,20;17:1,9,
    13;18:16,23;19:6,14,
    15,15,17,18;20:3,16,
    21;33:22;34:3
**months (13)**
    15:14;28:12,16,17,
    21;32:23;40:8;41:19;
    42:9,9;44:9,12;45:4
**moot (1)**
    29:4
**more (7)**
    10:5;12:10;16:10;
    17:19;23:4;36:19,21
**morning (1)**
    26:23
**most (1)**
    19:16
**motion (4)**
    6:20;40:5,15,23
**motions (2)**
    31:20;41:9
**mouth (1)**
    25:15
**move (6)**
    11:4,7;23:1,5;
    25:19;40:17
**moved (2)**
    40:4,20
**moving (4)**
    9:25;10:5;11:2,9
**much (4)**
    13:22;15:12;16:9,
    21
**myself (6)**
    6:21;10:4;18:16;
    21:8;34:20,25

**N**

**necessarily (1)**
    44:19
**need (1)**
    45:15

**needs (1)**
    8:15
**negotiating (1)**
    13:2
**nest (2)**
    22:22;44:7
**New (8)**
    5:10;17:2;21:13,
    15;32:13;35:17;
    43:18,20
**Next (8)**
    11:20;24:7;25:19,
    23;27:20;28:17,21;
    39:11
**noticed (3)**
    36:8;40:9,10
**number (1)**
    19:4

**O**

**obligations (2)**
    25:14;27:19
**obsessed (2)**
    25:21;38:5
**obviously (1)**
    10:4
**off (2)**
    16:1;20:13
**office (4)**
    22:18;24:3,10;26:6
**one (16)**
    7:19,23;12:11;
    13:1;17:19;23:10,11;
    26:19;29:21;34:7;
    36:16;37:9;38:10;
    41:4;44:6,10
**one-page (1)**
    31:14
**only (5)**
    6:3;7:15;14:17;
    18:2;41:4
**operations (1)**
    13:7
**opinion (4)**
    31:14,14,16,22
**option (1)**
    29:7
**order (12)**
    8:15;9:19;25:11,
    25;26:21;29:17;
    31:25;34:16;35:7;
    36:4,14;42:21
**original (3)**
    5:11;17:12;37:8
**originally (1)**
    9:9
**out (15)**
    5:23;6:13;7:1;8:7;
    17:14,22,24;18:17;
    20:8;22:18;23:6;
    25:15;34:25;38:7;
    41:11

**outside (3)**
    30:6;32:15;43:25
**over (4)**
    26:17;32:11;36:16;
    43:4
**owe (1)**
    16:9
**owes (5)**
    16:4,6,7,20;17:1
**own (11)**
    7:18,24;10:22,24;
    12:22;19:12;31:13,
    15,17,23;44:18
**owned (2)**
    9:9,10
**owner (1)**
    11:24
**ownership (1)**
    14:15
**owns (5)**
    7:4,8,19;10:23;
    12:9

**P**

**paid (8)**
    9:21;18:3,3,4,17;
    34:5,9;40:14
**parameters (1)**
    41:20
**participant's (1)**
    19:17
**participating (1)**
    13:17
**Participation (5)**
    14:19,22;15:1,2,17
**parties (1)**
    13:11
**parties' (1)**
    29:3
**parts (3)**
    9:25;10:5;11:2
**party (3)**
    8:20;13:8;28:11
**past (1)**
    25:8
**pay (8)**
    8:6;9:19;15:21;
    16:4;20:13;28:2;
    34:14;39:11
**paying (1)**
    34:1
**payment (1)**
    34:11
**pending (1)**
    6:20
**people (8)**
    22:3;27:25;32:18;
    38:3;39:11,16,17,19
**personal (3)**
    17:12,13;29:15
**personally (6)**
    9:3;19:2;29:22;

