# EXHIBIT
# "A"

# *Togut v. eProdigy Financial, LLC (In re Kossoff PLLC)*

United States Bankruptcy Court for the Southern District of New York

July 27, 2026, Decided

Chapter 7, Case No: 21-10699 (DSJ), Adv. Pro. No. 23-01109 (DSJ)

**Reporter**
2026 Bankr. LEXIS 1850 *; 2026 LX 369720

In re: KOSSOFF PLLC, Debtor.ALBERT TOGUT, Not Individually but Solely in His Capacity as Chapter 7 Trustee of the Estate of Kossoff PLLC, Plaintiff, v. EPRODIGY FINANCIAL, LLC, CAPITAL STACK, LLC, and ACH CAPITAL, LLC, Defendants.

**Prior History:** *Togut v. Perevoski (Kossoff PLLC), 667 B.R. 405, 2025 Bankr. LEXIS 351 (Feb. 14, 2025)*

**Counsel:** **[*1]** For Albert Togut, not individually but in his capacity as Chapter 7 Trustee: By: John McClain, Ronald Howard, TOGUT, SEGAL & SEGAL LLP, New York, New York.

For eProdigy Financial, LLC, Capital Stack, LLC, and ACH Capital, LLC, Defendants: By: William Thompson, Brendan Best, VARNUM LLP, Birmingham, Michigan.

**Judges:** HONORABLE DAVID S. JONES, UNITED STATES BANKRUPTCY JUDGE.

**Opinion by:** DAVID S. JONES

# Opinion

**OPINION GRANTING THE TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING THE DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**DAVID S. JONES**

**UNITED STATES BANKRUPTCY JUDGE**

This decision addresses an evolving area of law that is significant in bankruptcy and other commercial contexts: whether a series of so-called "merchant cash advance" agreements are, as they are expressly styled, agreements for the sale of assets under which a provider of funding makes an up-front payment to a business in exchange for a specified share of its future receivables or revenues, or whether transactions under the agreements are, under New York law requiring examination of agreements' substance rather than their form, disguised loans notwithstanding the financing party's best efforts to style the transactions as asset purchases. The **[*2]** consequences of this recurring issue can be significant. Here, if the transactions are deemed to constitute asset purchases, they likely will be beyond the reach of avoidance actions brought by the Trustee, whereas if they are loans the Trustee can pursue efforts to avoid the transactions or payments to the financing party. In other cases, the same or substantially similar analysis informs the question whether the transaction violates New York's usury laws, which generally apply to loans but not asset sales.

A growing body of case law has grappled with disputes involving merchant cash advance agreements. Many cases concluded that similar agreements constitute asset sales, but more recently an increasing number, following long-established New York state-court case law, have concluded that similar transactions are disguised loans.

The immediate dispute before this Court arises from two competing motions for partial summary judgment filed pursuant to *Federal Rule of Civil Procedure 56* and *Federal Rule of Bankruptcy Procedure 7056*, one filed by the

Shane Heskin

Chapter 7 Trustee of the estate of Kossoff PLLC, Albert Togut (the "Trustee"), and the other filed by eProdigy Financial, LLC ("eProdigy"), Capital Stack, LLC ("Capital Stack"), and ACH Capital, LLC ("ACH Capital," and **[*3]** collectively, the "Defendants"). The Trustee seeks entry of an order pursuant to *28 U.S.C. § 2201(a)* (the *Declaratory Judgment Act*) and *Federal Rule of Bankruptcy Procedure 7001(i)* declaring that certain pre-bankruptcy merchant cash advance agreements entered into by and between the Debtor in the main case, Kossoff PLLC, and the Defendants, are loans as a matter of New York law. In support of his motion for partial summary judgment (the "Trustee Motion" or "Trustee Mot.") [ECF No. 86], the Trustee filed the declaration of John McClain, attached as Exhibit B to the Trustee Motion ("McClain Decl.") [ECF Nos. 86-2, 86-3], and his statement of undisputed material facts, attached as Exhibit C to the Trustee Motion ("Trustee Statement") [ECF No. 86-4]. The Trustee filed a response to the Defendant Motion ("Trustee Response") [ECF No. 89] and a reply in support of the Trustee Motion ("Trustee Reply") [ECF No. 93].

The Defendants contend that the transactions at issue are not disguised loans and instead are true sales of Debtor's future receivables. As noted, a ruling in their favor would shield them from the Trustee's bid to avoid and recover the transactions and resulting payments at issue as allegedly fraudulent and preferential transfers. In support of their motion for partial **[*4]** summary judgment (the "Defendants' Motion" or "Def. Mot.") [ECF No. 85], the Defendants filed the Expert Report of Brian Phillips dated November 14, 2025, attached as Exhibit 4 to the Defendants' Motion [ECF No. 85-4], and the deposition transcript of Brian Phillips dated March 5, 2026, attached as Exhibit 5 to the Defendants' Motion [ECF Nos. 85-5], as well as their statement of undisputed material facts, attached as Exhibit 12 to the Defendants' Motion ("Def. Statement") [ECF No. 86-12]. The Defendants filed a response to the Trustee Motion ("Def. Resp.") [ECF No. 88] and a reply in support of the Defendants' Motion ("Def. Reply") [ECF No. 95].

For the reasons that follow, the Court concludes that the transactions at issue are disguised loans. The Trustee Motion is therefore GRANTED and the Defendant Motion is DENIED.

## BACKGROUND

Pertinent background is as follows.

Mr. Togut is the Trustee in the Chapter 7 bankruptcy liquidation of a now-failed law firm, Kossoff PLLC, whose sole managing member was Mitchell Kossoff. Mr. Kossoff misappropriated millions of dollars in client funds, for which he has been disbarred and has pled guilty to criminal charges, on which he is now imprisoned. Upon **[*5]** the discovery of his theft, his firm rapidly failed, leaving numerous creditors in his wake. *See generally In re Kossoff PLLC, 667 B.R. 405, 412 (Bankr. S.D.N.Y. 2025)*. Several creditors of the Debtor commenced the bankruptcy case by filing an involuntary Chapter 7 petition on April 13, 2021 (the "Petition Date"). *See* ECF No. 1, Case No. 21-10699 (DSJ).

The Trustee is faced with the challenging task of tracing funds and recovering avoidable transfers and preferences for the benefit of the Kossoff PLLC estate and its creditors. As part of that effort, he investigated the firm's financial history and affairs and commenced numerous adversary proceedings seeking to avoid transfers to enable the estate to partly compensate victims of Mr. Kossoff's misappropriations and any other creditors of his firm. *See id.* The defendants in those actions vary, typically depending on who was involved in a given transfer.

The Trustee commenced this particular adversary proceeding on May 5, 2023, challenging nineteen merchant cash advance agreements styled as "Agreements for the Purchase and Sale of Future Receipts" (the "MCA Agreements") entered into between the Debtor and Capital Stack between November 2016 and June 2020. *See generally* Complaint [ECF No. 1]; Answer **[*6]** ¶¶ 91, 100, 109, 119, 129, 138, 149, 158, 167, 176, 186, 196, 205, 215, 225, 238, 247, 259, and 273 [ECF No. 11]. The parties conducted discovery and the court-approved time for discovery has expired.

The parties agree that there are no material differences among the nineteen MCA Agreements and that New York law governs them. Each is an agreement between Capital Stack and Kossoff PLLC, with Mr. Kossoff as guarantor.

*See* Defendants' Statement of Uncontested Facts ("Def. Statement") ¶ 12 [ECF No. 85-12]; Trustee's Counter-Statement of Material Facts ("Trustee Counter-Statement") ¶ 12 [ECF No. 91]; Hr. Tr. 11:23-12:11, June 17, 2026 ("June 17 Hr. Tr.") [ECF No. 102]. A typical agreement which both sides referred to in briefing appears at ECF No. 85-8.[1]

Each agreement states explicitly that it concerns a "sale" of assets and is "NOT A LOAN." MCAA No. 2 ¶ 4. Aspects of the agreement are discussed in more detail in this decision's Discussion section, but, by way of high-level overview, each agreement provides that Capital Stack will advance a specified sum of cash to Kossoff PLLC (a $300,000 up-front payment in the main exemplar agreement the parties are using, *see id.* at 1), and that, in **[*7]** exchange, Kossoff PLLC will route all its revenues through a specified bank account and will authorize Capital Stack to sweep a specified amount ($2190.48 in the exemplar, *see id.*) from the account each day using so-called automated clearing house ("ACH") sweeps until a specified sum has been paid to Capital Stack ($414,000 in the exemplar agreement, *see id.*). *See id.* ¶ 1. That equates to 38% more than the $300,000 advanced sum over a 189-day repayment period.