30:9,15,22
**physical (1)**
    20:7
**plaintiff (1)**
    6:21
**plan (1)**
    21:11
**play (1)**
    39:11
**please (1)**
    24:18
**plus (1)**
    41:23
**PM (1)**
    45:19
**pocket (2)**
    17:23;18:17
**point (7)**
    9:13,17;14:8,11,18,
    22;27:1
**policies (1)**
    41:25
**position (4)**
    8:17,24,25;39:18
**positive (1)**
    31:1
**possible (1)**
    14:2
**possibly (1)**
    38:9
**potentially (1)**
    28:13
**power (1)**
    28:6
**premiums (1)**
    15:8
**pretty (6)**
    18:15,22,24;19:21,
    22;20:16
**prevented (1)**
    33:16
**preventing (1)**
    29:12
**previous (1)**
    26:12
**previously (1)**
    4:14
**principal (3)**
    17:9,23;45:2
**prior (2)**
    18:8;45:1
**pro (7)**
    21:17;29:16;34:20;
    35:13,15;36:5;41:6
**probably (3)**
    5:5;15:14;22:3
**problem (1)**
    16:8
**procedure (1)**
    43:22
**proceed (1)**
    34:12
**proceeding (1)**

21:17
**process (2)**
    29:17;33:14
**produce (1)**
    20:23
**produced (2)**
    20:5;21:6
**profit (1)**
    18:15
**prohibited (2)**
    42:20;43:3
**protect (7)**
    31:17,23,25;32:3,
    4;33:24;34:17
**protecting (1)**
    45:13
**pull (1)**
    23:24
**pursue (1)**
    29:5
**put (14)**
    13:8,12;15:7;17:9,
    12,13;18:16,23,25;
    19:5;20:2,3;39:17;
    42:12

**Q**

**quick (1)**
    39:15

**R**

**rabbit (1)**
    31:15
**raise (1)**
    5:7
**raised (1)**
    34:7
**ran (2)**
    12:23;13:6
**range (1)**
    16:20
**reached (1)**
    45:8
**read (1)**
    37:22
**real (2)**
    6:3;28:11
**really (5)**
    6:3;7:3;15:12;
    21:14;24:14
**reason (4)**
    5:19;22:9;34:13;
    36:2
**recall (11)**
    5:12,18;6:17;14:1;
    16:1;17:7;19:4;20:2;
    22:2,7;24:17
**recently (1)**
    32:23
**recollection (1)**
    19:19

Case 1:24-cv-08515-AS   Document 160-9   Filed 05/26/26   Page 52 of 53
GOLDEN FOOTHILL INSURANCE SERVICES, LLC, et. al. v.
SPIN CAPITAL, LLC, et. al.
AVRUMI LUBIN
April 17, 2026

**record (3)**
4:19;15:16;39:23
**records (2)**
20:18,22
**recover (3)**
17:3,6,8
**reference (1)**
5:8
**refuse (1)**
11:18
**relate (1)**
4:16
**related (14)**
5:9;9:4;10:1;
11:15;22:20;24:21;
25:1,13;26:5;27:3,19,
20;28:5;39:10
**relates (1)**
22:20
**relationship (2)**
12:17,20
**relevant (8)**
8:21;9:5;10:14,16,
17;16:23;23:17,25
**remaining (1)**
41:25
**remember (13)**
4:15;5:1,16;6:8;
17:18;18:21;24:19;
26:20,21,24;41:17,
25;42:1
**reminder (1)**
4:21
**removed (1)**
30:13
**replow (1)**
5:24
**reported (2)**
13:1,3
**Reporter (3)**
4:22;5:6;38:20
**represent (7)**
28:1;33:20;35:20,
24;36:16;38:8,13
**represented (13)**
25:8;26:9;32:2;
34:18,23,24;35:3,12,
15;37:4;38:10;43:11,
12
**representing (10)**
33:19;34:20;38:14,
17,21;39:4,20;40:11;
41:1,5
**requests (1)**
20:10
**required (1)**
36:10
**resolve (13)**
24:19,24;25:10,11,
11,25;26:1,3,4;27:14,
15,15;28:7
**resolved (3)**
14:9;44:4,10