The MCA Agreements include a "reconciliation" provision that concerns possible adjustments to the amount and/or timing of payments under the agreement to accommodate financial challenges that Kossoff PLLC might experience. However, as discussed below, the "reconciliation" provision left whether to allow a change in the daily sweep amount completely within the discretion of Capital Stack, merely providing that Kossoff PLLC "may" request a change in the daily sweep amount, and that Capital Stack "may" authorize it. *See id.* ¶ 2. Further, any such change would be only prospective, and not retrospective so as to adjust obligations that had already accrued under the MCA Agreements even if Kossoff PLLC's revenues had fallen short of **[*8]** its obligations. *See id.*

The MCA Agreements did specify that if Kossoff PLLC — without having already defaulted on the MCA Agreement — missed any payments because the firm entered bankruptcy or ceased operations, no default would result, and the agreement recites that Capital Stack enters the transaction "knowing the risks that Seller's business may slow down or fail, and [Capital Stack] assumes these risks." *See id.* ¶ 4. Further, because Mr. Kossoff's personal guarantee was of Kossoff PLLC's compliance with the agreement, and because nonpayment caused by a Kossoff PLLC bankruptcy in the absence of a breach was not defined as an event of default, there were bankruptcy or business-failure scenarios in which Mr. Kossoff's financial guarantee would not be triggered. *See id.*, Personal Guaranty of Performance. At the same time, however, the agreement nowhere says that Kossoff PLLC's obligations to route receipts into the specified bank account or to allow daily sweeps would terminate upon a bankruptcy filing, and, as detailed below, the probability of a bankruptcy or business failure that was not preceded by a breach of the MCA Agreement was low at best.

Finally, the agreement did not specify **[*9]** a repayment term or maturity date of Kossoff PLLC's obligations, instead specifying a daily payment amount due until the firm's full repayment obligation was satisfied. *See id.* ¶ 1. Nevertheless, as noted above, other features of the agreement including the daily required payment amount and the limited "reconciliation" provision meant that Capital Stack would be fully repaid 38% more than it advanced within 189 days unless it agreed otherwise, a question about which it had complete discretion.

Although the material contract provisions are undisputed, the parties sharply dispute the legal characterization of the MCA Agreements and disagree about how much if at all of facts outside the four corners of the agreements may be considered on this motion. Setting that question aside (it is discussed below), in total under the nineteen MCA Agreements, there appears to be no factual dispute that Capital Stack advanced a total of roughly $10.88 million to Kossoff PLLC in exchange for a total repayment obligation of roughly $14.88 million. *See* Def. Statement ¶ 19; Trustee Counter-Statement ¶ 19. At the time of the Kossoff PLLC bankruptcy, the firm had repaid roughly $8 million to Capital Stack, **[*10]** leaving Capital Stack with an out-of-pocket loss of roughly $2 million and a $6 million

[1] The parties agree that each of the MCA Agreements entered into after MCAA No. 2 featured the same general boilerplate form and without material substantive difference as MCAA No. 2. MCAA No. 1 uses a different form but does not differ in substance from the rest of the MCA Agreements. *See* Trustee Mot. ¶ 17 n.4; Def. Reply at 3. In its Opinion, the Court will cite to MCAA No. 2, except where appropriate.

shortfall in its receipt of payments due under the MCA Agreements. Capital Stack did not file a proof of claim in the Kossoff PLLC bankruptcy. *See* Claims Register, Case No. 21-10699. Defendants' counsel represented and the Trustee did not dispute that neither Capital Stack nor the other Defendants issued notices of default to the Debtor prior to the Petition Date. *See* June 17 Hr. Tr. 63:6-25. During the parties' pre-bankruptcy dealings, Kossoff PLLC made an unspecified number of requests for "reconciliation," under the terms of the contract, meaning a modification of its future payment obligations or sweep amounts. Capital Stack emphasizes that it agreed to seven such modifications. *See* Def. Statement ¶ 21.

The complaint seeks, among other relief, a declaration pursuant to *28 U.S.C. § 2201(a)* (the Declaratory Judgment Act) that the MCA Agreements constitute loans under New York law, *see* Complaint ¶¶ 308-12, and asserts claims for turnover, avoidance and recovery of allegedly fraudulent and preferential transfers, avoidance of security interests, and disallowance of claims. *See id.* ¶¶ 308-60. Defendants answered the complaint in July 2023 **[*11]** and denied the material allegations. *See generally* Answer.

The parties now seek partial summary judgment on the threshold issue of whether the MCA Agreements should be treated as loans or as purchases of future receivables under applicable New York law. The Court heard argument from counsel for both parties on June 17, 2026. The Court reserved decision.

## JURISDICTION

The Court has jurisdiction over the Chapter 7 case and this adversary proceeding pursuant to *28 U.S.C. §§ 157* and *1334* and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding within the meaning of *28 U.S.C. §§ 157(b)(2)(A)*, *(B)*, *(E)*, *(F)* and *(H)*. Venue is proper in this district pursuant to *28 U.S.C. §§ 1408* and *1409*.

## LEGAL STANDARDS

### A. Summary Judgment

A court "shall" grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)* (made applicable in bankruptcy proceedings by *Fed. R. Bankr. P. 7056*). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Frost v. N.Y.C. Police Dep't, 980 F.3d 231, 242 (2d Cir. 2020)* (quoting *SCR Joint Venture 7 L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009)*). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether **[*12]** there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Id.* (quoting *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004)*); *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (the moving party bears the initial burden of identifying "the absence of a genuine issue of material fact").

"If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006)* (emphasis omitted) (quoting *Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)*). When adjudicating a summary judgment motion, the court "must be satisfied that the citation to evidence in the record supports the assertion" set forth in the statement of undisputed facts. *Vt. Teddy Bear, 373 F.3d at 244.* "And, of course, the court must determine whether the legal theory of the motion is sound." *Jackson v. Fed. Exp., 766 F.3d 189, 194 (2d Cir. 2014).*

"Narrowing issues . . . is one of the potential benefits of moving for early partial summary judgment." *Therabody, Inc. v. Tzumi Elecs. LLC, No. 21-CV-7803 (PGG) (RWL), 2022 U.S. Dist. LEXIS 215089, 2022 WL 17826747, at*

*13 (S.D.N.Y. Nov. 28, 2022), *report and recommendation adopted*, No. 21 CIV. 7803 (PGG) (RWL), 2023 U.S. Dist. LEXIS 177036, 2023 WL 6387231 (S.D.N.Y. Sept. 29, 2023) (citing *Luv n' Care, Ltd. v. Regent Baby Prods. Corp., No. 10-CV-9492, 2014 U.S. Dist. LEXIS 18645, 2014 WL 572524, at *1 (S.D.N.Y. Feb. 13, 2014)* (discussing "significant narrowing of the issues as a result of . . . the partial summary judgment ruling"); *Schanker & Hochberg, P.C. v. Berkley Assurance Co., 589 F. Supp. 3d 281, 297 (E.D.N.Y. 2022)* ("A district court may grant partial summary judgment to streamline the litigation **[*13]** process by narrowing the triable issues" (internal quotation marks omitted)).

## B. Declaratory Judgment Act

The *Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201 et seq.*, provides that a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," in a case meeting the DJA's requirements. *28 U.S.C. § 2201(a)*.

A bankruptcy court "is a 'Court of the United States' and has power to hear declaratory matters pursuant to *[DJA § 2201*]." *Katz v. Wagner (In re Metiom, Inc.), 2002 Bankr. LEXIS 2250, 2002 WL 433588, at *1 (S.D.N.Y. Feb. 25, 2002)*. More specifically, under the Declaratory Judgment Act, "the bankruptcy court has the power to issue declaratory judgments when the matter in controversy regards the administration of a pending bankruptcy estate." *Sears, Roebuck & Co. v. O'Brien, 178 F.3d 962, 964 (8th Cir. 1999)*.