**resolving (2)**
27:21;29:13
**respect (1)**
43:4
**respond (2)**
35:4,6
**response (2)**
45:4,6
**rest (1)**
21:11
**result (1)**
16:25
**retain (1)**
10:12
**retained (1)**
36:15
**retainer (1)**
34:3
**right (68)**
5:21;6:24;7:12,20;
8:5,8,12;9:11,15;
10:21,22;11:3,10,25;
13:14,25,25;14:1,9,
11,23;15:1;17:5,16;
20:6,11,12,13;23:9;
25:12,12;27:16,23,
25;29:23;30:9,12,20;
31:19;32:8,18;33:11;
35:13,21;36:6;37:16,
22;38:21;39:5,8,21;
40:2,21,21,23,25;
41:2,4,6,9;42:11,14,
15,17,19;43:2;44:13;
45:9
**rights (45)**
6:6,23;7:4,5,6,8,8,
15,24,25;8:20;9:1,9,
14,18,19,22;10:4,11,
13,25;14:5,8,11,15,
19,20,23;21:20,21,
24;28:11,14;29:1,16,
22;35:8,23,24;41:23,
24;42:8;43:4;44:13,
19
**role (1)**
17:17
**ruled (2)**
33:7;44:18
**rules (1)**
4:20
**ruling (18)**
23:16;28:11,14;
29:2,15;31:11;32:4,7,
16,18,19,20,22;
33:16,22,23;34:15;
42:7
**run (4)**
24:6;25:17;39:12,
13

**S**

**sale (1)**

15:9
**saying (9)**
7:9;9:24;14:14;
25:1;26:2;35:22;
36:5;38:1;39:19
**se (7)**
21:17;29:16;34:20;
35:13,15;36:5;41:6
**search (2)**
20:18,22
**second (1)**
45:8
**seeking (1)**
34:8
**send (6)**
7:13;8:7;19:25;
20:1;23:2,6
**sending (1)**
19:21
**sent (8)**
8:7;15:14;18:19;
19:20,24;22:3,8;
26:16
**separate (2)**
10:2;16:5
**series (1)**
22:8
**setting (1)**
22:7
**settle (9)**
28:12,13;42:15;
44:4,14,16,20,24;
45:9
**settled (1)**
42:6
**settlement (11)**
7:5,6,25;10:4;
24:18;37:9;41:18;
42:12,19;45:1,8
**several (1)**
32:23
**Shane (11)**
11:7;24:6;25:16;
26:25;28:2;32:13;
37:1;39:9,13,24;
40:16
**shares (1)**
10:23
**sharing (1)**
18:15
**sheets (1)**
13:24
**short (1)**
4:13
**sign (1)**
28:20
**signed (3)**
6:20;29:17;35:9
**simply (1)**
4:13
**single (2)**
26:19;37:4
**sit (5)**

8:18,22;9:23;
10:10;39:21
**sitting (2)**
25:2;26:7
**situation (6)**
21:19;25:16;30:5;
43:14;44:1,2
**skip (1)**
6:1
**sole (3)**
7:17,18;11:24
**somewhere (1)**
16:19
**sorry (2)**
11:9;14:12
**sort (2)**
23:9;31:9
**Southern (3)**
28:15,24;29:10
**space (1)**
45:11
**specific (3)**
8:21;19:19;36:1
**speculate (1)**
22:21
**speed (1)**
6:3
**Spin (28)**
5:11,16;6:6;9:9,14;
10:20;13:25;14:14,
17,23;19:12,12;20:8,
15,17;25:14;27:19;
28:21;30:12,13,21;
31:4,16,23;32:4;
34:22;41:1;42:24
**Spin's (9)**
15:17;19:15;20:21,
22;29:1;33:24;34:17;
42:7;44:18
**state (34)**
4:14,18;5:9,10,10;
6:7;7:16;9:2;13:19;
14:14,16;17:16;20:6;
26:22;28:7;30:3,6,7;
32:11,15;35:11,17,
19;38:18;39:5,21;
40:3,11;41:18;42:22;
43:2,22,25;44:10
**States (1)**
35:8
**status (1)**
33:4
**stay (1)**
32:18
**steered (1)**
40:15
**Stefan (2)**
19:24;20:1
**stem (1)**
10:18
**step (1)**
29:21
**still (10)**