The DJA serves "'a broad, remedial purpose and, therefore, should be construed liberally.'" *Metiom, 2002 Bankr. LEXIS 2250, 2002 WL 433588, at *2* (quoting *Akzona Inc. v. E.I. du Pont de Nemours & Co., 662 F. Supp. 603, 615 (D. Del. 1987)*); *see also Treemond Co. v. Schering Corp., 122 F.2d 702, 705 (3d Cir. 1941)* (rejecting a narrow interpretation of "case or controversy" in patent actions under the Declaratory Judgment Act); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 123 8 (4th ed. 2024) (noting that "[i]n order to effectuate the purpose of the [Declaratory Judgment] Act ... complaints should be construed liberally").

The Declaratory Judgment Act does not, however, itself confer subject matter jurisdiction. Rather, in enacting the Act, "Congress enlarged the range of remedies available in the federal **[*14]** courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petrol. Co., 339 U.S. 667, 671, 70 S. Ct. 876, 94 L. Ed. 1194 (1950)*. Consistent with that principle, the Second Circuit has explained that "[t]he Declaratory Judgement Act permits declaratory relief only in cases presenting 'actual controvers[ies],' *28 U.S.C. § 2201(a)*, a requirement that incorporates into the statute the case or controversy limitation on federal jurisdiction found in Article III of the Constitution." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians, 94 F.3d 747, 752 (2d Cir. 1996)*.

## C. Contract Interpretation Under New York Law

"Under New York law, the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996)* (internal quotations omitted). If the Court finds the contract ambiguous, the proper interpretation of the contract becomes a question of fact. *Id.* "It is axiomatic under New York law . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Attestor Cap. LLP v. Lehman Bros. Holdings (In re Lehman Bros. Holdings), 2019 U.S. Dist. LEXIS 139185, 2019 WL 3852445, at *10 (S.D.N.Y. Aug. 16, 2019)* (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011)* (internal quotation marks omitted)). "[S]pecific clauses of a contract are to be read consistently with the overall manifest purpose of the parties' agreement. Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms." *In re AMR Corp., 562 B.R. 20, 29 (Bankr. S.D.N.Y. 2016)* (quoting *Barrow v. Lawrence United Corp., 146 A.D.2d 15, 18, 538 N.Y.S.2d 363 (N.Y. 3d Dep't 1989)*).

Under New York law, "a contract that is complete, clear, and unambiguous on its face must be enforced **[*15]** according to the plain meaning of its terms." *Utica Mut. Ins. v. Fireman's Fund Ins., 957 F.3d 337, 344 (2d Cir. 2020)* (quoting *Glob. Reinsurance Corp. of Am. v. Century Indem. Co., 30 N.Y.3d 508, 69 N.Y.S.3d 207, 91 N.E.3d 1186, 1193 (N.Y. 2017)*). Moreover, "[w]hen the contract's language is clear and unambiguous, 'courts should not rewrite the term under the guise of interpretation' nor 'redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.'" *In re Wonderwork, Inc., 2021 Bankr. LEXIS 3157, 2021 WL 5343934, at \*6 (Bankr. S.D.N.Y. Nov. 16, 2021)* (quoting *In re Dynegy Inc., 486 B.R. 585, 590 (Bankr. S.D.N.Y 2013)*). "A contract is unambiguous where the contract's terms have a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Barclays Cap. Inc. v. Giddens (In re Lehman Bros. Holdings), 478 B.R. 570, 586 (S.D.N.Y. 2012)*, *aff'd sub nom. In re Lehman Bros. Holdings, 761 F.3d 303 (2d Cir. 2014)*, and *aff'd sub nom. In re Lehman Bros. Holdings, 590 F. App'x 92 (2d Cir. 2015)* (internal quotation marks and citations omitted). However, where "reasonable minds could differ about the meaning of contractual language, such language is ambiguous, . . . the court must turn to extrinsic evidence to determine the parties' intent." *In re Lehman Bros. Holdings, 2019 U.S. Dist. LEXIS 139185, 2019 WL 3852445, at \*10*, *aff'd 829 F. App'x. 567 (2d Cir. 2020)* (citing *In re Motors Liquidation Co., 500 B.R. 333, 340 (S.D.N.Y. 2013)*, *aff'd, 578 F. App'x 43 (2d Cir. 2014)*).

## DISCUSSION

### A. The MCA Agreements Are Disguised Loans

As to whether the MCA Agreements constitute loans under New York law, neither party argues that any of the contractual language here is ambiguous, and the Court agrees there is no material contractual ambiguity. *See* Def. Reply at 2 n.2; Def. Response at 15; Trustee Response ¶ 2; June 17 Hr. Tr. 11:23-12:11. The Court therefore will evaluate **[*16]** that language to classify the MCA Agreements as a matter of law. *See Fleetwood Servs., LLC v. Ram Cap. Funding, LLC, No. 20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at \*8-14 (S.D.N.Y. June 6, 2022)* (interpreting a contract as a matter of law to classify it as a loan under New York law); *In re Grand Union Co., 219 F. 353, 356-59 (2d Cir. 1914)* (same). In other words, whether the agreement gives rise to a loan or a sale is a question of law, and therefore, in the absence of any material factual dispute, can and must be resolved by the Court on summary judgment. *See Hi Bar Cap. LLC v. Parkway Dental Servs., LLC, No. 533245/2021, 2022 N.Y. Misc. LEXIS 5814, 2022 WL 3757589, at \*3, 2022 NY Slip Op 32934[U] [N.Y. Sup. Ct. Aug. 25, 2022]* (observing that "[r]ecently, Federal courts have engaged in a more thorough and exacting scrutiny of merchant cash advance agreements, looking at the agreements in a holistic and comprehensive manner, and the conclusions they have reached are compelling.").

"The hallmark of a loan is that the lender 'is absolutely entitled to repayment under all circumstances,' or put otherwise, the 'principal sum' 'is repayable absolutely.'" *Fleetwood, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at \*9* (quoting *LG Funding, LLC v. United Senior Props. of Olathe, LLC, 181 A.D.3d 664, 666, 122 N.Y.S.3d 309 (N.Y. 2d Dep't 2020)*). "Under New York law, which governs the Agreement[s], 'substance—not form—controls' when a court determines whether a transaction is a loan." *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC, No. 22-1885-cv, 2023 U.S. App. LEXIS 14241, 2023 WL 3882697, at \*2 (2d Cir. June 8, 2023)* (quoting *Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612, 621-22 (N.Y. 2021)*). "New York courts usually weigh three factors in making that determination: '(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse **[*17]** should the merchant declare bankruptcy.'" *Id.* (quoting *Principis Cap., LLC v. I Do, Inc., 201 A.D.3d 752, 754, 160 N.Y.S.3d 325 (N.Y. 2d Dep't 2022)*). In assessing the first two of these factors, courts examine whether the merchant could practicably invoke the reconciliation provision, *see Fleetwood, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at \*13* ("The Fleetwood Agreement nominally has a reconciliation provision . . . But that provision functions in such a way that renders it largely illusory."), and whether, even if the agreement purports to have no maturity date, it has a "de facto fixed term," *Lateral Recovery LLC v. Queen Funding, LLC, No. 21 Civ. 9607 (LGS), 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at \*6 (S.D.N.Y. July 20, 2022)*.

More broadly, "[t]he 'three factors provide only a guide' to the analysis; 'they do not dictate the conclusion.'" *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC, 632 F. Supp. 3d 402, 452 (S.D.N.Y. 2022)* (quoting *Fleetwood, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *9*). In addition to the three *LG Funding* factors, courts have considered generally whether the agreement bears the characteristics of a true sale of receivables. *See id. at 453*. Among the considerations that different courts have found relevant are whether the agreement identifies the specific accounts purportedly sold and grants the purchaser the attendant rights to possess, use, or transfer those accounts; which party bears responsibility for collecting the receivables; and the extent to which the merchant's failure to make scheduled payments constitutes a default under the agreement. *Fleetwood, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *10-11*. Courts have also considered whether the contractual **[*18]** daily remittance amount appears to reflect a good-faith estimate of the merchant's anticipated revenues. *Davis v. Richmond Cap. Grp., LLC, 194 A.D.3d 516, 517, 150 N.Y.S.3d 2 (N.Y. 1st Dep't 2021)*. As the Second Circuit has explained, "[t]he root of all of these factors is the transfer of risk. Where the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Endico Potatoes Inc. v. CIT Group/Factoring Inc., 67 F.3d 1063, 1069 (2d Cir. 1995)* (emphasis in original).