5:15;9:23;10:12,
24;12:15,17;15:2;
18:3;37:18,25
**stop (5)**
5:7;26:4,16,20,23
**structure (3)**
13:20;18:22;42:1
**structured (1)**
18:4
**stuck (2)**
35:7;44:3
**stupid (3)**
23:16;27:13;39:11
**subject (3)**
9:25;11:20;13:19
**substitute (1)**
6:21
**successfully (1)**
33:12
**sudden (1)**
24:25
**sue (4)**
22:12;26:18;38:25;
39:2
**summary (4)**
20:25;31:19;37:25;
41:8
**supplement (1)**
7:7
**supposed (2)**
17:19;41:15
**Sure (14)**
4:18;5:7;6:16;
14:20;16:3;18:15,22,
24;19:21,22;20:16;
29:11;30:25;43:8
**sworn (1)**
4:4
**syndicate (1)**
13:18
**syndication (5)**
13:23,24,25;14:1,5
**system (1)**
32:12

**T**

**table (2)**
42:4;45:2
**talk (5)**
6:19;7:25;8:23;
27:22;39:25
**talking (19)**
7:7,18:10,11,12;
21:1;24:12,13;25:24;
27:21;31:13;32:16;
33:21;37:2;39:2,5,
17;41:15;42:23,25
**TD (1)**
19:11
**technically (1)**
40:13
**telling (3)**

GOLDEN FOOTHILL INSURANCE SERVICES, LLC, et. al. v.
SPIN CAPITAL, LLC, et. al.

AVRUMI LUBIN
April 17, 2026

25:25;28:6;32:5
**ten (5)**
  5:6;26:16;30:8,11;
  36:19
**terms (3)**
  8:7;15:23,24
**terrible (2)**
  4:21;5:3
**testified (1)**
  4:5
**testimony (7)**
  5:21,25;9:9;17:15,
  18;18:8;43:20
**Teton (27)**
  6:11,23,24,25;7:1,
  9,11,20,22,23,23;8:2;
  9:1,18;10:4,12,20,23;
  11:21;29:9;38:21;
  39:5,21;41:1;42:25;
  43:1,4
**therefore (2)**
  9:22;36:6
**thinking (2)**
  41:13;44:23
**thought (2)**
  30:5;43:10
**threaten (1)**
  39:1
**threatened (2)**
  22:12;38:25
**threatening (1)**
  26:18
**throughout (1)**
  29:6
**times (2)**
  5:6;19:13
**today (6)**
  4:10;5:6;7:4;8:18;
  10:11;39:22
**together (1)**
  37:10
**told (1)**
  28:10
**took (1)**
  5:14
**top (1)**
  16:1
**topic (12)**
  10:2;11:3,4,8;22:1,
  24,25;23:1,5;24:14;
  40:18;45:7
**transacting (1)**
  13:4
**transaction (1)**
  6:6
**transactions (2)**
  12:21;17:20
**transfer (5)**
  8:2,15,19;9:19,22
**transferred (12)**
  6:6,10,16,22,23,24;
  7:20;9:14,17;10:11;
  14:9,23

**trial (1)**
  30:14
**tried (7)**
  15:11;29:4;35:18;
  36:3;37:5,8,15
**trouble (2)**
  32:5,6
**true (2)**
  8:19;36:3
**truthful (2)**
  5:21,25
**try (9)**
  24:19,23,25;25:10,
  18;27:14;36:7;39:15;
  41:12
**trying (15)**
  15:11,15;21:7;
  22:15,19;25:22;
  27:15;33:9,11;36:24;
  38:7;41:11,14;43:8;
  45:12
**two (7)**
  15:10;28:16,17,21;
  33:1,2;45:4
**type (1)**
  14:20