The Defendants argue that the *LG Funding* factors require an examination of "'the real character' of the transaction and its 'substance' over 'form,'" including by using extrinsic evidence to demonstrate how the contracts were performed. Def. Reply at 5 (quoting *LG Funding, 181 A.D.3d at 665*). *LG Funding* indeed states that a usurious loan "must be 'considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it.'" *LG Funding, 181 A.D.3d at 665* (quoting *Abir v. Malky, Inc., 59 A.D.3d 646, 649, 873 N.Y.S.2d 350 (N.Y. 2d Dep't 2009)*). But nowhere does *LG Funding* state that a court should consider extrinsic evidence when examining an unambiguous contract through the parties' course of dealing and contractual performance. The other case cited by the Defendants for this proposition **[*19]** clearly reaffirms the principles of contract interpretation under New York law discussed *supra*, stating that "[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide." *Kelly, Grossman & Flanagan, LLP v. Quick Cash, Inc., 35 Misc. 3d 1205[A], 950 N.Y.S.2d 723, 2012 WL 1087341, at *4, 2012 NY Slip Op 50560[U] [N.Y. Sup. Ct. 2012]*. Therefore, there is no need for the Court to use extrinsic or parol evidence to interpret contracts which it and the parties view as unambiguous. The Court nevertheless will comment at times on the extrinsic evidence advanced by Defendants, none of which, in the Court's view, alters the conclusion that flows from an assessment of the governing contract itself.

By way of overview and as detailed in succeeding paragraphs, the MCA Agreements are well drafted attempts to characterize high-return financing as asset sales, at least in part because the rate of return under the agreements almost surely would violate New York usury law if the agreements were loans. But the MCA Agreements in substance reflect loans, which is a question of law for the Court given the absence of contractual ambiguity or other material fact disputes. *See Greenwich Retail Grp. LLC v. Moby Cap., LLC (In re Greenwich Retail Grp. LLC), 677 B.R. 473, 496-97 (Bankr. S.D.N.Y. 2026)* (citing *Hi Bar Cap., 2022 N.Y. Misc. LEXIS 5814, 2022 WL 3757589, at *3, 2022 NY Slip Op 32934[U]*). This is so largely because the contract required a daily payment no matter what, unless Capital **[*20]** Stack in its discretion allowed a change in the daily payment amount; any such revision was to be prospective, not retrospective, which is inconsistent with the idea that Capital Stack was purchasing some share of Kossoff PLLC's receivables or receipts; the daily payment amount that could only be changed if Capital Stack said so resulted in a *de facto* defined repayment period (of 189 days); Capital Stack had sweeping remedies for defaults, including an acceleration provision making immediately due and enforceable against any Kossoff PLLC assets the entire amount due under the agreement; and the provision that might most support Capital Stack's position concerning Capital Stack bearing the risk of nonpayment due to a bankruptcy filing or cessation of business operations was not as potent as Capital Stack contends, and is insufficient to outweigh the other considerations pointing in the Trustee's favor. *See* discussion below, *infra*.

**a. The MCA Agreements' Reconciliation Provisions Are Not Mandatory**

The first factor under the commonly applied three-part test is whether the MCA Agreements contain a genuine reconciliation provision. *See LG Funding, 181 A.D.3d at 666*. Reflecting the logical view that true sales of receivables [*21] should involve payment amounts that change to track receivables that are actually realized, a true reconciliation provision requires a mechanism by which the remittance amount is adjusted to reflect the merchant's actual receivables and obligates the MCA funder to account for amounts collected in excess of the agreed percentage of receivables. *See O'Toole v. Radium2 Cap., LLC (In re J.P.R. Mech. Inc.), 2025 Bankr. LEXIS 1319, 2025 WL 1550541 at *7 (Bankr. S.D.N.Y. May 29, 2025)*. Such a provision supports characterization of a transaction as a true sale because it demonstrates that the purchaser, rather than the merchant, bears the risk that receivables will underperform. *See Fleetwood Servs, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *9*. Conversely, where a purported reconciliation provision does not bind the funder to reconcile or refund overcollections, courts have found the provision to be illusory, a factor weighing in favor of recharacterization as a loan. *See J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at *7*; *Greenwich Retail Grp. LLC v. Moby Cap., LLC (In re Greenwich Retail Grp. LLC), 677 B.R. 473, 499-500 (Bankr. S.D.N.Y. 2026)*.

The MCA Agreements contain the following reconciliation provision:

> **[Debtor] May Request Changes to the Daily Amount**: The initial Daily Amount is intended to represent the Specified Percentage of [Debtor's] daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, [Debtor] may request that [Capital Stack] adjust the Daily Amount to more closely reflect the [Debtor's] actual [*22] Future Receipts times the Specified Percentage. [Debtor] agrees to provide [Capital Stack] any information requested by [Capital Stack] to assist in this reconciliation. No more often than once a month, [Capital Stack] *may adjust* the Daily Amount on a going-forward basis to more closely reflect the [Debtor's] actual Future Receipts times the Specified Percentage. [Capital Stack] will give [Debtor] notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

MCAA No. 2 ¶ 2 (emphasis added).

This reconciliation provision is illusory, not genuine, for at least two significant reasons. First, it left Capital Stack with complete discretion whether it would accept a reduction in the contractually required payment amount no matter how much Debtor's revenues or receivables decreased. Although the provision permits the Debtor to request an adjustment to the Daily Amount once per month, it imposes no corresponding obligation on Capital Stack to grant such a request. *See* MCAA No. 2 ¶ 2. Rather, the agreement provides only that Capital Stack "*may adjust*" the Daily [*23] Amount. The use of permissive language leaves reconciliation entirely within Capital Stack's discretion and creates no enforceable right to an adjustment. Courts analyzing similar language have consistently concluded that such provisions do not constitute meaningful reconciliation mechanisms because they impose no affirmative obligation on the funder. *See In re Ram Distribution Group, LLC, 2022 Bankr. LEXIS 48, 2022 WL 587891, at *7 (Bankr. E.D.N.Y. Feb. 25, 2022)*, *aff'd Ram Distrib. Group, LLC v. Joseph Gunnar & Co., LLC, 2023 U.S. Dist. LEXIS 175799, 2023 WL 6385728 (E.D.N.Y. Sept. 29, 2023)*; *Lateral Recovery, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *5*; *J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at *7*. By contrast, courts have found reconciliation provisions genuine and not illusory where reconciliation is "automatic, mandatory," and not subject to the funder's discretion. *Power Up Lending Group, Ltd. v. Cardinal Energy Group, Inc., 2019 U.S. Dist. LEXIS 57527, 2019 WL 1473090, at *5 (E.D.N.Y. Apr. 3, 2019)*; *see also Retail Capital, LLC v. Spice Intentions Inc., 2016 N.Y. Misc. LEXIS 4883, 2017 WL 123374 at *2, 2016 NY Slip Op 32614[U] [N.Y. Sup. Ct. Jan. 3, 2017]* (not a loan when "[t]he agreement provided a reconciliation on demand provision whereby the parties [were each] permitted to demand the monthly reconciliation of funds from the other to ensure that neither entity collected more or less of the sales proceeds than they were contractually entitled to collect from the designated bank account.").

Second, any adjustment under the "Reconciliation" provision operates solely on a going-forward basis. Nothing in the MCA Agreements requires Capital Stack to remit back to the Debtor amounts previously collected to conform with changes that have occurred in the amount of Kossoff PLLC's receivables. [*24] As this Court explained in *J.P.R. Mechanical*, a reconciliation provision is deficient where "the merchant could request a modification only once per month, and only on a going-forward basis," and where "[n]othing in the Agreements requires the

Defendant to remit back to the Debtors any amounts by which the Debtors have been overcharged during any given month." *J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at \*7*. The same is true here. Because the MCA Agreements provide no mechanism requiring repayment where Kossoff PLLC's revenues make the daily payment amount excessive, they fail to ensure that Capital Stack would receive only the percentage of receivables it purportedly purchased.