### U

**ultimately (2)**
  6:23;13:18
**unable (1)**
  42:14
**uncomfortable (1)**
  39:18
**under (1)**
  9:18
**underlying (2)**
  12:21;13:4
**Understood (1)**
  5:3
**Unfortunately (2)**
  43:14;44:3
**United (1)**
  35:8
**unless (1)**
  19:17
**up (18)**
  6:3;13:12,17;14:8;
  15:7;17:13;18:3,16,
  23;19:1,5;20:2,3;
  22:7;23:24;33:9;
  42:10;45:11
**used (5)**
  12:13;24:4,5;
  25:20;38:4
**using (1)**
  24:5

### V

**valid (1)**
  31:5

**various (2)**
  23:8;25:7
**versus (2)**
  5:11,16
**view (1)**
  9:21
**violate (1)**
  5:5
**violating (2)**
  33:23;34:16

### W

**wait (4)**
  4:25;5:1;17:19;
  42:8
**warned (1)**
  32:18
**Warren (1)**
  23:13
**way (8)**
  4:22;12:6;28:22;
  32:9;34:12;35:15;
  42:8;44:10
**weekend (1)**
  26:17
**weeks (1)**
  24:17
**weren't (3)**
  34:9,23;43:10
**What's (17)**
  6:14;8:24,24;11:5;
  12:3;14:6;16:7,8,12;
  22:6,10;26:25;28:23,
  24;33:4;38:22;42:2
**whatsoever (3)**
  10:1,15;11:15
**whole (5)**
  13:10;28:3;29:6;
  31:15;44:7
**who's (1)**
  28:11
**willing (1)**
  45:3
**wire (7)**
  7:13;18:19;19:20,
  22;20:13,20,23
**wires (2)**
  20:5,8
**withdraw (7)**
  33:8,11,18;34:8;
  40:4,16,20
**withdrawing (1)**
  33:17
**withdrawn (1)**
  40:2
**withdrew (1)**
  39:6
**within (2)**
  32:23;41:9
**without (1)**
  35:25
**WITNESS (2)**

38:22;45:17
**word (6)**
  24:4,5,6;25:20,21;
  38:4
**words (2)**
  25:15,15
**work (2)**
  12:13,15
**worked (1)**
  15:9
**working (1)**
  21:4
**writing (1)**
  21:14
**wrong (2)**
  4:22;31:12
**wrote (2)**
  14:2;18:19

### X

**X-amount (1)**
  7:13

### Y

**year (1)**
  33:3
**years (8)**
  12:13;15:10;17:1;
  22:23;32:19;33:1,2;
  36:17
**Yisroel (3)**
  12:8;13:9,11
**Yoel (5)**
  12:12,24;13:9,12,
  14
**York (7)**
  5:10;21:13,15;
  32:13;35:17;43:18,
  21

### Z

**zero (1)**
  15:17

### 1

**1.2 (1)**
  16:15
**100% (8)**
  7:6,24,24;10:3;
  14:14;15:18;19:12;
  44:18
**12:05 (1)**
  45:19

### 2

**20 (3)**
  5:6;36:21,23
**21 (1)**

41:9
**25% (11)**
  13:25;14:1,10,10,
  17,17;15:17;17:16;
  18:6;19:23;20:16

### 3

**3.5 (1)**
  41:23
**3:00 (1)**
  26:23
**30% (1)**
  41:23
**35% (1)**
  41:24

### 4

**40 (2)**
  22:5;38:2
**45 (1)**
  42:7

### 5

**50 (2)**
  22:3;38:3
**50% (8)**
  13:24;14:10,16,18,
  25;15:2,5,16

### 6

**60 (1)**
  42:7
**600 (3)**
  18:18,20;20:20

### 8

**800,000 (1)**
  16:14