Defendants point out that a prior SDNY District Court decision examined what they say was an essentially identical provision in a case that also involved Capital Stack, and concluded that the presence of the reconciliation provision substantially satisfied the first merchant cash advance agreement factor under New York law. *See* Def. Mot. at 13 (citing *Womack v. Cap. Stack, LLC, No. 1:18-CV-04192 (ALC), 2019 U.S. Dist. LEXIS 148644, 2019 WL 4142740, at \*5 (S.D.N.Y. Aug. 30, 2019)*).[2] But, as the presence of the reconciliation provision in the agreement at issue was not in dispute and its functioning appeared not to be questioned in the case, beyond noting the presence of a "reconciliation **[\*25]** provision," the district court conducted little substantive analysis into the "true character" of the provision, *see Womack, 2019 U.S. Dist. LEXIS 148644, 2019 WL 4142740, at \*5*. The parties' arguments here call for closer scrutiny given the instruction of New York law to characterize whether an agreement establishes a loan or a sale according to the agreement's substance, "rather than by the form it purports to take or by the names, labels or characterizations that the parties have elected to apply to it." *Greenwich Retail, 677 B.R. at 496* (citing *Adar Bays, 37 N.Y.3d at 334* ("[w]hen determining whether a transaction is a loan, substance — not form — controls"); *Fleetwood, 2023 U.S. App. LEXIS 14241, 2023 WL 3882697, at \*2* ("Under New York law . . . 'substance—not form—controls' when a court determines whether a transaction is a loan.") (citations omitted); *LG Funding, 181 A.D.3d at 665*; *Abir, 59 A.D.3d at 649*; *Hall v. Eagle Ins. Co., 151 A.D. 815, 826, 136 N.Y.S. 774 (N.Y. 1st Dep't 1912)*, aff'd, 211 N.Y. 507, 105 N.E. 1085 (N.Y. 1914)). Further, case law that post-dates *Womack* re-emphasizes the need to closely consider the substance of an agreement, suggesting that the mere existence of some form of "reconciliation" provision does not satisfy New York law as it has evolved. *See Greenwich Retail, 677 B.R. at 496*.

Defendants also contend that their position is favored by the undisputed factual assertion that reconciliation requests were in fact honored on several occasions during the parties' course of dealing. *See* Def. Mot. At 13-14. Whatever the **[\*26]** permissibility of looking to extrinsic evidence in assessing the workings of the contract, that argument is unpersuasive. The relevant inquiry is whether the MCA Agreements themselves obligated Capital Stack to perform a reconciliation and to return excess collections, not whether Capital Stack occasionally elected (in the exercise of its contractually exclusive discretion) to do so. *See Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F. Supp. 3d 237, 248-49 (S.D.N.Y. 2022)* (holding that a reconciliation provision may be illusory where its structure leaves the funder with substantial discretion to prevent adjustment). Any lender could voluntarily agree to reduce or modify repayment terms, and the fact that Capital Stack occasionally did so does not fundamentally alter the nature of the agreement.

Accordingly, the Court finds that the reconciliation provision did not meaningfully shift collection risk to Capital Stack. Because the provision neither required Capital Stack to honor reconciliation requests nor obligated it to return amounts collected in excess of an agreed quantum of supposedly purchased receivables, the contracts' reconciliation provisions are illusory as that characterization and its implications are discussed in *J.P.R. Mechanical*, *Haymount*, and *Greenwich Retail* **[\*27]** . *See J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at \*7*; *Haymount, 609 F. Supp. 3d at 248-49*; *Greenwich Retail, 677 B.R. at 498*. The first factor therefore weighs in favor of concluding that the MCA Agreements are loans rather than true sales of receivables.

### b. The MCA Agreements Contain *De Facto* Finite Terms

The second factor under the *LG Funding* framework considers whether the agreement contains a finite term. *See LG Funding, 181 A.D.3d at 666.* A true purchase of future receivables ordinarily has no maturity date because the

---

[2] Defendants include two purported quotes from the *Womack* opinion, but the Court is unable to find them in the text of the opinion. *See* Def. Mot. at 13.

timing of payments to the funder depends entirely upon the generation of future receivables and, therefore, cannot be predicted with certainty. *See K9 Bytes, Inc. v. Arch Capital Funding, LLC, 56 Misc. 3d 807, 817-18, 57 N.Y.S.3d 625 (N.Y. Sup. Ct. 2017)*. By contrast, a finite repayment period is characteristic of a loan. *See Lateral Recovery, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *6*.

The MCA Agreements contain no express maturity date and state that "there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer." MCAA No. 2 ¶ 4. Standing alone, however, the absence of an express maturity date is not dispositive. As another Bankruptcy Judge in this district recently explained, "the existence of a fixed repayment term is a factor that suggests that a 'sale' is really a loan, but that does not mean that the opposite is always true." *Greenwich Retail, 677 B.R. at 505*. Rather, the Court must examine the substance of the parties' obligations to determine **[*28]** whether the agreements impose a *de facto* finite term. *See Lateral Recovery, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *6*; *J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at *8*.

Here, the MCA Agreements required the Debtor to make fixed daily ACH remittances and further provided that the failure to make more than four daily payments within any month without advance notice constituted an event of default. *See* MCAA No. 2 ¶ 15(f). As in *Lateral Recovery*, although the agreements do not specify an express maturity date, the required periodic payments permit the anticipated duration of the agreements to be readily calculated by dividing the purchased amount by the daily remittance amount. *See Lateral Recovery, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *6*. Thus, the MCA Agreements function as instruments requiring repayment over a calculable period rather than open-ended purchases of future receivables. See *J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at *8*.

Defendants argue that the MCA Agreements nevertheless lacked a finite term because the reconciliation provision rendered the daily remittance amount variable. *See* Def. Mot. at 15. That might be true if there were a genuine reconciliation provision, but, as discussed above, any change in daily payment amounts would only occur if Capital Stack agreed, and any such change would operate only prospectively, rather than by retrospectively making adjustments to account **[*29]** for any past shortfalls in receipts by Kossoff PLLC. For reasons also just discussed, these flaws in Defendants' argument are not overcome by their invocation of expert testimony and evidence concerning the parties' course of performance, including instances in which Capital Stack voluntarily reduced the Debtor's remittance amounts and testimony from Defendants' expert that those adjustments extended the duration of certain MCA Agreements. *See id.* at 16; Def. Response at 11-12. Finally on this point, the insufficiency of Defendants' arguments is not overcome by their observation that this Court considered extrinsic evidence in *J.P.R. Mechanical* when it cited deposition testimony from the funder's principal admitting that those agreements had *de facto* fixed terms. June 17 Hr. Tr. 48:18-49:2. That concession was a potent additional consideration in *J.P.R. Mechanical*, *see 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at *8*, but its absence here does not alter the fundamental nature of the parties' relationship.

Because the Court finds the proffered course-of-conduct evidence unpersuasive, the Court need not decide (but acknowledges) the Trustee's contention that the Court cannot consider that evidence because the governing contract is **[*30]** unambiguous. It is true that, under New York law, whether a contract is ambiguous is a question of law for the Court to decide. *Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569-70, 780 N.E.2d 166, 750 N.Y.S.2d 565 (N.Y. 2002)*. If the contract is unambiguous, extrinsic evidence may not be considered. *See R/S Assocs. v. N.Y. Job Dev. Auth., 98 N.Y.2d 29, 33, 771 N.E.2d 240, 744 N.Y.S.2d 358 (N.Y. 2002)*. Here, the parties do not contend that the relevant contractual provisions are ambiguous and the Court perceives no ambiguity in the MCA Agreements' terms, so there is a reasonable argument that the Court should not even consider such conduct. *See id.*; *Greenfield, 98 N.Y.2d at 569* (citing *WWW Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 565 N.Y.S.2d 440 (N.Y. 1990)*). But here even setting this cautionary case law to the side, the proffered course-of-conduct evidence does not alter the outcome.

Rather, and as discussed *supra*, the reconciliation provision itself does not obligate Capital Stack to adjust the Daily Amount or refund prior overcollections, and even any modification that Capital Stack voluntarily accepted would operate only prospectively. The reconciliation provision thus does not alter the otherwise fixed payment structure

established by the MCA Agreements; it simply and in substance gives Capital Stack the option but no obligation to reduce future payment amounts while elongating the repayment schedule.

Accordingly, although the MCA Agreements contain no stated maturity **[*31]** date, they establish *de facto* finite terms through mandatory daily remittances. Consistent with *Lateral Recovery*, *J.P.R. Mechanical*, and *Greenwich Retail*, the second *LG Funding* factor therefore weighs in favor of concluding that the MCA Agreements are loans rather than true sales of future receivables.

**c. The MCA Agreements Did Not Meaningfully Limit Capital Stack's Recourse in the Event of Bankruptcy**

The third *LG Funding* factor examines whether the agreement meaningfully limits the funder's recourse in the event the merchant files bankruptcy. *See LG Funding, 181 A.D.3d at 666*; *J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at *8*. Although a true purchaser of receivables assumes the risk that the purchased receivables will never be collected, an agreement that affords the funder broad contractual remedies against the merchant, its principals, or its assets upon default reflects continuing recourse more characteristic of a secured lending transaction than a sale of receivables. *See Endico Potatoes, 67 F.3d at 1069*; *Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *9, *12-13*.

The MCA Agreements provide in part: "if the full Purchase Amount is never remitted because Seller's business went bankrupt[]or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach or **[*32]** default under this Agreement." MCAA No. 2 ¶ 4. Defendants contend that this provision conclusively establishes that they assumed the risk of the Debtor's bankruptcy. *See* Def. Mot. At 16-18. The Court disagrees.

As this Court explained in *J.P.R. Mechanical*, and as Judge Wiles recently reiterated in *Greenwich Retail*, the analysis does not end with the inclusion of a bankruptcy carve-out. Rather, the Court must examine the agreement as a whole to determine whether the purported limitation on recourse is meaningful in light of the agreement's remaining provisions. *See J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at *8*; *Greenwich Retail, 677 B.R. at 495-500*. A theoretical limitation on recourse does not suffice where other provisions effectively restore the funder's ability to obtain repayment notwithstanding the merchant's insolvency. *See id. at 500-05*. Further, the impact of any bankruptcy "carve-out" must be assessed in light of the MCA Agreement overall, and the extent to which the overall agreement does or does not suggest the existence of an asset sale, as opposed to a loan.

Several considerations here limit the extent to which the bankruptcy-specific provision supports Capital Stack. First, a close reading of the agreement reveals that the mere filing of a bankruptcy does not eliminate **[*33]** Kossoff PLLC's payment obligation. Rather, the agreement states that Capital Stack will be owed nothing if "the full Payment Amount is never remitted because of" a bankruptcy or cessation of business. MCAA No. 2 ¶ 4. That language does not foreclose an argument that any future proceeds of Kossoff PLLC had already been sold and/or remained due and owing, notwithstanding the filing of a bankruptcy. Thus, it is possible that the provision by its own plain terms simply means that Capital Stack's collection entitlement would end if Kossoff PLLC went fully out of business, whether due to a bankruptcy or otherwise. It is true that the MCA Agreement specifies that Capital Stack "assumes these risks," but what that risk is is not as sweeping as Capital Stack suggests.

Moreover, because the bankruptcy-specific provision excuses further repayment only where "Seller has not breached this Agreement," the practical likelihood is that a bankruptcy would be preceded by a breach of the MCA Agreement, especially because all the MCA Agreement requires is a "breach" - not even a "material" breach — much less an actual assertion by Capital Stack that an event of default had occurred. Among the MCA Agreement's **[*34]** requirements are a representation that Seller (meaning Kossoff PLLC) "is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection" (very possibly false as to insolvency, given reports of Mr. Kossoff's secret diversion of assets, seemingly over a period of years); that Seller "does not anticipate filing a bankruptcy petition, and does not anticipate that an involuntary petition will be filed against it" (same); that Seller has not "consulted with a bankruptcy attorney within six months"; that Seller "has no current plans to close its business" and that it "will not voluntarily close its business"; and that "Seller will notify Buyer

immediately if there are material adverse changes . . . in the condition or operation of Seller" (almost surely breached before the involuntary petition date given the firm's insolvency even if representations of solvency were true when made). *See* MCAA No. 2 ¶¶ 13.3, 13.7. Further, the MCA Agreements recite numerous events of default, including any violation by Seller of "any term or covenant in this Agreement," *see id.* ¶ 15(b); interference with Capital Stack's collection rights, *see id.* ¶ 15(a); changes to the Debtor's **[*35]** banking arrangements, *see id.* ¶ 15(d); and repeated unsuccessful ACH withdrawals about which Seller had not provided timely notice, *see id.* ¶ 15(f).

Upon the occurrence of an event of default, the MCA Agreements permit Capital Stack to accelerate the entire unpaid Purchased Amount, *see id.* ¶ 16.1; debit the Debtor's accounts for the full purchased amount, *see id.* ¶ 16.5; enforce a sweeping security interest in substantially all of the Debtor's assets, *see id.* ¶ 16.7; proceed against Mitchell Kossoff under a personal guaranty, *see id.* ¶ 16.2; and enforce a confession of judgment and other collection remedies, *see id.* ¶¶ 16.3, 5(v). These draconian remedies are entirely consistent with secured lenders' rights, and flatly incompatible with the notion that Capital Stack merely was acquiring a share of Kossoff PLLC's ongoing receipts or revenues. Rather, as courts have repeatedly concluded, such remedies provide recourse well beyond the purportedly purchased receivables and therefore weigh in favor of characterizing the transaction as a loan. *See LG Funding, 181 A.D.3d at 666*; *Fleetwood, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at \*12-13*; *Greenwich Retail, 677 B.R. at 503-04*. As observed in *J.P.R. Mechanical*, where broad default provisions would almost inevitably be implicated by (and often before) a bankruptcy **[*36]** filing, a contractual bankruptcy carve-out provides only a theoretical limitation on recourse and does not conclusively alter the substance of the parties' relationship. *J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at \*8*.

The Court does not entirely discount the existence of the Agreement's bankruptcy-specific provision. An express disavowal of a right to repayment in any circumstance, and/or a provision that would render a guarantor not responsible, is not typical of loan agreements. But given the high likelihood that the carve-out would never be triggered given the high likelihood that any bankruptcy would be preceded by a default, at least by Kossoff PLLC having become insolvent, the significance of this possibility is limited and greatly outweighed by strong indications that the agreement, in substance, was a loan. Key indicators include the absence of a meaningful or reliable reconciliation provision, the existence of a *de facto* repayment period, and the presence of provisions that would require immediate repayment of the full amount owed upon highly probable triggers including any event of default, which in turn included any breach of the agreement, as well as creating enforceable security interests against any and all Kossoff **[*37]** PLLC assets, not merely the purportedly purchased revenue stream. Taken as a whole, the circumstances point to the existence of a loan and not an asset purchase; it cannot be said, as the Second Circuit characterized the animating principle, that "[w]here the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Endico Potatoes, 67 F.3d at 1069* (emphasis in original); *see also J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at \*7* (relevant inquiry is not whether an agreement contains language referencing bankruptcy, but whether the agreement, viewed as a whole, genuinely transfers the risk that the purchaser will not be repaid if the merchant's business fails) (citing *Endico Potatoes*).

Defendants nevertheless argue that their post-petition decision not to file a proof of claim or notice potential defaults demonstrates that they, in fact, bore the risk of the Debtor's business failure and therefore acted consistently as purchasers of receivables rather than as lenders. *See* Def. Mot. at 16-18; June 17 Hr. Tr. 63:22-24. In support, they point to language in this Court's *J.P.R. Mechanical* **[*38]** opinion that the MCA funder's decision to file a proof of claim was a "virtually dispositive undisputed fact" for the proposition that it was a "creditor" with a "claim" against the debtors there. *See* Def. Response at 17-18 (citing *J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at \*9*); *see also* June 17 Hr. Tr. 44:20-22. But, again setting aside the likely impropriety of considering extrinsic evidence when the controlling contract is unambiguous, Capital Stack's decision not to file a proof of claim once the bankruptcy case began, while strategically necessary, does nothing to alter the nature of the agreement or of the parties' relationship. And the fact that *J.P.R. Mechanical* featured a glaringly obvious lender-like act on the part of the financing party does not mean that the absence of such an act here saves the day for Capital Stack. *See J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at \*9*. Rather, at risk of repetition, the relevant inquiry under

*LG Funding* is the nature of the contractual rights created at the time the MCA Agreements were executed, *181 A.D.3d at 666*, not whether a party later elected to exercise every remedy available to it. Indeed, accepting Defendants' position would permit the legal characterization of an otherwise unambiguous contract to turn on unilateral litigation strategy rather **[*39]** than the contractual rights actually granted. New York contract law does not permit that result.

The above close reading establishing the unlikelihood that the bankruptcy-based debt forgiveness implication would ever be implicated further distinguishes *Womack*, even though that decision concerned another, reportedly substantially similar Capital Stack contract. For whatever reason, likely flowing from the arguments there advanced (and not advanced), *Womack* did not identify or grapple with the high likelihood that a breach and thus an event of default would precede any bankruptcy, nor with the possibility that a bankruptcy would not extinguish payment obligations, which, along with all the other features discussed above, caused *Womack* to overvalue the significance and effectiveness of the agreement's bankruptcy-specific language, while under-weighing other features such as the acceleration clause, security interest, personal guaranty by Mr. Kossoff, confession of judgment, and other collection remedies. *See Womack, 2019 U.S. Dist. LEXIS 148644, 2019 WL 4142740, at \*6-7*. As Judge Wiles explained in *Greenwich Retail*,

> Courts that adopt a mechanical focus on the existence of an "absolute" right to repayment (which is only part of the definition set forth **[*40]** in [*Rubenstein v. Small, 273 A.D. 102, 75 N.Y.S.2d 483 (N.Y. 1st Dep't 1947)]*, and/or that focus mechanically on the existence of theoretical "contingencies" without assessing both the nature of those contingencies and whether those contingencies are substantial and realistic, are focused on form rather than substance, which is the opposite of what the New York Court of Appeals has commanded that courts do in applying the usury laws.

*Greenwich Retail, 677 B.R. at 499*.

Viewed as a whole, the MCA Agreements afforded Capital Stack extensive contractual remedies extending well beyond the collection of future receivables. The bankruptcy carve-out, when read together with the agreements' broad default provisions and remedial rights, provided at most a narrowly circumscribed limitation on recourse. As in *J.P.R. Mechanical* and *Greenwich Retail*, the third *LG Funding* factor therefore weighs in favor of concluding that the transactions are loans rather than true sales of receivables. And even if this were not so, the impact of such a limited provision is slight enough to be greatly outweighed by the absence of a meaningful reconciliation provision and the existence of a *de facto* repayment schedule. *See Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at \*9* ("The three factors provide only a guide to analysis. They do not dictate the conclusion, and a court need **[*41]** not find the presence of all three factors in concluding that a transaction is a loan."). As discussed in the ensuing section, this conclusion is reinforced by other features of the agreement that are consistent only with the presence of a loan, not a true asset sale.

## B. The MCA Agreements Lack the Features of True Sales

Beyond the three *LG Funding* factors, the Court also considers whether the MCA Agreements contain the attributes one would expect to find in a true sale of accounts receivable. *See J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at \*7-9*; *Greenwich Retail, 677 B.R. at 502-03*. Those attributes are absent here.

First, the MCA Agreements do not identify any specific accounts receivable being sold, *see* MCAA No. 2 at 1 (giving Capital Stack rights in "the proceeds of each future sale" Debtor made "in the ordinary course of [its] business"), but instead purport to transfer only a percentage of the proceeds of the Debtor's anticipated future sales. *See id.* ¶ 4 ("[Capital Stack] is buying the Purchased Amount of Future Receipts knowing the risks that [Debtor's] business may slow down or fail, and [Capital Stack] assumes these risks based on [Debtor's] representations, warranties and covenants in this Agreement."). Capital Stack acquired no identifiable accounts that it could possess, **[*42]** assign, or collect upon in its own right, and thus the MCA Agreements do not transfer to Capital Stack the collection risk attendant to ownership of receivables. *See Fleetwood, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207 at \*11*;

*Haymount, 609 F. Supp. 3d at 247*; *Greenwich Retail, 677 B.R. at 502*. Again, as the Second Circuit has explained, "[t]he root of [the analysis] is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Endico Potatoes, 67 F.3d at 1069*. But "where economic analysis reveals that 'the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay],' then there has not been a bona fide purchase of receivables and the transaction is, in substance, a loan." *Haymount, 609 F. Supp. 3d at 247* (quoting *Endico Potatoes, 67 F.3d at 1069*; citing *Adar Bays, 37 N.Y.3d at 334* ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders.")). Here, as discussed *supra*, the numerous contractual remedies afforded to Capital Stack in the **[*43]** MCA Agreements ensure that it only bore the risk that the Debtor would be unable to meet its payment obligations, *i.e.*, a credit risk, rather than "the risks of nonpayment associated with any particular receivable," *i.e.*, a collection risk. *Greenwich Retail, 677 B.R. at 502*. Capital Stack's entitlement to fixed daily ACH withdrawals from the Debtor's operating account without retroactive adjustments for excessive transfers, *see* MCAA No. 2 ¶¶ 1, 5(ii), does not evidence a transfer of collection risk from the Debtor to Capital Stack. The Debtor remained on the hook regardless of the performance of its account debtors, discussed *infra*. *See Greenwich Retail, 677 B.R. at 498-99*; *J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at *9*.

In his papers and at the June 17 hearing, the Trustee argued that a purported sale of future receivables is a "legal impossibility" because the proceeds of Debtor's future sales cannot be transferred until they come into existence, *i.e.*, until Capital Stack's right to payments arises. *See* Trustee Reply ¶¶ 19-22 (citing *M Design Vill. v. Versant Funding LLC (In re M Design Vill.), No. 24-21406 (MEH), 2025 Bankr. LEXIS 1778, 2025 WL 2088887, at *6 (Bankr. D.N.J. July 24, 2025)*; Trustee Response ¶ 45 n.9; June 17 Hr. Tr. 31:10-32:15. At the June 17 hearing, Defendants pointed out numerous examples of contracts for the sale of goods that do not yet exist. *See id.* 74:9-75:18 (citing, *e.g.*, *N.Y. U.C.C. 2-105*). Even the prior cases holding that a merchant cash **[*44]** advance was a loan rather than a sale have not relied on the Trustee's legal impossibility theory, but, because the Court has already concluded *supra* that the transfers at issue do not sufficiently shift the collection risk onto the Defendants, it need not delve into that question here.

A second attribute pointing to the agreement not reflecting a true sale is that Capital Stack possessed no right or obligation to collect directly from the Debtor's customers absent a default. *See* MCAA No. 2 ¶ 5(ii). As this Court observed in *J.P.R. Mechanical*, the absence of provisions empowering the purchaser to collect directly from account debtors is inconsistent with a true asset purchase because it leaves the merchant—not the purported purchaser—bearing the risk that particular customers will fail to pay. *See J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at *9*; *see also Fleetwood, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *12*; *Greenwich Retail, 677 B.R. at 502*.

Third, the stated "Daily Amounts" paid from the Debtor to Capital Stack were not tied to the projected or actual amount of Kossoff PLLC's receipts, *see* MCAA Nos. 2 & 4 at 1, and, coupled with the illusory reconciliation provision discussed *supra*, the MCA Agreements contained no meaningful mechanism to ensure that Capital Stack shared in either the upside or downside of the performance **[*45]** of the underlying receivables. *See Fleetwood, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *10-11*; *Greenwich Retail, 677 B.R. at 503*.

These characteristics reinforce the conclusion that the MCA Agreements allocated to Capital Stack only the ordinary credit risk that accompanies any financing transaction, rather than the market or collection risk associated with ownership of accounts receivable. *See Haymount, 609 F. Supp. 3d at 247*; *J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at *9*.

Defendants nevertheless argue that the MCA Agreements should be treated as true sales based upon the parties' expressed intent, *e.g.*, language titling each MCA Agreement "Sale of Future Receipts (THIS IS NOT A LOAN)", the testimony of their expert, and evidence concerning the parties' course of performance. *See* Def. Mot. at 18-19. This self-serving contractual language is one of form, not substance, and so cannot carry the day in the face of the MCA

Agreements' clear economic substance. Nor can purported expert testimony or contentions about the parties' conduct change the outcome. Under New York law, where, as here, the contract language is unambiguous, the Court's task is to determine the legal effect of the MCA Agreements from the language the parties chose, viewed in light of the economic substance of the transaction, not through extrinsic evidence offered to recast that language **[\*46]** or characterize its legal effect. *See Greenwich Retail, 677 B.R. at 495-500* (applying New York's substance-over-form analysis to MCA agreements); *J.P.R. Mech., 2025 Bankr. LEXIS 1319, 2025 WL 1550541, at \*4-9* (same). Accordingly, the Court is not to rely upon evidence such as proffered expert testimony opining that the MCA Agreements possess the "hallmarks" of true sales, nor upon evidence regarding the parties' subjective understanding (none of which was offered here) or subsequent performance. Such evidence cannot alter the legal character of an unambiguous agreement or overcome the Court's independent obligation to examine the substance of the transaction rather than the labels affixed by the parties. *See Haymount, 609 F. Supp. 3d at 246-48*; *Fleetwood, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at \*8-12*; *Rowan Advance Grp. LLC v. DraftPros, LLC, 87 Misc. 3d 1215[A], 240 N.Y.S.3d 704, 2025 WL 2858612 at \*3, 2025 NY Slip Op 51581[U] [N.Y. Sup. Ct. 2025]* (discarding language stating "THIS IS NOT A LOAN" in a sale of future receipts agreement as "self-serving") (citing *LG Funding, 181 AD3d at 666*); *People by James v. Richmond Cap. Grp. LLC, 80 Misc. 3d 1213[A], 195 N.Y.S.3d 637, 2023 WL 6053768 at \*4 n.4, 2023 NY Slip Op 50975[U] [N.Y. Cnty. Sup. 2023]*, *aff'd*, *246 A.D.3d 585, 253 N.Y.S.3d 31 (2026)*). Moreover, as discussed above, even if considered, the proposed extrinsic evidence advanced here does not overcome the MCA Agreements' substance, which shows that those agreements effectuated loans, not sales.

For these reasons, the MCA Agreements lack the characteristics of a true sale of receivables and instead reflect financing arrangements structured as loans under New York law.

## C. The Trustee Timely Brought His Claims Within the Applicable [\*47] Statute of Limitations Period

*Section 544(b)(1) of the Bankruptcy Code* gives the trustee the power to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." *11 U.S.C. § 544(b)(1)*. Such applicable law includes state statutes and other nonbankruptcy law. *See, e.g.*, *In re Fitzpatrick Container Co., 670 B.R. 425, 440 (Bankr. E.D. Pa. 2025)*; *Dundon v. TPG Capital, LP (In re Endo Int'l PLC), No. 22-22549 (DSJ), 2026 Bankr. LEXIS 1337, 2026 WL 1534328, at \*5 (Bankr. S.D.N.Y. May 29, 2026)*.

Defendants argue that some of the Trustee's fraudulent-conveyance claims brought under *Section 544(b)(1)*, which invoke the fraudulent-conveyance provisions of the *New York Debtor-Creditor Law (NYDCL) §§ 273-76*, are barred by *section 213(8) of the New York Civil Practice Law and Rules (CPLR)*, the six-year statute of limitations applicable to *NYDCL §§ 273-76* claims. *See* Def. Mot. at 21-23. Defendants argue that since some of the underlying transfers occurred between December 2016 and May 4, 2017, more than six years before the trustee filed his complaint in this adversary proceeding on May 5, 2023, those claims are therefore barred by *CPLR § 213(8)*. *Id.*

These arguments fail. The avoidance action sought by the trustee here is not time-barred because the NYDCL's applicable six-year statute of limitations refers to the petition date of the main bankruptcy proceeding, not the filing date of the Trustee's complaint. *See Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC), 454 B.R. 317, 337 (Bankr. S.D.N.Y. 2011)*. "Although the New York statute of limitations for fraudulent conveyance actions allows a creditor to recover transfers made six years before **[\*48]** the filing of the complaint, it is well established that once a bankruptcy petition is filed, *section 546(a)* of the Code is triggered, allowing a trustee to recover transfers made six years *before the petition date*." *Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC), 445 B.R. 206, 231 (Bankr. S.D.N.Y. 2011)* (emphasis added). "[A]s long as the six-year statute of limitations has not expired as of the petition date, a trustee is permitted to bring New York fraudulent conveyance actions in accordance with *section 544(b)* at *any* point during the two-year period set out in *section 546(a)*." *Id.* (emphasis in original); *see also 6 Collier on Bankruptcy ¶ 546.02[1][b]* (15th ed. rev. 2007) ("If the state law limitations period governing a fraudulent transfer action has not expired at the commencement of a bankruptcy case, the Trustee may bring the action pursuant to *Section 544(b)*, provided that it is commenced within the *Section 546(a)* limitations period").

Here, the main petition was filed on April 13, 2021, *see* Chapter 7 Case, ECF No. 1, and so the challenged transfers, which occurred between December 2016 and May 2017, fall within the six-year limitations period.

Where, as here, a claim is voidable as of the petition date, *Section 546(a)* limits the time a trustee has to file a complaint, stating in relevant part that an avoidance action may not be commenced after "2 years after the entry of the order **[*49]** for relief." Here, the order for relief was entered on May 11, 2021, *see* Case No. 21-10699, ECF No. 14, and the complaint timely filed on May 5, 2023.

Indeed, courts have acknowledged there are "strong policy goals involved" in construing the Code in this manner, with deference to the trustee. *Chais, 445 B.R. at 230-231*. "[T]he ability of a trustee to recover property for the bankrupt estate's benefit is a congressional goal intended to be accomplished by the Code." *In re Metro. Mortg. & Sec. Co., Inc., 344 B.R. 138, 141 (Bankr. E.D. Wash. 2006)*. "The steward of a bankruptcy estate thus has a right to some consideration when it comes to the rigors of limitations periods on claims that he must investigate and reconstruct from scratch, long after the fact." *In re Petters Co., Inc., 494 B.R. 413, 439 (Bankr. D. Minn. 2013)*. "As such, courts have consistently held that that the applicable state's statute of limitation period is relevant only to determine whether the claim would have been timely as of the *petition date*." *Chais, 445 B.R. at 232* (emphasis in original).

In sum, for purposes of *Section 544(b)(1)* claims, state-law-based statutes of limitations are only relevant to determining whether one of a debtor's unsecured creditors could have brought state-law-based causes of action on the Petition Date; if so, the Trustee can bring the *Section 544(b)(1)* claim, so long as the trustee's complaint is filed within **[*50]** the limits of *Section 546(a)*. Since a creditor could have brought a cause of action under the NYDCL—or, in the alternative, the FDCPA[3]—the Trustee had a *Section 544(b)(1)* claim which was timely brought within the limits of *Section 546(a)*. Defendants' affirmative statute of limitations defense is denied.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the Trustee Motion and DENIES the Defendant Motion. The Trustee is directed to submit a proposed order in Word format to Chambers memorializing and implementing this Opinion.

IT IS SO ORDERED.

Dated: New York, New York

July 27, 2026

*/s/ David S. Jones*

HONORABLE DAVID S. JONES

UNITED STATES BANKRUPTCY JUDGE

---

**End of Document**

---

[3] *See* Trustee Reply ¶ 68 n.13 (regarding possible recovery under the *Federal Debt Collection Practices Act ("FDCPA")*). This Court has already established that the IRS was a creditor of the estate, effectively extending the statute of limitations to 10 years, *see Kossoff PLLC, 667 B.R. at 422-24, 426*, within which the challenged transfers undeniably fall. It is not necessary to examine the statute of limitations for the other laws under which the Trustee brings its *Section 544(b)(1)* claims.